UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

    v.

PAYTON GENDRON,

        Defendant.
_____

22-CR-109 (LJV)

# MEMORANDUM IN SUPPORT OF
# DEFENDANT'S PROPOSED SCHEDULING ORDER

    Defendant, Payton Gendron, through undersigned counsel, respectfully files this Memorandum in Support of the Defense Proposed Scheduling Order (annexed hereto as Exhibit A) and in Response to the Government's Proposed Scheduling Order (annexed hereto as Exhibit B). The government's proposal purports to encompass all of the litigation that may potentially become necessary in this case, up to and including a specific date for commencement of trial. Though there are significant areas of agreement regarding structure and sequence, the government's proposed schedule is unrealistic, at points illogical, and if adopted, would necessarily complicate and impede the efficient and orderly resolution of this matter.

    Instead, the defense proposes that the Court follow a tiered, sequential approach in which rulings that directly inform subsequent litigation are timed to occur first, and deadlines are imposed with due regard for the amount of time that must be expended by the parties and the Court at each stage. That way, unnecessary litigation or re-litigation is avoided, only realistic deadlines are set and the process can be managed as efficiently as possible.

I. **THE DEFENSE PROPOSED SCHEDULING ORDER IS EFFICIENT, SEQUENTIAL, REALISTIC AND IN LINE WITH OTHER FEDERAL DEATH PENALTY ACT CASE SCHEDULES.**

   A. **The Defense Proposal**

Defense counsel propose a schedule that sets forth filing deadlines for the first two (foundational) waves of litigation. The first wave encompasses motions related to discovery including motions for a bill of particulars, an informational outline[1] regarding the government's noticed aggravating factors, and discovery motions relating to the statutory and non-statutory aggravating factors contained in the Notice of Intent to Seek the Death Penalty, as well as for discovery relating to potential mitigating factors, including lack of future danger, and case specific discovery. The second wave encompasses the extensive, preliminary legal challenges that do not turn on the resolution of the discovery litigation, including a motion to challenge the capital-eligible counts of the indictment which allege violations of Section 249(a)(1)(B)(i) and 924(c); challenges to the constitutionality of the Federal Death Penalty Act (FDPA); any motion to strike the death notice based on the defendant's age,[2] and defects in the indictment and/or prosecution as outlined in Fed. R. Crim. P. Rule 12(a)(3).

---

[1] Informational outlines are used to provide defense counsel with meaningful advance notice of the facts and categories of evidence the government intends to rely on to prove the aggravating factors it has alleged under 18 U.S.C. § 3593(a). Providing this information prior to trial streamlines the investigation and litigation necessary for defense counsel to move to exclude and/or prepare to meet such evidence in accordance with their stringent obligations as counsel in a death penalty case. For these reasons, while such an outline is not statutorily required, an overwhelming number of district courts in federal capital prosecutions have recognized their utility and ordered the government to provide them.

[2] A claim that the government is categorically precluded from seeking the death penalty due to the defendant's mental illness, in contrast, is dependent upon the completion of the extensive psychosocial history investigation and expert evaluation process that must precede an adequate understanding of a capital client's mental condition. For reasons stated more fully below, *see* Section II.C., *infra*, that investigation cannot be completed by April 15, 2024, and that motion is inappropriate for inclusion in the second wave of litigation.

The motion challenging Counts 11-20 of the Indictment, on the grounds that a violation of 18 U.S.C. § 249(a)(1)(B)(i) is not a valid predicate offense under 18 U.S.C. § 924(c) pursuant to *United States v. Johnson*, 576 U.S. 591 (2015), and its progeny is particularly significant because it is potentially case-dispositive. It is also meritorious, and based on a large and growing body of case law that strike non-categorical crimes from those which may predicate a Section 924 penalty. Indeed, the district court in the recent federal capital case of *United States v. Bowers*, No. 18-292-RJC, ECF No. 874, 2022 WL 17718686 (W.D. Pa. Dec. 15, 2022), squarely held that a violation of Section 249 fails to qualify as a predicate offense for Section 924(c).[3] If this Court were to agree with the *Bowers* court that Section 249 cannot serve as a predicate offense for Section 924(j) liability, the potentially capital counts of this indictment would be dismissed, leaving only the non-capital hate crimes counts remaining that carry the penalty of multiple life sentences without the possibility of parole. As the defense has made clear, without the prospect of the death penalty, Payton Gendron will plead guilty to the Indictment and no trial will be necessary.

Once these initial two waves of litigation are complete, the parties will be in a position - if necessary - to propose a realistic schedule for further proceedings that includes discovery-dependent motions challenging pleadings and evidence and motions to establish procedures for trial. To ensure that the litigation process continues uninterrupted, the defense proposes that the Court schedule a control date 14 days following the rulings on the first and second phase motions

---

[3] The *Bowers* trial nevertheless proceeded as a capital prosecution because, in addition to the charges predicated on the hate crimes statute, Mr. Bowers was charged with multiple counts of religious obstruction resulting in death in violation of 18 U.S.C. § 247 that also carried a potential death sentence. No such charges are applicable in this case.

requiring the parties to confer and file a joint proposed scheduling order for the subsequent litigation phases.

### B. Areas of Agreement With the Government's Proposal

In terms of the basic premise that the litigation will proceed most efficiently if it is organized logically and sequentially, the parties are in agreement. Both proposals begin with discovery motions. The defense proposal is a little more fulsome, as it specifies certain categories of discovery with respect to which motions may be required and incorporates pleadings that fall under the umbrella of discovery-related litigation, including a motion for an informational outline of the government's aggravating factors and a motion for a bill of particulars. Nevertheless, the parties are in accord that discovery litigation is the logical first step.

The government's proposal then moves on to what it refers to as "capital motions." The defense similarly acknowledges that there are a number of motions that involve questions of law, rather than fact, and that are therefore not dependent upon the resolution of discovery motions. As noted above, these motions include the meritorious and case-dispositive challenge to the capital-eligible counts of the indictment. The defense agrees that these motions can be prepared and filed while the discovery litigation is ongoing, and the defense proposal so reflects.

Thereafter, the government's proposal moves on first to what it terms "pretrial motions," roughly those motions contemplated under Fed. R. Crim. P. 12(a)(3), including motions to suppress, challenges to the government's aggravating factors such as victim impact, and grand jury challenges. The defense agrees that, broadly speaking, motions in this category are appropriately scheduled after the specific, non-discovery dependent pleadings identified in the defense proposal. The defense also agrees that those motions should in turn be followed by

motions directed towards establishing procedures for trial. In other respects, however, the parties' proposals diverge. As explained more fully below, the defense submits that it will be more efficient for the Court to schedule specific deadlines for those motions immediately after the first two rounds of litigation have been completed. The defense proposal includes a specific timeframe for the parties to confer and propose an appropriate schedule for the subsequent waves of litigation. In contrast, the government proposal includes deadlines all the way up to and including the start of trial, all within an unrealistically compressed timeframe.

### C. Areas of Disagreement Between the Proposals

#### 1. The Government's Proposal Allots Too Little Time for the Filing of the First Waves of Motions.

While the government implicitly acknowledges the need for sequential motion practice (i.e., discovery followed by facial challenges to the FDPA before fact specific motion practice), they do not give sufficient time for each phase. The government would have the defense file its first wave of motions on March 1, 2024, approximately six weeks after the Notice of Intent to Seek the Death Penalty was filed. Recent capital litigation demonstrates that the government's proposal is impractical. In both *United States v. Bowers*, 18-cr-292-RJC (W.D. Pa) and *United States v. Saipov*, 17-cr-722-VSB (S.D.N.Y.), the two most recent FDPA trials, the pretrial schedules allotted three months for the first waves of motions following the government's notice of intent to seek death. A similar schedule is appropriate here.

#### 2. It Is Impossible to Meaningfully Litigate the Scope of Victim Impact Evidence and the Validity of the Alleged Aggravating Circumstances Prior to the Completion of Discovery and Provision of an Informational Outline.

The government's proposed scheduling order incongruously groups motions to dismiss/strike the special findings in the indictment and/or the Notice of Intent to Seek the Death

5

Penalty, and motions attacking the sufficiency of the notice, and/or validity of the government's alleged aggravating factors, in with the first wave of discovery motions. Such motions are prime examples of pleadings whose factual predicates are dependent upon the resolution of matters to be decided during discovery litigation. They are therefore more appropriately scheduled in the third wave, after the requisite findings have been made.

Simply put, the defense is unable to mount meaningful challenges to the government's proposed aggravating factors until it knows the contours of the proof that the government intends to rely on to establish those factors. Furnishing the defense with the information necessary to file these motions is the purpose of the informational outline that we will be asking the Court to order in the first wave of discovery motions. Attempting to craft challenges to aggravating factors in the abstract, without the benefit of this information, will result in generic pleadings that assist neither the parties nor the Court in framing the issues for decision. Such a course of action will almost inevitably lead to unnecessary re-litigation once more detailed disclosures are made, whether the Court agrees with the overwhelming number of district courts who have found that provision of an informational outline is the most efficient way to proceed, or whether information is provided piecemeal through discovery or the disclosure of *Jencks* material. The Court should therefore adopt the defense proposal in this respect.

      **3.**    **The Court Can Most Efficiently Manage the Pretrial Litigation in the Case By Scheduling Rule 12 Motions and Motions Regarding Trial Procedures Once the First Waves Have Been Completed.**

As noted above, the government's proposal includes deadlines for the filing of pretrial motions of the type contemplated by Fed. R. Crim. P. 12(b)(3), including suppression motions and challenges to grand jury proceedings. Instead, the defense proposes that, as the first two waves of litigation near completion, the Court direct the parties to meet and confer regarding an

appropriate scheduling order for this fact-dependent phase of litigation. Plainly, the defense cannot identify which fact-dependent motions may be necessary and the comprehensive grounds therefore until the rulings on the first phase of discovery-related motions have informed and further defined scope of the government's case.

Similarly, it makes little sense to schedule motions regarding trial procedures until the government's case has been further defined by rulings on motions to suppress and other Rule 12(b)(3) motions, and the parties are closer to scheduling a realistic trial date as opposed to the aspirational date set forth in the government's proposal. At the appropriate juncture, the defense contemplates asking the Court to schedule another date, approximately 14 days following the resolution of the Rule 12(b)(3) motions, for the parties to confer and propose a schedule for litigation regarding procedures to be followed at trial.

> 4. **The Court Should Set a Trial Date Only When the Litigation Has Progressed Sufficiently to Permit a Realistic and Firm Date to be Set.**

While the parties actively litigate the first two waves of ligation, with the ongoing schedule and pace of that litigation being managed by the Court, the defense would continue the time-consuming work of conducting a mitigation investigation; analyzing the voluminous digital discovery material; and preparing for a trial with the highest possible stakes. Putting off a decision on the timing of the remaining waves of pretrial motion practice and the scheduling of a trial for approximately six months allows for the foundational motion practice and investigation to be completed and a realistic schedule to be more fully contemplated once that litigation is complete. The Court's previous decision to assume responsibility of pretrial motions from the Magistrate Judge has the effect of allowing the parties to proceed faster than the routine pace of cases in this district as well, none of which carried the gravity of a death sentence.

The immediate lead-up to the months-long trial of this case will require the commitment of extraordinary time and resources above and beyond those required to be expended by the parties. Extensive time and effort will likely be required by the Court and its staff to review and decide a constant flow of motions, right up until the start of voir dire and beyond. The sheer logistics of staging a capital trial also imposes an enormous amount of extra work upon courthouse staff tasked with coordinating the courtroom and administering the court calendar. The work of the jury administrator necessarily begins months before the trial actually commences, in order to identify and summon many hundreds of potential jurors; oversee the completion of extensive written questionnaires by each of them and distribute them to the parties; coordinate with the Court and parties to handle requests for excusal on hardship and other grounds; and to ultimately ensure that a sufficient number of venirepersons are present in court on the day that voir dire begins. If dictated by a trial date set a year or more in advance that ultimately proves unworkable, all of this work would be for nought. It is a significantly more efficient allocation of critical resources to complete the initial phases of motions, followed by the remainder of the pretrial litigation, and then to set a firm trial date informed by the actual pace of the litigation.

Adopting the defense proposal will also avoid creating unrealistic expectations for the surviving victims of the crimes of May 14, 2022, the families of the deceased, and the community at large. A capital trial in this matter would undoubtedly be a highly anticipated, emotionally fraught and intensely difficult time for all concerned. Any steps that minimize the likelihood of requiring those most deeply affected by these crimes to ready themselves for the event more than once are therefore worthy of the most serious consideration.

The defense proposal will result in a trial that is both optimally ready for presentation to a jury and within the time frame that is typical of complex, high-profile federal capital cases such as this one and of recent capital trials conducted in this circuit that were substantially less involved.

In *United States v. Bowers*, 2:18-cr-00292-RJC-1, a Notice of Intent to Seek the Death Penalty was filed on August 26, 2019. (ECF No. 86). A trial date was eventually set in the matter to begin approximately 44 months later in April 2023. ECF No. 788.

There, as here, the government moved one month after the notice of intent was filed for the Court to impose a scheduling order that included all stages of litigation up to an including a trial date. ECF No. 91. The Court denied the motion to set a trial date and set for date for the filing of initial motions only, as the defense requests here. ECF No. 110. The lifespan of the case, of course, included the period for which the nation was affected by the global coronavirus pandemic. However, extensive litigation continued throughout that period - over 220 docket entries were made in the year following the World Health Organization's declaration of a pandemic on March 11, 2020 – and so the scheduling of the matter cannot be attributed to the COVID-19 crisis.

Similarly in *United States v. Saipov*, 1:17-cr-722-VSB-1 (S.D.N.Y.), the time between notice of intent to seek the death penalty and trial was 50.8 months.

Including *Saipov*, in the most recent capital trials in the Second Circuit going back to 2011, the time from the authorization decision to the trial was an average of 36.33 months. (*See id.; and United States v. Basicano,* 1:05-cr-60-NGG-1 (E.D.N.Y.); *United States v. Azibo Aquart*, 3:06-cr-160-SRU-3 (Conn.); where the time from the death-penalty authorization to trial was 26.3 months and 31.9 months, respectively.). Other cases in which seeking a death sentence

9

was initially authorized and later deauthorized, proceeded on comparable schedules. For example, *in United States v. Tartaglione*, 7:16-cr-832-KMK-1 (S.D.N.Y.), following a 2016 indictment, the case was initially authorized in 2019. Once ancillary counsel issues were resolved in March 2021, the Court set a trial date for May 2023, some 22 months hence. And in *United States v. Alexis Saenz & Jario Saenz*, No. 2:16-cr-403-GRB-SIL-11 & 12 (E.D.N.Y.), following a 2017 indictment, the case was first authorized in July 2020. A trial date was set on October 6, 2023, to commence six months later in March 2024.

## II. ADDITIONAL ASPECTS OF THE GOVERNMENT'S PROPOSED SCHEDULE ARE UNWORKABLE AND/OR AN INEFFICIENT USE OF THE COURT'S TIME.

For the reasons stated above, the tiered approach proposed by the defense is the most efficient and expeditious method of completing the massive amount of pretrial litigation that will be required in this case and should therefore be adopted by the Court. Accordingly, we will not address the remainder of the government's proposals in detail at this juncture, except to point out, by way of illustration, some examples of particular suggestions that are flawed and unworkable on their face.

### A. Requiring Defense Disclosures Under Fed. R. Crim. P. 16(b) to be Made a Year or More Before a Possible Trial Will Create Additional and Unnecessary Litigation and Impede the Timely Resolution of This Case.

The government's proposal that the defense be required to make its disclosures under Fed. R. Crim. P. 16(b) by April 15, 2023, or more than a year before its proposed trial date, is unworkable and will hinder the timely resolution of this case rather than promote it. Rule 16 provides that, upon request, a defendant must disclose before trial documents and objects that are "within the defendant's possession, custody, or control" and that that he "intends to use . . . in [his] case-in-chief at trial," Fed. R. Crim. P. 16(b)(1)(A)(i)-(ii), and reports of examinations and tests that are "within the defendant's possession, custody, or control" and that that he "intends to

use . . . in [his] case-in-chief at trial," Fed. R. Crim. P. 16(b)(1)(B)(i)-(ii).[4] Identifying which items are subject to disclosure under this Rule thus necessarily requires a defendant to be in a position to ascertain what his theory of defense at trial will be and what evidence is necessary to support that theory.

It is patently unreasonable to expect the defense to be able to make these decisions meaningfully and effectively by April 15, 2024. This proposed date is barely two months after the government filed its Notice of Intent to Seek the Death Penalty, ECF No. 125; more than 12 months before the government's proposed trial date; and, perhaps most crucially, before litigation that even the government acknowledges is necessary to define the scope of the government's evidence and the issues to be decided at trial. Until the defense has been informed, for example, of what, if any, items are subject to suppression; what evidence, if any, the government will seek to introduce under Fed. R. Evid. 404(b); what evidence will be used to support the government's case in aggravation; and, indeed, whether the case will even proceed as a potential death penalty prosecution in light of highly significant questions regarding the viability of the weapons charges under 18 U.S.C. § 924(c) that are the only offenses for which a death sentence may be imposed, such determinations are impossible.[5]

Moreover, the legal and ethical requirements imposed upon defense counsel engaged in capital litigation are such that the defense has an inescapable obligation to conduct an

---

[4] Rule 16 also provides for disclosures regarding defense expert witnesses, *see* Fed. R. Crim. P. 16(b)(1)(C); these disclosures are contained elsewhere in the government's proposed schedule and therefore are not addressed here.

[5] Underscoring the inescapable logic of this point is the fact that Fed. R. Crim. P. 16(b)(1)(A) and (B) provide for defense disclosures only after the defense has requested discovery from the government "and the government complies." *Id.* As written, the government's proposed schedule contemplates requiring disclosures by the defense while discovery motions remain pending, or plainly before the government may be deemed to have fully "complie[d]" with its obligations under Rule 16.

exhaustive, independent investigation of all matters potentially relevant to both the culpability and sentencing phases of a trial. *See generally* American Bar Association, *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, Guideline 10.7 – Investigation and Commentary, 31 Hofstra L. Rev. 913, 1015-27 (2003) ("Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty."). The investigation in this case remains ongoing and is substantially incomplete due to its painstaking and time-consuming nature. Requiring defense Rule 16 disclosures by the date proposed by the government will simply engender further, unnecessary litigation over whether the defense has or has not complied with the scheduling order when additional evidence, inevitably, is uncovered and its significance becomes apparent.

      **B. Less Than Six Months After the Government Filed its Notice of Intent to Seek the Death Penalty is an Unreasonably Short Period of Time in Which to Require the Defense to Prepare and File a Motion for Change of Venue.**

Experience shows that competently researching and preparing a motion for change of venue in a case as high profile and complex as this one is a massive undertaking that cannot be successfully accomplished in a period of only six months. Additionally, there are valid reasons for conducting the appropriate research as close to the time of trial as is reasonably practicable, and certainly only after pretrial litigation of substantive motions has been conducted. Most recently, the amount of research and investigation required to meaningfully assess whether a change of venue is warranted and, if so, to prepare and file an adequately briefed and supported motion was illustrated by the venue litigation in *United States v. Robert Bowers*, No. 2:18-cr-292 (W.D. Pa.).

Ultimately, the defense in that case filed a 26-page motion for change of venue that was accompanied by a 54-page declaration from its expert jury research analyst. *Id.* (ECF No. 669). The defense expert first conducted both a comprehensive search for, and thorough quantitative

12

and qualitative analysis of, the extensive media coverage of the case. *Id.* at 11. Then, in collaboration with a specialized research firm, he designed and conducted a survey of 1150 jury-eligible members of the presumptive venue community as well as three alternative possible venues. *Id.* The survey was crafted to assess participants' relative knowledge about the case, rates of exposure to publicity and opinions regarding the defendant's guilt and the appropriate punishment. *Id.* at 14. Also attached to the motion was the report of the results of that survey, which spanned 246 pages, and over 3,500 pages of representative print and digital media articles that had been published about the case. *Id.* (ECF No. 669-1-5). Only after completing this work was the expert able to render his opinions and support them with the large body of applicable social science research.

The defense motion for change of venue in the *Bowers* case was filed on January 17, 2022 – over three years following the defendant's arrest and two years, four months after the government filed its Notice of Intent to Seek the Death Penalty. A deadline of October 1, 2020, was initially established by the court but was subsequently vacated at the request of the defense to be reinstated following resolution of suppression motions. *Id.* at ECF Nos. 257, 270. After being reset for December 31, 2021, a joint motion to extend time for filing the venue challenge based upon the complexity of the issues involved was granted and only then was the ultimate filing date of January 17, 2022, established. *Id.* at ECF Nos. 655, 656. As is clear from the foregoing, it is simply not realistic to require the defense in this case to identify and retain appropriate experts, conduct a thorough media search and necessary analysis of the results and obtain a survey of a statistically significant number of jury-eligible individuals who reside in this

13

district and in selected alternative districts to enable meaningful comparisons to be drawn under the time constraints proposed by the government.[6]

Attempts to truncate this process in an earlier case, *United States v. Dzokhar Tsarnaev*, No, 13-cr-10200 (D. Mass.), resulted in litigation that was more protracted and cumbersome than necessary, rather than less. Mr. Tsarnaev was arrested on April 19, 2013, and the government filed notice of its intent to see a death sentence on January 30, 2014. ECF No. 167. Even before the notice of intent was filed, on November 12, 2013, the court set a deadline for a change of venue motion of February 28, 2014. ECF No. 148. A defense motion to vacate that date was subsequently granted, ECF No. 158, and the filing deadline was thereafter reset for June 18, 2014. ECF No. 172. On June 11, 2014, the defense sought an extension of time until August 3, 2014, explaining that the research and investigation necessary to support such a motion remained incomplete despite its best efforts. ECF No. 364. That request was denied, ECF No. 368, and the defense's initial motion was accordingly filed on June 18, 2014, ECF No. 376.

Predictably, however, the initial motion was based upon only a preliminary review of survey data that had been gathered by the defense expert and on a partial but incomplete accounting of the publicity that surrounded the case. *Id.* The defense was subsequently obliged to file a supplement to the motion, permitted by the court over the government's written opposition, followed by a lengthy reply to the government's opposition that included an additional 25

---

[6] As is apparent from the above descriptions of the expertise that must be applied to this endeavor and the many hours of labor that it entails, preparing and filing an adequately supported venue challenge is a resource-intensive proposition. Defense counsel obviously could not responsibly obligate the public fisc for this purpose before the government decided to seek a death sentence against their client. A decision to accept multiple life sentences without possibility of release would have led to immediate termination of this prosecution with guilty pleas to each count of the indictment and would have obviated the need for such an outlay of time and resources.

14

exhibits. ECF Nos. 430, 461. That motion was finally adjudicated by the court on September 14, 2014, ECF No. 577, although ongoing publicity required the filing of a second pretrial motion containing additional research and analysis and accompanied by additional exhibits on December 1, 2014. ECF 684.

As recognized by the court in *Bowers*, ECF No. 270, and illustrated by the litigation in *Tsarnaev*, ECF No. 684, there are rational reasons for delaying the deadline for a change of venue motion until significantly later in the litigation process even beyond the logistics of preparing such a challenge. Future events, including the filing and adjudication of substantive motions - such as motions to suppress that require evidentiary hearings, or motions concerning sensitive or inflammatory aspects of the evidence in this case - will undoubtedly engender extensive publicity, as has nearly every filing that has been made in this case to date. An arbitrary deadline for a change of venue motion too early in the litigation process would necessitate that the underlying research and community surveys be performed before the inevitable onslaught(s) of additional media coverage. Such a procedure would create a significant risk the results of those premature efforts would be inadequate and misleading regarding the actual amount of publicity to which the relevant communities have been exposed and its true impact on attitudes and opinions, and increase the likelihood that a second motion, supported by a second round of research and expert analysis, will be required. Delaying the filing date until a reasonable time closer to trial is thus a far more efficient and reliable way to proceed.

Notably, although the government's proposal places it within a group of pretrial motions governed by Fed. R. Crim. P. 12(b), a motion to change venue is in a category of its own, governed instead by the Fifth and Sixth Amendment right to a fair trial and Fed. R. Crim. P. 21 (Transfer for Trial). Rule 21(d) expressly states that such a motion "may be made at or before

15

arraignment or at any other time the court or these rules prescribe." *Id.* For the reasons stated, when the time is ripe for entering a scheduling order governing subsequent stages of litigation, the Court should exercise its authority under this Rule and Payton Gendron's Fifth and Sixth Amendment rights to a fair trial by an impartial jury.

    **C. The Procedures Applicable to the Provision of Notice of Defense Expert Mental Health Evidence and Requests by the Government for a Rebuttal Evaluation by its Own Expert Under Fed. R. Crim. P 12.2 are Complex and Will Require Extensive Briefing by the Parties at the Appropriate Juncture.**

The government proposes that the defense provide notice pursuant to Fed. R. Crim. P. 12.2, of its intent to introduce expert mental health evidence by October 14, 2024, approximately 6 months before the start of trial. It also purports to define the content of the defense notice under 12.2 and assumes that, in the event of such notice, the government would be entitled to a rebuttal examination.

As an initial matter, the date government suggests for the defense notice, six months in advance of trial, is wildly premature. The rule is written in terms of the defense "intent" to introduce expert mental health evidence—a decision the defense cannot even approach until the government completes discovery (guilt/innocence, its case in aggravation, and any *Brady*-type evidence in its possession relevant to the defendant's mental condition) and the defense completes its own social-history and mental-health investigation and evaluation(s), if any. The defense has, of course, begun, but is not near completing, its mental-health investigation. Accordingly, the date by which notice should be given should be postponed—to permit completion of that work and consistent with the practice frequently followed in federal capital trials of setting a notice date closer in time to a realistic trial date.

In addition, the defense objects both to the government's description of the scope of notice required under Rule 12.2 and its assumption that it will automatically be entitled to a

16

rebuttal examination. The government's proposal far exceeds the notice required under either the plain text of the rule or the numerous cases interpreting the language of the Rule since its adoption in 2002. And the government's right to a rebuttal examination, and the scope and procedural protections governing any such exam, will turn on the nature of the expert evidence the defense ultimately chooses to introduce and will, undoubtedly, require extensive litigation, as it has invariably in recent trials.

> D. **A Defendant's Competence to Stand Trial Must be Raised and Adjudicated Whenever There is a Bona Fide Doubt About His Fitness and Cannot Therefore be Subject to an Arbitrarily Imposed Deadline.**

The government's proposal that a motion challenging Payton Gendron's competence to stand trial, should one ever be necessary, be filed by a date certain, namely October 14, 2024, is irreconcilable with well-established constitutional principles governing the adjudication of such matters. Whenever a bona fide doubt about a defendant's competence to stand trial is raised, an evidentiary hearing to resolve the issue is mandated by the constitutional due process guarantee of a fair trial. *Pate v. Robinson*, 383 U.S. 375, 385 (1966); *Drope v. Missouri*, 420 U.S. 162, 178-80 (1975) (reversing conviction for failure to hold competency hearing when events occurring on eve of trial raised doubts about defendant's fitness to proceed). Any other rule would manifestly fail to protect a defendant's constitutional rights. Medical professionals recognize that symptoms of mental impairment typically wax and wane and thus a defendant's ability to understand the proceedings and rationally assist his counsel may change over time. *Drope*, 420 U.S. at 181 ("Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial."). Granting the government's request for an

arbitrary cut-off date by which a competency motion must be filed would thus be a meaningless exercise.[7]

### III. CONCLUSION

Rather than trying to compress necessary pretrial litigation into an unrealistic schedule in the service of an unattainable trial date, only to find a continuance necessary on the eve of trial, it would be prudent and appropriate to resolve pretrial issues through a logical process based on what actually must be accomplished before trial, with the trial date being set only when a realistic and firm date can be ascertained. Defense counsel's proposed scheduling of two initial phases of litigation best furthers that goal. Therefore, the defendant requests that this Court adopt the scheduling order as set forth in the defense proposal.

Dated: February 1, 2024
Buffalo, New York

*s/Sonya A. Zoghlin*
Sonya A. Zoghlin
Assistant Federal Public Defender

*s/Anne M. Burger*
Anne M. Burger
Supervisory Assistant Federal Public Defender

*s/MaryBeth Covert*
MaryBeth Covert
Senior Litigator

---

[7] The government's associated request for an order directing defense counsel to file an ex parte declaration under seal explaining a decision not to raise competence to stand trial is similarly meritless. Such a request is an unjustified intrusion into the defense camp that implicates attorney-client privilege as well as counsel's ethical duties such as the obligation to maintain client confidences and the duty of loyalty.