UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

    v.

                             22-CR-109 (LJV-HKS)

PAYTON GENDRON,

          Defendant.
_____


**MOTION TO DISMISS INDICTMENT BASED ON UNCONSTITUTIONALITY
OF THE FEDERAL HATE CRIMES ACT, 18 U.S.C. § 249(a)(1)**


## I.  INTRODUCTION

      "There is no doubt that hate crimes … still exist.  There is also no doubt that such crimes

are deplorable acts."  *United States v. Cannon*, 750 F.3d 492, 511 (5th Cir. 2014) (Elrod, J.,

specially concurring).  That is why New York, along with almost every other state, has

criminalized and reserved its severest punishment for such offenses.  Thus, within weeks of the

shooting deaths of ten shoppers and employees and wounding of three others at the Tops grocery

store in Buffalo on May 14, 2022 Defendant Payton Gendron was indicted under those laws in

state court and, upon pleading guilty to the killings several months later, was sentenced to life

without possibility of parole plus 90 years imprisonment.[1]

      However, the federal government is now trying to further, capitally punish Payton

Gendron for these same offenses, under a relatively novel federal hate-crimes statute, 18 U.S.C.

§ 249(1)(a).  The question this Motion raises is whether that law, on its face or as applied,

_____

[1] Payton Gendron accepted the sentences and did not file an appeal.  Accordingly, those
convictions and his sentences are now final.

violates the Constitution because its enactment exceeds Congress's authority under the Thirteenth Amendment. That 1865 amendment forbade "slavery" and "involuntary servitude," and authorized Congress to "enforce" the prohibition "by appropriate legislation." While the Supreme Court has approved immediate post-Civil War statutes targeted not just at slavery but also its "badges and incidents," those have been limited to eradicating or preventing the reemergence of one of the inherent legal or economic elements of pre-Civil War slavery, such as the racially motivated denial of the rights to hold property, travel freely, or enter contracts. Section 249(a)(1), enacted in the 21st Century, almost 150 years after the Civil War, is unprecedented in addressing private acts of violence that are unconnected to the exercise of those rights.[2]

The Second Circuit has not yet considered the constitutionality of that law, though two decades ago it observed that "a statute … that federally criminalized private racially motivated violence quite generally might or might not be constitutional under the Thirteenth Amendment," *United States v. Nelson*, 277 F.3d 164, 191 n.25 (2d Cir. 2002). To be sure, several other circuits have approved § 249(a)(1) under the Thirteenth Amendment.[3] Yet its constitutionality has been questioned by multiple circuit judges and the leading national expert on the legal history of the Amendment. *See United States v. Hougen*, 76 F.4th 805, 816 (9th Cir. 2023) (Ikuta, J., dissenting); *Cannon*, 750 F.3d at 509 (Elrod, J., concurring);Jennifer Mason McAward, *Defining*

---

[2] A separate section of the Federal Hate Crimes Act, § 249(a)(2), criminalizes assault motivated by a victim's religion, national origin, gender, sexual orientation, or disability, and was enacted based on Congress's constitutional authority under the Commerce Clause. Payton Gendron is not charged under that section, and thus this Motion does not address it.

[3] *See United States v. Hougen*, 76 F.4th 805, 814 (9th Cir. 2023); *United States v. Roof*, 10 F.4th 314, 392 (4th Cir. 2021); *United States v. Diggins*, 36 F.4th 302, 311 (1st Cir. 2022); *United States v. Metcalf*, 881 F.3d 641, 645 (8th Cir. 2018); *United States v. Cannon*, 750 F.3d 492, 502 (5th Cir. 2014); *United States v. Hatch*, 722 F.3d 1193, 1205 (10th Cir. 2013).

*the Badges and Incidents of Slavery*, 14 U. Pa. J. Const. L. 561, 626-27 (2012); *see also United States v. Hatch*, 722 F.3d 1193, 1201-04 (10th Cir. 2013) ("Hatch's argument raises important concerns we share"). As they have detailed, a careful reading of Supreme Court precedents as well as the text and history of the Thirteenth Amendment indicates that § 249(a)(1) exceeds Congress's authority and violates federalism and separation-of powers-limitations under the Tenth Amendment. As these authorities have explained, the decisions approving the law all involve limited reasoning, a misreading of Supreme Court precedent, excessive deference to Congress, or untenable analogies to quite different statutes. Upon careful study, it is clear this minority view has the better of the argument, and that when the current Supreme Court considers this issue, as it eventually must, it will almost certainly agree.

Accordingly, Payton Gendron, through counsel, moves this Court to dismiss the indictment in its entirety, as all its counts charge a violation of that statute, either as an offense in itself or as an element of one under another statute, 18 U.S.C. § 924(a), (j). (ECF No. 6). Alternatively, he moves for other relief as described below because the government's certification of the prosecution, as required by § 249(b), was flawed and insufficient.

## II. FACTUAL BACKGROUND

Within a few minutes of the shootings at the Tops grocery store, 18-year-old Payton Gendron was arrested at the scene by local law enforcement officers. He was charged in Buffalo City Court the same day and remanded to the local county jail. The state indictment that followed two weeks later included the harm to all the victims at Tops – the ten who were killed and the three who were injured. The indictment charged Payton Gendron with crimes under New York's hate-crimes statutes. *See People v. Gendron*, No, 71645-22/001 (Erie Cty. Ct. June 1, 2022) (Exhibit A). Those laws punish intentional murder or terrorism committed "because of

a belief or perception regarding the race [or] color" of another person.  N.Y. Penal Law §§ 125.25, 485.05(1)(b), (3), 485.10(e)(4), and 490.28.  Under these provisions, the state charges against Payton Gendron carried the most severe sentences, including a mandatory sentence of life imprisonment without parole.

In November 2022, about five months after he was indicted in state court, Payton Gendron took responsibility for his crimes by pleading guilty, unconditionally, to the entire indictment.  At his state-court sentencing that followed three months later, in February 2023, he received eleven sentences of life imprisonment without parole, one for each slain victim, one for committing a domestic act of terrorism motivated by hate, and additional terms of imprisonment totaling 90 years to be served consecutively to the life without parole sentences.  *People v. Gendron*, No, 71645-22/001, Transcript at 53-57 (Erie Cty. Ct. Feb. 15, 2023) (Exhibit B).

At the sentencing hearing, relatives and friends of the deceased spoke publicly and in stark detail about the victims and about the impacts of the crimes on their loved ones and their community.  Although the speakers expressed enormous sorrow and loss, as well as anger with Payton Gendron, a number also voiced other sentiments, including that they prayed to God to forgive him, preferred he be imprisoned for life rather than executed, and acknowledged the role of other forces, such as social media, gun companies, and systemic racism, in bringing about his acts. *Id*. at 6-41.

Then, the prosecutor spoke.  He declared that the victims' legacy would be "as a beacon of light that has brought love to this community, that made this community stronger, that united people of all races throughout our community and country . . .  instead of choosing violence, they

chose love." The defendant, he added, "will have to live . . . the rest of his life in a jail cell while this community continues to flourish."[4]  *Id.* at 44-45.

Finally, the sentencing judge addressed those in court, and the community.  Before imposing sentences of life imprisonment without parole plus 90 years on Payton Gendron, the judge said she and others were proud to see "the community turn out in support and are seeing signs of much needed change in East Buffalo.  It is a testament to the power of love and compassion to overcome evil and hate by turning pain into purpose."  Continuing, she observed that the crimes require "a reckoning for us as a nation.  The ugly truth is that our nation was founded and built in part on white supremacy," and it remains "an insidious cancer on our society."  She concluded: "We are stronger together," and "there is always light, if only we are brave enough to see it."  *Id.* at 50-52.

Meanwhile, in July 2022, the month after Payton Gendron was indicted in state court, the federal government obtained an indictment against him for the crimes committed at the Tops grocery store on May 14, 2022.  (ECF No. 6).  That federal indictment charges him with killing the ten deceased victims and attempting to kill the three injured survivors "because of their actual and perceived race and color."  (*Id.,* Counts 1-10, 21-23, 27).  Those charges rest on the federal version of New York's hate-crimes statute, 18 U.S.C. § 249(a)(1), which makes it a crime to "willfully cause[] bodily injury to any person . . . because of the actual or perceived race [] or color . . . of any person."  The federal indictment also charged Payton Gendron under 18 U.S.C.

---

[4] Defense counsel acknowledged that Payton Gendron was responsible for his actions and would be held accountable, but also observed that his "hate-fueled assault was in part the product of … pervasive racism" that "need[s] to be addressed, just as many others have publicly demanded," and that "[t]he racist hate that motivated this crime was spread through on-line platforms, and the violence that was made possible was in part due to the easy access of assault weapons."  *Id.* at 46-47.  Payton Gendron spoke briefly to express his regret and sorrow for his crimes and all the pain they had caused.  *Id.* at 48.

§ 924(c), (j), for using a firearm during and in relation to § 249(a)(1) crimes.  (ECF No. 6, Counts 11-20, 24-26).  Thus, every offense alleged in the indictment is either a violation of § 249(a)(1) or includes such a violation as an element.

Section 249(a)(1)'s motive element — that the offense was committed "because of the actual or perceived race [] or color . . . of any person" — almost exactly mirrors the motive element of New York's hate-crimes statutes.  *See* N.Y. Penal Law § 485.05(1)(b) ("because of a belief or perception regarding the race [or] color" of another person); 490.28 ("because of the perceived race [or] color . . . of such other person").  While federal law purports to allow a death sentence for violations of § 249(a)(1) committed with a firearm, *see* §§ 924(c), (j), while New York law does not,[5] the Department of Justice Manual explicitly warns that "the legal unavailability of capital punishment in the state where the crime was committed should not form the basis for concluding the state cannot effectively prosecute the case."  Justice Manual, § 9-10.140(A).  Nonetheless, the month before the federal indictment, the Assistant Attorney General for the Civil Rights Division, Kristin Clarke, signed a certification declaring, without explanation, that prosecuting Payton Gendron federally under § 249(a)(1), despite the already-pending state hate-crimes prosecution, "is in the public interest and is necessary to secure substantial justice."  (Exhibit C).  Then, in January 2024, about a year after Payton Gendron's state-court sentencing, the federal government filed notice of its intent to seek the death penalty against him.  (ECF No. 125).  The government did so apparently without reconsidering the certification in light of Payton Gendron's state-court guilty plea and life-plus-90-year sentences, though DOJ's own manual called for it to do so.  *See* Justice Manual, § 9-10.140(A)

---

[5] In any event, hate crimes under § 249(a)(1) fail as a proper predicate for §§ 924(c), (j) as briefed in our Motion to Dismiss Counts 11 through 20 for failure to state an offense pursuant to Fed. R. Crim. P. 12(b)(3)(B)(v), filed simultaneously herewith.

(Authorization process should reconsider "whether a substantial federal interest justifies charging a federal capital crime in the first instance").

## III. ARGUMENT

**A. Under its text, history, and Supreme Court precedents, the Thirteenth Amendment's enforcement clause extends, at most, only to racially-motivated harms that were inseparable legal incidents of slavery, such as, for example, deprivations of the rights to freely travel, own property, and enter contracts.**

Under our federalist system, including the Tenth Amendment expressly, the national government has only those powers enumerated for it in the Constitution. And the Framers specifically intended that the general police powers remain with the States. *See United States v. Morrison*, 529 U.S. 598, 661 n.8 (2000) ("The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States. Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims . . . [T]he principle that [t]he Constitution created a Federal Government of limited powers, while reserving a generalized police power to the States, is deeply ingrained in our constitutional history."); *United States v. Lopez*, 514 U.S. 549, 561 n.3 (1995) ("When Congress criminalizes conduct already denounced as criminal by the States, it effects a 'change in the sensitive relation between federal and state criminal jurisdiction'") (quotation omitted).

Section 249(a)(1), which federally criminalizes private conduct with no required nexus to interstate commerce, was enacted by Congress in 2009, solely based on its authority under Section 2 of the Thirteenth Amendment. *See* 34 U.S.C. § 30501(7); *Cannon*, 750 F.3d at 498. That amendment, adopted almost a century and a half earlier just after the close of the Civil War in 1865, has two sections.

Section One provides, in relevant part: "Neither slavery nor involuntary servitude …
shall exist within the United States." The primary purpose of that section, which is self-
executing, "was to abolish the institution of African slavery as it had existed in the United States
at the time of the Civil War." *United States v. Kozminski*, 487 U.S. 931, 941 (1988). But it was
also intended "to cover those forms of compulsory labor akin to African slavery," such as
peonage. *Id.* (internal quotation omitted); *see Bailey v. Alabama*, 219 U.S. 219, 242 (1911).

Section Two of the Thirteenth Amendment, often referred to as the "enforcement clause,"
is the one on which § 249(a)(1) rests. It states: "Congress shall have power to enforce this article
by appropriate legislation."[6]

The Supreme Court first considered the scope of Congress's power under the
enforcement clause in *United States v. Harris*, 106 U.S. 629 (1883). There, it invalidated a
provision of the Ku Klux Klan Act of 1871 that forbade conspiracies to deprive any person of
equal protection of the law. The Court held that the coverage of crimes against "free white
citizens" under that statute "cannot be authorized by the amendment which simply prohibits
slavery and involuntary servitude." *Id.* at 641.

Later that same year, in the *Civil Rights Cases*, 109 U.S. 3 (1883), the Supreme Court
examined whether Section 2 empowered Congress to enact the Civil Rights Act of 1875. That
statute had made it a crime for anyone to deny a person of color (most of whom had until
recently been enslaved) full enjoyment of public accommodations or transportation because of
their race. The Court said that the enforcement clause licensed Congress "to pass all laws

---

[6] "Enforce" had a concrete, limited meaning at the time. "The 1860 edition of Noah Webster's
American Dictionary of the English Language . . . defined 'enforce' as: 'To put in execution to
cause to take effect; as, to enforce the laws." Similarly, another leading dictionary published that
same year defined it as "[t]o put in force; to cause to be applied or executed; as, 'To enforce a
law.'" *Tennessee v. Lane*, 541 U.S. 509, 559 (2004) (Scalia, J., dissenting).

necessary and proper for abolishing all *badges and incidents* of slavery" (emphasis added).[7]

Thus, Congress's authority extended to protecting "those fundamental rights . . . the enjoying or

deprivation of which constitutes the essential distinction between freedom and slavery." More

specifically, the Court said the "necessary incidents" of slavery included "[c]ompulsory service

of the slave for the benefit of the master, restraint of his movements except by the master's will,

disability to hold property, to make contracts, to have a standing in court, to be a witness against

a white person, and such like burdens and incapacities which were inseparable incidents of the

institution." *Id.* The Court concluded that the "necessary incidents" of slavery did not embrace a

racially motivated denial of access to an inn or hotel.[8] *Id.* at 8-9, 20-23.

Eighty years after the *Civil Rights Cases*, the Supreme Court decided *Jones v. Alfred H.*

*Mayer Co.*, 392 U.S. 409 (1968). It held that Section 2 of the Thirteenth Amendment authorized

the challenged portion of an 1866 statute that had barred racial discrimination in the sale or rental

of property. *Id.* at 413. The Court reiterated its view that Congress had the power to pass "'all

laws necessary and proper for abolishing all badges and incidents of slavery,'" and that this

"included restraints upon 'those fundamental rights which are the essence of civil freedom,

namely, the same right to inherit, purchase, lease, sell and convey property, as is enjoyed by

white citizens.'" *Id.* at 439-43 (quoting *Civil Rights Cases*, 109 U.S. at 20, 22).

---

[7] The term "badges and incidents" was "not used at all in the ratification debates" on the Thirteenth Amendment, "and it appeared during the debates on the Civil Rights Act of 1866 only in Senator Trumbull's comments" – and both times he "appeared to understand the term narrowly," defining it as "a law 'which deprives any citizen of civil rights which are secured to other citizens.'" Jennifer Mason McAward, *The Scope of Congress's Thirteenth Amendment Enforcement Power After* City of Boerne v. Flores, 88 Wash. U. L. Rev. 77, 126 (2010) (quoting Cong. Globe, 39th Cong., 1st Sess. 322-23, 474 (1866)).

[8] Justice Harlan's dissent thought "discrimination practiced by corporations and individuals in the exercise of their quasi-public functions is a badge of servitude the imposition of which Congress may prevent" under the enforcement clause. *Id.* at 43.

Though *Jones* recognized Congress's authority to "determine what are the badges and incidents of slavery," it indicated the authority is not unlimited, and can only be exercised "rationally."[9]  And it believed Congress had done so with the 1866 law considered in *Jones*, which had actually been aimed at eradicating slavery and preventing its return, because forbidding freedmen from owning and conveying property meant they could not own a farm or even a home, would be entirely dependent on white people (including their former masters), and thus might end up "herd[ed] into ghettos" and trapped in relationships that for practical purposes were slavery.  *Id.* at 440-443.  Indeed, by tying "badges and incidents of slavery" to "the slave system" itself and "the Black Codes" (Southern laws that sought to reestablish *de facto* slavery right after the Civil War), *id.* at 441-42, *Jones* underscored that the term drew its meaning from the text and history of the Thirteenth Amendment.

Similarly, in saying it was overruling the invalidation of a prosecution for terrorizing several Black men to prevent them from working at a sawmill, *see Hodges v. United States*, 203 U.S. 1, 19 (1906), *Jones* also did not imply the category of "badges and incidents" of slavery was unlimited or subject to Congress's whim.  Instead, it approvingly quoted *Hodges*' "recogni[tion]

---

[9] The Court partially quoted a speech in support of the 1866 statute by one of the sponsors of the Thirteenth Amendment, Senator Trumbull, saying that, under its enforcement clause, "we may destroy all *these* discriminations in civil rights against the black man."  *Id*. at 440 (emphasis added).  But the opinion omits the immediately preceding discussion in which the Senator identified and limited the kind of discriminations he meant: "With the destruction of slavery necessarily follows the destruction of the incidents to slavery.  When slavery was abolished, slave codes in its support were abolished also. Those laws that prevented the colored man going from home, that did not allow him to buy or sell, or to make contracts; that did not allow him to own property; that did not allow him to enforce rights; that did not allow him to be educated, were all badges of servitude made in the interest of slavery and as a part of slavery.  They never would have been thought of or enacted anywhere but for slavery, and when slavery falls they fall also."  Gillman et al., *American Constitutionalism*, Volume II, Chap. 6. (2012); *see also* McAward, *supra*, at 110.  This incomplete quotation, with an emphasis on "all . . . discriminations," has since been invoked by some lower courts in approving the constitutionality of § 249(a)(1).  *See, e.g., United States v. Diggins*, 36 F.4th 302, 308-09 (1st Cir. 2022).

that 'one of the disabilities of slavery, one of the indicia of its existence, was a lack of power to make or perform contracts.'" *Id.* at 441 n.78 (quoting *Hodges*, 203 U.S. at 17).

Two similar decisions followed closely on the heels of *Jones*, both approving legislation, enacted shortly after adoption of the Thirteenth Amendment, that covered racially-motivated harms equivalent to other inherent and essential features of slavery. *See Runyon v. McCrary*, 427 U.S. 160, 170-71, 179 (1976) (approving cause of action against whites-only private school because it deprived Black citizens of "right to make and enforce contracts"); *Griffin v. Breckenridge*, 403 U.S. 88, 105-06 (1971) (same for cause of action for Black citizens victimized by racially discriminatory conspiracy to deprive them of "the right of interstate travel," one of the "rights of national citizenship").[10] Later, in *Kozminski*, the Court considered the reach of the Thirteenth Amendment in determining the meaning of a statute that criminalized interference with its guarantee against involuntary servitude. 487 U.S. at 941. In limiting the law to "the use or threatened use of physical or legal coercion," the Court explained that this, rather than broader forms of coercion, was a *necessary incident* of pre-Civil War slavery and thus of "the slave like conditions of servitude." *Id.* at 950.

---

[10] Based on *Griffin*, the Second Circuit in *Nelson* held that the Thirteenth Amendment's enforcement clause authorized a prosecution under 18 U.S.C. § 245(b)(2)(B) for injuring and depriving a victim of the use of a city street because of his race. 277 F.3d 164. The "critical feature" of the statute "for purposes of constitutional analysis," observed the Court, was that it required that the injury be committed because of the victim's race "*and* because the victim was participating in enjoying a [public] facility." *Id.* at 185-86 (emphasis added)*; see also id.* at 191 (noting connection "between post Civil War efforts to return freed slaves to a subjugated status and private violence directed at interfering with and discouraging the freed slaves' exercise of civil rights in public places"). Indeed, *Nelson* acknowledged that a statute that "federally criminalized private racially motivated violence" without that second prong "might or might not be constitutional under the Thirteenth Amendment." *Id.* at 191 n.25.

**B. More recent Supreme Court decisions make clear that Congressional enforcement of the Reconstruction Amendments must be proportional and congruent to deterring or remedying actual constitutional violations and must be justified by current conditions, not just those from long ago.**

The Supreme Court has not considered the reach of Section 2 of the Thirteenth Amendment in the last three and a half decades. But it has clarified how the almost identically-worded enforcement clauses in the Fourteenth and Fifteenth Amendments confine Congressional authority to prophylactic legislation that is congruent and proportional to actual constitutional violations, and that responds to current conditions rather than just those from long ago.[11]

Thus, in *City of Boerne v. Flores*, 521 U.S. 507 (1997), the Court held that, by enacting the Religious Freedom Restoration Act (RFRA), Congress exceeded the scope of its enforcement power under the Fourteenth Amendment. The Court acknowledged, much as it did in *Jones* with the Thirteenth Amendment, that "[l]egislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional." *Id.* at 518. Still, Congress has "the power 'to enforce,' not the power to determine what constitutes a constitutional violation." *Id.* at 518-19 (quotation omitted). Thus, "[t]here must be a congruence and proportionality between the [constitutional] injury to be prevented or remedied, and the means adopted to that ends. Lacking such a connection, legislation becomes substantive in operation and effect."[12] *Id.* at 520.

---

[11] As noted, the enforcement clause of the Thirteenth Amendment reads: "Congress shall have power to enforce this article by appropriate legislation." That of the Fourteenth Amendment reads: "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article." U.S. Const., Amend. XIV, § 5. And that of the Fifteenth Amendment reads: "The Congress shall have power to enforce this article by appropriate legislation." U.S. Const., Amend. XV, § 2.

[12] Justice Scalia later correctly observed that Congress exceeds its enforcement power if it seeks to prevent or remedy conduct "that does not itself violate" the Constitution. "So-called 'prophylactic legislation' is reinforcement rather than enforcement." *Tennessee v. Lane*, 541

Notably, the Court said this was not a new limitation on Congress's enforcement power under the Fourteenth Amendment, but rather traced back to the *Civil Rights Cases*, which addressed all the Reconstruction Amendments. *Id.* at 524-25. Applying this standard, the Court concluded that the RFRA, which forbade burdens not themselves unconstitutional on religious practices, was not a congruent and proportional means of protecting the constitutional right to free exercise of religion, in part because there lacked contemporary evidence of a "widespread pattern of religious discrimination in this country" that had stood unaddressed. *Id.* at 530-31. Following *City of Boerne*, the Supreme Court later found that several civil rights laws exceeded Congress's enforcement authority. *See Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001) (Title I of the Americans with Disabilities Act); *United States v. Morrison*, 529 U.S. 598 (2000) (Violence Against Women Act); *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62 (2000) (Age Discrimination in Employment Act).

In *Shelby County v. Holder*, 570 U.S. 529 (2013), the Court applied similar scrutiny to a federal statute that rested on Congress's authority to enforce the Fifteenth Amendment. Echoing *Jones*' discussion of the Thirteenth Amendment, the Court framed the issue as whether the challenged provision was "rational in both practice and theory." *Id.* at 546, 550 (quotation omitted); *see also id.* at 551, 554, 556. And, just as it did in *Jones*, 392 U.S. at 444, the Court said the "basic test" it was applying derived from *McCulloch v. Maryland*, 17 U.S. 316, 421 (1819), which authorized Congress to legislate as long as "the end" is "legitimate," and the "means" are "appropriate," "plainly adapted to that end, and "not prohibited." *Shelby County*,

U.S. 509, 559 (2004) (Scalia, J., dissenting); *see also id.* at 558 ("One does not, for example, 'enforce' a 55-mile-per-hour speed limit by imposing a 45-mile-per-hour speed limit – even though that is indeed directed to the same end of automotive safety and will undoubtedly result in many fewer violations of the 55-mile-per-hour limit.").

383 U.S. at 326-27. Critically, the statute needed to "make[] sense," as a means to deter or remedy unconstitutional racial discrimination in voting, "in light of current conditions." *Id.* at 553. But the challenged provision, which required federal preclearance of voting changes in certain jurisdictions, selected those with the most demonstrable records of voting discrimination in 1965, when the law was first enacted. And it had been reauthorized, without change, in 2006. Because "today's statistics tell an entirely different story," the Court concluded that the statute's coverage formula based on 1965 conditions was "irrational," and thus exceeded Congress's enforcement power. *Id.* at 556.

Though *City of Boerne* and *Shelby County* do not discuss the Thirteenth Amendment's almost-identically worded enforcement clause, those decisions can be harmonized with *Jones* and the Court's Thirteenth Amendment decisions in determining the reach of that clause. Indeed, even if they conflicted with *Jones*, they would still need to be given effect. *Cf. United States v. Lumumba*, 741 F.2d 12, 16 (2d Cir. 1984) (1952 Supreme Court decision had "limited vitality as precedent, even though it has not been expressly overruled").

### C. Section 249(a)(1) exceeds Congress's Thirteenth Amendment enforcement power and violates federalism and separation-of-powers limitations under the Tenth Amendment.

The first circuit court to consider § 249(a)(1) expressed doubt as to its constitutionality. *United States v. Hatch*, 722 F.3d 1193, 1201 (10th Cir. 2013) ("Hatch's arguments raise important federalism questions"); *id.* at 1204 ("Hatch's argument raises important concerns we share"). As the court explained, if the Thirteenth Amendment licensed a law federalizing all racially motivated assaults as "badges and incidents of slavery," that would "place few limits" on what other conduct Congress could reach under the enforcement clause. *Id.* "Given slaves' intensely deplorable treatment and slavery's lasting effects, nearly every hurtful thing one human

could do to another and nearly every disadvantaged state of being might be analogized to slavery – and thereby labeled a badge or incident of slavery." *Id.* Nonetheless, that court approved the law because it misread *Jones* as holding that "the Thirteenth Amendment can be seen as treating most forms of racial discrimination as badges and incidents of slavery," at the discretion of Congress. *Id.* at 1200. And while acknowledging that seemed to conflict with *City of Boerne*'s "narrower interpretation" of the Fourteenth Amendment's almost identically worded enforcement clause, the Tenth Circuit believed it had to "leave it to the Supreme Court to bring Thirteenth Amendment jurisprudence in line." *Id.* at 1205.

Doubts about the constitutionality of § 249(a)(1) emerged in even greater detail in two subsequent decisions from other circuits. In *United States v. Cannon*, 750 F.3d 492 (5th Cir. 2014), the Fifth Circuit echoed many of the Tenth Circuit's concerns from *Hatch*. It observed that the Supreme Court had never spelled out the scope of "badges and incidents of slavery," and that the words "were originally terms of art with specific" – and narrower – "meanings tied to their historical context." *Id.* at 498, 501-02. *Cannon* also quoted the Tenth Circuit's warning that "nearly every hurtful thing" or "disadvantaged state" could be considered a "badge or incident of slavery," thus giving Congress "the power to define the meaning of the Constitution – a rare power indeed." *Id.* at 504 (quotation omitted). And it acknowledged the "textual similarities" between the enforcement clause of the Thirteenth Amendment and those of the Fourteenth and Fifteenth Amendments, whose limits the Court had recognized in *City of Boerne* and *Shelby County*.[13] Nonetheless, "absent a clear directive from the Supreme Court," *Cannon*

---

[13] *Cannon* also clarified that the *McCulloch* test, invoked in both *Jones* and *Shelby County*, "requires deference to the means that Congress uses to achieve a particular end, but not to Congress's determination that the end itself is legitimate." *Id.* at 504; *see also Lane*, 541 U.S. at 522 ("The first step of the *Boerne* inquiry requires us to identify the *constitutional* right or rights that Congress sought to enforce when it enacted" the challenged statute) (emphasis added).

construed *Jones* as requiring approval of § 249(a)(1) because "Congress could rationally determine that racially motivated violence is a badge or incident of slavery." *Id.* at 505.

In a concurring opinion, Judge Elrod went further, detailing why she believed approving the provision stood in "substantial tension with other lines of recent constitutional jurisprudence." *Id.* at 514. It had "the power to implicate vast swaths of activities that do not relate to removing 'badges' and 'incidents' of slavery as the terms were originally understood."[14] *Id.* at 512. Invoking the Tenth Amendment, Judge Elrod noted the Supreme Court "has cautioned against such expansions of federal law into areas, like police power, that are the historical prerogative of the states." *Id.* In addition, she warned, letting Congress set the meaning of the protected constitutional rights and thus "define the scope of its own powers" was precisely what the Supreme Court had invalidated in *City of Boerne. Id.* Finally, in Judge Elrod's view, § 249(a)(1) also failed the test of *Shelby County* that a Reconstruction Amendment's enforcement clause had to be "justified with congressional findings regarding current needs," for Congress had made no "findings that state currently and consistently fail to adequately address the problem" of racial violence. *Id.* at 511. Indeed, "at least 45 states have criminal statutes that impose harsher penalties for crimes that are motivated by bias." *Id.* at 510-14; *see also* 34 U.S.C. § 30501 (in enacting § 249(a)(1), Congress finds that slavery was enforced by racial violence "prior to and after the adoption of the 13th Amendment," but that, today, "state and

---

[14] Judge Elrod noted that the statute "reaches even racial violence against white persons when those acts are based on race." *Id.* at 511. This would seem to underscore that being the victim of a § 249(a)(1) violation is not a badge or incident of slavery.

local authorities" do prosecute "violent crimes motivated by bias," though they can do so "more effectively with greater federal assistance.").[15]

The same constitutional flaws in § 249(a)(1) identified by Judge Elrod were flagged several years later by Judge Ikuta of the Ninth Circuit in her dissent in *United States v. Hougen*, 76 F.4th 805, 816 (9th Cir. 2023), to explain why this provision "was not a valid exercise of Congress's authority under the Thirteenth Amendment." Under decisions from the *Civil Rights Cases* through the present day, she noted, the Supreme Court had "defined the badges and incidents of slavery" as the denial of "the fundamental rights which are the essence of civil freedom." *Id.* at 821. But it had "characterized those in terms of economic and legal parity with white people," such as the ensuring Black citizens have the same right to make contracts, give evidence, travel freely, and own property. *Id.* Critically, "the Court has never held that an assault and battery – when committed without an intent to deprive a person of [such] fundamental rights of citizenship – was a badge or incident of slavery," even if it was based on the victim's race. *Id.* at 822. And Congress, Judge Ikuta explained, could not "rationally" determine that punishing such an assault or battery was within its Thirteenth Amendment enforcement power. *Id.* at 826. For while slavery had historically been enforced through legally sanctioned violence against slaves (and former slaves later suffered violence intended to prevent them from exercising their

---

[15] Despite being provided repeated opportunities, the proponents of § 249(a)(1), including then-Attorney General Holder, could point to no data showing that the states had failed to adequately prosecute hate crimes. The Matthew Shepard Hate Crimes Prevention Act of 2009, Hearing before the Sen. Comm. on the Jud., 111th Cong. (June 25, 2009) ("Sen. Hrg."), at 7, 14, 35, 38-39, 62, 73; House Report No. 111-86 (Apr. 27, 2009), 2009 WL 1137121 at *44. Indeed, even the crimes against the victims after whom the Federal Hate-Crimes Act was named, James Byrd, Jr., and Matthew Shepard, were successfully prosecuted in state court, with all the perpetrators being convicted and sentenced to either life imprisonment or the death penalty. *See* Michael Janofsky, *Parents of Gay Obtain Mercy for His Killer*, N.Y. Times (Nov. 5, 1999), Campbell Robertson, *Texas Executes White Supremacist for 1998 Dragging Death of James Byrd*, Jr., N.Y. Times (Apr. 24, 2019).

fundamental rights as citizens), Congress's findings in support of § 249(a)(1), 34 U.S.C. § 30501, "fail[] to explain how it rationally determined that 'eliminating racially motivated violence' writ large, without an element requiring the government to prove a connection between such violence and the deprivation of civil rights, is addressed to either eradicating slavery or its badges and incidents" or preventing its return. *Id.* at 825. Indeed, as Judge Ikuta observed, almost no one, of any race, ethnicity, or religion, is immune from bias crimes. *Id.*[16] Thus, § 249(a)(1) impermissibly worked "a substantive redefinition of the constitutional right at issue" (into a "guarantee of protection against any private violence by a person with discriminatory animus") and "an improper federal exercise of state police power." *Id.* at 816-27.

In questioning the constitutionality of § 249(a)(1), these opinions in *Hatch*, *Cannon*, and *Hougen* have all recognized the scholarship of the leading national expert on the legal history of the Thirteenth Amendment, Notre Dame Law Professor Jennifer McAward. She has explained that "the best understanding of the 'badges and incidents of slavery," including its "original public meaning" at the time the Thirteenth Amendment was enacted in 1865, "refers to public or widespread private action, based on race or the previous condition of servitude, that mimics the law of slavery and that has significant potential to lead to the de facto reenslavement or legal subjugation of the targeted group." Thus, she concludes that § 249(a)(1) – a law enacted almost a century and a half after the end of slavery – "lack[s] a constitutional predicate" both because it "proscribes private violence motivated by race" and because Congress made no finding "linking racial hate crimes to a threatened reemergence of slavery or involuntary servitude" or their

---

[16] Certainly "there is no rational basis for determining that a state-law assault committed because the victim was a Jew, a Catholic, a Muslim, a Korean, an Argentinian, a Mexican, or a white person" – which have all been prosecuted under § 249(a)(1) – "vindicates the Thirteenth Amendment's ban on slavery and involuntary servitude." *Id.* at 825 (Ikuta, J., dissenting).

modern equivalent, the subordination of Black people to "second-class citizenship." McAward (2012), *supra,* at 569-570, 605, 616, 626-27 & n.235; *see also* McAward (2010), *supra* at 80-85.

Again, it is true that all this represents the minority view. But the majority opinion in *Hougen, see id.* 815-16, and the decisions from the other circuits that have signed off on the constitutionality of § 249(a)(1)—none of which bind this Court——"involve limited reasoning, excessive deference to Congress under *Jones*, or both."[17] And they dismiss *City of Boerne* and *Shelby County*, without grappling with the almost-identical wording of the enforcement clauses of all the Reconstruction Amendments, and inaptly rely on precedents involving other, quite different statutes.[18] *Hougen*, 76 F.4th at 826 (Ikuta, J., dissenting) (*citing United States v. Diggins*, 36 F.4th 302, 311 (1st Cir. 2022); *United States v. Roof*, 10 F.4th 314, 392 (4th Cir. 2021); *United States v. Metcalf*, 881 F.3d 641, 645 (8th Cir. 2018)).

Finally, unlike Payton Gendron, apparently none of the defendants in those cases had been prosecuted (let alone was convicted and sentenced to life imprisonment) under a state hate-crimes provision essentially indistinguishable from § 249(a)(1). *Cf. Roof*, 10 F.4th at 397

---

[17] Alternatively, if *Jones* needs to be revisited to restore Thirteenth Amendment jurisprudence to its proper moorings (including by revisiting the validity and scope of Congress's authority to reach the extra-textual category of "badges and incidents" of slavery) in order to invalidate § 249(a)(1), Payton Gendron hereby preserves, for future review, the argument that the Supreme Court should overrule it. *See also* David P. Currie, *The Constitution in the Supreme Court: The First Hundred Years 1789-1888* 400-01 (1985) (arguing that the Thirteenth Amendment does not justify legislation unrelated to actual slavery).

[18] For example, in *Hougen*, the majority relied on precedent involving 18 U.S.C. § 245(b)(2). 76 F.4th at 814-15. But as the dissent explained, that statute "prohibits private violence that deprives an individual of a fundamental right of citizenship, 'participating in or enjoying any benefit, service, privilege, program, facility or activity provided or administered by any State or subdivision thereof.' 18 U.S.C. § 245(b)(2)(B). This formulation of the offense brings § 245(b)(2)(B) in line with precedent: the Supreme Court has indicated that similar violence aimed at preventing the free exercise of one's civil rights constitutes a badge or incident of slavery and that Congress can validly legislate against such violence … But § 249(a)(1) is missing this crucial component." *Id.* at 826-27 (Ikuta, J., dissenting).

("Because South Carolina does not have a hate-crimes statute, it was unable to charge Roof for a crime that considers his alleged discriminatory intent as an element of the offense"). Thus, even if § 249(a)(1) is not unconstitutional on its face, it is unconstitutional as applied to Payton Gendron.

### D. The Assistant Attorney General Improperly Certified This Case Under 18 U.S.C. § 249(b)(1) Because Duplicative Federal Prosecution is Neither in the Public Interest nor Necessary to Secure Substantial Justice.

The Hate Crimes Prevention Act (HCPA) requires that prosecutions under any of its subsections be brought under written certification of the Attorney General or designee that one of four grounds for the exercise of federal jurisdiction exists. In this case, Assistant Attorney General Kristin Clarke certified that jurisdiction is authorized by 18 U.S.C. § 249(b)(1)(D) because it is in the public interest and necessary to secure substantial justice. Neither is, in fact, the case, and this Court should accordingly dismiss the Indictment on this ground also.

The certification requirement of the HCPA states:

(b) Certification Requirement.—

(1) In general.—No prosecution of any offense described in this subsection may be undertaken by the United States, except under the certification in writing of the Attorney General, or a designee, that—

(A) the State does not have jurisdiction;

(B) the State has requested the Federal Government assume jurisdiction;

(C) the verdict or sentence obtained pursuant to State charges left demonstrably unvindicated the Federal interest in eradicating bias-motivated violence; or

(D) a prosecution by the United States is in the public interest and necessary to secure substantial justice.

18 U.S.C. § 249(b)(1)(A-D).

The requirement that this certification be made reflects the intent of Congress that the HCPA be used extremely sparingly, as the exception to state prosecution of criminal offenses, rather than the rule. "[T]he Shepard-Byrd hate crime prevention bill was designed only to assist state and local law enforcement in their investigations and prosecutions by providing funding and other resources to effectively address local hate crime. The bill was not intended to replace state and local law enforcement with the federal government as the primary investigative, prosecutorial, and enforcement authority for hate crime." Erica G. Safran, *A Time to Kill Hate: A Case for a Hate Crime Law in South Carolina*, 69 S.C. L. Rev. 887, 898 (2018). Then Attorney General Eric Holder, in promoting the legislation, continually referred to it as a "backstop" to the primary prosecution power of the states – suggesting that the federal government would only step in where a state was unable or unwilling to prosecute – and by assuring Congress it would not give the federal government "unlimited authority" to prosecute such traditionally state crimes. *See, e.g.*, Sen. Hrg. at 9 ("The backstop of the law is that the Federal Attorney General, if the State refuses to prosecute, can also look into the case and make a decision, well, this case, in fact, does deserve prosecution."); *id.* ("if there is a State that refuses to prosecute, that ignores the element of hate in the commission of a felony, the Federal Government can stand up and say, we're going to prosecute"); *id.* at 14 ("What we're looking for is an ability in those instances – those rare instances – where there is an inability or an unwillingness by State or local jurisdiction to proceed, that the Federal Government would be able to stop, would be able to fill that gap."); *id.* at 20, 69, 73 (describing the legislation as a "backstop" to the states' efforts); *id.* at 67 ("The certification provision … will not provide the Attorney General with unlimited authority and it will not interfere with the prosecution of crimes that can be handled effectively at the local level").

To be meaningful, the Attorney General's certification under this provision must be subject to judicial review. The alternative is to require courts to stand by in silence even if the Department of Justice acts in a manner directly contrary to the promises made to Congress to secure the expansion of its power to prosecute criminal acts.

1. This Court Should Find That the Attorney General's Certification of a Prosecution Under 18 U.S.C. § 249(b)(1) is Subject to Judicial Review.

The Second Circuit has yet to address whether certification under § 249(b)(1) is subject to judicial review. This Court should adopt the reasoning of the Fourth Circuit Court of Appeals and find that a certification under the HCPA is reviewable.[19] The Fourth Circuit assumed without deciding that such certifications are reviewable in *United States v. Roof*, 10 F.4th 314, 396-97 (4th Cir. 2021), following circuit precedent establishing the reviewability of a similar certification provision in the Juvenile Justice and Delinquency Prevention Act, 18 U.S.C. § 5032, *see United States v. Juvenile Male #1*, 86 F.3d 1314 (4th Cir. 1996). There, the court noted that the certification requirements of that section "act as limits on the federal courts' jurisdiction to act in this sphere" and, accordingly, "a court must first satisfy itself that [the certification is factually correct] before jurisdiction can be assumed over the juvenile." *Id.* at 1319. *See also United States v. Doe*, 49 F.3d 859, 866 (2d Cir. 1995) (holding that "[p]roper certification is a prerequisite to federal jurisdiction over juveniles" and reviewing attorney general certification that charge against juvenile constituted "crime of violence" under § 5032).

The court in *Juvenile Male #1* based its reviewability determination in large part on "'the strong presumption'" that "executive determinations generally are subject to judicial review and

---

[19] *But see United States v. Diggins*, 36 F.4th 302, 318 (1st Cir. 2022) (finding certification under § 249(b)(1) unreviewable, citing circuit precedent in juvenile transfer context); *United States v. Bowers*, 495 F. Supp. 3d 362, 374 (W.D. Pa. 2020) (same).

that mechanical judgments are not the kind federal courts are set up to render.'" *Id.* (quoting

*Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 434 (1995)); *see also id.* at 426 (noting that a

finding of non-reviewability would "authorize[] the Attorney General's delegate to make

determinations of the kind at issue without any judicial check" and "cast[] Article III judges in

the role of petty functionaries . . . stripped of capacity to evaluate independently whether the

executive's decision is correct"). Finding in the statutory language or legislative history of §

5032 "nothing . . . that would overcome the presumption of judicial review," the court held that

"we can and must first satisfy ourselves that our jurisdiction has been properly invoked." *Id.* at

1320-21.[20]

> 2. Duplicative Federal Prosecution of the Crimes at Issue in This Case is Neither in the Public Interest nor Necessary to Secure Substantial Justice.

In June of 2022, while the state prosecution against Payton Gendron was proceeding

apace but still in its infancy, Assistant Attorney General for Civil Rights Kristin Clarke signed a

certification declaring that prosecuting Payton Gendron federally under § 249(a)(1) was "in the

public interest and is necessary to secure substantial justice." (Exhibit C). The certification was

made despite the fact that the State of New York had already indicted him with Domestic Act of

Terrorism Motivated by Hate in the First Degree, in violation of New York State Penal Law

---

[20] It is the case that, in *United States v. Vancier*, 515 F.2d 1378, 1380 (2d Cir. 1975), the Second Circuit found a previous, narrower version of § 5032 not judicially reviewable. However, following significant amendments to the statute enacted in 1984 many courts, including the Second Circuit, expanded the scope of review of certifications under that provision to include substantive review of determinations such as whether the juvenile was charged with an offense constituting a crime of violence. *See Doe*, 49 F.3d at 866-67; *United States v. Juvenile Male*, 923 F.2d 614, 617 (8th Cir. 1991). The holding in *Vancier* is thus best understood as limited to its specific facts. *See United States v. Male Juvenile*, 844 F. Supp. 280, 283 n.5 (E.D. Va. 1994) (noting that "to the extent the non-reviewable argument [of *Vancier*] is viable, it is viable only as applied to review of the merits of [the particular certification at issue]") (quoting *United States v. Ramapuram*, 432 F. Supp. 140, 143 n.5 (D. Md. 1977) (dicta)).

§490.28, in addition to ten counts of Murder in the First Degree, three counts of Attempted Murder in the Second Degree as a Hate Crime, and one count of Criminal Possession of a Weapon in the Second Degree. (Exhibit A). The Domestic Act of Terrorism Motivated by Hate carried a mandatory sentence of life in prison without parole.

This case therefore stands in stark contrast to that confronted by the Fourth Circuit in *Roof*. Unlike New York, South Carolina is one of three states that has no statute outlawing hate crimes. Accordingly, the court upheld the Attorney General's certification in part because the lack of an applicable statute rendered the state "unable to charge Roof for a crime that considers his alleged discriminatory intent as an element of the offense." *United States v. Roof*, 10 F.4th 314, 397 (4th Cir. 2021). *See also United States v. Hill*, No. 16-cr-9, 2018WL3872315, at *5 (E.D. Va. Aug. 15, 2018) (approving certification as in public interest and necessary to secure substantial justice because Virginia's hate crime statute does not cover crimes based on sexual orientation, leaving Commonwealth with charge of simple assault with no discriminatory intent as only option available) *rev'd on other grounds by United States v. Hill*, 927 F.3d 188 (4th Cir. 2019).

The government made no attempt to explain how a duplicative federal hate-crimes prosecution could possibly be "necessary to secure substantial justice" under these circumstances and none is discernible, especially given the prohibition on DOJ's considering "the legal unavailability of capital punishment in the state where the crime was committed" in its assessment of whether there is a substantial federal interest in bringing the prosecution. Justice Manual, § 9-10.140(A).[21] Thereafter, the absence of a federal interest in re-prosecuting Payton

---

[21] Even if the Court were to find that certifications under § 249(b)(1) are unreviewable as a general matter, the Indictment is nevertheless subject to challenge if the decision to certify was

Gendron became even clearer, when he pled guilty to every count in the state indictment and was sentenced to life in prison without parole plus 90 years. The State of New York thereby guaranteed that he will spend the rest of his life shut away in one of its prisons and die there. Not only has it been established that the state is willing and able to prosecute Payton Gendron to the fullest, to condemn acts of racial violence in the strongest possible terms and to ensure that justice is served – it has done so. Still, the federal government has offered no explanation for why it continues to press forward with a prosecution that will serve only to delay judicial resolution of the matter for years if not decades. The Court should reject the Attorney General's certification of this matter or, at a minimum, order the government to provide an explanation of how it believes that proceeding this way is in the public interest and necessary to achieve substantial justice.

## IV. CONCLUSION

For the foregoing reasons, Payton Gendron requests that this Court grant this Motion and dismiss the Indictment in this case or, alternatively, grant the relief described above to remedy the government's flawed certification.

---

based on improper considerations and therefore rendered in bad faith. *See United States v. Carter*, 493 F.2d 704, 707 (2d Cir. 1974) (noting that Attorney General certification that witness sought to be deposed is believed to have participated in organized crime may be rejected upon proof that government acted in bad faith); *United States v. C.G.,* 736 F.2d 1474, 1478 (11th Cir. 1984) (noting exception to general rule of non-reviewability of certifications of juvenile prosecutions under § 5032 "for certifications made in bad faith"). The absence of any legitimate basis upon which to authorize a wholly duplicative prosecution by the federal government in this case suggests that the decision to certify under § 249(b)(1) was for improper reasons, such as the desire to pursue a death sentence for political gain. *Cf. United States v. Male Juvenile*, 844 F. Supp. 280, 283 (E.D. Va. 1994) (noting that while defendant's allegation of bad faith in certifying juvenile prosecution under § 5032 was not fully proven, court has "grave concerns that the case was certified for reasons other than those articulated by the Government at the hearing"). The defense reserves the right to challenge the certification on this basis, together with the decision to pursue a death sentence, at a later date as relevant information is received.

Dated:      June 10, 2024
            Buffalo, New York

*s/Sonya A. Zoghlin*
Sonya A. Zoghlin
Assistant Federal Public Defender

*s/Anne M. Burger*
Anne M. Burger
Supervisory Assistant Federal Public Defender

*s/MaryBeth Covert*
MaryBeth Covert
Senior Litigator

*s/Julie Brain*
Julie Brain
Attorney at Law