UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

     v.

                              22-CR-109 (LJV-HKS)

PAYTON GENDRON,

             Defendant.

_____


**MOTION FOR AN ORDER CATEGORICALLY EXEMPTING PAYTON GENDRON FROM THE DEATH PENALTY BECAUSE HE WAS EIGHTEEN YEARS OLD AT THE TIME OF THE ALLEGED CAPITAL CRIMES**


## I.  INTRODUCTION AND BACKGROUND

Payton Gendron, through the undersigned counsel, hereby moves this Court for an Order categorically exempting him from the death penalty because he was eighteen years old at the time of the alleged capital crimes. This Motion is made pursuant to the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and the Federal Death Penalty Act, 18 U.S.C. §§ 3591-93, and on such evidence as may be presented at the requested evidentiary hearing.

In *Roper v. Simmons*, 543 U.S. 551 (2005), the Supreme Court, reasoning that "[t]he differences between juvenile and adult offenders are too marked and well understood to risk allowing a youthful person to receive the death penalty despite insufficient culpability," *id.* at 572-73, held, on the facts then before it, that the execution of persons who were under the age of 18 at the time of their capital crimes is prohibited by the Eighth and Fourteenth Amendments, *id.* at 574. At the time of the capital crimes charged against him, Payton Gendron was aged eighteen years, ten months, and twenty-days—328 days over the *Roper* line.

Subsequently, in *Hall v. Florida*, 572 U.S. 701 (2014), and later again in *Moore v. Texas*, 581 U.S. 1 (2017) the Court, again concerned with the "unacceptable risk" that a defendant lacking the requisite culpability might receive a death sentence, *id.* at 704, highlighted the constitutional imperative to afford due weight to the teachings of the scientific community, *id.* at 712. Where a scientific consensus supports a defendant's lesser culpability, "[p]ersons facing that most severe sanction [the death penalty] must have a fair opportunity to show that the Constitution prohibits their execution." *Id.* at 723. *Hall* and *Moore* require significant deference to the consensus of the scientific community when evaluating the Eighth Amendment's bar on cruel and unusual punishments.

Since *Roper*, the science of late-adolescent brain development has advanced markedly. A new consensus has developed, including in those areas emphasized by *Roper* itself as indicative of constitutionally significant lesser culpability: lack of maturity and undeveloped sense of responsibility, greater vulnerability to negative influences and outside pressures, and inchoate character development, *id*. at 569-70. As now understood, the brain may continue to develop into the early 20s. Accordingly, the exemption *Roper* carved out for persons under the age of 18 has been left behind by advancements in the science on which it rested and should be updated, as *Hall* and *Moore* require, to afford appropriate weight to the consensus of medical experts.

At the same time, and again since *Roper*, the use of the death penalty in this country has continued to evolve. The objective indicia of community standards endorsed by the Supreme Court—such as its lack of use, in general or against particular classes of persons—show a uniform march away from executing persons under 21.

Given both the consensus in the scientific community and evolving community standards, this Court should bar the government from seeking the death penalty against Payton Gendron

under the Eighth Amendment: His age at the time of the offenses should categorically exempt

him from capital punishment.[1] In the alternative, this Court should hold a hearing to afford him

the opportunity to present proof that his execution for crimes committed during late adolescence

would violate the Eighth Amendment.

## II.    ARGUMENT

### A.   In Light Of The Modern Scientific Consensus Regarding Late Adolescent Brain Development, The Age Cutoff Established In *Roper V. Simmons* Should Be Expanded To Exempt Persons, Like Payton Gendron, Whose Conduct Occurred During The Developmental Period

Based on findings from the medical and scientific community, the Supreme Court held in

*Roper* that it is cruel and unusual punishment to impose death sentences on juveniles under the

age of 18. Given the knowledge about the human brain maturation process then available, the

Court's cutoff at age eighteen made sense. As Drs. Laurence Steinberg and Elizabeth Scott,

leading researchers in the field, have explained, research extant at the time of the Court's

decision showed only that "[y]oung adults between the ages of eighteen and twenty-one

constitute a less well-defined category." *See* Elizabeth S. Scott, Richard J. Bonnie, & Laurence

Steinberg, *Young Adulthood as a Transitional Legal Authority: Science, Social Change, and*

---

[1]  In 2012, the Supreme Court held that the Eighth Amendment forbids mandatory life sentences for persons under the age of 18 at the time of their offenses. *Miller v. Alabama*, 567 U.S. 460 (2012). In *United States v. Sierra*, 933 F.3d 95 (2d Cir. 2019), appellants, who were between 18 and 22, argued that the *Miller* exemption should, in light of current scientific research, be expanded to include persons in their early 20s. The Second Circuit rejected the effort to expand *Miller*, relying on the Supreme Court's repeated drawing of a bright line at 18. *Id.* at 97; *see also Cruz v. United States*, 826 Fed. App'x 49 (2d Cir. 2020) (summary order) (same, relying on *Sierra*). Death, of course, is different, *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion), and what the 8th Amendment will countenance in an ordinary prosecution does not dictate what it will permit, or the level of culpability required, when the government seeks the ultimate punishment of death. In addition, as set out below, both the science and community standards have continued to evolve in the years since *Sierra* and *Roper*. In any event, should this Court conclude that this issue is foreclosed by *Sierra*, we raise it now to preserve the challenge for later Supreme Court review.

*Justice Policy*, 85 Fordham L. Rev. 641, 644 (2016). While scientists suspected that the "psychological and neurobiological development that characterizes adolescence continues into the midtwenties, [] the research [had] not yet produced a robust understanding of maturation in young adults age eighteen to twenty-one." *Id.* at 653.

Since *Roper*, the science of brain development has progressed significantly. While previous studies focused on the effects of brain development on juveniles under eighteen, researchers of late have increasingly examined what this process means for youths in their late teens and early twenties who also do not yet have fully developed adult brains. This research shows that people in this age group bear a strong resemblance to juveniles under eighteen when it comes to their decision-making and behavioral abilities. As stated by Dr. Steinberg and his co-authors in 2016:

> Although eighteen- to twenty-one-year-olds are in some ways similar to individuals in their midtwenties, in other ways, young adults are more like adolescents in their behavior, psychological functioning, and brain development. Thus, developmental science does not support the bright-line boundary that is observed in criminal law under which eighteen-year-olds are categorically deemed to be adults.

*Scott, et al., supra,* at 645.

The agency tasked with scrupulously analyzing federal sentencing practices nationwide is the United States Sentencing Commission. "For even though the [United States Sentencing Guidelines] are advisory rather than mandatory, they are, as we pointed out in [*Rita v. United States*, 551 U.S. 338, 127 S. Ct. 2456 (2007)], the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Gall v. United States*, 552 U.S. 38, 46 (2007). This makes the Commission's work product relevant evidence of a national scientific consensus on the issues raised in this Motion.

In a May 2017 report by the Commission, *Youthful Offenders in the Federal System*

("*Youthful Offenders*"), the Commission begins by defining a youthful offender as a person "age

25 or younger at the time they are sentenced in the federal system." *Youthful Offenders* at *1.

The Report explains:

> Traditionally, youthful offenders often have been defined as those under the age
> of 18, but for purposes of this study, the Commission has defined youthful
> offenders as a federal offender 25 years old or younger at the time of sentencing.
> The inclusion of young adults in the definition of youthful offenders is informed
> by recent case law and neuroscience research in which there is a growing
> recognition that people may not gain full reasoning skills and abilities until they
> reach age 25 on average.

*Youthful Offenders* at *5.

> The Report further explains:

> The contribution that neuroscience has made to the study of youthful offending is
> significant and continues to evolve. That research has focused on the prefrontal
> cortex of the brain, which is located at the front of the frontal lobe and is the last
> part of the brain to fully develop. The prefrontal cortex is utilized in impulse
> control, emotional reactions, executive function and decision making.
> Development of the prefrontal cortex involves both biology and sociocultural
> experiences. Focusing on the biological development of the brain, numerous
> studies using Magnetic Resonance Imaging (MRI) of the brain show that the brain
> goes through two major processes during adolescence and into young adulthood:
> (1) synaptic pruning, which involves the strengthening of important or often-used
> neural connections, and the discarding of infrequently used synapses; and (2) the
> myelination of the frontal lobe, which refers to the addition of the myelin sheath
> to the axiom of neurons that allows for faster and more complex brain functions.
> Neuroscientists refer to the former process as the whitening of brain matter;
> pruning reduces gray brain matter. People at different stages of these processes
> have different brain structures and functions compared to people who have fully
> developed brains.

*Id.* at *6.

The Report notes that "researchers caution against the over-generalization of brain

science," but summarizes the emerging scientific consensus concerning brain maturation as

follows:

> [T]here are a number of points on which researchers in this area generally agree. First, researchers agree that the prefrontal cortex is not complete by the age of 18, which is the legal age of majority in most state jurisdictions and in the federal system. Second, researchers agree that development continues into the 20s. Third, most researchers reference 25 as the average age at which full development has taken place, but note there will be significant variation from person to person.

*Id.* at *7; *see also* Alexandra Cohen, Richard Bonnie, Kim Taylor-Thompson and BJ Casey, *When Does a Juvenile Become and Adult? Implications for Law and Policy*, 88 Temple Law Rev. 769, 783 (2016) (summarizing recent scientific research on brain maturation and noting that "noninvasive brain imaging and postmortem studies have shown continued regional development of the prefrontal cortex, implicated in judgment and self-control beyond the teen years and into the twenties").[2]

Recent scientific evidence concerning brain development and its effects on behavior in the late teens and early 20s demonstrates that the protections announced in *Roper* should be expanded to include persons, like Payton Gendron, who were 18 at the time of the charged offenses.

---

[2] Other authorities have stated the same conclusions again and again. *See, e.g.*, Laurence Steinberg, et. al., *Around the World, Adolescence is a Time of Heightened Sensation Seeking and Immature Self-Regulation*, 21 Developmental Science 1 (2018) ("Self-regulatory capacities may reach adult-like levels at around age 15 in relatively less arousing, 'cool' contexts, but when tasks become more demanding or emotionally arousing, adult-like performance may not be reached until closer to the mid-20s. These findings are consistent with a growing neuroimaging literature showing amplified activation of reward-processing regions (e.g. the ventral striatum and medial prefrontal cortex) in adolescents compared with children and adults, and gradual maturation over the course of adolescence and young adulthood within brain regions that subserve executive function (e.g. lateral prefrontal and parietal cortices and the anterior cingulate)"); Bradley Taber-Thomas and Koraly Perez-Edgar, *Emerging Adulthood Brain Development, in The Oxford Handbook of Emerging Adulthood* 126-131(*Jeffrey Jensen Arnett ed.,* Oxford University Press (1st ed. 2016) (observing "neurodevelopment in EA [early adulthood] involves prominent changes in association corticies and the frontolimbic systems involved in executive attention, regard and social processes. In addition, alterations in neurodevelopment trajectories in EA may underlie differences in functioning and new vulnerabilities to psychopathology evident in this developmental window").

One of the most prominent researchers on brain development, Dr. Jay Giedd, explained the physiology this way:

> The most recent studies indicate that the riskiest behaviors (among adolescents) arise from a mismatch between the maturation of networks in the limbic system, which drives emotions and becomes turbo-boosted in puberty, and the maturation of networks in the prefrontal cortex, which occurs later and promotes sound judgment and the control of impulses. Indeed, we now know that the prefrontal cortex continues to change prominently until well into a person's 20s.

Jay Giedd, *The Amazing Teen Brain*, 312 Scientific American 33, 34 (2015). The full development of crucial executive functioning—the moral aspect of a person's brain that renders them fully culpable—does not occur until a person's 20s. Indeed, the full development of gray matter "peaks latest in the prefrontal cortex, crucial to executive functioning, a term that encompasses a broad array of abilities, including organization, decision making and planning, along with the regulation of emotion." *Id.* at 35. "The prefrontal cortex functions are not absent in teenagers; they are just not as good as they are going to get. Because they do not fully mature until a person's 20s, teens may have trouble controlling impulses or judging risks and rewards." *Id.* at 36.

Similarly, Dr. Laurence Steinberg, whose research was relied upon by the Supreme Court in *Roper*, 543 U.S. at 569, and in *Miller*, 567 U.S. at 471, details findings that neurological processes that account for the decline in risky behavior do not arrive until the mid-20s:

> [T]he development of self-regulatory capacities [] occurs over the course of adolescence and during the 20s. Considerable evidence suggests that higher level cognition, including the uniquely human capacities for abstract reasoning and deliberative action, is supported by a recently evolved brain system including the lateral prefrontal and parietal association cortices and parts of the anterior cingulate cortex to which they are highly interconnected.

Laurence Steinberg, *A Social Neuroscience Perspective on Adolescent Risk-Taking*, 28 Dev.'l Rev. 78, 93 (2008); *see also* Elizabeth P. Shulman, et. al., *The Dual Systems Model: Review,*

*Reappraisal, and Reaffirmation*, 17 Devl.l Cognitive Neuroscience 103, 103 (2016) ("We review evidence from both the psychological and neuroimaging literatures that has emerged since 2008, when this perspective was originally articulated. Although there are occasional exceptions to the general trends, studies show that, as predicted, psychological and neural manifestations of reward sensitivity increase between childhood and adolescence, peak sometime during the late teen years, and decline thereafter, whereas psychological and neural reflections of better cognitive control increase gradually and linearly throughout adolescence and into the early 20s.").

As Dr. Steinberg explains in *Should the Science of Adolescent Brain Development Inform Public Policy*, Vol. XXVIII, Issue 3 (Spring 2012):

> There is now incontrovertible evidence that adolescence is a period of significant changes in brain structure and function. Although most of this work has appeared just in the past 15 years, there is already strong consensus among developmental neuroscientists about the nature of this change. And the most important conclusion to emerge from recent research is that important changes in brain anatomy and activity take place far longer into development than had been previously thought.

*Id.* at 1.

Dr. Steinberg further noted: "Reasonable people may disagree about what these findings may mean as society decides how to treat young people, but there is little room for disagreement about the fact that adolescence is a period of substantial brain maturation with respect to both structure and function." *Id.*

The significant changes in brain structure and function that take place during late adolescence underscore that, for the three reasons discussed in *Roper*, an individual such as Payton Gendron who committed his crimes at age 18 "cannot with reliability be classified among the worst offenders." *Roper*, 543 U.S. at 569.

8

First, as in *Roper*, "as any parent knows and as the scientific and sociological studies . . . tend to confirm, [a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions . . . It has been noted that adolescents are overrepresented statistically in virtually every category of reckless behavior." *Id.* (internal quotations omitted).

The recent scientific literature discussed above strongly suggests that "young adulthood is a developmental period when cognitive capacity is still vulnerable to negative emotional influences. This diminished capacity is paralleled by immature engagement of prefrontal regions that are important for overriding emotionally triggered actions." Cohen et al., supra, at 787. "Around the world, adolescence is a time when individuals are inclined to pursue exciting and novel experiences but have not yet fully developed the capacity to keep impulsive behavior in check." Steinberg, et al. (2018), *supra*, at 12. "Impulsiveness—acting in an unplanned and reactive, or less thought out, fashion—is often considered a quintessential adolescent characteristic that predisposes adolescents to engage in reckless behaviors." Shulman, et al., *supra*, at 109.

In fact, older adolescents are especially prone to risky behaviors. *See* Alexandra O. Cohen, et. al, *When is an Adolescent an Adult? Assessing Cognitive Control in Emotional and Nonemotional Contexts*, 27 Psych. Sci. 549, 549 (2016). Rather than decreasing at age 18, the desire to seek risk actually increases between the ages of 18 and 21 before starting to taper off later. So "individuals in the young adult period (i.e. ages 18-21)" are even more likely to engage in risky behavior than younger adolescents. *See* Marc Rudolph, et. al., *At Risk of Being Risky: The Relationship between 'Brain Age' Under Emotional States and Risk Preference*, 24 Devl.

Cognitive Neurosci. 93, 102 (2017) ("[I]t was individuals in the young adult period (*i.e.* ages 18–21) who were at the greatest risk to be risky"); Steinberg (2008), *supra*,, at 79 ("[A]s a general rule, adolescents and young adults are more likely than adults over 25 to binge drink, smoke cigarettes, have casual sex partners, engage in violent and other criminal behavior, and have fatal or serious automobile accidents, the majority of which are caused by risky driving or driving under the influence of alcohol."). Thus older adolescents are even more prone than their younger counterparts to act before they think. The National Institute of Medicine reported in 2015 that "young adults (aged eighteen to twenty-four) experience higher rates of morbidity and mortality than either adolescents or older adults from a wide variety of preventable causes, including automobile crashes, physical assaults, gun violence, sexually transmitted diseases, and substance abuse." Scott, et al., *supra,* at 645-46.

Second, an eighteen-year-old is "more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." *Roper*, 543 U.S. at 569. "The scientific research on adolescent development shows heightened sensitivity to rewards, threats, and social influences, which potentially renders adolescents more vulnerable to making poor decisions in these situations." Cohen, et al.*, supra,* at 771. "[C]onnectivity, especially between the prefrontal cortex and brain regions that process rewards and respond to emotional and social stimuli, is not complete until the midtwenties, which is why aspects of social and emotional functioning, such as impulse control and resistance to peer influence, are slower to mature. The bottom line is that brain systems that govern 'cold cognition' (thinking that takes place under ideal conditions) reach adult levels of maturity long before those that govern 'hot cognition' (thinking that takes place under conditions of emotional or social arousal)." Scott, et al., *supra*, at 651-52. Moreover, while it is well recognized that "[a]dolescence is a transitional period of development

characterized by heightened sensitivity to peer influence, social cues, and rewards," in the real

world, "social interactions that take place among teenagers involve multiple contextual factors"

and thus "[t]o the extent that these influences have synergistic effects, prior research may

underestimate the impact of social influences and rewards on adolescent choices and actions."

Kaitlyn Breiner, et. al., *Combined Effects of Peer Presence, Social Cues, and Rewards on*

*Cognitive Control in Adolescents*, 60 Devl. Psychobiology 292, 292-93 (2018).

      Third, the character of an 18-year-old "is not as well formed as that of an adult. The

personality traits of [eighteen-year-olds] are more transitory, less fixed." *Roper*, 543 U.S. at 569.

Personality traits are just as transient in late adolescents as they are in juveniles. Put simply, the

personality or character of late adolescents is not yet formed due to the lack of maturity in the

developing brain. "[Y]oung adulthood is a developmental period when cognitive capacity is still

vulnerable to the emotional influences that affect adolescent behavior, in part due to continued

development of prefrontal circuitry involved in self-control." Cohen, et al., *supra,* at 771.

"Recent evidence suggests that functional connectivity between prefrontal cognitive control and

reward circuitry increases from adolescence to adulthood, demonstrating that adolescents may

have weaker prefrontal-reward connectivity compared to older age groups and thus diminished

control in the presence of potential rewards." Breiner, et al., *supra*, at 293.

      In sum, "[t]hese differences render suspect any conclusion that [an eighteen-year-old]

falls among the worst offenders. The susceptibility of [eighteen-year-olds] to immature and

irresponsible behavior means their irresponsible conduct is not as morally reprehensible as that

of an adult." *Roper*, 543 U.S. at 570. Thus, the central point of Laurence Steinberg & Elizabeth

Scott, *Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished*

*Responsibility, and the Juvenile Death Penalty*, 58 Am. Psychologist 1009, 1016 (2003), the

article which informed the Court's conclusion in *Miller*, 567 U.S. at 471, that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds" is still valid. The only difference today is, Dr. Steinberg would apply the article's conclusions to "the whole adolescent period." *Cruz v. United States*, Case No. 3:11cv787(JCH) (D. Conn. Sept. 13, 2017) (testimony of Dr. Steinberg), at 22.

In conclusion, the science is as clear and uniform: People under 21 are not yet adults and should not be punished as such.[3]

### B. Consistent With The New Consensus In The Scientific Community Concerning Late-Adolescent Brain Development, There Is A National Consensus Against The Execution Of 18-Year-Olds

The Eighth Amendment draws its meaning from the "evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958). Objective indicators aid the Supreme Court's effort to determine whether a punishment practice or method is consistent with contemporary standards of decency. In *Roper*, for example, the Court counted 30 states that rejected the death penalty for juvenile offenders—"12 that ha[d] rejected it altogether and 18 that maintain[ed] it but, by express provision or judicial interpretation, exclude[d] juveniles from its reach." *Roper*, 543 U.S. at 564; *see also Kennedy v. Louisiana*, 554 U.S. 407, 422 (2008) (noting the consistent approach of measuring the objective indicia of consensus).

In *Atkins v. Virginia*, 536 U.S. 304, 316 (2002), holding that intellectually disabled persons are exempt from execution, the Court looked beyond a narrow count of statutes. In

---

[3] This Court need not resolve the upper limit of what age the 8th Amendment would exempt from execution. It need only decide whether the new scientific consensus and objective indicia of evolving standards of decency require exempting a person, such as Payton Gendron, who was 18 years old at the time of the offenses charged against him.

addition to the 30 states that had formally barred the death penalty at the time of *Atkins*—either generally or specifically for the intellectually disabled—the Court also noted that although states like New Hampshire and New Jersey "continue[d] to authorize executions," neither one had performed an execution in decades, which meant "there [was] little need to pursue legislation barring the execution of the mentally retarded in those States." *Id.*; *see also Kennedy*, 554 U.S. at 433 ("There are measures of consensus other than legislation. Statistics about the number of executions may inform the consideration whether capital punishment for the crime of child rape is regarded as unacceptable in our society.").

And in *Hall*, 572 U.S. 701 (2014), the Court also indicated that long-term disuse coupled with executive action counted against the permissibility of a challenged punishment practice. *Id.* at 716 (placing on the abolitionist side of the "ledger" the "18 States that have abolished the death penalty, either in full or for new offenses, and Oregon, which has suspended the death penalty and executed only two individuals in the past 40 years"). In each of these opinions, the Court recognized that the risk of cruel and unusual punishment was sufficient to warrant prohibiting the execution of an entire class.[4]

As will be demonstrated, in 37 jurisdictions there is little or no practical possibility of executing a person who was 18 at the time of the offense. While a handful of jurisdictions continue to permit the imposition of capital punishment on 18-year-olds, most of these

---

[4] In *Roper*, *Atkins*, and *Hall*, the Court recognized that not all juvenile or all intellectually disabled offenders had diminished culpability in a way that required exemption from execution; rather, in each instance, the Court recognized that the risk of executing individuals in a manner that was cruel and unusual required exemption of the entire class. For example, in *Roper*, the Court interpreted the consensus against the juvenile death penalty to flow not necessarily from the rigid belief that no juvenile could ever possess sufficient culpability to warrant a death sentence, but rather as a marker that society cannot tolerate the risk that "a youthful person" might "receive the death penalty despite insufficient culpability." *Roper*, 543 U.S. at 572–73.

jurisdictions imposedthose sentences during a period in the 1990's when youth was viewed as an aggravating rather than mitigating circumstance, and/or imposed such sentences well before the new scientific consensus concerning brain maturation first emerged in the years following *Roper*. Executing individuals barely old enough to vote, unable to drink legally or rent a car, unable to serve in Congress, and still in the throes of cognitive development—based upon now-disregarded views of culpability—undermines the Supreme Court's commitment to dignity, and the possibility of rehabilitation and redemption. *See Hall*, 572 U.S. at 708 ("The Eighth Amendment's protection of dignity reflects the Nation we have been, the Nation we are, and the Nation we aspire to be."); *id.* at 724 ("Florida's law contravenes our Nation's commitment to dignity and its duty to teach human decency as the mark of a civilized world. The States are laboratories for experimentation, but those experiments may not deny the basic dignity the Constitution protects."); *Roper*, 543 U.S. at 572 ("By protecting even those convicted of heinous crimes, the Eighth Amendment reaffirms the duty of the government to respect the dignity of all persons."); *Trop v. Dulles*, 356 U.S. 86, 100 (1958) (plurality opinion) ("The basic concept underlying the Eighth Amendment is nothing less than the dignity of man").

Reviewing the "objective indicia of society's standards, as expressed in legislative enactments and state practice with respect to executions," *Kennedy*, 554 U.S. at 408, reveals a growing consensus that executing 18-year–olds is excessive. Of the fifty-two jurisdictions in the United States (fifty states, the District of Columbia, and the federal government), there is no reasonable likelihood of executing an 18-year-old in 37 jurisdictions.

Twenty-four jurisdictions have removed the death penalty as a possible punishment.
Twenty-three states[5] plus the District of Columbia do not have the death penalty.[6] Eleven of
these states have rejected capital punishment since *Roper*, in the past 19 years: New Jersey
(2007), New York (2007), New Mexico (2009), Illinois (2011), Connecticut (2012), Maryland
(2013); Delaware (2016), New Hampshire (2019), Colorado (2020), Virginia (2021),
Washington (2023). *See Commonwealth of Kentucky v. Bredhold*, No. 14-CR-161, Order
Declaring Kentucky's Death Penalty Statute as Unconstitutional (Fayette Circuit Court, August
1, 2017) at 4 (holding unconstitutional the death penalty for persons under the age of 21, noting
"[s]ince *Roper*, six (6) states have abolished the death penalty, making a total of nineteen (19)
states and the District of Columbia without a death penalty statute"), *vacated on other grounds
by* 599 S.W.3d 409 (Ky. 2020).

Six additional jurisdictions have moratoria in place suspending use of the death penalty,
several with a long history of disuse. As the Court observed in *Hall*, states that have suspended
use of the death penalty, coupled with long-term disuse, are similar to those that have abolished
the punishment. *Id.* at 716 (placing "on the abolitionist side of the ledger" "Oregon, which has
suspended the death penalty and executed only two individuals in the past 40 years"). The
growing concern over the ability of states to identify the most culpable offenders contributed to

---

[5] Alaska, Colorado, Connecticut, Delaware, Hawaii, Illinois, Iowa, Maine, Maryland,
Massachusetts, Michigan, Minnesota, New Hampshire, New Jersey, New Mexico, New York,
North Dakota, Rhode Island, Vermont, Virginia, Washington, West Virginia, and Wisconsin.

[6] The death penalty is also prohibited under the constitutions of Puerto Rico and the
Commonwealth for the Northern Mariana Islands. *See* P.R. Const. Art. II § 7 ("The death penalty
shall not exist."); C.N.M.I. Const. Art. I § 4(i) ("Capital punishment is prohibited."). In Guam
and the U.S. Virgin Islands, the death penalty is not a possible sentence. *See, e.g.,* 9 G.C.A. §
16.39(b) (punishment for aggravated murder is life); 14 V.I. C. § 923(a) (providing for life in
prison as punishment for murder).

formal moratoriums in the federal system and five states: California,[7] Pennsylvania,[8] Oregon,[9] Arizona,[10] and Tennessee.[11] In addition, in 2021 the United States government declared a hold on federal executions.[12] *Cf. United States v. Fell*, 224 F. Supp. 3d 327,  349 (D. Vt. 2016) ("Governors in four more states with death penalty statutes on the books have imposed moratoria on capital punishment."); *Bredhold*, at 4 (in 2017: "Additionally, the governors of four (4) states have imposed moratoria on executions in the last five (5) years.")

Seven additional states have exhibited long-term disuse and have little or no prospect of executing 18-year-olds. Most of these jurisdictions have no individual on death row who was 18 years of age and have not in the modern era executed someone who was that young at the time of the offense. A small handful may have a single young person on death row, sentenced decades ago, reflecting the broad trend towards disuse, and the evolving consensus that executing 18-

---

[7] *See* Office of the Governor Gavin Newsom, Governor Gavin Newsom Orders a Halt to the Death Penalty in California, March 13, 2019, *available at* https://www.gov.ca.gov/2019/03/13/governor-gavin-newsom-orders-a-halt-to-the-death-penalty-in-california/.

[8] *See* Governor Tom Wolf, Memorandum of Moratorium, February 13, 2015, *available at* https://www.scribd.com/doc/255668788/Death-Penalty-Moratorium-Declaration.

[9] *See* Governor John Kitzhaber, Executive Order, November 22, 2011, *available at* https://deathpenaltyinfo.org/gov-john-kitzhaber-oregon-declares-moratorium. Governor Kate Brown continued Gov. Kitzhaber's hold on executions and in 2022 commuted all death sentences of those on Oregon's death row. Governor Kate Brown has continued this moratorium.

[10] *See* Jacques Billeaud, *Arizona governor won't proceed with execution set by court*, Associated Press, March 3, 2023.

[11] *See* https://deathpenaltyinfo.org/news/tennessee-gov-says-no-death-warrants-until-execution-protocol-problems-fixed.

[12] *See* Memo FROM: THE ATTORNEY GENERAL MORATORIUM ON FEDERAL EXECUTIONS PENDING REVIEW OF POLICIES AND PROCEDURES, July 1, 2021, available at https://www.justice.gov/opa/page/file/1408636/download.

year-olds is excessive: 1) Wyoming has executed one person in the last 50 years and has had no one on its death row since 2014, when the last death sentence (for a prisoner who was 43 at the time of the offense) was overturned. 2) Montana has two individuals on death row; one was 24 and one was 26 at the time of the offense. In the last 50 years, it has executed three people—all older than 30 at the time of the offense. 3) Kansas, as the *Hall* Court noted, "has not had an execution in almost five decades." *Hall*, 572 U.S. at 716. Kansas has nine people under sentence of death, but only one individual under the age of 23. 4) Utah has seven people on death row, none under the age of 22. Two of the seven people executed in Utah over the last 50 years were 21 years-old or younger; however, those executions occurred over 25 years ago. 5) Idaho has executed two offenders in the last 15 years. Neither was under the age of 21 years old at the time of his offense. Currently, Idaho has eight people on death row. Only James Hairston was under 22 years old. His sentence was imposed nearly 30 years ago. 6) South Dakota has executed 5 persons in the last nearly 50 years. It has one person remaining on its row; he was under the age of 22 at the time of the offense. South Dakota has not sentenced a young person to death in over 15 years. 7) Kentucky has executed three individuals since 1968. Each was well older than 22 at the time of offense. Kentucky has 26 people on death row. Only two were under the age of 22 at the time of the offenses. One, Ronnie Lee Bowling, was sentenced to death for an offense in 1989; the other, Karu Gene White, was sentenced to death for an offense in 1979.

Even in jurisdictions that continue to execute and sentence individuals to death, there is a strong trend towards exempting young adults from execution. The broad trend is reflected in the aggregate numbers. As one court has found, "[o]f the 31 death penalty states, only about half continue to impose the penalty on a regular basis and in these states, the number of death sentences has dropped greatly over the last decade. In 2015, there were 49 death sentences

nationally. This number is down from a peak of 315 in 1996." *Fell*, 224 F. Supp. 3d at 350. "The

principal change over the course of the last 20 years has been a marked decrease in death

sentences and executions." *Id.*

In 2007, 30 individuals under the age of 22 were sentenced to death. In 2017, that

number was eight. And as the court found in *Bredhold*,

> Of the thirty-one (31) states with a death penalty statute, only nine (9) executed
> defendants who were under the age of twenty-one (21) at the time of their offense
> between 2011 and 2016. Those nine (9) states have executed a total of thirty-three
> (33) defendants under the age of twenty-one (21) since 2011- nineteen (19) of
> which have been in Texas alone. Considering Texas an outlier, there have only
> been fourteen (14) executions of defendants under the age of twenty-one (21)
> between 2011 and 2016, compared to twenty-nine (29) executions in the years
> 2006 to 2011, and twenty-seven (27) executions in the years 2001 to 2006 (again,
> excluding Texas). In short, the number of executions of defendants under twenty-
> one (21) in the last five (5) years has been cut in half from the two (2) previous
> five- (5) year periods.

*Id.* at 4 (relying on statistics provided by the state).

The trend is also reflected in the practice of the United States government. In the

"modern" era of capital punishment, the federal government has executed 16 individuals since

the reinstatement of a federal death penalty in 1988. In the early 2000s, it executed three persons;

in 2003, it executed a Black man named Louis Jones for crimes he committed when he was 44

years of age; in 2001, Timothy McVeigh was executed for crimes he committed when he was 26

years of age; and Juan Garza was executed the same year for crimes he committed when he was

34 years of age.[13]

---

[13] The data in this paragraph and the next are derived from Exhibit A, a chart obtained from the
Federal Death Penalty Resource Counsel Project which contains available information on the age
of defendant at the time of crime/indictment, and case status, for all authorized federal death
penalty cases.

Then, following a nearly 20-year hiatus, in the final months of Donald Trump's administration the federal government, carried out 13 executions. Three were under the age of 21, when they were sentenced 23 and 25 years previously; the rest were older: Daniel Lee (22), Wesley Purkey (45), Dustin Honken (25), Lezmond Mitchell (20, in 2001), Keith Nelson (24), William Lecroy (31), Chistopher Vialva (18, in 1999), Orlando Hall (23), Brandon Bernard (18, in 1999), Alfred Bourgeois (38), Lisa Montgomery (36), Cory Johnson (23), and Dustin Higgs (23).[14]

Age information currently exists for 543 authorized federal capital defendants. (Ex. A). Of those 543 authorized defendants, 101 of them were less than 21 years of age at the time of the commission of their charged crimes. Of these 101 authorized defendants, only 12 of them

---

[14] Prior to the Trump executions, the federal government had not executed anyone less than 21 years of age at the time of the offense since 1952, when it executed a 20-year-old Black man named William Tyler, Jr. Before that, the next closest in time execution of someone less than 21 years of age was in 1934, when the federal government executed another 20-year-old Black man named Joseph Jackson.  Another 20-year-old Black man named George Banton was executed in 1923. A 20-year-old white man named John Proctor was executed in 1928. A 19-year-old white man named John McHenry was executed in 1922. According to the available data, these were the only five individuals less than 21 years of age at the time of the offense that the federal government executed in the period 1901-1976, although in that time period it carried out 120 executions. Perhaps more telling, in the entire period from 1795-1976, during which the federal government executed 352 individuals, available data indicates that only 18 of these persons were less than 21 years of age at the time of execution. Twelve of those persons were Black or Native American. The youngest person the federal government has executed appears to be 17-year-old Isaac Filmore, a Native American who was executed in Arkansas in 1874.

It is also significant that in all three Trump-era executions of persons under 21, the death verdicts were handed down prior to 2008, when the current scientific consensus regarding brain maturation began to develop, and prior to *Roper*. And in Mitchell's case, trial counsel failed even to ask for his age to be listed as a mitigating factor, while in Bernard's and Vialva's cases, the jurors failed to find that the undisputed fact of their ages existed, let alone that it was mitigating. *See* Bernard, Vialva, and Mitchell verdict forms, available at https://fdprc.capdefnet.org/verdict-forms.

(2.2%) have had sentences of death imposed.[15] And of those 12, five—nearly half—had those sentences overturned on appeal or in § 2255 post-conviction proceedings.[16] Thus, the overwhelming majority of cases involving federal capital defendants less than 21 years of age were resolved either by the government agreeing to a disposition less than death, by a jury finding that the death penalty was not appropriate, or, in two cases, by acquittal.

The overall trend in the states and the federal government reflects the on-the-ground consensus that executing individuals for what they have done at age 18 is excessive and inappropriately precludes the possibility of rehabilitation and redemption. *See Bredhold*, at 5 ("Contrary to the Commonwealth's assertion, it appears there is a very clear national consensus trending toward restricting the death penalty, especially in the case where defendants are eighteen (18) to twenty-one (21) years of age.").

## III.    CONCLUSION

The new current scientific consensus and the evolving standards of the community point in the same direction: persons in the developmental period into their early 20s—but at the very least persons like Payton Gendron who were still 18 years old at the time of their charged capital offenses—thus, should be treated differently than fully developed adults under the Supreme Court's Eighth Amendment death-penalty jurisprudence. Their continuing brain development

---

[15] The twelve defendants, their ages at the time of the crime, their race, the date of the death sentence, and the jurisdictions from which they were sentenced are as follows: Jorge Torrez (20) (Latino) (2014) (E.D. Va.); Dzhokhar Tsarnaev (19) (white) (2015) (D. Mass.); Ronell Wilson (20) (Black )(2013) (E.D.N.Y.); Rejon Taylor (19) (Black) (2008) (E.D. Tenn.); Thomas Hagar (20) (Black) (2007 ) (E.D. Va.); Kenneth Lighty (20 ) (Black ) (2005) (D. Md.); Donald Fell (20) (white) (2005) (D. Vt); Lezmond Mitchell (20) (Native American) (2003) (D. Ariz.); Brandon Bernard (18) (Black) (2000) (W.D. Tex.); Christopher Vialva (19) (Black) (2000) (W.D. Tex.) (co-defendant of Bernard); Billie Allen (19) (Black) (1998) (E.D. Mo.); Jeffrey Paul (18) (white) (1997) (W.D. Ark).

[16] Paul, Tsarnaev, Lighty, Wilson (twice reversed), Fell.

results in a lesser culpability, recognized in the country's laws and practices, that should exempt them, like persons a few months younger, from capital punishment.

For the foregoing reasons, Payton Gendron requests that this Court grant this Motion and strike the death notice against him.

Dated:       June 10, 2024
               Buffalo, New York

                                            _s/Sonya A. Zoghlin_
                                            Sonya A. Zoghlin
                                            Assistant Federal Public Defender

                                            _s/Anne M. Burger_
                                            Anne M. Burger
                                            Supervisory Assistant Federal Public Defender

                                            _s/MaryBeth Covert_
                                            MaryBeth Covert
                                            Senior Litigator

                                            _s/Julie Brain_
                                            Julie Brain
                                            Attorney at Law