IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

───────────────────────────────

UNITED STATES OF AMERICA,

           v.                          22-CR-109-V

PAYTON GENDRON,

               Defendant.

───────────────────────────────

### GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO STRIKE THE DEATH PENALTY AS A POSSIBLE PUNISHMENT IN THIS CASE (DOCKET NO. 181)

The United States of America, by and through its attorneys, Trini E. Ross, United States Attorney for the Western District of New York, and Kristen M. Clarke, Assistant Attorney General, Civil Rights Division, and Joseph M. Tripi and Brett A. Harvey, Assistant United States Attorneys; Laura B. Gilson, Trial Attorney, Civil Rights Division; and Michael Warbel, Trial Attorney, Criminal Division, of counsel, respectfully submits this response in opposition to the defendant's Motion To Strike The Death Penalty As A Possible Punishment In This Case [Docket No. 181].

The defendant moves the Court to find the federal death penalty constitutes cruel and unusual punishment prohibited by both the Fifth and Eighth Amendments and to strike the Notice of Intent to Seek the Death Penalty in this case. Docket No. 181 at 1. The motion is a sprawling facial attack upon capital punishment and the Federal Death Penalty Act, 18 U.S.C. §§ 3591-99 ("FDPA"). The defendant's motion fails. Binding authority from the Supreme Court and the Second Circuit Court of Appeals has consistently held that the federal death penalty comports with both the Fifth and Eighth Amendments.

As the defendant recognizes, his arguments are not new.  *See* Docket No. 181 at 5. Indeed, defendants have similarly raised and courts have regularly rejected such arguments in almost every capital case litigated in federal courts in the past 20 years.[1]  The body of this Supreme Court and circuit court authority includes the Second Circuit Court of Appeals decision in *United States v. Aquart*, 912 F.3d 1 (2d Cir. 2018) — which is binding precedent the defendant fails to acknowledge.[2]  Where the defendant's arguments are not foreclosed by

---

[1] *See, e.g.*, *United States v. Fell*, 360 F.3d 135 (2d Cir. 2004); *United States v. Coonce*, 932 F.3d 623, 645-46 (8th Cir. 2019); *United States v. Lawrence*, 735 F.3d 385 (6th Cir. 2013); *United States v. Snarr*, 704 F.3d 368, 398-400 (5th Cir. 2013); *United States v. Fields*, 516 F.3d 923 (10th Cir. 2008); *United States v. Mitchell*, 502 F.3d 931 (9th Cir. 2007); *United States v. Sampson*, 486 F.3d 13 (1st Cir. 2007); *United States v. Fulks*, 454 F.3d 410 (4th Cir. 2006); *United States v. Saipov*, No. 17-722, 2023 WL 371531, *2-*3-*6, *7-*9 (S.D.N.Y. Jan. 24, 2023); *United States v. Schlesinger*, No. 18-2719, 2021 WL 5578900, *2-*11 (D. Ariz. Nov. 29, 2021); *United States v. Bowers*, No. 18-292, 2020 WL 1675916, *2-*4 (W.D. Pa. Apr. 6, 2020); *United States v. Candelario-Santana*, 368 F. Supp. 3d 316, 319-21 (D.P.R. 2019); *United States v. Arnold*, 412 F. Supp. 3d 732, 736-40 (E.D. Mich. 2019); *United States v. Mills*, 393 F. Supp. 3d 650, 657-58 (E.D. Mich. 2019); *United States v. Council*, No. 17-866, Docket No. 414 (D.S.C. May 7, 2019); *United States v. Smith*, No. 16-86, 2019 WL 11863731, *1-*3 (D. Alaska Apr. 22, 2019); *United States v. Christensen*, No. 17-20037, 2019 WL 651501, *2 (C.D. Ill. Feb. 15, 2019); *United States v. Ofomata*, No. 17-201, 2019 WL 527696, *2 (E.D. La. Feb. 11, 2019); *United States v. George*, No. 17-201, 2019 WL 537186, *7-*8 (E.D. La. Feb. 11, 2019); *United States v. Madison*, 337 F. Supp. 3d 1186, 1198-1200 (M.D. Fla. 2018); *United States v. Con-Ui*, No. 13-123, 2016 WL 9331115, *4-*7 (M.D. Pa. Jan. 28, 2016); *United States v. Roof*, 225 F. Supp. 3d 413 (D.S.C. 2016), aff'd, 10 F.4th 314 (4th Cir. 2021); *United States v. Sampson*, No. 01-10384, 2015 WL 7962394, *8-*24 (D. Mass. Dec. 2, 2015); *United States v. Ciancia*, No. 13-902, Docket No. 141 at 3-4 (C.D. Cal. May 15, 2015); *United States v. Briseño*, No. 11-77, 2015 WL 163526, *3-*4, *6-*7 (N.D. Ind. Jan. 12, 2015) (discussing repetitive nature of the defendant's claims); *United States v. Montgomery*, No. 11-44, 2014 WL 1453527, *6 (W.D. Tenn. Apr. 14, 2014); *United States v. Coonce*, No. 10-3029-01, 2014 WL 1018081, *18 (W.D. Mo. Mar. 14, 2014) (adopting magistrate judge's report and recommendation upholding the constitutionality of the FDPA); *United States v. Savage*, No. 07-cr-550, 2013 WL 2060932, *4-*5 (E.D. Pa. May 15, 2013); *United States v. Basciano*, 763 F. Supp. 2d 303, 339-40 (E.D.N.Y. 2011).

[2] In *Aquart*, the Second Circuit affirmed the defendant's convictions for murder in aid of racketeering and murder in furtherance of a continuing criminal enterprise, 912 F.3d at 28, but vacated the defendant's death sentences and remanded for a new sentencing hearing due to prosecutorial misconduct in closing arguments during the penalty phase of trial.  *Id.* at 43-44.  The court, nonetheless, still reviewed Aquart's many constitutional challenges to the death penalty and the FDPA because, if successful, relief on the constitutional claims would

binding authority, they are wholly unsupported by caselaw and contrary to overwhelming persuasive authority from other courts.  Accordingly, this Court must deny the defendant's motion in its entirety and deny his request for an evidentiary hearing.

## GENERAL PRINCIPLES

### I.    This Court Must Following Binding Supreme Court and Second Circuit Precedents.

It is longstanding Supreme Court precedent that capital punishment is constitutional. *Bucklew v. Precythe*, 587 U.S. 119, 129 (2019) ("The Constitution allows capital punishment.") (citations omitted).  *See also Gregg v. Georgia*, 428 U.S. 153, 186-87 (1976).  This authority along with other binding Supreme Court decisions stand in stark contrast to several of the defendant's arguments.  When the Supreme Court has directly decided an issue, lower federal courts *must* follow the case that directly controls, leaving to the Supreme Court only the prerogative of overruling its own decisions.  *See Aquart*, 912 F.3d at 49 ("Whatever the merits of Aquart's argument, only the Supreme Court can overrule *Gregg* or recognize exceptions thereto.").  *See also United States v. Barnes*, 532 F. Supp. 2d 625, 641 (S.D.N.Y. 2008) ("If the

have been vacatur and remand for the imposition of a term of imprisonment, not remand for a new sentencing hearing and a possible second death sentence.  *Id*. at 48.

The Second Circuit ultimately rejected Aquart's many constitutional challenges to the FDPA that mirror many of the claims made by the defendant in the instant case.  In the instant motion, however, defense counsel fail to recognize and alert this Court to this binding, on-point authority from *Aquart*, though they are clearly aware of the case because they cite it repeatedly for other propositions of law.  *See* Docket No 181 at 18 (citing *Aquart* for the proposition that appellate courts have found a variety of trial errors in capital cases); *id*. at 22 (citing a hearing transcript from a post-remand district court hearing); *id*. at 27 (citing a victim impact statement made at the non-capital re-sentencing hearing); *id*. at 27 n. 26 (citing decision to vacate Aquart's death sentence because of prosecutorial misconduct in the sentencing phase); *id*. at 28 (citing trial judge's comments at non-capital re-sentencing hearing).

Supreme Court decisions [upholding the death penalty] are to be reevaluated in light of evolving standards of decency under the Eighth Amendment, as defendants urge, they must be reevaluated by the Supreme Court, not us.") (quotation omitted).  By the same token, this Court must also adhere to rulings from the Second Circuit.  *See*, *e.g.*, *Saipov*, 2023 WL 371531 at *3 (recognizing *Aquart* as "controlling" and "binding" in deciding Saipov's challenges to the FDPA).

## II.  To Support his Facial Challenges to the FDPA, the Defendant Must Establish that no Set of Circumstances Exists Under which the Act Would be Valid.

"Statutes duly enacted by Congress are presumed to be constitutional."  *Sampson*, 486 F.3d at 20 (citing *INS v. Chadha*, 462 U.S. 919, 944 (1983)).  Thus, the defendant has the burden of proving that the FDPA is unconstitutional.  *Id.* (citing *Lujan v. G & G Fire Sprinklers, Inc.*, 532 U.S. 189, 198 (2001)).  His burden is high.  "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."  *United States v. Salerno*, 481 U.S. 739, 745 (1987).  *See also United States v. Le*, 902 F.3d 104, 117 n. 12 (2d Cir. 2018).  The Second Circuit has found that facial challenges are "disfavored." *Copeland v. Vance*, 893 F.3d 101, 111 (2d Cir. 2018) (explaining that facial challenges "'often rest on speculation,' flout the 'fundamental principle of judicial restraint' that courts should avoid unnecessary constitutional adjudication, and 'threaten to short circuit the democratic process.'") (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450-51 (2008)).  What is more, where a statute is susceptible to both constitutional and unconstitutional construction, a court is obligated to adopt the construction that avoids "grave

and doubtful constitutional questions." *Jones v. United States*, 526 U.S. 227, 239 (1999) (internal quotation marks and citations omitted).

Federal courts have repeatedly applied this *Salerno* standard in evaluating facial challenges to the FDPA. *See*, *e.g.*, *United States v. Brown*, 441 F.3d 1330, 1367 (11th Cir. 2006) (denying facial challenge to the FDPA); *United States v. Robinson*, 367 F.3d 278, 290 (5th Cir. 2004) (same); *Briseño*, 2015 WL 163526 at *3 (same); *Montgomery*, 2014 WL 1453527 at *4-*5 (same); *Coonce*, 2014 WL 1018081, *22 n. 10 (same); *United States v. Taylor*, 635 F. Supp. 2d 1243, 1246 (D.N.M. 2009) (same). This Court must apply this same rigorous standard now.

## III. Evidentiary Hearings are Warranted Only when the Defendant Raises a Material Issue of Fact Requiring Relief.

An evidentiary hearing is ordinarily required only if "contested issues of fact . . . are in question." *United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992) (internal quotation marks and citations omitted). *See also United States v. Durand*, 767 F. App'x 83, 87 (2d Cir. 2019) (same). A defendant may not rely on "bald assertions," and "[w]ithout specification of the factual basis . . . the district court is not required to have a hearing." *United States v. Mathurin*, 148 F.3d 68, 69 (2d Cir. 1998). *See also United States v. Fugate*, No. 21-CR-127-LJV-MJR, 2022 WL 18359077, at *1 n.1 (W.D.N.Y. July 13, 2022), *report & recommendation adopted*, 2023 WL 279815 (W.D.N.Y. Jan. 18, 2023) (denying evidentiary hearing where there are no contested issues of fact).

"General and conclusory factual allegations which are based upon mere suspicion or conjecture . . . will not suffice to necessitate a hearing." *Gentile v. Cty. of Suffolk*, 926 F.2d 142, 148 (2d Cir. 1991) (internal quotation marks and citation omitted).  *See also United States v. Cobb*, 544 F. Supp. 3d 310, 339 (W.D.N.Y. 2021) (denying evidentiary hearing).  Moreover, if facts urged in support of a hearing would not entitle the moving party to relief as a matter of law, no evidentiary hearing is required.  *See Gentile*, 926 F.2d at 148.  As set forth herein, because the defendant fails to establish that material issues of fact are in dispute and because the defendant is not entitled to relief as a matter of law, the Court should deny the defendant's requests for an evidentiary hearing.

## LAW AND ARGUMENT[3]

### I.   Binding Precedent Forecloses the Defendant's Argument that Evolving Standards of Decency Render the Death Penalty Unconstitutional.

The defendant submits that evolving standards of decency, as reflected primarily in public polling and state legislative "trends" in the past five years, warrant this Court's

---

[3] Because it does not state a claim for relief, the "Introduction and Background" section of the defendant's motion, Docket No. 181 at 1-6, does not merit a substantive response herein. Nonetheless, the government does not concede any of the statements made by the defendant; indeed, many of the statements contained therein are false or misleading.  For instance, the FDPA did not create *any* new capital offenses.  In passing the FDPA, Congress merely established a capital sentencing scheme that must be followed to pursue the death penalty for violations of statutes that carry a potential sentence of death. *See United States v. Barnette*, 390 F.3d 775, 789-90 (4th Cir. 2004) ("[T]he Federal Death Penalty Act is nothing more nor less than the action of Congress to insure that the procedure in federal courts in the prosecution of a case involving the application of the death penalty complies with the Constitution."). Further, while the Supreme Court did not categorically exempt mentally retarded/intellectually disabled defendants from capital punishment prior to its 2002 decision in *Atkins v. Virginia*, 536 U.S. 304 (2002), the FDPA has prohibited executing such individuals since its inception.  *See* 18 U.S.C. § 3596(c).  Likewise, while the Court did not categorically exempt juveniles from capital punishment until its 2005 decision in *Roper v. Simmons*, 543 U.S. 551 (2005), the FDPA has done so since its inception.  *See* 18 U.S.C. § 3591(a).

consideration and render the federal death penalty *per se* unconstitutional (*i.e.*, cruel and unusual).  *See* Docket No. 181 at 30-32.  Binding Supreme Court and Second Circuit precedent hold otherwise.  The defendant's argument therefore fails.[4]

The Constitution expressly authorizes the death penalty as a form as punishment.  *See* U.S. Const., amend V ("No person shall be held to answer for a capital . . crime, unless on a presentment or indictment of a Grand Jury . . . nor be deprived of life . . . without due process of law. . ."). While the defendant attempts to marshal evidence of changing attitudes as a basis for declaring the death penalty unconstitutional, the Supreme Court has not altered its view or its rulings, consistently recognizing that capital punishment is, indeed, constitutional. *See Bucklew*, 587 U.S. at 129 ("The Constitution allows capital punishment."); *Glossip v. Gross*, 576 U.S. 863, 881 (2015) ("[W]e have time and again reaffirmed that capital punishment is not *per se* unconstitutional."); *Baze v. Rees*, 553 US. 35, 47 (2008) ("[W]e begin with the principle . . . that capital punishment is constitutional."); *Gregg*, 428 U.S. at 187 ("We hold that the death penalty is not a form of punishment that may never be imposed, regardless of the circumstances of the offense, regardless of the character of the offender, and regardless of the procedure followed in reaching the decision to impose it.").

In *Aquart*, the Second Circuit rejected an Eighth Amendment claim that is the same as the one now made by the defendant in the instant case explaining:

> This panel is precluded [from finding the death penalty as cruel and unusual] by controlling Supreme Court and circuit precedent, specifically *Gregg v.*

---

[4] Though the defendant presented this as the final claim in his motion, the government elects to respond to this issue first because it establishes a baseline for all other responses herein; that is, that the death penalty is constitutional.

> *Georgia*, 428 U.S. 153 (1976), and *United States v. Quinones*, 313 F.3d 49 (2d Cir.
> 2002). *Quinones* recognized that, in *Gregg*, the Supreme Court "expressly held
> . . . that capital punishment does not constitute a *per se* violation of the Eighth
> Amendment" for crimes involving intentional murder.

912 F.3d at 48-49 (quoting *Quinones*, 313 F.3d at 67 and internal citations omitted). The court

further reiterated that only the Supreme Court (by revising *Gregg*) or Congress (by revising the

FDPA) could abolish capital punishment for federal defendants accused of murder, like the

defendant here. 912 F.3d at 49 ("[O]nly the Supreme Court can overrule *Gregg* or recognize

exceptions thereto."). *See also Quinones*, 313 F.3d at 67-68 (same). *Aquart* controls, and this

Court must reject the defendant's motion. *See Saipov*, 2023 WL 371531 at *3 (noting that

Saipov conceded that *Aquart* foreclosed his evolving standards of decency challenge to the

constitutionality of the FDPA).


Any reevaluation of "evolving standards of decency" must be undertaken by the

Supreme Court, and the defendant's "evolving standards" challenge must be denied. Further

factual inquiry via an evidentiary hearing is unwarranted because, as a matter of law, there is

no circumstance under which this Court can grant the requested relief.


**II.    Binding Precedent Forecloses the Defendant's Claim that the FDPA Operates in
an Arbitrary and Capricious Manner and his Arguments are Otherwise Without
Merit.**

The defendant submits that decades' worth of studies, surveys, and experience

demonstrate that the FDPA operates in an unconstitutionally arbitrary and capricious

manner. Docket No. 181 at 7-19. Though he presents his claims under somewhat different

pretenses than many other capital defendants who have raised similar claims to no avail,[5] the thrust of his arguments are the same.  They boil down to the following: 1) that prosecutorial discretion to seek the death penalty renders the FDPA unconstitutional because the death penalty is arbitrarily sought; 2a) that the process of death qualifying capital juries fatally invalidates the FDPA; 2b) that capital juries are unable to comprehend instructions due to "information overload"; and 3) that trial errors unconstitutionally undermine the reliability of death sentences under the FDPA.  Binding Second Circuit precedent defeats many, if not all, of the defendant's arguments.  Where they are not entirely foreclosed, the defendant's arguments are wholly unsupported by law and contrary to overwhelming, persuasive authority from other federal courts.  Accordingly, this Court must collectively reject the defendant's arbitrariness claims.

### A. *Aquart* Establishes that the FDPA does not Operate Arbitrarily or Capriciously.

In *Furman v. Georgia*, 408 U.S. 238 (1972) (per curiam), the Supreme Court struck down then-existing death penalty statutes that offered no guidance to the sentencing bodies and were, therefore, constitutionally flawed.  This lack of guidance created the possibility that the death penalty would be imposed capriciously, or even worse, in a discriminatory manner. *See* 408 U.S. at 309-10 (Stewart, J., concurring).  Four years later, in *Gregg*, the Supreme Court upheld Georgia's revamped capital sentencing statute, explaining that the concerns expressed in *Furman*, that the death penalty not be imposed in an arbitrary or capricious manner, can

---

[5] *See* Footnote 1, *supra*, for citation to a non-exclusive list of the cases in which courts have rejected similar arbitrariness claims.

be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance.  428 U.S. at 195.

Applying these principles in *Aquart*, the Second Circuit squarely rejected any assertion that the FDPA operates arbitrarily.  The court explained that *Furman*, which had no majority opinion, was not based on the infrequent imposition of the death penalty, but rather with the *manner* in which it was imposed.  912 F.3d at 54 (stating that the capital scheme in *Furman* was unconstitutional because "Georgia's then-available sentencing procedures were inadequate to ensure that death sentences were not being arbitrarily and capriciously imposed in individual cases") (citing *Gregg*, 428 U.S. at 187, 189).  *See also Sampson*, 486 F.3d at 23 (stating same). The court further held that the FDPA is the kind of carefully crafted statute contemplated by *Gregg*, as it "(1) rationally narrow[s] the class of death-eligible defendants; and (2) permit[s] a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime."  *Id*. at 54-55 (internal quotation marks omitted and citing *Kansas v. Marsh*, 548 U.S. 163, 173-74 (2006)).[6]

---

[6] In particular, the *Aquart* court found that the FDPA (i) restricts the death penalty to an enumerated list of eligible crimes; (ii) "requires a bifurcated trial, first to determine guilt, and only then to determine punishment;" (iii) "limits jury discretion to vote a death sentence to those defendants unanimously found beyond a reasonable doubt to have acted (a) with specific culpable intent and (b) under circumstances specified in at least one statutory aggravating factor;" (iv) requires jurors to "consider non-statutory aggravating factors that it finds proved beyond a reasonable doubt as well as any mitigating factors established by a preponderance of the evidence to the satisfaction of even a single juror;" (v) requires a jury to "weigh such aggravating and mitigating factors and only if it unanimously concludes that the aggravating factors so outweigh the mitigating factors as to justify a capital sentence can the jury return a death verdict;" (vi) "prohibit[s a jury] from considering race, color, religious beliefs, national origin, or sex in its sentencing decision;" and (vii) if the jury votes for the

The *Aquart* court, citing extensively to *McCleskey v. Kemp*, 481 U.S. 279 (1987), also rejected the appellant's assertion that his death sentence was arbitrary because his case could not be distinguished from 32 others in which juries did not vote for death sentences. 912 F.3d. at 56. The court explained that "the proper constitutional focus" is not on ensuring consistent outcomes, but rather "on providing the jury with adequate information and guidance to safeguard against arbitrary or capricious capital sentences." *Id*. at 57. Again, the court held that the FDPA "satisfactorily provided those constitutionally mandated safeguards." *Id*.

The FDPA meets the rigors of *Gregg* by guiding the decisionmakers' discretion through the application of narrowly defined statutory aggravating factors which stand as a prerequisite to a defendant's death eligibility. It also provides for individualized sentencing by, among other things, requiring broad admissibility of a defendant's mitigation information. Under *Aquart*, nothing more is required. Because the FDPA satisfies the dictates of *Furman* and *Gregg*, "no constitutional concern arises from the resulting infrequency with which federal juries vote a death sentence for crimes of intentional murder." *Id*. at 55. Further, discrepancies in outcomes do not point to a constitutional defect in a death penalty statute absent proof that the law does not appropriately channel and guide the discretion of the sentencer, or here, the prosecutor. *See id*. at 55-56.

Accordingly, as was done in *Aquart* and has been uniformly done in innumerous federal courts across the country (*see* Footnote 1, *supra*), this Court must reject any assertion

---

death penalty, "affords a defendant who appeals his sentence the comprehensive record review detailed [in the FDPA]." *Id*. at 52 (internal citations omitted).

that the FDPA operates in an arbitrary and capricious manner — that is, that there is no circumstance under which the FDPA may be valid because of purported infrequency with which death sentences are sought or imposed, or because of purported inconsistencies in outcomes. *See Coonce*, 932 F.3d at 646 ("Coonce's . . . argument that the FDPA itself is arbitrary has no legal merit. This court has previously rejected the arguments he advances. Even if we reconsidered that view, Coonce makes no showing that he personally received a sentence of death based on some arbitrariness inherent in the FDPA. This alternative argument is nothing more than a list of grievances about the FDPA with no causal connection to Coonce's case.") (internal citations omitted); *Sampson*, 486 F.3d at 24 (holding the infrequency with which "federal death penalty is so rarely sought or imposed" does not "render the FDPA unconstitutional"); *United States v. Jones*, 132 F.3d 232, 241 (5th Cir. 1998) ("The FDPA provides sufficient safeguards to prevent the arbitrary imposition of the death penalty."). Should this Court, nonetheless, address the specifics of each prong of the defendant's arbitrariness claim, it must still reject them.

### B. The Defendant's Prosecutorial Discretion Claim is Without Merit.

The defendant asserts that prosecutorial discretion in seeking the death penalty is the "root cause" of unconstitutional arbitrariness under the FDPA. *See* Docket No. 181 at 8-11. In support of his argument, he cites only to Supreme Court dissents, an oft-distinguished district court opinion, and three cases that he claims involved "similar violence" in which the government did not seek the death penalty or withdrew the notice of intent to seek the death penalty prior to trial. Docket No. 181 at 8-11. For the following reasons, this Court should deny the defendant's claim.

*1.   The Defendant Fails to State an Eighth Amendment Violation.*

Though the basis for the defendant's prosecutorial discretion claim is unclear, what is certain is that it cannot be rooted in *Furman* and the Eighth Amendment.  *Furman* was not concerned with the discretion afforded to the *charging* body, but rather, only to the *sentencing* body.  *See Sampson*, 486 F.3d at 23-24 (holding that the defendant's argument that "because the federal death penalty is rarely sought or imposed, the FDPA is no different from the Georgia statute invalidated in *Furman . . .* mistakes the nature of the arbitrariness concern in the Supreme Court's jurisprudence" since *Furman*).  The fractured opinions of *Furman* limit only the authority of the sentencing body in imposing a death sentence, not the government in seeking one.  *See McCleskey*, 481 U.S. at 307.

Indeed, in *Gregg*, the Supreme Court specifically rejected an assertion that unfettered prosecutorial discretion in deciding whether to seek the death penalty rendered a capital sentencing scheme unconstitutional.  *See* 428 U.S. at 198-99.  There, the petitioner argued that prosecutorial discretion, a jury's ability to find lesser included offenses, and an executive's authority to grant clemency rendered the revised Georgia capital sentencing statute unconstitutional on the basis that the arbitrariness and capriciousness from the pre-*Furman* law remained.  *Id.*  The Supreme Court disagreed, stating in pertinent part:

> The existence of these discretionary stages is not determinative of the issues before us.  At each of these stages an actor in the criminal justice system makes a decision which may remove a defendant from consideration as a candidate for the death penalty.  *Furman*, in contrast, dealt with the decision to impose the death sentence on a specific individual who had been convicted of a capital offense.  Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution.  *Furman* held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be

guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant.

*Id*. at 199. Thus, *Gregg* forecloses any facial attack on the FDPA based on prosecutorial discretion. *See also Sampson*, 486 F.3d at 24 ("Nor does the frequency with which the federal death penalty is *sought* render the FDPA unconstitutional.") (emphasis added).

What is more, to the extent that there may be an independent constitutional concern as to the government's decisional process by which it decides whether to seek the death penalty, that process is adequately guided by safeguards built into the Justice Manual's articulated Death Penalty Protocol (the "Protocol") and by the FDPA itself. *See Sampson*, 486 F.3d at 24 (citing United States Attorney's Manual § 9-10.000, et seq.);[7] *United States v. Taylor*, 648 F. Supp. 2d 1237, 1241 (D.N.M. 2008) (noting that, while "federal prosecutorial discretion in deciding whom to prosecute and against whom to seek the death penalty is broad, it too is limited and guided by the requirements of the FDPA's scheme") (internal citations omitted). Quite simply, the "exercise of prosecutorial discretion does not render the FDPA arbitrary and capricious." *Schlesinger*, 2021 WL 5578900 at *10 (denying a claim

---

[7] The United States Attorney's Manual is now known as the Justice Manual, and its Death Penalty Protocol remains largely intact from the date of the First Circuit's opinion in *Sampson*, with any current revisions generally inuring to the benefit of criminal defendants. The procedures set forth in the Protocol, J.M. §§ 9-10.010-190, buttress the conclusion that decisions to seek the federal death penalty are not arbitrarily made. Generally, the Protocol's review process includes assessments by the U.S. Attorney and trial team, the Attorney General's Capital Review Committee, the Office of the Deputy Attorney General, and the Attorney General of, among other things, the strength of the government's evidence, potentially applicable aggravating factors, mitigation evidence submitted by defense counsel (with multiple opportunities to submit such information), and an internal weighing of aggravating factors and mitigating factors to determine if pursuit of a death sentence is justified.

similar to the one raised by the defendant here).  *See also Bowers*, 2020 WL 1675916 at *3

(same).

    2.   *The Defendant's Citations to the Justice Manual, Three Other Federal Capital Cases, and <u>Littrell</u> are Unpersuasive.*

In support of his claim that the government fails to consistently pursue the death

penalty, the defendant cites the Justice Manual's Protocol and the government's decisions not

to pursue capital trials against Patrick Crusius (El Paso Walmart shooter who killed 23

persons and injured many more); Anthony Jordan (St. Louis-area drug dealer responsible for

at least 12 drug-related murders); and Jairo and Alexi Saenz (leaders of a Long Island MS-13

clique responsible for directing eight charged murders (seven for Jairo)).[8]  Docket No. 181 at

9-10.  These citations are unpersuasive and unavailing.


First, the Justice Manual confers no rights upon the defendant.  *See* J.M. § 1-1.200

("The Justice Manual provides internal DOJ guidance.  It is not intended to, does not, and

may not be relied upon to create any rights, substantive or procedural, enforceable at law by

any party in any matter, civil or criminal.").  *See also United States v. Jackson*, 327 F.3d 273,

295 (4th Cir. 2003) (holding that it is "well established that . . . internal prosecutorial protocols

do not vest defendants with any personal rights").  Accordingly, even if the government did

inconsistently pursue capital punishment — a point the government strongly contests and that

---

[8] Defendants in these other cases have typically couched their claims under the guise that the federal death penalty is "rarely sought and imposed" or that there is no "principled basis" for distinguishing cases in which the death penalty is sought and imposed and those in which it is not.  Regardless, the rationale remains the same — that is, the defendants suggesting that the federal death penalty is arbitrarily and capriciously sought and imposed under the FDPA.

the defendant fails to establish — the defendant is entitled to no relief from this Court under the Justice Manual.

Second, the defendant cannot prove a constitutional violation by demonstrating that other, arguably similarly situated defendants did or did not face the death penalty in other cases. *See McCleskey*, 481 U.S. at 306-07. As discussed in the previous section, his cry for consistency in results is a plea for false consistency that would strip decisionmakers of their ability to exercise the very discretion that benefits individual defendants. In rejecting pleas for the kind of false consistency the defendant seeks here, the *McCleskey* Court stated: "The Constitution is not offended by inconsistency in results based on the objective circumstances of the crime. Numerous legitimate factors may influence the outcome of a trial and a defendant's ultimate sentence, even though they may be irrelevant to his actual guilt." 481 U.S. at 307 n. 28. Further, the Court stated: "Where the discretion that is fundamental to our criminal process is involved, we decline to assume that what is unexplained is invidious." *Id*. at 313 (rejecting the petitioner's Eighth Amendment claim that his sentence was disproportionate to other, arguably similarly situated offenders who did not receive death sentences). *See also Aquart*, 912 F.3d at 56 (rejecting proportionality claim and explaining that "discrepancies in capital sentencing are inevitable").

Here, the defendant cites to just three cases he suggests are similar to his own, though only because they involved arguably similar levels of violence. His plea for consistency would strip prosecutors of their ability and duty to consider the individual circumstances of each

case in determining whether to seek the death penalty.  Further, his claim cannot stand in light of *McCleskey*.

The prosecution's discretion to seek the death penalty in this case is guided and bounded by the FDPA (which sets clear limits for when the prosecutor may seek the death penalty), as well as the safeguards included in the Justice Manual's Death Penalty Protocol. By arguing that the government has inconsistently sought the death penalty here, the defendant wholly disregards the mandated individualized consideration that informs every decision to seek the death penalty.

Finally, the defendant's reliance on the district court's decision in *United States v. Littrell*, 478 F. Supp. 2d 1179 (C.D. Cal. 2007), is unpersuasive. *Littrell* presented an exceptionally unique circumstance and is easily distinguishable.  Indeed, *Littrell* has been uniformly rejected by other federal courts faced with similar claims. *See Montgomery*, 2014 WL 1453527 at *14-*16 (declining to follow *Littrell* and rejecting a claim that the prosecutor arbitrarily elected to pursue the death penalty); *Taylor*, 648 F. Supp. 2d at 1243-1245 (detailing the weaknesses of this claim and declining to follow *Littrell*); *United States v. Sablan*, No. 00-CR-00531, 2007 WL 4116117, at *6-*7 (D. Colo. Nov. 16, 2007) (same); *United States v. Cooya*, 2011 WL 3608611, *3 (M.D. Pa. Aug. 16, 2011) ("The decision in *Littrell* . . . appears to be in direct contrast to every other decision, including United States Supreme Court decisions, that have considered the issue.").

In *Littrell*, the district court took the extraordinary step of granting the defendant's motion to strike the government's notice of intent to seek the death penalty against Gary Joe Littrell, finding that the government's decision to seek the death penalty was arbitrary and capricious. *See Littrell*, 478 F. Supp. 2d at 1192. The trial court was primarily concerned with the government's failure to consider a number of mitigating factors, particularly co-defendants who would not be sentenced to death. *See id.* at 1190-92. Littrell was one of more than 40 members of the Aryan Brotherhood charged in a sweeping RICO conspiracy case. *Id.* at 1182. Seventeen of the defendants were charged with capital offenses relating to one or more of thirteen murders. *Id.* Littrell faced capital punishment for a murder he committed while incarcerated. Prior to his trial, however, a jury was unable to unanimously reach a sentencing decision in the capital trial of two co-defendants who held leadership roles in the gang. After this result, the prosecution chose not to seek the death penalty against three other gang members who allegedly ordered Littrell to carry out the murder for which he was indicted. The prosecution also chose not to seek the death penalty against other members of the gang who were arguably similarly situated to Littrell. *See id.* at 1190-92. Given these circumstances, the district court held that "when all relevant facts and circumstances are considered, it is clear that no rational decision-maker would continue to seek to execute Gary Joe Littrell." *Id.* at 1192.

The government does not concede that *Littrell* was properly decided. As set forth above, the prosecutor has the discretion and duty to decide charging issues in the absence of an improper motive (such as charging based on race, religion, or another arbitrary classification), and such discretion is not normally subject to review. *See McCleskey*, 481 U.S.

at 296.   Also, as cited above, the *Gregg* Court concluded that unfettered prosecutorial discretion in seeking the death penalty does not offend the Eighth Amendment.   428 U.S. at 198-199.   Thus, the district court's decision in *Littrell* was a gross intrusion upon the government's prosecutorial discretion.

Regardless, the instant case is easily distinguishable from the circumstances presented in *Littrell*.   There, the district court considered the reasonableness of seeking the death penalty against Littrell only in comparison to the penalties sought and imposed against other co-defendants *in the same case*.   The defendant, here, argues that this Court should compare the government's decision to seek the death penalty against him to the decision not to seek the death penalty against defendants in *other* cases from *other* districts.   The only similarity he alleges is that all the cases involved at least seven murders, but he does not at all explore the unique circumstances of each respective case (*e.g.*, motives for the murders, circumstances of the murders, mitigation information, etc.).   Indeed, the instant case stands in stark contrast to *Littrell*.   Here, the defendant is the sole defendant charged in a racially motivated mass shooting that resulted in the murder of ten Black people and shooting injuries to one Black person and two white people.

The Supreme Court has clearly held that this form of "comparative proportionality" review is not required.   *See Pulley v. Harris*, 465 U.S. 37, 40 (1984).   *See also Aquart*, 912 F.3d at 52 (holding comparative proportionality review is not constitutionally required nor necessary under the FDPA, which contains "adequate checks on arbitrariness").   Accordingly, this Court should reject the defendant's invitation to compare the decision to seek the death

penalty in this case to the decisions not to ultimately pursue death sentences in *Crusius*, *Jordan*, or *Saenz*.   *See Montgomery*, 2014 WL 1453527 at \*15-\*16 (declining to conduct case comparisons in rejecting defendant's reliance on *Littrell*), *Taylor*, 648 F. Supp. 2d at 1244 (same); *Cooya*, 2011 WL 3608611 at \*3 (same).   It is enough to say that this is a different case with different facts, different quality and quantity of evidence, and ultimately, different charging, plea, and sentencing considerations.   *Taylor*, 648 F. Supp. 2d at 1244-45 (citation omitted).

There is also no allegation nor evidence here, as there arguably was in *Littrell*, that the government has turned a "blind eye" to relevant mitigating or aggravating evidence.   The government has validly exercised its prosecutorial discretion to seek the death penalty here. Whether a sentence of death is justified is a decision solely for a jury.   *Taylor*, 648 F. Supp. 2d at 1245; *Montgomery*, 2014 WL 1453527 at \*15-\*16 (finding *Taylor* analysis persuasive).   For the reasons set forth *supra*, the defendant's prosecutorial discretion claim fails and there is no need to hold an evidentiary hearing.   Accordingly, the defendant's motion to strike on prosecutorial discretion grounds should be denied.

### C. The Defendant's Claims about Death Qualification and Juror Confusion are Without Merit.

The defendant's attacks upon jury selection and jury instructions in capital cases are muddled, and it is unclear how he believes his arguments may facially invalidate the FDPA, a duly enacted federal statute.   The defendant argues the FDPA is unconstitutionally unreliable because death-qualified jurors are more prone to convict and jurors misunderstand their role in the penalty hearing, regardless of instructions given to them by the Court.   *See*

Docket No. 181 at 11-15.   The defendant cites no legal support for his claims, and indeed, none exists.   At the outset, because the defendant ultimately makes "reliability" claims, they must fail under *Aquart* for the reasons discussed *supra*.   They also fail for the following reasons.

### 1.   Death Qualification is Constitutional and does not Render the FDPA Unconstitutional.

The defendant contends that death qualified jurors are more prone to conviction, and thus, that this process renders the FDPA unconstitutionally arbitrary.   In support of this argument, he offers only citations to social science studies (including evidence presented at the evidentiary hearing in *Fell*), and excerpts from the district court's opinion in *United States v. Fell*, 224 F. Supp. 3d 327 (D. Vt. 2016), a case in which the district court, though expressing concerns with the state of the federal capital sentencing scheme, still recognized it was constrained by Supreme Court precedent from granting the defendant's challenges to the FDPA.   *See id*. at 359 ("The time has surely arrived to recognize that the reforms introduced by *Gregg* and subsequent decisions have largely failed to remedy the problems identified in *Furman*.   Institutional authority to change this body of law is reserved to the Supreme Court. For this reason, the trial court is required to deny the defense motions related to the constitutionality of the death penalty.").

"A death-qualified jury is one from which prospective jurors have been excluded for cause in light of their inability to set aside their views about the death penalty that would prevent or substantially impair the performance of their duties as jurors in accordance with their instructions and oath."   *Buchanan v. Kentucky*, 483 U.S. 402, 407 n. 6 (1987) (international quotations and citations omitted).   Death qualification does *not* violate a capital

defendant's Sixth Amendment right to an impartial jury.  *See Lockhart v. McCree*, 476 U.S. 162, 177-80 (1986) (rejecting claims that death qualification violates Sixth Amendment's "fair cross-section" and "impartial jury" rights); *Buchanan*, 483 U.S. at 419-20 (holding that death qualification did not violate Sixth Amendment right to impartial jury even in a joint trial where one defendant was not death-eligible).  Despite defendant's protestations that *Lockhart* is outdated and studies have evolved, just as with *Gregg*, discussed *supra*, only the Supreme Court can alter its holdings from *Lockhart* and *Buchanan*, and those precedents remain binding.

What is more, in *Morgan v. Illinois*, 504 U.S. 719 (1992), the Court indicated that death qualification is constitutionally *required*.  504 U.S. at 731 ("We have also come to recognize that the principles first propounded in *Witherspoon v. Illinois*, 391 U.S. 510 (1968), the reverse of which are at issue here, *demand inquiry* into whether the views of prospective jurors on the death penalty would disqualify them from sitting.") (emphasis added).  *See also Lockhart*, 476 U.S. at 170 n. 7 ("*Ipso facto*, the State *must* be given the opportunity to identify such prospective jurors by questioning them at *voir dire* about their views of the death penalty.") (emphasis added); *United States v. Whitten*, 610 F.3d 168, 184 (2d Cir. 2010) (holding that a court *"must"* conduct adequate voir dire, determining if jurors' personal views on the death penalty would substantially impair their ability to carry out their duties as jurors) (emphasis added).

It simply does not follow that a process that is constitutionally required renders all federal death sentences constitutionally unreliable, thus invalidating the FDPA.  Accordingly, just as multiple district courts have denied similar claims, this Court should do the same.  *See*, *e.g.*, *Schlesinger*, 2021 WL 5578900 at *4 (explaining data like that presented by the defendant

in the instant motion "do[es] not provide this Court with the authority to overlook Supreme Court precedent establishing that the process of death-qualification does not violate a defendant's rights"); *Mills*, 388 F. Supp. 3d at 899 (same); *Bowers*, 2020 WL 1675916 at *2 (finding "Supreme Court cases rejecting similar challenges controlling"); *Sampson*, 2015 WL 7962394 at *28 ("The fact that the jury at retrial must be 'death qualified' does not render the FDPA unconstitutional.").

> 2. *The FDPA is Comprehensible to Jurors and this Court is Capable of Crafting Instructions that Permit Jurors to Understand their Duties.*

The defendant next argues that federal capital sentencing is unconstitutionally arbitrary because "information overload" causes capital jurors to be incapable of understanding the Court's instructions and the process they must follow to determine the final sentence under the FDPA.  Docket No. 181 at 14-15.  Setting aside the speculative nature of this claim and insult to the prospective jury pool, this claim has been uniformly rejected by other federal courts and this Court must do the same.  *See*, *e.g.*, *Saipov*, 2023 WL 371531 at *7; *Schlesinger*, 2021 WL 5578900 at *4-*5 (noting "[f]ederal courts routinely deny challenges to the comprehensibility of the FDPA") (internal quotation marks and citation omitted); *Bowers*, 2020 WL 1675916 at *2; *Roof*, 225 F. Supp. 3d at 415-16; *Sampson*, 2015 WL 7962394 at *23.

The fundamental assumption underlying the jury trial system is that juries will follow the instructions given them by the trial judge.  *Richardson v. Marsh*, 481 U.S. 200, 211 (1987).  *See also Bowers*, 2020 WL 1675916 at *2 (calling this assumption "almost invariable").  In a capital case, instructions are constitutionally defective only if there is a "reasonable

likelihood" that they misled the jury into sentencing the defendant to death.  *Boyde v. California*, 494 U.S. 370, 380 (1990).  Instructions that are only arguably ambiguous or create "only a possibility of . . . [jury] inhibition" do not fall into this category.  *Id*. at 379-84.

Here, the defendant's reliance on empirical studies is insufficient to establish that any federal capital jury (or even a significant majority of federal capital juries) is so incapable of understanding the FDPA's sentencing scheme as to render it unconstitutional.  The statute guides the jury's discretion by requiring the finding of a Section 3591(a)(2) gateway intent factor and a Section 3592(c) statutory aggravating factor to establish the defendant's eligibility for capital punishment.  The statute then allows for individualized sentencing by allowing the broad presentation of information during the capital sentencing hearing.  *See* 18 U.S.C. § 3592(a) (providing for broad admissibility of mitigating factors), § 3593(c) (providing for relaxed evidentiary standards).  These concepts are simply not beyond the purview of an American jury.

The district court's decision in *Saipov* rejecting an "incomprehensibility" claim in that case is instructive.  The *Saipov* court found:

> [C]ourts must presume that juries follow their instructions unless the record suggests that the jurors were either confused or prejudiced in determining the counts of conviction.  This is thus a standard where a record is to be assessed for actual confusion, not where the law is struck down because of speculative, potential confusion.  At best, Saipov's position on confusion is pure speculation, based on the conclusory assertion that it is unreasonable to expect jurors to parse the FDPA's complex mélange of concepts and come out with an understanding of the process or a principled verdict.  Moreover, I disagree with Saipov's supposition.  Like other judges, I remain confident that the jury can be instructed in such a way that it will understand and correctly apply the provisions of the FDPA.  Jurors are asked to parse through complex concepts all the time in cases brought in federal court, and there is no reason to believe

> that jurors would be incapable of following my instructions. Because I find that the jury is capable of following the FDPA's structure, I find that the FDPA does not violate the Eighth Amendment or the Due Process Clause.

2023 WL 371531 at *7 (internal citations and quotation marks omitted). *See also Sampson*, 2015 WL 7962394 at * 23 (concluding defendant's empirical evidence, which was much more comprehensive than what the defendant offered here, did not "show a substantial risk that federal capital jurors do not meet the constitutional requirements of capital sentencing that have been stated by the Supreme Court").

Applying these standards, this Court should deny the defendant's motion. The minimal empirical studies he cites do not establish a "substantial risk" that jurors will not understand the FDPA's structure or their duties. This conclusion does not change should the defendant proffer additional data, including the evidence from the *Fell* evidentiary hearing he cites elsewhere in his motion. That is precisely the evidence or type of evidence rejected by many courts, including *Saipov*, *Schlesinger*, *Sampson*, and others cited *supra*.

What is more, this Court and the parties in this case, as well as any other federal capital case, are capable of carefully fashioning jury instructions that explain the evidence that the jury may consider, the various findings that must be made, and the burdens that correspond to those various findings. Accordingly, this Court must deny the defendant's "information overload" claim as meritless. Moreover, the defendant does not identify any disputed fact that, if proven, would entitle him to relief, and therefore, an evidentiary hearing is not warranted. *See Sampson*, 2015 WL 7962394 at *23.

### D. The Defendant's Wrongful Conviction and Wrongful Sentencing Claims are Contrary to Binding Precedent or Otherwise Without Merit.

Also, under the "arbitrariness" rubric, the defendant claims that the rate of error in federal capital cases renders the federal death penalty system unconstitutionally unreliable. Docket No. 181 at 16-19. He cites no legal support for his claim. Nor does he clearly state how he is entitled to relief. As an arbitrariness claim, his claim generally fails under *Aquart* for reasons set forth above (*i.e.*, that the FDPA adequately guides jury discretion and allows for individualized sentencing). It also fails on its specifics for the below reasons.

#### 1. Binding Precedents Bar a Wrongful Conviction/Innocence Claim.

The defendant argues that trial errors in past federal capital cases undermine the reliability of death sentences imposed under the FDPA. In support, he cites no cases in which a capital defendant has established actual innocence. Nonetheless, to the extent the defendant is claiming the federal death penalty system is infirm because there is a risk of executing an innocent person (*i.e.*, a "wrongful conviction" claim), his claim is foreclosed by the Supreme Court's opinion in *Herrera v. Collins*, 506 U.S. 390 (1993), and the Second Circuit's opinion in *Quinones*, 313 F.3d 49.

In *Herrera*, the Supreme Court affirmed the denial of a petition for a writ of habeas corpus in which the petitioner claimed that his execution would violate both the Due Process Clause and the Eighth Amendment because new evidence could prove his "actual innocence." 506 U.S. at 398. In doing so, the Court declined to find that "execution of a person who is innocent of the crime for which he was convicted" amounts to an independent violation of either the Eighth Amendment or the Due Process Clause. *Id*. The Court further

recognized that "due process does not require that every conceivable step be taken, at whatever cost, to eliminate the possibility of convicting an innocent person." *Id*. at 399 (internal quotation marks and citation omitted).

In *Quinones*, the Second Circuit reversed a district court opinion that found defendants have an enduring Fifth Amendment liberty interest in being exonerated throughout the duration of their lives, thus rendering the death penalty unconstitutional due to the risk of executing an innocent person. *Quinones*, 313 F.3d at 54-55 (reviewing lower court's opinion). The Second Circuit stated that the *Herrera* Court "made clear that, once an individual has exhausted his available legal remedies, the Due Process Clause no longer entitles him to an opportunity to demonstrate his innocence," and established "that there is no fundamental right to the opportunity for exoneration even before one's execution date, much less during the entire course of one's natural life." *Id.* at 68-69.  The court concluded that *Herrera* was binding precedent that "prevents us from finding capital punishment unconstitutional based solely on a statistical or theoretical possibility that a defendant might be innocent," and that only the Supreme Court had the "prerogative of overruling its own decisions." *Id*. at 69 (internal quotation marks and citation omitted).

In addition to holding that *Herrera* barred it from finding a risk of wrongful conviction/actual innocence rendered the FDPA unconstitutional, the Second Circuit also cited other persuasive authority for this conclusion.  First, the court noted that "the argument that innocent people may be executed . . . is not new; it has been central to the centuries-old debate over both the wisdom and the constitutionality of capital punishment, and binding

precedents of the Supreme Court prevent us from finding capital punishment unconstitutional based solely on a statistical or theoretical possibility that a defendant might be innocent." *Id.* at 63. The court also cited to legislative history indicating that members of Congress recognized the risk of executing innocent persons when moving forward to enact the FDPA. *Id.* at 64-65.

"Most importantly," the court found, the Supreme Court has upheld capital sentencing statutes for "over two hundred years . . . despite a clear recognition of the possibility that, because our judicial system . . . is fallible, innocent people might be executed and, therefore lose any opportunity for exoneration." *Id.* at 65. Indeed, when it reinstated capital punishment following *Furman*, the *Gregg* Court was "keenly aware of the argument . . . that execution terminates any asserted right to the opportunity for exoneration during one's natural life. Despite this awareness, the Court rejected the proposition that capital punishment is unconstitutional *per se.*" *Id.* at 67. As *Herrera* and *Quinones* remain binding precedent, this Court must deny the defendant's motion to the extent he argues that the FDPA is unconstitutional because trial errors in some cases have raised an intolerable risk of executing innocent persons.

> ### 2. *The Defendant's Wrongful Sentencing/Rate of Error Claim is Contrary to Law.*

To the extent the defendant is arguing that application of the FDPA results in an unacceptably high risk of wrongful *sentencing*, his claim fares no better.[9] To succeed on this

---

[9] The defendant's rationale appears to be that even if he is justly adjudicated guilty of hate crime shooting murders in this case, errors in other capital sentencing hearings indicate that he cannot be fairly sentenced under the FDPA, and that logically no capital defendant could

28

challenge to the FDPA, the defendant must prove that "jury error 'creates a substantial risk that the death penalty will be inflicted in an arbitrary and capricious manner.'"  *Sampson*, 2015 WL 7962394 at 19 (quoting *Gregg*, 428 U.S. at 188).  The defendant fails to satisfy this heavy burden.

Important to this context, the Supreme Court has recognized that the "criminal justice system does not operate perfectly" and rejected the proposition that "the death penalty can only be just in a system that does not permit error."  *See Marsh v. Kansas*, 548 U.S. 163, 181 (2006) (holding Kansas death penalty statute constitutional, which directed imposition of the death penalty when aggravating and mitigating evidence was in equipoise and rejecting dissent's arguments that DNA exonerations raised questions about the accuracy of guilt-phase determinations in capital cases).  *See also Quinones*, 313 F.3d at 67 (explaining the *Gregg* Court found no Eighth Amendment violation despite an argument that the death penalty entails "both mistake and caprice").

In denying a strikingly similar "wrongful sentencing" and "rate of error" motion in *Sampson*, the court stated:

> The protections afforded by the FDPA are greater than those in capital sentencing procedures that the Supreme Court has upheld.  The evidence of factual error that Sampson provides is of the type that the Supreme Court has implicitly recognized is inherent and acceptable in our judicial system.  For those reasons, Sampson has not proved that jury error creates a substantial risk that the death penalty will be inflicted in an arbitrary and capricious manner.

---

be.  In essence, he urges this Court to invalidate a duly enacted federal law because of a purported risk that he or some other persons guilty of capital murder will be sentenced to death where they otherwise might have received life sentences.

2015 WL 7962394 at *20 (internal quotation marks omitted).

The same rationale applies here.  The Second Circuit has explicitly found that the FDPA passes constitutional muster under *Gregg* in that it adequately guides the sentencer's discretion and permits for individualized sentencing.  *See Aquart*, 912 F.3d at 52, 54. Moreover, the FDPA also provides several safeguards to ensure heightened reliability.  For instance, the statute requires findings of aggravating factors to be unanimous and beyond a reasonable doubt, it allows for broad consideration of mitigation information, it relaxes the standard for admissibility of evidence in the penalty phase, it prohibits consideration of protected factors such as race, color, sex or religious beliefs, and it provides for meaningful appellate review.  *Id*. at 52.

Finally, the errors that the defendant cites do not "indicate that ordinary criminal procedural protections are insufficient." *Sampson*, 2015 WL 7962394 at *20.  He points to evidence indicating that as of 2015, 17 out of 73 federal capital defendants' cases had been reversed.  Docket No. 181 at 16.  Notably, the *Sampson* court found this same evidence was insufficient to support a constitutional claim.  2015 WL 7962394 at *20.  If anything, the defendant has demonstrated that the federal death penalty system works.  Robust appellate and post-conviction review has allowed courts to identify errors and remedy them.  Indeed, in two of the nine cases that the defendant cites, post-conviction courts found sufficient error to vacate death sentences (*Sampson* and *Wilson*), *see* Docket No. 181 at 16, and the defendants were retried and again sentenced to death (though Wilson's second death sentence was subsequently invalidated by an intellectual disability finding).  Moreover, of the 15 cases that

30

the defendant cites in which courts found trial errors on direct appeal, *see* Docket No. 181 at 18-19, ten of those errors did not even warrant reversal.[10]

For the reasons set forth above, this Court should deny the defendant's "wrongful sentencing" claim.  His request for an evidentiary hearing is unwarranted because he has not identified disputed facts that could entitle him to relief.  *See Sampson*, 2015 WL 7962394 at *21 (denying evidentiary hearing).

### III.    The Defendant's Undue Delay Claim is Without Merit.

The defendant claims the federal death penalty constitutes cruel and unusual punishment because the delay[11] between sentencing and the imposition of punishment

---

[10] The courts in *Troya*, *Hager*, *Runyon*, *Ebron*, *Bernard*, *Montgomery*, *Lighty*, *Purkey*, *Stitt*, *Barnette*, and *Webster* did not find reversible errors.  *See United States v. Troya*, 733 F.3d 1125 (11th Cir. 2013); *United States v. Hager*, 721 F.3d 167 (4th Cir. 2013); *United States v. Runyon*, 707 F.3d 475 (4th Cir. 2013); *United States v. Ebron*, 683 F.3d 105 (5th Cir. 2012); *United States v. Bernard*, 299 F.3d 467 (5th Cir. 2002); *United States v. Montgomery*, 635 F.3d 1074 (8th Cir. 2011); *United States v. Lighty*, 616 F.3d 321 (4th Cir. 2010); *United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005); *United States v. Stitt*, 250 F.3d 878 (4th Cir. 2001); *United States v. Webster*, 162 F.3d 308 (5th Cir. 1998).  Bernard, Montgomery, and Purkey have been executed. Webster received Section 2241 relief in 2019 after he was found to be intellectually disabled. *Webster v. Lockett*, No. 12-cv-86, 2019 WL 2514833 (S.D. Ind. Jun. 18, 2019).  Lighty's sentence was vacated on post-conviction review in 2023 on a *Davis/Johnson* claim relating to his Section 924(c) conviction.  *United States v. Lighty*, No. 03-cr-457, 2023 WL 2932960 (D. Md. Apr. 13, 2023).

[11] Defense counsel include the lengthy trial process among the "delays" they argue render the federal death penalty system cruel and unusual, and characterize the September 8, 2025 trial date as "tentative."  Docket No. 181 at 29.  The government respectfully submits that this statement mischaracterizes the trial schedule in this case and potentially creates confusion and mistrust among victims, victim families, and the public regarding.  In setting this trial schedule, this Court called September 8, 2025, a "realistic trial date," 2/2/24 Tr. at 48. Indeed, at the February 2, 2024 scheduling hearing, this Court stated that the September 8, 2025 trial date is "the date we're all going to work toward."  *Id*. at 49.

involves years in solitary confinement and such delay removes any deterrent effect capital punishment may have.  Docket No. 181 at 20-30.  No federal court has granted relief on these grounds to an individual sentenced to death under the FDPA.

### A. The Federal Death Penalty System does not Create Undue Delay that may Support Invalidating the FDPA.

First, the defendant's claim is not ripe.  Two factors are used to evaluate ripeness: (1) the fitness of the issues for judicial decision; and (2) the hardship to the parties of withholding court consideration.  *Abbott Labs v. Gardner*, 387 U.S. 136, 148-149 (1967) (explaining the basic rationale of the ripeness doctrine is to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements").  "Claims based on contingent future events that may not occur as anticipated, or indeed may not occur at all are not ripe for decision."  *United States v. Caro*, Case No. 06-cr-001, 2006 WL 1594185, *4 (W.D. Va. Jun. 2, 2006) (holding challenge to execution procedures was unripe) (internal quotation marks and citation omitted).  Here, any delay between the present time and the date of the defendant's possible execution is entirely speculative.  Trial has not yet even commenced.  This issue is therefore not currently fit for judicial decision, and the defendant has not identified any hardship if the issue is set aside for another day.  *See Schlesinger*, 2021 WL 5578900 at *10 ("[T]o the extent Schlesinger alleges that his execution will be unduly delayed, the claim is not ripe.  He has not been found guilty, let alone sentenced to death.").

Even assuming ripeness, the defendant's undue delay claim is meritless.  No circuit has found that any delay in carrying out an execution violates the condemned prisoner's Eighth Amendment rights.  *See White v. Johnson*, 79 F.3d 432, 439 (5th Cir. 1996) (rejecting

Eighth Amendment claim by petitioner whose death sentence had been pending for 17 years, including time for retrial after conviction was initially overturned by first habeas petition); *Stafford v. Ward*, 59 F.3d 1025, 1028 (10th Cir. 1995) (concluding appellant failed to show that executing him after 15 years on death row, during which time he faced at least seven execution dates, would constitute cruel and unusual punishment); *McKenzie v. Day*, 57 F.3d 1493, 1494 (9th Cir. 1995) (*"McKenizie II"*) (rejecting petitioner's argument that his execution would constitute cruel and unusual punishment after 20-year delay between date of conviction and date of execution that included resetting his execution eight times and allegedly unconstitutional conditions of confinement on death row). *See also United States v. Witt*, 73 M.J. 738, 812 (A.F. Ct. Crim. App. 2014) ("No American court has ruled that a lengthy period of confinement followed by execution is impermissible, and we decline to adopt such a standard based upon the delay in this case."); *Knight v. Florida*, 528 U.S. 990 (1999) (Thomas, J., concurring in denial of certiorari) ("I write only to point out that I am unaware of any support in the American constitutional tradition or in this Court's precedent for the proposition that a defendant can avail himself of the panoply of appellate and collateral procedures and then complain when his execution is delayed.").[12]

---

[12] In *Jones v. Chappel*, 31 F. Supp. 3d 1050 (C.D. Cal. 2014), the district court held that California's death penalty system ran afoul of the Eighth Amendment due to systemic delay, a claim similar to the one the defendant now brings here.  The cases are readily distinguishable, however, as they involve different death penalty systems with different delays and different triggers for delays.  *See Sampson*, 2015 WL 7962394 at *31 (distinguishing *Jones*). Regardless, the Ninth Circuit reversed the decision on appeal.  *See Jones v. Davis*, 806 F.3d 538 (9th Cir. 2015) (holding "systemic delay" was a novel theory of constitutional law, not cognizable on habeas review, and declining to address the merits of the district court's decision).

Moreover, contrary to the defendant's arguments, the time inherent in capital proceedings (pretrial litigation, trial, direct appeal, post-conviction review, etc.) does not amount to undue delay that may support constitutional relief. Setting aside the absurdity of the idea that this Court should invalidate a duly enacted law because it may take a long time for the defendant to fully avail himself of all the protections set forth in that law, courts have routinely rejected this argument as meritless.

There are compelling justifications for the delay between conviction and the execution of a death sentence because the government's interest in deterrence and swift punishment must compete with its interest in ensuring that those who are executed receive fair trials with constitutionally mandated safeguards. *See White*, 79 F.3d at 439. As such, federal courts have routinely held that delay occasioned by appellate review does *not* provide a basis for Eighth Amendment relief. *See Stafford*, 59 F.3d at 1028 n. 5 ("Again, because Appellant chose to avail himself of stays to pursue these avenues of review, they may not be used to support an Eighth Amendment claim."); *McKenzie II*, 57 F.3d at 1494 (adopting prior decision that a "defendant must not be penalized for pursuing his constitutional rights, but he also should not be able to benefit from the ultimately unsuccessful pursuit of those rights") (citation omitted); *Free v. Peters*, 50 F.3d 1362 (7th Cir. 1995) (holding any inordinate delay in petitioner's execution was due to his own choice to pursue discretionary appeals and did not support Eighth Amendment relief); *Turner v. Jabe*, 58 F.3d 924, 929-31 (4th Cir. 1995) (denying habeas relief for death row inmate filing fourth petition alleging that execution, after 15 years on death row under allegedly tortuous conditions constituted cruel and unusual punishment).

It appears that only three federal capital defendants have raised this same claim in a pretrial pleading – Robert Bowers, Gary Sampson, and Ryan Schlesinger.  Applying the above-cited rationale, the courts in all three cases denied these same claims.  In *Bowers*, the court stated: "Delays sought by a defendant to ensure a fair trial do not support a constitutional challenge." *Bowers*, 2020 WL 1675916 at *3. In finding the defendant's claim "not meritorious" in *Sampson*, the court held:

> Assuming, without deciding, that Sampson is correct that significant, unwarranted delay leading up to execution would violate the Constitution, the evidence Sampson presents fails to establish that the delay associated with the federal system is long as' compared to other jurisdictions that provide for capital punishment or unwarranted in the sense that the delays are avoidable.

2015 WL 7962394 at *30.  Finally, in *Schlesinger*, the court held the defendant's "claim that undue delay renders the FDPA unconstitutional is unsupported by any binding authority." *Schlesinger*, 2021 WL 5578900 at *10.

Here, this Court must likewise reject the defendant's undue delay claim as wholly unsupported by the law. It takes time to prepare for and conduct a capital sentencing proceeding that is fair, and meaningful appellate review is also time consuming.  *See Sampson*, 2015 WL 7962394 at *31.  It would be a "mockery of justice" if the potential delay that may be incurred during the process of trial, direct appeal, and post-conviction review of a defendant's federal capital case — much of which would be brought upon by the defendant himself — "accrue[s] into a substantive claim" to bar the government from even seeking to impose the death penalty upon him.  *McKenzie II*, 57 F.3d at 1494 (citation omitted).  Further, granting a claim such as this one would "wreak havoc with the orderly administration of the death penalty in this country by placing a substantial premium on speed rather than accuracy"

in capital sentencing.  *McKenzie v. Day*, 57 F.3d 1461, 1467 (9th Cir. 1995).  Accordingly, this Court must deny the defendant's undue delay claim.

### B.  Complaints about the Conditions of Confinement on Federal Death Row may not Support a Claim to Invalidate the Death Penalty *Per Se* or the FDPA.

The defendant's suggestion that the time he may spend on death row supports an independent basis for finding a death sentence cruel and unusual is also meritless.  *See Glossip*, 576 U.S. at 896 (Scalia, J. concurring) (calling Justice Breyer's assertion in dissent that the death penalty is cruel and unusual because it subjects inmates to long periods on death row "nonsense").  Notably, solitary confinement *per se* has not been held to violate the Cruel and Unusual Punishment Clause.  *See Sostre v. McGinnis*, 442 F.2d 178, 192 (2d Cir. 1971) (collecting cases), *overruled on other grounds by Davidson v. Scully*, 114 F.3d 12 (2d Cir. 1997). Regardless, complaints about the conditions of confinement on federal death row are speculative and might be appropriate for action under Section 1983 or, perhaps, Section 2241, but are not an appropriate basis to facially invalidate the FDPA.  Life without parole is an even lengthier period than the wait on death row; and if the objection is that death row is a more confining environment, the solution should be modifying the environment rather than abolishing the death penalty.  *Glossip*, 576 U.S. at 896 (Scalia, J. concurring).

In rejecting an analogous "solitary confinement" claim in *Bowers*, the court stated: "[T]he potential for solitary confinement does not support a constitutional challenge.  Such arguments go to the manner of confinement and not whether the death penalty is a cruel and unusual punishment under the Eighth Amendment."  *Bowers*, 2020 WL 1675916 at * 3. *See also Sampson*, 2015 WL 7962394 at *30 (rejecting claim that the delay from sentencing until

execution, which "entails years of waiting in the shadow of execution" is itself "cruel and unusual punishment"); *Schlesinger*, 2021 WL 5578900 at *10 (collecting circuit court opinions in federal post-conviction review of state death sentences that "have consistently held that prolonged incarceration under a sentence of death does not violate the Eighth Amendment"). Here, the defendant's "solitary confinement" claim does not state a basis for Eighth Amendment relief and certainly does not support a facial attack upon the FDPA.  Therefore, this Court must reject it and deny the defendant's "undue delay" claims and any request for an evidentiary hearing.

## CONCLUSION

For all the reasons set forth above, this Court should deny the defendant's motion and request for an evidentiary hearing in its entirety.

DATED:        Buffalo, New York, July 19, 2024

TRINI E. ROSS                                    KRISTEN M. CLARKE
United States Attorney                           Assistant Attorney General
Western District of New York                     Civil Rights Division

BY:   s/JOSEPH M. TRIPI                    BY:   s/LAURA B. GILSON
      s/BRETT A. HARVEY                           Trial Attorney
      Assistant United States Attorneys           Civil Rights Division
      United States Attorney's Office             U.S. Department of Justice
      Western District of New York                150 M Street NE
      138 Delaware Avenue                         Washington, DC 20530
      Buffalo, New York 14202                     202-598-1141
                                                  Laura.Gilson2@usdoj.gov

BY:   s/MICHAEL S. WARBEL
      Trial Attorney
      Criminal Division
      U.S. Department of Justice
      1331 F. St. NW, Ste. 623
      Washington, DC 20004
      (202) 514-5605
      Michael.Warbel@usdoj.gov