IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

           v.                                  22-CR-109-V

PAYTON GENDRON,

                 Defendant.

_____

## GOVERNMENT'S RESPONSE IN OPPOSTION TO DEFENDANT'S MOTION TO DISMISS THE INDICTMENT BASED ON THE UNCONSTITUTIONALITY OF THE FEDERAL HATE CRIMES PREVENTION ACT, 18 U.S.C. § 249(a)(1) [DOCKET NO. 179]

The United States of America, by and through its attorneys, Trini E. Ross, United States Attorney for the Western District of New York, and Kristen M. Clarke, Assistant Attorney General, Civil Rights Division, and Joseph M. Tripi and Brett A. Harvey, Assistant United States Attorneys; Laura B. Gilson, Trial Attorney, Civil Rights Division; and Michael Warbel, Trial Attorney, Criminal Division, respectfully submits this response in opposition to the defendant's Motion to Dismiss the Indictment Based on the Unconstitutionality of the Federal Hate Crimes Act, 18 U.S.C. § 249(a)(1) [Docket No. 179].

Defendant Payton Gendron's motion misconstrues the relevant constitutional standard and misapplies controlling law. Therefore, his motion must be denied. Congress validly invoked its power under the Thirteenth Amendment in enacting 18 U.S.C. § 249(a)(1), the Matthew Shepard, James Byrd Jr. Hate Crimes Prevention Act ("HCPA"), and the factual allegations in this case fall well within the scope of that constitutional authority. Section 249(a)(1) raises no federalism concerns and is constitutional both on its face and as applied

here. In addition, the government's certification of the § 249(a) charges was a sound exercise of prosecutorial discretion that does not warrant substantive judicial review.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

On July 14, 2022, a federal grand jury in the Western District of New York returned a 27-count Indictment charging the defendant, PAYTON GENDRON (hereinafter the "defendant"), with ten counts of the HCPA resulting in death, ten counts of discharge of a firearm to commit murder, four counts of the HCPA involving an attempt to kill, and three counts of the use and discharge of a firearm during and in relation to a crime of violence. *See* Docket No. 6. The HCPA counts with which the defendant is charged require proof that he willfully caused bodily injury to a victim because of that victim's actual or perceived race, either resulting in the victim's death or involving an attempt to kill the victim. 18 U.S.C. § 249(a)(1); Docket No. 6 (Counts 1-10, 21-23, 27).

The Indictment sets forth several introductory allegations that are incorporated into each charge. Those allegations state that on May 14, 2022, the defendant drove to the Tops Friendly Market, located at 1275 Jefferson Avenue, Buffalo, New York 14208 ("Tops"). Docket No. 6 ¶ 1. When he arrived at Tops, the defendant got out of his car wearing a tactical-style helmet, camouflage clothing, body armor, and a GoPro video camera, and carrying a loaded Bushmaster XM-15 .223 caliber rifle and multiple loaded magazines. *Id.* ¶ 2. The defendant then shot four Black people in front of Tops, killing three of them and injuring the fourth. *Id.* ¶ 3. Once inside Tops, the defendant shot multiple additional people, killing seven more Black people and injuring two white people. *Id.* ¶ 4.

2

The defendant now moves to dismiss the Indictment, claiming the HCPA is unconstitutional on its face and as applied to his case. *See* Docket No. 179. The defendant also challenges the certification of this prosecution under § 249(b)(1)(D) as subject to judicial review and substantively unsound. *Id*. These arguments lack merit.

## LAW AND ARGUMENT

A motion to dismiss an indictment under Federal Rule of Criminal Procedure 12(b) questions whether the indictment can, or properly does, charge the offense that the defendant is accused of committing. To be successful, such a motion "must meet a high standard." *United States v. Beardsley*, No. 1:20-CR-00049-RJA-MJR, 2022 WL 7706943, at *2 (W.D.N.Y. Sept. 23, 2022), *report and recommendation adopted*, No. 20-CR-49-A, 2022 WL 7626094 (W.D.N.Y. Oct. 13, 2022) (citation omitted). Further, at this stage, rather than weighing the evidence, the court "accepts as true the facts alleged in the Indictment and determines only whether the Indictment is valid on its face." *Ibid.* (internal quotation marks omitted); *see Boyce Motor Lines v. United States,* 342 U.S. 337, 343 n. 16 (1952) (same).

"A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully," as it requires "establish[ing] that no set of circumstances exists under which the [statute] would be valid." *United States v. Salerno,* 481 U.S. 739, 745 (1987). A defendant raising a facial challenge must show "that the law is unconstitutional in all of its applications[,]" or at the very least lacks "a plainly legitimate sweep." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) (internal quotation marks and citations omitted); *see also Cmty. Hous. Improvement Program v. City of New York*, 59 F.4th 540, 548 (2d Cir.), *cert. denied sub nom. Cmty. Hous. Improvement Program v. City of New York, New York*, 144 S. Ct. 264 (2023) (citing *Salerno*, 481 U.S. at 745 and *Grange*, 552 U.S. at 449). As a

result, facial challenges to statutes are "discouraged," *Sabri v. United States*, 541 U.S. 600, 609 (2004), and courts considering facial challenges must treat legislation with a "presumption of constitutionality." *United States v. Morrison*, 529 U.S. 598, 607 (2000) ("Due respect for the decisions of a coordinate branch of Government demands that [the judicial branch] invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds."); *United States v. Brunner*, 726 F.3d 299, 303 (2d Cir. 2013) (same); *United States v. Garcia*, No. 02-CR-110S-01, 2003 WL 22938040, at *3 (W.D.N.Y. Dec. 2, 2003) (same).

## I.   Section 249(a)(1) Raises No Federalism or Separation-of-Powers Concerns

The defendant, in various forms, argues that § 249 violates federalism principles by infringing on a general police power the Constitution reserves to the states. *See, e.g.*, Docket No. 179 at 3, 7, 14-20. The defendant's arguments boil down to the following: he urges this Court to hold that the authority to prosecute violent, race-motivated crime—including a mass shooting against Black people—rests exclusively with the states. But neither the Constitution nor case law support such a request.

As the Supreme Court has made clear, when Congress legislates pursuant to one of its enumerated constitutional powers, there can be no Tenth Amendment violation. *See, e.g.*, *New York v. United States*, 505 U.S. 144, 156 (1992) ("If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States."). Accordingly, the Tenth Amendment does not "prohibit[] Congress from displacing state police power laws regulating private activity" when exercising its own authority, and any holding to the contrary would be "a radical departure from long-established precedent."

*Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 292 (1981), *overruled on other grounds*, *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 528 (1985).

That a crime is prosecutable under both state and federal law does not alter this conclusion. Federal laws can, and often do, target harms also criminalized by the states. *Gamble v. United States*, 587 U.S. 678, 681 (2019). It has long been settled that "[u]nder [the] 'dual-sovereignty' doctrine, a State may prosecute a defendant under state law even if the Federal Government has prosecuted him for the same conduct under a federal statute." *Ibid.*; *see also Denezpi v. United States*, 596 U.S. 591, 597 (2022). Because, as described in detail below, § 249 represents an appropriate use of Congressional authority under the Thirteenth Amendment, the defendant's prosecution under both state and federal law for his racially motivated mass shooting of Black people raises no federalism or separation-of-powers issues.

## II.   Section 249(a)(1) Is Constitutional under the Thirteenth Amendment

The defendant seeks dismissal of the Indictment by arguing that § 249 is unconstitutional both on its face and as applied to his conduct. Specifically, the defendant contends that Congress exceeded its constitutional authority with § 249(a)(1)'s prohibition of racially motivated violence—an argument *no* court has ever agreed with—by claiming that race-based violence is not one of the "racially-motivated harms that were inseparable legal incidents of slavery" and that the HCPA is generally unnecessary. *See* Docket No. 179 at 7-19. The defendant also summarily argues that, even if facially valid, § 249(a)(1) is unconstitutional as applied to his conduct because the State of New York already prosecuted him for racially motivated state criminal offenses. *Id.* at 19-20. Both arguments fail. Section 249(a)(1) is an appropriate exercise of Congress's Thirteenth Amendment authority to pass all laws necessary and proper for abolishing all badges and incidents of slavery in the United

States—which, unquestionably, includes racially-motivated violence—and the application of § 249(a)(1) to the defendant's conduct is constitutionally permissible.

**A. Section 249(a)(1) Is Facially Constitutional Under the Thirteenth Amendment.**

As relevant here, the HCPA makes it a crime to willfully "cause bodily injury to any person, because of the actual or perceived race, color, religion, or national origin of any person[.]" 18 U.S.C. § 249(a)(1). In enacting the HCPA, Congress made clear that the authority for Subsection (a)(1) derived from the Thirteenth Amendment. Pub. L. No. 111-84, Div. E, 123 Stat. 2190, Sec. 4702 (2009). *Compare* 18 U.S.C. § 249(a)(2) (jurisdiction under Commerce Clause authority); 18 U.S.C. § 249(a)(3) (special maritime and territorial jurisdiction).

Every federal court to examine the constitutionality of § 249(a)(1) has upheld it as a valid exercise of Congress's Thirteenth Amendment authority. *See United States v. Hougen*, 76 F.4th 805, 814 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 1121 (2024); *United States v. Diggins*, 36 F.4th 302, 310 (1st Cir. 2022), *cert. denied*, 143 S. Ct. 383 (2022); *United States v. Roof*, 10 F.4th 314, 391-92 (4th Cir. 2021), *cert. denied*, 143 S. Ct. 303 (2022); *United States v. Metcalf*, 881 F.3d 641, 645 (8th Cir. 2018), *cert. denied*, 139 S. Ct. 412 (2018); *United States v. Cannon*, 750 F.3d 492, 505 (5th Cir. 2014), *cert. denied*, 574 U.S. 1029 (2014); *United States v. Hatch*, 722 F.3d 1193, 1205-06 (10th Cir. 2013), *cert. denied*, 572 U.S. 1018 (2014); *United States v. Bowers*, 495 F. Supp. 3d 362, 365-68 (W.D. Pa. 2020); *United States v. Henery*, 60 F. Supp. 3d 1126, 1129-30 (D. Idaho 2014); *United States v. Beebe*, 807 F. Supp. 2d 1045, 1048-52 (D.N.M. 2011). Over and over, courts have found that Congress acted rationally in enacting § 249 because race-based violence is a "paradigmatic badge and incident or relic of slavery." *Diggins*, 36 F.4th at 310 (internal quotation marks omitted). Against the backdrop of American history, such a

conclusion is not only rational but "ineluctable." *Beebe*, 807 F. Supp. 2d at 1052. No court has suggested otherwise.[1]

In addition, as detailed below, every court to consider § 249's constitutionality has applied the deferential rationality review from *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968). Although the Second Circuit has not yet considered the issue as it relates to the HCPA, it has applied *Jones* in reviewing and upholding the constitutionality of other federal hate-crime legislation under the Thirteenth Amendment, confirming this Court should do the same here. *See United States v. Nelson*, 277 F.3d 164, 190-91 (2d Cir.), *cert. denied*, 537 U.S. 835 (2002) (affirming the constitutionality of 18 U.S.C. § 245(b)(2)(B)).

1. *Section 2 of the Thirteenth Amendment Grants Congress Broad Enforcement Authority.*

The Thirteenth Amendment provides firm constitutional grounding for § 249(a)(1)'s prohibition on race-based violence as a badge and incident of slavery. Enacted in 1865, the Thirteenth Amendment abolished the institution of slavery as it existed in the United States at the time of the Civil War, declaring in § 1, "Neither slavery nor involuntary servitude, except as punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." Section 1 is not limited to

---

[1] To bootstrap his untenable argument, the defendant cherry-picks dicta from the majority opinion in *Hatch* and statements from the majority and concurring opinion in *Cannon*. The case law, however, speaks for itself, with each majority and the concurring opinion finding that § 249(a)(1) is a valid exercise of Congress's Thirteenth Amendment authority. *See Hatch*, 722 F.3d at 1206 (holding "that Section 2 of the Thirteenth Amendment authorized Congress to enact the racial violence provision of the Hate Crimes Act"); *Cannon*, 750 F.3d at 497 (holding that because of "the Supreme Court's precedent and our prior precedent in this area, we conclude that § 249(a)(1) is valid"); *Id.* at 514 (Elrod, J., concurring) (noting that despite having concerns about tension among recent constitutional jurisprudence, § 249(a)(1) "is clearly permissible under existing Thirteenth Amendment precedent"). Further, while the defense is correct that a lone dissenting Ninth Circuit judge questioned the constitutionality of § 249(a)(1), the Ninth Circuit majority, in line with every other Circuit, "ha[d] no trouble" finding that § 249(a)(1) is a valid exercise of Congress's Thirteenth Amendment authority. *Hougen*, 76 F.4th at 814 ("concluding that § 249(a)(1), and [the defendant's] prosecution thereunder, passes the deferential *Jones* [*v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968)] test").

the issue of antebellum slavery; it guarantees freedom for people of all races. *Bailey v. Alabama*, 219 U.S. 219, 240-41 (1911). Section 2 of the Thirteenth Amendment grants Congress the "power to enforce" Section 1 "by appropriate legislation." U.S. Const. Amend. XIII.

Interpreting that language, the Supreme Court has long recognized that the Thirteenth Amendment not only prohibits slavery but extends to eradicating the societal vestiges of slavery as well. *See, e.g.*, *Bailey*, 219 U.S. at 240-41 ("[T]he plain intention [of the Thirteenth Amendment] was to abolish slavery of whatever name and form and all its badges and incidents. . ."). The Supreme Court has also made clear that Congress's enforcement power under § 2 to define badges and incidents of slavery must be interpreted broadly.

In 1968—overruling the prior contrary case law cited by the defendant—the Court, in *Jones v. Alfred H. Mayer Co.*, confirmed that § 2 of the Thirteenth Amendment grants Congress the power to do "much more" than abolish slavery. 392 U.S. at 439, 441-43, n. 78 (disavowing the restrictive interpretation of that language in *Civil Rights Cases* and overruling conclusion in *Hodges v. United States*, 203 U.S. 1 (1906), that "only conduct which actually enslaves someone can be subjected to punishment under legislation enacted to enforce the Thirteenth Amendment"). The *Jones* Court adopted an expansive view of congressional authority under § 2, holding "Congress has the power under the Thirteenth Amendment *rationally to determine* what are the badges and the incidents of slavery, and the authority to translate that determination into effective legislation." *Jones*, 392 U.S. at 440 (emphasis added). Since *Jones*, both the Supreme Court and Second Circuit have affirmed Congress's inherent authority to rationally determine what are badges and incidents of slavery. *See United States v. Kozminski*, 487 U.S. 931, 951 (1988) (describing the determination

of what constitutes "involuntary servitude" as an "inherently legislative task"); *Nelson*, 277 F.3d at 185 n. 20 (recognizing that "the task of defining 'badges and incidents' of servitude is by necessity even more inherently legislative").

Moreover, the Supreme Court has repeatedly affirmed Congress's broad legislative power under the Thirteenth Amendment, as analyzed under *Jones*'s rational determination standard. *See, e.g.*, *Runyon v. McCrary*, 427 U.S. 160, 169-71 (1976) (applying *Jones* to uphold 42 U.S.C. § 1981's prohibition of racial discrimination in private contracts); *Griffin v. Breckenridge*, 403 U.S. 88, 105 (1971) (applying *Jones* to uphold 42 U.S.C. § 1985(3), a statute affording a civil remedy for private actions alleging civil rights violations, and noting that such legislation under the Thirteenth Amendment may "extend far beyond the actual imposition of slavery or involuntary servitude"); *see also Hougen*, 76 F.4th at 815 ("The Supreme Court has clearly said that *Jones* is the test under the Thirteenth Amendment."). Therefore, under this jurisprudence, "if Congress rationally determines that something is a badge or incident of slavery, it may broadly legislate against it through Section 2 of the Thirteenth Amendment," *Hatch*, 722 F.3d at 1201, and courts "must respect Congress's determination unless it lacks a rational basis." *Cannon*, 750 F.3d at 501.

Instructively, as noted *supra*, the Second Circuit, applying the *Jones* rationality standard that governs here, upheld other hate crimes legislation in *Nelson*. 277 F.3d at 190-91. There, the Second Circuit found 18 U.S.C. § 245(b)(2)(B)—another criminal statute that prohibits certain forms of racially motivated violence—to be a valid exercise of Congress's power to enforce the Thirteenth Amendment. *Ibid.* The Second Circuit began its analysis of § 245's constitutionality with the Supreme Court's holding in *Jones* that § 2 of the Thirteenth Amendment "clothed Congress with power to pass *all laws necessary and proper for abolishing all*

*badges and incidents of slavery in the United States*," *id.* at 183 (quoting *Jones*, 392 U.S. at 439 (internal quotation marks and citation omitted; emphasis in original)), and that "Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and the incidents of slavery, and the authority to translate that determination into effective legislation." *Ibid.* (quoting *Jones*, 392 U.S. at 440).

The Second Circuit then analyzed whether Congress could have rationally found that the acts of violence covered by § 245(b)(2)(B) impose such a badge or incident of slavery or involuntary servitude on their victims. *Id.* at 185. The Second Circuit concluded that because § 245(b)(2)(B) requires that victims be harmed *because of* their race or religion and *because of* their use of a public facility, *id.* at 185-86, § 245(b)(2)(B) "falls comfortably within Congress's 'power under the Thirteenth Amendment rationally to determine what are the badges and the incidents of slavery, and [its] authority to translate that determination into effective legislation,'" *id.* at 190-91 (quoting *Jones,* 392 U.S. at 440) (alteration in original), and therefore was a constitutional exercise of Congress's authority under the Thirteenth Amendment. *Id.* at 191.[2] Other federal courts that have considered § 245(b)(2)(B)'s constitutionality have agreed with the Second Circuit. *See, e.g.*, *United States v. Allen,* 341 F.3d 870, 883-84 (9th Cir. 2003); *United States v. Bledsoe,* 728 F.2d 1094, 1097 (8th Cir. 1984).

---

[2] Although in *Nelson*, the Second Circuit addressed the constitutionality of § 245(b)(2)(B), requiring both that a defendant acted *because of* a victim's race or religion and *because of* a victim's use of a public facility, it specifically noted that it was not holding that requirement that a defendant acted because of a victim's use of a public facility was necessary to the statute's constitutionality under the Thirteenth Amendment. *Id.* at 190 n. 25 ("[W]e emphasize that we are not holding that both (and in particular the second) of the conditions are necessary to the statute's constitutionality" and "[t]hus a statute, for example, that federally criminalized private racially motivated violence quite generally might or might not be constitutional under the Thirteenth Amendment.").

2.   *Congress Rationally Determined that Race-Based Violence Is a Badge and Incident of Slavery.*

Under the settled authority of *Jones* and its progeny, to find § 249(a)(1) unconstitutional on its face would require this Court to conclude that it was *irrational* for Congress to deem racially motivated violence a badge and incident of slavery. This cannot be done. The relationship between slavery and racial violence is "'not merely rational, but inescapable.'" *Roof*, 10 F.4th at 392 (quoting *Beebe*, 807 F. Supp. 2d at 1052, *aff'd sub nom Hatch*, 722 F.3d at 1193). Indeed, Congress expressly determined as much when, in enacting § 249(a)(1), it found:

> For generations, the institutions of slavery and involuntary servitude were defined by the race, color, and ancestry of those held in bondage. Slavery and involuntary servitude were enforced, both prior to and after the adoption of the 13th amendment to the Constitution of the United States, *through widespread public and private violence directed at persons because of their race*, color, or ancestry, or perceived race, color, or ancestry. Accordingly, *eliminating racially motivated violence is an important means of eliminating, to the extent possible, the badges, incidents, and relics of slavery and involuntary servitude.*

Shepard-Byrd Act, Pub. L. No. 111-84, § 4702(7), 123 Stat. 2836; 34 U.S.C. § 30501 (emphasis added); *Cannon*, 750 F.3d at 500 (noting that in enacting the HCPA, Congress explicitly found that "eliminating racially motivated violence" was a critical means to eradicating "the badges, incidents, and relics of slavery and involuntary servitude") (quotation omitted).

Historical evidence amply supports this conclusion, as recognized by the Second Circuit and other circuit courts. *See, e.g., Nelson*, 277 F.3d at 189-91 (citing modern and antebellum sources discussing the issue and noting "[s]ignificantly, this practice of race-based private violence both continued beyond the demise of the institution of chattel slavery and was closely connected to the prevention of former slaves' exercise of their newly obtained civil

and other rights (rights that slavery had previously denied them), thereby presenting 'a spectacle of slavery unwilling to die'") (quoting *Jones*, 392 U.S. at 445 (Douglas, J., concurring)); *Cannon*, 750 F.3d at 501-02 (discussing the history of race-motivated violence). As the Second Circuit succinctly put it:  "slavery is preeminently a relationship of power and dominion originating in and sustained by violence," and "the peculiar institution of American slavery unquestionably did not depart from this general rule." *Nelson*, 277 F.3d at 189 (internal quotation marks and citations omitted); *see also Hatch*, 722 F.3d at 1206 (discussing that "unrestrained master-on-slave violence [w]as one of slavery's most necessary features") (citations omitted).

Racially  motivated violence continued into the 20th century and persists today.  In 2009, while considering enacting the HCPA, Congress weighed extensive evidence of the continuing problem of racial violence.  The House Report noted that "[s]ince 1991, the FBI has identified over 118,000 reported violent hate crimes," and that in 2007 alone the FBI documented more than 7,600 hate crimes, including nearly 4,900 (64 percent) motivated by bias based on race or national origin.  H.R. Rep. No. 111-86, pt. 1, at 5 (2009); *see also ibid.* ("Bias crimes are disturbingly prevalent and pose a significant threat to the  full  participation of all Americans in our democratic society.").  A 2002 Senate Report, addressing proposed legislation that ultimately became § 249, noted that "the number of reported hate crimes has grown by almost 90 percent over the past decade," averaging "20 hate crimes per day for 10 years straight." S. Rep. No. 107-147, at 2 (2002). The Senate Report also noted that "[r]ecent hate motivated killings in [several states] have demonstrated the destructive and devastating impact the [hate] crimes have on individual victims and entire communities." *Ibid.*

Every court—including the Second Circuit—to consider the issue has found that Congress rationally determined that race-based violence is a badge and incident of slavery. *See, e.g.*, *Hougen*, 76 F.4th at 814 ("The rationality of concluding that violence (or attempted violence) perpetrated against victims on account of the victims' race is a badge or incident of slavery is well established."); *Diggins*, 36 F.4th at 310 (stating that, "[i]ndeed, the violence in the record before us -- attacks against two Black men born of white-supremacist ideology -- constitutes the paradigmatic 'badge and incident' or 'relic of slavery' that the Thirteenth Amendment exists to eliminate") (citation omitted); *Roof*, 10 F.4th at 392 (stating "[i]f the point were not already obvious, we state here emphatically that concluding there is a relationship between slavery and racial violence is not merely rational, but inescapable") (internal quotation marks and citation omitted); *Nelson*, 277 F.3d at 190-91 (same); *Metcalf*, 881 F.3d at 644-45 (same); *Cannon*, 750 F.3d at 502 (same); *Bowers*, 495 F. Supp. 3d at 368 (same). The Tenth Circuit said it most plainly: "Congress could rationally conclude that physically attacking a person of a particular race because of animus toward or a desire to assert superiority over that race is a badge or incident of slavery," and that "[j]ust as master-on-slave violence was intended to enforce the social and racial superiority of the attacker and the relative powerlessness of the victim, Congress could conceive that modern racially motivated violence communicates to the victim that he or she must remain in a subservient position, unworthy of the decency afforded to other races." *Hatch*, 722 F.3d at 1206.

Congress was, therefore, well within its power under § 2 of the Thirteenth Amendment to enact § 249(a)(1): it passed the statute to criminalize race-based violence, having rationally determined that such violence is a badge and incident of slavery. Section

249(a)(1) is thus constitutional, and the defendant's motion to dismiss the Indictment must be denied.

> 3.  *The Defendant's Argument that the <u>City of Boerne</u> and <u>Shelby County</u> Standards Apply to Thirteenth Amendment Legislation Is Unavailing.*

Perhaps recognizing the frailty of arguing that Congress irrationally found racially motivated violence to be a badge and incident of slavery, the defendant next attempts to import the Fourteenth Amendment "congruence and proportionality" test from *City of Boerne v. Flores*, 521 U.S. 507 (1997), and the Fifteenth Amendment "current needs" test from *Shelby County v. Holder*, 570 U.S. 529 (2013), to Thirteenth Amendment jurisprudence. *See* Docket No. 179 at 12-14. These arguments are baseless. Indeed, to find otherwise, this Court would have to overrule controlling Supreme Court case law and disagree with every federal court to have considered this argument. Further, even if somehow the standards articulated in *City of Boerne* and *Shelby County* did apply to Thirteenth Amendment legislation, § 249(a)(1) would satisfy them.

The defendant's request to set aside *Jones*'s rational determination standard would require this Court to overrule controlling Supreme Court precedent without any reason or authority to do so. Supreme Court "decisions remain binding precedent until [the Supreme Court] see[s] fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality." *Hohn v. United States*, 524 U.S. 236, 252-53 (1998); *see also Rodriguez de Quijas v. Shearson/Am. Express. Inc.*, 490 U.S. 477, 484 (1989) (If Supreme Court precedent "has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [lower courts] should follow the case which directly controls, leaving to [the Supreme Court] the prerogative of overruling its own decisions."). Neither *City*

of *Boerne*, in establishing its "congruence and proportionality" test, nor *Shelby County*, in setting forth its "current needs" test, disturbed *Jones*. *Jones*, therefore, remains controlling Supreme Court precedent and its rational determination standard governs Thirteenth Amendment legislation.

Every federal court to consider this defense argument against § 249 has rejected it. *See, e.g.*, *Hougen*, 76 F.4th at 815 (noting that "[o]ther defendants have relied on [*City of Boerne* and *Shelby County*] to challenge § 249(a)(1), and their arguments have been consistently rejected" because "[t]he Supreme Court has clearly said that *Jones* is the test under the Thirteenth Amendment"); *Diggins*, 36 F.4th at 311 (stating that "[w]e are in no position to overrule binding Supreme Court precedent," but regardless "we absolutely disagree with [the defendant's] postulation" that *Jones* no longer applies); *Roof*, 10 F.4th at 395 (finding that "the congruence and proportionality test from *City of Boerne* and the current needs test from *Shelby County* "need not be applied to legislation enacted under the Thirteenth Amendment, absent clear direction to that effect from the Supreme Court" and thus *Jones* remains controlling law) (internal quotation marks omitted); *Metcalf*, 881 F.3d at 645 ("*Jones* constitutes binding precedent that we must follow."); *Cannon*, 750 F.3d at 505; *Hatch*, 722 F.3d at 1204-05.

The defendant's contention that *City of Boerne* and *Shelby County* overruled, or otherwise eroded, *Jones* fares no better under an examination on the merits. The defendant's position ignores several key differences between the Thirteenth Amendment, at issue in *Jones*, and the Fourteenth and Fifteenth Amendments, at issue in *City of Boerne* and *Shelby County*, respectively. *See Diggins*, 36 F.4th at 317 ("The Thirteenth, Fourteenth, and Fifteenth Amendments are independent and distinct constitutional provisions, each with its unique scope, enforcement clause, and ratification history, and each spawning its own unique

15

jurisprudence."). Because the Fourteenth and Fifteenth Amendments apply only to state actions,[3] legislation under these Amendments often directly impacts state sovereignty. By contrast, the Thirteenth Amendment allows for federal legislation targeting private conduct. *Griffin*, 403 U.S. at 105. And its enforcement provision assigns Congress the task of determining the badges and incidents of slavery—a flexible category requiring fact-specific findings that are, as discussed above, "inherently legislative." *Kozminski*, 487 U.S. at 951. That all three Amendments allow Congress to pass "appropriate" enforcement legislation does not erase these important substantive distinctions. The Second Circuit has been clear on the matter: "[T]hese [Fourteenth and Fifteenth Amendment] cases do not refer to the Thirteenth Amendment context and hence cannot be read by us as applying to that context or as undermining the foundational principle that Congress's enforcement power under Section Two of the Thirteenth Amendment extends well beyond the scope of the direct prohibitions contained in Section One." *Nelson*, 277 F.3d at 185 n. 20.

Disregarding the distinctions between the Amendments, the defendant posits that *City of Boerne* and *Shelby County* "confine Congressional authority to prophylactic legislation that is congruent and proportional to actual constitutional violations, and that responds to current conditions rather than just those from long ago." *See* Docket No. 179 at 12. However, as the defendant acknowledges, the Supreme Court did not mention the Thirteenth Amendment in *City of Boerne* or *Shelby County*. *Id.* at 14. Nor did the Supreme Court mention *Jones* in either case. *See Roof*, 10 F.4th at 394 ("Like *City of Boerne*, *Shelby County* nowhere mentions the Thirteenth Amendment or *Jones*."). Instead, the case law makes clear that the Supreme Court

---

[3] U.S. Const. amend. XIV, § 1 ("No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."); U.S. Const. amend. XV, § 1 (Voting rights shall not be abridged "by any State on account of race, color, or previous condition of servitude.").

crafted each standard at different times, for different statutes involving different constitutional provisions, and with different purposes in mind.

Specifically, in *City of Boerne*, the Supreme Court, focusing on particularities unique to the Fourteenth Amendment and its legislative history, evaluated the constitutionality of the Religious Freedom Restoration Act ("RFRA"). There, the Court held that Congress has the power to enact legislation to deter or remedy violations of the core rights guaranteed by the Fourteenth Amendment, even if such legislation intrudes into traditional areas of state autonomy. 521 U.S. at 518. But the Court made clear that this legislative power does not include the authority to expand or redefine the substantive scope of those core rights. *Id.* at 519. It held that the legislation must therefore have "congruence and proportionality between the [constitutional] injury to be prevented or remedied and the means adopted to that end." *Id.* at 520. The Court supported this conclusion by focusing on the distinct legislative history of the Fourteenth Amendment, which rejected granting Congress plenary legislative authority, *id.* at 520-22, and retained the judiciary's "primary authority" to interpret the scope of the Amendment's substantive prohibitions, *id.* at 523-24. Thus, nothing in *City of Boerne* undermines *Jones*'s recognition that Congress has a broader role under the Thirteenth Amendment, to identify the "badges and incidents of slavery," than it does under the Fourteenth Amendment, to enforce judicially-defined rights.

In *Shelby County*, a Fifteenth Amendment case, the Supreme Court addressed the narrow issue of a preclearance requirement in the Voting Rights Act, which required some states and subdivisions to seek prior federal approval for changes in electoral practices. 570 U.S. at 544-45. Concerned with the imposition of different obligations on different states, and with the potential infringement on state sovereignty, the Court rejected Congress's authority

to impose different preclearance burdens on different states based on what the Court concluded was "decades-old data and eradicated practices." *Id.* at 551. The Court did not announce a blanket rule — even for purposes of the Fifteenth Amendment — that any other legislation must tie to "current conditions." *Id.* at 557 (noting that "[o]ur decision in no way affects the permanent, nationwide ban on racial discrimination in voting found in § 2"). Thus, *Shelby County* resulted from federalism concerns not implicated by § 249(a)(1), which neither targets state action nor differentiates between states.

Assuming, *arguendo*, that the *City of Boerne* and *Shelby County* standards applied to the Thirteenth Amendment, and therefore to this case, Congress would still have acted well within its constitutional authority in enacting § 249(a)(1). While the defendant attempts to argue that Congress's enactment of § 249(a)(1) was "unprecedented" and "exceed[ed] Congress's authority and violate[d] federalism and separation-of powers-limitations," *see* Docket No. 179 at 2, 3, neither the text of § 249(a)(1) nor history support these contentions. Section 249(a)(1) is directly and narrowly drawn to address a pervasive problem that Congress rationally identified as a badge and incident of slavery: racially motivated violence. Congress based that determination on extensive findings that race-based violence was and continued to be used to perpetuate the legacy of slavery.

In response to that national problem, Congress enacted § 249(a)(1), a statute that addresses only violence involving the "willful" causation of "bodily injury." The statute does not criminalize threats of force, and it only covers attempts to cause bodily injury under a few conditions: by the use of "fire, a firearm, a dangerous weapon, or an explosive or incendiary device." 18 U.S.C. § 249(a)(1). Further, the statute only covers such actions when undertaken "*because of* the actual or perceived race, color, religion or national origin of any person." *Id.*

(emphasis added). Such circumscribed legislation simply cannot be said to be so "[l]acking" in proportionality with the "injury to be prevented or remedied" that it substantively redefines the rights protected by the Thirteenth Amendment. *See City of Boerne*, 521 U.S. at 520. It is a cabined statute directly responsive to an extensive historical, and continuing, problem. *Diggins*, 36 F.4th at 314-15 (holding "even if we were to accept [the defendant's] invitation to apply *City of Boerne* here, § 249(a)(1) would still be constitutional" and analyzing why "unlike RFRA, § 249(a)(1) is congruent and proportional to the harm Congress sought to address," that being, racially motivated violence). When "judged with reference to the historical experience which it reflects," *Tennessee v. Lane*, 541 U.S. 509, 523 (2004) (quotations and citations omitted), § 249(a)(1) is entirely congruent and proportional.

The defendant also appears to argue that § 249(a)(1) is unnecessary legislation that cannot be justified by "current needs" because many states have enacted hate crime statutes, *see* Docket No. 179 at 16-17, and he believes the legislative record offered insufficient evidence that states were failing to prosecute these offenses, *id.* at 17 n. 15. But *Shelby County*'s "current needs" standard does not require that states have abdicated their own separate enforcement responsibilities before Congress may legislate. Moreover, and as explained above, Congress enacted § 249(a)(1) after considering extensive evidence about both historical and current conditions relating to the pernicious problem of racially motivated violence. *See Diggins*, 36 F.4th at 316 (holding that "even if *Shelby County* can be read to impose a general obligation on Congress to update civil rights laws to account for current conditions, we see no issue with § 249(a)(1)" and finding that "Congress adopted the law after looking at conditions in 2009, which it found were broadly consistent with historical data. H.R. Rep. 111-86 at 5 (2009).").
*Shelby County*'s concerns therefore were not present in Congress's enactment of § 249.

**B. Section 249(a)(1) Is Constitutional As Applied to the Defendant's Case.**

In a total of two sentences, the defendant next argues that § 249(a)(1) is unconstitutional both on its face and as applied in this case because the State of New York prosecuted him for bias-motivated state criminal offenses. *See* Docket No. 179 at 19-20. The defendant provides no authority or analysis in support of this argument. As discussed *supra* in Section III, federal laws can, and often do, target harms that are also criminalized and prosecuted by the states. *See Gamble*, 587 U.S. at 681; *Denezpi*, 596 U.S. at 597 ("Because the sovereign source of a law is an inherent and distinctive feature of the law itself, an offense defined by one sovereign is necessarily a different offense from that of another sovereign.") (citations omitted). The State of New York's bias-motivated offenses are different offenses than the HCPA, and nothing precludes both sovereigns from seeking justice under their own laws for the defendant's bias-motivated mass shooting. Therefore, like the defendant's facial challenge, his as-applied challenge must also fail.

**III. The Federal Government's Certification Is Substantively Unreviewable and a Sound Exercise of Prosecutorial Discretion.**

Finally, the defendant challenges the federal government's certification of the 18 U.S.C. § 249(a) charges in this case, made pursuant to 18 U.S.C. § 249(b). The defendant argues that the Assistant Attorney General of the United States's Department of Justice's Civil Rights Division (AAG), Kristen Clarke, improperly certified this case under § 249(b)(1)(D) because, in the defendant's *opinion*, the State of New York and the federal government pursuing dual prosecutions against him for his bias-motivated mass shooting is not in the public interest or necessary to secure substantial justice. *See* Docket No. 179 at 20, 23-25. Arguing from this lens, the defendant asks this Court to find that the government's

certification of the HCPA charges is subject to judicial review—despite the weight of authority clearly finding that such a certification is not judicially reviewable. *See id.* at 22-23.

Section 249(b) specifies four separate and sufficient bases for certification under § 249, including that "a prosecution by the United States is in the public interest and necessary to secure substantial justice." 18 U.S.C. § 249(b)(1)(D). Section 249 explicitly allows the Attorney General to delegate authority to issue a certification under § 249 to the Assistant Attorney General for the Civil Rights Division. *See* 28 C.F.R. § 0.50(n) (delegating authority for § 249); *see also* 5 U.S.C. § 3345 (Federal Vacancies Reform Act, outlining the authority of an acting officer to perform the duties of a vacant office).

Pursuant to the Attorney General's delegation, AAG Kristen Clarke issued a certification on June 10, 2022, that prosecution of Payton Gendron under § 249(a) was, in her judgment, in the public interest and necessary to secure substantial justice. *See* Exhibit 1. On June 15, 2022, the government filed a complaint charging the defendant with violating, among other offenses, § 249(a). Docket No. 1. A federal grand jury subsequently returned an Indictment charging violations of the same statute. Docket No. 6.

### A. Certification Under 18 U.S.C. § 249(b) Is Substantively Unreviewable.

The defendant urges this Court to find § 249 certification judicially reviewable and then to "reject the Attorney General's certification of this matter or, at a minimum, order the government to provide an explanation of how it believes that proceeding this way is in the public interest and necessary to achieve substantial justice." *See* Docket No. 179 at 25. This argument is unsupported by the statutory text of the HCPA or case law.

21

A reading of the certification in this case shows that it conforms to the statutory requirements. The defendant acknowledges that AAG Kristen Clarke certified this matter under one of § 249(b)'s enumerated bases, any one of which is sufficient. *See id.* at 20. Although the defendant may wish it otherwise, that is all the statute requires. Section 249(b) demands no further written explanation for the certification decision; coordination of certification with other prosecutorial decisions; or any particular timing for certification other than prior to a prosecution. Where, as here, the certification of the federal government's prosecution under § 249 complies with the language of the statute, the certification is facially valid and procedurally sound.

Nevertheless, the defendant asks this Court to proceed with a substantive evaluation of the government's decision to charge him with violating § 249(a).  But the language of § 249 contains no provision or standard for substantive judicial review of the certification—much less for review premised on a defendant's preference for state prosecutions over federal ones. Certification under § 249(b) involves a quintessential prosecutorial decision within the Executive Branch's well-established "exclusive authority and absolute discretion to decide whether to prosecute a case." *Greenlaw v. United States*, 554 U.S. 237, 246 (2008) (quotation omitted).  Recognizing that prosecutorial judgments are "particularly ill-suited to judicial review[,]" courts have long exercised restraint in this area. *Wayte v. United States*, 470 U.S. 598, 607 (1985) ("Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake."). Indeed, "[f]ew subjects are less adapted to judicial review than the exercise by the Executive of his

discretion in deciding when and whether to institute criminal proceedings, or what precise charge shall be made, or whether to dismiss a proceeding once brought." *United States v. Ross*, 719 F.2d 615, 620 (2d Cir. 1983) (quotation and citation omitted); *see also United States v. HSBC Bank USA, N.A.*, 863 F.3d 125, 138 (2d Cir. 2017) (holding that the court's "role is not to act as 'superprosecutors,' second-guessing the legitimate exercise of core elements of prosecutorial discretion, but rather as neutral arbiters of the law") (quoting *Inmates of Attica Corr. Facility v. Rockefeller*, 477 F.2d 375, 380 (2d Cir. 1973)). The defendant offers no reason to upend this firm deference afforded to the Executive's prosecutorial discretion.

Although the defendant correctly notes that the Second Circuit has yet to consider whether a certification decision under § 249 is substantively judicially reviewable, he skirts around relevant Second Circuit precedent denying substantive review of an analogous certification requirement. *See* Docket No. 179 at 23 n. 20.[4] In *United States v. Vancier*, the Second Circuit considered the federal juvenile transfer statute, which requires the Attorney General or his designee to certify juvenile cases to an appropriate federal court where, among other things, "the State does not have available programs and services adequate for the needs of juveniles." 18 U.S.C. § 5032.  The Second Circuit held that the Attorney General's certification of statute was not subject to review. *Vancier*, 515 F.2d at 1381 ("We conclude that the certification called for by s 502, 18 U.S.C.A. s 5032 (Supp.1975), also falls into the category of unreviewable determinations to be made, in this instance, by the Attorney

---

[4] Despite the defendant's suggestions otherwise, the Second Circuit did not overrule, or otherwise significantly erode, *United States v. Vancier*, 515 F.2d 1378 (2d Cir. 1975), in *United States v. Doe*, 49 F.3d 859 (2d Cir. 1995). Indeed, two years after *Doe*, the Third Circuit found *Vancier* persuasive in finding certifications of § 5032 prosecutions substantively unreviewable. *See Impounded*, 117 F.3d 730, 733, 736 (3d Cir. 1997) (stating that *Vancier* is the "seminal case" on § 5032 certifications not being subject to judicial review, and based on "*Vancier* and its progeny," "hold[ing] that, while we have jurisdiction to review a § 5032 certification only for technical defects, for whether a crime is one of violence, and for whether the certification was made in bad faith or for improper purposes, we have no jurisdiction to review the other aspects of a § 5032 certification[.]").

General.").[5] Further, the Second Circuit discussed that it had, on multiple occasions, found certifications from the Attorney General or his designee unreviewable. *Ibid.* (looking to *United States v. Carter*, 493 F.2d 704, 707-08 & n.3 (2d Cir. 1974), and collecting cases).

As is relevant here, the certification provisions in § 249 and § 5032 are not meaningfully different. "Like § 5032, § 249(b) neither expressly provides for judicial review nor specifies any standards to evaluate the nature of the federal interest at stake." *Diggins*, 36 F.4th at 319. Accordingly, *Vancier* controls. Other courts considering § 249 certification have also turned to the § 5032 line of cases for guidance, with the overwhelming majority finding § 249 certifications not subject to judicial review.   *See ibid.* (under First Circuit precedent finding § 5032 certification unreviewable, concluding that "certifications under § 249(b) are 'unreviewable act[s] of prosecutorial discretion'") (quoting *Smith*, 178 F.3d at 26); *Bowers*, 495 F. Supp. 3d at 374-75 (under Third Circuit precedent finding § 5032 certification unreviewable, concluding that the Court "lack[ed] the ability to engage in a substantive review of the Government's certification" of §§ 247 or 249); *United States v. Maybee*, No. 11-CR-30006, 2013 WL 3930562, at *3 (W.D. Ark. July 30, 2013) (holding that "[j]udicial review of an Attorney General's certification under 18 U.S.C. § 249(b)(1) is inappropriate"); *United States v. Jenkins*, 909 F. Supp. 2d 758, 774 (E.D. Ky. 2012) (stating that "[l]ike § 5032,

---

[5] Nine other Circuits have reached the same conclusion. *See United States v. F.S.J.*, 265 F.3d 764, 771 (9th Cir. 2001) (holding "certification of a 'substantial federal interest' under § 5032 is not subject to judicial review except for such formalities as timeliness and regularity (e.g., signed by the proper official) and for allegations of unconstitutional prosecutorial misconduct"); *United States v. Doe*, 226 F.3d 672, 678 (6th Cir. 2000) (agreeing with "the overwhelming majority of circuit courts which have held that the clear implication of § 5032 is that the Attorney General's certification of a substantial federal interest is a non-reviewable act of prosecutorial discretion[]"); *United States v. Smith*, 178 F.3d 22, 25 (1st Cir. 1999); *United States v. Jarrett*, 133 F.3d 519, 538 (7th Cir. 1998); *United States v. Juvenile Male J.A.J.*, 134 F.3d 905, 909 (8th Cir. 1998); *Impounded*, 117 F.3d at 736; *United States v. Juvenile No. 1*, 118 F.3d 298, 307 (5th Cir. 1997); *United States v. I.D.P.*, 102 F.3d 507, 513 (11th Cir. 1996); *In re Sealed Case*, 131 F.3d 208, 215 (D.C. Cir. 1997). Indeed, only the Fourth Circuit has found otherwise. *See United States v. Juvenile Male No. 1*, 86 F.3d 1314, 1321 (4th Cir. 1996).

HCPA § 249(a)(2) simply requires that the Attorney General provide 'certification in writing' of one of the four listed grounds," "[t]herefore, the text of the statute indicates Congress intended that judicial review of the certification process should be precluded in favor of the broad discretion of federal prosecutors," and thus "judicial review of the Attorney General's certification under HCPA § 249(b)(1) is inappropriate").

Only the Fourth Circuit, in *United States v. Roof*, "assumed without deciding that [§ 249 certifications] are reviewable." Docket No. 179 at 22 (looking to *Roof*, 10 F.4th at 396-97). In *Roof*, the district court felt "compelled" to find Fourth Circuit precedent allowing limited judicial review of § 5032 certification "open[ed] the door" to a "limited" substantive review of § 249 certification—though it still noted that the Attorney General's certification decision "deserves great deference," and "[t]he Government, not the Court, decides whether to prosecute a case." *United States v. Roof*, 225 F. Supp. 3d 438, 451 (D.S.C. 2016), *aff'd*, 10 F.4th 314 (4th Cir. 2021) (internal quotation marks and citation omitted); *see also United States v. Hill*, 182 F. Supp. 3d 546, 551 (E.D. Va. 2016) (constrained by the same Fourth Circuit precedent), *rev'd on other grounds* 700 F. App'x 235 (4th Cir. 2017). This Court, of course, is not governed by outlier Fourth Circuit precedent. *See F.S.J.*, 265 F.3d at 768 (noting that "[o]nly the Fourth Circuit has held that the government's certification of a substantial federal interest [in a juvenile prosecution under 18 U.S.C. § 5032] is subject to judicial review"). Indeed, Second Circuit precedent forecloses such a finding.

### B. Certification Under 18 U.S.C. § 249 of the Defendant's Case Is a Sound Exercise of Prosecutorial Discretion.

As stated *supra*, in addition to arguing that the certification is subject to judicial review, the defendant argues that AAG Krsiten Clarke improperly certified this case under

§ 249(b)(1)(D) because his case does not fit the requisite statutory criteria. To bootstrap this argument, the defendant points to statements made to Congress describing § 249 as a "backstop" to state prosecution. *See* Docket No. 179 at 21. He then argues that § 249 certification in this case runs contrary to this "backstop" regime and raises federalism and double jeopardy concerns.

The defendant argues in essence that because he was prosecuted by the State of New York for bias-motivated state offenses, he should be exempt from a federal hate crimes prosecution. But the very language of § 249 explicitly envisions circumstances *other* than where a state cannot, does not want to, or unsuccessfully prosecutes a defendant: where, as here, "a prosecution by the United States is in the public interest and necessary to secure substantial justice." 18 U.S.C. § 249(b)(1)(D). Nor does federal certification of a hate crimes prosecution risk violating federalism or the Double Jeopardy Clause, notwithstanding a parallel or preceding state proceeding. As stated *supra*, the longstanding dual sovereignty doctrine permits parallel state and federal prosecutions. *Gamble*, 587 U.S. at 681. The defendant may wish it otherwise, but the Supreme Court has repeatedly reaffirmed that separate sovereigns may prosecute a defendant for the same criminal conduct. His argument is thus unavailing.

The certification of this case—in writing, by the Attorney General's designee, that prosecution under § 249(b)(1)(D) is in the public interest and necessary to secure substantial justice—meets the applicable statutory requirements. The defendant massacred Black people at a grocery store, people who were simply trying to buy food for themselves and their families, to spread his racist ideology and inspire others to commit similar violence. He murdered ten Black people, shot three other people, and traumatized dozens of others.

The impact of this massacre was felt nationwide, and nationwide deterrence is vital. Accordingly, the substance underlying the federal government's decision to pursue this prosecution is an exercise of constitutionally delegated prosecutorial discretion that is not proper for substantive judicial review.

## **CONCLUSION**

For all the reasons set forth above, this Court should deny the defendant's motion to dismiss in its entirety. Congress acted well within its constitutional authority in enacting 18 U.S.C. § 249(a)(1), the Matthew Shepard, James Byrd Jr. Hate Crimes Prevention Act, with which the defendant is charged, and § 249(a)(1) is constitutional as applied to the defendant's conduct. In addition, the certification of the defendant's prosecution under § 249(a)(1) is judicially unreviewable and a sound exercise of delegated prosecutorial discretion.

DATED:       Buffalo, New York, July 19, 2024

TRINI E. ROSS                                          KRISTEN M. CLARKE
United States Attorney                                 Assistant Attorney General
Western District of New York                           Civil Rights Division


BY:   s/JOSEPH M. TRIPI                    BY:   s/LAURA B. GILSON
      s/BRETT A. HARVEY                          Trial Attorney
      Assistant United States Attorneys           Civil Rights Division
      United States Attorney's Office              U.S. Department of Justice
      Western District of New York                150 M Street NE
      138 Delaware Avenue                         Washington, DC 20530
      Buffalo, New York 14202


                                           BY:   s/MICHAEL S. WARBEL
                                                 Trial Attorney
                                                 Criminal Division
                                                 U.S. Department of Justice
                                                 1331 F. St. NW, Ste. 623
                                                 Washington, DC 20004