IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

───────────────────────────────

UNITED STATES OF AMERICA,

                v.                           22-CR-109-V

PAYTON GENDRON,

                Defendant.

───────────────────────────────

## GOVERNMENT'S MOTION TO ESTABLISH PROCEDURES FOR 12.2 PROCEEDINGS

The United States, by and through its attorneys, Trini E. Ross, United States Attorney for the Western District of New York, and Kathleen Wolfe, Deputy Assistant Attorney General, Civil Rights Division, and Joseph M. Tripi and Brett A. Harvey, Assistant United States Attorneys; Daniel E. Grunert, Trial Attorney, Civil Rights Division; and Michael Warbel, Trial Attorney, Criminal Division,  and pursuant to this Court's May 24, 2024, text scheduling order, Docket No. 173, moves this Court to establish the following procedures for litigation of issues governed by Fed. R. Crim. P. 12.2.


**I.**        **Requirements for the Contents of Defendant's Rule 12.2(b)(2) Notice**

If the defendant intends to introduce expert evidence relating to a mental disease or defect or any other mental condition of the defendant bearing on the issue of guilt or punishment in this capital case, he must notify the government in writing of this intention and file a copy of the notice with the court.  Fed. R. Crim. P. 12.2(b).  This Court has set a May 19, 2025, deadline for the defendant to file any Rule 12.2(b) notice.  The purpose of this notice provision is to give the government the ability to meaningfully respond to the defendant's

mental health claims, which will usually require reliance on expert assistance, while also preventing unnecessary trial delays. *See* Fed. R. Crim. P. 12.2 advisory committee's notes. In *United States v. Sampson*, 335 F. Supp.2d 166 (D. Mass. 2004), the district court examined what must be included in a capital defendant's Rule 12.2(b) notice. In that case, the defendant filed notice stating: "he may introduce, at the penalty phase of this capital case, expert evidence relating to a mental disease or defect or any other mental condition bearing on the issue of punishment." *Id*. at 241. Though the court found this terse notice was sufficient to trigger the government's request for a rebuttal examination, *id*. at 242, the court nonetheless found "meritorious" the government's request for supplemental information, which "was necessary to enable the government to hire the right type of rebuttal experts and conduct the proper tests." *Id*. at 243. The court resolved that Rule 12.2(b) requires "meaningful notice," that is, notice that is sufficient to provide the government "the opportunity to conduct the kind of investigation needed to acquire rebuttal testimony." *Id*. at 242-43.

Applying the above reasoning, the *Sampson* court adopted the parties' agreement that defense counsel would supplement the defendant's Rule 12.2 Notice to include "[t]he kinds of mental health professionals who have evaluated [the defendant] (e.g., forensic psychiatrist, neuropsychologist, clinical psychologist) as well as the specific nature of any testing that these experts have performed (e.g. MMPI-2, WAIS-2, etc.))." *Id*. at 242. The court found that these requirements for Rule 12.2 notice balanced the government's need for meaningful notice with the defendant's rights. *See id*. at 243-44 (noting that requiring more-detailed contents, such as notice of "nature of proffered mental condition(s), and/or notice of defense strategies would run afoul of Rule 12.2(c) and/or the Sixth Amendment).

Though the government has requested more-detailed information in some cases, the government acknowledges that the notice requirements adopted in *Sampson* have become the prevailing standard in capital cases in the past two decades.   *See*, *e.g.*, *United States v. Skates*, Case No. 15-285, 2018 WL 6002321, *3 (N.D. Cal. Nov. 15, 2018) ("Skates fails to identify any case concluding that Rule 12.2 does not require disclosure of the kinds of mental health experts and the nature of the examinations that such experts have conducted or will conduct."); *United States v. Watts*, Case No. 14-40063, 2016 WL 7337986, *10 (S.D. Ill. Dec. 19, 2016) (concluding that meaningful notice under Rule 12.2 includes the kind of mental condition experts and nature of tests to be performed); *United States v. Council*, Case No. 17-866, 2018 WL 7821136, *1 (D.S.C. Oct. 31, 2018) (same) ; *United States v. Roof*, Case No. 15-472, Docket No. 226 (D.S.C. Jun. 30, 2016) (same);[1] *United States v. Richardson*, Case No. 08-139, 2010 WL 11665018, *2 (N.D. Ga. Jul. 12, 2010) (same); *United States v. Umana*, Case No. 08-134, 2009 WL 2489309, *3 (W.D.N.C. Aug. 12, 2009) (same); *United States v. Lujan*, 530 F. Supp.2d 1224, 1238-39 (D.N.M. 2008) (same); *United States v. Wilson*, 493 F. Supp.2d 348, 353 (E.D.N.Y. 2006) (same).   *See also United States v. Bowers*, Case No. 18-292, Docket No. 753 at 11 (W.D. Pa. Jul. 5, 2022) (defense response to government request for expansive Rule 12.2(b) notice, in which the defense conceded that courts have required Rule 12.2(b) notices to include "(i) the type of experts the defense intends to call, and (ii) the names of any tests administered by the defense experts").[2]

---

[1] The court's order in *Roof* differed slightly from others cited herein in that the court required the defendant to provide a list of "the specific tests the experts have performed or are expected to perform."  *Id*. at 1.

[2] The *Bowers* court ultimately denied the government's request for expansive Rule 12.2(b) notice, which would have included the names and qualifications of defense experts and diagnostic conclusions.  On February 23, 2023, Bowers filed a sparse notice tracking only the

Here, the defendant's May 19, 2025, notice must be sufficient to permit the government to prepare potential rebuttal evidence. Such evidence will include identifying appropriate experts in the vast mental health arena and having those professionals conduct interviews and evaluations of the defendant that will allow the government to fully assess and respond to the defendant's mental health claims, testing the validity and veracity of any diagnoses or claims asserted by defense experts, and offering alternative explanations where appropriate. Accordingly, the government requests that the notice identify, at a minimum, the type(s) of expert(s) that have or will examine the defendant, as well as the type(s) of examination(s) that were or will be conducted.

---

language of Rule 12.2(b), which stated "Notice is hereby given by counsel for Robert Bowers that the defense intends to 'introduce expert evidence relating to a mental disease or defect or any other mental condition of the defendant bearing on the issue of punishment,' within the meaning of FRCP 12.2(b)(2)." *Bowers*, Case No. 18-292, Docket No. 972 at 1 (W.D. Pa. Feb. 23, 2023). That same day, however, Bowers provided to the government a letter providing robust notice of the "kinds of mental health professionals, areas of expertise and specific nature of testing." *See* 2/23/23 Ltr. from Clarke, et al. to Rivetti, et al. (attached as **Exhibit A**). Though the *Bowers* defense team asserted that the information they provided was in excess of that required by Rule 12.2, the letter demonstrates a strong example of the type of notice that can truly permit the government to prepare its rebuttal and, as averred by the *Bowers* defense team, "assist the parties and the Court in determining the limits of the government's rebuttal case." *Id*. at 1. In the letter, Bowers's counsel stated in pertinent part:

> Specifically, the defense intends to introduce evidence that Mr. Bowers is a person with schizophrenia, epilepsy, and structural and functional impairments of his brain. These are neurodevelopmental conditions that significantly and negatively alter a person's life course, life expectancy, perceptions, beliefs, cognitive behavior and functioning. These conclusions are based on clinical assessment, interpretation of neuropsychological test data, and neurological and neuroimaging data (CT, MRI, PET, EEG).

*Id*. The defense letter went on to list six different types of medical/psychological professionals that had examined Bowers, descriptions of each expert's testing, and basic descriptions of the types of opinions each expert would offer. *Id*. at 1-3.

## II.    Requirements for the Government's Motion for an Examination

This Court has ordered that, should the defendant file a Rule 12.2(b)(2) notice on or before the May 19, 2025 deadline, the government must then file by June 2, 2025 a motion for rebuttal examination of the defendant.  Docket No. 158 (Text Order); *see also* Fed. R. Crim. P. 12.2(c)(1)(B).  Rule 12.2 does not provide guidance on what must be included in the contents of such motion, and there is a dearth of caselaw on the topic.  The government proposes to include the following in its motion for rebuttal examination of the defendant:

a.    *The names and qualifications of the mental health professional(s) who will examine the defendant*.  The government reserves the right to utilize more than one mental health professional, depending on what the defendant avers in his Rule 12.2(b)(2) notice.  *See United States v. Bowers*, Case No. 18-292, 2023 WL 3309432, *9 (W.D. Pa. May 8, 2023) (generally granting government's request for multiple expert examinations); *United States v. Christensen*, 2019 WL 1272912, *2 (C.D. Ill. Feb. 5, 2019) ("So long as the Government shows that multiple experts would not be duplicative, more than one expert may conduct these examinations.").  The government also reserves the right to move for examination by additional expert(s) should any initial examination reveal the need for further evaluation.  *See Bowers*, 2023 WL 3309432 at *9 (permitting government experts to request additional testing).

b.    *A description of the general nature of examination(s) to be conducted by the government expert(s)*.  To the *extent* possible, this may include a list of tests to be performed, but listing tests may not be possible at this juncture, given the brief time (two weeks) between the defendant's deadline for filing his Rule 12.2(b)(2) notice and the deadline for this government filing.  Nonetheless, the government further agrees to provide a list of tests to be performed by its expert(s) at least five days prior to examination, reserving the right for the expert to administer

additional tests as reasonably informed by the expert's professional judgment (e.g., if results of one test suggest another test is necessary, the expert should have the professional discretion to administer the additional test). *See Bowers*, 2023 WL 3309432 at *9 (requiring government to provide advance notice of proposed testing, but explaining that the court "orders the same not for purposes of Defense objections to such testing and the Court's review of the same, but rather so that counsel and Defendant are sufficiently aware in advance of the nature of the examination to allow for appropriate discussions;" and holding government experts may request leave to conduct additional testing if the expert(s) determined such testing was necessary); *id.* at *13 (requiring government disclosures at least five days before testing): *Sampson*, 335 F. Supp.2d at 246 (explaining Sixth Amendment arguably does not require advance notification of testing, but citing advantages to such advance notification, such as providing defendant with opportunity to withdraw mental health defense and to understand consequences of refusing testing).

        c.    *The time and location for examination*.  The government reserves the right to examine the defendant over the course of more than one day, if necessary.  *See Bowers*, Case No. 18-292, Order of Court, Docket No. 1202 at 1 (W.D. Pa. May 8, 2023) (allowing government exam to be conducted on multiple days).  The government anticipates conducting all examinations in a closed room at the location the defendant is detained at the time of examination, but will have to coordinate with the government's expert(s), the detention facility, and U.S. Marshal's service to make this decision.  Among other things, inquiries must be made regarding the space needed by the government's expert(s), the availability of appropriate space, and necessary security provisions.  Identifying the location now would be premature.

d.    *A request, if any, to record the examination*.  The government provides briefing below regarding the Court's authority to order recording.  However, a decision regarding recording would be premature at this point.  Input from the defense is necessary, and the government *expert*(s) must be given the opportunity to opine on the propriety of or necessity for recording.  Nonetheless, should the government decide to request recording, it will include such request in its June 2, 2025 motion for examination.

e.    *A request, if any, for medical records, raw data from psychological testing by defense experts, and any imaging/scans created by or relied upon by defense experts (e.g., CT, MRI, PET, etc.).* *See Bowers*, 2023 WL 3309432 at *12 (W.D. Pa. May 8, 2023) (requiring disclosure of these categories of information).

### III.    Procedures for the Disclosure of Results and Reports Pursuant to Rule 12.2(c)

The government proposes the following procedures for disclosure of results and reports.  These proposed procedures strictly follow Rule 12.2(c) and were employed by the courts in *United States v. Roof*, 235 F. Supp.3d 419 (D.S.C. 2016) and *Bowers*, Case No. 18-292, Docket No. 1202 (W.D Pa. May 8, 2023).

1.    After completion of testing, each of the government's expert(s) shall create two copies of a) the expert(s)'s C.V., b) the expert(s)'s testing results and raw data, and c) the expert(s)'s report.  The expert(s) shall place one copy into a folder labeled "For the Defense" and the second copy into a folder labeled "For the Government."  The expert(s) shall seal the folders and deliver the folders to the Clerk of Court, together with a signed statement from the expert(s) indicating that the materials delivered to the Court are true, accurate, and

complete copies, and indicating the expert(s)'s understanding that he/she may not discuss the examination with anyone unless and until given approval from the court. These materials may not be disclosed to any attorney for the government or defendant unless the defendant is found guilty of one or more capital crimes and the defendant confirms an intent to offer during sentencing proceedings expert evidence on mental condition.

2.      If the defendant is acquitted, the materials submitted to the Court by the government experts may be destroyed upon order of the Court. If the defendant is found guilty of one or more capital crimes, the defendant shall, within 24 hours of the verdict, file notice confirming or withdrawing his intent to introduce expert evidence relating to mental condition during sentencing. If the defendant withdraws his notice of intent to introduce expert evidence relating to mental condition during sentencing, the Court shall not disseminate the sealed government expert materials to counsel for either party. If the defendant confirms his intent to introduce expert evidence relating to mental condition during sentencing, the Court will release the sealed reports and results of examinations by government expert(s) to counsel for the defense and government as soon as practicable.

3.      Upon receipt of the results and reports of the government expert(s), the defendant shall have 24 hours to provide to the government the results and reports of any examination on mental condition conducted by a defense expert about which the defendant intends to introduce expert evidence, as well as each expert's C.V. If the defense expert witness has not prepared a report, then the defendant must also disclose to the government in writing: (a) a complete statement of all opinions that the defendant will elicit from the witness in the defendant's penalty-phase case-in-chief; (b) the bases and reasons for them; (c) the witness's qualifications, including a list of all publications authored in the previous 10 years;

and (d) a list of all other cases in which during the previous 4 years, the witness has testified as an expert at trial or by deposition.  Failure to timely disclose the above-referenced expert's materials may result in preclusion of the defense expert's testimony at trial.

4.      No results or report of a government expert's examination of the defendant, statement made by the defendant to such expert, or medical record provided by the defendant shall be used by the government for any purpose except to rebut expert testimony relating to the defendant's mental condition offered by the defense during sentencing proceedings.

## IV.    Trial Briefing on Select Issues

At the May 21, 2024 status hearing, the Court requested briefing that would inform Rule 12.2 litigation, particularly relating to the permissible scope of government rebuttal examinations.  The government provides the following in response.

### A. Scope of Inquiry By Government Rebuttal Experts

#### 1.  Government Rebuttal Experts Are Entitled To Make Broad Inquiry into the Defendant's Mental Condition

Government experts should have broad latitude to conduct testing and evaluations that are, in their professional judgment, necessary to fully assess and explain the defendant's mental condition.  The government experts should not be limited to, among other things, administering only the same tests administered by defense experts or assessing only whether defense expert diagnoses are correct (particularly since the government experts may not know the defense expert diagnoses at the time of testing).  Further, government experts must not be limited from exploring alternative diagnoses and/or explanations for the defendant's behavior.

In this capital case, the defendant will have broad latitude to present mitigation, including information pertaining to his mental health.  The government has a corresponding, independent right to fairly investigate and present potential rebuttal information, the scope of which will necessarily be informed by what the government's mental health experts deem appropriate.  That investigation should involve appropriate testing, consistent with current clinical standards, to determine whether the defendant suffers from any mental defects he may allege.  Such an investigation necessarily contemplates testing to determine if another diagnosis is more clinically appropriate or whether the defendant suffers from any mental health malady at all.  In fact, as discussed below, the great weight of authority supports a broad rebuttal investigation guided by the professional discretion of experts, rather than the preferences of the defendant and his counsel.

The Federal Death Penalty Act (the "FDPA") provides that the defendant "may present any information relevant to a mitigating factor."  18 U.S.C. § 3593(c).  *See also Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality holding that the sentencer may "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death").  The FDPA further states that the "government and the defendant shall be permitted to rebut any information received at the hearing and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any aggravating or mitigating factor."  18 U.S.C. § 3593(c).  Consistent with that statutory command, the Supreme Court has pronounced that so long as evidence is not unduly prejudicial, confusing or misleading, "it is desirable for the jury to have as much information

before it as possible when it makes the [capital] sentencing decision." *Gregg v. Georgia*, 428 U.S. 153, 204 (1976).

When a defendant presents evidence through a psychological expert who has examined him, the government likewise is permitted to use the only effective means of challenging that evidence: testimony from an expert who has also examined him. *Kansas v. Cheever*, 571 U.S. 87, 94 (2013) (holding in a capital case that the Fifth Amendment did not prohibit the government from introducing evidence from a court-ordered mental evaluation of the defendant to rebut the defendant's presentation of expert testimony to support a defense of voluntary intoxication). The *Cheever* Court did not articulate or imply any limitation on testing of the defendant or provide the defense with a right of refusal as to any type of evaluation. Rather, it explained, "admission of this rebuttal testimony harmonizes with the principle that when a defendant chooses to testify in a criminal case, the Fifth Amendment does not allow him to refuse to answer related questions on cross-examination." *Id*. Thus, the Court countenanced a rebuttal investigation, even if it exceeded in some measure, the scope of testing conducted by the defense.

In *United States v. Troya*, one of the two defendants facing the death penalty for the drug-related murders of two adults and their two children gave notice under Rule 12.2(b) that he would raise a mental status defense based on his intelligence. 733 F.3d 1125, 1139 (11th Cir. 2013). The trial court then denied a defense request to limit the government rebuttal expert to conducting only I.Q. testing because that was the limited scope of the defendant's proposed mitigation evidence. *Id*. Instead, the court permitted full testing of the defendant's

mental health and status. *Id*. The court then permitted the government to present at trial rebuttal based on its experts' wider-ranging inquires, as their results contradicted the defense testimony. *Id*.

The Eleventh Circuit found on appeal no fault with the district court's decision to permit the broader rebuttal testing and testimony. *Id*. at 1140. The appellate court recognized that the "purpose of rebuttal testimony is to explain, repel, counteract, or disprove the evidence of the adverse party." *Id*. at 1138. The court also explained that, if the defendant opens the door to a line of mental health testimony, he cannot successfully object to the prosecution attempting to challenge and rebut the proposition asserted. *Id*.

The *Tsarnaev* case is also instructive. In that case, the defendant submitted notice that he would introduce expert evidence regarding his mental condition in the penalty phase. *See United States v. Tsarnaev*, 968 F.3d 24, 76 (1st Cir. 2020) (reversed on other grounds). The defendant objected to the government's planned examinations, arguing that the government had only a "limited rebuttal right" that encompassed only the "same type of testing conducted by the defense experts." *Id*. at 76. The defense argued that any broader examinations would compel the defendant to testify against himself. *Id*.

The district court ultimately overruled the defendant's objections, finding that "an appropriate rebuttal . . . might be to say that the wrong tests were done or that insufficient tests were done." *Id*. at 77 (internal quotation marks omitted). Therefore, the judge refrained from "prevent[ing] the government experts from using tests that they in 'professional

judgment' deemed 'appropriate.'"  *Id*.  The judge noted, however, that the defense could still challenge the admissibility of the examinations' results later in the proceedings.  *Id*.  The defendant ultimately withdrew his Rule 12.2 notice and did not present mental health evidence during the penalty phase.  *Id*.

Tsarnaev appealed the district court's ruling and argued that by not limiting rebuttal, the district court violated his rights under the Fifth Amendment and Rule 12.2.  *Id*.  The First Circuit rejected that argument, holding that merely allowing the examination would not amount to a Fifth Amendment violation.  *Id*. at 78.  Rather, the court explained, an appreciable Fifth Amendment violation would only have arisen if "(1) [the defendant] incriminated himself during the government experts' exams, (2) he still chose to present mental-health evidence, (3) the judge let a government expert testify based on [the defendant's] self-incriminating comments, and (4) the expert's testimony was not proper rebuttal."  *Id*.

Similar to decisions in *Troya* and *Tsarnaev*, district courts have regularly granted government mental health experts in capital cases the freedom to conduct professionally appropriate examinations untethered from defense-manufactured limitations.  *See*, *e.g.*, *United States v. Wilson*, 920 F. Supp.2d 287, 298 (E.D.N.Y. 2012) (holding that because "psychiatric examination requires considerable freedom to the examiner," any perceived flaws in the examiner's choice of tests would be addressed in cross examination or briefing to the court after the examinations); *Richardson*, 2010 WL 11665018 at *8 (rejecting Fifth and Sixth Amendment claims that a government examination could not go "beyond the scope and

nature of the examinations performed by the defense mental health experts" and rejecting a defense assertion that government experts should not be able to perform any tests because defense psychiatrists had not done any testing, reasoning that: "While Defendant's experts may not have deemed testing necessary or useful, the Government's expert may determine in his or her professional opinion that testing is necessary to evaluate Defendant's mental condition and properly rebut Defendant's expert mental health evidence"); *United States v. Hardy*, 644 F. Supp.2d 749, 751 (E.D. La. 2008) (refusing to "restrict the scope of the examination" because the court was "not in a position to know what lines of inquiry are appropriate from the standpoint of the experts," and noting that the defense could later "object to the admission of any conclusions by the government expert that i[t] found to be based on improper lines of inquiry").

The district court decision in *United States v. Holmes*, Case No. 18-258, 2020 WL 5414786, (N.D. Cal. Sept. 9, 2020), a well-publicized non-capital case, is also helpful.  In *Holmes*, the defendant, the founder of biotech firm Theranos who was charged with defrauding investors, provided Rule 12.2(b)(1) notice of intent to offer expert mental health evidence bearing on guilt.  2020 WL 5414786 at *1.  The government moved for an examination of the defendant pursuant to Rule 12.2(c), and the defendant sought discovery of the government's rebuttal experts' planned testing in order to "object in advance to the testing."  *Id*. at *5.  Noting the government's examination was for rebuttal purposes only and that the examination would, therefore, be limited to the scope of the topics raised in the defendant's Rule 12.2(b) notice, the court refused to "litigat[e] the proposed testing or topics

of inquiry in advance of the examination." *Id.* (explaining that to do so would "not be practicable or productive"). The court stated:

> The Government's experts will be permitted to administer any tests and ask any questions they deem necessary to form an expert opinion on the above topics. If, after the examination has been conducted, Defendant Holmes believes the Government has gone beyond what is reasonably necessary for rebuttal, she will have the opportunity to bring an appropriate motion to the Court."

*Id.*

Most recently, in *Bowers*, the defense attempted to sharply limit the scope of the government's-expert's evaluations, arguing "proper rebuttal is limited to a determination of whether there is support for the defense assertion that Mr. Bowers is a person with schizophrenia, epilepsy, and structural and functional impairments of his brain." 2023 WL 3309432 at *5 (quoting defense submission). The court held that it would not limit the government experts prior to examination and would defer addressing the issue of the scope of the examination until ruling on the admissibility of any evidence gained from the examination. *Id.* The court reasoned that this was "the most efficient manner to allow for the Government to prepare meaningful rebuttal testimony while protecting the Defendant's rights." *Id.* (citing with approval the First Circuit's analyses in *Tsarnaev* and *Holmes*).

Here, though the defendant has not yet made any public representations of what mental health claims he may advance in support of potential penalty phase mitigation, the government has no obligation to accept any representations the defense may assert. Further, the government should not labor under limitations that would thwart its ability to ascertain information that may "explain, repel, counteract, or disprove" assertions made by the defendant with regard to his mental health. *Troya*, 733 F.3d at 1138.

15

The adversarial process demands an opportunity to examine the defendant as effectively as possible – through full psychological, psychiatric, neurological, or radiological examinations, whatever the case may be.  *See Cheever*, 571 U.S. at 94 (explaining the "only effective means of challenging" expert mental health evidence is through testimony from an expert who has also examined the defendant).  Here, any ruling that forestalls or limits the government's ability to rebut mental health evidence "would undermine the adversarial process, allowing [the] defendant to provide the jury, through an expert operating as a proxy, with a one-sided and potentially inaccurate view of his mental state at the time of the alleged crime."  *Id.*

What is more, in the mental health field, differential diagnoses abound.  Thus, rebuttal evidence may properly offer alternative diagnostic explanations for symptoms ascribed to different conditions by the defense.  Accordingly, the district court recognized alternative diagnoses as proper rebuttal in the *Sampson* retrial.  *See United States v. Sampson*, Case No. 01-10384, 2016 WL 11726919, *20 (D. Mass. Sept. 2, 2016).  Sampson argued that "his mental condition evidence . . . [would] be limited to testimony regarding brain impairment and the general symptoms his experts opined the result thereof."  *Id*.  He, therefore, moved the court to restrict the government's rebuttal to evidence that he did not suffer from alleged brain damage and to otherwise exclude any testimony explaining his conduct via alternative diagnoses, including that of antisocial personality disorder (ASPD).  *Id*. at 19-20.  Relying on *Cheever* the district court declined to preemptively limit the testimony, explaining:

> This view elevates semantics over substance, and it appears inconsistent with the Supreme Court's view of rebuttal mental health evidence.  Although an ASPD diagnosis does not necessarily rule out the possibility of brain damage, it is not clear that rebuttal evidence is properly subject to such a rigid limitation.

> The specific relevance, however, of the proffered testimony here is a question best answered after Sampson's presentation to the jury is complete.

*Id.* at 20 (internal citations omitted).  As in *Sampson*, this Court should reject the cribbed and erroneous view that as between multiple potential mental health diagnoses, the defenses' proffer of a theory will delimit the diagnostic course of the government's rebuttal.

In light of the persuasive authority cited above, the government will move this court, if ever necessary, to permit the government rebuttal experts to conduct inquiries as they see professionally fit, and then to evaluate the admissibility of the experts' potential testimony at trial.

## 2.  Government Experts Are Permitted To Inquire About the Charged Crimes and the Defendant's State of Mind Before, During, and After the Charged Crimes

Just as government experts should not be limited in the general scope of their rebuttal examinations, they should also not be prohibited during clinical interviews and assessments from questioning the defendant about his offense conduct.  Such questioning may be central to the experts fully understanding, among other things, the defendant's mental state before, during and after the crime, stressors or influences that may have affected the defendant's decision-making process and conduct, and the defendant's understanding of the effects of his actions.

In *United States v. Coonce*, 932 F.3d 623 (8th Cir. 2019), the trial court in a capital prison-murder case ordered the defendant to submit to mental health testing that included discussion of the crime.  932 F.3d at 636-37.  On appeal from his conviction and death sentence, Coonce

asserted "he should not have been compelled to discuss the relevant crime during his examination by the government's psychiatrist." *Id.* at 636. The Eighth Circuit disagreed, stating "[t]he district court's order on the scope of the interview complied with Fed. R. Crim. P. 12.2." *Id.* The court also held that the Rule 12.2 procedures "limit the admissibility, not the scope of the interview." *Id.*

Likewise, in *Tsarnaev*, the First Circuit affirmed the district court's decision to allow questioning about the charged criminal conduct. *Tsarnaev*, 968 F.3d at 76-79. Tsarnaev had argued that, among other things, his proposed mental health evidence (paper and pen neuropsychological testing and neuroimaging) was "non-testimonial," and that forcing him to submit to examinations by government experts was tantamount to "exposing [him] to an interrogation by a government agent." *Id.* at 77. The trial court was unmoved, though the judge did repeatedly state that he was not making a decision about the admissibility of expert testimony, only the scope of the government expert's pretrial examination. *Id.*

On appeal, the First Circuit rejected the premise that "the judge forced [the defendant] to withdraw his notice, damaging his mitigation case." *Id.* Emphasizing that the trial court would not automatically admit the results of the government's experts' exams, and that even if he did admit them, prosecutors could use them only for rebuttal, the appellate court found no Fifth Amendment violation. *Id.* at 78-79 (finding no "reasonable cause to apprehend danger").

18

Finally, the district court in *Bowers* also rejected the defendant's objections to offense-specific questioning during the government experts' examinations.  *See Bowers*, 2023 WL 3309432 at *9.  The *Bowers* court found that, if the defendant introduced offense-specific mitigation information, it could be appropriate to admit government expert testimony relating to questions the expert posed to the defendant about his criminal conduct.  *Id*.  The court further reasoned that concerns with trial delay were "legitimate" if it barred government experts from questioning the defendant on offense conduct during the initial examination, and then had to take a break in proceedings to allow a subsequent examination in which the expert could ask such questions.  *Id*.  Thus, the court permitted the government experts to question the defendant about his offense conduct, finally concluding that "any risk of harm is abated by the timing of disclosure [under Rule 12.2] and the Court's ability to restrict the admission of any information that is not properly characterized as rebuttal evidence."  *Id*. (relying on *United States v. Christensen*, Case No. 17-20037, 2019 WL 1569348, *2 (C.D. Ill. Apr. 11, 2019) (allowing government expert to conduct offense questioning in case the defendant offers "offense-specific mental health arguments")).

In this case, among other things, the defendant could introduce expert mental health information in the penalty phase to challenge the government's proof of gateway intent factors set forth in 18 U.S.C. § 3591(a)(2), which are prerequisites to statutory death eligibility.  This would be akin to challenging the *mens rea* element of a substantive offense.  Further, defense experts may testify in support of offense-specific statutory mitigating factors of impaired capacity, 18 U.S.C. § 3592(a)(1) and disturbance, § 3592(a)(6), as well as myriad non-statutory mitigating factors relating to the defendant's state of mind before and during the

criminal activity.[3]  In these circumstances, it would be entirely appropriate for government mental health experts to offer testimony relating to questions they posed to the defendant about his state of mind before, during, and after his criminal activity.

At this moment, and likely still at the time the government experts conduct their mental health examinations, the government is entirely in the dark as to the specifics of the defense mitigation case.  Just as it would not be "practicable or productive" to limit the scope of pretrial testing to be administered by government rebuttal experts, *Holmes*, 2020 WL 5414786 at *5, it would be impractical and unproductive to prohibit the government experts from questioning the defendant about his criminal activity.  Instead, the court should permit the government experts to question the defendant as they see professionally necessary to develop their rebuttal opinions, and then permit the defendant to challenge any potential portion of the government expert's testimony at trial, particularly after the defendant has presented his own case, and we best know what the scope of proper rebuttal should be.

To be sure, too, no Fifth Amendment concerns are implicated.  First, by placing his mental health at issue, the defendant has waived Fifth Amendment protections in the course of the rebuttal examination.  *See Cheever*, 571 U.S. at 94.  Further, Rule 12.2 specifically guards the defendant from any Fifth Amendment violation by not permitting trial prosecutors to have access to the reports of the government expert's examination unless and until the defendant

---

[3] For example, the defendant could claim that due to a mental disease or defect, he was incapable of showing empathy for his victims that may have prevented him from committing this horrible mass shooting, or he could claim that mental disease or defect made him susceptible to online influences that influenced his racial animus.

is found guilty of the charged crimes and has confirmed his intent to introduce mental health information in the penalty phase. *See* Fed. R. Crim. P. 12.2(c)(2). The Rule also permits the government to only use the fruits of the experts' examinations in rebuttal at the penalty phase; that is, the government may not use anything the defendant says to government experts in its penalty-phase case-in-chief. *See* Fed. R. Crim. P. 12.2(c)(4).

### B. Presence of Counsel

Defense counsel should not be permitted to be present during any examination(s) by a government expert, nor should any live feed be made available to the defense. *See Bowers*, 2023 WL 3309432 at \*10; *Richardson*, 2010 WL 11665018, \*8 (citing cases and holding "the examination . . . shall be limited to Defendant and the expert only"); *Wilson*, 920 F. Supp.2d at 304-06 (holding that neither the Fifth Amendment nor the Sixth Amendment require the presence of counsel during a mental examination conducted to rebut a psychiatric defense the defendant has initiated, and further rejecting defense requests that a live video feed be made available to them); *Sampson*, 335 F. Supp.2d at 247 (holding defense counsel's presence at the testing would not have been necessary to protect Sampson's Fifth Amendment rights because Rule 12.2 provides adequate protections and noting "substantial of majority of state and federal jurisdictions have held that a defendant does not have the right to counsel during a psychiatric examination"); *United States v. Johnson*, 362 F. Supp.2d 1043, 1091 (N.D. Iowa 2005) (holding defendant's Sixth Amendment rights adequately protected by advance notice of testing and the recording of her examinations so that there was no need for defense counsel or the defense expert to be present during testing by government expert).

The presence of counsel during the examination would taint the evaluation process and, indeed, invalidate at least some neuropsychological examinations. Any objections they would potentially raise during the evaluation process would interfere with examination. *Wilson*, 920 F. Supp.2d at 305. Such objections would also likely be meritless, given the defendant would have waived Fifth Amendment privileges by first opening the door to the examinations with his Rule 12.2(b) notice, and then agreeing to sit for such examinations. *Id*. Finally, any objections could be made after the examinations are over and prior to the expert's testimony, should the defense believe any rights were violated during the examination. *Id*. *See also Sampson*, 335 F. Supp.2d at 247 (citing cases in which courts held that a defendant does not have the right to counsel during a psychiatric examination).

**C. Recording**

Recording mental health examinations may have several benefits for both parties. First, recording will enhance efficiency by relieving the examiners of the obligation to take copious notes and permit them to concentrate fully on the interviews they conduct. Second, recording "provides the defense with the tools necessary to act if a government evaluation intrudes upon [his] rights," *United States v. Fell*, Case No. 01-12, 2015 WL 13781291, *2 (D. Vt. Oct. 9, 2015), while simultaneously shielding the examiner and examinee from false accusations. Third, recording will provide a thorough and accurate record in the event the defendant seeks to limit the experts' testimony or challenge it in cross-examination. The recordings will facilitate evaluations of the experts' methods, inquires, and alleged errors, and will ensure that any statements by the defendant can be placed in their full context.

As noted above, the government is not yet in a position to say whether it will request recording of any examinations conducted by its experts.  Among other things, input will be needed from the experts and the defense.  Nonetheless, the government provides the following brief summary of cases in which recording of government expert examinations has been at issue.

At the outset, courts have generally agreed that they may order recording pursuant to authority granted by Rule 12.2(c)(1)(B), which states: "If the defendant provides notice under Rule 12.2(b), the court may . . . order the defendant to be examined *under procedures ordered by the court*."  (Emphasis added).  *See also*, *e.g.*, *Sampson*, 335 F. Supp.2d at 247 (stating "the court has discretion to order . . . the testing be recorded"); *Johnson*, 362 F. Supp.2d at 1091 (ordering audio recordings).  Courts have also found that recording may protect the defendant by documenting the government expert evaluation process and providing clear means for the defense to raise objections to potential government expert testimony.  That said, courts have often erred on the side of caution and deferred to defendants when deciding whether to order or permit recording.  *See Bowers*, 2023 WL 3309432 at *10 ("[I]n light of Defendant's vehement opposition to the recording of any examination, the Court denies the Government's request for the same.") (listing cases).

Here, the Court should permit the parties to meet and confer on the issue of recording examinations before this issue is litigated, if at all.

23

## V.    <u>CONCLUSION</u>

For these reasons, the government requests that the Court establish the foregoing procedures for litigation of issues governed by Fed. R. Crim. P. 12.2.

Respectfully submitted,

TRINI E. ROSS                          KATHLEEN WOLFE
United States Attorney                 Deputy Assistant Attorney General
Western District of New York           Civil Rights Division


BY:  s/JOSEPH M. TRIPI            BY:  s/DANIEL E. GRUNERT
     s/BRETT A. HARVEY                 Trial Attorney
     Assistant United States Attorney's     Civil Rights Division
     United States Attorney's Office        U.S. Department of Justice
     Western District of New York           150 M Street NE
     138 Delaware Avenue                     Washington , DC 20530
     Buffalo, New York 14202


BY:  s/MICHAEL S. WARBEL
     Trial Attorney
     Criminal Division
     U.S. Department of Justice
     1331 F. St. NW, Ste. 623
     Washington, DC 20004