UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

v.

PAYTON GENDRON,

        Defendant.

22-CR-109-LJV
DECISION & ORDER

---

      A federal indictment charged Payton Gendron with hate crimes under the Matthew Shepard and James Byrd Jr. Hate Crimes Prevention Act of 2009, 18 U.S.C. § 249 ("Hate Crimes Act"), as well as firearm offenses for which the hate crimes are predicate offenses, 18 U.S.C. § 924(c), (j). Docket Item 6. On June 10, 2024, Gendron moved to dismiss the indictment on the basis that the Hate Crimes Act is unconstitutional. *See* Docket Item 179. More specifically, he argued that the law exceeds Congress's authority to legislate under the Thirteenth Amendment and violates the Tenth Amendment. *Id.* at 7-20.[1] He argued in the alternative that the government did not satisfy procedural requirements of the Hate Crimes Act. *Id.* at 20-25. The government responded to Gendron's motion, Docket Item 193, Gendron replied, Docket Item 203, and this Court heard oral argument, Docket Item 230.

      Following a well-trodden path and led by Supreme Court precedent, this Court denies Gendron's motion.

---

[1] Page numbers in docket citations refer to ECF pagination.

**BACKGROUND**

Both local and federal prosecutors have pursued criminal charges against Gendron in connection with a shooting that killed ten people and injured three at a Tops grocery store in Buffalo, New York, on May 14, 2022. *See* Docket Items 6 and 179-1. On June 1, 2022, Gendron was indicted in Erie County Court for New York State hate crimes and other crimes. Docket Item 179-1 at 2-11. A little more than a week later, Kristen M. Clarke, Assistant United States Attorney General in the Civil Rights Division, certified that "in [her] judgment, prosecution by the United States of [Gendron], for violations of [the Hate Crimes Act] on May 14, 2022, is in the public interest and is necessary to secure substantial justice." *Id.* at 72. About a month after that, a federal grand jury indicted Gendron on 27 counts: 14 for alleged hate crimes, 18 U.S.C. § 249(a)(1), and 13 for alleged use and discharge of a firearm in relation to the hate crimes, 18 U.S.C. § 924(c), (j). Docket Item 6.

Gendron later pleaded guilty in Erie County Court, and on February 15, 2023, he was sentenced to eleven concurrent life sentences plus consecutive sentences totaling another 90 years in prison. *See* Docket Item 179-1 at 65-69. On January 12, 2024, federal prosecutors gave notice that they intended to seek the death penalty against Gendron. Docket Item 125.

**DISCUSSION**

In 2009, Congress passed the Hate Crimes Act, which criminalizes "willfully caus[ing] bodily injury to any person . . . because of the actual or perceived race, color, religion, or national origin of any person." 18 U.S.C. § 249(a)(1).

I.  **FACIAL CHALLENGE**

Statutes are presumptively constitutional, see *United States v. Morrison*, 529 U.S. 598, 607 (2000), and a facial challenge requires establishing that there is "no set of circumstances . . . under which the [statute] would be valid," *United States v. Salerno*, 481 U.S. 739, 745 (1987).

A.  **Thirteenth Amendment**

Congress passed the relevant provision of the Hate Crimes Act using its authority under the Thirteenth Amendment.[2]  See 34 U.S.C. § 30501(7); *Cannon*, 750 F.3d at 498 ("[Section] 249(a)(1) rests solely on Congress's authority under [section] 2 of the Thirteenth Amendment.").  As to the reason behind the statute, Congress found that

> Slavery and involuntary servitude were enforced, both prior to and after the adoption of the 13th amendment to the Constitution of the United States, through widespread public and private violence directed at persons because of their race. . . . Accordingly, eliminating racially motivated violence is an important means of eliminating, to the extent possible, the badges, incidents, and relics of slavery and involuntary servitude.

34 U.S.C. § 30501(7).

The Thirteenth Amendment was adopted in 1865 and has two sections.  Section one abolishes slavery and involuntary servitude.  U.S. Const. Amend. XIII § 1.  Section two, the enforcement clause, grants "Congress [the] power to enforce this article by appropriate legislation."  *Id.* § 2.

---

[2] Congress used its authority under the Commerce Clause to pass other parts of the Hate Crimes Act that cover crimes involving religion, national origin, gender, sexual orientation, gender identity, and disability.  See 18 U.S.C. § 249(a)(2); *United States v. Cannon*, 750 F.3d 492, 498 (5th Cir. 2014).  Unlike hate crimes involving race, one element of those offenses is a connection to interstate commerce.  See 18 U.S.C. § 249(a)(2).

The Supreme Court has embraced an expansive view of the rights that the Thirteenth Amendment protects.  In 1911, the Supreme Court explained that while Congress's "immediate concern was with African slavery, the [Thirteenth] Amendment was not limited to that.  It was a charter of universal civil freedom for all persons, of whatever race, color, or estate, under the flag."  *Bailey v. Alabama*, 219 U.S. 219, 240-41 (1911); *see also Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 439 (1968) (repeating that the Thirteenth Amendment "established universal freedom" (quoting *Civil Rights Cases*, 109 U.S. 3, 20 (1883))).

As for enforcement, in *Jones*, the Supreme Court made clear that the amendment "clothed 'Congress with power to pass *all laws necessary and proper for abolishing all badges and incidents of slavery in the United States*.'"  *Id.* (quoting *Civil Rights Cases*, 109 U.S. at 20); *see also id.* at 442-43, 441 n.78; (referring to the "relic[s]" and "vestiges" of slavery).  And, according to the Supreme Court, Congress plays a leading role in deciding how to accomplish that end:  "Surely Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and the incidents of slavery, and the authority to translate that determination into effective legislation."  *Id.* at 440.

*Jones* applied these principles and upheld a law prohibiting "all racial discrimination, private and public, in the sale and rental of property."  *Id.* at 437-45.  "At the very least," the Court said, the Thirteenth Amendment protects "the freedom to buy whatever a white man can buy [and] the right to live wherever a white man can live."  *Id.* at 443.

4

The Supreme Court has applied *Jones* in more recent cases, including *Griffin v. Breckenridge*, 403 U.S. 88 (1971). In *Griffin*, the Court explained that "the varieties of private conduct that [Congress] may make criminally punishable or civilly remediable [under section two of the Thirteenth Amendment] extend far beyond the actual imposition of slavery or involuntary servitude." *Id.* at 105; *see also Runyon v. McCrary*, 427 U.S. 160, 169-71 (1976). The Court concluded that Congress had the authority under the Thirteenth Amendment to pass a statute providing a civil cause of action for conspiracies to deprive "any person or class of persons of the equal protection of the laws[] or of equal privileges and immunities under the laws." *Griffin*, 403 U.S. at 96, 104-05 (quoting 42 U.S.C. § 1985(3)).

Those principles apply equally to the Hate Crimes Act. Although the Second Circuit has not considered whether the Thirteenth Amendment authorizes that law, all six circuit courts to address the question have found that it does. *See United States v. Hougen*, 76 F.4th 805, 814-16 (9th Cir. 2023); *United States v. Diggins*, 36 F.4th 302, 310-11 (1st Cir. 2022); *United States v. Roof*, 10 F.4th 314, 391-92 (4th Cir. 2021); *United States v. Metcalf*, 881 F.3d 641, 645 (8th Cir. 2018); *Cannon*, 750 F.3d at 505; *United States v. Hatch*, 722 F.3d 1193, 1205-06 (10th Cir. 2013). Several district courts have done the same. *See United States v. Earnest*, 536 F. Supp. 3d 688, 715-17 (S.D. Cal. 2021); *United States v. Bowers*, 495 F. Supp. 3d 362, 365-68 (W.D. Pa. 2020); *United States v. Henery*, 60 F. Supp.3d 1126, 1129-30 (D. Idaho 2014); *United States v. Beebe*, 807 F. Supp. 2d 1045, 1048-53 (D.N.M. 2011).

This Court is persuaded by the heavy weight of that authority. Perhaps moved by the lynchings and other horrific violence that replaced slavery beginning in the 19th

Century, *see United States v. Nelson*, 277 F.3d 164, 190 (2d Cir. 2002), Congress rationally determined that racially motivated violence still is a badge or incident of slavery. *See Jones*, 392 U.S. at 440, 444; *Hatch*, 722 F.3d at 1206 ("Congress could rationally conclude that physically attacking a person of a particular race because of animus toward or a desire to assert superiority over that race is a badge or incident of slavery."); *see also* H.R. Rep. No. 111-86, pt. 1, at 5 (2009) ("Since 1991, the FBI has identified over 118,000 reported violent hate crimes," and in 2007, the FBI had documented 7,624 hate crimes, 64% of which were motivated by race or national origin.). "[T]here is widespread agreement among scholars of slavery that slavery in general (across cultural and historical periods) centrally involves the master's constant power to use private violence against the slave." *Nelson*, 277 F.3d at 189. "American slavery unquestionably did not depart from this general rule," and "race-based private violence both continued beyond the demise of the institution of chattel slavery and was closely connected to the prevention of former slaves' exercise of their newly obtained civil and other rights." *Id.* at 189-90; *see also Cannon*, 750 F.3d at 502 ("[R]acially motivated violence was essential" to slavery in the United States.). "In light of these facts," this Court certainly "cannot say that Congress was irrational in determining that racially motivated violence is a badge or incident of slavery." *Cannon*, 750 F.3d at 502; *see also Hatch*, 722 F.3d at 1206.

Indeed, the relationship between slavery and racial violence is "not merely rational, but inescapable." *Roof*, 10 F.4th at 392 (quoting *Beebe*, 807 F. Supp. 2d at 1052). And violence against Black people that is "born of white-supremacist ideology," such as the type of violence alleged in this case, "constitutes the paradigmatic 'badge

and incident' or 'relic of slavery' that the Thirteenth Amendment exists to eliminate."
See *Diggins*, 36 F.4th at 310 (quoting *Jones*, 392 U.S. at 441, 443).

Gendron disagrees but concedes that his position represents the "minority view." See Docket Item 179 at 19. His argument has two main parts: (1) the Thirteenth Amendment's enforcement clause allows Congress to protect against a narrow set of harms that does not include racially motivated violence, and (2) *Jones* must be cabined by more recent Fourteenth and Fifteenth Amendment caselaw. See Docket Item 179 at 7-19; Docket Item 203 at 1-5.

On the first point, Gendron argues that "the Thirteenth Amendment's enforcement clause extends, at most, only to racially[ ]motivated harms that were inseparable legal incidents of slavery, such as, for example, deprivations of the rights to freely travel, own property, and enter contracts." Docket Item 179 at 7 (bolding omitted). And he concludes that racially motivated violence is not one of those inseparable legal incidents of slavery. See *id.* at 14-19; Docket Item 203 at 1-5, 4 n.3; Docket Item 231 at 32. But for the reasons explained above, this Court disagrees.

Gendron also maintains that the conduct that the statute criminalizes need not be a badge or incident of slavery because the statute can apply to racially motivated crimes with white victims. See Docket Item 179 at 16 n.14. But courts have upheld under the Thirteenth Amendment other statutes that lacked limiting language about the race of the protected group. Indeed, *Jones* itself was about a statute guaranteeing "[a]ll citizens" the property rights "enjoyed by white citizens." See 392 U.S. at 412 (quoting 42 U.S.C. § 1982); *see also Griffin*, 403 U.S. at 96 (finding that Thirteenth Amendment authorized statute involving conspiracies to deprive "any person or class of persons" of equal

7

protection (quoting 42 U.S.C. § 1985(3))).  And the Second Circuit has explained that "the Thirteenth Amendment 'protect[s] from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics.'"  *Nelson*, 277 F.3d at 180 (quoting *St. Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987)); *see id.* at 168-69, 191 n.27, 213 (holding, in case involving Black defendants, that 18 U.S.C. § 245, which criminalizes injuring "any person because of his race" and because the person used a public facility, was constitutional as applied to Jewish victims).

As for his second point, Gendron argues that this Court should "harmonize[]" *City of Boerne v. Flores*, 521 U.S. 507 (1997) and *Shelby County v. Holder*, 570 U.S. 529 (2013), with *Jones*.  Docket Item 179 at 14.  Gendron contends that these cases "make clear that Congressional enforcement of the Reconstruction Amendments must be proportional and congruent to deterring or remedying actual constitutional violations and must be justified by current conditions."  *Id.* at 12 (bolding omitted); *see City of Boerne*, 521 U.S. at 518-20; *Shelby County*, 570 U.S. at 550, 553.  That is not a novel argument.  In fact, courts have considered and rejected it time and time again.  *See, e.g., Cannon*, 750 F.3d at 505 ("Even if the legal landscape regarding the Reconstruction Amendments has changed in light of *Shelby County* and *Flores,* absent a clear directive from the Supreme Court, we are bound by prior precedents."); *Hatch*, 722 F.3d at 1204 ("[E]ven if we assume [] authorities [including *Flores*] impliedly undermine *Jones*'s approach to the Thirteenth Amendment, we may not blaze a new constitutional trail simply on that basis.").  This Court agrees with and follows those precedents.

*City of Boerne* and *Shelby County* involved, respectively, the Fourteenth and Fifteenth Amendments, and neither opinion mentioned the Thirteenth Amendment or *Jones*. *See generally*, *City of Boerne*, 521 U.S. 507; *Shelby County*, 570 U.S. 529. In effect, Gendron's request would have this Court apply a more stringent standard than the one *Jones* articulates, but this Court must "follow the case [that] directly controls [and] leave[] to [the Supreme Court] the prerogative of overruling its own decisions." *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989); *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000) ("[The Supreme] Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio*.").

The Second Circuit applied similar reasoning when considering the constitutionality of a different hate crimes law in *Nelson*. The court noted that Fourteenth Amendment cases, including *City of Boerne*, "do not refer to the Thirteenth Amendment context and hence cannot be read by us as applying to that context or as undermining the foundational principle that Congress's enforcement power" under the second section of the Thirteenth Amendment "extends well beyond the scope of the direct prohibitions" of the first section. *Nelson*, 277 F.3d at 185 n.20.

What is more, there are good reasons to think that, given the unique scope and ratification history of the three amendments, Congress's enforcement power under them should be different. *See Diggins*, 36 F.4th at 317. For example, the Thirteenth Amendment reaches private action, but the Fourteenth and Fifteenth Amendments do not. *Compare Griffin*, 403 U.S. at 105 ("[S]urely there has never been any doubt of the power of Congress to impose liability on private persons" under the Thirteenth Amendment.), *with* U.S. Const. amend. XIV, § 1 (prohibiting action by the "State"), *and*

9

U.S. Const. amend XV, § 1 (same).  And the Second Circuit has contrasted the "long, well-established, doctrinally rich, and highly sophisticated tradition of judicial interpretation of the substantive protections established by [s]ection [o]ne of the Fourteenth Amendment," with the "inherently legislative" "task of defining 'badges and incidents' of servitude."  *Nelson*, 277 F.3d at 185 n.20.  So even if this Court were inclined and able to rewrite *Jones*, which it is not, it "cannot simply graft doctrines articulated and crafted for entirely separate constitutional provisions onto the Thirteenth Amendment context."  *See Diggins*, 36 F.4th at 317; *see also id.* at 311-17.

Gendron's real complaint seems to be with current and historical Thirteenth Amendment jurisprudence.  In fact, his position is better characterized not as a "minority view," *see* Docket Item 179 at 19, but as simply not comporting with precedent.  For example, he says that under *Jones*, courts do not defer to Congress's "choice of whether . . . [a particular] end is itself 'legitimate' and 'within the scope of the constitution.'"[3]  Docket Item 203 at 4 n.3 (quoting *Jones*, 392 U.S. at 443).  But *Jones* explicitly said that "Congress has the power . . . rationally to determine what are the badges and the incidents of slavery" and that those badges and incidents are the "ends"

---

[3] In support of this argument, Gendron says that *Cannon* "clarified" that courts defer to "the means that Congress uses to achieve a particular end, but not to Congress's determination that the end itself is legitimate."  *See* Docket Item 179 at 15 n.13 (citing *Cannon*, 750 F.3d at 504).  But as the beginning of the sentence that Gendron quotes makes clear, the Fifth Circuit was merely articulating "[a]mici['s] . . . argu[ment]."  *Cannon*, 750 F.3d at 504.  The court held that this argument "[wa]s foreclosed" and "continue[d] to follow the Supreme Court's binding precedent in *Jones*."  *Id.* at 505; *see also id.* at 501 ("[W]e must respect Congress's determination unless it lacks a rational basis.").

to which courts owe deference.[4]  *See* 392 U.S. at 440.  Again, this Court must and will follow the controlling caselaw.[5]  *See Rodriguez de Quijas*, 490 U.S. at 484.

### B.    Tenth Amendment

Gendron also argues that the Hate Crimes Act violates the Tenth Amendment as well as principles of federalism and separation of powers.  Docket Item 179 at 14-20.  But like his Thirteenth Amendment arguments, this argument has been considered and consistently rejected by the courts.  *See Diggins*, 36 F.4th at 311-17; *Hatch*, 722 F.3d at 1201-05; *Bowers*, 495 F. Supp. 3d at 364-65; *Henery*, 60 F. Supp. 3d at 1131-32; *Beebe*, 807 F. Supp. 2d at 1057-58.

Citing a concurring opinion in a Fifth Circuit case, Gendron suggests that Congress should be cautious when expanding federal law into areas historically reserved for the states.  *See* Docket Item 179 at 16 (citing *Cannon*, 750 F.3d at 512).  But that argument fails because, as the First Circuit has explained, "[section] 249(a)(1) is a cornerstone of a scheme of cooperative federalism, representing an ordinary example of one of many parallel state and federal penal laws."  *Diggins*, 36 F.4th at 316;

---

[4] As another example, Gendron cites a scholar who critiqued Congress for enacting the Hate Crimes Act without making a specific finding "linking racial hate crimes to a threatened reemergence of slavery or involuntary servitude."  *See* Docket Item 179 at 18-19 (quoting Jennifer Mason McAward, *Defining the Badges and Incidents of Slavery*, 14 U. Pa. J. Const. L. 561, 626-27 (2012)).  But the scholar herself acknowledged that "[t]o be fair, Congress had no reason to make a record on this point.  Its basic findings of fact would certainly satisfy the [Supreme] Court under the deferential standard set out in *Jones*."  McAward, *supra*, at 626 n.338 (italics added); *see also id.* at 630 ("Indeed, [*Jones*] empowered Congress to define the concept [of badges and incidents] itself, subject to only the most minimal rational basis review.").

[5] Gendron certainly has "preserve[d] . . . the argument that the Supreme Court should overrule [*Jones*]" in order to, in his characterization, "restore Thirteenth Amendment jurisprudence to its proper moorings."  Docket Item 179 at 19 n.17.

*see also id.* at 317 ("[Section 249(a)(1)] supports rather than offends principles of federalism."). And the Hate Crimes Act "does not allow the federal government to veto state laws or restructure state governance . . . [n]or does [it] discriminate between states." *Id.* at 316.

Moreover, as the government correctly notes, Docket Item 193 at 4-5, when the Constitution "delegate[s a power] to Congress . . . , the Tenth Amendment expressly disclaims any reservation of that power to the [s]tates," *New York v. United States*, 505 U.S. 144, 156 (1992); *see also Hatch*, 722 F.3d at 1202 ("[W]hen the Constitution explicitly grants Congress authority to act, the Tenth Amendment gives way . . . ."). Put differently, because the Constitution explicitly gives Congress the power to enforce the Thirteenth Amendment, *Hatch*, 722 F.3d at 1202, when Congress acts within that power, it cannot—by definition—offend the Tenth Amendment. *See Beebe*, 807 F. Supp. 2d at 1057. So because Congress was acting within its authority under the Thirteenth Amendment when it passed the Hate Crimes Act, that statute does not violate the Tenth Amendment or principles of federalism.[6]

---

[6] Gendron also refers to "separation[]of[] powers." *See* Docket Item 179 at 3, 14; Docket Item 203 at 1. But his reference is unavailing because he does not make any argument about it. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) (Selya, J.) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.").

Gendron's contention may be about "safeguard[ing] the Supreme Court's role as the final arbiter of the meaning of Section 1 of the Thirteenth Amendment." *See* McAward, *supra*, at 624; Docket Item 179 at 12 (explaining that in *City of Boerne*, 521 U.S. at 518-19, the Supreme Court said that Congress lacks the power to determine what constitutes a constitutional violation). But if that is Gendron's point, it is foreclosed by *Jones*, which while preserving judicial review, makes that review deferential to Congress's rational determinations. 392 U.S. at 440; *see also Hatch*, 722 F.3d at 1204-05 (noting that giving "Congress the power to define the meaning of the Constitution" is

Finally, this Court agrees with the government that under the dual-sovereignty doctrine, federal laws may target the same harms as state law.  *See* Docket Item 193 at 5 (citing *Gamble v. United States*, 587 U.S. 678, 681 (2019)).  Both federal and state governments are empowered to "determine what shall be an offense against [their] authority and to punish such offenses."  *United States v. Davis*, 906 F.2d 829, 832 (2d Cir. 1990).  And "[w]hen a single act violates the laws of two sovereigns, the wrongdoer has committed two distinct offenses."  *Id*.  Moreover, while Department of Justice policy generally disfavors dual state and federal prosecutions, such policy "is not a limitation on the government's sovereign right to vindicate its interests and values, and nothing prevents a federal prosecution whenever the state proceeding has not adequately protected the federal interest."  *See id.*

For all those reasons, Gendron's reliance on the Tenth Amendment and principles of federalism is misplaced.

## II.   AS-APPLIED CHALLENGE

Gendron says that the Hate Crimes Act is unconstitutional as applied to him because he already was prosecuted under a state hate crime provision.  Docket Item 179 at 19-20.  He makes this argument in a single paragraph and does not elaborate upon why the state prosecution makes the federal prosecution unconstitutional.  *See id.*

---

"a rare power indeed" but concluding that *Jones* controls).  Furthermore, Congress enacted the Hate Crimes Act "within the scheme announced by the Supreme Court, and did not purport to pronounce the scheme the Supreme Court ought to apply."  *Diggins*, 36 F.4th at 314; *cf. City of Boerne*, 521 U.S. at 512-16, 536 (explaining that the statute at issue "was designed to control cases and controversies" and was in direct opposition to an earlier Supreme Court decision).

At oral argument, defense counsel said that because there was a "full-throated state prosecution" and Gendron pleaded guilty to the indictment in state court, "that makes this prosecution unconstitutional."  Docket Item 231 at 27.  But that is little more than a conclusion.  And to the extent that this argument relates to Gendron's federalism argument, for the reasons explained above this Court agrees with the government that under the dual-sovereignty doctrine, a state and the federal government may prosecute a defendant for the same conduct.  *See* Docket Item 193 at 20 (citing *Gamble*, 587 U.S. at 681).

### III.     CERTIFICATION

Gendron argues that even if the Hate Crimes Act is constitutional, the government improperly certified the case for prosecution under that statute.  *See* Docket Item 179 at 20-25.  To bring a prosecution under the Hate Crimes Act, the Attorney General or a designee must certify in writing that one of four requirements is met.  18 U.S.C. § 249(b)(1).  The statute says that

> No prosecution of any offense described in this subsection may be undertaken by the United States, except under the certification in writing of the Attorney General, or a designee, that—
>
> (A) the State does not have jurisdiction;
>
> (B) the State has requested that the Federal Government assume jurisdiction;
>
> (C) the verdict or sentence obtained pursuant to State charges left demonstratively unvindicated the Federal interest in eradicating bias-motivated violence; or
>
> (D) a prosecution by the United States is in the public interest and necessary to secure substantial justice.

*Id.* In June 2022, the Attorney General's designee certified this case under subdivision (D), stating that "in [her] judgment" federal prosecution under the Hate Crimes Act "is in the public interest and is necessary to secure substantial justice." Docket Item 179-1 at 72.

Gendron asks this Court to "reject" that certification "or, at a minimum, order the government to provide an explanation of how it believes that proceeding this way is in the public interest and necessary to achieve substantial justice." Docket Item 179 at 25. He argues that New York State "[n]ot only . . . established that [it] is willing and able to prosecute [him] to the fullest, to condemn acts of racial violence in the strongest possible terms[,] and to ensure that justice is served[—but] it has done so." *Id.*

The government responds that the certification is not subject to "substantive" judicial review and that even if it were, the government has satisfied the statute. Docket Item 193 at 20-27. On the first point, the government argues that courts may only ensure that the certification "complies with the language of the statute." *Id.* at 22. In other words, the government's position is that the certification is proper so long as it cites one of the four statutory grounds. On the second point, the government says that this certification in particular was indeed in the public interest and necessary to secure substantial justice: It notes that Gendron "massacred Black people at a grocery store, people who were simply trying to buy food for themselves and their families, to spread his racist ideology and inspire others to commit similar violence." *Id.* at 26. And the government says that "[t]he impact of this massacre was felt nationwide, and nationwide deterrence is vital." *Id.* at 27.

Both sides agree that the Second Circuit has not addressed whether certifications are subject to judicial review. *See* Docket Item 179 at 22; Docket Item 193 at 23. Therefore, this Court will "assume[] justiciability," just as the Fourth Circuit did in *Roof*, 10 F.4th at 396-97. As for the standard of review, Gendron concedes that the standard is "more deferen[tial] . . . than de novo" review. Docket Item 231 at 15. But he also contends that this Court must ask whether the government's justification "is . . . in the public interest[] and [necessary to secure] substantial justice," *id.*, which sounds much like de novo review. As in *Roof*, this Court finds that, to the extent that certification is substantively reviewable, the decision "must be afforded substantial deference." *See* 10 F.4th at 396-97. Under this deferential standard, the government's reasoning about the severity of the alleged offenses and the need for national deterrence is enough to support the certification decision for several reasons.

First, this Court agrees with the government that by including subdivision (D), Congress "explicitly envision[ed] circumstances *other* than where a state cannot [prosecute], does not want to [prosecute], or unsuccessfully prosecutes a defendant." *See* Docket Item 193 at 26. Therefore, the fact that New York State has successfully prosecuted Gendron for hate crimes is not dispositive.

Second, the heinous and racist nature of the crimes alleged, and their alleged broadcast by the defendant to attract likeminded individuals and encourage similar behavior, is as reprehensible a crime as one can imagine. In other words, if—as Gendron suggests—certification was unwarranted given the allegations here, it is difficult to imagine a case in which it would be warranted.

Gendron may be correct that *Roof* is inapposite because of differences in state law. *See* Docket Item 179 at 24. "Because South Carolina does not have a hate-crimes statute, it was unable to charge Roof for a crime that consider[ed] his alleged discriminatory intent as an element of the offense." *Roof*, 10 F.4th at 397. In contrast, Gendron was charged with, convicted of, and sentenced to life without the possibility of parole for violating New York State law, including state hate crimes. *See* Docket Item 179 at 23-24; Docket Item 179-1 at 2, 65. But that difference does not make the certification of Gendron's case improper. For one, the Fourth Circuit specifically noted that the *Roof* case did not "raise close questions." 10 F.4th at 397. And the Fourth Circuit's reasoning relied both on the "statutory difference" *and* "the highly aggravated nature of Roof's crimes," which "clearly implicated a substantial federal interest in eradicating the badges and incidents of slavery." *Id.* The alleged conduct in Gendron's case likewise is aggravated and implicates the same federal interest. *See, e.g.*, Docket Item 125 at 4 (alleging that killings were racially motivated and that Gendron attempted to incite violence).

In sum, applying deferential substantive review, this Court finds that the government's certification was proper.

## **CONCLUSION**

For the reasons stated above, Gendron's motion to dismiss the indictment based on the unconstitutionality of the Federal Hate Crimes Act, 18 U.S.C. § 249(a)(1), Docket Item 179, is DENIED.

SO ORDERED.

Dated:   March 12, 2025
         Buffalo, New York

                                          /s/ Lawrence J. Vilardo
                                         LAWRENCE J. VILARDO
                                         UNITED STATES DISTRICT JUDGE