UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

      v.                                                         22-CR-109 (LJV)

PAYTON GENDRON,

            Defendant.

_____

## SUPPLEMENT TO MOTION TO STRIKE THE DEATH PENALTY AS A POSSIBLE PUNISHMENT

**I.   Introduction and Background**

On June 10, 2024, Payton Gendron filed a Motion challenging the constitutionality of the Federal Death Penalty Act under the Due Process Clause of the Fifth Amendment and the Eighth Amendment of the Federal Constitution. (ECF No. 181.) As part of that Motion, he argued that prosecutorial discretion as exercised by the Attorney General, who decides against whom the government will seek death and who will be spared a capital prosecution, results in an arbitrary application of the federal death penalty. Relying on *Gregg v. Georgia*, 428 U.S. 153 (1976), the government responded that "unfettered prosecutorial discretion in seeking the death penalty does not offend the Eighth Amendment." (ECF No. 191 at 19.) In the government's view, Payton Gendron's comparison of his case to other, similar cases in which the death penalty was not sought was inapt because "he does not at all explore the unique circumstances of each respective case (e.g., motives for the murders, circumstances of the murders, mitigation information, etc.)." *Id.* In his Reply, Payton Gendron emphasized that, notwithstanding the government's position, prosecutorial discretion is subject to constitutional restraints. (ECF No. 204 at 5.)

In a subsequent Text Order, the Court asked Payton Gendron to be ready to discuss at an upcoming status conference "the evidence that he would like to introduce about the first issue (on prosecutorial discretion)." (ECF No. 267.)  The Court also asked the government to be ready to "articulate its basis for making the prosecutorial decisions that Gendron has identified in his briefing" and, if its position was that it did not have to do so, "the government should be ready to explain the privilege or authority that it believes applies." *Id.*

At the status conference on February 7, 2025, defense counsel explained that the evidence necessary to prove his claim would first have to be obtained through discovery. (2/7/25 Tr.at 14.) Counsel accordingly asked the Court for an opportunity to supplement their Motion with appropriate discovery demands surrounding the Department of Justice's decision to seek the death penalty against Payton Gendron. Counsel additionally noted that, since their Motion was filed, Executive branch decisions surrounding commutations of previously imposed federal death sentences for 37 men on death row had been made and had provided further evidence supporting the claims in the Motion. *Id.* Accordingly, defense counsel also sought leave to supplement the Motion with this information. *Id*. Those requests were granted, and this Supplement now follows.

## II. To obtain discovery in support of his claim that the exercise of prosecutorial discretion to seek the death penalty against him was constitutionally defective, Payton Gendron must proffer "some credible evidence" that similarly situated individuals were not prosecuted.

While the Attorney General has "broad discretion to enforce the Nation's criminal laws," *United States v. Armstrong*, 517 U.S. 456, 464 (1996), this discretion "is not 'unfettered'" and is "subject to constitutional constraints." *Wayte v. United States*, 470 U.S. 598, 608 (1985) (quoting *United States v. Batchelder*, 442 U.S. 114, 124-25 (1979)). This is because unbounded prosecutorial discretion leads to arbitrary outcomes, which undermine the rule of law. *See*

*Heckler v. Chaney*, 470 U.S. 821, 826, 848 (1985) (recognizing that the "breadth of a prosecuting attorney's discretion" can result in "both individual and institutional abuse" and so courts may properly consider claims of illegal or arbitrary use of discretion"). Constitutional limits on the exercise of prosecutorial discretion include the guarantees of fair and equal treatment contained in the Due Process Clause of the Fifth Amendment. *See, e.g., United States v. Goodwin*, 457 U.S. 368, 384-85 & n.19 (1982) (holding that prosecutor's charging decision may be reviewed for vindictive motivation that violates due process). Additionally, equal protection[1] principles forbid the prosecutor from "deliberately bas[ing]" those discretionary decisions "upon an unjustifiable standard such as race, religion, or other arbitrary classification." *Oyler v. Boles*, 368 U.S. 448, 456 (1962) (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 374 (1886)); *see also Batchelder*, 442 U.S. at 125 n.9.

A criminal defendant raising a substantive selective prosecution claim, i.e., that his prosecution is based on an unconstitutional exercise of discretion, must provide "clear evidence" of discriminatory effect and discriminatory intent. *Armstrong*, 517 U.S. at 465. Meeting this standard generally requires evidence that "similarly situated" individuals of a different race or classification were not prosecuted. *Id.* Discriminatory purpose may be established either with

---

[1] In *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954), which extended the holding of *Brown v. Bd. of Ed.*, 347 U.S. 483 (1954), to the federally-sponsored segregated school system in the District of Columbia, the Court announced that "the concepts of equal protection and due process, both stemming from our American ideal of fairness, are not mutually exclusive." Since then, the Supreme Court has consistently held that the Due Process Clause of the Fifth Amendment contains an equal protection component whose substance is "precisely the same" as the Equal Protection Clause of the Fourteenth Amendment. *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638, n.2 (1975); *see also Hampton v. Mow Sun Wong*, 426 U.S. 88, 100 (1976) ("The concept of equal justice under law is served by the Fifth Amendment's guarantee of due process, as well as by the Equal Protection Clause of the Fourteenth Amendment.")

direct evidence of discriminatory intent, or with statistical disparities, or other indirect or circumstantial evidence regarding the unequal application of the law. *See United States v. Alameh*, 341 F.3d 167, 173 (2d Cir. 2003) (citing *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)); *see also Branch Ministries, Inc. v. Richardson*, 970 F. Supp. 11, 17 (D.D.C. 1997).

Because "[a] criminal defendant, however, will often not have access to the information statistical or otherwise, that might satisfy a 'clear evidence' burden," the Court in *Armstrong* and *United States v. Bass*, 536 U.S. 862 (2002) (per curiam), "propounded a facially less rigorous standard for criminal defendants seeking *discovery* on an anticipated selective prosecution claim." *United States v. Washington*, 869 F.3d 193, 214 (3d Cir. 2017) (emphasis in original). To obtain discovery, all the criminal defendant must present is "some evidence of both discriminatory effect and discriminatory intent." *Bass*, 536 U.S. at 862 (citing *Armstrong*, 517 U.S. at 465); *see also Washington*, 860 F.3d at 214 ("Instead of 'clear evidence,' a successful discovery motion can rest on 'some evidence.'"); *United States v. Arenas-Ortiz*, 339 F.3d 1066, 1068 (9th Cir. 2003) ("The showing necessary to obtain discovery is somewhat less" than prevailing on the merits). "Some evidence" must still include a showing that similarly situated persons were not prosecuted. *Armstrong*, 517 U.S. at 469; *Bass*, 536 U.S. at 864 ("Under *Armstrong*, therefore, because respondent failed to submit relevant evidence that similarly situated persons were treated differently, he was not entitled to discovery.") And the defendant's showing must be "credible" and cannot generally be satisfied with nationwide statistics alone. *See Armstrong*, 517 U.S. at 470.

To apply this standard, the Sixth Circuit's decision in *United States v. Jones*, 159 F.3d 969, 978 (6th Cir. 1998), is instructive. There, the defendant alleged that he was prosecuted

based on his race, citing the government's decision to prosecute him in federal court instead of state court and the conduct of the arresting local law enforcement officers. *Id.* at 975. Defendant and his wife, both of whom were African American, were charged with involvement in a drug dealing operation with a third person, a Caucasian man. *Id.* at 977. When law enforcement officers went to arrest them, they wore shirts emblazoned with the faces of the defendant and his wife; his Caucasian co-defendant's face was not on the shirts. *Id.*[2] at 975, 977. Additionally, the defendant proffered evidence that, of the cases referred for federal prosecution in the preceding five years, only he and his wife's prosecution involved crack cocaine. *Id*. at 976. In contrast, eight non-African American defendants prosecuted for crack cocaine offenses were not referred for federal prosecution. *Id.* On appeal, the Sixth Circuit concluded that the district court erred in denying the defendant's request for discovery. It determined that Jones had "set forth 'some evidence' tending to show the existence of discriminatory effect that warrants discovery on his selective prosecution claim," and reiterated that "[o]bviously, a defendant need not prove his case in order to justify discovery on an issue." *Id.* at 978 (citing *Armstrong*, 517 U.S. at 468).

### A. Payton Gendron has credible evidence that the exercise of prosecutorial discretion in his case was arbitrary and unjustifiably influenced by unconstitutional considerations, warranting discovery under the *Armstrong/Bass* standard.

1. <u>The government's decision to seek the death penalty against Payton Gendron is arbitrary.</u>

The government has treated Payton Gendron differently than Patrick Crusius, who was convicted of a crime strikingly similar to that with which Payton Gendron is charged but against whom the Department of Justice decided not to seek the death penalty. On August 3, 2019,

---

[2] One officer also sent the defendant a postcard of a Black woman with a basket of bananas on her head while the defendant was in jail awaiting trial, which the defendant regarded as a racial insult. *Id.* at 975.

Crusius, a 21-year-old white man, murdered 23 people at a Walmart in El Paso, Texas. Among the dead was a 25-year-old mother of three who was shot while holding her 2-month-old baby. In addition to the 23 deceased, Crusius injured 22 other people. Minutes before he started the attack, Crusius posted online a manifesto entitled "An Inconvenient Truth" in which "he characterized himself as a white nationalist, motivated to kill Hispanics because they were immigrating to the United States." *See* Department of Justice, Press Release, *Texas Man Sentenced to 90 Consecutive Life Sentences for 2019 Mass Shooting at Walmart in El Paso, Texas, Killing 23 People and Injuring 22 Others*, July 7, 2023, available at: https://www.justice.gov/archives/opa/pr/texas-man-sentenced-90-consecutive-life-sentences-2019-mass-shooting-walmart-el-paso-texas. Crusius's offense was obviously at least as aggravated as Payton Gendron's, if not more. To date, however, the government's only response to Payton Gendron's claims of arbitrariness is that the decision not to seek the death penalty against Crusius was based on "individualized consideration" and the "safeguards included in the Justice Manual's Death Penalty Protocol." (ECF 191 at 17.) This is insufficient. Accordingly, as outlined in section II.B below, Payton Gendron seeks discovery about the government's decision not to seek the death penalty against Crusius, while choosing to seek it against him.

2. Payton Gendron is further entitled to discovery under *Armstrong/Bass* because there is additional evidence that the government has engaged in selective prosecution in his case.

Payton Gendron also seeks discovery because there is additional credible evidence that the government's decision to seek the death penalty against him has an unjustifiable basis. The Attorney General authorized a capital prosecution against Payton Gendron even as the Department of Justice withdrew previously filed notices of the government's intent to seek the death penalty against similarly situated Black and Hispanic defendants, including Jairo and Alexi

Saenz, the alleged leaders of the notoriously violent transnational MS-13 gang who pled guilty to seven and eight murders respectively. The murders committed by the Saenz brothers were carried out with guns, bats and machetes and, while some of the victims were rival gang members, they also victimized wholly innocent civilians. Similarly, the government withdrew its notice of intent to seek the death penalty against Anthony Jordan, who was recently found guilty of cocaine trafficking and charges related to the death of nine people between 2008 and 2014 in the Eastern District of Missouri. *See* ECF No. 181 at 10; Department of Justice Press Release, *Jury Convicts St. Louis Man of Drug Trafficking and Charges Connected to Nine Murders* (Feb. 24, 2024), available at: https://www.justice.gov/usao-edmo/pr/jury-convicts-st-louis-man-drug-trafficking-and-charges-connected-nine-murders. And similarly, again, was the withdrawal of the notice of intent to seek the death penalty against Victor Skates, who was charged in the Northern District of California with nine RICO murders, from 2009 and 2010. *See United States v. Victor Skates*, 5:15-CR-00285-LHK, ECF No. 993, *see also* Department of Justice Press Release, *Federal Murder Charges Unveiled in 73-Count Indictment Against Gang Members* (Nov. 13, 2015), available at https://www.justice.gov/usao-ndca/pr/federal-murder-charges-unveiled-73-count-indictment-against-gang-members. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████

In addition to withdrawing previously filed notices of intent to seek the death penalty, Attorney General Garland also declined to seek death in the first instance against numerous Black and Hispanic defendants charged with multiple, brutal homicides. Those defendants include Romeo Blackman, No. 18-cr-728 (N.D. Il.) (Black member of Goonie street gang charged with murdering seven people); Yefri Revelo, No. 19-cr-117 (C.D. Ca.) (Hispanic male

charged with five murders as part of RICO conspiracy); Darius Murphy, No. 19-cr-641 (N.D. Il.) (Black member of Traveling Vice Lords gang charged with seven murders); Daniel Chavez, No. 15-cr-285 (N.D. Ca.) (Hispanic male charged with five murders as part of RICO conspiracy); Andrew Alvarado, No. 18-506 N.D. Ca. (Hispanic member of Norteños gang charged with 6 murders); Donald Lee, No. 19-cr-641 (N.D. Il.) (Black member of Traveling Vice Lords charged with six murders); Fermin Montilla, No. 22-cr-243 (D.P.R.) (Hispanic male charged with deaths of 11 women being transported by boat); Derrick George, No. 24-13 (E.D.N.C.) (Black male charged with five robbery/gun murders); Jose Reyes-Castillo, No. 19-cr-103 (D. Nev.) (Hispanic member of MS-13 gang charged with 9 murders).

On December 23, 2024, ███████████████████████████████████ ███████████████████████████ a few months after he filed his original motions challenging the arbitrariness of the government's decision to pursue the death penalty against him, former President Biden commuted the death sentences of 37 of the 40 men on federal death row, leaving in place the death sentences of Dzhokhar Tsarnaev, Dylann Storm Roof, and Robert Bowers, three White men.

This decision not to commute the death sentences of these three men appears to have been made pursuant to the recommendation of the Department of Justice, which processed and reviewed all commutation requests and recommended which ones should be granted. Days before the decision was announced, the Wall Street Journal reported that the Attorney General had "recommended that Biden commute all but a handful of the sentences." Jess Bravin and C. Ryan Barber, *Biden Weighs Commuting Sentences of Death Row Inmates*, Wall Street Journal (Dec. 20, 2024) (correctly predicting that "exceptions could include Dzhokhar Tsarnaev, convicted in the 2013 Boston Marathon bombing that killed three and wounded more than 250

8

others, Robert Bowers, who killed 11 people in the 2018 attack on the Tree of Life synagogue in Pittsburgh, and Dylann Roof, who in 2015 killed nine at the Emanuel African Methodist Episcopal Church in Charleston, S.C.").

In contrast to the three White men passed over for commutation, included on the list of those receiving commutations was Kaboni Savage, an African American man who was convicted and sentenced to death in 2013 for committing or directing the commission of 12 murders in Philadelphia. Six of the victims, including four children, were killed when Savage, from his jail cell, directed the firebombing of a cooperating witness's family home. *See United States v. Savage*, 970 F.3d 217 (3d Cir. 2020). Also spared were Richard Tipton and James H. Roane, Jr., co-defendants in a drug trafficking enterprise who were convicted of murdering 10 individuals and leaving several others critically injured in the Richmond, Virginia area during a crime spree. *See United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996).

On the Attorney General's recommendation, former President Biden also commuted the death sentences for Daniel Troya and Ricardo Sanchez, Jr., two Hispanic men who were convicted for the murders of two toddlers and both of their parents to protect a drug trafficking operation in South Florida. *See United States v. Troya*, 733 F.3d 1125 (11th Cir. 2013). Biden also accepted Garland's recommendation and commuted the death sentence of Jorge Avila Torrez, a Hispanic man responsible for the strangulation death of a fellow service member; the abduction, sexual assault and murder of two children; and another kidnapping and rape. *See* https://arlnow.com/2024/12/23/rapist-who-murdered-Fort-Myer-naval-officer-is-taken-off-death-row, and Department of Justice Press Release, *Former Corporal Sentenced to Death In Barrack Murder*, April 24, 2014, available at https://www.justice.gov/usao-edva/pr/former-corporal-sentenced-death-barracks-murder. Savage, Tipton, Roane, Jordan, and the Saenz brothers, four

African American and two Hispanic men, were similarly situated to Roof, Bowers, Tsarnaev and Payton Gendron. All of them had been charged with terrorizing communities by committing multiple, brutally violent murders. And yet, only the White men are still facing execution, while the African American and Hispanic men, on the Attorney General's recommendation, are no longer subject to being put to death at the federal government's hands.

In addition to this circumstantial evidence regarding the unequal application of the law, *see Alameh*, 341 F.3d at 173, the Attorney General's own statements about his views on the federal death penalty further support Payton Gendron's argument that the decision to seek the federal death penalty against him was motivated by race. As one newspaper noted, Payton Gendron's case was a "crucial test" for the Biden administration which had "pledge[d] to pursue racial equity in the criminal justice system." David Nakamura, *Garland Weighs Racial Equity As He Considers Death Penalty in Buffalo*, The Washington Post (July 4, 2022), available at:

https://www.washingtonpost.com/national-security/2022/07/04/buffalo-death-penalty-garland/.

During his confirmation hearing, General Garland stated:

> I have developed concerns about the death penalty in the 20-some years since [the Timothy McVeigh Capital trial], and the sources of my concern are issues of exonerations of people who have been convicted, of sort of arbitrariness and randomness of its application because of how seldom it is applied and because of its disparate impact on Black Americans and members of other communities of color. Those are the things that give me pause, and those are things that have given me pause over the last--you know, as I have thought about it over the last 20 years.

*Confirmation Hearing on the Nomination of Hon. Merrick Brian Garland to be Attorney General of the United States*, 117th Congress, (Feb. 22-23, 2021), available at:

https://www.govinfo.gov/content/pkg/CHRG-117shrg48356/html/CHRG-117shrg48356.htm.

And shortly after his appointment, he memorialized these sentiments in a Department of Justice memo in which he expressed "serious concerns . . . about the continued use of the death penalty

across the country, including arbitrariness in its application." Attorney General Memorandum, *Moratorium on Federal Executions Pending Review of Policies and Procedures*, (July 1, 2021) available at https://www.justice.gov/opa/page/file/1408636/download.

Former President Biden, too, was sensitive to the role race had played in capital cases, and federal criminal cases generally, and campaigned on a promise to end the federal death penalty. His campaign had faced criticism from both Republicans and Democrats that his 1994 crime bill "led to mass incarceration and tilted the system unfairly against African Americans." Matt Viser and Sean Sullivan, *Biden Announces Criminal Justice Policy Sharply at Odds with His '94 Crime Law*, The Washington Post (July 23, 2019), available at https://www.washingtonpost.com/politics/biden-announces-criminal-justice-policy-sharply-at-odds-with-his-94-crime-law/2019/07/23/950e7eb0-acc2-11e9-a0c9-6d2d7818f3da_story.html. As senator, former President Biden had boasted that he "wrote this bill with my own little hands, and I added into the bill more than 50 death penalties." Matt Viser, *Sentenced to Death Under a Biden Law – And Now Hoping for Biden's Mercy*, The Washington Post, (Dec. 21, 2024), available at: https://www.washingtonpost.com/politics/2024/12/21/biden-death-penalty-law-commute/. Indeed, before the commutations, 36 of the 40 men who were facing executions for federal crimes were sentenced under provisions of the 1994 crime bill. As the Washington Post stated: "Few if any previous presidents have been responsible, if indirectly, for convicts facing death, then responsible for potentially saving their lives." *Id.*

Some may say that former President Biden's campaign promises and his efforts to right his past wrongs were noble. No one could take issue with the attempt to eliminate disparities in federal capital prosecutions and death sentences. But the law does not countenance the use of unconstitutional means to right the errors of the past.

11

Payton Gendron has proffered more than "some evidence" to meet the *Armstrong/Bass* standard for discovery. He has provided credible evidence establishing that—taking into account the Attorney General's decisions not to seek the death penalty in the first instance, his withdrawal of death notices in cases as aggravated or more so than Payton Gendron's, and his recommendations to former president Biden regarding commutations—there are similarly situated African American and Hispanic defendants who were treated differently from Mr. Gendron, and that race played a role in this treatment. Because the authorization process has been shrouded in secrecy, Payton Gendron is unable to produce preliminary evidence as shocking as that in *Jones*, *see* 159 F.3d at 975-77, but his claim is nonetheless powerful and credible. *See id.* at 978 ("Obviously, a defendant need not prove his case in order to justify discovery on an issue.").

### B. Payton Gendron's initial discovery request is limited and seeks a narrow category of information.

Payton Gendron accordingly seeks limited discovery to support his claims that the death penalty is arbitrary and unconstitutional as applied to him. *See United States v. Washington*, 869 F.3d 193, 198, 220 (3d Cir. 2017) (applying the *Armstrong/Bass* standard in a selective enforcement claim and affirming that "*Armstrong/Bass* remains the lodestar" and "hold[s] that a district court may exercise its discretion to grant limited discovery, or otherwise to conduct in camera analysis of government data before deciding whether limited discovery is warranted"); *see also United States v. Brooks,* No. CV 14-382(RMB), 2019 WL 258694, at *4 (D.N.J. Jan. 18, 2019) and *id.* at ECF No. 155 (contemporaneous order) (in a stash house case ordering government to provide "limited discovery" necessary to establish selective enforcement including: (a) a list of each defendant in each stash house robbery sting conducted by ATF from 2007 to 2013 who has been prosecuted in the District of New Jersey; (b) the race of each

defendant, if known; (c) the hometown or community of the defendant, as it was known to the ATF at the time of its investigation; (d) in the case of ATF stash house robbery sting investigations between 2007 and 2013 in the District of New Jersey that did not result in arrest(s) or prosecution(s); and (e) the portions of the so-called ATF "manual" in effect during the ATF's investigation into Leroy Brooks and his co-defendants that specify the selection and initiation criteria for targets for home invasion robbery reverse stings); *United States v. Jackson*, No. 16-cr-2362-MCA, 2018 WL 748372, at *8 (D.N.M. Feb. 7, 2018) (granting limited discovery pertaining to claims of selective enforcement). Accordingly, Payton Gendron requests the following information:

1. All correspondence, including emails, notes and internal memoranda, by employees of the United States Attorney's Office for the Western District of New York, including the United States Attorney, (collectively "the local prosecutors") and the Department of Justice, including the Attorney General, the Deputy Attorney General, the Capital Case Section, the Assistant Attorney General and the Associate Attorney General (collectively "Main Justice") regarding the decision to seek the death penalty against Payton Gendron;

2. All correspondence, including emails, notes and internal memoranda, by employees of the United States Attorney's Office for the Western District of Texas, including the United States Attorney and Main Justice regarding the decision not to seek the death penalty against Patrick Crusius;

3. All correspondence, including emails, notes and internal memoranda, by employees of the respective local United States Attorney's Offices, including the

United States Attorney and Main Justice regarding the decisions not to seek the death penalty against:

a. Romeo Blackman No. 18-cr-728 (N.D. Il.)

b. Yefri Revelo No. 19-cr-117 (C.D. Ca.)

c. Darius Murphy No. 19-cr-641 (N.D. Il.)

d. Daniel Chavez No. 15-cr-285 (N.D. Ca.)

e. Andrew Alvarado No. 18-506 N.D. Ca.)

f. Donald Lee No. 19-cr-641 (N.D. Il.)

g. Fermin Montilla No. 22-cr-243 (D.P.R.)

h. Derrick George No. 24-13 (E.D.N.C.)

i. Jose Reyes-Castillo No. 19-cr-103 (D. Nev.)

4. ███████████████████████████████████████

5. All correspondence, including emails, notes and internal memoranda by employees of the Department of Justice including the Attorney General, the Deputy Attorney General and the Capital Case Section regarding the decision to withdraw the notices of intent to seek the death penalty against Jairo and Alexi Saenz, Anthony Jordan, and Victor Skates; and

6. All correspondence, including emails, notes and internal memoranda by employees of the Department of Justice including the Attorney General, the Deputy Attorney General, and the Office of the Pardon Attorney regarding the

recommendation for executive clemency for Kaboni Savage, James Tipton, James H. Roane, Jr., Daniel Troya, Ricardo Sanchez, and Jorge Avila Torrez.

Dated: March 10, 2025
Buffalo, New York

*s/Sonya A. Zoghlin*
Sonya A. Zoghlin
Assistant Federal Public Defender

*s/MaryBeth Covert*
MaryBeth Covert
Senior Litigator

*s/Julie Brain*
Julie Brain
Julie Brain, Attorney at Law

*s/Monica Foster*
Monica Foster
Executive Director
Indiana Federal Community Defenders Inc.