IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

              v.                                 22-CR-109-LJV

PAYTON GENDRON

              Defendant

_____

**GOVERNMENT'S RESPONSE TO DEFENSE SUPPLEMENT TO MOTION TO
STRIKE THE DEATH PENALTY AS A POSSIBLE PUNISHMENT**

The United States, by and through its attorneys, Michael DiGiacomo, United States Attorney for the Western District of New York, and Mac Warner, Deputy Assistant Attorney General, Civil Rights Division, and Joseph M. Tripi and Brett A. Harvey, Assistant United States Attorneys; Daniel E. Grunert, Trial Attorney, Civil Rights Division; and Michael Warbel, Trial Attorney, Criminal Division, of counsel, hereby submits the following response to the defendant's Supplement To Motion To Strike The Death Penalty As A Possible Punishment (Docket Nos. 181 (the "Original Motion") and 290 (the "Supplement")). In his Original Motion, the defendant asserted, among other things, that the Federal Death Penalty Act (the "FDPA") is unconstitutionally arbitrary because it affords prosecutors unbound discretion to seek the death penalty. Now, in his Supplement, for the first time, the defendant couches his claim as a selective prosecution claim, and he requests discovery. For the reasons set forth below, this Court should deny the defendant's "prosecutorial discretion" arguments asserted in the Original Motion and should reject the defendant's discovery requests in support of his new selective prosecution claim.

### A.  The Defendant's Constitutional Arbitrariness Claim Lacks Merit

At the outset, and as more fully discussed in the government's response to the Original Motion (Docket No. 191), to the extent the defendant asserts an Eighth Amendment arbitrariness claim based on the argument that the FDPA provides too much discretion to the government (here, the Attorney General) in deciding against whom to seek capital punishment, this claim must fail.  This Court can only assess a claim of arbitrariness by determining if the FDPA "(1) rationally narrow[s] the class of death-eligible defendants; and (2) permit[s] a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of [the defendant's] crime." *Kansas v. Marsh*, 548 U.S. 163, 175 (2006).  Federal courts, including the Second Circuit, have uniformly held that the FDPA meets these standards, and have thus rejected claims similar to those raised by the defendant.  *See United States v. Aquart*, 912 F.3d 1, 55-56 (2d Cir. 2018); *see also* Docket No. 191 at 2, n. 1 (listing cases).

The FDPA and the Department of Justice's Capital Case Review Protocol (the "Protocol"), which is memorialized in the Justice Manual, *see* J.M. § 9-10.010, *et seq.*, involve consideration of multiple factors in determining whether to seek the death penalty in any case. Given the number of variables present in every potential capital prosecution, attempting to establish arbitrary action through general case comparisons, as the defendant tries here, is futile.

Courts have recognized this reality and rejected efforts to premise claims of arbitrariness on comparisons of cases. *See, e.g.*, *McCleskey v. Kemp*, 481 U.S. 279, 306-07 (1987) (holding the defendant "cannot prove a constitutional violation by demonstrating that other defendants who may be similarly situated did *not* receive the death penalty"); *United States v. Sampson*, 486 F.3d 13, 24-25 (1st Cir. 2007) (holding that case summaries are "wholly inadequate to prove that the death penalty has been imposed in an arbitrary manner"). One court summarized the inadequacies of such comparisons as follows:

> These case summaries certainly paint a vivid picture[;] however, they are ultimately not persuasive. The summaries are very short – almost all of them are between one and three sentences long. In many cases they do not provide enough detail to allow the reader to determine whether or not the crimes they describe are comparable to each other. Moreover, they do not provide any information about the various aggravating and mitigating factors that existed in those cases and that the juries would have considered under the FDPA when deciding whether or not to impose the death penalty. This was exactly the concern expressed by the First Circuit in *United States v. Sampson*, 486 F.3d 13 (1st Cir. 2007), a case in which the defendant apparently provided similar summaries in support of a similar argument. The *Sampson* court stated, "The summaries on which Sampson relies to demonstrate inconsistency are devoid of details and fail to account for the objective circumstances of the crimes. . . . [W]e decline Sampson's invitation to ignore individual differences across offenders and offenses." *Id.* at 25. While the case summaries are compelling, they simply do not constitute evidence of the arbitrary imposition of the death penalty.

*United States v. Taylor*, 648 F. Supp.2d 1237, 1242 (D.N.M. 2008); *see also United States v. Bowers*, 18-cr-292, 2023 WL 3198215, *5 (W.D. Pa. May 2, 2023) ("The Court agrees with this rationale [from *Sampson* and *Taylor*] and finds that Defendant fails entirely to establish a basis upon which the Court could conclude that the Government has arbitrarily sought the death penalty in this case. The Motion to Dismiss sets forth the type of case summaries that

courts have repeatedly determined are insufficient to establish that the death penalty has been sought arbitrarily.").

Here, the defendant cites as many as 14 cases involving multiple murders in which the government did not seek the death penalty or withdrew death notices, and asserts that it is, therefore, arbitrary to seek the death penalty against him.  The defendant makes much of the Department's decision not to seek the death penalty against Patrick Crusius, the white male convicted in the Western District of Texas for the 2019 hate-crime mass-murder of 23 persons at an El Pass Wal-Mart Supercenter.  The sole point of comparison the defendant provides for each of these cases is that they involved multiple killings (and for Crusius, that he was motivated by racial/ethnic bias).  His arguments suffer from the same deficiencies as those based on statistics in *McCleskey* or those based on thumbnail sketches of arguably similar cases in *Sampson* and *Taylor*.  That is, they are wholly devoid of details and fail to acknowledge potential distinctions in the cases, including, among other things, the strength of the government's evidence to prove both the substantive crimes and any appliable aggravating factors, motives for the crimes, circumstances of the crimes, the backgrounds and characters of the defendants, and other potential mitigating circumstances.  The FDPA and the Protocol require careful consideration of all of these factors.  This careful, detailed, multifactor review process is constant across cases, such that each defendant in each federal case involving capital-eligible charges receives individualized consideration.

The defendant, thus, cannot demonstrate that the statute did not operate appropriately to identify him as a defendant for whom a jury of his peers should decide whether to impose

a death sentence.  The defendant is charged (and has admitted in state court) with killing 10 Black persons in their neighborhood grocery store because they were Black.  He substantially planned the attack, publishing a Manifesto and journal detailing his racist motivation for the attack, his deliberate preparations, and his clarion call for others to follow him.  In committing his lethal attack, he shot and injured three other persons and created a significant and considerable possibility that more than 60 other persons could have been killed.  Some of his victims were particularly vulnerable due to their advanced ages, and the defendant specifically chose to commit his attack at the Jefferson Avenue Tops in order to kill as many Black people as possible.

As reflected in the government's Notice of Intent To Seek The Death Penalty, four statutory aggravating factors, and five non-statutory aggravators apply to the defendant's conduct for each of his ten murders.  *See* Docket No. 125.  The defendant, who broadcast his attack in real time on the Internet, faces overwhelming evidence of his guilt.  He falls squarely within the narrowed class of death-eligible defendants, and evidence supporting the aggravating factors is compelling.  Therefore, the defendant's capital prosecution underscores the rational and consistent manner in which the FDPA and the Protocol operate.

Accordingly, this Court should deny the defendant's Eighth Amendment arbitrariness claim as it relates to prosecutorial discretion.

### B. The Defendant Is Not Entitled To Discovery On His Selective Prosecution Claim

In the Supplement, for the first time, the defendant pivots his argument to one of selective prosecution based on an assertion that the government has improperly sought the death penalty against him because of his race (that he is white). The defendant further contends he is entitled to discovery because he has presented "credible evidence that the government's decision to seek the death penalty against him has an unjustifiable basis." Docket No. 290 at 6. In support, however, the defendant merely lists the names and the general nature of the charges against 13 non-white defendants who committed multiple murders for whom the government did not seek the death penalty during the Biden/Garland administration.[1] He also cites to the former President's commutation of death sentences for six non-whites convicted of multiple murders.[2] In so doing, the defendant falls far short of meeting the rigorous standard to obtain discovery on a selective prosecution claim.

---

[1] The defendant also identifies Patrick Crusius, the El Paso Wal-Mart shooter, as a comparator. For reasons set forth below, Crusius, also a white male, is not proper to consider.

[2] The government requests that this Court dismiss any reference to grants of clemency when assessing the defendant's discovery requests. Clemency cases are distinguishable in that the commutation of death sentences by the former President was a unique and independent exercise of presidential powers. Though the former President may have received recommendations from the former Attorney General or the Department's Office of the Pardon Attorney, the decision to grant commutation is the exclusive and independent power of the President. *See Rosemond v. Hudgins*, 92 F. 4th 518, 525 (4th Cir. 2024) (citing U.S. Const. art. II, § 2, cl. 2). Because decisions to seek the death penalty are made exclusively by the Attorney General and decisions to commute sentences are made exclusively by the President, they should not be compared for purposes of assessing a selective prosecution claim. What is more, a pretrial decision to seek the death penalty and a decision to grant clemency years after trial and appeal are fundamentally different, and may be informed by different available information and motives. Whereas the decision to seek the death penalty is closely guided by the FDPA and the Justice Manual's Protocol, commutations are standardless. They may be given to anyone for any reason, without regards to the facts of the case, strength of the evidence, legal arguments, etc. Also, much may have changed in the cases between the times the two decisions were made. Thus, it is further inappropriate to include the clemency cases in the assessment of the defendant's current selective prosecution claim. Should the Court disagree with this request, the government explains below why the clemency cases do not support the defendant's request for discovery, but these arguments are made only in the

A defendant who seeks discovery on a claim of selective prosecution must show some evidence of both discriminatory effect and discriminatory intent/purpose. *United States v. Bass*, 536 U.S. 862, 863 (2002) (per curiam). Contrary to the defendant's assertions, this standard is "rigorous," *United States v. Armstrong*, 517 U.S. 456, 468 (1996), because a "presumption of regularity supports . . . prosecutor[s'] decisions, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *Id*. at 464. Discovery into prosecutorial decisions imposes high costs, as it "may disclose the Government's prosecutorial strategy," and unnecessarily impair the performance of a "core executive constitutional function." *Id*. at 464, 468; *see also Bass*, 536 U.S. at 864 (noting lower court's failure to apply the rigorous standard "threatens the 'performance of a core executive function'" (citing *Armstrong*); *United States v. James*, 257 F.3d 1173, 1178 (10th Cir. 2001) (explaining that given the high burden that discovery can impose on the government, the showing necessary to obtain discovery for a selective prosecution claim must "itself be a significant barrier to the litigation of insubstantial claims"). Indeed, ordering discovery on a selective prosecution claim "imposes many of the costs present when the government must respond to a prima facie case." *Armstrong*, 517 U.S. at 464.

In the capital context, "the policy considerations behind a prosecutor's traditionally wide discretion [further] suggest the impropriety of [courts] requiring prosecutors to defend their decisions to seek death penalties." *McCleskey*, 481 U.S. at 296 (internal quotations and citations omitted). Absent "far stronger proof," it is unnecessary to require discovery

---

alternative.

regarding the capital charging decision because a legitimate and unchallenged explanation for the decision is apparent from the record; that is, the defendant committed an act for which the Constitution and FDPA permit imposition of the death penalty. *See id*. Because discretion is "essential to the criminal justice process," the *McCleskey* Court stated, "we would demand exceptionally clear proof before we would infer that the discretion has been abused." *Id*. at 296-97. The defendant has not offered sufficient proof to establish discriminatory effect or a discriminatory intent, and therefore, the Court should not order any additional discovery.

1. <u>The Defendant Fails to Establish Discriminatory Effect</u>

To establish discriminatory effect, the defendant "must make a 'credible showing' that 'similarly situated individuals of a different race were not prosecuted.'" *Bass*, 536 U.S. at 863 (quoting *Armstrong*, 517 U.S. at 465, 470). Defendants are "similarly situated" when "their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." *United States v. Olvis*, 97 F.3d 739, 744 (4th Cir. 1996); *United States v. Watts*, 14-cr-40063, 2016 WL 305059, *5 (S.D. Ill. Jan. 25, 2016) (citing *Olvis*); *United States v. McCluskey*, 10-cr-2734, 2012 WL 13080252, *4 (D.N.M. Jul. 26, 2012) (citing same and stating "a court must examine *all factors* relevant to the government's decision to prosecute in determining whether persons are similarly situated" (emphasis added)); *United States v. Lecco*, 05-cr-107, 2009 WL 3347108, *6 (S.D. W. Va. Oct. 15, 2009) (citing same and holding that absent "detailed, defendant-and crime specific information," "it is impossible to determine if persons similarly situated to defendant were treated differently from him"). Factors to consider include, but are not limited to, the strength of the government's case, the prosecution's general deterrence value, the government's

enforcement priorities, the case's relationship to the government's overall enforcement plan, relative culpability, a defendant's willingness to cooperate, and government resources. *See Watts*, 2016 WL 305059 at *5.

Notably, the defendant fails to cite even one instance where a federal court granted discovery to support a selective prosecution claim in a case prosecuted under the FDPA, let alone one where a defendant prevailed on a similarly sparse offer to establish discriminatory effect. Indeed, applying the *Armstrong-Bass* rubric, courts have uniformly rejected such discovery requests for failure to adequately allege discriminatory effect. Most recently, in *Bowers*, the defendant cited to arguably similar cases in which the government did not seek the death penalty as purported evidence of discriminatory effect. *See Bowers*, 2023 WL 3198215 at *1 (citing to defense motion).[3] The district court denied Bowers's request for discovery, explaining in pertinent part:

> Defendant has not made a sufficient showing as to either discriminatory effect or intent. With respect to effect, Defendant fails entirely to satisfy his burden of proving some evidence that the defendants in the cases he cites are "similarly situated" to him, instead relying again on limited, one- or two-sentence descriptions of these other cases. Given the limited record before the Court, the Court agrees that Defendant's attempt to analogize his case to others based on the number of victims or the motive for the murders involves a gross over-

---

[3] Review of the defense motion in *Bowers* reveals that Bowers, like Gendron, compared his case to that of Patrick Crusius and Anthony Jordan (St. Louis-area drug murders over the course of a decade), as well as John Earnest (Poway, California Jewish synagogue attack that resulted in one death, one gunshot injury, and grave risk of death to more than 50 others). *Bowers*, *supra*, Docket No. 1096. He also attached to his motion an affidavit from Kevin McNally, a member and former director of the Federal Death Penalty Resource Counsel Project, outlining 26 cases in which former Attorney General Garland directed withdrawing notices of intent to seek the death penalty, as well as nearly 400 cases in which AG Garland directed prosecutors not to seek the death penalty. *See id.*, Docket No. 1096-2.

> simplification of the variables at hand.  Defendant has not sufficiently shown
> discriminatory effect such that the Court could permit the discovery he seeks.

*Id.* at *6.  In the instant case, the defendant has provided no more details of comparator cases involving purported "similarly situated" defendant than did Bowers.  *See also*, *e.g.*, *United States v. Lawrence*, 735 F.3d 385, 438-39 & n.3 (6th Cir. 2013) (affirming denial of discovery for failure to show discriminatory effect or intent); *United States v. Lighty*, 616 F.3d 321, 369-70 (4th Cir. 2010) (affirming denial of discovery for failure to show discriminatory effect where defendant introduced only statistical evidence); *United States v. Webster*, 162 F.3d 308, 336 (5th Cir. 1998) (affirming denial of discovery); *United States v. George*, 17-cr-201 2020 WL 8881620, *7-*9 (E.D. La. Apr. 27, 2020); *United States v. Christensen*, 17-cr-20037, 2019 WL 570730, *3 (C.D. Ill. Feb. 12, 2019); *Watts*, 2016 WL 305059 at *2-*5; *United States v. Savage*, 07-cr-550, 2013 WL 2060932, *5 (E.D. Pa. May 15, 2013); *United States v. Johnson*, 900 F. Supp.2d 949, 970-72 (N.D. Iowa 2012); *McCluskey*,  2012 WL 13080252 at *3-*5; *Taylor*, 608 F. Supp.2d at 1265-67; *Lecco*, 2009 WL 3347108 at *5-*6; *United States v. Henderson*, 485 F. Supp.2d 831, 861-63 (S.D. Ohio 2007); *United States v. Solomon*, 05-cr-385, 2007 WL 1300769, *1-*3 (W.D. Pa. May 2, 2007).

In each of the above-cited cases, the courts held that references to statistical studies or thumbnail sketches of other cases were insufficient to demonstrate that other defendants were "similarly situated," and thus, that the defendants failed to establish discriminatory effect. The same must be true in the instant case.  The defendant has done nothing more than list cases in which the government did not pursue capital trials against defendants of other races who share the sole common characteristic of being charged with multiple murders.  This is a

"gross over-simplification" of the variables at hand that does not satisfy the "some evidence" threshold. *See Johnson*, 900 F. Supp.2d at 972 (denying discovery and finding defendant had "not accounted for numerous factors that would demonstrate similarity (or difference)"). As discussed above, so much more is considered when deciding whether to seek the death penalty than just the underlying charge or the number of victims.

Here, too, the defendant's proffered "comparators" are easily distinguishable. None of the defendants cited by the defendant in his Supplement (except possibly Patrick Crusius, who is discussed below), including the inmates who received clemency, committed the "same basic crime in substantially the same manner as the defendant," *McCluskey*, 2012 WL 3080252 at *4 (*citing United States v. Smith*, 231 F.3d 800, 810 (11th Cir. 2000). That is, none committed a race-based mass-shooting that killed 10 people in a single criminal episode, injured three others, and put more than 60 others at grave risk of death. Likewise, none committed such atrocities after months of careful planning that included drafting and publishing a manifesto and journal that called for others to commit similar acts. The defendant also provides no discussion of the strength of the government's evidence in the various cases, the prosecutorial priorities involved, potential mitigation, or any other legitimate prosecutorial factors. *See Olvis*, 97 F.3d at 744; *Watts*, 2016 WL 305059 at *5. This is the crucial type of information the government uses on a case-by-case basis to determine if seeking the death penalty is justified in any case.

As recognized in *Watts*, the comparable defendant "need not . . . be identical in all factors, but they need to be similar enough that their circumstances present no distinguishable

legitimate factor that might justify making different prosecutorial decisions with respect to them." 2016 WL 305059 at *5. The defendant's comparator cases fall well short of this burden.

Although the defendant attempts to analogize his case with Patrick Crusius's, he does little more than recite a few similar facts (e.g., that Crusius committed a bias-motivated mass shooting after careful planning). The defendant offers no discussion of the individual characteristics of each defendant and each case that make them unique. What is more, the defendant fails to confront the fact that in making such an analogy, he upends his race-based selective prosecution claim. Crusius – like this defendant – is white. Thus, if anything, the government's decision not to seek the death penalty against Crusius demonstrates the lack of racial bias against white people in the capital charging process.

Furthermore, while the defendant attempts to analogize to a select few cases, the totality of circumstances regarding the prior administration's capital charging practices doom any argument regarding discriminatory effect here. As reflected in the Supplement, the prior administration did not seek the death penalty against minority offenders charged with multiple murders. With the exception of the defendant, however, the prior administration also did not seek the death penalty against all other white offenders submitted for review, including those responsible for killing multiple persons (including Patrick Crusius).[4] Indeed,

---

[4] The McNally Affidavit submitted in support of the selective prosecution discovery request in *Bowers* listed more than 60 white defendants, including more than five accused of multiple murders, who were not authorized for capital prosecutions in the prior administration as of January 27, 2023. *See Bowers*, *supra*, Docket No. 1096-2. The same affidavit listed nine white defendants for whom the government withdrew notices of intent to seek the death penalty in

the instant case is the only case for which the prior administration authorized pursuit of the death penalty.  Further, the only cases in which the prior administration did not withdraw previously-issued notices of intent to seek the death penalty were the prosecutions of Robert Bowers and Sayfullo Saipov (minority defendant): bias-motivated mass murder cases.  Thus, the evidence demonstrates the prior administration pursued a narrow enforcement strategy in capital cases that had nothing to do with the race of the defendant.

Likewise, though the former President commuted the sentences of 37 individuals, this encompassed several white inmates, including the following who, according to publicly available sources, were convicted of multiple killings: 1),2) Iouri Mikhel and Jurijus Kadamovas (2001-02 crime spree in which the defendants killed five individuals in kidnapping, ransom, and bribery schemes); 3),4) Chadrick Fulks and Brandon Basham (convicted of carjacking resulting in death and kidnapping resulting in death in connection with 2002 crime spree that involved two killings, multiple attempted murders, and other crimes); 5) Edward Fields (2003 double-murder of a couple in a national campground); and 6) Shannon Agofsky (2001 prison murder at USP-Beaumont while serving life sentence for murder).  The government does not assert that any of these defendants were "similarly situated" to the defendant, as none engaged in the same type of bias-motivated mass murder as the defendant, and the backgrounds and circumstances of the men's lives are all different.  Nonetheless, the decisions not to pursue death sentences or commute death sentences for

---

the prior administration as of January 28, 2023.  The list included four defendants accused of multiple murders, including Nicholas Tartaglione, a former New York City Police officer who killed four victims in a single criminal episode.  *See id.*

these white men demonstrate the absence of the kind of discrimination against white defendants the defendant complains about here.

In sum, the defendant has not pointed to any non-white defendants similarly situated to him in background and alleged criminal acts for whom the Department of Justice did not seek the death penalty.  Further, there is ample publicly available evidence that the government has not, in fact, singled out white men for capital prosecutions.  The defendant, Roof, Tsarnaev, and Bowers make up a small group of offenders responsible for atrocious, ideologically-motivated mass murders in which multiple aggravating circumstances applied. These men are/were clearly eligible for death sentences under the FDPA, and decisions to seek the death penalty against them advance legitimate prosecutorial priorities.  Accordingly, this Court should hold that the defendant has failed to make a credible showing of discriminatory effect and deny his request for discovery.

## 2.  The Defendant Fails to Establish Discriminatory Intent

The defendant submits that the government also acted with discriminatory intent in electing to seek the death penalty against him.  In support, he again relies upon citations to several cases in which the prior administration withdrew death sentences or decided not to seek the death penalty against minority defendants (ignoring the bounty of decisions not to seek death against white males), as well as the former President's decision to commute death sentences of several minority inmates, while leaving only three white men on death row (again, ignoring the decision to commute the sentences of many white inmates).  The defendant also cites to public statements made by the former President and Attorney General

expressing their concerns with racial inequities, among other things, in capital cases. Even applying the lesser standard of scrutiny of "some evidence" to support discovery requests, these bald assertions are insufficient.

To establish discriminatory intent, the defendant must demonstrate credible evidence that "the decisionmakers *in his case* acted with discriminatory purpose." *United States v. Barnes*, 532 F. Supp.2d 625, 637 (S.D.N.Y. 2008) (quoting *McCleskey*, 481 U.S. at 292) (emphasis in original); *Bowers*, *supra*, 2023 WL 3198215 at *5; *see also*, *Watts*, 2016 WL 305059 at *3 ("To establish discriminatory purpose, the defendant must show the Government 'selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group.'" (citing *McCleskey*, 481 U.S. at 298)). In assessing the defendant's discriminatory intent argument, the Court must begin with the "strong presumption" that "any individual against whom such extensive evidence had been amassed" would have been prosecuted for capital crimes, regardless of his race and regardless of any stated concerns the prior administration had with racial equity in capital cases. *See United States v. Alameh*, 341 F.3d 167, 174 (2d Cir. 2003) (holding in a fraudulent nationalization case in which the defendant alleged selective prosecution that evidence of post-9/11 bias was insufficient to "dislodge this presumption" that prosecutorial decisions are proper).

The process employed to determine whether to seek the death penalty in this case, which is outlined in the Protocol and is followed in all potential federal capital cases, sets forth race-and gender-neutral standards for approving the pursuit of capital punishment. The defendant has made no showing that implementation of the Protocol is infected by intentional

15

race bias.  *See Watts*, 2016 WL 305059 at *9 (finding defendant did not establish discriminatory intent).

As with discriminatory effect, courts have repeatedly found that statistics or mere references to outcomes in other cases are insufficient to prove discriminatory intent.  *See*, *e.g.*, *Barnes*, 532 F. Supp.2d at 637; *Watts*, 2016 WL 305059 at *5; *McCluskey*, 2012 WL 13080252 at *5.  Thus, the defendant's references to decisions in the prior administration not to seek the death penalty against minority defendants in cases involving multiple murders or to grant clemency to minority defendants convicted of more than one murder are insufficient to establish discriminatory purpose in *this* case.

The defendant's reference to public statements made by the former President and Attorney General equally fails to demonstrate that the government acted with discriminatory purpose in charging him with capital crimes.  The statements do not refer to the facts of *this case* or the government's decision-making process in *this case*.  Rather, those statements are, at most, reflective of the prior administration's general concerns with potential or perceived racial inequities in capital sentencing.  To be sure, the former executives were expressing concerns about whether minorities received fair treatment under the law, not whether white people have been treated fairly.

It is a great leap to suggest that, based on the former executives' statements, the decisionmakers in this case intended to attempt to cure any perceived racial inequities in capital cases by seeking the death penalty against more white people, or more importantly,

elected to seek the death penalty against this defendant because he is white.  In fact, the defendant is the only white person (and only person, period) against whom the prior administration directed a decision to seek the death penalty.  The prior administration's extremely limited application of the death penalty cuts against the defendant's discriminatory intent argument.

Furthermore, a non-discriminatory explanation for seeking the death penalty against the defendant is evident.  The decision is justified by the objective circumstances of the crime and the overwhelming evidence to support the substantive charges and several aggravating factors, which are "the precise considerations the Supreme Court identified as proper and legitimate grounds for such a decision.  *Webster*, 162 F.3d at 335 (citing *McCleskey*, 481 U.S. at 307); *United States v. Edelin*, 134 F. Supp.2d 59, 89 (D.D.C. 2001) ("Even if defendant Edelin had ben able to provide some evidence to support a prima facie case of selective prosecution on the basis of race, . . . [t]he government could easily provide a race-neutral explanation for its decision to charge defendant Edelin with a capital crime (explaining evidence supported charging capital offenses)")

For these reasons, this Court should find the defendant has failed to make a credible showing of discriminatory intent and should, again, deny the defendant's discovery request.

## C. The Court Should Deny the Defendant's Discovery Requested Because the Requested Materials Are Privileged

Even if the Court were to hold that the defendant met the stringent standards for discovery discussed above, the Court should still deny the defendant's discovery requests

because the materials he pursues are privileged. The defendant seeks "[a]ll correspondence, including emails, notes, and internal memoranda" by employees of United States Attorneys' Offices and Main Justice relating to the decisions to seek/not seek the death penalty against him and 14 other defendants. *See* Docket No. 290 at 13-14. He also seeks all correspondence by employees of the Department of Justice "regarding the recommendation for executive clemency for" six minority defendants. *See id.* at 14-15. The requested materials are protected by the deliberative process privilege and the attorney work product doctrine.

The "deliberative process privilege, which is a form of executive privilege," "'shields from disclosure documents reflecting advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *United States Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 267 (2021) (quoting *NLRB v. Sears Roebuck & Co.*, 421 U.S. 132, 150 (1975). To encourage candor, which improves agency decision-making, the privilege blunts the chilling effect that accompanies the prospect of disclosure. *Id.* Documents qualify for the privilege if they were (1) "predicisional," i.e., generated before the agency's final decision on the matter; and (2) "deliberative," i.e., prepared to help the agency formulate its position. *Id.* at 268.

The work product doctrine shields "certain materials prepared by an attorney acting for his client in anticipation of litigation." *United States v. Nobles*, 422 U.S. 225, 237-38 (1975); *see also* Fed. R. Crim. P. 16(a)(2) (except as otherwise permitted, "this rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government . . . in connection with investigating or prosecuting

the case").  The work product rule "clearly applies to memoranda prepared by an attorney in contemplation of litigation which sets forth the attorney's theory of the case and his litigation strategy."  *Sears*, 421 U.S. at 154.

Here, the materials sought by the defendant relating to the capital review process clearly fall within the parameters of both privileges.  This includes memoranda prepared by the U.S. Attorneys' Offices, Death Penalty Evaluation Forms, correspondence, notes of meetings, and memoranda prepared by the Capital Review Committee, the Capital Case Section, and any Department personnel involved in the capital review process.  As to the "deliberative process" privilege, the materials are (1) predecisional, i.e., created prior to the Department's final determination whether to seek the death penalty; and (2) deliberative, i.e., they contain opinions, recommendations, and advice about agency decision-making.  The materials are also attorney work product because they are internal government documents prepared by attorneys in anticipation of litigation.

For these reasons, multiple federal courts have recognized the privileged status of the very same materials the defendant now seeks in this case.  *See*, *e.g.*, *United States v. Fernandez*, 231 F.3d 1240, 1246 (9th Cir. 2000); *McCluskey*, 2012 WL 13080252 at *5; *Taylor*, 608 F. Supp.2d at 1269; *Edelin*, 134 F. Supp.2d at 89; *United States v. Furrow*, 100 F. Supp.2d 1170, 1174 (C.D. Cal. 2000); *United States v. Frank*, 8 F. Supp.2d 253, 284 (S.D.N.Y. 1998).  At least *Edelin*, *Frank*, and *McCluskey* recognized the application of these privileges where, as here, the defendant has requested discovery to support a selective prosecution claim.  In *Frank*, the court explained the importance of protecting this type of information, stating:

There are strong policy reasons in favor of keeping confidential the internal deliberative process through which the Government decides whether to use its prosecutorial power to seek the most severe punishment possible. Through an unrestrained and multi-level review, which gives an opportunity for defense counsel participation at each stage of the deliberative process (both at the local United States Attorney's Office and at the Department of Justice in Washington, D.C.), prosecutors are encouraged and required to evaluate carefully the strengths and weaknesses of their cases, along with the factors in favor of and opposed to the imposition of the death penalty. Defense counsel are given the opportunity to present to the Department of Justice any evidence of racial bias in the Government's administration of the federal death penalty. [former U.S.A.M.] § 9-10.050. In determining whether to seek the death penalty, Government officials are instructed to consider any mitigating factor reasonably raised by the evidence in the light most favorable to the defendant and to satisfy themselves that there is sufficient admissible evidence of aggravating factors to both obtain a death sentence and to sustain it on appeal before filing a Notice of Intent to Seek the Death Penalty. [former U.S.A.M.] § 9-10.080. *Discovery of the deliberative materials would have a chilling effect on the thorough evaluation of these issues and hinder the just, frank, and fair review of the decision for every individual defendant who faces the prospect of receiving a Notice of Intent to Seek the Death Penalty.*

8 F. Supp.2d at 284 (emphasis added). This same rationale for protecting the deliberative materials applies in the instant case.

With regard to the correspondence relating to commutations, these materials are also subject to the deliberative process privilege. *See Judicial Watch v. Dept. of Justice*, 365 F.3d 1108, 1114-24 (D.C. Cir. 2004) (discussing application of deliberative process privilege to DOJ memoranda and correspondence relating to pardons).[5] They are materials drafted prior

---

[5] As discussed in *Judicial Watch*, materials prepared by DOJ personnel relating to pardon (and commutation) recommendations may also be protected from disclosure by the presidential communications privilege if materials prepared by DOJ personnel were "solicited and received by the President or his immediate advisers." *Judicial Watch*, 365 F.3d at 1114. Because the government believes that the materials in this case, if deemed discoverable for

to final decisions of the former President containing opinions, advice and recommendations about executive decision-making.  Dissemination of these materials would likely have a chilling effect on future pardon and commutation discussions, particularly given strong public opinions about the decisions made and the decisionmakers.

Given the applicability of these privileges to the materials at issue, this Court should decline to order discovery.

### D. Conclusion

For the reasons set forth above, the Court should deny the defendant's motion to declare the FDPA unconstitutionally arbitrary and should deny the defendant's request for unprecedented and unjustified discovery into the Department's decision-making process.

Dated: March 24, 2025

MICHAEL DIGIACOMO                         MAC WARNER
United States Attorney                        Deputy Assistant Attorney General
Western District of New York                Civil Rights Division

BY:   s/JOSEPH M. TRIPI              BY:   s/DANIEL GRUNERT
      s/BRETT A. HARVEY                     Trial Attorney
      Assistant United States Attorney's      Civil Rights Division
      United States Attorney's Office         U.S. Department of Justice
      Western District of New York            150 M Street NE
      138 Delaware Avenue                     Washington, DC 20530
      Buffalo, New York 14202                 202-598-1141

_____

the defendant's selective prosecution claim, are exempt from disclosure by the deliberative process privilege, it is not necessary to determine application of the presidential communications privilege at this time.  Should, however, the Court disagree with the government's assertion of the deliberative process privilege, the government reserves the right to provide further briefing on the presidential communications privilege.

Daniel.Grunert@usdoj.gov

BY:    s/MICHAEL S. WARBEL
       Trial Attorney
       Criminal Division
       U.S. Department of Justice
       1331 F. St. NW, 6th Floor
       Washington, DC 20004
       (202) 514-5605
       Michael.Warbel@usdoj.gov