IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

───────────────────────────────────────

UNITED STATES OF AMERICA,

        v.                                    22-CR-109-V

PAYTON GENDRON,

                   Defendant.

───────────────────────────────────────

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO ADJOURN THE TRIAL

The United States of America, by and through its attorneys, Michael DiGiacomo, United States Attorney for the Western District of New York, and Mac Warner, Deputy Assistant Attorney General, Civil Rights Division, and Joseph M. Tripi, Brett A. Harvey, and Caitlin M. Higgins, Assistant United States Attorneys, Daniel E. Grunert, Trial Attorney, Civil Rights Division, and Michael Warbel, Trial Attorney, Department of Justice Capital Case Section, of counsel, respectfully submits this response in opposition to the defendant's motion to adjourn the trial (*see* Docket No. 303).

## PRELIMINARY STATEMENT

1,046 days since 13 innocent people's lives changed in an instant—ten innocent people were mercilessly killed, three others were injured and their lives forever changed, and dozens of others were perilously close to being shot and killed as they shopped for groceries; 926 days after initially receiving voluminous open file discovery; 847 days after the defense represented to a federal magistrate judge that they were diligently reviewing the discovery; and 427 days

after this Court set the trial date, the defendant has moved to adjourn the trial. The defendant's motion to adjourn the trial should be denied.

## FACTUAL BACKGROUND

To respond to the defendant's motion to adjourn the trial date by a year, a thorough review of the docket to date is warranted.

On June 15, 2022, the defendant was charged via criminal complaint with ten counts of a hate crime resulting in death; three counts of a hate crime involving bodily injury and attempt to kill; ten counts of use of a firearm to commit murder during and in relation to a crime of violence; and three counts of use and discharge of a firearm during and in relation to a crime of violence. *See* Docket No. 1. Magistrate Judge H. Kenneth Schroeder ("Judge Schroeder") held an initial appearance on June 16, 2022. *See* Docket No. 5. During this appearance, Judge Schroeder formerly appointed three Assistant Federal Public Defenders as counsel for the defendant. Judge Schroeder also stated that "when the events of May 14, 2022, or shortly thereafter had occurred, [his] chambers was contacted by representatives of the Federal Public Defender's Office as a result of there having been references to a possible Federal charge being made involving the death penalty. . . . And that is where I was compelled, upon consent, as well as upon request, to appoint what is called learned counsel." *See id.* Thus, it appears the federal defenders have been representing the defendant since on or about the date of the crime.

On June 16, 2022, the government produced voluntary discovery to the defendant.  *See* Exhibit A.  The discovery letter listed the materials provided, which included items seized pursuant to search warrants, the defendant's online manifesto, and other digital evidence.

On July 14, 2022, the federal grand jury returned a 27-count indictment against the defendant.  *See* Docket No. 6.  Judge Schroder arraigned the defendant on July 18, 2022. During this appearance, defense counsel advised the court that "our understanding is that the discovery is voluminous; particularly voluminous forensic discovery in the order of several terabytes.  I think that will take us quite some time to go through."  *See* Docket No. 34 at 7. In response, Judge Schroeder emphasized that "there is a third party beneficiary involved in the speedy trial requirements. . . . The public is also entitled to have a reasonably speedy disposition of criminal cases."  *Id.*  In setting a 90-day report period, Judge Schroeder asked defense counsel to confirm that the time until that period would be used to the benefit of the defendant, including giving "defense counsel sufficient time within which to begin and hopefully substantially complete the review process of the material provided."  *Id.* at 9.

On July 15, 2022, the government disclosed a copy of the defendant's G server from his Discord account (comprising 780 pages), covering the period from November 2021 to May 14, 2022, to the defense team via email.  The G server provides, in the defendant's own words, a daily accounting of how he diligently planned and  trained for the attack almost right up to the mass shooting.

On September 21, 2022, the government provided additional organized and searchable voluntary discovery to the defense. *See* Exhibit B. In its disclosure letter, the government stated, "[t]he government considers voluntary discovery to be complete. However, we are mindful of our ongoing obligations to produce discovery pursuant to Rule 16(c) and *Brady* material. With some limited exceptions, you now have all the materials we have and all of the materials we intend to introduce at trial." These discovery materials consisted of approximately 11,994 documents (a total of 55,164 pages), which were Bates numbered, and two external hard drives containing "NON-BATES NUMBERED DISCOVERY." The government furnished the discovery materials in a loadable/searchable format, along with correspondence and an index describing the organizational structure of the materials, the categories of materials that were being disclosed, and corresponding Bates number ranges. The September 2022 disclosure contained Rule 16 materials, including, *inter alia*, recordings of the defendant's post-arrest statements at the crime scene and the police station; federal search warrants and applications, and one state search warrant and application; law enforcement reports and photographs relating to the search warrants, and copies of documentary and digital evidence obtained from the search warrants; body camera footage from law enforcement officers; interior and exterior surveillance footage from Tops from March 8, 2022, May 13, 2022, and May 14, 2022; the defendant's GoPro video of the attack/murders; and copies of records and documents obtained from grand jury subpoenas. In addition, the government provided copies of Jencks Act materials (including reports and notes of some witness interviews, and transcripts of grand jury testimony from both the federal and state grand jury investigations).

Of particular relevance, in the September 2022 disclosure, the government disclosed to the defendant federal and state search warrants and applications relating to the following property and social media accounts: (1) the Tops Friendly Market located at 1275 Jefferson Avenue, Buffalo, New York (Case No. 22-MJ-109); (2) a 2003 Ford Taurus SE, bearing VIN 1FAFP53203A192590 and New York License Plate DHH8025, which was the vehicle used by the defendant at the time of the attack/murders (Case No. 22-MJ-110); (3) two USB drives and a computer tower seized from the defendant's residence at 14 Amber Hill Road, Conklin, New York (Case No. 22-MJ-111); (4) the Discord account associated with the username jimboboiii#9670 and user ID 356560721183506444, which was the Discord account used by the defendant (Case No. 22-MJ-112); (5) the Facebook account associated with user ID 100077425113293 and username "Payton Gendron" (Case No. 22-MJ-113); (6) an iPhone 11 and HP laptop computer seized from the defendant's Ford Taurus (Case No. 22-MJ-114); (7) the Snapchat accounts "Pgendron77" and "Matthew-Casado" (Case Nos. 22-MJ-115 and 22-MJ-121); (8) the Verizon account associated with cellular telephone number (607) 427-9125, which was the cell phone possessed and used by the defendant (Case No. 22-MJ-116); (9) the Twitch accounts "jimboboiii" and "pgendron77" (Case No. 22-MJ- 117); (10) the Apple iCloud ID vcvnmvcvnm@icloud.com (Case No. 22-MJ-118); (11) the Google account gendronp@acad.sunybroome.edu, which was the defendant's email account at SUNY Broome (Case No. 22-MJ-119); (12) the Twitter account "@vcvnm7777777" (Case No. 22-MJ-120); (13) the Google account vcvnmvcvnm4@gmail.com, which was an email account used by the defendant (Case No. 22-MJ-122); (14) two iPads, a GoPro camera, and two iPhones recovered from the defendant's residence at 14 Amber Hill Road, Conklin, New York (Case No. 22-MJ-123); (15) the defendant's residence at 14 Amber Hill Road, Conklin, New

York (this search warrant was issued under Case No. 22-MJ-235 in the Northern District of New York); and (16) the defendant's Ford Taurus, and a GoPro camera and black iPhone found in the defendant's possession at the time of his arrest. This search warrant was issued by a Buffalo City Court Judge.

Since that time, the government has made numerous supplemental disclosures to the defense pursuant to Rule 16(c).[1] The defense, however, has been in possession of virtually the same information as the government since September 21, 2022.

On November 28, 2022, 859 days ago, the defendant was prepared to and did plead guilty in state court to ten counts of first-degree murder, three counts of attempted murder in the second degree as a hate crime, one count of criminal possession of a weapon, as well as one count of domestic terrorism motivated by hate. He was sentenced to consecutive life sentences without the possibility of release.

On December 9, 2022, Judge Schroeder held a status conference. Defense counsel stated that "since the last date, we have received voluminous discovery from the government in the form of multiple terabytes of data. We have certainly begun the process of reviewing that, processing it, so that it's capable of being reviewed. I can tell you that it will take significant additional time to complete that review." Docket No. 41 at 2-3. In this vein, the

---

[1] These disclosures have included additional materials gathered by the government and materials specifically requested by the defense. Most recently, on March 28 2025, defense counsel sent correspondence to the government seeking clarification of several issues relating to the discovery. The government is working expeditiously to provide a complete response to defense counsel.

defense requested another 90 days to review discovery, which the government agreed to because it coincided with the defendant's time to present mitigation evidence to the government. *See id.* at 11-12. Judge Schroeder stated as follows:

> THE COURT: I'm not criticizing anybody for their carrying out their responsibilities, both the government and the defense counsel. I'm just trying to put this thing in what I see as the perspective that it needs to be put in.
>
> I also wanted to emphasize for the record and for enlightenment, for want of a better term at the moment, to the members of the public and members of the families of the victims. Oftentimes, attorneys -- attorneys for the government and attorneys for the defense -- lose sight of the concept of the Speedy Trial Act by thinking that it's just something that applies to the two parties, the prosecution and the defense. It does not.
>
> And caselaw, especially caselaw from the 2nd Circuit Court of Appeals, which is quite expressive, clearly establishes that the Speedy Trial Act, and a provision for a speedy trial under the Constitution of the United States, also confers third-party rights on the members of the public. The public has a right to have speedy dispositions of criminal matters that are brought.
>
> And, so, it's in that context that I also have an obligation when doing these scheduling steps to enforce the rights of that public.

*Id.* at 12. Defense counsel reaffirmed that the defense would use the additional 90 days "to continue to review the discovery and then to report to the Court about the status of that

review" and that "[w]e're certainly reviewing all of the discovery, some of which does have to do with mitigation." *Id.* at 13 and 16. In addition, counsel represented that "it is still our hope to resolve this matter short of a trial. And just as Payton Gendron entered a plea of guilty in county court, he is prepared to enter a plea of guilty in federal court in exchange for the same sentence." *Id.* at 14.

On February 16, 2023, the parties appeared before Judge Schroeder for a scheduling conference. The government confirmed that it would likely request a scheduling order at the March 10, 2023 status conference. *See* Docket No. 71. During the status conference, Judge Schroeder granted the defendant's request to label the case complex. The government made an extensive record regarding the extraordinary efforts it had made with discovery. *See id.* at 9-15. In doing so, the government had proposed "[t]he bulk of [the defendant's] motions [be] set out six months, which would be well over a year from the time they had complaint discovery, and almost a year since they had indictment discovery." *Id.* at 15. The defense responded that before setting a motion date, it needed "to know what's in the discovery. We need to be able to have reviewed the discovery before we can propose a scheduling order." *Id.* at 37. Judge Schroeder set a further status conference for 90 days and excluded time based on the representation that the defense would continue to review discovery.

On March 21, 2023, this Court held a status conference. *See* Docket No. 53. During the conference, the Court stated that it would not set a trial date at this point because of the many moving parts to the case. The Court stated, however, "I share the magistrate judge's concern about moving this case at a decent pace, and so I don't want to let that get away from

me." *Id.* at 8.  With respect to setting motions, the defendant opposed any motion deadline asserting that "[i]n terms of the discovery process . . . we received 4.1 terabytes. . . . We have been diligently going through it all.  We certainly have an obligation and a desire to go through all of it.  All of it is relevant, we think, to both phases of a trial, if there is one.  So we would not be in a position at this point to consent to a motion schedule because we haven't gotten through the discovery." *Id.* at 10-11.  Indeed, when asked about setting another status conference, the government asked for 45 days, the Court proposed 90 days, and the defense requested six months.  *Id.* at 11.  The Court rejected that requested saying it was "too long," and scheduling a date 90 days out.

On June 5-7, 2023, defense counsel attended several sessions at the FBI Buffalo Office to review physical evidence seized during the investigation, including evidence from the crime scene, the defendant's residence, and vehicle.  During the sessions, the government made all physical evidence available, and counsel for the defendant took photos items of evidence and the FBI scanned chain of custody forms for the defense at their request.[2]

On June 15, 2023, the parties appeared for a status conference before Judge Schroeder.  Defense counsel stated, "I can tell the Court . . . that we have continued to review the discovery.  As we've discussed many times, it's voluminous, particularly the digital discovery, which is about 2.8 terabytes.  We have continued to do that intensively.  It is not possible for us to have completed that by now, but certainly we have continued to review.  Obviously, we

---

[2] The defense reviewed most of the physical evidence on June 5-7, 2023, and returned to the FBI Buffalo Office and reviewed additional evidence on July 10, 2024.

are doing an extensive investigation, which we have people working on all the time, including ourselves." Docket No. 77 at 3. The government, yet again, urged Judge Schroeder to set a scheduling order. *See id.* at 5-7. Indeed, the government asserted that "If the defense has discovery-type motions or anything else along those lines to file, we've been in this posture for over a year now and they have had a lot of discovery, even at the complaint stage. Enough to know the framework of what their motion practice should look like by now, in my view, anyway. So we are here to ask you to at least solicit proposals from the parties to what a schedule should look like. If not, set a schedule and then take input as to how that schedule should be broken down." *Id.* at 6-7. The defense resisted setting a trial urging the court that they could not possibly draft motions without the death penalty decision. Judge Schroeder responded that the defense knew "what search warrants have been issued. And so if [they were] going to attack the validity of the search warrants, [they] knew which warrants they [were]." *Id.* at 28. Judge Schroeder further stated that:

> You can move to have all 15 search warrants ruled invalid, as violating the Fourth Amendment rights of the defendant.
>
> The legal issue will be whether there was probable cause for the issuance of each and every one of those warrants; whether there was misrepresentation in the affidavits in support of the warrants necessitating a Franks Hearing, whatever, but they are all legal issues that are identifiable to particular things, search warrants.
>
> You know that. You've known that since probably 60 days after the defendant was charged.

*Id.* at 29.  The defense responded, then, arguing that it may not be "wise use of judicial resources, let alone any other resources, for us to go through that process in a case that would be resolved if they decided not to seek the death penalty."  *Id.* at 29-30.  The defense did not respond that they could not start preparing the motions—just that they did not want to.

Instead, the defendant requested that the court set yet another status conference down the line for the government to provide an update on the death penalty decision and an additional extension for them to draft a discovery motion.  Judge Schroeder questioned why the defense would need so much time—to which the defense stated "[w]ell, the first thing one would need to do is know what discovery they had already provided," to which the Court aptly responded "[w]ell, I assume you know what that is, because you've been reviewing it."  *Id.* at 33-34.  The defense responded that "[t]he issue though Judge, the discovery that was provided is so voluminous that no one could have by this point gone through that much evidence.  So we know -- I can tell you how many hard drives.  I  can tell you how many terabytes and certainly we have been endeavoring to review it as efficiently as we can, but no one could have done that by now."  *Id.* at 34.  Over the defense counsel's objections, Judge Schroeder set a scheduling order.  Docket No. 78.

On June 29, 2023, the defendant filed a notice of appeal regarding the scheduling order and revoking Judge Schroeder's referral order.  *See* Docket No. 79.  In the appeal, the defendant asserted that "[e]ffective capital representation at both the guilt and penalty phases of a capital trial requires that defense counsel thoroughly review all such discovery material provided by the government and follow up on all resulting investigative leads provided by this

review." *Id.* at 14.  Furthermore, the defense argued that Judge Schroeder erred in setting a scheduling order before the death penalty determination and requested that this Court rescind the referral order.   Notably, in support of the appeal, the defense acknowledged that "[u]nderstandably, those most impacted by the terrible events of May 14, 2022, wish to be present to represent their loved one and remain apprised of the events in the case, despite the inconvenience to their lives and the unimaginable pain that accompanies any reminder of their loss." *Id.* at 20.  The defense further quoted from a news article where Zeneta Everhart, the mother of a surviving victim, stated: "I think we all feel frustrated. Coming to these court cases are not easy.  It's hard to come here. It's hard to hear over and over and over again about what happened that day."  Likewise, the defendant quoted Barbara Massey-Mapps, whose sister was killed by the defendant, stating "I'm praying to God that this is over by the end of the year." *Id.* at 21.

The government opposed the motion with respect to Judge Schroeder's decision and deferred to the Court regarding rescission. *See* Docket No. 83.  The government asserted that:

> Judge Schroeder's decision to set a scheduling order was not only within his authority, but also reasonable given the long procedural history, discussed *supra*, that proceeded his decision to do so. As of July 14, 2023, it will have been 426 days since the mass shooting at Tops, 393 days since the government provided voluminous discovery at the complaint stage, and 296 days since the government disclosed copies of the majority of its case file to the defense. Further, over the history of the case, the parties have appeared before Magistrate Judge Schroeder for multiple status conferences, during which Magistrate Judge Schroeder has agreed, on more than occasion, to the defense's request for additional time to review discovery before setting a scheduling order. *See* Minute Entry, December 9, 2022; Minute Entry, March 10, 2023. Thus, under these circumstances, it was neither clearly erroneous nor contrary to law for Magistrate Judge Schroeder to set a scheduling order on June 15, 2023.

*Id.* at 7.  The government further argued that "The government's intention was and is to propose a scheduling order that would be consistent with the scheduling orders utilized in other similar mass-shooting cases.  Setting a scheduling order that accounts for the complex and unique nature of this case would allow both parties to effectively, and as efficiently as possible, litigate this case.  To the extent that this Court is inclined, as discussed below, to rescind its referral order and resume supervision of pretrial matters, the government would request the opportunity to propose a scheduling order for the Court's consideration."  *Id.*

On August 8, 2023, this Court held a status conference.  *See* Docket No. 103.  During the conference, the Court asked why the defense would not be able to draft certain motions, such as suppression motions, while awaiting the death penalty decision.  The defense stated that it would be a waste of resources because a no-seek would moot any motion practice. Again—the defense did not argue that they could not begin preparing motions.  Moreover, the defense asserted that "[t]here is work being done. . . . whenever we run into a discovery issue that we think we're missing something, we communicate with the government, they often give that to us.  We, of course, are continuing with our mitigation investigation, and especially leading up to this meeting on September 18th.  So there is work being done.  What we're suggesting is that we shouldn't be doing which that, A, wouldn't be done at all if the decision goes one way, or B, would have to be redone or at least supplemented if the decision goes the other way."  *Id.* at 7.  The government proposed an elongated schedule, prioritizing motions such as discovery and motions to suppress.  The defense opposed this idea and, instead, proposed to have another status conference after the September 18, 2023 meeting in Washington.  *Id.* at 8.

On October 2, 2023, the Court held oral argument on a motion. *See* Docket No. 113. At the end of the oral argument, defense counsel asked that the Court adjourn the status conference it had scheduled in the coming weeks because there had been no death penalty update. *See id.* at 19. The Court rescheduled the status for November 28, 2023. *See id.* at 19. As part of the speedy trial exclusion, the Court stated that "[a]s the parties have previously reported, there's voluminous discovery, counsel are through all of that." *Id.* at 20.

The Court held another status conference on November 28, 2023 and, with no death penalty decision, scheduled another status conference for January 12, 2024. *See* Docket No. 121. On January 12, 2024, the government filed the notice of intent to seek the death penalty. *See* Docket No. 125. On the same day, the Court held a status conference where the defense asked to adjourn "so that the government and the defense can get together to see if there any areas of agreement about a motion schedule," and requested 30 days to do so. *See* Docket No. 127 at 3. The government objected to the 30-day request and asked for a shorter time-period. *Id.* at 5. The Court set a status conference for February 2, 2024.

On February 1, 2024, the government filed a motion for a scheduling order and to set a trial date (*see* Docket No. 133) and the defense filed a memorandum in support of the defendant's proposed scheduling order, which did not include a trial date (*see* Docket no. 134). In his motion, the defendant urged the Court not to set a trial date because, essentially, if the date had to be adjourned "all of this work would be for nought." Docket No. 134 at 8. Furthermore, the defendant argued that postponing setting a trial date would avoid creating "unrealistic expectations for the surviving victims of the crimes of May 14, 2022, the families

of the deceased, and the community at large.  A capital trial in this matter would undoubtedly be a highly anticipated, emotionally fraught and intensely difficult time for all concerned. Any steps that minimize the likelihood of requiring those most deeply affected by these crimes to ready themselves for the event more than once are therefore worthy of the most serious consideration." *Id.*  Implicit in this statement was the tacit acknowledgment that any trial date the Court set would be adjourned.

On February 2, 2024, the Court held a status conference.  *See* Docket No. 154.  The government requested that the Court issue a scheduling order that included commencement of trial on April 14, 2025.  Indeed, the government asserted that the defense "had essentially complete discovery since September of 2022, so they've had a lot of time to dig into that.  And [we] think at every status conference that we've had before this Court and the handful of conferences we've had before Judge Schroeder, the defense affirmed on the record that they were going through the discovery. That was the basis for, [we] think to this day, a lot of the speedy trial exclusions." *Id.*  The defense not only resisted setting a trial date, but equally resisted setting dates for all motions.  *See id.* at 42 ("The Court:  Let me ask the defense this. Why can't we set -- even if -- even if we don't set a trial date right now, why can't we set dates for pretrial motions, including venue motions and the response to pretrial motions and the hearing on that, why can't we do that now.").  The defense responded:

> And so because of that, Judge, we're just saying why don't we allow us to continue our investigation, continue to review the voluminous discovery, continue to conduct our mitigation investigation as we go through these initial phases, and then we would be in a better position to be able to set deadlines in a sequential manner come, you know, as we move forward. It's all -- all the litigation is being managed by the Court, so we're not suggesting there's gonna be substantial delays or we're building

in any delays. It's all about just being sequential, being mindful
of what those rulings are, and how it impacts the later litigation.
It doesn't make sense to us to say we're going to set deadlines.

*Id.* at 42-43.

Ultimately, the Court set a trial date in September 2025, stating "I think that that is a realistic date to begin trial of this case.  I think that builds in enough time for everything that we're talking about, and we will set some dates now with respect to the motions.  We'll set a trial date. But, as I say, and it's -- and it's -- and it's a real deadline, it gives everybody something to work toward. But I recognize that this case is different than any case that I've ever handled, so I'm not going to say what I usually say, that it's cast in stone, come hell or high water, we're going." *Id.* at 48.   The defense objected stating that "given all the unknowables right now, that would not be prudent." *Id.* at 49.

On May 1, 2024, the defense filed a letter regarding discovery.  *See* Docket No. 157. In the letter, the defendant conceded that "[t]hroughout this process, the government has repeatedly emphasized that it will provide us with essentially 'open file' discovery.  Where the government has not outright agreed to supply us with the material we requested, it has advised us that it is still considering our requests and will advise us of its decision as promptly as possible.  Accordingly, the government has not refused to provide us with any material we have requested to date."  For this reason, the defense stated that it had "no grounds upon which to file discovery motions tomorrow." *Id.*  This letter solidifies two points: (1) that the defense had utilized the 2.5 years to dig into the discovery the government provided them;

and (2) that the government continued to work cooperatively and extensively with the defense regarding discovery.

Between May 1, 2024, and October 22, 2024, the parties filed and responded to motions.  On October 22, 2024, in the context of whether the Court had authority to review the death penalty certification, defense counsel posited that "[t]he only thing this prosecution can do is delay judicial finality for years, certainly, decades possibly.  That is the question before the Court, is it therefore in the public interest to expend the resources, the time, the effort, the heartache, to prosecute this when the metrics are clear."  Docket No. 231 at 20.  In making the argument, defense essentially concedes that delay is part of the litigation strategy in these cases.

In addition, the government used this time to work with the defense on any remaining discovery issues.  On July 26, 2024, the defendant sent a supplemental discovery demand requesting the government to "redisclose . . . all law enforcement reports, including but not limited to FBI-302 and FBI-1057 reports, that have attachments, including but not limited to physical and digital 1A, 1B and 1C materials, with those attachments and the reports to which they relate clearly identified."  In response to this request, the government downloaded almost the entire FBI file and created a detailed spreadsheet describing its contents.  To track the materials, the government assigned new Bates numbers to the documents contained in the re-production.  On October 24, 2024, the government provided the re-produced discovery materials and the spreadsheet to the defendant.

On November 29, 2024, over two years after the government provided the bounty of discovery in this case, the defense filed a motion to suspend the scheduling order and to compel the government to produce discovery in a useable format that permits timely and efficient review. *See* Docket No. 246. Tellingly, one of the first lines in this brief states that "[t]he defense team has spent the last two and a half years processing, organizing, reviewing, and analyzing the discovery as it has been provided." *Id.* at 1. Although the defense denigrated the government's "primitive methods of production and organization," they remained silent as to the numerous hours the government has spent quite literally clicking through the discovery alongside the defense. *See id.* Instead, the defense argued that the government's reproduction of discovery—which was at defense counsel's request—rendered the 2.5 years of review useless. *Id.* at 2-3.

Astonishingly, despite having access to this discovery for 2.5 years, the defense argued that the reproduction rendered them unable to now "begin the process of determining *whether* a motion to suppress may be required." *Id.* at 5 (emphasis added). They made this claim despite the multiple representations for the last years that they had been reviewing the discovery. Defense counsel, then, requested that the Court compel the government to "comply with its discovery obligations in this case" and also "to suspend the current scheduling order until the government complied with these directives." *Id.* at 11. In so moving, the defense contended that it could not "identify or prepare motions to suppress and other fact-dependent motions until these tasks have been accomplished and the defense has had a reasonable period of time to review and analyze the results. Because it's unclear how long it will take the government to accomplish the work with a sufficient degree of

completeness and accuracy, the defense asks the Court to suspend the current schedule and set a status conference to ascertain the date by which the defense will be provided with the information necessary to continue its preparation for motion practice and trial." *Id.* On December 10, 2024, the government filed its response. *See* Docket No. 252.

On December 11, 2024, the Court held a status conference. During the conference, the defense, again, contended it could not possibly be in a position to file motions without the government essentially identifying each and every piece of discovery for them. Despite the fact that the government pointed out that the defendant has had every search warrant in an easily searchable form since in and around September 2022, the Court ordered that the government reconcile the production issues. The Court, however, denied the defendant's request for a stay of the scheduling order in general. Instead, the Court provided the defense with an adjournment of 30 days. The defense made the representation "[w]e have been working on researching and preparing the suppression motions, too." *Id.* at 26. The Court further stated that "I'm not inclined to change the trial date. I want to keep that date in place," to which defense counsel stated "[w]e certainly haven't asked for that, Your Honor." *Id.* Of course, by asking to stay the scheduling order indefinitely, the defense *did* ask for that.

On February 7, 2025, the Court held oral argument. During this argument, the Court held that it was going to allow the defense to conduct a *Roper* extension hearing. In response to the government stating that the defendant failed to establish that he would be entitled to relief as a matter of law, the Court stated that it was "going to let the defendant make a record on this," and that the Court wanted "a complete record on this so that the Court of Appeals

and the Supreme Court can eventually look at this." Docket No. 273 at 8. In so holding, the Court stated that "we've got a trial date, and we're working toward that trial date, and I'm planning to keep that trial date. . . . we're gonna be on dual tracks. . . . we're all going to be working hard, including me." *Id.* at 9. In response to the Court ordering expert disclosures for the hearing by a certain date, the defense responded "[w]e will certainly endeavor to do that, Judge, and if we can't we'll let the Court know why." *Id.* at 10. The Court responded "Yeah, well, you better have a good reason because I want to keep this on a very short track. I'm -- I'm, you know, the government is opposed to this. I understand why the government is opposed to it. They've got good reasons to be opposed to it. I want to make the record, but we're not gonna let this delay anything. So let's keep these deadlines." *Id.*

When the government and the Court agreed to set dates for the hearing, the defense resisted stating, "Judge, if I may, just to build into that. We're looking at between probably four to seven expert witnesses. We have been reaching out to witnesses. Obviously, they're not always that easy to reach or that easy to schedule, but we're endeavoring to keep this narrow, and to follow the Court's schedule." *Id.* at 11. In response, the Court asked for hearing dates in the first three weeks of May, to which the defense objected stating "we would ask for the end of May or the beginning of June, just so we can get our ducks in a row and be as efficient as possible." *Id.*

The Court reiterated again that "I don't want any delays. I don't want -- I don't want the government coming back and saying they need more time because the defense hasn't given

them enough. Okay? I want to get this done. This is gonna get done, and it's gonna get done quickly." *Id.* at 12.

On March 6, 2025, defense counsel emailed the Court and stated that "[w]hile we have worked diligently to meet the interim scheduling deadlines set by the Court for various phases of the litigation thus far, there remain several critical, constitutionally mandated areas of litigation and investigation that will require more time than the current schedule allows. We intend to address in detail each of those categories in a motion to adjourn the start date of the trial, which we plan to file no later than March 17, 2025." The government opposed the adjournment request. The Court denied the adjournment request. *See* Docket No. 281.

On March 12, 2025, the Court held oral argument. During the appearance, and despite the Court's admonition that it wanted dates for the hearing in early May, the defense provided dates for experts on May 20, May 21, and May 22. *See* Docket No. 287. The Court then directed the defense to provide earlier dates in May as soon as possible. *Id.*

On March 25, 2025, the defendant filed the instant motion requesting to adjourn the trial date by one year.

## **ARGUMENT**

**I.**      **The Court Should Deny the Defendant's Motion to Adjourn the Trial to Protect the Right to a Speedy Trial of All Parties and to Effectuate the Crime Victims' Rights Act.**

The Sixth Amendment and the Speedy Trial Act require the government to provide the defendant with a speedy trial. The Sixth Amendment guarantees that "the accused shall

enjoy the right to a speedy and public trial." U.S. Const. amend. VI. Indeed, the Supreme Court has deemed the right to a speedy trial is "fundamental" to our system of justice. *Klopfer v. North Carolina*, 386 U.S. 213, 223-26 (1967) ("The history of the right to a speedy trial and its reception in this country clearly establish that it is one of the most basic rights preserved by our Constitution."). The Second Circuit has held that the public, just as much as the defendant, "is the loser when a criminal trial is not prosecuted expeditiously, as suggested by the aphorism, 'justice delayed is justice denied.'" *United States v. Gambino*, 59 F.3d 353, 360 (2d Cir. 1995).

Pursuant to the Sixth Amendment, the Court and the government owe an "affirmative obligation to [a criminal defendant] and to the public to bring matters to trial promptly." *United States v. New Buffalo Amusement Corp.*, 600 F.2d 368, 377 (2d Cir. 1979).  This burden, however, weighs particularly heavily on the government, which "owe[s] the additional duty of monitoring the case and pressing the court for a reasonably prompt trial."  *United States v. Vispi*, 545 F.2d 328, 334 (2d Cir. 1976).  As such, the Second Circuit has "repeatedly emphasized that affirmative action by the government in bringing cases to trial is mandated." *United States v. Tigano*, 880 F.3d 602, 613 (2d Cir. 2018).

In the same vein, the Speedy Trial Act requires the government to bring a criminal defendant to trial within 70 days of their first appearance before a judicial officer or the filing of an indictment, whichever is later. *See* 18 U.S.C. § 3161 (c)(1).  "A district court is under an obligation at all times to protect the interests embodied in the Speedy Trial Clause. The

Speedy Trial Act was enacted to assist courts in that task." *United States v. Black*, 918 F.3d 243, 277 (2d Cir. 2019) (Cote, J., concurring and dissenting in part).

Neither the Sixth Amendment nor the Speedy Trial Act require "unreasonable speed," which could "have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself." *United States v. Ewell*, 383 U.S. 116, 120 (1966). Rather, both recognize that "criminal cases vary widely and that there are valid reasons for greater delay in particular cases." *Zedner v. United States*, 547 U.S. 489, 497 (2006). "Partly because of these often dueling interests, the speedy-trial right has been described as amorphous, slippery, and necessarily relative." *United States v. Tufino*, 2021 WL 1788521, at *2 (W.D.N.Y. May 5, 2021) (citing *Barker v. Wingo*, 407 U.S. 514, 522 (1972)) (internal quotation marks omitted). The right to a speedy trial, however, is never peripheral or irrelevant (even where a defendant agrees to waive his rights by, for example, consenting to exclusions of time).

The Supreme Court has recognized that:

> [T]he deprivation of the right [to a speedy trial] may work to the accused's advantage. Delay is not an uncommon defense tactic. As the time between the commission of the crime and trial lengthens, witnesses may become unavailable or their memories may fade. If the witnesses support the prosecution, its case will be weakened, sometimes seriously so. And it is the prosecution which carries the burden of proof.

*Barker*, 407 U.S. 522.

In death penalty cases, this axiom rings particularly true. "The simple fact is the process takes so long because there is a concerted effort afoot to slow it down." Jeffrey Omar Usman, *The Twenty-First Century Death Penalty and Paths Forward*, 37 Miss. C. L. Rev. 80, 90 (2019). Indeed, "[f]or attorneys fighting for the lives of their clients and in opposition to the

death penalty itself, every day is a victory in a struggle to run out the clock on the State's ability to execute their client." *Id.* The strategy, then, becomes "delay, delay, delay. Every day without the execution is another little victory" *Id.* (citing to Andrew H. Malcolm, *The Wait on Death Row; Legal Delays Thwart Death Penalty*, N.Y. Times, June 23, 1990).

Incentives diverge with respect to moving death penalty cases forward. For example, "[w]here the client is incarcerated with no capital sentence, every day in prison is another day of freedom lost, thus delay runs contrary to what is being sought." *Id.* In contrast, "[i]n capital cases, every day is another day of the client's life prolonged, another step toward achieving the prevention of the state from executing the condemned prisoner." *Id.* For this reason, Chief Justice Rehnquist opined that "[t]he capital defendant does not need to prevail on the merits in order to accomplish his purpose; he wins temporary victories by postponing a final adjudication .... [T]he [death row] prisoner [has] every incentive to invite delay." *Id.*

Put simply, in a case where the defendant faces consecutive life sentences with no possibility of release, he has every incentive to invite delay and has done so, as illustrated extensively above, at every point in this case. Indeed, every day he avoids trial is, in fact, a victory for him. Delaying the start of this trial beyond September 8, 2025, however, constitutes an extraordinary loss for the surviving victims, deceased victims' families, and the public, who are all entitled to a speedy trial—even if this defendant does not want one.

Pursuant to the Crime Victims' Rights Act, 18 U.S.C. § 3771, the surviving victims and the deceased victims' family members have the right to proceedings without unreasonable

delay.  And for good reason.  The deleterious consequences of strategic delay to victims cannot be overstated.  For example, family members of homicide victims often experience "feelings of shock, rage, guilt, helplessness, isolation, elongated or chronic grief, and posttraumatic stress reactions."  Usman, *The Twenty-First Century Death Penalty and Paths Forward*, 37 Miss. C. L. Rev. 80, 97 (2019).  Many victims' family members struggle "to find meaning after five years," and these co-victims "endure[] post-homicide distress that [does not] dramatically lessen over time, and [are] significantly more likely than other [even] direct crime victims to have life-time PTSD [(post-traumatic stress disorder)]."  *Id.*  The defendant may not have killed the surviving individuals or the deceased victims' family members, but he caused devastating effects on their lives.  Delaying the trial of this case only exacerbates their pain.

In opposing setting a trial date, the defense cited the need to manage the expectations of the surviving victims and deceased victims' families as a reason to postpone setting a date. But the uncertainty and promised delay hurts these people more.  The words cited by the defense from these people underscore the impropriety of any adjournment:  Zeneta Everhart, stated: "I think we all feel frustrated.  Coming to these court cases are not easy.  It's hard to come here.  It's hard to hear over and over and over again about what happened that day" and "I'm praying to God that this is over by the end of the year."  What is more, adjourning the trial puts the government at risk with respect to victim impact testimony.  Several victim family members are elderly—the government, then, faces the prospect of potentially losing victim testimony because of the defendant's delay strategy.  For example, one deceased victim's brother passed away in early 2025 and another family member recently suffered a

serious medical emergency.  Accordingly, the Court should deny the defendant's motion to adjourn to properly effectuate the right to a speedy trial and the CVRA.

**II.    The Court Should Deny the Defendant's Adjournment Request Because the Scheduling Order Comports with Similar Death Penalty Cases.**

A.  <u>The Current Scheduling Order and Trial Date Comport with Other Death Penalty Cases Across the Country</u>.

The defendant contends that he cannot be ready to proceed to trial on September 8, 2025 because, *inter alia*, his case "is simply more complex than the other capital cases tried in this Circuit."  Docket No. 303 at 2.  But the defendant's argument is flawed.  The cases in this circuit—with the exception of *Saipov*—are not the best comparators for how to proceed in this case.  Instead, *Tsarnaev, Roof, Saipov,* and *Bowers* prove better comparators based on analogous facts, complexity, and prominence:

| Case | Date of Crime | No. of Victims | Time to NOI | NOI to Trial | Total Time to Trial |
|------|---------------|----------------|-------------|--------------|---------------------|
| Tsarnaev | 4/15/13 | 3 dead/281 injured | 290 days (9.5 mos.) | 340 days (11.2 mos.) | 632 days (20.8 mos.) |
| Roof | 6/17/15 | 9 | 314 Days (10.3 mos) | 188 days (6.2 mos.) | 530 days (17.4 mos.) |
| Saipov | 10/31/17 | 8 dead/serious injury to others | 332 day (10.9 mos) | *374 days (12.2 mos.) **563 days (18.5 mos.) ***570 days (18.7 mos.) ****1474 days (48.5 mos.) | 1806 days (59.4 mos.) |
| Bowers | 10/27/2018 | 11 | 303 Days (9.9 mos) | *1337 days (44 mos.) | 1640 days (54 mos.) |
| **Gendron** | **5/14/2022** | **10 dead/3 injured** | **609 days (20 mos.)** | **606 days (19.9 mos.)** | **1214 days (39.9 mos.)** |
| **Defense Proposed Gendron** | **5/14/2022** | **10 dead/3 injured** | **609 days (20 mos.)** | **971 days (31.9 mos.)** | **1579 days (51.9 mos.)** |

The defendant's argument that this case is more complex than the other capital cases tried in this Circuit may be true in the sense that this case involves more victims and more publicity.  No other factors, however, make this case particularly "complex."  This case does not involve multiple defendants, cooperating witnesses, electronic surveillance, or other particularly thorny evidentiary issues.  Indeed, in the instance case, defendant video streamed himself committing the murders; admitted his guilt publicly during a state plea colloquy; and kept a daily online journal detailing the preparations for the crime.  Nonetheless, the defendant simply assumes that all death penalty cases, regardless of the underlying facts, involve the same interests.  Although every death penalty case is important, death penalty cases vary by significance based on the details of the case.  When someone, like this defendant, perpetrates a heinous mass-shooting based on racial animus, the public has an unusually powerful, vested interest in seeing justice advanced promptly.  The cases in the chart above reflect that principle as explained below.

The defendant refuses to confront this fact and instead relies on a superficial comparison of the death penalty cases from the Second Circuit.  Providing only the victim count for each case, the defendant argues that the average charge to trial time for capital cases in this Circuit is 53.4 months and that the average notice of intent to trial time is 30.2 months.  The defendant then attempts to argue that because "[t]he number of victims is significantly higher [in his case] than any of the Second Circuit apart from *Saipov*" the current scheduling order in this case is unreasonable.  Not so.  In making this argument, the defendant not only fails to account for the factual differences between *Saipov* and the other Second Circuit Cases, but he misrepresents *Saipov*'s procedural history in the chart.  First, *Saipov* involved a terrorist

attack—purportedly carried out in the name of the Islamic State of Iraq and the Levant, a jihadist militant group—resulting in the death of eight people and serious injury to 13 others. These facts, more so than the number victims, distinguish *Saipov* from the other Second Circuit cases, such as the drug murders in *Khalid Barnes* (SDNY, 04-cr-186) or *Kenneth McGriff* (EDNY, 04-cr-966).

Under the defendant's logic, *Saipov* should be the longest case from notice of intent to trial. And, according to the defendant chart, it is. This is skewed. In *Saipov*, the court set a trial date for April 20, 2020—570 days or 18.7 months from the notice of intent. The COVID-19 Pandemic, however, forced the court to adjourn the trial. Had the trial proceeded according to the pre-pandemic schedule, *Saipov* would prove to be a significant outlier on the defendant's chart—indeed, *Saipov* would have been the fourth shortest case from notice to trial.

Further to this point, the defendant relies on a chart created by an attorney with the Federal Death Penalty Resource counsel. *See* Docket No. 303-1. The Federal Death Penalty Resource Center website features multiple declarations pertaining to trial times.[3] One such declaration, from 2019, states that "[t]he average time between indictment and the trial date in federal capital cases is approximately 29.0 months," and the "average time between the notice of intent to seek the death penalty and the trial date is approximately 16.9 months." *See* Exhibit C (Declaration of Kevin McNally, then-Director of the Federal Death Penalty Resource Center). With respect to this average, the declarant stated that "[t]he project

---

[3] *See* https://fdprc.capdefnet.org/project-declarations/time (last visited on April 2, 2025).

obtained the date for 515 indictments, 504 notices of intent to seek the death penalty and the date or schedule date for 460 trials." *Id.* Based on this declaration, not only is the current schedule slower than average in terms of length of time between notice of intent and trial, but the defendant's requested trial date, resulting in 31.9 months from notice of intent to trial would be significantly slower than average.

Put simply, that drug murder cases proceeded slowly in the Second Circuit does not compel the same result here. The pace of those prosecutions could have been complicated by any number of issues absent in the instant case. To the contrary, too, *Saipov* demonstrates that courts in the Second Circuit recognize a compelling interest in moving similar cases faster. For this reason, the defendant's argument that the Court should adjourn the trial because "this case requires more investigation and more careful consideration of penalty phase themes than the average capital case" is unavailing—particularly when considering the timelines in *Saipov*, *Tsarnaev, Roof,* and *Bowers*[4] and the average time provided by the Federal Death Penalty Resource Center.

B. The Court Should Deny the Defendant's Request for an Adjournment Because the Current Scheduling Order Accounts for All Necessary Litigation.

The defendant asserts that the current scheduling order is too onerous to be completed by the trial date. *See* Docket No. 303 at 13 ("[A]ttempting to complete the pretrial litigation that remains to be conducted, even aside from the suppression motions, would result in an unreasonably compressed schedule that would deprive the parties of an adequate opportunity

---

[4] *Bowers* was also delayed due to the COVID-19 pandemic.

to properly raise and address critically important issues in this matter."). This is wrong. The government agrees that the scheduling order is demanding—and it should be. That a "substantial amount of litigation has taken place since the government filed its NOI just fourteen months ago," does not justify relaxing the scheduling order. Rather, the amount of litigation completed demonstrates that the scheduling order is appropriate and working. The Court does not need the defendant to detail how much work everyone is doing—the Court is doing just as much while balancing an incredibly demanding docket. The reality is that death penalty cases of this import require extraordinary dedication, attention, time, and effort. The defendant deserves that. The surviving victims deserve that. The deceased victims and their family members deserve that. And the community deserves that.

Finally, this case is not one of David v. Goliath—the government with its mighty resources against one overburdened defense attorney. The defendant has five counsel of record,[5] in addition to specialists from the Federal Death Penalty Resource Counsel and the Capital Resource Counsel, who are part of the Federal Capital Trial Project. The Trial Project "is staffed by experienced capital litigators who work in close coordination to provide consultation, training, and assistance to counsel and courts to improve the quality of representation and the cost-effectiveness of defense services in federal capital prosecution cases."[6] Such attorneys are "full-time salaried federal defender staff who often serve as 'learned' counsel as part of their Project responsibilities." *Id.* Their responsibilities include:

---

[5] Furthermore, the government's understanding is that the Assistant Federal Public Defenders on this case are solely assigned to this case.

[6] https://fdprc.capdefnet.org/overview/about-us/177 (last visited April 2, 2025).

- identifying learned counsel;
- making referrals for experts, mitigation specialists, investigators, paralegals, defense victim outreach specialists, and other defense team members;
- conducting legal research, providing model pleadings, and preparing pleadings;
- crafting written and oral arguments addressing the government's decision whether or not to seek the death penalty; and
- ultimately, if necessary, all aspects of capital trial and sentencing.

*Id.* This is all to say that the defendant has labor resources capable of complying with the Court's scheduling order.

Nor should the Court allow the defendants to now decry the difficulties of preparing for the *Roper* hearing that he requested as a basis for the adjournment. As reflected in the government's briefing on the issue, the Court is precluded by binding precedents from granting the defendant relief on this issue. Thus, this hearing serves only as an opportunity for the defendant to make a record for any potential appeal that may follow should the defendant be convicted and sentenced to death. *See* Docket No. 303 at 8-9 ("This hearing, which will require extensive preparation, is expected to be held in May."). In granting the hearing, the Court admonished the defense that "you know, the government is opposed to this. I understand why the government is opposed to it. They've got good reasons to be opposed to it. I want to make the record, but we're not gonna let this delay anything." Now, two months later, the defense has cited the hearing *they* requested—and the extensive preparation it will require—as a basis for the adjournment.

There is, undoubtedly, still much to do before the start of trial in this case. That said, both trial teams are adequately equipped and have completed almost all goals that have been established in the Court's scheduling order thus far. Rather than move the trial date, the

government urges the Court to maintain the current schedule and continue to set clear deadlines for litigation that is yet to be completed.  The parties have been working, or should have been working, toward this goal since last February (14 months ago).  The Court and parties carefully considered the schedule when setting the trial date, and there is still adequate time, as originally contemplated, to complete remaining litigation.  Accordingly, the Court should deny the defendant's motion for an adjournment because the scheduling order and trial date comport with other similar death penalty cases and because the current schedule is, quite simply, working.

**III.    The Court Should Deny the Defendant's Adjournment Request Because the Defense Has Adequate Time to File Motions and Complete the Penalty Phase Investigation.**

A. The Court Should Deny the Defendant's Adjournment Request Because the Defendant Should Be Ready to File Motions.[7]

The defendant further argues that the Court should grant his request for an adjournment based on the volume and organization of discovery in this case.  *See* Docket No. 303 at 3.  The defendant has stated repeatedly throughout this litigation that the government has provided more than 4 terabytes of digital discovery, for example:

- **July 14, 2022** ("[O]ur understanding is that the discovery is voluminous; particularly voluminous forensic discovery in the order of several terabytes.  I think that will take us quite some time to go through.") [Docket no. 34 at 7];

---

[7] The government discussed its discovery production extensively at Docket 252, which it incorporates herein by reference.

- **December 9, 2022** ("[W]e have received voluminous discovery from the government in the form of multiple terabytes of data.") [Docket No. 41 at 2-3];

- **March 21, 2023** ("In terms of the discovery process . . . we received 4.1 terabytes. . . . We have been diligently going through it all.") [Docket No. 53 at 10]; and

- **June 15, 2023** ("I can tell the Court . . . that we have continued to review the discovery. As we've discussed many times, it's voluminous, particularly the digital discovery, which is about 2.8 terabytes.") [Docket No. 77 at 3].

And, now, on March 25, 2025, the defense is making the same exact argument—not to mention one that is a bit misleading. To be certain, four terabytes is a large amount of data. But, not all data takes up on the same amount of space. Four terabytes of paper is different than what we have here—which is terabytes of data, large swaths of which consist of video footage. The government submits that a small percentage of the video footage as relevant. Consistent with its obligations, the government, however, produced all the video footage for the defense. At bottom, the defendant's argument that even after possessing nearly all the discovery for 2.5 years, he still is not prepared to file his *suppression motions*, is not credible. This is particularly true where the defendant devotes over ten pages to Fourth Amendment case law in his motion to adjourn.

Moreover, the defense asserts that:

> [T]he defense team must identify and review in the more than four terabytes of discovery materials: the search warrant, the affidavit in support thereof and the return; the data set that was produced by the company in response to the warrant; all documents that pertain to the process utilized by law enforcement to search that data set; and the subsets of data that the reviewing officers deemed "relevant" and seized during the

> search process.  With respect to both the initial data set and the
> seized portions, we must assess: whether the search warrant was
> supported by probable cause to believe a crime had been
> committed and that evidence thereof was reasonably likely to be
> found on the device or in the account searched; whether the
> warrant sufficiently particularized the categories of data that
> could be searched and those which could be seized; whether it
> properly limited each category to data for which probable cause
> existed; whether the search protocols employed sufficiently
> minimized the intrusions upon privacy for which no probable
> cause existed; whether the seized data was in fact within the
> scope of the seizure authorized by the warrant; and whether the
> remaining data was appropriately disposed of when the search
> process was complete.

*See* Docket No. 303 at 30-31.


This is not the first case to involve multiple search warrants of devices and/or online

accounts, and the defendant has known the number and types of search warrants the

government executed since, approximately, September 2022.  The defendant has had copies

of the search warrants and applications, law enforcement reports and photographs relating to

those search warrants, and the bulk of the digital evidence obtained from his social media

accounts and electronic devices, for almost 31 months. Similarly, the defense team has fully

inspected and photographed the evidence obtained from the search warrants executed at Tops

and the defendant's residence, and on the defendant's Ford Taurus.  Moreover, the defendant

has had the recordings of his post-arrest statements at the crime scene and the police station

for almost 31 months.  Given the extraordinary length of time the defendant has had these

discovery materials in his possession, he should be prepared to draft and file any motions to

suppress that he wishes to submit for the Court's consideration.

Although the defendant asserts that "[t]o date, the defense team has been prevented from completing the process of preparing motions to suppress by their inability to reliably identify the subsets of data that the reviewing officers deemed 'relevant' and seized during the search process in each instance," he fails to explain why this hampers him from filing any suppression motions.  At a minimum, the defendant should be prepared to litigate whether the search warrants were validly issued, which requires review of the affidavit in support of a search warrant.  Contrary to defendant's assertions, this review is untethered to the "initial data set and the seized portions."  In other words, the salient questions are: does the defendant have standing to challenge the search warrant and is the search warrant valid?  The defense does not have to review every terabyte of discovery to argue these points or to assess "whether the warrant sufficiently particularized the categories of data that could be searched and those which could be seized; whether it properly limited each category to data for which probable cause existed."  Nor does the defendant need to review every terabyte of discovery to determine whether companies violated the defendant's Fourth Amendment by disclosing subscriber data pursuant to EDRs and to then make an argument regarding fruit of the poisonous tree.

To be certain, the government has fully satisfied its disclosure obligations in this case. In May 2024, when the defense was apparently preparing suppression motions, the defendant filed a letter informing the Court that because the government had essentially provided open file discovery and had not refused any discovery request, "we have no grounds upon which to file discovery motions."  *See* Docket No. 157.  The government reproduced all the discovery in October 2024 not because we had to—but because we were trying, in good faith, to help

the defense.  And now, the defense has used this good-faith effort against the government.  Somehow, according to the defense, the government's reproduction of discovery wiped out 2.5 years of strenuous work dedicated to these motions.

The government is not responsible for reviewing discovery for the defendant.  Nor is the government responsible for the operations of the document review platform employed by the defense.  The government has been responsive to the defendant's requests and has offered, repeatedly, to meet in-person to help guide their review of the discovery.  At this point, years after its production, the volume of discovery or the manner in which it was produced is not a basis to adjourn.

B.  <u>The Court Should Deny the Defendant's Adjournment Request Because the Defense Has Had Ample Time for its Penalty Phase Investigation</u>.

The defendant asserts that "[d]espite our sustained and diligent efforts, the defense team is unable to complete the constitutionally required investigation into [the defendant's] psychosocial history and comprehensive evaluation of his mental condition within the time remaining until the currently scheduled trial date."  *See* Docket No. 303 at 35.  But defense counsel has been beating this drum since 2022.  *See, e.g.*, *id.* at 4 ("Counsel notified the government of the team's unavailability on November 15th and urged that, given the volume of discovery produced on September 21, 2022, significantly more time was needed to continue our investigation in accordance with our ethical obligations, including review of the discovery material.  Defense counsel requested a date in March 2023.").  The defendant livestreamed himself committing his crimes and then plead guilty in state court.  For these reasons, undoubtedly, the defense has been focused on the penalty phase of this case from its inception.

The defense certainly represented that to Judge Schroeder and to this Court over time.  *See, e.g.*, Docket No. 77 at 3 ("Obviously, we are doing an extensive investigation, which we have people working on all the time, including ourselves.").

Moreover, the government cannot fully respond to the defendant's argument because the defense submitted an "*Ex Parte* Supplement in Support of Motion to Adjourn the Trial Date and for a Further Pretrial Scheduling Order."  *See* Docket No. 35.  "A comprehensive record, particularly in a criminal case, is a paramount feature of fair proceedings.  A full record not only protects the rights of the parties and enables future proceedings—including, of course, appeals that come before this Court—but also preserves and promotes transparency, a feature pivotal to public perception of the judiciary's legitimacy and independence."  *United States v. Rechnitz*, 75 F.4th 131, 146 (2d Cir. 2023) (internal quotation marks omitted).  Thus, "[i]n our adversary system, *ex parte* motions are disfavored."  *Ayestas v. Davis*, 138 S. Ct. 1080, 1091 (2018).  The Court should order the defense to submit a redacted or sanitized version of the same document to be provided to the government and placed under seal.  *See, e.g.*, *United States v. Brandon Michael Council*, No. 4:17-CR-00866-RBH, 2018 WL 7822135, at *2 (D.S.C. Oct. 31, 2018) (allowing defense counsel to submit an *ex parte* supplement, but requiring disclosure of a non-confidential description index to be filed under seal).

## CONCLUSION

For all the reasons stated above, the Court should deny the defendant's motion to adjourn the trial.


DATED:        Buffalo, New York, April 4, 2025


MICHAEL DIGIACOMO                    MAC WARNER
United States Attorney               Deputy Assistant Attorney
Western District of New York         General
                                     Civil Rights Division

BY:    *s/JOSEPH M. TRIPI*           BY:    *s/DANIEL GRUNERT*
       *s/ BRETT A. HARVEY*                 Trial Attorney
       *s/ CAITLIN M. HIGGINS*              Civil Rights Division
       Assistant United States Attorneys    U.S. Department of Justice
       United States Attorney's Office      150 M Street NE
       Western District of New York        Washington, DC 20530
       138 Delaware Avenue                 202-532-3805
       Buffalo, New York 14202            Daniel.Grunert@usdoj.gov
       Joseph.Tripi@usdoj.gov
       Brett.Harvey@usdoj.gov
       Caitlin.Higgins@usdoj.gov
                                     BY:    *s/MICHAEL S. WARBEL*
                                            Trial Attorney
                                            Criminal Division
                                            U.S. Department of Justice
                                            1331 F. St. NW, Ste. 623
                                            Washington, DC 20004
                                            (202) 514-5605
                                            Michael.Warbel@usdoj.gov