UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

        v.                                                                22-CR-109 (LJV)

PAYTON GENDRON,

        Defendant.
_____

**SUPPLEMENTAL MEMORANDUM IN SUPPORT OF DEFENSE MOTION TO STRIKE THE DEATH PENALTY AS A POSSIBLE PUNISHMENT IN THIS CASE**

    **I.**    **Introduction**

On June 10, 2024, the defense filed a Motion to Strike the Death Penalty as a Possible Punishment in this Case. ECF No. 181. The defense raised multiple challenges, including: (1) that the exercise of prosecutorial discretion leads to the arbitrary application of the federal death penalty; (2) that "death qualification" produces juries that are more prone to convict, resulting in unreliable death sentences; (3) that trial errors undermine the reliability of death sentences; (4) that delays in federal capital prosecutions result in decades-long solitary confinement and in executions so far in time from the offense conduct that the consequence is a sentence that is cruel and unusual; and (5) that the death penalty is increasingly disfavored.

The government responded and the defense replied. ECF Nos. 191 and 204, respectively. Following oral argument on the Motion, the Court issued a Text Order on January 27, 2025, directing the parties to be prepared at the next scheduled status conference to address the Court's proposed plan to "consider[] taking judicial notice of the related testimony and records in [*United States v.*] *Fell* and permitting both sides to submit written proffers of any additional evidence not covered in *Fell* that they would like this Court to consider." ECF No. 267. At the

1

status conference held on February 7, 2025, the Court directed the defense to review the *Fell* record and designate the relevant portions of the hearing held in that case that the defense would seek to admit in this case. *See* ECF No. 273 at 13. The Court set a deadline of May 1, 2025, for the defense to submit those portions of the *Fell* record as well as any new evidence for the Court's consideration. This submission follows.

On the issues raised, the defense submits as evidence the full record of the evidentiary hearing in *United States v. Fell*, No. 5:01-cr-12 (D. Vt.), for this Court's consideration. The record includes transcripts of defense and government witness testimony, argument by counsel, defense and government witness and exhibit lists, and defense and government admitted exhibits.[1] In supplement, we present the declaration of Dr. Mona P. Lynch, who proffers new evidence developed since *Fell* concerning the effect of death qualification on the composition of juries in capital cases. This new evidence further demonstrates that the death qualification process violates Payton Gendron's Sixth Amendment rights to a fair and impartial jury.

## II.     Evidence from *United States v. Fell*, No. 5:01-cr-12 (D. Vt.)

In *United States v. Fell*, the district court held a multi-day evidentiary hearing on the defense motion challenging the constitutionality of the Federal Death Penalty Act. The court then issued a published opinion and order. *United States v. Fell*, 224 F. Supp.3d 327 (D. Vt. 2016). In its opinion, the court noted, "[t]hrough two weeks of hearings, only three issues were contested through the admission of conflicting testimony and other evidence. These were bias arising from the race of the victim (Part II (B)), the effects of solitary confinement on death row (Part III (B)), and the statistical evidence of a deterrent effect on the murder rate achieved through capital

---

[1] The *Fell* hearing testimony and exhibits are filed simultaneously under separate cover. For convenience, the defense adopted the same exhibit numbering system used in *Fell* and has ordered the exhibits as they were presented chronologically in that hearing.

punishment (Part III (D)." *Id*. at 330-31. It noted that "[i]n all other areas, . . . the evidence was one-sided and came only from the defense." *Id*. This was so because "in working through these factual issues and the available scholarship, one realizes that the criticism of the death penalty published during the modern, post-Furman era rests on studies and analysis which are largely uncontroverted in academic circles." *Id*. The court issued findings with respect to the following areas covered by defense witness testimony: unreliability, arbitrariness, excessive delay, and the decline in use of the death penalty. We outline below the court's findings in each area.

    A.     **Unreliability**

The court in *Fell* identified the following defense witnesses as relevant to unreliability of the federal death penalty.

    1.     **Richard Dieter**, former director of the Death Penalty Information Center, testified regarding mistaken convictions and exonerations. *Id*. at 331. He testified that between 1973 and 2015, 156 state death row prisoners have been exonerated in the United States. *Id*. There have been 14 acquittals at the guilt phase since enactment of the FDPA. *Id*.

    2.     **Dr. Craig Haney**, a social psychologist at the University of California at Santa Cruz, testified "that the process of death qualification results in capital juries which are biased in favor of the prosecution." *Id*. at 332. Social science supports the propositions that the process of death qualifying jurors leads to a jury that is more likely to convict and more likely to impose the death penalty. *Id*. at 332-334. Dr. Haney identified five reasons why this is so: "(1) Death qualification tends to exclude women and minorities who are more likely to oppose the death penalty than white men. (2) The jurors who emerge from the death qualification process tend to be more conservative than average on issues related to criminal justice. (3) Due to these inherent biases, a death penalty qualified jury is more likely to convict on the issue of guilt than juries that

3

sit on other criminal cases. (4) Jurors who are 'death qualified' are more likely to impose the death penalty than other jurors. (5) The process of death qualification itself tends to promote death penalty verdicts because of the psychological effect of the questions asked and the answers provided by prospective jurors." *Id.* at 332. The court said, "Dr. Haney's testimony supported all of these conclusions as did the exhibits admitted in connection with his testimony." *Id.* The court reviewed the extensive social science literature on this subject, noting that Dr. Haney himself, "[s]ince at least 1980," has "worked to fill in the gap in the scientific record." *Id.* at 333.

   3.   **Dr. Wanda Foglia**, a law professor at Rowan University who conducts social science research in the area of criminology, testified concerning the work of the Capital Jury Project ("CJP"). *Id.* at 335. The empirical research conducted by the CJP "was exhaustive and painstaking." *Id.* It involved interviewing 1,198 jurors who had served in 353 capital trials. *Id.* The court noted that the CJP's research "provides very strong evidence of three primary findings derived from seven specific problems." *Id.* The three findings are: (1) "the process of death qualification at voir dire produces juries which are biased in favor of imposing the death penalty; (2) in the course of trial, a majority of jurors make up their minds about the death penalty *before* completing the conviction phase;" and (3) "jurors demonstrated a consistent inability to understand and apply the courts' instructions concerning the two phases of the trial, the different burdens of proof for aggravating and mitigating factors, and the other protections intended to guide the jury's discretion." *Id.* 335-36 (emphasis in original). The seven problems that cause the issues identified are: premature decision-making, bias in jury selection, failure to understand instructions, erroneous belief that death is required, the belief that other actors are ultimately responsible for the death decision, racial influence, and underestimating the alternative punishment of life without parole. *Id.* at 336-37. Though the CJP research involved state jurors,

4

the court concluded, "Ms. Foglia testified credibly that because the state and federal death penalty requirements established by the Supreme Court apply equally to both legal systems, the CJP findings drawn primarily from interviews with state court jurors apply with equal validity to federal death penalty cases." *Id.* at 337.

    4.    **Scott Sundby**, a law professor involved in CJP research, testified, based on the CJP's research, "that 'it is beyond human present ability to formulate a capital punishment scheme which would get us the type of non-arbitrary, non-capricious decisions that the Supreme Court has said we must have after Furman.'" *Id.* at 337 (quoting Sundby Tr. at 167).

Regarding death qualification of jurors in capital cases, based on the testimony of Dr. Craig Haney, Dr. Wanda Foglia, and Scott Sundby, the court concluded:

> In considering testimony about the level of inherent bias generated by the process of jury selection, the court finds that the social science studies conducted since 1980 have converged on a common conclusion that the process by which jurors are selected does not measure up to the standards of detached objectivity required by *Gregg*. The exclusion of many people opposed to the death penalty on religious or moral grounds and the implicit process of persuasion at voir dire that death is the likely outcome create jury populations which stack the deck against defendants. This suspicion originally expressed by Justice Stewart has been shown to be true. The most telling evidence is the absence of contrary research results. The studies brought to the court's attention supported the position of the defense that jury selection since *Gregg* is not the solution to inherent jury bias but rather a substantial part of the problem.

*Id.* at 339.

    5.    **Thomas Reidy** testified concerning flawed forensic testimony. He "testified credibly that forensic opinions of future dangerousness have an impact on a lay jury which greatly exceeds their real predictive value." *Id.* at 339. The court described Mr. Reidy's opinion as "plausible" and noted that it "went unchallenged by contrary testimony" but concluded that "standing alone, it is an insufficient body of research from which to draw a conclusion that

expert testimony regarding future dangerousness should be excluded at trial or that it presents a systemic criticism of the FDPA." *Id.* at 339.

6.  **Michael Radelet**, a psychology professor at the University of Colorado at Boulder, testified about identifiable rates of erroneous convictions. He testified "that research demonstrates that state court death penalty prosecution results in an erroneous conviction rate of approximately four percent." *Id.* at 339. The court noted that there are "no known claims of factually erroneous convictions on federal death row." *Id*. It declined to make any findings regarding this issue.

Regarding the unreliability of the federal death penalty, based on the testimony of Richard Dieter, Dr. Craig Haney, Dr. Wanda Foglia, and Scott Sundby, the court concluded:

> In summary, the court finds that the evidence introduced at the hearing supports a finding that the procedures for conducting jury trials mandated by the *Gregg* decision have not cured systemic shortcomings in jury selection and jury deliberations. The death qualification process continues to weight jury panels in favor of conviction and in favor of the death penalty through the exclusion of a large portion of the community which holds views opposed to the death penalty. When surveyed, jurors who actually served in capital cases had great difficulty in following the trial courts' instructions. It is an inadequate response to presume that juries follow our instructions when the evidence is to the contrary. The evidence introduced at the hearing demonstrates that despite efforts to create a more just death penalty regime, the FDPA—like the very similar state death penalty statutes enacted after *Furman*—remains inherently unreliable as it seeks to identify those cases in which death is the just outcome.

*Id.* at 339-40.

B.  **Arbitrariness**

1.  **Kevin McNally**, former Director of the Federal Death Penalty Resource Counsel Project ("FDPRC"), who testified "about the effects of race, geography, and the absence of discernible standards for the determination of who is sentenced to life imprisonment and who is

sentenced to death focused entirely on the application of the FDPA." *Id.* at 340. The court noted that the "most striking evidence of arbitrary application of the death sentence provided by Mr. McNally was his review of all cases . . . in which there were multiple victims." *Id.* In reviewing the facts Mr. McNally presented, it became "obvious that there are no identifiable, objective criteria which distinguish one multiple homicide which resulted in the death penalty from the great majority which did not." *Id.* at 341. The court said, "The defense could not have made the point more clearly: the decision to impose death is subjective, multi-factorial, unreproducible, and, for these reasons, irremediably arbitrary." *Id.*

    2.    **Dr. Lauren Bell**, a political scientist, used statistical analysis and "determined that 'defendants who kill white female victims receive the death penalty at a substantially higher rate than defendants whose victims are not white women and that this correlation between white female victims and death sentencing is not the result of chance,'" and that "defendants who killed white female victims are 'overrepresented among federal death sentenced defendants.'" *Id.* at 342 (quoting Bell Declaration). The court said that Dr. Bell's "findings were highly unlikely to be explained by other variables or conditions." *Id.*

    3.    **Carol Steiker**, a professor at Harvard Law School, testified "concerning shortcomings in the federal system of capital defense," including "limited discovery under the federal rules and very limited experience in defending cases because so few are ever filed in the federal system." *Id.* at 343-44. The court also noted "a high level of reversals of federal death penalty cases and a relatively high incidence of *Brady* violations," as well as the propensity for "overcharging decisions in those few cases which meet federal jurisdictional criteria." *Id.*

    4.    **Scott Sundby** testified "that many defense attorneys in capital cases 'do just enough to get their client executed'" while meeting "minimum standards under *Strickland v.*

7

*Washington*, 466 U.S. 668 (1984), without doing enough to present a persuasive case for a life sentence." *Id.* at 344. He noted that the "'wild card' of quality legal representation contributed to his perception that the death penalty decision was highly arbitrary." *Id.*

    5.    **Lisa Greenman**, one of the authors of the 2010 Report to the Committee on Defender Services Judicial Conference of the United States, testified she "found that lower expenditure was correlated with higher rates of death sentence" and that the "low-cost states (Georgia, Texas, North Carolina and Florida) correlated generally with the states with high rates of federal death sentences." *Id.* at 344-45.

Regarding the arbitrariness of the federal death penalty, based on the testimony noted above, the court concluded:

> In summary, the court finds that the death penalty continues to be imposed in an arbitrary manner. The state in which a crime occurs is the strongest predictor of whether a death sentence will result. Whether the murder victim is white is also a significant predictor. These findings are as true of cases brought under the FDPA as they are for state death sentences. When large groups of cases which qualified for the FDPA but did not result in death sentences are compared with the much smaller groups which did, it is not possible to identify principled distinctions between the groups. The imposition of the death penalty through the FDPA remains arbitrary despite the efforts of the prosecution and the courts to impose legal standards to guide the decisions leading to a death sentence.

*Id.* at 345.

    C.    **Excessive Delay**

    1.    **Dr. Craig Haney** "testified at length about his work in studying the effects of long-term isolation on death row." *Id.* at 346. The court noted, "[w]ith remarkable uniformity, researchers have identified the harm caused by social isolation in settings in and out of prison." *Id.* The court described these findings as "intuitively obvious." *Id.* The court noted that the government presented testimony from two federal prison wardens, David Berkebile and John Oliver, but their testimony "did little to contradict Dr. Haney's testimony." *Id.* at 347. The court

concluded: "It is clear to the court that the process of holding prisoners for indefinite terms extending into decades in solitary confinement is highly damaging. No persuasive evidence was offered that such severe isolation was necessary for reasons of security or prison safety." *Id.*

2.   On the issue of the **deterrent effect of the death penalty**, the court heard testimony from defense witness **Michael Radelet** and government witnesses **H. Naci Mocan**, **Matthias Schonlau**, and **Paul Zimmerman**. The court concluded that the evidence was "insufficient either to identify a deterrent effect or to rule it out as a possibility." *Id.* at 349.

On the issue of excessive delays, the court found as follows:

> In summary, delay continues to be a primary feature of the FDPA as well as state death penalty cases. The decades condemned men and women spend on death row under conditions of severe isolation cause harm. Although deterrence of future murders is identified as a basis for the death penalty, the statistical evidence that executions, many years after the offense conduct, affect the murder rate has not been accepted by the National Resource Council and continues to be unprovable.

*Id.*

### D.   Unusual—the decline in use of the death penalty

On the issue of the decline of the use of the death penalty, the court concluded:

> In summary, the evidence does not support the claim by the defense that there is a consensus of public opinion opposed to the death penalty. State legislatures are divided on the issue. Approximately one-third have abolished the practice. Another third retain the death penalty on the books but do not make use of it. One-third of the states impose death sentences with some degree of regularity. A few of these states use it frequently. The rates of death sentences and of executions have dropped sharply over the last two decades. Public support is divided with a slight majority in favor of the death penalty. Recent referenda in three states (Oklahoma, Nebraska and California) revealed continuing public support for the death penalty by varying margins of 5% to 10%.

*Id.* at 354.

### E.   The district court's decision in *Fell*

The court ultimately found most persuasive the defense argument "that the FDPA in common with state death penalty provisions contains systemic flaws which make it inherently arbitrary and incapable of a reliable determination of which offenders should die and which should not." *Id.* at 356. Though it denied the defense motion, stating that it was bound by Supreme Court precedent, it concluded:

> It has become clear that the adoption of the bifurcated jury trial by so many states and the federal government has not done enough to eliminate the arbitrary imposition of the death penalty. The court returns to the question it asked at the beginning of the opinion. Has actual experience borne out the promise for a more reliable system of capital punishment expressed in the *Gregg* decision? The evidence produced for the court answers the question in the negative. These findings and the fuller record of the hearing conducted before the court substantiate the questions and the criticism expressed in the *Glossip* dissent. The trial court stops short, however, of altering the holding in *Gregg* that "[t]he concerns expressed in *Furman* that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance." *Gregg* is still the law of the land. As the Supreme Court wrote about its own authority in *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997), 'it is this Court's prerogative alone to overrule one of its precedents.'

*Id.* at 358-59.

### III.    Declaration of Dr. Mona P. Lynch

As noted in section I above, in *Fell* the district court reviewed extensive social science literature on how the process of death qualification in capital cases results in juries biased in favor of the prosecution. Based on the testimony of Dr. Craig Haney, Dr. Wanda Foglia, and Scott Sundby, and its review of the admitted exhibits, which included numerous studies and social science literature, the court concluded: "The death qualification process continues to weight jury panels in favor of conviction and in favor of the death penalty through the exclusion of a large portion of the community which holds views opposed to the death penalty." *Id.* at 339. It noted "that the social science studies conducted since 1980 have converged on a common

10

conclusion that the process by which jurors are selected does not measure up to the standards of detached objectivity required by *Gregg*." *Id.* at 338.

Since the summer of 2016, the time of the evidentiary hearing in *Fell*, additional social science research has been conducted which provides further support for the conclusions reached by the court in *Fell*. Dr. Mona P. Lynch, a Professor of Criminology, Law and Society at the University of California, Irvine, conducted four surveys in different counties on death qualification and its racial and gender impact: 1) Fresno County, CA (2017); 2) Los Angeles County, Norwalk Division, CA (2018); 3) Sedgwick County, KS (2021-22); and 4) Wyandotte County, KS (2024). Generally, each survey found that death qualification results in a jury pool significantly more supportive of the death penalty. *See* Declaration of Dr. Mona P. Lynch annexed hereto as Exhibit A.[2]

The four studies Dr. Lynch conducted, from 2017 through 2024, document the starkly different views of Blacks versus whites with respect to the fairness and equitability of the criminal justice system and capital punishment. She also documents how Blacks and whites assess penalty-phase evidence in capital cases in dramatically different ways. Because of their diverse views of the criminal justice system and capital punishment, and the ways in which they assess penalty-phase evidence in capital cases, the death qualification process operates to exclude Blacks from capital juries: "Analysis of jury selection patterns from capital trial transcripts also shows that Black Americans are significantly more likely than White Americans

---

[2] Appended to the Declaration are copies of Dr. Lynch's curriculum vitae (Exhibit A-1) and two of her published studies related to the death qualification process: (1) Lynch, M. and Haney, C., *Capital Jury Deliberation: Effects on Death Sentencing, Comprehension, and Discrimination*, 33 L. & Hum. Behav. 481, 485 (2009) (Exhibit A-2) and (2) Lynch, M. and Haney, C. *Death Qualification in Black and White: Racialized Decision Making and Death-Qualified Juries*. 40 Law & Policy, 148-171 (2018) (Exhibit A-3).

to be excluded from capital juries as a consequence of the death qualification process." *See* Exhibit A at 6. Put another way, the process of death qualification serves to increase the odds of a death verdict.

The Fresno County Study from 2017 found that "Black respondents were significantly more likely than White respondents to be excludable due to their opposition to the death penalty." *See* Exhibit A at 15. The Los Angeles County Study from 2018 found that "Black respondents were significantly more likely to be excludable, relative to White respondents" and that "Black respondents were also more likely than White respondents to be excludable due to their opposition to the death penalty." *Id*. at 19. The Sedgwick County Study from 2021–2022 found that "Black respondents' rate of exclusion was approximately 50% higher than White respondents' rate" and that "Black respondents were also more likely (by 10.1%) to be excludable due to their opposition to the death penalty." *Id*. at 23. The Wyandotte County Study from 2024 found that "Black respondents were more likely than White respondents to be excludable due to their opposition to the death penalty, a finding that was significant." *Id*. at 28. It also found that "women were much more likely than men to be excluded on the basis of their death penalty opposition." *Id*. at 29.

The studies generally "indicate that Black and White jury-eligible citizens hold significantly different views of the death penalty, as do men and women, and that death qualification has the potential to disproportionately exclude Black jury-eligible citizens and women for their opposition to the death penalty." *Id*. at 30. The studies "also indicate that the death qualification process will result in a jury pool that is significantly and substantially more supportive of the death penalty than is the broader jury-eligible population in the given county."

*Id*. These findings are "consistent with previous research on death penalty attitudes and death qualification." *Id*.

### IV. Death Qualification of Jurors Violates Payton Gendron's Sixth Amendment Rights to a Fair and Impartial Jury

The death qualification of jurors violates Payton Gendron's Sixth Amendment rights to a fair and impartial jury. *See* G. Ben Cohen and Robert J. Smith, *The Death of Death-Qualification*, 59 Case W. Res. L. Rev. 87 (Fall 2008). A jury selection process that removes jurors "for cause" who believe the death penalty to be unconstitutional is itself an unconstitutional process. At the time the Framers adopted the Sixth Amendment, criminal petit juries determined both fact and law; that is, they determined guilt without any instruction limiting them to solely finding facts and they served on juries regardless of their views concerning the applicable law. *Id.* at 87. At no point did a citizen's view of the constitutionality or appropriateness of the law matter. *Id.* at 89. Therefore, "citizen-jurors who believed the death penalty to be unconstitutional in any particular case or context would not have been subject to a 'for cause' challenge on the basis of partiality, for the accused's right to an 'impartial jury' was simply a tool to eliminate relational bias and personal interest from the criminal adjudication process." *Id.* at 88–89.

The "modern" practice of death qualification developed through "judicial activism" in the context of the nation's struggles with religious freedom and slavery. *Id.* at 93–95 (describing how the first instance of death qualification arose in a case where a practicing Quaker venireperson expressed opposition to the death penalty). Death qualification, and other instances of removing jurors based on conscientious scruples, has continued, in contravention of the common law practice. The "common law rule that a juror must stand indifferent was meant to protect the accused and the state from bias based on affiliation with the particular actors trying

13

the case or stemming from personal involvement in the cause at issue." *Id.* at 98. It was not meant to prevent jurors with views on the appropriateness of the law from serving. Rather, jurors with views on the law served an important "'check' on governmental overreaching" *Id.* at 113. The Framers viewed juries as "enabl[ing] the people to review the actions of the executive in enforcing the law, the judiciary in applying the law, and the legislature in establishing it." *Id.*

In recent decades, the Supreme Court has focused on stricter "fidelity to the original meaning of the Constitution" with respect to the Sixth Amendment. *Id.* at 110; *see Jones v. United States*, 526 U.S. 227, 246 (1999); *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Ring v. Arizona*, 536 U.S. 584 (2002); *Blakely v. Washington*, 542 U.S. 296 (2004); *see also Pena-Rodriguez v. Colorado*, 580 U.S. 206, 231–32 (2017) (Thomas, J. dissenting) (citing *Pettis v. Warren*, 1 Kirby 426, 427 (Conn. Super. 1788), in the context of determining the meaning of "impartial jury" in the Sixth Amendment in accord with the Amendment's "original understanding").

The court in *Pettis* understood that "[j]uries are judges of law as well as fact, as relative to the issues put to them, and are supposed to have opinions of what the law is, though a willingness to change them, if reason appears in the course of the trial." *Pettis*, 1 Kirby at 427. It is not a "sufficient cause of challenge" even if a juror "has declared his opinion that the party is guilty, and will be hanged, if it appears he made such declaration from his knowledge of the cause, and not out of ill will to the party." *Id.* at 428. *Pettis* reveals that the Framers' original understanding of the Sixth Amendment right to a jury trial is inconsistent with the modern practice of death qualification. The death qualification process removes jurors based solely on their death penalty views and, therefore, violates a defendant's rights to a fair and impartial jury under the Sixth Amendment as understood by the Framers.

## V.   CONCLUSION

For all the reasons stated in our original Motion to Strike the Death Penalty as a Possible Punishment in this Case, ECF No. 181, and based on the evidence submitted herein, this Court should strike the Notice of Intent to Seek Death in this case.

Dated: Buffalo, NY
       May 1, 2025

                                        Respectfully Submitted,

                                        *s/Sonya A. Zoghlin*
                                        Sonya A. Zoghlin
                                        Assistant Federal Public Defender

                                        *s/MaryBeth Covert*
                                        MaryBeth Covert
                                        Senior Litigator

                                        *s/Julie Brain*
                                        Julie Brain
                                        Attorney at Law

                                        *s/Monica Foster*
                                        Monica Foster
                                        Indiana Federal Community Defenders, Inc.