UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

        v.                                        22-CR-109 (LJV)

PAYTON GENDRON,

            Defendant.

_____

## REPLY TO GOVERNMENT'S RESPONSE TO SUPPLEMENT IN SUPPORT OF MOTION FOR AN ADJOURNMENT OF THE TRIAL DATE AND FOR A FURTHER SCHEDULING ORDER

Payton Gendron, through undersigned counsel, respectfully submits this Reply to the government's Response in Opposition, (ECF No. 348), to his Supplement in Support of Motion for an Adjournment of the Trial Date, (ECF No. 334).

## I.      BACKGROUND

On March 25, 2025, the defense filed a Motion for an Adjournment of the Trial Date and for a Further Pretrial Scheduling Order. ECF No. 303. This Motion, along with the Sealed Ex Parte Supplement, (ECF No. 304), detailed the mitigation investigation conducted thus far, the substantial and vitally important areas of inquiry that remain outstanding, and the extensive amount of work that is yet to be completed. The government opposed this Motion, (ECF No. 316), and the defense replied. (ECF No. 320). The parties appeared before the Court to address the Motion on April 10, 2024. At that time, the Court rejected the defense request to postpone the beginning of jury selection until June 22, 2026, for the completion of jury questionnaires by the venire, followed by in-person voir dire beginning on September 8, 2026. The Court instead proposed that the venire be summoned to complete jury questionnaires beginning in October

2025, and individual voir dire commence on January 5, 2026. The Court noted, however, that the schedule was not yet "cast in stone" and permitted both sides to submit alternative proposals. ECF No. 324 at 17.

On April 24, 2025, the defense filed a Supplement to its Motion, reiterating therein that the schedule they requested represented in their judgment, reached in the utmost good faith, the minimum period of time that would permit them to be ready for trial and to fulfill their constitutionally mandated obligation to provide Payton Gendron with the effective assistance of counsel for his defense. ECF No. 334 at 1-3. The defense also pointed out, however, that the Court's proposed schedule created a serious risk that the penalty phase of the trial would occur around the same time as the anniversary of the awful events of May 14, 2022 —a time that has proven to be highly emotional for the City of Buffalo and, appropriately, of enormous public remembrance and concomitant media attention. *Id.* at 3-11. The defense therefore moved the Court to at least avoid this unnecessary and highly prejudicial confluence of events by ordering that proof at the trial begin no earlier than June 1, 2026. The government responded on May 6, 2025. ECF No. 348. This Reply follows.

In the midst of this supplemental briefing, circumstances changed dramatically when, on April 29, 2025, the defense team learned that Learned Counsel Monica Foster, the Executive Director of the Indiana Federal Community Defenders and a litigator with more than 40 years of experience in death penalty cases, had been diagnosed with a serious illness that requires major surgery followed by additional lengthy treatment, leaving her no choice but to withdraw from the case. At a chambers conference on May 2, 2025, the Court granted the defense request for a brief adjournment to permit them to attempt to find a replacement Learned Counsel, and scheduled a status conference for May 21, 2025, for defense counsel to report on the results of their efforts.

The Court further directed defense counsel to address the "latest circumstances" in this Reply. *See* ECF No. 353, Sealed Tr. of In Chambers Conference on May 2, 2025, at 16.

## II. THE SUDDEN WITHDRAWAL OF THE MOST EXPERIENCED FEDERAL CAPITAL TRIAL ATTORNEY ON THE DEFENSE TEAM IS A SUBSTANTIAL LOSS NECESSITATING AN ADJUSTMENT TO THE CURRENT SCHEDULE

As was disclosed privately to the Court and government counsel, then set out on the record during an *in camera* appearance on May 2, 2025, one quarter of the trial team and an attorney with decades of federal capital trial experience, Monica Foster, was diagnosed with a life-threatening cancer only days earlier, necessitating her immediate withdrawal as counsel in this case. Her condition requires prompt and extensive treatment, beginning with major surgery, that precludes her from continuing to work on this case. As a result, her work ceased on the day she received this diagnosis, and the team was left without its most experienced federal capital litigator. The significance of this loss is difficult to overstate.

Representing a client in a federal death penalty prosecution is a uniquely demanding undertaking that can be effectively accomplished only by a well-functioning, multi-disciplinary team led by counsel with specialized skills and significant experience in litigating and trying such cases. "[D]eath penalty cases have become so specialized that defense counsel have duties and functions definably different from those of counsel in ordinary criminal cases." American Bar Association, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, Guideline 1.1, Comm., 31 Hofstra L. Rev. 913, 923 (2003) ("ABA Guidelines").

> The quality of counsel's 'guiding hand' in modern capital cases is crucial to ensuring a reliable determination of guilt and the imposition of an appropriate sentence. Today, it is universally accepted that the responsibilities of defense counsel in death penalty cases are uniquely demanding, both in the knowledge that counsel must possess and in the skills he or she must master. At every stage of a capital case, counsel must be aware of specialized and frequently changing legal principles, scientific developments, and psychological concerns. Counsel

must be able to develop and implement advocacy strategies applying existing rules in the pressure-filled environment of high-stakes, complex litigation, as well as anticipate changes in the law that might eventually result in the appellate reversal of an unfavorable judgment.

As one writer has explained:

> Every task ordinarily performed in the representation of a criminal defendant is more difficult and time-consuming when the defendant is facing execution. The responsibilities thrust upon defense counsel in a capital case carry with them psychological and emotional pressures unknown elsewhere in the law. In addition, defending a capital case is an intellectually rigorous enterprise, requiring command of the rules unique to capital litigation and constant vigilance in keeping abreast of new developments in a volatile and highly nuanced area of the law.

*Id.* at 923 (quoting Douglas W. Vick, *Poorhouse Justice: Underfunded Indigent Defense Services and Arbitrary Death Sentences*, 43 Buff. L. Rev. 329, 357-58 (1995)). "The unique, bifurcated nature of capital trials and the special investigation into a defendant's personal history and background that may be required, the complexity and fluidity of the law, and the high emotional stakes involved all make capital cases more costly and difficult to litigate than ordinary criminal trials." *McFarland v. Scott*, 512 U.S. 1256, 1257 (1994) (Blackmun, J., dissenting from denial of certiorari).

The government's decision to charge a case capitally exponentially increases the time and effort the defense team must expend at all stages of the representation. "Studies have consistently found that defending capital cases requires vastly more time and effort by counsel than noncapital matters. For example, one study found that over the entire course of a case, defense attorneys in federal capital cases bill for over twelve times as many hours as in noncapital homicide cases." Guideline 6.1, Commentary, at 967-68 (citing Subcomm. on Federal Death Penalty Cases, Comm. on Defender Services, Judicial Conference of the United States, *Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense*

*Representation* (1998) ("1998 Spencer Report")); *United States v. Wilson*, 354 F. Supp. 2d 246, 248 (E.D.N.Y. 2005 (noting that "[r]epresenting a defendant in a capital case is an extraordinary undertaking" and that federal capital prosecutions "necessarily involve 'more motions, more legal challenges and generally more work'" than noncapital cases) (quoting Molly Treadway Johnson & Laura L. Hooper, Federal Judicial Center, *Resource Guide for Managing Capital Cases* at 3 (April 2004)).

A federal capital trial is far from a typical homicide prosecution with a jury sentencing proceeding tacked on at the end. Rather, the threat of a death sentence must change the way that the entire case is approached and presented. *See* Sean D. O'Brien, *When Life Depends on It: Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 36 Hofstra L. Rev. 693, 705 (2008) (warning against "the false impression that mitigation is separate from issues related to the guilt or innocence of the accused—that the mitigation effort only comes into play at the penalty stage of trial. Experienced capital litigators and mitigation specialists understand that the client's humanity is intricately interwoven with every aspect of a capital case").

Instead, "the nature of a capital case 'transforms counsel's role from start to finish.' The goal of saving the client's life must be the top priority for the defense and must be considered in all other decisions made and actions taken by counsel from the inception of representation through the conclusion of the case." Jill Miller, *The Defense Team in Capital Cases*, 31 Hofstra L. Rev. 1117, 1121 (2003) (quoting 1998 Spencer Report, *supra*, at I.B.(4)). "[A] capital trial is thus fundamentally different from a non-capital trial. Because the death penalty implicates unique procedural and constitutional requirements, including a separate penalty trial phase, the government's decision to pursue capital punishment triggers resource-intensive processes in

practically every arena of trial preparation—from appointment of counsel to motion practice to jury selection to qualification of experts." *United States v. Spurlock*, No. 23-cr-22, 2025 WL 1360499, at *11 (May 9, 2025). Ultimately, counsel must "'construct a persuasive narrative in support of the case for life, rather than simply present a catalog of seemingly unrelated mitigation factors.'" Hon. Mark W. Bennett, *Sudden Death: A Federal Trial Judge's Reflections on the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 42 Hofstra L. Rev. 391, 400 (2013) (quoting ABA Guideline 10.11, Comm., 31 Hofstra L. Rev. at 1061). And that narrative must be consistent across both phases of the trial. *See* O'Brien, *supra*, at 707 (noting ABA Guidelines require that "counsel harmonize the defense presentation of both guilt-innocence and punishment issues").

Performing this constitutionally mandated obligation can be accomplished only by a multi-disciplinary team, guided and overseen by attorneys who, by virtue of experience, understand this specialized endeavor and what it takes. The nature of what is required to represent a client through a capital penalty phase, i.e., to gather and present evidence in mitigation of punishment as well as counter the government's case in aggravation, is such that even the most highly skilled and experienced death penalty lawyers cannot provide constitutionally adequate representation alone. Instead, "counsel must rely on the assistance of experts, investigators and mitigation specialists in developing mitigating evidence." American Bar Association, *Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 36 Hofstra L. Rev. 693, 677 (2008) ("ABA Supplementary Guidelines"). Because "the mitigation function is multi-faceted and multi-disciplinary," counsel "must assemble a capital defense team [that includes] an investigator, and a mitigation specialist." *Id.*

Nevertheless, "ultimate responsibility for the [mitigation] investigation . . . rests irrevocably with counsel." *Id.*; *see also id.* at 678 ("the duty to investigate, develop and pursue avenues relevant to mitigation of the offense or penalty, and to effectively communicate the fruits of those efforts to the decision-makers, rests upon defense counsel"); Robin M. Maher, *The ABA and the Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 36 Hofstra L. Rev. 763, 770-71 (2008) (noting that one purpose of Supplementary Guidelines is "to help defense counsel understand how to supervise the development of mitigation evidence and direct a key member of the defense team").

Accordingly, a vital component of the duties of competent capital defense counsel is to conceptualize, direct and supervise the development of the entire case with a constant eye towards ensuring the presentation of a coherent, unified narrative for life. "Counsel has specific obligations to train, supervise, and regularly communicate with members of the defense team, to make strategic decisions based on the collective work and expertise of the entire team, and to otherwise closely monitor the work of the defense team." O'Brien, *supra*, at 704; *see also* ABA Supplementary Guidelines, Guideline 4.1.B., 36 Hofstra L. Rev. at 680 (Counsel has a duty to hire, assign or have appointed competent team members . . . to supervise and direct the work of all team members . . . and must ensure on an ongoing basis that their work is of high professional quality").

The vital importance of a fully functioning defense team led by capitally qualified counsel is well known. Judge Bennett, who presided over the federal capital prosecutions of two codefendants in the early 2000's—as well as the subsequent § 2255 post-conviction proceeding for one defendant following which he granted a new penalty phase because of ineffective assistance of counsel at the first trial—put it this way:

> One of the lessons learned is that the 'chemistry' of the defense trial team is vital to provide constitutionally effective assistance of counsel . . .Johnson's defense team was appointed prior to the 2003 adoption of the ABA Guidelines; had they understood the importance of a 'team approach,' I believe the lawyers would have worked together far more cohesively. Instead, they never developed a unified theory of the defense or a consistent and cohesive mitigation strategy with each other.

Bennet, *supra*, at 406. *See also id.* at 401-02 (noting that "death is different" is why "the 'team approach' mandated by the ABA Guidelines is so critical); *id.* at 405 ("Failing to pursue the 'team approach' mandated by the ABA Guidelines can, and did in Johnson's case, lead to disastrous results."); *Wilson*, 354 F. Supp. 2d at 250 (noting court's "focus on forming a defense team that would be able to work effectively together and have the requisite blend of skills and experience to mount a vigorous defense").

As is obvious from the foregoing, capital defense representation requires the appointment of counsel with highly specialized skills, expertise and experience; even the best, most highly skilled non-capital trial lawyers are not, standing alone, sufficient. *See* Miller, *supra*, at 1122 (capital representation "requires different skills and expertise that those generally possessed by attorneys handling non-capital criminal cases"); *Spurlock,* 2025 WL 1360499, at *11 (noting that capital trial obligates court to "appoint counsel with sufficient experience, knowledge, and resources" to perform the "particularly meaningful ethical duties" that are imposed on them); 1998 Spencer Report, Comm. ("the preparation of a death penalty case for trial requires knowledge, skills and abilities which are absent in even the most seasoned felony trial lawyers, if they lack capital experience"); Bennett, *supra*, at 400 (noting that "[i]t is critically important for those judges who do not have experience in death penalty cases to fully appreciate the magnitude of the 'death is different' phenomenon in terms of appointing a defense trial team . . . [and] the critical distinction between death penalty prosecutions and our usual fare of criminal cases"); *id.*

at 407 ("Looking back, I was naïve to think that, merely because I had appointed three excellent criminal defense lawyers, my obligation to ensure competent capital representation was complete").

In recognition of this reality, the ABA Guidelines mandate that "no fewer than two [qualified] attorneys," Guideline 4.1.A.1., *id.* at 952, who have *both* "demonstrated a commitment to providing zealous advocacy and high quality legal representation in the defense of capital cases," Guideline 5.1.B.1.b., *id.* at 961, should be appointed in every capital case. In federal death penalty prosecutions, defendants have a statutory right to a minimum of two attorneys, at least one of whom has significant experience and expertise in capital defense litigation. *See* 18 U.S.C. § 3005 ("Whoever is indicted for treason or other capital crime shall be allowed to make his full defense by counsel; and the court before which the defendant is to be tried, or a judge thereof, shall promptly, upon the defendant's request, assign 2 such counsel, of whom at least 1 shall be learned in the law applicable to capital cases"); 18 U.S.C. § 3599(a)(1)(B); *see also Guide to Judiciary Policy, Vol. 7 – Defender Services, Part A: Guidelines for Administering the CJA and Related Statutes, Chap. 6: Federal Death Penalty and Capital Habeas Corpus Representation,* § 620.10.10 (a) ("As required by 18 U.S.C. § 3005, at the outset of every capital case, courts should appoint two attorneys, at least one of whom is experienced and knowledgeable about the defense of death penalty cases.").

So-called "Learned Counsel" must have "'distinguished prior experience in the trial, appeal, or post-conviction review of federal death penalty cases, or distinguished prior experience in *state* death penalty trials, appeals or post-conviction review that, in combination with co-counsel, will assure high quality representation.'" *United States v. Miranda*, 148 F. Supp. 2d 292, 294 (S.D.N.Y. 2010) (quoting 1998 Spencer Report, *supra*, at II.1.b.) (emphasis in

original);[1] *see also* United States District Court for the Western District of New York, *Revised Plan for Furnishing Representation Pursuant to the Criminal Justice Act 18 U.S.C. § 3006A*, at 25 (2021) ("WDNY CJA Plan") (same); *Wilson*, 354 F. Supp.2d at 248-49 ("Because of the stakes involved and the unique procedural aspects of a capital proc[2]eeding, representing a capital defendant requires a great deal of technical expertise specific to capital cases that can only be gained through firsthand experience.") (citing 1998 Spencer Report).

Although the statute guarantees two lawyers in every death-eligible case from indictment or before, more may be appointed in a capital case "if necessary for adequate representation." *Guide to Judiciary Policy, supra,* at § 620.10.10(b) (citing 18 U.S.C. § 3599(a)(1)). As a matter of practice, the appointment of more than two attorneys, including two that meet the criteria to serve as learned counsel, is common in even the least complex capital cases, especially once the

---

[1] Since *Miranda* was decided, the 1998 Spencer Report has been revised and includes revised commentary that is endorsed by the Judicial Conference Committee on Defender Services. *See* Jon B. Gould & Lisa Greenman, *Report to the Committee on Defender Services Judicial Conference of the United States Update on the Cost and Quality of Defense Representation in Federal Death Penalty Cases* (2010) ("2010 Spencer Report") (available at https://www.uscourts.gov/file/fdpc2010pdf (last visited May 14, 2025). The updated Report continues to recommend that "'learned counsel' should have distinguished prior experience in the trial, appeal, or post-conviction review of federal death penalty cases, or distinguished prior experience in *state* death penalty trials, appeals or post-conviction review that, in combination with co-counsel, will assure high quality representation.'" *Id.* at VIII.1.b. It adds, "[c]ourts should ensure that all attorneys appointed in federal death penalty cases are well qualified, by virtue of their prior defense experience, training and commitment, to serve as counsel in this highly specialized and demanding type of litigation. High quality legal representation is essential to assure fair and final verdicts, as well as cost-effective case management." *Id.* at VIII.1.a.

[2] The WDNY CJA Plan, at XV.C.2.d-g., p. 27, adds: "'Distinguished prior experience' contemplates excellence, not simply prior experience. Counsel with distinguished prior experience should be appointed even if meeting this standard requires appointing counsel from outside the district where the matter arises . . . The suitability of learned counsel should be assessed with respect to the particular demands of the case, the stage of the litigation, and the defendant . . . Learned counsel must be willing and able to adjust other caseload demands to accommodate the extraordinary time required by the capital representation . . . Learned counsel should satisfy the qualification standards endorsed by bar associations and other legal organizations regarding the quality of representation in capital cases."

government has formally announced its intention to pursue a death sentence. *See* Exhibit A

(Declaration of Kevin McNally Regarding the Appointment of More Than Two Attorneys

Including Out-of-State Counsel), and Exhibit B, (Declaration of Kevin McNally Regarding

Appointment of Two Learned Counsel), attached.[3] *See also United States v. Chappelle*, No. 25-

CR-50056, 2025 WL 1088164, at *2 (D.S.D. Apr. 11, 2025) (appointing, pre-authorization, in

addition to retained counsel, learned counsel who is "highly experienced as a capital litigator . . .

[who has] defended over 50 murder prosecutions, including successfully defending 16 death

penalty cases [and is] recognized nationally as a capital defense attorney;" second counsel who

served as co-counsel with the federal defender in a federal capital habeas matter and "has

handled multiple state capital cases;" and the Federal Public Defender and his Office as

"additional counsel"); *Wilson*, 354 F. Supp. 2d at 250-52 (appointing as learned counsel state

capital defender with 10 years of experience, including as lead counsel in 27 death-eligible cases

and two capital cases tried to verdict, and as associate learned counsel state capital defender who

had represented 34 capital-eligible clients and consulted on 95 other cases, both in addition to

existing counsel who himself had been appointed learned counsel in multiple federal capital

cases in the district including one tried to verdict).

In cases that proceed to a death penalty trial, particularly complex, high-profile ones such

as this one, considerably more than two attorney members of the trial team, at least two of whom

qualify as learned counsel based upon distinguished experience and knowledge, is the norm. In

*United States v. Saipov*, 1:17-cr-00722-VSB (S.D.N.Y.), for example, the defendant was

represented by Federal Defenders of New York together with two learned counsel appointed

---

[3] These Declarations were signed on February 13, 2020, and September 16, 2021, respectively.
Counsel have requested updated versions from the Federal Capital Resource Counsel Project and
will submit them to the Court as soon as they are received.

under the CJA. Five attorneys from the defender office were assigned to the trial team, including the Executive Director, David Patton, who had previously tried another capital case in the district. Similarly, in *United States v. Bowers*, 2:18-cr-00292-RJC (W.D. Pa.), the first assistant and senior litigator of the Federal Defender Office for the Western District of Pennsylvania were joined by three experienced capital litigators, including two of the most well-known and experienced federal capital trial lawyers in the country. A sixth lawyer, also a highly experienced capital defense attorney, was added to conduct the entirety of the individual voir dire process in the case.

Immediately after the defense team learned of Ms. Foster's sudden need to withdraw, we began our attempts to recruit another comparably experienced capital litigator to join the team in her stead. Payton Gendron is entitled to a replacement of comparable caliber, and that is what we are diligently endeavoring to find. As directed by the CJA Plan, counsel have consulted the head of the Federal Defender Office, Ms. Marianne Mariano, and asked her to search for, and recommend, a suitable replacement who possesses the qualifications necessary to be appointed as a learned counsel in this matter. *See* WDNY CJA Plan at 25 ("When appointing counsel [in a death-eligible case], the judge must consider the recommendation of the Federal Public Defender, who will consult with Federal Death Penalty Resource Counsel to recommend qualified counsel") (citing 18 U.S.C. § 3005); *see also Wilson*, 354 F. Supp.2d at 250 (noting that court considered the recommendation of the Federal Public Defender prior to appointing capital counsel, and "also received valuable guidance from . . . Federal Death Penalty Resource Counsel"); *Chapelle*, 2005 WL 1088164, at *2 (same). Undersigned counsel are also consulting independently with the Federal Death Penalty Resource Counsel Project to solicit

recommendations, as well as diligently pursuing their own extensive contacts within the Federal Defender and capital defense communities.

The task of identifying a litigator with the requisite knowledge and experience who is willing and able to step into the case at this juncture is a daunting one. Contrary to the government's assertion, ECF No. 348 at 5, this case is far from "straightforward." The facts of this highly publicized crime are well known to this Court and need not be reiterated here. Suffice to say, its profound impact on the deceased victims' families, the surviving victims, and the entire community, make the anticipated trial enormously challenging. There is nothing straightforward about representing a teenager charged (and convicted in state court) of murdering 10 innocent shoppers and injuring three others in a racist attack.

Indeed, identifying learned counsel to join the team following the Attorney General's decision to seek the death penalty on January 12, 2024, required sustained and diligent efforts. And that was in a different era, when this was literally the only federal case in the nation that was authorized for the death penalty. Now, as briefly noted during the conference on May 2, 2025, experienced federal capital litigators have become exponentially more in demand, busier and increasingly committed to other capital and potentially capital cases following the change in administration in January 2025. In the first 100 days under its current leadership, the Department of Justice announced its intent to reconsider all of the previous administration's decisions not to seek the death penalty (estimated to be approximately 304), in addition to its review of all new potentially capital cases.

To date, DOJ has issued four additional notices of intent to seek the death penalty; 16 defendants are awaiting a decision after being invited to present a case in mitigation before the Capital Review Committee; 29 defendants have such meetings scheduled; and nine more have

been informed that they will be invited and are waiting for a date to be confirmed. For these reasons, and many others, undersigned counsel are acutely aware of the need to identify and secure the appointment of replacement learned counsel as soon as humanly possible and we are proceeding accordingly. As instructed, we will report to the Court on the status of our efforts at the hearing scheduled for May 21, 2025.

### III. THE GOVERNMENT'S RESPONSE LARGELY IGNORES ISSUES RAISED BY THE DEFENSE, DENIGRATES THE DEFENSE TEAM, AND DISREGARDS CONSTITUTIONAL IMPERATIVES

#### a. *Additional Support for Request to Adjourn Until September 8, 2026*

In support of the original Motion for Adjournment of Trial Date and for Further Pretrial Scheduling Order, ECF No. 303, defense counsel submitted an ex parte, under seal Supplement outlining the status of the defense investigation and detailing the need for the additional time requested, ECF No. 304. As additional support for the request, counsel submits herewith, also ex parte and under seal, the Declaration of Susan Garvey, the National Mitigation Coordinator for the Administrative Office of the U.S. Courts' Habeas Assistance and Training ("HAT") Project.

#### b. *The Risk of Prejudice from the Media Coverage and Community Events Surrounding the Anniversary of the Crime Threatens Payton Gendron's Right to a Fair Trial*

In the defense's Supplement in Support of the Motion for an Adjournment of the Trial Date, ECF No. 334, counsel briefly reiterated the reasons set forth in earlier pleadings (*see* ECF No. 303, 304, 320) that an adjournment of the proposed schedule was a constitutional imperative. In response to the Court's parameters, however, counsel also requested that any alternative schedule imposed by the Court at least direct that proof not begin to be presented any sooner than June 1, 2026. This modification is requested to ensure that no portion of the penalty phase of the trial occurs during the days and weeks surrounding the anniversary of the devastating

events of May 14th, due to the prejudice that will inevitably ensue from the widespread community gatherings, tributes, and memorial events that take place at that time, and the sharp increase in media coverage of the case that follows. *See* ECF 334 at 3-11; *see also* ECF No. 308 (Motion to Transfer Venue) at 10-14.

In response, the government downplayed the significance of these commemorations arguing that, "*to the extent there is any news coverage* of the trial, or of any events commemorating the victims" the jury will have been selected by then and instructed to "avoid any such media coverage." ECF No. 348 at 3-4 (emphasis added). The government's insouciance flies in the face of the intensity of the community's response to the anniversary. In our Supplement, ECF No. 334 at 3-11, we outlined the commemorations of this important date that have taken place in previous years, as well as what was then known about the plans for the current year. In addition to the dozens if not hundreds of events scheduled for this years' anniversary, many of which were referenced in defense counsel's pleadings filed on April 24, 2025, s*ee* ECF 334 at 3-11, an enormous outpouring of media coverage and announcements of special events occurred and were publicized in the short time since the pleading was filed. Indeed the anniversary was prominently commemorated on the front page of the Buffalo News on both May 14th and May 15th this year. *See* Exhibits D and E attached hereto.

From May 2 through May 15, 2025, the defense collected 134 local news articles and media pieces related to the third anniversary of May 14th. Most of these articles discuss commemoration events for the third anniversary of the shooting in detail, providing Buffalo community members with event specifics and volunteer opportunities in an effort to cultivate a

tradition of annual remembrance in the month of May.[4] This collection effort, however, does not

purport to be wholly comprehensive as it undoubtedly fails to capture any number of news

segments that air throughout the month of May regarding the anniversary, social media posts

made by local organizations and city and state officials to mark the solemn time, and, most

importantly, the on-the-ground relationship-building and community-making that occurs within

Buffalo throughout the month of May as countless individuals partake in a culture of service.[5]

In addition to individual news articles, multiple Buffalo news outlets also mark the

anniversary with special programming aired on local television and published online:

- Buffalo Toronto Public Media presented the *Remembering May 14th* series which consists of a collection of podcasts speaking with victim family members and Buffalo community leaders published throughout the week of the anniversary;[6]
- Spectrum News 1 created a category of coverage for the anniversary, "5/14 Remembrance," comprised of various anniversary-related articles and coverage in

---

[4] This collection intentionally excludes articles related to developments in Payton Gendron's federal case to ensure that this number solely captured the deluge of media surrounding the anniversary.

[5] *See, e.g.,* Swift, Chelsea, *Community heals through service: Honoring victims of tragic shooting on its third anniversary*, WGRZ, (May 14, 2025) (available at https://www.wgrz.com/article/news/local/volunteers-participate-in-acts-of-service-commemorate-514/71-a98f9b77-58a3-485a-bb7b-7dd4a58156fa); *See, e.g.,* https://www.instagram.com/reel/DJpSP9CSKmt/?utm_source=ig_web_copy_link&igsh=MzRlO DBiNWFlZA%3D%3D (Video posted to Instagram by Gov. Kathy Hochul for the third anniversary which includes footage of her recent visit to Buffalo).

[6] *Remembering May 14th: Honoring Lives Lost and Community Reflections*, Buffalo Toronto Public Media, (May 12, 2025) (available at https://www.btpm.org/2025-05-12/remembering-may-14th-honoring-lives-lost-community-reflections); *Remembering May 14th: Processing Trauma and Building Resilience*, Buffalo Toronto Public Media, (May 13, 2025) (available at https://www.btpm.org/2025-05-13/remembering-may-14th-processing-trauma-and-building-resilience); *Remembering May 14th: East Side Development and Food Injustice*, Buffalo Toronto Public Media, (May 14, 2025) (available at https://www.btpm.org/2025-05-14/remembering-may-14th-east-side-development-food-injustice); *Remembering May 14th: Policy, Advocacy & Systemic Change*, Buffalo Toronto Public Media, (May 15, 2025) (available at https://www.btpm.org/2025-05-15/remembering-may-14th-policy-advocacy-systemic-change).

addition to a multi-part series aired on local news regarding revitalization and recovery efforts in East Buffalo in the wake of the shooting;[7]

- The Buffalo News published a 27-minute-long video memorial in addition to expanded coverage of the third anniversary;[8]

- WGRZ aired a 55-minute special report entitled *5/14 3 Years Later* on its station including live coverage of the Remembrance Ceremony at Tops Markets on Jefferson Avenue.[9] Further, WGRZ aired an additional special report recognizing a moment of silence in remembrance of victims on the steps of City Hall, facilitated by the City of Buffalo;[10]

- WKBW similarly sought to honor victims and acknowledge the impact of 5/14 via coverage which included a website heading reading, "5/14: Three Years Later" accompanied by a full-page memorial to the ten victims in the form of a video tribute and third anniversary articles.[11] WKBW also featured two separate specials on its website: *Buffalo Strong: In Remembrance*, a 30-minute broadcast special originally published in 2022 and featured yet again on May 14th; and *5/14: Witness to the aftermath; What it was like to cover the mass shooting that changed Buffalo*, a 41-minute documentary featuring journalists' experiences covering May 14th.[12]

---

[7] (available at https://spectrumlocalnews.com/nys/buffalo); Roesser, Brianne, *Jefferson Ave. Business owners come together to promote prosperity 3 years after 5/14 mass shooting*, Spectrum News 1, (May 13, 2025) (available at https://spectrumlocalnews.com/nys/buffalo/news/2025/05/07/jefferson-ave--business-owners-come-together-to-promote-prosperity).

[8] Buffalo News, *One Year Later: The Legacy of 5/14*, (May 14, 2025) (available at https://buffalonews.com/multimedia/video_99c38caf-5870-5f49-bbb2-b7e84681e61c.html).

[9] *5/14 3 Years Later*, WGRZ, (May 14, 2025) (available at https://www.wgrz.com/video/news/special-reports/buffalo-mass-shooting/514-remembrance-ceremony/71-0bb9261d-36aa-4eba-9fdd-7ed80608ca86).

[10] *City of Buffalo Remembrance Ceremony for 5/15 victims and survivors*, WGRZ, (May 14, 2025) (available at https://www.wgrz.com/video/news/special-reports/buffalo-mass-shooting/city-of-buffalo-remembrance-ceremony-for-514-victims-and-survivors/71-8d5b38b9-14eb-4270-984f-3ee285cc9ac1).

[11] *See* https://www.wkbw.com/.

[12] Erbacher, August, *Watch 'Buffalo Strong: In Remembrance' honoring 10 lives lost in the Buffalo mass shooting*, WKBW, (May 15, 2022) (available at https://www.wkbw.com/news/local-news/buffalo-mass-shooting/buffalo-strong-in-remembrance-honoring-10-lives-lost-buffalo-mass-shooting); WKBW Staff, *5/14: Witness to the aftermath; What it was like to cover the mass shooting that changed Buffalo*, WKBW, (May 13, 2025) (available at https://www.wkbw.com/news/local-news/5-14-witness-to-the-aftermath-what-it-was-like-to-cover-the-mass-shooting-that-changed-buffalo).

As in previous years, a robust community response was organized by city and state officials, local organizations, and Buffalo residents to take place not only on May 14th, but in the days and weeks surrounding the anniversary. Disparate efforts to memorialize those lost and those affected by May 14th coalesced during the month of May into a ubiquitous memorial in Buffalo and surrounding areas.

Of course, a considerable number of these events did indeed take place on May 14th, such as *5/14 Day of Remembrance*, "a city-wide day of service, action, and connection" organized by the Clementine Gold Group with input from community members and victim families and friends. Organizers also ensured that community support and remembrance would not end in only its third year, and Buffalo Common Council Majority Leader Leah Halton-Pope introduced a resolution for the City of Buffalo to formally recognize the day in this and future years.[13] *5/14 Day of Remembrance* activities included:

- A community card tournament in honor of Celestine Chaney;

- Volunteer opportunities at Home Beneath Our Feet's All-Inclusive Sensory Garden;

- Donations to Agents for Advocacy, an organization created by Mark Talley in honor of his mother, Geraldine Talley;

- Donations to Community Access Services' food pantry;

- Volunteer-assembled gift packages for HighPointe Long Term Care Facility's nursing staff;

- Volunteer-assembled floral arrangements for HighPointe Long Term Care Facility residents in honor of Ruth Whitfield;

- Beautification and clean-up effort for the Jefferson Avenue Business Corridor;

- Clean-up day at Kat Massey Pocket Park;

---

[13] *Day of service planned for 5/14 mass shooting anniversary*, Buffalo Toronto Public Media, (May 12, 2025) (available at https://www.btpm.org/local/2025-05-12/day-of-service-planned-for-5-14-mass-shooting-anniversary).

- Garden clean-up and planting day at Mulberry Street Garden;

- Remembrance Block Party;

- Volunteer and donation opportunities with Buffalo Community Fridges;

- Gobike's Ride to School Day for students and families of Tapestry Charter School, Olmsted School, and Bennett Park Montessori.[14]

Tops Markets hosted a memorial ceremony at the Jefferson Avenue Tops on May 14th at 2:00 PM.[15] The moment of silence was led by the City of Buffalo on the steps of City Hall on May 14th. A crowd including local and state officials gathered for the moment of silence, which was preceded by a prayer from Ulysses O. Wingo Sr., comments from the Mayor's Office, and remarks from Councilwoman Leah Halton-Pope.[16] Before the gathered crowd and Buffalo at-large, a representative from the Mayor's Office called for Buffalo residents to turn on their porch lights at dusk to commemorate victims.[17] Further, the front of City Hall and the dome of the building itself was illuminated in orange, the color of gun violence prevention, to mark the day.[18]

This visual commemoration spread well beyond Buffalo. In the evening, landmarks across New York State served as memorials to victims, including the One World Trade Center, Albany International Airport Gateway, Alfred E. Smith State Office Building, Empire State

---

[14] Nussbaumer, Newell, *2025 Day of Remembrance*, Buffalo Rising, (May 12, 2025) (available at https://www.buffalorising.com/2025/05/2025-day-of-service-remembrance/).

[15] *New efforts seek to turn 5/14 into special day of remembrance*, Spectrum News 1, (May 6, 2025) (available at https://spectrumlocalnews.com/nys/buffalo/news/2025/05/06/new-efforts-seek-to-turn-5-14-into-special-day-of-remembrance-).

[16] *City of Buffalo Remembrance Ceremony for 5/15 victims and survivors*, WGRZ, (May 14, 2025) (available at https://www.wgrz.com/video/news/special-reports/buffalo-mass-shooting/city-of-buffalo-remembrance-ceremony-for-514-victims-and-survivors/71-8d5b38b9-14eb-4270-984f-3ee285cc9ac1).

[17] *Id.*

[18] *Id.;* City of Buffalo, *May 2025 Lighting Calendar*, (available at https://www.buffalony.gov/DocumentCenter/View/14681/MAY-CALENDAR).

Plaza, Fairport Lift Bridge over the Erie Canal, Governor Mario M. Cuomo Bridge, Grand

Central Terminal, Kosciuszko Bridge, Moynihan Train Hall, Niagara Falls, State Education

Building, State Fairgrounds, H. Carl McCall SUNY Building, "Franklin D. Roosevelt" Mid-

Hudson Bridge, and Walkway Over the Hudson State Historic Park.[19]

Further efforts throughout the City of Buffalo include but are not limited to:

- In the pages of the Buffalo Criterion, Eva M. Doyle urged Buffalo residents to place
flowers on their door or in their hallway "to remember those who lost their lives."[20] This
act of remembrance, in addition to displays of light at Buffalo residents' front doors and
City Hall itself, is only a small illustration of the unavoidable nature of anniversary
events, not only through the sheer volume of these acts but through the often-visual
nature that alters the very landscape of Buffalo for all those who look out their window or
walk down the street;

- The Second Annual Jefferson Strong: Our Side of the Story event, organized by St. Brian
Clothiers and the Poetic Justice Society, occurred on May 14th. In the past, this event
facilitated community writing exercises to contribute to the book *Jefferson Strong—Our
Side of the Story* by Dr. Silvia M. Lloyd[21] Faith leaders from multiple Buffalo religious
communities was facilitated a community-wide prayer on May 14th, followed by a Color
Guard presentation and performances;[22]

---

[19] Gov. Kathy Hochul, Press Release, Governor Hochul to Illuminate New York State Landmarks
in Remembrance of Gun Violence Victims on Third Anniversary of Tops Shooting, (May 14,
2025) (available at https://www.governor.ny.gov/news/governor-hochul-illuminate-new-york-
state-landmarks-remembrance-gun-violence-victims-third).

[20] Doyle, Eva M., *Remembering the Victims of the Tops Massacre*, Buffalo Criterion, (May 10,
2025) (available at https://www.thebuffalocriterion.com/blog-3-2/remembering-the-victims-of-
the-tops-massacre).

[21] *Community Prepares to Mark 3rd Anniversary of the Tops Massacre*, Buffalo Challenger, (May
9, 2025) (available at https://www.buffchallnews.com/news/local/community-prepares-to-mark-
3rd-anniversary-of-the-tops-massacre/article_eaaba50c-36c9-40e5-ab98-0744742a10b6.html);
Minkewicz, Sarah, *'Every small effort makes a difference:' Volunteers clean up Jefferson Avenue
in preparation of 5/14 remembrance ceremonies*, WIVB, (May 13, 2024) (available at
https://www.wivb.com/news/buffalo-supermarket-mass-shooting-tops/every-small-effort-makes-
a-difference-volunteers-clean-up-jefferson-avenue-in-preparation-of-5-14-remembrance-
ceremonies/).

[22] *Area Clerics to Lead Community-Wide Prayer*, Buffalo Criterion, (May 9, 2025) (available at
https://www.thebuffalocriterion.com/local-news-1/area-clerics-to-lead-community-wide-prayer).

- Agents for Advocacy and Colored Girls Bike Too hosted a speaker event on Jefferson Avenue;[23]

- Buffalo AKG Art Museum and the Community Health Center of Buffalo Resiliency Center, community institutions, hosted a ceremony to facilitate healing and unity for the city. This ceremony featured musical performances and was attended by two survivors of the 2015 mass shooting at Emanuel African Methodist Episcopal Church in Charleston, South Carolina;[24]

- Senator Chuck Schumer honored victims of May 14th on the Senate floor in the nation's capital.[25]

However, as previously noted, events marking the third anniversary of May 14th reach beyond this remarkable outpouring of support and community action on the day itself:

- On May 17th, Councilwoman Zeneta Everhart, mother of injured victim Zaire Goodman, will deliver the commencement speech for Canisius University. An announcement published by Canisius University expands upon Zeneta Everhart's political career and her advocacy for stricter gun laws in the wake of 5/14;[26]

- New York lawmakers finalized the budget, including an aid package for Buffalo and $357 million in funding for gun violence prevention programs;[27]

- Governor Kathy Hochul announced that applications for East Side Building Fund, a $10 million fund dedicated to "help East Buffalo's business property owners" and to revitalize

[23] Schwartz, Michael, *How you can honor the victims of the Buffalo mass shooting this week*, WKBW (May 9, 2025) (available at https://www.wkbw.com/news/local-news/buffalo/how-you-can-honor-the-victims-of-the-buffalo-mass-shooting-this-week).

[24] *Buffalo AKG holds ceremony to give community members a space to heal*, WGRZ, (May 14, 2025) (available at https://www.wgrz.com/video/news/local/buffalo-akg-holds-ceremony-to-give-community-members-a-space-to-heal/71-f4e7f0cf-c214-4cce-a929-e3616b48dd23); Schwartz, Michael, Buffalo AKG Art Museum holds tribute for those impacted by Buffalo mass shooting, WKBW, (May 15, 2025) (available at https://www.wkbw.com/news/local-news/buffalo/buffalo-akg-art-museum-holds-tribute-for-those-impacted-by-buffalo-mass-shooting).

[25] *Sen. Schumer pays tribute to 5/14 victims on Senate floor*, Spectrum News 1, (May 15, 2025) (available at https://spectrumlocalnews.com/nys/buffalo/news/2025/05/15/sen--schumer-pay-tribute-to-5-14-victims-on-senate-floor).

[26] *Speakers Announced for 2025 Commencement Ceremonies*, Canisius University (April 25, 2025) (available at https://www.canisius.edu/news/speakers-announced-2025-commencement-ceremonies).

[27] Gavin, Robert, *State lawmakers finalize $254 billion budget, aid plan for Buffalo*, Buffalo News (May 9, 2025) (available at https://buffalonews.com/news/state-regional/article_89283bde-b609-4218-b18c-dc715ccc6a47.html).

"neighborhood business districts in East Buffalo," opened in early May.[28] Governor Hochul made this announcement at the Pratt Willert Community Center stating "as we approached the anniversary just on May 14, I wanted to make sure I stopped by, gathered with the 5/14 Memorial Commission members who are working so hard so these families have a place to go to hear, read the stories of their family members, their loved ones."[29] Governor Hochul continued to note the support and strength shown by the Buffalo community "that was so tough, and so resilient, and so loving and giving of each other that they pulled together in their memory" and said, "We will stand against gun violence with every fiber of our being."[30] A public information meeting is set to occur in late May;[31]

- On May 7th, more than 100 Tops employees from across Western New York joined the City of Buffalo in Operation Clean Sweep, a neighborhood beautification project that organizers state they hope to continue in future years.[32] One participating community member said, "It becomes a week of remembrance for the lives that were lost. It brings it all together, allowing us to not forget, and to grow from it";[33]

- Zeneta and Zaire's Book Club Reading Nook at Villa Maria College opened on May 12th;[34]

- On May 10th, the third annual Buffalo Black Caucus convened not only to mark the third anniversary of 5/14 but to offer resources and support to Buffalo's Black community;[35]

---

[28] Gov. Kathy Hochul, Press Release, *Governor Hochul Announces Applications Open for East Side Building Fund*, (May 9, 2025) (available at https://www.governor.ny.gov/news/governor-hochul-announces-applications-open-east-side-building-fund).

[29] Gov. Kathy Hochul, Press Release, *Rush Transcript*, (May 9, 2025) (available at https://www.governor.ny.gov/news/video-audio-photos-rush-transcript-governor-hochul-announces-applications-open-east-side).

[30] *Id.*

[31] *Id.*

[32] Castro de la Mata, Althea, *'Something that's close to my heart': Tops employees come together to give back on Jefferson Avenue*, WKBW (May 7, 2025) (available at https://www.wkbw.com/news/local-news/buffalo/something-thats-close-to-my-heart-tops-employees-come-together-to-give-back-on-jefferson-avenue).

[33] *Id.*

[34] Rios-Malviya, Alexandra, WGRZ, *Buffalo mother and son turn tragedy into educational inspiration*, (May 12, 2025) (available at https://www.wgrz.com/article/news/local/new-reading-nook-honors-514-mom-mission/71-b58f9e3c-888e-4838-afaa-7fb4212d6616).

[35] Sepulveda, Helena, *Third annual Buffalo Black Caucus honors victims of 5/14 tragedy*, Spectrum News 1, (May 10, 2025) (available at https://spectrumlocalnews.com/nys/buffalo/news/2025/05/10/buffalo-black-caucus-remembers-5-14).

- The Legacy 5.14 5K and 1/2 Marathon took place on May 10th;[36]

- Congressman Tim Kennedy called a press conference on May 12th at the site of the shooting to announce the reintroduction of the Aaron Salter, Jr. Responsible Body Armor Possession Act.[37] Congressman Kennedy was joined by community leaders and the friends and family of victims. The bill was set to be introduced in Congress on May 14th

- Representative Kennedy also convened a press conference in Washington on the anniversary, flanked by colleagues, gun violence prevention advocates, and local and national leaders, to speak about the legislation;[38]

- The WNY for Hope Diaper and Hygiene Drive is collecting diapers, hygiene, and feminine products through May 21st.[39] Participants note that these items were among those most direly needed in the community directly following May 14th;[40]

- On May 13th, the 5/14 Memorial Foundation announced the site for the memorial, "Seeing Us," at a City Hall press conference. Joined by local leaders, the 5/14 Memorial Foundation indicated that the "living memorial" to honor victims, survivors, and the community at-large would be located at the corner of Jefferson Avenue and Best Street on 18 parcels of land.[41] Public meetings will continue to be held throughout site development and the 5/14 Memorial Foundation will organize a year-long fundraising campaign to facilitate the memorial's construction;[42]

- One Race: The Human Race is a speaker event sponsored by Tops Market featuring historian Emmanuel Kulu Jr. and Poet Laureate Jillian Hanesworth with a stated purpose of "honor[ing] our beloved community pillars lost in the 5/14 massacre" on May 15th;[43]

---

[36] *See* https://legacy514.com/.

[37] Joly, Aidan, *Legislation re-introduced by Kennedy to restrict body armor*, WIVB, (May 12, 2025) (available at https://www.wivb.com/news/buffalo-supermarket-mass-shooting-tops/legislation-re-introduced-by-kennedy-to-restrict-body-armor/amp/).

[38] *Honoring a Hero: Kennedy introduces Aaron Salter, Jr., Responsible Body Armor Possession Act*, Niagara-Gazette, (May 14, 2025) (available at https://www.niagara-gazette.com/news/local_news/honoring-a-hero-kennedy-introduces-aaron-salter-jr-responsible-body-armor-possession-act/article_5809634c-f201-4735-876f-f6efea0347f7.html).

[39] Schwartz, Michael, WKBW, *How you can help families in Buffalo through annual diaper and hygiene drive*, (May 8, 2025) (available at https://www.wkbw.com/news/local-news/how-you-can-helpfamilies-in-buffalo-through-annual-diaper-and-hygiene-drive).

[40] *Id.*

[41] Skoog, Katie, *5/14 Memorial Foundation secures 18 parcels for the memorial project*, (May 13, 2025) (available at https://www.wivb.com/news/buffalo-supermarket-mass-shooting-tops/5-14-memorial-foundation-secures-18-parcels-for-memorial-project/).

[42] *Id.*

[43] Nussbaumer, Newell, *One Race: The Human Race*, Buffalo Rising, (May 12, 2025) (available at https://www.buffalorising.com/2025/05/one-race-the-human-race/).

- Pappy Martin Legacy Jazz Collective Celestial Jazz Wellness Series will host their annual Betty Carter Birthday Celebration and 5/14 Tops Massacre Remembrance on May 16th at Elim Christian Fellowship;[44]

- The 2025 Buffalo Solidarity Ride hosted by the East Side Bike Club is scheduled for May 17th;[45]

- The University at Buffalo Jacobs School of Medicine will be joined by Michigan State University to host a joint Remembrance Conference June 6 through June 8 at the University at Buffalo. The impetus for this joint conference was shared tragedy for both schools in that both institutions experienced shootings on or near their campuses.[46]

Even the most scrupulous juror could not avoid being exposed to and affected by this outpouring of media attention, public mourning, and community events.

   *c. The Government Wrongly Relies on Nationwide Statistics and Dissimilar Cases to Urge an Inappropriate Timeline in this Case*

  The government also takes issue, ECF No. 348 at 2-3, as it did in its initial Response to the Motion, ECF No. 316 at 26-29, with defense counsel's demonstration that assertion that their proposed timeline is entirely consistent with other federal capital prosecutions in this Circuit. Instead, the government urges the Court to compare this case to the nationwide average.[47]

---

[44] *Community Prepares to Mark 3rd Anniversary of the Tops Massacre*, Buffalo Challenger (May 9, 2025) (available at https://www.buffchallnews.com/news/local/community-prepares-to-mark-3rd-anniversary-of-the-tops-massacre/article_eaaba50c-36c9-40e5-ab98-0744742a10b6.html).

[45] Nussbaumer, Newell, *2025 Buffalo Solidarity Ride*, Buffalo Rising, (April 6, 2025) (available at https://www.buffalorising.com/2025/04/2025-buffalo-solidarity-ride/).

[46] Dudzik, Kelly, *Remembrance Conference set to tackle gun violence*, WGRZ, (May 13, 2025) (available at https://www.wgrz.com/article/news/local/buffalo/remembrance-conference-tackle-gun-violence/71-ad5db648-6da4-477d-ad20-ffb4499bebe7); Goldbaum, Ellen, *In Unity Against Gun Violence*, University at Buffalo, (February 5, 2025) (available at https://medicine.buffalo.edu/news_and_events/remembrance-conference.host.html/content/shared/smbs/news/2025/2/remembrance-conference-2025-20118.detail.html).

[47] In so doing, the government ignores that its speediest comparators, *Tsarnaev* and *Roof*, have resulted in, respectively, more than 10 years of litigation on direct appeal that still has not reached its conclusion, *see* ECF No. 320 at n.6, and a massive filing seeking post-conviction relief under § 2255 that includes a declaration by Roof's lead trial counsel admitting that the

Specifically, the government includes statistics from the Federal Death Penalty Resource Project, ECF No. 348-1, noting that the average time from indictment to penalty verdict in the 33 federal capital cases that proceeded to a penalty phase verdict between 2010 and 2021 was 1,382 days.

As previously noted, *see* ECF No. 320 at 5-7, comparing this case with a nationwide average of federal capital cases is a fool's errand. First, despite the government's attempts to cast this case as "straightforward" (relying exclusively on the strength of the guilt-phase evidence), *see* ECF No. 348 at 5, it cannot escape the magnitude of the crime, the number of victims and families affected, the overwhelming publicity and community activity it inspired, and the attendant legal issues. *See, e.g.*, ECF No. 303 at 17-31 (addressing the complexity of the suppression issues related to the seizure of digital evidence); ECF No. 309 (addressing the admissibility of "victim impact evidence.") Nor should this Court aspire to "match" the average duration of cases that are not only factually and legally dissimilar but include those tried in Circuits with significantly less demanding standards for capital litigation.

Finally, the government neglects to note what is prominently illustrated in its own exhibit, i.e., the dramatic difference between the average pendency of capital cases that resulted in a death sentence and those that did not: "Cases that resulted in a death verdict proceeded to penalty verdict on average 718 days faster than cases that resulted in a life sentence because the jury declined to return a death verdict." ECF No. 348-1 at ¶7. In other words, the less time defense counsel has to complete its mitigation investigation and competently engage in pre-trial litigation, the more likely it is that their client will be sentenced to death. When the increased

---

"time period for pretrial preparation was grossly inadequate." *See* ECF No. 334 at 11-13 (detailing the myriad ways in which the defense team was woefully unprepared for trial, e.g., "The decision to go to trial in November 2016 was made based on incomplete information and prior to having secured the assistance of critical experts and key members of the defense team."). Both trials also resulted in a death sentence.

speed at which a verdict is reached is prioritized over the reliability and soundness of that verdict, it is inevitable that the overall length of the case will be extended by appeals, post-conviction litigation and the need for retrial.

> d.  *Payton Gendron's Request for a Continuance of the Trial Schedule is a constitutional imperative, not a Defense tactic to achieve unnecessary delay*

Despite the disingenuous throat-clearing that it is not seeking to "denigrate defense counsel or the defendant," the government does just that, repeatedly, in its Response. ECF No. 348 at 4-8. First, it asserts that counsel's advocacy on Payton Gendron's behalf is a "tactic" designed to "invite delay, and perhaps infect the record for appeal." *Id.* at 4. It then criticizes the defense for filing meritorious motions and requesting hearings, including a *Roper*-extension hearing, *which this Court granted*, and for having the temerity to exercise Payton Gendron's constitutional right to put the government to its proof at a culpability phase of his capital trial. *See* ECF No. 348 at 7-8 ("the defense chose to devote time pursuing, preparing for, and conducting a Roper-extension hearing" and the defendant "has chosen to exercise his right to contest the guilt phase of his federal charges rather than proceed directly to a penalty-phase trial"). This latter assertion is utterly disingenuous; the government well knows that, even if Payton Gendron did proceed directly to a penalty phase, it would insist upon its right to present evidence of his guilt at that proceeding just as vigorously as it would at a culpability phase. And surely a better strategy to "infect the record" for purposes of appeal would be *not* to file viable motions or contest the government's evidence.

Worse, the government again goes after Payton Gendron himself for his lawyers' perceived misdeeds, going so far as to assert that "the defendant foreshadowed this litigation strategy" in his "manifesto." ECF No. 348 at 8. Again, it publicly accuses Payton Gendron of having "no incentive to proceed to trial, expeditiously or otherwise," *id.* at 7, insinuating that the

delay requested by his lawyers to complete their work "may mean nothing" to him, *id.* at 4, and proclaiming that "[u]nlike a defendant whose liberty is at stake, each day this defendant spends in jail alive is a victory," *id.* at 8.

The government accurately asserts that Payton Gendron "does not want to be sentenced to the death penalty" and "his lawyers are working tirelessly to try to save him." *Id.* These efforts do not include a lack of candor to the Court or asserting frivolous claims as a "tactic" to delay the litigation. Rather, as expressed and supported at length, defense counsel's sole goal is to provide him with effective assistance of counsel. By falsely and publicly claiming otherwise, knowing that its words will be faithfully reported in the news media, the government not only denigrates defense counsel and Payton Gendron personally, but further compromises his right to a fair trial, making the need for a change of venue all the more apparent. *See* ECF No. 308 (Motion to Transfer Venue); *see also* Exhibit C ("Prosecution resists trial delay for Tops gunman: 'Each day this defendant spends in jail alive is a victory' for him").

IV.    CONCLUSION

For the foregoing reasons, in addition to those previously set forth in pleadings requesting a continuance of the trial date, counsel for Payton Gendron respectfully request an adjustment of the Court's proposed schedule.


Dated: May 15, 2025
        Buffalo, New York

                                            *s/Sonya A. Zoghlin*
                                            Sonya A. Zoghlin
                                            Assistant Federal Public Defender

                                            *s/MaryBeth Covert*
                                            MaryBeth Covert
                                            Senior Litigator

<u>*s/Julie Brain*</u>
Julie Brain
Attorney at Law