*United States v. Payton Gendron*

**22-CR-109-LJV**

# EXHIBIT A

**DECLARATION OF KEVIN McNALLY REGARDING THE APPOINTMENT
OF MORE THAN TWO ATTORNEYS INCLUDING OUT-OF-STATE COUNSEL**

1.  I currently serve with the Federal Death Penalty Resource Counsel Project, assisting court-appointed and defender attorneys charged with the defense of capital cases in the federal courts.  I have served as Resource Counsel since the inception of the Resource Counsel Project (RCP) in January, 1992.  I was the Director of the Project between 2007 and 2018.  The Project is funded and administered under the Criminal Justice Act by the Defender Services Office of the Administrative Office of the United States Courts.

2.  My responsibilities as federal resource counsel include the monitoring of all federal capital prosecutions throughout the United States in order to assist in the delivery of adequate defense services to indigent capital defendants in such cases. This effort includes the collection of data on the initiation and prosecution of federal capital cases.[1]

---

[1]The work of the Federal Death Penalty Resource Counsel Project is described in a report prepared by the Subcommittee on Federal Death Penalty Cases, Committee on Defender Services, Judicial Conference of the United States, FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION (May, 1998), at 28-30. http://www.uscourts.gov/sites/default/files/original_spencer_report.pdf.    The Subcommittee report "urges the judiciary and counsel to maximize the benefits of the Federal Death Penalty Resource Counsel Project ..., which has become essential to the delivery of high quality, cost-effective representation in death penalty cases ...." *Id.* at 50.

3.   In order to carry out the duties entrusted to me, I maintain a comprehensive list of federal death penalty prosecutions and information about these cases.  I accomplish this by internet news searches, by reviewing dockets and by downloading and obtaining indictments, pleadings of substance, notices of intent to seek or not seek the death penalty, transcripts and by telephonic or in-person interviews with defense counsel or consultation with chambers. This information is regularly updated and is checked for accuracy by consulting with defense counsel. The Project's information regarding federal capital prosecutions has been relied upon by the Administrative Office of the United States Courts, by the Federal Judicial Center and by various federal district courts.

4. Federal district courts, since the reinstatement of the federal death penalty in 1988, have appointed more than two counsel,[2] including out of state

_____

An update to the Report states: "Many judges and defense counsel spoke with appreciation and admiration about the work of Resource Counsel. Judges emphasized their assistance in recruiting and recommending counsel for appointments and their availability to consult on matters relating to the defense, including case budgeting. Defense counsel found their knowledge, national perspective, and case-specific assistance invaluable." http://www.uscourts.gov/services-forms/defender-services/publications/update-cost-and-quality-defense-representation-federal

[2]*United States v. Thomas Pitera*, (E.D. NY CR No. 90-0424) (Judge Reena Raggi appointed a defense team of four attorneys to represent Mr. Pitera. Although one of these lawyers was ultimately relieved prior to trial, three attorneys represented

the accused throughout the trial pursuant to their appointment under CJA); *United States v. Dandenny Munoz-Mosquera*, (E.D. NY CR No.91-CR-1285) (three attorneys appointed to represent the defendant in view of an anticipated death penalty request by the government); *United States v. Ronald Eugene Mathis* (M.D. FL CR No. 91-301-CR-T (17) (A)) (a third, "death qualified" attorney was appointed; *United States v. William Green* (E.D. LA CR No. 92-468) (third counsel appointed); *United States v. Wayne Anthony Perry* (D.C. DC CR No. 92-474) (district court permitted CJA-appointed counsel to submit vouchers for hours expended by their law partners in defense of Mr. Perry); *United States v. Kevin Wyrick* (W.D. MO CR. No. 94-00194-01-12-CR-W-9) (third counsel, an associate of the law firm which had been previously appointed, assisted in the defense); *United States v. Stanley Secatero*, (D.NM CR No. 94-401 MV) (third counsel appointed); *United States v. John Acosta, et al.* (D. NM CR No. 95-538-MV) (third counsel appointed for three of the six potential capital defendants to assist previously appointed counsel); *United States v. Ricky Rivera Mungia* (N.D. TX CR No. 5-95-CR-0017-C) (third counsel appointed); *United States v Timothy James McVeigh and Terry Nichols* (W.D. OK CR No. M-95-98-H) (two counsel and one staff federal defender were initially appointed for each defendant. Thereafter, numerous other lawyers were appointed to assist both defendants. Judge Richard Matsch appointed five attorneys to represent McVeigh in 28 U.S.C. §2255 proceedings. Additionally, associates of appointed lead counsel assisted in the defense); *United States v. Theodore Kaczynski* (E.D. CA CR No. S-96-259 & D. NJ CR No. 96-607) (two staff defenders and third counsel were appointed); *United States v. David Paul Hammer* (M.D. P 4-96-CR-239) (two federal defenders and one CJA attorney); *United States v. Howard L. Smith, Jr.* (E.D. VA CR No. 97-341-A) (third counsel appointed); *United States v. Richard Pena* (E.D. LA CR No. 97-CR-145-ALL) (third counsel appointed); *United States v. Jose Cortina Perezo* (S.D. NY No. S3 97-CR-1105) (three attorneys); *United States v. Darryl Anthony Carr* (C.D. CA No. 98-CR-34) (two CJA counsel and one federal defender); *United States v. Cody Glover* (D. KS CR No. 98-10059-01-MLB) (third counsel appointed to assist two federal defenders); *United States v. Roy Green* (C.D. CA CR No. 98-337-CBM) (three federal defenders); *United States v. Ahmed Khalfan Ghailani* (S.D. NY CR No. S6 98 CR 1023) (three CJA counsel, along with two military counsel); *United States v. Jamal Shakir* (M.D. TN CR No. 3:98-00038) (three attorneys); *United States v. William Sablan* (D. CO CR No. 00-CR531) (third counsel appointed); *United States v. Diego Rodriguez* (S.D. NY CR No. 00 CR 0761(JSR)) (third lawyer appointed as "learned" counsel pursuant to 18 U.S.C.

§3005 to assist two other very experienced CJA lawyers); *United States v. Angela Johnson* (N.D. IA CR No. 00 CR 3034-MWB) (three attorneys); *United States v. Zacarius Moussaoui* (E.D. VA CR No. 01-CR-455-ALL) (two CJA counsel were appointed to assist five federal public defenders); *United States v. Lezmond Mitchell* (D.AZ CR No. 01-CR-1062) (two federal defenders joined by one CJA panel attorney); *United States v. David Lien* (N.D. CACR No. 01-CR-20071-ALL) (judge appointed a research and writing attorney in addition to two CJA attorneys); *United States v. Anh The Duong* (N.D. CA CR No. 5:01CR20154 JF) (judge appointed a research and attorney in addition to two CJA attorneys); *United States v. Jairo Zapata* (E.D. NY CR No. 01-516) (three CJA attorneys); *United States v. Brian P. Regan* (ED VA No. 01-CR-405-ALL) (four attorneys at counsel table during trial); *United States v. Ronald Mallay* (E.D. NY CR No. 02-778 (S-1) (SJ)) (three CJA attorneys); *United States v. William LeCroy* (N.D. GA CR No. 02-CR-38) (three federal defenders joined by one CJA counsel); *United States v. Darryl Green* (D. MA CR No. 02-CR-10301-ALL) (third counsel appointed after the notice of intent to seek the death penalty was filed); *United States v. Darrell David Rice* (W.D. VA CR No. 02-CR-26) (two CJA counsel were appointed to assist the federal defender); *United States v. Darryl Henderson* (S.D. NY CR No. 1:02-CR-00451-MBM-ALL) (three federal public defenders were joined by one CJA panel attorney); *United States v. Yamil Matos-Quinones* (D.PR CR No. 02-CR-183) (third counsel appointed); *United States v. Wilfredo Perez* (D. CT CR No. 02-CR-7) (three CJA counsel); *United States v. Richard James* (E.D. NY CR No. 02-778 (S-1) (SJ)) (three CJA counsel); *United States v. Brima Wurie* (D. MA CR No. 1:03-CR-10329-PBS-ALL) (three CJA counsel were appointed in the pre-authorization stage); *United States v. Terrance Lash* (E.D. LA No. 03-CR-135-ALL) (three CJA attorneys); *United States v. Kenneth Jamal Lighty* (D. MD CR No. 8:03-CR-00457-PJM-ALL) (three CJA attorneys); *United States v. Larry Gooch* (D. DC CR No. 04-128) (three CJA attorneys); *United States v. Rejon Taylor* (E.D.TN CR No. 1:04-CR-00160-1) (four CJA attorneys); *United States v. John Johnson* (E.D. LA No. 2:04-CR-00017-HGB-SS) (three CJA attorneys); *United States v. Gilbert Saldana* (C.D. CA CR No. 04-CR-415-ALL) (a panel attorney was appointed along with two federal public defenders); *United States v. Scott Cheever* (D. KS CR No. 05-10050-01-06-MLB) (three federal public defenders were joined by one CJA panel attorney); *United States v. Ryan Veazie* (E.D. LA CR No. 2:05 CR 00268-ILRL-SS) (three federal defenders were assigned); *United States v. Raheen Davis* (S.D. NY CR No. 05 1157) (three CJA attorneys); *United States v. Michael Petzold* (D. ND CR No. 3:05-CR-00101-RRE-ALL) (three CJA attorneys);*United States*

*v. Jorge Amador* (D. MD CR No. 8:05 CR 00393-DKC-ALL) (three CJA attorneys); *United States v. Vincent Basciano* (E.D. NY No. 05-CR-060) (four counsel appointed); *United States v. Patrick Holifield* (C.D. CA No. 05-CR-920) (three federal defenders); *United States v. Antonio Argueta* (D. MD CR No. 8:05 CR 00393-DKC) (three CJA counsel); *United States v. Michael Eldren Bracey* (E.D. MI No. 2:06-CR-20185) (two federal defenders and one CJA counsel); *United States v. Damion Jerome Thompson* (C.D. CA No. 06-CR-00466) (three federal defenders); *United States v. Steven Green* (W.D. KY No. 5:06-CR-00019-TBR) (two federal defenders and one CJA counsel); *United States v. Jorge Manuel Arandas* (D. ND No. 3:06-CR-14-01) (three counsel appointed); *United States v. James Dinkins* (D. MD No. 1:06-CR-00309-JFM) (research and writing attorney appointed); *United States v. Harry Burton* (D. MD No. 1:07-CR-00149-WDQ) (research and writing attorney appointed); *United States v. Jesse Dorsz* (D. MD No. 1:07-CR-00399-JFM) (research and writing attorney appointed); *United States v. Joseph Ebron* (E.D. TX No. 1:07-CR-142) (three CJA counsel); *United States v. Catherina Voss* (E.D. VA CR No. 4:08-CR-16) (three federal defenders and one CJA counsel); *United States v. Charles Santiago* (E.D. NY No. 1:08-CR-00559) (three CJA counsel); *United States v. Sheldon Villanueva* (W.D. LA No. 08-00386) (three federal defenders and one CJA counsel); *United States v. Michael Raymond Thompson* (W.D. TN No. 08-20397-M1) (three CJA counsel); *United States v. James Kendrick and Pablo (Paul) Plaza* (W.D. NY No. 10-CR-6096) (each have three CJA counsel); *United States v. Miguel Alvarado-Linares* (N.D. GA No. 1:10-CR-086) (three federal defenders and one CJA counsel); *United States v. Silvestre Rivera* (D. CO No. 1:10-CR-00164-LTB) (three CJA counsel); *United States Dwayne A. Davis, Jr.* (N.D. OH No. 1:10-CR-021) (three CJA attorneys*); United States v. Quenshy Mitchell* (E.D. LA No. 2:10-CR-00297-EEF-DEK) (three CJA counsel appointed); *United States Efrain Rodriguez-Mendoza* (S.D. TX No. H-10-459) (three CJA counsel); *United States v. Ronald Herron* (E.D. NY No. CR-10-615) (three CJA counsel); *United States v. Watland* (D. CO No. 1:11-CR-00038-JLK ) (three CJA counsel); *United States v. Ahmed Muse Salad* (E.D. VA No. 2:11CR34) (two federal defenders and one CJA counsel); *United States v. Gregory Plaskett* (S.D. NY No. 11CR184) (three CJA counsel); *United States v. Davie Jimmy Mejia-Sensente* (N.D. CA No. 3:11-CR-00293-MMC) (three CJA counsel); *United States v. Edgar Nelson Pitts* (E.D. CA 2011) (two federal defenders and one CJA counsel); *United States v. Khaa McKenzie* (E.D. NY No. 11-405) (one federal defender and two CJA counsel); *United States v. Connell Williams* (W.D. OK No. 5:11-CR-298) (one federal defender and two CJA counsel); *United States v. Ricky L. Wedgeworth* (S.D.

MS No. 5:11 CR 7 DCB-LRH) (two federal defenders and one CJA counsel); *United States v. Efrain Hidalgo* (W.D. NY No. 1:11-CR-00151-RJA) (three CJA counsel); *United States v. Nestor Pagan* (D. CT No. 3:12-CR-00267-ACV) (two federal defenders, one CJA counsel); *United States v. Trumaine Hearst* (D. CT No. 3:13-CR-00139-MPS) (two federal defenders, one CJA counsel); *United States v. Paul Ciancia* (C.D. CA No. 2:13-CR-00902-PSG) (three federal defenders, one CJA counsel); *United States v. Jonathan Rene Martinez* (W.D. OK No. 5:13-CR-00286-D) (two federal defenders, one CJA counsel); *United States v. Alfonzo Williams* (N.D. CA No. 3:13-CR-00764-WHO) (one federal defender and two CJA counsel); *United States v. Lorell Antonio Battle* (N.D. OK No. 4:13-CR-00028) (three CJA lawyers); *United States v. Gordon Lasley* (N.D. IA No. 1:14-MJ-00065-JSS) (three federal defenders); *United States v. Kevin Bolton* (W.D. AR No. 6:14-CR-60003-SOH) (two federal defenders, one CJA counsel); *United States v. Lance Green* (S.D. OH No. 3:14-CR-00127-ALM) (one federal defender, two CJA counsel); *United States v. Tommy Smalls* (S.D. NY No. 7:14-CR-00604-UA) (four CJA lawyers); *United States v. Irek Ilgiz Hamidullin* (E.D. VA No. 3:14-CR-00140-HEH) (one federal defender and two CJA lawyers); *United States v. John Vailette* (D. CT. No. 3:14-CR-00060-RNC) (three CJA counsel, two at same firm); *United States v. Robin Tyrone Smith* (D. MD No. 1:14-CR-00582-JFM) (three CJA lawyers); *United States v. Maryssa Middleton* (D. KS No. 5:15-CR-40018-DDC) (three CJA lawyers); *United States v. Antonio Cruz* (N.D. CA No. 5:15-CR-00285-LHK) (three CJA lawyers); *United States v. Leonardo Antolin* (C.D. CA No. 2:16-CR-00390-R) (two federal defenders, one CJA lawyer); *United States v. Jason Polanco* (S.D. NY No. 1:16-CR-00826-LTS) (three CJA lawyers); *United States v. Joseph Biggs* (S.D. NY No. 7:16-CR-00832-KMK) (three CJA lawyers); *United States v. Juan R. Pedro-Vidal* (D. PR No. 3:16-CR-00778-GAG) (four federal public defenders, one CJA lawyer); *United States v. Enrique Portillo and Omar Villalta* (E.D. NY No. 2:16-CR-00403-JFB) (three CJA lawyers); *United States v. Francis McCard* (D UT 2016) (five federal defenders); *United States v. Tyvon Bannister* (E.D. NY No. 1:17-CR-00116-BMC-1) (three CJA lawyers); *United States v. Adam Purinton* (D KS No. 2:17-CR-20028-CM-JPO-1) (three public defenders); *United States v. Fitzroy Simmonds* (E.D. NY No. 1:17-CR-00220-GBD) (two public defenders and one CJA lawyer); *United States v. Romeo Giovanni* (D. AZ No. 4:17-CR-01428-JAS-BPV) (three public defenders); *United States v. Jarvis Wayne Madison* (M.D. FL No. 6:17-CR-00015-RBD-KRS) (two federal defenders, one CJA lawyer); *United States v. Curtis Johnson, Jr.* (E.D. LA No. 2:17-CR-00201-LMA-DEK) (three CJA lawyers); *United States v. Chukwudi Ofomata* (E.D. LA No. 2:17-CR-00201-LMA-DEK) (three CJA lawyers);

counsel,[3] in a significant number of federal death penalty cases in which the facts

*United States v. Aurelio Patino* (C.D. CA No. 5:18-CR-00250-SJO) (two federal defenders, one CJA lawyer); *United States v. Luis Rojas* (N.D. CA No. 3:18-CR-00119-RS) (three CJA lawyers); *United States v. Terrence Allen Miles* (W.D. TX No. 1:18-CR-00039-LY) (three federal defenders and one CJA lawyer); *United States v. Victor Kingsley* (E.D. NY No. 1:18-CR-00128-SJ-ST) (two federal defenders and one CJA lawyer); United *States v. Donnie Arlondo Ferrell* (N.D. TX No. 3:18-CR-00142-K) (two federal defenders and one CJA lawyer); *United States v. James Alex Fields, Jr.* (W.D. VA No. 3:18-CR-00011-MFU) (two federal defenders and one CJA lawyer); *United States v. Aurelio Patino* (C.D. CA No. 5:18-CR-00250-SJO) (three federal defenders), *United States v. Jorge Luis Monsivais, Jr.* (W.D. TX No. 2:18-MJ-05710-CW) (three federal defenders); *United States v. Louis Coleman, III* (D. MA No. 1:19-MJ-06053-MPK) (two federal defenders and one CJA counsel); *United States v. Javier Enrique Da Silva Rosa* (S.D. NY No. 7:19-MJ-01458-UA) (two federal defenders and one CJA attorney) and *United States v. Jose Baquiax Alvarez* (C.D. CA No. 2:19-CR-00117-ODW) (three CJA counsel).

[3]*United States v. Darryl Johnson* (W.D. NY CR No. 92-159-16C) (district court appointed a third, death penalty qualified, out-of-state, attorney); *United States v. Michael Murray* (M.D. PA CR No. 1:CR-92-200) (out-of-state third counsel appointed); *United States v. Tyrone Tidwell* (E.D. PA CR No. 94-353) (out of state, third counsel was appointed due to the lack of death penalty experience of the previously appointed counsel); *United States v. Tim Holloway* (M.D. TN CR No. 3:96-00004) (a third, out-of-state, counsel was appointed); *United States v. Deric Frank* (S.D. NY CR No. 97 CR269 (DLC)) (a third, out-of-state, CJA counsel was appointed to assist two federal defenders); *United States v. Renee Beth Smith* (D. HI No. 97-CR-01141 HG 01) (two federal defenders and one CJA counsel from out-of-state); *United States v. Ricky Lee Brown* (N.D. WV No. 1:98CR34) (three CJA counsel - two from out-of-state); *United States v. Chris Dean* (D. VT CR No. 2:98M0021) (third, out-of-state, counsel appointed); *United States v. Donald Fell* (D. VT No. 2:01-CR-12-01) (three CJA lawyers, two from out-of-state); *United States v. Gary Sampson* (D. MA CR No. 01-CR-10384-ALL) (third, out-of-state counsel appointed); *United States v. Petro Krylov* (C.D.CA CR No. 02-220 (A)-NM) (third, out-of-state counsel appointed); *United States v. Craig Petties* (W.D. TN No. 02-20449-ML) (two CJA lawyers, one from out-of-state and associate billing); *United States v. Khalid Barnes* (S.D. NY No. 7:04-CR-00186-SCR)

(one federal defender and two CJA appointed counsel, one from out-of-state); *United States v. Ronell Wilson* (E.D. NY CR No. 1:04-CR-01016-NGG-ALL) (three CJA attorneys, one from out-of-state); *United States v. Timothy O'Reilly* (E.D. MI No. 05-80025) (two CJA counsel, including out of state counsel and two associates permitted to bill); *United States v. Larry Lujan* (D. NM No. 05-924) (three federal defenders and one CJA counsel); *United States v. LaShaun Casey* (D. PR No. 3:05-CR-0277-JAG) (three federal defenders and one CJA counsel from out-of-state); *United States v. Jelani Solomon* (W.D. PA No. 2:05-CR-00385-TFM-ALL) (third, out-of-state, counsel appointed); *United States v. Valeri Friend* (S.D. WV CR No. 2:05-00107) (two CJA counsel, including one out-of-state, and billing also approved for out-of-state law partner); *United States v. George Lecco* (S.D. WV CR No. 2:05-00107) (three federal defenders, two from out-of-state); *United States v. Azikiwe and Azibo Aquart* (D. CT No. 3:06CR160 (PCD)) (both had third, out-of-state counsel appointed); *United States v. Antoine Baker* (E.D. AR No. 4:06 CR 00041 GTE) (third, out-of-state, counsel appointed); *United States v. Jarvis Brown* (S.D. IN EV06-CR-0014-01-Y/H) (three counsel appointed, one from out-of-state); *United States v. Martin Carillo* (D. ND No. 3:06 CR 14) (two federal defenders and out-of-state counsel appointed); *United States v. Naeem Williams* (D. HI No. 1:06-CR-00079-DAE) (three CJA counsel appointed, two out of state); *United States v. Joseph Duncan* (D. ID No. 07-23-N-EJL) (two out-of state counsel and federal defender office); *United States v. Steven Northington* (E.D. PA No. 2:07-CR-00550-RBS) (three CJA counsel, one out of state); *United States v. Hisan Lee* (S.D. NY 1:07-CR-00003-BSJ) (three CJA counsel, one out-of-state); *United States v. Earl Davis* (D. MD No. 8:07-CR-00199-RWT) (two federal defenders and one CJA counsel from out-of-state); *United States v. Kaboni Savage* (E.D. PA No. 2:07-CR-00550-RBS) (three counsel appointed, two from out-of-state); *United States v. William Merriweather, Jr.* (N.D. AL No. 2:07-CR-243-RDP-JEO) (five CJA lawyers, one from out-of-state); *United States v. Michael Thompson* (MD FL) (two federal defenders and one CJA appointed counsel from out-of-state); *United States v. Joseph Cabrera Sablan* (E.D. CA No. 08 CR 00259) (one federal defender from out of state and two CJA appointed counsel, one from out-of-state); *United States v. Antun Lewis* (N.D. OH No. 1:08-CR-404) (two federal defenders and two CJA appointed counsel); *United States v. James Leon Guerrero* (E.D. CA No. 08-CR-00259) (one federal defender and two CJA counsel appointed); *United States v. Patrick Albert Byers, Jr.* (D. MD No. 08-056) (three CJA attorneys, one out-of-state); *United States v. Narayan Thadani* (E.D. MI No. 2:08-CR-20290-GER-VMM) (three CJA

8

counsel, one from out of state); *United States v. Michael Jacques* (D. VT No. 2:08-MJ-00057-JJN) (one federal defender and two CJA counsel from out-of-state); *United States v. Jonathan Ortiz-Torres* (D. PR No. 10-138 (GAG)) (three federal defenders and one CJA counsel from out of state); *United States v. John Charles McCluskey* (D. NM No. 1:10-CR-02734) (three CJA lawyers, one from out-of-state); *United States v. Wesley Paul Coonce, Jr.* (W.D. MO 10-03029-01/02-CR-S-GAF); (two CJA counsel and an Assistant Federal Public Defender from out of state); *United States v. Thomas Steven Sanders* (W.D. LA No. 1:10CR00351) (three federal defenders, one from out-of-state and CJA counsel appointed); *United States v. Ricky Lewis Kelly* (W.D. KY No. 3:11CR-33-H) (three CJA counsel, one from out-of-state); *United States v. Jorge Avila Torrez* (E.D. VA No. 1:11-CR-115) (two federal defenders and one CJA appointed counsel from out-of-state; three CJA counsel were appointed to replace the initial defense team); *United States v. Chastain Montgomery* (W.D. TN No. CR 11-20044) (three CJA lawyers appointed, one from out of state); *United States v. Christian John* (E.D. NY No. 11-CR-405) (three CJA lawyers, one from out-of-state); *United States v. Jared Loughner* (D. AZ No. 4:11-CR-00187-LAB) (two out-of-state attorneys and the Federal Defender of Southern California appointed); *United States v. Walter Porter* (E.D. LA No. 2:12-CR-00001-MLCF-ALC) (three CJA counsel, including one from out-of-state); *United States v. Samuel Stone* (E.D. CA CR No. E.D. CA No. 1:12-CR-00072-AWI-DLB) (two federal defenders and one CJA counsel from out-of-state); *United States v. Farad Roland* (D. NJ No. 2:12-CR-00298-ES) (four CJA counsel); *United States v. Dzhokhar Tsarnaev* (D. MA No. 1:13-CR-10200-GAO) (the federal defender and two out-of-state CJA counsel); *United States v. John Travis Millner* (E.D. KY No. 7:13-CR-15-ART) (three CJA counsel, one from out-of-state); *United States v. James Wayne Ham* (S.D. TX No. 4:13-CR-00363) (three federal defenders, one from out-of-state); *United States v. Ahmed Abu Khatallah* (D. DC No. 1:14-CR-00141-CRC) (two federal defenders and one out-of-state CJA counsel); *United States v. Jessie Con-Ui* (M.D. PA No. 3:CR-13-123) (three CJA lawyers, two from out-of-state); *United States v. James Watts* (S.D. IL No. 4:14-CR-40063-JPG) (one federal defender, two CJA attorneys, one from out-of-state); *United States v. Milton Huff* (C.D. CA 2014) (two federal defenders, one CJA lawyer from out-of-state); *United States v. Ailsa Jackson* (D. HI No. 1:15-CR-00293-SOM-KSC-1) (two federal defenders, one CJA lawyer from out-of-state); *United States v. Victor Skates* (N.D. CA No. 5:15-CR-00285-LHK) (two CJA and five from Federal Defender Office out of state); *United States v. Daniel Chavez* (N.D. CA No. 5:15-CR-00285-LHK) (two federal defenders from out-of-state, one CJA

of the case and the situation warranted the appointment or participation of three or

more attorneys in the defense of the accused.[4]   Appointment of more than two

_____

lawyer); *United States v. Dylann Storm Roof* (D. SC No. 2:15-MC-00218-BM) (two
federal defenders, one CJA lawyer from out-of-state); *United States v. Jesus Yeizon
Deniz Mendoza* (D. MT No. 1:15-CR-00093-SPW) (two federal defenders, one CJA
lawyer from out-of state); *United States v. Ramon De La Cerda* (S.D. TX No. 4:15-CR-
00564) (three CJA lawyers, one from out-of-state); *United States v. Andrew Rogers*
(S.D. IN No. 2:16-CR-00018-WTL-CMM) (two federal defenders, two CJA lawyers from
out-of-state, one research and writing attorney); *United States v. Richard Smith* (S.D.
IN 2016) (one federal defender, two CJA lawyers from out-of-state); *United States v.
John Pearl Smith, III* (D. AK No. 3:16-CR-00086-SLG-DMS) (three CJA attorneys,
including two from out-of state); *United States v. Jaime Rivera* (E.D. NY No. 2:17-CR-
0050-SJF) (two federal defenders, one CJA lawyer from out-of-state); *United States
v. Brendt Christensen* (C.D. IL No. 2:17-CR-20037-CSB-EIL) (three federal defenders,
one CJA lawyer from out-of-state); *United States v. Brandon Durell Hardison* (M.D.
TN No. 3:17-CR-00124) (three CJA attorneys, one from out-of-state); *United States
v. Omar Rivera-Moyet* (D. PR No. 3:18-CR-00023-PAD) (three federal defenders and
one CJA lawyer from out-of-state); *United States v. Chase Smothermon* (D. NM No.
1:18-CR-00930-MV) (two federal defenders and one CJA lawyer from out-of-state);
*United States v. Mariah Ferry* (D. NM No. 1:18-CR-00930-MV) (three CJA attorneys);
*United States v. Armando Raul Ramirez-Serna* (D. WY No. 2:18-MJ-00051-ABJ-1) (one
federal defenders and two out-of-state CJA lawyers); *United States v. Steven Joshua
Wiggins* (M.D. TN No. 3:18-MJ-01099) (two federal defenders and one out-of-state
CJA lawyer); *United States v. Devonte Hodge* (N.D. IN No. 2:18-CR-00021-JVB-APR)
(two CJA lawyers [one out of state] and one out-of-state federal defender); *United
States v. Ryan Bacon* (D. DE 1:18-CR-00075-LPS) (two federal defenders and one out-
of-state CJA lawyer); *United States v. Reta Mays* (N.D. WV 2019) (one federal and
two CJA lawyers, one out-of state); *United States v. Daniel Nantz* (E.D. KY No. 6:19-
CR-00016-REW-HAI) (out-of-state CJA counsel in addition to two retained counsel)
and *United States v. Patrick Crusius* (W.D. TX No. 3:20-CR-00389-DCG) (one out-of-
state federal defender and two CJA lawyers, one out of state).

[4]There have been several pending appeals in which federal courts have appointed
or allowed appointment of three attorneys, none of whom work in the same office:

lawyers to defend a federal death penalty case has become the standard of practice.

Currently, at least three attorneys have been appointed in a clear majority of cases

"authorized" for a capital trial by the Attorney General.[5]

---

*Gabrion v. United States,* Nos. 02-1386, 02-1461 and 02-1570 in the Sixth Circuit (three CJA attorneys appointed) *United States v. Honken,* No. 05-3871 in the Eighth Circuit (three CJA lawyers appointed from start of case); *United States v. Wilson,* No. 07-1320 in the Second Circuit (three CJA lawyers initially appointed; one later withdrew on her own motion); *United States v. Caro,* No. 07-05 in the Fourth Circuit (two assistant federal defenders, from different offices, and one CJA lawyer presently assigned); *United States v. Kadamovas,* No. 07-99009 in the Ninth Circuit (three CJA attorneys appointed); *United States v. Duncan,* No. 08-99031 in the Ninth Circuit (two CJA lawyers and one assistant federal defender appointed); *United States v. Savage,* No. 14-9003 in the Third Circuit (one federal defender and two CJA attorneys appointed); *United States v. Coonce,* No. 14-2800 in the Eighth Circuit (one federal defender and two CJA attorneys); *United States v. Tsarnaev,* No. 16-6001 in the First Circuit (one federal defender and two CJA attorneys) and *United States v. Sampson,* No. 17-6001 in the First Circuit (one federal defender and two CJA attorneys).

At least three lawyers participated in the appellate briefing in: *United States v. Lecroy*, No. 04-15597 in the Eleventh Circuit; *United States v. Taylor*, No. 09-5517 in the Sixth Circuit; *United States v. Barnette*, No. 10-2 in the Fourth Circuit and *United States v. Wilson*, No. 13-3566 in the Second Circuit (resentencing appeal). Additionally, associate billing was permitted in: *United States v. Lee*, No. 02-2389 in the Eighth Circuit; *United States v. Lawrence*, No. 07-3004 in the Sixth Circuit; *United States v. Lighty*, No. 09-6 in the Fourth Circuit and *United States v. Nelson,* No. 12-4025 in the Eight Circuit. On post-conviction, federal defender organizations have paired with two CJA counsel in: United States v. Nelson (4:04-cv-08005-FJG) and *United States v. Montgomery* (4:12-cv-08001-GAF).

[5]*United States v. Madison* (M.D. FL) (three attorneys); *United States v. Ashley* (C.D. CA) (four attorneys); *United States v. Candelario-Santana* (D PR) (three attorneys); *United States v. Owle* (ND WV) (four attorneys); *United States v. Duran-Gomez* (SD TX) (five attorneys); *United States v. Rodriguez-Mendoza* (SD TX) (five attorneys);

5. The relevant Judicial Conference policy governing representation in federal capital cases expressly contemplates such appointments, in that it specifies: "Pursuant to 21 U.S.C. § 848(q)(4), if necessary for adequate representation, more than two attorneys may be appointed ..." CJA Guidelines, § 6.01(A)(1).

6. The "Federal Death Penalty Act of 1994" included the first substantive revision of 18 U.S.C. §3005, enacted in 1790 by the first Congress of the United States. This appointment of counsel statute remained virtually unchanged until President Clinton signed into law the 1994 Act. The limitation of appointment of counsel "learned in the law ... not exceeding two ..." was removed.

---

*United States v. Ham* (S.D. TX) (three attorneys); *United States v. Laurel* (ND WV) (four attorneys); *United States v. Skates* (N.D. CA) (seven attorneys); *United States v. Arnold* (ED MI) (three attorneys); *United States v. Wilson* (E.D. MI) (three attorneys); *United States v. Jordan* (E.D. MO) (ten attorneys); *United States v. Tartaglione* (S.D. NY) (seven attorneys); *United States v. Saipov* (SD NY) (eight attorneys), *United States v. George* (ED LA) (three attorneys); *United States v. Ofomata* (ED LA) (three attorneys); *United States v. Curtis Johnson* (ED LA) (three attorneys); *United States v. Pedro-Vidal* (D PR) (five attorneys); *United States v. Smith* (D AK) (four attorneys); *United States v. Nesbitt* (WD MO) (three attorneys); *United States v. Rebolledo* (ND CA) (three attorneys); *United States v. Wiggins* (MD TN) (five attorneys); *United States v. Wood* (ND NY) (four attorneys) and *United States v. Bowers* (MD PA) (four attorneys).

7.  Federal Public Defenders have assigned as many as seven attorneys in a capital trial prosecution.[6]

8.  Courts have also appointed counsel to assist retained counsel in federal capital prosecutions.[7]

---

[6]*United States v. James Allen Irby* (D. MD CR No. 8:03-CR-00490-RDB) (four federal defenders), *United States v. Brian Richardson* (N.D. GA No. 1:08CR139) (four federal defenders); *United States v. Frederick Ashley* (C.D. CA 2012) (four federal defenders); *United States v. Anthony Jordan* (E.D. MO No. 4:15-CR-00404-HEA-NAB) (seven federal defenders); *United States v. Victor Skates* (N.D. CA No. 5:15-CR-00285-LHK) (six federal defenders); *United States v. Juan R. Pedro-Vidal* (D. PR No. 3:16-CR-00778-GAG) (four federal defenders); *United States v. Saipov* (SD NY No. 1:17-CR-00722) (six federal defenders) and *United States v. Steven Joshua Wiggins* (M.D. TN No. 3:18-MJ-01099) (four federal defenders).

[7]*United States v. Anthony Jones* (D. MD CR No. WMN-96-0458) (two CJA counsel were appointed to assist retained counsel); *United States v. Daniel Ray Bennett and Edward Stanley* (C.D. CA CR No. 96-1140(A)) (two staff federal defenders assigned to assist retained counsel); *United States v. Julio Otero* (M.D. PA CR No. 3:CR-96-005) (two CJA counsel were appointed to assist retained counsel); *United States v. Richard Oslund* (D.MN CR No. 03-151) (two CJA attorneys were appointed to assist retained counsel); *United States v. Ekabal Singh Busra* (E.D. WI CR No. 1:03 CR 00052-WCG-AEG) (two retained counsel and one CJA counsel from out-of-state); *United States v. Kenneth McGriff* (E.D. NY No. 04-966-ERK) (retained counsel and two CJA counsel from out-of-state); *United States v. Michael Antonio Natson* (N.D. OH No. 1:06CR-00395-DDD) (out-of-state CJA attorney appointed to assist two retained counsel); *United States v. Donna Moonda* (N.D. OH No. 1:06-CR-00395-DDD) (CJA attorney appointed to assist two retained counsel); *United States v. Maurice Phillips* (E.D. PA No. 2:07-CR-00549-JCJ) (CJA attorney appointed to assist two retained counsel); *United States v. Jose Luis Gracesqui* (S.D. NY No. 1:10-CR-00074-PKS) (two CJA counsel and one retained counsel); *United States v. Eugene Slone* (E.D. KY No. 6:12-CR-00028-ART-HAI) (three retained counsel and one CJA lawyer from out-of-state); *United States v. Melissa Hack* (D. NV No. 2:12-CR-00063-PMP-RJJ) (two retained

9.  Various courts have permitted CJA appointed counsel to submit vouchers for hours expended by their law partners.  The effect of this authorization (which is in any event contemplated in non-capital cases, see, Administrative Office of the United States Courts, *Guide to Judiciary Policies and Procedure,* Guidelines for Administration of the Criminal Justice Act, Vol. VII (Appointment of Counsel in Criminal Cases), § 2.11(A), (hereinafter CJA Guidelines), is to permit at least three and as many as four lawyers to participate.

I declare under the penalty of perjury under the laws of the United States of American, 28 U.S.C. §1746, that the foregoing is true and correct.

Executed this 13th day of February, 2020.

 /s/ Kevin McNally_____
Kevin McNally
Attorney at Law

---

counsel and one out-of-state CJA counsel); *United States v. Geovanny Valladares* (E.D. NY No. 2:14-CR-00068-JFB) (two CJA counsel and one retained counsel); *United States v. Carlo Wilson* (E.D. MI No. 2:16-CR-20460-MAG-RSW) (two out-of-state CJA counsel, one federal defender and one retained counsel) and *United States v. Daniel Nantz* (E.D. KY No. 6:19-CR-00016-REW-HAI) (out-of-state CJA counsel in addition to two retained counsel).

*United States v. Payton Gendron*

**22-CR-109-LJV**

# EXHIBIT B

## DECLARATION OF KEVIN McNALLY REGARDING APPOINTMENT OF TWO LEARNED COUNSEL IN FEDERAL CAPITAL CASES

1.  I currently serve with the Federal Death Penalty Resource Counsel Project, assisting court-appointed and defender attorneys charged with the defense of capital cases in the federal courts.  I have served as Resource Counsel since the inception of the Resource Counsel Project (RCP) in January, 1992.  I was the Director of the Project between 2007 and 2018.  The Project is funded and administered under the Criminal Justice Act by the Defender Services Office of the Administrative Office of the United States Courts.

2.  My responsibilities as federal resource counsel include the monitoring of all federal capital prosecutions throughout the United States in order to assist in the delivery of adequate defense services to indigent capital defendants in such cases. This effort includes the collection of data on the initiation and prosecution of federal capital cases.[1]

---

[1]The work of the Federal Death Penalty Resource Counsel Project is described in a report prepared by the Subcommittee on Federal Death Penalty Cases, Committee on Defender Services, Judicial Conference of the United States, FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION (May, 1998), at 28-30. http://www.uscourts.gov/sites/default/files/original_spencer_report.pdf.    The Subcommittee report "urges the judiciary and counsel to maximize the benefits of the Federal Death Penalty Resource Counsel Project ..., which has become essential to the delivery of high quality, cost-effective representation in death penalty cases ...." *Id.* at 50.

3.  In order to carry out the duties entrusted to me, I maintain a comprehensive list of federal death penalty prosecutions and information about these cases.  I accomplish this by internet news searches, by reviewing dockets and by downloading and obtaining indictments, pleadings of substance, notices of intent to seek or not seek the death penalty, transcripts and by telephonic or in-person interviews with defense counsel or consultation with chambers. This information is regularly updated and is checked for accuracy by consulting with defense counsel. The Project's information regarding federal capital prosecutions has been relied upon by the Administrative Office of the United States Courts, by the Federal Judicial Center and by various federal district courts.

4.  There is considerable precedent for appointment of two "learned counsel," pursuant to 18 U.S.C.§3005 in federal death penalty cases authorized for a capital prosecution: *United States v. Jones* (D. MD No. 1:96-CR-00458-WMN); *United States v. Holloway* (M.D. TN No. 3:96-CR-00004); *United States v. Kaczynski* (E.D. CA No.

---

An update to the Report states: "Many judges and defense counsel spoke with appreciation and admiration about the work of Resource Counsel. Judges emphasized their assistance in recruiting and recommending counsel for appointments and their availability to consult on matters relating to the defense, including case budgeting. Defense counsel found their knowledge, national perspective, and case-specific assistance invaluable." http://www.uscourts.gov/services-forms/defender-services/publications/update-cost-and-quality-defense-representation-federal

2:96-CR-00259-GED-GGH); *United States v. Rudolph* (N.D. AL No. 2:00-CR-00422-CLS-TMP); *United States v. Sablan* (D. CO No. 1:00-CR-00531-WYD); *United States v. Johnson* (N.D. IA No. 3:01-CR-03046-MWB); *United States v. Sampson* (D. MA No. 1:01-CR-10384-LTS); *United States v. Fell* (D. VT No. 5:01-CR-00012-GWC); *United States v. Rice* (W.D. VA No. 3:02-CR-00026-NKM); *United States v. Wilson* (E.D. NY No. 1:04-CR-01016-NGG); *United States v. Barrett* (E.D. OK No. 6:04-CR-00115-RAW) (on retrial); *United States v. Barnes* (S.D. NY No. 7:04-CR-00186-SCR); *United States v. Williams* (D. HI No. 1:06-CR-00079-DAE); *United States v. Aquart* (D. CT No. 3:06-CR-00160-PCD); *United States v. Duncan* (D. ID No. 2:07-CR-00023-EJL); *United States v. Merriweather* (N.D. AL No. 2:07-CR-00243-RDP-JEO); *United States v. Jacques* (D. VT No. 2:08-CR-00117-WKS); *United States v. Sanders* (W.D. LA No. 1:10-CR-00351-DDD-JDK); *United States v. Montgomery* (W.D. TN No. 2:11-CR-20044-JPM); *United States v. Stone* (E.D. CA No. 1:12-CR-00072-AWI-DLB); *United States v. Millner* (E.D. KY No. 7:13-CR-00015-ART); *United States v. Con-Ui* (M.D. PA No. 3:CR-13-00123-ARC); *United States v. Tsarnaev* (D. MA No. 1:13-CR-10200-GAO); *United States v. Sablan* (C.D. CA No. 2:14-CR-00738-AK); *United States v. Watts* (S.D. IL No. 4:14-CR-40063-JPG); *United States v. Roof* (D. SC No. 2:15-CR-00472-RMG); *United States v. Arnold* (E.D. MI No. 2:15-CR-20652-GCS-DRG); *United States v. Rogers* (S.D. IN No.

2:16-CR-00018-WTL-CMM); *United States v. Laurel* (N.D. WV No. 1:17-CR-00039-IMK-MJA), *United States v. Hardison* (M.D. TN No. 3:17-CR-00124), *United States v. Zelaya-Martinez* (E.D. VA No. 1:18-CR-00123-TSE); *United States v. Wiggins* (M.D. TN No. 3:19-CR-00194) and *United States v. Silva* (W.D. VA No. 2:20-CR-00017-JPJ-JMS).

5.  Two "learned counsel" have been appointed pursuant to 18 U.S.C. §3005 in potential federal death penalty cases, which were not authorized for a capital prosecution: *United States v. Rivera* (D. CO No. 1:10-CR-00164-LTB); *United States v. Williams* (N.D. CA No. 3:13-CR-00874-WHO); *United States v. Battle* (N.D. OK No. 4:13-CR-00028); *United States v. Loughner* (D. AZ No. 11-CR-0187-TUC-LAB); *United States v. Delgado-Perez* (D. MD No. 8:16-CR-00444-PX); *United States v. Carter* (D. MD No. 1:17-CR-00667-MJG); *United States v. Aldridge* (M.D. TN No. 3:17-CR-00130) and *United States v. Mays* (N.D. WV 1:20-CR-00027-TSK).

6.  Two "learned counsel" have been appointed pursuant to 18 U.S.C. §3005 in potential federal death penalty cases, which are currently pending an "authorization" decision: *United States v. Crusius* (W.D. TX No. 3:20-CR-00389-DCG).

I declare under the penalty of perjury under the laws of the United States of American, 28 U.S.C. §1746, that the foregoing is true and correct. Executed this 16th day of September, 2021.

/s/ Kevin McNally
Kevin McNally

*United States v. Payton Gendron*

**22-CR-109-LJV**

# EXHIBIT C



THE BUFFALO NEWS
NEWS+

*OFFER APPLIES TO OUR WEBSITE AND APP.
DOES NOT EXTEND TO THIRD-PARTY WEBSITES.

GO NOW

Local    Crime    State    Politics    Business    Education    Nation & World

## LATEST HEADLINES



**Trump continues Middle East trip; MLB reinstates Rose | Hot off the Wire podcast**

Lee National Newsroom, The Associated Press



**And Shake Shack's opening date in Amherst is ...**

Samantha Christmann



**One Year Later: The Legacy of 5/14**



**Take a seat: Bills start installing 60,000 of them at new stadium**

Michael Petro



**Dan Higgins: What we remember and what we carry from May 14**

Dan Higgins



**Prosecution resists trial delay for Tops gunman: 'Each day this defendant spends in jail alive is a victory' for him**

Patrick Lakamp



**Building trust with the 'unbanked' in Buffalo area**

Matt Glynn

    

Celebrating National Nurses Week & The Power of Nurses



**Dan Higgins: What we remember and what we carry from May 14**



**Prosecution resists trial delay for Tops gunman: 'Each day this defendant spends in jail alive is a victory' for him**



**Building trust with the 'unbanked' in Buffalo area**



**#EveryDayAPhoto 2025**

adclick.g.doubleclick.net/pcs/.../AccountUpgradePlus.aspx?Domain=buffalonews.com&ut...

https://buffalonews.com/news/local/crime-courts/article_0bbf1ff1-8556-4040-95e3-9435ca7ef837.html



TOP STORY    SPOTLIGHT    TOPICAL

# Prosecution resists trial delay for Tops gunman: 'Each day this defendant spends in jail alive is a victory' for him

From the Complete coverage: United States v. Payton Gendron series

**Patrick Lakamp**

May 14, 2025



Some 1,038 days have passed since a federal grand jury indicted Payton Gendron for his deadly racist rampage on May 14, 2022.

The start of in-court jury selection for his death penalty trial will not begin until Jan. 5 at the earliest — 1,274 days after the indictment.

The nearly 42 months may seem like a long wait.

But it is also the average wait, according to data from the Federal Death Penalty Resource Project.



Flowers are laid at the base of the sculpture by Valeria and Hiram Cray during the dedication ceremony for the 5/14 Honor Space at Tops on Jefferson Avenue in Buffalo, May 14, 2024.

Libby March / Buffalo News

Across the country between 2010 and 2020, 34 federal defendants proceeded to and completed trials in death penalty cases. On average, the defendants waited 1,299 days between indictment and the start of voir dire, the legal process where potential jurors are questioned to determine their suitability for jury service.

Gendron already has been sentenced by an Erie County judge to life in prison without parole on his guilty pleas to state charges of first-degree murder for the 10 he killed and second-degree attempted murder for the three he wounded, among other charges.

---

## People are also reading…

1   **Ryan O'Halloran: Why Buffalo Bills coach Sean McDermott is limiting team's on-field work this offseason**

**2**  Bills Mailbag: Brandon Beane's 2024 roster purge looks like good business

**3**  17-year-old charged with Depew shopping plaza shooting remains held without bail

**4**  15 Western New York nursing homes hit with 10-day notices of strike



U.S. District Judge Lawrence Vilardo.

Derek Gee, News file photo

"Unlike a defendant whose liberty is at stake, each day this defendant spends in jail alive is a victory" for him, according to a recent court filing, signed by three prosecutors with the U.S. Attorney's Office for the Western District of New York and two trial attorneys for the U.S. Department of Justice in Washington.

In the meantime, "an exceptional amount of patience" is required of victims' families who filed civil suits in State Supreme Court against social media companies, among others, for their reported roles in the radicalization of Gendron, according to a Buffalo lawyer representing families of three people who were murdered in the shooting.

The next step in the civil cases comes on May 20, when the Appellate Division in Rochester will hold arguments on appeals over Supreme Court Justice Paula L. Feroleto's rulings denying motions to dismiss the civil complaints.

"At each stage of the litigation, delay is a useful tactic for them," attorney Kristen Elmore-Garcia said of the defendants. "It's the plaintiff's job … to really push the litigation forward. Because if it was up to the other parties, these cases would go on for decades. It's our job to really churn the administration of justice forward, and you have to fight for every single inch of it."

## 'Working tirelessly to save him'



Seated, from left, Adrienne Massey, Barbara Massey Mapps, Leandra Elliott and Shawanda Rogers talk about their grief ahead of the one year mark of the 5/14 massacre. Behind them from left to right, attorney John V. Elmore, Buffalo Common Council Member Ulysees O. Wingo, attorney Kristen Elmore-Garcia and Bishop T. Anthony Bronner of Elim Christian Fellowship Church. The families of three people who were killed in the 5/14 massacre and a Tops worker who survived the mass shooting have filed a wrongful death lawsuit against social media platforms, a gun store, body armor manufacturer and the killer's parents.

According to the Federal Death Penalty Resource Project data, 18 of the 34 defendants waited longer than the 1,274 days Gendron would wait if U.S. District Judge Lawrence Vilardo sticks to the tentative Jan. 5 start date for courtroom questioning of prospective jurors in his case.



**Tops gunman loses bid to dismiss hate-crime count tied to those he did not kill**

A couple of defendants among the 34 waited around 3,000 days. Dylann Roof, who shot and killed nine people at a Charleston, S.C., church, waited 495 days, according to the project, part of the Defender Services Office of the Administrative Office of the United States Courts, which assists the defense in federal capital prosecution cases.

Vilardo has said the Jan. 5 date is not yet set "in stone," and he asked prosecutors and defense lawyers to weigh in on how long the trial should be postponed, if at all.

The grand jury returned a 27-count indictment against Gendron in July 2022, and the Justice Department announced in January 2024 that it will seek the death penalty against Gendron.



**Judge refuses to dismiss death penalty option over grand jury questions in Tops massacre case**

The prosecution urged Vilardo to deny the defense team's motion to adjourn the trial.

"At bottom, the defendant does not want to be sentenced to the death penalty," prosecutors said in a court filing last week. "And his lawyers are working tirelessly to try to save him. Part of this strategy will be to delay – whether it is in hopes that a new administration will change their mind in the future; to plant appellate issues so that the record is replete with post-conviction litigation; or in pursuit of weakening the government's case."

Meanwhile, Gendron's defense team presses for a delay in voir dire.

Calling it a "constitutional imperative," Gendron's defense lawyers initially suggested a Sept. 8, 2026, start date for courtroom jury selection. That would have meant 1,520 days between indictment and voir dire, a span longer than all but eight of the 34 capital case defendants in the project's analysis.

"We maintain that, if we are forced to proceed to trial on a more accelerated schedule, we will be unable to render the effective assistance of counsel to which Payton Gendron is entitled under the Sixth Amendment," his defense team said in a court filing.



**In court for first time in two years, Tops gunman hears judge say 'we're not adjourning the trial date for a year'**

Vilardo, however, said last month that he would not agree to that long of a delay.

So, Gendron's lawyers are now asking for voir dire to start in March or April of 2026. That would allow for the start of trial testimony on or after June 1, 2026, the defense lawyers say.

Making that "modest adjustment" would also help prevent any portion of the trial or verdict coinciding with next year's anniversary of the shooting, according to the defense filing.

Estimates of how long it will take to seat a jury range from six to 12 weeks, with the defense lawyers expecting the longest time. If it takes eight weeks, testimony would likely start in early March 2026. The estimated time for both the culpability and penalty phases of the trial is about two months.

"Thus, under the court's current proposed schedule, penalty phase deliberations would be expected to occur precisely around mid-May 2026 – in other words, on or near the anniversary of the shooting," according to the defense filing.



**Judge grants a hearing to May 14 mass shooter on whether he's too young for death penalty**

Prosecutors said Vilardo has been accommodating to the defense team's request for more time.

"All things must come to an end," the prosecutors said in their filing. "This is a serious case. But it is also a straightforward one. What is inescapable, is that the defendant has no incentive to proceed to trial, expeditiously or otherwise."

## 'Push back against the delays'

A stringent protective order in Gendron's criminal case prevents the families' civil lawyers from obtaining evidence they would like in their lawsuits against the social media companies, Elmore-Garcia said.

All of Gendron's social media communications with others are contained in the federal criminal file.



Tops gunman Payton Gendron in state court

Derek Gee, News file photo

"We don't have that because of the protective order," Elmore-Garcia said. So, the federal case affects the civil case, she said.

The victims' families are left to balance their attention between the criminal and civil cases.

"Their minds are focused on punishment, as well as justice, in the broader sense of making our country safer," by holding the social media companies accountable, she said.

"I think we expected undue delays," Elmore-Garcia said. "They can be frustrating, at times. I don't think there's really a playbook for what it is we're doing. We're doing something that has never been done. Although it's been frustrating, at times, I think we are doing our due diligence to make sure that we push back against the unexpected delays at every corner."

Patrick Lakamp can be reached at **plakamp@buffnews.com**

---

IN THIS SERIES

### Complete coverage: United States v. Payton Gendron

3 hrs ago

**Prosecution resists trial delay for Tops gunman: 'Each day this defendant spends in jail alive is a victory' for him**

May 13, 2025

**Tops gunman loses bid to dismiss hate-crime count tied to those he did not kill**

Apr 22, 2025

**Judge refuses to dismiss death penalty option over grand jury questions in Tops massacre case**

⌄ **31 updates**

Next ❯

*United States v. Payton Gendron*

**22-CR-109-LJV**

# EXHIBIT D



**Gosnell a study in overcoming adversity**
*Bills' undrafted wideout has the skills and determination to be a success* | PAGE C1

# THE BUFFALO NEWS

BUFFALONEWS.COM    *Serving Western New York since 1880*    WHERE **YOUR STORY** LIVES    *Copyright 2025*    WEDNESDAY, MAY 14, 2025

**BUFFALO NEXT:**
**BUSINESS OF SPORTS**

## Take a seat: Bills install first six in new stadium

*Construction is 'well ahead' of halfway point*

The first six seats are in – only about 59,994 to go.

The installation of the approximately 60,000 seats in the Buffalo Bills new stadium will take place throughout the summer and into the fall. Those first six seats were placed in the stadium last week and anchoring and bracketing for rails has been put down for more seats to be installed in the lower bowl as part of a process that is expected to take around six to seven months.

"We've met every milestone we've had so far – digging the hole, breaking ground, topping out and now with seats," said Matt Sikora, Turner Construction's general superintendent.

**MIKE PETRO**

It's another critical step in getting things done inside the stadium so that it is completed by July 2026 – a date that is not negotiable, said Pete Guelli, executive vice president and COO of the Bills. The approximately three-year project remains on time as the team approaches two years since the groundbreaking in June 2023.

"It's pretty gratifying to see where we are at this point," Guelli said. "It feels close. It's exciting to see some of the spaces closing in and visualizing where people will be in the stadium."

The placing of the seats can be a time-consuming task. There will be around 10 crew members working on it until almost the end of the year.

The first part of the process includes stadium construction workers pouring

Please see **STADIUM**, Page A6

---

**ANALYSIS**

## *Trump still flouting norms with Qatari jet*

**CHARLIE SAVAGE**
New York Times

WASHINGTON — During Donald Trump's first term, the idea that special interests and governments were buying meals and booking rooms at his hotels set off legal and ethical alarms about the potential for corruption.

Trump's second term is making those concerns look trivial.

The administration's plan to accept a $400 million luxury jet from the Qatari royal family is only the latest example of an increasingly no-holds-barred atmosphere in Washington under Trump 2.0. Not only would the famously transactional close ex-ecutive be able to use the plane while in office, but he is also expected to transfer it to his presidential foundation once he leaves the White House.

The second Trump administration is showing striking disdain for onetime norms of propriety and for traditional legal and political guardrails around public service. It is clearly emboldened, in part because of the Supreme Court's ruling last year that granted immunity to presidents for their official actions and because of the political reality that Trump's hold on the Republican Party means he need not fear impeachment.

Trump's inaugural committee raked in $239 million from wealthy business interests hoping to curry his favor or at least avoid his wrath, more than doubling the

Please see **JET**, Page A4

---

**5/14: THREE YEARS LATER**

# Remembering 10 lost on Buffalo's darkest day



Twilight wanes over the 5/14 Memorial at Tops on Jefferson Avenue on Tuesday. It was three years ago today that a white supremacist killed 10 Black people and injured three other people at the Tops Markets on Jefferson Avenue.

JOED VIERA, BUFFALO NEWS

    

Katherine 'Kat' Massey    Margus Morrison    Celestine Chaney    Andre Mackniel    Ruth Whitfield

    

Roberta Drury    Heyward Patterson    Geraldine Talley    Aaron Salter Jr.    Pearl Young

---

## Long wait for justice in death penalty trial

**PATRICK LAKAMP**
News Enterprise Editor

Some 1,038 days have passed since a federal grand jury indicted Payton Gendron for his deadly racist rampage on May 14, 2022.

The start of in-court jury selection for his death penalty trial will not begin until Jan. 5 at the earliest – 1,274 days after the indictment.

The nearly 42 months may seem like a long wait.

But it is also the average wait, according to data from the Federal Death Penalty Resource Project.

Across the country between 2010 and 2020, 34 federal defendants proceeded to and completed trials in death penalty cases. On average, the defendants waited 1,299 days between indictment and the start of voir dire, the legal process where potential jurors are questioned to determine their suitability for jury service.

Gendron already has been sentenced by an Erie County judge to life in prison without parole on his guilty pleas to state charges of first-degree murder for the 10 he killed and second-degree attempted murder for the three he wounded, among other charges.

"Unlike a defendant whose liberty is at stake, each day this defendant spends in jail alive is a victory" for him, according to a recent court filing, signed by three prosecutors with the U.S. Attorney's Office for the Western District of New York and two trial attorneys for the U.S. Department of Justice in Washington.

In the meantime, "an exceptional amount of patience" is required of victims' families who filed civil suits in State Supreme Court against social media companies, among others, for their reported roles in the radicalization

Please see **JUSTICE**, Page A6

---

## *Holding trauma of tragic day is complicated*

It's May 14, the anniversary of the racist attack at Tops on Jefferson Avenue that left 10 people dead, three injured, and countless others traumatized, bereaved and angry.

It comes naturally to us to mark such occasions because we don't want to forget, but also because we cannot forget.

**DAN HIGGINS**

What do you do with memories tied to intense trauma, grief and fear? And how do we navigate those feelings when those awful memories also are connected to people we lost and loved, with whom we celebrated our joys, our accomplishments and the daily

Please see **HIGGINS**, Page A6

---

**INDEX**

| | | | |
|---|---|---|---|
| Asking Eric | B7 | Classified | C7 |
| City & Region | B1 | Comics | C9 |
| Buffalo Next | B3 | Crossword | C10 |
| Horoscope | C7 | Opinion | A10 |
| Local News | B6 | Sports | C1 |
| Obituaries | B4 | Television | B8 |



**WEATHER**
Breezy and cloudy, High 73, low 59. Details on Page B8




**$3.00**
Newsstand and machine price

## CONTINUED FROM THE COVER

# Tops killer loses bid to drop hate-crime count

**PATRICK LAKAMP**
News Enterprise Editor

A federal judge Monday refused to dismiss the hate-crime count tied to those who were not killed or wounded during the Tops gunman's racist rampage on May 14, 2022.

Payton Gendron's lawyers had asked U.S. District Judge Lawrence Vilardo to dismiss the charge covering his attempt to kill the Black shoppers and workers who were not struck by his barrage of 60 bullets at the Tops Markets on Jefferson Avenue.

Gendron's defense team said the 27th and last count in the indictment – the only one not tied to the 10 people Gendron killed and three he wounded – did not include identifiable victims, so it should be dismissed.

"The arguments made by both sides beg the question: What does it mean to identify an intended victim in this context?" Vilardo said in his 14-page ruling. "It could mean, for example, that the indictment must list the first and last name of every intended victim. Or it could mean that the indictment must give enough detail to discern the identity of each intended victim with reasonable certainty. This court holds that it means the latter."

The indictment's 27th count identifies the intended victims as Black people who were in and around the Tops grocery store at the time of Gendron's attack, Vilardo said.

"So the indictment refers to a discrete group of people in a particular location, on a particular date, and at the particular time when Gendron allegedly arrived and began shooting," he wrote.

Also, the names are not essential in the indictment because the information the government later turned over to the defense team identified by first and last name the 66 people who were in front of or inside the store at the time of the attack, but not shot, Vilardo said.

Prosecutors scoffed at the defense motion to dismiss the count, saying the motion "defies both reason and the law."

During a court proceeding in March, U.S. Department of Justice trial attorney Daniel Grunert said the indictment sufficiently identified the victims as Black people, other than those who were shot, who were in and around the Tops grocery store. The government's pleadings make clear that Gendron "embarked on a mission to kill as many Blacks as possible," prosecutors said in their court filing.

The count includes enough other information to identify the targets of his attempted hate crime against them, Grunert said. So the indictment did not need to provide the names of victims, Grunert told Vilardo.

Gendron, 18 years old at the time of his attack, drove from his Binghamton-area home to the grocery store and got out of his car wearing a tactical-style helmet, camouflage clothing, body armor and a video camera. He carried a Bushmaster XM-15 .223 caliber rifle and multiple loaded magazines.

He fatally shot three Black people in front of the store – Roberta Drury, 32; Pearl Young, 77; and Heyward Patterson, 67 – and wounded another.

After entering the store, he kept shooting and killed seven more Black people: Ruth Whitfield, 86; Celestine Chaney, 65; Aaron W. Salter Jr., 55; Andre Mackniel, 53; Margus Morrison, 52; Katherine Massey, 72; and Geraldine Talley, 62.

But Gendron did not shoot at only them. So a federal grand jury added a charge to cover the intended victims who were not shot.

The grand jury returned a 27-count indictment against Gendron in July 2022, and the Justice Department announced in January 2024 that it will seek the death penalty against Gendron.

Gendron already has been sentenced by an Erie County judge to life in prison without parole on his guilty pleas to 10 state charges of first-degree murder and three counts of second-degree attempted murder, among other charges. Gendron's federal public defenders have said he would plead guilty to the federal charges if the government drops the death penalty as a potential punishment.

---

## Justice

*From A1*

of Gendron, according to a Buffalo lawyer representing families of three people who were murdered in the shooting.

The next step in the civil cases comes on May 20, when the Appellate Division in Rochester will hold arguments on appeals over Supreme Court Justice Paula L. Feroleto's rulings denying motions to dismiss the civil complaints.

"At each stage of the litigation, delay is a useful tactic for them," attorney Kristen Elmore-Garcia said of the defendants. "It's the plaintiff's job ... to really push the litigation forward. Because if it was up to the other parties, these cases would go on for decades. It's our job to really churn the administration of justice forward, and you have to fight for every single inch of it."

According to the Federal Death Penalty Resource Project data, 18 of the 34 defendants waited longer than the 1,274 days Gendron would wait if U.S. District Judge Lawrence Vilardo sticks to the tentative Jan. 5 start date for courtroom questioning of prospective jurors in his case.

A couple of defendants among the 34 waited around 3,000 days. Dylann Roof, who shot and killed nine people at a Charleston, S.C., church, waited 495 days, according to the project, part of the Defender Services Office of the Administrative Office of the United States Courts, which assists the defense in federal capital prosecution cases.

Vilardo has said the Jan. 5 date is not yet set "in stone," and he asked prosecutors and defense lawyers to weigh in on how long the trial should be postponed, if at all.

The grand jury returned a 27-count indictment against Gendron in July 2022, and the Justice Department announced in January 2024 that it will seek the death penalty against Gendron.

The prosecution urged Vilardo to deny the defense team's motion to adjourn the trial.

"At bottom, the defendant does not want to be sentenced to the death penalty," prosecutors said in a court filing last week. "And his lawyers are working tirelessly to try to save him. Part of this strategy will be to delay – whether it is in hopes that a new administration will change their mind in the future; to plant appellate issues so that the record is replete with post-conviction litigation; or in pursuit of weakening the government's case."

Meanwhile, Gendron's defense team presses for a delay in voir dire. Calling it a "constitutional imperative," Gendron's defense lawyers initially suggested a Sept. 8, 2026, start date for courtroom jury selection. That would have meant 1,520 days between indictment and voir dire, a span longer than all but eight of the 34 capital case defendants in the project's analysis.

"We maintain that, if we are forced to proceed to trial on a more accelerated schedule, we will be unable to render the effective assistance of counsel to which Payton Gendron is entitled under the Sixth Amendment," his defense team said in a court filing. Vilardo, however, said last month that he would not agree to that long of a delay.

So, Gendron's lawyers are now asking for voir dire to start in March of April of 2026. That would allow for the start of trial testimony on or after June 1, 2026, the defense lawyers say.

Making that "modest adjustment" would also help prevent any portion of the trial or verdict coinciding with next year's anniversary of the shooting, according to the defense filing.

Estimates of how long it will take to seat a jury range from six to 12 weeks, with the defense lawyers expecting the longest time. If it takes eight weeks, testimony would likely start in early March 2026. The estimated time for both the culpability and penalty phases of the trial is about two months.

"Thus, under the court's current proposed schedule, penalty phase deliberations would be expected to occur precisely around mid-May 2026 – in other words, on or near the anniversary of the shooting," according to the defense filing.

Prosecutors said Vilardo has been accommodating to the defense team's request for more time.

"All things must come to an end," the prosecutors said in their filing. "This is a serious case. But it is also a straightforward one. What is inescapable, is that the defendant has no incentive to proceed to trial, expeditiously or otherwise."

### 'Push back against the delays'

A stringent protective order in Gendron's criminal case prevents the families' civil lawyers from obtaining evidence they would like in their lawsuits against the social media companies, Elmore-Garcia said.

All of Gendron's social media communications with others are contained in the federal criminal file.

"We don't have that because of the protective order," Elmore-Garcia said. So, the federal case affects the civil case, she said.

The victims' families are left to balance their attention between the criminal and civil cases.

"Their minds are focused on punishment, as well as justice, in the broader sense of making our country safer," by holding the social media companies accountable, she said.

"I think we expected undue delays," Elmore-Garcia said. "They can be frustrating, at times. I don't think there's really a playbook for what it is we're doing. We're doing something that has never been done. Although it's been frustrating, at times, I think we are doing our due diligence to make sure that we push back against the unexpected delays at every corner."

### 'Working tirelessly to save him'

---

## Higgins

*From A1*

rhythms of life?

It's complicated.

"The first thing you need to do is recognize that what people are feeling is their reality," said Pastor James Giles, who leads Back to Basics Outreach Ministries in Buffalo. In addition to being a pastor, Giles is a mental health counselor who has treated a number of people whose lives were directly touched by the events of 5/14.

"You don't say to someone, 'There's no need to feel that way,' or 'You're wrong to feel that way.' That's not helpful," he said.

What is helpful, he said, is building trust. Encouraging people to speak honestly about their emotions. Showing up not just with words but with action.

"You pull them up to the next level," Giles said. His clients have included people who lost loved ones in the attack. Others lost jobs or housing after encountering difficulties getting promised relief funds. He has worked with teens who were touched by the violence and who are now afraid to go into grocery stores.

Some are healing well. Some have a longer way to go.

We talked about how the trauma of 5/14 is singular in its horror, but not in its context. The mass shooting was like a boulder dropped into a still pond in the way it sent shock waves in every direction. But it landed in a neighborhood where the water already was churning, where violence, poverty and systemic racism and neglect have long shaped daily life.

"For me, the mass shooting that took place is not any more significant than when the 3-year-old got killed, the young boy Ramone 'Red' Carter," Giles said.

Carter, just 3 years old, was shot and killed while riding his tricycle near a family gathering last June on Domedion Avenue. His 7-year-old sister was shot, too, and survived. Two teenagers have been charged.

Giles didn't stop there. He remembered Jazzmine Fomby, 14, a student at Buffalo Charter School, killed last year when six teenagers were shot in a parking lot on Alexander Place. And Raymond Patterson, also 14, who was shot and killed 11 years ago on a footbridge that crosses the Kensington Expressway near Roosevelt Park.

These were just a few examples. Each loss left its own wound in a family and the community. They are part of the story now, Giles said, and part of the reason marking the anniversary of 5/14 is not a simple thing.

Because while it's right and human to remember what happened that day – to honor the lives lost and reject the hate that took them – it's also true that many in the community were already carrying deep grief long before the world came to Jefferson Avenue.

And they still are.

Giles agrees that remembering 5/14 is important. But he also urges care and caution today.

"You have to remember," he said, "that people are carrying trauma – and not everyone wants to have that reopened every time the date comes around." That's part of what makes this anniversary so difficult: the balance between remembering and retraumatizing. Between public acknowledgment and allowing people their own, personal grief.

Despite the fact that 5/14 brought the world to our doorstep – the president of the United States laying flowers on the corner of Jefferson and Landon, media trucks broadcasting live from a gravel lot across from the store – it wasn't the beginning of the story. And it's not the end.

If there's anything to take from this day, perhaps it's that we remember all of it. The names we know and the names we don't. The visible wounds and the ones that are buried. The trauma of 5/14 and the traumas that came before and after.

And that we keep showing up. Not just today. But in the quiet weeks and months that follow, when the cameras are gone and healing still has to happen.

Because it's complicated, isn't it?

---

## Stadium

*From A1*

the concrete steps that go on top of the prefabricated stands, helping set each aisle. Once those are laid, the work is turned over to the seat contractor, Irwin Seating Co.

Irwin has placed seats in 18 of the 30 NFL stadiums, as well as doing seating in more than half of the venues for the NHL, MLB and NBA.

The company's installation service workers lay out bracket supports and vertical brackets, before installing the rail mounts that hold and support the main body of the seats. Those brackets and rails already can be seen throughout some of the first level inside the Bills new stadium. An entire area of them will be set up before seats are placed.

Once that's done, the seats simply slide down and snap into the clips. Seat arms are added and then the cupholders.

"We've got to do that 60-some thousand 'times,'" Sikora said. "We'll be doing seats all summer long."



Plastic wraps the first seats installed at the site of the new Buffalo Bills stadium. About 60,000 in total will be installed in a process that will take approximately seven months.
JOSHUA BESSEX, BUFFALO NEWS

There are two crews – one that does the anchor and drilling and the other works on the brackets, before seats are placed in each area.

They will focus on finishing first along the south side of the stadium in the lower bowl and then put seats in the club sections, suites and mid-bowl. The same process will be repeated in the upper bowl to finish the seating.

Another important part of what is going on right now inside the stadium is at the ground level, where the systems needed for grass growth for the natural sod field are being put into place. The team hopes to have grass growing by Thanksgiving, Sikora said.

The north end of the field has already been turned over to the field contractor, SCG Fields, which is working on the main drain line. The south end will be turned over to SCG Fields in June and that's when the field will be off limits for final installations and grass growth.

The first growing season will be in October, which will test the heating and air systems so that the grass can make it through winter. The second growing season starts next spring as the Bills prepare for the fall 2026 season.

As for construction around the stadium, the prefabricated stands, or structural precast, forming the sections, stairways and aisles all around the stadium, have been placed. Also, the bracketing is up to place the huge video boards on both sides of the facility, and the final pieces of the fifth and final level, or the canopy, are being installed.

The topping out ceremony for the final pieces of the major structural steel to be placed on the project was held in April. This project will include 21,000 pieces of steel and a million and a half square feet of concrete.

Speakers are up throughout the stadium, including under the canopy. Scaffolding is set up high in the air under one part of the canopy for installation work being done. The canopy will not only provide coverage from the elements to about 65% of fans in the stadium but will also serve other purposes, including being able to melt snow on the roof and helping to hold sound in the stadium.

The stadium is now "well ahead" of the halfway point in the construction process, Guelli said. The team will need to have an event or two, though, before the Bills play a preseason game in August 2026 to make sure everything is ready for the regular season.

"We need a window in there to test it out," Guelli said. "We don't want the first thing we do in that building is to play a football game. We'd love to make sure everything is working properly before we do that."

Whether it's overtime or continuing to work throughout the week and into weekends, the stadium will be ready by July 2026, Guelli said.

"Whatever it takes to get this building open, we will do," he said.

*United States v. Payton Gendron*

**22-CR-109-LJV**

# DEFENDANT'S EXHIBIT E

# THE BUFFALO NEWS

BUFFALONEWS.COM    *Serving Western New York since 1880*    WHERE **YOUR STORY** LIVES    *Copyright 2025*    Thursday, May 15, 2025

# Inflation rebate checks to come later this year

*Over 8 million people across the state could get as much as $400*

**ROBERT GAVIN**
Albany Bureau Chief

ALBANY – Western New Yorkers will get a financial boost this fall in the form of inflation rebate checks that for some households will be as high as $400.

While the amounts on the rebate checks will vary depending on individual circumstances, all recipients are set to receive their money in September and October, according to Gov. Kathy Hochul, who spearheaded the financial refunds last December as a way to help inflation-zapped New Yorkers. Lawmakers finalized the financial relief Thursday evening in approving the $254 billion state budget.

Statewide, the checks will go to 8.2 million New Yorkers. That includes 585,000 households in Erie, Niagara, Chautauqua, Cattaraugus and Allegany counties, and 513,000 households in the Finger Lakes region, which includes Wyoming, Orleans and Genesee counties.

For single taxpayers who earn up to $150,000, it will be a check as high as $200. For joint filers, it will be a check as high as $400. The governor's office broke it down as follows:

■ Single filers, heads of households and married people filing separately from their spouses who make $75,000 or less will receive $200.

■ Single filers, heads of households and married people filing separately from their spouses who earn more than $75,000 but less than $150,000 will receive $150.

■ Joint married filers or qualified surviving spouses who make $150,000 or less will receive $400.

■ Joint married filers or qualified surviving spouses who make more than $150,000 but less than $300,000 will receive $300.

In a news release, the governor's office noted that to receive the money there is no need to apply, sign up or do anything else. The money, the governor said during an appearance in New York City on Wednesday, was available because inflation led to more sales tax revenue than was expected.

"We're going to give it back directly – no red tape, no hoops to jump through; just giving you that check," Hochul said. "When it comes time to be shopping for fall, school clothe, and supplies, and it's going to be $400 right here – that's what we're doing for families."

The inflation rebates were in a budget revenue bill that passed the Assembly 103-46 and passed the Senate 35-27.

Please see REBATES, Page A6

# Prison chief says strike leaders earned ban by threatening staff

**ROBERT GAVIN**
Albany Bureau Chief

ALBANY – The commissioner of New York's state prison system told a joint legislative panel Wednesday that leaders of the recent correction officer strike used the "threat of force" to keep fellow officers from returning to their jobs, earning a lifetime ban from state employment.

"People that were leaders of the strike will never work for DOCCS or the state of New York. It's just not happening," State Department of Corrections and Community Supervision Commissioner Daniel Martuscello told lawmakers.

Martuscello testified at a hearing on the Safety of Persons in Custody, Transparency and Accountability Within State Correctional Facilities held by a joint panel of the Senate Committee on Crime Victims, Crime and Correction, and the Assembly's Committee on Correction.

As the first witness called to testify, Martuscello divulged that the 22-day strike between February and March has left his agency around 4,500 correction officers short as it tries to institutionally reform its 42-facility system. Gov.

Kathy Hochul fired some 2,000 of the officers, whom she said engaged in an illegal strike in violation of the state's 1967 Taylor Law, which allows public employees to organize, elect union representatives and engage in collective bargaining. It also makes it illegal for them to strike and allows for punishments for strikers that includes jail time. The strikers walked off the job without the approval of the New York State Correctional Officers Police Benevolent Association, the union that represents

Please see PRISON, Page A6

# *Solemn tribute*

Photos by Libby March, Buffalo News



Shawanda Rogers weeps as she hugs the pillar commemorating her father, Andre Mackneil, during a ceremony honoring the victims and survivors of the mass shooting on May 14, 2022, outside Tops on Jefferson Avenue in Buffalo. Mackneil was buying a birthday cake for his 3-year-old son when he was shot and killed. For more stories and photos, see Page B6.




Left: Wayne Jones, right, who lost his mother, Celestine Chaney, in the mass shooting, sits with his wife, Halimah Jones, during a ceremony marking the three-year anniversary. Above: Tiffany Gaines, holding a cluster of flowers, claps at the close of the ceremony remembering the victims and survivors.

# Trump's opponents learning to react to his thought patterns

**DAVID SANGER**
New York Times

WASHINGTON — President Trump has long reveled in his reputation as a maximalist, issuing a huge demand, creating a crisis and setting off a high-pressure negotiation.

But increasingly often, he ends up backing down and simply declaring a win. His opponents appear to be catching on, sharpening their tactics based on Trump's patterns and his unapologetically transactional attitude toward diplomacy.

The dynamic has played out in recent weeks as Trump backed off, to varying degrees, on his plans to transform Gaza into the "Riviera of the Middle East," turn Canada into the 51st state and beat China into submission with tariffs.

Now, two very different tests are emerging. One is over where Trump stands, with America's biggest allies or with Russian President Vladimir Putin, on preserving Ukraine's sovereignty and safety in any ceasefire deal. The other, with Iran, may determine whether he is really willing to stand aside and let Israel bomb Iran – or join in, despite the risks – if

Please see TRUMP, Page A6

**INDEX**
Asking Erie ....... B7
Buffalo Next ....... B1
City & Region ....... B1
Classified ....... C9
Comics ....... B7
Crossword ....... C11
Horoscope ....... B7
Obituaries ....... B5
Opinion ....... A8
Picture Page ....... C12
Sports ....... C1
Television ....... B8

**WEATHER** Sun, a few showers. High 75, low 64. Details on Page B8

**$3.00** Newsstand and machine price



Mind Over Foundation
MIND OVER MILES
2025
24 HOUR RUN
MAY 17TH – MAY 18TH
12PM START – DELAWARE PARK
ADVOCATING FOR PHYSICAL ACTIVITY, COMMUNITY, AND FRIENDSHIP FOR MENTAL HEALTH AND SUICIDE PREVENTION
Scan to Register & Support

## LOCAL NEWS

# 5/14 Commission moves closer to having permanent memorial

**JUSTIN SONDEL**
News Staff Reporter

Members of the 5/14 Memorial Commission celebrated approval of a land acquisition the day ahead of the commemoration of the May 14, 2022, racist mass shooting at the Jefferson Avenue Tops Markets that will allow the installation of a permanent memorial to move forward.

The Common Council approved the purchase or transfer of 18 lots at the corner of Jefferson Avenue and Best Street that will become the home of the permanent memorial honoring the 10 Black people killed in the attack.

Representatives from Gov. Kathy Hochul's office, Mayor Chris Scanlon, Council members and memorial commission board members gathered at City Hall to mark the occasion and talk about the importance of having a permanent place to honor and preserve the memory of the victims.

Masten Council Member Zeneta Everhart, whose son Zaire Goodman was shot in the attack, but survived, is also a commission board member. Everhart thanked those involved in moving the process forward, including the property owners, some of whom donated their parcels for the memorial.

"This memorial will be a living, breathing entity that will not only teach the community



Polly Sheppard visits the 5/14 Memorial outside of Tops on Jefferson Avenue Monday. A land acquisition will allow a permanent memorial to move forward.
*JOED VIERA, BUFFALO NEWS*

about the horrific events of 5/14, but will be a space that teaches the history of African Americans for years to come," Everhart said.

Officials released renderings of the plans last year ahead of the anniversary, unveiling the structure designed by University at Buffalo's Jin Young Song and Douglass Alligood, an architect and partner for the Bjarke Ingels Group. The project is expected to cost $15 million.

Council Majority Leader Leah Halton-Pope said the site will offer the community an affirmation that Black lives and the East Side matter.

"This moment represents

more than a transfer of land," she said. "It is a transfer of purpose, of collective will and of deep resolve to remember those we lost on May 14, and the community that continues to rise in their honor."

Scanlon thanked Hochul, the Council and commission board members for working to see the process through.

"Today's announcement isn't just about transferring property," he said. "It's about the next step in creating a permanent and living space that reflects the strength of the East Side community and ensures the lives we lost are never forgotten."

# Everhart and son celebrate book nook opening at Villa Maria

**JUSTIN SONDEL**
News Staff Reporter

Masten District Council Member Zeneta Everhart and her son Zaire Goodman celebrated the opening of their Zeneta & Zaire's Book Club Reading Nook at Villa Maria College this week. The opening coincided with the third anniversary of the racist attack at the Jefferson Avenue Tops, where Goodman was shot and wounded.

Everhart launched her campaign for Common Council after the attack that killed 10 people and injured three more, in part because she felt moved to do more to fight the epidemic of gun violence, she said.

The reading nook, an extension of the book club the mother and son started after the mass shooting to educate young people on issues like racism, diversity and Black history, is part of the college's new Scott Bieler Center for Academic Excellence.

Everhart, a Villa Maria graduate and a member of the school's board of trustees, said that she was thrilled when college President Matthew Giordano approached her with the idea to create a permanent space to promote the ideals of the book club and offer books they have been collecting.

"It brought me to tears, immediately," Everhart said. "Because, what an honor."

The nook is supported by $75,000 secured by Erie County Legislators Lawrence Dupre and Tim Meyers. Everhart and Goodman have collected tens of thousands of books that will now be kept at the college. The space will host public readings, visits from county schoolchildren and other events.

Everhart said one of the great things about having the nook on a college campus is that it will bring school-age students to the college, exposing them to the higher education environment at an early age.

"It is more than just a book club now," Everhart said. "Because now I envision this as a space where we're bringing little kids onto a college campus, right? That's exposing them to college, showing them what a college campus looks like, and maybe setting them up for their future."

Giordano said the nook is a natural fit at Villa Maria and aligns with the goals of the college.

"The book club embodies the college's mission and values that education can transform lives and create a more equitable society," he said in a statement. "The opening of the reading nook is special to the College not only because Zeneta is deeply committed to community engagement and educational equity, but she is one of our most prestigious alumni."

## BRINGING BACK SOME JOY




LEFT: People line dance Wednesday during a Remembrance Community Gathering in honor of survivors and those who were lost on May 14, 2022, bringing joy back to Utica Street in Buffalo.
RIGHT: DeeDee McDade, left, reaches out for a hug from Grace Tate, while handing out food for residents during a Remembrance Community Gathering Wednesday.
*LIBBY MARCH PHOTOS, BUFFALO NEWS*

## THE NEWS IN BRIEF

### National Fuel investigation finds no gas leaks in Lake View house explosion

National Fuel and the New York State Public Service Commission found "no leaks or other operational issues" in its investigation of the house explosion on Monday in Lake View that killed one woman and left her husband in critical condition.

Karen L. Merkel, spokesperson for National Fuel, said Wednesday the gas utility company looked specifically into its "natural gas delivery facilities serving 5834 West Lane," the address of the house that exploded. Gas service was restored to customers in the neighborhood by Tuesday afternoon, Merkel added.

Joene Pease, 78, died in the explosion, while her husband John Pease, also 78, remained in critical condition at Erie County Medical Center on Wednesday, a hospital spokesperson said.

More than 200 first responders arrived at the scene from more than 20 fire and rescue agencies following the explosion, which occurred at about 8:45 p.m.

The cause of the explosion and fire has been under investigation by Hamburg, state and Erie County fire investigators, and Merkel said National Fuel will continue to assist as needed.

*– Ben Tsujimoto*

### Man on probation taken into custody after police officers pay him a home visit

A South Buffalo man on probation remains in custody on multiple charges after weapons and drugs were found last week when officers paid him a home visit, Erie County Sheriff John C. Garcia reported.

David Forcucci, 46, has been charged with third- and fourth-degree criminal possession of a weapon, seventh-degree criminal possession of a controlled substance, probation violation and two counts of second-degree criminal contempt. He is being held in the Erie County Holding Center.

According to the report, officers from Erie County Probation and the Sheriff's Office Narcotics and Intelligence Unit found some suspected methamphetamine, a 16-gauge shotgun and three daggers on May 9 when they visited his apartment on Culver Road off South Park Avenue.

Garcia noted that Forcucci is restricted from having weapons due to his conviction on a charge of third-degree burglary in November 2023 and because he is the subject of two separate orders of protection.

*– Dale Anderson*

### Dredging project set to begin today at Barcelona Harbor on Lake Erie

Dredging is scheduled to get underway Thursday to remove sediment that has built up in Barcelona Harbor on Lake Erie in Chautauqua County, the U.S. Army Corps of Engineers, Buffalo District, announced.

The project will move about 80,000 cubic yards of material at the mouth of the channel into the harbor and along its west breakwater. It will add about a foot of depth and 10 feet of width to the channel.

The work will not prevent boats from entering or leaving the harbor and is scheduled to be completed by the end of June. All boat operators, including paddle craft, should steer clear of

dredging operations for their own safety, the Corps of Engineers advised.

Barcelona Harbor, which is used for recreational boating, is dredged when the need arises and funds are available, the announcement noted. It was last dredged in 2023, when 65,000 cubic yards were removed. Dredged material is taken to a designated area out in the lake.

Contractor for the project is Ryba Marine Construction Co. of Cheboygan, Mich. A $1.4 million contract was awarded in September, with advanced maintenance dredging added in March, the announcement said.

*– Dale Anderson*



BUFFALO **NEXT**
BuffaloNext.com

**Business news** for the **new Buffalo**

Sign up for our FREE newsletter
BuffaloNews.com/newsletters