UNITED STATES DISTRICT COURT
<u>WESTERN DISTRICT OF NEW YORK</u>

UNITED STATES OF AMERICA                                      22-CR-109 (LJV)

    v.

PAYTON GENDRON,

                        Defendant.

_____

**MOTION TO DISMISS THE INDICTMENT AS IT WAS OBTAINED IN VIOLATION OF THE FIFTH AND SIXTH AMENDMENTS TO THE UNITED STATES CONSITUTION AND IN VIOLATION OF THE JURY SELECTION AND SERVICE ACT**

      Payton Gendron, through undersigned counsel, moves to dismiss the indictment under the Sixth Amendment right to a grand jury drawn from a fair cross section of the community, under the Equal Protection Clause of the Fifth Amendment and under the Jury Selection and Service Act of 1968, 28 U.S.C. §1861, et seq. [the "JSSA"].

I.      INTRODUCTION

      The integrity of the jury selection process relies on transparent and fair procedures, consistent with the Equal Protection Clause of the Fifth Amendment, the Sixth Amendment's guarantee of a jury selected from a fair cross-section of the community, *Taylor v. Louisiana*, 419 U.S. 522, 528 (1975), and the JSSA. The Sixth Amendment and JSSA provide that all litigants in federal courts are entitled to have grand and petit juries selected at random from a fair cross-section of the community. *See* 28 U.S.C. § 1861. The JSSA prohibits discrimination in jury service and mandates the use of systematic procedures to ensure that jury pools reflect a fair and reasonable cross-section of the relevant community. The JSSA also requires that "all records and papers compiled and maintained" by the clerk be preserved and maintained. 28 U.S.C. §1868. When a litigant raises a JSSA challenge, the court focuses its analysis on the fairness and

accuracy of the jury selection process, including the data and algorithms used to select potential jurors. Under a fair cross-section challenge, the court applies the three-pronged test set forth in *Duren v. Missouri*, 439 U.S. 357, 364 (1979).

In the Western District of New York, Black, Hispanic/Latino, and male individuals are systemically and significantly underrepresented in the District's jury lists. To illustrate this point, the grand jury that indicted Payton Gendron was drawn from a pool from which approximately one third of the Black persons expected and one third of the Hispanic/Latino persons expected were missing. *See* Ex. A, Declaration of Jeffrey Martin, at ¶¶ 42, 43. Exacerbating this serious problem and despite the JSSA's directive that the records compiled during the construction of the Master Jury Wheel be preserved, the Clerk failed to preserve the source lists from which the Master Jury Wheel here was constructed. Further, although the JSSA directs that the clerk manage the jury selection process under the supervision of the Court, it appears that the process has been largely delegated to an outside contractor or vendor who was apparently given discretion to determine how jury source lists should be merged and how duplicates were to be identified and eliminated. Rather than managing the process, the Jury Administrator, who conceded there is no written procedure for merging juror source lists, seemed to rely almost entirely on the vendor for information about the content of the jury source lists and how he constructed the master jury list. This problem was compounded by the vendor who apparently failed to document the procedure he used.

Due to the systemic underrepresentation in the District's jury lists, the indictment should be dismissed. Dismissal is also warranted because the source data used to construct the Master Jury Wheel was destroyed in violation of the JSSA mandate that district courts preserve "all records and papers compiled and maintained by the jury commission or clerk before the master

wheel was emptied." 28 U.S.C. § 1868. In this way, the Jury Administrator failed to substantially comply with the JSSA and the Court should dismiss the indictment. Dismissal is also warranted here because the Clerk failed to adequately manage and supervise the jury selection process and to create written guidelines to ensure that the source data would be combined in a uniform manner consistent with the goals of the JSSA and the Sixth Amendment.

II.     PROCEDURAL HISTORY

On July 14, 2022, Payton Gendron was indicted by the March 2022 grand jury that was impaneled on March 25, 2022. (ECF No. 6). On July 21, 2022, Payton Gendron moved the Court to grant him access to grand jury records pursuant to the Fifth and Sixth Amendments and the JSSA. (ECF No. 10). That same day, the defense served on the Jury Administrator a written request for the disclosure of all available public records relating to the formation of the grand jury as an aid to a potential challenge to jury selection procedures. *See* Ex. B. An initial round of briefing on the JSSA motion was completed with the defense's reply on August 17, 2022, at which time the Magistrate Judge indicated he would take the motion "under advisement." (ECF Nos. 10, 12, 17, 18). The Jury Administrator never responded to the defense's July 21, 2022, letter, although the Magistrate Judge's law clerk did provide an email link to counsel on December 8, 2022, for the then-current Jury Plan on the WDNY website. *See* Ex. C.

Beginning on May 17, 2024, and again on June 18, 2024, the Jury Administrator began providing general information that was responsive to the defense's July 21, 2022, requests. (ECF Nos. 169, 184). Shortly after these early disclosures, on July 16, 2024, the Court granted a defense request and directed that the "Clerk of Court shall preserve all jury records related to the Master Jury Wheels from which the Grand Jury was empaneled and from which any petit jury will be empaneled in Payton Gendron's case until further order of the Court." (ECF No. 189).

3

The Court's preservation order remains in effect. Other information was ordered disclosed to the parties, piecemeal, from August of 2024 through late May of 2025 following additional rounds of briefing. (ECF No. 199, 217, 240, 261, 262, 286, 310, 311, 325, 332, 344, 359, 364, 373).

During the process of reviewing this material, it became apparent that the Clerk employed an outside contractor/vendor, Michael Sutera ["Sutera"] to construct the Master Jury Wheel. The Jury Administrator and Sutera have confirmed that all of the source data from which the Master Jury Wheel was comprised, consisting of Buffalo Division voter, Department of Motor Vehicles ["DMV"], tax, disability and unemployment data files was destroyed. No information has been provided as to when or why the source data was destroyed aside from a remark by Sutera that "[p]er our agreement with the state, all data, except the voter data, is removed from the system, once the Master Jury Wheel is put into production." (ECF No. 310).

The Jury Administrator repeatedly relied on Sutera for responses to the defense's queries about the specifications and details regarding the source data and the construction of the Master Jury Wheel. For example, with regard to questions about the process of merging the five source lists, the Jury Administrator, whose response is highlighted in red, gave the following answer:

Item 19. Specifications for Merging Sources. **Response: Needed from Vendor.**
    a. What information was supplied (or data layout) for the DMV source?
    b. What information was supplied (or data layout) for the Tax source?
    c. What information was supplied (or data layout) for the Voter source?
    d. What information was supplied (or data layout) for the "Disab" source?
    e. What information was supplied (or data layout) for the "Unemp" source?
    f. Were any groups eliminated from the source data? If so, which groups?
    g. Please supply the specifications of how the sources were merged.
    h. What fields or data were used to determine matches of data between the sources?
    i. If data that would be used for matching is not available, how does matching occur?
    j. How were records without a date of birth matched to other sources?
    k. For matching records, how was conflicting data such as address resolved?

> l. Were all records on each source used in the merger of data?
>
> m. Was there an analysis of the merged list for duplications? If so, what sort of duplication analysis was done?
>
> n. Was a proportion of the merged list or Master Jury Wheel assigned to each source? If so, what proportions were assigned to each source?
>
> o. Is the source identified on the Master Jury Wheel?

(ECF No. 261-1 at 2-3). Similarly, the Jury Administrator relied on Sutera for information about the content of the source data, such as what information was produced and/or excluded in the five data sets used to create the Master Wheel. (ECF No. 261-1 at 4-5).

The Jury Administrator also relied on Sutera to answer questions about whether the data was available, whether any records were eliminated, what the 'as of' date of the data was, and what data layout or fields were included. *Id*. Similarly, for questions about whether the DMV data included personal identification cards, expired licenses or persons younger than 18, the Jury Administrator responded with "Response: Needed from Vendor." (ECF No. 261-1 at 4). For questions about the tax data set, the Jury Administrator deferred to Sutera about what tax year was included, whether persons under 18 were included, and whether the tax data included and identified joint filers. (ECF No. 261-1 at 5). Regarding voter data, the Jury Administrator responded "Response: Needed from Vendor" as to whether the data included both active and inactive voters. *Id*. Regarding whether the disability and unemployment data include birth dates along with spouses and dependents, the Jury Administrator likewise answered "Response: Needed from Vendor." *Id*.

Although Sutera was able to supply some general information relating to his work, he was unable to provide responses to many questions that directly related to his work in constructing the Master Jury Wheel that were relayed to him by the Jury Administrator. For example, in response to the question about the 'as of' date for the DMV data produced in 2021,

Sutera responded, "I don't know, sorry. Data has been removed from systems." (ECF No. 311 at 1). When asked whether expired DMV license data was included in the dataset, Sutera responded "[d]o not know, only used data required for the input into the Master Jury Wheel. I.E. Name and Address, (if available, date of birth, SSN)." *Id*. Sutera was also non-committal with respect to whether the DMV data included personal identification cards stating "I believe Driver ID was provided." *Id*. Regarding the tax data, Sutera's response to queries about the 'as of' date and which tax years were included was "[s]orry, data has been removed from system" and "I have no idea. I assume the current tax data base or what was requested by the court" respectively. (ECF No. 311 at 2). Regarding whether persons younger than 18 years of age were included in the data, Sutera responded "I have no idea, did not test for under 18." *Id*.

Regarding voter data, Sutera supplied the following answers for the data produced in 2021:

> Q: What is the as of date of the data?
>
> A: Sorry, data has been remove[d] from system. Normally it is current as of the last SOS update [w]hen the data is requested.
>
> Q: Were both active and inactive voters included?
>
> A: I believe the request was for all registered [v]oters. Voter status is not used in the JMS data [b]ase.

*Id*.

The defense has previously explained that, because the District uses five sources of names to create the Master Jury Wheel, individuals included in multiple lists will appear as duplicates on the Master Jury Wheel. (ECF No. 325). Undetected duplicates necessarily impact the representativeness of the Master Jury Wheel as the actual demographic statistics are skewed by these duplicates. *Id*. The presence of undetected, unresolved duplicates has the effect of destroying the randomness of the draw of jurors from the jury wheel because persons included

on all five source lists potentially could be listed five times and, as a result, are five times more likely to be drawn than a person listed once. *Id*.

Before it became apparent that the compiled source data used to create the Master Jury Wheel had been destroyed, the Court ordered the Jury Administrator to obtain and redact the source data from Sutera and to disclose it to the parties, finding that "[t]his Court agrees that source data qualifies as a record used by the Clerk in connection with the jury selection process that may be necessary for the preparation of a motion challenging the creation of the master wheel." (ECF No. 286 at 11) (cleaned up). After it was revealed that Sutera had destroyed the source data the Court directed the Jury Administrator to disclose, the defense moved the Court to direct the Jury Administrator to re-compile the destroyed source data and disclose it to the defense. (ECF No. 325). The Court denied the motion because "[t]he request to reproduce data sets goes beyond records and papers already in existence." (ECF No. 359 at 6) (cleaned up). The Court also rejected the defense's request for the disclosure of current source data. *Id*.

III.   PROCEDURAL REQUIREMENTS AND DEFICITS

The JSSA mandates that district courts enact procedures designed to produce a random selection of grand jurors. Title 28 U.S.C. §1863(a) requires district courts to create and implement a written plan for the random selection of grand jurors that is designed to achieve the JSSA's objectives. Before the written plan is operational, a reviewing panel must analyze it to ensure that it complies with the JSSA by generating a random selection of a fair cross section of those residing in the district. 28 U.S.C. §§ 1863(a) & (b)(3). The JSSA further directs that a district's jury plan must "specify detailed procedures to be followed" in selecting names from source lists of potential jurors. 28 U.S.C. § 1863(b)(3). It must also provide information about whether the source data will be obtained from voter registration lists or lists of actual voters in

addition to other data sources that will be relied upon to "foster the policy and protect the rights secured by sections 1861 and 1862 of this title." 28 U.S.C. §1863(b)(2). These detailed procedures must ensure proportional representation in the jury wheel. 28 U.S.C. §1863(b)(3).

Recognizing the importance of the data gathered during the creation of a jury wheel, the JSSA mandates that "all records and papers compiled and maintained by the jury commission or clerk before the master wheel was emptied shall be preserved…and shall be available for public inspection for the purpose of determining the validity of the selection of any jury." 28 U.S.C. §1868. As noted above, the JSSA also requires districts' jury plans to "specify detailed procedures to be followed" in creating the master jury wheel.  Where, as here, the lack of any written procedures or specifications for merging source data is accompanied by a failure to preserve the source data itself, biased or unfair practices are shielded from review, thereby undermining public trust in the judicial system. Similarly, a litigant's ability to raise a JSSA or fair cross section challenge is significantly impaired, as is the Court's ability to assess the merits of the challenge, raising broader concerns about the administration of justice.

In this case, the selection process for the grand jury that returned the indictment against Payton Gendron failed to meet the standards established by the JSSA, thereby violating the JSSA and Gendron's rights under the Fifth and Sixth Amendments. None of the five data sources used by Sutera to construct the 2021 Master Jury Wheel that was filled on September 21, 2021, were produced for the defense. *See* Ex. A at ¶¶ 65, 66. As the Court put it, "the vendor does not have the source data, and the clerk's office does not or did not maintain it." (ECF No. 359 at 7).

Through the defense's efforts to identify what specifications or process was used by the Jury Administrator and/or Sutera to construct the jury wheel, the Jury Administrator confirmed that "there were no written instructions provided to the vendor for the production of the Jury

8

Wheel used for the March 2022 grand jury." (ECF No. 364 at 1), *see* Ex. A at ¶ 17, 98. From additional disclosures made to the parties, it appears that the Jury Administrator doesn't know what specifications were used by Sutera to merge the data sources and, instead, relied on the vendor to provide this information in response to the defense's queries. Although Sutera had some limited information about the process and the data sources used to construct the Master Jury Wheel, in many instances he qualified his answers, suggesting that he didn't know or recall what process he had used. *See*, e.g., "I believe", "normally", "I assume." (ECF No. 311 at 1-2), *see* Ex. A at ¶ 74, 84, 85, 86. In several instances, he simply responded, "I have no idea" or "do not know." (ECF No. 311 at 1-2).

Because the Jury Administrator did not provide Sutera with any written specifications or instructions for merging five data sources in the construction of the Master Jury Wheel, and Sutera apparently didn't create or maintain any written record of what he did, it is impossible to know for certain whether the process used by the vendor to create the Master Jury Wheel complies with the requirements of the Sixth Amendment, the JSSA or even the Western District of New York's Jury Plan. *See* Ex. A at ¶¶ 98-102.[1] Relatedly, with such a 'black box' process it is impossible to conclusively identify the systematic factors causing distinct groups to be under-represented. *See* Ex. A at ¶ 104. *See United States v. Davis*, 546 F.2d 583, 589 (5th Cir. 1977) ("If we were left in the dark about the procedures employed behind closed doors, or if we had reason to believe that there were any improprieties which had escaped detection as a result of non-public drawings, the result might be different.").

---

[1] In line with the JSSA, the Western District of New York Jury Plan in effect at the time the Master Jury Wheel was created required that the Clerk of Court "shall retain all jury records and papers compiled and maintained by the Clerk of Court. . ." *See* Ex. C at 8.

9

The information revealed in Court-ordered disclosures relating to the jury selection process suggests that the Clerk failed to exercise the level of supervision and management over Sutera required by the JSSA. Instead, the Clerk apparently delegated discretion for merging the source lists to Sutera and was largely unaware of the process he used. Here, Sutera was responsible for decisions that extended well beyond merely "ministerial" tasks; for example, he was charged with identifying potential duplicate names and eliminating them from the combined source lists. As explained above and in the attached declaration, this step in the process is not a simple or mechanical one, and the manner in which it is accomplished can have significant implications for the resulting master list. *See* Ex. A at ¶¶ 118-9, 123-4. Not only was this task delegated to Sutera, but it seems he was neither given instructions about how to exercise his discretion nor did he maintain any record of how it was done. *See Davis*, at 590 ("We hold that the clerk and his deputies were not required personally to perform every mechanical step in the selection process, as long as they exercised all of the discretion at each step in the scheme where discretion was called for and permitted, and they exercised enough control over the system so that it was responsive to the mandates of the Act and the authority of the court."). Here, both discretion and control over the creation of the Master Jury Wheel were outsourced to a vendor, Sutera, who seems to have been largely unaccountable for the processes he used or the results he produced.

IV.   LEGAL STANDARD

Under 28 U.S.C. § 1867(a), a defendant may move to dismiss the indictment or stay the proceedings if there has been a substantial failure to comply with the JSSA in selecting the grand jury. To establish a prima facie violation of the fair cross-section requirement, a defendant must show:

      A.      "[T]he group alleged to be excluded is a 'distinctive' group in the community";

      B.      "[T]he representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community"; and

      C.      "[T]his underrepresentation is due to systematic exclusion of the group in the jury-selection process."

*Duren v. Missouri*, 439 U.S. 357, 364. If the defendant meets these elements, the burden then falls on the government to demonstrate that a significant governmental interest is "manifestly and primarily advanced by those aspects of the jury-selection process. . . that result in the disproportionate exclusion of a distinctive group." *Id*. at 367-68; *see also United States v. Slaughter*, 110 F.4th 569, 578-79 (2d Cir. 2024).

V.      ARGUMENT

    A. *Distinctive Groups Excluded*

    Black and Hispanic/Latino people are "distinctive" groups in the community, and a claim of underrepresentation of those groups satisfies the first prong of Payton Gendron's fair-cross section claim. *United States v. Slaughter*, 110 F.4th 569, 579.

    Male persons are also a distinctive group in the community. The Supreme Court has concluded that a gender-based group is distinctive for purposes of the fair cross section requirement: "[t]he exclusion of one [sex] may indeed make the jury less representative of the community than would be true if an economic or racial group were excluded." *Taylor v. Louisiana*, 419 U.S. 522, 531–32 (quoting *Ballard v. United States*, 329 U.S. 187, 193–94, (1946)).

    B. *Significant Underrepresentation*

    The second prong of *Duren* involves a determination of whether "the representation of [the distinctive groups] in venires from which juries are selected is not fair and reasonable in

relation to the number of such persons in the community". *Slaughter* at 580 (cleaned up), citing *Duren*, at 364. The Second Circuit has applied several statistical models to assess claims of significant underrepresentation: the statistical decision theory,[2] the absolute disparity method, and the comparative disparity method. *Slaughter*, at 580-1, citing *United States v. Rioux*, 97 F.3d 648, 655–57 (2d Cir. 1996).

The *Slaughter* court summarized these statistical models. "Statistical decision theory measures the likelihood that underrepresentation could have occurred by sheer chance"; in other words, "the more improbable it is that a particular jury pool resulted from random selection, the more likely there is a defect in the jury selection process."[3]  *Slaughter*, at 580 (cleaned up), citing *Rioux*, at 655. In contrast, the absolute disparity method "measures the diminished likelihood that members of an underrepresented group, when compared to the population as a whole, will be called for jury service." *Slaughter*, at 580-81, citing *Rioux*, at 655. Finally, "[c]omparative disparity is calculated by dividing the absolute disparity by the group's percentage in the population, then multiplying by 100 (to turn the figure into a percentage)." *Id*. at 581.

Applying any of these methods of analysis, Black, Hispanic/Latino, and male individuals are significantly underrepresented in the Buffalo Division qualified jury wheel. Jeffrey Martin, an expert in statistical analysis and jury composition, has reviewed and analyzed the data disclosed by the Court. *See* Ex. A. Using any of the approved methods of analysis, there is a "statistically significant" underrepresentation of Blacks, Hispanics/Latinos and men in the jury pool.

---

[2] The statistical decision theory is also known as standard deviation analysis. *See* Ex. A at ¶ 46.
[3] *Id*.

For the 2021 Buffalo Division Qualified Jury Wheel,[4] Form AO-12 reflects the following absolute disparities:

> The Absolute Disparity for Black or African-American persons on the 2021 Qualified Jury Wheel is 3.65% under-representation (8.85% minus 5.21%).

Ex. A at ¶ 36.

> The Absolute Disparity for Hispanic or Latino persons on the 2021 Qualified Jury Wheel is 1.58% under-representation (4.15% minus 2.57%).

Ex. A at ¶ 37.

> The Absolute Disparity for Male persons on the 2021 Qualified Jury Wheel is 1.73% under-representation (48.74% minus 47.01%).

Ex. A at ¶ 38.

Using the comparative disparity method to analyze the same data revealed the following:

> The Comparative Disparity for Black or African-American persons on the 2021 Qualified Jury Wheel is 41.19% under-representation (3.65% divided by 8.85%). That is, more than 1 out of 3 of the Black or African-American persons expected to be in the Qualified Jury Wheel are missing.

Ex. A at ¶ 42.

> The Comparative Disparity for Hispanic or Latino persons on the 2021 Qualified Jury Wheel is 38.02% under-representation (1.58% divided by 4.15%). That is, more than 1 out of 3 of the Hispanic or Latino persons expected to be in the Qualified Jury Wheel are missing.

Ex. A at ¶ 43.

---

[4] Because the Buffalo Division 2021 Master Jury Wheel refilled on September 21, 2021, which was used to select Grand Jurors in this case, omits demographic information while also including some ineligible and exempt persons and potentially duplicated persons, the 2021 Qualified Jury Wheel is instead used in Mr. Martin's statistical analysis.

> The Comparative Disparity for Male persons on the 2021 Qualified Jury Wheel is 3.56% under-representation (1.73% divided by 48.74%).

Ex. A at ¶ 44.

Relying on the same data and applying Statistical Decision Theory, otherwise known as Standard Deviation analysis, a widely accepted tool used by statisticians to analyze data, produced the following results:

> The percentage of Black or African-American persons in the 2021 Qualified Jury Wheel differs from the percentage of Black or African-American persons in the jury eligible population by more than 14 standard deviations. The under-representation of Black or African-American persons is statistically significant. That is, the under-representation is a product of a systematic non-random factor.

Ex. A at ¶ 47.

> The percentage of Hispanic or Latino persons in the 2021 Qualified Jury Wheel differs from the percentage of Hispanic or Latino persons in the jury eligible population by more than 9 standard deviations. The under-representation of Hispanic or Latino persons is statistically significant. That is, the under-representation is a product of a systematic non-random factor.

Ex. A at ¶ 48.

> The percentage of Male persons in the 2021 Qualified Jury Wheel differs from the percentage of Male persons in the jury eligible population by more than 3 standard deviations. The under-representation of Male persons is statistically significant. That is, the under-representation is a product of a systematic non-random factor.

Ex. A at ¶ 49.

### C. *Systematic Exclusion*

The underrepresentation of Black, Hispanic/Latino, and male individuals in the Buffalo Division Qualified jury wheel is the result of "systematic exclusion in the jury-selection process" as reflected by Mr. Martin's conclusion that, over time, "the under-representation of Black or

African-American persons and Hispanic/Latino persons compared to the jury eligible population shows consistent statistically significant under-representation." Ex. A at ¶ 64. Mr. Martin also observes that, "[a] historical review of AO-12 Forms shows consistent under-representation of Black or African-American persons, Hispanic/Latino persons, and Male persons." Ex. A at ¶ 15.

Systematic exclusion may be proven where, as here, a defendant demonstrates that underrepresentation of a distinctive group occurred over an extended time. As observed by a panel of the Second Circuit Court of Appeals in *United States v. Biaggi*, 909 F.2d 662, 678 (2d Cir. 1990) (cleaned up), the "opportunity [for a representative jury] can be imperiled if venires regularly lack even the small numbers of minorities necessary to reflect their proportion of the population." Underrepresentation of Black and Hispanic/Latino persons in the Buffalo Division qualified jury wheel is significant and continuous for the periods for which data was supplied to the defense. Likewise, male persons were consistently under-represented in the Buffalo Division qualified jury wheel.

D. *Substantial Failure to Comply with the JSSA Requires Dismissal*

Pursuant to 28 U.S.C. § 1867(d), upon a showing of substantial failure to comply with the JSSA, dismissal of the indictment is required unless the court finds that the failure to comply was harmless error. Here, the nature and degree of the exclusion coupled with the Clerk's failure to adequately manage and supervise the jury selection process, the failure to create any written guidelines or instructions to ensure that the source data would be combined in a uniform manner consistent with the goals of the JSSA and the Sixth Amendment, and the failure to preserve materials relating to the construction of the Master Jury Wheel constitute a substantial failure that undermines the fairness and integrity of the grand jury process.

A violation of the JSSA becomes "substantial" when it constitutes a significant deviation that frustrates an important JSSA policy. *See United States v. Coleman*, 429 F.Supp. 792 (E.D.

15

Mich. 1977), *United States v. Davis*, 546 F.2d 583, 589. Beyond the systematic exclusion of Black, Hispanic/Latino and male persons and the Clerk's failure to manage and supervise the vendor, other processes employed here frustrated key policies of the JSSA.

While the vendor disclosed that he thought the voter data supplied *probably* included all registered voters, active and inactive, (ECF No. 311 at 2), based on the disparity between data from the New York State Board of Elections and the number of persons included in the 2021 Master Jury Wheel, it appears far more likely that the voter dataset relied upon here excluded inactive voters. Specifically, according to the Board of Elections, the total number of registered voters (active and inactive) for the Buffalo Division on November 1, 2020, was 1,064,758. *See* Ex. A at ¶ 70. In contrast, the number of voters as of November 1, 2020, that were used to create the 2021 Master Jury Wheel was 1,008,087. *See* Ex. A at ¶ 72. The only reasonable explanation for this disparity is that Sutera used only *active* voters to create the 2021 Master Jury Wheel, eliminating more than 56,000 individuals who were registered to vote as of November 1, 2020, from this data source. *See* Ex. A at ¶¶ 69-78.

The exclusion of inactive voters violates the JSSA and the local Jury Plan because it undermines the goal that juries represent a fair cross section of the community. The JSSA provides that "[i]t is further the policy of the United States that all citizens shall have the opportunity to be considered for service on grand and petit juries in the district courts of the United States. . ." 28 U.S.C. § 1861. By excluding those who have been administratively labeled as "inactive" yet who are registered and able to vote, the jury selection process eliminates these citizens from inclusion in the Master Jury Wheel and, thereby, makes it impossible for them to be "considered for service" unless, by chance, their names are included from another data source. The exclusion of registered but inactive voters also runs afoul of the District Jury Plan that

provides that "[t]he lists shall be obtained from the voter registration lists of the political subdivisions within each Division of this district" and supplemented by the five other sources. *See* Ex. C at 2. These excluded citizens who were registered to vote made up a significant 5.32% of the entire pool of Buffalo Division registered voters. *See* Ex. A at ¶ 76.

A further exclusion appears to have occurred in the context of source data from the Department of Motor Vehicles ["DMV"]. In response to questions from the defense about whether the DMV dataset included individuals for whom a non-driver's ID was issued, the vendor responded, "I believe Driver ID was provided[ ]" and, regarding the inclusion of expired licenses in the dataset he responded, "[d]o not know, only used data required for the input in the Master Jury Wheel." (ECF No. 311 at 1), s*ee* Ex. A at ¶¶ 85,86.

In reality, it appears that the number of licenses used to create the 2021 Master Jury Wheel most closely aligns with the number of "D" Driver's licenses while excluding CDL (Commercial Driver's License), ID (Identification only), M (Motorcycle), and Taxi licenses. The DMV data used to create the 2021 Master Jury Wheel included 1,048,575 records. *Id.* at ¶ 83. There are currently 1,310,976 licenses in the Buffalo Division including 1,116,223 "D" licenses. *See* Ex. A at ¶¶ 87-89. Mr. Martin concludes that 14.94% of the people who comprise all other classes of licenses combined (excluding "D" licenses) are Black or African-American; of those with ID only, a huge 17.93% of this group is Black or African-American. *See* Ex. A at ¶ 91. Mr. Martin concludes that if the DMV dataset had been expanded to include licenses other than class "D", the representation of Black persons in the Master Jury Wheel would increase. *See* Ex. A at ¶ 92.

In sum, it appears that the Clerk delegated the important task of merging data sets from five sources to create the Master Jury Wheel to the Jury Administrator, who delegated this

process to the vendor, Sutera. The Jury Administrator neither provided the vendor with directions about how to merge the data sets, nor maintained control over what the vendor did, leaving this process apparently largely in the vendor's discretion. The vendor didn't document important aspects of this process, e.g., how duplicates were eliminated when the datasets were merged; whether inactive voters were included in the registered voter data set; and whether any categories other than "D" licenses were included in the DMV data set. What we do know, however, is that the resulting Master Jury Wheel significantly underrepresented Blacks or African Americans; Hispanics/Latinos; and men, and that the process the vendor used contributed to, if not caused, this systemic underrepresentation.

For all these reasons, the conduct here constitutes a significant and serious deviation from the JSSA that frustrates key policies of the JSSA and the Jury Plan.

VI.    CONCLUSION

For the reasons stated above, the Defendant respectfully requests that the Court, upon a showing of substantial noncompliance with the JSSA, and violations of the Fifth and Sixth Amendments, dismiss the indictment returned by the improperly constituted grand jury.

WHEREFORE, for the foregoing reasons, the Court should grant the relief sought and grant such further relief as the Court deems just and proper.

DATED: July 1, 2025
       Rochester, New York

Respectfully submitted,

*/s/Anne M. Burger*
Anne M. Burger
Supervisory Asst. Federal Public Defender

*/s/Sonya A. Zoghlin*
Sonya A. Zoghlin

        Assistant Federal Public Defender

*/s/MaryBeth Covert*
MaryBeth Covert
Senior Litigator

*s/Julie Brain*
Julie Brain
Attorney at Law