EXHIBIT A

## DECLARATION OF JEFFREY MARTIN

The undersigned, Jeffrey Martin, declares as follows:

1. My name is Jeffrey O'Neal Martin. I am over the age of majority and provide this declaration voluntarily and based on my personal knowledge.

2. I hold a Bachelor's degree in Mathematics and Economics from Vanderbilt University and a Master's degree in Economics from the University of Chicago.

3. I am employed as a consultant on statistical issues, a consultant on actuarial issues, and as a consultant to political campaigns. I have been qualified as an expert on statistical issues in Federal Courts and State Courts.

4. Since 1997, I have been involved in cases involving challenges to the jury lists in Federal and State Courts. I have worked on over 50 cases in Federal Courts.

5. I have been asked by counsel for Payton Gendron to review the construction and demographics of the jury list that was used to select grand jurors in this case.

## SUMMARY OF FINDINGS

6. The data supplied shows an under-representation of Black or African-American persons in the 2021 Qualified Jury Wheel used to select grand jurors. The under-representation is statistically significant.

7. From the limited source data supplied, there are systematic and correctable factors that lead to the under-representation of Black or African-American persons in the 2021 Qualified Jury Wheel, including the choice and age of the source data and the implementation of disqualifications.

8. The data supplied shows an under-representation of Hispanic or Latino persons in the 2021 Qualified Jury Wheel used to select grand jurors. The under-representation is statistically significant.

9. From the limited source data supplied, there are systematic and correctable factors that lead to the under-representation of Hispanic or Latino persons in the 2021 Qualified Jury Wheel, including the choice and age of the source data and the implementation of disqualifications.

10. The data supplied shows an under-representation of Male persons in the 2021 Qualified Jury Wheel used to select grand jurors. The under-representation is statistically significant.

11. From the limited source data supplied, there are systematic and correctable factors that lead to the under-representation of Male persons, including the choice and age of the source data.

12. The data supplied shows an under-representation of Generation Z persons in the 2021 Qualified Jury Wheel used to select grand jurors. The under-representation is statistically significant.

13. From the limited source data supplied, there are systematic and correctable factors that lead to the under-representation of Generation Z persons in the 2021 Qualified Jury Wheel, including the choice and age of the source data and the choice not to include persons who will become eligible when the Master Jury Wheel is implemented.

14. The Rochester Division 2021 Qualified Jury has a similar under-representation of Black or African-American persons, Hispanic or Latino persons, Male persons, and Generation Z persons.

15. A historical review of AO-12 Forms shows consistent under-representation of Black or African-American persons, Hispanic or Latino persons, and Male persons.

16. Persons are excluded from the voter registration list used to create the 2021 Master Jury Wheel, in contrast to the Jury Service and Selection Act.

17. There are several issues with the procedure for creating the 2021 Master Jury Wheel, including, most importantly, the absence of any written instructions or specifications and the choice of the matching procedure.

18. The Silent Generation is under-represented after the excusal for Age 70. The under-representation is statistically significant.

19. Of the 20 persons who were present when the indictment in this case was returned, only 10 were present on all of the days when the case was evaluated.

## THE JURY ELIGIBLE POPULATION OF THE WESTERN DISTRICT OF NEW YORK

20. The jury eligible population is defined as the population that is aged 18 years and older and who are citizens of the United States. While there are other requirements to serve as a juror besides age and citizenship, this definition is standard for the analysis of jury lists and is the basis for census numbers on the Administrative Office of the U.S. Courts' Form AO-12 ("Report on the Operation of the Jury Selection Plan* Completed Pursuant to 28 U.S.C. § 1863(a)"). Form AO-12 is used by federal Courts and Clerks to assess the representativeness of their jury lists.

21. The census numbers used by federal Courts and Clerks are the United States Census Bureau's American Community Survey 5 Year Average which is published every year. The most concurrent numbers to when the indictment in this case was returned on July

14th, 2022, are the census numbers for the year 2022.  This analysis will use the 2022 census numbers.

22. The revised Form AO-12 which was supplied uses the American Community Survey 5 Year Average for the year 2020.

23. The indictment was returned by Grand Jurors selected from the Buffalo Division of the Western District of New York.

24. Using the 2022 American Community Survey 5 Year Average numbers, the jury eligible population for the Buffalo Division of the Western District of New York includes 1,208,467 persons and is 84.07% White persons, 8.85% Black or African-American persons, 0.51% American Indian or Alaska Native persons, 1.61% Asian persons, 0.02% Native Hawaiian or Pacific Islander persons, 1.82% persons of some other race, and 3.12% multi-racial persons.  The jury eligible population is 4.15% Hispanic or Latino persons.  The jury eligible population is 48.74% Male and 51.26% Female.

25. Note that the Post-Enumeration Survey conducted by the United States Census Bureau found that Black or African-American persons, American Indian and Alaska Native, and Hispanic or Latino persons were statistically significantly under-counted in the 2020 decennial census.  If census numbers were adjusted for this undercount, the under-representation shown in the statistical analysis for Black or African-American persons and Hispanic or Latino persons would be greater.

26. The Pew Research Center has defined generations in the population.  The Silent Generation consists of persons born from 1928 to 1945.  Baby Boomers consist of persons born from 1946 to 1964.  Generation X consists of persons born from 1965 to 1980.  Millennials consist of persons born from 1981 to 1996.  Generation Z consists of persons born after 1996.

27. The jury eligible population of the Buffalo Division of the Western District of New York consists of 8.21% from the Silent Generation, 28.91% from Baby Boomers, 24.76% from Generation X, 24.94% from the Millennials, and 13.19% from Generation Z.

## STATISTICAL ANALYSIS OF THE DATA FOR THE BUFFALO DIVISION

28. The 2021 Master Jury Wheel refilled on September 21st, 2021 used to select Grand Jurors in this case does not include demographic information and includes some ineligible and exempt persons and potentially duplicated persons.

29. Self-reported information on race, gender, and Hispanic ethnicity is collected once a person submits a qualification questionnaire.

30. The 2021 Qualified Jury Wheel of persons qualified for jury service in the Buffalo Division is used in the statistical analysis of the representativeness that follows.

31. The supplied Form AO-12 for Part III Sampling of the Qualified Jury Wheel only reflects persons who were qualified for jury service and who also did not receive a temporary excuse from jury service.  This analysis will include all qualified persons.

32. The 2021 Qualified Jury Wheel for the Buffalo Division includes 13,262 persons and is 89.86% White persons, 5.21% Black or African-American persons, 0.54% American Indian or Alaska Native persons, 1.45% Asian persons, 0.08% Native Hawaiian or Pacific Islander persons, 1.41% persons of some other race, and 1.46% multi-racial persons (excluding 141 persons without self-reported racial information).  The 2021 Qualified Jury Wheel is 2.57% Hispanic or Latino persons (excluding 156 persons without self-reported Hispanic ethnicity).  The 2021 Qualified Jury Wheel is 47.01% Male and 52.99% Female (excluding 362 without self-reported gender).  The Qualified Jury Wheel is 10.84% Silent Generation persons, 32.40% Baby Boomer persons, 24.46% Generation X persons, 24.30% Millennial persons, and 8.00% Generation Z persons (excluding 267 persons without self-reported date of birth).

33. There are several standard statistical analyses used to analyze the under-representation of a distinctive group.  The most common and easiest to calculate are Absolute Disparity and Comparative Disparity.  From a scientific perspective, the number of Standard Deviations from Expected or Statistical Decision Theory shows whether the under-representation of a group is systematic or merely the result of "luck of the draw."

## ABSOLUTE DISPARITY IN THE DATA FOR THE BUFFALO DIVISION

34. Absolute Disparity, which is the difference between the percent representation of a group in the population and the percent representation of the same group in the jury list, has the benefit of being very easy to calculate.  Once Absolute Disparity is calculated, then there is a judgment of whether the Absolute Disparity is great enough to reflect a non-representative jury list.  There is no scientifically determined threshold to reflect a non-representative jury list, only that more Absolute Disparity is worse than less.

35. For example, Absolute Disparity is much harsher on smaller populations than it is on larger populations.  A set threshold of acceptable Absolute Disparity of 10% would allow the complete exclusion of Black or African-American persons (8.85% of the population) or Hispanic or Latino persons (4.15% of the population).

36. The Absolute Disparity for Black or African-American persons on the 2021 Qualified Jury Wheel is 3.65% under-representation (8.85% minus 5.21%).

37. The Absolute Disparity for Hispanic or Latino persons on the 2021 Qualified Jury Wheel is 1.58% under-representation (4.15% minus 2.57%).

38. The Absolute Disparity for Male persons on the 2021 Qualified Jury Wheel is 1.73% under-representation (48.74% minus 47.01%).

39. The Absolute Disparity for Generation Z persons on the 2021 Qualified Jury Wheel is 5.19% under-representation (13.19% minus 8.00%).

## COMPARATIVE DISPARITY IN THE DATA FOR THE BUFFALO DIVISION

40. In response to the shortcomings of Absolute Disparity, Comparative Disparity has also been used to analyze jury lists. As a formula, Comparative Disparity is the Absolute Disparity of a group divided by the population percentage of the group. Comparative Disparity (also known as Relative Disparity), or the rate at which a group is under-represented or over-represented, treats smaller groups in the same way that it treats larger groups. That is, Comparative Disparity takes into account the relative size of the distinctive group. If there is a 50% Comparative Disparity under-representation, it reflects that half of the group is missing whether from a larger group such as White persons (84.07%) in the Buffalo Division, or a smaller group such as Black or African-American persons (8.85%). Like Absolute Disparity, there is no scientifically determined threshold of non-representativeness except that more Comparative Disparity under-representation is worse than less.

41. Note that, mathematically, since the population percentage of a group can never be greater than 100% or 1.00, Comparative Disparity which is divided by something less than or equal to 1.00, will always be greater than Absolute Disparity.

42. The Comparative Disparity for Black or African-American persons on the 2021 Qualified Jury Wheel is 41.19% under-representation (3.65% divided by 8.85%). That is, more than 1 out of 3 of the Black or African-American persons expected to be in the Qualified Jury Wheel are missing.

43. The Comparative Disparity for Hispanic or Latino persons on the 2021 Qualified Jury Wheel is 38.02% under-representation (1.58% divided by 4.15%). That is, more than 1 out of 3 of the Hispanic or Latino persons expected to be in the Qualified Jury Wheel are missing.

44. The Comparative Disparity for Male persons on the 2021 Qualified Jury Wheel is 3.56% under-representation (1.73% divided by 48.74%).

45. The Comparative Disparity for Generation Z persons on the 2021 Qualified Jury Wheel is 39.38% under-representation (5.19% divided by 13.19%). That is, more than 1 out of 3 of the Generation Z persons expected to be in the Qualified Jury Wheel are missing.

## STANDARD DEVIATIONS FROM EXPECTED IN THE DATA FOR THE BUFFALO DIVISION

46. Standard Deviation analysis or Statistical Decision Theory is a widely accepted and fundamental tool used by statisticians to analyze data. Standard Deviation analysis

allows statisticians to scientifically determine if the under-representation of a distinctive group is statistically significant or not. That is, in any group drawn from the population such as a jury list, there are random factors that mean that the demographics of the jury list drawn from the population will not match the population demographics exactly because of "luck of the draw." However, standard deviations allow statisticians to scientifically determine whether the demographics of the jury list diverge substantially enough from the population demographics that the difference is not the product of chance but is systematic. Statisticians use a standard of 2 or 3 standard deviations to determine statistical significance. If there is no systematic under or over-representation of a distinctive group, the divergence of demographics should exceed 2 standard deviations only approximately 5% of the time while the divergence of demographics should exceed 3 standard deviations only approximately 0.5% of the time. In the same way that the decrease in probability from 2 standard deviations to 3 standard deviations from expected is much greater than 1.5 times (or 3/2 times), higher standard deviations from expected exponentially reduce the probability. The probability of more than 5 standard deviations from expected is practically 0.00%. The smaller the sample size, the larger the range of possible outcomes and so the less a non-random factor can be determined.

47. The percentage of Black or African-American persons in the 2021 Qualified Jury Wheel differs from the percentage of Black or African-American persons in the jury eligible population by more than 14 standard deviations. The under-representation of Black or African-American persons is statistically significant. That is, the under-representation is a product of a systematic non-random factor.

48. The percentage of Hispanic or Latino persons in the 2021 Qualified Jury Wheel differs from the percentage of Hispanic or Latino persons in the jury eligible population by more than 9 standard deviations. The under-representation of Hispanic or Latino persons is statistically significant. That is, the under-representation is a product of a systematic non-random factor.

49. The percentage of Male persons in the 2021 Qualified Jury Wheel differs from the percentage of Male persons in the jury eligible population by more than 3 standard deviations. The under-representation of Male persons is statistically significant. That is, the under-representation is a product of a systematic non-random factor.

50. The percentage of Generation Z persons in the 2021 Qualified Jury Wheel differs from the percentage of Generation Z persons in the jury eligible population by more than 17 standard deviations. The under-representation of Generation Z persons is statistically significant. That is, the under-representation is a product of a systematic non-random factor.

**STATISTICAL ANALYSIS OF THE DATA FOR THE ROCHESTER DIVISION**

51. The under-representation of Black or African-American persons, Hispanic or Latino persons, Male persons, and Generation Z persons in the 2021 Qualified Jury Wheel for the Rochester Division is similar to the under-representation in the Buffalo Division.

52. Using the 2022 American Community Survey 5 Year Average numbers, the jury eligible population for the Rochester Division of the Western District of New York includes 987,522 persons and 83.30% White persons, 9.07% Black or African-American persons, 0.18% American Indian or Alaska Native persons, 1.77% Asian persons, 0.03% Native Hawaiian or Pacific Islander persons, 1.90% persons of some other race, and 3.75% multi-racial persons. The jury eligible population is 5.71% Hispanic or Latino persons. The jury eligible population is 48.68% Male and 51.32% Female. The jury eligible population consists of 7.92% from the Silent Generation, 28.42% from Baby Boomers, 24.52% from Generation X, 25.27% from the Millennials, and 13.87% from Generation Z.

53. The 2021 Qualified Jury Wheel for the Rochester Division includes 8,827 persons and is 89.44% White persons, 4.92% Black or African-American persons, 0.17% American Indian or Alaska Native persons, 2.03% Asian persons, 0.08% Native Hawaiian or Pacific Islander persons, 1.83% persons of some other race, and 1.53% multi-racial persons (excluding 194 persons without self-reported racial information). The 2021 Qualified Jury Wheel is 3.49% Hispanic or Latino persons (excluding 222 persons without self-reported Hispanic ethnicity). The 2021 Qualified Jury Wheel is 46.53% Male and 53.47% Female (excluding 191 without self-reported gender). The Qualified Jury Wheel is 10.57% Silent Generation persons, 33.33% Baby Boomer persons, 24.57% Generation X persons, 28.80% Millennial persons, and 7.74% Generation Z persons (excluding 120 persons without self-reported date of birth).

54. The Absolute Disparity for Black or African-American persons on the 2021 Qualified Jury Wheel for the Rochester Division is 4.15% under-representation (9.07% minus 4.92%). The Comparative Disparity for Black or African-American persons on the 2021 Qualified Jury Wheel is 45.73% under-representation (4.15% divided by 9.07%). That is, more than 1 out of 3 of the Black or African-American persons expected to be in the Qualified Jury Wheel are missing. The percentage of Black or African-American persons in the 2021 Qualified Jury Wheel differs from the percentage of Black or African-American persons in the jury eligible population by more than 13 standard deviations. The under-representation of Black or African-American persons is statistically significant. That is, the under-representation is a product of a systematic non-random factor.

55. The Absolute Disparity for Hispanic or Latino persons on the 2021 Qualified Jury Wheel for the Rochester Division is 2.22% under-representation (5.71% minus 3.49%). The Comparative Disparity for Hispanic or Latino persons on the 2021 Qualified Jury Wheel is 38.93% under-representation (2.22% divided by 5.71%). That is, more than 1 out of 3 of the Hispanic or Latino persons expected to be in the Qualified Jury Wheel are missing. The percentage of Hispanic or Latino persons in the 2021 Qualified Jury Wheel differs

from the percentage of Hispanic or Latino persons in the jury eligible population by more than 8 standard deviations. The under-representation of Black or African-American persons is statistically significant. That is, the under-representation is a product of a systematic non-random factor.

56. The Absolute Disparity for Male persons on the 2021 Qualified Jury Wheel for the Rochester Division is 2.16% under-representation (48.68% minus 46.53%). The Comparative Disparity for Male persons on the 2021 Qualified Jury Wheel is 4.43% under-representation (2.16% divided by 48.68%). The percentage of Male persons in the 2021 Qualified Jury Wheel differs from the percentage of Male persons in the jury eligible population by more than 4 standard deviations. The under-representation of Male persons is statistically significant. That is, the under-representation is a product of a systematic non-random factor.

57. The Absolute Disparity for Generation Z persons on the 2021 Qualified Jury Wheel for the Rochester Division is 6.13% under-representation (13.87% minus 7.74%). The Comparative Disparity for Generation Z persons on the 2021 Qualified Jury Wheel is 44.21% under-representation (6.13% divided by 13.87%). That is, more than 1 out of 3 of the Generation Z persons expected to be in the Qualified Jury Wheel are missing. The percentage of Generation Z persons in the 2021 Qualified Jury Wheel differs from the percentage of Generation Z persons in the jury eligible population by more than 16 standard deviations. The under-representation of Generation Z persons is statistically significant. That is, the under-representation is a product of a systematic non-random factor.

## HISTORICAL DISPARITY OF THE BUFFALO DIVISION

58. Form AO-12s were supplied for other Master Jury Wheels for the Buffalo Division showing a historical view of representativeness. Form AO-12 was supplied for the Master Jury Wheel refiled on August 1st, 2017, October 10th, 2018, October 1st, 2019, September 24th, 2020, September 21st, 2021 (used to select the Grand Jury in this case), and October 11th, 2022.

59. The information on the supplied Form AO-12 for the Qualified Jury Wheel excludes temporary excusals for jury service. The temporary excusals have been included in the statistical analysis of the Qualified Jury Wheel used to select the Grand Jury in this analysis. For the historical analysis below no data files were supplied so the numbers for the Qualified Jury Wheel excluding temporary excusals are used.

60. Form AO-12 for the Master Jury Wheels refiled on August 1st, 2017, October 10th, 2018, and October 1st, 2019 include less than 200 persons in the Sampling for the Qualified Jury Wheel while later Form AO-12s include more than 7,000 persons. Because of the

small numbers reported and their inconsistency with later Form AO-12s the forms are not included in the analysis of historical disparity.

61. The Qualified Jury Wheel excluding temporary excusals for the September 24th, 2020 Master Jury Wheel includes 7,578 persons and is 6.17% Black or African-American persons, 2.82% Hispanic or Latino persons, and 49.11% Male persons.

62. The Qualified Jury Wheel excluding temporary excusals for the September 21st, 2021 Master Jury Wheel includes 7,924 persons and is 6.21% Black or African-American persons, 2.96% Hispanic or Latino persons, and 49.57% Male persons.

63. The Qualified Jury Wheel excluding temporary excusals for the October 11th, 2022 Master Jury Wheel includes 7,705 persons and is 6.51% Black or African-American persons, 3.58% Hispanic or Latino persons, and 48.97% Male persons.

64. The three years of Form AO-12s show consistent and slightly more representation of Black or African-American persons and Hispanic or Latino persons over time. However, the under-representation of Black or African-American persons and Hispanic or Latino persons compared to the jury eligible population shows consistent statistically significant under-representation.

### THE CONSTRUCTION OF THE 2021 MASTER JURY WHEEL – SOURCES OF DATA

65. Five sources of data were used to construct the 2021 Master Jury Wheel that was filled on September 21st, 2021 and was used to select Grand Jurors in this case. The sources of data were the voter registration list, a list of licensed drivers from DMV ("DMV list"), a list of recipients of Home Relief and recipients of Aid to Families with Dependent Children from the New York State Office of Temporary & Disability Assistance ("OTDA list"), a list of persons receiving New York State Unemployment Insurance Benefits from the New York State Department of Labor ("Labor list"), and a list of filers of IT-100 Fast Form, IT-200 or IT-201 Resident Income Tax Return, IT-214 Claim for Real Property Tax Credit, or IT-203 Nonresident and Part-Year Resident Income Tax Return from the New York State Department of Taxation and Finance ("Tax list").

66. None of the sources of data were supplied. With the actual sources of data, a complete analysis could be made as to whether the sources are complete, comply with the Jury Plan and the Jury Service and Selection Act, and the effect on the representativeness of the Master Jury Wheel.

67. However, enough other data such as summary statistics were supplied to answer some very basic questions about the sources.

68. The date of the data can be determined by the birth years supplied. All of the birth years on the 2021 Master Jury Wheel are from 2002 or earlier except for 13 persons

(0.04%) with a birth year of 2003. Therefore, the data almost exclusively reflects persons who would have turned 18 before December 31st, 2020 implying the data comes from the year 2020.

69. The voter registration list used to create the 2021 Master Jury Wheel included 1,012,917 persons.

70. The New York State Board of Elections publishes voter registration statistics for February and November of each year at https://elections.ny.gov/enrollment-county. The total number of registered voters for the Buffalo Division on November 1st, 2020 was 1,064,758, on February 1st, 2021 was 1,052,793, and on November 1st, 2021 was 1,045,552.

71. The New York State Board of Elections splits all registered voters into "active" voters and "inactive" voters. "Inactive" voters are registered voters and can vote on election day in their proper polling station.

72. The number of voters used to create the 2021 Master Jury Wheel more closely aligns with the number of "active" voters.   The number of "active" registered voters for the Buffalo Division on November 1st, 2020 was 1,008,087, on February 1st, 2021 was 1,007,859, and on November 1st, 2021 was 995,848.

73. The Jury Service and Selection Act requires that the Master Jury List include, at a minimum, all registered voters or voters who voted in an election.  The Jury Plan delineates that the voter registration list shall be used.

74. The response supplied to the question asking whether active and inactive voters were included was "I believe the request was for all registered Voters.  Voter status is not used in the JMS data Base".

75. From the summary numbers, the voter registration list used to construct the 2021 Master Jury Wheel did not include all registered voters and appears to have excluded "inactive" voters.

76. "Inactive" voters made up 5.32% of the entire voter registration list in the Buffalo Division on November 1st, 2020, 4.27% on February 1st, 2021, and 4.75% on November 1st, 2021.

77. A complete voter registration data file would allow an analysis of the extent and effect of excluding "inactive" voters on the representativeness of the Master Jury Wheel.

78. Most persons register to vote in anticipation of a presidential election as occurred on November 3rd, 2020.  Many Jury Plans in federal districts choose the as-of-date for the voter registration source as the last federal general election which, in this case, would be the election on November 3rd, 2020. The Jury Plan in this case does not delineate the as-of-date of the voter registration list or any other source list.

79. The response supplied to the question asking what data is used from the sources where matches exist was "The data from the Voter file is used. The correct address would be obtained via the NCOA process." While the NCOA process (National Change of Address) will capture some address changes if a change of address card is submitted, the rest of the data comes from the voter registration list even if DMV or other sources contain a later update date.

80. If the voter file reflects the November 3rd, 2020 election, the data from the voter registration list would be 10 months old when the 2021 Master Jury Wheel was filled on September 21st, 2021 and the youngest person would be 18 years and 10 months old.

81. If the voter file reflects the November 3rd, 2020 election, the data from the voter registration list would be 1 year and 3 months old when the potential grand jurors were summoned in this case in mid-February 2022 and the youngest person would be 19 years and 3 months old.

82. If the voter file reflects the November 3rd, 2020 election, the data from the voter registration list would be 1 year and 8 months old when the potential grand jurors returned the indictment on July 14th, 2022, and the youngest person would be 19 years and 8 months old.

83. The DMV data used to create the 2021 Master Jury Wheel included 1,048,575 records.

84. The response supplied to the question asking for the as-of-date of the DMV data was "I don't know, sorry. Data has been removed from systems."

85. The response supplied to the question asking if personal identification cards were included was "I believe Driver ID was provided."

86. The response supplied to the question asking if expired licenses were included was "Do not know, only used data required for the input in the Master Jury Wheel."

87. New York State Government supplies information on current driver's licenses, permits, and non-driver identification cards issued at NY.Gov.Data https://data.ny.gov/Transportation/Driver-License-Permit-and-Non-Driver-Identificatio/a4s2-d9tt/about_data. For the Buffalo Division there are 1,310,976 licenses including CDL (Commercial Driver's License), D (Drivers), ID (Personal ID Card), M (Motorcycle only), and Taxi licenses.

88. The number of licenses used to create the 2021 Master Jury Wheel more closely aligns with the number of "D" licenses only while excluding CDL, ID, M, and Taxi licenses. There are currently 1,310,976 licenses in the Buffalo Division including 1,116,223 "D" licenses.

89. Self-reported racial data is the way to accurately determine the demographics of any group. There is no self-reported racial information in the license data. When self-

reported racial data is not available a second-best way to estimate the demographics of a group is to use geocoding, the process of assuming that persons in the same geographic area share the same demographics.

90. In the case of the current license data from NY.Gov.Data, the supplied zip code for each license and census data of the jury eligible population for zip codes can be used to estimate the demographics of the various license types.

91. There is a distinct difference in the estimation of Black or African-American persons among the different license types. The estimation of the Black or African-American for "D" licenses is 7.44%, "CDL" licenses is 6.62%, "ID" is 17.93%, "M" licenses is 5.67%, and "Taxi" licenses is 23.95%. Taken together, all of the license types except "D" are 14.94% Black or African-American.

92. Depending on which licenses are included in the source will have an impact on the representation of Black or African-American persons. If licenses other than "D" were included in the DMV list, the representation of Black or African-American persons would increase.

93. It is possible to obtain a driver's license or personal identification card before a person becomes 18 years old. If the plan was to implement the Master Jury Wheel in September 2021, then persons in the DMV data who would have become 18 years old by September 2021 (date of birth before September 2003) could have been included thereby lessening the exclusion of young persons.

94. A complete DMV data file would allow an analysis of the extent and effect of excluding certain license types, whether expired or suspended licenses are included, the possible inclusion of 18-year-old persons, and the effects on the representativeness of the Master Jury Wheel.

95. The three remaining sources of data are the OTDA, Tax, and, Unemployment data.

96. There are 1,151 persons or 3.83% of the 2021 Master Jury Wheel for whom no birth year is listed. Because a date of birth is required to register to vote or to obtain a license, the persons missing dates of birth came from the three remaining sources of data. From the data, it is unclear whether these persons would be eligible for jury service.

97. Complete data files of the three remaining sources would allow an analysis of where the persons without dates of birth come from, the inclusion of joint filers and family members, and the effects on the representativeness of the Master Jury Wheel.

## THE CONSTRUCTION OF THE 2021 MASTER JURY WHEEL – PROCESS

98. The response supplied to the question asking if written instructions existed was "there were no written instructions provided to the vendor for the production of the Jury

Wheel used for the March 2022 grand jury." Likewise, the Jury Plan only briefly describes the creation of the merged source as "The above lists shall be merged and any duplication between the lists shall be purged" and then a prorated random selection of persons from the merged list based on the number of registered voters in each county.

99. The lack of written specifications or instructions for the complex task of combining five different sources and the removal of duplicates across the sources raises questions and issues.

100. Any best practice for an important task such as the creation of the Master Jury Wheel would include documentation of the process. In that way, all parties (the Court, the Clerk, the Jury Administrator, the vendor, prosecutors, defenders, defendants, and citizens) who have different expectations of the completed task have a transparent agreement on what the process is or should be.

101. Without written instructions, it is impossible to determine if the procedure used to create the Master Jury Wheel matches the general requirements of the Jury Plan. For instance, there are basic questions on what is included in each of the five sources and whether those sources match the general description in the Jury Plan.

102. Without written instructions, it is impossible to replicate the process for the creation of future Master Jury Wheels, especially with the loss of key employees or vendors.

103. A procedure without written instructions is subject to intentional abuse or merely "corner cutting" which can unintentionally affect the representativeness of the Master Jury Wheel.

104. From the narrow perspective of this analysis, without written instructions, it is impossible to determine all of the systematic factors causing the under-representation of any distinct groups.

105. The voter registration list forms the basis of the Master Jury Wheel. At the end of the process of creating the 2021 Master Jury Wheel, 71.20% of the merged list for the 2021 Master Jury Wheel came directly from the voter registration list. Furthermore, if persons are also included in other sources, the data from the voter registration list is used.

106. After the voter registration list, persons on the DMV list who do not match a person on the voter registration list are added.

107. Because a person could be both a registered voter and on the DMV list, there is a procedure to identify persons on both lists so that that person is not duplicated.

108. The procedure for the 2021 Master Jury List matched registered voters with the DMV list by an exact comparison of the county of residence, the first name, the last name, and the date of birth.

109. The matching procedure implemented is problematic for a number of reasons. This type of matching relies on certain assumptions such as whether the name on one source matches the name on other sources (married versus unmarried names, initials versus full names, nicknames, hyphenated and composite last names), that no typographical errors exist (transposition of month and day, missing month and day), that there is no change in county (especially if expired licenses are included in the DMV data), the choice of voter registration as the most current address data (as indicated in this case), and other specifics of the data. No agency or independent authority verifies the match.

110. Since the advent of voter identification requirements, the need to match a supporting ID, such as a driver's license, to the voter registration information has become important. The issues raised in matching a supporting ID to a voter registration record are the same issues found in the matching procedure used to create the 2021 Master Jury Wheel.

111. For instance, in Texas, a supporting ID is required to vote but the name on the ID must be "substantially similar" to the name on the voter registration.

The Texas Secretary of State website at https://www.votetexas.gov/voting/need-id.html describes "substantially similar" as follows:

"A voter's name is considered substantially similar if one or more of the following circumstances applies:

The name on the ID is slightly different from one or more of the name fields on the official list of registered voters.

The name on the voter's ID or on the list of registered voters is a customary variation of the voter's formal name. For example, Bill for William

The voter's name contains an initial, middle name, or former name that is either not on the official list of registered voters or on the voter's ID.

A first name, middle name, former name or initial of the voter's name occupies a different field on the presented ID document than it does on the list of registered voters.

In considering whether a name is substantially similar, election officials will also look at whether information on the presented ID matches elements of the voter's information on the official list of registered voters such as the voter's residence address or date of birth."

112. The process of determining if a driver's license is "substantially similar" to a voter registration is a manual one-by-one process that is not done in the computer-coded matching procedure for the 2021 Master Jury Wheel.

113. Likewise, the "exact match" requirement in the State of Georgia for voter registration to exactly match information from the Georgia Department of Driver Services or the Social Security Administration was halted by a federal court for the federal election in November 2018 (Georgia Coalition for the People's Agenda v. Brian Kemp at https://www.courthousenews.com/wp-content/uploads/2018/11/GEORGIA-EXACT-MATCH-RULING.pdf).

114. A failure of the implemented matching procedure to identify matches would lead to the inclusion of duplicate records in the merged file for the 2021 Master Jury Wheel.

115. The voter registration form for New York (https://elections.ny.gov/new-york-state-voter-registration-form-english) requires applicants to either supply their New York State DMV number, the last four digits of their Social Security number, or to certify that they don't have a New York State driver's license or a Social Security number.

116. Matching voter registration records to the DMV list could have been done by matching the voter identification information collected when registering to vote. This method of matching is much simpler and more effective, is based on and verified by the work done by the New York State Board of Elections, and is not based on assumptions about name and date of birth matches as in the matching procedure used in the 2021 Master Jury Wheel.

117. At the end of the process of creating the 2021 Master Jury Wheel, 20.66% of the merged list for the 2021 Master Jury Wheel came from the DMV list. Persons from either the voter registration list or the DMV list account for 91.86% of the merged list for the 2021 Master Jury Wheel.

118. The matching procedure implemented is subject to creating duplicates of persons who are registered voters and hold a DMV license. The National Center for State Courts describes the problems associated with duplicates in jury lists as "Courts using multiple source lists to compile the master jury list have established general "merge and purge" procedures to identify and remove duplicate records after two or more source lists have been combined. The accuracy of the duplicate removal process is extremely important. Failing to identify duplicate records undermines the principle of random selection insofar that individuals who have more than one record on the master jury list (e.g., people who both vote and drive) have a greater probability of being selected than individuals with only one record. On the other hand, incorrectly removing a record on the mistaken belief that it duplicates an existing record disenfranchises a potentially eligible individual and decreases the inclusivity of the master jury list." https://www.jurytoolbox.org/more/Characteristics%20of%20Effective%20MJL.pdf

119. Note that the problem with duplicates is not that one person is summoned twice. In that case, only one person will respond. The problem with duplicates is that the chance of a duplicated person being selected is twice the chance of non-duplicated persons. This destroys the randomness of the selection.

120. The three remaining sources of data are matched into the merged list for the 2021 Master Jury Wheel similarly. Because the 2021 Master Jury Wheel includes persons without a year of birth, showing that some sources or parts of sources did not include the date of birth, the matching procedure was altered by the vendor.

121. The response supplied to the question asking if matching data was not available was "If the Date of Birth is not provided then the year of birth is used. If the year of birth is not provided then the first four characters of the address is used."

122. The matching procedure described when the date of birth is not available is based on even more assumptions than the first matching procedure and is subject to creating duplicates.

123. The National Center for State Courts recommends that duplicates be held below 5% of the jury list.

124. If the source data or the merged source data were provided, an analysis of whether the number of identifiable duplicates meets the National Center for State Courts' recommendation, if duplicates affect the randomness of the selection of jurors, and the effect of duplicates on the representativeness of the 2021 Master Jury Wheel could be conducted.

125. Finally, a selection of approximately 30,000 persons from the merged source data is made in proportion to the voter registration data for each county to construct the 2021 Master Jury Wheel.

126. If the voter registration data only includes "active" voters as indicated by the summary statistics, then the proration by county of the 30,000 persons was incorrectly affected by the exclusion of "inactive" voters.

127. Additionally, while using persons from sources other than the voter registration list increases the scope of persons possibly selected for the 2021 Master Jury Wheel, the effect of prorating the selection by the voter registration in each county has the effect of diminishing the additional scope of sources that are not in the same proportion for each county as the voter registration list. That is, in a county that has disproportionately more persons who hold driver's licenses than are registered to vote, the effect of the broadening of the scope by supplementing the voter registration list with the DMV file is diminished. In the extreme, if no persons were registered to vote in a county but there were persons who had driver's licenses in that county, the proration of the Master Jury Wheel according to the percentage on the voter registration list, would yield no persons selected for the Master Jury Wheel from that county.

**SYSTEMATIC FACTORS IN THE UNDER-REPRESENTATION**

128. Black or African-American persons, Hispanic or Latino persons, Males, and Generation Z are under-represented in the 2021 Qualified Jury Wheel for the Buffalo Division. These groups overlap somewhat and so are both related but also show different attributes. Likewise, the systematic factors in the under-representation of these groups are both similar and different.

129. Self-reported demographic information is collected during the qualification process. To analyze systematic factors a geocoding estimate is necessary for some persons for whom a questionnaire response was not received or for those who responded but did not supply self-reported demographic information on their response.

130. The following table details the percentage of persons on the jury list during the process leading to the Qualified Jury Wheel.

| | Percent African-American | Percent Hispanic | Percent Male | Percent Generation Z |
|---|---|---|---|---|
| Jury Eligible Population (18+ and US Citizens) | 8.85% | 4.15% | 48.74% | 13.19% |
| Population Prorated to Voter List | 8.99% | 4.17% | 48.71% | 13.12% |
| Master Jury Wheel | 8.20% | 4.02% | 48.42% | 8.61% |
| Selected to Receive a Questionnaire | 8.02% | 3.81% | 48.69% | 8.72% |
| Questionnaires Delivered According to Post Office | 7.71% | 3.66% | 48.58% | 8.47% |
| Responses to Questionnaires Received | 5.33% | 3.14% | 46.99% | 7.72% |
| Qualified Jury Wheel | 5.21% | 2.57% | 47.01% | 8.00% |

131. Black or African-American persons are 8.85% of the jury eligible population but are 5.21% of the Qualified Jury Wheel.

132. The largest decrease in the percentage of Black or African-American persons occurs when responses are received. The percentage of Black or African-American persons decreases by 2.38% during the step when responses are received.

133. There are several reasons that a response to the questionnaire would not be received including the intentional ignoring of a delivered questionnaire, the mis-delivery or non-delivery of the questionnaire, an out-of-date address, the lack of an apartment number or other identifying information on the address or name, problems with the delivery point, and mis-delivery or non-delivery of the response.

134. It is possible to estimate and quantify the effect of using year-old or out-of-date data in the 2021 Master Jury Wheel by looking at mobility rates in the Buffalo Division.

135. The Public Use Microdata Sample or PUMS from the American Community Survey allows for the analysis of multi-factor census data. Note that the PUMS is from the same data that is used for the jury eligible population in this analysis and on Form AO-12.

136. Using PUMS data, the percentage of the jury eligible population in the Buffalo Division that has moved in the last year is 9.93%. The percentage of Black or African-American persons who have moved in the last year is 1.46 times higher at 14.51%.

137. The 2021 Master Jury Wheel was constructed with data from the year 2020. By the time the 2021 Master Jury Wheel was filled, the data would have been 9 months out-of-date. By the time questionnaires for this Grand Jury were received in mid-February 2022 the data would have been more than a year out-of-date.

138. Note that a very small number of persons (87 or 0.51%) were disqualified due to "Not a Resident in District for One Year". Given the overall mobility rate of 9.93% per year, this low percentage aligns with the data being out-of-date.

139. Adjusting and estimating the percent of Black or African-American persons for whom a response is received by the differential mobility rates for each race increases the percent of Black or African-American persons for whom a response is received by 0.76% to 6.09%. That is, approximately a third of the decrease in Black or African-American percentage in the group of responses could be from the use of out-of-date data.

140. The largest factor in the disqualification process of Black or African-American persons is for "Criminal Charge Pending/Convictions". This disqualification reduces the percentage of Black or African-American persons by 0.14%.

141. It is unclear how persons disqualified for "Criminal Charge Pending/Convictions" have their information verified. Anecdotally, from the 700 questionnaires sent to select the Grand Jury in this case, an African-American was disqualified for responding that he had a Buffalo City Court drug charge from the 1990's for which he served 1 year.

142. The largest decrease in the percentage of Hispanic or Latino persons occurs during the qualification process. The percentage of Hispanic or Latino persons decreases by 0.55% during qualification.

143. The largest factor in the disqualification process of Hispanic or Latino persons is for "Unable to Read, Write, or Understand English La(nguage)". This disqualification reduces the percentage of Hispanic or Latino persons by 0.39%.

144. Hispanic or Latino persons were disqualified at a rate of 14.14% for the language qualification. Non-Hispanic or Latino persons were disqualified at a rate of 1.62% for the language qualification.

145. Using PUMS data, the percent of the jury eligible population in the Buffalo Division that speaks English less than well (Not well or Not at all) is 1.08%. Hispanic or Latino persons speak English less than well at a rate of 11.01%. Non-Hispanic or Latino persons speak English less than well at a rate of 0.64%.

146. The rate at which persons were disqualified for the language qualification is higher than the PUMS data for both Hispanic and Latino persons and for Non-Hispanic or Latino persons.

147. Because Hispanic or Latino persons are a smaller group than Non-Hispanic or Latino persons, the higher rate of language disqualification over the PUMS data has a greater effect on the representation of Hispanic or Latino persons.

148. The language ability information in the PUMS data is self-reported. It is unknown in this analysis if the self-reported language ability information on the qualification questionnaire is verified in any way.

149. The second largest decrease in the percentage of Hispanic or Latino persons occurs when responses are received. The percentage of Hispanic or Latino persons decreases by 0.52% during the step when responses are received.

150. Using PUMS data, the percentage of the jury eligible population in the Buffalo Division that has moved in the last year is 9.93%. The percentage of Hispanic or Latino persons that have moved in the last year is 1.68 times higher at 16.70%.

151. Adjusting and estimating the percent of Hispanic or Latino persons for whom a response is received by the differential mobility rates for each race increases the percent of Hispanic or Latino persons for whom a response is received by 0.39% to 3.53%. That is, approximately a quarter of the decrease in Hispanic or Latino percentage in the group of responses could be from the use of out-of-date data.

152. The largest decrease in the percentage of Male persons occurs when responses are received. The percentage of Male persons decreases by 1.59% during the step when responses are received.

153. The largest decrease in the percentage of Generation Z persons occurs when the Master Jury Wheel is created. The percentage of Generation Z persons decreases by 4.51% during the step when the Master Jury Wheel is created.

154. Generation Z includes persons who would have been aged between 18 and 24 years old when the Master Jury Wheel was created.

155. Adding in an extra year of Generation Z persons to account for excluded 18-year-olds is estimated to increase the percentage of Generation Z persons by 1.29% to 9.90%. That is, approximately a quarter of the decrease in Generation Z percentage in the Master Jury Wheel could be from the exclusion of 18-year-olds.

156. The second largest decrease in the percentage of Generation Z persons occurs when responses are received. The percentage of Generation Z persons decreases by 0.75% during the step when responses are received.

157. Using PUMS data, the percentage of the jury eligible population in the Buffalo Division that has moved in the last year is 9.93%. The percentage of Generation Z persons who have moved in the last year is 2.40 times higher at 23.81%.

158. Adjusting and estimating the percentage of Generation Z persons for whom a response is received by the differential mobility rates for each generation increases the percentage of Generation Z persons for whom a response is received by 1.63% to 9.35%. That is, nearly two-thirds of the decrease in Generation Z percentage in the group of responses could be from the use of out-of-date data.

## CORRECTIBLE FACTORS

159. There are some correctible factors identified from the limited supplied data and this analysis.

160. A written set of instructions or specifications for the construction of the Master Jury Wheel, including the complete definition of sources, can be created.

161. The creation of the Master Jury Wheel could be completed at a time more concurrent with the data. In this way the data would not be out-of-date.

162. Persons younger than 18, especially from the DMV list, who will become jury eligible as of the planned date for the Master Jury Wheel could be included.

163. "Inactive" voters could be included in the voter registration list used to create the Master Jury Wheel and prorate the merged file as required by the Jury Service and Selection Act.

164. Matching of the voter registration list with the DMV list could be achieved by using the license information in the voter registration data. A more sophisticated matching procedure could be used for other source data.

165. All types of licenses could be included in the DMV data.

## THE SILENT GENERATION REPRESENTATION

166. The Silent Generation is under-represented after excusals are granted. 97.74% of persons who are over age 70 avail themselves of an excusal from jury service.

167. The Silent Generation makes up 8.21% of the jury eligible population but only 0.55% of the Jury List after excusals. The Absolute Disparity for the Silent Generation after excusals is 7.66%, the Comparative Disparity is 93.29%, and the percentage is over 24 Standard Deviations too low.

168. The excusal of persons over age 70 in the current times could be viewed as an accommodation of respect more than a fact of mobility or energy.

169. According to PUMS data, 90.51% of the jury eligible persons in the Buffalo Division over the age of 70 have no ambulatory difficulty.

170. According to PUMS data, 52.72% of the jury eligible persons in the Buffalo Division over the age of 70 were in the labor force in the preceding week.

## GRAND JURY ATTENDANCE

171. From the data supplied, 20 Grand Jurors attended on July 14th, 2022 when the indictment in this case was returned.

172. The 20 Grand Jurors included 17 White persons, 1 Black or African-American person, 1 multi-racial person, and 1 person of some other race. There was 1 Hispanic or Latino person.

173. There were nine dates when the case was evaluated (June 2nd, June 9th, June 10th, June 13th, June 16th, June 23rd, June 30th, July 7th, and July 14th of 2022).

174. 10 of the 20 Grand Jurors who attended on July 14th, 2022 when the indictment in this case was returned attended all nine dates when the case was evaluated.

175. The 10 Grand Jurors who attended all nine dates the case was evaluated included 9 White persons and 1 person of some other race. There was 1 Hispanic or Latino person.

176. 6 of the 20 Grand Jurors attended for eight days when the case was evaluated.  2 of the 20 Grand Jurors attended for seven days when the case was evaluated.  1 of the 20 Grand Jurors attended for five days when the case was evaluated.  1 of the 20 Grand Jurors attended for three days when the case was evaluated.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated this _1st_ day of _July 2025_

_____Jeffrey Martin

EXHIBIT B

# FEDERAL PUBLIC DEFENDER'S OFFICE
## WESTERN DISTRICT OF NEW YORK

MARIANNE MARIANO
*FEDERAL PUBLIC DEFENDER*
marianne_mariano@fd.org

28 EAST MAIN STREET
FIRST FEDERAL PLAZA, SUITE 400
ROCHESTER, NEW YORK 14614

BUFFALO OFFICE
300 PEARL STREET, SUITE 200
BUFFALO, NEW YORK 14202
716-551-3341
716-551-3346-FAX

ANNE M. BURGER
*SUPERVISORY ASST. FEDERAL PUBLIC DEFENDER*
anne_burger@fd.org

585-263-6201
FAX: 585-263-5871

*REPLY TO: ROCHESTER*

July 21, 2022

**VIA FAX**
Joel Drier
Jury Administrator, W.D.N.Y.
2 Niagara Square
Buffalo, New York  14202

Re:     *United States v. Gendron*, 22-cr-00109-LJV-HKS

Dear Mr. Drier,

My office has been assigned to represent the defendant in the above matter. I write to request the disclosure of all available public records pertaining to the formation of the Grand Jury that considered the above-captioned case. This request is made to aid in the potential preparation of motions relating to a challenge of jury selection procedures.

Thank you in advance for your assistance.

Sincerely,

/s/Anne M. Burger
Anne M. Burger
Supervisory Assistant Federal Public Defender

EXHIBIT C

# United States District Court
## Western District of New York



# Jury Plan
### April 2018

**JURY SELECTION PLAN**
**OF THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**
**FOR THE RANDOM SELECTION OF GRAND AND PETIT JURORS**
**(As amended April 30, 2018**)

Pursuant to the Jury Selection and Service Act of 1968, as amended, 28 U.S.C. §1861 *et seq.*, ("the Act"), this Jury Selection Plan is hereby adopted by this Court, subject to approval by the Reviewing Panel of the Judicial Council for United States Court of Appeals for the Second Circuit, and to such rules and regulations as may be adopted from time to time by the Judicial Conference of the United States.

**APPLICABILITY OF THE PLAN (28 U.S.C. §§ 1861, 1863)**

This Plan is applicable to the Western District of New York.  There being no statutory divisions in the Western District of New York, the District is hereby divided into two divisions for jury selection purposes only, as defined in 28 U.S.C. § 1869(e), as follows:

1. Buffalo Division -- Counties of Erie, Genesee, Niagara, Orleans, Wyoming, Chautauqua, Cattaraugus, and Allegany – for sessions of Court held at Buffalo.

2. Rochester Division -- Counties of Livingston, Monroe, Ontario, Seneca, Wayne, Yates, Steuben, Schuyler, and Chemung – for sessions of Court held at Rochester.

**DECLARATION OF POLICY (28 U.S.C. § 1861)**

It is the policy of the United States and this Court that all litigants in this Court entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross-section of the community in each division wherein the court convenes.  It is also the policy of the United States and this Court that all citizens who reside within the district shall have the opportunity to be considered for service on grand and petit juries and they shall have an obligation to serve as jurors when summoned for that purpose.

**DISCRIMINATION PROHIBITED (28 U.S.C. § 1862)**

No citizen shall be excluded from service as a grand or petit juror in this Court on account of race, color, religion, sex, national origin, or economic status.

**MANAGEMENT AND SUPERVISION OF THE JURY SELECTION PROCESS (28 U.S.C. § 1863(b)(1))**

The Clerk of the Court shall manage the jury selection process under the supervision and control of the Chief Judge, or such other District Judge or Judges as the Chief Judge may from time to time designate.  In the event of the simultaneous absence, disability, or inability to act of the Chief Judge and the Chief Judge's designee(s), the active District Judge who is present in the District and has been in service the greatest length of time shall be authorized to act.  In managing and supervising the jury selection process, the Clerk of Court is authorized to delegate duties as may be necessary in the jury selection process to Deputy Clerks.  The use of the word "clerk" and "clerk of the court" in this plan will mean the clerk of the district court of the United States, any authorized deputy clerk, and any other person authorized by the court to assist the clerk in the performance of functions under this plan (28 U.S.C. § 1869(a)).

**SOURCES OF NAMES OF PROSPECTIVE JURORS (28 U.S.C. § 1863(b)(2)**)

The names of prospective jurors shall be selected at random, following the procedures outlined in this Plan.  The lists shall be obtained from the voter registration lists of the political subdivisions within each Division of this district.  That list may be further supplemented from some or all of the lists enumerated below:

- Lists of licensed drivers maintained by the New York State Department of Motor Vehicle("DMV")

- Lists of persons receiving New York State Unemployment Insurance Benefits from the New York State Department of Labor

- Lists of recipients of Home Relief and recipients of Aid to Families with Dependent Children from the New York State Office of Temporary & Disability Assistance

- List of filers of IT-100 Fast Form, IT-200 or IT-201 Resident Income Tax Return, IT-214 Claim for Real Property Tax Credit, or IT-203 Nonresident and Part-Year Resident Income Tax Return from the New York State Department of Taxation and Finance.

The above lists shall be merged and any duplication between the lists shall be purged.  The resulting combined list is hereinafter referred to as the "combined source list."

### MAINTAINING THE MASTER JURY WHEEL (28 U.S.C. §1863(b)(3) & (4))

The names of prospective jurors selected at random from the combined source list, following the procedures outlined in this Plan, shall be placed in a Master Jury Wheel.  There shall be a separate Master Jury Wheel for each of the two Divisions in the District.

The minimum number of names to be placed initially in the Master Jury Wheels shall be as follows:

1. <u>Buffalo Division</u> - 30,000 names beginning with the prior year master wheel refill
2. <u>Rochester Division</u> - 30,000 names beginning with the prior year master wheel refill

Each Master Jury Wheel shall be emptied and refilled at least annually, and upon order of the Chief Judge or the Chief Judge's designee(s), may be supplemented with additional names selected on a random basis to assure an adequate supply of qualified jurors.  The Clerk of Court, with the approval of the Chief Judge or the Chief Judge's designee(s), may revise the minimum number of names for any Master Jury Wheel without need for amendment to this Plan.


### METHOD AND MANNER OF RANDOM SELECTION (28 U.S.C. §1863(b)(3))

The selection of names from complete source list databases in electronic media for the creation of a master jury wheel will be accomplished by using a properly programmed electronic data processing system employing a purely random selection technique.  A properly programmed electronic data processing system for pure randomized selection will be used to select names from the master jury wheel for the purpose of summoning persons to serve as grand or petit jurors.

Such random selections of names from the source list for inclusion in the master jury wheel by data computer personnel must insure that the names of persons residing in each county within the jury division is substantially proportionally represented in the master jury wheel according to the number of registered voters in each county.  The selection of names from the source list and the master jury wheel must also insure that the mathematical odds of any single name being picked are substantially equal.

In order to ensure the exercise of proper supervision and management over the automated aspects of jury selection and in accordance with statutory requirements, the operator of the computer shall comply with the instructions for random selection of grand and petit jurors by electronic machine

methods contained in the Court's plan for random selection of grand and petit jurors and such additional written instructions as provided by the Court.

### DRAWING OF NAMES FROM THE MASTER JURY WHEEL - ONE STEP SUMMONING AND COMPLETION OF JURY QUALIFICATION FORM (28 U.S.C. §§ 1878, 1864(a), 1864(b) and 1866(g))

This District has adopted the one-step summoning and qualification procedure. Accordingly, all prospective jurors shall be qualified and summoned in a single procedure through the use of the Jury Management System.   The Jury Management System (JMS) provided and supported by the Administrative Office of the United States Courts, shall be used to select names from the master jury wheel of persons to be summoned to serve as grand or petit jurors and for the recording of names and other information on any papers and records needed by the Court to administer the selection and payment of juries.

From time to time, as ordered by the Court, the Clerk of the Court shall draw at random from the master jury wheel using a properly programmed data processing system, the names of as many individuals as may be required for jury service for a particular jury division.  The Court will specify the number of jurors to be drawn based upon anticipated juror usage plus a margin of additional names sufficient to compensate for individuals who become unavailable or ineligible to serve as jurors.

The Clerk of Court will post a general notice for public review in the Clerk's Office and to the Court's website explaining the processes by which names are periodically and randomly drawn.

The Clerk of the Court shall retain the names so drawn, and shall mail to every person whose name is drawn from the master jury wheel a one-step summons/qualification form, accompanied by instructions to fill out and return the form to the Clerk's Office within ten (10) days.  The form may either (1) be completed manually and returned to the Clerk's Office by mail, or (2) effective October 1, 2009, be completed electronically through the Court's internet website at www.nywd.uscourts.gov.  The qualification questionnaire used will be approved as to form and content by the Judicial Conference of the United States Courts and the Administrative Office of the United States Courts.

Each juror qualification questionnaire will require completion by the individual to whom the questionnaire is addressed.  Should the addressee be unable to complete the questionnaire, another

individual may do so, indicating the need and reason(s therefore.  In cases where there appears to be an omission, ambiguity or error in a completed juror qualification questionnaire, the questionnaire will be returned promptly to the individual with instructions that corrections or additional information are required.

Any person failing to return a juror qualification questionnaire may be summoned to do so.  Any person failing to appear pursuant to a summons may be ordered by the Court to appear and show cause for failure to comply with the summons.  A person failing to appear or show cause for noncompliance with a jury summons may be fined not more than $1,000.00, imprisoned not more than three (3 days or ordered to perform community service (or any combination thereof.

## SELECTION, SUMMONING, AND ASSIGNMENT OF GRAND JURORS (28 U.S.C. §§ 1866 and 1878)

Upon order of the Court, if a grand jury is to be impaneled, this will be done initially from the prospective jurors reporting.  Separate grand jury panels shall be selected and maintained in each divisional office.  Prospective jurors not designated to sit on a grand jury shall thereafter be added to the pool from which petit jurors shall be selected and shall remain available for service until selected or until the time for service expires.

Each grand jury shall serve until discharged by the Chief Judge, but no regular, criminal grand jury shall serve for more than eighteen (18 months unless the Court extends the service of the grand jury for a period of six months or less, upon a determination that such extension is in the public interest. Special Grand Juries as defined in 18 U.S.C. § 3331, shall serve a term of eighteen (18 months unless an order for its discharge is entered earlier by the Court.  If, at the end of an eighteen-month term or any extension thereof, the Court determines the business of the grand jury has not been completed, the Court may enter an order extending such term for up to three additional six month periods.  No special grand jury term so extended shall exceed thirty-six months, except as provided in 18 U.S.C. § 3333(e.

The Court may direct that alternate jurors may be designated at the time a grand jury is selected. Alternate jurors in the order in which they were designated may thereafter be impaneled to replace excused jurors.  Alternate jurors shall be drawn in the same manner and shall have the same qualification as the regular jurors and if impaneled shall be subject to the same challenges, shall take the same oath and shall have the same functions, powers, facilities and privileges as the regular grand jurors.

**QUALIFICATIONS FOR JURY SERVICE (28 U.S.C. §1865(b))**

The Chief Judge or presiding judge, on his or her own initiative, or on the recommendation of the Clerk of Court, or the Clerk of Court under the supervision of the Court, shall determine solely on the basis of information provided on the juror qualification form and other competent evidence whether a person is unqualified for, or exempt, or to be excused from jury service.  The Clerk shall enter such determination in the space provided on the juror qualification form and in the electronic database.  If a person did not appear in response to a summons, such fact shall be noted.

Any person shall be deemed qualified to serve on grand and petit juries in this Court unless he or she:

(1) is not a citizen of the United States eighteen years old who has resided for a period of one year within this District;
(2) is unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form;
(3) is unable to speak the English language;
(4) is incapable, by reason of mental or physical infirmity, to render satisfactory jury service; or
(5) has a charge pending against him for the commission of, or has been convicted in a State or Federal court of record of, a crime punishable by imprisonment for more than one year and his civil rights have not been restored.

Notice of persons who identify themselves as non-citizens through the juror qualification process shall be provided by the Clerk of Court to appropriate election officials for verifying voter registration eligibility.

**EXEMPTIONS FROM JURY SERVICE (28 U.S.C. §§1863(b)(6); 1869(i))**

The Court hereby finds that the exemption of the following occupational classes or groups of persons is in the public interest, not inconsistent with the Act, and shall be granted:

1) members in active service of the armed forces of the United States;
2) full-time members of Fire or Police Departments of any State, District, Territory, Possession, or subdivision thereof;
3) public officers in the executive, legislative, or judicial branches of the government of the United States or an State, District, Territory, or Possession or subdivision thereof who are actively engaged in the performance of official duties (public officer shall mean a person who is either elected to public office or who is directly appointed by a person elected to public office).

**EXCUSE FROM JURY SERVICE UPON INDIVIDUAL REQUEST (28 U.S.C. §§1863(b)(5)(A) & (B); 1866(e); 1869(j) and District Court Clerk's Manual Chapter 23)**

The Court hereby finds that jury service by members of the following occupational classes or groups of persons would entail undue hardship or extreme inconvenience to the members thereof, and the excuse of such members would not be inconsistent with the Act and that upon individual request such persons shall be excused:

1) Persons over seventy (70) years of age;
2) Persons who have, within the past two years, served on a federal or state grand or petit jury panel;
3) Persons having active care and custody of a child or children under twelve (12) years of age whose health and/or safety would be jeopardized by their absence for jury service
4) A person who is essential to the care of the aged or infirm persons; and
5) volunteer safety personnel (personnel who serve without compensation as fire fighters, members of a rescue squad or ambulance crew for a public agency; and
6) Any person whose services are so essential to the operation of a business, commercial, or agricultural enterprise that said enterprise must close if such person were required to perform jury duty.

**TEMPORARY EXCUSES (28 U.S.C. § 1866(c)(1))**

The Chief Judge, presiding judge or the Clerk of Court under the supervision of the Court may grant temporary excuses on the grounds of undue hardship or extreme inconvenience. The names of individuals temporarily excused shall be reinserted into the master jury wheel for possible re-summoning. If the circumstances causing undue hardship or extreme inconvenience may be reasonably expected to continue for an indefinite period, the prospective juror may be excused from the current jury wheel.

**PERIOD OF POTENTIAL PETIT JURY SERVICE (District Court Clerk's Manual Chapter 23)**

Persons summoned for petit jury service shall be subject to being called for such service for a period of ninety (90) days following the date of first appearance or reporting, unless they shall then be serving as jurors in an uncompleted trial, or until they shall have completed service as a trial juror in one trial, whichever shall have occurred first.

**FREQUENCY OF SERVICE (28 U.S.C. §1866(e))**

In any two-year period, no person shall be required to (1) serve or attend court for prospective service as a petit juror for a total of more than thirty (30) days, except when necessary to complete

service in a particular case, or (2) to serve on more than one grand jury, or (3) to serve as both a grand and petit juror.


## RECORDS TO BE MAINTAINED BY THE CLERK AND MADE PUBLIC UPON REQUEST (28 U.S.C. §§1863(a); 1867(f); 1868)

The Clerk of Court shall retain all jury records and papers complied and maintained by the Clerk of Court, including the following documents:

1) Jury Selection Plan;
2) Orders regarding refilling of the master jury wheel, petit juries, and grand juries;
3) Jury memos from the Administrative Office and internal memos;
4) Qualification questionnaires
5) Pre-screening questionnaires
6) Individual petit jury and grand jury panel information
7) Administrative Office reports: JS-11, JS-11G and AO-12.

These records shall not be disclosed, except (1) pursuant to this Plan, or (2) pursuant to an order of the Court finding disclosure is necessary in preparation of a motion challenging the selection of a jury, until the master jury wheel has been refilled and all persons selected as jurors from the prior master jury wheel have completed service. Parties who have obtained an order of disclosure shall be allowed to inspect, reproduce, and copy such records at reasonable times during the pendency of the motion challenging the selection of a jury.

Upon written order of the Court, except when the court orders a longer retention period, these records can be disposed of four (4) years after the master jury wheel has been refilled and all persons selected have completed jury service in accordance with 28 U.S.C. § 1868.  These records shall not be transferred to the Federal Records Center.


## RELEASE OF JUROR INFORMATION (28 U.S.C. §1863(b)(7))

Names and personal information concerning petit and grand jurors shall not be disclosed to attorneys, parties, the public or the media, except as provided herein.

Names and personal information concerning persons who have been entered in the jury wheel shall not be disclosed, except upon order of the Court.

Names and personal information concerning prospective and sitting petit jurors shall not be disclosed to the public or media outside open court, except upon order of the Court. A request for disclosure of petit juror names and personal information to the media or public must be made in writing to the presiding judge.

The Clerk of Court may provide names and personal information concerning prospective petit jurors to the attorneys (or a party if proceeding *pro se*) in a case set for trial unless otherwise directed by the Court. The names and information will be provided in written form only (hereafter "the jury list"). The attorneys (or party) may not share the jury list or information therein except as necessary for purposes of jury selection. Following jury selection, the attorneys (or party) provided the jury list must return to the clerk the jury list and any copies made from the jury list provided to them and/or destroy them.

The Court may order juror names and personal information to be kept confidential where the interests of justice so require.

## APPLICABILITY AND DEFINITIONS (28 U.S.C. § 1869)

The provisions of this Plan apply to both divisions in the District unless specifically indicated otherwise.

The definitions set forth in 28 U.S.C. § 1869 shall apply to this Plan unless specifically indicated otherwise.

## EFFECTIVE DATE

This plan as amended this _9th_ day of ~~April~~ May, 2018, shall become effective when approved by the Judicial Council of the Second Circuit.

**FOR THE COURT**

FRANK P. GERACI, JR.
Chief United States District Judge

**SECOND JUDICIAL CIRCUIT OF THE UNITED STATES**
**UNITED STATES COURTHOUSE**
**40 FOLEY SQUARE-ROOM 2904**
**NEW YORK, NEW YORK 10007**
*(212) 857-8700 PHONE*
*(212) 857-8680 FACSIMILE*

JUDICIAL COUNCIL
APPROVED

MAY 1 5 2018

C/E

Robert A. Katzmann
Chief Judge

Karen Greve Milton
Circuit Executive

**MEMORANDUM**
May 11, 2018

To:    Second Circuit Judicial Council

From:  Karen Greve Milton, Circuit Executive

**Re:    Request to Amend Jury Plan - Western District of New York**

The United States District Court for the Western District of New York requests the Judicial Council's approval to amend the District's Jury Plan.

Attached is the final plan, a red-line version comparing it to the prior adopted plan, and an Executive Summary.

**Kindly return your ballot by email or fax to 212-857-8680, by Friday, May 18, 2018. Thank you.**

**BALLOT**

Judge: _____

_____ Yes, I approve the request to amend the WDNY Jury Plan.

_____ No, I do not approve the request to amend the WDNY Jury Plan.

_____ I request additional information and/or further discussion.