UNITED STATES DISTRICT COURT
<u>WESTERN DISTRICT OF NEW YORK</u>

UNITED STATES OF AMERICA

     v.                                        22-CR-109 (LJV)

PAYTON GENDRON,

                    Defendant.

_____

**REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS THE INDICTMENT BECAUSE IT WAS OBTAINED IN VIOLATION OF THE FIFTH AND SIXTH AMENDMENTS TO THE UNITED STATES CONSITUTION AND IN VIOLATION OF THE JURY SELECTION AND SERVICE ACT**

      Payton Gendron, through undersigned counsel, submits this Reply to the government's opposition (ECF No. 413) to his Motion to Dismiss the Indictment under the Sixth Amendment right to a grand jury drawn from a fair cross section of the community, under the Equal Protection Clause of the Fifth Amendment, and under the Jury Selection and Service Act of 1968, 28 U.S.C. §1861, et seq. [the "JSSA"] (ECF No. 409).

I.      INTRODUCTION

      Payton Gendron, like every other individual indicted by a federal grand jury, is entitled to a grand jury drawn from a fair cross section of the community. So, too, are the people who live in the Western District of New York entitled to a fair opportunity to serve on a grand or petit jury regardless of their race, gender, or economic status. *See Handbook for Federal Grand Jurors*, published by the Administrative Office of the United States Courts, available at https://www.nywd.uscourts.gov/sites/nywd/files/grand_juror_handbook.pdf ("Federal law requires that a grand jury be selected at random from a fair cross section of the community in the district or division in which the federal grand jury convenes. Thus, all citizens have an equal opportunity and obligation to serve.") The government's implicit suggestion that Payton

1

Gendron has forfeited that right by committing the crime charged, *see* ECF No. 413 at 1-2, is a rhetorical flourish unmoored from any legal principle.

In contrast, the defense proffered unrebutted, expert analysis (ECF No. 409-1) showing that 1) Black, Hispanic/Latino, and male individuals (all distinctive groups in the community) were underrepresented in the Master Jury Wheel from which the grand jury that issued this indictment was selected; 2) the underrepresentation of these groups in the District's jury lists was significant; and 3) the underrepresentation of these distinctive groups is systemic. The defense also explained that the Court Clerk's failure to create guidelines and maintain records documenting the creation of the Master Jury Wheel not only undermined the fairness and integrity of the grand jury process and violated the mandate of the JSSA, it also prevented the defense from presenting additional evidence to document these claims. *See* ECF No. 409 at 7-10. In response, the government presented no evidence to counter the factual conclusions urged by the defense; argued that the evidence presented by the defense was inadequate; and simultaneously defended the destruction of the material required to further substantiate the defense claim.[1]

Because Payton Gendron has established that he was deprived of his right to a grand jury drawn from a fair cross section of the community, pursuant to the Sixth Amendment, the Equal Protection Clause of the Fifth Amendment, and the Jury Selection and Service Act of 1968, 28 U.S.C. §1861, et seq., the Court should dismiss this indictment.

---

[1] The government claims "the defense conjures up alleged 'failures' on the part of the Clerk that, in truth and fact, are neither failures nor violations of the JSSA." ECF No. 413 at 2. In fact, the Court ordered that information be disclosed to the defense because it agreed that these materials were directly relevant to "any argument Gendron might raise regarding systematic exclusion" ECF No. 286 at 8 (records involving instructions as to how the Master Jury Wheel was constructed); and "[b]ecause [information about how jury wheels are created] is relevant and necessary to a potential JSSA motion." *Id.* at 6.

II. ARGUMENT

    *a. The Court should deny the government's request for leave to file a supplemental brief*

As the government has noted on multiple occasions, the litigation underlying the instant motion has been pending for years. *See* ECF No. 10 (requesting access to records used in connection with the constitution of the Master Jury Wheel to assess whether a challenge exists to the jury selection procedures used in this district, filed July 21, 2022); *see also* ECF No. 332 (letter from government requesting more compressed briefing schedule than previously jointly proposed because "the parties have been litigating issues surrounding JSSA records for years now"); ECF No. 344 (defense letter response to government's request to compress briefing schedule). And yet, in a footnote regarding the instant motion, the government advises the Court that its response "does not address the accuracy of the statements made by the defendant's expert" and, if necessary, "requests an opportunity to file a supplemental brief after consulting with its own expert." ECF No. 413 at n.1. This request should be denied.

From its inception, the defense proffered the expert declaration of Jeffrey Martin to support the request for records and explained that Mr. Martin's role would be to inspect and analyze the records sought "to determine whether the jury plan procedures run afoul of the Fifth and Sixth Amendments to the United States constitution and the JSSA." ECF No. 10 at 3; ECF No. 10-1. Mr. Martin has been present and participated in multiple meetings with the government including on March 21, 2024, when he provided considerable background and detail regarding the requests in his declaration; and a two-day session at the Buffalo courthouse on November 18–19, 2024, that involved reviewing juror qualification questionnaires and related materials and discussions with the Jury Administrator and Deputy Court Clerk. In addition, the government has been receiving the same productions of information from the Jury Administrator

as the defense for over a year - beginning in mid-May of 2024 and continuing through late May of 2025. There is no excuse for the government's brazen assertion that it failed to address the "accuracy of the statements made by the defendant's expert" because the "defendant's arguments fail as a matter of law, and to obviate the need for the Court to resolve complex factual questions." ECF No. 413 at n.1. The Court should accept the uncontroverted data analysis proffered by the defense and deny the government's unreasonable and untimely request to begin the process anew after "consulting with its own expert." *Id.*[2]

      b. *The defense has established significant underrepresentation of Black, Hispanic/Latino, and male individuals in the 2021 Buffalo Division Qualified Jury Wheel*

The government concedes that Blacks, Hispanics/Latinos, and men are distinctive groups for purposes of the fair cross section analysis under the Sixth Amendment and the JSSA. ECF No. 413 at 4. Without proffering any evidence or statistical analysis to rebut the expert declaration offered by the defense to establish that these groups are underrepresented (ECF No. 409-1), however, the government simply asserts that they are not. That conclusion ignores the data, which establishes a statistically significant underrepresentation using any of the basic methods of analysis. Specifically, the data for the 2021 Buffalo Division Qualified Jury Wheel establishes the following:

- Using the Absolute Disparity method, Black or African American individuals are under-represented by 3.65%; Hispanic or Latino individuals are under-represented by 1.58%; and men are under-represented by 1.73%.

---

[2]In both *Biaggi* and *Slaughter*, two cases heavily relied upon by the government, the district courts made factual findings based on a complete record that included expert opinions from both sides. *See United States v. Biaggi*, 909 F.2d 662, 677 (2d Cir. 1990) (findings of fact following a two-day hearing); *United States v. Slaughter*, 110 F.4th 569, 577 (2d Cir. 2024) (government "countered Slaughter's expert report with its own…"); *Id*. at 585 ("Our assessment is driven by the data and expert evidence in this case.").

4

*See* ECF No. 409-1 at ¶¶36-38.

- The Comparative Disparity for Black or African American people is 41.19% underrepresentation; for Hispanic or Latino people the comparative disparity is 38.02%; and for men it is 3.56%.

*Id.* at ¶¶ 42-44.

Applying only the absolute disparity (or "absolute numbers") method, the government dismisses these conclusions simply because the under-representation is not *worse* than in *United States v. Biaggi*, 909 F.2d 662 (2d Cir. 1990), a case arising out of the Southern District of New York.[3] There, the Court highlighted the risks inherent in using only the "absolute numbers" approach: "[t]he risk of using this approach is that it may too readily tolerate a selection system in which the seemingly innocuous absence of small numbers of a minority from an average array creates an unacceptable probability that the minority members of the jury ultimately selected will be markedly deficient in number and sometimes totally missing." *Id*. at 678. The Court in *Biaggi* also noted that the facts of that case pressed the "absolute numbers" approach "to its limit." *Id*.

In *Slaughter*, another case arising out of the Southern District of New York, the Court again "recognized the limits of [the absolute disparity/absolute numbers] method 'when applied to an underrepresented group that is a small percentage of the total population,' because an underrepresentation that can be fixed by adding 'only' one or two members to an average venire might 'lead to the selection of a large number of venires in which members of the group are substantially underrepresented or even totally absent.'" 110 F.4th at 581 (quoting *United States v. Jackman*, 46 F.3d 1240, 1247 (2d Cir. 1995)). Considering these concerns, the Court was

---

[3] Using this method in *Biaggi*, *id.* at 677, the Court found that Blacks were underrepresented by 3.6% and Hispanics by 4.7%.

5

"mindful that the circumstances of any given case may warrant the use of different or even multiple modes of statistical analysis…." *Id*.

The risks and limitations of relying exclusively on the absolute disparity method of analysis, as the government does, are readily apparent under the circumstances of this case. Under this method, a challenge to Black or African American representation or Hispanic or Latino representation is all but thwarted mathematically in the Buffalo Division. Because absolute disparity does not adjust for the size of the group, it disproportionally affects minority groups in less-populated districts, and comparisons across jurisdictions are misleading. Yet the Government insists that, because the absolute disparities cited by the defense "fall within Biaggi's guidance" the defense has failed to establish underrepresentation and the motion should be denied. ECF No. 413 at 5.

For instance, The Government notes that "the Second Circuit [in *Biaggi*] held that where the absolute disparities for Blacks and Hispanics were 3.6% and 4.7%, the defendant failed to establish a fair cross-selection claim under the Sixth Amendment." ECF No. 413 at 5. Because these figures are the same or higher than in the instant case, the government reasons, this challenge, too, must fail. If one were to assume, however, that an absolute disparity of 4.7% for Hispanic or Latino persons was the highwater mark for the Buffalo Division, then Hispanic or Latino persons could be entirely excluded. That is, if Hispanics or Latinos were unilaterally excluded from jury service here, the absolute disparity would not be as high as 4.7%. *See United States v. Jackman*, 46 F.3d 1240, 1247 (2d Cir. 1995) (the problem with absolute numbers/disparity approach is "particularly acute here because of the small percentage of voting-age Blacks and Hispanics residing within the Hartford Division (6.34% and 5.07% respectively,

as compared with 19.9% and 15.7% within the Manhattan Master Wheel of the Southern District of New York in *Biaggi*").

The comparative disparity approach resolves the defect of misleading comparisons from different jurisdictions. In this case, the comparative disparity approach reveals that the Buffalo Qualified Jury Wheel is missing more than 1 out of 3 Blacks or African Americans and 1 out of 3 Hispanics or Latinos. *See* ECF No. 409-1 at ¶¶42-43. Surely these uncontested figures establish the significant underrepresentation of these cognizable groups in the pool from which grand jurors were selected in this case. Nonetheless, the government presses the absolute disparity numbers from *Biaggi*, ignoring the risk highlighted by the court in *Jackman* where, as here, cognizable groups are present in much smaller percentages than in New York City.

    *c. The defense has established that the underrepresentation of these groups is systemic*

The uncontested data analysis proffered by the defense also establishes that the underrepresentation of these cognizable groups in the 2021 Qualified Jury Wheel for the Buffalo division was systemic. Using Statistical Decision Theory, the percentage of Blacks or African Americans in the qualified jury wheel differs from the percentage in the jury eligible population by 14 standard deviations; the percentage of Hispanics or Latinos differs from the percentage in the jury eligible population by 9 standard deviations; and the percentage of men differs from the percentage in the jury eligible population by 3 standard deviations. Each of these examples of under-representation are statistically significant, i.e., the under-representation is a product of a systematic, non-random factor. *See* ECF No. 409-1 at ¶¶46-48. Unlike in *Slaughter*, where the government "countered Slaughter's expert report with its own, arguing that any underrepresentation is not systematic but the product of factors external to the jury selection

7

process," 110 F.4th at 576, here the government failed to proffer any data or analysis to dispute these conclusions.

Instead, the government faults the defense for appearing "to offer no argument or evidence whatsoever regarding how the jury selection process caused systematic exclusion." ECF No. 413 at 7. This argument ignores both the expert analysis offered by the defense showing potential reasons for what appears to be systemic underrepresentation and ways in which the District could correct this persistent problem (*see* ECF No. 409-1 at ¶¶132-152, 159-165) and, perhaps more significantly, the fundamental failure of the Court Clerk, Jury Administrator, and/or the vendor (Sutera) to document how the jury selection process was implemented. *See* ECF No. 409 at 7-10.

        d. *The District's failure to preserve records, provide written instructions to the vendor, or recall how the plan was implemented violated the JSSA and undermined the defense expert's ability to analyze the data*

The government simultaneously argues that the defense failed to meet its burden *and* that the Clerk, and by extension the vendor, had no obligation to maintain the source data or any record of how the source data was combined to create the Master Wheel. This information, which includes which categories of individuals were included in the source data, *see* ECF No. 409 at 5-6, and how the vendor excluded duplicate entries, s*ee* ECF No. 409-1 at ¶118-124, is critical to any expert analysis. As this Court found, "source data qualifies as a record used by the Clerk in connection with the jury selection process that may be necessary for the preparation of a motion challenging the creation of the master wheel." ECF No. 286 at 11 (cleaned up). The defense's ability to further substantiate its statistical analysis was undermined by the Clerk's failure to maintain this data in violation of the JSSA. *See* 28 U.S.C. 1868 (mandating that "all records and papers compiled and maintained by the jury commission or clerk before the master

wheel was emptied shall be preserved…and shall be available for public inspection for the purpose of determining the validity of the selection of any jury.")

The government defends Sutera's destruction of the source data by asserting that "New York State law requires Sutera to do so." ECF No. 413 at 10. This is simply not true, and no citation is offered to support it. Rather, the government attaches as an exhibit the "Western District of New York – Project to Expand Jury Diversity," ECF No. 413-1, which explains at length how representatives of the WDNY worked with New York State legislators to pass legislation facilitating the sharing of data lists with the Court. Although precautions were taken to ensure the confidentiality of this information, the government provides no support for the assertion that the Court, and by extension the vendor, are required to destroy it.

Moreover, the government implies that the WDNY's attempts to diversify the jury pool somehow excuses the District from complying with the mandates of the JSSA to preserve "all records and papers compiled and maintained by the jury commission or clerk." *See* ECF No. 413 at 11 ("Ironically, the defendant criticizes the Clerk for failing to preserve data that WDNY fought to obtain to diversify the jury pool"). These are apples and oranges. A plan to diversify the jury pool, however laudable, must still comply with the law. Indeed, if the various source lists are not merged with precision and care, the attempt to diversify the jury pool could be counterproductive. As the National Center for State Courts explained:

> Failing to identify duplicate records undermines the principle of random selection insofar that individuals who have more than one record on the master jury list (e.g., people who both vote and drive) have a greater probability of being selected than individuals with only one record. On the other hand, incorrectly removing a record on the mistaken belief that it duplicates an existing record disenfranchises a potentially eligible individual and decreases the inclusivity of the master jury list.

*See* ECF No. 409-1 at ¶118

*e. The indictment must be dismissed*

To the extent possible with the information provided, the defense has presented unrebutted evidence that Payton Gendron was deprived of his right to a grand jury drawn from a fair cross section of the community. The only adequate remedy for these violations is the dismissal of this indictment. Moreover, if these significant violations are not addressed now, they will surely recur when the Master Jury Wheel is constructed from which the petit jury will be drawn, thereby compounding the harm.

III. CONCLUSION

For the reasons stated above, Payton Gendron respectfully requests that the Court, upon a showing of substantial noncompliance with the JSSA and violations of the Fifth and Sixth Amendments, dismiss the indictment returned by the improperly constituted grand jury.

WHEREFORE, for the foregoing reasons, the Court should grant the relief sought and grant such further relief as the Court deems just and proper.

DATED: July 31, 2025
Rochester, New York

Respectfully submitted,

*/s/Anne M. Burger*
Supervisory Asst. Federal Public Defender

*/s/Sonya A. Zoghlin*
Assistant Federal Public Defender

*/s/MaryBeth Covert*
Senior Litigator

*s/Julie Brain*
Attorney at Law