UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————————

UNITED STATES OF AMERICA

     v.

PAYTON GENDRON,

        Defendant.

———————————————————————

22-CR-109-LJV
DECISION & ORDER

      The defendant, Payton Gendron, has moved to strike aggravating factors from the government's notice of intent to seek the death penalty, Docket Item 268, and to establish procedures for the admission of victim impact evidence, Docket Item 309. After the government responded to each motion, Docket Items 289 and 350, Gendron replied, Docket Items 341 and 372.  This Court then held oral argument on June 17, 2025, *see* Docket Item 388, and the parties submitted supplemental briefs about the aggravating factors, Docket Items 411 and 414.  Having carefully reviewed the parties' submissions and arguments, and for the reasons explained below, the Court grants Gendron's motions in part and denies them in part.

## BACKGROUND

      A federal indictment charged Gendron with twenty-seven felony counts in connection with a shooting that killed ten people and injured three at a Tops grocery store in Buffalo, New York, on May 14, 2022.  Docket Item 6.  On January 12, 2024, the government filed a notice of intent to seek the death penalty.  Docket Item 125.  That notice included nine aggravating factors that the government proposed asking the jury to consider when deciding whether Gendron should be sentenced to death.  *Id*.

The Federal Death Penalty Act ("FDPA") enumerates certain aggravating factors and allows the jury to consider "other aggravating factor[s]" as well.  *See* 18 U.S.C. § 3593(d).  The government alleged four enumerated factors in this case: grave risk of death to additional persons, substantial planning and premeditation, vulnerable victim, and multiple killings and attempted killings.  Docket Item 125 at 3.  And the government added five other aggravating factors: victim impact, injury to surviving victims, racially motivated killings, attempt to incite violence, and selection of site.  *Id.* at 4-5.

## DISCUSSION

Juries at capital sentencing hearings make an "eligibility decision" and a "selection decision."  *United States v. Fell*, 531 F.3d 197, 240 (2d Cir. 2008) ("*Fell I*"); *see* 18 U.S.C. § 3593(b)-(e).  A jury will find a defendant *eligible* for the death penalty "if [it] finds the charged homicide, a statutory intent element or threshold mental culpability factor under [18 U.S.C.] § 3591(a)(2), and at least one of the statutory aggravating factors in [18 U.S.C.] § 3592(c)."  *Fell I*, 531 F.3d at 216.  If the jury finds a defendant eligible, it will then *select* a sentence by deciding whether the aggravating factors "sufficiently outweigh" the mitigating factors "to justify a sentence of death."  18 U.S.C. § 3593(e).  The purpose of aggravating factors is "to limit the death penalty to the most culpable defendants and the most serious offenses."  *United States v. Fell*, 2017 WL 10809983, at *5 (D. Vt. Jan. 20, 2017) ("*Fell II*") (citing *Zant v. Stephens*, 462 U.S. 862, 877 (1983)).

Aggravating factors must meet certain criteria.  A factor "must not be so vague as to lack 'some common[]sense core [of] meaning . . . that criminal juries [are] capable of understanding.'"  *United States v. Bin Laden*, 126 F. Supp. 2d 290, 298 (S.D.N.Y. 2001)

(quoting *Tuilaepa v. California*, 512 U.S. 967, 972 (1994)), *aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93 (2d Cir. 2008).  And a factor "cannot be overbroad such that a sentencing juror 'fairly could conclude that [it] applies to every defendant eligible for the death penalty.'"  *Id.* (quoting *Arave v. Creech*, 507 U.S. 463, 474 (1993)).  An aggravator also must be "sufficiently relevant to the consideration of who should live and who should die."  *U.S. v. Davis*, 912 F. Supp. 938, 943 (E.D. La. 1996).

Some courts have found duplicative factors to be impermissible.  In *United States v. McCullah*, 76 F.3d 1087 (10th Cir. 1996), the Tenth Circuit held that duplicative aggravating factors result in "double counting," which "creates an unconstitutional skewing of the weighing process."  *Id.* at 1111-12.  Likewise, several district courts have rejected certain aggravating factors because they were impermissibly duplicative.  *See, e.g.*, *United States v. Regan*, 228 F. Supp. 2d 742, 751-52 (E.D. Va. 2002) (striking two factors about removal of documents from government facilities as duplicative because the elements of one factor "includ[ed] the elements" of the other); *Bin Laden*, 126 F. Supp. 2d at 300-01 (consolidating "serious injury to surviving victims" and "victim impact evidence" factors because the former was subsumed within the latter); *United States v. Nguyen*, 928 F. Supp. 1525, 1543-44 (D. Kan. 1996) (striking "low potential for rehabilitation" factor as duplicative of "future dangerousness" factor).  In addition to potentially skewing the weighing process by double counting, a "duplicative factor does not limit the field [of death penalty cases] since its fellow, already applied, has either included or excluded the same case."  *Fell II*, 2017 WL 10809983, at *5.  But factors that "arguably overlap to a certain degree" are not duplicative unless "one factor

necessarily subsumes another."[1]  *Fell I*, 531 F.3d at 236.  As for the evidence that the government may use to prove aggravating factors, "information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury."  18 U.S.C. § 3593(c); *see id.* (explaining that "the rules governing admission of evidence at criminal trials" do not apply during capital sentencing proceedings).

## I.      STATUTORY AGGRAVATING FACTORS

### A.      Grave Risk of Death to Additional Persons

The government alleges that Gendron "in the commission of the offense . . . knowingly created a grave risk of death to one or more persons in addition to the victim of the offense."  Docket Item 125 at 3.  Knowingly creating a grave risk of death means that a defendant "was conscious and aware that his conduct in the course of committing the offense might have this result."  Leonard B. Sand et al., *1 Modern Federal Jury*

---

[1]  In *Fell I*, the Second Circuit declined to decide whether "a capital jury may permissibly be presented with duplicative aggravating factors" and instead found that certain aggravating factors at issue were not duplicative.  531 F.3d at 235-36.  The three factors were that (1) the defendant abducted a victim "to facilitate [the defendant's] escape from the area in which he and an accomplice had committed a double murder"; (2) the defendant helped murder that victim "to prevent her from reporting the kidnapping and carjacking"; and (3) the defendant helped murder that victim "after substantial premeditation to commit the crime of carjacking."  *Id.* at 234.

Along the same lines, a plurality of the Supreme Court addressed a claim of duplicative aggravating factors by first noting that it had never held that duplicative factors were constitutionally invalid and then concluding that "accepting, for the sake of argument, [the] 'double counting' theory," the factors at issue were not duplicative. *Jones v. United States*, 527 U.S. 373, 398-99 (1999).  The two factors at issue were (1) "[the victim's] personal characteristics and the effect of the instant offense on [her] family" and (2) "[the victim's] young age, her slight stature, her background, and her unfamiliarity with" the city where she was kidnapped.  *Id.* at 378 n.3, 398-99.

*Instructions-Criminal*, ¶ 9A.03, Instr. 9A-10 (2025).  In its briefing, the government proposed applying this factor to everyone in and around the store: the ten people Gendron shot and killed, the three people he shot and injured, and "all store patrons and employees."[2]  *See* Docket Item 289 at 11.

Gendron argues that the grave risk aggravating factor has a mens rea of *recklessness*, whereas charges involving some of the alleged victims require a *specific intent to kill* those same people.  Docket Item 268 at 3-8.  He also argues that the multiple killings and attempted killings factor is duplicative of this factor.  Docket Item 341 at 16-19.

At oral argument, the government maintained that there was no inconsistency between the charges and this factor and that it could allege the same victims for this factor and the multiple killings and attempted killings factor.  Docket Item 387 at 13.  But it conceded that it would be "cleaner for the jury, perhaps, if we choose one or the other" factor for each alleged victim.  *Id.*  The government therefore proposed applying the multiple killings and attempted killings factor to the ten victims who were killed as well as Z.G., the one Black victim who was shot and survived.  *Id.* at 15.  And it proposed applying the grave risk factor to everyone else: all Black people present who were not shot and all white people present, for whom "there's no allegation of an intent to kill."  *Id.*

Gendron took issue with one aspect of that proposal: the inclusion of Black people who were not shot within the grave risk factor.  *Id.* at 15-16.  He argued that if

---

[2] The government has described its position somewhat inconsistently.  For example, in its supplemental brief, it asserted that Gendron "created a grave risk of death for all the other people in front of and throughout the grocery store *that he did not shoot or kill*," Docket Item 411 at 9-10 (emphasis added), thus suggesting that the first two groups listed in his original response should be excluded.

the jury finds him guilty of Count 27, it will have determined that he intended to kill all the Black people whom he did not shoot. *Id.* at 16-17. And that would be inconsistent with the intent of the grave risk factor, Gendron says. *Id.*

The Court will not strike the grave risk factor. The government may pursue this factor at least as to the white people in and around the store. The Black people who were shot fit best within the multiple killings and attempted killings factor. To avoid duplication and juror confusion, the Court will not allow the government to cite the killing or attempted killing of those 11 people again as part of the grave risk factor. The Court reserves decision as to whether the government may argue that this factor applies to all remaining Black people. If the jury finds that Gendron is not guilty of Count 27, the Court is inclined to find that Gendron's argument is moot and to allow the government to allege that group within the grave risk factor. If the jury finds that Gendron is guilty of Count 27, the Court is inclined not to allow the government to include this group within the grave risk factor.[3]

---

[3] Gendron also makes a factual argument: Some alleged victims of this factor were outside the zone of danger, he says, so he did not put them at grave risk of death. Docket Item 268 at 8-15. He cites, for example, people who hid in nonpublic areas of the store and never saw him. *Id.* at 12-13.

Gendron's argument is based on the incorrect premise that the government can prove the grave risk factor only if it proves it as to every single person that the government alleged in its informational outline were victims. *See id.* at 11-12. But the factor requires the government to prove only that Gendron put "[one] or more persons" at grave risk. *See* 18 U.S.C. § 3592(c)(5); Docket Item 125 at 3. The jury will need to unanimously determine the person or persons whom Gendron put at grave risk, but the government can prove this factor without proving it as to everyone. The Court therefore will not strike the factor on this ground, either.

In the alternative, Gendron asks the Court to preclude the government "from presenting evidence regarding any individual who was not within the 'zone of danger.'" Docket Item 268 at 15. Gendron has not demonstrated as a matter of law that certain

### B.    Multiple Killings and Attempted Killings

The government alleges that Gendron "intentionally killed and attempted to kill more than one person in a single criminal episode."  Docket Item 125 at 3.

Gendron asks the Court to remove the "attempted to kill" language from this factor based on a statement that the government made in its response to his request for an informational outline.  Docket Item 268 at 21.  Essentially, he argues that the government conceded that it is trying to prove this factor only as to the killings.  *See id.*

But the plain language of the factor includes attempts to kill, and the government did not concede otherwise.  *See* Docket Item 289 at 40-41.  The Court therefore denies Gendron's request to remove the "attempted to kill" language.  As explained in the previous section, *see supra* Section I.A., the government may argue that this factor applies to the ten victims who were killed and the one Black victim who was shot and survived.

### C.    Substantial Planning and Premeditation

Gendron asks the Court not to strike this factor but to preclude the government from introducing certain evidence to support it.  *See* Docket Item 268 at 15-19.  As this Court stated during oral argument, it is inclined to exclude evidence of specific locations that Gendron allegedly considered as other potential targets, *see id.* at 16-17, and his beliefs about what might happen after he committed the attack, *see id.* at 18.  The Court is inclined to admit some "evidence of [Gendron's] alleged 'ideological rational[e]'"

---

people were "insufficiently close . . . to have been at risk of being hit" for the entirety of the shooting.  *See id.*  The Court therefore denies this request without prejudice to Gendron's raising it in a motion in limine.

related to his planning.  *See id.* at 15, 17.  Ultimately, these issues are better suited for motions in limine, however, so the Court denies this request without prejudice.

### D.    Vulnerable Victim

The government alleges that Gendron committed the offenses charged in five of the capital counts "against a victim who was particularly vulnerable due to old age."[4] Docket Item 125 at 3.  Those counts pertain to the killings of Pearl Young, Heyward Patterson, Ruth Whitfield, Celestine Chaney, and Katherine Massey.  *See id.*; Docket Item 6 at 3-4.

To find this factor, a jury must find "a connection between the victim's vulnerability and the offense(s) committed upon the victim."  Leonard B. Sand et al., *1 Modern Federal Jury Instructions-Criminal*, ¶ 9A.03, Instr. 9A-14 (2025).  The "connection does not mean that the defendant targeted the victim because of the vulnerability" but that "once targeted, the victim was more susceptible to death due to the vulnerability."  *Id.*; *see United States v. Sampson*, 486 F.3d 13, 33-34 (1st Cir. 2007).

Gendron asserts that the government will not be able to show a nexus between the victims' alleged vulnerabilities and their deaths.  *See* Docket Item 268 at 19-21. Because Gendron used a "high-powered, semiautomatic rifle capable of firing dozens of rounds in seconds," he says, age "had no bearing on the likelihood that [these five victims] would be killed."  *Id.* at 20.  In other words, Gendron contends that once

---

[4] The government originally alleged that the vulnerability was due to "old age and infirmity," Docket Item 125 at 3, but it later conceded the infirmity prong and said that it would "proceed at trial only on the 'old age' prong," Docket Item 167 at 34 n.15.

targeted, no one—young or old—could have escaped and that these five victims therefore were no more susceptible to death than anyone else.

The government disagrees.  It responds that "[u]nlike others in the store who were able to run to safety, or at least attempt to run to safety or take cover, the [vulnerable] victims were unable to do so due to, at least in part, limitations in mental and physical capacity that were natural results of their advanced ages."  Docket Item 289 at 39.

Gendron has not demonstrated that the government cannot prove its theory, and this factor "must await factual development at trial."  *See United States v. Walker*, 910 F. Supp. 837, 849 (N.D.N.Y. 1995).  For example, it appears that three of the allegedly vulnerable victims were inside the store when the shooting began outside.  *See* Docket Item 125 at 3; Docket Item 6 at 2.  Their age may have affected their ability to hear the shooting and to react to protect themselves as the government alleges other people did. The Court therefore denies the motion to strike this factor without prejudice.

## II.    NON-STATUTORY AGGRAVATING FACTORS

### A.    Injury to Surviving Victims

The government alleges that Gendron "caused serious physical and emotional injury[] and severe psychological impact to individuals who survived the offense and are listed in Counts 21 through 26 of the Indictment (Z.G., C.B., and J.W.)."  Docket Item 125 at 4.  Gendron argues that the Eighth Amendment and the FDPA "preclude the use of evidence of the impact upon victims of non-capital crimes as a basis upon which to seek a death sentence for other, death-eligible offenses."  Docket Item 309 at 35.

The FDPA specifies that the notice of intent to seek the death penalty "may include factors concerning the effect of the offense"—that is, a death-eligible offense—"on the victim and the victim's family."  18 U.S.C. § 3593(a).  But the statute does not specify whether the government may include victim impact evidence related to other, non-capital offenses as a factor.  *See id.*; *United States v. Sampson*, 335 F. Supp. 2d 166, 193 (D. Mass. 2004).

In *United States v. Gooch*, 2006 WL 3780781 (D.D.C. Dec. 20, 2006), the court concluded that "losses and emotions" related to noncapital crimes "[we]re not relevant to whether the jury selects the death penalty for the alleged [capital crimes] and would also be more prejudicial than probative."  *Id.* at *22.  The court therefore precluded the families of the defendant's other alleged non-capital murder victims from testifying during the capital sentencing.  *Id.*; *but see United States v. Bowers*, 498 F. Supp. 3d 741, 757 (W.D. Pa. 2020) ("declin[ing] to adopt" this argument).

This Court agrees with the court in *Gooch* that victim impact evidence related to the non-capital crimes is not relevant to the capital sentencing.  If the jury finds Gendron guilty of the offenses relating to Z.G., C.B., and J.W., evidence of the impact of those crimes on the victims and their families will be important and relevant to the sentencing for those offenses.  But the Court, not the capital jury, will determine Gendron's sentence for those offenses in a separate sentencing proceeding during which Z.G., C.B., and J.W. will have an opportunity to be heard.  *See* Fed. R. Crim. P. 32(i)(4)(B); 18 U.S.C. § 3771(a)(4).

The Court therefore grants Gendron's motion to strike this factor.

B.     **Racially Motivated Killings**

The government alleges that Gendron "expressed bias, hatred, and contempt toward Black persons and his animus toward Black persons played a role in the killings of [the ten victims]."  Docket Item 210 at 21.  Gendron contends that "race is an impermissible aggravator under the . . . FDPA."  Docket Item 268 at 23.

The FDPA forbids the jury from "consider[ing] the race . . . of the defendant or of any victim" when it "consider[s] whether a sentence of death is justified."  18 U.S.C. § 3593(f).  The jury cannot "recommend a sentence of death unless it has concluded that it would recommend a sentence of death for the crime in question no matter what the race . . . of the defendant or of any victim may be."  *Id.*  "[U]pon return" of the jury's sentencing verdict, jurors "shall also return to the court a certificate, signed by each juror, that consideration of the race . . . of the defendant or any victim was not involved in reaching his or her individual decision and that the individual juror would have made the same recommendation regarding a sentence for the crime in question no matter what the race . . . of the defendant or any victim may be."  *Id.*

Gendron argues that "the racially motivated killing aggravator flatly violates the antidiscrimination intent of section 3593(f)[] and creates an unconstitutional risk that juror bias, confusion, or passion will influence the verdict in violation of the Eighth Amendment."  Docket Item 268 at 31.  He argues that "[t]he Court cannot, in one breath, instruct the jury to weigh the 'racially motivated' nature of the offense on death's side of the scale, and in another breath, admonish them not to consider the victims' or the defendant's race."  *Id.*

The government responds that this is a "new and novel claim," Docket Item 289 at 55, but the claim's novelty says little about its merit.  The government also argues

11

that "[i]t defies common sense to suggest the anti-discrimination clause would preclude the government from seeking the death penalty in any case involving murder motivated by racial or religious animus."  *Id.*  But that argument overstates Gendron's position:  He is not arguing that the antidiscrimination clause precludes the death penalty for racially motivated murders but only that it precludes the government from using racial motivation as a specific aggravating factor.[5]

The government argues that "[t]he very plain purpose of [section 3593(f)] is for the jurors to say that the sentence . . . would be the same for any defendant, regardless of his race or that of his victims."  Docket Item 411 at 17.  To that end, it proposes instructing jurors that they cannot "choose [a] sentence based simply upon the race of the defendant or the victim" and that "there is no room for [them] to express any racial bias in [their] decision-making process."  *Id.*  But the FDPA covers more ground than the government's interpretation and proposed instruction.  The government reads out the requirement not to "consider" race at all.  *See* 18 U.S.C. § 3593(f).  The proposed instruction cannot cure the conflict between the factor and section 3593(f).

The government also submits that this factor does not ask the jury to select a death sentence because the victims were Black but instead "because [Gendron] killed the victims because of their race and his desire to eliminate Black people living on white

---

[5] Gendron conceded at oral argument that, "[b]ecause [the charges involve violations of the] Hate Crimes Act, the fact that these crimes were committed because of the race of the victims is absolutely go[ing to] come in."  Docket Item 387 at 46.  And the defense conceded in the context of the substantial planning factor that the government "certainly" would be "allowed to prove [Gendron's] motive."  *Id.* at 30; *see also id.* at 34 ("[A]nything he wrote that is his reasons for what he did is absolutely fair game.").  But he contended that the issue was whether the government should be allowed to ask the jury to "focus . . . specifically" on racial motivation as an aggravating factor during sentencing.  *Id.* at 46-47.

lands." Docket Item 289 at 57. That distinction is perplexing to the Court; it likely would be even more perplexing to a lay jury. Indeed, during oral argument the government itself characterized this as "a difficult word problem." Docket Item 387 at 44.

In its supplemental briefing, the government argued that "[t]here is . . . a difference between allowing a jury to punish an offender more severely because [of] the defendant's racist motives and not permitting the jury to act with any racial biases of their own." Docket Item 411 at 19. But as framed by the government in its notice of intent, this factor is not about a general racist motive but about bias and animus towards "Black persons." *See* Docket Item 210 at 21. And it is that specific focus on the victims' race that conflicts with the FDPA.

Because this factor asks the jury to focus on the victims' race as a reason to select a death sentence despite the statute's proscription against even "consider[ing]" the victims' race for that purpose, the Court strikes this factor.[6] But the government may offer evidence about Gendron's racist motives in connection with other factors relevant to those motives.

### C.    Attempt to Incite Violence

The government alleges that Gendron, "in preparation for and in committing the acts of violence charged in this case, attempted to incite violent action by others." Docket Item 125 at 4. Gendron says that this factor "rests upon constitutionally protected speech under the First Amendment." Docket Item 268 at 31. He contends

---

[6] The Court need not and does not address other reasons that Gendron raised for striking this factor, including that the factor punishes constitutionally protected speech. *See* Docket Item 268 at 22-31.

that the evidence generally contains only "vague exhortations to 'act' in unspecified ways, or ways that have nothing to do with violent attacks." *Id.* at 34. These "thoughts and words," he says, "do not rise anywhere near the level of incitement" and therefore "are constitutionally protected speech under the First Amendment that cannot be the basis of an aggravating factor." *Id.* at 35. And because the government's evidence is not enough to prove incitement or even attempted incitement, he argues, the factor also is insufficiently relevant to the jury's sentencing decision. *Id.* at 36.

The government responds that the evidence supporting this factor is not constitutionally protected and that even if it is, courts are allowed to introduce some protected speech if it is relevant to sentencing. *See* Docket Item 289 at 58-62.

Based on the evidence that the government has presented, a jury could not find that what Gendron did constituted incitement. The Supreme Court laid out the test for incitement in *Brandenburg v. Ohio*, 395 U.S. 444 (1969). It explained that "the constitutional guarantees of free speech and free press do not permit [the government] to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Id.* at 447. In other words, to punish someone for speech that incites violence, the government must prove that the speaker intended unlawful violence to occur, unlawful violence was likely to occur, and unlawful violence was imminent. *Id.* "[U]nsurprisingly, '[t]here will rarely be enough evidence to create a jury question on whether a speaker was intending to incite imminent crime.'" *Bible Believers v. Wayne Cnty., Mich.*, 805 F.3d 228, 244 (6th Cir. 2015) (quoting Eugene Volokh, *Crime-Facilitating Speech*, 57 Stan. L. Rev. 1095, 1190 (2005)).

Here, there certainly is evidence of the first factor—intent to incite unlawful violence.  According to the government, before the attack Gendron "disclosed the links to his journal, manifesto, and livestream of the attack to approximately 65 Discord recipients,"[7] and made these materials "available to a wider audience" by "publish[ing] a post on [two Discord channels] containing links to his manifesto, journal, and livestream of the attack."  Docket Item 210 at 29-30.  The government says that Gendron's livestreaming the shooting is its "primary evidence of [his] attempt to incite violence."  Docket Item 411 at 21.

Moreover, Gendron's writings explicitly evince an intent to incite violence.  His manifesto lists as a reason for the attack "[t]o **incite violence**, retaliation and further divide between the European people and the replacers."  Docket Item 268 at 32.  And his journal says that he livestreamed the attack and published his manifesto online "to increase coverage and spread [his] beliefs."  Docket Item 411 at 60.  It also says that Gendron's "wish from the attack is that you[,] and I mean YOU the reader[,] become[] red-pilled and decide to fight back yourself."  Docket Item 210 at 30; *see also id.* ("I hope to inspire YOU to attack against the replacers as I did[.]").  The government also alleges that Gendron's writings were "meant to serve as a 'guidebook'" for others to commit violence by "teaching others how to select the site for the attack, what gear is best, how to train, etc."  Docket Item 289 at 63.

---

[7] "Discord is a real time messaging service with over 150 million active monthly users who communicate within a huge variety of interest-based communities[] or servers."  *Moody v. NetChoice, LLC*, 603 U.S. 707, 787 (2024) (Alito, J., concurring) (citation and quotation marks omitted).

Gendron describes his writings as "adolescent ramblings" and emphasizes that he "copied and pasted verbatim" or "paraphrase[d]" some of his statements from another shooter's manifesto.  Docket Item 268 at 33 & n.12, 34 n.14, 37.  But that is an argument for the jury—which could agree with Gendron that his statements were not serious and did not reflect his real intent, or with the government that when Gendron said he attacked Black people "[t]o incite violence," he meant it.  *See* Docket Item 268 at 32; Docket Item 289 at 60.  There is ample evidence of intent.

But intent alone is not enough.  Inciting violence outside the protection of the First Amendment has two additional requirements—likelihood and imminence.  And the government does not explain how its evidence meets either of those requirements.

Instead, the government relies on *Rice v. Paladin Enters., Inc.*, 128 F.3d 233 (4th Cir. 1997), a case from a different circuit in an entirely different context.  *See* Docket Item 411 at 20-23.  In *Rice*, the survivors of homicide victims sued the publisher of a how-to guide for hitmen.  *Id.* at 241.  The book was "so comprehensive and detailed that it is as if the instructor were literally present with the would-be murderer not only in the preparation and planning, but in the actual commission of, and follow-up to, the murder."  *Id.* at 249.

The publisher moved for summary judgment on First Amendment grounds.  For the purpose of the motion, the publisher stipulated to facts that "establish[ed] as a matter of law that [it was] civilly liable for aiding and abetting [a killer in a triple homicide] unless the First Amendment absolutely bar[red] the imposition of liability upon a publisher in the commission of criminal acts."  *Id.* at 241.  The court found that the book was "devoid . . . of any political, social, entertainment, or other legitimate discourse" and

that "[i]f there is a publication that could be found to have no other use than to facilitate unlawful conduct, then this would be it." *Id.* at 255. The court explained that *Brandenburg*'s imminence requirement "generally poses little obstacle to the punishment of speech that constitutes criminal aiding and abetting[] because culpability in such cases is premised[] not on defendants' advocacy of criminal conduct, but on defendants' successful efforts to assist others." *Id.* at 246 (internal quotation marks omitted); *see also United States v. Miselis*, 972 F.3d 518, 533 (4th Cir. 2020) (*Rice* "effectively recognizes a second category of unprotected speech . . . which may be proscribed without regard to whether it's directed and likely to produce imminent lawlessness."). The court ultimately held that speech "tak[ing] a form other than abstract advocacy," such as speech that "constitutes . . . aiding and abetting of criminal conduct," does not implicate the First Amendment and that a reasonable jury could find that the publisher aided and abetted murder. *Rice*, 128 F.3d at 243.

The government suggests that Gendron's writings are like those in *Rice* because "analyzing and recommending gun components . . . and body armor . . . largely amount[] to aiding and abetting other racially[ ]motivated mass shooters." Docket Item 411 at 22-23. But to prove aiding and abetting, the government must prove that "someone other than the defendant" committed an "underlying crime." *United States v. Pipola*, 83 F.3d 556, 562 (2d Cir. 1996). Among other obvious differences between *Rice* and this case, there was an underlying crime in *Rice* but not here. And because Gendron did not aid and abet anyone, this Court cannot ignore *Brandenburg*'s imminence and likelihood requirements.

17

To meet the likelihood requirement, there must be "a high probability that [the] incitement would be effective." *Collin v. Chicago Park Dist.*, 460 F.2d 746, 753 (7th Cir. 1972). And "it is a long leap" from an action's being "foreseeable" to its being "likely" under *Brandenburg*. *James v. Meow Media, Inc.*, 300 F.3d 683, 699 (6th Cir. 2002).

To meet the imminence requirement, the time between the speech and lawless conduct must be less than "weeks or months." *See N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 928 (1982); *see also United States v. Fullmer*, 584 F.3d 132, 155 n.10 (3d Cir. 2009) (explaining that imminence requirement was not met when "events occurred a minimum of three weeks apart"). "[A]dvocacy of illegal action at some indefinite future time" does not meet the imminence requirement. *Hess v. Indiana*, 414 U.S. 105, 107-08 (1973) (finding that defendant's statement that "[w]e'll take the fucking street later" or "[w]e'll take the fucking street again" did not meet the imminence requirement). Something like "persistent exposure" to speech that "gradually undermine[s]" another person's "moral discomfort with violence to the point that" the other person eventually "solved . . . social disputes with a gun" is "far from the temporal imminence . . . required to satisfy the *Brandenburg* test." *James*, 300 F.3d at 698.

Here, the government has not argued that there was a "high probability" that Gendron's incitement would be effective, nor has it argued that any violence occurred— or even that it was likely to occur—within the temporal bounds of *Brandenburg*. Nor are those elements apparent from the evidence the government has identified in support of the incitement aggravating factor.

The government is correct that there is evidence Gendron "sought to inspire others just as he had been inspired." *See* Docket Item 411 at 22. But it is at best

"foreseeable," not "likely," *see James*, 300 300 F.3d at 699, that someone "at some indefinite future time," *see Hess*, 414 at 108, might be so "inspired." On these facts, Gendron's actions do not satisfy the incitement test.

The government argues that its aggravating factor nevertheless can be saved because "[e]ven if [Gendron]'s statements and postings that support this aggravator are found to not pass the incitement test under *Brandenburg*, . . . [it] may still introduce evidence of protected speech for relevant evidentiary purposes, such as to prove motive or aggravating factors." Docket Item 289 at 61.

"[A] defendant's abstract beliefs, however obnoxious"—or worse—"may not be taken into consideration by a sentencing judge," but "[t]he First Amendment . . . does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 485, 489 (1993); *see also Fell I*, 531 F.3d at 228 ("[T]he government may introduce evidence of beliefs or associational activities, so long as they are relevant to prove, for example, motive or aggravating circumstances, to illustrate future dangerousness, or to rebut mitigating evidence."). Put another way, a defendant's beliefs and protected speech cannot be used *as* an aggravating factor, but they can be used to *prove* another aggravating factor.

Here, however, the aggravating factor the government seeks to prove is that Gendron attempted to incite violence. The term "incite" is a legal term of art, and as this Court has explained, the evidence does not meet the high standard of incitement. Thus, the speech cannot successfully be used to prove that aggravating factor. And that leaves only the protected speech *as* the aggravating factor, which would amount to

19

punishing Gendron for his protected speech.[8]  That is precisely what the law prohibits.  *See Brandenburg*, 395 U.S. at 447.

For all those reasons, the Court strikes the alleged attempt to incite violence as an aggravating factor.

### D.    Selection of Site

The government alleges that Gendron "selected the Tops Friendly Market, located at 1275 Jefferson Avenue in Buffalo, New York, in order to maximize the number of Black victims of the offense."  Docket Item 125 at 5.  Gendron argues that this factor is duplicative of other factors, including substantial planning and premeditation.  Docket Item 268 at 38-42.

This Court agrees with Gendron and finds that the substantial planning and premeditation factor "necessarily subsumes" the selection of site factor.  *See Fell I*, 531 F.3d at 235-36; *Bin Laden*, 126 F. Supp. 2d. at 300 ("[T]he [g]overnment's attempt to spin off multiple freestanding aggravators from what should really only be one represents a strategy that should not be permitted.").  Selecting the site is one aspect of planning.  Indeed, the government apparently intends to introduce the same evidence and argument in support of both site selection and planning.  *Compare* Docket Item 210

---

[8] *Barclay v. Florida*, 463 U.S. 939 (1983), in which a plurality of the Supreme Court approved a Florida sentencing judge's consideration of "the elements of racial hatred" that motivated a defendant's committing murder, *id.* at 949, does not support the government's position.  First, *Barclay* did not address the First Amendment.  What is more, the speech itself was not the aggravating factor in *Barclay*.  Instead, the trial court found that the racial motive supported other aggravating factors, including the defendant's causing "great risk of death to many persons" and "disrupt[ing] or hinder[ing] the lawful exercise of any governmental function or the enforcement of the laws."  *Id.* at 949 & n.7.

at 9-12 (citing in informational outline the government's intent to introduce evidence of "[t]he defendant's selection of a target location for the attack" and the racial reasoning for it as part of substantial planning) *with id.* at 32-36 (same for site selection).

As Gendron acknowledges, "a decision to preclude the jury from considering a separately submitted and duplicative factor in no way affects the *evidence* that the government may present and the jury may consider." Docket Item 268 at 39 n.15. So the government may present evidence about Gendron's selection of site, subject to future evidentiary rulings, but it may do so only within the statutorily enumerated factor of substantial planning and premeditation. The Court therefore strikes site selection as a separate factor.

## III.    VICTIM IMPACT PROCEDURES

"Victim Impact" is another aggravating factor in the government's notice of intent. Docket Item 125 at 4. That factor alleges that Gendron "caused injury, harm, and loss to the families and friends of [the ten people who were killed]" and that "[t]he injury, harm, and loss" Gendron caused "with respect to each victim is evidenced by the victim's personal characteristics and by the impact of the victim's death upon his or her family and friends." *Id.*

The Supreme Court held in *Payne v. Tennessee*, 501 U.S. 808 (1991), that victim impact evidence is admissible in capital sentencing proceedings. But such evidence is subject to limits: For example, allowing a victim's family member to testify about his or her "characterizations and opinions [of] the crime, the defendant, and the appropriate sentence" would violate the Eighth Amendment. *See Bosse v. Oklahoma*, 580 U.S. 1, 3 (2016) (per curiam). Moreover, courts have the "authority and

21

responsibility to control the proceedings consistent[] with due process."  *Payne,* 501

U.S. at 836 (Souter, J., concurring); *see also United States v. McVeigh*, 944 F. Supp.

1478, 1491 (D. Colo. 1996) (explaining that the Court must ensure that the jury is not

"influenced by passion or prejudice").  The Court therefore addresses the trial

procedures designed to avoid violating those Eighth Amendment and due process

proscriptions.

### A.    General Procedures

Given the potential prejudice of victim impact evidence, Gendron asks the Court

to adopt certain procedures "to ensure that [he] receives a fair trial."  Docket Item 309 at

18.  More specifically, he asks the Court to (1) "order the government to produce written

victim impact statements," (2) weigh each specific point of proffered testimony to

determine the relevance and whether the probative value is substantially outweighed by

the risk of undue prejudice and misleading the jury, (3) "direct the government to instruct

its witnesses to read from those statements before the jury," and (4) "take all available

measures to limit the possibility of prejudicial emotional outbursts during victim impact

testimony."  *Id.* at 18-20.  The Government responded with its own proposed

procedures, Docket Item 350 at 43-44, which the Court addresses in the context of

ruling on Gendron's requests.

The Court grants Gendron's first request and will require the government to

provide a written summary of the proposed testimony for each victim impact witness.

The government contends that this procedure "would run afoul of the victims' statutory

rights" and create a "significant hardship" for witnesses.  Docket Item 350 at 31.  But the

risk of prejudice to Gendron is high, and several district courts have adopted this

procedure to protect against such prejudice.  *See United States v. Sampson*, Case No. 01-cr-10384, Docket Item 2430 at 4 & n.3 (D. Mass. Aug. 26, 2016); *United States v. Northington*, 2013 WL 2147947, at *5 (E.D. Pa. May 16, 2013); *United States v. Wilson*, 493 F. Supp. 2d 491, 505-06 (E.D.N.Y. 2007); *United States v. Henderson*, 485 F. Supp. 2d 831, 849-50 (S.D. Ohio 2007); *United States v. O'Driscoll*, 203 F. Supp. 2d 334, 340-41 (M.D. Pa. 2002); *United States v. Glover*, 43 F. Supp. 2d 1217, 1235 (D. Kan. 1999); *but see United States v. Bowers*, 2023 WL 3979375, at *10 (W.D. Pa. June 13, 2023) (denying similar request).  The government must provide a proposed written statement for each witness no later than May 1, 2026.  As the Court explained on the record, the statements must be thorough and complete, covering every topic about which the witness will testify; each statement may be in the form of a victim impact statement written by the witness or a summary written by the government.[9]  *See* Docket Item 387 at 68-69.

The Court also grants Gendron's second request:  The Court "will review the proposed statement[s] and weigh each specific point of the proffered testimony to

---

[9] The government argues that its informational outline already provided the victim impact information that Gendron requests.  Docket Item at 350 at 32.  Instead of providing statements, the government proposes updating its informational outline at least 14 days before voir dire begins with "any new information relating to the witnesses identified in the original [o]utline and to identify any additional victim impact witnesses."  *Id.* at 43; *see* Docket Item 387 at 66 (clarifying that request was "no less than 14 days" rather than "no more than 14 days").

The Court denies this request in favor of Gendron's proposal.  The informational outline merely lists the anticipated victim impact witnesses for each victim and "briefly summarize[s] personal characteristics of each victim and the type and scope of the loss, injury, and harm suffered by the victims' family and friends."  Docket Item 210 at 13-19.  There is a single paragraph of information for each person who was killed.  *See id.*  This is insufficiently detailed, especially because it does not address the topics about which the witnesses will testify.

ensure that its probative value is not substantially outweighed by the danger of unfair prejudice." *See Glover*, 43 F. Supp. 2d at 1236.

But the Court denies the third request:  It will not require witnesses to read their statements verbatim.  That would be a significant deviation from this Court's ordinary procedures and would be unfair to the witnesses and the government.  Additionally, Gendron offers almost no federal precedent for it.  *See* Docket Item 309 at 18-20 (citing only *Henderson*, 485 F. Supp. 2d at 849-50, as an example in federal court).  Some victim impact procedures are appropriate to ensure a fair trial, but this goes too far.  The Court therefore rejects this proposal.

The Court grants the fourth request in part.  Gendron asks the Court to "require the government to inform the Court and the defense in advance of the hearing if it anticipates that any of its witnesses may have difficulty controlling their emotions on the witness stand" so that the Court can take additional measures such as playing a video recording of the testimony or having a third party read it.  Docket Item 309 at 20.  He also asks the Court to "admonish all victim impact witnesses prior to taking the stand that they must . . . 'refrain from reflecting excessive emotion and that the witnesses' failure to do so might result in the Court's decision to terminate their testimony.'"  *Id.* at 21 (quoting *Henderson*, 485 F. Supp. 2d at 850).

The government opposes a preemptive admonishment by the Court and instead proposes that the *government* "advise witnesses that they must make reasonable efforts to control their emotions and maintain the dignity of the proceedings."  Docket Item 350 at 33-34, 44.  It also proposes remedial measures, such as having a recess to

allow "overly emotional" witnesses to "regain composure" and "instruct[ing] the jury to disregard any inappropriate comments."  *Id.* at 44.

The Court agrees with the government that the government can advise the witnesses about the need to maintain composure and decorum.  But the government shall make a good faith effort to advise the Court of witnesses who it believes may not be able to do that so that the Court may take remedial measures, such as explaining to the witness what is expected during his or her testimony.

### B.    Specific Evidentiary Requests

Gendron also asks the Court to "exclude[,] . . . at the outset," certain categories of information that he says are "categorically inadmissible," Docket Item 309 at 22, and he provides specific examples of statements within those categories, *see, e.g.*, *id.* at 22-25.  The statements are taken largely from FBI reports that memorialized interviews with potential witnesses.  *See, e.g.*, *id.*  In response, "the government submits that each category of challenged testimony is admissible" and "opposes each of [Gendron]'s requests to preclude specific evidence."  Docket Item 350 at 2 n.2.  But it also says that "some of the [FBI reports] may include statements [that] the government would not try to introduce at trial."  *Id.*

Because the Court is requiring the government to provide detailed victim impact statements, the Court will not decide the admissibility of hypothetical testimony now.  Gendron's requests therefore are denied without prejudice to his raising them in a motion in limine.[10]

---

[10] The government seeks to introduce unspecified photos and mementos of the victims.  Docket Item 350 at 44.  The Court grants this general request and will rule about specific evidence later.  Gendron's briefing discusses the potentially prejudicial

Because the government "submits that each category of challenged testimony is admissible," *id.*, however, the Court notes that the category of "[v]ictims' family members' characterizations and opinions about the crime, [Gendron], and the appropriate sentence" is inadmissible under *Bosse*, 580 U.S. at 2. The government seems to agree, proposing that it "instruct its witnesses prior to testifying that they may not opine upon [Gendron], the circumstances of the offense, or their desired sentence." Docket Item 350 at 44. Witnesses must comply with those restrictions, and the Court agrees that the government must tell its witnesses about these requirements.

The government offers a few other proposals limiting its ability to introduce evidence, so the Court rules on those now. The government proposes having "up to two-to-three witnesses per deceased victim"; generally limiting testimony to "the deceased victim's background and character" and "the victim's life at or near the time of his/her death, as well as the harm and loss suffered by the witness and his/her loved ones as a result of the murders"; and requiring witnesses to "refrain from directly addressing the defendant." *Id.* at 43-44. The Court will limit the government to two witnesses per deceased victim, with the possibility of some flexibility as explained on the record. *See* Docket Item 387 at 66. Because Gendron neither addressed nor objected to the other requests, *see generally* Docket Item 372, the Court grants them.

---

nature of videos about victims, Docket Item 309 at 7-8, but the government's proposal makes no mention of videos. All that can await another day.

## **CONCLUSION**

For the reasons stated above, Gendron's motions to strike aggravating factors and for victim impact procedures are GRANTED IN PART and DENIED IN PART.

The government shall provide a proposed testimonial statement for each victim impact witness no later than **May 1, 2026**.  Any objections to the statements shall be filed with motions in limine.


SO ORDERED.

Dated:   September 16, 2025
         Buffalo, New York


 */s/ Lawrence J. Vilardo*
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE