IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

PAYTON GENDRON,

Defendant.

22-CR-109-V
(Redacted Version of Docket No. 435)

---

## GOVERNMENT'S CONSOLIDATED RESPONSE IN OPPOSITION TO DEFENDANT'S MOTIONS TO SUPPRESS

The United States of America, by and through its attorneys, Michael DiGiacomo, United States Attorney for the Western District of New York, and Harmeet K. Dhillon, Assistant Attorney General, Civil Rights Division, and Joseph M. Tripi, Brett A. Harvey, Caitlin M. Higgins, Maeve E. Huggins, and Charles M. Kruly, Assistant United States Attorneys, Sanjay Patel, Trial Attorney, Civil Rights Division, and Michael Warbel, Trial Attorney, Department of Justice Capital Case Section, of counsel, respectfully submits this consolidated response to the defendant's motions to suppress evidence seized from the defendant's iCloud account (Docket No. 399); the defendant's desktop computer and thumb drives (Docket No. 400); Verizon Wireless (Docket No. 401); the defendant's iPhone (Docket 402); the defendant's Discord account (Docket No. 403); and the defendant's residence (Docket No. 405).

For the reasons stated below, the Court should deny the defendant's motions to suppress because each of the challenged search warrants was supported by probable cause, was sufficiently particularized, and was not overbroad. But even if the Court disagrees, the good faith exception to the exclusionary rule requires that the Court deny the defendant's

motions. In the case of every search warrant, the issuing magistrate concluded that the warrant was supported by probable cause, was sufficiently particularized, and was not overbroad. If this Court disagrees with those conclusions, the good faith exception mandates that law enforcement officers not be punished for an issuing magistrate's error. Thus, suppression is not appropriate.

## ARGUMENT

### 1. Legal Background

#### A. The Court owes substantial deference to the issuing magistrates' determinations that probable cause existed to search each of the accounts and devices at issue.

Probable cause "is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). To determine whether there is probable cause to issue a search warrant, a magistrate must therefore "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238. Probable cause does not require "hard certainties," and the facts supporting probable cause "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Id.* at 231-32 (quotation marks omitted). An agent's "expert opinion" is thus "an important factor to be considered by the judge reviewing a warrant application." *United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985).

The Fourth Amendment's "strong preference for searches conducted pursuant to a warrant" means that a reviewing court "should not invalidate warrants by interpreting affidavits in a hypertechnical, rather than commonsense, manner." *Gates*, 462 U.S. at 236 (quotation and editorial marks omitted). The Second Circuit has therefore instructed reviewing courts to "resolve any doubt about the existence of probable cause in favor of upholding the warrant." *United States v. Salameh*, 152 F.3d 88, 113 (2d Cir. 1998). And "[a] reviewing court must accord substantial deference to the finding of an issuing judicial officer that probable cause exists." *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993). This review, in turn, "should be limited to whether the issuing judicial officer had a substantial basis for the finding of probable cause." *Id.*

These standards apply in the same manner no matter the type of property being searched. The defendant repeatedly suggests that the Court should give additional scrutiny to the warrants in this case because they authorized searches of electronic evidence. *See, e.g.*, Docket No. 402 at 7 ("The nexus requirement is particularly important in the context of search warrants for digital devices and information.") But probable cause is probable cause. The same probable cause standard that justifies a search of a person's home—the "first among equals" in Fourth Amendment case law, *Collins v. Virginia*, 584 U.S. 586, 592 (2018) (quotation marks omitted)—justifies a search of electronic evidence. *Cf. United States v. Biaggi*, 853 F.2d 89, 95 (2d Cir. 1998) (holding that "the standard of probable cause applicable" to a Title III wiretap "is the same as the standard for a regular search warrant") (quotation marks omitted). Neither case law nor the Fourth Amendment impose a heightened probable cause standard for searches of electronic devices. Accordingly, the Court should review these

warrants in the same way it reviews any others: by asking only whether the issuing magistrates had a "substantial basis for the finding of probable cause." *Wagner*, 989 F.2d at 72.

### B.  Particularity and Overbreadth

A search warrant must "particularly describe[e] the place to be searched and the persons or things to be seized." U.S. Const. amend. IV. The Fourth Amendment's particularity clause has three requirements: (1) the warrant "must identify the specific offense for which the police have established probable cause"; (2) the warrant "must describe the place to be searched"; and (3) the warrant "must specify the items to be seized by their relation to designated crimes." *United States v. Galpin*, 720 F.3d 436, 445-46 (2d Cir. 2013) (quotation marks and citations omitted).

This last requirement is not especially demanding. Its purpose is to avoid leaving to "the unguided discretion of the officers executing the warrant the decision as to what items may be seized." *United States v. Riley*, 906 F.2d 841, 844 (2nd Cir. 1990). This requirement, however, is not "so exacting" as to eliminate all discretion of the executing officers. *Id.* Instead, "[o]nce a category of seizable [items] is adequately described, with the description delineated in part by an illustrative list of seizable items, the Fourth Amendment is not violated because the officers executing the warrant must exercise some minimal judgment." *Id.* at 845. In other words, a court considering a particularity challenge must review the warrant with a heavy dose of practicality and a "concern[] with realities of administration of criminal justice." *United States v. Vaughn*, 830 F.2d 1185, 1186 (D.C. Cir. 1987) (quotation marks omitted). This means that "courts may tolerate some ambiguity in the warrant so long as law enforcement agents have done the best that could reasonably be expected under the

circumstances, have acquired all the descriptive facts which a reasonable investigation could be expected to cover, and have insured that all those facts were included in the warrant." *Galpin*, 720 F.3d at 446 (quotation marks omitted). After all, a finding of probable cause is not predicated on the government's knowledge as to precisely how certain records are stored. *See Riley*, 906 F.2d at 845 ("[A]llowing some latitude . . . simply recognizes the reality that few people keep documents of their criminal transactions in a folder marked 'drug records.'")

The related question of overbreadth asks whether a warrant's "description of the objects to be seized . . . is broader than can be justified by the probable cause upon which the warrant is based." *Galpin*, 720 F.3d at 446 (quotation marks omitted). A warrant is overbroad, then, if it "authorized the search and seizure of items as to which there is no probable cause." *United States v. Dupree*, 781 F. Supp. 2d 115, 148 n.14 (E.D.N.Y. 2011) (quotation marks omitted). A warrant may also be overbroad if it does not "enable the executing officer to ascertain and identify with reasonable certainty those items that the magistrate has authorized him to seize." *United States v. George*, 975 F.2d 72, 75 (2d Cir. 1992). By contrast, a warrant is not overbroad simply because it authorizes the seizure of a large number of items; this argument is "fundamental[ly] flawed," because "it confuses a warrant's breadth with a lack of particularity." *United States v. Ulbricht*, 858 F.3d 71, 102 (2d Cir. 2017), *overruled on other grounds by Carpenter v. United States*, 585 U.S. 296 (2018). "A warrant may be broad, in that it authorizes the government to search an identified location or object for a wide range of potentially relevant material, without violating the particularity requirement." *Id.* What matters is that the categories of information to be seized relate to the crimes under investigation. *See United States v. Zaso*, 22-CR-74-LJV, 2023 WL 4011149, at *6 (W.D.N.Y.

June 15, 2023) ("[T]here is nothing 'overbroad' about a warrant that details and breaks down categories of materials, all of which relate to drug dealing in some way.")

Once again, these principles apply no differently to searches of electronic evidence. *See Ulbricht*, 858 F.3d at 100. Both the Federal Rules of Criminal Procedure and case law recognize a "practical necessity when dealing with electronic evidence": that law enforcement will obtain "broad categories of information, to be searched later with specific queries yielding information to be seized." *United States v. Westley*, No. 3:17-CR-171 (MPS), 2018 WL 3448161, at *12 (D. Conn. July 17, 2018); *see also* Fed. R. Crim. P. 41(e)(2)(B) (authorizing the seizure or copying of electronically-stored information for later review). This two-part review is both required and permissible because "it will often be impossible to identify in advance the words or phrases that will separate relevant files or documents before the search takes place." *Ulbricht*, 858 F.3d at 102. Agents "cannot readily anticipate how a suspect will store information related to the charged crimes . . . . [E]ven very simple codes can defeat a pre-planned word search." *Id.* After all, just as a "warrant may allow the government to search a suspected drug dealer's entire home where there is probable cause to believe that evidence relevant to that activity may be found anywhere in the residence," *id.* at 102, the Fourth Amendment allows the government to search an entire electronic device or social media account if evidence may be found somewhere in the device or account. So long as the warrant satisfies the Fourth Amendment's particularity requirement, "a broad warrant allowing the government to search [electronics] for potentially extensive evidence of those crimes does not offend the Fourth Amendment." *Id.* at 102-03.

**2. The Court should deny the defendant's motions to suppress evidence obtained from the challenged search warrants.**

   **A. The Court should summarily deny the defendant's motions because he has not provided affidavits of standing.**

"Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978). It is therefore well settled that "it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the [exclusionary] rule's protections." *Id.* at 134. The burden of establishing standing to assert Fourth Amendment rights "is met only by sworn evidence, in the form of affidavit or testimony, from the defendant or someone with personal knowledge." *United States v. Montoya-Eschevarria*, 892 F. Supp. 104, 106 (S.D.N.Y. 1995).

It is, then, "well settled that a defendant seeking to suppress evidence must demonstrate by a preponderance of the evidence that he had a reasonable expectation of privacy in the location or items searched." *United States v. Matthews*, 2020 WL 2770817, at *1 (W.D.N.Y. Apr. 21, 2020) (quotation marks omitted), *report and recommendation adopted by* 2020 WL 2768839 (W.D.N.Y. May 28, 2020). This means that the defendant must submit an affidavit attesting that he had a reasonable expectation of privacy in each of the accounts and locations whose search he seeks to suppress. He "cannot rely on the government's position or theory to establish standing and must instead prove [his] expectation of privacy as to a particular search." *Id.* (quotation marks omitted). Because the defendant has not submitted affidavits in support of his suppression motions, the Court should summarily deny each motion.

**B. The Discord warrant**

On May 16, 2022, Magistrate Judge Schroeder issued a search warrant (Case No. 22-MJ-112) for the Discord account associated with username ███████████ and user ID ███████████. Docket No. 403, Exhibit B. In response to the search warrant, Discord produced records to the FBI in two separate installments on May 18, 2022. The initial production consisted of approximately 40.3 gigabytes (GB) of records and a supplemental production consisted of approximately 1.48 megabytes (MB) of records. The records were divided into three categories: the defendant's personal server,[1] labeled by the defendant as "G\," which contained 11 channels;[2] direct message communications, which included communications with approximately ████████████████████████████████ ████████████████████; and several other Discord servers and channel conversations, which included information from nine additional Discord servers (which contained a total of 18 channels) that were identified by the FBI as relevant to this investigation. During its review of the Discord materials, the FBI accessed and analyzed over 1,000,000 posts and chats, which included written chats, attachments, images, videos, and links.

### i. The defendant has not established standing to challenge the Discord warrant.

"A defendant cannot invoke the Fourth Amendment's protections unless he has a legitimate expectation of privacy against the government's intrusion." *United States v. Roy*, 734

---

[1] According to Discord, a "server" "provide[s] you with the ability to create private, invite-only spaces for your friends or community." *Beginners Guide to Discord*, https://support.discord.com (accessed July 31, 2025). A user may then have different "channels" within their server. *Id.*

[2] These channels were called ████████████████████████████████ ███████████████

F.2d 108, 110 (2d Cir. 1984). "When considering a claimed violation of Fourth Amendment rights, the burden is on the defendant to establish that his own rights under the Fourth Amendment were violated." *United States v. Paulino*, 850 F.2d 93, 96 (2d Cir. 1988); *see also Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978) ("The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure"). "This inquiry involves two distinct questions: first, whether the individual had a subjective expectation of privacy; and second, whether that expectation of privacy is one that society accepts as reasonable." *United States v. Hamilton*, 538 F.3d 162, 167 (2d Cir. 2008).

Here, the defendant has failed to demonstrate a legitimate expectation of privacy in the Discord account. He has not submitted an affidavit asserting a subjective privacy interest in the account or asserting that any subjective privacy interest he may have had in the account was objectively reasonable. In fact, the defendant fails to even acknowledge his burden of establishing a legitimate privacy interest in his motion papers. As a result, he has not established standing to contest the Discord warrant, and his motion must be denied. *See United States v. Swain*, 2024 WL 2205001, at *4 (W.D.N.Y. May 15, 2024) (Vilardo, J.) (finding that defendant lacked standing to challenge search of Discord account where he did not file an affidavit establishing a reasonable expectation of privacy) (citing *United States v. Loera*, 333 F.Supp.3d 172, 179 (E.D.N.Y. 2018), and *United States v. White*, 2018 WL 4103490, at *8 (S.D.N.Y. Aug. 28, 2018); *United States v. Tennant*, 2023 WL 6978405, at *7-8 (N.D.N.Y. Oct. 10, 2023) (finding that defendant lacked standing to contest searches of Discord, Snapchat, and Instagram accounts because he failed to file an affidavit demonstrating a legitimate expectation of privacy); *United States v. Whitcomb*, 2021 WL 5150040, at *5-6 (D. Vt. Nov. 5,

2021) (finding that defendant failed to show a reasonable expectation of privacy in Facebook account where he failed to show steps he took to keep the account private); *United States v. Westley*, 2018 WL 3448161, at *6-7 (D. Conn. July 17, 2018) (same).

In any event, the defendant cannot demonstrate a reasonable expectation of privacy in the contents of the G\ server because he made it publicly available before committing the Tops attack. In the G\ server, the defendant chronicled the development, preparation, and progress of his plan to commit the Tops attack in a series of private posts between November 20, 2021, and May 14, 2022.[3] As detailed, *infra*, the defendant relinquished any expectation of privacy in the G\ server by sending links to his transcripts from the Discord account to approximately 65 Discord users and two Discord servers/channels, and expressly inviting those Discord users to join the G\ server. The Supreme Court has repeatedly recognized that "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Smith v. Maryland*, 442 U.S. 735, 743-44 (1979); *see also Katz v. United States*, 389 U.S. 347, 351 (1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection"). That is the case here. Notably, the defendant does not acknowledge this fact and makes no effort to explain how he maintained a reasonable expectation of privacy in the Discord content that he purposely shared with the others, and which was further disseminated on the internet and reported in the news media.[4]

---

[3] A summary of the contents of the G\ server (which is also referred to in government filings as the "Discord journal") is contained in the government's informational outline. *See* Docket No. 210 (filed under seal). The government, therefore, will not repeat that information here.

[4] *See, e.g.,* Matthew Spina, *Accused Shooter's Log Says he Fired AR-15 with his 'Buddy Matt' before Buffalo Mass Killing,* The Buffalo News (dated Jun. 2, 2022) (quoting and summarizing content from Gendron's Discord publicly available diary).

From the outset of this investigation, it was evident from that the defendant did not seek to maintain any expectation of privacy in his Discord writings. In fact, he made it clear that he wanted his writings about the attack and the video footage of the attack to be widely disseminated in service of his virulent, racist ideology. In his manifesto, the defendant declared that his purpose for carrying out the attack was, *inter alia*, to "[s]pread ideals" and ██████████████████████████████████████████ Ex. B at 6, 58. Similarly, in his Discord journal,[5] the defendant wrote, ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████ To the defendant, ███████████████████████████ Ex. B at 6. In keeping with this mindset, the defendant planned to livestream the attack and make his manifesto and Discord journal available to others. *See, e.g., id.* at 11 (writing, "[m]y discord transcript should also be available, which is much less formal than this and covers some personal and other information"), 59 (writing that "[v]ideo will be livestreamed and manifesto published online to increase coverage and spread my beliefs"), and 60 (writing that, on the day of the attack, he planned to "send links to the discord servers I'm in, and send links to all people on my discord friend list").

Consistent with his plan, on May 14, 2022, between approximately 2:03 p.m. and 2:14 p.m., the defendant sent 13 messages to approximately 65 Discord users,[6] and messages to

---

[5] This excerpt was taken from the Discord transcript that the defendant published shortly before he carried out the attack. *See, infra,* at 12.

[6] The FBI identified the 65 Discord users after a review of the defendant's iPhone 11, which was recovered by law enforcement at the scene of the attack and subsequently searched pursuant to a federal search warrant. This search warrant is the subject of a pending motion to suppress. *See* Docket No. 380.

two Discord servers/channels.[7] In those messages, he stated, "HAPPENING THIS IS NOT

A DRILL," which was a reference to his impending attack at Tops (which would begin only

minutes later at approximately 2:30 p.m.). The Discord messages also listed several links to,

*inter alia*, the livestream of the attack on Discord and Twitch, copies of the defendant's

Discord transcripts, and an invitation to join the defendant's G\ server. A copy of the Discord

message is attached hereto as Exhibit A.

Below is an excerpt from Exhibit A wherein the defendant sent others the links to his

Discord transcripts.



In the aftermath of the attack, the FBI, like any other member of the public could do, accessed

both of these publicly-available links online and obtained copies of the Discord transcripts.

The first transcript – titled "April_29_and_before.docx" – consisted of approximately 586

pages of written content and images from the defendant's Discord account from the period

between November 20, 2021, and April 25, 2022. The second transcript – titled

"Post_April_29th_Discord_Transcript.docx" – consisted of approximately 83 pages of written

content and images from the Discord account from the period between April 29, 2022, and

May 12, 2022 (at approximately 9:41 p.m.). Based on a comparison of the G\ server obtained

through the Discord warrant and the two Discord transcripts, the FBI has determined that the

---

[7] Based on review of the Discord search warrant returns, the FBI determined that the defendant sent
this message to two Discord servers/channels – █████████████████████

Discord transcripts contain a substantial portion of the written content and images from the G\ server.[8]

Below is the excerpt from Exhibit A wherein the defendant made an invitation link for others to join the G\ server.



By including this invitation in the messages and broadly disseminating the invitation on Discord, the defendant effectively made the G\ server publicly available to anyone who could access or use the link. In other words, any of the 65 Discord users who received the message from the defendant, any member of the two servers/channels to which the defendant sent the messages, and anyone else who was provided with or obtained the messages with the invitation link, would have been able to access and view the contents of the G\ server.[9]

---

[8] It should be noted, however, that the Discord transcripts did not include the final approximately 56 pages of the G\ server, which covered the time period from May 12, 2022, at 10:14 p.m., through May 14, 2022, at 2:21 p.m. (which was the time of the defendant's last Discord post before the attack). In the event the defendant attempts to file a standing affidavit, the government is prepared to submit the G\ server and the Discord transcripts to the Court to demonstrate the substantial overlap between the documents.

[9] Upon information and belief, the invite link to the G\ server contained in Exhibit A was a "Custom Invite Link." According to Discord, "[a] Custom Invite Link is a personalized invite link that replaces Discord's default randomly-generated codes with a memorable, branded address . . ." *Beginners Guide to Discord*, https://support.discord.com/hc/en-us/articles/115001542132-Custom-Invite-Link (last accessed July 31, 2025). "Setting a Custom Invite Link makes your server public and anyone able to join with the link." *Id.*

Courts in this Circuit have held that "when a social media user disseminates his postings and information to the public, they are not protected by the Fourth Amendment." *United States v. Thomas*, 2025 WL 1771910, at *2 (W.D.N.Y. April 24, 2025) (Roemer, M.J.) (citing *United States v. Meregildo*, 883 F. Supp. 2d 523, 525 (S.D.N.Y. 2012) (holding that defendant had no reasonable expectation of privacy in Facebook account because "he had no justifiable expectation that his 'friends' would keep his profile private" and finding that defendant's "legitimate expectation of privacy ended when he disseminated posts to his 'friends' because those 'friends' were free to use the information however they wanted . . .")); *see also United States v. Jordan*, 2017 WL 9516819, at *8 (W.D.N.Y. July 14, 2017) (finding no reasonable expectation of privacy in Facebook account where defendant had 1,965 Facebook "friends") (citing *Meregildo*, 883 F. Supp. 2d at 525). In contrast, courts have found that "postings using more secure privacy settings reflect the user's intent to preserve information as private and may be constitutionally protected." *Meregildo*, 883 F. Supp. 2d at 525; *see also United States v. Weber*, 599 F. Supp. 3d 1025, 1033 (D. Mont. 2022) ("[W]hether someone can assert a subjective expectation of privacy in their social media accounts depends on the privacy settings they had in place at the time the intrusion occurred"); *United States v. Chavez*, 423 F. Supp. 3d 194, 202-04 (W.D.N.C. 2019) (holding that a Facebook user has a reasonable expectation of privacy in content that he has intentionally excluded from public access); *Westley*, 2018 WL 3448161, at *6 ("Because of the nature of a Facebook account, which allows users to post information privately, share information with select groups of 'friends,' or post information publicly, courts have held that whether the Fourth Amendment applies to a user's Facebook content 'depends, *inter alia*, on the user's privacy settings'").

As detailed, *supra*, the defendant made his Discord transcripts and the entire contents of his G\ server available to 65 Discord users and two Discord servers/channels, as well as an untold number of other Discord users who may have had the message forwarded to them. Viewed in the context of the defendant's specific intent to have his writings and the video footage of the attack broadly circulated, the defendant simply cannot carry his burden of showing a reasonable expectation of privacy in his G\server. It comes as no surprise, then, that the defendant has made no effort to do so. As a result, he has no standing to challenge the search of his G\ server, and his motion should fail on this ground alone.

### ii. The Discord warrant was not overbroad and was sufficiently particularized.

Even assuming that the defendant has standing to challenge the Discord warrant, he has failed to demonstrate that the search warrant was overbroad or lacked sufficient particularity.[10]

The defendant argues that the Discord warrant was overbroad because the "application failed to justify issuance of a warrant authorizing law enforcement to rummage through every scrap of information relating to the account that Discord maintained," the warrant did not "provide any justification for permitting law enforcement to examine all of [the defendant's] stored content, communications and messages," and "[t]here was no reason why the warrant could not have been limited to only those categories for which probable cause to search had been established, if any there were, and for Discord to have limited its

---

[10] The defendant does not argue that the Discord search warrant application failed to establish probable cause. Docket No. 403 at 10 ("[e]ven acknowledging the warrant was based on probable cause to search some aspect of Payton Gendron's Discord account . . .").

disclosure to those categories." Docket No. 403 at 10-11. This argument fails because it is contrary to the law in this Circuit.

Attachment B.I of the warrant required Discord to disclose ten categories of records relating to the defendant's account to the FBI. Docket No. 403, Exhibit B.[11] Attachment B.II authorized the FBI to search those records for, and seize evidence relating to, violations of 18 U.S.C. §§ 249 (hate crime acts), and 924(c)(1)(A)(iii) and 924(j)(1) (discharge of firearm causing death in furtherance of a crime of violence). *Id.* The warrant further provided 15 illustrative examples of the types of evidence that the FBI was authorized to seize, including evidence relating to "the motivation, planning, and/or execution" the Tops attack (Attachment B.II.a); "the selection of targets or victims" (Attachment B.II.b); the drafting, preparation and publishing of the defendant's manifesto (Attachment B.II.c); other individuals who communicated with the defendant about his criminal activities (Attachment B.II.d); the defendant's racial/political animus or hostility, association with white supremacist/hate groups, and ideological justification for the attack (Attachment B.II.f, Attachment B.II.h-k); "other mass shooting events and shooters" (Attachment B.II.g); the defendant's efforts to obtain and acquisition of "firearms, ammunition, firearm accessories and body armor" (Attachment B.II.l-m); the defendant's manufacture of firearms (Attachment B.II.n); and "firearms tactics and methods for executing a mass shooting." (Attachment B.II.o).

Courts in this Circuit have consistently upheld search warrants for social media accounts that are structured like the Discord warrant. *See United States v. Yu*, 2023 WL 4687970, at *19 (E.D.N.Y. July 21, 2023) (finding that search warrant that required Instagram

to "provide broad categories of information" and the government to "seize a narrower set of information tailored to the crimes specified" was not overbroad); *Westley*, 2018 WL 3448161, at *10-17 (same); *United States v. Liburd*, 2018 WL 2709199, at *3 (E.D.N.Y. June 5, 2018) ("[B]ecause of the nature of digital media searches, it was proper for the search warrant to allow the FBI to search the entire contents of Defendant's Facebook account, once [the judge] determined that there existed probable cause to believe that evidence relating to Defendant's criminal activity was contained in that account, even if the account also contained information unrelated to criminal activity"); *United States v. Pugh*, 2015 WL 9450598, at *4-5, 27 (E.D.N.Y. Dec. 21, 2015) (upholding a search warrant that required Facebook to "disclose . . . a substantial amount of information" but permitted seizure of only "information relating to [the charged offense]"). In light of this precedent, there was nothing improper about the warrant requiring Discord to disclose broad categories of records under Attachment B.I, so the FBI could search them for the narrower categories of information they were authorized to seize under Attachment B.II.

Moreover, all of the categories of evidence delineated in the Discord warrant were rationally related to the underlying crimes upon which the warrant was based. In fact, the probable cause to seize these categories of evidence was obvious. The defendant used a rifle to murder 10 Black people and attempt to murder numerous others and used a GoPro camera to livestream the attack over the internet. At the time of the attack, the defendant was wearing body armor. The defendant had scrawled the names of other mass shooters – as well as racial slurs and references to BLM (Black Lives Matter), reparations, and "Great Replacement" theory – on the rifle prior to the attack. In his manifesto, the defendant described, in exhaustive detail, his research, motivation, practice, and planning for the attack. The

defendant wrote in his manifesto, *inter alia*, that his goals were to kill as many Black people as possible and spread his white supremacist beliefs and "ideals," and that he was inspired by other mass shooters, ███████████████████, to carry out the attack. In addition, in his manifesto, the defendant described at length the pros and cons of different firearms, firearms components, and tactical gear. Given these facts, there was ample probable cause to authorize the seizure of the evidence described in Attachment B.II.

The illustrative examples contained in Attachment B.II – all of which were tied to the defendant's planning, preparation, motivation, and execution of his attack – are "sufficiently specific to permit a rational exercise of judgment by the executing officers in selecting what items to seize" from the Discord account. *United States v. LaChance*, 788 F.2d 856, 874 (2d Cir. 1986) (quotation and editorial marks omitted).[12] As this Court has observed in a different context, "there is nothing 'overbroad' about a warrant that details and breaks down categories of materials, all of which relate to drug dealing in some way." *United States v. Zaso*, 22-CR-74-LJV, 2023 WL 4011149, at *6 (W.D.N.Y. June 15, 2023). So too here: a warrant is not overbroad because it provides executing agents with more guidance than is constitutionally required.

Relying on *United States v. Winn*, 79 F.Supp.3d 904, 920 (S.D. Ill. 2015), the defendant argues that the search warrant application did not contain sufficient information to justify the

---

[12] The defendant argues that some of the illustrative examples are "not inherently criminal and may even be constitutionally protected conduct." Docket No. 403 at 12. But as the defendant has acknowledged elsewhere in this case, "[t]he First Amendment 'does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent,' or to prove legitimate aggravating factors at sentencing." Docket No. 268 at 23 (quoting *Wisconsin v. Mitchell*, 508 U.S. 476, 486, 489 (1993)). If the government is able to use this evidence to prove its case—which it is—then it must also be able to search for and seize such evidence. Likewise, it goes without saying that evidence need not be "inherently criminal," *id.*, to be subject to seizure. Standing alone, an image of a rifle is not criminal; in the context of an investigation of a mass-murderer, that image has obvious relevance.

search of the entire Discord account, and that the investigative team should "have been limited to [searching] only those categories for which probable cause to search had been established . . ." Docket No. 403 at 11. In *Winn*, the police seized the suspect's cell phone after he was caught taking photos and videos of underage girls while "rubbing his genitals on the exterior of his swim trunks." 79 F. Supp. 3d at 909-10. The police obtained a warrant to search the cell phone for "any or all files" for evidence of the statutory offense of public indecency, which included, *inter alia*, the cell phone's calendar, ringtones, audio files, call logs, messages, internet history, and usage. *Id.* at 911, 918. The in *Winn* court concluded that the warrant was overbroad and violated the Fourth Amendment because "the police did not have probable cause to believe that *everything* on the phone was evidence of the crime of public indecency." *Id.* at 919 (emphasis in original). The court found that, at most, the search warrant affidavit demonstrated probable cause to seize only photos or videos. *Id.*

The defendant's reliance on *Winn* is misplaced. First, *Winn* is factually distinguishable from the instant case. Here, Attachment B.I listed the records that the FBI was authorized to *search* for the relevant evidentiary items listed in Attachment B.II. In contrast, the warrant in *Winn* authorized the police to *seize* "any and all files" related to the public indecency charge. Moreover, racially motivated mass murder and public indecency are vastly different crimes. In this case, unlike in *Winn*, the search warrant affidavit showed that the defendant meticulously and methodically researched, planned, and prepared for the attack over a "few years," and that he "got serious" about carrying out the attack in January 2022. In addition, the defendant documented, in exhaustive detail, his planning and preparation for the attack in his manifesto. Given the scope and depth of the defendant's planning, and his use of Discord during that process, the search warrant properly authorized the FBI to search the

defendant's Discord account and seize the categories of evidence specified in Attachment B.II. Second, *Winn* is an out-of-Circuit case that is not binding on this Court. Third, and perhaps most importantly, the defendant's argument is inconsistent with the Second Circuit authority, which, in appropriate cases, permits searches of broad categories of social media information for evidence of specific offenses. *See, supra*, at 16-17.

The defendant also claims that the Discord warrant was insufficiently particular. Docket No. 403 at 12-15. "[T]o be sufficiently particular under the Fourth Amendment, a warrant must satisfy three requirements. First, a warrant must identify the specific offense for which the police have established probable cause. Second, a warrant must describe the place to be searched. Finally, the warrant must specify the items to be seized by their relation to designated crimes." *United States v. Ulbricht*, 858 F.3d 71, 99 (2d Cir. 2017).

Here, the Discord warrant easily satisfied these three requirements. The warrant, as noted, authorized agents to seize evidence of violations of 18 U.S.C. §§ 249 (hate crimes acts), and 924(c)(1)(A)(iii) and 924(j)(1) (discharge of firearm causing death in furtherance of crime of violence), and then provided 15 illustrative examples of such evidence. This is all the Fourth Amendment's particularity clause requires: "where, as here, warrants call for the seizure of records relating to the suspected crime or crimes and include a list providing examples of the items to be seized, they have been found to offer sufficient guidance to law enforcement officers to pass constitutional muster." *United States v. Nejad*, 436 F. Supp. 3d 707, 728 (S.D.N.Y. 2020) (Nathan, J.) (emphasis added; quotation and editorial marks omitted); *see also United States v. Akparanta*, 2019 WL 5616875, at *6 (S.D.N.Y. Oct. 30, 2019) (same); *United States v. Lustyik*, 57 F. Supp. 3d 213, 227-28 (S.D.N.Y. 2014) (collecting cases for this proposition).

Indeed, "courts typically tolerate *less* specificity where electronic evidence is involved" because "documentary evidence may be difficult to describe *ex ante* with the same particularity as a murder weapon or stolen property." *Nejad*, 436 F. Supp. 3d at 729 (quotation marks and citations omitted). Put differently, the Discord warrant would have been sufficiently particularized if the government did nothing more than identify the crimes under investigation and then used "generic terms . . . to describe the items to be seized." *Id.* (quotation marks omitted). If that is true, then it is difficult to understand how a warrant is defective by providing *too much* guidance to the executing agents. The defendant unsurprisingly offers no law for the proposition that a warrant is invalid because it is too particularized.

The defendant's argument to the contrary starts from the premise that probable cause is limited to "the shooting at the Tops Market on May 14, 2022." Docket No. 403 at 14. For the reasons stated above, however, that is incorrect. The defendant does not contest that there was probable cause to believe that he committed murder "because of the actual or perceived race, color, religion, or national origin of any person." 18 U.S.C. § 249(a)(1). Because there was probable cause to believe the defendant committed racially-motivated murder, the Discord warrant properly authorized agents to seize evidence related to the defendant's racial animus. Many of the categories of evidence identified in the warrant are based on this probable cause. The defendant, for example, wrote, "BLM," "Here's your reparations!" and "The Great Replacement" on his rifle. *See* Docket No. 403, Ex. A ¶ 31. There was probable cause, then, to search for evidence of the defendant's motivation to attack others based on their participation in "social justice and/or political protests." *Id.* at Attachment B.II.k.

The defendant also complains, without citing any supporting legal authority, that several categories of information listed in Attachment B.II violated the particularity

requirement because they "contain[ed] no limitation to the Tops Market shooting." *Id.* at 15. Such a limitation is simply not required. As detailed, *supra*, the opening paragraph of Attachment B.II limited the items to be seized to evidence relating to violations of 18 U.S.C. §§ 249, and 924(c)(1)(A)(iii) and 924(j)(1). This language sufficiently limited the scope of the government's review of the enumerated categories of evidence to information relating to the subject offenses. *See United States v. Saipov*, 2019 WL 3024598, at *7 (S.D.N.Y. July 11, 2019) (finding that failure of each enumerated category of information to include specific reference to the subject offense(s) did not render warrant insufficiently particular) (citing *United States v. Alston*, 2016 WL 2609521, at *4 (S.D.N.Y. Apr. 29, 2016) (stating that, "[w]hile it certainly would have been clearer had each and every paragraph included a reference to the target offense, a warrant need not necessarily survive a hyper-technical sentence diagraming and comply with the best practices of *Strunk & White* to satisfy the particularity requirement")). Nothing in the law mandates that each specified category of evidence in Attachment B must be limited to the specific event being investigated (in this case, the Tops attack).[13]

In any event, for many of the enumerated categories of evidence, it would defy common sense to limit them to the Tops attack. For example, some of the categories related to evidence of the defendant's racial/political animus (Attachment B.II.f, Attachment B.II.i-j), and association with white supremacist and/or hate groups. (Attachment B.II.h). Of course, evidence of the defendant's racial/political animus and association with white

---

[13] Notably, in *Saipov*, a case involving a terrorist attack in New York City that occurred on October 31, 2017, the Attachment B to the search warrant for the defendant's cell phone was structured much like the Discord warrant in this case. That is, it set out the subject offenses in the introductory paragraph and did not specifically refer to the subject offenses or the terrorist attack in the specific categories of evidence. *Saipov*, 2019 WL 3024598, at *2-3. The *Saipov* court upheld the warrant, although the defense in that case did not appear to raise precisely the same challenge that is before this Court.

supremacist/hate groups on the day of the attack would be highly relevant of his motive. Because the defendant admitted planning his attack over an extended period of time, evidence of the defendant's racial/political animus and association with white supremacist/hate groups on other occasions and/or in the months leading up to the attack would also be highly relevant of his motive.

Finally, the defendant claims that certain categories of evidence subject to seizure under the Discord warrant were "hopelessly ambiguous," "extraordinarily broad," and just plain "ambiguous." Docket No. 403 at 15. The defendant does not question (nor could he) that, when investigating potential violations of 18 U.S.C. § 249, agents are properly authorized to seize evidence tending to show whether the defendant committed certain acts "because of the actual or perceived race, color, religion, or national origin of any person." 18 U.S.C. § 249(a)(1). If that is true—and it unquestionably is—then the defendant fails to show what is wrong with a warrant that uses different words, such as "animus" or "hostility," to illustrate evidence that tends to prove this element of § 249. "A warrant need only be 'sufficiently specific to permit the rational exercise of judgment by the executing officers in selecting what items to seize.'" *United States v. Saint Clair*, 2024 WL 413422, at *3 (2d Cir. Feb. 5, 2024) (quoting *United States v. Shi Yan Liu*, 239 F.3d 138, 140 (2d Cir. 2000)). In the context of a § 249 investigation, the terms "animus," "hostility," and "intimidation" have sufficiently definite meanings that agents can use to guide their execution of the warrant. The same is true as for evidence "relating to the selection of targets or victims." (Attachment B.II.b). It is difficult to imagine that a trained and experienced FBI agent could read this category of evidence in the warrant, in the context of this racially-motivated mass murder case, and feel that it is "hopelessly ambiguous."

23

### iii.   Agents acted reasonably when executing the Discord warrant.

The defendant argues that the FBI violated the scope of the Discord search warrant in three respects. First, he contends that the FBI seized information beyond the scope of the warrant, alleging that "[m]uch of the content seized under the Direct Messages component as well as the content from the Other Servers and Channels component were beyond the scope of what the warrant authorized." Docket No. 403 at 17. Second, he argues that the FBI improperly re-searched the Discord production in August 2022 without first obtaining a new search warrant. *Id.* Third, he claims that the government improperly "retained the entire Discord warrant return – including information that the government itself deemed outside the scope of the warrant during its initial review." *Id.* Each of the defendant's arguments lacks merit.

Regarding the first claim, the defendant challenges the FBI's seizure of the Direct Message communications involving Discord users ██████████████████, arguing that those communications "have no conceivable link to this case, or to any category described in Attachment B to the Discord Warrant." Docket No. 403 at 18.[14] While FBI personnel, at the time of the search, had reason to identify the Direct Messages with these Discord users as potentially relevant, the government does not intend to use those Direct Messages at trial.

Contrary to the defendant's second claim, the FBI did not improperly conduct a second, warrantless search of the Discord account in August 2022. Docket No. 403 at 19. In

---

[14] The defendant also claims that other Direct Messages "contain general content related to gear but similarly have no link to this case," and that "[m]any of the channels seized from the Other Servers and Channels component during the initial review are related to gaming" or involve "general content relating to firearms or gear," which are outside the scope of the warrant. Docket No. 403 at 18. The defendant, however, fails to specify which of these communications/channels were improperly seized. The government, therefore, will limit its response to the specific content challenged by the defendant.

making this argument, the defendant is referring to a search of the Discord records that occurred in August 2022, after the FBI had identified additional, potentially relevant Discord servers and chats during a search of the defendant's iPhone 11 pursuant to a federal search warrant (Case No. 22-MJ-114).

The defendant's argument is factually incorrect and based on the faulty assumption that the FBI had completed its review of the Discord records by May 31, 2022.[15] In fact, the August 2022 search was part of the then-ongoing responsiveness review of the Discord records by the FBI. Upon information and belief, the FBI began its review of the Discord records on or about May 18, 2022, and continued its review until on or about August 19, 2022, when FBI Special Agent Christopher Dlugokinski authored an FBI 302 report titled, "Final Summary of Findings – Discord account username ▮▮▮▮▮▮▮▮ (22-MJ-112) includes additional direct message threads and contents extracted from two servers: ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮." With the issuance of that final summary, the FBI deemed the search of the Discord records to be complete on or about August 19, 2022.

Because the FBI's search of the Discord records was in progress through August 19, 2022, the continuing review of the Discord records for responsive information in August 2022 did not constitute a second search that required a new search warrant. As a result, the cases relied upon by the defendant – *United States v. Wey*, 256 F. Supp. 3d 355, 406 (S.D.N.Y. 2017) (FBI conducted new searches of electronic evidence in months and years after initial search), and *United States v. Sun*, 2025 WL 1220040, at *3-4 (E.D.N.Y. April 28, 2025) (FBI conducted new search of Gmail account almost two years after initial search) – are inapposite.

---

[15] In an FBI 302 report, dated June 8, 2022, the case agent, FBI Special Agent Christopher Dlugokinski stated that he had "completed a review" of Discord records on June 7, 2022, which merely denoted the review he completed that day—as opposed to his "Final Summary of Findings," which documented the completed responsiveness review finished on August 19, 2022.

In the end, the FBI's responsiveness review of the Discord records took approximately three months to complete. Considering the size of the Discord production,[16] and the pace and sheer scale of this investigation, the FBI's three-month review of the Discord records was more than reasonable within the meaning of the Fourth Amendment. *See United States v. Brown*, 627 F. Supp. 3d 206, 232 (S.D.N.Y. 2022) (noting that "courts 'have previously determined that delays of 10 months, or more, in reviewing electronic data are no *per se* unreasonable, even when the government does not furnish a basis for the delay in searching electronic data'") (quoting *United States v. Estime*, 2020 WL 6075554, at *14 (S.D.N.Y. Oct. 14, 2020)).[17]

The defendant finally argues that the government improperly retained a copy of his entire Discord account, separate and apart from evidence that was seized from the account. The government did so to ensure that it could provide the defendant with a copy of his entire Discord account in discovery. The government is aware that it may not re-search the account without a new search warrant.

There is nothing improper about providing the defendant with a copy of his entire account; to the contrary, as the defendant did in this case, defense counsel in many cases request copies of the underlying data that law enforcement searched. Anticipating that defense

---

[16] As detailed, above, the Discord production consisted of more than 40 gigabytes of information—a substantial amount of data—and more than 1,000,000 lines of posts and chats. It belies common sense to conclude that a review of that volume material would have been completed by the FBI on May 31, 2022, as the defendant contends.

[17] In the event the defendant challenges the time it took the complete the Discord search, the government is prepared to demonstrate that, under the circumstances of this case, three months was an entirely reasonable period of time to do so.

counsel in this case would make that same request, the government preserved a copy of the defendant's Discord account for discovery.

### C. The Buffalo City Court warrant for the defendant's iPhone

The defendant next moves to suppress a search of his iPhone conducted pursuant to a search warrant issued by Buffalo City Court Judge Craig Hannah.[18] *See* Docket No. 402. As the defendant notes, technological limitations prevented the Buffalo Police Department (BPD) from executing that warrant. As a result, the only information BPD was only able to recover pursuant to the state warrant was the defendant's phone number. As discussed below, the state warrant complied with the Fourth Amendment. But if the Court disagrees, the good faith exception—properly viewed through the lens of the high-pressure situation in which law enforcement found itself—applies to this search. Finally, the Court should not grant suppression because the defendant's phone number would have been—and, in fact, was— inevitably found in multiple other ways independent of the search.

#### a. The state warrant application provided a nexus between the defendant's crimes and his iPhone.

The state warrant application provided a sufficient nexus between the defendant's attack and the iPhone that was found on his person.

Buffalo Police Detective Joseph Acquino swore out an affidavit in support of the warrant less than four hours after the defendant committed his attack. After describing the attack, Detective Acquino stated that, "at the time of the shooting, [the defendant] was wearing a tactical helmet with a 'GoPro' style personal video recording device." Docket No.

---

[18] That same warrant also authorized a search of the defendant's car and the GoPro camera he used to livestream his attack. The defendant does not challenge the search of those items. *See* Docket No. 402 at 1 n.1.

402, Ex. A at 2. Detective Acquino also stated that "[m]ultiple videos of the shooting have been posted online" and that a particular Twitch account—known as ███████—had "posted a live video of the shooting from a first-person perspective, which appears to have been created with [a] video recording device." *Id.* Detective Acquino therefore requested authority to search the defendant's iPhone for, among other things, "social media applications linked with the iPhone." *Id.* at 3.

A search warrant application must "establish[ ] a sufficient nexus between the criminal activities alleged" and the place or object to be searched. *United States v. Singh*, 390 F.3d 168, 182 (2d Cir. 2004). "A showing of nexus," however, "does not require direct evidence and may be based on reasonable inference from the facts presented based on common sense and experience." *Id.* at 182 (cleaned up). That is the case with the defendant's iPhone: Detective Acquino reported that the defendant appeared to have livestreamed his attack on the social media application Twitch. Applying "common sense and experience," *id.*, it was reasonable for Judge Hannah to conclude that—of the two electronic devices found on the defendant's person—evidence of the Twitch application would likely be found on the defendant's phone. This is an entirely "reasonable inference." *Id.* Judge Hannah therefore had a "substantial basis for the finding of probable cause," *Wagner*, 989 F.2d at 72, to search the defendant's iPhone. The Court should affirm that finding.

### b. The warrant was not overbroad and was sufficiently particularized.

The defendant next argues that the state warrant was insufficiently particularized and overbroad. The particularity requirement mandates that a warrant (1) "identify the specific offense for which the police have established probable cause"; (2) "describe the place to be

searched"; and (3) "specify the items to be seized by their relation to designated crimes." *Galpin*, 720 F.3d at 445-46 (quotation marks and citations omitted).

The state warrant identified the item to be searched as the defendant's iPhone. The government acknowledges that the warrant did not explicitly identify "the specific offenses for which the police have established probable cause." *Id.* The warrant, however, made references to victims who were "dead from gunshot wounds" and "the shooting at Tops Market." Docket No. 402, Ex. A at 4. This language is sufficiently descriptive to advise the executing officers that they were to search for evidence of, at the very least, violations of New York Penal Law 125.25 (second degree murder), and that such evidence must be related to a shooting that had happened at Tops. Likewise, the warrant provided sufficient examples of evidence to be searched on the defendant's phone, such as his internet searches, call history, and "social media applications linked with the iPhone." *Id.* The warrant likewise specifically instructed officers to use "Cellebrite Cloud Analyzer to extract content from social media accounts linked to the iPhone." *Id.* Taken together, then, the warrant provided sufficient guidance for the executing officers as to how to conduct their search: they were to search the defendant's phone for evidence of mass murder that had occurred at Tops.

The warrant was not overbroad because it authorized a search of "all electronic contents of the phone." Docket No. 402 at 13. A warrant that authorizes "law enforcement agents to access all the data on the phone does not automatically render it overbroad." *United States v. Dawkins*, 2019 WL 2464924, at *7 (S.D.N.Y. May 23, 2019). *See also Saipov*, 2019 WL 3024598, at *7 (noting that "the fact that the Search Warrant contemplates that the entire contents of the Cell Phones" is an "unremarkable" approach to searching electronic devices). Because "it will often be impossible to identify in advance the words or phrases that will

29

separate relevant files or documents before the search takes place, [and] because officers cannot readily anticipate how a suspect will store information related to the charged crimes," *Ulbricht*, 858 F.3d at 102, the Second Circuit has "not required specific search protocols or minimization undertakings as basic predicates for upholding digital search warrants." *Galpin*, 720 F.3d at 451.

At the very least, however, Detective Acquino's affidavit established probable cause to believe that the defendant used the Twitch application on his phone to livestream his attack. To investigate that belief, the warrant authorized officers to search for evidence of the livestreamed attack, as well as evidence that would identify whether the defendant was the Twitch user ███████ who had posted the livestreamed attack online. Pursuant to that search authority, officers were able to identify the phone number associated with the phone. To the extent that the warrant authorized the seizure of evidence beyond that described above, the proper remedy is to "sever[] (or redact[]) the constitutionally infirm portion . . . from the remainder" of the warrant. *George*, 975 F.2d at 79. In other words, the remedy is not to suppress the officers' discovery of the phone number.

### c. The agents executed the warrant in good faith.

If the Court concludes that the warrant was invalid, suppression is inappropriate because the executing officers acted in good faith.

"[C]ourts have recognized that evidence obtained by officers in objectively reasonable reliance on a warrant subsequently invalidated by a reviewing court is not generally subject to exclusion." *United States v. Raymonda*, 780 F.3d 105, 118 (2d Cir. 2015) (quotation marks omitted). This principle is rooted in the fact that the exclusionary rule is meant to deter police misconduct. Thus, "[w]hen an officer genuinely believes that he has obtained a valid warrant

30

from a magistrate and executes that warrant in good faith, there is no conscious violation of the Fourth Amendment 'and thus nothing to deter.'" *Id.* (quoting *United States v. Leon*, 468 U.S. 897, 920-21 (1984)). The exclusionary rule does not, then, require suppression unless reliance on the warrant would be "objectively [un]reasonable." *Leon*, 468 U.S. at 918.

The Second Circuit's decision in *United States v. Rosa*, 626 F.3d 56 (2d Cir. 2010), is particularly instructive on whether Detective Acquino's reliance on the state warrant was unreasonable. In *Rosa*, the Second Circuit found that a search warrant was defective "in failing to link the items to be searched and seized to the suspected criminal activity—i.e., any and all electronic equipment potentially used in connection with the production or storage of child pornography and all and all digital files and images relating to child pornography contained therein—and thereby lacked meaningful parameters on an otherwise limitless search of [the defendant's] electronic media." *Id.* at 62.

Yet the Second Circuit declined to suppress evidence in light of the high-pressure circumstances under which the warrant was obtained: "the application documents were drafted, the warrant was issued, and the search of [the defendant's] residence was executed pursuant to a judicially authorized warrant in the three hours from 2:00 a.m. to 5:00 a.m.," and the search warrant application made "clear that the purpose of the search was to obtain evidence of child pornography and child molestation." *Id.* at 64-65. Recognizing "the time pressures and the content of the application and the affidavit," the Second Circuit concluded that it was "only reasonable to conclude that the failure to ensure that the items to be seized were properly limited under the express terms of the warrant was simply an inadvertent error that was the product of 'isolated negligence.'" *Id.* at 65 (quoting *Herring v. United States*, 555 U.S. 135, 137 (2009)). What is more, there was "no evidence that [the search warrant

31

applicant] and his team of officers actually relied on the defective warrant, as opposed to their knowledge of the investigation . . . in executing the search, the requisite levels of deliberateness and culpability justifying suppression are lacking." *Id.* at 66.

This is one of the few cases that replicate *Rosa*'s unique facts. It is important to put the warrant's drafting and execution in context: the defendant arrived at Tops and began shooting at approximately 2:30 p.m. Police officers arrived on scene within two minutes and faced an armed defendant, a sprawling crime scene with multiple deceased victims, several surviving victims who required medical attention, and dozens of witnesses in and around Tops. In addition to gathering evidence in the largest-ever shooting in the City of Buffalo, officers and detectives had to assure themselves that the defendant acted alone, and they had to coordinate with other law enforcement agencies throughout Buffalo and New York State.

In the midst of all of this, Detective Acquino prepared a search warrant application, which Judge Craig Hannah signed at 6:23 p.m.—less than four hours after the defendant had begun his attack. Within that short time-span, as set out in his affidavit, Detective Acquino learned a number of facts: he explained what the defendant wore during the attack; he described surveillance footage showing the shooting; he identified what could be seen inside the defendant's car; he summarized reports from "multiple witnesses"; and he explained that the shooting was live-streamed on Twitch by a user named █████████ Docket No. 402, Ex. A at 1-3. The time pressure under which Detective Acquino was operating is obvious from the fact that he did not yet know the full scale of the defendant's attack; in his affidavit, Detective Acquino reported that "at least 8 individuals are dead from gunshot wounds," *id.* at 1, when, in fact, the defendant had killed ten people.

The warrant's failure to provide more particularity can therefore be attributed to the "time pressures," *Rosa*, 626 F.3d at 65, inherent in an investigation as unique as this one. In other words, the warrant's failure to be more particularized was "simply an inadvertent error that was the product of 'isolated negligence.'" *Id.* (quoting *Herring*, 555 U.S. at 137). This is not the type of error that the exclusionary rule is not meant to punish. The exclusionary rule "cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity." *Leon*, 468 U.S. at 918-19. The unprecedented situation in which Detective Acquino found himself means that "any marginal deterrence [from excluding evidence] does not pay its way." *Herring*, 555 U.S. at 147-48 (quotation marks omitted). There is, in other words, little to deter in a case such as this one that has few parallels. Thus, the exclusionary rule does not apply to the state warrant.

### d. Law enforcement discovered the defendant's phone number independent of a search of his phone.

As the defendant notes, BPD was unable to perform a forensic extraction of his phone. The only information BPD could obtain from the phone was the phone's SIM card, which identified the make and model of the phone; the phone's IMEI number;[19] and the phone number. BPD used that phone number to obtain records from Verizon.

If the Court concludes that the warrant was invalid and that the good faith exception does not apply, the Court should not suppress the phone number because law enforcement would have—and did—discover the defendant's phone number in multiple ways independent of the defendant's phone. Identifying a suspect's phone number is one of the most basic (and often first) investigative steps law enforcement agents can take. This case illustrates that fact:

---

[19] An IMEI number is a unique number associated with a cell phone.

the fifth entry in the FBI's case file documents preliminary research the FBI conducted on the day of the attack. That research shows that, on May 14, 2022, the FBI identified the defendant's phone number through a LexisNexis database search. *See* Ex. C at 19. In the coming days, the FBI learned the defendant's phone number from countless search warrant and subpoena returns for social media accounts, many of which identified that same phone number as the defendant's. And, finally, the defendant provided his phone number to BPD as a part of the basic booking process after arrest. The defendant's phone number, in other words, was not a secret found only on his phone.

It is well settled that "evidence obtained during the course of an unreasonable search and seizure should not be excluded 'if the government can prove that the evidence would have been obtained inevitably' without the constitutional violation." *United States v. Heath*, 455 F.3d 52, 55 (2d Cir. 2006) (quoting *Nix v. Williams*, 467 U.S. 431, 447 (1984)). This "turns on a central question: Would the disputed evidence inevitably have been found through legal means 'but for' the [alleged] constitutional violation? If the answer is 'yes,' the evidence seized will not be excluded." *Id.* This requires a court to find, "with a high level of confidence, that each of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor." *Id.* at 60. The government must make this showing by a preponderance of the evidence. *See United States v. Stokes*, 733 F.3d 438, 444 (2d Cir. 2013).

The inevitable discovery doctrine applies here because law enforcement would have—and did—easily identify the defendant's phone number from multiple sources independent of the search of his phone. The FBI documented those sources in the FBI's file, and they did so roughly contemporaneously (or possibly even before) BPD searched the defendant's phone. These are the sorts of "demonstrated historical facts capable of ready verification or

34

impeachment" that the inevitable discovery doctrine requires. *Stokes*, 733 F.3d at 444 (quotation marks and emphasis omitted). The Court, then, does not need to weigh "speculative" what-ifs, *id.*, and ask what would have happened had law enforcement not conducted an illegal search. The Court likewise does not need to consider the likelihood of a series of "contingencies necessary to the legal discovery of the contested evidence." *Id.* (quotation marks omitted). Documentary evidence shows that law enforcement identified the defendant's phone number from multiple sources. Thus, suppression of the defendant's phone number is not warranted.

### D. The Verizon Warrant

The defendant next moves so suppress evidence obtained from a search warrant to Verizon. *See* Docket No. 401. As described below, the Verizon warrant stands apart from the other warrants in this case because it did not seek to search and seize evidence in the traditional sense. Rather, it sought the defendant's call and text detail records (other than the contents of those communications) to map the defendant's physical location as he planned and ultimately committed his attack. That warrant was supported by probable cause and otherwise complied with the Fourth Amendment. The Court should therefore deny the defendant's motion.

#### a. The Court should not suppress evidence obtained pursuant to emergency disclosure requests.

##### i. The emergency disclosure requests complied with the Stored Communications Act.

As the defendant notes, BPD and the FBI submitted emergency disclosure requests (EDRs) to Verizon on May 14, 2022, seeking non-content information about the defendant's

call and text records. The EDRs sought to determine whether the defendant had any accomplices who were also planning to commit mass murder. The EDRs were therefore justified by the Stored Communications Act (SCA).

As the Second Circuit has observed, in passing the SCA, "Congress . . . deemed it reasonable to subordinate any individual privacy interest in cell phone location information to society's more compelling interest in preventing an imminent threat of death or serious bodily injury." *United States v. Gilliam*, 842 F.3d 801, 805 (2d Cir. 2016) (quotation marks omitted). Congress therefore gave "service providers the authority to decide whether there existed an emergency involving danger of death or serious physical injury to any person." *Id.* (quotation marks omitted). To that end, the SCA authorizes electronic service providers to voluntarily disclose information about a subscriber's account "if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay" of information pertaining to a customer's account. 18 U.S.C. § 2702(b)(8) (disclosure of communications); *id.* § 2702(c)(4) (disclosure of customer records). This authority allows providers to disclose information in cases that "include[] a realistic threat of . . . injury, [and] not just a completed injury." *Gilliam*, 842 F.3d at 803.

Verizon's decision to disclose information fits comfortably within the SCA's emergency disclosure provisions. At the time law enforcement requested emergency disclosure, the defendant had just recently attacked a busy grocery store, murdered ten people, and attempted to inspire others to do the same by livestreaming his attack and publishing his manifesto. Law enforcement acted reasonably in attempting to verify, on an emergency basis, whether the defendant had conspired with others to engage in similar attacks at other locations; the most expedient way of doing so was requesting that Verizon provide records on

36

an emergency basis. Verizon agreed that disclosure was appropriate and provided records to the FBI. That resolves this issue.

But even if the Court concludes that Verizon improperly disclosed information to the FBI and BPD, the remedy is not suppression. "Congress provided a number of specific remedies for such violations; these do not include suppression of evidence in a criminal case." *United States v. Gasperini*, 894 F.3d 482, 488 (2d Cir. 2018). The SCA does not authorize suppression for nonconstitutional violations. *See* 18 U.S.C. § 2708 ("The remedies and sanctions in this chapter are the only judicial remedies and sanctions for nonconstitutional violations of this chapter.") There "is no exclusionary rule generally applicable to statutory violations," and because the SCA makes "no mention of a suppression remedy," there is none. *United States v. Clenney*, 631 F.3d 658, 667 (4th Cir. 2011) (quotation marks omitted) (addressing claim that another provision of SCA was violated); *see also id.* ("Congress has shown that it knows how to create a statutory suppression remedy" and noting that it did so for evidence "obtained in violation of the statutes governing wiretaps") Accordingly, the Court should deny the defendant's motion to suppress on this ground because there is no suppression remedy for violations of the SCA's emergency disclosure provisions. *See United States v. Karmo*, 109 F.4th 991, 994-95 (7th Cir. 2024).

Even if that were not true, SA Dlugokinski did not err by including information provided by Verizon in his search warrant affidavit. Verizon concluded, in its judgment, that § 2702 was satisfied and that, as a result, the SCA authorized emergency disclosure. The Court, then, should not punish agents for relying on a valid statute and a third-party's independent decision to disclose information pursuant to that statute. After all, § 2702 leaves it to the *provider*—not the agent—to decide whether the statute is satisfied. In these

37

circumstances, there is nothing to deter by suppressing evidence. *See Illinois v. Krull*, 480 U.S. 340, 349 (1987) ("The application of the exclusionary rule to suppress evidence obtained by an officer acting in objectively reasonable reliance on a statute would have as little deterrent effect on the officer's actions as would the exclusion of evidence when an officer acts in objectively reasonable reliance on a warrant.").

### ii. Exigent circumstances justified Verizon's disclosure of cell site location information.

The Fourth Amendment does not provide a basis to suppress the EDR returns. Like other courts of appeals, the Second Circuit has recognized that traditional exigency doctrine applies to the emergency disclosure of cell site location information. The "core question" in such cases "is whether the facts would lead a reasonable, experienced officer, to believe that there was an urgent need to take action." *Gilliam*, 842 F.3d at 805 (quotation and editorial marks omitted). And like any other exigency case, this is not an exercise in hindsight; the question is whether "[t]he evidence available to law enforcement *at the time of the search*" showed an exigency. *Id.* at 804 (emphasis added). *See also United States v. Klump*, 536 F.3d 113, 117-18 (2d Cir. 2008) ("The core question is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer to believe that there was an 'urgent need to render aid or take action.'") (quoting *United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir. 1990) (*en banc*)) (citation omitted). *Cf. Graham v. Connor*, 490 U.S. 386, 396 (1989) ("The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.") (quotation marks and citation omitted).

A finding of exigency does not require that officers know with certainty that particular facts have, or will, occur. In a related context, for instance, the Second Circuit has affirmed findings of exigency where a suspect "could" have destroyed evidence or where there was a "possibility" of doing so. *MacDonald*, 916 F.2d at 770 . Similarly, the Second Circuit has affirmed an exigency finding for a defendant's real-time location data based on a "concern" that a crime had occurred. Specifically, the Second Circuit found that an exigency warranted disclosure of a defendant's cell site location information where a child was found missing from her home; where the child's foster mother reported that the child had a "boyfriend"; and where the child's social worker "expressed concern that [the child] was being forced into prostitution by [the defendant]." *Gilliam*, 842 F.3d at 802. *See also Karmo*, 109 F.4th at 995 (affirming finding of exigency for real-time location information where FBI had reason to believe that defendant was traveling with guns to a city undergoing civil unrest).

In other words, the factual basis necessary for an exigency finding depends, in part, on the type of danger that police are trying to prevent. In *Mora v. City of Gaithersburg, MD*, 519 F.3d 216 (4th Cir. 2008), for example, the Fourth Circuit found exigent circumstances justified warrantless searches as a "preventive action" to stop potential mass murder. In *Mora*, a healthcare hotline operator notified police that a hotline caller reported that "he was suicidal, had weapons in his apartment, could understand shooting people at work, and said 'I might as well die at work.'" *Id.* at 220. The defendant's girlfriend "confirmed that [the suspect's] threats should be taken seriously." *Id.* The Fourth Circuit held that these exigencies justified a warrantless search of the suspect's luggage, van, and apartment. *Id.* at 220-24. In describing why these facts supported an exigency finding, *Mora* emphasized that, "[a]s the likelihood, urgency, and magnitude of a threat increase, so does the justification for and scope

of police preventive action. In circumstances that suggest a grave threat and true emergency, law enforcement is entitled to take whatever preventive action is needed to defuse it." *Id*. at 224-25. More succinctly, the Court observed, "[r]especting the rights of individuals has never required running a risk of mass death." *Id.* at 224.

Of particular relevance here, *Mora* observed that police were justified in conducting a warrantless search of the suspect's belongings even after he had been arrested. "The authority to defuse a threat in an emergency," the court explained, "necessarily includes the authority to conduct searches aimed at uncovering the threat's scope." *Id.* at 226. Thus, when the police "arrived at [the suspect's] apartment and handcuffed him, they did not and could not fully know the dimensions of the threat they faced." *Id.* The police did not know, for example, whether the suspect "might have had a bomb—not an unprecedented thing for men in his state of mind" or whether he "might have had a confederate." *Id.* That is because, "[i]n an emergency situation . . . , officers are entitled to find out what they are up against." They "often cannot" do that "without conducting searches." *Id.*

The same is true here. At the time they submitted EDR requests to Verizon, the FBI and BPD knew that the defendant had just traveled hundreds of miles—to a place with which he had no connection—and committed mass murder. They also knew that he had broadcast his attack to the internet and published a manifesto with the explicit goal of inspiring other mass murderers. The FBI and BPD did not know whether the defendant had conspirators or whether others were planning similar mass attacks.

"The very concept of an emergency was made for this situation." *Id.* at 226. The defendant's arrest did not "defus[e] the threat" because the police did not know "threat's scope." *Id.* The defendant's claim to have acted alone did not require law enforcement to

40

suddenly stop their investigation. Law enforcement was not required to take the defendant's word for it; they were entitled to investigate whether the defendant was being truthful. It bears recalling that these facts must be viewed "not with the 20/20 vision of hindsight" from the "peace of a judge's chambers." *Graham*, 490 U.S. at 396 (quotation marks omitted). They must be viewed as the officers did in the moment: with significant uncertainty about the scope of the threat and an unquestionable obligation to take "preventive action . . . to defuse it." *Mora*, 519 F.3d at 224-25. An EDR to Verizon was a measured and reasonable step towards understanding whether there was an ongoing risk to others. As the Fourth Circuit observed, "[i]naction, no less than action, has its costs—a failure of response where one is called for permits the blasts of the gunman to shatter those connections that human beings hold most dear." *Id.* at 225. The Fourth Amendment does not require police to ignore these realities.

The Supreme Court's decision in *Carpenter v. United States*, 585 U.S. 296 (2018), supports this conclusion. *Carpenter* held that the compelled disclosure of comprehensive cell site information is a Fourth Amendment search that generally requires a search warrant. But *Carpenter* emphasized that its holding was "a narrow one," *id.* at 298, and the Court explicitly recognized that "case-specific exceptions"—including "urgent situation[s]" like "active shootings"—could still support the warrantless search of cell-site records. *Id.* at 319-20. As the Court explained, its decision, "d[id] not call into doubt warrantless access to CSLI [i.e., cell site location information] in such circumstances. While police must get a warrant when collecting CSLI to assist in the mine-run criminal investigation, the rule we set forth does not limit their ability to respond to an ongoing emergency." *Id.* at 320.

###### b. There was a nexus between the defendant's crimes and his cellular data.

The Verizon warrant stands apart from the other search warrants in this case because it did not seek authority to "seize" evidence in the traditional sense; rather, it sought the defendant's historical location information (but not the content of his communications) so that that data could be mapped by the FBI's Cellular Analysis Survey Team (CAST). As SA Dlugokinski's affidavit explained, "CAST is a highly-qualified group of federal law enforcement agents who are experts in the field of historical cell site analysis." Docket No. 401, Ex. C ¶ 42. CAST agents use historical cell site data to "identify criminal suspects and the general location of . . . suspects . . . at fixed points in time." *Id.* Thus, the warrant sought data from Verizon that could be used to identify the defendant's phone's approximate location based on the cell towers that the phone communicated with at particular points in time. *Id.* ¶¶ 49-51.

The facts described in SA Dlugokinski's affidavit supported the belief that the defendant's physical location was, itself, evidence of his crimes. After describing the defendant's attack and manifesto, SA Dlugokinski stated that, during a search of the defendant's bedroom on May 15, 2025, the FBI identified "a receipt for a purchase of a candy bar at the Tops supermarket located at 1275 Jefferson Avenue, Buffalo, New York, on March 8, 2022"—roughly two months before the attack—"and a sketch of the inside of the Tops supermarket located at 1275 Jefferson Avenue, Buffalo, New York." *Id.* ¶ 39. From this, SA Dlugokinski drew the common-sense inference that the defendant "cased and target[ed]" Tops before his attack. *Id.* ¶ 41. SA Dlugokinski further observed that the defendant "began planning this mass shooting months ago, and that he traveled over approximately 200 miles and over 3 hours to Buffalo, New York to commit it." *Id.* ¶ 40. Applying "the factual and practical considerations of everyday life," *Gates*, 462 U.S. at 231 (quotation marks omitted),

leads to two common-sense conclusions: that, in the course of planning his attack, the defendant had traveled from Conklin to Buffalo at least once; and that he again traveled from Conklin to Buffalo to commit his attack.

Taken together, then, SA Dlugokinski's affidavit provided probable cause to believe that (1) the defendant had traveled to Buffalo at least twice in the course of planning and committing his attack; and (2) evidence of those trips would be found by CAST analysis of the defendant's historical cell site data. Judge Schroeder therefore had a "substantial basis for the finding of probable cause." *Wagner*, 989 F.2d at 72. This Court should affirm that finding.

### c.  The warrant was sufficiently particularized and not overbroad.

The defendant argues that the Verizon warrant was insufficiently particularized because it did not adequately identify what evidence agents could seize. Docket No. 401 at 17-20. This argument fails to read the warrant as a whole. A warrant is sufficiently particularized if the "alleged crimes appear in either (1) the warrant itself, or (2) in a supporting document if the warrant uses appropriate words of incorporation and if the supporting document accompanies the warrant." *In re 650 Fifth Avenue and Related Properties*, 830 F.3d 66, 100 (2d Cir. 2016). The Verizon warrant authorized agents to search for and seize evidence of violations of 18 U.S.C. §§ 249, 924(c)(1)(A) and 924(j)(i), as "more particularly described in the application for this warrant which is incorporated [into the warrant] by reference." Docket No. 401, Ex. D. The warrant, in other words, expressly incorporated SA Dlugokinski's affidavit, which described the crimes being investigated and the type of evidence likely to be found in the defendant's Verizon records.

The defendant concedes that the warrant application was incorporated by reference into the Verizon warrant. Docket No. 401 at 18 (observing that "the warrant application is

incorporated by reference into the warrant"). That resolves this argument. The defendant, however, tries to minimize this fact by arguing that "no reasonable officer would read the warrant as limiting authorized seizures to evidence of the Tops Market shooting on May 14, 2022, in light of the fact that the application defines the 'Target Offenses' of the warrant only as" violations of 18 U.S.C. §§ 249, 924(c)(1)(A)(iii), and 924(j)(i). *Id.* But this argument ignores SA Dlugokinski 18-page affidavit, which, in turn, incorporated the defendant's 180-page manifesto. No reasonable officer could read those documents—which discusses *no crime* other than the defendant's attack on Tops—and identify any other crime that was being investigated. The warrant application likewise described the use of CAST to analyze cell site information to identify the defendant's location. Taken together, the application gave agents sufficient guidance about what they could seize.

In addition, the warrant was not overbroad. It directed Verizon to produce basic subscriber information about the defendant's account,[20] and it directed Verizon to produce records about the dates and times the defendant's phone had communicated. The warrant, however, expressly directed Verizon *not* to provide the contents of the defendant's communications. There was probable cause to search this information because, as SA Dlugokinski's affidavit explained, that information could be used to map the defendant's physical location at particular points in time. For instance, SA Dlugokinski explained that, "[w]hen sending or receiving a communication, a cellular device broadcasts signals to the cellular tower that is routing its communication." Docket No. 401, Ex. C ¶ 48. Thus, information about which cell phone tower—and which "sector" of that tower—a phone

---

[20] The information identified in Section I(a) of Attachment B could have been obtained with a grand jury subpoena, rather than a search warrant. *See* 18 U.S.C. § 2703(c)(2). The fact that that information was requested in the search warrant was therefore a matter of efficiency, rather than legal obligation.

connected to when sending or receiving a communication is evidence of the phone's physical location when it sent or received the message. *Id.* ¶ 50.

It therefore does not matter whether the defendant "had called or text messaged any other person in relation to the planning or execution" of his attack, Docket No. 401 at 22; whether he did so has no bearing on his physical location while he was planning and carrying out his attack. SA Dlugokinski's affidavit established probable cause to believe that the defendant had traveled to Buffalo at least twice in the course of planning and carrying out his attack, and that he had been planning his attack for an unknown period of time. To that end, the warrant authorized agents to search for and seize evidence of that travel in the form of historical cell site location information. Thus, the warrant's "description of the objects to be seized"—evidence of the defendant's travel—was "justified by the probable cause upon which the warrant is based." *Galpin*, 720 F.3d at 446 (quotation marks omitted).

Finally, it does not matter, as the defendant argues, that a violation of § 249 can be committed in several ways. *See* Docket No. 401 at 23. The defendant offers examples of different ways in which § 249 can be violated, but each of those examples is tied together by a common theme: they involve the actual or attempted causation of bodily injury or violence. Thus, whether or not a violation of § 249 "is susceptible to different theories of proof, it is by no means so broad a statute that it provides no limitation to law enforcement officers in executing a search warrant." *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 308 (S.D.N.Y. 2018) (rejecting this argument in context of warrant to search for evidence of securities fraud, which can be committed in multiple ways).

### d. The warrant's execution complied with the Fourth Amendment.

As described above, the Verizon warrant sought location information that could be mapped to identify the defendant's physical location. That is, in fact, what happened: the FBI reviewed the cell site data and prepared maps showing the movement of the defendant's phone on multiple dates that were relevant to the investigation. Drafts of those maps were provided in discovery. There are, therefore, no "unknowns" about how the Verizon warrant was executed. Docket No. 401 at 25. At this point, the defendant has had preliminary cell site mapping for years, and all the data necessary to conduct their own mapping—if they so choose.

The defendant finally argues that the government improperly retained a copy of his entire Verizon account, separate and apart from evidence that was seized from the account. The government did so to ensure that it could provide the defendant with a copy of his entire Verizon account in discovery. The government is aware that it may not re-search the account without a new search warrant.

There is nothing improper about providing the defendant with a copy of his entire account; to the contrary, defense counsel in many cases request copies of the underlying data that law enforcement searched. Anticipating that defense counsel in this case would make that same request, the government preserved a copy of the defendant's Verizon account for discovery.[21]

---

[21] Indeed, during a June 17, 2025, discovery meeting between the government and defense counsel, defense counsel affirmed that they wanted copies of the entire, unreviewed contents of the defendant's accounts.

**E.  The** ███████████ **warrant**

The defendant concedes that there was probable cause for "an appropriately limited search of [his] residence for evidence related to the shooting at the Tops Market on May 14, 2022." Docket No. 405 at 7. He nonetheless argues that the warrant was overbroad and that agents—who seized only evidence identified in the warrant—seized too much evidence. Neither argument has merit.

### a.  The defendant's mother consented to a search of ███████████

"The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained." *Georgia v. Randolph*, 547 U.S. 103, 106 (2006). Thus, the "well established rule" in the Second Circuit is that "consent to a search by one with access to the area searched, and either common authority over it, a substantial interest in it or permission to exercise that access, express or implied, alone validates the search." *United States v. Buettner-Janusch*, 646 F.2d 759, 765 (2d Cir. 1981) (quotation and editorial marks omitted). *See also Randolph*, 547 U.S. at 106.The government may establish third-party consent in one of two ways: by showing that a common resident had actual authority to consent to the search, *see United States v. Matlock*, 415 U.S. 164, 171 n. 7 (1974); or by showing that the resident had apparent authority to consent to the search. *See Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990). Third-party consent need not be explicit; instead, "it is well settled that consent may be inferred from an individual's words, gestures, or conduct. Thus, a search may be lawful even if the person giving consent does not recite the talismanic phrase: 'You have my permission

to search.'" *United States v. Grant*, 375 F. App'x 79, 80 (2d Cir. 2010) (quotation marks omitted).

A third-party has actual authority to consent to a search when she has "both access to and some measure of control (or right to exert control) over the area" to be searched. *Moore v. Andreno*, 505 F.3d 203, 210 (2d Cir. 2007) (quotation marks omitted) (emphases omitted). Whether a third-party has actual authority "depends on the understandings communicated by the titular owner to [the third party]." *United States v. McGee*, 564 F.3d 136, 140 (2d Cir. 2009). A third-party has authority to "consent to a search if two prongs are present: first, the third party had access to the area searched, and, second, either: (a) common authority over the area; or (b) a substantial interest in the area; or (c) permission to gain access." *Id.* at 139-40 (quotation marks omitted).

Several courts have also held that certain relationships between a defendant and a consenting third party "create[] a [rebuttable] presumption of control for most purposes over the property by the third party." *United States v. Rith*, 164 F.3d 1323, 1329-30 (10th Cir. 1999). "Relationships which give rise to a presumption of control of property include parent-child relationships," including relationships with adult children. *Id.* (holding that parents could consent to search of 18-year-old son's bedroom where, among other things, there was "no lock on [defendant's] bedroom door; no agreement with [defendant's] parents that they not enter his room without his consent; [and] no payment of rent"); *United States v. Block*, 590 F.2d 535, 541 (4th Cir. 1978) (mother had authority to consent to search of 23-year-old son's room); *United States v. Corley*, 342 F. Supp. 2d 776, 781 (N.D. Ind. 2004) (mother had authority to consent to search of areas of home shared with adult son). *See also United States v. LeClerc*, 185 F. Supp. 3d 370, 377-78 (W.D.N.Y. 2016) (concluding that spouses could presumptively

consent to search of all marital property). *But see United States v. Whitfield*, 939 F.2d 1071, 1075 (D.C. Cir. 1991).

"[E]ven if a third party lacks actual authority to consent to a search of a particular area, he may still have apparent authority to consent to the search." *Moore*, 505 F.3d at 209. That is, "effective consent to search the defendant's premises can be communicated to the police by a person who had apparent authority to consent, even if that person in fact lacked actual authority." *McGee*, 564 F.3d at 139. Whether an officer believes that a person has apparent authority to consent to a search is an objective question judged against "the facts available to officer at the moment." *Rodriguez*, 497 U.S. at 188 (quotation marks omitted).

The defendant's mother consented to a search of ████████ on May 14, 2022, before the FBI obtained a search warrant. *See* Ex. D (grand jury testimony of Pamela Gendron) at 76:3-5 ("Q: You consented to the search of your home even though they later got a search warrant anyway, correct? A: That's right."). *See also* Docket No. 405, Ex. A ¶ 44 ("I have been advised that GENDRON's parents have consented to the search of ████████ ████). Although the consent was not reduced to writing, there is no requirement that that happen. Thus, although the FBI obtained a warrant "in an abundance of caution," *id.*, doing so was not legally necessary. The Court should therefore deny the defendant's motion.

### b.  The warrant was not overbroad

The warrant authorized agents to seize evidence of violations of 18 U.S.C. § 249 (hate crimes acts), § 924(c)(1)(A)(iii) and § 924(j)(i) (discharge of firearm causing death in furtherance of crime of violence). The warrant then provided 19 illustrative examples of such evidence (one of which had multiple subparts), such as, among other things, "[f]irearms,

ammunition, body armor, firearm magazines, and firearm accessories"; information related to the defendant's "motivation, planning, and/or execution of" his crimes; and "[a]ny information expressing animus or hostility based on race or color."

The probable cause to seize that evidence was obvious. The defendant used a rifle to murder 10 people and had two other firearms in his car at the time of the attack. His manifesto described, in exhaustive detail, the pros and cons of different firearm components. And at the same time that the defendant filmed himself committing mass murder, he published his manifesto to explain that his goal was to kill as many Black people as possible. These facts justified the seizure of evidence such as firearms, ammunition, and evidence of the defendant's racial bias. To take another example, the warrant authorized agents to search for evidence of "other mass shooting events and shooters"; that was justified by the fact that the defendant had written the names of other white supremacist mass shooters on his rifle, as well as the defendant's admission to being inspired by another racially-motivated mass shooting.

These examples, all of which are tied to the defendant's planning, motive, and execution of his attack, are "sufficiently specific to permit the rational exercise of judgment by the executing officers in selecting what items to seize." *United States v. LaChance*, 788 F.2d 856, 874 (2d Cir. 1986) (quotation and editorial marks omitted).[22] As this Court has observed in a different context, "there is nothing 'overbroad' about a warrant that details and breaks

---

[22] The defendant argues that some of the illustrative examples are "not inherently criminal and may even be constitutionally protected conduct." Docket No. 405 at 8. But as the defendant has acknowledged elsewhere in this case, "[t]he First Amendment 'does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent,' or to prove legitimate aggravating factors at sentencing." Docket No. 268 at 23 (quoting *Wisconsin v. Mitchell*, 508 U.S. 476, 486, 489 (1993)). If the government is able to use this evidence to prove its case—which it is—then it must also be able to search for and seize the evidence. Likewise, it goes without saying that evidence need not be "inherently criminal," *id.*, to be subject to seizure. Standing alone, an image of a rifle is not criminal; in the context of an investigation of a mass-murderer, that image has obvious relevance.

down categories of materials, all of which relate to drug dealing in some way." *United States v. Zaso*, 22-CR-74-LJV, 2023 WL 4011149, at *6 (W.D.N.Y. June 15, 2023). So too here: a warrant is not overbroad because it provides executing agents with more guidance than is constitutionally required.

Finally, the defendant attempts to wordsmith the warrant by claiming that certain categories of seizable evidence were "impermissibly ambiguous." Docket No. 405 at 8-9. The defendant does not question (nor could he) that, when investigating potential violations of 18 U.S.C. § 249, agents are properly authorized to seize evidence tending to show whether the defendant committed certain acts "because of the actual or perceived race, color, religion, or national origin of any person." 18 U.S.C. § 249(a)(1). If that is true—and it unquestionably is—then the defendant fails to show what is wrong with a warrant that uses different words, such as "animus" or "hostility," to illustrate evidence that tends to prove this element of § 249. "A warrant need only be 'sufficiently specific to permit the rational exercise of judgment by the executing officers in selecting what items to seize.'" *United States v. Saint Clair*, 2024 WL 413422, at *3 (2d Cir. Feb. 5, 2024) (quoting *United States v. Shi Yan Liu*, 239 F.3d 138, 140 (2d Cir. 2000)). In the context of a § 249 investigation, the terms "animus," "hostility," and "intimidation" have sufficiently-definite meanings that they can guide an agent's execution of a warrant.

### c. Agents acted reasonably when executing the warrant.

Finally, the defendant seeks suppression of *all* evidence seized from the ███████ residence because, he argues, agents seized evidence that he believes was ultimately irrelevant.

To start, the defendant does not acknowledge that agents seized evidence from the ▮▮▮▮▮▮ residence that is plainly covered by the warrant. This includes the defendant's hand-drawn map of Tops; a letter he left for his family in which he stated that, "I had to commit this attack because I care for the future of the white race"; and a note in which the defendant appeared to describe a Tops security guard and wrote, "security/Glock on left hop" and "cameras outside/Not facing me."

The defendant nonetheless faults agents for seizing evidence—such as electronics and firearms—that are unquestionably described in the warrant. *See* Docket No. 405, Ex. B, Attachment B(a) & B(q). In the case of firearms and ammunition, the defendant's only claim is that agents seized ammunition "with apparently no regard for the item's owner." Docket No. 405 at 10. But he fails to explain why that fact is relevant, given that the evidence was explicitly identified in the warrant. What is more, the defendant fails to explain how a law enforcement officer executing a search warrant should be able to identify, at the moment of seizure, whether something such as ammunition belongs to one resident or another. The warrant authorized agents to seize ammunition. Agents did not violate the warrant by doing so.

As for electronic devices, Federal Rule of Criminal Procedure 41(e)(2)(B) authorizes agents to seize electronic media "for later review of the media . . . consistent with the warrant." That is exactly what the executing agents did: they seized electronic media as authorized by the warrant and analyzed it offsite to determine whether it fell within the scope of the warrant.[23] The government then returned to the defendant's family electronic devices

---

[23] The defendant faults agents for seizing electronic evidence such as an Xbox. But the warrant directed the seizure of "computers" and "storage media," and it defined the former term as "all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical arithmetic, or storage functions, including desktop computers, notebook computers, mobile

that, upon further review, the defendant did not use to commit his crimes. That is exactly how Rule 41(e)(2)(B) is meant to operate. *See* 2009 Advisory Committee Note to Fed. R. Crim. P. 41(e)(2) ("This rule acknowledges the need for a two-step process: officers may seize or copy the entire storage medium and review it later to determine what electronically stored information falls within the scope of the warrant.") To the extent that evidence was improperly seized and remains in the government's custody, the "normal remedy is suppression and return of those items [outside the scope of the warrant], not invalidation of the entire search." *United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988). That is what the government did in this case. That should be end of the defendant's motion.

The defendant, however, seeks the heavy-handed remedy of suppression of *all* evidence. To be sure, the Second Circuit has recognized a narrow and "drastic" remedy of "blanket suppression" for cases in which agents "flagrantly disregarded the terms of a warrant." *Shi Yan Liu*, 239 F.3d at 140, 142 (quotation marks omitted). But this remedy is available "only when (1) [agents] effect a widespread seizure of items that were not within the scope of the warrant, and (2) do not act in good faith." *Id.* at 140 (quotation marks and citation omitted).

Neither requirement is satisfied here. First, agents did not effect a "widespread seizure" of evidence beyond the scope of the warrant. Instead, the items they seized were specifically identified in the warrant, such as the notes and letter described above, firearms and ammunition, and electronic devices. The defendant does not identify any case law in which courts have suppressed *all* evidence recovered from a search when agents executed the

---

phones, tablets, server computers, and network hardware." Docket No. 405, Ex. B at 4. Devices such as an Xbox, a gaming console with storage and internet capabilities, therefore falls within the scope of the warrant.

warrant exactly as written. Second, and relatedly, the agents' good faith is shown by the care they took in identifying and seizing evidence specifically identified in the warrant. An agent does not act in bad faith when he or she executes a search warrant by following its literal terms. In other words, the facts of this care "bear none of the hallmarks of a general search: They suggest a fairly systematic inventory, not indiscriminate rummaging, and a search for items enumerated in the warrant, not an exploratory search for items not mentioned there." *Shi Yan Liu*, 239 F.3d at 141. In those circumstances, there is no basis for blanket suppression.

### F. The computer and thumb drive warrants

The defendant next moves to suppress evidence seized from a laptop and two thumb drives seized from his bedroom. These warrants complied with the Fourth Amendment and were properly executed. The Court should therefore deny the defendant's motion.

### a. There was a nexus between the defendant's crimes and the devices.

SA Dlugokinski's affidavit provided case-specific evidence of the connection between the devices found in the defendant's bedroom and the attack. Specifically, the application showed, among other things, that (1) the defendant carried out the attack and did so for the express purpose of killing as many Black people as possible, Docket No. 400, Ex. A at ¶ 16; (2) the defendant used a GoPro camera to livestream the attack over the internet through Twitch, a social media application, *id.* at ¶¶ 7, 27; (3) the defendant possessed an iPhone during the attack, *id.* ¶ 29.; (4) the defendant used the internet and social media applications to research, plan, prepare, and execute the attack, *id.* ¶¶ 27-29; and (5) the defendant drafted a 180-page manifesto in which he described, in exhaustive detail, his research, planning, preparation, and motivation for the attack. As set out below, these facts lead to the "common

sense conclusion," *Gates*, 462 U.S. at 231 (quotation marks omitted), that the computer and thumb drives would contain evidence of the defendant's crimes.

The defendant's manifesto described the critical role that the internet played in his decision to plan and carry out the attack. Based on the typewritten appearance of the manifesto and the inclusion of numerous images, graphics, and website links throughout the document, it is evident that the defendant used a computer to create it. And as SA Dlugokinski affidavit noted, the defendant's mother stated in an interview on May 14, 2022, that the defendant had told her that he was "writing a book"; that he wrote the "book" in his bedroom and at school; and that part of the book was about ballistics and body armor. Docket No. 400, Ex A ¶ 32(f). A reasonable inference from these facts is that the defendant used the computer found in his bedroom to draft the manifesto. The contents of the manifesto likewise support the common-sense inference that the defendant used the internet to research the manifesto. A small sample of the manifesto illustrates this:





These excerpts show that the defendant was motivated and devised his plan for the attack after browsing a social media application (4chan); visiting websites; ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; viewing "infographics, shitposts, and memes" about Black people online; and conducting online research.

The defendant devoted pages and pages of his manifesto to describing the purported "evidence" supporting his racist ideology and beliefs. ▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████ Much of the "research" documented in these

sections of the manifesto included images, graphics, charts, and links to websites that plainly

came from the internet.

In a section of the manifesto titled "Weapons, Equipment, and Mentality of the

Attacker," the defendant wrote 100 pages about every conceivable detail of the attack, his

goals, and his strategy. *Id.* at 57-158. For example, he stated the goals of the attack, *id.* at 57

("Kill as many blacks as possible," "Avoid dying," and "Spread ideals"); his "[s]trategies for

success," *id.* at 58 (*e.g.*, "To maximize deaths of the intended target, attack in a high density,

highly populated area"); his "[s]trategy application," *id.* at 58-59 (*e.g.*, "Zip code 14208 in

Buffalo has the highest black percentage that is close enough to where I live," "Top's Market

is an area in zip code 14208 where a high percentage and high density of blacks can be found,"

and "Video will be livestreamed and manifesto published online to increase coverage and

spread my beliefs"); and his "plan of action," which included a step-by-step plan for the day

of the attack (including what appeared to be a computer-generated diagram of the Tops floor

plan). *Id.* at 59-61. The defendant also detailed the firearms, equipment, accessories, and

clothing he planned to use during the attack (including, among other things, his Bushmaster

XM-15 firearm, firearm magazines, ammunition, body armor, GoPro camera, ballistic

helmet, gloves, glasses, medical kit, pants, boots, socks, underwear, belt, and hearing

protection). *Id.* at 61-158.

The scope and depth of the research described in this section of the manifesto is difficult to articulate; the defendant listed prices and specifications for hundreds of pieces of equipment and accessories, ranked the equipment and accessories by brand and quality, and described the pros and cons of nearly every item. To take just one of countless examples, the defendant wrote that "[g]unshots are loud, especially indoors," so he described the benefits of hearing protection made of different materials, followed by 13 different options for hearing protection, which he ranked from "Low-End" to "Better Options." *Id.* at 146-148. Notably, this section of the manifesto includes photographs of the firearms and ballistic helmet that he intended to use during the attack, *id.* at 61-62, 80-81, 83-84; graphics—which appeared to be from the internet—relating to the specifications of certain pieces of equipment, *id.* at 87-89, 91-101, 117-142; and approximately 15 links to various websites.

The sheer level of detail, likely largely obtained from internet-based sources, supports the probable cause that evidence of the target offenses would be found on the computer and thumb drives found in the defendant's bedroom. In his affidavit, SA Dlugokinski opined that, "[b]ecause of [the defendant's] use of the Internet and Internet-connected devices in the planning and execution of the attack, and based on my training and experience, there is probable cause to believe that evidence of the planning and execution of the attack will be found on" the defendant's devices Docket No. 400, Ex. A at ¶ 30. He further opined about the types of digital evidence that were likely to be found on the devices, including evidence relating to the defendant's "social media and Internet-based gaming accounts" (including Facebook, Twitter, Instagram, Snapchat, and Twitch). *Id.* at ¶ 43. Ultimately, SA Dlugokinski opined:

> I know that when an individual uses a computer to research and plan a racially-
> motivated attack, the individual's computer will serve both as an

58

> instrumentality for committing the crime, and also as a storage medium for evidence of the crime . . . The computer is likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

*Id.* at ¶ 46(f).

Based on the information in SA Dlugokinski's affidavit and the defendant's manifesto, the search warrant application demonstrated probable cause to believe that the devices found in the defendant's bedroom would contain evidence of the attack. A search warrant application must "establish[ ] a sufficient nexus between the criminal activities alleged" and the place or object to be searched. *Singh*, 390 F.3d at 182. "A showing of nexus does not require direct evidence and may be based on reasonable inference from the facts presented based on common sense and experience." *Id.* at 182 (cleaned up). Here, the facts described in SA Dlugokinski's affidavit and the manifesto—taken together with reasonable inferences from those facts based on common sense and experience—established probable cause to believe that the computer and thumb drives would contain evidence of the defendant's online research, planning, and preparation for the attack; the development of the defendant's racist ideology; and the creation or drafting of the defendant's manifesto. In other words, SA Dlugokinski's affidavit provided exactly the type of case-specific facts necessary to establish probable cause. Judge Schroeder agreed. The Court owes "substantial deference" to that finding and should affirm it. *Wagner*, 989 F.2d at 72.

**b.  The defendant has not met his burden to establish the need for a *Franks* hearing.**

The defendant requests a *Franks* hearing based on two perceived inaccuracies or omissions in SA Dlugokinski's search warrant affidavit. The defendant, however, has not cleared the high bar that justifies a *Franks* hearing. To be entitled to a *Franks* hearing, a defendant must make "'a substantial preliminary showing' of (1) falsity, 'that a false statement . . . was included by the affiant in the warrant affidavit,' (2) knowledge, that the affiant made the allegedly false statement 'knowingly and intentionally, or with reckless disregard for the truth,' and (3) materiality, that 'the allegedly false statement is necessary to the finding of probable cause.'" *United States v. Sandalo*, 70 F.4th 77, 85 (2d Cir. 2023) (quoting *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)). This burden is a "heavy one," requiring "more than a mere conclusory showing." *Id.* at 86. Neither issue the defendant identifies meets this burden.

First, the defendant argues that SA Dlugokinski's affidavit failed to disclose that the defendant "owned a laptop computer and a smart phone, specifically an iPhone 11, both of which were capable of connecting to the internet and both of which he took with him to the scene of the attack." Docket 405 at 14. That is true, but it is irrelevant. In addressing omissions in a search warrant application, the Second Circuit has held that "an affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." *United States v. Awadallah*, 349 F.3d 42, 67–68 (2d Cir. 2003). Whether the defendant had other electronic devices does not mean that there was not also probable cause to believe that the defendant planned his attack using the electronic devices found in his bedroom to. As described above, the defendant's mother stated in an interview on May 14, 2022, that the defendant had told her that he was "writing a book"; that he wrote the book in

his room and at school; and that part of the book was about ballistics and body armor. Docket 400, Ex. A ¶ 32. A common-sense inference from these facts is that the defendant had used the electronic devices in his bedroom to plan his attack and write his manifesto. Probable cause to search devices found in one location does not mean that there is not also probable cause to search devices found elsewhere.

The defendant has therefore not made a "a substantial preliminary showing," *Sandalo*, 70 F.4th at 85, that the affidavit knowingly, intentionally, or recklessly omitted information about other devices the defendant possessed. More importantly, however, the defendant has not shown how this fact was material within the meaning of *Franks*. To decide whether a misstatement was material, the "ultimate inquiry is whether, after putting aside erroneous information and material omissions, there remains a residue of independent and lawful information sufficient to support probable cause." *United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000) (quotation marks omitted). In other words, if SA Dlugokinski's affidavit had included the fact that the defendant brought a laptop and phone with him to the attack, there would still have been probable cause to believe that the defendant used the computer in his bedroom to write his manifesto. Thus, the defendant has not met his "heavy" burden to obtain a *Franks* hearing. *Sandalo*, 70 F.4th at 86.

The defendant next argues that a *Franks* hearing is required because ██████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

███████████████████████████ but a defendant is not entitled to a *Franks* hearing based on a "conclusory showing." *Sandalo*, 70 F.4th at 86.

Even assuming, however, that this statement was false, and even assuming that it was intentionally false, the defendant has not shown how it was material. If the statement about ████████████ is "put[] aside," *Canfield*, 212 F.3d at 718, there remains ample probable cause to believe that the defendant used the electronic devices found in his room to plan the attack. Whether or not ████████████████████████████ does not change whether the defendant used the internet and electronic devices to extensively document his attack. Because the defendant has not met his "heavy" burden, *Sandalo*, 70 F.4th at 85, the Court should deny the defendant's request for a *Franks* hearing.

### c. The search warrants were sufficiently particular and not overbroad.

The defendant next claims that the search warrants for the computer and thumb drives were not sufficiently particular and were overbroad. Docket No. 400 at 15-22. They were not.

The defendant first contends that the warrant was overbroad "because it imposed no temporal limitation on the data to be searched or seized." Docket No. 400 at 15-16. A temporal limitation, however, "is not an absolute necessity, but only one indicium of particularity in a warrant." *Pinto-Thomaz*, 352 F. Supp. 3d at 306 (quotation marks omitted). Whether a temporal limit is necessary often "depends on the context of the case, as the complexity of and duration of the alleged criminal activities render a time frame less significant in a case that required a search for a small set of discrete items related to one or only a few dates." *Id.* (quotation marks omitted). When a warrant does not include a temporal limit, the warrant's examples of seizable evidence may nonetheless "effectively time-limit[]"

the search. *Id.* In other words, "[t]here [is] no need for an explicit time limit as the subject matter limitations on seizure effectively limited the time frame concerned." *Id.* at 307.

The defendant's manifesto justified a warrant with no temporal limitation. The defendant not only stated that he had been inspired to conduct research after learning about another livestreamed, racially-motivated mass shooting, but his manifesto also reflects the defendant's research over an extended period of time. In signing a warrant with no temporal limit, Judge Schroeder agreed that there was probable cause to search the electronic devices to determine when, exactly, the defendant began forming racist beliefs. *Cf. Gaplin*, 720 F.3d at 446 (the warrant's "description of the objects to be seized" is "justified by the probable cause upon which the warrant is based") (quotation marks omitted). Thus, the "effective[] time-limit[]," *Pinto-Thomaz*, 352 F. Supp. 3d at 307, is the unknown date when the defendant began conducting research to justify and plan his attack. In other words, agents knew that the defendant began his research at some point in the past, but they did not (and could not) know when that research began without searching the devices. Under these circumstances, Judge Schroeder's finding that there was probable cause to issue a search warrant without temporal limit is entitled to "substantial deference." *Wagner*, 989 F.2d at 72.

The defendant next argues that the warrants were overbroad because they authorized the seizure of evidence for which there was no probable cause. Docket No. 400 at 17-18. But the warrants' "description of the objects to be seized" was comfortably "justified by the probable cause upon which the warrant is based." *Galpin*, 720 F.3d at 446 (quotation marks omitted). The warrants authorized agents to seize evidence of violations of 18 U.S.C. § 249 (hate crimes acts), § 924(c)(1)(A)(iii) and § 924(j)(i) (discharge of firearm causing death in furtherance of crime of violence). The warrants then provided 27 illustrative examples of such

63

evidence, such as (among other things), information related to the defendant's "motivation, planning, and/or execution of" his crimes and "[a]ny information expressing animus or hostility based on race or color." The probable cause to seize that evidence was obvious: simultaneous to the defendant filmed himself committing mass murder, he published a 180-page manifesto explaining that his crimes were an attempt to kill as many Black people as possible. To take another example, the warrant authorized agents to search for evidence of "other mass shooting events and shooters"; that was justified by the fact that the defendant had written the names of other white supremacist mass shooters on his rifle, as well as the defendant's admission to being inspired by another racially-motivated mass shooting.

These examples, all of which are tied to the defendant's planning, motive, and execution of his attack, are "sufficiently specific to permit the rational exercise of judgment by the executing officers in selecting what items to seize." *LaChance*, 788 F.2d at 874 (quotation and editorial marks omitted). As this Court has observed in a different context, "there is nothing 'overbroad' about a warrant that details and breaks down categories of materials, all of which relate to drug dealing in some way." *Zaso*, 2023 WL 4011149, at *6. So too here: a warrant is not overbroad because it provides executing agents with more guidance than is constitutionally required.

The defendant's argument to the contrary starts from the incorrect premise that probable cause is limited to "the shooting at the Tops Market on May 14, 2022." Docket No. 400 at 18-19. The shooting itself is, of course, a significant part of the probable cause underlying the warrant. But it is far from everything. The defendant does not contest that there was probable cause to believe that he committed murder "because of the actual or perceived race, color, religion, or national origin of any person." 18 U.S.C. § 249(a)(1). And

because there was probable cause to believe that the defendant committed racially-motivated murder, the warrant properly authorized agents to seize evidence related to the nature and bases for the defendant's racial animus. Many of the categories of evidence identified in the warrant are based on this probable cause. The defendant, for example, wrote, "Here's your reparations!" and "The Great Replacement" on his rifle. *See* Docket No. 400, Ex. A ¶ 26. There was probable cause, then, to search for evidence of the defendant's motivation to attack others based on their participation in "social justice and/or political protests." *Id.* at Attachment B.II.k.

It similarly does not matter, as the defendant argues, that a violation of § 249 can be committed in several ways. *See* Docket No. 400 at 18. The defendant offers examples of different ways in which § 249 can be violated, but each of those examples is tied together by a common theme: they involve the actual or attempted causation of bodily injury or violence. Thus, whether or not a violation of § 249 "is susceptible to different theories of proof, it is by no means so broad a statute that it provides no limitation to law enforcement officers in executing a search warrant." *Pinto-Thomaz*, 352 F. Supp. 3d at 308 (rejecting this argument in context of warrant to search for evidence of securities fraud, which can be committed in multiple ways).

Finally, the warrants were sufficiently particularized in identifying evidence that could be seized. As discussed above, the warrants, as noted, authorized agents to seize evidence of violations of 18 U.S.C. § 249 (hate crimes acts), § 924(c)(1)(A)(iii) and § 924(j)(i) (discharge of firearm causing death in furtherance of crime of violence), and then provided 27 illustrative examples of such evidence. This is all the Fourth Amendment's particularity clause requires: "where, as here, warrants call for the seizure of records relating to the suspected crime or

crimes and include a list providing examples of the items to be seized, they have been found to offer sufficient guidance to law enforcement officers to pass constitutional muster." *United States v. Nejad*, 436 F. Supp. 3d 707, 728 (S.D.N.Y. 2020) (Nathan, J.) (emphasis added; quotation and editorial marks omitted). *See also United States v. Lustyik*, 57 F. Supp. 3d 213, 227-28 (S.D.N.Y. 2014) (collecting cases for this proposition). Indeed, "courts typically tolerate *less* specificity where electronic evidence is involved" because "documentary evidence may be difficult to describe *ex ante* with the same particularity as a murder weapon or stolen property." *Nejad*, 436 F. Supp. 3d at 729 (quotation marks and citations omitted). Put differently, the warrants would have been sufficiently particularized if they did nothing more than identify the crimes under investigation and then used "generic terms . . . to describe the items to be seized." *Id.* (quotation marks omitted). If that is true, then it is difficult to understand how a warrant is defective by providing *too much* guidance to the executing agents. The defendant unsurprisingly offers no law for the proposition that a warrant is invalid because it is too particularized.

The defendant's argument to the contrary again starts from the premise that probable cause is limited to "the shooting at the Tops Market on May 14, 2022." Docket No. 400 at 22. For the reasons stated above, however, that is incorrect. The defendant does not contest that there was probable cause to believe that he committed murder "because of the actual or perceived race, color, religion, or national origin of any person." 18 U.S.C. § 249(a)(1). And because there was probable cause to believe that the defendant committed racially-motivated murder, the warrant properly authorized agents to seize evidence related to the defendant's racial animus.

### 3. The executing agents acted within the scope of the search warrants for the computer or thumb drives.

Agents complied with the Fourth Amendment by "confin[ing]" their search of the computer and thumb drives "to the terms and limitations of the warrant authorizing it." *Matias*, 836 F.2d at 747. Their careful and deliberate review shows that agents intended to—and did—confine their review to evidence within the scope of the warrant.

Each piece of evidence the defendant identifies in his motion was properly seized under the warrants. The warrants, for instance, authorized the seizure of "[a]ny records, stored content, communications, messages and information relating to the . . . use and/or possession of firearms, ammunition, firearm accessories and body armor." Docket 400, Ex. B. This language justified the seizure of photos of the defendant hunting, which could just as well be evidence of the defendant engaged in target practice for his attack. Likewise, the defendant's extensively documented research into what equipment to use during his attack shows why it would be relevant to seize evidence about "military weapons and equipment." Docket No. 400 at 24. And the defendant's extensively documented racial motivation justified the seizure of, among other things, "images, infographics, cartoons and memes relating to abstract beliefs about Black people based on race." *Id.* at 24-25. To take just one example, the defendant wrote "The Great Replacement" on the rifle he used to commit his attack; the defendant offers no serious argument for why agents were not justified in seizing "images, infographics and memes relating to abstract beliefs about 'White Genocide.'" Docket No. 400 at 25. Likewise, the defendant's admission to having started forming his racist beliefs at some unknown point in the past justified the seizure of evidence from a mere nine months before the attack took place. *Id.*

As explained above, agents engaged in a careful, deliberate, and thoughtful review of evidence from the defendant's laptop and thumb drives. This is, then, far from a case where agents "flagrantly disregarded the terms of a warrant." *Shi Yan Liu*, 239 F.3d at 140, 142 (quotation marks omitted). That remedy is available "only when (1) [agents] effect a widespread seizure of items that were not within the scope of the warrant, and (2) do not act in good faith." *Id.* at 140 (quotation marks and citation omitted). The defendant does not identify any seized evidence that was not called for by the terms of the warrants. If he does, the remedy is to suppress that evidence. But because he cannot, the heavy-handed remedy of blanket suppression is not appropriate.

The defendant finally argues that the government improperly retained the entire contents of the computer and thumb drives, separate and apart from evidence that was seized from the devices. The government did so to ensure that it could provide the defendant with copies of his devices in discovery. The government is aware that it may not re-search the devices without a new search warrant.

There is nothing improper about providing the defendant with copies of his entire devices; to the contrary, defense counsel in many cases request copies of the underlying data that law enforcement searched. Anticipating that defense counsel in this case would make that same request, the government preserved a copy of the defendant's devices for discovery.

### G. The iCloud warrant

Finally, the defendant moves to suppress evidence recovered from his iCloud account. The warrant, however, complied with the Fourth Amendment and was properly executed. The Court should therefore deny the defendant's motion.

### a. There is no suppression remedy for an improperly-issued emergency disclosure request.

The defendant first argues that law enforcement improperly relied on information voluntarily disclosed by Apple in response to an EDR. But the law does not authorize a court to suppress information improperly disclosed by a provider such as Apple. In any event, the Court should not punish law enforcement agents for Apple's independent decision to make an emergency disclosure to the FBI.

As explained above, the SCA authorizes electronic service providers to voluntarily disclose information about a subscriber's account "if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay" of information pertaining to a customer's account. 18 U.S.C. § 2702(b)(8) (disclosure of communications); *id.* § 2702(c)(4) (disclosure of customer records). The defendant asserts only that Apple emergency disclosure violated the language of § 2702. *See* Docket No. 399 at 14 ("[I]nvestigators' EDR to Apple, and Apple's subsequent return of information, violated *the SCA* and Payton Gendron's *statutory* rights in the nondisclosure of that information.") (emphases added). In other words, the defendant does not claim (nor could he) that Apple violated the constitution by voluntarily providing evidence to the FBI.

That, alone, is sufficient to deny the defendant's motion because the SCA does not authorize suppression for nonconstitutional violations. *See* 18 U.S.C. § 2708 ("The remedies and sanctions in this chapter are the only judicial remedies and sanctions for nonconstitutional violations of this chapter."); *see Gasperini*, 894 F.3d at 488. There "is no exclusionary rule generally applicable to statutory violations," and because the SCA makes "no mention of a suppression remedy," there is none. *United States v. Clenney*, 631 F.3d 658, 667 (4th Cir. 2011) (quotation marks omitted) (addressing claim that another provision of

SCA was violated); *see also id.* ("Congress has shown that it knows how to create a statutory suppression remedy" and noting that it did so for evidence "obtained in violation of the statutes governing wiretaps"). Accordingly, the Court should deny the defendant's motion to suppress on this ground because there is no suppression remedy for violations of the SCA's emergency disclosure provisions. *See Karmo*, 109 F.4th at 994-95.

Even if that were not true, SA Dlugokinski did not err by including information provided by Apple in his search warrant affidavit. Apple concluded, in its judgment, that § 2702 was satisfied and that, as a result, the SCA authorized emergency disclosure.[24] The Court, then, should not punish agents for relying on a valid statute and a third-party's independent decision to disclose information pursuant to that statute. After all, § 2702 leaves it to the *provider*—not the agent—to decide whether the statute is satisfied. In these circumstances, there is nothing to deter by suppressing evidence. *See Krull*, 480 U.S. at 349 ("The application of the exclusionary rule to suppress evidence obtained by an officer acting in objectively reasonable reliance on a statute would have as little deterrent effect on the officer's actions as would the exclusion of evidence when an officer acts in objectively reasonable reliance on a warrant."). As such, the Court should deny the defendant's motion to suppress.

---

[24] Indeed, Apple has stated that, "[w]here Apple determines that there is no valid legal basis or where a request is considered to be unclear, inappropriate or over-broad, Apple will object, challenge or reject the request." *See* Apple Legal Process Guidelines (Feb. 2025), *available at* https://www.apple.com/legal/privacy/law-enforcement-guidelines-us.pdf. Apple's decision to disclose information in response to the EDR is, then, telling of its "good faith" view, 18 U.S.C. § 2702, that disclosure was warranted.

**a. There was a nexus between the defendant's crimes and his iCloud account.**

The defendant next argues that the Court should suppress evidence seized pursuant to the iCloud warrant because there was not probable cause to believe that evidence of his attack would be found in his iCloud account. This argument fails to appreciate the unique purpose for searching the defendant's iCloud account. As SA Dlugokinski's affidavit articulated (and as explained below), there was probable cause to search the defendant's iPhone. And as SA Dlugokinski further explained, iCloud "is a storage and cloud computing service from Apple that allows its users to . . . utilize iCloud-connected services to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device." Docket No. 399, Ex. A, ¶ 42.d. In other words, a search of the defendant's iCloud account would reveal the contents of the defendant's Apple devices, such as the iPhone the defendant was carrying on the day of his attack.[25] That is because, in SA Dlugokinski's training and experience, "users of iPhone devices, which are manufactured by Apple, often backup data from the devices to iCloud." *Id.* ¶ 37. What is more, the iPhone 11—the phone the defendant was brought with him to Buffalo—"started with iOS 13 [i.e., a particular iPhone operating system] and, for Apple devices running iOS 8 and later, a user registers his or her device by associating it with an iCloud Apple ID." *Id.*

SA Dlugokinski's affidavit explained why there was probable cause to search the defendant's phone. Among other things, (1) the defendant carried out his attack and did so for the express purpose of killing as many Black people as possible, Docket No. 399, Ex. A at

---

[25] It is irrelevant that the FBI also obtained a warrant for the defendant's iPhone. As an initial matter, nothing in Fourth Amendment case law prohibits law enforcement from obtaining the same evidence from multiple sources. But more practically, searching the defendant's iCloud account provided a method for accessing the contents of the defendant's phone in the event that agents could not access the phone itself.

¶ 24; (2) the defendant used a GoPro camera to livestream the attack over the internet through Twitch, a social media application, *id.* at ¶ 33; (3) the defendant possessed a phone during the attack, *id.*; (4) the defendant used the internet and social media applications to research, plan, prepare, and execute the attack, *id.* ¶ 34; and (6) the defendant drafted a 180-page manifesto in which he described, in exhaustive detail, his research, planning, preparation, and motivation for the attack. As set out below, these facts lead to the "common sense conclusion," *Gates*, 462 U.S. at 231 (quotation marks omitted), that the iPhone would contain evidence of the defendant's crimes.

In his manifesto, the defendant described the critical role that the internet played in his decision to plan and carry out the attack. *See supra* at 55 – 56. These excerpts show that the defendant was motivated and devised his plan for the attack after browsing a social media application (4chan); visiting websites; ███████████████████████████████ ███████████████████████; viewing ██████████████████████ about Black people online; and conducting online research.

The defendant devoted pages and pages of his manifesto to describing the "evidence" supporting his racist ideology and beliefs. For example, in a section titled █████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ █████████████████████████ Much of the "research" documented in these sections

of the manifesto included images, graphics, charts, and links to websites that plainly came from the internet.

In a section of the manifesto titled "Weapons, Equipment, and Mentality of the Attacker," the defendant wrote 100 pages about every conceivable detail of the attack, his goals, and his strategy. *See* Ex. B at 57-158. For example, he stated the goals of the attack, *id.* at 57 ("Kill as many blacks as possible," "Avoid dying," and "Spread ideals"), his "[s]trategies for success," *id.* at 58 (*e.g.*, "To maximize deaths of the intended target, attack in a high density, highly populated area"); his "[s]trategy application," *id.* at 58-59 (*e.g.*, "Zip code 14208 in Buffalo has the highest black percentage that is close enough to where I live," "Top's Market is an area in zip code 14208 where a high percentage and high density of blacks can be found," and "Video will be livestreamed and manifesto published online to increase coverage and spread my beliefs"); and his "plan of action," which included a step-by-step plan for the day of the attack (including what appeared to be a computer-generated diagram of the Tops floor plan). *Id.* at 59-61. The defendant also detailed the firearms, equipment, accessories, and clothing he planned to use during the attack (including, among other things, the Bushmaster XM-15 firearm, firearm magazines, ammunition, body armor, GoPro camera, ballistic helmet, gloves, glasses, medical kit, pants, boots, socks, underwear, belt, and hearing protection). *Id.* at 61-158. Notably, the defendant specifically stated he would be using his "***iPhone 11*** . . . to livestream the gopro footage onto [his] twitch account" and "to upload all [his] posts and such." *Id.* at 144 (emphasis added).

The scope and depth of the research described in this section of the manifesto is difficult to articulate; the defendant listed prices and specifications for hundreds of pieces of equipment and accessories, ranked the equipment and accessories by brand and quality, and

described the pros and cons of nearly every item. To take just one of countless examples, the defendant wrote that "[g]unshots are loud, especially indoors," so he described the benefits of hearing protection made of different materials, followed by 13 different options for hearing protection, which he ranked from "Low-End" to "Better Options." *Id.* at 146-148. Notably, this section of the manifesto includes photographs of the firearms and ballistic helmet that he intended to use during the attack, *id.* at 61-62, 80-81, 83-84; graphics – which appeared to be from the internet – relating to the specifications of certain pieces of equipment, *id.* at 87-89, 91-101, 117-142; and approximately 15 links to various websites.

Based on the information in SA Dlugokinski's affidavit and the defendant's manifesto, the search warrant application demonstrated probable cause to believe that the defendant's iCloud account would contain evidence of his crimes. A search warrant application must "establish[ ] a sufficient nexus between the criminal activities alleged" and the place or object to be searched. *Singh*, 390 F.3d at 182. "A showing of nexus does not require direct evidence and may be based on reasonable inference from the facts presented based on common sense and experience." *Id.* at 182 (cleaned up). Here, the facts described in SA Dlugokinski's affidavit and the manifesto established probable cause to believe that the defendant's iPhone—and, by extension, his iCloud account—would contain evidence of the defendant's online research, planning, and preparation for the attack; the development of the defendant's racist ideology; the creation or drafting of the defendant's manifesto; and geolocation information. In short, Judge Schroeder had a "substantial basis" for issuing the iCloud warrant. The Court should affirm that finding.

### b. The search warrant was sufficiently particular and not overbroad.

The defendant next contends that the warrant was overbroad "because it imposed no temporal limitation on the data to be searched or seized." Docket No. 399 at 19. As an initial matter, SA Dlugokinski explained why he sought a warrant with no temporal limitation: "based on [his] training and experience, a consistent pattern of racist statements spanning a lengthy period of time tends to make it much more likely [that] an individual acted with racial animus on a particular occasion, and thus even temporally distant expressions of such animus are relevant to violations" of the crimes under investigation. Docket No. 399, Ex. A, ¶ 51. In signing the warrant, Judge Schroeder agreed that there was probable cause to issue a warrant without temporal limitation. That is sufficient to deny the defendant's motion.

Setting that aside, however, a temporal limitation "is not an absolute necessity, but only one indicium of particularity in a warrant." *Pinto-Thomaz*, 352 F. Supp. 3d at 306 (quotation marks omitted). Whether a temporal limit is necessary often "depends on the context of the case, as the complexity of and duration of the alleged criminal activities render a time frame less significant in a case that required a search for a small set of discrete items related to one or only a few dates." *Id.* (quotation marks omitted). When a warrant does not include a temporal limit, the warrant's examples of seizable evidence may nonetheless "effectively time-limit[]" the search. *Id.* In other words, "[t]here [is] no need for an explicit time limit as the subject matter limitations on seizure effectively limited the time frame concerned." *Id.* at 307.

The defendant's manifesto justified a warrant with no temporal limitation. The defendant not only stated that he had been inspired to conduct research after learning about another livestreamed, racially-motivated mass shooting, but his manifesto also reflects the

defendant's research over an extended period of time. In signing a warrant with no temporal limit, Judge Schroeder agreed that there was probable cause to search the entirety of the defendant's iCloud account to determine when, exactly, he began forming racist beliefs. *Cf. Gaplin*, 720 F.3d at 446 (the warrant's "description of the objects to be seized" is "justified by the probable cause upon which the warrant is based") (quotation marks omitted). Thus, the "effective[] time-limit[]," *Pinto-Thomaz*, 352 F. Supp. 3d at 307, is the unknown date when the defendant began conducting research to justify and plan his attack. In other words, agents knew that the defendant began his research at some point in the past, but they did not (and could not) know when that research began without searching the defendant's Google account. Under these circumstances, Judge Schroeder's finding that there was probable cause to issue a search warrant without temporal limit is entitled to "substantial deference." *Wagner*, 989 F.2d at 72.

The defendant next argues that the warrant was overbroad because of the scope of data it authorized agents to search for and seize. It is, however, "well-established that a search warrant can properly permit the Government to obtain access to electronic information for purposes of a search even where the probable cause showing does not apply to the entirety of the electronic information that is disclosed to the Government." *In the Matter of a Warrant for All Content and Other Information Associated with the Email Account xxxxxx@gmail.com Maintained at Premises Controlled by Google, Inc.*, 33 F. Supp. 3d 386, 393 (S.D.N.Y. 2014). To that end, the warrant and supporting affidavit in this case—which "track[s] [is] modeled on the warrants routinely approved in this Circuit," *United States v. Ray*, 541 F. Supp. 3d 355, 400 (S.D.N.Y. 2021)—directed Apple to provide the entire contents of the defendant's Apple account. The warrant "makes clear," however, "that the government sought to obtain these

categories of documents in order to review them for evidence of the subject offenses, intending to seize only information that was evidence of the crime[s]." *United States v. Tontisabo*, 21-cr-701 (LKA), 2023 WL 411622, at *4 (S.D.N.Y. Jan. 25, 2023).

The facts set forth in SA Dlugokinski's affidavit support this request. As described above, the defendant's manifesto provided probable cause to believe that that the defendant had used the internet to conduct a substantial amount of planning for his attack; he likewise discussed purchasing equipment online, and he provided links for some of his purchases and other websites supporting his belief. Those statements lead to a "commonsense," *Gates*, 462 U.S. at 236, belief that the defendant's phone would contain evidence of his research and purchases. Likewise, the defendant's manifesto described how he had narrowed in on Tops as the location of his attack, and it contained a hand-drawn layout of Tops with the defendant's planned attack route. Once again, a common sense (and correct) conclusion from this is that the defendant had researched multiple possible attack locations and had traveled to Tops prior to the attack. Applying "the factual and practical considerations of everyday life," *Gates*, 462 U.S. at 231 (quotation marks omitted), leads to the common-sense conclusion that the defendant likely used an online mapping service to conduct part of his research, evidence of which could be found on his phone. Likewise, the defendant's manifesto contained a number of images of his guns and equipment, as well as photos and memes justifying his racial animus. Given the defendant's extensive use of the internet to plan other parts of his attack, common sense again suggests that those photos could have been stored on his phone and, by extension, in his iCloud account. Taken together, these facts provided Judge Schroeder with "a substantial basis" to conclude that the defendant's entire iCloud

account could have evidence. *Wagner*, 989 F.2d at 72. This Court owes "substantial deference to [that] finding," *id.*, and should affirm it.

The defendant next argues that the warrant was overbroad because it authorized the seizure of evidence for which there was no probable cause. Docket No. 399 at 21. But the warrant's "description of the objects to be seized" was comfortably "justified by the probable cause upon which the warrant is based." *Galpin*, 720 F.3d at 446 (quotation marks omitted). The warrant authorized agents to seize evidence of violations of 18 U.S.C. § 249 (hate crimes acts), § 924(c)(1)(A)(iii) and § 924(j)(i) (discharge of firearm causing death in furtherance of crime of violence). The warrant then provided 17 illustrative examples of such evidence, such as (among other things), information related to the defendant's "motivation, planning, and/or execution of" his crimes and "[a]ny information expressing animus or hostility based on race or color." The probable cause to seize that evidence was obvious: simultaneous to the defendant filming himself committing mass murder, he published a 180-page manifesto explaining that his crimes were an attempt to kill as many Black people as possible. To take another example, the warrant authorized agents to search for evidence of "other mass shooting events and shooters"; that was justified by the fact that the defendant had written the names of other white supremacist mass shooters on his rifle, as well as the defendant's admission to being inspired by another racially-motivated mass shooting.

These examples, all of which are tied to the defendant's planning, motive, and execution of his attack, are "sufficiently specific to permit the rational exercise of judgment by the executing officers in selecting what items to seize." *LaChance*, 788 F.2d at 874 (quotation and editorial marks omitted). As this Court has observed in a different context, "there is nothing 'overbroad' about a warrant that details and breaks down categories of

materials, all of which relate to drug dealing in some way." *Zaso*, 2023 WL 4011149, at *6. So too here: a warrant is not overbroad because it provides executing agents with more guidance than is constitutionally required.

The defendant's argument to the contrary starts from the incorrect premise that probable cause is limited to "the shooting at the Tops Market on May 14, 2022." Docket No. 399 at 23. The shooting itself is, of course, a significant part of the probable cause underlying the warrant. But it is far from everything. The defendant does not contest that there was probable cause to believe that he committed murder "because of the actual or perceived race, color, religion, or national origin of any person." 18 U.S.C. § 249(a)(1). And because there was probable cause to believe that the defendant committed racially-motivated murder, the warrant properly authorized agents to seize evidence related to the nature and bases for the defendant's racial animus. Many of the categories of evidence identified in the warrant are based on this probable cause. The defendant, for example, wrote, "Here's your reparations!" and "The Great Replacement" on his rifle. *See* Docket No. 399, Ex. A ¶ 32 There was probable cause, then, to search for evidence of the defendant's motivation to attack others based on their participation in "social justice and/or political protests." *Id.* at Attachment B.II.k.

It similarly does not matter, as the defendant repeatedly argues, that a violation of § 249 can be committed in several ways. *See* Docket No. 399 at 22. The defendant's redundant argument offers examples of different ways in which § 249 can be violated, but each of those examples is tied together by a common theme: they involve the actual or attempted causation of bodily injury or violence. Thus, whether or not a violation of § 249 "is susceptible to different theories of proof, it is by no means so broad a statute that it provides no limitation

to law enforcement officers in executing a search warrant." *Pinto-Thomaz*, 352 F. Supp. 3d at 308 (rejecting this argument in context of warrant to search for evidence of securities fraud, which can be committed in multiple ways).

Finally, as explained in prior sections, the warrant was sufficiently particularized in identifying evidence that could be seized. The warrant, as noted, authorized agents to seize evidence of violations of 18 U.S.C. § 249 (hate crimes acts), § 924(c)(1)(A)(iii) and § 924(j)(i) (discharge of firearm causing death in furtherance of crime of violence), and then provided 17 illustrative examples of such evidence. This is all the Fourth Amendment's particularity clause requires: "where, as here, warrants call for the seizure of records relating to the suspected crime or crimes and include a list providing examples of the items to be seized, they have been found to offer sufficient guidance to law enforcement officers to pass constitutional muster." *Nejad*, 436 F. Supp. 3d at 728  (emphasis added; quotation and editorial marks omitted). *See also Lustyik*, 57 F. Supp. 3d at 227-28 (collecting cases for this proposition). Indeed, "courts typically tolerate *less* specificity where electronic evidence is involved" because "documentary evidence may be difficult to describe *ex ante* with the same particularity as a murder weapon or stolen property." *Nejad*, 436 F. Supp. 3d at 729 (quotation marks and citations omitted). Put differently, the warrant would have been sufficiently particularized if it did nothing more than identify the crimes under investigation and then used "generic terms . . . to describe the items to be seized." *Id.* (quotation marks omitted). If that is true, then it is difficult to understand how a warrant is defective by providing *too much* guidance to the executing agents. The defendant unsurprisingly offers no law for the proposition that a warrant is invalid because it is too particularized.

The defendant's argument to the contrary again starts from the premise that probable cause is limited to "the shooting at the Tops Market on May 14, 2022." Docket No. 399 at 25. For the reasons stated above, however, that is incorrect. The defendant does not contest that there was probable cause to believe that he committed murder "because of the actual or perceived race, color, religion, or national origin of any person." 18 U.S.C. § 249(a)(1). And because there was probable cause to believe that the defendant committed racially-motivated murder, the warrant properly authorized agents to seize evidence related to the defendant's racial animus.

### c. Agents acted reasonably when executing the warrant.

Agents complied with the Fourth Amendment by "confin[ing]" their search of the defendant's iCloud account "to the terms and limitations of the warrant authorizing it." *United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988). Agents, for instance, seized hundreds of photos of firearms, equipment the defendant wore for the attack, and racist memes. They likewise seized a series of notes the defendant had written discussing: firearms; the fact that his "helmet camera mount fell off"; a reminder to "[t]uck combat shirt into pants"; and a note reading, "[c]ombat shirt works much better than the standard shirt I was going to use, change that in manifesto."

The defendant identifies seized items that, he claims, are beyond the scope of the warrant. Much of this evidence (such as messages with family members) helps confirm "[t]he identity of the person(s) who created or used the Apple ID"—evidence whose seizure the warrant authorizes. Docket No. 399, Ex. C at 3. To the extent this evidence is beyond the scope of the warrant, the "normal remedy is suppression and return of those items [outside the scope of the warrant], not invalidation of the entire search." *Matias*, 836 F.2d at 747.

The defendant finally argues that the government improperly retained a copy of his entire iCloud account, separate and apart from evidence that was seized from the account. The government did so to ensure that it could provide the defendant with a copy of his entire iCloud account in discovery. The government is aware that it may not re-search the account without a new search warrant.

There is nothing improper about providing the defendant with a copy of his entire account; to the contrary, defense counsel in many cases request copies of the underlying data that law enforcement searched. Anticipating that defense counsel in this case would make that same request, the government preserved a copy of the defendant's iCloud account for discovery.

### H. The executing agents relied in good faith on validly-issued warrants.

Even if the Court concludes that any of the warrants are somehow invalid, the Court should still deny suppression because the executing agents relied in good faith on the issuing magistrates' legal conclusions that (1) there was probable cause to issue each warrant; and (2) the warrants were sufficiently particularized and not overbroad. If the Court disagrees with the issuing magistrates, the remedy is not to punish agents who relied in good faith on the magistrates' decision to issue the warrants.

"Suppression of evidence . . . has always been [a court's] last resort, not [its] first impulse." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006) (quoting *Leon*, 468 U.S. at 907). This reluctance stems from the fact that the exclusionary rule "exacts a heavy toll on both the judicial system and society at large," because it "almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence," where the "bottom-line effect,

in many cases, is to suppress the truth and set the criminal loose in the community without punishment." *Davis v. United States*, 564 U.S. 229, 237 (2011).

As a result, "courts have recognized that evidence obtained by officers in objectively reasonable reliance on a warrant subsequently invalidated by a reviewing court is not generally subject to exclusion." *Raymonda*, 780 F.3d at 118  (quotation marks omitted). This principle is rooted in the fact that the exclusionary rule is meant to deter police misconduct. Thus, "[w]hen an officer genuinely believes that he has obtained a valid warrant from a magistrate and executes that warrant in good faith, there is no conscious violation of the Fourth Amendment 'and thus nothing to deter.'" *Id.* (quoting *Leon*, 468 U.S. at 920-21). Put differently, "[p]enalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." *Leon*, 468 U.S. at 921.

The exclusionary rule does not, then, require suppression unless reliance on the warrant would be "objectively [un]reasonable." *Id.* at 918. The Second Circuit has identified four scenarios in which reliance on an invalid warrant would be objectively unreasonable: "(1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable." *Clark*, 638 F.3d at 100 (quotation marks omitted).

As this list suggests, exclusion is generally appropriate in only a handful of situations where "police conduct [has been] sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."

*Herring*, 555 U.S. at 144. Such conduct is typically "deliberate, reckless, . . . grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Id.* This high burden is not surprising given that "the abuses that gave rise to the exclusionary rule featured intentional conduct that was patently unconstitutional." *Id.* at 143-44 (collecting cases).

The defendant does not argue (nor could he) that the issuing magistrates were misled or that they "wholly abandoned [their] . . . judicial role." *Clark*, 638 F.3d at 100. (quotation marks omitted). His arguments are instead centered around claims that there was not probable cause to issue the search warrants and that the warrants were facially invalid. But even if he were correct, nothing about the warrants or their supporting affidavits was so problematic to justify the harsh remedy of suppression.

First, the issuing magistrates concluded that there was probable cause to believe that each of the accounts and devices at issue would contain evidence of the defendant's crimes. The executing agents did not "act[] unreasonably in accepting [the magistrates'] legal conclusion that probable cause existed." *United States v. Cancelmo*, 64 F.3d 804, 809 (2d Cir. 1995). And once the issuing magistrates "ruled on the legal sufficiently of the facts alleged in the affidavit, [the agents] were justified in executing the warrant[s]." *United States v. Falso*, 544 F.3d 110, 128 (2d Cir. 2008) (Sotomayor, J.) Put differently, because "there was at least arguable probable cause" for each of these warrants, the executing agents "acted based on an 'objectively reasonable good-faith belief that [their] conduct was lawful.'" *United States v. Jones*, 43 F.4th 94, 111 (2d Cir. 2022) (quoting *Davis*, 564 U.S. at 238) (quotation and editorial marks omitted). This is not the sort of "culpable" conduct, *Herring*, 555 U.S. at 144, that justifies suppression.

Second, if the Court concludes that the warrants were overbroad or insufficiently particularized, those deficiencies do not warrant suppression. Agents again relied on the issuing magistrates' legal conclusion that the warrants were sufficiently particularized and not overbroad. There is, then, nothing to deter; indeed, it is difficult to identify how the warrants—which identified the crimes under investigation and provided specific examples of seizable evidence—could have been more particularized. That shows this is not a case where "the officers' conduct was 'sufficiently deliberate that exclusion can meaningfully deter it.'" *Rosa*, 626 F.3d at 66 (quoting *Herring*, 555 U.S. at 144). The warrants were, thus, not "so facially deficient—*i.e.*, [by] failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 923. *Compare Rosa*, 626 F.3d at 62 (finding insufficient particularity for warrant that did not "incorporate any supporting documents, or set forth the nature of the suspected criminal activity"). What is more, even if the warrants were deficient for not explicitly tying the items to be seized to the crimes under investigation—which they were not—"there is no evidence that [agents] . . . actually relied on the [allegedly] defective warrant, as opposed to their knowledge of the investigation . . . in executing the search," *Rosa*, 626 F.3d at 66, meaning that the "requisite levels of deliberateness and culpability justifying suppression are lacking." *Id.*

At bottom, this is not a case where the agents' conduct was "sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144. "For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." *Davis*, 564 U.S. at 237. To be justified in a particular case, suppression must "pay its way." *Id.* at 238 (quotation marks omitted). Suppression would fall far short of that goal in

this case. Suppression would instead "require[] [the Court and jury] to ignore reliable, trustworthy evidence bearing on guilt or innocence." *Id.* at 237. It would "suppress the truth." *Id.* And it would do so all on the thinnest of technicalities: by word-smithing search warrants drafted in the midst of a fast-moving and dynamic mass shooting investigation with few parallels in recent history.

It is difficult to underscore the "substantial social costs," *Leon*, 468 U.S. at 907, of suppression in this case. At trial, there will be no serious question that the defendant executed ten innocent people. His intent, motive, and moral culpability for those murders will be fundamental to the decisions the jury will be asked to make. Much of the evidence relevant to those decisions was obtained through search warrants. The Fourth Amendment does not require suppression in these circumstances. The Court should therefore deny the defendant's suppression motions.

## I.   In the alternative, the Court can redact the warrants.

The defendant concedes that the warrants would not be overbroad and would be sufficiently particularized if they had "been limited to Attachment B.II.a and authorized the seizure only of 'information relating to the motivation, planning, and/or execution of the May 14, 2022, mass shooting at Tops Friendly Markets, located at 1275 Jefferson Avenue, Buffalo, New York." *E.g.*, Docket No. 400 at 19. For the reasons stated above—and as this Court has held—this is an incorrect statement of the law, because "there is nothing 'overbroad' about a warrant that details and breaks down categories of materials, all of which relate to" the crimes under investigation. *Zaso*, 2023 WL 4011149, at *6. But if the Court agrees with the defendant, and if the Court concludes that the good faith exception does not

apply, the proper remedy is not suppression. It is to "sever[] (or redact[]) the constitutionally infirm portion . . . from the remainder" of the warrant and admit "evidence seized under the valid portion." *George*, 975 F.2d at 79. Thus, if the Court concludes that some portion of the warrants are invalid and not subject to the good faith exception, the Court should still not invalidate the warrants in their entirety.

**CONCLUSION**

For all the reasons stated above, the Court should deny the defendant's motions to suppress.

DATED:          July 31, 2025
                Buffalo, New York

MICHAEL DIGIACOMO                                    HARMEET K. DHILLON
United States Attorney                               Assistant Attorney General
Western District of New York                         Civil Rights Division

BY:  *s/JOSEPH M. TRIPI*                        BY:  */s/ SANJAY PATEL*
     *s/ BRETT A. HARVEY*                            Trial Attorney
     *s/ CAITLIN M. HIGGINS*                         Civil Rights Division
     *s/ MAEVE E. HUGGINS*                           U.S. Department of Justice
     *s/ CHARLES M. KRULY*                           150 M Street NE
     Assistant United States Attorney                Washington, DC 20530
     United States Attorney's Office                 (202) 598-9627
     Western District of New York                    Sanjay.Patel@usdoj.gov
     138 Delaware Avenue
     Buffalo, New York 14202
     (716) 843-5839
     Joseph.Tripi@usdoj.gov

BY:  *s/MICHAEL S. WARBEL*
     Trial Attorney
     Criminal Division
     U.S. Department of Justice
     1331 F. St. NW, Ste. 623
     Washington, DC 20004
     (202) 514-5605
     Michael.Warbel@usdoj.gov