IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

         v.

PAYTON GENDRON,

               Defendant.

22-CR-109-V
(Redacted Version of Docket No. 460)

---

## GOVERNMENT'S MOTION TO
## <u>FILE SUR-REPLY AND PROPOSED SUR-REPLY</u>

The United States of America, by and through the undersigned attorneys, moves for permission to file a sur-reply to the defendant's motion to suppress evidence obtained from a Discord account. *See* Docket No. 403.

## <u>ARGUMENT</u>

**1. The defendant's affirmation is insufficient to establish standing to challenge the Discord search warrant.**

In connection with his reply, the defendant has filed an affirmation in which he attempts to establish standing to contest the search of his Discord account. Docket No. 449. The defendant states, in pertinent part, that (1) he "had a legitimate expectation of privacy in . . . the data stored by electronic service providers related to [his] . . . online accounts," *Id.* at ¶ 3; (2) he was "the creator and user of the Discord accounts associated with the username ██████████, user ID ██████████, and ██████████, user ID ██████████," *Id.* at ¶ 7(f); and (3) he "believed that [Discord] would protect the privacy of [his] data . . ." *Id.* at ¶ 8. None of these statements – taken individually or as a

whole – is sufficient to establish standing to challenge the search of the G\ server from his Discord account.

The defendant's affirmation is insufficient for two reasons. First, his statement that he had a "legitimate expectation of privacy" in the Discord account is a legal conclusion, one that this Court must decide based on the facts and arguments advanced by the parties. Second, the defendant does not adequately demonstrate that he had a subjective expectation of privacy in the G\ server. He has failed to offer any information about privacy settings that he may have had in place in his Discord account or any efforts he made to intentionally exclude the public from accessing his G\ server. Notably, the defendant does not dispute that he shared the links to his Discord writings and G\ server with approximately 65 other users and two servers/channels ████████████████████. Rather, he argues that he shared the links with a "small number of selected individuals." Docket No. 449 at 2. The defendant, however, has failed to explain in his affirmation whether the ███████████████ channels were private or open to the public. The conclusory and non-specific statements in the defendant's affirmation do not satisfy his burden to establish a reasonable expectation of privacy in the G\ server. *See, e.g., United States v. Westley*, 2018 WL 3448161, at *6-7 (D. Conn. July 17, 2018) (finding no standing to contest search of Facebook accounts where defendant failed to provide an affidavit describing any privacy settings on the accounts or efforts made to keep the accounts private).

Moreover, the defendant makes no effort to distinguish two cases cited by the government from this Circuit – *United States v. Meregildo*, 883 F. Supp. 2d 523, 525 (S.D.N.Y. 2012) (holding that defendant had no reasonable expectation of privacy in his Facebook account because "he had no justifiable expectation that his 'friends' would keep his profile

private" and finding that defendant's "legitimate expectation of privacy ended when he disseminated posts to his 'friends' because those 'friends' were free to use the information however they wanted . . ."), and *United States v. Jordan*, 2017 WL 9516819, at *8 (W.D.N.Y. July 14, 2017) (Schroeder, J.) (finding no reasonable expectation pf privacy in Facebook account where defendant had 1,965 Facebook "friends").

The defendant cites *United States v. Chavez*, 423 F. Supp. 3d 194, 204 (W.D.N.C. 2019), in support of his standing argument. This Court should decline to follow the *Chavez* for two reasons. First, the *Chavez* decision is not binding on this Court. Second, *Chavez* is distinguishable from this case. In *Chavez*, the defendant testified that he restricted access to certain portions of his Facebook account "because there was some content that he did not want 'a member of the general public . . . who was not a Facebook Friend' to see," and that he had "roughly three or four hundred" Facebook friends. *Chavez*, 423 F. Supp. 3d at 200, 202. In contrast, in the instant case, the defendant has not shown that his Discord posts could be viewed only by his chosen circle of friends; indeed, the evidence shows that the defendant's intent was to share his Discord posts far beyond the 65 users to whom he initially sent his posts. As noted above, he has failed to show that the two servers/channels to which he made the posts, ███████████████, were private and not otherwise available to the public.

## 2. The Discord warrant was lawfully obtained and executed by the government.

In his reply, the defendant raises new and expanded arguments based on an inaccurate description of Discord. Thus, to understand the Discord search warrant—and why the warrant was lawfully obtained and executed—a basic review of what Discord is, and how it generally functions, is necessary.

As Federal Bureau of Investigation (FBI) Special Agent (SA) Christopher Dlugokinski described in his affidavit in support of the search warrant, Discord is a messaging platform where millions of users from around the world connect with each other through chat, voice, and video. Discord has both a desktop (PC, Mac, Linux) application and a mobile (iOS, Android) application. The service can also be accessed from the website directly at www.discordapp.com. *See* Search Warrant Aff. at ¶ 44(a). Upon creating a Discord account, a Discord user must create a unique username and an account password and provide an email address and date of birth. Users may also adjust various privacy and account settings for the account on Discord. This information is collected and maintained by Discord. *Id.* at ¶ 44(b). Once a Discord account is created, users can create a server and invite their friends to join it with an invite link, or they can join an existing server. Servers are broken down into sub-categories or "channels" where users can connect with each other by either chatting or calling. Users can also communicate through direct messages, which are private chats created between 1-10 users. Discord users may send photos, videos, and links to select individuals or within groups. *Id.* at ¶ 44(d). Discord stores messages and attachments that users send to each other in text channels, whether it is in a server or in direct messages. Discord does not store the content of voice and video calls. If users delete content, that content is immediately deleted and is not retainable. *Id.* at ¶ 44(e). Discord also maintains the content of messages between two or more users, and server content, which contain messages sent and received in the channels the user was participating in. *Id.* at ¶ 45.

Here, the defendant created a server, called the G\ server, which had ten channels, including ██████████ which has been referenced in this litigation as his Discord diary—a daily catalogue of his motivation, planning, and thoughts leading up to the attack. The

defendant's G\ server channel, ██████████ which is nearly 800 pages long, contains more detail than the defendant's self-proclaimed manifesto. In the moments before the attack, the defendant sent links to a substantial portion of his Discord writings and an invitation to join his G\ server, to approximately 65 other users. In addition, he posted the link in two separate Discord channels—██████████████████—meaning that other people, in addition to the 65 users he directly messaged, had access to it. Indeed, in the days following the defendant's mass-shooting attack, several major media outlets, including the Wall Street Journal and New York Times, located, reviewed, and published large swaths of the contents of the defendant's "████████ channel, as follows:





A complete copy of the defendant's ████████ channel is attached hereto as **Exhibit A**. Other channels on his G\ server also contained considerable content relating to his planning and preparation for the attack, including: ████████████████████ ██████████ Examples of relevant material seized from those channels are excerpted as follows:



[1]

---

[1] The defendant wrote (among other things) "Here's your reparations" ███████ on the rifle he used in his attack. ██████████████████████████████
████████████████





### Scope and Standing

Any claim that the type of material excerpted above or attached as **Exhibit A** exceeded the permissible bounds of the search warrant authorized by United States Magistrate Judge H. Kenneth Schroeder, Jr., should be summarily rejected. Moreover, even assuming *arguendo* that the search of the defendant's Discord account was not supported by probable cause, to

the extent considerable portions of the defendant's G\ server were published broadly by major media outlets within days of the defendant's mass shooting, the information would have been inevitably discovered by the government. At that point, the government could have viewed substantial portions of the contents of the defendant's G\ server without a warrant, just as any other member of the public could. *See United States v. Meregildo*, 883 F. Supp. 2d 523, 525 (S.D.N.Y. 2012) ("When a social media user disseminates his postings and information to the public, they are not protected by the Fourth Amendment."); *see also United States v. Heath*, 455 F.3d 52, 60 (2d Cir. 2006) (concluding that that "illegally-obtained evidence will be admissible under the inevitable discovery exception to the exclusionary rule only where a court can find, with a high level of confidence, that each of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor.").

The defendant's use of Discord also involved servers and channels in which he visited, and was a member of the chat, but did not comment directly. This practice of visiting a chat without making direct comment is often referred to as "lurking." The records returned by Discord, as authorized by the search warrant, included, among other things:

> h.    Any and all messages and attachments (including photographs, videos and other images) sent to or received by the TARGET ACCOUNT, whether in a server or in direct messages. This includes any and all content sent or received in the messages, date and timestamp of when content was sent or received in the messages, attachments (including photographs, videos and other images), and the date and timestamp of when the attachment was sent or received and to whom it was sent or received;
>
> i.    A listing of any and all groups, servers, or channels that the TARGET ACCOUNT owns, administers, or is a member of; and

*See* Case No. 22-MJ-112, Attachment B.I ("Information to be Disclosed by Discord, Inc.").

The search warrant permitted the FBI to seize, among other things:

c.  Any records, stored content, communications, messages and information relating to the research, drafting, editing, and publishing of the manifesto posted by **PAYTON GENDRON**;

h.  Any records, stored content, communications, messages and information indicating support for, association with and/or membership in white supremacist, extremist and/or hate groups;

l.  Any records, stored content, communications, messages and information relating to efforts to obtain firearms, ammunition, firearm accessories and body armor;

m.  Any records, stored content, communications, messages and information relating to the acquisition, transfer, use and/or possession of firearms, ammunition, firearm accessories and body armor;

n.  Any records, stored content, communications, messages and information relating to the manufacture of firearms; and,

o.  Any records, stored content, communications, messages and information relating to firearms tactics and methods for executing a mass shooting.

*See* Case No. 22-MJ-112, Attachment B.II ("Information to be Seized by Law Enforcement Personnel"). Thus, the defendant's presence in chats occurring on other Discord servers, which enabled him to read the chats and learn from others actively engaging in chats about firearms, firearm accessories, body armor, racial extremism, firearm tactics, etc., was plainly "information" that was authorized to be seized pursuant to the search warrant. For example, the ███████ server, in which the defendant appears to have been a "lurker,"[2] contained

---

[2] It should be noted that the FBI did not seize chats from channels or servers in which the defendant was exclusively a "lurker." Rather, they limited the seizure of chats to channels and servers in which the defendant actually participated.

information about firearms, accessories, and body armor, all information that law enforcement was permitted to seize. *See, e.g.,* Attachment B.II at ¶¶ c., l., m., o. Moreover, the defendant was not an administrator in the ███████ server; to the contrary, the administrator testified before the Grand Jury and, independent of the search, provided content from the ███████ server to the government.

The defendant has not attempted to meet his burden of asserting a privacy interest in the ███████ server, nor could he. *See Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978) (noting that defendant has the burden to establish standing). To claim standing in what amounts to a public comment board would not be an "expectation of privacy is one that society accepts as reasonable." *United States v. Hamilton*, 538 F.3d 162, 167 (2d Cir. 2008).

To the extent the defendant argues that information seized from the ███████ server should have been limited to the day of the attack, this argument lacks merit. The defendant formulated, researched, planned, and prepared for the attack over a lengthy period of time[3] and, given that reality and the plain language of Attachment B.II, there is no basis in fact to assign the myopic view espoused by the defense—which would limit the scope of the permissible bounds of the search warrant to May 14, 2022—to agents who were authorized to seize "information" relating to the defendant's manifesto, firearms, accessories, tactics, body armor, extremism, and racial animus. *See generally* Attachment B.II; *see also United States v. Bershchansky,* 788 F.3d 102, 111 (2d Cir. 2015) (courts "look directly to the text of the search warrant to determine the permissible scope of an authorized search."). Thus, because the information seized from the ███████ server was both permitted by the search warrant, and because the defendant does not have, and has not even sought to establish, standing to contest

---

[3] As stated in the government's original response, the defendant stated in his manifesto that he has been planning this attack for a "few years."

the search or seizure of material from a Discord server in which he was not an administrator, there is no basis to suppress the evidence.[4] *See e.g., United States v. Lifshitz,* 369 F.3d 173, 190 (2d Cir. 2004) ("Individuals generally possess a reasonable expectation of privacy in their home computers.... They may not, however, enjoy such an expectation of privacy in transmissions over the Internet or e-mail that have already arrived at the recipient."); *see also United States v. Rosenschein,* 136 F.4th 1247, 1257 (10th Cir. 2025) (no expectation of privacy in photos uploaded to a free internet chatroom) (collecting cases); *United States v. Lustyik,* 57 F. Supp. 3d 213, 223 (S.D.N.Y. 2014) (no expectation of privacy in another person's email account).[5]

---

[4] In part because of the nature of chat rooms, which involve single conversations over a period of days or weeks in which participants and observers may come and go, the FBI seized chats that occurred up two days before and up to two days after each identified chat to ensure the proper context of the chat was seized. The FBI's approach to the manner of seizure in such situations was reasonable. *See United States v. Knights,* 534 U.S. 112, 118–19 (2001) ("[t]he touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.' ") (quoting *Wyoming v. Houghton,* 526 U.S. 295, 300 (1999)); *United States v. Purcell,* 967 F.3d 159, 183 (2d Cir. 2020) (where officers acted reasonably "the exclusionary rule would serve little deterrent purpose."); *Brigham City, Utah v. Stuart,* 547 U.S. 398, 404 (2006) ("[a]n action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively,* justify [the] action.'") (quoting *Scott v. United States,* 436 U.S. 128, 138 (1978)); *see also* FED. R. EVID. 106 (the rule of completeness).

[5] To the extent the defendant relies upon *United States v. Winn,* 79 F.Supp.3d 904, 919-920 (S.D. Ill. 2015), in support of its overbreadth argument, the Court should find it wholly unpersuasive. The search warrant affidavit in *Winn* was "just over two pages long," and "[a]pproximately one-and-a-half pages [were] original content and set forth the facts upon which [the detective] believed he had probable cause to search the phone."  Whereas here, FBI SA Dlugokinski's search warrant affidavit was 20 pages long and included the defendant's 180-page self-styled manifesto that included extensive details relating to the defendant's motive, planning, and preparation for the mass-shooting attack. While the details undergirding the search warrant and the crime under investigation in *Winn* was singular or discreet, here, the affidavit and manifesto established that the defendant had been planning the attack for at least a "few years." *See e.g., Pointer v. United States,* 151 U.S. 396, 414 (1894) ("[t]he presence or absence of a motive for the commission of the offense charged is always a legitimate subject of inquiry."); *United States v. Moss,* 34 F.4th 1176, 1189 (11th Cir. 2022) (motive is always relevant in a criminal case); *United States v. King,* 560 F.2d 122, 133 (2d Cir. 1977). Moreover, every court that has discussed *Winn* has declined to follow it, declined to extend it, or distinguished it. This Court should not be the first to put stock in its analysis.

**Good Faith**

The Discord search warrant was amply supported by probable cause and sufficiently particular, and law enforcement relied upon it in good faith. Nevertheless, the defense claims there was not good faith reliance upon the search warrant, and that "unlike in *United States v. Rosa*,[6] the warrant here was not cobbled together in a few hours as a terrorist attack or other emergency was unfolding. Rather, the application was submitted the evening of May 16, 2022, two days after the shooting. Docket No. 449 at 16.  The defendant's claim defies reality.

In the wake of the first ever mass shooting of its kind in Buffalo, there was uncertainty as to the number of victims, number of perpetrators, or whether it was part of a larger conspiracy or terrorist plot. Immediately after the attack, SA Dlugokinski, the affiant on the Discord warrant, began quickly gathering information around the clock and started the process of applying for search warrants while embedded with a legion of FBI agents and analysts, and prosecutors from the United States Attorney's Office. The FBI obtained three search warrants within the first twenty-four hours after the attack,[7] seventeen search warrants within the first week of the defendant's attack,[8] and nineteen search warrants within the first two weeks of the attack. All of this was occurring on top of substantial efforts to locate and identify witnesses, review information from the crime scene, review information from the internet, identify information to seek pursuant to appropriate legal process, review information as it came in from various search warrants (including the defendant's residence

---

[6] 626 F.3d 56 (2d Cir. 2010).

[7] On May 15, 2022, FBI SA Dlugokinski was the affiant on three search warrant applications relating to the defendant's residence at ███████████ Conklin, New York; the Tops grocery store on Jefferson Avenue; and the defendant's 2003 Blue Ford Taurus.

[8] On May 16, 2022, the FBI obtained seven search warrants, and FBI SA Dlugokinski was the affiant on all but one of the applications underlying the federal search warrants, which included the Discord application.

in the Northern District of New York), review and resolve numerous tips from the public, and ensure that the defendant acted alone and that no other attacks were imminent.

While SA Dlugokinski and many others were in the midst of all of that investigative activity, SA Dlugokinski still took great care in preparing the search warrants, including the Discord search warrant. To that end, the government submitted the search warrant applications to Magistrate Judge Schroeder only after SA Dlugokinski carefully prepared his search warrant affidavits and ensured that they were reviewed and approved by prosecutors at the United States Attorney's Office and the Civil Rights Division of the Department of Justice. Magistrate Judge Schroeder reviewed each warrant (with the exception of the search warrant for the defendant's residence in the Northern District of New York) and authorized the searches. SA Dlugokinski's care and good faith is apparent from the affidavits themselves. For example, when SA Dlugokinski made an error in an affidavit, he notified Magistrate Judge Schroder of his error. Specifically, in his search warrant application related to the defendant's iPhone 11 and HP Laptop, SA Dlugokinski wrote a footnote:

> On May 15, 2022, I was the affiant on a search warrant for a 2003 Ford Taurus SE, ██████████████████, bearing New York State License Plate ██████████, Case No. 22-mj-110, which was signed by this Court, United States Magistrate Judge H. Kenneth Schroeder, Jr., on May 15, 2022, at 9:45 p.m. In my affidavit on May 15, 2022, I made an error insofar as the state search warrant was executed early the next morning, after 6 a.m., on May 15, 2022, as opposed to on May 14, 2022, which was the day the state search warrant was obtained.

See Case No. 22-mj-114, Affidavit at n. 2.

Moreover, in some of his early affidavits, SA Dlugokinski indicated that the defendant's photo was in the manifesto annexed to the search warrant application. However, when SA Dlugokinski noticed that the defendant had put a photo of a different individual in

the manifesto (because the defendant released the manifesto to the internet before the attack),

SA Dlugokinski identified the error for Magistrate Judge Schroeder by writing the following:

> It should be further noted that on May 15 and 16, 2022, the search warrant affidavits ███████. The affidavits included quotes from the manifesto's alleged author, **GENDRON**, in which ███████████████████████████████████████████ ███████ █ █ ███████ █ ███████. However, the remaining identification information in the manifesto matches **GENDRON**'s personal identifiers, including his name, date of birth, age, family structure, and school name and enrollment. Notwithstanding the fact that the ████ █████████████████, all prior search warrant affidavits in this investigation were truthful based upon the information known at the time, which has been evolving since May 14, 2022. Additionally, the fact that the manifesto contained ███████████ does not impact the probable cause supporting each search warrant that the Court has authorized. It is respectfully submitted that there is more than sufficient probable cause in each search warrant.

*See* Affidavit at n. 1, Google account ████████████(dated May 21, 2022).

Indeed, the record plainly demonstrates that SA Dlugokinski operated with diligence and in

good faith, including his reliance upon the Discord search warrant authorized by Magistrate

Judge Schroeder. Accordingly, the defendant's assertions that good faith is lacking with

respect to the Discord search warrant (or any search warrants) is unavailing.

**Username ███████████ and ██████████ Server**

The defendant claims that Discord's production of information associated with

username ██████████ and the ██████████ server was overbroad. Docket No. 449 at

17. Not so. The search warrant permitted the search of "information that is stored at premises

controlled by Discord. . . relating to the account associated with Username ███████████

and User ID ██████████████, which was registered on September 10, 2017." The

meaning of the words "relating to" has been given its ordinary meaning—"to stand in some

relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with[.]" *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (quoting Black's Law Dictionary 1158 (5th ed. 1979)); *see also Mizrahi v. Gonzales,* 492 F.3d 156, 159 (2d Cir. 2007); Black's Law Dictionary (12th ed. 2024) (defining "relate" as "to have some connection to"). So, Discord was authorized and directed to provide information "relating to" Username ███████████ and User ID ███████████████, that is, information in its possession that had "some connection to" Username ████████████ and User ID ████████████████. In disclosing the material pursuant to the warrant, Discord identified information associated with username ██████████ and the ████████ server as having some connection to Username ████████████ and User ID 3████████████. From there, the FBI was permitted to seize, among other things, "Any records, stored content, communications, messages and information relating to the motivation, planning, and/or execution of the May 14, 2022, mass shooting at Tops Friendly Markets, located at 1275 Jefferson Avenue, Buffalo, New York." *See* Attachment B.II(a). The ████████ server (which was formerly referred to as ████████), contained information about firearms, accessories, and body armor, all information that law enforcement was permitted to seize. *See, e.g.,* Attachment B.II at ¶¶ c., l., m., o. Additionally, while Discord produced information related to username ████████████ to be searched, the agents did not seize it.

Moreover, the defendant has not established standing to challenge the search of the ██████████ server. *See, e.g.*, *United States v. Swain*, 2024 WL 2205001, at *4 (W.D.N.Y. May 15, 2024) (Vilardo, J.) (finding that defendant lacked standing to challenge search of Discord account where he did not file an affidavit establishing a reasonable expectation of privacy) (citing *United States v. Loera*, 333 F.Supp.3d 172, 179 (E.D.N.Y. 2018), and *United States v.*

*White*, 2018 WL 4103490, at *8 (S.D.N.Y. Aug. 28, 2018)); *United States v. Tennant*, 2023 WL 6978405, at *7-8 (N.D.N.Y. Oct. 10, 2023) (finding that defendant lacked standing to contest searches of Discord, Snapchat, and Instagram accounts because he failed to file an affidavit demonstrating a legitimate expectation of privacy).

**G\ server claims**

The defendant's G\ server was highly relevant to this investigation. To the extent the defendant claims otherwise, his rendition leaves out compelling context. The defendant claims agents were not permitted to seize portions of the defendant's own thoughts and plans as he prepared for the attack. Particularly in a case where the government must prove motive and intent, there are few forms of evidence more probative than the defendant's own words. Yet, the defendant attempts to put a benign gloss on the G\ server content seized from his diary by describing it as "online test results, medical and mental health information, diet and exercise records, comments on life and family information, thoughts and feelings unrelated to the crime, reposts of cartoons, Youtube videos, movies and TV series, and discussions thereof; and posts relating to hobbies such as coin collecting and hunting; pet photos and selfies; and reposts of memes and infographics conveying abstract political, racist and ██████████ beliefs unconnected to the planning or execution of the shooting." Docket No. 449 at 18-19. The defendant chose not to identify *any specifics* other than his sanitized descriptions of what law enforcement seized in an effort to denigrate their work in executing the Discord warrant. However, the reality of the defendant's words in his G\ server make plain that law enforcement properly seized the entirety of it. *See, e.g.,* Ex. A (██████████ channel on the G server). As the government has stated in prior filings, the G\ server

chronicled the development, preparation, and progress of the defendant's plan to shoot and kill Black people at the Tops store.

For example, in the G\ server—*which detailed the defendant's almost daily activities and preparations for the attack between November 2021 and May 14, 2022*—the defendant discussed, *inter alia*:

- Online tests results—the defendant discussed ███████████████████ ████████████████████████████████████████ ███████████████████████

- Medical and mental health information—the defendant discussed this in the context of ████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████████

- Comments on life and family information—relating to, for example, ████████ ████████████████████████████████████████ ██████████████████████████████████

- Thoughts and feelings unrelated to the crime—everything on his G\ server related to the crime in one way or another—██████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████



- Reposts of cartoons—the defense has not identified any specific cartoons. However, some of the cartoons contained in Exhibit A demonstrate animus that is plainly responsive to the warrant. *See* Ex. A at 365 (cartoon about "white genocide").

- YouTube videos—many of which related to firearms, tactics, and planning. *See* ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and second YouTube link to video about firearms assembly); ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓

- Movies—the defense has not identified any specific movies, but the defendant discusses a movie in the midst of picking out which songs he will listen to while committing his attack. *See* Ex. A at 24 (noting that a particular song would help "keep my timing").

- Hobbies such as his coin collection and hunting—the defendant funded his attack, in part, by selling his coin collection, and hunting is where he gained proficiency with firearms—particularly probative where almost every victim was killed with a

head shot. *See* Ex. A at 5-6 (noting that he had sold silver at a flea market that day and observing, "I need to fund it by selling my stuff and buying some body armor, helmet, gopro 7 black or better and mounts and some more ammo to train with.

████████████████████████████████████████████████████████

████████████████████████████████ 12 (noting how much he had sold selling coins at a flea market and stating, "I keep telling them it's for my college education haha"); 16 ("For example, playing Apocalypse Rising on Roblox gave me interests in survival and guns, which led to me hunting and shooting, ██████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

- Reposts of memes and graphics—in the white supremacy world certain memes have white supremacist meanings, such as the memes the defendant used. *See* Ex. A at 36 ████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████

## Manner of Execution- Multiple Search Claim

Finally, regarding the manner of execution, the search conducted by the FBI was one continuous search of voluminous material over a period of time. Contrary to the defendant's claims, there were no instances where searched material was marked "not responsive" and later changed to "responsive." Rather, as the case agent and law enforcement personnel were reviewing the material over the course of several days, they identified additional responsive materials during the course of a rapidly unfolding investigation. As the Second Circuit recognized in *United States v. Johnson*, 93 F.4th 605 (2d Cir. 2024), not every review of digital

materials responsive to a warrant constitutes a new search. In *Johnson*, the Second Circuit observed:

> When criminal investigators reexamine evidence that has lawfully been seized pursuant to a warrant – returning to look again at a drug ledger, for instance, or to perform lab tests on a blood-stained jacket – we do not ordinarily view such investigative steps as constituting a new Fourth Amendment event. To be sure, as this Court has said before, the seizure of electronic devices, which can give the government possession of a vast trove of personal information about the person to whom [the devices] belong[ ], much of which may be entirely irrelevant to the criminal investigation that led to the seizure, is very different from the seizure of a drug ledger or an item of clothing. For this reason, the mere fact that digital material has been lawfully collected does not in all circumstances permit the future review of stored information. That said, the general principle that law enforcement can reexamine lawfully seized material during the course of an investigation without engaging in a new search has clear application in a case like this, where stored data responsive to a search warrant has been separated out from nonresponsive data, and investigators return to reexamine only the responsive material in pursuit of law enforcement ends.

*Id.* at 613 (citations and quotations omitted).

Moreover, there is no basis for a "one size fits all" presumptive period, and "[a] substantial amount of time can be involved in the forensic imaging and review of information. This is due to the sheer size of the storage capacity of media, difficulties created by encryption and booby traps, and the workload of the computer labs." *See* Fed. R. Crim. P. 41(e)(2)(B), 2009 Advisory Committee Notes (emphasis added). This reality is consistent with the facts established by SA Dlugokinski's FBI 302 reports wherein he described the progress of his search of the Discord account over a period of days, which culminated with his FBI 302 report documenting his "Final Summary of Findings," on August 19, 2022. In sum, the manner of execution of the Discord search warrant was reasonable, permissible, and wholly appropriate.

### 3. The government has not improperly maintained or accessed the full Discord production.

In his reply, the defendant claims that the government has improperly retained the full Discord production in "the files of the FBI" and "as part of the trial file maintained by the prosecution team at the United States Attorney's Office." Docket No. 449 at 25. He speculates that "it is highly unlikely that the government considered its own use of the [full Discord production] constrained in any way," and erroneously states that "the prosecution team indexed, applied Bates numbers to and filed the complete return in its own filing system, intermingled with other discovery material and inferably with no attempt to label the material off limits to members of the team." *Id.* at 25-26.

The FBI received the original, full production from Discord on or about May 18, 2022.[9] After receiving the production, FBI IT personnel converted the records into a readable format and provided a working copy to the investigative team for their Attachment B review. Thereafter, FBI personnel logged storage media (1B2 and 1B3) containing the full production into the Evidence Control Room at the FBI office in Buffalo, where it remains to this day. Between May and August 2022, FBI personnel reviewed the working copy of the full production, retained any records that fell within the scope of Attachment B, and deleted any records that did not fall within the scope of Attachment B from the FBI's electronic evidence management system. Subsequently, on July 16, 2024, the Honorable Jeremiah J. McCarthy issued a search warrant (24-MJ-1151) authorizing the FBI to access and review the portions of the full production that pre-dated January 1, 2020 (which was beyond the scope of the original warrant issued by Magistrate Judge Schroeder). In connection with this warrant, the

---

[9] The FBI received two productions from Discord on that date. The government will refer to these productions collectively as "the full production."

FBI accessed the full production to extract the records corresponding to the time period of September 10, 2017 (which was the inception of the account), through January 1, 2020. The FBI did not identify any responsive data in this portion of the full production. FBI personnel have not accessed and reviewed the full production other than in connection with the duly authorized search warrants.

In preparation for voluntary discovery, the FBI provided copies of the full production and the Attachment B evidence to an IT specialist at the United States Attorney's Office ("USAO IT specialist"). After receiving the full production, the USAO IT specialist stored it on a hard drive, which was maintained by him and was not accessible to the prosecution team without his permission and assistance. The full production has been maintained on the hard drive since it was received from the FBI. The USAO IT specialist accessed the full production to the extent necessary to copy the full production onto a hard drive for the purpose of providing it to the defense team.[10] In addition, the USAO IT specialist applied Bates numbers to the Attachment B evidence that had been identified by the FBI. The government provided, *inter alia*, the full production and the Attachment B evidence to the defendant on or about September 21, 2022.

No one from the prosecution team has accessed the full production at any time. Nor did the USAO ever "index[]" or "appl[y] Bates numbers" to the full production.[11] In addition, the prosecution team has not – at any time – maintained the full production in its internal files

---

[10] This was an entirely mechanical process that did not involve a review of the full production by any member of the prosecution team.

[11] In fact, the government provided an index to the defense team with the discovery production on September 21, 2022, which stated that the Discord production and supplemental production were being disclosed as "NON-BATES NUMBERED DISCOVERY PROVIDED ON FPD EXTERNAL HARD DRIVE." This flatly contradicts the defendant's claim that the government "indexed" and "applied Bates numbers" to the full production.

or digital review platform, or "intermingled" the full production with other discovery materials. Rather, as stated above, the full production has been maintained by the USAO IT specialist, separate and apart from the discovery materials accessible by the prosecution team.[12] The defendant's wholly speculative and unsubstantiated claims that the government has improperly accessed the full production do not warrant a hearing.

## CONCLUSION

For all the reasons stated above, the Court should consider the government's proposed sur-reply.

DATED:      September 12, 2025
            Buffalo, New York

MICHAEL DIGIACOMO                          HARMEET K. DHILLON
United States Attorney                     Assistant Attorney General
Western District of New York               Civil Rights Division

BY:   *s/JOSEPH M. TRIPI*             BY:   */s/ SANJAY PATEL*
      *s/ BRETT A. HARVEY*                  Trial Attorney
      *s/ CHARLES M. KRULY*                 Civil Rights Division
      Assistant United States Attorney      U.S. Department of Justice
      United States Attorney's Office       150 M Street NE
      Western District of New York          Washington, DC 20530
      138 Delaware Avenue                   (202) 598-9627
      Buffalo, New York 14202               Sanjay.Patel@usdoj.gov
      (716) 843-5839
      Joseph.Tripi@usdoj.gov

BY:   *s/MICHAEL S. WARBEL*
      Trial Attorney
      Criminal Division
      U.S. Department of Justice
      1331 F. St. NW, Ste. 623
      Washington, DC 20004
      (202) 514-5605
      Michael.Warbel@usdoj.gov

---

[12] To avoid any further concerns by the defendant, the government is willing to delete the full production from the hard drive maintained by the USAO IT specialist.