UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

v.

PAYTON GENDRON,

Defendant.

22-CR-109-LJV
DECISION & ORDER

---

After obtaining extensive discovery and other information about grand jury selection practices and procedures in this District, the defendant, Payton Gendron, moved to dismiss his indictment under the Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861-1878 ("JSSA"). Docket Item 409. The government then responded to Gendron's motion, Docket Item 413; Gendron replied, Docket Item 434; and the Court heard oral argument, *see* Docket Items 440 and 448. The Court now denies the motion because Gendron has not proven a fair-cross-section violation: The disparities in representation that he identifies are neither unfair nor systematic, *see Duren v. Missouri*, 439 U.S. 357, 364 (1979), and the other issues he raises are at best "[m]ere 'technical' violations" that are not actionable, *see United States v. LaChance*, 788 F.2d 856, 870 (2d Cir. 1986) (quoting *United States v. Carmichael*, 685 F.2d 903, 911 (4th Cir. 1982)).

## BACKGROUND

On July 14, 2022, a grand jury impaneled in March of the same year indicted Gendron*, see* Docket Item 6, and a week later, Gendron asked for access to grand jury

records so that he could bring a motion under the JSSA, *see* Docket Item 10.  The government responded to the motion for records, objecting to certain requests, Docket Item 17, and Gendron replied, Docket Item 18.  As outlined in more detail below, the Court ultimately granted nearly all of Gendron's requests.

In response to questions from this Court on February 2, 2024, about the status of the JSSA records request, Gendron said that both sides had agreed to discuss the motion in an effort to resolve any disagreements.  Docket Item 154 at 27.  On April 26, 2024, Gendron confirmed that both sides had conferred, and he submitted questions for the Jury Administrator about the records.  Docket Item 155.  On May 17, 2024, the Jury Administrator answered those questions in writing, Docket Item 169; he provided more information on June 18, 2024, Docket Item 184.

In light of the Jury Administrator's response, Gendron updated this Court about the status of his motion on July 12, 2024.  Docket Item 187.  More specifically, he said that several issues had been resolved, and he asked the Court to rule on or schedule oral argument for the remaining requests.  *See id.*  On July 17, 2024, this Court granted many of those requests and ordered the Jury Administrator to produce certain records.[1] *See United States v. Gendron*, 2024 WL 3439502, at *2 (W.D.N.Y. July 17, 2024).  On September 13, 2024, the Court heard oral argument and granted several more requests for records as well as a request by Gendron's attorneys to meet with the Jury Administrator.  *See* Docket Items 211 and 214.

---

[1] Gendron had asked the Court to rule immediately on eight requests.  *See* Docket Item 187.  The Court granted some or all of seven requests and deferred ruling on the eighth.  *See United States v. Gendron*, 2024 WL 3439502, at *2-3 & nn. 3-4 (W.D.N.Y. July 17, 2024).

The Jury Administrator promptly produced the records, *see* Docket Items 199, 217, and 218, and on October 17, 2024, he met with the attorneys on both sides, the defense expert, and the Chief Deputy Clerk of the Court to answer outstanding questions. *See* Docket Item 262 at 1. For some of Gendron's questions, the Jury Administrator explained that a vendor who created the Jury Wheel may have the answers. *See* Docket Item 261-1 at 2, 4; Docket Item 262 at 2-3. On November 18 and 19, 2024, defense counsel and the defense expert inspected juror questionnaires at the courthouse under this Court's order. *See* Docket Item 214; Docket Item 262 at 1.

In light of the October meeting and the November inspection, on December 20, 2024, Gendron made "additional requests for disclosure" related to some of his original requests. *See* Docket Item 262. On March 12, 2025, the Court granted nearly all those additional requests. *United States v. Gendron*, 2025 WL 778748, at *2-8 (W.D.N.Y. Mar. 12, 2025). In addition to requiring the Jury Administrator to produce many records, the Court instructed him to get written answers from the vendor to certain questions. *See id.* at *4-5. The Jury Administrator produced the additional records and the vendor's responses in early April 2025. *See* Docket Items 310 and 311.

Gendron then made more follow-up requests, Docket Item 325; the government responded, objecting to some requests, Docket Item 332; and Gendron replied, Docket Item 344. On May 15, 2025, the Court ruled on those requests. *United States v. Gendron*, 2025 WL 1403308 (W.D.N.Y. May 15, 2025). The Court granted many

requests, including some with tenuous connections to Gendron's JSSA claims.[2]  *See id.* at \*1, \*3-4.  But the Court denied two requests.

First, the Court denied the request for source data because the Jury Administrator and the vendor had not retained that data.[3]  *Id.* at \*3.  Second, it denied the request for additional instructions that were used to merge datasets because the Jury Administrator said that he had no such instructions and because he already had produced answers from the vendor on this topic.  *Id.* at \*2.  The Jury Administrator produced the final round of records on May 19, 2025.  *See* Docket Item 364.

On July 2, 2025, Gendron moved to dismiss the indictment, arguing that this District's jury selection process "systemically and significantly underrepresent[s]" certain groups in violation of his right to a grand jury drawn from a fair cross section of the community under the Sixth Amendment and the JSSA.  Docket Item 409 at 1-2.  He also identified purported flaws with the Clerk's procedures in conjunction with the underrepresentation, and he argued that these issues constituted a substantial failure to comply with the JSSA.  *Id.* at 15.  Gendron submitted a declaration from his expert, Jeffrey Martin, in support of his motion*, see* Docket Item 409-1, and Martin attended and participated in oral argument*, see* Docket Item 448.

---

[2] For example, the Court required the Jury Administrator to produce data about the Rochester division—despite Gendron's grand jury having been selected from the Buffalo division—based on his theory that there may have been errors in dividing the lists.  *See Gendron*, 2025 WL 1403308, at \*1-2.

[3] The Court likewise denied Gendron's alternative request to reproduce datasets because the JSSA requires only the production of data already in existence, *United States v. Gendron*, 2025 WL 1403308, at \*3 (W.D.N.Y. May 15, 2025) (citing *United States v. Miller*, 116 F.3d 641, 658 (2d Cir. 1997)), and denied his request for current datasets because they had no bearing on Gendron's motion about the 2022 jury wheel, *id.*

**DISCUSSION**

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a . . . trial[ ] by an impartial jury of the State and district wherein the crime [was] committed."  U.S. Const. amend. VI.  To address the systemic exclusion of Black people, women, and other groups that persisted despite that guarantee, Congress enacted the JSSA in 1968.  *See United States v. Slaughter*, 110 F.4th 569, 578 (2d Cir. 2024).  The JSSA provides that "all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes."  28 U.S.C. § 1861.  And "[n]o citizen shall be excluded from service as a grand or petit juror . . .  on account of race, color, religion, sex, national origin, or economic status."  *Id.*, § 1862.  Each federal district court must "devise and place into operation a written plan for random selection of grand and petit jurors."  *Id.*, § 1863(a).

This District's jury plan requires prospective jurors to be "selected at random" using voter registration lists.  *U.S. District Court for the Western District of New York Jury Plan*, 2 (Apr. 2018) ("Jury Plan").[4]  The Jury Plan permits the District to supplement the voter data with four other sources: DMV data, unemployment data, disability data, and tax data.  *Id.*  In practice, the District uses all five sources.  *See* Docket Item 409-1 at ¶ 65.  The Jury Plan requires the lists from all sources to be "merged" and "any duplication between the lists [to] be purged."  Jury Plan at 2.  It specifies that "[a]

---

[4] The Court cites the April 2018 Jury Plan, which was in place when Gendron's grand jury was selected.  In March 2025, the District updated the Jury Plan in minor ways that are unrelated to Gendron's challenge to his grand jury.  *See U.S. District Court for the Western District of New York Jury Plan* (Mar. 2025).

properly programmed electronic data processing system for pure randomized selection will be used to select names from the master jury wheel for the purpose of summoning persons to serve as grand . . . jurors." *Id.* at 3.

A defendant may "move to dismiss the indictment or stay the proceedings against him on the ground of substantial failure to comply with the provisions of [the JSSA] in selecting the grand . . . jury." 28 U.S.C. § 1867(a); *see United States v. Davis*, 546 F.2d 583, 589 (5th Cir. 1977) (explaining that this is the "exclusive ground for challenging jury-selection procedures under the [JSSA]").

## I.    FAIR-CROSS-SECTION CLAIMS

Gendron's motion focuses on the fair-cross-section requirement.  To establish a prima facie violation of that requirement, a defendant must show:

> (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren*, 439 U.S. at 364.  "The *Duren* test 'governs fair[-]cross[-]section challenges under both the JSSA and the [S]ixth [A]mendment.'"[5]  *United States v. Rioux*, 97 F.3d 648, 660 (2d Cir. 1996) (quoting *LaChance*, 788 F.2d at 864).

_____

[5] Gendron's motion makes passing reference to the Equal Protection Clause of the Fifth Amendment.  *See* Docket Item 409 at 1.  But those references are unavailing because he does not raise any argument about that constitutional provision.  *See Slaughter*, 110 F.4th at 575 n.1 (deeming Fifth Amendment challenge to jury selection process abandoned where defendant "invoked his right to equal protection under the Fifth Amendment . . . , but he did not devote any argument to this issue in his briefs"); *see also United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) (explaining that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

6

Gendron argues that this District's jury selection process systematically underrepresents "Black, Hispanic/Latino, and male individuals."  Docket Item 409 at 2.  As to the first *Duren* prong, there is no dispute that Black people, Hispanic or Latino people, and men are "distinctive" groups.  *See Duren*, 439 U.S. at 364 (explaining that women are a distinctive group); *United States v. Jackman*, 46 F.3d 1240, 1246 (2d Cir. 1995) (explaining that Black people and Hispanic people are distinctive groups); Docket Item 413 at 4 (government's conceding first prong).  But Gendron satisfies neither the second prong nor the third.

## A.  Prong Two: Unfair and Unreasonable Underrepresentation

Gendron tries to show unfair and unreasonable underrepresentation by using three statistical methods: absolute disparity, comparative disparity, and statistical decision theory.  The absolute disparity method examines the difference between a group's percentage of the population and its percentage in the sample.  Docket Item 409-1 at ¶ 34.  The comparative disparity method looks at the absolute disparity as a proportion of a group's population.  *Id.* at ¶ 40.  And the statistical decision theory "measures the likelihood that underrepresentation could have occurred by sheer chance."  *Rioux*, 97 F.3d at 655.

The Second Circuit has approved and applied the absolute disparity method—examining the difference between a group's percentage of the population and the sample—in several cases.  *See id.* at 655-56; *United States v. Biaggi*, 909 F.2d 662, 678 (2d Cir. 1990); *United States v. Jenkins*, 496 F.2d 57, 65 (2d Cir. 1974).  More precisely, the court has used absolute disparity data to apply the related "absolute numbers approach," which examines how many more individuals a district would need

7

to add to an average venire to eliminate the disparities. *See Rioux*, 97 F.3d at 655, 657-58. In *Biaggi*, for example, the court affirmed a district court's finding that absolute disparities of 3.6% for Black people and 4.7% for Hispanic people in the Manhattan jury wheel were not large enough to violate the fair-cross-section requirement. 909 F.2d at 677-78. To eliminate that underrepresentation, the district would have needed to add only about two additional Black people and two to three additional Hispanic people to a 60-person venire. *See id.* at 678. And those numbers were not significant enough to show underrepresentation that was unfair and unreasonable. *See id.*

Although the Second Circuit has acknowledged some limitations of the absolute disparity method, it has continued to apply that method. *See Slaughter*, 110 F.4th at 581. In *Slaughter*, which involved the same Manhattan jury wheel at issue in *Biaggi* more than two decades earlier, the court noted that "the circumstances of any given case may warrant the use of different or even multiple modes of statistical analysis." *Id.* More specifically, the court said that there are "limits of [the absolute disparity] method 'when applied to an underrepresented group that is a small percentage of the total population,' because an underrepresentation that can be fixed by adding 'only' one or two members to an average venire might 'lead to the selection of a large number of venires in which members of the group are substantially underrepresented or even totally absent.'" *Id.* (quoting *Jackman*, 46 F.3d at 1247[6]). But the Second Circuit

---

[6] In his reply brief, Gendron cites *Jackman* for the first time. *See* Docket Item 434 at 5-7; *see generally* Docket Item 409. *Jackman* involved the District of Connecticut's "exclu[sion] from petit jury venires [of] all residents [in two] communities with large minority populations." 46 F.3d 1240 at 1241. Even after the district became aware of that exclusion, it continued using its old list "as the primary source of names, with only a sporadic supplementation" from a new list. *Id.* at 1242, 1244-46, 1248. The Second Circuit found that this was "entirely unacceptable" to fix the deficiency. *Id.* at

nevertheless "proceed[ed], as the district court did, with the absolute disparity . . . method." *Id.* at 581-82.

The *Slaughter* jury pool had absolute disparities of 5.72% for Black people and 9.88% for Hispanic or Latino people.  110 F.4th at 581.  "In absolute numbers, the [district] would have [needed] to add between 3–4 Black people and 5–6 Hispanic or Latino people to the average 60-person venire to eliminate the disparities."  *Id.*  The Second Circuit noted that those disparities were larger than those it had approved in other cases, including *Rioux*, *Jenkins*, and *Biaggi*, and that they had worsened in the decades since *Biaggi*.  *See id.* at 581-82.  The court therefore "assume[d] without

---

1245.  When considering the second prong of *Duren*, the court declined to apply the absolute numbers method for several reasons.  *Id.* at 1246-47.  First, the court noted that Black and Hispanic people made up relatively small percentages of the relevant population.  *Id.* at 1247.  Additionally, the underrepresentation was "far less benign" than in other cases because it persisted—due to the district's own procedures—for more than a year after the district learned of it.  *Id.*  And there was a "basic flaw" with applying the absolute numbers method because the district's ad hoc use of more than one list meant that there was "no larger pool or pre-established source list" that the court could use to examine representation.  *Id.* at 1247-48.  In other words, the court "lack[ed] the data to show the demographic breakdown" of the list used, so "[w]hat [wa]s left [wa]s" the defendant's actual venire, which had zero Black people and one Hispanic person.  *Id.*  In light of those circumstances, the court concluded that there was significant and systematic underrepresentation and ordered a new trial.  *Id.* at 1248.

In *Rioux*, the Second Circuit clarified that *Jackman* was not a broad rejection of the absolute numbers approach.  "In *Jackman,* the court spurned the absolute numbers approach, not just because the minority population was small," the Second Circuit explained, "but because: (1) the underrepresentation did not arise from a 'benign' voter registration list; and (2) [] some important data was missing, [so] there were no effective means of review."  *Id.*  As in *Rioux*, the juries in this District "are derived from voter registration lists and driver registration records [among other state sources], and no significant data are missing," so the Court is "satisfied that the absolute disparity approach is most appropriate for analyzing the underrepresentation claims in this case." *See id.*

deciding that the disparities . . . satisf[ied] the second prong of *Duren*" but ultimately found that the third prong had not been met. *Id.* at 581-85.

In the present case, Black people make up 8.85% of the population in the District, Hispanic/Latino people make up 4.15%, and men make up 48.74%. Docket Item 409-1 at ¶ 24. So the absolute disparities are 3.65% for Black people, 1.58% for Hispanic/Latino people, and 1.73% for men.[7] *Id.* at ¶¶ 36-38. And that means that the Buffalo division would need to add, on average, about 2 Black people, 1 Hispanic/Latino person, and 1 man to a venire of 60 people to eliminate the disparities. *See* Docket Item 448 at 5. In *Biaggi*, the Second Circuit held that similar and higher absolute disparities—3.6% and 4.6%—did not amount to violations of the fair-cross-section requirement.[8] *See* 909 F.2d at 677-78. Gendron therefore does not meet the underrepresentation prong under this method.

Citing *Slaughter*, Gendron asks the Court to apply two other methods for evaluating underrepresentation. *See* Docket Item 409 at 11-14. Specifically, he asks the Court to consider the comparative disparity method and the statistical decision theory. *See id.* But as *Slaughter* acknowledged, "[i]n *Rioux*, [the Second Circuit]

---

[7] The cited figures are taken from the defense expert's declaration. *See* Docket Item 409-1. The government "does not address the accuracy of the statements made by [Gendron]'s expert," Docket Item 413 at 4 n.1, and the Court accepts them as accurate.

[8] In *Rioux*, the Second Circuit approved absolute disparities of 2.08% and 2.14% for Black and Hispanic people, respectively. 97 F.3d at 657-58. Those disparities are greater than those found for two groups in this case (Hispanic/Latino people and men) but somewhat less than the disparities for one group (Black people). *See* Docket Item 409-1 at ¶¶ 36-38.

rejected [those two methods] and embraced the absolute disparity/absolute numbers method to assess underrepresentation." *Slaughter*, 110 F.4th at 581.

With respect to the comparative disparity method, the Second Circuit noted that it had "earlier considered and rejected" that test; moreover, the court "s[aw] no reason to revisit the issue."[9] *Rioux*, 97 F.3d at 655 (citing *United States v. Jenkins*, 496 F.2d 57, 65-66 (2d Cir. 1974), where the court had explained that, "[c]arried to its logical conclusion," requiring courts to consider comparative disparity for a district that used voter registration rolls "would require that if [Black people] constituted 1% [o]f the population, but only 1/4 of 1% [w]ere registered voters, the 4 to 1 disparity would deny a [Black person] a fair trial").

The court considered and rejected the statistical decision theory—also called standard deviation analysis—as well. *Rioux*, 97 F.3d at 655. "It is illogical to apply a theory based on random selection when assessing the constitutionality of a qualified wheel," the court explained, because "[b]y definition, the qualified wheel is not the product of random selection; it entails reasoned disqualifications based on numerous factors." *Id.* The court concluded that "[i]t is irrational to gauge the qualified wheel—an inherently non-random sample—by its potential for randomness." *Id.*

---

[9] Notably, *Rioux* involved jury wheels in New Haven, Connecticut, where the population statistics—7.08% Black and 4.24% Hispanic—were similar to those in Buffalo. *See* 97 F.3d at 657. The comparative disparities in *Rioux* were approximately 29% for Black people (2.08% divided by 7.08%) and 50% for Hispanic people (2.14% divided by 4.24%). *See id.* The comparative disparities here are 3.56%, 38.02%, and 41.19%, for men, Hispanic/Latino people, and Black people, respectively. Docket Item 409-1 at ¶¶ 42-44. So the Court in *Rioux* did not accept the comparative disparity method despite being confronted with data—particularly for the Hispanic group—that seems to have been less representative than the data here.

*Rioux*'s reasoning applies equally here; this District uses non-random factors to create the qualified jury wheel.  For example, to comply with statutory requirements, the District must disqualify people who cannot speak English or who have certain criminal convictions.  28 U.S.C. § 1865(b); *see* Jury Plan at 6.  Likewise, active members of the armed forces and full-time members of fire or police departments are exempt from service.  28 U.S.C. § 1863(b)(6); *see* Jury Plan at 6.  It should come as no surprise that a process that must follow non-random requirements produces results different from those expected through sheer chance.

Although *Slaughter* suggested that it may be appropriate in some circumstances to look beyond the absolute numbers method, the Second Circuit did not disclaim its earlier reasoning in *Rioux* that rejected the comparative disparity method and statistical decision theory.  *See* 110 F.4th at 581.  Given the precedent in *Rioux* and the questionable efficacy of the alternative methods that Gendron offers, the Court does not apply them here.

Finally, the Court notes that—according to the defense expert—the 2020 through 2022 AO-12 forms "show consistent and slightly more representation of Black or African-American persons and Hispanic or Latino persons over time."  Docket Item 409-1 at ¶ 64; *cf. Slaughter*, 110 F.4th at 582 ("These disparities are troubling, especially considering the fact that underrepresentation of Black and Hispanic or Latino people in SDNY venires has only *increased* in the decades since *Biaggi*.").  Of course, that is not dispositive.  But it does show improvement in the jury pools that cuts against finding systematically unfair and unreasonable underrepresentation and granting the drastic relief Gendron requests.

12

In sum, applying the absolute disparity method that has been approved by the Second Circuit, the Court finds that Gendron has not demonstrated that Black people, Hispanic/Latino people, or men are unfairly and unreasonably underrepresented.

### B.     Prong Three: Systematic Exclusion

And even if Gendron had established underrepresentation, his claim still would fail because he has not shown systematic exclusion.  Under prong three, courts ask "whether the underrepresentation of [the relevant groups] is caused by systematic exclusion of these groups in the . . . jury selection process."  *Slaughter*, 110 F.4th at 583.  Systematic exclusion means exclusion "inherent in the particular jury-selection process utilized."  *Duren*, 439 U.S. at 366.

When determining whether a factor is systematic, courts consider whether it is "within the [d]istrict's control."  *See Slaughter*, 110 F.4th at 585 (emphasis omitted). "[S]ystematic exclusion does not occur simply because a facially neutral disqualification criterion disproportionately impacts a particular group."  *United States v. Barlow*, 732 F. Supp. 2d 1, 40 (E.D.N.Y. 2010), *aff'd*, 479 F. App'x 372 (2d Cir. 2012) (summary order). The presence of disparities over time *plus* practices that exclude a certain group can demonstrate systematic exclusion, but "the persistence of disparities by itself" does not satisfy prong three.  *Slaughter*, 110 F.4th at 583.

In his effort to show systematic exclusion, Gendron relies on only two sets of evidence: (1) what his expert calls "consistent statistically significant under-representation" for the three groups, and (2) his expert's conclusion that "[a] historical review of AO-12 Forms shows consistent under-representation" of those groups. Docket Item 409 at 15 (citing Docket Item 409-1 at ¶¶ 14, 64).  Gendron says that

"[s]ystematic exclusion may be proven where, as here, a defendant demonstrates that underrepresentation of a distinctive group occurred over an extended time." Docket Item 409 at 15. But as *Slaughter* made clear, that alone is not enough. *See* 110 F.4th at 583.

Although not in the systematic exclusion section of his briefing, Gendron's motion papers seem to suggest two specific practices that Gendron thinks exclude certain groups. One is the use of only active voters from the voter rolls. Docket Item 409 at 16. The other is the use of only one type of driver's license from DMV data. *Id.* at 17.

With respect to the voter data, Gendron says that excluding inactive voters "violates the JSSA and the local Jury Plan." *Id.* at 16. But there is nothing in the JSSA or the Jury Plan that requires the inclusion of inactive voters. The Jury Plan specifies that "[t]he lists shall be obtained from the voter registration lists of the political subdivisions within each [d]ivision of this [D]istrict." Jury Plan at 2. And "courts in th[e Second C]ircuit have consistently held that the exclusion of inactive voters does not satisfy *Duren*'s third prong." *United States v. Corbett*, 2021 WL 5588816, at *8 (E.D.N.Y. Nov. 30, 2021).

What is more, "voters are moved to inactive status not by the Clerk of Court, but because New York State has received information that the[y] ha[ve] moved." *Id.* For that reason, Gendron "cannot show systematic exclusion because the underrepresentation caused by the exclusion of inactive voters is attributable to the external force of people moving." *See id.*; *see also United States v. Charles*, 2021 WL 2457139, at *5 (S.D.N.Y. June 16, 2021); *United States v. Middlebrooks*, 2021 WL 2402162, at *3 (S.D.N.Y. June 10, 2021); *United States v. Schulte*, 2021 WL 1146094,

14

at *8 (S.D.N.Y. Mar. 24, 2021); *United States v. Allen*, 2021 WL 431458, at *10

(S.D.N.Y. Feb. 8, 2021).  And it is "entirely logical" for the District to exclude inactive

voters, who may have left the District's geographic area, *Allen*, 2021 WL 431458, at *10;

in fact, Gendron "cannot show that inactive voters who have moved would still qualify

for jury service" in the District, *see Corbett*, 2021 WL 5588816, at *8.

For all those reasons, using the list of active voters is not systematic exclusion.[10]

With respect to the DMV data, Gendron complains that the District used only "D"

licenses—traditional driver's licenses—and not commercial driver's licenses,

identification cards, motorcycle licenses, or taxi licenses.  Docket Item 409 at 17.

According to Gendron, a larger proportion of Black people have those other types of

---

[10] Gendron's motion and reply are silent about the connection between excluding inactive voters and the groups he says were underrepresented.  *See generally* Docket Items 409 and 434.  His expert's declaration, however, says that Black people and Hispanic or Latino people—but not men—have higher than average mobility rates. Docket Item 409-1 at ¶¶ 136, 150.  Somewhat relatedly, the expert also says that the 2021 Master Jury Wheel was constructed with data from 2020 and that the data would have been over a year out of date when potential grand jurors received questionnaires in mid-February 2022.  *Id.* at ¶ 137.  At oral argument, the expert said that the District's use of addresses that were a year old, together with the differential mobility rates, created a disparate demographic effect.  *See* Docket Item 448 at 28.  Gendron's motion and reply are silent on this issue as well.  *See generally* Docket Items 409 and 434.

Gendron's motion did not raise any issue as to the District's violating the JSSA based on the age of its data.  And even if it had, such an argument is grounded in the differential mobility rates, which are "an external force, not a systemic defect inherent in the Jury Plan."  *See Schulte*, 2021 WL 1146094, at *8.  The District has at least some control over how frequently it updates its data and replenishes the master wheel.  But this Court is hard-pressed to find that using data that is one to two years old amounts to systematic exclusion.  *See id.* (rejecting claim that "replenishment of the master wheels only once every *four* years constitutes systematic exclusion" (emphasis added)).

The expert's declaration refers to several other issues that Gendron elected not to brief or argue.  These range from claims that Generation Z and the Silent Generation were underrepresented to claims about grand jurors' attendance.  *See, e.g.*, Docket Item 409-1 at ¶¶ 12-13, 18, 19.  The Court does not address those unargued points.

licenses: He says that Black people make up 7.44% of those who have D licenses but 14.94% of those who have other licenses. Docket Item 409-1 at ¶ 91. And Gendron argues that including the other types of licenses therefore "would increase" the representation of Black people in the jury wheel.[11]  *Id.* at ¶ 92.

But Gendron's expert does not provide an estimate of the scale of this increase, and there are reasons to believe that any increase would indeed be modest. Non-D licenses make up a small minority—15%—of the licenses in the Buffalo division, and the DMV data is just one of five sources that the District merges to create the master wheel. *See id.* at ¶¶ 65, 88. Moreover, regardless of the effect of using only traditional driver's licenses, that practice is "facially neutral," and therefore cannot constitute systematic exclusion. *See Corbett*, 2021 WL 5588816, at *8.

Finally, the defense expert's own declaration undermines Gendron's arguments by suggesting other reasons for the disparities. For example, the expert provided data about the percentage of people lost within each group at different stages in the process. *See* Docket Item 409-1 at ¶ 130. That data shows that "[t]he largest decrease in the percentage of Black . . . persons occur[ed] when responses [we]re received."[12]  *Id.* at ¶ 132.

Gendron's expert notes that "[t]here are several reasons that a response to the questionnaire would not be received [by the District,] including the intentional ignoring of

---

[11] Gendron does not assert any connection between the use of driver's licenses and disparities for men and Hispanic/Latino people.  *See* Docket Item 409 at 17.

[12] More specifically, Black people made up 7.71% of the pool of people whose questionnaires were delivered but only 5.33% of those whose responses were received by the court—a difference of 2.38%.  Docket Item 409-1 at ¶¶ 130, 132.

a delivered questionnaire, the mis-delivery or non-delivery of the questionnaire, an out-of-date address, the lack of an apartment number or other identifying information on the address or name, problems with the delivery point, and mis-delivery or non-delivery of the response." *Id.* at ¶ 133. But most of those reasons have nothing to do with the District's procedures, and Gendron's motion does not explain why the Court should assume that those reasons—listed by Gendron's own expert—do not account for all or most of the disparities in the racial data.[13] *See Slaughter*, 110 F.4th at 585 (rejecting defendant's systematic exclusion argument because there was evidence that disproportionality was based on disproportionate responses to questionnaire and the defendant did not "offer any data to suggest that the content of those questionnaires, the process by which they are disseminated, or any other factor within *the District's* control contributes to the disproportionate response rate").

Along the same lines, the largest decrease in the representation of Hispanic/Latino people occurred during the qualification process, with a decrease of .55%. Docket Item 409-1 at ¶ 142. And the most common factor disqualifying members of that group was the inability to read, write, or understand English, which results in a decrease of .39%. *Id.* at ¶ 143. So a large proportion of this group was lost during the disqualification process due to language barriers.[14] Disqualification due to lack of

---

[13] The expert's declaration says that "approximately *a third* of the decrease in Black or African-American percentage in the group of responses *could be* from the use of out-of-date data." *See* Docket Item 409-1 at ¶ 139 (emphasis added). For the reasons it has explained, the Court rejects any argument that using out-of-date data amounted to systematic exclusion here. *See supra* note 10.

[14] Like the data for Black people, the data for Hispanic/Latino people also shows a decrease at the stage of returning questionnaires, with a drop of .52% at this stage. Docket Item 409-1 at ¶¶ 130, 149.

English proficiency is an external factor and not systematic exclusion. "[T]he Supreme Court has recognized that there is room in every jury selection system for reasonable qualifications and exemptions." *Rioux*, 97 F.3d at 659 (citing *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975)). And "[t]he requirement that jurors speak English is unquestionably reasonable" and not systematic exclusion. *See id.* at 658-59.

In sum, Gendron's fair-cross-section claim also fails because he does not satisfy prong three of the *Duren* test.

## II.    PROCEDURAL CLAIMS

Finally, Gendron raises purported flaws with the Clerk's procedures in conjunction with the alleged underrepresentation. Specifically, he argues that the District substantially failed to comply with the JSSA due to the "nature and degree of the exclusion coupled with" three factors: (1) "the Clerk's failure to adequately manage and supervise the jury selection process"; (2) "the failure to create any written guidelines or instructions to ensure that the source data would be combined in a uniform manner"; and (3) "the failure to preserve materials relating to the construction of the Master Jury Wheel." Docket Item 409 at 15.

If a court finds a "substantial failure to comply" with the JSSA, it must "stay the proceedings pending the selection of a grand jury in conformity with this title or dismiss the indictment, whichever is appropriate." 28 U.S.C. § 1867. But "[m]ere 'technical' violations of the procedures prescribed by the [JSSA] do not constitute 'substantial failure to comply' with its provisions." *LaChance*, 788 F.2d at 870 (quoting *Carmichael*, 685 F.2d at 911). "Whether a violation is 'substantial' or merely 'technical' depends

18

upon the nature and extent of its effect on the wheels and venire from which a defendant's grand jury was derived." *Id.*

Gendron argues that the Clerk insufficiently managed and supervised the jury selection process. Docket Item 409 at 15. He seems to suggest that there is a problem with the Clerk's delegating certain tasks—namely merging and de-duplicating source lists—to a vendor. *See id.* at 2, 17-18. This Court disagrees.

The JSSA defines "clerk" to include not only the Clerk of the Court but also "any other person authorized by the court to assist the clerk in the performance of functions under this chapter," 28 U.S.C. § 1869; therefore, the law plainly authorizes the delegation of at least some tasks to a vendor. The management and supervision issue involves the extent to which the Clerk may use a vendor to assist with creating the wheel and the Clerk's instructions to the vendor, so what Gendron raises as two issues is really one: whether the Clerk provided sufficient guidelines and instructions.

And as to the Clerk's alleged failure to provide guidelines or instructions, the Jury Plan indeed includes written instructions about the creation of the jury wheel, including a list of the sources to be used and the requirement that the "lists shall be merged and any duplication between the lists shall be purged." Jury Plan at 2. Moreover, the vendor confirmed that he followed those instructions. *See* Docket Item 310 at 9-10. More specifically, he started with the voter data and then merged the DMV data, looking for duplicates using the county code, last name, given name, and date of birth; if he found a match, he retained only the voter record. *Id.*; Docket Item 409-1 at ¶ 108. He then merged the remaining sources into the list in a similar manner. Docket Item 409-1

at ¶ 120.  Because there *are* instructions and the vendor followed them, the Court rejects Gendron's arguments about insufficient supervision and instruction.[15]

With respect to preserving materials, the Court agrees with Gendron that the Clerk should have retained the source data.  The JSSA requires that

> [a]fter the master jury wheel is emptied and refilled pursuant to section 1863(b)(4) of this title, and after all persons selected to serve as jurors before the master wheel was emptied have completed such service, *all records and papers compiled and maintained by the . . . clerk* before the master wheel was emptied *shall be preserved in the custody of the clerk for four years* or for such longer period as may be ordered by a court, and shall be available for public inspection for the purpose of determining the validity of the selection of any jury.

28 U.S.C. § 1868 (emphasis added).  The Jury Administrator has advised that the Clerk's office does not have the source data.  Docket Item 184 at 2; *see* Docket Item 262 at 3.  And the vendor says that "[p]er our agreement with [New York] state, all data, except the voter data, is removed from the system[] once the Master Jury Wheel is put into production" Docket Item 310 at 4, later clarifying that he had voter data "back to [only] 2024," Docket Item 311 at 1.

There may be historic reasons for the Clerk's failure to retain the source data.  In the past, the District used only voter and DMV data, but in approximately 2018, it added the three other sources to "increase jury diversification."  *See* Docket Item 413-1 at 2.  To facilitate this change, the New York Legislature amended New York state labor law, tax law, and social services law to allow state agencies to share data with the federal courts.  *See id.*; Assemb. B. 9273/S. B. 7196, 2016 Reg. Sess. (N.Y. 2016) (signed into

---

[15] Perhaps, as Gendron suggests, *see* Docket Item 409 at 18, it would be a better practice for the Clerk to have more specific written instructions for merging the lists.  But that is not required, and the Clerk cannot substantially fail to comply with a nonexistent rule.

law Aug. 24, 2016).  But the amendments limit the District's use of the data to jury

selection and require the District to take steps to ensure that the information remains

confidential.  Assemb. B. 9273/S. B. 7196.  According to the vendor, his agreement with

the state required him to remove all but the voter data from his system after creating the

wheel.  Docket Item 310 at 4.  Of course, that does not change the fact that the source

data are records and papers "compiled and maintained" by the Clerk under the JSSA,

28 U.S.C. § 1868, which must be preserved notwithstanding any agreements to the

contrary.[16]  But it does explain why they were not preserved here.

In any event, the failure to comply with technical JSSA requirements about

preserving source data does not amount to a substantial failure to comply.  *See*

*LaChance*, 788 F.2d at 870.  There was no broad policy of improperly destroying jury

records, and the Jury Administrator provided an abundance of other records that were

properly preserved.  More importantly, there is no evidence that the failure to retain the

source data had a large—or, indeed, any—"effect on the wheels and venire."  *See id.*

Therefore, any technical violations do not amount to a substantial failure to

comply with the JSSA.

---

[16] The government argues that because the Clerk in fact did not "compile[]
maintain[]" the source data, the Clerk did not need to preserve such data.  Docket Item
413 at 10; Docket Item 448 at 9-11.  But the idea that the Clerk need not preserve
records so long as the Clerk decides or agrees not to do so is circular and would nullify
the requirement to preserve records.

## **CONCLUSION**

For the reasons stated above, the motion to dismiss the indictment is DENIED.


SO ORDERED.

Dated:   December 10, 2025
         Buffalo, New York


　*/s/ Lawrence J. Vilardo*
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE