UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

         v.                                           22-CR-109 (LJV)

PAYTON GENDRON,

                Defendant.
_____

### REPLY TO GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO TRANSFER VENUE

      Payton Gendron, by and through his attorneys, respectfully submits this Reply to the government's Response in Opposition, submitted for sealed filing on 1/12/26 (ECF No. 521), to his Motion to Transfer Venue Pursuant to Federal Rule of Criminal Procedure 21 and the Fifth, Sixth and Eighth Amendments to the United States Constitution, ECF No. 308, and Supplement thereto, ECF No. 489. The issues raised in the Motion and Supplement are considerably more complex and nuanced than the government's simplistic Response implies and thus, unsurprisingly, the Response fails to adequately meet them.

      The assessment of whether a transfer of venue must be granted to ensure a fair trial in this matter requires more than just an analysis of how much information has been conveyed to what percentage of the potential jury pool through the blanket media coverage of this case from its inception. It requires a searching inquiry into the emotional impact that such a shocking and large-scale attack had on the community in which it took place, informed by the ways in which the media coverage both reflects and amplifies that impact. It requires an understanding of the media environment in the age of technology and the internet, and how dramatically different it is from the world that existed when the Supreme Court issued its last opinions on change of venue.

It also demands acknowledgement of the long history of racial segregation in Buffalo and the multiple ways in which it threatens the ability to seat a diverse and representative jury in this case.

Most importantly, the effects of this confluence of factors must be considered in the context of the government's decision to seek the death penalty against Payton Gendron. The fundamental and inescapable truth is that jurors will not just decide the facts of what happened on May 14, 2022. They will be required to undertake the entirely different task of rendering a personal, moral judgment as to whether Payton Gendron should be sentenced to life in prison without the possibility of release or death. The government's myopic focus on the exposure of the jury pool to evidence of guilt therefore undermines every argument that it makes.

Finally, as clearly stated in the Supplement, deferring a decision on whether to transfer venue until voir dire is underway is undoubtedly an option before the Court. Thorough and effective questioning may uncover the extent of prospective jurors' exposure to prejudicial publicity and may reveal if they have been so personally affected by the crimes that the law requires them to be excused from service. Should it become evident that identifying a sufficient number of impartial jurors is not possible, the Court can abandon the process and start over in a new venue. However, even if voir dire were sufficient to identify bias, no such solution is available if the process results in the disproportionate disqualification of jurors of color and ends with the seating of an all-White jury. For the reasons set forth in the Motion such an outcome is overwhelmingly likely, and the Motion should accordingly be granted.

**ARGUMENT**

I.    **THE LAW REQUIRES THE COURT TO EXCUSE FOR CAUSE ANY PROSPECTIVE JUROR WHOSE KNOWLEDGE OF OR PERSONAL CONNECTION TO THE CRIME IS LIKELY TO SUBSTANTIALLY IMPAIR THE PERFORMANCE OF THEIR DUTIES.**

In its Response, the government mischaracterizes the defense Motion as relying on the assumptions that no Black resident of Buffalo's East Side could be a fair and impartial juror in this case and that such jurors will therefore be automatically excluded from service. This assertion is unequivocally false. First, the Motion is based upon the effect of this tragedy, and the ensuing deluge of traditional and online media coverage, on *the entire community*, not just the members of one racial group or the residents of a particular section of the district. *See* ECF Nos. 308 at 10-14, 16-18, 489 at 8-73. Where the Motion discusses the uniquely situated Black residents of the East Side, it does so in connection with a specific aspect of the prejudice that will ensue from conducting this trial in Buffalo, namely the severely diminished likelihood that the jury ultimately seated will reflect the diversity of the community.

Second, as is plain from even a cursory review, the Motion makes no assumption that every Black resident of the East Side will be excused from service. Rather, the point compellingly made therein – and never meaningfully addressed by the government – is that a disproportionate number of Black East Side residents will be excused. That is so because (1) the Constitution and laws of the United States require the Court to excuse from service prospective jurors whose personal connections to the crime will likely impair their ability to decide whether Payton Gendron lives or dies in a fully impartial manner, and (2) because historical and current conditions of racial discrimination and segregation in the City of Buffalo have significantly increased the likelihood that prospective jurors who reside on the East Side have such personal connections to the crime.

The United States Constitution entitles every criminal defendant to trial by an impartial jury, defined as "one in which every juror is 'capable and willing to decide the case solely on the evidence before it.'" *United States v. Sampson,* 820 F. Supp. 2d 151, 162 (D. Vt. 2011) (quoting *McDonough Power Equip. Inc. v. Greenwood*, 464 U.S. 548, 554 (1984)). "[A] juror is not impartial if his experiences, opinions, predispositions, biases, prejudices, interests, or relationships 'would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Id.* (quoting *Wainwright v. Witt*, 469 U.S. 412, 424 (1985)). In a federal death penalty case, each individual juror has the power to determine whether the defendant will live or die. *Id.* at 157. Accordingly, it is vitally important to ensure that a prospective juror "be able to make that decision based solely on the evidence, uninfluenced by personal experiences that he or she may have had." *Id.*; *see also id.* at 159 (noting defendant had "constitutional right to have the issue of whether he should live or die decided by twelve women and men who were each capable of deciding that most consequential question impartially").

None of us is a blank slate; all individuals who have made it to adulthood have acquired a wealth of experience and knowledge that, in certain circumstances, would impair our ability to render impartial judgment of another. Additionally, as the law has long recognized, the full effects of our experiences are not always within our conscious awareness. *See, e.g., McDonough*, 464 U.S. at 554 (noting voir dire serves to protect right to impartial jury by "exposing possible biases, both known and unknown"); *Sampson*, 820 F. Supp. 2d at 157, 163 (noting that bias may exist even if prospective juror is not "consciously aware of it," and emphasizing importance of uncovering "life experiences that might subconsciously injure an individual's ability to decide [the] case based solely on the evidence") (citing *Smith v. Phillips*, 455 U.S. 209, 221-22 (1982)

(O'Connor, J., concurring)); *United States v. McVeigh*, 918 F. Supp. 1467, 1472 (W.D. Okla.

1996) (noting that prejudice "may go unrecognized in those who are affected by it"). As the

Supreme Court stated over a century ago:

> Bias or prejudice is such an elusive condition of the mind that it is most difficult, if not impossible, to always recognize its existence, and it might exist in the mind of one (on account of his relations with one of the parties) who was quite positive that he had no bias, and said that he was perfectly able to decide the question wholly uninfluenced by anything but the evidence.

*Crawford v. United States*, 212 U.S. 183, 196 (1909) (cited in *Sampson*, 820 F. Supp. 2d

at 163).

Even when a prospective juror is responding to voir dire questions in the utmost good

faith and making every effort to be candid, "it can be challenging . . . to determine whether a

juror is capable of being impartial in a particular case." *Sampson*, 820 F. Supp. 2d at 167.[1] That

challenge is entrusted to the trial judge, who is "in the best position to evaluate the juror's

demeanor and to determine, by the juror's answers to the judge's questions, whether he could

fairly and impartially hear the case and return a verdict based solely on the evidence presented in

court." *United States v. Ploof*, 464 F.2d 116, 118 (2d Cir. 1972).

The law mandates that the Court excuse for cause any prospective juror who

demonstrates "'actual bias,'" i.e., who is determined, based on admission or inference, to have a

"'state of mind'" such that he or she "'will not act with entire impartiality.'" *United States v.

Nelson*, 277 F.3d 164, 202 (2d Cir. 2002) (quoting *United States v. Torres*, 128 F.3d 38, 43 (2d

---

[1] Accordingly, and contrary to the government's baseless accusation, ECF No. 521 at 14, the defense makes absolutely no claim that jurors will not be truthful and honest regarding their ability to serve fairly and impartially; nor does acknowledgment of the complexity of seating an impartial jury in a capital case cast aspersions upon any segment of the venire. By the same token, the government's suggestion that all the Court need do to assess whether a prospective juror is legally permitted to serve is "ask[] . . . [them] whether they can be fair and impartial," *id.* at 1, is specious.

Cir. 1997)). Any doubts about the existence of actual bias must be resolved in favor of excusing the juror. *Id.* Additionally, the Court is bound by law to assess for "[i]mplied or presumed bias," and to excuse prospective jurors even in the absence of admitted or proven partiality when "objective circumstances cast concrete doubt on the impartiality of a juror." *Torres*, 128 F. 3d at 45-46; *see also id.* (noting that "even though a person 'may declare that he feels no prejudice in the case, the law cautiously incapacitates him from serving on the jury because it suspects prejudice, because in general persons in a similar situation would feel prejudice'") (quoting *United States v. Burr*, 25 F. Cas. 49, 50 (C.C. Va. 1807) (No. 14,692g) (internal alterations omitted)).

Finally, in the Second Circuit and others, courts have discretion to exclude on the ground of "inferable bias" jurors who satisfy neither of the above standards but whose responses on voir dire "permit an inference that the juror in question would not be able to decide the matter objectively." *Id.* at 46-47; *see also Sampson*, 820 F. Supp. 2d at 165-66 (noting that inferable bias exists "'when a juror discloses a fact that bespeaks a risk of partiality sufficiently significant to warrant granting the trial judge discretion to excuse the juror for cause, but not so great as to make mandatory a presumption of bias'") (quoting *United States v. Greer*, 285 F.3d 158, 165 (2d Cir. 2002)). There is no room for error in the Court's discharge of these duties. If a single juror who lacks the requisite degree of impartiality participates in deciding a case, the defendant is entitled to a new trial and the conviction and sentence will be reversed, regardless of whether or not the verdict would have been different if another juror had been seated. *Sampson*, 820 F. Supp. 2d at 162; *see also id.* ("'The presence of a biased juror cannot be harmless; the error requires a new trial without a showing of actual prejudice.'") (quoting *Dyer v. Calderon*, 151 F.3d 970, 973 n.2 (9th Cir. 1998) (en banc)).

To state the obvious, the circumstances of this case evoke strong emotional responses. *See McVeigh*, 918 F. Supp. at 1468 (noting that case had "immeasurable effects on the hearts and minds of the people" of state in which it occurred). The emotional impact reverberated throughout the entire community. Not just one family lost a loved one; 10 did. Three other people were physically injured. At least 66 other people were in or around the Tops Market when the shooting happened and witnessed or experienced the events; untold numbers watched the crime occur on video. The fact that the attack occurred at a grocery store, the type of place where virtually all of us go, and that the victims just happened to be present at the time, undoubtedly resulted in a pervasive sense that "it could have been me, or one of my loved ones."

While claiming that the pretrial publicity "does not contain any inadmissible evidence, or any other blatantly prejudicial information" (ECF No. 521 at 13), the government also acknowledges the extremely prejudicial calls for Payton Gendron's execution by public officials and some victims' family members. *Id*. at 17.  The government urges this Court to disregard those prejudicial statements, however, because they "would likely be inadmissible at trial."  *Id*. at 17.  This is exactly the point.  The law clearly prohibits the admission at trial of witnesses' or community opinions on what the appropriate sentence might be.  *See United States v. Sampson*, 335 F. Supp. 2d 166, 187 (D. Mass. 2004). This is because those opinions are not only irrelevant, they are also extremely prejudicial.

Of course, not everyone who was emotionally affected by what happened, or is close to someone who was, must be excused for cause. As the district court noted in *McVeigh*, *id.* at 1473, "properly motivated and carefully instructed jurors can and have exercised the discipline to disregard" their prior awareness of a case. However, "[t]rust in their ability to do so diminishes when the prior exposure is such that it evokes strong emotional responses or such an

identification with those directly affected by the conduct at issue that the jurors feel a personal

stake in the outcome." *Id.* A realistic and cautious assessment of that ability is vital because

> Deciding whether to excuse a juror for cause necessarily requires a prediction, in part because even a well-intentioned juror at voir dire does not then know much in advance about the nature of the evidence at trial. A judge must decide whether a juror who claims to be impartial at voir dire, and who the judge may not find to be actually or impliedly biased at that time, will in fact become impaired during the course of the trial because exposure to the evidence will dredge up in the juror's mind memories of disturbing events and associated emotional responses.

*Sampson*, 820 F. Supp. 2d at 168.

As set forth in the Supplement, ECF No. 489 at 73-100, because of a long history of

racial discrimination and segregation in the City of Buffalo and conditions of food apartheid on

the East Side, the likelihood that an East Side resident of any race has personal connections to

the shooting at the Tops Market on May 14, 2022, is dramatically increased as compared to a

resident from elsewhere in the district.[2]  Also because of the history of discrimination and

segregation, the overwhelming majority of the residents of the East Side are Black, and the

majority of the Black residents of the district as a whole live on the East Side. Simple

mathematics therefore dictate that Black members of the venire will be required by law to be

excused at a rate grossly disproportionate to the rates of excusal of White prospective jurors.

As also set forth in the Supplement, *id.* at 97-99, the disproportionate rate of excusal of

Black jurors for cause will compound the existing underrepresentation of jurors of color in the

---

[2] As stated in the Motion, the defense stands ready to prove all relevant facts at an evidentiary hearing. Since filing the Supplement, additional evidence has become available regarding the demographics of customers at the Jefferson Avenue Tops Market. *See* Exhibit A (Declaration of Jeffrey Martin dated Jan. 1, 2026). Not surprisingly, analysis of usage data for Tops BonusPlus Loyalty cards at the Jefferson Avenue Tops Market shows that, in 2025, 72.53% of the trips to that store "by Tops BonusPlus loyalty card holders are from within the Buffalo East Side ZIP codes," and 55.33% of the "loyalty card shoppers in the year 2025 at the Tops Store 250 are from within the Buffalo East Side ZIP codes." *Id.*

venire due to the systematic failure of the jury selection process to yield a jury wheel that represents a fair cross section of the population. Far from a "manufactured . . . underrepresentation of potential Black jurors from the Buffalo Division" as the government claims, ECF 521 at 2, the chronic failure of the jury system to include proportionate numbers of jurors of color and the likelihood that an all-White jury will be seated if this case is tried in Buffalo are real. Aside from its inflammatory rhetoric, however, the government ignores the issue.

## II. THE COURT MUST REJECT THE GOVERNMENT'S SUGGESTION THAT PAYTON GENDRON HAS FORFEITED HIS RIGHT TO THE PROTECTIONS OF THE CONSTITUTION BECAUSE OF THE NATURE OF HIS CRIME.

In the United States, no defendant, no matter how heinous the crime of which he is accused, forfeits his right to a fair trial as guaranteed by the Constitution. The Due Process Clause demands that criminal proceedings comport with "'those canons of decency and fairness which express the notions of justice . . . even toward those charged with the most heinous offenses.'" *Rochin v. California*, 342 U.S. 165, 169 (1952) (quoting *Malinski v. New York*, 324 U.S. 401, 416-17 (1945)); *see also Powell v. Alabama*, 287 U.S. 45, 52 (1932) ("However guilty defendants, upon due inquiry, might prove to have been, they were, until convicted, presumed to be innocent. It was the duty of the court having their cases in charge to see that they were denied no necessary incident of a fair trial."); *Sampson*, 820 F. Supp. 2d at 160 ("the Constitution guarantees every man [fair process] no matter how despicable his conduct"). This principle is no mere lofty ideological aspiration; it is part of the foundation of a functioning democratic society.

"One touchstone of a fair trial is an impartial trier of fact – 'a jury capable and willing to decide the case solely on the evidence before it.'" *McDonough*, 464 U.S. at 554 (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982)). Even when the crime charged is egregious, "it is not

requiring too much" that, when put on trial for his life, the defendant be afforded a fair and impartial jury. *Irwin v. Dowd*, 366 U.S. 717, 728 (1961) (involving a defendant charged with one murder who had confessed to six more). "[T]here is a difference between a murder and an execution. That difference is the fair process by which a jury of citizens from th[e] community decide[s] that [the defendant's] death is justified." *Sampson*, 820 F. Supp. 2d at 160 (internal quotations and alterations in original omitted).

The government knows this. Nevertheless, in its Response it repeatedly suggests that Payton Gendron has forfeited his constitutional rights because of the manner in which his crime was committed. *See* ECF No. 521 at 12 (urging the Court to deny the Motion because "the defendant is responsible for much of the publicity. He publicized his . . . manifesto and Discord journal [and] broadcast his crime live on the internet"); *id.* at 18-19 (noting that "the defendant himself publicized his . . . views and plans and broadcast his crimes"); *id.* at 23 ("the defendant also expresses concern about the number of people who have seen the livestream of his attack . . . But again, it was the defendant who chose to broadcast his crime on the internet. At the very least, it is disingenuous to complain that the defendant's decision to do so causes prejudice").

It even urges the Court to dispense with the requirement of a fair and impartial trial because Payton Gendron accepted responsibility for his actions and pled guilty to all charges against him in New York state court, blaming him for the heavy media coverage of his plea and televised sentencing proceeding. *See id.* at 12 (adding that Payton Gendron is also "responsible for much of the publicity" because "he pled guilty to state crimes relating to his attack"); *id.* at 21 ("The Court should give this media coverage little, if any, weight because it was the *defendant's* decision to plead guilty and be sentenced in state court").

In making these arguments, the government appeals not to the law, but to the basest desires for vengeance that have no place in the criminal legal system. The Court should disregard them.

### III.  THE GOVERNMENT'S CRITICISMS OF THE COMMUNITY SURVEY ARE BOTH UNWARRANTED AND UNSUPPORTED BY ANY CONTRARY EVIDENCE.

The government's baseless criticisms of Dr. Edelman's survey are nothing more than an attempt to divert attention from the alarming results. A supplemental declaration from Dr. Bryan Edelman, which is attached as Exhibit B, explains in detail why the government is mistaken – factually, legally and methodologically. The defense relies on Dr. Edelman's supplemental declaration in full, offering only brief highlights of some of the conclusions below.

### A.  The Government Ignores the Legal Standard for Change of Venue and the Requirements of the District's Jury Plan with Repeated Suggestions That the Comparison of Data Should Have Been District-Wide.

Throughout its discussion of the survey, the government criticizes the defense for failing to conduct a district-wide analysis of the study data. *See* ECF No. 521 at 30-35.  However, as explained in more detail below, *see* Section IV, *infra*, the government's suggestion that the Court can expand the jury pool for this case by including jurors who reside in the Rochester Division is inconsistent with the Jury Plan for this district and therefore prohibited by law.[3] Thus, the criticism for not including the Rochester data in the survey analysis for a transfer of venue is unwarranted.  The data was not "conveniently minimize[d] or ignore[d]," ECF No. 521 at 30; it is simply irrelevant for assessing bias in the Buffalo Division, and for determining the appropriateness of the relief sought, namely transfer to another district under Fed. R. Crim. P. 21.

---

[3]*See* Jury Selection Plan for the United States District Court for the Western District of New York  (effective April 2, 2025).

The Jury Plan requires that the pool in this case be drawn from the Buffalo Division only, not a combined district-wide draw.[4]

### B.     The Survey was Administered Consistent with Applicable Professional Standards.

With no basis in fact and with no expert evidence of their own, the government claims the survey was conducted with a "pre-determined outcome."  ECF No. 521 at 29. This unsupported claim should be rejected by this Court. Alternatively, a hearing is necessary to demonstrate Dr. Edelman's qualifications and the reliability of the community survey.

In the meantime, a few points warrant immediate response. First, as any lay person could glean, the amount of media coverage of this case has been voluminous. But to measure whether that media coverage is prejudicial requires a complete examination of the coverage since the date of the mass shooting on May 14, 2022. A cursory review of the media coverage demonstrated a significant amount of inflammatory publicity, which necessitated a full media analysis. The results of the media analysis supported the need to conduct a community survey. Second, the purpose of the survey was indeed, "to determine the *degree of prejudice* in the local market." ECF No. 308 at 1. There was no prejudgment as to the degree of prejudice that would exist; anywhere from 0 to 100 percent of the jury pool could be impacted by prejudicial publicity.

The survey comports with all professional standards set forth in the American Society of Trial Consultants Professional Code[5] and American Association of Public Opinion Research

---

[4] A comparison of the Rochester Division data to the Buffalo Division data is appropriate in the context of a request for an intradistrict transfer of the case for trial pursuant to Fed. R. Crim. P. 18. Although the Motion to Transfer Venue has yet to be ruled upon, in light of the impending issuance of jury summonses for this case, the defense will shortly be filing a Motion for an Intradistrict Transfer of the Case for Trial in the Rochester Division, as a request for secondary relief.

[5] Available at https://www.astcweb.org/professionalcode.

Code of Professional Ethics and Practices.[6] These standards, and Dr. Edelman's implementation of them, have previously been found to be reliable. *See e.g. United States v. Mosby*, No. 22-CR-00007-LKG, 2023 WL 5879294 (D. MD September 11, 2023). In *Mosby*, the government made the same unpersuasive arguments that the phone and community surveys were unreliable due to flaws in the methodology. There, the government hired an expert in "labor and operations strategy," who had no experience in conducting telephone surveys, to question Dr. Edelman's findings. Here, it has not even attempted to present a professional opinion challenging Dr. Edelman's methodology and instead resorts to its own amateur methods of conjecture and speculation completely unsupported by facts and professional standards.

Moreover, the suggestion that Dr. Edelman had a predetermined outcome is belied not just by his adherence to applicable professional standards, but his experience. At a hearing, Dr. Edelman would testify that he has designed surveys in more than 70 cases in both state and federal courts consistent with the methodology used in this survey, that his methodology meets industry standards, and that it has been found to be valid and reliable in federal and state cases across the country including New York. *See* Exhibit B at 4.  He affirms in his declaration that he did not design this survey to achieve a specific result, and that he has conducted numerous surveys on behalf of defendants that did not demonstrate bias or support a change of venue. *Id.*

### C.    The Government Ignores the Professional Standards Altogether.

In criticizing Dr. Edelman's survey and methodology, the government demonstrates no working knowledge of the professional codes guiding trial consultants on how to conduct venue surveys.  A few examples prove this point.

---

[6] https://aapor.org/standards-and-ethics/#aapor-code-of-professional-ethics-and-practices

       1.      <u>The Sample Size Followed Accepted Standards.</u>

The government criticizes Dr. Edelman for conducting a "private [community] survey of less than 400 people in the Buffalo Division to conclude that the Court cannot find 12 impartial jurors from more than 1 million prospective jurors." ECF No. 521 at 29.  Setting aside the fact that the legal standard for a change of venue does not require the defendant to survey the entire Buffalo division to prove prejudice, a look at the American Society of Trial Consultants Code of Professional Standards (rev. May 2025), demonstrates that Dr. Edelman's sample size was exactly what the standards require:

> Where resources are limited or case awareness and prejudgment are high or the jurisdiction is sparsely populated thus the risk of inadvertent contact with actual jurors is high, a small sample size can provide evidence as to whether a defendant is not likely to receive a fair trial….Under other circumstances, **however, a sample size of 400, yielding a confidence interval of +/- 5% for opinions that are evenly distributed in the population, serves as a point of reference.**

> As Dr. Edelman explains,

> The margin of error for a sample size of 400 with a 95% confidence interval is a function of variance. For example, the margin of error is +/-5% for a "yes" or "no" question that is evenly divided (i.e., 50% for each response). However, the margin of error narrows as the variance shrinks. The margin of error for case recognition in the Buffalo Division is just +/-3%. The margin of error is also +/-3% for prejudgment and +/-5% sentence.

*Id.* at 3.

       2.      <u>The Professional Standards Caution Against Using Direct Questions to Measure Impartiality.</u>

The government faults the survey for not "measur[ing] the concepts relevant to jury service: the ability to follow instructions, set aside impressions, or remain impartial.

> Nor did it test whether respondents can distinguish between media exposure and jury obligations. Instead, the survey essentially asks whether respondents remember various reported facts. But factual recall is not an indicator of bias, and awareness of a major event does not mean that a potential juror cannot apply the presumption of innocence, consider mitigation evidence, or follow the Court's directions. Because the survey measures knowledge rather than impartiality, it cannot meaningfully support the defendant's argument of prejudice warranting venue transfer."

ECF No. 521 at 33.

The survey measured more than whether respondents remember various reported facts. It measured the extent of exposure to prejudicial media coverage, and addressed opinions about the defendant and victims, prejudgment, intransient opinions toward sentence, willingness to consider mitigation, personal connections to the shooting, and how community residents may react if Payton Gendron were sentenced to life without possibility of release or death.

As Dr. Edelman notes, the findings reveal the significant level of prejudice in the Buffalo Division:

> The survey data demonstrate high levels of case awareness, personal connections to the crime, prejudgment of guilt and sentence, and fixed opinions. For example, **78%** of Buffalo Division survey respondents who believed Gendron should receive the death penalty reported that there was nothing he could present to convince them that he should receive a life sentence instead of the death penalty. In addition, **62%** reported that they could not meaningfully consider mitigating evidence that Payton Gendron was a vulnerable 18-year-old who was exposed to extreme white supremacy ideology online leading up to the shooting as justification for a of life sentence.  These findings are not measures of case awareness. They are measures of bias, the shift toward a presumption of death, and an unwillingness to consider mitigation.

Exhibit B at 4-5.

Additionally, it is not appropriate to ask questions about the presumption of innocence, application of the law, or ability to follow the court's directions. As explained in detail in Dr. Edelman's declaration, questions about the ability to follow the court's instructions or set aside bias lead to socially desirable responses and are not reliable. In fact, the American Society of Trial Consultants Professional Codes explicitly states <u>not</u> to include these questions in venue surveys.  *See* n. 4, *supra*, at Venue Surveys: Professional Standards, Section II, Basic Questionnaire Design, Subsection G, Questions to Measure respondents' Prejudgment of a Case ("Direct questions about a respondent's ability to be fair and impartial if called to be a juror in

the case should be avoided. Such questions and others that inquire whether the respondent can set aside prejudicial information and reach a verdict based on the evidence presented at trial yield inflated estimates of this ability.").  Exhibit B at 9-10.

The survey used multiple items to measure intransience and fixed opinions with regard to the death penalty:

- Is there something the defense could present that would convince you that Payton Gendron should receive life without the possibility of release instead of the death penalty? [Note: measures fixed opinion and shift to a presumption of death];
- Could you meaningfully consider this explanation from the defense as justification for a sentence of life in prison without the possibility of release instead of the death penalty? [Note: measures willingness to consider mitigation]; and
- How do you believe residents in your community or area would react if the jury did not sentence Payton Gendron to death? [Note: measures community investment and pressure to sentence Gendron to death].

Exhibit B at 10-11. The government does not seriously challenge the results of the survey data in the Buffalo Division.  As outlined in the results, the survey data demonstrated case awareness, personal connections, prejudgment, and strong opinions that the defense would have a difficult time overcoming. In fact, **78%** of those who believed Payton Gendron should receive the death penalty reported that there was *nothing* the defense could present that would convince them that he should receive a life sentence instead.  That is precisely the type of prejudgment that demonstrates a fair and impartial jury cannot be seated in the Buffalo Division.

And, the survey demonstrates that voir dire will not be an effective remedy, as has been recognized by several courts in which Dr. Edelman has conducted similar research. Exhibit B at 11-12.  Approximately 94% of Buffalo Division survey respondents later recognized at least one of the seven media items tested in the survey that they failed to recall in their open-ended answer to the question, "What have you read, seen, or heard about this case." On average, respondents recognized **3.8** additional media items that they failed to mention in their open-ended answer.

16

These examples highlight the need for the Court to disregard the government's elementary challenge to the survey data, or alternatively to conduct an evidentiary hearing so that testimonial evidence can be presented to explain fully the survey methodology and analysis of the data gathered.

## IV.    THE GOVERNMENT'S PROPOSAL OF COMPILING A DISTRICT-WIDE VENIRE FROM WHICH TO SELECT THE JURY WOULD AMOUNT TO AN IMPERMISSIBLE AMENDMENT TO THE DISTRICT'S JURY PLAN.

In its Response, the government urges the Court to attempt to remedy the prejudice that will ensue from conducting the trial in this district by expanding the pool from which the jury will be selected district-wide, to include residents of the Rochester Division. *See* ECF No. 521 at 15-17, 25-26. The government avers that it is "aware of no prohibition in the District's jury plan that prevents drawing from both Divisions." *Id*. at 26. In fact, the district's Jury Plan clearly specifies that the jury pool for a trial conducted in the Buffalo Division is to be drawn from specified data sources pertaining to residents of the counties that comprise that division. Employing the procedure advocated by the government would therefore amount to an impermissible de facto amendment to Jury Plan in violation of the Jury Selection and Service Act, 28 U.S.C. §§ 1861, et seq. ("JSSA").

The JSSA mandates that each district court adopt a written plan for the jury selection process that satisfies a number of specific substantive requirements for such plans. *See* 28 U.S.C. § 1863(a) ("Each United States district court shall devise and place into operation a written plan for random selection of grand and petit jurors that shall . . . comply with the provisions of this title"). The statute requires that a district's plan may be put in place only after "approval by a reviewing panel consisting of the members of the judicial council of the circuit and either the chief judge of the district whose plan is being reviewed or such other active district judge of that

17

district as the chief judge of the district may designate." *Id.* Additionally, modifications to the plan once adopted may be made only following "approval by the panel." *Id.* "Once adopted, the plan is intended to provide a uniform procedure for assembling jurors in that district court binding upon each district judge." *In re United States*, 426 F.3d 1, 6 (1st Cir. 2005).

The current Jury Selection Plan for the United States District Court for the Western District of New York ("Jury Plan") was revised in March 2025. The Jury Plan directs that:

> There being no statutory divisions in the Western District of New York, the District is hereby divided into two divisions for jury selection purposes only, as defined in 28 U.S.C. § 1869(e), as follows:
>
> 1. Buffalo Division – Counties of Erie, Genessee, Niagara, Orleans, Wyoming, Chautauqua, Cattaraugus, and Allegany – for sessions of Court held at Buffalo.
>
> 2. Rochester Division – Counties of Livingston, Monroe, Ontario, Seneca, Wayne, Yates, Steuben, Schuyler, and Chemung – for sessions of Court held at Rochester.

Jury Plan at 1.

The plan further directs that the names of prospective jurors be selected by the clerk "at random . . . from the voter registration lists of the political subdivisions within each Division of this District."[7] *Id.* at 2; *see also id.* at 3 ("Such random selections of names from the source list for inclusion in the master jury wheel . . . must ensure that the names of persons residing in each county within the jury division is substantially proportionately represented in the master jury wheel according to the number of registered voters in each county."). Those names are then to be placed in a Master Jury Wheel. *Id.* at 3. "There shall be a separate Master Jury Wheel for each of the two Divisions in the District." *Id.* Finally, "[f]rom time to time, as ordered by the Court, the Clerk of Court shall draw at random from the master jury wheel . . . the names of as many individuals as may be required for jury service for a particular jury division." *Id.* at 4.

---

[7] The lists may thereafter be supplemented with some or all additional data sources listed in the Jury Plan. *See id.*

Thus, pursuant to the Jury Plan, the jury pool for a trial conducted in the Buffalo Division must be drawn from the specified data sources pertaining to residents of the counties that comprise that division. *See United States v. Rodella*, No. CR 14-2783 JB, 2014 WL 4792598, at *5 (D.N.M. Sept. 15, 2014) (holding that similar jury plan "requires that a petit jury be drawn from the division in which the trial is held, and it does not provide for waiving or deviating from the Jury Plan"). In this respect, the Jury Plan for this district is materially different than the one at issue in *United States v. Grisham*, 63 F.3d 1074, 1078 (11th Cir. 1995), cited by the government, ECF No. 521 at 26. In that case, the district's jury plan expressly provided for a district-wide, rather than division-wide, jury pool. *Id.* at 1077. The Eleventh Circuit found that the adoption of such a plan violated no constitutional provision; it was not, however, called upon to address any deviation from the district's plan. *Id.*

Here, however, the government's proposal to expand the jury pool to the entire district for the purpose of this one case is in direct contravention of the Jury Plan. Such a course would amount to a de facto amendment of the Jury Plan that is prohibited by the JSSA. In *In re United States,* 426 F.3d at 4, 9, the First Circuit Court of Appeals granted a writ of mandamus to the government in connection with a federal capital prosecution in which the district judge had ordered the clerk to deviate from the jury selection procedure contained in the district's jury plan. It found that the trial court's order, directing the issuance of supplemental summonses in certain zip codes, violated the statutory command that "the district court as a whole and then the review panel . . . consider plan changes in the first instance," and granted the government's request to enjoin it. *Id.* at 9 (citing 28 U.S.C. § 1863(a)).

In so doing, the court rejected the district court's assertion of supervisory authority to depart from the jury plan, holding: "The court's supervisory power does not license it to ignore

an otherwise valid existing jury plan or to bypass the mechanism provided by statute to alter such plan. To allow otherwise would confer on the judiciary discretionary power to disregard the considered limitations of the law it is charged with enforcing." *Id.*  (quoting *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988)). *See also Rodella*, 2014 WL 4792598 at *9 (rejecting defendant's request for jury drawn from division other than one in which case was to be tried or entire district as contrary to district's binding jury plan). The government's proposal to expand the jury pool in this case to include residents of the Rochester Division is therefore prohibited by law.

Even if the Court were legally permitted to alter the Jury Plan as the government suggests, which it is not, drawing jurors from the entire Western District would not resolve the issues raised in Payton Gendron's Motion; at best, it dilutes them. Nor is the proposal that jurors from the farthest reaches of the Rochester Division be required to travel to Buffalo for weeks on end fair or reasonable.

In response to the defense argument that a disproportionate number of Black prospective jurors within the Buffalo Division may be disqualified for cause based on their proximity to the crime, the government counters that "Rochester contains substantial Black populations that do not share the concentrated proximity to the Tops location…." ECF No. 521 at 34. Combining the two divisions, however, would also add to the jury pool an overwhelming number of White potential jurors from the Rochester Division.[8] And the Black jurors from the Buffalo Division would still be disproportionately underrepresented after the exercise of cause challenges.

---

[8] The jury eligible population of the Rochester Division is 83.3% White and 9.07% Black or African American. *See* ECF No. 409-1 at ¶52.

The same logic applies to the toxic effect of pretrial publicity on the potential jurors in the Buffalo Division, i.e., more than half the potential jurors (those in the Buffalo Division) would still have been unduly influenced by the negative media attention, undermining Payton Gendron's right to a fair and impartial jury. Diluting the pool would fail to eliminate this contamination.

From a logistical perspective, the government's suggestion of drawing jurors from the entire District is also untenable because it would unfairly burden jurors from the Rochester Division, thereby reducing the number of potential jurors who are able to participate. Those jurors, some of whom would be required to travel more than 2.5 hours, one way, to reach the courthouse[9] will be disproportionately eliminated because of that distance. Moreover, jurors who do not have and/or cannot afford reliable transportation will also be excluded. Surely, this reasoning contributed to the creation of two separate divisions based on proximity to either Rochester or Buffalo. Engaging in a process that is sure to disproportionately exclude jurors from the Rochester Division defeats its ostensible purpose.

## V.    THE GOVERNMENT'S RESPONSE MISAPPREHENDS HOW INTERNET ALGORITHMS WORK AND WHY IT WILL BE HARDER TO INSULATE BUFFALO JURORS FROM PREJUDICIAL MEDIA DUE TO ITS PREVALENCE AND EASY ACCESSIBILITY ON THE INTERNET AND SOCIAL MEDIA.

As discussed in greater detail in the Supplement, internet algorithms make it more likely people in a particular geographic area (such as Buffalo) will see internet-based news coverage and commentary regarding events impacting that area than will people outside of it. *See* ECF No. 489 at 43-48. This is because, as is well documented in the studies cited in the Supplement, those algorithms "personalize" experiences by analyzing user behavior such as "likes", shares, and

---

[9] The Town of Chemung, for example, is approximately 154 miles from the Buffalo Courthouse; Elmira is only 10 miles closer.

watch time, as well as user location and relationships to other users, to predict what content will

keep users engaged. *Id*. at 46.

> In the context of a salient local event, residents are more likely to be connected to local sources and local networks that generate and circulate case-related content, and their platforms are more likely to infer local relevance. These factors increase the probability of repeated exposure among local residents relative to non-residents.

Declaration of Dominic DiFranzo[10] dated Feb. 2, 2026, at 3, attached as Exhibit C.

Despite the many studies cited in the Supplement, the government asserts there is no

support for the premise that internet algorithms drive content about local events to people in the

community where those events happen. ECF No. 521 at 23.  It suggests that the social media

companies themselves are the only appropriate source of evidence on this point. *Id*. This is

absurd. Unlike the academics and researchers whose studies the defense cites, social media

companies are driven by profit not science. Their algorithms are closely guarded secrets and "are

closely tied to the business models of the platforms that deploy them." Exhibit C at 3. On the rare

occasions social media companies publish information about their algorithms, that information is

frequently incomprehensible to outsiders.[11]

Nonetheless, it is well established that those business models led to the creation of

algorithms that increase attention and engagement with the platforms in order to increase

revenue and profit through advertising:

> Many major internet and social media platforms are substantially supported by advertising revenue, and their financial incentives increase when they can keep users' attention for longer periods and deliver more effective targeted advertising. As a result,

---

[10] Dr. DiFranzo is an Assistant Professor of Computer Science & Engineering at Lehigh University.  He has conducted extensive research and teaching in "social computing, online communities, and internet platform design, including how online systems shape information exposure, attention, and social behavior." Exhibit C, Appendix A.

[11] *See, e.g.,* Noah Giansiaracusa, "How the Secret Algorithms Behind Social Media Actually Work," Time Magazine (Aug. 7, 2025), available at https://time.com/7308120/secret-algorithms-behind-social-media/.

these systems are engineered to predict and maximize measurable engagement and to improve targeting performance, often by inferring user attributes, interests, and contexts (including location-related signals) that can be used to select and prioritize content most likely to capture attention. Peer-reviewed research in marketing and economics documents that targeting and personalization can materially affect advertising effectiveness and thus platform profitability, and that the use of personal data and privacy tradeoffs are integral to this advertising-supported ecosystem.

Exhibit C at 3. And, as noted elsewhere, people are more likely to be connected to local sources and local networks that generate and circulate content related to local events and, thus, their platforms are more likely to infer local relevance and interest and push content accordingly. *Id*.

In seeking to rebut the assertion that Buffalo jurors are more likely to be exposed to prejudicial media online than jurors outside Buffalo, the government relies on selected portions of Dr. Edelman's survey while ignoring others. ECF No. 521 at 23. The government notes that more Buffalo survey respondents reported never listening to media reports online than reported doing so daily. *Id*. However, it ignores the survey findings that nearly 68% of Buffalo respondents talked about this case "with [their] family, friends, or co-workers, or discussed it online, for example, on social media" and 65% heard others discuss the case in person or online. ECF 489, Ex. B at 10-11. This exposure matters. As noted elsewhere in the survey most Buffalo respondents exposed to pretrial publicity regarding this case favored the death penalty for Payton Gendron. ECF 489, Ex. A at 33 ("(59%) of survey respondents who had read, seen, or heard statements from the victims' families about the shooting or their loss favored the death penalty."). Equally troubling, "[a]pproximately 73% of those who recognized this media item reported that there was nothing the defense could present that would convince them that Gendron should receive a life sentence instead of the death penalty." *Id*.

As discussed extensively in the Supplement, because of the way social media algorithms work, internet users are exposed to prejudicial media, community discussions, and other pretrial

publicity related to events in their community regardless of whether they seek it out. "News

exposure in the United States is now frequently ambient and incidental: many individuals

encounter news while using online platforms primarily for other purposes, such as entertainment,

social connection, or shopping." Exhibit C at 1.

> Algorithmic ranking and personalization increase the likelihood that residents of a
> particular geographic area will be exposed to online coverage and discussion of locally
> salient events more often than people outside that area. Local relevance and local network
> activity are commonly used signals in content selection and ranking.
>
> As a result, local residents often do not need to seek out local news. Instead, they can be
> repeatedly exposed through feeds, recommended modules, and notifications, as well as
> through social sharing within local networks. This dynamic also makes sustained
> avoidance during trial more difficult than in legacy media environments.
> Ignoring the numerous independent research articles the defense cites in its supplement,

*Id.*

The government's assertion that "jury selection is not an exercise in investigating social

media algorithms" further misses the point. ECF No. 521 at 23. The point is that social media

algorithms exponentially increase potential jurors' exposure not only to mainstream media but

also to other users' inflammatory and highly prejudicial commentary about relevant events.

> Online platforms routinely provide user comment features and social feedback
> mechanisms (likes, shares, replies). The result is that case-related reporting is often
> accompanied by user-generated commentary that may include speculation,
> misinformation, and expressions of strong bias. Experimental research indicates that
> hostile or uncivil comments can affect readers' interpretations and perceptions. In
> practical terms, the same news item may be encountered alongside inflammatory
> commentary that can heighten emotional response and shape impressions beyond the
> factual content of the reporting.

Exhibit C at 3. It also substantially increases the risk that jurors selected to decide this case will

be exposed to such information even if they do not seek it out or actively work to avoid it. This

exposure, and the community's knowledge and sentiment about this case have created an

atmosphere in which it is highly improbable that Payton Gendron can receive a fair trial in Buffalo.

Finally, the government's assertion that internet algorithms are just as likely to flood New York City with media regarding this case if the trial is moved there is not only speculative and unsupported, it is also contrary to what we know about algorithms.  ECF No. 521 at 26-28. Algorithms direct content based not only on a user's current location, but also on their prior usage and engagement as well as the usage and engagement of the people they have interacted with online.  As shown by the community survey results, potential Southern District jurors have not been following media coverage of the May 14, 2022, shootings as closely as the Buffalo residents directly impacted by the crime have.  ECF No. 489, Ex. B at 9-11. Moreover, New York City is a significantly larger metropolitan area than Buffalo (with a population of 8.5 million versus 1.2 million people)[12] and much more is happening there.[13] Thus, even if the trial were to generate local coverage in the Southern District, there is so much more for recommendation algorithms to choose from, including events and topics that have interested New York City residents for extended periods of time and thus have already shaped and focused algorithmic personalization in the area.

---

[12] See ECF 489, Ex. C, ¶ 12 (Buffalo population); https://www.census.gov/quickfacts/fact/table/newyorkcitynewyork,NY/PST045224#PST045224 (NYC population).

[13] For example, the state and federal proceedings against Luigi Mangione for the shooting of a healthcare executive in Manhattan has generated significant media attention and are progressing on a similar timeline as this case. *See* Aaron Katersky and Tonya Simpson, "Luigi Mangione latest: Death penalty off the table, judge rules," ABC News (Jan. 30, 2026) (Mangione's federal trial scheduled to begin Oct. 13, 2026), available at https://abcnews.go.com/US/luigi-mangione-latest-judge-rule-death-penalty-stays/story?id=129677290; Michael R. Sisak, "DA seeks July trial in Luigi Mangione's state murder case, with his federal trial slated for fall," apnews.com (Jan. 28, 2026), available at https://apnews.com/article/luigi-mangione-unitedhealthcare-murder-trial-new-york-6f36ab979a4e82fe6e2d840416bcdbcc.

While it may be argued that, because major online platforms use algorithmic ranking and personalization, prospective jurors in New York City would be as likely to be targeted with case-related publicity as prospective jurors in Buffalo if venue were transferred, in my opinion, this overstates the equivalence between these two jury pools. Algorithmic targeting is not only driven by geographic location, but by a wide array of behavioral signals including prior attention and engagement (like reading articles, watching video, or writing a comment). Online platforms use this data to predict what will keep a given user viewing, clicking, and sharing. In a case that is locally salient over an extended period, residents in the originating region are more likely, on average, to have accumulated a multi-year history of direct and indirect engagement signals (e.g., clicks, watch time, searches, shares, or repeated exposure through friends and local pages) that can cause platforms' systems to treat the topic as personally relevant and therefore worthy of repeated placement.

Exhibit C at 5. For these reasons, the government's argument that "a Southern New York jury stands just as great a risk as a Western District jury of being improperly subjected to improper media" is without merit.

In sum, internet algorithms make it more likely that jurors in Buffalo will be exposed to prejudicial publicity during trial than would jurors in communities that were not personally impacted by the shootings. Additionally, Buffalo jurors are more likely to have friends, neighbors, and other social media contacts who will closely watch the trial and potentially share information and opinions on social media, through texts or emails, or even in person. Given how uniformly prejudicial to the defense social media posts and comments about this case have been to date, it is highly likely coverage during the trial will be equally prejudicial. Thus, a change of venue to the Southern District of New York is necessary to safeguard Payton Gendron's right to a fair trial.

## VI.    CONCLUSION

For all these reasons and those given in his Motion and Supplement thereto, ECF Nos. 308 and 489, Payton Gendron moves the Court for an evidentiary hearing on his Motion for

Change of Venue, and, at the conclusion of said hearing, for a change of venue to the Southern

District of New York.

Dated: February 2, 2026
       Buffalo, New York

                                        _s/Sonya A. Zoghlin_
                                        Sonya A. Zoghlin
                                        Assistant Federal Public Defender

                                        _s/MaryBeth Covert_
                                        MaryBeth Covert
                                        Senior Litigator

                                        _s/Julie Brain_
                                        Julie Brain
                                        Attorney at Law

                                        _s/Theresa M. Duncan_
                                        Theresa M. Duncan
                                        Law Office of Theresa M. Duncan LLC