UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.                                                    22-CR-109 (LJV)
                                                      Redacted Version of ECF No. 530

PAYTON GENDRON,

                    Defendant.

---

## MOTION FOR INTRADISTRICT TRANSFER FOR TRIAL
## PURSUANT TO FED. R. CRIM. P. 18

Payton Gendron, through undersigned counsel, moves this Court, pursuant to the Fifth,

Sixth, and Eighth Amendments to the United States Constitution, and Fed. R. Crim. P. 18, for an

intradistrict transfer from the Buffalo Division to the Rochester Division for trial. He submits

that, in his Motion to Transfer Venue Pursuant to Federal Rule of Criminal Procedure 21 and the

Fifth, Sixth, and Eighth Amendments to the United States Constitution, ECF No. 308,

supplemented by ECF Nos. 489 and 525, he has clearly shown that a change of venue to the

Southern District of New York is required by the Constitution and Fed. R. Crim. P. 21(a).

In its papers, the defense has shown that the saturation of the Western District by

prejudicial pretrial publicity, the devastating impact of the crimes on the Buffalo community and

the region as a whole, and the history of systemic racism and discrimination in the City of

Buffalo preclude the possibility that a fair, impartial and diverse jury can be seated if the case is

tried in this district. *See id.*

As of this filing, the Motion to Transfer Venue remains pending. Due to timing

considerations, and in an abundance of caution, the defense submits now a request for secondary

relief pursuant to Federal Rule of Criminal Procedure 18.[1] Should the Court deny the request to conduct the trial in the Southern District, the defense seeks at least an intradistrict transfer to the Rochester Division. The availability of such a transfer is governed by Fed. R. Crim. P. 18, which requires only that the place of trial be set "within the district with due regard for the convenience of the defendant, any victim, and the witnesses, and the prompt administration of justice." Factors relevant to the decision to transfer a case within-district under Rule 18 weigh in favor of transfer here, including: (1) the greater saturation of the Buffalo Division with prejudicial pretrial publicity as compared to the Rochester Division; (2) the higher incidence of bias, prejudgment and personal connections to the crime amongst jury-eligible residents of the Buffalo Division, as demonstrated by the results of a community survey of both divisions; (3) the significantly greater possibility of seating a diverse jury that is representative of the community if the case is tried in Rochester; and (4) the salutary effects on the prompt administration of justice resulting from a shorter and more efficient jury selection process in that location.

A transfer to Rochester will concededly result in inconvenience to the Court, the parties, some witnesses, and the families of the victims. However, this inconvenience is clearly outweighed by the tangible and significant array of advantages outlined above. Analysis and weighing of the various considerations as required by Rule 18 thus compels the conclusion that the trial of this case is most appropriately held in the Rochester Division.

---

[1] Because many of the factual issues set forth in the prior pleadings are relevant to the present Motion, rather than repeat their voluminous content here, counsel have endeavored to incorporate relevant portions by reference wherever possible.

I.      **AN INTRADISTRICT TRANSFER SHOULD BE ORDERED BECAUSE CONSIDERATION OF ALL RELEVANT FACTORS UNDER FED. R. CRIM. P. 18 COMPELS THE CONCLUSION THAT THE CASE WOULD BE MORE APPROPRIATELY TRIED IN THE ROCHESTER DIVISION.**

       a.    **Under Fed. R. Crim. P. 18, the Court is Afforded Broad Discretion to Order Intradistrict Transfer if, After Weighing the Relevant Factors, it Finds that Such Transfer is Appropriate.**

The determination of where within a district a criminal trial should be held is governed by Fed. R. Crim. P. 18. The Rule states:

> Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed. The court must set the place of trial within the district with due regard for the convenience of the defendant, any victim, and the witnesses, and the prompt administration of justice.

*Id.*

As noted elsewhere, *see* ECF Nos. 308, 489, a court may grant a defendant's motion to change venue to another district under Fed. R. Crim. P. 21(a) only upon a finding that the defendant cannot obtain a fair and impartial trial in the original venue. Under Rule 18, however, "[a] district judge has broad discretion in determining where within a district a trial will be held." *Unted States v. Stanko*, 528 F.3d 581, 584 (8th Cir. 2008); *see also United States v. Balistrieri*, 778 F.2d 1226, 1229 (7th Cir. 1985) (same) (citing *United States v. Truglio*, 731 F.2d 1123, 1130 (4th Cir. 1984)); *United States v. Dickie*, 775 F.2d 607, 609 (5th Cir. 1985) (same).

Accordingly, under L.R. Crim. P. 7 (a), the Court "may transfer a case among Judges and/or within the District, *sua sponte."* L.R. Crim. P. 7 (a). A party may also request a transfer from one division to the other by "a written motion requesting such relief, returnable before the Judge to whom the case is originally assigned." *Id.* The Court is required only to give due consideration to relevant facts, including those specified in Rule 18. *See Balistrieri*, 778 F.2d at 1229 (noting that ruling under Rule 18 "will not be overridden on appeal as long as the court

gives 'due consideration' to the facts listed in Rule 18") (quoting *Truglio*, 731 F.2d at 1130); *see also Dickie*, 75 F.2d at 610 ("[i]n deciding whether to transfer venue, the trial court must balance the statutory factors of the convenience of the defendant and witnesses and the prompt administration of justice"); *Stanko*, 528 F.3d at 584-85 (reversing denial of defendant's motion for intradistrict transfer where there was "no evidence in the record that the district court undertook any consideration of the convenience of the defendant or witnesses or the prompt administration of justice"); *United States v. Scholl*, 166 F.3d 964, 970 (9th Cir. 1999) (affirming decision to transfer within district under Rule 18 where "court considered the relevant facts" including travel options for witnesses).

Where relevant, courts also consider factors in addition to those stated in Rule 18, including the impact of pretrial publicity on the jury pool, even where the evidence thereof is deemed insufficient to require a change of venue under Rule 21(a). *See United States v. Mase*, 556 F.2d 671, 675-76 (2d Cir. 1977) (affirming *sua sponte* transfer within district under Rule 18 based on pretrial publicity as appropriate way to accommodate public's right to speedy and public trial with defendant's right to fair one); *Dickie*, 75 F.2d at 610 (holding that district court correctly considered effects of pretrial publicity when ordering within-district transfer under Rule 18); *Scholl*, 166 F.3d at 970 (affirming transfer decision based in part on substantial pretrial publicity in original division); *United States v. Addonizio*, 451 F.2d 49, 61-62 (3d Cir. 1971) (affirming trial court's denial of motion for interdistrict change of venue under Rule 21(a) but *sua sponte* transfer to another division under Rule 18 to minimize effects of pretrial publicity); *United States v. Joyce,* CR. No. 07-31 Erie, 2008 WL 2367307, *2-4 (W.D. Pa. June 10, 2008) (granting defense motion for intradistrict transfer from Erie to Pittsburgh based in part on pretrial publicity, noting that the government's opposition "might prevail were this a question of whether

4

venue should be transferred to another district"); *United States v. Pirk*, 284 F. Supp. 3d 398, 419 (W.D.N.Y. 2018) (considering argument regarding pretrial publicity in support of request for within-district transfer but rejecting based on paucity of evidence).

In particular, courts consider the adverse impact of extensive pretrial publicity on the ability to complete the voir dire process in a timely and efficient manner. In *Balistrieri*, 778 F.2d at 1229, the circuit court commended the district court for "act[ing] quite prudently" by ordering an intradistrict transfer for jury selection from Milwaukee to Green Bay, based on "ample reason . . . to be concerned about the ability of the parties to select quickly an unbiased jury." The court specifically credited the district court's finding that, in light of pretrial publicity, selecting jurors in Milwaukee "would unduly elongate the procedure and conceivably diminish the quality of those willing to serve." *Id.* A similar conclusion was reached by the district court and affirmed on appeal in *Addonizio*, 451 F.2d at 61 (holding district court's determination that, "in view of the concentration of public interest and news coverage in the Newark area, the court is convinced that the jury selection process will be facilitated by the transfer of these proceedings," and that this interest "clearly outweighed" any inconvenience to defendants or witnesses).

In the final analysis, after weighing each factor, the Court should grant an intradistrict transfer if it determines that "all relevant things considered, the case would be better off transferred to another division." *United States v. Mosby*, No. 22-cr-00007-LKG, 2023 WL 5879294, at *21 (D. Md. Sept. 11, 2023) (internal quotations and alterations omitted); *see also United States v. Chitolie*, 1:09-cr-0026; 3:10-cr-0020, 2010 WL 2384550, at *3 (D.V.I. June 8, 2010) (same); *United States v. Schock*, No. 16-cr-30061, 2016 WL 7156461, at *2 (C.D. Il. Dec. 7, 2016) (same); *United States v. Christensen*, No. 17-cr-20037-JES-JEH, 2018 WL 6382050, at

*3 (C.D. Il. Dec. 6, 2018) (same). In *Mosby*, the district court granted the defendant's request for a transfer for trial from the Northern to the Southern Division of the District of Maryland. 2023 WL 5879294 at *5-8. The request was based primarily upon a claim of bias in the jury pool in the Northern Division due to pretrial publicity. *Id.* at *2, 6-7. To assess bias, the court relied upon the expert analysis and opinions of Dr. Bryan Edelman, the defense expert in this case. *Id.* at *2, 6-7.

As here, Dr. Edelman conducted an analysis of the media coverage that had appeared in print, on television and in social media. *Id.* at *2. Also as here, he found that, while some of the coverage simply reported the facts as alleged in the indictment, the Northern Division had also been saturated with prejudicial content that included information inadmissible at trial. *Id.* Dr. Edelman also conducted a community survey to assess the knowledge and opinions about the case held by residents of both districts. *Id.* at 2-3.

Applying the standard above, the court first considered the evidence of prejudice. *Id.* at *5-7. It concluded that, based on Dr. Edelman's analysis, the defense had shown "that the pretrial publicity about this has, to a degree, had a more negative impact on the views held about the Defendant and this case by potential jurors residing in the Court's Northern Division, when compared to their counterparts in the Court's Southern Division." *Id.* at *6. It cited in particular the survey finding that 45% of Northern District respondents described the defendant as "somewhat" or "very corrupt," whereas only 26% of those from the Southern District did so. *Id.* at *6-7. "Given the almost 20 percentage point disparity between the survey results for the two divisions on this question, the Defense argues with persuasion that there are more negative views held about the Defendant among potential jurors residing" in the respective divisions. *Id.* at *7.

The court also found evidence of a greater presumption of guilt in the Northern Division than the Southern, though it deemed the survey figures "not as convincing." *Id.* It also characterized other aspects of the survey results as "show[ing] relatively modest differences between the attitudes of potential jurors in the two divisions." *Id.*

> But, overall, the survey results consistently show that Northern Division respondents hold a more negative view of the Defendant than their Southern Division counterparts. And so, on balance, the data provided by the Defense shows that the pool of potential jurors in the Southern Division would hold less bias against the Defendant. For this reason, **the impact of the pre-trial publicity about this case weighs in favor of a transfer of venue** to the Court's Southern Division.

*Id.* (emphases added).

The court then went on to consider the factors explicitly included in Rule 18. *Id.* at *7-8. As to the convenience of the defendant, the factor was deemed neutral as the defense had requested the transfer. *Id.* at 7. The convenience of the witnesses, the court found, also did not weigh for or against transfer. *Id.* at 7-8. Several witnesses lived out of the district altogether, and thus would be unaffected by a within-district transfer, while even those who lived in the Northern Division would be required to travel only about 30 miles to the Southern Division courthouse. *Id.* at 8. The prompt administration of justice could have been threatened if transfer to the Southern Division would have necessitated a delay of the trial, but the Court found no delay would be required. *Id.* Accordingly this factor, too, was deemed neutral. *Id.* And finally, the court found that there were "adequate facilities and security to hold the trial in this case in either of the Court's two divisions," and so once again the factor was found to "neither weigh significantly for or against" transfer. *Id.*

In the end, the court concluded that, in light of the survey results indicating that pretrial publicity had had a comparatively more negative impact in the Northern Division than in the

Southern Division, "the Defendant has shown that, all relevant things considered, this case would be better off transferred to the Court's Southern Division. And so, for this reason," transfer was ordered. *Id.* at 8. This was so even though the court acknowledged that it had already taken steps to protect the defendant's right to a fair and impartial jury, including developing a juror questionnaire, issuing a gag order to counsel for both parties, and carefully crafting instructions for the jury. *Id.* at *6. Consideration of the relevant factors in this case compels the same conclusion.

      **b.  The Impact of the Crime and the Ensuing Deluge of Pretrial Publicity has Demonstrably Resulted in Significantly More Negative Beliefs and Opinions About Payton Gendron in the Jury Pool of the Buffalo Division Than in the Rochester Division and Weighs in Favor of Transfer.**

The results of the survey conducted by Dr. Bryan Edelman in this case reveal that the combination of massive amounts of publicity and the profound impact of the crime on the Buffalo community has resulted in an even starker difference in measurable bias between the two divisions than was present in *Mosby*. The jury pool in the Buffalo Division has been saturated with extensive prejudicial pretrial publicity surrounding this crime, which generated massive media coverage and sparked an outpouring of support for the victims and the community. *See* Exhibit A at 10-31; *see also* ECF No. 489 at 3-70; ECF No. 308. Community survey results confirm that this media coverage has had a significant, negative impact on the jury pool in the Buffalo Division. *See* Exhibit A at 31-39.  In contrast, as the government correctly observes, "[t]he survey results from Rochester show substantially lower levels of case recognition, decreased emotional proximity, less detailed knowledge of reported facts, and lower rates of fixed opinions about punishment." *See* ECF No. 521 at 30.

1. **Potential Jurors in the Rochester Division Have Been Exposed to Significantly Less Publicity About This Crime Because the Divisions Do Not Share the Same Media Market**

Though relatively close geographically, the Rochester and Buffalo Divisions do not share

the same media market as captured in the figure below. As a result, the Rochester Division has

seen far less prejudicial pretrial publicity related to the Tops Market Shooting.



Source: The Nielsen Company, *Nielsen DMA--Designated Market Area Regions 2018-2019, https://thevab.com/storage/app/media/Toolkit/DMA_Map_2019.pdf.* [2]

Notably, virtually the entire Buffalo Division, and none of the Rochester Division, falls within

the same Designated Market Area (#52). This separation is reflected in the striking differences

---

[2] A Designated Market Area (DMA) is an exclusive geographic region defined by Nielsen, an audience measurement and analytics company, in which local television stations account for a majority of viewing. There are 210 DMA regions in total across the United States. DMAs are heavily relied upon for audience measurement, advertising, and media planning. Each DMA is bounded by a blue border on the map and labeled with its DMA region name. *See* The Nielsen Company, *Need to know: What is a Designated Market Area (DMA®), and Why Does it Matter?* (March 2025), https://www.nielsen.com/insights/2025/what-is-a-designated-market-area-and-why-does-it-matter/.

between media exposure and related opinions between the two divisions according to the survey results discussed below.

### 2. The Survey Data Reflects a Marked Disparity Between Knowledge, Attitudes, and Bias Between the Buffalo and Rochester Divisions

Dr. Edelman's community attitude survey revealed that there is a bias against Payton Gendron in the Buffalo Division so great it poses a risk to his due process rights and the ability to seat a fair and impartial jury. Exhibit A at 51. In contrast, the comparison survey conducted in the Rochester Division indicates that bias is not as severe or pervasive as it is in the Buffalo Division; several areas of inquiry supported this conclusion.

#### a. Case Recognition

The community survey results show that **90%** of respondents in the Buffalo Division were familiar with the case, which increased to **100%** for those who regularly watch the news and read a newspaper. *Id*. at 31. In contrast, approximately **72%** of Rochester Division survey respondents were familiar with the case, *18 points lower* than their counterparts in the Buffalo Division. *Id*. at 51.

#### b. Case Knowledge

Prospective jurors in the Buffalo Division have a significantly deeper familiarity with this case. Approximately **80%** of survey respondents recognized at least three of seven media items tested in the survey, while just **63%** of Rochester survey respondents recognized three or more of those media items — *17 points lower* than in the Buffalo Division. *Id*. at 4; *see also id*. at 39 (noting the disparity in familiarity with specific details). Dr. Edelman explains that, as case knowledge is significantly related to bias, "familiarity with such incriminating details is particularly concerning." *Id.* at 32.

c.  <u>Statements by Public Officials</u>

Approximately **54%** of Buffalo Division survey respondents had heard statements made by public officials about the shooting; in the Rochester Division that total dropped to **43%**. *See* ECF No. 489, Ex. B at 10. Similarly, in the Buffalo Division, **68%** of respondents recalled hearing statements from the victims' family members; for Rochester Division respondents that number dropped by *21 percentage points*, to **47%**. *Id*.

d.  <u>Presumption of Death</u>

Perhaps most significantly, prospective jurors in the Buffalo Division maintained a "presumption of death." Fifty-six percent (**56%**) of survey respondents who recognized the case reported that Payton Gendron should be sentenced to death if he is convicted of first-degree murder, compared to thirty-two percent (**32%**) who believed he should receive a life sentence. *Id.* at 32. In the Rochester Division, respondents were equally divided between life and death: **43%** of respondents who recognized the case had concluded that Payton Gendron should be sentenced to death (*13 percentage points lower* than Buffalo) and **44%** believed he should receive a life sentence, *twelve-points lower t*han Buffalo. *See* ECF No. 489, Ex. B at 7.

e.  <u>Fixed Opinions</u>

Prospective jurors who favored death demonstrated strong fixed opinions, with approximately **78%** in the Buffalo Division reporting that there was nothing Payton Gendron could present to convince them that he should receive a life sentence instead of the death penalty. *See* Exhibit A at 31. The percentage of fixed opinions drops in the Rochester Division by 9 points, to **69%**, which, when coupled with a lower case recognition rate of 72%, demonstrates a significantly lower rate of fixed opinions. *See* ECF No. 489, Ex. B at 8. Thus, the overall

percentage of respondents who held fixed opinions that Payton Gendron should be sentenced to death was significantly lower in the Rochester Division than in the Buffalo Division.

### f.   Personal Connections

The survey data also reveals that survey respondents in the Rochester Division had significantly fewer personal connections to the crime. Approximately **25%** of survey respondents in the Buffalo Division who recognized the case reported that they or someone they knew were directly or indirectly affected by the shooting, as compared to only **9%** of respondents in the Rochester Division, *a 16-point difference*. **50%** of respondents in the Buffalo Division were personally familiar with the Tops Market where the shooting occurred as compared to **21%** of Rochester respondents, *a 29-point difference*. In Buffalo, **31%** reported that they or a family member had shopped at the Tops Market, Exhibit A at 34, compared to **12%** in Rochester, *19 percentage points lower. Id*. at 39; ECF No. 489, Ex. B at 12.

### g.   Impact on the Community

**78%** of respondents in the Buffalo Division who knew about the shooting have talked about it or heard others talking about it in person or online. Approximately **85%** of survey respondents have seen or heard something about the Buffalo community's response to the shooting, and **32%** reported that they or someone close to them contributed to the efforts to assist the victims. *See* Exhibit A at 34. In contrast, in the Rochester Division, **62%** of respondents who knew about the shooting have talked about it or heard others talking about it in person or online; **52%** have seen or heard something about the Buffalo community's response to the shooting, *33% points lower* than in the Buffalo Division; and just **9%** in Rochester reported that they or someone close to them contributed to the efforts to assist the victims, *a 23 point difference from Buffalo. Id*. at 38-39.

Based on the extensive, prejudicial pretrial publicity in the Buffalo Division; the comparison of the community survey data between the Buffalo and Rochester Divisions; the social science literature regarding the effect of pretrial publicity and the limitations of voir dire as a tool for assessing the full extent of prospective jurors' case knowledge in high profile cases, Dr. Edelman concludes, as he did in *Mosby,* that remedial measures are necessary to protect the defendant's constitutional right to a fair and impartial trial, and that those interests would be served by a transfer of this matter to the Rochester Division for trial. Ex. A, at 50 – 52.

### c. It is Far More Likely That a Diverse Jury Reflecting the Makeup of the Buffalo Community Can Be Seated in the Rochester Division and This Factor Weighs in Favor of Transfer.

A separate, but equally important, source of prejudice that will result if the trial is held in Buffalo is the adverse impact on the ability to seat a diverse and representative jury. In his Motion to Transfer Venue, ECF No. 308, and related pleadings, ECF Nos. 489, 525, Payton Gendron demonstrated that jury selection in this case will likely result in the disqualification of most African American potential jurors and the selection of an all-White jury if this case is tried in the Buffalo Division. *See* ECF No. 489 at 70-100. That is because nearly half of Black potential jurors in the entire Buffalo Division live on the East Side of the City of Buffalo, where this crime was committed. Significantly more are strongly connected to friends or family members who live there and/or were deeply and personally affected by this crime. *Id.* As a result, Black prospective jurors are disproportionately likely to be excused for cause.

In contrast, Black potential jurors in the Rochester Division are significantly less likely to have deep connections to the neighborhood where this crime occurred or have been personally affected by it, as survey results confirm. *See* Section I.b.2.f-g, *supra*. The government acknowledges that this is the case. *See* ECF No. 521 at 30 ("The survey results from Rochester

show . . . decreased emotional proximity" among potential jurors there); *id.* at 34 ("Rochester contains substantial Black populations that do not share the concentrated proximity to the Tops location.").

As noted in Payton Gendron's Motion to Dismiss the Indictment under the Fifth and Sixth Amendments to the United States Constitution and 28 U.S.C. §1861, et seq. (the "JSSA"), the two divisions are similar in both size and demographic composition. *See* ECF No. 409-1. Specifically, the jury eligible population of the Buffalo Division is approximately 1,208,467. Of these individuals, 84.07% are White; 8.85% are Black or African American; 0.51% are American Indian or Alaska Native; 1.61% are Asian, 0.02% are Native Hawaiian or Pacific Islander; 1.82% are of some other race; and 3.12% are multi-racial. In addition, the jury eligible population in the Buffalo Division is 4.15% Hispanic or Latino; 48.74% Male; and 51.26% Female. *Id.* at ¶24.

In comparison, the jury eligible population of the Rochester Division consists of approximately 987,522 people. Of these individuals, 83.30% are White; 9.07% are Black or African American; 0.18% are American Indian or Alaska Native; 1.77% are Asian, 0.03% are Native Hawaiian or Pacific Islander; 1.90% are of some other race; and 3.75% are multi-racial persons. The jury eligible population of the Rochester Division is 5.71% Hispanic or Latino persons; 48.68% Male; and 51.32% Female. *Id.* at ¶52. A transfer to the Rochester Division, therefore, where Black potential jurors are not similarly and disproportionately subject to excusals for cause, would significantly enhance the likelihood of a diverse jury in this case. This factor, too, then, weighs in favor of transfer.

14

**d.** **Due to the Relative Proximity and Accessibility of the Rochester Courthouse, Considerations of Convenience for the Court, Parties, Witnesses, Victims and Victims' Families Are Outweighed By the Other Relevant Considerations.**

Although it would undoubtedly raise some additional logistical issues for the Court and its staff, counsel, witnesses and the victims' families, transfer of the case to Rochester for trial will not unduly burden those participants and thus this factor weighs modestly against transfer. In this context, courts have looked to the distance and travel conditions between divisions in assessing the extent to which inconvenience weighs against a transfer. In *Joyce,* for example, the court concluded that a transfer would not "unduly burden or inconvenience" the parties or witnesses given that "[t]he Erie Courthouse is just 128 miles from the Pittsburgh Courthouse and connected by Interstate Highways." *Joyce,* 2008 WL 2367307, *4. *See also United States v. Mathis*, No. 3:14CR00016, 2015 WL 5012159, at *4, (W.D. Va. Aug. 21, 2015) (granting intradistrict transfer from Charlottesville to Roanoke, a distance of approximately 121 miles, finding that although "Roanoke will be a longer drive for some victims and witnesses . . . any inconvenience . . . is outweighed by . . . other relevant factors"); *Christensen*, 2018 WL 6382050, at *3 (granting intradistrict transfer from Urbana to Peoria, noting that "the Peoria courthouse is only about 93 miles – an hour and a half drive – from the Urbana courthouse"); *Addonizio*, 451 F.2d at 61-62 (approving intradistrict transfer from Newark to Trenton, a distance of approximately 50-60 miles via I-95, which would not "unduly burden or inconvenience either the defendants or the witnesses").

The distance between Rochester and Buffalo is significantly less than in *Joyce*, *Mathis*, and *Christensen*, and equivalent in travel time to *Addonizio*. As the Court well knows, Rochester and Buffalo are approximately 75 miles apart and the travel time by car is usually 75 minutes, almost entirely on the New York State Thruway (I-90). Though judges in this district are

ordinarily assigned cases in one of the two divisions, it is not uncommon for a judge located in one division to preside over a trial in the other. Court staff, attorneys and other parties routinely travel between the two courthouses for court appearances and trials.

The trial teams for both sides have members who live outside of the district entirely. For them, the existence of an international airport in Rochester means that travel there is no more burdensome than travel to Buffalo. *See, e.g., Scholl*, 166 F.3d at 970 (noting that transfer from Tucson to Phoenix made more daily flights available to out-of-state witnesses). There are also a number of public transportation options available between Buffalo and Rochester city centers, including frequent, regularly scheduled trains and buses. *See, e.g., United States v. Nyah*, 35 F. 4th 1100, 1107 (8th Cir. 2022) (affirming within-district transfer decision where district court acknowledged the "inconvenient distance" for defendant's family and spectators created by transfer from Eastern Division (Davenport) to Central Division (Des Moines) of Southern District of Iowa, 170 miles away, but found that "public transportation mitigated the inconvenience"); *compare United States v. Fernandez*, 480 F.2d 726, 730 (2d. Cir. 1973) (decrying decision to transfer case from Brooklyn to courthouse 26 miles away "without public transportation").

The inconvenience of a transfer to Rochester can also be minimized by providing transportation from Buffalo to the Rochester Courthouse and overnight lodging when appropriate. In addition, a closed-circuit video feed from the Rochester Courthouse to a courtroom in Buffalo could certainly be arranged to permit victims' families and spectators to observe the proceedings in Buffalo without the need to travel if they so choose. Indeed, based on the public interest in this trial and previous court appearances, and the experiences in other high-profile federal capital prosecutions, it is likely that some spectators will be required to watch the

16

trial via video from an "overflow" courtroom due to space restrictions no matter where the trial is held.

Finally, it is also the case that the jail facility in which Payton Gendron is held is significantly closer to the Rochester Courthouse than it is to the Buffalo Courthouse. Specifically, while the jail is 65 miles, or approximately an 80-minute drive from the Buffalo Courthouse, it is only 37 miles, or an approximately 40-minute drive, from the Rochester Courthouse. Conducting the trial in Rochester would therefore result in a significant reduction in travel time and expenses for the United States Marshal Service when transporting Payton Gendron back and forth to court. *See Mathis*, 2015 WL 5012159 at *4 (finding that closer proximity of jail facility housing defendants and incarcerated witnesses to transferee division weighed in favor of transfer).

### e. Transfer to the Rochester Division Will Affirmatively Promote the Prompt Administration of Justice.

No negative impact on the Rule 18 consideration of "the prompt administration of justice" will result from transfer to Rochester for trial; if anything, the efficiency of the proceeding will be slightly increased. As in *Mosby*, 2023 WL 5879294, at *8, no delay in the start of the trial will be necessary due to the switch in locations. Additionally, because of the lower rates of exposure to pretrial publicity, bias and preconceived opinions, and personal connections to the crime and victims in the jury pool, the jury selection process will be streamlined significantly.

As noted above, the relative ease of seating a fair and impartial jury in an alternate location within the district is a relevant factor in the transfer decision. *See Balistrieri*, 778 F.2d at 1229 (affirming trial court finding that, in light of pretrial publicity, selecting jurors in transferor division "would unduly elongate the procedure"); *Addonizio*, 451 F.2d at 61 (noting district

court's determination that jury selection process would be facilitated by transfer). In *Mathis*, 2015 WL 5012159 at *3, the district court's decision to transfer was based in part on the fact that "because of the extensive publicity . . . [it had] been advised that a much larger jury pool would have to be assembled in the Charlottesville Division in order to seat a fair and impartial jury." Thus, the jury selection process would "consume judicial resources [and] protract the trial proceedings" absent transfer. *Id.*

The same is true here. For the purpose of selecting a jury in the Buffalo Division, the parties have requested that the Court issue summonses to a sufficient number of individuals from the Master Jury Wheel to ensure approximately 1,000 to 1,200 prospective jurors remain to fill out the Special Juror Questionnaire after individuals who fail to respond or are unqualified and/or exempt from service are released. *See* ECF No. 271 at ¶ 2. Based upon the results of Dr. Edelman's survey, however, selecting a jury in the Rochester Division could be accomplished by summoning only sufficient individuals to ensure 800-1000 jurors are available to complete questionnaires. That is so because of the difference between the percentage of survey respondents who reported being directly or indirectly affected by the crime. For Buffalo, that number is 23%, while for Rochester it is only 7%.

Transfer will thus result in a reduction in the number of potential jurors that will need to be summoned; whose completed one-step summons and qualification forms will need to be processed and reviewed; whose claims of exemption or lack of qualification must be adjudicated; and who will be required to appear and fill out questionnaires for review by the Court and the parties. Jury selection in Rochester is also likely to significantly reduce the need for extensive individual voir dire questioning on topics related to bias, exposure to pretrial publicity and connection to the crime and victims. Fewer difficult questions regarding whether a particular

venireperson is or is not legally permitted to serve will arise, and it is more likely that a sufficient number of jurors will be qualified to move on to peremptory strikes without the necessity of individual voir dire of the entire panel. This factor therefore weighs in favor of transfer.

### f. Factors Such as the Availability of Adequate Facilities Weigh Neither For Nor Against Transfer.

Just as in *Mosby*, 2023 WL 5879294, at *8, the Rochester Courthouse and its staff are equally as capable as their Buffalo counterparts of providing the physical space, facilities and logistical support necessary to conduct lengthy jury selection and trial proceedings, including in a high-profile death penalty case such as this one. *Compare Mathis*, 2015 WL 5012159 at *4 (basing intradistrict transfer decision in part on fact that courthouse in transferee division was better equipped to handle trial in terms of courtroom and meeting room spaces and was more appropriately staffed with court and security personnel). This factor should therefore be considered as neutral.

### g. Overall, Consideration of the Relevant Factors Weighs Conclusively in Favor of Transfer to the Rochester Division.

In sum, consideration and weighing of the relevant factors compels the conclusion that this case is most appropriately tried in the Rochester Division. As in *Mosby*, 2023 WL 5879294, at *8, survey results showing the greater negative impact of pretrial publicity on the jury pools in the Buffalo versus Rochester Division alone justifies the transfer. *Id* at 8. Here, the Court must also consider the inconvenience to the parties, witnesses and victims' families that transfer will cause. However, as in *Joyce, Mathis* and numerous other cases, this inconvenience is "outweighed by the overwhelming adverse publicity in the [transferee division] that will no doubt continue." *Joyce,* 2008 WL 2367307, *4; *see also Mathis*, 2015 WL 5012159, at *4 ("the court is convinced that any inconvenience to victims and witnesses is outweighed by the other

relevant factors . . . which militate in favor of transferring venue"). This case should therefore be transferred to Rochester for trial.

WHEREFORE, for all these reasons, the Court should order an intradistrict transfer of the case for trial from the Buffalo Division to the Rochester Division of the Western District of New York.

Dated: February 6, 2026
Buffalo, New York

*s/Sonya A. Zoghlin*
Sonya A. Zoghlin
Assistant Federal Public Defender

*s/MaryBeth Covert*
MaryBeth Covert
Senior Litigator

*s/Julie Brain*
Julie Brain
Attorney at Law

*s/Theresa M. Duncan*
Theresa M. Duncan
Law Office of Theresa M. Duncan LLC

*United States v. Payton Gendron*

**22-CR-109-LJV**

# DEFENDANT'S

# EXHIBIT A

## DECLARATION OF BRYAN EDELMAN, Ph.D.

I, Bryan Edelman, solemnly, sincerely, and truly declare and affirm as follows:

## I.    INTRODUCTION

I am the co-founder of Trial Innovations, Inc., a national full-service jury research firm. I have worked as a trial consultant for 20 years and have conducted pretrial and post-trial research on both criminal and civil cases across the country. I have been retained as an expert in over 70 high profile cases to assess the impact of pretrial publicity on the fairness of the trial proceedings including the *State of Idaho v. Bryan Kohberger, State of Tennessee v. Haley, et al., State of Texas v. Tanner Horner*, *United States v. Cloud, United States v. Sablan, United States v. Marilyn Mosby, United States v. Robert Bowers*, *State of Florida v. Nikolas Cruz*, and *United States v. David DePape.*

Counsel for the defendant in *United States v. Payton Gendron* retained me to research and evaluate: (1) whether there was extensive and prejudicial pretrial publicity regarding the shooting at the Tops Market in Buffalo on May 14, 2022; (2) if the media coverage has impacted the defendant's ability to obtain a fair and impartial jury in the Buffalo Division of the Western District of New York; and (3) based on the findings, recommend appropriate remedial measures to protect the defendant's right to be tried by a fair and impartial jury.

In a prior declaration, I recommended a change of venue based on my analysis of the online and print newspaper coverage, television publicity, social media content surrounding this case, and a community attitude survey conducted in the Western District of New York (Buffalo Division) and the Southern District of New York. Counsel has also asked me to explore the extent of bias within the Rochester Division of the Western District of New York. This declaration focuses on the Buffalo Division and Rochester Division survey findings. In an effort to craft a standalone document, it duplicates the social science literature and media analysis from my prior declaration.

Based on my analysis of the Rochester Division survey data, it is my opinion that the findings support an intra-district transfer. As detailed in my previous declaration, the jury pool in the Buffalo Division has been saturated with extensive prejudicial pretrial publicity surrounding the Tops Market shooting, which resulted in the deaths of ten people and injuries to three more. This shooting generated massive media coverage and sparked an outpouring of support for the victims and the community. The media described the shooting as a meticulously planned, racially motivated hate crime that targeted Black people. The coverage cited Gendron's online manifesto where he denigrated minorities and described himself as a white supremacist. There are countless

mentions of the live stream video of Gendron preparing and carrying out the attack. The footage quickly spread across online platforms including Facebook, Twitter, Reddit, and Telegram.

Negative character evidence and emotional pretrial publicity have been found to be particularly prejudicial in the social science literature.[1] Emotional public statements by survivors and their families appear throughout the coverage including victim impact statements from the State sentencing hearing in Erie County Court. The media focused on Payton Gendron's racist motivations for targeting the Tops Market and includes statements from public officials such as Erie County Sheriff John Garcia who described Gendron as "pure evil" and called for the death penalty.

This mass shooting generated a tremendous outpouring of support for the victims and the community. The Buffalo Together Community Response Fund raised $3 million and distributed $560,000 in grants to Black-led organizations. A scholarship was created to honor Aaron Salter Jr., one of the victims in the shooting. In addition, the design for a permanent 5/14 memorial— expected to cost $15 million—was unveiled by Governor Hochul, former Mayor Byron Brown, and the 5/14 Memorial Commission. A sculpture entitled "Unity" was placed at the Tops supermarket in Buffalo and a mini documentary was created by Buffalo News Chief Photographer Derek Gee. Multiple events have commemorated each anniversary of the shooting, including a ceremony at the Tops supermarket and a 5K and half marathon. The shooting resulted in new legislation to help police enforce "red flag" laws and to restrict the purchase of soft body armor. In addition, the pretrial publicity contains potentially inadmissible content such as prejudicial comments from public officials, interviews with the victims' families, and an attempted attack on Gendron by a victim's family member during a court hearing.

Ninety percent (**90%**) of survey respondents in the Buffalo Division were familiar with the case, which increased to **100%** for those who regularly watch the news and read the newspaper. In addition, prospective jurors have more than just a passing familiarity with these events. Approximately **80%** of survey respondents recognized at least three of seven media items tested in the survey. Eighty-seven percent (**87%**) of survey respondents who recognized the case had read, seen, or heard that Payton Gendron drove three hours from his home in Conklin to the Tops Market in Buffalo to kill Black people, and **59%** were aware that he published a diary online detailing his plan to commit a mass shooting. In addition, **47%** had heard that Payton Gendron

---

[1] Otto, A.L., Penrod, S. & Dexter, H.R. (1994). The biasing impact of pretrial publicity on juror judgments. *Law and Human Behavior*, 18(4), 452-469.

DECLARATION OF BRYAN EDELMAN, PH.D.

published a long manifesto online explaining his white supremacist ideology. Despite efforts by online platforms to remove the video, **39%** saw footage from the live stream of the shooting. Approximately **54%** of survey respondents had heard statements made by public officials about the shooting, and **68%** recalled hearing statements from the victims' families.

The survey data show that the media coverage has shifted the burden of proof to the defendant. Most community members hold a "presumption of guilt" in this case. Ninety-three percent (**93%**) of survey respondents in the Buffalo Division who recognized the case reported that Gendron is guilty of murder, with **76%** indicating that he is "definitely guilty."

Prospective jurors in the Buffalo Division also hold a "presumption of death." Fifty-six percent (**56%**) of survey respondents who recognized the case reported that Gendron should be sentenced to death if he is convicted of first-degree murder, compared to just thirty-two percent (**32%**) who believed he should receive a life sentence. Only nine percent (**9%**) remained undecided. Respondents who favored death demonstrated strong fixed opinions. Seventy-eight percent (**78%**) of those who believed Gendron should receive the death penalty reported that there was nothing the defendant could present to convince them that he should receive a life sentence instead of the death penalty.[2]

The survey data provide insight into the extent of personal connections among prospective jurors in the Buffalo Division to this mass shooting. Approximately **25%** of survey respondents who recognized the case reported that they or someone they knew were directly or indirectly affected by the shooting. Fifty percent (**50%**) were personally familiar with the Tops Market where the shooting occurred. In addition, **31%** reported that they or a family member had shopped there. Seventy-eight percent (**78%**) of respondents who knew about the shooting have talked about it or heard others talking about it in person or online. Approximately **85%** of survey respondents have seen or heard something about the Buffalo community's response to the shooting, and **32%** reported that they or someone close to them contributed to the efforts to assist the victims.

Personal connections to the crime were found to be significantly related to race. Sixty-five percent (**65%**) of Black survey respondents in the Buffalo Division were affected or know someone who was affected by this shooting, and **48%** reported that they or someone close to them contributed to efforts to assist the victims. In addition, **94%** of Black survey respondents in the Buffalo Division were familiar with the Tops Market where the shooting occurred, and **87%**

---

[2] This statistic <u>only</u> includes survey respondents who reported that Gendron should receive the death penalty.

reported that they or someone in their family had shopped there. These findings suggest that a disproportionate number of Black jurors may be subject to cause challenges because of personal connections to the shooting, the victims, and/or the crime scene.

As pointed out by the government in its opposition to the change of venue motion, "[t]he survey results from Rochester show substantially lower levels of case recognition, decreased emotional proximity, less detailed knowledge of reported facts, and lower rates of fixed opinions about punishment."[3] Approximately **72%** of survey respondents from the Rochester Division were familiar with the case, 18 points lower than their counterparts in the Buffalo Division. Just **43%** of survey respondents familiar with the case reported that Gendron should be sentenced to death if he is convicted of first-degree murder, 13 percentage points lower than their Buffalo Division counterparts. In addition, **63%** of survey respondents recognized three or more media items tested in the survey, compared to **80%** in the Buffalo Division. Respondents in the Rochester Division also had fewer personal connections to the shooting. Only nine percent (**9%**) were directly or indirectly affected by the shooting and **21%** were personally familiar with the Tops Market where the shooting occurred. Nine percent (**9%**) of Rochester Division survey respondents reported that they or someone close to them contributed to the efforts to assist the victims, 3.6 time lower than in the Buffalo Division (**32%**).

Based on the Rochester Division survey data—and the lower standard required for a transfer within the District under Rule 18—it is my opinion that the findings support an intra-district transfer to the Rochester Division.

## II.    QUALIFICATIONS

**Education and Experience**: A copy of my curriculum vitae can be found in **Appendix A** to this declaration. Upon completion of my undergraduate education, I received an MA and Ph.D. in Social Psychology from the University of Nevada, Reno, and an LL.M. from the University of Kent in the United Kingdom.  My graduate studies have provided me with a broad foundation in both qualitative and quantitative research methodologies as well as statistics

The Social Psychology Program at the University of Nevada is unique in that it is one of the few in the country that has an emphasis on the application of social psychological theory to the legal arena.  During my studies I specialized in jury related issues and examined how attitudes, race, stereotypes, pretrial publicity, and other factors influence juror and jury decision-making.  In

---

[3] Government's Response in Opposition to Defendant's Motion to Transfer Venue (ECF No. 521), at 30.

this regard, I took coursework addressing topics associated with change of venue motions, the impact of pretrial publicity on jurors' ability to be fair and impartial, and the steps necessary to conduct a change of venue analysis. The University's association with the National Judicial College and other government agencies also afforded me the opportunity to conduct research with the Public Defender, District Attorney, Court Services, the judiciary, and other institutions in Washoe County, Nevada.

**Research Experience**: While at the University of Nevada, Reno I worked as a Research Assistant and Project Manager at the Grant Sawyer Center for Justice Studies where I assisted with several national surveys, including one that examined the judiciary's understanding and application of the Daubert standard. I also explored how jurors "minimize" what they have read, seen, or heard about high profile cases during voir dire. In addition, I oversaw a study of the Washoe County's pretrial release program and assisted with the development of training programs for foreign justices, court administrators, prosecutors, and defense attorneys who were brought to the United States by the Department of State.

Further, I have conducted and published research on the impact of illegitimate factors on juror decision-making. This research included developing and testing a model that attempted to explain how factors such as race and empathy influence pre- and post-deliberation sentencing decisions in capital cases. My research on juror decision-making in capital cases was later published as a book. Since completing my studies I have also published on the impact of graphic images on jurors, and on methodological issues associated with online survey research.

**Jury Research Experience**: I began working as a trial consultant in 1998 and cofounded Trial Innovations in 2010. Over the years I have worked on hundreds of criminal and civil cases across the country. As a trial consultant I have conducted mock trials, focus groups, surveys, post-trial interviews, and other research exercises. I have consulted in the courtroom and assisted with jury selection on more than 100 cases. I have also served as a presenter at local bar associations, law firms, national meetings, and conferences. In addition, I have been invited to conduct MCLE courses related to jury selection by the Public Defender, Alternate Defender, and District Attorney in California, Nevada, and New Mexico. I have also served as a guest lecturer at the University of Santa Cruz, Saint Mary's College, and Stanford Law School.

**Venue Experience**: As a graduate student, I was trained by Dr. Ronald Dillehay and Dr. Edward Bronson, two of the leading experts in the country on venue and pretrial publicity. Over the years I have had the opportunity to work with Dr. Bronson on a number of change of venue

studies.

I have worked on change of venue issues in several different capacities. As a researcher I have coded trial transcripts in high profile cases to evaluate how jurors "minimize" their bias and exposure to pretrial publicity during voir dire, and the challenges this phenomenon poses for judges and attorneys. In addition, I examined the impact of television pretrial publicity on prejudgment of guilt. I have also presented as a panelist on change of venue issues at the American Society of Trial Consultants' annual conference and been a co-author on the chapter in the "California Criminal Law Procedure and Practice" on change of venue since 2011.

I have conducted content analyses of media coverage on a host of topics and have designed more than 50 community attitude surveys over the years. I have been retained as an expert to conduct and evaluate change of venue studies, and also to recommend remedial measures for addressing exposure to pretrial publicity outside of a change of venue.

**Expert Witness Experience**: I have been retained as an expert witness on matters including freedom of religion in China (political asylum hearing), eyewitness identification, and change of venue. I have testified as an expert witness in person or by declaration in California, Idaho, Colorado, Texas, Michigan, Florida, Massachusetts, Nevada, Pennsylvania, Tennessee, West Virginia, and Washington in state and federal court. In the majority of cases in which I have been retained to conduct a pretrial publicity and venue study,[4] I have found insufficient evidence to conclude that a change of venue was warranted.

III.    THE INFLUENCE OF ATTITUDES ON COGNITION[5]

There is a substantial body of literature documenting the impact of attitudes on information processing. Attitudes have been shown to have an impact on selective attention, the evaluation of new information, memory recall, and behavior. This research provides insight into how media coverage may lead to juror bias.

Pretrial publicity can have a prejudicial effect on jurors through its impact on the formation of attitudes and beliefs that they bring into the courtroom. Attitudes are not isolated entities but are often linked to other memories, experiences, attitudes, and beliefs. These links can create large networks of attitudes, which are resistant to change. The links between attitudes strengthen with

---

[4] These exclude instances where I have been hired to review a change of venue survey, assist with addressing media coverage during voir dire, or review trial transcripts and pretrial publicity as part of a post-conviction appeal.
[5] Cognition is a term referring to the mental processes involved in gaining knowledge and comprehension, including thinking, knowing, remembering, judging and problem solving.

DECLARATION OF BRYAN EDELMAN, PH.D.

repeated activation. As these links strengthen, the probability increases that attitudes and underlying beliefs will be consistent with one another and brought to awareness simultaneously. Attitudes that are strongly linked to one another are more easily accessible in memory and more likely to be automatically activated with exposure to the attitude object. Attitudes can be activated automatically without any conscious, intentional processing. This is more likely to occur when an attitude has been repeatedly activated in the past.[6]

When media coverage surrounding a case is broad, extensive, and redundant, strong links between relevant attitudes and beliefs begin to form. If the pretrial publicity creates links between case details, attitudes, and beliefs over the course of a trial, these attitudes are likely to be automatically activated at a subconscious level. As described below, this network of linked attitudes can have an impact on a juror's attention to and evaluation of the evidence and arguments presented in court.

As the network of linked attitudes grows and strengthens, specific attitudes become resistant to change because change requires revisions to other attitudes and beliefs within the network. Resistance to revising well-established attitudes has been shown to lead to biased information processing. When attitudes are strong, there is a tendency to favor arguments and information in support of those attitudes over arguments that may disprove them. The acceptance of a counterargument can create cognitive dissonance.[7] In an effort to avoid cognitive dissonance, information that supports attitudes may be selectively attended to and counterarguments may be distorted or dismissed.[8]

Attitudes can also have an impact on attention and recall. Research has shown that information that supports a preexisting attitude is easier to learn, more accurately retained and easier to recall. The links formed between attitudinally supporting information and preexisting attitudes are stronger than those formed between counterarguments and preexisting attitudes. As a result, the latter is more difficult to retrieve from memory. Further, there is a tendency to produce new beliefs, which support preexisting attitudes and suppress those that run counter to such attitudes.

---

[6] Eagley, A.H., & Chaiken, S. (1993). *The psychology of attitudes.* Florida: Harcourt Brace College Publishers.

[7] Cognitive dissonance is an uncomfortable feeling caused by holding two contradictory ideas simultaneously. People have a motivational drive to reduce dissonance by changing their attitudes, beliefs, and behaviors or by justifying or rationalizing them.

[8] For example, people list more counterarguments for information that refutes preexisting attitudes than information that supports them.

DECLARATION OF BRYAN EDELMAN, PH.D.

In sum, when a community is exposed to prejudicial media coverage surrounding a crime, there is a risk that potential jurors will develop a large network of linked attitudes and beliefs relating to the victim, the defendant, and the crime. These linked attitudes include opinions about the guilt of the defendant, appropriate sentence and evaluations of the evidence presented through the media. When the links between attitudes are strong, they can be activated at a subconscious level and have an impact on jurors' evaluation of the evidence and arguments presented at trial.

Attitudinally supporting arguments will be more closely attended to, evaluated as persuasive, integrated into the existing network of attitudes and beliefs and made easily accessible during deliberations. In contrast, counterarguments and evidence conflicting with well-established attitudes may create cognitive dissonance. As a result, jurors will either ignore this evidence or make cognitive efforts to refute it. This evidence will not establish strong links to preexisting attitudes and will not be easily accessible during deliberations. When a venue has been saturated with pretrial publicity, these psychological processes can put the defendant at a significant disadvantage, undermine the presumption of innocence, and diminish the prosecution's burden of proof.

The prejudicial impact of preexisting attitudes is accentuated by the fact that the media coverage underlying them is often biased in favor of the prosecution.[9] Furthermore, news content is encoded under very different circumstances from those found in the courtroom, because the rules of evidence that are strictly enforced at trial do not apply. As such, the persuasive impact of information presented through the news media becomes more significant and engrained in the juror's mind than the evidence presented at trial.

## IV.    THE PREJUDICIAL IMPACT OF PRETRIAL PUBLICITY

There is a body of research within the social sciences that attempts to address the impact of pretrial publicity on decision-making in the courtroom. This literature suggests that pretrial publicity influences evaluations of the defendant, perceptions of criminality, sympathy toward the defendant, pretrial judgments regarding guilt, and final verdicts.[10]

---

[9] See Bakhshay, S. & Haney, C. (2018). The media's impact on the right to a fair trial: A content analysis of pretrial publicity in capital cases. *Psychology, Public Policy, and Law,* 24(3), 326-340.

[10] *See* Constantini, E., & King, J. (1980-1981). The partial juror: Correlates and causes of prejudgment. *Law and Society review, 15,* 9-40; DeLuca, A.J. (1979). *Tipping the scales of justice. The effects of pretrial publicity.* Unpublished master's thesis, Iowa State University, Ames; Hvistendahl, J.K. (1979). The effect of placement of biasing information. *Journalism Quarterly, 56,* 863-865; Kline, F.G., & Jess, P.H. (1966). Prejudicial publicity: Its effects on law school mock

(continued…)

Daftary-Kapur, Penrod, O'Connor, and Wallace (2014) conducted a field study that incorporated real time evidence into the methodology.[11] Participants included jury-eligible community members who were naturally exposed to pretrial publicity over a 14-month period leading up to the trial. Trial summaries were presented online during six sessions over the course of ten weeks.

The researchers reported a pretrial publicity effect that persisted throughout the actual trial. Despite the admonitions to set aside prejudicial pretrial publicity, participants were biased by the content of the pretrial publicity. Specifically, those exposed to prosecution-oriented articles were more punitive in their guilty ratings across all six sessions compared to those exposed to pro-defense pretrial publicity. The amount of the pretrial publicity participants were exposed to also had a significant effect. In addition, the biasing effect of pretrial publicity did not disappear over time. Thus, neither delay nor trial evidence eliminated the pretrial publicity effect on judgments of guilt.

Steblay, et al. (1999) conducted a meta-analysis[12] encompassing 44 research studies on pretrial publicity. The authors reported a statistically significant relationship between pretrial publicity and verdicts.[13] Media coverage addressing the defendant's prior record, the existence of confessions, the heinousness of the crime, and negative character of the defendant have all been shown to have an effect on perceptions of guilt and final verdicts. Furthermore, deliberations may

---

juries. *Journalism Quarterly, 43,* 113-116; Moran, G. & Cutler, B.L. (1991). The prejudicial impact of pretrial publicity. *Journalism of Applied Social Psychology, 21,* 345-367; Otto, A.L., Penrod, S., & Dexter, H. (1994). The biasing impact of pretrial publicity on juror judgments. *Law and Human Behavior, 18,* 453-470; Padawer-Singer, A. & Barton A.H. (1975). The impact of pretrial publicity on jurors' verdicts. In R.J. Simon (Ed.) *The jury system in America: A critical overview* (pp. 123-139). Beverly Hills, CA: Sage; Simon, R.J., Eimermann, T. (1971). The jury finds not guilty: Another look at media influence on the jury. *Journalism Quarterly, 48,* 343-344; Sue, S., Smith, R.E., & Gilbert, R. (1974). Biasing effect of pretrial publicity on judicial decisions. *Journal of Criminal Justice, 2,* 163-171;Tans, M., & Chaffee, S. (1966). Pretrial publicity and juror prejudice. *Journalism Quarterly, 43,* 647-654.

[11] Daftary-Kapur, T., Penrod, S.D., O'Connor, M. & Wallace, B. (2014). Examining pretrial publicity in a shadow jury paradigm: Issues of slant, quantity, persistence, and generalizability. *Law and Human Behavior*, 38(5), 462-477.

[12] A meta-analysis is a statistical analysis of several separate but similar experiments or studies in order to test the pooled data for statistical significance.

[13] Steblay, Jasmina Besirevic, Solomon M. Fulero, Belia Jimenez-Lorente. "The Effects of Pretrial Publicity on Juror Verdicts: A Meta-Analytic Review", Law and Human Behavior, vol.23, no.2, pp. 219-235, 1999.

DECLARATION OF BRYAN EDELMAN, PH.D.

not reduce the biasing impact of pretrial publicity.[14] In fact, Kramer, Kerr, and Carroll (1990), found that deliberations actually accentuated the effects of pretrial publicity on final verdicts.[15]

Dexter, Cutler, and Moran (1992) also reported a significant relationship between pretrial publicity and views toward guilt. Participants were given pretrial publicity a week before the study began. Negative pretrial publicity increased conviction rates, even for subjects who underwent extensive voir dire addressing pretrial publicity.[16]

As demonstrated by Ruva and McEvoy (2007) exposure to pretrial publicity can influence verdicts by affecting perceptions of defendant credibility, ratings of the prosecuting and defense attorneys, and source attribution errors (i.e., misattributing information learned from the media as evidence presented as trial evidence).[17]

Consistent with the experimental literature on attitudes described above, Hope, Memon, and McGeorge (2004) found that jurors exposed to negative pretrial publicity evaluate pro-prosecution evidence more favorably than its actual probative value, a phenomenon coined "pre-decisional distortion."[18] Thus, attitudes developed from exposure to pretrial publicity serve as a filter through which later trial evidence is evaluated.

## V.    MEDIA ANALYSIS

There is no threshold for what constitutes excessive pretrial publicity. However, based on a conservative analysis of print, online newspaper, and television media with circulation in the Buffalo Division, it is my opinion that the jury pool was exposed to massive prejudicial and sensational publicity surrounding the shooting at the Tops Market. A search of the NewsBank database was conducted to collect articles from newspaper publications with circulation in the Buffalo Division. The NewsBank database contains articles from thousands of newspaper titles, newswires, web editions, periodicals, and other publications.[19] However, this was not an exhaustive search as several newspaper publications were not in the database including: *The Olean*

---

[14] Otto, A.L., Penrod, S. & Dexter, H.R. (1994). The biasing impact of pretrial publicity on juror judgments. *Law and Human Behavior*, 18(4), 452-469.

[15] Kramer, G.P., Kerr, N.L., & Carroll, J.S. (1990). Pretrial publicity, judicial remedies, and jury bias. *Law and Human Behavior,* 14(5), 409-438.

[16] Dexter, H., Cutler, B.L., & Moran, G. (1992). A test of voir dire as a remedy for the prejudicial effects of pretrial publicity. *Journal of Applied Social Psychology*, 22, 819-832.

[17] Ruva, C.L., & McEvoy, C. (2008). Negative and positive pretrial publicity affect juror memory and decision-making. *Journal of Experimental Psychology: Applied,* 14(3), 226-235.

[18] Hope, L., Memon, A. & McGeorge, P. (2004). Understanding pretrial publicity: Predecisional distortion of evidence by mock jurors. *Journal of Experimental Psychology: Applied, 10,* 111-119.

[19] https://www.newsbank.com/about-newsbank

*Times Herald, The Post-Journal, The Salamanca Press, The Challenger,* and *The Buffalo Criterion.* In addition, the search did not include articles published online by television stations such as CBS4, NBC2, ABC7, Fox29, Buffalo NPR, SpectrumNews1.

Between May 14, 2022, and November 3, 2025, the search of the NewsBank database uncovered **1535** articles published in *The Buffalo News*, the *Amherst Bee, Cheektowaga Bee, Clarence Bee, The Daily News, East Aurora Bee, Island Dispatch, Ken-Ton Bee, Lancaster-Depew Bee, Lewiston-Porter Sentinel, Niagara Gazette, Niagara-Wheatfield Tribune, Orchard Park Bee, The Spectator, Union-Sun & Journal,* and the *West Seneca Bee.* This conservative count does not include other newspapers with readership in the Buffalo Division, for example, the *New York Times* which published 107 articles about this case.

The News Data Service is a media monitoring service that covers all 210 local US markets and over 100 national networks and cable stations. They provided a detailed report with summaries of local television news coverage in the Buffalo Division. According to the News Data Service, there were **2703** television segments[20] covering the Tops Market shooting and the aftermaths between May 14, 2022, and November 5, 2025.

The nature of the coverage is an important factor to consider when assessing the need for a change of venue. This mass shooting was often described as "the worst in Buffalo's history." Prominent local attorney John V. Elmore—who represents several of the deceased victims' family members in civil lawsuits—told the media that this was "the worst crime I have ever seen." Prominent figures have also made public statements about the appropriate sentence in the federal case. Erie County Sheriff John Garcia described Gendron as "pure evil" and said, "if any criminal deserves the death penalty, Payton Gendron deserves it." In an interview, Buffalo Mayor Byron Brown said that the death penalty may be the appropriate sentence for Gendron, "While I am not ordinarily a proponent of the death penalty, I think people should know ahead of time that if you commit mass murder in the United States of America, the death penalty applies. I think there should be the death penalty for all mass murderers."[21] While there is not a consensus among survivors or victims' families, several have made statements about the decision to pursue the death penalty. Examples of reporting in the news coverage discussing sentence include:

---

[20] These include teasers and stories.

[21] https://www.wgrz.com/article/news/special-reports/buffalo-mass-shooting/mayor-brown-discusses-death-penalty-option-tops-mass-shooting/71-d46939c9-e29a-4d6b-ac89-45bda0dea96f

- Erie County Sheriff John C. Garcia has **urged federal prosecutors to pursue the death penalty** against the **admitted racist killer** who murdered 10 Black people at the Jefferson Avenue Tops grocery store last year.

- "**This racist, callous individual** spent a great deal of time devising a **plan to terrorize the city of Buffalo**," Garcia said. "**I cannot imagine** a **more appropriate case for capital punishment**."

- "As far as I'm concerned, **if you don't use the death penalty in this case, when would you ever use it?**" the sheriff asked.

- May 14 killer **deserves death penalty** for act of '**pure evil**,' Garcia says.

- REDACTED, whose son REDACTED was a Tops worker who survived being shot, **said she wants the federal government to pursue the death penalty** so that there will be a trial.

- "Let me ask y'all a question," [youth football coach Douglas "Rome"] Hunt said. "So, being that he did what he did, do y'all **think he should get the death penalty**?" "**Yes!**" the children shouted.

- REDACTED, whose 62-year-old mother was killed by Gendron, said he understood the death penalty decision. But after learning of it from prosecutors, he told reporters he prefers to see Gendron "**tortured for the rest of his life**" in a state prison surrounded **by people who want to kill him** on a daily basis or trapped in solitary confinement.

- REDACTED, whose son was shot and survived the May 14 attack, said she **felt anger and disgust as she saw Gendron** led into the courtroom Thursday. "It's hard being in a courtroom with a **terrorist** – seeing the man who tried to kill my son," she told reporters after the court appearance. But she felt it was important to be there.

- Former Buffalo Fire Commissioner REDACTED is the son of Gendron's oldest victim, REDACTED. "**Gendron is already dead to me**, he's not going to hurt anyone else," Whitfield told The News on Friday. "**My only interest in this death penalty issue is that, if it goes to trial, it would shine a light** on some of the other people responsible for his actions. That would include people who encouraged him in the darkest corners of the internet."

- Elmore said his clients have a range of feelings about whether Gendron should face the death penalty. **Some feel strongly that he should**, Elmore said, while others are satisfied knowing he would never walk free again.

- "I absolutely hate the idea of the death penalty," REDACTED said Tuesday. "**I want him to experience unimaginable suffering. I want every moment of his life to be filled with fear and the constant threat of knowing he could be killed.** ... Giving him the death penalty will be an easy way out. I want him to alive so he can truly suffer."

- "**He does deserve to die**. **But I want something worse than that**." REDACTED told reporters outside the courthouse that he understood the death penalty decision but would have preferred to see Gendron "**tortured for the rest of his life**" in a state prison surrounded by people who want to kill him on a daily basis or trapped in solitary confinement.

- "At first I said the death penalty would be too easy. But the way they have him protected in jail? That's easy, too…**I wouldn't wish death on anyone. But this right here I have to work on that because I would rather see him dead**."

Negative character evidence and emotional pretrial publicity have been found to be particularly prejudicial in the social science literature.[22] The coverage in this case was emotionally charged and often included powerful statements from survivors and victims' families.  Quotes from victim impact statements during Gendron's sentencing hearing appeared throughout the coverage. Examples of this type of pretrial publicity include:

- **There was rage. There were tears.** There were words from the Bible and there were calls to action. **The raw emotions** of the May 14 massacre at the Tops markets on Jefferson Avenue **spilled out into a packed courtroom** in Buffalo on Wednesday morning as the killer, Payton Gendron, was sentenced to spend the rest of his life behind bars.

- REDACTED, the widow of REDACTED, was the first family member to address the court. "**We wear red and black – red for the blood that he shed for his family** and **his community, and black because we are still grieving**," she said.

- REDACTED'S widow turned to Scripture in her words to the court. "**You will reap what you sow, more than you sow**," she said, and she also read the 35th Psalm. "My soul shall be joyful in the Lord," she said. "Oh Lord do not be far from me."

- REDACTED looked at Gendron and told him that he did not value himself. "You

---

[22] Otto, A.L., Penrod, S. & Dexter, H.R. (1994). The biasing impact of pretrial publicity on juror judgments. *Law and Human Behavior*, 18(4), 452-469.

DECLARATION OF BRYAN EDELMAN, PH.D.

**thought you broke us, but you woke us.** We are here to tell you that you failed," she said.

- REDACTED spoke for his mother, REDACTED, who was shopping at Tops when she was killed. **He talked of the gut-wrenching pain of watching the video** of Gendron's attack that **quickly spread on social media**. "**I watched you kill my mother**," he said. "**I watched you shoot her once, reload and shoot her again.**"

- REDACTED, a niece of REDACTED, told Gendron that **he destroyed her family's life.** "There is **not a day that goes by that we don't think about May 14**," she said.

- In an **especially emotional moment**, REDACTED, the sister of REDACTED, spoke angrily at Gendron. "I'm not going to be nice," she said, staring at him and sometimes **pounding the podium with her hand**. She **spoke of the anguish she felt** as she waited for eight hours, pleading with police for information, before she learned that her sister was one of the victims. "**You're going to come to our city and decided you don't like Black people? You don't know a damn thing about Black people. We're human ... We love our kids. We'd never go to another neighborhood to take people out,**" she said.

- REDACTED spoke for the two of the victims. **She said she lost two loved ones that day**, her aunt, REDACTED, and her cousin, REDACTED. She said her **aunt was shot so many times that she needed a closed casket**. She also said REDACTED's **mother buried him on his mother's birthday**. "Thanks, Payton, for that," she said.

- REDACTED had suffered a gunshot wound to her head. REDACTED said she raced to the airport and was in agony as she sat on a plane that was delayed. "**I roared in pain for my sister, my beautiful sister.**"

- REDACTED, one of Andre REDACTED's daughters, spoke for their family. REDACTED went to Tops that day to buy a birthday cake for his son who was turning three. "**I'll never forgive you**," REDACTED said. "It **wasn't my dad's time to go.**"

- "He **went to that store to get a cake for my little brother** because May 14 is his birthday, my little brother's birthday, and **he turned three years old and then didn't get to celebrate his birthday with his dad because he never came back**."

- Whatever the killer says in court, REDACTED said, he is doing "for his own benefit more than mine. Even if he's sincere, he's trying to redeem himself in the eyes of his creator. **There's nothing he can do for me or my mother,**" REDACTED said. "He's

doing it for himself. And if he's insincere, he's looking to mitigate his federal sentence. It's still for him. Not me."

- "My message will be clear that **forgiveness is not an option**. He tried to kill REDACTED because of the color of his skin, took the lives of ten people and terrorized an entire community," REDACTED said. "**We hope he gets the fate that he deserves**."

- "**You don't even know any Black people. Your little punk** (expletive) decided to come and kill my sister ...

- "**Everything about it still haunts me,**" REDACTED said. In addition to his physical injuries, he suffers from PTSD from what he endured that day. "**I saw all the victims where they lay. The visions haunt me every night**," he said.

- "**Everything about it still haunts me. I saw all the victims where they lay. The visions haunt me every night ... I'm always on edge and hypervigilant about my surroundings all the time** ... You haven't taken away my will to live. **You haven't broken my spirit.**"

- "**How can you possibly stand up here and say that you're sorry**? You planned this whole thing. **You planned it. You put it on a video**."

- "**You didn't shoot her once, but you turned around and shot her two times** ... I am **jealous of my friends and family because they can remember all the beauty** of **her smile** and **I grapple with my final image**."

- "She said 'Steph, I'm in an ambulance. I've been shot in the head. **If I die, please be there for my children**.'"

- "There's **no such thing as healing when you see your mother die 15 times**," he said.

- "There is **no place for your hateful and evil ideology in a civilized society. There can be no mercy, no understanding, no second chances**. The damage caused is too great. You will never see the light of day as a free man again." [Erie County Judge Susan Eagan, as she sent Gendron to prison for the rest of his life]

In addition to victim impact statements from the sentencing hearing, the coverage is replete with vivid accounts from survivors and their family which are likely to further elicit empathy and sympathy toward the victims and antipathy toward the defendant. This type of reporting can have a significant impact on how jurors evaluate aggravating and mitigating evidence. Examples of this type of news coverage include:

DECLARATION OF BRYAN EDELMAN, PH.D.

- "I didn't see him at first, **I turned around and I saw him shoot this woman**," REDACTED said.

- "She was just going into the store. **And then he shot another woman. She was putting groceries into her car.** I got down because I did not know if he was going to shoot me."

- Tops Markets employee REDACTED **can't stop himself from returning to the Jefferson Avenue grocery store** where ten people were massacred and **he narrowly escaped harm** last weekend.

- "**Every time I close my eyes, all I see is blood and dead bodies**, and **all I hear is gunfire and people screaming**," REDACTED said. "I can't sleep."

- "**Then, there were people running like crazy, people screaming and I heard rapid fire**. ... I knew it was **gunfire and it was moving closer to where I was**," REDACTED said.

- He said h**is 15-year-old son kept calling** REDACTED's **cellphone, trying to find out if** REDACTED **was OK**.

- "I couldn't answer him and I had to silence the phone," the store worker said. "**I was scared the shooter was going to hear my phone and come after us**."

- "I keep telling everyone I know, 'Jefferson Strong, 250 Strong,'" REDACTED said. "**Nobody is going to come in to Buffalo and destroy our store, or our neighborhood. This is our store, our neighborhood.**"

- Since that day, REDACTED **has made it her mission to tell her story**. She has been interviewed on local and national media. **She spoke at the March for Our Lives on Jefferson Avenue**. She was among those who **met with U.S. Attorney General Merrick Garland** when he came to Buffalo to announce federal charges against the gunman.

- "This wasn't just a mass shooting, right? This was a hate crime. **Someone came in there who hated Black people and wanted to kill them. And because I worked there, they came to kill me** ... They knew that there were going to be Black Tops employees in that store. **So, I was a target**."

- **She grabbed her daughter's arm and began to run**. She thought her daughter was running, too, but **instead** REDACTED **froze and then crouched down beneath Register 6. Someone yelled: "He's shooting back at him!**"

DECLARATION OF BRYAN EDELMAN, PH.D.

- **She would later see on the video that the killer livestreamed** from a GoPro camera on his helmet that he **walked past her twice but somehow didn't see her.**

- "**When I finally opened my eyes, he was still shooting around**," REDACTED said. She looked over to the next checkout lane and **saw a co-worker lying there**. He had **been shot but was alive. He put his finger to his lips to silently signal to her**

- "**I see all the bodies," she said. "I'm crying**."

- On May 14, 2022, REDACTED had just visited her ailing husband of 68 years in a nursing home when **she stopped at Tops Markets on Jefferson Avenue to pick up seeds for her garden. She would never make it home**. Neither would nine other Black people who were at the store, shopping or working.

- **Her brother,** REDACTED **said, had time to warn shoppers and staff – a response universally credited with saving lives** – before **he exchanged fire with a gunman in body armor, an act of raw courage** in which REDACTED had little chance.

- **Survivors** of the racially motivated mass shooting at a Buffalo supermarket **continue to feel the effects of the tragedy a year later**.

- During therapy, **she learned she was suffering from post-traumatic stress disorder and anxiety and was told she would "never be able to heal"** if she kept working at the store.

- REDACTED**, a customer inside Tops when the shooting occurred, is also dealing with PTSD a**nd now feels **triggered working in cramped spaces at her job as a chef**.

- "**Knowing that we were basically hunted down like rabid dogs was like insane to me**," said REDACTED, whose daughter REDACTED and the child's father, L REDACTED, also survived. "I**t was ... it's still surreal. How can somebody have that much hatred in their whole being**? Like, how did you get that instilled in you? How? I don't know."

- He **wrapped his arms around** REDACTED**. "I'm so sorry. I'm so sorry. I'm so sorry,"** REDACTED said.

- "**She was just a young girl, had a lot of love to give**," said REDACTED. "That was my goddaughter, but that was my best friend."

- "**The entire East Buffalo community was torn apart by the racially motivated mass shooting** at Tops, and my administration remains committed to supporting this

community while it continues to recover," REDACTED said in an excerpt from the speech.

- And **the massacre opened a wound in Buffalo – exposing how society's evils and failures helped lay the path for a white gunman** armed with a military style weapon and **hatred of Black people** to choose to carry out his plan at one of the only large grocery stores on the city's predominantly Black East Side.

- Within hours of the mass shooting last year, **she began learning the essence of** REDACTED's **choice, how a murderer – armed as if for war – emerged from a vehicle in the Tops parking lot.** He **started killing and wounding defenseless people whom** REDACTED **knew by name, simply because they were African American**.

- In the end, she said, "**He chose to give his life, protecting theirs**."

- "As we approach the one-year anniversary of this horrific, racist act of terror, **we are steadfast in our commitment to supporting the east Buffalo community** and making sure **we never forget our ten neighbors who were senselessly taken from us**," REDACTED said.

- "That's probably one of the most trying issues that the families are having," he said, adding that while **the court case may not offer emotional closure to families, it can deliver a legal one**.

- REDACTED's **absence**, REDACTED **said, is "like a piece of me is gone**."

- REDACTED decided against going to the killer's court proceedings, **staggered even now by such malice. "My issue," she says, "is how at 18 he could get that much hatred in his heart,**" poison she knows he did not draw from thin air.

- **Their families have spent the past 51 weeks dealing with their personal grief** while also asking questions about racism, guns, why the killer chose Buffalo and how his act of terror exposed the often-overlooked issue of food insecurity in traditionally Black neighborhoods.

- "**My mom's physically gone, but spiritually she's ever present**, and I'm thankful to God for that. As difficult as this has been, I talk with my mom every day."

- In the aftermath of REDACTED's murder, **her family has become outspoken advocates of policy and community changes**.

- "It's **like walking onto a horror movie**, but everything is real. It is **Armageddon-like**," a police source told The News. "It is so overwhelming."

DECLARATION OF BRYAN EDELMAN, PH.D.

In contrast to the victims, the media often incorporates pejorative language such as "evil," "white supremacist," and "terrorist" when mentioning the defendant. There are also multiple references to a potentially inadmissible 2021 high school incident when Gendron "used the term murder suicide when asked a question in class." This type of pretrial publicity can lead to the formation of a strong, negative cognitive schema of the defendant. When this occurs, jurors are more likely to experience cognitive dissonance when presented with mitigation evidence that conflicts with established attitudes that Gendron is an "evil terrorist and outsider." This type of cognitive dissonance can trigger confirmation bias so that mitigation evidence in support of a life sentence is ignored, misinterpreted, or given less weight than aggravating evidence that is consistent with preexisting attitudes toward the defendant. Examples of this type of media publicity include:

- "This is a tragic incident by someone who's **not part of our community**, **who does not live here,**" Buffalo Police Commissioner Joseph Gramaglia, said.
- "This **was pure evil**: a straight-up racially motivated hate crime **from somebody outside our community**, **outside of the city of good neighbors**," Erie County Sheriff John Garcia said.
- "This **was pure evil**: a straight-up racially motivated hate crime **from somebody outside our community**, **outside of the city of good neighbors**," Erie County Sheriff John Garcia said.
- Erie County Sheriff John Garcia said, "**It was straight up, a racially motivated hate crime**. Garcia added, "**This person was pure evil**."
- "It **strikes us in our very heart to know that such evil lurks out there**," Gov. Kathy Hochul said in a news conference.
- This defendant is **accused of traveling to our area and targeting innocent people**.
- In June 2021, police in Broome County were called by officials of a local high school who told them **Gendron had threatened violence in comments made to fellow students**.
- A school official reported that this **very troubled young man had made statements indicating that he wanted to do a shooting,** either at a graduation ceremony, or sometime after.
- The suspect, Payton Gendron, was 17 when he made the threat during an online class discussion at Susquehanna Valley High School in June 2021. **The threat consisted of**

him saying his **post graduation goal was to commit a murder-suicide**, a local prosecutor said previously.

- The **most glaring red flag** was raised when Gendron made **troubling remarks** in June 2021 – the New York Times reported they involved a **mention of a murder-suicide – at Susquehanna Valley High School** in Broome County.

- In 2021, **Gendron made remarks about a murder-suicide at Susquehanna Valley High Schoo**l in Broome County.

- A **self-described white supremacist**.

- And for her to lose her life at the hands of a **hatemonger, an evil person**, is more than we can bear.

- "We already deal with racism from time to time locally but **now evil is driving 200 plus miles to kill innocent people because of the color of their skin**."

- That certainly was the case this weekend in the immediate **aftermath of "pure evil**," as termed by local law enforcement officials.

- This **evil young man** said he was bored during the pandemic and explored sites that radicalized him.

- The perpetrator of this heinous act was **an evil, sick individual** who will be brought to justice.

- A member of the public **called him out as a coward** as he exited the courtroom.

- You are a **cowardly racist**.

- The **racist killer**.

- To satisfy his **racist blood lust**.

- **Coldhearted**, **cruel**, **calculating** way.

- As you know, **the terrorist** drove to our community with the **specific intent to kill as many Black people as he could**, because he believed a **deranged conspiracy theory** that claims people of color and immigrants are seeking to "replace" white Americans.

- **The terrorist** behind the Buffalo supermarket shooting.

- "It's hard being in a courtroom **with a terrorist** – seeing the man who tried to kill my son," she told reporters after the court appearance.

- "**A terrorist** came into our community and tried to destroy us, but we're here."

- "I don't know how **that terrorist** was raised, but in this community, we (are) raised with love and we spread love and we give love all day long," she said.

The racist motivations behind Gendron's attack was a major focus in the coverage. District Attorney John Flynn said investigators collected evidence showing "racial animosity" was behind the attack. Sheriff Garcia described the shooting as a "straight up, a racially motivated hate crime." The coverage is replete with references to the attack as a "hate crime," a shooting driven by racism, and descriptors of Gendron's "white supremacist" ideology. It was often reported that Gendron chose his target because it had a higher percentage of Black Americans than other nearby areas. In his manifesto, which is mentioned more than 142 times in the newspaper coverage, Gendron said he selected the Tops Market because he wanted to find a busy store within his targeted neighborhood. The news coverage also references the live stream of Gendron planning and executing his plan to kill Black people. Examples of this type of pretrial publicity include:

- A **hate-filled, 180-page manifesto**, purportedly written by Gendron, circulated on social media in the hours after the mass shooting.

- A **180-page online manifesto** widely attributed to Gendron e**xpresses strongly racist and anti-Semitic beliefs** while outlining the massacre plans in calculated detail.

- Gendron appears to have left evidence for any hate crime charge by publishing a **180-page manifesto spelling out his white supremacist philosophy**.

- A screenshot of the video showed a **racial epithet used against Black people** written in bold lettering **on the barrel of the shooter's high-powered assault rifle**.

- Law enforcement investigators said the **massacre was live-streamed** on a social media platform.

- **Gendron live-streamed the shooting** on Twitch, a gaming service owned by Amazon.

- **Gendron is accused of live-streaming** the brutal attack, and of **revealing his racist plans online** before driving from his Southern Tier home to Buffalo.

- **The attack had been live streamed**, and subsequent investigations uncovered a **180-page document** that appears to be written by the attacker in which he describes himself as a white supremacist and fascist.

- …wearing a helmet-mounted camera that live-streamed his horror.

- The semi-automatic gun that Gendron used in the shooting **had "the N-word" spelled out in white paint on the barrel**, and also the **number 14**.

- The official said **"14" refers to a 14-word statement** that is **popular with white**

supremacists.

- The statement is, "We must **secure the existence of our people and a future for white people**."

- The **document is filled with racial hatred**, he writes, he was **radicalized** online.

- A **racially motivated hate crime spilled the blood of 13 people**, leaving ten of them dead.

- Gendron appears to have **left evidence for any hate crime charge by publishing a 180-page manifesto** spelling out his **white supremacist philosophy**.

- The **manifesto** is 180 pages long, but d**ozens of pages are nothing more than anti-Black and anti-Semitic memes** and statistics.

- After reviewing the **manifesto**, J.J. MacNabb[23] also tweeted: "The **shooter chose his target** because it has a **higher percentage of Black Americans than other nearby area**s."

- "The rhetoric that fuels **hate-filled conspiracies** has to stop."

- The mass shooting at a Tops Markets on Saturday is being investigated as a "**racially motivated hate crime.**"

- Flynn said investigators have collected evidence showing **"racial animosity" was behind the attack**.

- Based on a **racist diatribe posted online**, the 18-year-old assailant was driven by "**replacement theory**," the poisonous and deep-seated lie that **Black women and men are of lesser meaning, of lesser humanity, than white people** they might somehow "replace" within the nation.

- In writings posted online before the mass killing, **Gendron described his desire to kill Black people**.

- He pointed to a heading in the plaintiff's complaint: "**White Replacement Theory Caused Payton Gendron to Murder Ten Innocent Black People**."

- Amy Spitalnick[24] talked about the **ideology** behind both the May 14 massacre and the 2017 rallies in Virginia – "**this idea of the great replacement theory**, that somehow there is an **effort to replace white men, white Christians, straight men**."

---

[23] A fellow at George Washington University's program on extremism.
[24] Executive director of Integrity First for America.

DECLARATION OF BRYAN EDELMAN, PH.D.

- An 18-year-old from Broome County acted upon **extremist ideas from a hate-filled diatribe he authored and discussed on Discord** and 4chan, social media channels devoted to messaging and anonymous forums, respectively.

- "**Gendron was motivated to commit his heinous crime by racist, antisemitic, and white supremacist propaganda** fed to him by social media companies," Matthew Bergman, founding attorney of the Social Media Victims Law Center, said in a statement.

- "These posts led Gendron down a rabbit hole of increasingly radical sites, where he was **indoctrinated in white supremacist replacement theory and violent accelerationism**," Bergman said.

The government has charged Payton Gendron with hate crimes, which require proof that the crime was committed because of the victims' race. The Buffalo Division jury pool has been inundated with detailed reports surrounding Gendron's white supremacist beliefs and guilty plea to State charges of murder and hate-motivated domestic terrorism. This type of pretrial publicity further contributes to the negative cognitive schema of Gendron as an inhumane white supremacist and domestic terrorist. Examples of this type of news coverage include:

- Gendron **aired his plans to murder Black people on Discord** and outlined his plans there in the months before the killings.

- Payton Gendron, who is white, is **serving a sentence of life in prison with no chance of parole after he pleaded guilty** to state charges of murder and **hate-motivated domestic terrorism**.

- The sequence of events preceding the complaint began in the aftermath of convicted murderer Payton Gendron's May 14, 2022, **racially motivated massacre of 10 people at Tops supermarket**

- Gendron is **already serving a sentence of life in prison** with no chance of parole after he pleaded guilty to state charges of **murder and hate-motivated domestic terrorism** in the 2022 attack.

- Became the **first person in the state to be convicted of domestic terrorism motivated by hate**.

- Gendron, already serving a life sentence after pleading guilty in state court, **intended to plead guilty to all 27 federal charges**, including 10 counts of **committing hate crimes**, if prosecutors did not seek capital punishment, his defense lawyers said.

- …was one of at least six individuals who **regularly communicated with accused gunman Payton Gendron in an online chat room where racist hatred was discussed,** the two officials said.
- The gunman had just gotten out of his car dressed in combat gear and armed with an **AR-15 scrawled with racist epithets and the names of other mass shooters**, according to police.
- Two other weapons were mentioned in the **suspect's racist diatribe posted to a Discord** server.
- People who knew Gendron were aware of his **"propensity for racist outbursts"** since he was in sixth grade.
- He was **suspended for using a racial slur**.
- The **white supremacist** accused in the Tops Markets mass shooting that killed ten people.
- These were like-minded people who **used this chat group to talk about their shared interests in racial hatred, replacement theory and hatred of anyone who is Jewish, a person of color or not of European ancestry**.

The media often focused on the collective trauma this shooting had on the community and the public's outpouring of support for the victims. Weeks after the shooting there was a march past the Tops Market in support of gun control. A memorial service was held at the two-month, one-year, and second-year anniversary of the shooting. A scholarship was created for Aaron Salter Jr. and a 5/14 5K and half marathon were held to benefit the scholarship fund. The 5/14 Memorial Commission was established to design a permanent memorial for the victims which will cost approximately $15 million. The Buffalo Together Community Response Fund collected $3 million and distributed $560,000 worth of grants to Black-led organizations. A mini-documentary was also created by News Chief Photographer Derek Gee as a memorial to the May 14 shooting. Examples of this type of coverage include:

- The **Buffalo Together Community Response Fund** has **collected $3 million** in financial commitments from foundations and corporations, and individuals from around the country.
- The **Buffalo Together fund will distribute $560,000 worth of grants** in the coming days to **70 Black-led organizations**.

- Four weeks after the Tops Markets massacre, a **crowd of hundreds will march past the store** on Saturday in support of gun control.
- Tops Markets Assistant Dairy Manager Pat Patterson **read a poem by Buffalo Poet Laureate Jillian Hanesworth** that's **displayed on a memorial water wall** inside the Jefferson Avenue store where 10 Black neighbors lost their lives May 14.
- The **occasion was a memorial service T**hursday marking the **two-month anniversary** of the mass shooting.
- Bradford Pitts and Nate Goldsmith announced their **plans for a scholarship in honor and memory of their close friend, Aaron Salter Jr.**
- They are planning an **Aug. 29 fundraising golf tournament in Salter's memory** at the Lockport Town and Country Club, an event in which **Bruce Smith predicts many good friends from football and the business community will participate**.
- They talk now of what **they might be able to do for all the families** of those lost or wounded at Tops.
- A **final design for a memorial honoring the victims** of the May 14, 2022 Tops shooting in Buffalo **has been unveiled**.
- The **permanent memorial is expected to cost nearly $15 million** and the commission will now begin a **yearlong fundraising campaign** to raise the remaining funds needed to break ground
- The city of Buffalo on Tuesday **marked the second anniversary** of a racist mass shooting that killed 10 Black people **with the dedication of a memorial space honoring the victims.**
- In Buffalo, **anchoring the space outside the Tops supermarket** targeted in the attack is a **sculpture entitled "Unity,"** which features p**urple metal pillars representing each person killed.** Three gold pillars represent those who were wounded.
- The result is a **mini-documentary created by Gee that is now online at buffalonews.com** and is the cu**lmination of a year of coverage from him and a host of other Buffalo News journalists**.
- On Wednesday, [Governor] Hochul, a Buffalo native, **recalled a memorial event she attended in the supermarket to pay respects to the victims.** She said she **walked down one aisle to find a family sobbing at the spot where their loved one was murdered**. She said she hugged them.

DECLARATION OF BRYAN EDELMAN, PH.D.

- This week, they have **brought together diverse voices from Buffalo** and those with **national platforms for a conference they titled the "Pursuit of tRuth." The "Ruth" in "truth" is an homage to the matriarch** they lost nearly a year ago.

- On Friday, **a panel on the "Legacy and Myth of White Supremacy"** laid out how the hate that brought the gunman to Buffalo can be traced to the ideologies that allowed and excused the enslavement of Black people.

- The **discussion on Saturday at SUNY Buffalo State University stemmed from the racist massacre of 10 people at Tops Markets**.

- **Governor Kathy Hochul and Buffalo Mayor Byron Brown** announced the **May 14th Memorial Commission will begin a public engagement campaign** seeking the input of the community on siting and design of a future memorial.

- "**This memorial will honor the lives and legacies of those we lost**, but it will also be shared with the community and **reflect its strength and resiliency**, which is why engaging with the public is a crucial step forward."

- **It includes not only memorials to the victims but enhanced food offerings for the very people the shooter so disdained**.

- Buffalo is preparing an **array of events to commemorate those who lost their lives** and **uplift the community**.

- With **warm memories of Salter**, it was **natural for Foster to join over 300 runners and walkers in paying tribute to him on Saturday.** They were part of the **inaugural 5/14 5K and half marathon benefiting a scholarship fund** established in Salter's name.

- The **races were among the events taking place this weekend on the one-year mark** of the May 14 attack.

- **Buffalo pauses exactly at one-year mark to remember 5/14 massacre**.

- **Hundreds were gathered Sunday in the same parking lot** where the slaughter began.

- **Jefferson was shut down to traffic** as dozens of police patrolled the area.

- As 2:28 p.m. approached, **Mayor Byron W. Brown read the names of the 10 lives lost last May 14.**

- **Brown then called for a moment of silence**, and the normally b**ustling neighborhood grew quiet, except for the sobs of one woman who was overcom**e.

- **A firefighter rang a ceremonial bell**.

- Many in the crowd **looked up to the sky and noticed an ethereal halo had formed around the sun.**

- **The service ended with a stirring message from Rev. Rachelle Robinson**, senior pastor at New Covenant United Church of Christ: **"Hate did not win. Hate cannot win. Why? Because love will always win. Love will end hate. Love will always win, and we stand here as Buffalonians to prove it."**

- The **ceremony at Tops drew an array of people, from Gov. Kathy Hochul, Sen. Chuck Schumer and actor William Fichtner**, to survivors of the massacre and people who just wanted to be a part of the moment.

- **Governor Kathy Hochul will work with the State Legislature to amend a law she just signed that restricts the purchase of soft body armor** by citizens to make sure it prevents them from buying the type of hard armor plates that a gunman wore while killing 10 people in a Buffalo supermarket,

- **Governor Kathy Hochul signed the body armor ban into law** in July 2022, a couple of months after Payton Gendron wore body armor he purchased online as he targeted and killed Black people inside the Tops Markets on Jefferson Avenue.

- **Governor Kathy Hochul signed a bill** into law Wednesday to **help police enforce "red flag" laws** intended to keep guns away from potentially violent individuals such as the white supremacist gunman who murdered 10 people and wounded three others on May 14, 2022.

- On Thursday, as the governor received a newer version of the **proposed Grieving Families Act**, a Buffalo attorney representing victims of the May 14, 2022, racist massacre at Tops Markets on Jefferson Avenue **urged her to sign the legislation.**

The report provided by the *News Data Service* demonstrates that the television coverage mirrored the nature of the pretrial publicity from the newspaper media. The shooting is often characterized as a racially motivated hate crime. The report is replete with references to racism such as "racist fueled mass murder at the Tops supermarket." In addition, Gendron is often described as a white supremacist. The coverage frequently calls him a racist gunman or racist attacker, for example, "we're looking ahead to what's next in the federal case against Tops racist gunman Payton Gendron." A segment on the anniversary of the mass shooting referred to the day when "a racist attacker killed ten people and wounded three others... Emotions are still very raw." Gendron was also described as an "admitted hate-fueled domestic terrorist."

The broadcasts also discuss Gendron's online racist manifesto. A Fox 29 report mentioned his "180-page manifesto" which "leaves no doubt about how intensely and carefully the attack" was planned. News segments quote from the manifesto where he describes himself as a white supremacist who started believing in the differences between races when he was just 12-years old.

The television media often includes emotional content which reflects the community's collective sorrow and trauma in the aftermaths of the mass shooting. News anchors told harrowing stories about the victims who were killed including the hero security guard and former police officer who died trying to stop the shooter, and a father killed while buying a birthday cake for his son. The television media makes references to Buffalo "in mourning" and "our community was shaken again." On the two-year anniversary anchors noted that the city was "left shattered and shocked" by the massacre. When Gendron pleaded guilty to State charges, an anchor reflected on the shooting and said the community "will grieve forever" before going on to say that the "pain of May 14th will never go away."

Other television segments focused on the emotional undercurrent of anger and grief in the community. For example, "the waves of grief, anger and desire for change ripped through the community" after a white supremacist took ten lives. Like the newspaper coverage, television media included interviews and public statements from family members and community leaders who expressed a desire for justice. In addition, the media highlighted the outpouring of sympathy and support for the victims. Many segments showed vigils, prayer services, and memorials for the victims.

At the six-month anniversary, a segment discussed a service which started with a prayer and recognition of the victims. Another ABC 7 story covered a ceremony held by community leaders at the Tops Market to honor the victims from the "racist attack." The segment mentioned a moment of silence and prayer beginning at 2:30pm. Mayor Brown, who was at the ceremony said, "None of us will ever forget the cruel racist attack on the Jefferson Avenue Tops Market." Each yearly anniversary has been commemorated in the media and with numerous community observances and events.

The Tops Market shooting has also generated extensive content and engagement on social media. Despite Twitch's swift effort to remove the live stream of the shooting, the footage quickly spread across online platforms including Facebook, Twitter, Reddit, and Telegram.[25] These videos

---

[25] https://www.adl.org/resources/article/footage-buffalo-attack-spread-quickly-across-platforms-has-been-online-days

received large numbers of views and engagement. Social media has also been a tool for spreading and sharing emotional content about the victims and the community. There are countless videos and discussions extolling the victims and vilifying the defendant. Many of these posts have received extensive distribution and engagement. For example, a video posted by ABC7NY on Facebook shows a man lunging at Payton Gendron during the sentencing hearing. The post received over 6000 "likes" and hundreds of comments. Many of these comments demonstrate the anger and vitriol people have toward the defendant:[26]

- I would have done the same!!

- Protecting the racist

- Look the other way and just let him have one more on behalf of all of humanity [347 likes]

- See how they protect that murdering demon and accost this Black man for having emotions…Really it takes 10 of them. OK more protecting white supremacy what about protection for the families that have their love ones murdered by that demon [33 likes]

- Let that man have him! [136 likes]

- Protecting the murderer! Let him a minute with this POS!

- Let him have 2 minutes with him!

- Let 'em get 'em [255 likes]

- They should have let him beat him

- Should of let the man get some in, why protect that POS

- I'll allow it [314 likes]

- Let him beat up him claat kmt. Trying to protect that demon after him kill off ppl loved ones.

- He should have been allowed just a few minutes with that murderer.

- Throw him to the. Crowd!

Members of the Buffalo community have also created content about the shooting on social media. The hashtag "#Jefferson10" returns countless emotional posts and videos from the victims and their supporters.[27] Dominique Calhoun—a community activist and influencer who ran for the Erie County legislator—has posted regularly about the Tops Market shooting. She was driving

---

[26] https://www.facebook.com/reel/714719386814446
[27] https://www.facebook.com/hashtag/jefferson10

DECLARATION OF BRYAN EDELMAN, PH.D.

back from her daughter's dance open house when she came upon the crime scene. She posted a photo from the parking lot with the caption "Omg a white guy just shot Up tops on Jefferson in Buffalo, NY. Please check on your family. Numerous people are dead. Kids are in the store. Wtf is going on!!!!." [28] The post was shared over 2800 times, received 485 reactions, and 700 comments.

Video content has also proliferated on YouTube. Many of these videos cover the live stream of the shooting, Gendron's arrest, his sentencing hearing, and community efforts to memorialize the victims. For example, a clip by Brandon Conner—who has 3.4 million followers—describing the shooting and live stream received 84,000 likes and over 3000 comments. Videos covering the State sentencing hearing have received over 150,000 views. WKBW TV Buffalo—which has 122,000 subscribers—posted a victim impact statement from the hearing by one of the victim's siblings. The video received 70,000 views and 354 comments. [29]

The podcast industry is a growing market with a rapidly increasing audience. This shooting has been the subject of 114 podcasts and 185 episodes including several miniseries and episodes from national and local podcasts. [30] For example, NPR's *Embedded* did a three-part series on the shooting titled, "Buffalo Extreme." An episode on *This American Life* covered the shooting and the ten victims' stories. The local podcast *What's Next* was developed in response to the shooting. The podcast also created a special series on the victims. Many of these episodes are available on popular streaming platforms such as Spotify and YouTube.

In addition, one of the victim's family members wrote a book about the shooting titled, *5/14: The Day the Devil Came to Buffalo*. The book description on Amazon reads, "...a day that will go down in history as the day the devil, disguised as a racist asshole with hate in his heart and a semiautomatic rifle, came to the eastside of Buffalo and killed ten innocent Black people at Tops Friendly Market." [31]

In conclusion, the jury pool in the Buffalo Division of the Western District of New York has been saturated with prejudicial pretrial publicity and social media content which pose a risk to Payton Gendron's due process rights. The survey data indicate that the media coverage has negatively impacted the Buffalo Division jury pool. For example, **90%** of survey respondents have read, seen, or heard about this case, and **80%** recognized at least three of seven media items tested

---

[28] https://www.facebook.com/photo/?fbid=10103220213164235&set=a.593108359365
[29] https://www.youtube.com/watch?v=wjkKDL_c3o0
[30] https://ivy.fm/tag/payton-gendron
[31] https://www.amazon.com/14-Day-Devil-Came-Buffalo/dp/B0C51XDBMJ

DECLARATION OF BRYAN EDELMAN, PH.D.

in the survey. In addition, **78%** of survey respondents in the Buffalo Division have talked about this case or heard others talking about it in person or online. The media coverage has also shifted the burden of proof to the defendant. Most community members exposed to prejudicial media coverage hold strong opinions about this case and the appropriate sentence. Ninety-three percent (**93%**) of survey respondents familiar with the case believe that Payton Gendron is guilty of murder, and **56%** reported that he should be sentenced to death. Prospective jurors who favored death demonstrated strong fixed opinions. Approximately **78%** of those who believed Gendron should receive the death penalty reported that there was nothing he could present to convince them that he should receive a life sentence instead of the death penalty.

## VI.    TELEPHONE SURVEY

A telephone survey was conducted in the Buffalo Division of the Western District of New York. Comparison surveys were conducted in the Rochester Division and the Southern District of New York. *Research Strategies Inc,* which is based in Mobile, Alabama, was hired to field the telephone survey. Standard methodological practices related to the development of the instrument, interviewer training, sampling, and callbacks were closely followed. The survey instrument and methodology adhere to the professional standards and guidelines put forth by the *American Society of Trial Consultants.*[32] All recognition questions were designed to describe the case using the language found in the media coverage. The surveys were in the field between April 22nd and July 19th of 2025.[33] Ultimately, 414 jury-eligible residents in the Buffalo Division, 418 in the Rochester Division, and 401 from the Southern District completed the survey.

Case Recognition

The results from the telephone survey indicate that there is bias in the Buffalo Division jury pool against the defendant stemming from exposure to pretrial publicity. Prospective jurors remain highly invested in this mass shooting despite the passage of time. Ninety percent (**90%**) of jury eligible respondents were familiar with the case, which increased to **100%** for those who regularly watch the news and read the newspaper. In addition, **62%** of survey respondents reported that they have followed this case "somewhat" or "very" closely, with **17%** falling into the latter category.

Presumption of Guilt

The survey data also indicate that the "presumption of innocence" has been shifted to a

---

[32] https://www.astcweb.org/professional_code
[33] The survey instrument can be found in **Appendix B**.

"presumption of guilt." Approximately **93%** of prospective jurors who were familiar with the case believe Payton Gendron is guilty of murder, with **76%** falling into the "definitely" guilty category.

<u>Presumption of Death</u>

Residents in the Buffalo Division have also developed strong opinions toward sentence. Fifty-six percent (**56%**) of survey respondents who recognized the case reported that Gendron should be sentenced to death if he is convicted of first-degree murder, compared to just **32%** who believed he should receive a life sentence. Prospective jurors who favored death demonstrated strong fixed opinions. Seventy-eight percent (**78%**) of those who believed the defendant should receive the death penalty reported that there was nothing Gendron could present to convince them that he should receive a life sentence instead of the death penalty.

<u>Case Knowledge</u>

Community members have more than just a passing familiarity with this case. Approximately **80%** of Buffalo Division survey respondents recognized at least three of seven media items tested in the survey, and **67%** were familiar with four or more. Eighty-seven percent (**87%**) of survey respondents who recognized the case had read, seen, or heard that Payton Gendron drove three hours from his home in Conklin to the Tops Market in Buffalo to kill Black people, and **59%** were aware that he published a diary online detailing his plan to commit a mass shooting. In addition, **47%** had heard that Payton Gendron published a long manifesto online explaining his white supremacist ideology. A significant percentage of prospective jurors in the Buffalo Division appear to have watched the video of the shooting despite efforts by online platforms to remove it from their sites. Thirty-nine (**39%**) of survey respondents reported that they had seen footage from the live stream. Approximately **54%** of survey respondents had heard statements made by public officials about the shooting, and **68%** recalled hearing statements from the victims' families.

Familiarity with such incriminating details is particularly concerning given that case knowledge was significantly related to bias. Approximately **70%** of survey respondents who recognized five or more media items reported that they could not meaningfully consider Gendron's exposure to white supremacy ideology online as mitigation, compared to **51%** percentage for those who were familiar with one or fewer media items.[34]

---

[34] Survey respondents were asked, "Assume you heard during the sentencing phase from the defense that Payton Gendron was a vulnerable 18-year-old who was exposed to extreme white supremacy ideology online leading up to the shooting. Could you meaningfully consider this

(continued…)

Several media items that were widely reported in the pretrial publicity were found to be related to a "presumption of death" at a statistically significant level. These media items are provided in the table below. Fifty-nine percent (**59%**) of survey respondents who had read, seen, or heard statements from the victims' families about the shooting or their loss favored the death penalty. Approximately **73%** of those who recognized this media item reported that there was nothing the defense could present that would convince them that Gendron should receive a life sentence instead of the death penalty. In addition, **61%** of survey respondents who were familiar with Gendron's manifesto explaining his white supremacist beliefs favored the death penalty. Approximately **63%** of survey respondents who recognized six or more media items favored the death penalty. and **74%** reported that there was nothing the defense could present to convince them that Gendron should receive a life sentence instead of the death penalty. In addition, **71%** of survey respondents who recognized six or more media items reported that they could not meaningfully consider Gendron's exposure to white supremacy ideology online as mitigation, 20 percentage points higher than those who were familiar with one or fewer media items.

Exposure to the video of the mass shooting was particularly prejudicial. Sixty-three percent (**63%**) of survey respondents who had seen footage from the live stream reported that Gendron should receive the death penalty. Approximately **82%** of those who had seen the video agreed that there was nothing the defense could present that would convince them that he should receive a life sentence instead of the death penalty.

| Have you read, seen, or heard… | Favor the Death Penalty | Nothing the defense could present that would convince them that Gendron should receive a life sentence instead of the death penalty |
|---|---|---|
| Payton Gendron published a long manifesto online explaining his white supremacist ideology? | 61% | - |
| Any statements from the victims' families about the shooting or their loss? | 59% | 73% |
| Payton Gendron drove three hours from his home in Conklin to the Tops Market in Buffalo to kill | 58% | - |

explanation from the defense as justification for a sentence of life in prison without the possibility of release instead of the death penalty?"

| | | |
|---|---|---|
| Black people? | | |
| Payton Gendron published a diary online detailing his plan to commit a mass shooting? | - | 75% |
| Have you ever watched any footage from the live stream video of the shooting on the news or online? | 63% | 82% |

*NOTE: The relationships between the media items and measures of prejudgment in the table are statistically significant.*

Impressions of the Defendant

The pretrial publicity is replete with negative comments and descriptors of the defendant. Survey respondents were asked, "What three words do you believe best describe Payton Gendron?" Their responses show that the coverage has led to negative impressions of the defendant. Consistent with the pretrial publicity, Payton Gendron was often described ███████

████████████████████████████████████████████████████

Approximately **86%** of survey respondents in the Buffalo Division hold negative opinions of Gendron, with **78%** reporting a "very" negative opinion of him. Consistent with the social science literature, impressions of the defendant were related to prejudgment at a statistically significant level. Sixty-two percent (**62%**) of prospective jurors who had developed "very" negative opinions of Gendron reported that he should be sentenced to death if convicted of first-degree murder.

Impact on the Community

This mass shooting, which was the worst in Buffalo's history, shocked the conscience of the community. Seventy-eight percent (**78%**) of prospective jurors who knew about the shooting have talked about it or heard others talking about it in person or online. In addition, **85%** have seen or heard something about the Buffalo community's response to the shooting, and **32%** reported that they or someone close to them contributed to the efforts to assist the victims.

The survey data also provide insight into the extent of personal connections among prospective jurors in the Buffalo Division to this mass shooting. Approximately **25%** of survey respondents reported that they or someone they knew were directly or indirectly affected by the shooting. Fifty percent (**50%**) of those who recognized the case were personally familiar with the Tops Market where the shooting occurred. In addition, **31%** reported that they or a family member had shopped there.

These connections were even more prevalent in East Buffalo where **56%** of survey respondents reported that they or someone they knew were directly or indirectly affected by the

DECLARATION OF BRYAN EDELMAN, PH.D.

shooting. Most (**93%**) were personally familiar with the Tops Market and **82%** indicated that they or a family member shopped there.

Personal connections to the crime were found to be correlated with race. Sixty-five percent (**65%**) of Black survey respondents in the Buffalo Division were affected or know someone who was affected by this shooting, and **48%** reported that they or someone close to them contributed to efforts to assist the victims. In addition, **94%** of Black survey respondents in the Buffalo Division were familiar with the Tops Market where the shooting occurred, and **87%** reported that they or someone in their family shopped there.

These numbers were even higher in East Buffalo, where **75%** of Black survey respondents reported that they or someone they knew were directly or indirectly affected by the shooting. In addition, **100%** were personally familiar with the Tops Market and **94%** indicated that they or a family member shopped there.

Survey respondents who reported that they were affected by the shooting were asked to explain how. Many reported personal connections to the Tops Market and the victims. Others focused on the collective trauma associated with this local tragedy, for example:

- **My husband was a first responder** and **my company supports the local Tops Markets**, so I **helped with the memorials and fundraisers**.
- **My friend** REDACTED **was the aunt of the nephew who had gone into the store to pick up a birthday cake for his son and was killed**.
- **Everybody is indirectly and directly affected**.
- **Everyone** in the community **was affected**.
- My **friend's brother was killed** that day.
- My **co-worker's cousin was shot in the head** by him.
- I **had students in the school I teach that had family in the shooting**.
- I **knew the workers** that worked there.
- **Psychologically**, **I was affected and I think most people were as well**.
- I **know people that were in the store** at the time that **will never be the same** and I **know people that lost family in the shooting**.
- I **know someone that lost family** in the shooting.
- My **brother works for Tops**.
- **I work in those neighborhoods as a social worker** and know a lot of the people there. **It really affected the whole community** because **everyone somehow knows**

**everyone**.

- My **brother-in-law worked there**.
- Just **saddened and depressed** over it.
- One of my **mom's friends was shot and killed**.
- Feel like some type of way about the store, **I can't enter it anymore**.
- My **aunt and cousin died**.
- My **brother was. I guess he was seeing a therapist**.
- My **students were definitely affected** because **they were able to see the video**.
- I **know somebody that knows somebody**, but I don't know the person. The **cop that got shot was my daughter's uncle**, but I didn't know him, she didn't know him, just heard from other family members. I still shop at the Tops everyday and curse everyone.
- I was **really shocked about the whole thing**.
- **Friends that had family members in there**.
- I **cut the grass for the property**.
- **Everyone was shocked**.
- I **knew a teacher that was close by**.
- I **do business with a lady whose sister passed away**.
- A **friend of my aunt was a victim**.
- A friend is married to a Black guy **and it hit close to home for them**.
- My **uncle's friend lost his mother**.
- **One of the ones that was killed was one of my wife's co-worker's cousin**.
- I **know someone that was shot**.
- It was **hard not to be. It affects your mental health** and it was **devastating**.
- I think **it had an impact on the entire community**.
- **It was a girl I worked with, and she was Blac**k and it is **hard to know someone who would kill you, because of the color of your skin**.
- I have an **old friend who was there at that time**, and **she is scared**.
- I am a **mental health counsellor**, and **some clients came in for grief counselling**.
- We **had friends that were in the shooting that we lost. We knew multiple people** in there.
- **Family members were victims**.

DECLARATION OF BRYAN EDELMAN, PH.D.

- **Just having relationships with people and the community and charities and events**, tuning in on the **support for the victim's family as a community**.
- I **knew people that knew people that it happened to.**
- I think the **whole city was affected.** We have a **lot more Black folks shopping at my neighborhood stores.** Not that they aren't welcome, **I've just noticed it.**
- **My oldest son often delivers to that store** when he worked at Amazon and he was just like, wow! it affected everybody because it **made everyone nervous going to the store.**
- I **lost a family member.**
- It was my **boyfriend's cousin.**
- **They were in the store where it happened**, and **he worked there** and **he helped get people from the front of the store to the back to safety**. My friend took people to the deli for protection.
- I had **some friends that were affected.**
- It was in our community**, how could I not be affected**?
- They were horrified, **my friend who investigated, horrified**.
- **Just living in the community and everyone**.
- A **couple of friends live in that neighborhood**, and **they felt traumatized.** The world doesn't have room for people like him.
- I think **my brother is going to be scarred for life**. He **needs the support** that they are offering.
- **The friend that I work with was traumatized** because the **school that we work at was scouted out by the defendant**.
- A **classmate of mine's father was killed**.
- My **friends were killed.**
- **Only emotionally**, not affected by any friends or family in any way. I didn't know anybody.
- **I knew some of them, but none of them were killed.** One **manager was hiding the cashier** and **he shot them in the leg and said sorry, because he was white**.
- I **knew a retired security guard**.
- I **was afraid to go anywhere**. **I'm scared to go out anywhere**.

DECLARATION OF BRYAN EDELMAN, PH.D.

- **A resident where I live lost his wife** in the shooting and **an old teacher of my sister's was also killed.**
- **I go to church with a guy and his mother was there**, also I was on the phone with someone while they were there. I don't want to talk about that.
- **My heart was broken**.
- It **created real problems because everyone used that market**.
- I **work with one person that took it really hard**.
- When people come in from out of town **I take them on a tour of the Tops Market. I have a friend that is afraid to go into any community due to this.**
- **There was one woman that was shot, and I went to church with her**.
- I had **friends that had family members that died in the shooting**.
- One of the **victims was a relative of my wife**.
- I live on the East side of Buffalo**, professionally and personally have a lot of colleagues on the East side, public safety work, community events affect me.**
- **Some people that I knew was a close friend to some of the people**.
- I **work at the county hospital and had to deal with all of this**.
- **Of course I was**, those were people. **I'm an EMS. I don't care what color my patients are. No one should die like that**.

Comparison Survey – Rochester Division

As pointed out by the government in its opposition to the change of venue motion, "[t]he survey results from Rochester show substantially lower levels of case recognition, decreased emotional proximity, less detailed knowledge of reported facts, and lower rates of fixed opinions about punishment."[35] Approximately **72%** of survey respondents in the Rochester Division had read, seen, or heard about the case, and just **39%** followed the case "somewhat" or "very" closely. Only seven percent (**7%**) reported that they followed the case "very" closely. In contrast, **62%** of survey respondents in the Buffalo Division followed the case "somewhat" or "very" closely. In addition, **62%** of survey respondents in the Rochester Division have talked about the case or heard others talk about the case in person or online compared to **78%** in the Buffalo Division.

The level of bias in the Rochester Division was also lower compared to the Buffalo Division. Approximately **88%** of survey respondents familiar with the case believe Payton

---

[35] Government's Response in Opposition to Defendant's Motion to Transfer Venue, p. 30.

DECLARATION OF BRYAN EDELMAN, PH.D.

Gendron is guilty of murder. However, just **43%** reported that he should be sentenced to death if convicted of first-degree murder. In contrast, **56%** of survey respondents in the Buffalo Division favored death.

Survey respondents in the Rochester Division were also significantly less familiar with prejudicial details reported in the pretrial publicity compared to their Buffalo Division counterparts. Approximately **46%** of those who recognized the case were familiar with at least four of the seven media items tested in the survey, compared to **67%** in the Buffalo Division. Seventy-two percent (**72%**) had read, seen, or heard that Payton Gendron drove three hours from his home in Conklin to the Tops Market in Buffalo to kill Black people, 15 points lower than in the Buffalo Division. In addition, **47%** knew that Gendron published a diary online detailing his plan to commit a mass shooting, compared to **59%** of survey respondents in the Buffalo Division. Only **39%** were aware that Gendron published a long manifesto online explaining his white supremacist ideology, 12 points lower than their Buffalo Division counterparts. Just **47%** recalled hearing statements from the victims' families, compared to **68%** in the Buffalo Division.

Survey respondents in the Rochester Division also had fewer personal connections to the shooting. Just nine percent (**9%**) reported that they or someone they knew were directly or indirectly affected by the shooting compared to **25%** in the Buffalo Division. Approximately **21%** were personally familiar with the Tops Market, 29 percentage points lower than their Buffalo Division counterparts. While most (**85%**) survey respondents in the Buffalo Division who knew about the case had seen or heard something about the community's response to the shooting, that figure stood at **52%** in the Rochester Division. In addition, only nine percent (**9%**) of Rochester Division survey respondents reported that they or someone close to them contributed to the efforts to assist the victims, 3.6 time lower than in the Buffalo Division (**32%**).

Personal connections to the crime did not have the same connections to race as found in the Buffalo Division. Only **15%** of Black survey respondents in the Rochester Division were affected or know someone who was affected by the shooting, and **18%** reported that they or someone close to them contributed to the efforts to assist the victims. In addition, **41%** of Black survey respondents in the Rochester Division were familiar with the Tops Market where the shooting occurred, and **26%** reported that they or someone in their family had shopped there. These numbers were significantly higher in the Buffalo Division.

DECLARATION OF BRYAN EDELMAN, PH.D.

## VII.    ABILITY TO SELECT A FAIR AND IMPARTIAL JURY IN VENUES SATURATED WITH MEDIA COVERAGE

When a jury pool has been exposed to prejudicial media coverage, the trial court and parties are faced with unique challenges which are not present in most cases. In high-profile cases, many prospective jurors enter the courtroom with extensive knowledge and attitudes about the case, defendant, and victims. However, it is often difficult for prospective jurors to predict how case-specific knowledge and opinions may affect them over the course of a trial. Prospective jurors may also unintentionally omit exposure to specific media items during voir dire when asked what they recall hearing about the case. These items, however, may become salient and recalled from memory once witness testimony begins. The research also shows that information learned from media exposure can be misattributed as evidence presented at trial.[36]

Given these factors, it is important to ferret out during voir dire the full extent of exposure to pretrial publicity, case-specific attitudes, impressions of the defendant, and potential motivations to serve. However, the prejudicial effects of preexisting attitudes can occur at both a conscious and subconscious level, meaning jurors who profess impartiality may not be fully aware of their bias or how it may affect them as the trial unfolds. This can make it difficult to identify potential prejudice during the jury selection process. The Supreme Court has recognized the limitations of the voir dire process as a remedy where potentially prejudicial pretrial publicity is an issue. In *Irvin v. Dowd*, the Court concluded:

> No doubt, each juror was sincere when he said that he would be fair and impartial
> to petitioner, but the psychological impact requiring such a declaration before one's
> fellows is often its father. Where so many, so many times, admitted prejudice, such
> a statement of impartiality can be given little weight. As one of the jurors put it,
> "You can't forget what you hear and see." With his life at stake, it is not requiring
> too much that petitioner be tried in an atmosphere undisturbed by so huge a wave
> of public passion and by a jury other than one in which two-thirds of the members
> admit, before hearing any testimony, to possessing a belief in his guilt.[37]

Research on voir dire shows that these concerns are justified. Jurors are often reluctant to disclose relevant experiences, relationships or opinions that may lead to bias, even when pretrial

---

[36] Ruva, C.L., & McEvoy, C. (2008). Negative and positive pretrial publicity affect juror memory and decision-making. *Journal of Experimental Psychology: Applied,* 14(3), 226-35.
[37] *Irvin v. Dowd*, 366 U.S. 717, 727-28 (1960).

publicity is not an issue. One study found that while 71% of jurors had a fixed opinion regarding guilt, only 15% admitted so during the voir dire.[38] Marshall obtained questionnaires from 277 former jurors in two counties and found that 18% of those jurors admitted to withholding information during voir dire.[39] Seltzer reported that approximately 39% of jurors who were interviewed after trial should have come forward in response to questions regarding crime victimization or knowledge of police officers during jury selection, but failed to do so.[40]

Many aspects of the large group voir dire format deter juror candor. D.C. Superior Court Judge Gregory Mize published his findings after experimenting with an expanded voir dire procedure in 30 federal criminal trials over a nine-month period, which included individual interviews with every venire member who failed to respond to his general opening questions. Judge Mize reported that approximately 28% of members of each panel failed to respond to the dozens of questions posed in open court, an average of about 16 people per trial. However, when questioned in private, one in five of these silent jurors disclosed personal information that was relevant to the case. In 90% of the trials, between one and four of these silent jurors expressed bias that led to their removal for cause.[41]

A search of appellate opinions shows that juror disclosure has led to several mistrials by undermining a defendant's fair trial rights. For example, in *U.S. v. Colombo*, 869 F.2d 149 (2d Cir. 1989), a juror failed to disclose when asked during voir dire that her brother-in-law was a lawyer for the government. She did not mention this fact because she wanted to sit on the jury for the case. In *Dyer v. Calderon*, 151 F.3d 970 (9th Cir. 1998), a juror answered, "no" when the panel was asked if anyone had ever been the victim of a crime. After the guilt phase, the defense learned that her brother had been shot and killed six years earlier. When questioned, she told the judge that she answered, "no" because she, "thought the shooting was an accident, not a crime." Her brother had been pistol-whipped four times and shot in the back of the head.

Problems such as these have also been reported in high-profile cases. For example, a juror in the 2022 sex trafficking trial of Ghislaine Maxwell—who was convicted of helping Jeffrey Epstein sexually abuse multiple teenage girls—failed to disclose his child abuse history during

---

[38] Fahringer, H.P. (1980). In the valley of the blind: A primer on jury selection in a criminal case. *Law and Contemporary Problems,* 43, 116-36.

[39] Marshall, L.L. (1983). Juror, judge, and counsel perceptions of voir dire. Ph.D. dissertation, Boston University.

[40] Seltzer, R. (1991). Juror honesty during the voir dire. *Journal of Criminal justice*, 19, 451.462.

[41] Mize, G.E. (1999). On better jury selection: Spotting UFO jurors before they enter the jury room, *Connecticut Review Spring,* 33.

DECLARATION OF BRYAN EDELMAN, PH.D.

jury selection. All prospective jurors had been asked if they had ever been the victim of sexual harassment, sexual abuse, or sexual assault. The juror later told the judge in a post-conviction hearing that he incorrectly answered the question because the sex abuse he endured did not define him. He went on to say "I do not feel I am a victim of a crime. It's not something I think about. It happened so long ago and it's not part of who I am."[42]

In the Boston Marathon bombings case—*United States v. Tsarnaev*—one juror reported on her questionnaire and in voir dire that she was not personally affected by the bombings and had not posted about the case online. However, there were approximately 20 tweets and retweets from her discussing the case. In one instance Tsarnaev was described as a "piece of garbage." She also mentioned being "locked down" with her family as the bombing and manhunt unfolded. Another juror said in voir dire that he had obeyed the court's instruction not to discuss the case on social media. However, he had started a Facebook thread about the jury selection, and one friend had urged him to "play the part" to get on the jury and send Tsarnaev "to jail where he will be taken care of."[43]

A $6.5 million judgment was overturned in the high-profile police corruption lawsuit against the Public Defender surrounding the Los Angeles Police Department's Rampart Division in Los Angeles County. It was uncovered after the verdict that one of the jurors—Jennifer Salinas—had concealed knowledge of the scandal during jury selection. She did not raise her hand when asked if anyone had some knowledge of events surrounding the Rampart Division. Later it was discovered that Salinas had played a prominent role in a movie titled "Gang Warz" that was based on the Rampart Division. Other jurors on the panel corroborated that she was very familiar with the scandal and discussed aspects that were not in the evidence.[44]

Prospective jurors who have been exposed to prejudicial pretrial publicity enter the courtroom with case-specific knowledge gleaned from the media, social media, and discussions with friends, family members, and co-workers. Uncovering the full extent of jurors' case-specific knowledge and opinions in high-profile cases can be extremely difficult. Jury selection as a judicial remedy to address such bias relies on two factors: 1) that jurors can access their source of bias and

---

[42] Associated Press (2022, March 8). A Ghislaine Maxwell juror says he regrets not disclosing his sex abuse history. *NPR*. Retrieved November 17, 2025, from https://www.npr.org/2022/03/08/1085276735/ghislaine-maxwell-juror

[43] *U.S. v. Tsarnaev* 96 F.4th 441 (1st Cir. 2024)

[44] Ellis, S.M. (2008, January 22). Appeals court orders new trial in suit against public defender. *Metropolitan News-Enterprise*. Retrieved February 12, 2015, from http://www.metnews.com/articles/2008/ovan012208.htm.

2) are willing to report it. In one study where researchers tested the effectiveness of extended voir dire, participants in the experimental condition were exposed to pretrial publicity a week before the experiment.[45] Prior to viewing a trial, they were subjected to minimal or extended voir dire. The attorney in the extended voir dire condition explained how pretrial publicity may inappropriately impact decision-making, asked jurors to hold each other accountable for not discussing pretrial publicity, obtained public commitments to base their verdict solely on the evidence presented in court, and to ensure that fellow jurors did the same. The researchers ultimately found that educating jurors on the potential impact of pretrial publicity did not eliminate the effects of pretrial publicity.

High-profile cases also create a unique challenge during jury selection known as the "minimization effect."[46] This concept refers to prospective jurors' attempts to minimize the full extent of their exposure to pretrial publicity. During voir dire, prospective jurors try to downplay their knowledge of the case using qualifiers such as, "just," "nothing other than," "only," "a little bit," and "that's all." In an archival study that analyzed the jury selection transcripts from five high-profile cases, 69% of prospective jurors used minimization language when questioned by the judge or attorneys.[47]

Another challenge in cases with significant media coverage surrounds the difficulty jurors have during voir dire to recall every detail they have read, seen, or heard about a case. These types of open-ended "recall" questions require significant cognitive effort and often result in incomplete recollection. This phenomenon is an inherent limitation in how memory works. For example, if someone is asked to recall everything they know about the movie *Star Wars,* their description would likely miss important details they are familiar with. Memory is much more accurate when answering "recognition" questions: *Have you read, seen, or heard if Darth Vader was Luke Skywalker's father?*

This concern is not mere speculation. In a 2017 change of venue hearing in Texas, community residents exposed to detailed pretrial publicity over several years were called as witnesses.[48] During the hearing they were asked to recall everything they knew about the case.

---

[45] Dexter, H. R., Cutler, B. L., & Moran, G. (1992). A test of voir dire as a remedy for the prejudicial effects of pretrial publicity. *Journal of Applied Social Psychology*, 22, 819-32.

[46] Bronson, E. (1989). The effectiveness of *voir dire* in Discovering Prejudice in High Publicity Cases: An archival Study of The Minimization Effect.

[47] Edelman, B., Dahir, V.B., & Dillehay, R. (2011). Paper presented at the meeting of the American Society of Trial Consultants.

[48] *State of Texas v. John Feit*, CR-0464-16-A (2017).

DECLARATION OF BRYAN EDELMAN, PH.D.

Following the "recall" question, they were asked a number of "recognition" questions about specific prejudicial and potentially inadmissible media items they failed to mention. The hearing demonstrated the limitations in memory [Emphasis added]:

Q. Can you tell the Court the facts that you know about the State of Texas versus John Feit as it relates to Irene Garza?

A. [Description of basic facts]

Q. Is that it?

A. **Let's see. I believe so.**

Q. Now, Ms. Perez, have you read, seen, or heard about John Feit **giving a confession to a priest**?

A. **Yes.**

Q. **And you didn't mention that a few minutes ago?**

A. I'm sorry. **There were two that I remember. They mentioned that there were two confessions that he made to two priests.**

Q. Okay. Have you read, seen, or heard about whether or not Ms. Irene Garza **was alleged to have been raped?**

A. **I read, yes.**

Q. Now having refreshed your memory a few minutes ago, **are there any other facts that you have read, seen, or heard that you haven't told the Court about**?

A. **I don't believe so.**

Q. Okay. Have you read, seen, or heard that **John Feit was transferred to a monastery after this**?

A. **I did read that, yes.**

This limitation in memory recall has been demonstrated in several high-profile cases around the country. For example, in a change of venue survey in Sonora, California, 95% of survey respondents recognized at least one additional detail reported in the media from the closed-ended recognition questions that they failed to mention in the open-ended recall question. A near identical trend (96%) was found in another high-profile excessive force case in Nashville, Tennessee.[49] For example, when asked, "What have you read, seen, or heard about the case," one respondent answered, "Bits and pieces on the news. They were just talking about the case." However, he later

---

[49] *State of Tennessee v. Andrew Delke*, Case No. 2019-A-26 and *People of the State of California v. Diane Anderson*, Case No.: CRF53011.

DECLARATION OF BRYAN EDELMAN, PH.D.

recognized several media items including that: 1) the shooting was captured on video by surveillance cameras in the area and played on the television news and internet; and 2) the public approved a ballot measure in the last election to create a community oversight board to monitor the Metro Nashville Police Department. Both were prejudicial items widely reported in the media.

A similar pattern was found in this case. When asked what they have read, seen, or heard about the case, survey respondents from the Buffalo Division reported an average of **1.74** details. However, **94%** of them later recognized at least one of the seven media items tested in the survey that they failed to recall in their open-ended answer.[50] Many survey respondents used "minimization language" or incomplete responses when asked what they knew about the case. Most of these prospective jurors later recognized items widely reported in the media. For example, only two percent (**2%**) of survey respondents mentioned public statements from the victims' families when asked what they had read, seen, or heard about the case. However, **68%** later recognized this media item when asked: *Have you read, seen, or heard any statements from the victims' families about the shooting or their loss?* This finding is particularly concerning given that it is significantly related to bias. Approximately **59%** of survey respondents familiar with this media item reported that Gendron should be sentenced to death. In addition, **73%** reported that there was nothing the defense could present that would convince them that Gendron should receive a life sentence

Buffalo Division survey respondents recognized an average of **3.8** additional media items that they failed to mention in their open-ended answer when later asked the battery of media recognition questions. Examples of minimization language and incomplete answers to the recall question along with the number of media items the survey respondent later recognized are provided in the table below.

| What have you read, seen, or heard about this case? [recognized the case] | Number of the survey media items recognized later in the survey | Have you read, seen, or heard any statements from the victims' families about the shooting or their loss? |
|---|---|---|
| Whatever was on the news. | 7 of 7 | Yes |
| That he went in Tops and murdered a bunch of innocent people. | 7 of 7 | Yes |
| Just aware of the location. | 6 of 7 | Yes |

---

[50] These items were measured with closed-ended recognition questions (e.g., Have you read, seen, or heard if…).

| | | |
|---|---|---|
| Just a little on the news. | 6 of 7 | Yes |
| He shot ten Black people and wounded two others and it was a hate crime. | 6 of 7 | Yes |
| He targeted the Tops because it is a Black area. | 6 of 7 | Yes |
| I heard he massacred a lot of people. | 6 of 7 | Yes |
| I heard they tried to have the case moved to the city. Heard they were seeking the death penalty. | 6 of 7 | Yes |
| I saw the same things everyone saw. I heard he was specifically looking to kill Blacks. | 6 of 7 | Yes |
| It was a bad shooting and it brought out other issues. | 6 of 7 | Yes |
| It was caught on tape. | 6 of 7 | Yes |
| That he killed the people. | 6 of 7 | Yes |
| That they want it out of the area to do the trial. | 6 of 7 | Yes |
| There was a shooting and he was young. | 6 of 7 | No |
| They caught him red-handed. | 6 of 7 | Yes |
| Just what I've seen on TV and in the newspaper. | 5 of 7 | Yes |
| Just when it happened. | 5 of 7 | No |
| He came and killed the people. | 5 of 7 | Yes |
| He entered the market and killed people and they were Black. | 5 of 7 | Yes |
| I know that there was a mass shooting on a hate crime. | 5 of 7 | Yes |

The inability to provide a full account of everything a juror knows about a case puts the defendants in an untenable position. Counsel must choose to either rely on an open-ended question—known to generate incomplete recall—or ask media specific recognition questions, which are more diagnostic but risk exposing prospective jurors to extrajudicial information they may not be familiar with.

Prospective jurors' inability to recall the full extent of their exposure to pretrial publicity can undermine the value of voir dire as a corrective measure for identifying and ferreting out bias in high-profile cases. If jurors are unable to fully recall from memory their detailed knowledge about a case when asked an open-ended question (e.g. a victim's family member charged Gendron in the sentencing hearing), it makes it difficult for counsel to effectively exercise challenges. This problem is exacerbated when there is extensive reporting around prejudicial content and emotional victim impact statements. Incomplete recall also poses a problem for the trial court when

exercising its discretion to weigh prospective jurors' self-reports about their ability to be fair and impartial and rule on cause challenges.

This predicament is compounded by research, which suggests that professions of impartiality should not always be taken at face value. Part of the challenge media coverage presents surrounds jurors' efforts to guess how exposure to pretrial publicity may affect their evaluations of the evidence. Given the difficulties that such a guess poses, it is not surprising that claims of impartiality in high-profile cases have been shown to be unreliable. A study on the prejudicial impact of pretrial publicity found that 62% of jury-eligible residents said they could be fair and impartial and decide the case solely on the basis of the evidence presented. However, only 39% said they could put knowledge of the media out of his or her mind.[51]

Another obstacle is the well-documented tendency for individuals to respond in a manner that will be viewed favorably by others, which has been coined the "social desirability" effect. This phenomenon has been researched and found in a multitude of disciplinary settings, including the courtroom. Socially desirable responses are more likely to occur when individuals become focused on the public aspects of themselves. Public awareness of oneself can become particularly salient in a courtroom setting where prospective jurors are asked questions by an authority figure in front of a public audience. Jones, for example, reported that participants appeared to alter their answers to reflect what they thought a judge wanted to hear rather than what they actually thought.[52] When potential jurors learn through the jury selection process that the law requires them to be fair and impartial, there is a risk that they will overstate their ability to set aside their knowledge and beliefs in order to create a favorable public impression.

Also referred to as response bias and demand characteristics, this effect causes the juror (interviewee) to pick up the subtle and overt clues as to what a lawyer or judge (interviewer) wants to hear. During voir dire a clear, strong message is often sent to prospective jurors: good jurors are not supposed to have prejudicial information or biases about the case. If they do, then they should set them aside and decide the case solely on the law and the evidence presented in court.[53] When

---

[51] Moran, C., & Cutler, B.L. (1991). The prejudicial impact of pretrial publicity. *Journal of Applied Social Psychology*, 21(5), 345-67.

[52] Jones, S. (1987). Judge versus attorney conducted voir dire: An empirical investigation of juror candor. *Law and Human Behavior,* 11(2), 131-46. Responses were inconsistent with what had been reported earlier in a questionnaire.

[53] The same "good citizen" impulse leads a number of respondents in telephone surveys to claim that they are registered to vote when in fact they are not. Silver, B., et al., "Who Overreports

(continued…)

this is established, many prospective jurors will adjust their public statements to meet these courtroom norms.

The social desirability effect is found even in instances when the jury pool has been exposed to extreme forms of prejudicial media coverage. In *Rideau*, the jury pool was exposed to a taped 20-minute interview in the jail between the defendant and Sheriff.[54] In the interrogation, the defendant confessed to the murder of three people during a bank robbery. A soundtrack was added to the recording and the interview aired three times on television within a few months leading up to trial. Three of the 12 seated jurors had seen the televised interrogation. Despite the highly prejudicial nature of such a sensational televised confession, all three jurors told the court during voir dire that they could "lay aside any opinion, give the defendant the presumption of innocence as provided by law, base their decision solely upon the evidence, and apply the law as given by the court."[55] Chief Justice Hughes offered this honest view of the world nearly ninety years ago in *United States v. Wood*:[56]

> "[i]mpartiality is not a technical conception. It is a state of mind." A trial court's decision whether a juror possessed "this mental attitude of appropriate indifference" must be reviewed in the totality of circumstances. It is not limited to the juror's response to a "magic question."

The set-aside question has also been shown in the social science literature to be leading, increases socially desirable responses, and lacks validity (i.e., not correlated with other measures of bias). Research has demonstrated that answers to the set-aside question often conflict with responses to other measures of bias. For example, Moran and Cutler (1991) found that 74% of jury-eligible residents in a high-profile case said they could be fair and impartial and decide the case solely on the basis of the evidence presented. However, only 39% said they could put knowledge of the media out of his or her mind.[57] They also found that subjective estimates of the

---

Voting?" 80 <u>American Political Science Review</u> 613 (1986). Book publishers have long said that if survey respondents had actually read all the books they reported having read recently when they are surveyed, the book publishing business would be the most profitable business in the country. These effects, in response to an anonymous telephone pollster, are amplified in the presence of real authority figures in the courtroom and makes it difficult to assess problematic attitudes in prospective jurors.

[54] *Rideau v. Louisiana*, 373 U.S. 723 (1963).

[55] *Id*. at 732.

[56] *United States v. Wood*, 299 U.S. 123, 146, 57 S.Ct. 177, 185, 81 L.Ed. 78 (1936), *718

[57] Moran, C., & Cutler, B.L. (1991). The prejudicial impact of pretrial publicity. *Journal of Applied Social Psychology*, 21(5), 345-67.

DECLARATION OF BRYAN EDELMAN, PH.D.

ability to be fair and impartial was <u>not</u> related to case knowledge. Sue, Smith, and Pedrozza (1975) found that the negative effects of pretrial publicity were not eliminated by professions of fairness. Participants were more likely to convict if they were exposed to negative pretrial publicity even when they reported that they could render an unbiased and fair verdict. [58]

My own research also demonstrates the unreliability of the set-aside question. A 2020 study presented at the *American Psychology Law and Society* annual conference found that prospective jurors profess that they can be fair and impartial, even in the most extreme of circumstances. [59] Participants were recruited from a Facebook Page dedicated to a popular miniseries called "The Jinx." The documentary is about Robert Durst, a real estate mogul in New York who had been associated with a string of murders. Durst was arrested and charged with murder shortly after the documentary aired on Max, formerly known as HBO Max. The miniseries included many highly prejudicial and potentially inadmissible allegations and details. The documentary also captured a confession that was unintentionally recorded while Durst was in the bathroom. People who publicly posted highly prejudicial opinions on the Facebook page were recruited for the study. For example, one participant posted: "This is the true vision of a sociopath. I am physically ill over the conclusion. I am beside myself. I was overjoyed at the news that he was arrested." Approximately 92% of participants reported that Durst was guilty, and 77% reported that he would have a difficult time convincing them that he was not guilty in his upcoming murder trial. In addition, participants were familiar with multiple prejudicial media items from the documentary including that Durst: 1) was a suspect in his wife's disappearance (96%), was a suspect in several murders (92%), had been tried in Texas for murder (92%), and had allegedly confessed (100%).

Participants were read an instruction drafted from the transcript from a high-profile case. The introduction mentioned that Durst was entitled to a fair and impartial trial. The burden of proof was on the prosecution to prove that he was guilty "beyond a reasonable doubt." Participants were also told that the law requires them to set aside any biases and opinions they had and decide the case solely based on the evidence in the courtroom.

Participants were then asked if they "could be a fair and impartial juror and decide the case solely on the basis of the evidence as the law required." Even though these participants had been exposed to a prejudicial miniseries with multiple inadmissible prejudicial details, made negative

---

[58] Sue, S., Smith, R. E., & Pedroza, G. (1975). Authoritarianism, pretrial publicity, and awareness of bias in simulated jurors. *Psychological Reports, 37*(3, Pt 2), 1299–1302.
[59] Gordan, N. & Edelman, B. (2020). Self-Assessments About Fairness in the Robert Durst Case. Presented at the American Psychology Law Society Annual Conference, New Orleans, LA.

comment about the defendant publicly, believed that Durst was guilty, and indicated that he would have a difficult time convincing them otherwise, **81%** reported that they could be fair and impartial. When asked an open-ended question, their responses mirrored what they had heard from the introduction. For example, the participant who described the defendant as a "true vision of a sociopath" reported that he could "definitely" be fair and impartial and explained: "I could start from the beginning and listen to the information presented and follow the directions and wipe out everything that I know. I would need to be convinced beyond a shadow of a doubt."

These findings are consistent with the body of social science literature on the efficacy of the set-aside question. Even in the most extreme of circumstances, prospective jurors provide the socially desirable response.

Accordingly, a juror's professed ability to be fair and impartial should not be taken at face value in cases where there is substantial prejudicial pretrial publicity. This is less of an issue when dealing with the tangential experiences, limited case knowledge, and general attitudes jurors typically bring with them into the courtroom in most cases (e.g., medical malpractice, DUI). There is little evidence, however, to suggest that individuals can forget or dissociate themselves from specific attitudes, emotions, and beliefs about the defendant and case developed from exposure to media coverage.

## VII.    CONCLUSION

It is my opinion that residents in the Buffalo Division of the Western District of New York have been exposed to extensive, prejudicial pretrial publicity and social media surrounding the mass shooting at the Tops Market in Buffalo. This racially motivated crime generated massive coverage and sparked an outpouring of support for the Black community in Buffalo. Emotional public statements by survivors and their families appear throughout the coverage including victim impact statements from the State sentencing hearing. The media also includes statements from public officials such as Erie County Sheriff John Garcia who describes Gendron as "pure evil" and calls for the death penalty in this case.

The media regularly refers to the shooting as a hate crime targeting Black people and quotes from Gendron's online manifesto where he describes himself as a white supremacist. There are also countless mentions of the live stream video of Gendron preparing and carrying out the attack. This footage quickly spread across online platforms including Facebook, Twitter, Reddit, and Telegram. Social media has also been a tool for spreading and sharing emotional content about the victims and the Buffalo community. These include videos and discussions extolling the victims

and vilifying the defendant. Many of these posts have received extensive distribution and engagement.

The survey data indicate that the coverage has had a significant impact on the jury pool in the Buffalo Division. Most survey respondents have developed detailed case knowledge from exposure to pretrial publicity which has led to a "presumption of guilt" and a "presumption of death." Survey respondents who had been exposed to prejudicial media coverage were more likely to favor the death penalty and these opinions were resistant to change.

Exposure to extensive prejudicial media is particularly concerning given the limitations of voir dire as a tool for assessing the full extent of prospective jurors' case knowledge in high profile cases. Consistent with the research literature, survey respondents offered incomplete recall when asked the common open-ended question, "What have you read, seen, or heard about the case?" Most survey respondents later recognized at least one additional media item they failed to report in their open-ended answer. For example, only two percent (**2%**) of survey respondents mentioned public statements from the victims' families when asked what they had read, seen, or heard about the case. However, **68%** later recognized this media item when asked: *Have you read, seen, or heard any statements from the victims' families about the shooting or their loss?* Jurors' inability to fully recall what they know about the case undermines the value of voir dire as a tool for ferreting out bias.

The survey data demonstrate that many members of the community have direct and indirect personal connections to this case, which are even higher in the Black community. Black prospective jurors who enter the courtroom are likely to know someone who was affected by the shooting, have contributed to the efforts to assist the victims, and/or come from a household where someone shops at the Tops Market in Buffalo. These personal connections to the shooting, the victims, and the crime scene are likely to result in a disproportionate number of Black jurors being excused for cause.

The comparison survey in the Rochester Division demonstrates that bias is not ubiquitous throughout the district. Approximately **72%** of survey respondents from the Rochester Division were familiar with the case compared to **90%** in the Buffalo Division. Survey respondents in the Rochester Division who were familiar with the shooting had significantly lower levels of case knowledge than those in the Buffalo Division. In addition, they did not harbor the level of bias or "presumption of death" exhibited by their Buffalo Division counterparts. Only **43%** reported that Gendron should be sentenced to death compared to **55%** in the Buffalo Division. Personal

connections to the shooting were also significantly lower in the Rochester Division. While personal connections to the shooting and crime scene were widespread in the Buffalo Division, just nine percent (**9%**) of survey respondents from the Rochester Division were directly or indirectly affected by the shooting. In addition, personal connections to the crime did not have the same connections to race as found in the Buffalo Division. For example, **15%** of Black survey respondents in the Rochester Division were affected or know someone who was affected by the shooting compared to **65%** of their counterparts in the Buffalo Division.

As correctly pointed out by the government in its opposition to the change of venue motion, "The survey results from Rochester show substantially lower levels of case recognition, decreased emotional proximity, less detailed knowledge of reported facts, and lower rates of fixed opinions about punishment." However, its proposed remedy—drawing jurors from both the Buffalo and Rochester Divisions—would not sufficiently mitigate the bias created by the substantial amount of pretrial publicity which saturated the Buffalo Division. It is unclear how such a remedy would be implanted given the circumstances (e.g., distance from the courthouse, current jury plan, nature of bias across the division, stratified or random sampling across the jury pool).

In conclusion, given the extent and nature of the pretrial publicity and its negative impact on the jury pool in the Buffalo Division, the burden of proof has shifted toward the defendant. Prospective jurors enter the courtroom with a "presumption of guilt" and "presumption of death" that appear to be intransient. Based on the findings from the media analysis and community attitude surveys in both the Buffalo and Rochester Divisions, is my opinion that remedial measures are necessary to protect the defendant's constitutional right to a fair and impartial trial. Given the lower standard required for a transfer within the District under Rule 18, it is my opinion that the findings support an intra-district transfer to the Rochester Division where bias is substantially lower.

DECLARATION OF BRYAN EDELMAN, PH.D.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on February 2, 2026

Bryan Edelman

DECLARATION OF BRYAN EDELMAN, PH.D.

# APPENDIX A: CURRICULUM VITA

## BRYAN EDELMAN, PH.D.

6257 Westover Dr. • Oakland, California 94611
(415) 944-9989 • bryan@trialinnovations.com

## PROFESSIONAL EXPERIENCE

**Trial Innovations,** Oakland and Los Angeles, California                     2011-Current
Co-founder
- Design and implement jury research
- Conduct community survey research on jury issues
- Serve as expert witness on venue, survey jury issues, and eyewitness identification
- Assist with jury selection, juror questionnaire design, etc.
- Provide trial consulting services
- Provide in-house legal education
- Conduct post-trial juror interviews
- Conduct consumer insight research for fortune 500 companies (e.g., Facebook, Google)

**The Jury Research Institute,** Alamo, California                              2005-2010
Senior Trial Consultant
- Conducted multi-stage qualitative and quantitative research (e.g., focus groups, mock trials, shadow juries)
- Served as expert witness (e.g., change of venue motions)
- Designed and conducted telephone and online survey research
- Conducted post-trial juror interviews
- Provided trial consulting services
- Analyzed qualitative and quantitative data
- Served as speaker and visiting lecturer at conferences, universities, law firms, and Bar Associations

**The National Jury Project,** Oakland, California                              2005
Associate Trial Consultant
- Conducted qualitative and quantitative research
- Analyzed quantitative and qualitative data from prospective juror questionnaires
- Interpreted research results and developed strategy recommendations
- Assisted with crafting opening statements and closing arguments

**Trial Science, Inc.,** Reno, Nevada                                           1999-2003
Associate Trial Consultant
- Conducted focus groups and mock trials
- Analyzed quantitative and qualitative data
- Presented findings and recommendations to trial team
- Developed jury selection profiles

**Grant Sawyer Center for Justice Studies,** Reno, Nevada                       2000-2003
Project Manager, "Predicting Failure in Pre-trial Release Programs in Washoe County"
- Designed and implemented an evaluation of the Washoe County pre-trial release program
- Oversaw data collection (over 40,000 cases) and analyzed data
- Served as an ombudsman between trial courts, police departments, Court Services, and the judicial sub-committee
- Presented findings to the Court Services Sub-Committee and at international conferences

DECLARATION OF BRYAN EDELMAN, PH.D.

Research Associate, "Minimization of Pre-Trial Publicity Knowledge during Voir Dire"
- Co-developed research methodology
- Performed content analysis of trial transcripts from high profile cases
- Analyzed data

Research Associate, "Science in the Courtroom"
- Co-developed survey codebook
- Completed content analysis of judges' responses regarding the Daubert standard

Research Associate, "Judicial Workload Pilot Project"
- Completed telephone interviews with judges
- Conducted content analysis of qualitative data from interviews

## EXPERT WITNESS & VENUE EXPERIENCE[60]

*State of California v. Edward Wackerman,* (2025).  Conducted a content analysis of media coverage. Recommended change of venue.

*State of West Virginia v. Timothy Kennedy,* (2025).  Conducted community attitude survey and content analysis of media coverage.  Testified at change of venue hearing.  Recommended change of venue.

*State of Utah v. Kouri Richins,* (2025).  Conducted community attitude survey and content analysis of media coverage.  Testified at change of venue hearing.  Recommended change of venue.

*State of Tennessee v. Haley, et al.* (2025).  Conducted community attitude survey and content analysis of media coverage.  Testified at change of venue hearing.  Recommended change of venue.

*State of Texas v. Tanner Horner* (2024).  Conducted community attitude survey and content analysis of media coverage.  Testified at change of venue hearing.  Recommended change of venue.

*State of Idaho v. Bryan Kohberger* (2024).  Conducted community attitude survey and content analysis of media coverage.  Testified at change of venue hearing.  Recommended change of venue.

*State of California v. Chunli Zhao* (2024). Conducted content analysis of media coverage and grand jury transcript. Testified via declaration. Recommended grand jury transcript remain sealed.

*United States v. Jairo Saenz* (2024).  Conducted community attitude survey and content analysis of media coverage.  Testified at change of venue hearing.  Recommended change of venue.

*State of California v. Erika Sandoval* (2024). Conducted content analysis of media coverage. Testified via declaration. Recommended improved voir dire conditions.

*Kupfner et al. v. Xcel Energy* (2024). Conducted community attitude survey. Testified via declaration. Recommended change of venue.

*State of Florida v. Patrick McDowell* (2024).  Conducted community attitude survey and content analysis of media coverage.  Testified at change of venue hearing.  Recommended change of venue.

---

[60] This is not an exhaustive list and does not include some current cases which are still pending.

*Jaxon Baker, et al. v. State of California* (2023). Conducted community attitude survey. Testified via declaration. Recommended change of venue.

*United States v. Marilyn Mosby* (2023).  Conducted community attitude survey and content analysis of media coverage.  Testified at change of venue hearing.  Recommended change of venue.

*State of California v. Joseph Maloney* (2023).  Conducted community attitude survey and content analysis of media coverage.  Testified at change of venue hearing.  Recommended change of venue.

*State of Ohio v. Bennie Adams* (2023).  Conducted content analysis of media coverage and reviewed jury selection transcripts.  Testified at post-conviction hearing.

*State of California v. David DePape* (2032).  Conducted community attitude survey. Recommended change of venue. Testified via declaration.

*State of Tennessee v. Lemaricus Davidson* (2023).  Conducted content analysis of media coverage and reviewed jury selection transcripts.  Testified via declaration.

*United States v. Aaron Zahn* (2022).  Conducted community attitude survey. Recommended change of venue.

*State of California v. Robert Somerville* (2022).  Conducted preliminary media analysis.  Recommended against moving forward with venue study.

*State of California v. Joshua Rodriquez* (2022. Conducted preliminary media analysis.  Recommended against moving forward with venue study.

*State of Tennessee v. Michael Gray* (2022).  Conducted community attitude survey. Recommended change of venue.

*State of West Virginia v. Joshua Phillips* (2022).  Conducted community attitude survey and testified in change of venue hearing. Recommended change of venue.

*State of Colorado v. Barry Morphew* (2022).  Conducted community attitude survey. Recommended change of venue.

*United States v. Robert Bowers* (2022).  Conducted community attitude survey. Recommended change of venue.

*State of Washington v. David Nickels* (2021).  Conducted community attitude survey. Recommended change of venue.

*United States v. James Cloud* (2021).  Conducted community attitude survey. Recommended change of venue.

*State of Florida v. Nikolas Cruz* (2021).  Analysis of media coverage and testified in closure hearing.

*State of Nevada v. James Biela* (2021).  Conducted post-conviction analysis (media coverage, defense motions, and reviewed jury selection transcripts).

*State of Minnesota v. Alex Kueng (2021*).  Conducted community attitude survey.  Pending.

*United States v. Robert Bowers* (2021).  Conducted community attitude survey.  Pending.

DECLARATION OF BRYAN EDELMAN, PH.D.

*People v. Nikolas Cruz* (2021).  Conducted community attitude survey.  Testified in closure hearing.

*Timaero Ireland Limited v. The Boeing Company* (2020).  Conducted community attitude survey.  Pending.

*State of Tennessee v. Andrew Delke* (2019).  Conducted community attitude survey and content analysis of media coverage.  Testified at change of venue hearing.  Recommended change of venue.

*People v. Diane Anderson* (2019).  Conducted community attitude survey and content analysis of media coverage.  Testified at change of venue hearing.  Recommended change of venue.

*State of Tennessee v. Nikolaus Johnson* (2019).  Conducted content analysis of media coverage and reviewed jury selection transcripts.  Testified at post-conviction hearing.

*People v. Jason Van Dyke* (2018).  Conducted community attitude survey and content analysis of media coverage.  Testified at change of venue hearing.  Recommended change of venue.

*People v. Brian Cooks* (2017).  Conducted community attitude survey and content analysis of media coverage.  Testified at change of venue hearing.  Recommended remedial measures during jury selection [Case settled].

*People v. Johnathan Feit* (2017).  Conducted community attitude survey.  Conducted community attitude survey.  Conducted community attitude survey and content analysis of media coverage.  Testified at change of venue hearing.  Recommended change of venue.

*People v. Jonathan Renfro* (2017).  Conducted community attitude survey.  Did not make recommendations regarding remedial measures.

*People v. Kenneth Rossy* (2017).  Conducted preliminary media analysis.  Recommended moving forward with community attitude survey.

*Angelo Harmon et al. v. The Salvation Army, et al* (2017).  Conducted community attitude survey.  Did not make any recommendations.

*United States v. Charles Banks* (2016). Conducted community attitude survey.  Recommended change of venue.

*United States v. Jessie Con-ui* (2016).  Conducted community attitude survey.  Recommended remedial measures during jury selection.

*People v. Lubrin, et al.* (2016).  Conducted community attitude survey.  Recommended remedial measures during jury selection.

*Melissa Mays, et al., v. Rick Snyder, et al.* (2016).  Conducted community attitude survey.  Recommended change of venue.

People v. Balser and Robinson (2016).  Conducted preliminary media analysis.  Recommended against moving forward with venue study.

United States v. Dredd (2016).  Conducted community attitude survey.  Recommended remedial measures during jury selection.

People v. Romero (2016): Conducted preliminary media analysis.  Recommended against moving forward with venue study.

People v. Morales (2016). Conducted community attitude survey and content analysis of media coverage. Testified at change of venue hearing.  Recommended remedial measures during jury selection [Granted].

DECLARATION OF BRYAN EDELMAN, PH.D.

People v Williams (2015). Conducted community attitude survey.  Recommended against a change of venue.

Commonwealth v. Chism (2015). Approved by Court to assist with crafting juror questionnaire to address pretrial publicity.

U.S. v. Blankenship (2015). Conducted community attitude survey for the DOJ.

U.S. v. Sablan (2014). Conducted community attitude story and submitted a declaration.  Recommended a change of venue [Granted].

People v. Bealer (2014). Conducted community attitude survey and content analysis of media coverage. Testified at change of venue hearing and transfer hearing.  Recommended a change of venue [Granted].

People v. Ware, et al. (2014). Conducted content analysis of media coverage and grand jury transcript. Submitted a declaration recommending that the grand jury transcript remain sealed [Granted].

People v. Castillo (2014).  Conducted community attitude survey [Venue hearing denied].

People v. Shirakawa (2014). Conducted community attitude survey Recommended against a change of venue.

People v. Holmes (2014): Conducted content analysis of media coverage.  Recommended a change of venue [Denied].

People v. Tree (2014): Conducted preliminary media analysis.  Recommended against moving forward with venue study.

People v. Hoyt (2014): Reviewed pretrial publicity, juror questionnaires, and voir dire transcript. Recommended that trial counsel should have pursued change of venue.

People v. Duran (2014). Conducted preliminary media analysis.  Recommended against moving forward with venue study.

People v. White (2013): Conducted preliminary media analysis.  Recommended against moving forward with venue study.

People v. Vega (2013): Conducted preliminary media analysis.  Recommended against moving forward with venue study.

People v. Ayers (2013): Conducted community attitude survey.  Recommended against a change of venue.

People v. Lucero (2013): Conducted community attitude survey.  Recommended against a change of venue.

People v. Bennett (2013): Conducted media analysis.  Recommended against a change of venue.

People v. Deloney (2012): Testified as expert witness regarding literature on the accuracy of eyewitness identification, memory, cognition, and suggestive questioning.

People v. Ortega, et al. (2012):  Conducted community attitude survey and content analysis of pretrial publicity. Testified as expert witness about results, the impact of pretrial publicity on attitudes, memory, jury selection, and jury-decision making.

DECLARATION OF BRYAN EDELMAN, PH.D.

People v. Bey (2011): Conducted community attitude survey and content analysis of pretrial publicity. Testified as expert witness about results, the impact of pretrial publicity on attitudes, memory, jury selection, and jury-decision making.

Johnson, et al. v. BART, et al. (2011).  Conducted community attitude survey.  Recommended against filing a change of venue motion.

People v. Fowler (2011): Conducted community attitude survey. Recommended certain communities be excluded from the venue [Granted]

People v. Sanchez, et al (2011): Conducted preliminary media analysis.  Recommended against moving forward with venue study.

People v. Loughner (2011): Conducted media analysis.

Huang Xiu Mei, New York (2007): Expert witness in political asylum hearing.

Weather Shield v. Bostik (2005): Evaluated plaintiff's change of venue motion.

Olympic Pipeline Company v. Washington (2002).  Assisted with content analysis of media coverage.

## PUBLICATIONS AND PRESENTATIONS

Edelman, B., & Veleker, S. (2025). Change of Venue.  In N. Yuenger (Ed.), *California criminal law procedure and practice*. Oakland: Continuing Education of the Bar.

Gordan, N. & Edelman, B. (2020). Self-Assessments About Fairness in the Robert Durst Case.  Presented at the American Psychology Law Society Annual Conference, New Orleans, LA.

Edelman, B. (2018). *Psychology of the Jury.* Presented at the American Board of Trial Advocates MIT Program, Sacramento, CA.

Edelman, B. (2018). *Preventing Runaway Juries*. Presented at the Michigan Defense Trial Counsel's Annual Meeting, MT Pleasant, MI.

Edelman, B. (2018). *Trial Consulting 101*. Presented at the American Psychological Association, Division 41, Memphis, TN.

Edelman, B. (2018). *Trial Consulting 101*. Presented at American Society of Trial Consultants Conference, Ft Worth, TX.

Edelman, B. (2016). *Conducting an Effective Jury Selection*. Presented at Santa Barbara Bar Association Bench and Bar Conference, Santa Barbara, CA.

Edelman, B. (2015). *Trial Consulting 101*. Presented at American Society of Trial Consultants Conference, Nashville, TN.

Edelman, B. (2015). *Effective Jury Selection Lunch and Learn*. Sponsored by Thomas Reuters (Oakland).

Edelman, B. (2015). *The Social Psychology of Jurors and Juries*. Presented at Washoe County Alternate Defender, Reno, NV.

Edelman, B. (2013). *The Social Psychology of Jurors and Juries*. Presented at Washoe County Alternate Defender, Reno, NV.

Edelman, B. (2013).   *Police Liability.* Presented at the Lorman Education Services Seminar in Santa Rosa.

Edelman, B., & Canon, D. (2012). *The Social Psychology of Jurors and Juries*. Presented at Office of the Public Defender, Albuquerque, NM.

Edelman, B. (2013).   *Police Liability.* Presented at the Lorman Education Services Seminar in Sacramento.

Edelman, B., & Canon, D. (2012). *The Social Psychology of Jurors and Juries*. Presented at Office of the Public Defender, Albuquerque, NM.

Edelman, B. (2011). Using online surveys to conduct jury research. *The Jury Expert,* 23(6), 51-54.

Edelman, B. (2011). Juror race and capital sentencing. *The Jury Expert,* 23(4), 47-49.

Bronson, E., Dillehay, R. Edelman, B., & Rountree, W. (2011). *Analyzing Pretrial Publicity in the New-Media Universe.* Presented at the American Society of Trial Consultants Conference.

Edelman, B. (2010). *CLE: Selecting your Jury*.   Presented at White and Williams, LLP, Philadelphia, PA. Edelman, B. (2010). *Trial Consulting 101*. Presented at the University of Nevada, Reno.

Edelman, B. (2009). The impact of graphic injury photographs on liability verdicts and non-economic damage awards. *The Jury Expert,* 21(5), 1-4.

Edelman, B. (2009) *Online Research Tools to Evaluate Cases.* Presented at the Santa Clara County Bar Association.

Edelman, B. (2009).   *Psychology in the Courtroom: Selecting Your Jury.* Presented at the Monterey County Bar Association.

Edelman, B. (2008).   *Striking the Jury.* Visiting lecturer at Stanford Law School.

Edelman (2008).   *Communicating with the Jury.* Presented at the International Symposium on Life Care Planning, Phoenix.

Edelman (2007).   *Race, Empathy, and Capital Punishment.*   Visiting lecturer at the University of California, Santa Cruz.

Edelman, B. *Racial Prejudice, Juror Empathy, and Sentencing in Death Penalty Cases.* (New York: LFB Scholarly Publishing LLC, 2006).

Edelman, B. & J.T. Richardson, (2005). Imposed limitations on freedom of religion in China and the margin of appreciation doctrine: A legal analysis of the crackdown on the Falun Gong and other "evil cults." *The Journal of Church and State,* 47(2), 243-267.

Richardson, J.T., & Edelman, B., Cult controversies and legal developments concerning new religions in Japan and China. In D.H. Davis & G. Besier (Eds.), *International Perspectives on Freedom and Equality of Religious Belief,* Waco: (Dawson Institute of Church-State Studies, Baylor University, 2002), reprinted in J.T. Richardson (Ed), *Regulating Religion Case Studies from Around the World*. (United States: Kluwer Academic/Plenum Publishers, 2004), pp. 359-380.

Edelman, B. & Richardson, J.T. (2003).   Falun Gong and the law: Development of legal social control in China. *Nova Religio*, 6(2), pp. 312-331.

Edelman, B., Dillehay, R.C., Bennett, D., & Hinxman, C. (2002). *The difficulties of collecting data in a local justice system*. Presented at the annual meeting of the Pacific Sociological Association, Vancouver, Canada.

Edelman, B. & Richardson, J.T. (2002). *Falun Gong and the law*.  Presented at the annual meeting of the Society for the Study of Religion, Houston, TX.

Edelman, B. & Richardson, J.T. (2002). *The crackdown on the Falun Gong: Western influence and the development of the anti-cult movement in China*.  Presented at the Society for the Scientific Study of Religion annual conference, Salt Lake City, Utah.

Richardson, J.T. & Edelman, B. (2001). *Cult controversies and legal developments in Japan and China*. Presented at the annual conference on "New Religions," Heidelberg, Germany.

## EDUCATION

**LL.M.,** International Law, with Distinction, University of Kent, Canterbury, United Kingdom        **2004**

**Ph.D.,** Interdisciplinary Social Psychology, University of Nevada, Reno, Nevada        **2003**

**B.S.,** Magna Cum Laude, Psychology, Florida State University, Tallahassee, Florida        **1997**

**APPENDIX B: SURVEY INSTRUMENT**

**S C R E E N I N G   F O R M -   B U F F A L O   D I V I S I O N**

**Intro1. Hello.  My name is (your name) calling from the (Survey Company Name).  We are not selling anything and this is not a political poll.  We're doing a public opinion survey among local residents to obtain opinions about an upcoming jury trial in your community. Your cooperation is very important because your household was selected at random by computer as being representative of your county.  Again, we are not selling anything and this is not a political poll.**

*[IF RESPONDENT HESITATES TO COOPERATE, SAY: **If you like, you can verify the authenticity of the survey by calling NAME at SURVEY COMPANY during regular office hours; call collect PHONE NUMBER.***

S0.    *[Do Not Read]* **Does the respondent have a reasonable working knowledge of English?**

1..........Yes
2..........No → → → →        *Discontinue Survey*

S1.    **First, what county do you live in?**

1……………….    Erie County
2……………..    Genesee County
3……………….    Niagara County
4……………….    Orleans County
5……………….    Wyoming County
6……………….    Chautauqua County
7……………….    Cattaraugus County
8……………….    Allegany County
97……………..    Other → → → →  *Discontinue Survey*
98……………….    Don't know → → →  *Discontinue Survey*
99……………….    Refused → → → →  *Discontinue Survey*

S2.    **Have I reached you on your cell phone or landline?**

1..........Cell phone
2..........Landline

DECLARATION OF BRYAN EDELMAN, PH.D.

S3.    **Are you a U.S. citizen, 18 or older with a New York driver's license or state-issued ID with a [county identified in S1] address on it?**

                1..........Yes  → → →     *SKIP to S4*
                2..........No → → → →     *SKIP to S3a*
                9..........Refused → → → →  *SKIP to S3a*

S3a.   **Are you a U.S. citizen who is 18 or older and registered to vote in [county identified in S1]?**

                1..........Yes
                2..........No → → → →     *Discontinue Survey*
                9..........Refused → →       *Discontinue Survey*


# M A I N   Q U E S T I O N N A I R E –   B U F F A L O   D I V I S I O N


Before I begin asking you questions, I'd like you to know that there are no right or wrong answers and that you are free to respond with a "don't know" or "no opinion" answer to any question. All of your answers will remain confidential!

Q1. Now I'd like to read you a few statements about the criminal justice system. Please tell me whether you strongly agree; somewhat agree; somewhat disagree; or strongly disagree with the following statement:

Q1a.  If the government brings someone to trial, that person is probably guilty.

                Strongly agree...............    1
                Somewhat agree..........    2
                Somewhat disagree......    3
                Strongly disagree..........    4
                No opinion...............    5
                Don't know....................    8
                Refused/NA..................    9

Q1b.  Next. Even the worst criminal should be considered for mercy.

                Strongly agree...............    1
                Somewhat agree..........    2
                Somewhat disagree......    3
                Strongly disagree..........    4
                No opinion...............    5
                Don't know....................    8
                Refused/NA..................    9

DECLARATION OF BRYAN EDELMAN, PH.D.

Q1c. Buffalo has a long history of segregation and discrimination against Black people.

Strongly agree............... 1
Somewhat agree.......... 2
Somewhat disagree...... 3
Strongly disagree.......... 4
No opinion............... 5
Don't know.................... 8
Refused/NA.................. 9

Q2a.   Now I'd like to ask you about a specific case in your area. On May 14th, 2022, a gunman opened fire and killed ten Black people at a Tops Market in Buffalo. Payton Gendron ["Jen-dron"] was arrested and charged with murder.  Have you read, seen, or heard anything about this case?

Yes…………................. 1 GO TO Q3a
No.…………................. 2 GO TO Q2b
Don't know................ 8 GO TO Q2b
Refused/NA.............. 9 GO TO Q2b

Q2b. Payton Gendron ["Jen-dron"] was dressed in body armor and armed with a high-power rife. Have you read, seen, or heard anything about this case?

Yes…………................. 1 GO TO Q3a
No.…………................. 2 GO TO Q17
Don't know................ 8 GO TO Q17
Refused/NA.............. 9 GO TO Q17

Q3a. The federal government charged Payton Gendron ["Jen-dron"] with multiple counts of hate crimes and intentional murder. Based on what you have read, seen, or heard, do you believe Payton Gendron ["Jen-dron"] is <u>definitely guilty</u>; <u>probably guilty</u>; <u>probably not guilty</u>; or <u>definitely not guilty</u> of murder?

Definitely guilty.................. 1
Probably guilty.................. 2
Probably not guilty............ 3
Definitely not guilty............ 4
No opinion............... 5
*Other……………………..... 7
Don't know....................... 8
Refused/NA....................... 9

**THE RESPONSE OPTIONS SHOULD BE ROTATED FOR HALF THE SAMPLE**

*Record responses

DECLARATION OF BRYAN EDELMAN, PH.D.

Q4.  How closely have you followed this case?  Would you say <u>very closely</u>, <u>somewhat closely</u>, <u>not too closely,</u> or <u>not at all</u>?

|  |  |
|---|---|
| Very closely............... | 1 |
| Somewhat closely.......... | 2 |
| Not too closely……… | 3 |
| Not at all...... | 4 |
| No opinion............... | 97 |
| Don't know.................... | 98 |
| Refused/NA.................. | 99 |

Q4a.  What have you read, seen, or heard about this case?

Q5a.  What are your thoughts and feelings about Payton Gendron ["Jen-dron"], the victims, and this shooting?

**PROBE ONCE: What other opinions do you have about the defendant or victims?**

Q6a. What three words do you believe best describe Payton Gendron ["Jen-dron"]?

Q6b. What is your opinion of Payton Gendron ["Jen-dron"]? Is it very positive; somewhat positive; somewhat negative; or very negative?

|  |  |
|---|---|
| Very positive............... | 1 |
| Somewhat positive ……. | 2 |
| Somewhat negative …… | 3 |
| Very negative …………. | 4 |
| No opinion……........... | 5 |
| Don't know.................... | 8 |
| Refused/NA.................. | 9 |

Q7a. What three words do you believe best describe the victims in the shooting?

Q7b. What is your opinion of the victims in the shooting? Is it very positive; somewhat positive; somewhat negative; or very negative?

|  |  |
|---|---|
| Very positive............... | 1 |
| Somewhat positive ……. | 2 |
| Somewhat negative …… | 3 |
| Very negative …………. | 4 |
| No opinion……........... | 5 |
| Don't know.................... | 8 |
| Refused/NA.................. | 9 |

DECLARATION OF BRYAN EDELMAN, PH.D.

Q8.   The prosecution is seeking the death penalty for Payton Gendron ["Jen-dron"].  If Payton Gendron ["Jen-dron"] is found guilty of first-degree, intentional murder which sentence do you believe he should receive, <u>the death penalty</u> or <u>life without the possibility of release</u>?

      Death penalty……………........             1
      Life without the possibility of release ………….   2 GO TO Q10a
      Other .......................................             3 [RECORD RESPONSE]
      No opinion...........................             5
      Don't know...........................             8
      Refused/NA.........................             9

**NOTE- ENTER VERBATIM RESPONSE FOR "OTHER."**

Q9. Is there something the defense could present that would convince you that Payton Gendron ["Jen-dron"] should receive life without the possibility of release instead of the death penalty?

      Yes............................................ 1
      No............................................ 2
      No opinion..............................  5
      Don't know..............................  8
      Refused/NA............................  9

Q10a. Assume you heard during the sentencing phase from the defense that Payton Gendron ["Jen-dron"] was a vulnerable 18-year-old who was exposed to extreme white supremacy ideology online leading up to the shooting. Could you meaningfully consider this explanation from the defense as justification for a sentence of life in prison without the possibility of release instead of the death penalty?

      Yes............................................ 1
      No............................................ 2
      No opinion..............................  5
      Don't know..............................  8
      Refused/NA............................  9

Q10b.  How do you believe residents in your community or area would react if the jury did <u>not</u> sentence Payton Gendron ["Jen-dron"] to death?

Q11.  As you may know, the media have reported a number of things about this case.  Some people may remember some things, while others may remember other things.  We're interested in what <u>you</u> may remember, even if you already told me in one of the previous questions.

[**ONLY** THOSE WHO ANSWERED "YES" ON Q2a SHOULD BE ASKED QUESTION Q11a]

Q11a.  Have you read, seen, or heard if Payton Gendron ["Jen-dron"] was dressed in body armor and armed with a high-power rifle?

        Yes............................................ 1
        No............................................. 2
        Don't know.............................. 8
        Refused/NA.............................. 9

[EVERYONE WHO ANSWERED "YES" ON Q2A OR Q2B SHOULD BE ASKED Q11B-Q11G]

Q11b.  Have you read, seen, or heard if Payton Gendron ["Jen-dron"] published a diary  online detailing his plan to commit a mass shooting?

        Yes............................................ 1
        No............................................. 2
        Don't know.............................. 8
        Refused/NA.............................. 9

Q11c.  Have you read, seen, or heard if Payton Gendron ["Jen-dron"] drove three hours from his home in Conklin to the Tops market in Buffalo to kill Black people?

        Yes............................................ 1
        No............................................. 2
        Don't know.............................. 8
        Refused/NA.............................. 9

Q11d.   Have you read, seen, or heard if Payton Gendron ["Jen-dron"] had written that he might be mentally ill and had suicidal thoughts?

        Yes............................................ 1
        No............................................. 2
        Don't know.............................. 8
        Refused/NA.............................. 9

Q11e.   Have you read, seen, or heard if Payton Gendron published a long manifesto online explaining his white supremacist ideology?

        Yes............................................ 1
        No............................................. 2
        Don't know.............................. 8
        Refused/NA.............................. 9

Q11f.   Have read, seen, or heard any statements made by public officials about this shooting?

        Yes............................................ 1
        No............................................. 2
        Don't know.............................. 8

DECLARATION OF BRYAN EDELMAN, PH.D.

Refused/NA.............................. 9

Q11g.   Have read, seen, or heard any statements from the victims' families about the shooting or their loss?

Yes........................................... 1
No............................................. 2
Don't know................................ 8
Refused/NA.............................. 9

Q12.   Have you ever watched any footage from the live stream video of the shooting on the news or online?

Yes........................................... 1
No............................................. 2
Don't know................................ 8
Refused/NA.............................. 9

Q13a.   Have you ever talked about this shooting with your family, friends, or co-workers, or discussed it online, for example, on social media?

Yes........................................... 1
No............................................. 2
Don't know................................ 8
Refused/NA.............................. 9

Q13b.   Have you ever heard others talking about the shooting in person or online?

Yes........................................... 1
No............................................. 2
Don't know................................ 8
Refused/NA.............................. 9

Q14.   Have you read, seen, or heard anything about the Buffalo community's response to this shooting, for example, memorials or fundraisers for the victims?

Yes........................................... 1
No............................................. 2
Don't know................................ 8
Refused/NA.............................. 9

Q15.   Have you or someone close to you volunteered or contributed to any community efforts to assist the victims or the neighborhood where this shooting occurred?

Yes........................................... 1
No............................................. 2
Don't know............................... 8
Refused/NA............................. 9

DECLARATION OF BRYAN EDELMAN, PH.D.

Q16a.   Were you or anyone you know directly or indirectly affected by this shooting or by any events connected to the shooting?

            Yes............................................. 1
            No.............................................. 2  [**Go to Q16c**]
            Don't know.............................. 8  [**Go to Q16c**]
            Refused/NA............................  9   [**Go to Q16c**]

Q16b.   How were you or they affected by the shooting?

Q16c.   Are you personally familiar with the Tops Market in East Buffalo where this shooting occurred?

            Yes............................................ 1
            No.............................................. 2
            Don't know.............................. 8
            Refused/NA............................ 9

Q16d.   Have you or anyone in your family ever shopped at the Tops Market in East Buffalo where this shooting occurred?

            Yes............................................ 1
            No.............................................. 2
            Don't know.............................. 8
            Refused/NA............................ 9

Q17.  Finally, I have a couple of more questions to be sure we have included all groups in this survey.  All of your answers will remain confidential.

[**ASK EVERYONE**]

Q17a.  First, how often do you read a hard copy or online version of a newspaper?  Would you say you read it <u>every day</u>, <u>several times a week</u>, <u>once or twice a week</u>, <u>less often than once a week,</u> or <u>never</u>?

                Every day.................................................  1 (GO TO Q170b)
                Several times a week............................ 2 (GO TO Q170b)
                Once or twice a week........................... 3 (GO TO Q170b)
                Less often than once a week............... 4 (GO TO Q170b)
                Never…………………………………….. 5 (GO TO Q170b)
                Don't know............................................. 8 (GO TO Q170b)
                Refused/NA.......................................... 9 (GO TO Q170b)

Q17b.  What newspapers do you read?  I am interested in both local and out-of-town papers.

(PROBE) Do you read any other papers?

DECLARATION OF BRYAN EDELMAN, PH.D.

[RECORD UP TO 4 NEWSPAPERS]

INSTRUCTION: DO NOT READ THE LIST OF NEWSPAPERS TO RESPONDENTS.

| Local Publications | |
|---|---|
| AM New York Metro | 1 |
| Artvoice | 2 |
| Beast, The | 3 |
| Bronx Times-Reporter | 4 |
| Brooklyn Eagle | 5 |
| Buffalo Criterion | 6 |
| Buffalo Courier-Express | 7 |
| Buffalo Enquirer, The | 8 |
| Buffalo News, The | 9 |
| Chief, The | 10 |
| Democrat and Chronicle | 11 |
| Epoch Times, The | 12 |
| Forward, The | 13 |
| Jewish Press, The | 14 |
| Long Island Press | 15 |
| Metro New York | 16 |
| New York Amsterdam News | 17 |
| New York Daily Mirror | 18 |
| New York Daily News | 19 |
| New York Evening Telegram | 20 |
| New-York Gazette | 21 |
| New York Graphic | 22 |
| New York Herald | 23 |
| New York Herald Tribune | 24 |
| New York Jewish Week | 25 |
| New York Journal-American | 26 |
| New York Observer, The | 27 |
| New York Post | 28 |
| New York Press | 29 |
| New York Sun, The | 30 |
| New Yorker Staats-Zeitung | 31 |
| New York Times, The | 32 |
| New York Times International Edition | 33 |
| New-York Tribune | 34 |
| New York World | 35 |
| New York World-Telegram | 36 |
| Newsday | 37 |
| Norwood News | 38 |
| Nowy Dziennik | 39 |
| Post-Standard, The | 40 |
| Public, The | 41 |

DECLARATION OF BRYAN EDELMAN, PH.D.

| Queens Chronicle | 42 |
| Riverdale Press | 43 |
| Sun, The | 44 |
| Super Express USA | 45 |
| Village Voice, The | 46 |
| Villager, The | 47 |
| Wall Street Journal | 48 |
| Washington Square News | 49 |
| World Journal | 50 |
| | |
| **OUT OF STATE PUBLICATIONS** | |
| USA Today | 51 |
| Washington Post | 52 |
| | |
| Other: Specify | 97 |
| Don't know | 98 |
| Refused/NA | 99 |

Q18. How often do you listen to local news on the radio <u>or</u> watch it on television? Do you listen to or watch local news: <u>every day</u>, <u>several times a week</u>, <u>once or twice a week</u>, <u>less often than once a week</u>, or <u>never</u>?

Every day................................................... 1
Several times a week............................. 2
Once or twice a week............................. 3
Less often than once a week.............. 4
Never…………………………………... 5
Don't know............................................ 8
Refused/NA............................................ 9

Q19. How often do you see local news or news related updates online or on social media sites such as TikTok, Twitter, or Facebook? Do you see them <u>every day</u>, <u>several times a week</u>, <u>once or twice a week</u>, <u>less often than once a week</u>, or <u>never</u>?

Every day................................................... 1
Several times a week............................. 2
Once or twice a week............................. 3
Less often than once a week.............. 4
Never…………………………………... 5
Don't know............................................ 8
Refused/NA............................................ 9

Q20. What city or town do you live in or closest to?

DECLARATION OF BRYAN EDELMAN, PH.D.

Q20a. Do you live in East Buffalo?

        Yes...............................1
        No............................. 2
        Don't know.............................. 8
        Refused/NA............................. 9

**Q21.** **Could you please tell us how old you are?**

(DO NOT READ RESPONSES.  IF RESPONDENT ANSWERS, E.G., "OVER 30," PROBE)

        18-24..................................... 1
        25-34..................................... 2
        35-44..................................... 3
        45-54..................................... 4
        55-64..................................... 5
        65 or over ........................... 6
        Refused/NA  ..................... 9

Q22.    Regardless of race, are you of Hispanic, Latino, or Spanish origin?

        Yes ..................................... 1
        No ...................................... 2
        Don't know ........................... 8
        Refused/NA ......................... 9

Q23.    Regardless of your Hispanic, Latino, or Spanish origin, what is your race?  Are you white, black, Asian, Pacific Islander, American Indian, a member of some other race, or of mixed race?

        White………….…………… 1
        Black ………… 2
        Asian……………………….. 3
        Pacific Islander…………… 4
        American Indian …………. 5
        Mixed……………………… 6
        Other: Specify_____ 97
        Don't know……………….. 98
        Refused/NA………………. 99

Q24.  Finally, for statistical purposes only, we need to know if you have ever been convicted of a felony.

        Yes ..................................... **1** **[TERMINATE]**
        No ...................................... 2
        Don't know ........................... 8
        Refused/NA ......................... 9

Q25.  (NOTE GENDER OF RESPONDENT)

        Female ……………....................      1
        Male …………………………      2

Well, those are all the questions that I have.  Lastly, let me verify that I dialed ____-_____.
Again, my name is (*Your First Name*), and on occasion a small percentage of people like you are
called back just to verify that this interview actually took place.  May I please have your first
name, and first name <u>only</u>, so my supervisor will know whom to ask for in case this interview is
verified? Thank you for your time and have a good (evening/day)!

Respondent Name:_____  Phone (    )_____-_____
Interview Date:_____  End Time:_____

DECLARATION OF BRYAN EDELMAN, PH.D.