UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

v.

PAYTON GENDRON,

Defendant.

22-CR-109-LJV
DECISION & ORDER

---

The defendant, Payton Gendron, has asked this Court to transfer his case to the Rochester Division of the Western District of New York so that the trial will take place in Rochester. Docket Item 543. The Court has carefully reviewed all submissions by both sides on this issue and has weighed all relevant interests and factors. For the reasons that follow, the Court denies Gendron's request, and the case will be tried in Buffalo.

## LEGAL PRINCIPLES

Federal Rule of Criminal Procedure 18 requires that a trial be held "in a district where the offense was committed." Fed. R. Crim. P. 18. But "[t]here is no constitutional or statutory right to trial in a particular division of a judicial district." *United States v. Mathis*, 2015 WL 5012159, at *3 (W.D. Va. Aug. 21, 2015) (citing *United States v. Erwin*, 155 F.3d 818, 824 (6th Cir.1998)), *aff'd*, 932 F.3d 242 (4th Cir. 2019). Instead, "[t]he court must set the place of trial within the district with due regard for the convenience of the defendant, any victim, and the witnesses, and the prompt administration of justice." Fed. R. Crim. P. 18. "Although the text of Rule 18 refers only to considerations of convenience and the prompt administration of justice, the court may

also look to other factors such as 'docket management, courthouse space and security, and . . . pretrial publicity.'" *Mathis*, 2015 WL 5012159, at *3 (quoting *United States v. Lipscomb*, 299 F.3d 303, 342 (5th Cir. 2002)); *see also United States v. Merrill*, 513 F.3d 1293, 1304 (11th Cir. 2008) (explaining that that "the prompt administration of justice" includes "matters of security" and "the state of the court's docket generally," and that courts "must weigh the impact the trial location will have on the timely disposition of the instant case and other cases").  In sum, Rule 18 allows the district judge to hold the trial in the best location within the district considering all of these practical considerations and the interests of justice.

### **DISCUSSION**

The question here boils down to whether, considering all the relevant interests, this case would be "better off" in Rochester.  *See Mathis*, 2015 WL 5012159, at *4.  As noted above, the primary considerations are "the convenience of the defendant, any victim, and the witnesses, and the prompt administration of justice."  Fed. R. Crim. P. 18.

Gendron offers several reasons why the relevant factors favor transfer to Rochester.  First, Gendron says that pervasive news coverage in Buffalo will make it difficult, if not impossible, to select a fair and impartial jury.  *See* Docket Item 530 at 2. Second, Gendron says that there is a "higher incidence of bias, prejudgment[,] and personal connections to the crime amongst jury-eligible residents of the Buffalo Division."  *Id.*  Third, Gendron says that there is a "significantly greater possibility of seating a diverse jury that is representative of the community if the case is tried in

2

Rochester." *Id.* And finally, Gendron says that holding the trial in Rochester will result in a "shorter and more efficient jury selection process." *Id.*

The government counters that the case should stay in Buffalo, primarily because holding the trial in Rochester would "preclude many victims from attending the trial"—something they have the right to do under the Crime Victim Rights Act ("CVRA"). Docket Item 546 at 2. "[F]or the victims and their families," the government asserts, "the importance of a trial held in Buffalo cannot be overstated." *Id.* at 5. For the reasons that follow, the Court agrees with the government that the trial should remain in Buffalo.

First, the Court finds that Gendron has not demonstrated that he will be unable to seat a fair and impartial jury in Buffalo after a careful voir dire process. Moreover, although the Court agrees with Gendron that holding the trial in Buffalo will likely result in a lengthier jury-selection process, that consideration is far outweighed by the victims' interests in being able to attend the trial. Similarly, even if Gendron is correct that there is a greater chance of a diverse jury in Rochester—an assertion that is hardly a given—that interest likewise is outweighed by the significant hardship to the victims and their families of holding the trial in Rochester. Finally, the Court finds the administration of justice factor is neutral and therefore does not favor transfer.

I. **GENDRON HAS NOT DEMONSTRATED HE CANNOT GET A FAIR AND IMPARTIAL JURY IN BUFFALO**

   A. **Media Coverage**

There is no question that there has been significant media coverage of this case in the Buffalo area. There also is no question that the survey results on which Gendron relies indicate more familiarity with and knowledge about the case in Buffalo than in Rochester. For example, 90% of survey respondents in the Buffalo Division reported

3

familiarity with the case, whereas that number was 72% in the Rochester Division.  *See* Docket Item 530 at 10.  Similarly, 80% of Buffalo Division "survey respondents recognized at least three of seven media items tested in the survey, while just 63% of Rochester [Division] survey respondents recognized three or more of those media items."  *Id.*

"Knowledge, however, does not equate to disqualifying prejudice."  *In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015).  Indeed, "[d]istinguishing between the two is at the heart of the jury selection process."  *Id.*  Moreover, as the Supreme Court has observed, "[n]otorious crimes are almost, as a matter of necessity, brought to the attention of those informed citizens who are best fitted for jury duty."  *United States v. Tsarnaev*, 595 U.S. 302, 312 (2022) (citation and internal quotation marks omitted).  Thus, in most cases, "pretrial publicity[—]even pervasive, adverse publicity[—]does not inevitably lead to an unfair trial."  *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976); *see also Skilling v. United States*, 561 U.S. 358, 381 (2010) ("Prominence does not necessarily produce prejudice, and juror *impartiality* . . . does not require *ignorance*.").

Significantly, other recent death penalty cases have been tried in the cities where the crimes were committed despite extensive media coverage.  *See In re Tsarnaev*, 780 F.3d at 15 (affirming denial of motion to transfer venue of Boston Marathon bombing case); *United States v. Bowers*, 2022 WL 825437, at *1 (W.D. Pa. Mar. 18, 2022) (denying transfer of Tree of Life Synagogue shooting case out of Pittsburgh); *see also United States v. Roof*, 10 F.4th 314, 334 (4th Cir. 2021) (trial for shooting of nine Black

churchgoers held in Charleston, South Carolina, where crime took place).[1]  And the capital cases that courts have transferred for trial—*United States v. Christensen*, 2018 WL 6382050 (C.D. Ill. Dec. 6, 2018), and *United States v. McVeigh*, 918 F. Supp. 1467 (W.D. Okla. 1996)—are distinguishable.

*Christensen* involved the murder and "kidnapping of Y.Z., a female Chinese national." 2018 WL 6382050, at *1.  The district court granted the defendant's motion to transfer the case from the Urbana Division to the Peoria Division of the Central District of Illinois after weighing all the Rule 18 factors.  *See id.* at *7.  Although the defendant's motion relied heavily on pretrial publicity, the court made clear that it would have made the same decision regardless of that factor.  *See id.* ("[E]ven if the Court were to find a complete absence of prejudicial pretrial publicity[,] . . . the Court's balancing of the Rule 18 factors would still weigh in favor of transfer to the Peoria Division.").  So *Christensen* does not change the calculus regarding pretrial publicity.

In *McVeigh*, the Oklahoma City bombing case, the trial judge granted the defendant's motion to transfer the case to Denver, Colorado.  *See McVeigh*, 918 F. Supp. at 1474-75.  But there, the government agreed to transfer the case from Oklahoma City, and the only question was whether it would be tried elsewhere in Oklahoma or moved out of state.  *Id.* at 1470.  Moreover, the Oklahoma City case had unique factors not present here.  After acknowledging that "[t]here are so many variables involved that no two trials can be compared regardless of apparent similarities," the trial judge found that there was "so great a prejudice against the[] two

---

[1] In *Roof*, the defendant "did not challenge the venue, and his trial was held locally." *United States v. Hanes*, 2017 WL 3602056, at *3 (D.N.M. Jan. 20, 2017) (citing *United States v. Roof*, No. 2015-CR-00472 (D.S.C. July 20, 2015)).

defendants in the State of Oklahoma that they c[ould not] obtain a fair and impartial trial at any place fixed by law for holding court in that state." *Id.* at 1473-74.  In particular, the trial judge cited as "[m]ost interesting," "the frequency of the opinions expressed in recent televised interviews of . . . Oklahoma[ns] emphasizing the importance of assuring certainty in a verdict of guilty with an evident implication that upon such a verdict death is the appropriate punishment." *Id.* at 1474.  Additionally, the judge noted, there was "a citizens' movement in Oklahoma to support pending legislation which would sharply limit the reviewability of a death sentence." *Id.*

But as the First Circuit observed in *Tsarnaev*, the "trial judge's exercise of discretion in *McVeigh* to move the trial to Denver says nothing about how the trial judge here should exercise his discretion.  Nor was it meant to."  780 F.3d at 23.  Indeed, as noted above, the court in *McVeigh* explicitly noted that "no two trials can be compared regardless of apparent similarities."  918 F. Supp. at 1473.  *McVeigh* was decided three decades ago when the media landscape was very different.  More importantly, here, there is no indication that Buffalo citizens are organizing or speaking publicly to advocate for the death penalty, as was the case in Oklahoma.  Additionally, as this Court noted in denying Gendron's motion to change venue to the Southern District of New York, "most of the coverage [here] is either not prejudicial or is of evidence that is likely to be admitted at trial, such as the state court guilty plea[ and] the video footage of the shootings."  Docket Item 554 at 48; *cf. Rideau v. Louisiana*, 373 U.S. 723, 724-26 (1963) (finding denial of motion to change venue violated defendant's right to due process when inadmissible video confession had been shown repeatedly on local television in small community where case was tried).

6

What is more, if the case were moved to Rochester, that surely would cause a substantial uptick in Rochester media coverage close to the trial. And the likely barrage of coverage in what is now a market that the defense says is less saturated with coverage about this case might well do more harm than good. So at best, the defense asks the Court to guess. And the Court is not convinced that by the time in-person voir dire starts five months from now, a Rochester venire would be significantly less familiar with the case.[2]

### B.    Bias and Personal Connections to the Crime

Gendron next argues that "there is a bias against [him] in the Buffalo Division so great it poses a risk to his due process rights and the ability to seat a fair and impartial jury." Docket Item 530 at 10. In addition to case recognition and case knowledge discussed above, he says that "prospective jurors in the Buffalo Division maintained a 'presumption of death'" and "demonstrated strong fixed opinions." *Id.* at 11. And he notes that more jurors in the Buffalo Division reported personal connections to the crime and having "talked about it or [having] heard others talking about it in person or online." *Id.* at 12.

---

[2] The government again argues that Gendron "is largely responsible for the extensive publicity this case generated" because "he live-streamed his attack to the internet and almost contemporaneously distributed his racist so-called manifesto." Docket Item 546 at 19; *see also id.* ("The defendant's effort to maximize coverage and discussion of his crime—as even a brief perusal of his manifesto and Discord diary establish—should not inure to his benefit when it comes to the location of the trial."). As this Court explained when it denied Gendron's motion to transfer the case to the Southern District of New York, *see* Docket Item 554 at 48, it firmly rejects the argument that a defendant could somehow forfeit the right to an unbiased jury or the best-suited location for the trial because of the manner in which he committed the crime.

The Court has carefully reviewed the survey data on which Gendron relies and given it extensive thought. Ultimately, however, the Court finds that the issues Gendron raises can be addressed by careful voir dire that will, for example, disqualify individuals who have a fixed opinion that Gendron should receive the death penalty or whose personal connections to the shooting render them unable to be impartial. And while it is true that a higher percentage of Buffalo Division prospective jurors surveyed responded that Gendron should be sentenced to death—56% compared with 43% in the Rochester Division, *see id.* at 11—that does not necessarily mean that a higher percentage of *qualified* jurors not be removed for cause would vote for death in Buffalo than in Rochester. Nor is the 56% number so high that it makes the Court doubt that it will be able to find enough jurors with an open mind in Buffalo.

It is true that selecting a jury in Buffalo almost certainly will take longer than selecting a Rochester jury. But for the reasons discussed below, that administrative sacrifice is far outweighed by the victims' rights. *See infra* Section II. Based on the survey data and the size of the jury pool, the Court is confident that a fair and impartial jury can—and will—be found here.

**C.     Racial Makeup of Jury**

"A separate, but equally important, source of prejudice," Gendron says, "is the adverse impact on the ability to seat a diverse and representative jury" in Buffalo. Docket Item 530 at 13. "[B]ecause nearly half of Black potential jurors in the entire Buffalo Division live on the East Side of the City of Buffalo, where this crime was committed," Gendon says, "[s]ignificantly more are strongly connected to friends or family members who live there and/or were deeply and personally affected by this

crime." *Id.* And "[a]s a result, Black prospective jurors are disproportionately likely to be excused for cause." *Id.*

While that may be true, Gendron has not shown that an all-White jury is a foregone conclusion in the Buffalo Division. Indeed, by Gendron's own admission, more than half of the Black jurors in the Division do *not* live on the East Side of Buffalo. *See id.* Nor is it necessarily true that every single East Side juror will automatically be disqualified, especially because the "East Side" is a large section of the city that includes several smaller neighborhoods.[3]

Moreover, based on the racial makeup of the Buffalo Division, only one of twelve jurors statistically would be Black. *See* Docket Item 530 at 14 (8.85% of Buffalo Division potential jurors "are Black or African American"). So even if the jury ultimately has no Black jurors, that is not so far off from the statistical cross-section.

Ultimately, while this Court agrees with Gendron that increasing the chances of a diverse jury is laudable, that interest does not warrant transfer to Rochester—especially considering the significant interests of the victims and their families in holding the trial in Buffalo.

## II.    TRANSFER TO ROCHESTER WOULD SIGNIFICANTLY IMPACT THE VICTIMS' AND THEIR FAMILIES' ABILITY TO ATTEND TRIAL

The government explains at length why moving the trial to Rochester would "preclude many victims from attending the trial." Docket Item 546 at 2. Among other things, the government notes that due to the "need to juggle work schedules, childcare,

---

[3] *See* Open Data Buffalo, *Buffalo Neighborhoods*, https://data.buffalony.gov/stories/s/Neighborhood-Population-Profile/cry5-9ict/ (last visited Mar. 10, 2026).

9

elder care, medical appointments, and other pressing issues," victims and family members who might be able to attend portions of the trial in Buffalo between their daily obligations would not be able to attend any of it in Rochester. *Id.* at 8, 10. And that, the government argues, "would run counter to their rights under the CVRA not to be excluded from court proceedings." *Id.* at 8 (citing 18 U.S.C. § 3771(a)(3)). Additionally, the government says that "[t]ransfer to Rochester also heightens the burden on the mental health of victims, who regularly express to government attorneys the stress and anxiety they work through to attend even the most mundane and routine court appearances in Buffalo." *Id.* at 9. And, the government adds, transferring the case to Rochester also would affect the trial attorneys' ability to meet with the victims throughout the trial, as is required under the CVRA.[4] *Id.* at 8.

It is true, as Gendron observes, Docket Item 530 at 15, that other courts have transferred cases with victims to cities a similar distance away. *See Christensen*, 2018 WL 6382050, at *1, *3 (transferring capital case with one victim from Urbana, Illinois, to Peoria, approximately 90 miles away); *Mathis*, 2015 WL 5012159, at *1, *3-4 (transferring non-capital case with several victims from Charlottesville, Virginia, to Roanoke, approximately 120 miles away). But in those cases, the courts found that the move would not substantially burden the victim or victims. *See Christensen*, 2018 WL 6382050, at *6 (finding only that the single "victim's family will likely be somewhat inconvenienced if the trial of this case takes place in the Peoria Division"); *Mathis*, 2015

---

[4] The government also notes that Rochester would be inconvenient for "the vast majority of witnesses—both civilian and law enforcement alike—[who] will come from the Buffalo area." Docket Item 546 at 6. Although that factor supports keeping the trial in Buffalo, the Court did not weigh it nearly as heavily as the impact on the victims, many of whose participation would be precluded by a Rochester trial.

WL 5012159, at *4 (finding only that "Roanoke will be a longer drive for some victims and witnesses" causing "inconvenience").  Here, however, the government has shown that moving the trial will be more than an "inconvenience" to the numerous victims and their families; indeed, the government has shown that it would at least be a significant burden to some and would prevent others from attending altogether.

This Court also acknowledges that in *McVeigh*, the court transferred the case to Denver despite being "acutely aware of the wishes of the victims of the Oklahoma City explosion to attend this trial and that it will be a hardship for those victims to travel to Denver."  918 F. Supp. at 1474.  The *McVeigh* court also noted that "[t]he attorneys for the government ha[d] earnestly argued that statutory provisions for victims must be considered by the court."  *Id.*  In *McVeigh*, however—as noted above, *see supra* Section I.A—the court found that the defendants would not be able to "obtain a fair and impartial trial" in Oklahoma.  *Id.* at 1474.  Therefore, the court found, "[t]he interests of the victims in being able to attend this trial in Oklahoma are outweighed by the court's obligation to assure that the trial be conducted with fundamental fairness and with due regard for all constitutional requirements."  *Id.* at 1475.  Here, by contrast, this Court finds that, with careful voir dire, Gendron can get a fair jury in Buffalo.  Moreover, the trial in *McVeigh* was eight years before the passage of the CVRA, which substantially expanded the rights of crime victims in federal prosecutions.  *See United States v. Patkar*, 2008 WL 233062, at *5 (D. Haw. Jan. 28, 2008) (noting, among other things, the fact "[t]hat Congress provided victims with the ability to enforce the CVRA by filing a writ of mandamus . . . makes clear that the law was intended to provide meaningful rights, and not a simple laundry list of aspirational goals").  So for all those reasons, *McVeigh* does

11

not persuade this Court that the same decision—that is, to transfer the case—is appropriate here.

### III. THE ADMINISTRATION OF JUSTICE FACTOR IS NEUTRAL

Both sides have raised arguments about why the administration of justice would be better served in their preferred location. Gendron argues that it will take longer and require calling more prospective jurors to seat a jury in Buffalo, Docket Item 530 at 17-19; the government notes that the Clerk's office staff in Buffalo already has made extensive preparations for the trial and that the Rochester courthouse does not have a "sallyport" to discreetly transport detained defendants into the building, which could cause security issues, Docket Item 546 at 14-15. The Court has weighed those arguments and finds that they favor neither side.

First, the Court wants to make clear that the convenience of the Court and its staff did not factor into this decision. Regardless of the inconvenience, this Court and its staff would do whatever was necessary to try this case in Rochester if that was what the Court thought best. Moreover, while it is true that substantial planning already has gone into the logistics of holding the trial in Buffalo, the Court also is confident that the Clerk's office could have pivoted to plans for Rochester without significant delay if it had been necessary.

The security issues identified by the government cut somewhat in favor of Buffalo, but, as Gendron observes, it will almost certainly take longer to select a jury in Buffalo, so those factors balance each other. All in all, the Court finds the administration of justice factor to be neutral.

* * *

In sum, the Court finds that it will be able to select, and that Gendron will have, a fair and impartial jury in either location. In light of that finding, and after weighing all the relevant factors under Rule 18, the Court finds that the trial should be held in Buffalo. In particular, the Court finds that the rights of the victims to be present at trial and the fact that moving the trial to Rochester would preclude at least some of them from attending outweighs Gendron's interest in moving the trial to Rochester due to lessened pretrial publicity and community impact.

## CONCLUSION

For all those reasons, Gendron's motion for intradistrict transfer, Docket Item 530, is DENIED.

SO ORDERED.

Dated:   March 10, 2026
         Buffalo, New York

                                           /s/ Lawrence J. Vilardo
                                           LAWRENCE J. VILARDO
                                           UNITED STATES DISTRICT JUDGE