UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

PAYTON GENDRON,

Defendant.

22-CR-109-LJV
DECISION & ORDER

The defendant, Payton Gendron, has been indicted on 27 counts in connection

with a shooting at a Tops Market in Buffalo, New York, on May 14, 2022.  Docket Item

6.  Before the Court are ten motions filed by Gendron to suppress evidence.  Docket

Items  376 (Facebook), 378 (Google), 380 (iPhone 11 and HP laptop), 381 (statements),

399 (Apple iCloud account), 400 (desktop computer and thumb drives), 401 (Verizon

wireless), 402 (iPhone under state warrant), 403 (Discord), and 405 (Gendron's

residence).[1]

After the government filed two consolidated responses to the motions, Docket

Items 420 and 435, Gendron replied, Docket Items 436, 437, 438, 450, 451, 452, 453,

454, and 455.  Gendron also filed a supplemental memorandum regarding the

statements he sought to suppress, Docket Item 461, and an affirmation of standing with

respect to his home, electronic devices, and online accounts, Docket Item 449.  The

---

[1] Gendron also moved to suppress evidence recovered from Snapchat, Docket
Item 377, and his State University of New York ("SUNY") Broome email account, Docket
Item 379.  In response, the government indicated that it did "not currently intend to use
evidence obtained from those accounts in its case-in-chief."  Docket Item 420 at 1 n.1.
Therefore, those two motions are denied without prejudice as moot.

government then moved to file a sur-reply regarding Discord, Docket Item 460, and the Court granted that motion and accepted the sur-reply, Docket Item 463.

The Court heard oral argument and reserved decision.  *See* Docket Items 462 (minute entry) and 471 (transcript).  After careful consideration, the Court denies Gendron's motions to suppress for the reasons that follow.

## DISCUSSION [2]

### I.    EMERGENCY DISCLOSURE REQUESTS

In the 36 hours following the shooting, law enforcement submitted emergency disclosure requests ("EDRs") to Facebook, Verizon, Apple, and Discord for information related to Gendron.  *See* Docket Item 376 at 2; Docket Item 401 at 3; Docket Item 399 at 2; Docket Item 403 at 2.[3]  Different service "providers have different processes for submitting EDRs."  Docket Item 471 at 37-38.  For example, Verizon has an EDR form with boxes to check and blanks to fill that law enforcement must complete and then fax to Verizon.  *See* Docket Item 401 at 29.  Other providers use an online portal.[4]  *See* Docket Item 471 at 38.  Gendron asks the Court to suppress the contents of each EDR response except Discord's, arguing that they violated the Fourth Amendment and the

---

[2] The Court assumes the reader's familiarity with the background of this case and will discuss only those facts necessary to explain its decision.

[3] Page numbers in docket citations refer to ECF pagination.

[4] The government does not have a copy of the Facebook EDR, possibly because it was sent through an online form.  *See* Docket Item 471 at 37-38.  Gendron argues that this alone requires suppression.  Docket Item 376 at 2 n.1.  This Court disagrees. Although it is not clear why the request was not preserved, there is no evidence of misconduct by the government that might warrant suppression.

Stored Communications Act ("SCA").  *See* Docket Item 376 at 8-9; Docket Item 401 at 6-9; Docket Item 399 at 13-15.

The government sent two EDRs to Verizon.  On both, the government checked a box indicating that the request "relate[d] to an emergency involving danger of death or serious physical injury to a person, necessitating disclosure without delay of information relating to that emergency."  Docket Item 401 at 29, 31.  On the first request—issued on May 14, 2022, shortly after Gendron had been taken into custody—the government added "Active Shooter situation with a possible accomplice outstanding" in the "Additional Comments" section.  *Id.* at 29.

The Apple EDR stated that "a mass shooting occurred at a Tops Marketplace in Buffalo, NY," and that "the subject [wa]s currently in custody."  Docket Item 399 at 2.  But the government said that there nevertheless was still an emergency because "FBI Buffalo is currently working to identify any accomplices the subject had prior to committing the attack."  *Id.* at 2-3.[5]  As noted above, *see supra* note 4, there is no record of the Facebook EDR which apparently was sent online.

The SCA authorizes electronic service providers to voluntarily disclose information about a subscriber's account "if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay" of information pertaining to a customer's account.  18 U.S.C.

---

[5] The government's explanation of the emergency in the Discord EDR was somewhat more detailed:  "[I]t is uncertain whether the subject acted completely alone or had accomplices. It is also unknown whether this incident is isolated or if there are additional connected acts of violence yet to be carried out."  Docket Item 403 at 2 n.1, 22.

§ 2702(b)(8) (disclosure of communications); *id.* § 2702(c)(4) (disclosure of customer records).  Gendron says that Facebook, Verizon, and Apple violated the SCA because he already was in custody by the time investigators submitted the EDRs, and as a result, "neither law enforcement nor [the service providers] had any basis to believe there was an ongoing emergency involving 'danger of death or serious physical injury.'" Docket Item 376 at 8; Docket Item 399 at 14; Docket Item 401 at 7.  This Court disagrees.

As an initial matter, to succeed on his SCA argument, Gendron would have to show that the providers—*Facebook, Verizon, and Apple*—did not have a good faith belief there was an ongoing emergency.  In other words, even assuming that the government misrepresented the emergency situation—which, as explained below, the Court finds was not the case—the communications providers would violate the SCA only if they knew of that misrepresentation.  And there is no evidence of that.[6]

But that does not end the inquiry:  If the EDRs submitted to these entities deliberately included false or misleading information, then the government's receipt of

---

[6] On the contrary, there is good reason to believe that the providers would not respond to an EDR that they knew misrepresented the facts.  Facebook, Verizon, and Apple are all large companies with robust legal teams.  Indeed, Facebook represents on its parent company's website that it "has a dedicated, trained Law Enforcement Response Team (LERT) that reviews and evaluates every government request for user data individually, whether the request was submitted related to an emergency or through legal process obtained by law enforcement or national security authorities." *See* Meta Transparency Center, *Further asked questions* (last visited May 18, 2026), https://transparency.meta.com/reports/government-data-requests/further-asked-questions/.  And, Facebook explains, if the team "determine[s] that a government request is not consistent with applicable law or our policies, we push back and engage the governmental agency to address any apparent deficiencies.  If the request is unlawful (for example, overly broad, or legally deficient in any way), we will challenge or reject the request." *Id.*  So there is good reason to believe that the providers would not turn over requested information if they knew that the request misrepresented the facts.

the responses might constitute a Fourth Amendment violation. *See United States v. Turner*, 2025 WL 1939591, at *6 (W.D. Va. July 15, 2025) (explaining that in addition to possible SCA violation, "the [c]ourt must also consider whether the [g]overnment violated the Fourth Amendment when it obtained the information from [third parties] without a warrant"). In fact, the government concedes that it cannot submit blatantly false EDRs, *see* Docket Item 471 at 26-27, which is what Gendron asserts happened here.

The only statement in the EDRs that gives this Court pause is the description of an "[a]ctive [s]hooter situation with a possible accomplice outstanding" in one of the Verizon EDRs. *See* Docket Item 401 at 29. As Gendron notes, it is undisputed that he had been in custody for at least a few hours at the time the EDR was sent; for that reason, Gendron says, suggesting an "[a]ctive [s]hooter situation with a possible accomplice outstanding" was deliberately misleading. *Id.* at 7. After careful consideration, this Court disagrees.

Although one can read the EDR as reporting a current, ongoing active shooter situation, it also can be read as reporting a "possible accomplice outstanding" in connection with what had been an active shooter situation—precisely the status when the EDR was submitted. Indeed, "with a possible accomplice outstanding" arguably suggests that the perpetrator is not outstanding. The crux of the emergency was that law enforcement did not then know whether Gendron had acted alone. And the Court is sensitive to the exigencies facing law enforcement in such a situation.

Gendron argues that "the SCA provides for disclosure *during* an emergency [and] is not an investigative tool for law enforcement to use in the wake of one emergency to

5

rule out the possibility that another emergency might arise."  Docket Item 452 at 4  And

that is largely accurate.  But reading the statute as narrowly as Gendron does would

hamstring law enforcement when it still needs to act quickly.  What is more, his reading

is inconsistent with the statutory language.

As noted above, the SCA permits the release of information pertaining to a

customer's account "if the provider, in good faith, believes that an emergency involving

danger of death or serious physical injury to any person requires disclosure without

delay."  18 U.S.C. § 2702(b)(8); *id.* § 2702(c)(4).  Such "emergenc[ies]" often may be

the threat of danger—that is, the risk of harm rather than actual ongoing harm.  *Cf. Mora*

*v. City of Gaithersburg*, 519 F.3d 216, 226 (4th Cir. 2008) (allowing warrantless search

of suspect's belongings after his arrest because the "[t]he authority to defuse a threat in

an emergency necessarily includes the authority to conduct searches aimed at

uncovering the threat's scope").  For example, if law enforcement learns one morning

that someone plans to shoot up a supermarket at noon, the Court would be hard

pressed not to call that an "emergency."  Or to use an example from a different context,

a state of emergency for a hurricane does not end the moment the winds die down;

depending on the circumstances, many risks may remain for some time.  Here, law

enforcement officers needed to know whether there might be an accomplice, and they

would have been derelict in their duties if they simply took Gendron's word for it.

Relying on the Supreme Court's decision in *Carpenter v. United States*, 585 U.S.

296 (2018), Gendron also argues that Verizon's EDR responses violated his rights

under the Fourth Amendment.  *Carpenter* held that the compelled disclosure of

comprehensive cell site location information ("CSLI") is a Fourth Amendment search

6

that generally requires a search warrant.  But the Court explicitly noted that "case-specific exceptions"—including "urgent situation[s]" such as "active shootings"—could still support the warrantless search of cell-site records.  *Id.* at 319-20; *see also id.* at 320 ("While police must get a warrant when collecting CSLI to assist in the mine-run criminal investigation, the rule we set forth does not limit their ability to respond to an ongoing emergency.").

The bottom line is that in the wake of a mass shooting like this, the "emergency" is not limited to taking a suspect into custody.  And while Gendron stated in his manifesto that he was acting alone, authorities were not obligated—nor would it have been prudent for them—to take that statement at face value.[7]  The EDRs all were issued on the day of the shooting or the following day while law enforcement was scrambling to determine the scope of the threat.  So while there is no question that the Verizon EDR could have been more carefully worded, the Court finds no misconduct or error in law enforcement's submission of the EDRs.[8]  *See United States v. Torres*, 661 F. Supp. 3d 1098, 1102 (D.N.M. 2023) (finding that "even assuming the FBI's emergency SCA requests qualified as searches, [d]efendant's location data need not be suppressed because exigent circumstances justified the requests").

The decision to produce the information then was made by Facebook, Verizon, and Apple.  And law enforcement was entitled to rely on that decision in accepting that information.  *See United States v. Duncan*, 2024 WL 331890, at *2-3 (E.D.N.C. Jan. 29,

---

[7] Indeed, elsewhere in his manifesto, Gendron apparently "utilized a photograph of another white male (with glasses and dyed blond hair) in order to create disinformation."  *See* Docket Item 401 at 38-39.

[8] In fact, the nature of the emergency counsels forgiving sloppy draftsmanship.

2024) (finding no Fourth Amendment violation because law enforcement relied in good faith on Meta's voluntary disclosure of Instagram data under SCA).

For all those reasons, there is no basis to suppress the EDR responses from Facebook, Verizon, and Apple. On the contrary, suppressing the information under the circumstances here might result in hesitation during the next gun-related emergency— hesitation that might make that event all the more disastrous.

## II. EVIDENCE OBTAINED UNDER FEDERAL WARRANTS

Gendron next challenges search warrants issued by the Honorable H. Kenneth Schroeder, Jr., United States Magistrate Judge for the Western District of New York, for Gendron's Facebook account, Docket Item 376; Google account, Docket Item 378; iPhone and laptop, Docket Item 380; desktop computer and thumb drives, Docket Item 400; Apple iCloud account, Docket Item 399; and Discord account, Docket Item 403. Gendron also challenges a warrant issued by the Honorable Thérèse Wiley Dancks, United States Magistrate Judge for the Northern District of New York, to search Gendron's residence, Docket Item 405. For the reasons that follow, the Court finds that the warrants were supported by probable cause, were sufficiently particular, and were not overbroad. But even if the Court did not reach those conclusions, it still would deny the motions to suppress under the good faith exception.

### A.    Legal Principles

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. "[P]robable cause to search is demonstrated where the totality of circumstances

8

indicates a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

In addition, "the Warrants Clause both 'requires particularity and forbids overbreadth,'" *United States v. Zemlyansky*, 945 F. Supp. 2d 438, 450 (S.D.N.Y. 2013) (quoting *United States v. Cioffi*, 668 F. Supp. 2d 385, 390 (E.D.N.Y. 2009)), which are "two distinct legal issues," *United States v. Romain*, 2014 WL 6765831, at *5 (S.D.N.Y. Dec. 1, 2014) (citation and internal quotation marks omitted), *aff'd*, 678 F. App'x 23 (2d Cir. 2017) (summary order).  "The particularity requirement prohibits general search warrants and requires a sufficient description of the evidence to be seized." *United States v. Hernandez*, 2010 WL 26544, at *9 (S.D.N.Y. Jan. 6, 2010).  Along the same lines, a warrant cannot be so broad as to sweep within its ambit evidence for which there is no probable cause.  *Romain*, 2014 WL 6765831, at *7.

"To be sufficiently particular under the Fourth Amendment, a warrant must satisfy three requirements": (1) it "must identify the specific offense for which the police have established probable cause," (2) it "must describe the place to be searched," and (3) it "must specify the items to be seized by their relation to designated crimes." *United States v. Ulbricht*, 858 F.3d 71, 99 (2d Cir. 2017) (internal citations and internal quotation marks omitted), *abrogated on other grounds by Carpenter*, 585 U.S. 296.

To determine whether a warrant is overbroad, on the other hand, "[c]ourts must ask whether the warrant authorized [a] search and seizure as to which there is no probable cause." *Romain*, 2014 WL 6765831, at *7 (citations and internal quotation marks omitted).  "In other words, a warrant is overbroad if its 'description of the objects

9

to be seized . . . is broader than can be justified by the probable cause upon which the warrant is based.'"  *Id.* (alteration in original) (quoting *United States v. Galpin*, 720 F.3d 436, 446 (2d Cir. 2013)).  For example, the Second Circuit held in *Galpin* that a warrant authorizing a search for "images depicting child sexual activity" was facially overbroad when the issuing judge found probable cause to believe that the defendant had violated only a law requiring the registration of sex offenders.  *Id.* at 448.  The court reasoned that because "the warrant neither mention[ed] the luring offense nor incorporated the warrant application," it was "facially overbroad and thus violated the Fourth Amendment."  *Id.* (citation omitted).

"[A] court reviewing a challenged warrant—whether at the district or appellate level—'must accord considerable deference to the probable cause determination of the issuing magistrate.'"  *United States v. Clark*, 638 F.3d 89, 93 (2d Cir. 2011) (quoting *Walczyk*, 496 F.3d at 157).  "Thus, the task of a reviewing court is simply to ensure that the 'totality of the circumstances' afforded the magistrate 'a substantial basis' for making the requisite probable cause determination."  *Id.* (quoting *Gates*, 462 U.S. at 238).

Moreover, a warrant that is issued in "violation of the Fourth Amendment does not necessarily result in the application of the exclusionary rule."  *United States v. Rosa*, 626 F.3d 56, 64 (2d Cir. 2010).  That is, while a determination that a warrant was issued without probable cause may require the suppression of the evidence seized under that warrant, the Supreme Court has "recognized an exception to the exclusionary rule for 'evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant.'"  *Galpin*, 720 F.3d at 452 (quoting *United States v. Leon*, 468 U.S. 897,

10

922 (1984)).  But there are "four circumstances" in which this "good faith exception to the exclusionary rule" does not apply:

> (1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned [the magistrate's] judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable.

*Id.* (citation omitted).

### B.    Facebook

Gendron concedes that the affidavit used to obtain the Facebook warrant "contained sufficient facts to establish probable cause to believe that a racially motivated mass shooting resulting in the deaths of 10 people was committed on May 14, 2022, and that [he] was the person who committed it."  Docket Item 376 at 7.  But Gendron challenges the warrant because its "only basis for probable cause came from illegally obtained information"—namely, Facebook's EDR response.  *Id.* at 7-8.  Because this Court already has found that the EDR response passes muster, *see supra* Section I, it also rejects Gendron's argument that the warrant response should be suppressed as the fruit of the poisonous tree.

### C.    Verizon

#### 1.    Probable Cause

The Verizon warrant sought Gendron's historical CSLI dating back to May 2021. Docket Item 401 at 56-57.  In the warrant application, the affidavit of FBI Special Agent Chrisopher Dlugokinski explained why that information was relevant and necessary. More specifically, Dlugokinski said that the FBI's Cellular Analysis Survey Team ("CAST") "is a highly[ ]qualified group of federal law enforcement agents who are

experts in the field of historical cell site analysis." *Id.* at 49.  CAST agents use "historical cell site analysis . . . [to] help identify criminal suspects and the general location of both suspects and crime victims at fixed points in time." *Id.*

In response to the EDR, Verizon produced Gendron's CSLI for January to May 2022. *Id.* at 50.  The warrant application sought CSLI for eight additional months— dating back to May 2021—"[b]ased upon [Gendron]'s documented statements contained in his manifesto concerning planning." *Id.* at 51.

Gendron first argues that because law enforcement unlawfully used the Verizon EDRs to obtain his CSLI, that "information should be excised from the warrant application, and this Court should consider whether, in its absence, the application provided probable cause to believe that evidence of the May 14, 2022, shooting would be found in Payton Gendron's cellular data." *See* Docket Item 452 at 12.  But as already noted, this Court disagrees that the EDR was issued improperly. *See supra* Section I.  And there is no question that the Verizon CSLI provided in response to the EDRs established probable cause for the search warrant.

But even if that were not so, other information in the warrant application also provided the requisite probable cause.  For example, Dlugokinski explained how specific facts supported his belief that Gendron's physical location was, itself, evidence of his crimes.  Among other things, the FBI had found in Gendron's bedroom "a receipt for a purchase of a candy bar at the Tops supermarket located at 1275 Jefferson Avenue, Buffalo, New York, on March 8, 2022"—roughly two months before the attack—"and a sketch of the inside of the Tops supermarket located at 1275 Jefferson Avenue, Buffalo, New York." Docket Item 401 at 48-49.  Those items led Dlugokinski to

conclude that Gendron had "cased and target[ed]" Tops before his attack. *Id.* at 49. Especially combined with the CSLI information obtained from the EDR response, that was sufficient to support a nexus between the information sought and potential evidence of the crime.

### 2.    Particularity

Gendron argues that the Verizon warrant was insufficiently particularized because it "failed to adequately specify the crime under investigation." *Id.* at 17.  He concedes that the warrant application was incorporated by reference, but he says that "no reasonable executing officer would read the warrant as limiting authorized seizures to evidence of the Tops Market shooting on May 14, 2022." *Id.* at 18.  This Court disagrees.  Indeed, as the government observes, the warrant application "discusses *no crime* other than the defendant's attack on Tops," *see* Docket Item 435 at 44, so the only fair reading of the warrant and application together necessarily pointed to that shooting and only to that shooting.  The Verizon warrant therefore identified the crime under investigation and was sufficiently particular.

### 3.    Overbreadth

In addition to directing Verizon to turn over subscriber information about the owner of the account, the warrant requested:

> All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:
>
>> i. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone

numbers (call detail records), email addresses, and IP addresses); and

ii. information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received as well as per-call measurement data (also known as the "real-time tool" or "RTT" data).

Docket Item 401 at 63.  In support of this request, Dlugokinski explained that "[w]hen sending or receiving a communication, a cellular device broadcasts certain signals to the cellular tower that is routing its communication." *Id.* at 51.  And the government sought that information with respect to Gendron "[b]ased upon [Gendron]'s documented statements contained in his manifesto concerning planning." *Id.*  For example, Dlugokinski noted, "historical cell site records w[ould] provide evidence of [Gendron]'s movements when he had his cell phone on and in use." *Id.*

Gendron argues that the warrant was overbroad because "the government offers no explanation for why it sought the detailed information in subsection (i) for a year's worth of [his] communications."  Docket Item 452 at 15.  "For example," Gendron says, "nothing in the warrant application established probable cause to believe that [he] had called or text messaged any other person in relation to the planning or execution of the May 14, 2022, shooting."  Docket Item 401 at 22.

But the warrant specifically excluded *the contents* of any communications; it sought only records of the *timing* and *location* of any communications.  Based on the extensive planning revealed in the manifesto and the receipts found in Gendron's bedroom indicating that he had previously visited the Tops as part of his planning, there was probable cause to obtain CSLI that would reveal Gendron's location and movements dating back to a year before the shooting.  It was important, for example, for

14

law enforcement to know whether Gendron had visited the Tops—or other potential targets—back in 2021.

What is less clear to the Court is whether "the source and destination" data of others, *see id.* at 63—such as the phone numbers of call recipients—was necessary to tracking Gendron's movements or could have been excised from the data. But even assuming that the identities of the other phone numbers with whom Gendron communicated was overbroad, law enforcement still was entitled to rely on the signed warrant under the good faith exception. *See infra* Section II.J.

### 4.    Execution

Finally, Gendron argues that the manner in which the government executed the Verizon warrant violated the Fourth Amendment. *See* Docket Item 401 at 24-26. More specifically, he says that "[t]here are many unknowns about the government's execution of the Verizon warrant in this case" and he "requests an evidentiary hearing to establish those facts." *Id.* at 25. He also notes that "the government appears to have retained the entire Verizon warrant return—which unquestionably contains information outside the scope of the warrant." *Id.* And, he says, "[i]t remains unclear whether, when, and how the government accessed, used, or searched the full return after the original search." *Id.* at 26.

The government counters that there are "no 'unknowns' about how the Verizon warrant was executed": "the FBI reviewed the cell site data and prepared maps showing the movement of the defendant's phone on multiple dates that were relevant to the investigation," and "[d]rafts of those maps were provided in discovery." Docket Item 435 at 46. And as to retaining a copy of the non-responsive information, the government

15

says that it "did so to ensure that it could provide the defendant with a copy of his entire Verizon account in discovery" and that it "is aware that it may not re-search the account without a new search warrant." *Id.*

Based on these representations—which the record provides no reason to doubt—the Court finds that the government did not violate the Fourth Amendment in its execution of the Verizon warrant and sees no basis for an evidentiary hearing.

### D.    Google

#### 1.    Probable Cause

Gendron concedes that Dlugokinski's affidavit applying for the warrant to search Gendron's Google account "contained sufficient facts to establish probable cause to believe that a racially motivated mass shooting resulting in the deaths of ten people was committed on May 14, 2022, and that . . . Gendron was the person who committed it." Docket Item 378 at 5.  Gendron argues, however, that "the affidavit failed to establish probable cause to believe that evidence of the crime would be found in [his] Google account." *Id.*  This Court disagrees and finds that Dlugokinski's affidavit provided ample probable cause to search Gendron's Google account.

Dlugokinski explained how Gendron's manifesto described in great detail both the racist philosophy underpinning the attack and the logistics of the attack itself. *See Id.* at 36-42.  As the government observes, Gendron's "extensive research—some of which he admitted having found 'online'—must have come from somewhere." Docket Item 420 at 12.  What is more, Gendron specifically wrote that "*according to Google* and an independent study, 4:00 p.m. on Friday is [the] most populated time at Tops." Docket Item 378 at 41 (emphasis added).  The fact that Gendron clearly had conducted

significant online research and admitted to using Google for at least one piece of that research was sufficient probable cause to search his Google account.

### 2.        Overbreadth and Particularity

Gendron next contends that the Google warrant was overbroad "because it imposed no temporal limitation on the data to be searched or seized."  Docket Item 378 at 9 (emphasis omitted).  And, in fact, Dlugokinski "request[ed] information pertaining to the Subject Account from creation of the account to present."  *Id.* at 57 (bold omitted). But given the warrant application, authorizing the search of all that information did not cross the overbreadth line.

In support of his request, Dlugokinski explained that based on his training and experience, "individuals tend to form radical beliefs over time, and this investigation, including [Gendron's] manifesto, [had] establish[ed] that [Gendron had] conducted research and formed his racist beliefs over time."  *Id.*  Because the FBI was investigating Gendron for hate crimes, any expressions of racial animus—whenever they were made—therefore might well be or lead to evidence of those crimes.

Moreover, as the government observes, based on the description of what is to be seized, "the 'effective[] time-limit[],' is the unknown date when the defendant began conducting research to justify and plan his attack."  *See* Docket Item 420 at 14 (internal citation omitted) (quoting *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 306 (S.D.N.Y. 2018)).  In other words, "[i]n signing a warrant with no temporal limit, Judge Schroeder agreed that there was probable cause to search the entirety of [Gendron's]

17

Google account to determine when, exactly, he began forming racist beliefs."[9]  *Id.*

Under those circumstances, the Court finds that the warrant was not overbroad

notwithstanding the lack of temporal limitation.[10]

Gendron also argues that the warrant was overbroad because it included "22

separate listed categories of data [that] cover virtually every single type of record that

Google maintains with respect to an individual account."  Docket Item 378 at 13.  He

says that "even if the single reference to Google in the manifesto established probable

cause to search some portion of [his] internet search history[,] . . . it certainly failed to

provide any justification for permitting law enforcement to examine his emails, contact

list, calendar, text messages, documents, photos, videos, maps, location history,

payment information, Google Play activity, or Google Voice records."  *Id.* at 13-14.

Again, this Court disagrees.  Common sense, combined with the extensive research in

Gendron's manifesto, leads to the conclusion that incriminating evidence might well be

found throughout his Google account.

---

[9] Additionally, given Gendron's young age at the time, this was not going to amount to a search of decades of material.

[10] The Court also rejects Gendron's argument that he was entitled to a hearing under *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978), to establish whether the government's omission of the date the account was created "was intentional or reckless."  *See* Docket Item 378 at 10.  "To be entitled to a *Franks* hearing, a defendant must make 'a substantial preliminary showing' of (1) falsity, 'that a false statement . . . was included by the affiant in the warrant affidavit,' (2) knowledge, that the affiant made the allegedly false statement 'knowingly and intentionally, or with reckless disregard for the truth,' and (3) materiality, that 'the allegedly false statement is necessary to the finding of probable cause.'"  *United States v. Sandalo*, 70 F.4th 77, 85 (2d Cir. 2023) (quoting *Franks*, 438 U.S. at 155-56).  Gendron falls far short of meeting this "heavy" burden, which requires "more than a mere conclusory showing."  *Id.* at 86.

18

For example, the manifesto contained numerous images of weapons and related equipment, making it likely that his Google photos included similar images. The manifesto referred to research about attack locations, leading to the commonsense conclusion that Gendron likely used a mapping service to plan. And Dlugokinski stated that in his "training and experience, people who utilize Google's search engine and have a [G]mail account"—as Gendron did—"tend to utilize other features of Google's services." *Id.* at 57.

Gendron also argues that the warrant was both overbroad and insufficiently particular because it was not limited to information directly related to the May 14 shooting but also included broader categories of information regarding, for example, racial animus and Gendron's acquisition of firearms generally. *See id.* at 16. But that argument is based on "the incorrect premise that probable cause is limited to 'the shooting at the Tops Market on May 14, 2022.'" *See* Docket Item 420 at 18 (quoting Docket Item 378 at 17). As the government explains, "[t]he shooting itself is, of course, a significant part of the probable cause underlying the warrant. But it is far from everything." *Id.* at 18-19. In particular, "because there was probable cause to believe that [Gendron] committed racially-motivated murder, the warrant properly authorized agents to seize evidence related to the nature and bases for [his] racial animus"— something the government must prove in a hate-crime case. *See id.* at 19.

For all those reasons, the warrant was not overbroad, nor did it lack particularity. But in any event, as explained below, even if some of the categories of data went too far afield, the good faith exception saves the search. *See infra* Section II.J.

19

### 3.    Execution

Google provided Gendron's entire account to FBI agents, and the agents reviewed all of it.  *See* Docket Item 378 at 23.  Gendron says that the manner in which the agents executed the warrant violated his Fourth Amendment rights because they "seized large quantities of data from the Google return that were outside [] the scope of the seizure authorized by the warrant."  *Id.* at 22.  He acknowledges that "[w]hen items outside the scope of a valid warrant are seized, the normal remedy is suppression and return of those items."  *Id.* (quoting *United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988)).  But he says that in this case, suppression of all material under the warrant is justified due to the agents' "flagrant disregard of the warrant's terms."  *Id.* (quoting *Matias*, 836 F.2d at 747).

The government explains that "[w]hen agents identified responsive evidence in [Gendron]'s Google account, they did two things: they documented their finding in an FD-302[,] and they 'seized' the digital evidence by attaching it to the FD-302."  Docket Item 420 at 21.  In some instances, the government says, there was no way to segregate non-responsive information, such as targeted advertisements based on Gendron's internet searches.  *Id.* at 22.  But the government notes that it will not use any irrelevant material in its case.  *Id.*

Even if Gendron is correct that material outside the warrant was seized, he has not met the high bar of showing "flagrant disregard" of the warrant's parameters that would justify suppressing everything obtained under the warrant.  Rather, the Court finds that only irrelevant material should be suppressed.  Because the government has said that it will not use that material, there is nothing to suppress at this point.  If the

government attempts to offer evidence that Gendron thinks was outside the warrant's scope, he can challenge that specific evidence in due course.

### E.    iPhone and Laptop

When police officers took Gendron into custody, they seized an iPhone11 that he was carrying with him. *See id.* at 25. That same day, the Honorable Craig D. Hannah, then-Chief Judge of Buffalo City Court, issued a warrant authorizing law enforcement to search Gendron's Ford Taurus, which Gendron drove to the site of the shooting. *See id.* Among other things, law enforcement seized an HP laptop computer that was in the car. *See id.* Two days later, Judge Schroeder issued search warrants authorizing law enforcement to search the iPhone and laptop. *See id.*

### 1.    Probable Cause

Gendron argues that "[e]ven if [Special Agent] Dlugokinski's affidavit connects [Gendron] to the shooting on May 14, 2022, nothing in the affidavit connects his *cell phone* or *laptop* to that shooting." Docket Item 380 at 13. "Rather," he says, Dlugokinski "simply speculates that because the manifesto referenced internet research—and because digital devices contain large amounts of information, including about someone's recent contacts and whereabouts—there would be evidence related to the May 14, 2022, shooting on those devices." *Id.*

This Court disagrees and finds that there was a sufficient nexus between the devices to be searched and the crimes charged. Among other things, Dlugokinski explained in his affidavit that Gendron had his iPhone with him during the attack and used it to livestream the attack over the internet through Twitch, a social media application. *Id.* at 46. In fact, Gendron had specifically stated in his manifesto that he

21

would be using his "iPhone 11 . . . to livestream the gopro footage onto [his T]witch account" and "to upload all [his] posts and such."  Docket Item 420-1 at 144. Dlugokinski also explained that the manifesto described "extensive [i]nternet-based research" that Gendron conducted in planning the attack.  Docket Item 380 at 48.  And he said that Gendron brought his laptop with him to the scene of the attack.  *See id.*

Based on all that, the Court agrees with the government that "the facts described in . . . Dlugokinski's affidavit and the manifesto—taken together with reasonable inferences from those facts based on common sense and experience—established probable cause to believe that the iPhone and laptop would contain evidence" related to the shooting.  *See* Docket Item 420 at 31; *see also United States v. Singh*, 390 F.3d 168, 182 (2d Cir. 2004) (explaining that "[a] showing of nexus does not require direct evidence and may be based on reasonable inference from the facts presented based on common sense and experience" (citation and internal quotation marks omitted)).  That evidence might include, for example, Gendron's "online research, planning, and preparation for the attack; the development of [his] racist ideology; the creation or drafting of [his] manifesto; and geolocation information, which would show [his] movements before the attack."  *See* Docket Item 420 at 31.

The cases on which Gendron relies, by contrast, deal with instances in which law enforcement searched a defendant's phone based merely on a "hunch" that it would contain incriminating information.  For example, in *United States v. Garcia*, 2023 WL 4850553 (D. Conn. July 28, 2023), the court explained that "the officer's opinion, *standing alone*, is generally not sufficient to establish a link between the item to be searched and the alleged criminal activity."  *Id.* at *7 (emphasis added) (citation and

22

internal quotation marks omitted).  Here, however, there was far more than Dlugokinski's opinion.

In *United States v. Silva*, 2024 WL 3488305 (S.D.N.Y. July 19, 2024)—another case on which Gendron relies—the district court held that the warrant application lacked "'case-specific evidence' that 'nudge[d the detective's] training and experience across the line from sheer speculation to probable cause.'"  *Id.* at *6 (quoting *United States v. Bertini*, 2023 WL 8258334, at *9 (S.D.N.Y. Nov. 29, 2023)).  But a month after Gendron filed his brief, the Second Circuit reversed, holding that the search warrant application in *Silva* had "identified specific attributes of the alleged criminal conduct that tended to show the cell phone would contain evidence of that conduct."  *United States v. Silva*, 146 F.4th 183, 193 (2d Cir. 2025).  Thus, the court found that "[a]ll told, common sense and [the officer's] experience combine[d] . . . to support a reasonable inference, given the totality of the circumstances, that a search of [the defendant]'s cell phone might have with a fair probability yielded evidence of his participation in the alleged criminal conduct."  *Id.* (citations and internal quotation marks omitted).  So too here, for both the phone and the laptop.

For all those reasons, the Court finds that there was probable cause to search Gendron's iPhone and laptop.

### 2.    Overbreadth and Particularity

The warrants for Gendron's iPhone and laptop permitted searching for and seizing the following information:

> a. Any records, stored content, communications, messages[,] and information relating to the motivation, planning, and/or execution of the May 14, 2022, mass shooting at Tops Friendly Markets, located at 1275 Jefferson Avenue, Buffalo, New York;

23

b. Any records, stored content, communications, messages[,] and information relating to the selection of targets or victims;

c. Any records, stored content, communications, messages[,] and information relating to the research, drafting, editing, and publishing of the manifesto posted by GENDRON;

d. Any records, stored content, communications, messages[,] and information relating to other individuals with whom GENDRON communicated regarding his criminal activity, including records and information useful for identifying or locating such individuals;

e. Any records, stored content, communications, messages[,] and information relating to acts of intimidation and/or threats of violence or injury against others;

f. Any records, stored content, communications, messages[,] and information expressing animus or hostility based on race or color;

g. Any records, documents, photos, or stored content relating to other mass shooting events and shooters;

h. Any records, stored content, communications, messages[,] and information indicating support for, association with[,] and/or membership in white supremacist, extremist[,] and/or hate groups;

i. Any records, stored content, communications, messages[,] and information expressing animus or hostility to individuals and/or groups believed to be involved in or associated with social justice and/or political protests;

j. Any records, stored content, communications, messages[,] and information relating to plans to intimidate, threaten, or commit acts of violence against others, including racial and/or ethnic minorities, and individuals and/or groups believed to be involved in or associated with social justice and/or political protests;

k. Any records, stored content, communications, messages[,] and information relating to an ideology providing alleged justification or motive for threatening individuals based on their race and/or color, individuals believed to be involved in or associated with social justice and/or political protests, and groups believed to be involved in social justice and/or political protests;

24

l. Any records, stored content, communications, messages[,] and information relating to efforts to obtain firearms, ammunition, firearm accessories[,] and body armor;

m. Any records, stored content, communications, messages[,] and information relating to the acquisition, transfer, use[,] and/or possession of firearms, ammunition, firearm accessories[,] and body armor;

n. Any records, stored content, communications, messages[,] and information relating to the manufacture of firearms;

o. Any records, stored content, communications, messages[,] and information relating to firearms tactics and methods for executing a mass shooting;

p. Evidence of who used, owned, or controlled the device whose search is authorized by this warrant ("the Device") at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, contact lists, "chat," instant messaging logs, text messages, photographs, and correspondence;

q. [E]vidence of software that would allow others to control the Device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

r. [E]vidence of the lack of such malicious software;

s. [E]vidence indicating how and when the Device was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

t. [E]vidence indicating the Device user's state of mind as it relates to the crimes under investigation;

u. [E]vidence of the attachment to the Device of other storage devices or similar containers for electronic evidence;

v. [E]vidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device whose search is authorized by this warrant;

w. [E]vidence of the times the Device was used and where the Device was used, to include any geolocation data;

25

x.  [P]asswords, encryption keys, and other access devices that may be necessary to access the Device;

y.  [R]ecords of or information about Internet Protocol addresses used by the Device;

z.  [R]ecords of or information about the Device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

aa.  [C]ontextual information necessary to understand the evidence described in this attachment.

Docket Item 380 at 60-62.

Gendron argues that these categories are insufficiently particular and overbroad both in what they authorized the officers to search and in what they authorized the officers to seize.  *See id.* at 22 ("The iPhone and laptop warrants authorized agents to sift through all contents within . . . Gendron's laptop and iPhone, and to seize broad categories of information untethered to the May 14, 2022, shooting, based on agents' own interpretations of those categories.").  "[E]ven if the iPhone and laptop warrants were supported by probable cause to search [his] iPhone and laptop," Gendron says, "that probable cause was limited to searching for evidence related to the motivation for, planning of, or execution of the May 14, 2022, shooting.  But the warrants authorized comprehensive searches of *all contents* of the iPhone and laptop with no limitations whatsoever."  *Id.* at 23.

This Court again disagrees.  First, the search warrants authorized the seizure of information relating only to "violations of Title 18, United States Code, Section 249 (hate crime acts), and Title 18, United States Code, Sections 924(c)(1)(A)(iii) and 924(j)(1) (discharge of a firearm causing death in furtherance of a crime of violence)."  *See* Docket Item 380 at 65, 81.  The warrants therefore were not like those in the cases

26

Gendron cites—that is, warrants that "set[ ] forth expansive categories of often generic items subject to seizure—several of a 'catch-all' variety—without, crucially, any linkage to the suspected criminal activity, or indeed any meaningful content-based parameter or other limiting principle." *See United States v. Wey*, 256 F. Supp. 3d 355, 385 (S.D.N.Y. 2017); *see also Zemlyansky*, 945 F. Supp. 2d at 454, 457 (finding warrant insufficiently particular because it failed to provide "any indication of the relevant criminal allegations" and allowed for the seizure of broad categories of materials "without indicating any individuals, entities, offenses, time frame, or relevance").

In *Wey*, for example, the warrant authorized blanket seizures of "financial records," "notes," "memoranda," "records of internal and external communications," "correspondence," "audio tapes and video tapes," and "photographs." 256 F. Supp. 3d at 386. Likewise, in *Zemlyansky*, "the warrant indiscriminately permit[ted] the search of all 'Computers' and 'Thumb drives'" without any link to the alleged conspiracy at issue. 945 F. Supp. 2d at 458. Here, on the other hand, while the categories of information were many and exhaustive, they all were linked in some way to the racially motivated mass shooting in which Gendron was suspected to have been involved. *See* Docket Item 380 at 65-67, 81-83.

Those categories all were sufficiently particular, except perhaps for the last one: "contextual information necessary to understand the evidence described in this attachment." *See id.* at 67, 83. But to the extent that description was too vague, the

good faith exception saves any evidence seized under it for the reasons explained below.  *See infra* Section II.J.[11]

In sum, the warrants to search Gendron's cellphone and computer were not overbroad and were sufficiently particularized.

### 3.    Execution

Gendron claims that the FBI seized information from the iPhone and laptop "far in excess of what the warrants permitted them to seize from those devices."  Docket Item 380 at 29.  Among other things, Gendron challenges the seizure of the following items: "images, infographics, cartoons[,] and memes relating to abstract beliefs about Black people based on race; images, infographics, cartoons[,] and memes relating to abstract beliefs about non-Black people based on race, ethnicity[,] or religion . . . ; [and] self-portrait photographs unrelated to the offense."  *Id.*  Along the same lines, he challenges the seizure of "images of guns, ammunition, firearms accessories, and firearms-related gear and clothing that had no connection to the crimes committed on May 14, 2022, and were neither inherently criminal nor contraband."  *Id.* at 29-30.

All those categories were fair game under the warrant.[12]  Regarding the evidence of Gendron's "abstract beliefs," the warrant authorized seizure of "[a]ny records, stored

---

[11] Gendron also argues that the lack of temporal limitation renders the warrant overbroad.  The Court rejects that argument for the same reasons explained above.  *See supra* Section II.D.2.

[12] Gendron also challenges the seizure of certain other images and memes, as well as his notes about school assignments.  *See* Docket Item 380 at 29-30.  These items fall closer to the line, but the government has indicated that it does not intend to use them at trial unless they become relevant based on evidence Gendron presents.  Docket Item 420 at 48 n.10.  The Court therefore will revisit this issue if need be.

content, communications, messages[,] and information expressing animus or hostility based on race or color." *Id.* at 65, 81.  With respect to the photographs of himself, the warrant covered "[e]vidence of who used, owned, or controlled the device." *Id.* at 66, 82.  And as to the images of firearms and related gear, the warrant included materials "relating to efforts to obtain" and "to the acquisition, transfer, use[,] and/or possession" of firearms and related items.  *Id.*

Gendron also challenges the government's retention of the entire contents of the iPhone and laptop. *Id.* at 31.  But the government "retained copies of the full contents of the iPhone and laptop for the sole purpose of disclosing them to [Gendron]."  Docket Item 420 at 49.  The Court finds no error in that.

Finally, Gendron requests a hearing to explore "the procedures employed by the government to search the iPhone and laptop, and to seize what the government determined to be within the scope of the warrant."  Docket Item 380 at 27.  Because that request is based on nothing more than speculation, it is denied.

### F.    Desktop Computer and Thumb Drive

Gendron makes many of the same arguments with respect to the warrant that Judge Schroeder issued to search the desktop computer and thumb drives found in Gendron's bedroom.  Among other things, Gendron says that "[n]ot a single allegation that [he] used [these] devices in any way in connection with the mass shooting on May 14, 2022, is included in the affidavit."  Docket Item 400 at 13.  In fact, Gendron says, "[c]omputers are used so routinely by all members of the community (not just criminals), that it is unreasonable to conclude that merely possessing such a device gives rise to

probable cause sufficient to justify the search of the device whenever the owner is accused of any type of crime." *Id.*

The Court agrees with Gendron that merely committing a crime and possessing a computer are not enough to provide probable cause to search the computer. But here there was far more. As explained above, Gendron typed up a manifesto using a computer and conducted exhaustive online research and planning. That certainly was enough to provide probable cause to believe that there was evidence on his desktop computer and the thumb drives in his bedroom.

Gendron also argues that he is entitled to a hearing under *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978), because (1) the affidavit submitted to Judge Schroeder did not disclose that Gendron also owned a laptop and smart phone that he brought to the scene of the crime and (2) the affidavit falsely stated that Gendron's father had found an AR-15 magazine in the home. Docket Item 400 at 14. But neither of those arguments, individually or together, meets the high bar for a *Franks* hearing. Among other things, to obtain a *Franks* hearing, Gendron would have to show that "the allegedly false statement is necessary to the finding of probable cause." *See United States v. Sandalo*, 70 F.4th 77, 85 (2d Cir. 2023) (quoting *Franks*, 438 U.S. at 155-56). He cannot do so.

Judge Schroeder was told, among other things, that Gendron had written a lengthy manifesto which "specifically stated that he developed his beliefs from the [i]nternet" and that "things that have been viewed via the [i]nternet are typically stored for some period of time on [an electronic] device." Docket Item 400 at 41, 45-46. The desk top and thumb drives "were located in [Gendron's] bedroom," where law

30

enforcement also found "a letter . . . signed by [Gendron in which he] apologized to his parents for committing this 'attack' and [stated] that he 'had to commit this attack' because he care[d] 'for the future of the White race.'"  Docket Item 400 at 44.  That was more than enough to search the desktop and thumb drives found in Gendron's bedroom.  Whether or not Gendron had a cellphone or computer with him at Tops or Gendron's father found a magazine at home could not possibly have tipped the balance.

Gendron makes many of the same arguments analyzed above regarding particularity, overbreadth, and execution of the warrant.  The Court will not rehash those arguments and engage in that same analysis here.  But in any event, as explained below, to the extent that there was some infirmity in the warrant, suppression is not warranted because of the good faith exception.  *See infra* Section II.J.

### G.    Apple iCloud

#### 1.    EDR Response

Gendron first argues that the Apple iCloud warrant application relied on information unlawfully obtained from Apple's EDR response.  *See* Docket Item 399 at 13-15.  The Court rejects that argument for the reasons explained above.  *See supra* Section I.

#### 2.    Probable Cause

Gendron next argues that Special Agent Dlugokinski's affidavit "failed to establish probable cause to believe that evidence of the crime would be found in . . . Gendron's Apple iCloud account."  Docket Item 399 at 15.  According to Gendron, "[n]ot a single allegation that [he] used his Apple iCloud account in any way in connection to the mass shooting on May 14, 2022, is included in the affidavit."  *Id*. at 16.  Rather, he says, "[t]he

31

information consists solely of the vaguest generalities about the typical behavior of criminals." *Id.* This Court disagrees.

Among other things, as noted above, Gendron specifically stated in his manifesto that he would be using his "iPhone 11 . . . to livestream the gopro footage onto [his T]witch account" and "to upload all [his] posts and such." Docket Item 435-2 at 144. And Dlugokinski noted that "[i]n [his] training and experience, users of iPhone devices, which are manufactured by Apple, often back[ ]up data from the devices to iCloud." Docket Item 399 at 60. Dlugokinski also explained that the manifesto evidenced extensive internet research that Gendron conducted in planning the attack. *Id.* at 59.

Based on all that, Dlugokinski's affidavit together with Gendron's manifesto provided good cause to believe that Gendron's iPhone—and, by extension, his iCloud account—would contain relevant evidence. For example, and as the government notes, the phone and the iCloud account likely would include "online research, planning, and preparation for the attack; the development of [Gendron]'s racist ideology; the creation or drafting of [his] manifesto; and geolocation information." Docket Item 435 at 74. Just as there was probable cause to search the cellphone, there was probable cause to search the associated iCloud account.

### 3.    Overbreadth and Particularity

Gendron argues that the Apple warrant was overbroad "because it imposed no temporal limitation on the data to be searched or seized." Docket Item 399 at 19 (emphasis omitted). The Court rejects this argument for the same reasons it did in connection with the other warrants already discussed. *See supra* Sections II.D.2 and II.E.2.

32

Gendron also says that the Apple warrant was overbroad because it did not "confine[] the authorized search [to] iCloud web browser data." Docket Item 450 at 6. But for the reasons stated above, the manifesto provided probable cause to search far more than just "web browser data."

Finally, Gendron argues that the citation to the statutes he is alleged to have violated was insufficiently particular. *See* Docket Item 399 at 22. But as discussed above, this contention ignores the warrant's incorporation of Dlugokinski's affidavit, and the only reasonable interpretation of the warrant and the application together is that the warrant was limited to evidence related to the Tops shooting.

For all those reasons, Gendron's challenge of the Apple warrant fails as well.

### H.    Discord

The government received three categories of Discord records: "[Gendron's] personal server, labeled by [Gendron] as 'G\,' which contained 11 channels; [his] direct message communications ["DMs"] . . . ; and several other Discord servers and channel conversations, which included information from nine additional Discord servers." Docket Item 435 at 8 (footnotes omitted).

#### 1.    Standing

As a threshold matter, the government argues that Gendron lacks standing to challenge the search and seizure of information from his Discord account. "To establish standing in the Fourth Amendment context, a defendant must prove that he had a legitimate expectation of privacy that was violated by the [g]overnment's conduct." *United States v. Loera*, 333 F. Supp. 3d 172, 179 (E.D.N.Y. 2018) (alterations, citation, and internal quotation marks omitted), *aff'd sub nom. United States v. Guzman Loera*,

24 F.4th 144 (2d Cir. 2022).  That "burden is met only by sworn evidence, in the form of [an] affidavit or testimony, from the defendant or someone with personal knowledge." *Id.* (citation and internal quotation marks omitted).

Initially, the government said that Gendron had failed to submit an affidavit of standing.  *See* Docket Item 435 at 9.  He has since remedied that, *see* Docket Item 449, but the government now maintains that he has not made the requisite showing, *see* Docket Item 471 at 3-5.

The government's primary argument with respect to standing is that Gendron "cannot demonstrate a reasonable expectation of privacy in the contents of the G\ server because he made it publicly available before committing the Tops attack." Docket Item 435 at 10.  More specifically, the government says, Gendron "sen[t] links to his transcripts from the Discord account to approximately 65 Discord users and two Discord servers/channels, and expressly invit[ed] those Discord users to join the G\ server."  *Id.*  The government adds that "[f]rom the outset of this investigation, it was evident . . . that [Gendron] did not seek to maintain any expectation of privacy in his Discord writings."  *Id.* at 11.  On the contrary, the government says, "he made it clear that he wanted his writings about the attack and the video footage of the attack to be widely disseminated in service of his virulent, racist ideology."  *Id*.  Gendron responds that "[a]lthough he shared certain aspects of the contents of his Discord account with a small number of selected individuals, . . . [he] nevertheless maintained a reasonable expectation of privacy in his data that prohibited law enforcement from accessing it except in accordance with the requirements of the Fourth Amendment."  Docket Item 454 at 2.

Courts are divided on the analogous question of whether a person maintains a reasonable expectation of privacy in content shared with Facebook "friends." *Compare United States v. Chavez*, 423 F. Supp. 3d 194, 201 (W.D.N.C. 2019) (finding that "[d]efendant had a legitimate expectation of privacy in the non-public content on his social media account" despite sharing it with "three or four hundred" Facebook friends), *with United States v. Meregildo*, 883 F. Supp. 2d 523, 526 (S.D.N.Y. 2012) (finding that defendant's "legitimate expectation of privacy ended when he disseminated posts to his 'friends' because those 'friends' were free to use the information however they wanted—including sharing it with the [g]overnment"), *and United States v. Jordan*, 2017 WL 9516819, at *8 (W.D.N.Y. July 14, 2017) (finding it was "patently unreasonable that [defendant] would have any expectation of privacy in a post published to" 1,965 Facebook friends), *report and recommendation adopted*, 2017 WL 4784317 (W.D.N.Y. Oct. 24, 2017).

The Court finds this to be a close issue.  Ultimately, however, the Court need not resolve it because even if Gendron has standing to challenge the Discord warrant, his challenge lacks merit.[13]

### 2.    Overbreadth and Particularity

Gendron's arguments on overbreadth and particularity are very similar to those addressed above.  The Court has carefully reviewed the warrant and finds it to be

---

[13] The parties' arguments and this standing section focus on Gendron's server, the G\ server.  The Court agrees with the government that Gendron has not established standing to challenge the search of the other servers, including the "Plateland" and "Lockdown" servers, for which he was not an administrator. *See* Docket Item 460 at 11-12; Docket Item 454 at 17 (Gendron's noting that "the Lockdown server . . . belonged to and was administered by unrelated individuals").

35

sufficiently narrow and particular for the same reasons that the other warrants were sufficient. And once again, even if there were some issue with overbreadth or particularly, the good faith exception would make the seized evidence admissible. *See infra* Section II.J.

### 3.    Execution

Gendron next raises two challenges to the manner in which law enforcement executed the Discord warrant. First, he says that "law enforcement unconstitutionally searched and seized large quantities of data from the Discord return that were outside [] the scope of the warrant." Docket Item 454 at 16. "Because the officers executing the warrant acted 'in flagrant disregard of the warrant's terms,'" he says, "the appropriate remedy is 'suppression of *all* evidence seized' pursuant to the warrant." *Id.* (quoting *Matias*, 836 F.2d at 747). Second, he argues that "law enforcement conducted multiple searches of the Discord data without obtaining additional search warrants, in violation of the Fourth Amendment." *Id.* at 19-20 (bold and some capitalization omitted).[14] The Court will address each claim in turn.

### a.    The Terms of the Warrant

Gendron identifies two DM conversations that he says were outside the scope of the warrant. *See* Docket Item 403 at 18 ("As to the DM Conversations, at least two of the conversations . . . have no conceivable link to this case, or to any category described in Attachment B to the Discord Warrant."). Other seized conversations, he

---

[14] Gendron also claims that the FBI violated the Fourth Amendment by maintaining a copy of the entire Discord file. Docket Item 403 at 17. The Court rejects that argument for the reasons explained above with respect to other warrants. *See supra* Sections II.C.4 and II.E.3.

says "contain[ed] general content related to gear but similarly ha[d] no link to this case." *Id.* And he argues the same with respect to the seized channels: "[m]any of the channels seized from the Other Servers and Channels component during the initial review are related to gaming and thus are outside the scope of the warrant; others have general content related to firearms or gear but have no link to this case." *Id.*

With regard to the two specific conversations Gendron identified, the government says that "[w]hile FBI personnel, at the time of the search, had reason to identify the Direct Messages with these Discord users as potentially relevant, the government does not intend to use those Direct Messages at trial." Docket Item 435 at 24. With regard to the remainder of what was seized from Gendron's G\ server, the government argues that it was comfortably within the scope of the warrant. *See id.*; Docket Item 460 at 4-10. After careful review, this Court agrees.[15] Gendron's writings on the G\ server include numerous posts explaining his racist beliefs, musing about his attack, and detailing his careful plans for the shooting. *See* Docket Item 460 at 6-9; Docket Item 460-1. It is hard to imagine information that would be more relevant to the prosecution's case.

Moreover, within days of the shooting several news outlets published "considerable portions of [Gendron]'s G\ server." *See* Docket Item 460 at 5, 9-10. So that content also is covered by the inevitable discovery doctrine. *See United States v. Heath*, 455 F.3d 52, 55 (2d Cir. 2006) (explaining that "evidence obtained during the course of an unreasonable search and seizure should not be excluded 'if the

---

[15] As explained above, *see supra* note 13, to the extent Gendron challenges the search and seizure of other servers not administered by him, he does not have standing to do so.

government can prove that the evidence would have been obtained inevitably' without the constitutional violation" (quoting *Nix v. Williams*, 467 U.S. 431, 447 (1984))).

> b.      Multiple Searches

Gendron also argues that law enforcement violated his Fourth Amendment rights by conducting a second search of material that it had previously determined was non-responsive to the warrant.  *See* Docket Item 403 at 18-19.  The government says that this "argument is factually incorrect and based on the faulty assumption that the FBI had completed its review of the Discord records by May 31, 2022."  Docket Item 435 at 25; *see also* Docket Item 460 at 21 ("Contrary to the defendant's claims, there were no instances where searched material was marked 'not responsive' and later changed to 'responsive.'  Rather, as the case agent and law enforcement personnel were reviewing the material over the course of several days, they identified additional responsive materials during the course of a rapidly unfolding investigation.").  Based on this explanation—which, based on the record before it, the Court has no reason to doubt—the Court finds that law enforcement did not violate the Fourth Amendment in executing the Discord warrant.

## I.      Gendron's Residence

On May 15, 2022—the day after the shooting—law enforcement searched Gendron's residence under a warrant issued by Judge Dancks.  *See* Docket Item 405 at 6.  During that search, law enforcement "seized 48 different electronic devices, including computers, storage media, cell phones, laptops, iPads, iPods, gaming consoles including an XBox One Console and a Nintendo Switch, a Kindle, a cassette player, and a router."  *Id.*  In addition to the electronics, law enforcement seized—in Gendron's

words—"any items that had anything whatsoever to do with any firearm whatsoever, including every scrap of gun cleaning supplies, ear protection, and spent shells and casings." *Id.* at 7. And they also seized "a photobook of family pictures, stacks of handwritten notes and notebooks (whether written by . . . Gendron or not), empty packages, bank documents[,] and a hazmat mask and suit." *Id.* at 6-7. Gendron argues (1) that the warrant was overbroad and (2) that its execution violated the Fourth Amendment.[16]

### 1. Overbreadth

Gendron concedes that "the warrant application was sufficient to establish probable cause to [conduct] an appropriately limited search of [his] residence for evidence related to the shooting at the Tops Market on May 14, 2022." *Id.* at 7. But, he says, "it manifestly failed to justify issuance of a warrant purporting to authorize law enforcement to rummage through the house from top to bottom and to seize items that had no conceivable relevance to the crime." *Id.* "And yet," he contends, "that was precisely the effect of the warrant that was ultimately issued." *Id.*

The warrant listed the following categories of evidence:

Items of evidence of violations of Title 18, United States Code, Section 249 (hate crime acts), and Title 18, United States Code, Sections 924(c)(1)(A)(iii) and 924(j)(1) (discharge of a firearm causing death in furtherance of a crime of violence), those violations involving PAYTON GENDRON, and occurring on or around May 14, 2022, including:

    a. Firearms, ammunition, body armor, firearm magazines, and firearm accessories;

---

[16] In response, the government argues among other things, that Gendron's mother consented to the search of the residence where she and Gendron both lived. *See* Docket Item 435 at 47-49. Because the Court finds that the warrant was valid, it need not and does not address this argument.

b. Any records, stored content, communications, messages[,] and information relating to the motivation, planning, and/or execution of the May 14, 2022, mass shooting at Tops Friendly Markets, located at 1275 Jefferson Avenue, Buffalo, New York;

c. Any records, stored content, communications, messages[,] and information relating to the selection of targets or victims;

d. Any records, stored content, communications, messages[,] and information relating to the research, drafting, editing, and publishing of the manifesto posted by GENDRON;

e. Any records, stored content, communications, messages[,] and information relating to other individuals with whom GENDRON communicated regarding his criminal activity, including records and information useful for identifying or locating such individuals;

f. Any records, stored content, communications, messages[,] and information relating to acts of intimidation and/or threats of violence or injury against others;

g. Any records, stored content, communications, messages[,] and information expressing animus or hostility based on race or color;

h. Any records, documents, photos, or stored content relating to other mass shooting events and shooters;

i. Any records, stored content, communications, messages[,] and information indicating support for, association with and/or membership in white supremacist, extremist[,] and/or hate groups;

j. Any records, stored content, communications, messages[,] and information expressing animus or hostility to individuals and/or groups believed to be involved in or associated with social justice and/or political protests;

k. Any records, stored content, communications, messages[,] and information relating to plans to intimidate, threaten, or commit acts of violence against others, including racial and/or ethnic minorities, and individuals and/or groups believed to be involved in or associated with social justice and/or political protests;

l. Any records, stored content, communications, messages[,] and information relating to an ideology providing alleged justification or motive for threatening individuals based on their race and/or color,

40

individuals believed to be involved in or associated with social justice and/or political protests, and groups believed to be involved in social justice and/or political protests;

m. Any records, stored content, communications, messages[,] and information relating to efforts to obtain firearms, ammunition, firearm accessories[,] and body armor;

n. Any records, stored content, communications, messages[,] and information relating to the acquisition, transfer, use and/or possession of firearms, ammunition, firearm accessories[,] and body armor;

o. Any records, stored content, communications, messages[,] and information relating to the manufacture of firearms;

p. Any records, stored content, communications, messages[,] and information relating to firearms tactics and methods for executing a mass shooting;

q. Computers or storage media used as a means to commit the violations described above;

r. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

   1. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   2. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   3. evidence of the lack of such malicious software;

   4. evidence indicating how and when the computer was accessed or used to determine the chronological context of

41

computer access, use, and events relating to crime under investigation and to the computer user;

5. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

6. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

7. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

8. evidence of the times the COMPUTER was used;

9. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

10. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

11. records of or information about Internet Protocol addresses used by the COMPUTER;

12. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

13. contextual information necessary to understand the evidence described in this attachment.

s. Routers, modems, and network equipment used to connect computers to the Internet.

Docket Item 405 at 39-42.

The Court agrees with the government that Gendron's interpretation of probable cause is too narrow:  There was probable cause to search for items beyond those that were obviously connected to the May 14 shooting.  For example, as explained above,

42

evidence of Gendron's racial hostility—even if not directly connected to planning the shooting—is evidence of his motive.

Moreover, the warrant was not limitless:  It authorized seizing only "[i]tems of evidence of violations of Title 18, United States Code, Section 249 (hate crime acts), and Title 18, United States Code, Sections 924(c)(1)(A)(iii) and 924(j)(1) (discharge of a firearm causing death in furtherance of a crime of violence)." *Id.* at 39.  And the Court is hard pressed to say that the individual descriptions—though many and exhaustive—do not particularize items that might be related to the crime.  All in all, after careful review of the above categories, the Court finds them sufficiently narrow.[17]

### 2.    Execution

Whether law enforcement seized items that were outside the bounds of the warrant is a closer question.  In particular, the seizures of "[e]very scrap of spent shell casing, ammunition[,] and cleaning supplies" and of "48 different electronic devices" from all over the house, *see* Docket Item 455 at 8, give this Court pause.  Ultimately, however, the Court finds that to the extent these items were outside the scope of the warrant, the remedy is suppression of particular items.  Especially given the nature of Gendron's crime, the breadth of what might shed light on that crime, and the immense pressure on law enforcement in its immediate aftermath, this Court cannot find that the "[e]xecuting agents . . . 'flagrantly disregarded' the warrant's terms," as would be

---

[17] Once again, the one possible exception is the catch-all "contextual information necessary to understand the evidence described in this attachment."  *See supra* Section II.E.2.  But even if this was too broad, the good faith exception would apply for the reasons explained below.  *See infra* Section II.J.

43

required to suppress all the evidence seized under the warrant. *See Pinto-Thomaz*, 352 F. Supp. 3d at 308-09.

The Court therefore denies the motion to suppress evidence obtained from the search of Gendron's residence without prejudice. Gendron may challenge any individual items the government seeks to offer at trial as having been seized outside the scope of the warrant.

## J.    Good Faith Exception

"[C]ourts have recognized that evidence obtained by officers in objectively reasonable reliance on a warrant subsequently invalidated by a reviewing court is not generally subject to exclusion." *United States v. Raymonda*, 780 F.3d 105, 118 (2d Cir. 2015) (citation and internal quotation marks omitted). After all, the primary purpose of the exclusionary rule is to deter police misconduct, and "[w]hen an officer genuinely believes that he has obtained a valid warrant from a magistrate and executes that warrant in good faith, there is no conscious violation of the Fourth Amendment, 'and thus nothing to deter.'" *Id.* (quoting *Leon*, 468 U.S. at 920-21). Moreover, courts want to encourage law enforcement officers to obtain warrants before they search. Thus, "[p]enalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." *Leon*, 468 U.S. at 921.

As noted above, there are only "four circumstances" in which this "good faith exception to the exclusionary rule" does not apply:

> (1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned [the magistrate's] judicial role; (3) where the application is so lacking in indicia of probable cause as to render

44

reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable.

*Galpin*, 720 F.3d at 452.

Gendron does not suggest that either Judge Schroeder or Judge Dancks was misled or wholly abandoned his or her judicial role. Rather, Gendron contends that the applications were wholly "lacking in indicia of probable cause" and that the warrants themselves were "facially deficient." This Court disagrees.

As explained above, this Court finds that the warrants were supported by probable cause and were facially valid. And to the extent that this Court—and Judge Schroeder or Judge Dancks—got any of those probable cause decisions wrong, the issues are close enough that the agents' reliance on the warrants was reasonable. Thus, under the good faith exception the evidence obtained under the warrants is not "subject to exclusion." *See Raymonda*, 780 F.3d at 118.

## III.    STATE COURT WARRANT (IPHONE)

Judge Hannah of the Buffalo City Court issued a search warrant for Gendron's iPhone. *See* Docket Item 435 at 27. But "technological limitations prevented the Buffalo Police Department (BPD) from executing that warrant" and, as a result, "the only information BPD was . . . able to recover pursuant to the state warrant was [Gendron]'s phone number." *See id.*

The Court need not linger long on this issue. Even if there were some infirmity with the warrant—which, to be clear, the Court does not see—Gendron's phone number would have been, and in fact was, inevitably found in many ways independent of the

search.  Thus, suppression is not warranted under the inevitable discovery doctrine.[18]
*See Heath*, 455 F.3d at 55.

## IV.    STATEMENTS

Finally, Gendron moves to suppress the statements he made to law enforcement.  Docket Item 381.  At oral argument, the government clarified that it will seek to admit only the statements Gendron made in the parking lot at the scene immediately after the shooting.  *See* Docket Item 471 at 14-15.  The government argues that these statements are covered by the public safety exception.[19]  *See* Docket Item 420 at 59.

The defense has not contested the government's invocation of the public safety exception.  Indeed, at oral argument counsel all but conceded that the public safety exception applied.  *See* Docket Item 471 at 13 ("THE COURT:  Is there something [in] your pant leg?  You got anything else on you?  I mean, those kinds of things are, you know, that really is a public safety exception, especially in a situation like this, isn't it?  The cops would be derelict in their duty if they didn't ask those kinds of questions.  [DEFENSE COUNSEL]:  I have nothing to add to that.").

---

[18] And even if that were not the case, the good faith exception would apply.  *See supra* Section II.J.

[19] At oral argument, there was some discussion about statements Gendron made during booking at the Erie County Holding Center.  The government reserved its right to argue that those statements should be admitted into evidence if the defense raised something that made them relevant.  *See* Docket Item 471 at 14, 22-24.  In response, the Court said that if the government had good reason to raise the issue later, it would address the issue then.  But the Court made it clear that absent such good reason, only the statements made at the scene would be admissible.  *See id.* at 24.

The Court finds that—as the government suggests—"[i]t is hard to imagine a fact-pattern more appropriate for applying the public safety exception to the *Miranda* requirement." *See* Docket Item 420 at 59.  Gendron had just been taken into custody immediately after a mass shooting.  The officers suspected that Gendron was the shooter, and they were trying to determine whether he had acted alone, whether he had weapons other than the firearm they took from him, and whether anything nearby posed a threat to the officers or others.  Because their questions focused only on issues of officer and public safety, those questions fell squarely and comfortably within the public safety exception.  *See United States v. Reyes*, 353 F.3d 148, 150 (2d Cir. 2003) (applying public safety exception when officer asked defendant "if he had anything on him that could hurt the officer or anyone on the field team"); *see also United States v. Bowers*, 676 F. Supp. 3d 403, 413-20 (W.D. Pa. 2022) (finding that public safety exception permitted officers to question defendant without *Miranda* warnings at the scene of large-scale mass shooting).

Gendron's motion to suppress the statements he made at the scene therefore is denied.  His motion to suppress the remaining statements that the government has indicated it will not seek to admit is denied without prejudice as moot.  If the government seeks to admit any other statements that Gendron made, the Court will give Gendron an opportunity to raise any arguments he sees fit.

47

**CONCLUSION**

For the reasons stated above, Gendron's motions to suppress, Docket Items

376, 378, 380, 381, 399, 400, 401, 402, 403, and 405 are DENIED.[20]


SO ORDERED.

Dated:    May 18, 2026
          Buffalo, New York


                                        */s/ Lawrence J. Vilardo*
                                        LAWRENCE J. VILARDO
                                        UNITED STATES DISTRICT JUDGE

---

[20] As noted above, *see supra* note 1, Gendron's motions to suppress the evidence from Snapchat and his SUNY Broome email account, Docket Items 377 and 379, are denied without prejudice as moot based on the government's representation that it will not use that evidence in its case in chief.