IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

      v.

PAYTON GENDRON,

      Defendant.

22-CR-109-LJV
(FILED UNDER SEAL)

---

### GOVERNMENT'S COMBINED
### GUILT PHASE PRETRIAL MEMORANDUM AND MOTIONS *IN LIMINE*

THE UNITED STATES OF AMERICA, by and through its attorney, Michael DiGiacomo, United States Attorney for the Western District of New York, Joseph M. Tripi, Brett A. Harvey, Charles M. Kruly, Maeve E. Huggins, and Pierre Richard Antoine, Assistant United States Attorneys, Neville S. Hedley, Trial Attorney, Civil Rights Division, and Michael S. Warbel, Trial Attorney, Department of Justice Capital Case Section, of counsel, hereby submits its Pretrial Memorandum of Law and Motions *in Limine* with respect to the guilt phase. This memorandum is not intended to be all inclusive or restrict the government's presentation of the proof at trial.

### I.  INTRODUCTION

This memorandum is provided to assist the Court in deciding evidentiary issues that may arise at trial, and the applicable authority the government submits should guide the Court in its evidentiary rulings. This memorandum also contains specific guilt phase motions *in limine* as to evidentiary issues that may require a pretrial ruling. This memorandum should not be interpreted as a bill of particulars or construed as setting forth all of the government's proof at trial. The government reserves its right to supplement this memorandum, to raise any

additional motions *in limine*, and/or to respond to any evidentiary issues raised by the defendant. This memorandum does not purport to address every evidentiary dispute that may arise or every item of evidence that a party may seek to introduce at trial.

## II. STATEMENT OF THE CASE AND SUMMARY OF CHARGES

On July 14, 2022, a federal grand jury returned a 27-count Indictment charging the defendant with ten counts of committing a hate crime resulting in death (18 U.S.C. § 249(a)(1)(B)(i)), ten counts of discharging a firearm to commit murder (18 U.S.C. § 924(j)(1)), four counts of committing a hate crime involving an attempt to kill (18 U.S.C. § 249(a)(1)(B)(ii)), and three counts of the use and discharge of a firearm during a crime of violence (18 U.S.C. § 924(c)(1)(A)(iii)). These charges stem from the defendant's mass shooting at the Tops grocery store, located at 1275 Jefferson Avenue, Buffalo, New York 14208 ("Tops"), on May 14, 2022. *See* Docket No. 6. Counts 1 through 11 charge ten separate hate crimes resulting in the deaths of the following victims: Roberta Drury, Pearl Young, Heyward Patterson, Ruth Whitfield, Celestine Chaney, Aaron W. Salter, Jr., Andre Mackniel, Margus Morrison, Katherine Massey, and Geraldine Talley. Counts 11 through 20 charge ten firearms violations—discharging a firearm to commit murder—for each of those same victims. Count 21 charges a hate crime for causing bodily injury to one victim, Zaire Goodman, and includes an attempt to kill Zaire Goodman. Counts 22 and 23 charge two hate crimes for causing bodily injury to two victims, Christopher Braden and Jennifer Warrington. Counts 24 through 26 charge three firearms violations with respect to the victims of Counts 21 through 23.

Because several of the death-resulting counts are capital-eligible offenses, the Indictment contains special findings pursuant to 18 U.S.C. § 3591 and § 3592, including

2

findings related to the defendant's substantial planning and premeditation, the vulnerability of the victims due to their old age, and multiple killings and attempted killings. *Id.* at 10-12.

### III.  STATEMENT OF FACTS

On May 13, 2022, the defendant drove from Conklin, New York, to Buffalo, New York, with a cache of firearms and ammunition intent on committing racially-motivated mass murder. On May 14, 2022, after publishing his racist journal and manifesto on Discord, the defendant livestreamed his attack targeting Black people at Tops. At the time, people filled the store, shopping or serving their community by working. The defendant killed 10 Black people and injured one Black person and two white people. Buffalo Police Department officers responded and eventually arrested the defendant. The defendant's manifesto and Discord journal, the physical and digital evidence seized at the scene (including the Bushmaster XM-15 .223 caliber rifle used in the attack and covered in the defendant's handwriting), and physical and digital evidence seized from his residence showed the defendant's racist motivation. *See, e.g.*, Docket No. 1 ¶¶ 13, 15, 16.

The Criminal Complaint, Indictment, Notice of Intent to Seek the Death Penalty, Bill of Particulars, and Informational Outline provide a factual overview of this case. *See* Docket Nos. 1, 6, 125, 209, 210. The government will provide necessary discussion of the facts relevant to various evidentiary issues set forth below.

### IV.  EVIDENTIARY ISSUES

At trial, the government anticipates that various evidentiary issues may arise and provides the following briefing to guide the Court.

### A. State Court Plea Colloquy Transcript

An Erie County grand jury returned an indictment charging the defendant with violations of New York Penal Law in connection with the murders and attempted murders he committed on May 14, 2022. On November 28, 2022, the defendant pleaded guilty before Erie County Court Judge Susan M. Eagan to Domestic Act of Terrorism Motivated by Hate in the First Degree, Murder in the First Degree as to each deceased victim, Attempted Murder in the Second Degree as to each injured person, and Criminal Possession of a Weapon in the Second Degree, all in violation of New York Penal Law. *See* Gov. Ex. 5000. The defendant pleaded guilty after an Erie County Assistant District Attorney provided a detailed description of the anticipated trial evidence. *See id.* at 7-13.

As part of the plea proceedings, Judge Eagan asked the defendant if he "wish[ed] to change his plea from not guilty to guilty," the defendant replied, "Yes." *Id.* at 14. Next, the defendant was sworn in and engaged in the following colloquy with Judge Eagan's Courtroom Clerk and Judge Eagan:

> THE CLERK: Please state and please spell your name for the record.
>
> THE DEFENDANT: Payton Gendron, P-A-Y-T-O-N, G-E-N-D-R-O-N.
>
> THE CLERK: Your date of birth?
>
> THE DEFENDANT: 6/20/03.
>
> THE CLERK: Thank you.
>
> THE COURT: Are you currently under the care of a physician or mental health provider?
>
> THE DEFENDANT: No.
>
> THE COURT: Have you used any drugs or alcohol in the past twenty-four hours that would impair your judgment or ability to understand these proceedings?

THE DEFENDANT: No.

THE COURT: What is your highest level of education?

THE DEFENDANT: I graduated high school and took some college.

THE COURT: Have you discussed this change of plea with your defense team?

THE DEFENDANT: Yes.

THE COURT: Have you had enough time to discuss this change of plea with them?

THE DEFENDANT: Yes.

THE COURT: Have they answered any questions or concerns you may have about changing your plea in this matter?

THE DEFENDANT: Yes.

THE COURT: Are you satisfied with their services?

THE DEFENDANT: Yes.

THE COURT: Do you have confidence in their advice?

THE DEFENDANT: Yes.

THE COURT: While you are an adult in the eyes of the law, you are still a young man. Have you had an opportunity to discuss this change of plea with your parents?

THE DEFENDANT: Yes.

THE COURT: Have you had enough time to discuss it with them?

THE DEFENDANT: Yes.

THE COURT: Is there anyone else that you wish to speak to regarding your plea before we go forward today?

THE DEFENDANT: No.

THE COURT: Is there anyone, including myself, any member of the prosecution team, Mr. Parker, Mr. Cutting, Mr. DuBois, or any other member of your defense team that is forcing you to change your plea in this matter?

THE DEFENDANT: No.

THE COURT: Has anyone threatened or coerced you in any way to change your plea to the indictment?

THE DEFENDANT: No.

THE COURT: Is it your independent decision to change your plea in this case?

THE DEFENDANT: Yes.

THE COURT: Do you understand that by pleading guilty you waive your right to a trial by a jury?

THE DEFENDANT: Yes.

THE COURT: At a trial by a jury you are presumed to be innocent and you are entitled to the following rights:
You have the right to be represented by your lawyers.
You have the right to confront and cross-examine witnesses presented by the government.
You have the right to remain silent and to not incriminate yourself.
You have the right, but are not required, to call witnesses and to testify yourself.
Finally, you have the right to require the government to prove your guilt beyond a reasonable doubt to a jury of twelve people who must unanimously - - must be unanimous in finding that you are guilty.
Do you understand each of those rights and that by pleading guilty, you give up each of those rights?

THE DEFENDANT: Yes.

THE COURT: Do you understand that by pleading guilty you give up any defense you may have to these charges?

THE DEFENDANT: Yes.

THE COURT: Do you understand that a plea of guilty is the same as a verdict of guilty rendered by a jury after a trial?

THE DEFENDANT: Yes.

THE COURT: You are pleading to one count of a domestic act of terrorism motivated by hate in the first degree, an A-one felony. Do you understand that the only sentence for this offense is life imprisonment without parole?

THE DEFENDANT: Yes.

THE COURT: You are pleading to ten counts of murder in the first degree, A-one felonies. Do you understand that the minimum possible sentence on these counts is twenty years to life and the maximum possible sentence is life imprisonment without parole?

THE DEFENDANT: Yes.

THE COURT: Do you understand that by operation of law the sentences on these counts must run concurrently to your sentence on the first count?

THE DEFENDANT: Yes.

THE COURT: Additionally, your plea to the top ten counts of murder in the first degree cover the ten counts of murder in the second degree as inclusive concurrent counts pursuant to New York State Court of Appeals decision People v. Rosas, 8 NY 3D 493, 2007. Thus, once you enter your plea to the top counts, counts twelve to twenty-one of the indictment are dismissed by operation of law. Do you understand?

THE DEFENDANT: Yes.

THE COURT: You are pleading to three counts of attempted murder in the second degree as a hate crime, B-violent felonies. Do you understand that the minimum possible sentence is a determinate term of imprisonment of eight years and the maximum possible sentence is a determinate sentence of twenty-five years plus five years of post-release supervision?

THE DEFENDANT: Yes.

THE COURT: Do you further understand that the sentences on these counts could run consecutively to each other and to the other counts of the indictment?

THE DEFENDANT: Yes.

THE COURT: You are pleading to one count of criminal possession of a weapon in the second degree, a C violent armed felony. Do you understand that the minimum possible sentence is a determinate term of imprisonment of three-and-a-half years and the maximum possible sentence is a determinate sentence of fifteen years plus five years of post-release supervision?

THE DEFENDANT: Yes.

THE COURT: Do you understand that the sentence on this count could run consecutively to the sentences on all other counts?

THE DEFENDANT: Yes.

THE COURT: Do you understand that you are not eligible for consideration as a youthful offender on the A-one felony offenses and the armed felony of criminal possession of a weapon in the second degree?

THE DEFENDANT: Yes.

THE COURT: You are, however, eligible for consideration as a youthful offender on the attempted murder in the second degree counts and I will make the determination at the time of sentencing. Do you understand?

THE DEFENDANT: Yes.

THE COURT: I am not making any commitment to you as to what your sentence will be. However, I would note that the only available sentence for the first count, domestic act of terrorism motivated by hate in the first degree, is life imprisonment without parole. Do you understand?

THE DEFENDANT: Yes.

THE COURT: When it comes to sentencing I will consider the presentence investigation and any statements made by the victims, as well as any statements made by you and your defense counsel in this matter prior to making a final determination. Do you understand?

THE DEFENDANT: Yes.

THE COURT: Do you understand that making a sworn admission here today could impact any other pending proceedings against you?

THE DEFENDANT: Yes.

THE COURT: The law requires that I inform you that your right to vote is suspended while you are incarcerated in a correctional facility. Do you understand?

THE DEFENDANT: Yes.

THE COURT: Additionally, while I understand you to be a US citizen, the law requires that I inform you that if you are not a US citizen, that this plea

could have immigration consequences, such as deportation, exclusion from admission or denial of naturalization. Do you understand?

THE DEFENDANT: Yes.

THE COURT: Are you prepared to go forward with your plea at this time?

THE DEFENDANT: Yes.

THE COURT: Do you need any more time to think about this change of your plea?

THE DEFENDANT: No.

THE COURT: Would you like another opportunity to speak with your lawyers before we proceed?

THE DEFENDANT: No.

THE COURT: Is there anyone else that you would like to speak with before we proceed?

THE DEFENDANT: No.

THE COURT: Are you entering your plea here today because you are in fact guilty?

THE DEFENDANT: Yes.

*Id.* at 15-22. The colloquy continued:

THE COURT: Based on this inquiry of the Defendant and Counsel, this Court finds that the Defendant is making a knowing, informed and voluntary decision to exercise his right to plead to the indictment pursuant to CPL 220.10 Subdivision 2 after consulting with his defense team and family and having had a sufficient opportunity to consider his options.

Further, this Court is confident that he is choosing to go forward with this plea today of his own free will and volition.

As it relates to the first count of the indictment, I will ask you if on or about May 14th of 2022, in this county, being more than eighteen years old at the time of the commission of the crime, and with the intent to cause the death of or serious physical injury to five or more persons, you caused the death of at least one person, to wit: Roberta Drury, and caused the death of four or more additional persons, to wit: Heyward Patterson, Pearl Young, Ruth Whitfield,

9

Celestine Chaney, Aaron Salter, Andre Mackniel, Margus Morrison, Katherine Massey and Geraldine Talley, none of whom were participants in the criminal transaction, and you did so in whole or in substantial part because of the perceived race and/or color of such person or persons, regardless of whether that belief or perception was correct. Did you engage in that conduct?

THE DEFENDANT: Yes.

THE COURT: How do you plead to a violation of Penal law 490.28, domestic act of terrorism motivated by hate in the first degree?

THE DEFENDANT: Guilty.

THE COURT: As it relates to the second count, I will ask you if on or about May 14th of 2022, while in this county, being more than eighteen years old at the time of the commission of the crime, and with the intent to cause the death of another person, you caused the death of Roberta Drury, who was not a participant in the criminal transaction, and as part of the same criminal transaction you, with the intent to cause serious physical injury to or the death of an additional person, caused the death of Heyward Patterson, who was not a participant in the criminal transaction. Did you engage in that conduct?

THE DEFENDANT: Yes.

THE COURT: How do you plead to a violation of Penal law 125.27 Subdivision 1(a)(viii), murder in the first degree?

THE DEFENDANT: Guilty.

*Id.* at 22-24. The court and the defendant continued the colloquy in a similar fashion with the defendant admitting guilt for intentionally causing the death of each of the murder victims at Tops. *See id.* at 24-30. Next, the defendant pleaded guilty and admitted to committing the attempted murders of Zaire Goodman, Christopher Braden, and Jennifer Warrington, *id.* at 30-32, and to possessing a loaded assault weapon, in violation of New York Penal Law. *Id.* at 32-33

The government does not anticipate any objection by the defense as to the authenticity, relevance, and admissibility of the state court transcript because the government and defense previously agreed to advise the potential jurors in the juror questionnaires as to the

defendant's state court plea, convictions, and sentence. However, in the event the defendant does object to introduction of the state plea transcript, or any of the excerpted portions set forth above, any such objections should be denied.

The Supreme Court recognized over 100 years ago that an admission by a defendant, particularly one made before a court, constitutes the strongest possible evidence of his guilt. *Wilson v. United States*, 162 U.S. 613, 622-23 (1896); *United States v. Persico*, 621 F. Supp. 842, 871 (S.D.N.Y. 1985). This common-sense principle remains true today. The defendant's state court plea allocution is an admissible non-hearsay statement of a party opponent, *see* Fed R. Evid. 801(d)(2)(A), and is highly relevant evidence whose probative value is not outweighed by the danger of unfair prejudice. *See United States v. Vanhoesen*, 366 F. App'x 264, 269 (2d Cir. 2010) (Summary Order) (finding no abuse of discretion of the district court's decision to allow the government to introduce into evidence the transcript of his state court plea, in which he admitted that he possessed digital scales and plastic baggies in order to package drugs, despite the defendant's offer to stipulate to the element of intent to distribute if the jury found that he possessed the crack cocaine); *see also United States v. Frederick,* 702 F. Supp. 2d 32, 37 (E.D.N.Y. 2009) (admitting state court guilty robbery plea in subsequent federal Hobbs Act robbery (collecting cases)); *People v. Mason*, 307 N.Y. 570 (1954) (under New York law, the guilty pleas entered by appellants in the state proceeding were formal judicial admissions of the allegations contained in the information).

Moreover, the Second Circuit has long held that a defendant's prior guilty plea to one crime is admissible to prove an element of a newly charged crime. *See United States v. Andreadis,* 366 F.2d 423, 433 (2d Cir. 1966) (rejecting contention that introduction of state court guilty plea for related state charge was prejudicial and holding that evidence of the guilty plea was

properly admitted as proof of element in newly charged federal crime); *see also United States v. Overton*, No. 15-CR-9S, 2017 WL 6347084, at *2 (W.D.N.Y. Dec. 13, 2017) (state court pleas for related charges admissible in subsequent federal prosecution as to the defendant's knowledge of victim's age and prostitution during time period charged); *United States v. White*, No. 17 CR. 611 (RWS), 2018 WL 4565140, at *5 (S.D.N.Y. Sept. 24, 2018) (denying defendant's motion to exclude prior state and federal guilty pleas related to firearms that matched shell casings related to subsequent prosecution for racketeering acts); *United States v. Allen*, No. 15-CR-95 (AJN), 2018 WL 1889759, at *9 (S.D.N.Y. Apr. 17, 2018).

The defendant's state plea colloquy, in which he admitted to committing all the murders and attempted murders charged in this case and admitted his racial motivation, are non-hearsay statements of a party opponent that serve as highly probative and compelling substantive evidence as to the instant charges. The November 28, 2022, plea allocution was voluntarily and validly made, Gov. Ex. 5000 at 22, and therefore, cannot not now be argued as unfairly prejudicial. *See United States v. Dabney,* 498 F.3d 455, 458 (7th Cir. 2007) ("The [defendant's state-court admission to possessing the gun] was certainly compelling evidence of [defendant's] guilt [on the federal charge], but there was nothing unfairly prejudicial about it."). Where, as here, a defendant has counsel, ample time for reflection, an opportunity to consider the weight of the evidence, and has been fully informed of his rights by a judge (Gov. Ex. 5000 at 15-22), his admissions under oath are admissible in a criminal proceeding against him. Indeed, the defendant acknowledged that his state guilty plea could "impact any other pending proceedings against" him. *Id*. at 21. Furthermore, admission of the state-court guilty plea "would not lead to conviction on an improper basis, tend to prove some fact not properly in issue, or excite an emotional conclusion from jurors. Instead, the state court guilty plea

12

allocution [would] logically contribute to the jury's potential conclusion" that the defendant committed the charged crimes. *Frederick*, 702 F. Supp. 2d at 37. Accordingly, the Court should admit the defendant's state court plea allocution into evidence at his federal trial.

### B.  911 Call Audio Recordings and CAD Reports

As the defendant commenced his attack, multiple victims, witnesses, and members of the public called 911. The government intends to introduce a limited number of 911 calls, *see* Gov. Ex. 2500-2506, that were made during or close in time to the defendant's attack. All the calls are admissible as non-hearsay, highly relevant substantive evidence of the defendant's attack. *See* Fed. R. Evid. 803(1)-(3) (hearsay exceptions for excited utterances, present sense impressions, and then existing mental, emotional, or physical condition). A custodian of records from Erie County Police Services, the law enforcement agency that provides 911 call services, will authenticate the 911 audio recordings pursuant to Federal Rule of Evidence 901.[1] This witness either duplicated and/or is familiar with the computer process of duplicating accurate recordings of the 911 calls from the computer system that stores all 911 call and radio transmission information.[2]

---

[1] While admissible as excited utterances and present sense impressions, the 911 calls are also admissible as business and public records. The 911 calls are reliable, time-stamped, utilized Computer-Aided Dispatch ("CAD"), and were preserved by, and are records kept in the course of regularly conducted business by, Erie County Police Services. *See United States v. Cadieux*, 500 F.3d 37, 40 (1st Cir. 2007) (affirming that the 911 "recording was admissible either as a business or public record; that the statements themselves, though hearsay, could be introduced either as excited utterances or present sense impressions; and that the statements were nontestimonial and therefore exempt from Confrontation Clause challenge"); *United States v. Harper*, No. 05-CR-6068L, 2009 WL 140125, at *1 (W.D.N.Y. Jan. 20, 2009) (holding that "[h]earsay statements on a 911 tape can be admitted into evidence as either a 'public record,' Fed. R. Evid. 803(8)(B), or a 'business record,' Fed. R. Evid. 803(6)" and then the citizen statements contained in the calls can be admitted through a separate hearsay exception).

[2] Alternatively, the calls may be authenticated by the 911 caller whose voice is captured on the audio recording.

13

Federal Rule of Evidence 803(1) exempts from the hearsay rule "[p]resent [s]ense [i]mpression[s]," which are defined as "statement[s] describing or explaining an event or condition, made while or immediately after the declarant perceived it." Fed. R. Evid. 803(1). "Such statements are considered to be trustworthy because the contemporaneity of the event and its description limits the possibility for intentional deception or failure of memory." *United States v. Jones*, 299 F.3d 103, 112 (2d Cir. 2002) (citing *United States v. Brewer*, 36 F.3d 266, 272 (2d Cir. 1994)). Rule 803(2) similarly exempts an "[e]xcited [u]tterance," or "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused," from the hearsay rule. Fed. R. Evid. 803(2). "Unlike present sense impressions, an excited utterance need not be contemporaneous with the startling event to be admissible under hearsay exception; rather, the length of time between the event and the utterance is only one factor to be taken into account." *Jones*, 299 F.3d at 112; *see also United States v. Ibanez*, 328 F. App'x 673, 675 (2d Cir. 2009) ("For statements to qualify as present sense impressions, precise contemporaneity is not required.").

Statements made during 911 calls are not testimonial within the meaning of *Crawford v. Washington*, 541 U.S. 36 (2004). *See Davis v. Washington*, 547 U.S. 813, 826-29 (2006); *see also Navarette v. California,* 572 U.S. 393, 400 (2014) ("Unsurprisingly, 911 calls that would otherwise be inadmissible hearsay have often been admitted on those grounds [i.e., excited utterance and present sense impression]."); *United States v. Steele*, 216 F. Supp. 3d 317, 323 (S.D.N.Y. 2016) (911 call related to a gunshot made within minutes was admissible as either a present sense impression or an excited utterance); *United States v. Mejia-Vales*, 855 F. Supp. 607, 613-14 (E.D.N.Y. 1994) (admitting under either Rule 803(1) or (2) hearsay exception a tape of a 911 call made by an eyewitness immediately following a shooting). "Statements are

14

nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency," such as a 911 call during a violent attack. *Davis,* 547 U.S. at 822.

Likewise, the CAD reports that are generated with 911 calls are admissible pursuant to Federal Rule of Evidence 803(6), *see Harper,* 2009 WL 140125, at *1-2, 4, and as long as the statement in the CAD report meets some other hearsay exception, the statements reflected in the CAD report should be admissible at trial. *Id.; see also United States v. v. Hughes,* 840 F.3d 1368, 1376 (11th Cir. 2016) (affirming district court's ruling that "the CAD Report was admissible as an exception to the rule against hearsay, either as the 911 caller's present sense impression or as an ordinary business record of the law-enforcement agency").

The 911 calls contain short contemporaneous narrations of the attack and the caller's observations. 911 call takers asked questions attempting to gather information for the law enforcement response to the ongoing emergency. In many calls, gunshots can be heard in the background. During some calls, 911 call takers patched in ambulance personnel to ask further questions relating to the victims' injuries.

For example, the government will seek to admit the 911 calls ███████████████ ██████████████████████████████████████████ █████████████████

---

[3] The Confrontation Clause does not prohibit the admission of 911 call audio where the caller does not testify because the statements are nontestimonial. *See Davis,* 547 U.S. at 822, 826-27; *Michigan v. Bryan,* 562 U.S. 344, 370-78 (2011) (statements were nontestimonial when made by a shooting victim to police 25 minutes after a shooting while the shooter was still at large and could have threatened others); *Ohio v. Clark,* 576 U.S. 237, 247 (2015) (teachers' questions to child abuse victim were nontestimonial because they "were meant to identify the abuser in order to protect the victim from future attacks"); *United States v. Liera-Morales,* 759 F.3d 1105, 1110 (9th Cir. 2014) (kidnappers' statements during telephone call with victim's mother were nontestimonial because the purposes of the call were to assist law enforcement's response to the hostage situation). The 911 calls that the government seeks to admit are all statements clearly made with the primary purpose of helping law

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████. *Id.* Accordingly, the identified 911 calls that the government seeks to

introduce should be admitted.

---

enforcement rescue victims, and stop the ongoing attack—not to enable a future prosecution. The statements were all made before the active shooter had been definitively identified, and therefore also had the primary purpose of resolving an emergency.

### C. **May 14, 2022, Buffalo Police Body Camera Footage**

The government will seek to introduce select police body worn camera footage from Buffalo Police officers who responded to Tops and eventually arrested the defendant on May 14, 2022. Gov. Ex. 3001-3004. Such footage captures the officers' response, arrival to Tops, their verbal commands to the defendant, and their actions as they took the defendant into custody, searched his person, briefly questioned him[4], and eventually transported him to Buffalo Police headquarters.[5] In short, the footage documents the real time events as police responded to the defendant's attack.

The body camera recordings are admissible as business records, public records, excited utterances, present sense impressions, statements of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental state, pain, or bodily health), and, to the extent they involve the defendant's statements, statements of a party opponent. *See* Fed. R. Evid. 803(1), (2), (3), (6), (8); *United States v. Spencer*, No. 22-1464-CR, 2023 WL 5091827, at \*2 (2d Cir. Aug. 9, 2023) (Summary Order) (affirming district court ruling that body camera footage was admissible as an excited utterance); *United States v. Clotaire*, 963 F.3d 1288, 1294 (11th Cir. 2020) ("no one doubts that the surveillance videos themselves were self-authenticating business records under Rule

---

[4] Federal Rule of Evidence 801(d)(2)(A) provides that a statement is not hearsay if it is offered against the party and is the party's own statement. The government anticipates that it will introduce numerous statements made by the defendant, both orally and in writing. The defendant's various statements are admissible as statements by a party opponent. *See On Lee v. United States*, 343 U.S. 747, 756 (1952); *see, e.g.*, *United States v. Meskini,* 319 F.3d 88, 93 (2d Cir. 2003); *United States v. Inserra*, 34 F.3d 83, 90 (2d Cir. 1994); *United States v. Clemons*, 676 F.2d 122 (5th Cir. 1982) ("A statement is not inadmissible hearsay if it is the statement of a party againstwhom it is offered.").

[5] The Court has previously reviewed some of this footage in relation to the defendant's motion to suppress and ruled that the defendant's statements were admissible pursuant to the public safety exception. Docket No. 582 at 46-47.

803(6)"); *Charlemagne v. Alibayof*, Civ. No. 20-62043, 2022 WL 1642299, at *2 (S.D. Fla. Apr. 29, 2022) (body camera videos "can either be qualified as business records or Plaintiff can call the officers who wore the body cameras as witnesses"); *Pryor v. Corrigan*, Civ. No. 17- 1968, 2023 WL 1100436, at *30 (N.D. Ill. Jan. 30, 2023) (holding that statements on a dashboard camera video were not hearsay because they showed state of mind under Rule 803(3)); *United States v. Bryan*, Cr. No. 3:19-00060-MMD-WGC-1, 2021 WL 2371580, at *2 (D. Nev. June 9, 2021) (denying motion to exclude body camera footage and holding that "any statements Defendant made that were captured by the body camera footage are admissible for their truth under the excited utterance exception to the hearsay rule"); *United States v. Williams*, Cr. No. 6:19-00029, 2020 WL 4927482, at *5 (E.D. Tex. Aug. 21, 2020) (admitting certain "transcripts and recordings from Dickerson and Samford's body cameras, dash cameras, and dispatch audio" as either present sense impressions or statements of a party opponent); *Knickerbocker v. United States*, Civ. No. 1:16-01811-DAD-JLT, 2020 WL 1433141, at *4 (E.D. Cal. Mar. 24, 2020), *aff'd*, 858 F. App'x 243 (9th Cir. 2021) ("the body camera footage does not constitute hearsay").

Where, as here, body worn cameras recorded law enforcement officers reponsding to an active shooter situation, such recordings fall squarely within the permissible exceptions to hearsay and are admissible under Federal Rule of Evidence 803. Thus, the selected body camera footage from the scene at Tops should be admitted. *See* Gov. Ex. 3001-3004.

**D.** ██████████████████████████████████████████████
██

████████████████████████████████████████████████████

████"█████████████████████████████████████████████████

███████████████████████████████████████████████████"███

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████

███████████████████████████████████████████ camera footage is

admissible as a business record, public record, present sense impressions, statements of the

declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory,

or physical condition (such as mental state, pain, or bodily health), and statements of a party

opponent. *See* Fed. R. Evid. 803(1), (3), (6), (8).█████████████████████

████████████████████████████████████████████████████████

████████████████████ *See* Fed. R. Evid. 801(d)(2)(A). The questions, statements,

and directions of ███████████ that contextualize the defendant's statements are not

hearsay. *See United States v. Bellomo*, 176 F.3d 580, 586 (2d Cir. 1999) ("Statements offered as

evidence of commands or threats or rules directed to the witness, rather than for the truth of

---

[6] In preparation for his attack, the defendant ██████████████████████████
████████████████████████████████████████████████████████
███████████████████████████

[7] ████████████████████████████████████████████████████████
████████████████████████████████████████ *See* Fed. R. Evid. 404(b)(2).

the matter asserted therein, are not hearsay."); *United States v. Oguns*, 921 F.2d 442, 449 (2d Cir. 1990) ("Because a question cannot be used to show the truth of the matter asserted, the dangers necessitating the hearsay rule are not present."); *United States v. Detrich*, 865 F.2d 17, 19 (2d Cir. 1988) (questions are not hearsay). Accordingly, ███████████ body camera footage of ████████████████████████████████████ be admitted.

### E.  The Defendant's "Goodbye Letter" to his Family

Before departing his parents' home in Conklin, New York, on May 13, 2022, the defendant wrote a letter to his family that he left in an envelope inside the drawer of the desk in his bedroom. *See* Gov. Ex. 6A (letter), 6B (envelope); Gov. Ex. 22.342-22.344, 22.348. Two weeks earlier, on April 29, 2022, the defendant wrote about this letter in his Discord journal, stating, ████████████████████████████████ ███████████████████████████. Law enforcement located and seized the letter from the desk drawer on May 14, 2022, when they searched the residence for evidence pursuant to a federal search warrant.[8] The defendant's letter is admissible as a non-hearsay statement of a party opponent under Rule 801(d)(2)(A).

As depicted below, the defendant addressed the envelope, ██████████ Gov. Ex. 6A, In the enclosed letter, ████████████████████████████████████ ████████████████████████████████████████ Gov. Ex. 6B.

---

[8] This Court denied the defendant's motion to suppress evidence seized during the execution of the federal search warrant for the residence. Docket No. 582 at 44.



While the defendant has not challenged the authenticity of the letter or the fact that he authored it, the envelope and letter are authentic statements of the defendant. An item is authentic pursuant to Fed. R. Evid. 901(a) if the proponent produces sufficient evidence to

support a finding that the evidence is what the proponent claims. "This finding may be based entirely on circumstantial evidence, including appearance, contents, substance and other distinctive characteristics of the writing," *United States v. Bagaric*, 706 F.2d 42, 67 (2d Cir. 1983) (internal quotation marks, brackets, and ellipses omitted) (quoting Fed. R. Evid. 901(b)(4)), "taken together with all the circumstances," Fed. R. Evid. 901(b)(4). *See also United States v. Wilson,* 532 F.2d 641, 645 (8th Cir. 1976) (notebooks found in the defendant's apartment reflecting transactions with which the writer was acquainted were properly authenticated). Rule 901(a) only requires the government to make a *prima facie* showing of authenticity or identification "so that a reasonable juror could find in favor of authenticity or identification." *United States v. Vayner*, 769 F.3d 125, 130 (2d Cir. 2014) (citation omitted). "The ultimate determination as to whether the evidence is, in fact, what its proponent claims is thereafter a matter for the jury." *Id.* (citation omitted). The proponent need not "rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be." *United States v. Pluta*, 176 F.3d 43, 49 (2d Cir. 1999) (internal quotation marks and citation omitted). Questions about authentication are therefore properly addressed through cross-examination, rather than exclusion of evidence.

Here, the appearance, contents, substance, handwriting,[9] location where the letter was found, and other surrounding circumstances support a finding of authenticity under Fed. R. Evid. 901(b)(4). *See also United States v. McGlory*, 968 F.2d 309, 329 (3d Cir. 1992). Law enforcement found the envelope and letter inside the drawer of the desk in the defendant's bedroom—███████████████████████████████████████

---

[9] In its discretion, another way for the government to authenticate the letter would be to call a non-expert witness (such as the defendant's mother) to testify as to their opinion as to the genuineness of the handwriting. *See* Fed. R. Evid. 904(b)(2).



▓▓▓▓▓ . ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ At the time it was found, the defendant had just committed a mass shooting consistent with ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓ Language in the letter mirrors the content of the defendant's other writings

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ , especially his stated purpose in committing the ▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Therefore, the defendant's letter is admissible as a non-hearsay statement of a party opponent under Rule 801(d)(2)(A) and statement against interest under Rule 804(b)(3).

## F.  Compilation Videos and Summary Exhibits

The government intends to introduce a compilation summary video, Government Exhibit 4000, during its case-in-chief at the guilt phase. The video is approximately 1 hour and 40 minutes long and synthesizes voluminous evidence from multiple sources into a single, concise chronology. The video chronicles the defendant's planning and preparation for the attack from the inception of his plan on December 5, 2021, through May 14, 2022, and his execution of the attack and arrest on May 14, 2022. It is comprised of numerous items of evidence that will be introduced by the government at trial, including the defendant's writings and photographs from his Discord journal, the GoPro video recording, body camera footage from the Buffalo Police Department and New York State Police, surveillance video footage from Tops and Cabela's, target practice and tactical videos recovered from the defendant's cell phone, a crime scene photograph, and images of certain physical and documentary evidence (including the defendant's "goodbye letter" to his family, receipts from Tops, the defendant's handwritten sketches of the interior layout of Tops, and a diagram of the crime

scene). The government anticipates introducing the video near the close of proof during the guilt phase.

Rule of Evidence 1006 permits a court to admit, as evidence, a "summary, chart, or calculation offered to prove the content of voluminous admissible writings, recordings, or photographs that cannot be conveniently examined in court, whether or not they have been introduced into evidence." Fed R. Evid. 1006(a).[10] If a party is permitted to introduce a compilation under Rule 1006, they must "make the underlying originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place." Fed R. Evid. 1006(b). "A summary must of course be based on foundation testimony connecting it with the underlying evidence summarized and must be based upon and fairly represent competent evidence already before the Court." *United States v. Palmer*, No. 7:24-CR-00067-NSR-2, 2025 WL 2978633, at *5 (S.D.N.Y. Oct. 21, 2025) (quoting *United States v. Neumann*, No. 21-CR-439-01 (NSR), 2023 WL 8700974, at *7 (S.D.N.Y. Dec. 14, 2023)). The Second Circuit has "regularly affirmed" the use of summary exhibits "to draw the jurors' attention to particular evidence culled from a voluminous set of records." *United States v. Yousef*, 327 F.3d 56, 158 (2d Cir. 2003) (telephone summary charts); *see also United States v. Blackwood*, 366 F. App'x 207, 212 (2d Cir. 2010) (telephone summary charts); *United States v. Casamento*, 887 F.2d 1141, 1149–50 (2d Cir. 1989) (jury reviewed binder containing reproductions of summary charts that utilized graphs, maps, brief written descriptions, and summarized surveillance, intercepted telephone conversations, seized items, and other evidence the government presented); *United States v. Pinto*, 850 F.2d 927, 935 (2d Cir. 1988)

---

[10] Maps of the Tops store with notations as to the location of victims at the time they were shot by the defendant, Gov. Ex. 552, 552.1, are also admissible as summary exhibits. Fed. R. Evid. 1006(a).

(summaries included the names of identified participants in the telephone conversations, the numbers used by conspirators and the addresses of several conspirators' residences, where calls were placed or received); *United States v. Baccollo*, 725 F.2d 170, 173 (2d Cir. 1983).

Here, the compilation summary video is admissible as an efficient and helpful exhibit to summarize hours of video footage, volumes of statements, and numerous items of physical and documentary evidence. Fed. R. Evid. 1006(a). All of the materials underlying the video have been provided in discovery,[11] are separately marked as trial exhibits, and will separately be introduced into evidence. The videos contained in the exhibit were taken from hundreds of hours of video from a variety of sources. In addition, the Discord writings contained in the video were excerpted from the defendant's ███████ Discord journal. The government previously provided the defendant with copies of the unedited raw footage from each of the sources, as well as the full content of his writings, thereby affording both parties full access to the material summarized.

Use of the compilation summary video avoids wasting the time of the jury and Court that would be caused by having to toggle between multiple different exhibits and sources of video. "[S]ummary exhibits are not rendered inadmissible merely because they present evidence in a manner that supports one party's theory of the case," and district courts regularly admit similar compilation summary video exhibits. *Palmer*, 2025 WL 2978633, at *5 (approximately 23-minute-long video that compiled portions of unedited video footage from approximately five different cameras); *see also United States v. Rodriguez*, No. 20-CR-548

---

[11] The government previously provided all marked trial exhibits, including Gov. Ex. 4000, to the Court and defense counsel.

(WFK), 2026 WL 561991, at *13 (E.D.N.Y. Feb. 27, 2026) (multiple illustrative aids and video compilations summarizing hours of video surveillance footage).

### G. Historical Cell Tower Analysis and Mapping

An expert, FBI Special Agent John Orlando, used historical cell site records[12] for the defendant's cell phone during the period of January 19, 2022, and May 14, 2022, to map the locations of the defendant's cell phone on relevant dates up to and including the date of his mass shooting attack at Tops. *See* Docket Nos. 484, 485. Special Agent Orlando completed this mapping as part of his role on the Cellular Analysis Survey Team ("CAST"). The mapped historical cell tower locations help establish the defendant's movements as he prepared and commenced his attack. *See* Govt. Ex. 1200.[13]

Historical cell site analysis evidence can, for example, establish that a particular cell phone was used within specific cell tower sectors located in the general vicinity of certain locations. Likewise, historical cell site analysis can corroborate the testimony of witnesses or the defendant's own writings, particularly his Discord journal that documented the locations he traveled to as part of his preparations. Generally, the mapping depicts the locations of the defendant's cell phone from January 19, 2022, through and including the defendant's attack

---

[12] The historical cell site data underlying the CAST mapping is admissible as a business record. *See* Fed. R. Evid. 802, 803(6); *see also United States v. Sanchez*, 586 F.3d 918, 927-29 (11th Cir. 2009). The data is also admissible through certification of a records custodian or other qualified witness pursuant to Federal Rule of Evidence 902(11). *See United States v. Yeley-Davis*, 632 F.3d 673, 680-81 (10th Cir. 2011) (certified cell phone records admitted into evidence pursuant to cell provider's certification under Rule 902(11) did not violate Sixth Amendment's Confrontation Clause); *see also Sanchez*, 586 F.3d at 929 n. 27 (rejecting "patently frivolous" defense argument that presentation of summary records through detective rather than cell provider's records custodian deprived defendant of Sixth Amendment right to cross-examine the records custodian).

[13] The government previously provided the Court and defense counsel with a copy of this cell tower mapping. The government also provided defense counsel with copies of the underlying historic cell site data as a part of discovery.

on May 14, 2022. The mapping covers highly relevant locations that the defendant visited during his extensive preparation, planning, and attack, including: pawns shops where he sold items to fund his attack; gun stores where he shopped and purchased a firearm used in the attack; locations, including Buffalo and ████████ that he surveilled when selecting his target location; and his travel from his residence and movements in an around Buffalo leading up to the May 14, 2022, attack. *See id.* In totality, as well as on specific dates, the CAST mapping demonstrates the extent of the defendant's planning and preparation, including the extensive travel and in-person surveillance and research he conducted.

The mapping relating to January 19, 2021, demonstrates ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████ :



Gov. Ex. 1000A-1 at 78.

CAST mapping ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████ *See* Gov. Ex. 1200 at 11. This mapping also corroborates █████████

███████████████████████████████████████████████

████████ Tops video surveillance, and other evidence. *See* Gov. Ex. 1000A-1 at 322-

325; 3000 (body camera footage); █████████████████████ 2000A (Tops video).

CAST mapping for April 20, 2022, data demonstrates the defendant's travel from his

residence in Conklin, New York, to ████████████████████████████████

████ . *See* Gov. Ex. 1200 at 14. The mapping demonstrates the time and mileage that the

defendant put into his plans. For example, the defendant left his house very early in the

morning and did not return until 4:23 p.m.—dedicating a full day to his preparations. ████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████ *See* Gov. Ex. 1000A-1 at 527. The defendant's trip to ██████ also

demonstrates the seriousness with which the defendant approached his planning, from

inception to conceptualizing his attack and ultimately making it come to fruition. Indeed, in

December 2021, approximately four months before he traveled to ██████ the defendant

was assessing the viability of ██████ as an attack location and documented that he planned

to ████████████████████████████████ as follows:

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████



*Id.* at 23, 25. The defendant continued to consider ▮▮▮▮ for the attack in February 2022 until he switched his focus to Buffalo. *Id.* at 156, 159, 174, 177, 192, 193, 195. As he contemplated the merits of both locations, the defendant documented:



*Id.* at 195.

CAST mapping for May 13, 2022, data demonstrates the defendant's travel from his residence in Conklin, New York, to his arrival and travels in and around Buffalo, New York up until his attack on May 14, 2022. *See* Gov. Ex. 1200 at 16-31.

Historical cell site analysis evidence is admissible at trial through a qualified expert witness pursuant to Federal Rule of Evidence 702. It is evidence that is based on valid, reliable, scientific, technical, and specialized knowledge that will assist the jury in understanding the evidence and determining facts in issue. Historical cell site analysis is

routinely admitted in criminal cases. *See United States v. Fama*, No. 12-CR-186 WFK, 2012 WL 6102700, at *3-4 (E.D.N.Y. Dec. 10, 2012) (historical cell site expert testimony admissible) (collecting cases); *United States v. Natal*, 849 F.3d 530, 536 (2d Cir. 2017) (testimony about how cell towers operate must be offered through an expert).[14] Accordingly, the Court should permit expert testimony regarding cell tower analysis, and should permit the expert witness, Special Agent Orlando, to detail his testimony through mapping that he created to explain his analysis to the jury.

## H. Admissibility of Business Records, Copies, and Computer Summaries

Throughout the trial, the government may offer copies of various business records, including CAD reports; cell phone service provider; records from Discord, Google LLC, Apple, Inc., Amazon; and other records. These records are admissible as records of regularly conducted activity pursuant to Federal Rule of Evidence 803(6) and 803(7).

The Second Circuit has stated that "Rule 803(6) favors the admission of evidence rather than its exclusion if it has any probative value at all.'" *United States v. Williams*, 205 F.3d 23, 34 (2d Cir. 2000) (internal quotation marks, brackets, and citation omitted). A prerequisite to admissibility is "that the record have sufficient indicia of trustworthiness to be considered reliable." *Id*. (internal quotation marks and citation omitted). "To lay a proper foundation for such a record, a custodian or other qualified witness must testify that the document was kept in the course of a regularly conducted business activity and also that it was the regular practice of that business activity to make the record." *Id*. (internal quotation marks, brackets, and citation omitted).

---

[14] The CAST mapping is also admissible as a summary exhibit pursuant to Federal Rule of Evidence 1006(a).

While the business record must be regularly maintained, it does not need to be routinely made. *See, e.g., United States v. Freidin*, 849 F.2d 716, 721 (2d Cir. 1988) ("Nonroutine records made in the course of a regularly conducted business should be admissible if they meet the other requirements of Rule 803(6) unless the sources of information or other circumstances indicate a lack of trustworthiness") (internal quotation marks and citations omitted); *see also United States v. Jacoby*, 955 F.2d 1527, 1536-37 (11th Cir. 1992) (allowing documents that noted concerns about transactions the defendant was involved with to be admitted as business records even though they were not routinely made, but instead were made from once a week to once a month or even less); *Willco Kuwait (Trading) S.A.K. v. de Savary*, 843 F.2d 618, 628 (1st Cir. 1988).

It is irrelevant whether the witness introducing the document created the document, has personal knowledge of its creation, or simply received and maintained it in the normal course of business. *See Phoenix Assocs. III v. Stone*, 60 F.3d 95, 101 (2d Cir. 1995); *Dyno Construction Co. v. McWane, Inc.*, 198 F.3d 567, 575-76 (7th Cir. 1999). Surveys, laboratory analyses, correspondence, reports, agreements and other records prepared by one entity and retained in the files of a separate entity, in the normal course of the retaining entity's business, are admissible under Rule 803(6). *United States v. Ullrich*, 580 F.2d 765, 772 (5th Cir. 1978). The sound policy supporting such admission is that the regular receipt of the records, reliance upon them, and their integration into the receiving entity's day-to-day operations lend a trustworthiness and probative value to the records. *See Black Sea & Baltic General v. S.S. Hellenic Destiny*, 575 F. Supp. 685, 691 (S.D.N.Y. 1983); *see also Ullrich*, 580 F.2d at 772. Where such circumstances are present, the records are admissible under Rule 803(6) even without testimony by a representative of the entity which prepared the records. *Starceski v. Westinghouse*

31

*Elec. Corp.*, 54 F.3d 1089, 1099 n. 9 (3d Cir. 1995) ("Rule 803(6)of the Federal Rules of Evidence . . . permits the admission of documents prepared in the ordinary course of business, even if the individual who prepared them does not testify about their contents."); *United States v. Hawkins*, 905 F.2d 1489, 1494-96 (11th Cir. 1990).

Where the foundation required under Rule 803(6) is laid, business records are admissible even when the records are incomplete and inaccurate. Claims of inaccuracy and incompleteness are matters going to the weight of the evidence and not its admissibility. *United States v. Panza*, 750 F.2d 1141, 1151 (2d Cir. 1984); *Matador Drilling Company v. Post*, 662 F.2d 1190, 1199 (5th Cir. 1981).

Phone records and cell tower records have traditionally been introduced and qualify as business records pursuant to Rule 803(6) because they are business records made in the ordinary course of business. *See* Fed. R. Evid. 802, 803(6); *see also United States v. Fujii*, 301 F.3d 535, 539 (7th Cir. 2002) ("Computer data compiled and presented in computer printouts prepared specifically for trial is admissible under Rule 803(6) [the business records exception] even though the printouts themselves are not kept in the ordinary course of business.") (italics omitted); *United States v. Briscoe*, 896 F.2d 1476, 1494 (7th Cir. 1990) ("computer data compilations are admissible as business records under Fed. R. Evid. 803(6)").

Records created by a process that does not involve a human assertion are not hearsay. Hearsay is a *statement*, other than one made by the declarant while testifying at the trial or hearing, offered "in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c) (emphasis added). A "statement" is (1) an oral or written *assertion* or (2) nonverbal *conduct* of a *person*, if it is intended by the person as an *assertion*. Fed. R. Evid. 801(a) (emphasis added). The rules of evidence do not define an "assertion," but courts have held that "the term has

32

the connotation of a positive declaration." *United States v. Lewis*, 902 F.2d 1176, 1179 (5th Cir. 1990). To be hearsay, the information must be an out of Court *statement*, by a *person*, and intended by the person to be a positive declaration or an expression of fact, condition or opinion.

In *United States v. Hamilton*, the Tenth Circuit found that computer-generated header information associated with uploaded pornographic images was not hearsay, as "there was neither a 'statement' nor a 'declarant' involved." 413 F.3d 1138, 1142 (10th Cir. 2005) (citing *United States v. Kohorozian*, 333 F.3d 498, 506 (3d Cir. 2003) ("nothing 'said' by a machine . . . is hearsay."). Similarly, the hearsay rule does not apply to automatically generated fax headers. *Kohorozian,* 333 F.3d at 506. Entering a phone number is a command to a system (i.e., connect me to the phone with this number) and is thus non-assertive conduct. *See Bellomo*, 176 F.3d at 586 ("Statements offered as evidence of commands or threats or rules directed to the witness, rather than for the truth of the matter asserted therein, are not hearsay."). Accordingly, authenticity of records produced by phone companies may also be by Rule 901 authentication. In practical terms, the foundation for such records, entered either pursuant to Rule 803(6) or Rule 901 will coalesce. Moreover, Federal Rule of Evidence 1003 provides that a duplicate, as defined in Rule 1001(4), is admissible to the same extent as the original.

## I.  Business Records and Rule 902(11) Certifications

The government will file notice of its intent to offer certain self-authenticating business records pursuant to Federal Rule of Evidence 902(11). The business record exception to the hearsay rule was intended to allow introduction of reliable and accurate records without the necessity of calling every person who made or contributed to the record. *United States v. Re*,

336 F.2d 306, 312-314 (2d Cir. 1964). The Second Circuit has repeatedly stated that Rule 803(6) "favors the admission of evidence rather than its exclusion if it has any probative value at all." *Williams*, 205 F.3d at 34. "The principal precondition to admissibility is that the record have sufficient indicia of trustworthiness to be considered reliable." *Id.* (quoting *Saks Intl, Inc. v. M/V Export Champion*, 817 F.2d 1011, 1013 (2d Cir. 1987)) (internal quotation marks omitted).

Rule 902 delineates items of evidence that are "self-authenticating" and "require no extrinsic evidence of authenticity in order to be admitted." Rule 902(11) permits authentication of such records by a written declaration of its custodian or other qualified person. Certified domestic records of a regularly conducted activity are admissible where "[t]he original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)-(C), as shown by a certification of the custodian or another qualified person that complies with a federal statute or a rule prescribed by the Supreme Court." *See United States v. Conde*, 134 F.4th 82, 88 (2d Cir. 2025) (custodian's sworn declaration that records had been created and maintained in the regular course of business laid proper foundation). The Advisory Committee Notes addressing the 2000 Amendments to the Federal Rules of Evidence make clear that "[a] declaration that satisfies 28 U.S.C. § 1746 would satisfy the declaration requirement of Rule 902(11), as would any comparable certification under oath." The rule also provides that an adverse party may challenge the introduction of the records after the proponent has given reasonable written notice of the intent to offer the record. Fed. R. Evid. 902(11).

Rules 902(11) and 803(6) are "designed to work in tandem." *United States v. Komasa*, 767 F.3d 151, 155 (2d Cir. 2014). Rule 803(6) provides that records of a regularly conducted

34

activity are not hearsay where:

> (A) the record was made at or near the time by – or from information transmitted by – someone with knowledge;

> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; [and]

> (C) making the record was a regular practice of that activity.

Fed. R. Evid. 803(6)(A)-(C). For the purposes of the rule, electronically stored data qualifies as a "record" for the purpose of admissibility. *Conde*, 134 F.4th at 89. The party opposing admission must "show that the source of the information or the method or circumstances of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803 (6)(E).

Similarly, Rule 902(13) provides that the certified records generated by an electronic process or system are self-authenticating and admissible where the "record [is] generated by an electronic process or system that produces an accurate result, as shown by a certification of a qualified person that complies with the certification requirements of Rule 902(11) or (12)." Rule 902(13) follows the procedural form of a Rule 902(11) certification but dispenses with the business records foundation. The procedural requirements of a Rule 902(13) certification drawn from Rule 902(11) are: (i) the certification must comply with a federal statute or Supreme Court rule and (ii) the proponent must give reasonable written notice of its intent to offer the evidence and furnish both the evidence and the certification to its opponent in advance of using it. *Id*.

A written declaration attesting to the authenticity of a business record is not testimonial in nature; the Supreme Court specifically observed that business records "by their nature are not testimonial." *Crawford*, 541 U.S. at 56. The Second Circuit has long held that documents that fit within the "business records" exception to the hearsay rule are not

testimonial. *See United States v. Feliz*, 467 F.3d 227, 236-37 (2d Cir. 2006) (holding autopsy reports non-testimonial); *see also United States v. James*, 712 F.3d 79, 99, 102 (2d Cir. 2013) (autopsy reports are not testimonial where there is no evidence that the autopsies were conducted in furtherance of a criminal investigation). For example, in *Komasa*, the Second Circuit held loan application files for mortgages were admissible even where some files were kept or generated via an automated process. 767 F.3d at 155-57.

Sister circuits have ruled similarly. *See also United States v. Ellis*, 460 F.3d 920, 927 (7th Cir. 2006) (concluded that business records could be properly introduced pursuant to Federal Rules of Evidence 803(6) and 902(11)). *See also United States v. Hagege*, 437 F.3d 943, 957-58 (9th Cir. 2006) (holding that "foreign business records admitted under § 3505 are not subject to the *Crawford* requirement of confrontation"); *United States v. Jamieson*, 427 F.3d 394, 411-12 (6th Cir. 2005) (holding that business records admitted under Rule 807 did not resemble the "formal statement" or "solemn declaration" identified by the Supreme Court in *Crawford*); *United States v. Lopez-Moreno*, 420 F.3d 420, 436-37 (5th Cir. 2005) (holding that public records are not testimonial and recognizing that, under *Crawford*, business records, which are analogous to public records, are not testimonial and are not subject to the requirements of the Confrontation Clause).

"The custodian need not have personal knowledge of the actual creation of the document to lay a proper foundation." *Komasa*, 767 F.3d at 156 (internal quotations and citation omitted); *see also Conde*, 134 F.4th at 88; *see also United States v. Jakobetz*, 955 F.2d 786, 800 (2d Cir. 1992) (toll receipt incorporated into a business's records qualified as a business record, even where the custodian had no knowledge of the toll receipt's preparation, because the receipt had been so embedded in the company's business records to allow an inference of

authenticity); *In re Ollag Constr. Equip. Corp.,* 665 F.2d 43, 46 (2d Cir. 1981) (finding that "business records are admissible if witnesses testify that the records are integrated into a company's records and relied upon in its day-to-day operations," and noting that the relevant financial statements were requested by a bank and regularly used by the bank to make decisions whether to extend credit).

The government's notice will reference certified business records, created and maintained in the regular course of business, and thus excepted from the hearsay rule under Rule 803(6). Absent a stipulation of authenticity and admissibility to the document between the parties, the government will be required to either (a) proceed by obtaining Rule 902(11) certifications, or (b) call records custodian witnesses for all of the relevant entities for the sole purpose of meeting the business record criteria set forth in Rule 803(6). The custodians of records of the above business and other entities are located around the country and would be required to travel significant distances to briefly testify at trial. Moreover, calling all such custodians of records witnesses at trial would needlessly delay the proceedings. Accordingly, certified copies of the business records and domestic records of regularly conducted activity that the government notices are admissible pursuant to Federal Rules of Evidence 902(11), 803(6), and 902(13).

### J. Authenticating Electronic Evidence Under Rules 902(11), 902(13) and 902(14)

The government will file notice of its intent to offer certified records pertaining to the defendant's iPhone, computer, and laptop, and thumb drives, which were all searched pursuant to federal search warrants. *See, e.g.,* Gov. Ex. 2B, 2E—2AA, 4B—4B-3, 77C—77C-17. The government's notice will further move the Court for an order requiring the defendant to challenge the introduction of the certified copies of the above-identified documents prior

37

to the commencement of trial in order that the Court may consider any such challenge and otherwise such a challenge be deemed waived.

The proposed exhibits are reliable copies of data extracted from the devices in this case.[15] The technicians who performed the extractions merely copied the data from each device through a reliable technological process and then provided the copy to the case agents for review. Absent an agreement between the parties and stipulation of authenticity and admissibility to the extractions, the government will either (a) proceed by moving to admit the data pursuant to a certification that complies with Rules 902(11) and 902(13)/(14), or (b) or by calling the forensic examiner who connected the devices to the hardware and software that made the copies.

Rule 902 provides, in pertinent part, that the "following items of evidence are self-authenticating; they require no extrinsic evidence of authenticity in order to be admitted:"

> (13) Certified Records Generated by an Electronic Process or System. A record generated by an electronic process or system that produces an accurate result, as shown by a certification of a qualified person that complies with the certification requirements of Rule 902(11) or (12). The proponent must also meet the notice requirements of Rule 902(11).

> (14) Certified Data Copied from an Electronic Device, Storage Medium, or File. Data copied from an electronic device, storage medium, or file, if authenticated by a process of digital identification, as shown by a certification of a qualified person that complies with the certification requirements of Rule 902(11) or (12). The proponent also must meet the notice requirements of Rule 902(11).

---

[15] The physical extractions are a mechanical download of the contents of the device or data through a mechanical process using tools like Cellebrite (or in the case of Discord, a similar tool called Fractal). These tools download the data from and create an extraction report of the contacts, call logs, text messaging, and photos contained inside the phone, or in the case of Discord the messages and photos contained in the data. No expert testimony is required to authenticate the extractions. *See United States v. Marsh*, 568 Fed. Appx. 15, 16 (2d Cir. 2014) (Summary Order); *see also Sec. & Exch. Comm'n v. Sabrdaran*, No. 14-CV-04825-JSC, 2016 WL 7826653, at *1 (N.D. Cal. Oct. 20, 2016) (denying defense motion to exclude testimony about Cellebrite extraction, quoting *Marsh*).

Fed. R. Evid. 902(13) & (14). The notice provision of Rule 902(11) provides as follows: "Before the trial or hearing, the proponent must give an adverse party reasonable written notice of the intent to offer the record — and must make the record and certification available for inspection — so that the party has a fair opportunity to challenge them."

Rule 902(14) sets out a procedure for authentication of digital copies without a live witness because, the Advisory Committee found, it is "often the case that a party goes to the expense of producing an authentication witness, and then the adversary either stipulates authenticity before the witness is called or fails to challenge the authentication testimony once it is presented" and Rule 902(14) allows for a "procedure by which parties can determine in advance of trial whether a real challenge to authenticity will be made, and can then plan accordingly." Fed. R. Evid. 902 advisory committee's notes to 2017 amendments.

"The bar for authentication of evidence under [Federal Rule of Evidence] 901(a) is 'not particularly high.'" *United States v. Bout*, 651 Fed. App'x 62, 63 (2d Cir. 2016) (quoting *United States v. Gagliardi*, 506 F.3d 140, 151 (2d Cir. 2007)). "It is met where 'sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification.'" *Id.* at 63-64 (quoting *United States v. Tin Yat Chin*, 371 F.3d 31, 38 (2d Cir. 2004)).

## K. Authentication and User Attribution

Through use of grand jury subpoenas, Emergency Disclosure Requests (EDRs), and state and federal search warrants, the government obtained account information and records related to the defendant's online activity from various service providers, including Google, Apple, Amazon (Twitch), Verizon, PayPal, and eBay. The government also extracted

evidence from the defendant's electronic devices, including his cell phone, laptop, computer, and thumb drives pursuant to federal search warrants.

In the event the defendant does not agree to stipulate to the authenticity of this evidence, the evidence will be properly authenticated through the appropriate Rule 902 certifications. Indeed, the Second Circuit has held that "[t]he bar for authentication of evidence is not particularly high." *Gagliardi*, 506 F.3d at 151. But even though "[t]he proponent need not rule out all possibilities inconsistent with authenticity, or . . . prove beyond any doubt that the evidence is what it purports to be," *id.* (internal quotation marks omitted), there must nonetheless be at least "sufficient proof . . . so that a reasonable juror could find in favor of authenticity or identification." *Pluta*, 176 F.3d at 49 (internal quotation marks omitted). The "proof of authentication may be direct or circumstantial." *United States v. Al–Moayad*, 545 F.3d 139, 172 (2d Cir. 2008). The simplest (and likely most common) form of authentication is through "the testimony of a 'witness with knowledge' that 'a matter is what it is claimed to be.'" *United States v. Rommy*, 506 F.3d 108, 138 (2d Cir. 2007) (quoting Federal Rule of Evidence 901(b)(1) (pre–2011 amendments)). This is by no means exclusive, however: Rule 901 provides several examples of proper authentication techniques in different contexts and the advisory committee's note states that these are "not intended as an exclusive enumeration of allowable methods but are meant to guide and suggest, leaving room for growth and development in this area of the law." Fed. R. Evid. 901, Advisory Committee's Note (Note to Subdivision (b)).

Here, each of the social media accounts are authentic and are easily linked to the defendant as the user of the accounts through either his name, email address, phone number, or a combination of those and other identifiers. Moreover, the internal content of the social

media accounts also readily identifies the defendant as the user, such that the content is attributable to him. The accounts use his name, contain photos of the defendant (including selfies), and other content that identifies him as the user of the account or device. For example, the defendant's so-called manifesto was found in several of his devices, and the content of the manifesto in many instances aligns with content in his Discord journal. Similarly, in many instances, photos, screenshots, and notes he took on his iPhone are also documented in his Discord journal and manifesto. Moreover, he referenced gear that he purchased via PayPal or acquired via eBay in his Discord journal and manifesto, and photographs of the gear were recovered from his iPhone. In addition, law enforcement seized the gear at the scene of the attack. These examples are not exhaustive.

Likewise, all of the electronic devices contain information that identify the defendant, such as his email, photos, videos, copies of his manifesto and other known writings, and all of the devices were found either in his possession at the scene at Tops (iPhone and laptop) or in an area he controlled, such as his bedroom (thumb drives and computer).

No reasonable argument can be made that the accounts or evidence extracted from the defendant's devices are not authentic or that the content is not attributable to him. The government can easily authenticate the records through sufficient extrinsic evidence under Rule 901(a). *See Vatyan v. Mukasey*, 508 F.3d 1179, 1184 (9th Cir. 2007); *United States v. Dockins*, 986 F.2d 888, 895 (5th Cir. 1993). Indeed, authorship may be established for authentication purposes by way of a wide range of extrinsic evidence. *See* Fed. R. Evid. 901(b). In *McGlory*, for example, the Third Circuit rejected a defendant's challenge to the authentication of notes that he had allegedly handwritten because, despite being unable to fully establish authorship through a handwriting expert, the prosecution had provided

"sufficient evidence from which the jury could find that [the defendant] authored the notes." 968 F.2d at 329. The notes had been seized from the trash outside the defendant's known residences; some of the notes were torn from a notebook found inside his residences; some notes were found in the same garbage bag as other identifying information; and certain notes were written on note paper from hotels where the defendant stayed during the alleged conspiracy. *Id.* at 328–29.

Likewise, in *United States v. Barnes*, 803 F.3d 209 (5th Cir. 2015), the Fifth Circuit held that the government laid a sufficient foundation to support the admission of the defendant's Facebook messages under Rule 901 where a witness testified that she had seen the defendant using Facebook and that she recognized his Facebook account as well as his style of communicating as reflected in the disputed messages. *Id.* at 217. Moreover, in *United States v. Hassan*, 742 F.3d 104, 133 (4th Cir. 2014), the Fourth Circuit held that the government properly linked the Facebook pages at issue to the defendants by using internet protocol addresses to trace the Facebook pages and accounts to the defendants' mailing and email addresses.

In contrast, the Second Circuit held that the government failed to adequately authenticate what it alleged was a printout of the defendant's profile page from a Russian social networking site where it offered *no evidence* to show that the defendant had created the page. *See Vayner*, 769 F.3d at 132 (emphasis added). However, the Second Circuit reaffirmed that authentication may be accomplished by direct and/or circumstantial evidence of authorship. *See United States v. Encarnacion-Lafontaine*, 639 Fed. Appx. 710, 713 (2d Cir. 2016) (Summary Order). In *Encarnacion-Lafontaine*, the Second Circuit concluded that the government provided ample evidence linking the defendant to a Facebook account and also

42

supported the accuracy of the chat logs by obtaining them directly from Facebook and introducing a certificate attesting to their maintenance by the company's automated systems. *Id.*

In all of these cases, the courts considered a variety of extrinsic evidence to determine whether the government had met its authentication burden under Rule 901—each reiterating, in the course of that analysis, that conclusive proof of authenticity is not required and that the jury, not the court, is the ultimate arbiter of whether an item of evidence is what its proponent claims it to be. Here, the accounts' content identify the defendant as the account's user, and, in many instances, the accounts are linked to his name, address, email, phone number, or other identifiers, which easily establish the defendant as the user of the account or device. *See United States v. Gonzalez,* 144 F.4th 396, 406 (2d Cir. 2025); *see also United States v. Morrison*, 153 F.3d 34, 57 (2d Cir. 1998) ("Breaks in the chain of custody do not bear upon the admissibility of evidence, only the weight of the evidence."); *United States v. Payne*, No. 19-CR-170-A, 2025 WL 2688928, at *17 (W.D.N.Y. Sept. 19, 2025) (describing that a cell phone extraction was authenticated in a number of ways, including "through matching the unique identifiers on the cell phone with those on the Cellebrite report; the testimony of witnesses who authenticated, for example, text message exchanges with Defendant located on such cell phone; and the unique characteristics of the phone's contents, such as photographs of Defendant, photographs of Defendant and his young son, and emails directly linked to Defendant.") (collecting cases).

43

**L. Chain of Custody**[16]

At trial, the government will seek to admit, among other things, physical evidence obtained from the defendant's person and residence. An uninterrupted chain of custody is not a prerequisite to admissibility of an exhibit. *United States v. Jackson*, 345 F.3d 59, 65 (2d Cir. 2003). "Breaks in the chain of custody do not bear upon the admissibility of evidence, only the weight of the evidence. . ." *Id*. "If the trial judge is satisfied that in reasonable probability the evidence has not been altered in any material respect, he may permit its introduction." *United States v. Olson*, 846 F.2d 1103, 1116 (7th Cir. 1988) (quoting *United States v. Aviles*, 623 F.2d 1192, 1198 (7th Cir. 1980)).

Proof of the connection of an exhibit to a defendant may be made by circumstantial evidence. *United States v. Mendel*, 746 F.2d 155, 167 (2d Cir. 1984). "[T]he prosecution need only prove a rational basis from which to conclude that the exhibit did in fact belong to the [defendant]." *Id.* "The ultimate question is whether the authentication testimony is sufficiently complete so as to convince the court of the improbability that the original item had been exchanged with another or otherwise tampered with." *Id.*

**M. Prior Statements as Substantive Evidence**

A witness's prior statements are ordinarily hearsay inadmissible under Federal Rule of Evidence 801. However, Federal Rule of Evidence 801(d)(1) provides, in pertinent part, as follows:

(d) Statements which are not hearsay.  A statement that meets the following conditions is not hearsay:

> (1) A Declarant-Witness's Prior Statement. The declarant testifies and is subject to cross-examination about a prior statement, and the statement:

---

[16] The government intends to seek stipulations as to chain of custody for physical evidence.

(A) is inconsistent with the is inconsistent with the declarant's testimony and was given under penalty of perjury at a trial, hearing, or other proceeding or in a deposition;

(B) is consistent with the declarant's testimony and is offered:

(i) to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying; or

(ii) to rehabilitate the declarant's credibility as a witness when attacked on another ground

Thus, under this Rule, statements which are inconsistent with the testimony at trial, and which were given under oath or in a deposition are admissible as substantive evidence. Here, the government expects that it may, at trial, seek to introduce such evidence as several witnesses testified under oath in a prior federal grand jury proceeding.

Under this Rule, the government may properly introduce a witness's prior grand jury testimony where such testimony is inconsistent with such witness's trial testimony. *See, e.g., United States v. Murphy*, 696 F.2d 282, 284 (4th Cir. 1982); *United States v. Marchand*, 564 F.2d 983, 997-99 (2d Cir. 1977) (inconsistent prior grand jury testimony admissible under Rule 801(d)(1)(A)); *United States v. Rivera*, 513 F.2d 519, 525-28 (2d Cir. 1975); *United States v. Mosley*, 555 F.2d 191, 193 (8th Cir. 1977). Such evidence may also be introduced where the trial witness forgets or cannot recall that about which he or she testified before the grand jury. *See United States v. Owens*, 484 U.S. 554, 558-62 (1988); *United States v. Milton*, 8 F.3d 39, 47 (D.C. Cir. 1994).

To be received as substantive evidence under Rule 801(d)(1)(A), the inconsistency between the witness's trial testimony and the former statement need not be in plain terms. Rather, it is enough if the proffered testimony, taken as a whole, either by what it says or by

45

what it omits to say, affords some indication that the facts are different from the testimony of the witness on the stand. *See United States v. Barrett*, 539 F.2d 244, 254 (1st Cir. 1976). The use of such evidence does not violate the Sixth Amendment's Confrontation Clause. *California v. Green*, 399 U.S. 149, 159-61 (1970). Under *Green*, any prior inconsistent statement, sworn or unsworn, may come in as evidence of its content so long as the declarant is on the witness stand at the trial and subject at that time to cross-examination.

With respect to Rule 801(d)(1)(B)(i), the Second Circuit has held that prior consistent statements are admissible so long as they are "made before the declarant developed an alleged motive to fabricate." *Al-Moayad*, 545 F.3d at 167 (internal brackets and citation omitted); *see also Tome v. United States*, 513 U.S. 150, 158 (1995). Rule 801(d)(1)(B) was intended to alter the substantive admission of consistent statements by noting "that prior consistent statements otherwise admissible for rehabilitation are now admissible substantively as well." Fed. R. Evid. 801 Advisory Committee Note (2014). The Advisory Committee Notes further explain that the "intent of the amendment is to extend substantive effect to consistent statements that rebut other attacks on a witness – such as the charges of inconsistency or faulty memory." *Id.*

Rule 801(d)(1)(B)(ii) expands the purpose for which prior consistent statements may be offered to include "the substantive use of prior consistent statements that are probative for rehabilitative purposes other than those specifically enumerated in subsection (i)." *United States v. Purcell*, 967 F.3d 159, 196 (2d Cir. 2020). Thus, a prior consistent statement may be used, for example, to rebut an attack on a witness's purportedly faulty memory or to address an apparent inconsistency. *See id.*

If cross-examination includes express or implied charges of recent fabrication, improper influence or motive, or attacks on the witness's credibility, the government intends

46

to seek to admit, where appropriate, that witness's prior consistent statements pursuant to Rule 801(d)(1)(B). Moreover, should such attack on the witness' credibility be argued in the defendant's opening statements, bolstering evidence may be introduced during direct examination of the witness. *Cf. United States v. Certified Env't Servs., Inc.*, 753 F.3d 72, 86 (2d Cir. 2014); *United States v. Cosentino*, 844 F.2d 30, 33 (2d Cir. 1988) (holding that government may introduce a witness's cooperation agreement on direct examination if the defendant's "opening statement sufficiently implicates the credibility of a government witness").

### N. Use of Transcripts

At trial of this matter, transcripts of the defendant's statements captured on his GoPro video and police body camera footage have been embedded into the compilation summary video exhibit, *see* Gov. Ex. 4000. Likewise, the government may use transcripts of 911 calls.

"Transcripts of tape-recorded conversations may be given to a jury in a criminal trial for the purpose of aiding the jury in following along if certain precautions are taken to ensure accuracy." *United States v. Ben-Shimon*, 249 F.3d 98, 101 (2d Cir. 2001) (*per curiam*). "If the accuracy of the transcript is contested, competing transcripts may be submitted to the jury." *Id.* Any prejudice arising from the introduction of the transcripts can usually be avoided by a limiting instruction emphasizing the jury's role as ultimate factfinder. *See United States v. Chalarca*, 95 F.3d 239, 246 (2d Cir. 1996). "[W]hen litigants disagree as to the precise words on a tape, or as to the accuracy of transcripts, the district court may permit each party to submit an alternative transcript to the jury." *Id.*; *See, e.g.*, *United States v. Carson*, 464 F.2d 424, 437 (2d Cir.), *cert. denied*, 409 U.S. 949 (1972); *see also United States v. Chiarizio*, 525 F.2d 289, 293 (2d Cir. 1975) ("In cases where the defense and prosecution disagree as to the contents of the tape, the proper procedure is for the jury to receive transcripts of both sides' versions.").

Disagreements over accuracy notwithstanding, a district court's admission of a properly authenticated transcript is not reversible error if the defendant is made aware that he is free to submit a competing transcript and does not do so. *See Ben-Shimon*, 249 F.3d at 102.

### O. **Witnesses Identified with an Adverse Party**

The government may call witnesses during its case-in-chief who may be aligned with the defendant. Specifically, the government's witness list includes ██████████████████

██████████████████████

Federal Rule of Evidence 611(c)(2) provides that the government should be able to use leading questions during its examination of any such witnesses without demonstrating any actual hostility. Under the rule, a "witness identified with an adverse party" is considered a hostile witness as a matter of law and is subject to direct examination by leading questions without any showing of hostility in fact. *See Notes of Committee on the Judiciary*, Senate Report No. 93-1277, note 2, subdivision (c). Rule 611(c) significantly enlarged the class of witnesses presumed hostile and subject to direct examination through leading questions without a showing of actual hostility. *See Haney v. Mizell Memorial Hosp.*, 744 F.2d 1467, 1477-78 (11th Cir. 1984). For example, a close friend of the defendant has been held to be a witness identified with an adverse party within the meeting of Rule 611(c). *United States v. Hicks*, 748 F.2d 854, 859 (4th Cir. 1984); *see also United States v. Brown*, 603 F.2d 1022, 1026 (1st Cir. 1979).

Friends and relatives of the defendant are witnesses who should be found to be identified with the defendant and subject to the use of leading questions by the government. Finally, Rule 611(c) may also be utilized by the government in conjunction with Rule 801(d)(1)(A). *See supra* at 45.

## P. Stipulations

The parties have not yet discussed stipulations in this case. The government may seek stipulations related to the chain of custody of certain evidence as well as authenticity of the defendant's online activity with various providers. In the event stipulations are reached, the parties will advise the Court accordingly.

## Q. Public and Self-Authenticating Records

The government may introduce various records pursuant to the public-records exception. Fed. R. Evid. 803(8). While the public records exception generally does not apply to criminal matters observed by police officers and other law enforcement personnel, courts have recognized the difference between objective observations made by law enforcement personnel as part of the everyday function of the agency and observations made by law enforcement personnel while investigating a crime. *See United States v. Feliz*, 467 F.3d 227, 237 (2d Cir. 2006) (routine autopsy reports qualified as a public record under Fed. R. Evid. 803(8)); *Cellco Partnership v. City of Rochester*, 623 F. Supp. 3d 184, 200-01 (W.D.N.Y. Aug. 22, 2022) (spreadsheet prepared by city's telecommunications director regarding city department activities admissible as public record).

Similarly, pursuant to Federal Rule of Evidence 902(4), the government may offer into evidence certificates of public documents, in the form of death certificates. These documents are self-authenticating public documents because they bear either a public seal and a signature purporting to be an attestation or execution or an official signature certified by an officer who has a seal. Copies of public records are also admissible pursuant to Rule 1005.

### R.  Limits on Cross-Examination

While the government does not believe the defense intends to exceed the proper bounds of cross-examination, the law is clear that defense counsel has no right to cross-examine a government witness about unrelated events. *United States v. Marji*, 158 F.3d 60, 63 (2d Cir. 1998) (limiting defense counsel's attempt to impeach a key government witness by introducing wholly unrelated events did not in any way constitute an abuse of discretion). Federal Rule of Evidence 611(b) provides that cross-examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility. Rules 608 and 609, in conjunction, provide the framework for cross-examination as to prior criminal convictions and acts affecting credibility.

Although the government cannot accurately predict the cross-examination anticipated by defense counsel, if defense counsel engages in improper cross-examination the government anticipates objecting and asking the Court to limit the extent of, or the scope of such cross-examination. The Confrontation Clause guarantees the defendant in a criminal prosecution the right to confront witnesses against him. This "means more than being allowed to confront the witness physically, for [t]he main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *United States v. Maldonado-Rivera*, 922 F.2d 934, 955 (2d Cir. 1990) (internal citations and quotations omitted).

However, the Confrontation Clause does not deprive the Court of all discretion in setting limits on cross-examination. It is well-established that the Court has broad discretion to limit the scope of cross-examination. *See United States v. Cambindo Valencia*, 609 F.2d 603, 630 (2d Cir. 1979). The trial judge has "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about,

among other things, . . . interrogation that is repetitive or only marginally relevant."
*Maldonado-Rivera*, 922 F.2d at 956 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986));
*see also United States v. Rahme*, 813 F.2d 31, 37 (2d Cir. 1987) (scope and extent of cross-
examination are within sound discretion of trial court); *United States v. Pedroza*, 750 F.2d 187,
195 (2d Cir.1984).

## S. Protective Order and Return of § 3500 and *Giglio* Material

The government provided or will provide the defendant with copies of prior statements
of its witnesses, criminal history information, and other impeachment information as part of
its discovery productions. Such information is provided to the defendant in order that the
defendant may effectively cross-examine witnesses at trial. The amended protective order
governing discovery, however, requires the defense team to return to the government all
discovery materials (including any copies) after any appeals or post-conviction proceedings
are completed. Docket Nos. 27, 470. The government submits, however, that once trial and
any appeal has been completed, the defendant would have no further use for these materials.
The government requests the defendant either return § 3500 material to the government
following trial and appeal or confirm its destruction by the defense (with the exception of
items entered into evidence).[17]

---

[17] The government is aware of various decisions which have held that § 3500 material must be returned
to the government only if there is a safety issue with respect to a witness to whom the material pertains.
*See United States v. Williams*, No. S1 00 CR. 1008 (NRB), 2005 WL 664933 (S.D.N.Y. Mar. 22, 2005);
*United States v. Harloff*, 826 F. Supp. 675, 676 (W.D.N.Y. 1993); *United States v. Badalamenti*, 626 F.
Supp. 655, 657-58 (S.D.N.Y. 1985). Given the nature of the case, the government submits that there
is a safety issue with respect to all its witnesses.

## T. Rebuttal Evidence and Summation

The government reserves the right to introduce rebuttal evidence at trial. Generally, rebuttal evidence may be introduced to refute evidence on material issues of fact, whether elicited under direct or cross examination, as well as to refute evidence on collateral issues of fact elicited on direct examination. *See United States v. Newman*, 481 F.2d 222, 224 (2d Cir. 1973). If rebuttal evidence is introduced, it would not be collateral to the main issue of guilt or innocence, nor would it be as a result of issues first drawn out by the government. *See United States v. Boatner*, 478 F.2d 737, 743 (2d Cir. 1973). The government hereby reserves its right, pursuant to Federal Rule of Criminal Procedure 29.1, to provide rebuttal summation argument to the jury, after the defense summation. Such argument will be relevant and responsive to the arguments and issues raised by the defense during his summation.

## V. GOVERNMENT'S SPECIFIC MOTIONS *IN LIMINE*

The government hereby requests specific pretrial rulings set forth *infra* and reserves its right to file additional motions *in limine* or to request the Court to make evidentiary rulings consistent with the arguments and legal authority set forth *supra* at Section IV.

### A. Motion to Admit Video and Photo Evidence of the Murders Committed by the Defendant at Tops on May 14, 2022

The government moves *in limine* to admit a select number of highly relevant, probative, and graphic video and photographic exhibits of the defendant's attack on May 14, 2022.[18]

---

[18] This portion of the government's briefing does not address any non-graphic video or photographic evidence, which includes but is not limited to: (i) videos and photographs of the defendant's gear, ammunition, and firearms; (ii) video of the ███████████████████████ ███████████████████████████████████████████ (iii) body camera video footage from ███████████ ███████████████ (iv) video surveillance footage of ███

This evidence is material and probative to establish the defendant's motive, intentionality, and planning in carrying out the attack, as well as to prove the killings, attempted killings, malice aforethought, premeditation, violent force, and extensive bodily injuries that resulted from the defendant's shooting and use of a dangerous weapon. And as discussed below, the government has proactively agreed to not introduce the most graphic evidence, notwithstanding the fact that long-established case law permits the government to introduce such evidence.

## I.      The Charged Offenses Require Proof of Violence and Murder

The defendant is charged with, among other things, ten counts of committing hate crimes resulting in death (18 U.S.C. § 249(a)(1)(B)(i)), ten counts of discharging a firearm to commit murder (18 U.S.C. § 924(j)(1)), four counts of committing hate crimes involving an attempt to kill (18 U.S.C. § 249(a)(1)(B)(ii)), and three counts of the use and discharge of a firearm during a crime of violence (18 U.S.C. § 924(c)(1)(A)(iii)). *See* Docket No. 6 at 1-7. Because several of the death-resulting counts are capital-eligible offenses, the Indictment contained special findings pursuant to 18 U.S.C. §§ 3591 and 3592, including findings related to the defendant's substantial planning and premeditation, the vulnerability of the victims due to their old age, and multiple killings and attempted killings. *Id.* at 10-12. In short, the charged offenses, as well as several aggravating factors, require the government to prove beyond a reasonable doubt that the defendant used a firearm to commit multiple murders.

---

██████████████████████████████████████████ (v) video surveillance footage of the defendant at Tops on May 13, 2022; (vi) ████████████████████████████████████████████ (vii) video surveillance footage of the defendant at Tops earlier in the day on May 14, 2022; and (viii) the pre-attack portion of the defendant's Go Pro video footage, which depicts him gearing up and driving to Tops immediately prior to commencing his attack. All such video and photographic evidence is highly relevant as to the defendant's motive, planning, purpose, and intent, and is admissible under Rule 401.

## II.    The Nature of the Limited Graphic Evidence the Government Will Seek to Introduce at Trial

The defendant used a high-powered rifle to shoot ten people at close range. The defendant ███████████████████████████████████████████████ ████████████████████████████████████████████████. Evidence of the defendant's crimes is therefore necessarily graphic.

Immediately after arresting the defendant, police seized the defendant's GoPro camera that he used to livestream the attack. A subsequent search warrant executed on the GoPro camera led to the recovery of video depicting some of the defendant's preparation immediately prior to the attack and a portion of his shooting attack at Tops. █████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████ In addition to the GoPro video, Tops store security cameras captured video of the defendant's attack from multiple viewpoints inside and outside of the store. The Tops security camera system recorded that footage onto DVRs.

The below exhibit depicts the approximate location of the victims' bodies and sequence of their murders or shootings as determined by review of the GoPro video, Tops security footage, crime scene photos, and the defendant's known route through the store.[19]

---

[19] *See* Gov. Ex. 552.1; *see also* Gov. Ex. 552.





████████████████████████████████████████████████████████

███████████████████████████████████████████████

Tops surveillance cameras captured video depicting the defendant's attack from multiple exterior and interior angles, including the locations of numerous other victims in the zone of danger that fled and hid. Many of these individuals and angles are not readily depicted on the defendant's GoPro video. For example, ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████

Moreover, the Tops video footage depicts ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████



Because the defendant's crimes were captured on video, the government intends to show those videos during the guilt and penalty phases of the trial. The government intends to play the defendant's GoPro video in its entirety and various video excerpts from Tops surveillance cameras depicting the various angles of the murders and attempted murders of all the victims who were shot and killed or injured. *See* Gov. Ex. 1B (Go Pro video), 2000 (Tops video), 200D, 2000E,[20] 4000. The government also intends to play the Tops video depicting various attempted murder victims who ran, hid, and fled the store during the attack, and body camera video of the police apprehending the defendant. *See* Gov. Ex. 2000D,[21] Gov. Ex. 3001-3004.[22]

---

[20] Consistent with the Court's order (Docket No. 481), the government provided the defendant with its exhibit list on November 10, 2025, which included the specified graphic photographs and video. This evidence was previously provided to the defendant through discovery and has been reproduced to the defense and provided to the Court as pre-marked trial exhibits. Given the sensitive nature of the photographs and video, the government requests they remain under seal for review by the Court for purposes of making evidentiary rulings unless and until such exhibits are admitted into evidence at trial. *See* 18 U.S.C. § 3771(a)(8) (crime victims have the right "to be treated with fairness and with respect for the victim's dignity and privacy").

[21] To the extent practicable, these videos have been clipped to avoid duplication of graphic footage contained on the defendant's GoPro video and Tops security video of depicting individuals who were murdered or injured.

[22] There is no graphic content depicted on the police body camera videos.

Near the end of the government's proof during the guilt phase, the government also intends to play a compilation summary video exhibit that depicts the timeline of the defendant's planning, preparation, and attack and incorporates excerpts from the defendant's Discord journal, videos from his iPhone, ███████████████████████████ ████████████, items seized during searches (such as receipts, notes, and diagrams that the defendant made of the layout of the store), ████████████████ the defendant's Go Pro video footage, and Tops surveillance video footage. *See* Gov. Ex. 4000. ████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████.

For purposes of the Court's analysis, it is important for the Court to understand the significant evidence the government does not plan to seek to introduce including the following:

- Crime scene photographs showing the most graphic and up-close depictions of ███ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████;[23]

---

[23] ████████████████████████████████████████████████████████████████████████████



- ████████████████████████████████████
  ████████████████████████████████████
  ████████████████████████████████████
  ████████████ ;[24]

- ████████████████████████████████████
  ████████████████████████████████████
  ████████████ ;[25]

- Voluminous Tops security surveillance footage contained on DVRs that recorded multiple camera views throughout the exterior and interior of the store for hours prior to, during, and after the defendant's attack.

As an aid to the Court's Rule 403 balancing analysis, the government is providing external media as Exhibit A, which contains the evidence the government intends to introduce at trial. Exhibit A contains the GoPro video, limited Tops security video, limited crime scene photographs of deceased victims, and the compilation summary video (Gov. Ex. 4000) that the government intends to introduce at trial. The government is also providing external media as Exhibit B, which contains ████████████████████████████ ████████████████████████████████████ that the government

---

[24] The government voluntarily agrees that it will not seek to admit autopsy photographs unless the defense presents evidence or makes arguments that makes it necessary to do so.

[25] The government will seek to introduce a limited number of non-graphic screenshots from the BPD crime scene video, *see* Gov. Ex. 554.1-554.9, and non-graphic crime scene photographs, *see* Gov. Ex. 553.1-553.216. Generally, the screenshots depict various areas within Tops, including break rooms, back rooms, and exit locations, to which people fled and hid during the attack, and the crime scene photographs depict the defendant's vehicle, ammunition, firearms, gear (including his Go Pro camera, iPhone, boots, body armor, helmet, and weapons, etc.), locations of spent casings, items of victims' property, and various locations within the store. They do not depict any graphic injuries or images of victims.

voluntarily agrees not to seek to introduce. Comparison of Exhibits A and B demonstrates that the government has already struck an appropriate balance between the evidence it will seek to introduce that is necessary to a fair presentation of the proof, and the graphic evidence that goes beyond that which is necessary to present a fair and compelling presentation.

### III.   The Governing Law

All evidence is admissible if it has "*any* tendency to make a fact more or less probable than it would be without the evidence," and if the evidence is "of consequence in determining the action." Fed. R. Evid. 401 (emphasis added). The standard is expansive. "Evidence need not be conclusive in order to be relevant. An incremental effect is sufficient." *United States v. Certified Environmental Services, Inc.*, 753 F.3d 72, 90 (2d Cir. 2014) (internal ellipses and brackets omitted).

"Relevancy is not an inherent characteristic of any item of evidence but exists only as a relation between an item of evidence and a matter properly provable in the case." *Huddleston v. United States*, 485 U.S. 681, 689 (1988) (quoting Fed. R. Evid. 401, Advisory Comm. Notes). If a "chain of inferences leads the trier of fact to conclude that the proffered submission affects the mix of material information, the evidence cannot be excluded at the threshold relevance inquiry." *United States v. Quattrone*, 441 F.3d 153, 189 (2d Cir. 2006). Indeed, "[t]o be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997). The Second Circuit has held that even evidence that does not directly establish an element of an offense is admissible and that background evidence "may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were

performed." *United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991) (quoting *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988)).

Once a court determines a piece of evidence is relevant, it must then weigh the probative value of the evidence under Rule 403, which provides that even relevant evidence may be excluded if its probative value is "*substantially outweighed*" by a danger of, among other things, "unfair prejudice." Fed. R. Evid. 403 (emphasis added). By design, evidence offered by the government is prejudicial to a defendant. *See Quattrone*, 441 F.3d at 186 ("All evidence introduced against a defendant, if material to an issue in the case, tends to prove guilt, but is not necessarily prejudicial in any sense that matters to the rules of evidence."). Rule 403 requires a court to examine whether the evidence is "unfair[ly]" prejudicial. "Evidence is unfairly prejudicial when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Curley*, 639 F.3d 50, 57 (2d Cir. 2011) (internal quotation marks omitted). "Since the trial judge is granted such a powerful tool by Rule 403, he must take special care to use it sparingly." *United States v. Jamil*, 707 F.2d 638, 642 (2d Cir. 1983) (citation and punctuation omitted); *Cf. United States v. Udeozor*, 515 F.3d 260, 264-65 (4th Cir. 2008) ("Rule 403 is a rule of inclusion, generally favoring admissibility...") (brackets and internal quotation marks omitted). Rule 403, in other words, is not an invitation to "'even out' the weight of the evidence, to mitigate a crime, or to make a contest where there is little or none." *United States v. McRae*, 593 F.2d 700, 707 (5th Cir. 1979). Because trials are not "conducted . . . on unreal facts tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing." *Id.*

Prejudicial evidence should not be excluded if it is sufficiently probative. *United States v. McGuire*, 27 F.3d 457 (10th Cir. 1994). "Unfair prejudice does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest a decision on an improper basis." *United States v. Johnson*, 581 F.3d 320, 327 (6th Cir. 2007). As the Tenth Circuit stated in *United States v. Naranjo*:

> Relevant evidence is inherently prejudicial; but it is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of relevant matter under Rule 403. Unless trials are to be conducted on scenarios, on unreal facts tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing. Its major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect. As to such, Rule 403 is meant to relax the iron rule of relevance, to permit the trial judge to preserve the fairness of the proceedings by exclusion despite its relevance. It is not designed to permit the court to even out the weight of the evidence, to mitigate a crime, or to make a contest where there is little or none.

710 F.2d 1465, 1469 (10th Cir. 1983) (citations and punctuation omitted) (emphasis in original).

Ascertaining the truth is the jury's most critical function, *see Tehan v. U.S. ex rel. Shott*, 382 U.S. 406, 416 (1966), and evidence is admissible even if it is probative of an undisputed fact. *Old Chief v. United States*, 519 U.S. 172, 186-87 (1997). Generally, even particularly gruesome and shocking crime scene photographs and video are not unfairly prejudicial and are admissible. *See, e.g., United States v. Salameh*, 152 F.3d 88, 122–23 (2d Cir. 1998) (no abuse of discretion to admit a "significant" number of "graphic" and "disturbing" photos of World Trade Center bombing victims, including corpse of a pregnant woman, despite defendants' stipulation offer); *United States v. Velazquez*, 246 F.3d 204, 211 (2d Cir. 2001) (details of autopsy photos depicting victim's injuries were legally and morally relevant to the conduct constituting the offenses committed by the defendant's principals and were admissible

notwithstanding defendant's offer to stipulate that the beating occurred because the defendant believed photos would invite the jury to convict him based on revulsion at what was done to the victim); *United States v. Contreras*, 149 F.4th 349, 365 (4th Cir. 2025) ("Certain evidence and testimony presented at trial was undoubtedly gruesome. Perhaps the most disturbing of all were two videos recorded during Victim 2's murder. We agree with the Government, however, that the videos' probative value was not outweighed by the risk of unfair prejudice. The videos placed several of the Appellants at the scene of the crime; corroborated witness testimony; helped establish the victims' identities; and depicted parts of the events that were the subject of the charges."); *United States v. Fields*, 483 F.3d 313, 354-56 (5th Cir. 2007) (32 gruesome and shocking crime scene and autopsy photographs, including photographs depicting a decomposing body, were highly probative and admissible even though the facts depicted by the photographs were not in dispute); *United States v. Escalante-Melgar*, 567 F. Supp. 3d 485, 492-93 (D.N.J. 2021) (photographs of a murder scene were probative to "help the jury understand the timeline of the murder," and "corroborate the testimony of fact witnesses;" autopsy photographs were probative to support "technical testimony" by a medical examiner and ballistics expert. Any unfair prejudice from this "graphic content" did not substantially outweigh the "highly relevant" probative value); *United States v. Con-ui*, No. 3:13-CR-123, 2017 WL 783437, at *2 (M.D. Pa. Mar. 1, 2017) (video of an inmate inflicting over 200 stab wounds, kicks to the head, and other acts of violence during the murder of a Federal Correction Officer was admissible as it was evidence of "the very crime" and showed "exactly what happened" and was "the most dependable evidence" from which the jury could decide the case).

64

The fact that "photos might have been graphic does not render them unfairly prejudicial under Rule 403[.]" *United States v. Osborne*, 739 F. App'x 11, 18 (2d Cir. 2018); *see also United States v. Salim*, 189 F. Supp. 2d 93, 98 (S.D.N.Y. 2002) ("[T]he graphic or disturbing nature of a photograph alone is not enough to render it inadmissible.") (citing *United States v. Velazquez*, 246 F.3d 204, 210-11 (2d Cir. 2001)). Indeed, "the prosecution may fairly seek to place its evidence before the jurors, as much to tell a story of guiltiness as to support an inference of guilt, to convince the jurors that a guilty verdict would be morally reasonable as much as to point to the discrete elements of a defendant's legal fault," *Old Chief,* 519 U.S. at 188, and "[g]ruesomeness alone does not make photographs inadmissible." *Naranjo*, 710 F.2d at 1468. In fact, "admitting gruesome photographs of the victim's body in a murder case ordinarily does not rise to an abuse of discretion where those photos have nontrivial probative value." *Fields*, 483 F.3d at 355; *see also Kuntzelman v. Black*, 774 F.2d 291, 292–93 (8th Cir. 1985) (*per curiam*) (holding that the admission of "flagrantly gruesome" photographs did not violate the petitioner's right to due process because the photographs "were at least arguably relevant and probative"); *United States v. Treas-Wilson*, 3 F.3d 1406, 1410 (10th Cir. 1993) (autopsy and crime scene photographs, though graphic, were relevant to the determination of the defendant's intent and state of mind).

Unfair prejudice as applied to a criminal defendant under Rule 403, "speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground *different from proof specific to the offense charged*." *Old Chief*, 519 U.S. at 180 (emphasis added). "[T]he vicious, brutal nature of a defendant's conduct is not itself sufficient to justify a complete exclusion of evidence tending to show the defendant engaged in those acts." *United States v. Lujan*, 603 F.3d 850, 858 (10th Cir. 2010). The prosecution—even in a capital case—

65

is entitled to present its case through the evidence it deems most appropriate. *See Salameh*, 152 F.3d 88, 122-23 (no abuse of discretion to admit a "significant" number of "graphic" and "disturbing" photos of World Trade Center bombing victims, including corpse of a pregnant woman, despite defendants' stipulation offer). Indeed, in other hate crime related prosecutions, trial courts have found similar graphic photographic and video evidence to be admissible. *See United States v. Bowers*, No. CR 18-292, 2023 WL 3688250 (W.D. Pa. May 26, 2023); *see also United States v. Maybee*, 687 F.3d 1026, 1033 (8th Cir. 2012) (holding that the trial court did not abuse its discretion in denying a defendant's motion for a new trial that argued in part that the frequency with which the government referred to photographs of a charred sedan inflamed the jury).

## IV.    Argument

The Court should admit the photographic and video evidence the government seeks to introduce pursuant to the balancing test set forth in Rule 403. The evidence is highly relevant, necessary to prove the offenses charged, and its probative value is not substantially outweighed by the danger of unfair prejudice, confusing the issues, or misleading the jury. Simply put, this evidence is the most direct and uncontroverted evidence of the defendant's violent crimes. While the government would be within its rights to seek to admit ███████ ████████████████████████████████████████████████████████████████████ ███████████████████ , the government significantly curtailed the evidence that it will seek to introduce and publish to the jury. *See* Exhibit B (cataloging evidence the government agrees not to seek to introduce).

As set forth below, upon reviewing the exhibits, the Court should determine that the government has already conducted an appropriate Rule 403 balancing with respect to the

66

voluminous video and graphic photographic evidence it agrees not to seek to introduce, and it should permit the government to introduce the selected video and photographic evidence, as described above and as set forth in Exhibit A, because (1) it is direct evidence of the crimes charged; (2) it is among the most compelling evidence depicting the manner in which the defendant achieved his criminal objective, including how the defendant methodically carried out his carefully documented preparations and plans to violently and lethally target Black people; (3) it is highly probative of the defendant's motive and intent; (4) it provides compelling video proof of elements of the charged offenses and the statutory and non-statutory aggravating factors; and (5) it will assist the jury in receiving witness testimony as to the chronology of events of May 14, 2022, and the locations and conditions of victims at the time of their deaths or shootings. Because the defendant committed a gruesome mass shooting, graphic evidence is unavoidable. But because the government has proactively agreed not to introduce among the most graphic evidence of the defendants' crimes (which, as described above, it would be within its rights to do), the Court should agree that the government's proposal—and the relevant evidence it proposes not to seek to introduce, *see* Exhibit B—strikes the appropriate Rule 403 balance.

There is no stronger or more accurate evidence of the way the defendant committed murders and attempted murders at Tops than the defendant's GoPro video and Tops store surveillance footage. The videos show the exact crimes charged in the Indictment. "The vicious, brutal nature" of the defendant's crimes should not on its own "justify a complete exclusion of evidence tending to show the defendant engaged in those acts." *Lujan*, 603 F.3d at 858. This Court should conclude, as the district court did in *Con-ui*, that the defendant should not "benefit from Rule 403 exclusion for unfair prejudice simply because his conduct

was of a grisly nature." 2017 WL 783437, at *4 (quoting *Lujan*, 603 F.3d at 858). Rule 403

does not protect a defendant from the inculpatory force of his own conduct, nor is it meant to

"even out the weight of the evidence." *McRae*, 593 F.2d at 707 (quotation marks omitted).

Indeed, Rule 403 does not bar powerful or even prejudicial evidence, including graphic video

evidence of the defendant's crimes. *Contreras*, 149 F.4th at 365. The limited photographic and

video evidence the government will introduce here is not dragged in by the heels for the sake

of its prejudicial effect, *Naranjo*, 710 F.2d at 1469, but rather as in *Con-ui*:

> depicts the very events underlying the murder charges against [the defendant],
> making it both relevant and highly probative on a number of issues of
> consequence that only the video can capture. The video at issue allows the jury
> to be a witness to the crime charged, and by having a more vivid picture of the
> incident, the jury might, for instance, be in a better position to make inferences
> about [the defendant's] intent. More importantly, because the video captures
> conscious physical suffering by [the victims] which did not stop [the defendant]
> from further attacks, it is highly probative of [the defendant's] intent to kill and
> consciousness of guilt.

2017 WL 783437, at *3.

The evidence that the government seeks to introduce depicts exactly what happened

before, during, and immediately after the defendant's attack. The videos and photos depict

the precise locations and actions of the victims, the sequence of the defendant's attack, his

mid-attack apology to Mr. B███████ upon realizing that he shot a White person, and his

movements throughout the store and vestibule until he surrendered to the police. Here, as

indeed in many instances, graphic images convey a relevant point much more persuasively

than testimony alone. *Fields*, 483 F.3d at 356 ("[T]he Government's point that the body had

decomposed too much for any physical evidence to be found was made more effectively with

images than it would have been with vague generalizations."). "[A] picture is worth a

thousand words, and the Government is not required to sanitize its case because a victim has

68

died." *United States v. Werther*, Cr. No. 11-434, 2013 WL 1410136, at *1 (E.D. Pa. 2013) (referencing *United States v. Cross*, 308 F.3d 308, 325 (3d Cir. 2002)); *cf. Lujan*, 603 F.3d at 858 ("[T]he vicious, brutal nature of a defendant's conduct is not itself sufficient to justify a complete exclusion of evidence tending to show the defendant engaged in those acts.").

Here, violence and death pervade the elements and special findings that the government must prove beyond a reasonable doubt. The government is required to prove the defendant's intent to kill Black people because of their actual and perceived race and color, *see* Docket No. 6, Counts 1 through 27, and where the penalty phase statutory aggravating factors require the government to prove the defendant's intent, the grave risk of death he created to one or more person, his substantial planning and premeditation, that he killed vulnerable victims, and that he intentionally killed and attempted to kill more than one person in a single criminal episode, the videos and limited photos the government intends to introduce are highly probative and are not substantially outweighed by the danger of unfair prejudice. In this case, the probative value of the evidence under Rule 403 is broader than simply proof of an element of a charged offense; this evidence also establishes the defendant's motive, particularly his stated goal of killing as many Black people as he could, and other important non-elements. Testimony alone is insufficient and cannot possibly substitute for images that will accurately, comprehensively, and unflinchingly prove the necessary elements, means, and motives that underline this defendant's crimes. No testimonial evidence could possibly equate to the visual demonstration that the photographs and video provide.

The government anticipates that the defendant may argue for the exclusion of graphic photographic and video evidence, alleging that such evidence creates a risk of unfair prejudice and that such images are cumulative. However, the volume of probative, graphic evidence is

the direct result of the carnage that the defendant wrought. The calculus for assessing whether graphic images are cumulative must account for and accommodate the substantial number of victims and corresponding number of offenses charged. *Cf. United States v. McVeigh*, 153 F.3d 1166, 1221 (10th Cir. 1998) ("The sheer number of actual victims and the horrific things done to them necessarily allows for the introduction of a greater amount of victim impact testimony [at the penalty phase]."). Moreover, as explained by the Supreme Court, "evidentiary relevance under Rule 401," is not, "affected by the availability of alternative proofs," such as a defendant's admissions or guilty plea, and the exclusion of relevant evidence "must rest not on the ground that other evidence has rendered it 'irrelevant,' but on its character as unfairly prejudicial . . ." *Old Chief*, 519 U.S. at 179; *See United States v. Patrick*, 513 F. App'x 882, 887 (11th Cir. 2013) (holding that the district court erred in excluding two surveillance videos showing the victim being stabbed because the videos were relevant and highly probative of whether the defendant committed the assault or aided and abetted in its commission, whether the defendant suffered a serious bodily injury, and whether the defendant's actions were the proximate cause of those injuries. This was true even where the defendant was willing to concede the facts that the victim was stabbed and that the victim's wounds were serious bodily injuries).

In summary, the GoPro and Tops video footage of the defendant's attack should be admitted and played because it is the most accurate and compelling evidence of the defendant's crimes. During the guilt phase of the trial, the government will have to prove elements related to intentional killings constituting murder and attempts to kill; malice aforethought and premeditation; the use of force; bodily injury; the use, carrying, brandishing and discharge of a firearm to commit murders and resulting in death. The video proof of the

70

defendant's actions constitute the most compelling and necessary proof of multiple elements and special findings related to the injuries and death suffered by the victims. *See United States v. Vosburgh*, 602 F.3d 512, 537-38 (3d Cir. 2010) (upholding the admission of evidence where it had a "tendency to prove any of the elements of the charges"). Witness testimony alone is insufficient and cannot possibly substitute for images that will accurately, comprehensively, and unflinchingly prove the necessary elements, means, and motives that underlie the defendant's crimes. The selected video and photographic evidence of the defendant's attack is relevant and highly probative as to all aspects and elements of the crimes, including his planning, purpose, and intent. As a result, the evidence the government will seek to introduce should be admitted because, under Rule 403 balancing, the strong probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.[26]

## B. Motion to Preclude the Defendant from Eliciting Evidence/Arguing About the Admissibility Of Evidence Already Decided At Suppression

Federal Rule of Criminal Procedure 12(b)(3)(C) requires that any motions to suppress evidence must be raised prior to trial. Similarly, Rule 104(a) states that the Court must decide any preliminary question about whether evidence is admissible. This is because motions to suppress or exclude evidence must be resolved by the Court, not by a jury. In fact, the defendant in this case has raised numerous such motions which have been denied by this Court. Docket No. 582. At trial, the jury will be asked to determine, based on the admitted evidence, whether the government has proven each element of each offense beyond a reasonable doubt, and if so, the appropriate sentence to impose. The jury will not be asked to

---

[26] During the guilt phase, the government will seek to prove the manner and cause of death through introduction of the death certificates of deceased victims, autopsy reports, and/or medical examiner testimony.

resolve any issues regarding the suppression or admission of evidence. It is not for the jury to revisit this Court's prior evidentiary rulings. Therefore, questioning, evidence, or arguments regarding the legality of evidence are irrelevant, unfairly prejudicial, confusing, and misleading and should be excluded from trial.

### C. Motion to Preclude the Defendant from Eliciting Evidence/Arguing About the Death Penalty or Other Punishment During the Guilt Phase of the Trial

The Court should prohibit discussion or evidence of the death penalty or other punishment during the guilt phase of the trial because such evidence is inadmissible under Federal Rules of Evidence 402 and 403. Punishment is irrelevant to determining the defendant's guilt, and juries are so instructed. Thus, interjection of penalty issues into the guilt phase of the trial could mislead or confuse the jury as to the nature of their duties in the guilt phase of the trial, where the jurors' duty is to determine whether the government has proved the elements of each charge. Although the government acknowledges that it will be necessary to address death penalty issues during jury selection, there should be no further references to the death penalty until the penalty phase of the trial, should there be one.

In *Beck v. Alabama*, 447 U.S. 625 (1980), the Supreme Court identified the problems with such evidence, in a case overturning an Alabama statute that barred jury consideration of lesser-included offenses of a capital murder charge and thus compelled the jury to focus on the death penalty during the guilt phase of the trial. The Supreme Court explained that, focusing on the death penalty during the guilt phase "interjects irrelevant considerations into the factfinding process, diverting the jury's attention from the central issue of whether the [government] has satisfied its burden of proving beyond a reasonable doubt that the defendant is guilty of a capital crime. . . . [I]n every case they introduce a level of uncertainty and unreliability into the factfinding process that cannot be tolerated in a capital case." *Id.* at 642-

43. Thus, the Court should preclude discussion or evidence of the death penalty or other punishment during the guilt phase of the trial.

**D. Government's Motion to Preclude Defendant from Introducing Self-Serving Hearsay through Cross-Examination of Government Agents**

The government anticipates introducing various written and oral statements of the defendant at trial pursuant to Federal Rules of Evidence 801(d)(2)(A) and 804(b)(3). When the government admits a portion of a defendant's prior statement, the defendant may not introduce his additional out-of-court statements because such statements are hearsay when offered by the defendant. Fed. R. Evid. 801(d)(2); *United States v. Fisher*, 15-CR-19, 2017 WL 6047705, at *4 (W.D.N.Y. Dec. 6, 2017) (citing *United States v. Kadir*, 718 F.3d 115, 124 (2d Cir. 2013)); *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982) ("When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible."). Introduction of such statements pursuant to the rule of completeness or some other hearsay exception is only permissible where the defendant can identify the statements he seeks to introduce, as well as the legal basis for introducing those statements. *Id.*

The rule of completeness, which underlies Federal Rule of Evidence 106, was designed to prevent one party from selectively excerpting statements offered against its opponent in order to present a distorted impression of the statements to the trier of fact. *Beech Aircraft Corporation v. Rainey*, 488 U.S. 153, 170-72 (1988). The rule of completeness does not "require the admission of portions of a statement that are neither explanatory of nor relevant to the admitted passages." *United States v. Jackson*, 180 F. 3d 55, 73 (2d Cir. 1999). Rather, a statement need only be admitted under the rule of completeness where (1) failure to do so would "mislead" the jury, *United States v. Blake*, 195 F. Supp. 3d 605, 610-11 (S.D.N.Y. 2016),

or (2) it is necessary "to ensure fair and impartial understanding *of the admitted portion*." *Jackson*, 180 F.3d at 73 (citations omitted and emphasis added). In short, self-serving statements will not be admissible.

The defendant should be precluded from introducing self-serving hearsay through the cross-examination of investigators. A statement is not hearsay if it is offered against a party and is the party's own statement. *See* Fed. R. Evid. 801(d)(2)(A). However, self-serving exculpatory statements, such as the defendant's self-assessment that he is autistic or on the spectrum, or that he should kill himself, are both irrelevant (particularly in the guilt phase) and, if offered by the defendant, are hearsay and are not generally admissible unless their exclusion would distort the meaning of the declarant's non-hearsay statements that are in evidence. *See Harper*, 2009 WL 140125 at \*5 (collecting cases). "Where the danger of such distortion does not exist, however, a defendant may not rely on the rule of completeness to put his out-of-court exculpatory statements before the jury through testimony of another witness. . ., while at the same time maintaining his own Fifth Amendment privilege so as to avoid being cross-examined about his prior statements." *Id.*; *see also United States v. Mitchell*, 502 F.3d 931, 964 (9th Cir. 2007) (defendant was properly precluded from eliciting, on cross-examination of government agents, exculpatory statements he made during interviews with those agents, since those statements were inadmissible hearsay).

Here, self-serving and/or exculpatory portions of the defendant's statements as contained in any of his writings should not be admissible through cross-examination of government investigators because their exclusion does not distort the meaning of the other relevant statements made by the defendant.

74

### E.  <u>Government Motion to Restrict Use of Third Party's Statements to Impeach</u>

Defense attempts to impeach any witnesses with the use of statements contained in an investigative report(s) (FBI 302 or similar law enforcement reports) of law enforcement agents should be prohibited. The Federal Rules of Evidence allow the introduction of a prior inconsistent statement to impeach witness testimony. However, a third party's characterization of a witness's statement does not constitute a prior statement of that witness unless the witness has subscribed to that characterization. *See United States v. Leonardi*, 623 F.2d 746, 757 (2d Cir.), *cert. denied* 447 U.S. 928 (1980). Thus, in the absence of endorsement by the witness, a third party's notes or report of a witness's statement may not be admitted as a prior inconsistent statement unless either is a verbatim transcript of the witness's own words. If the third party's notes only reflect the note-taker's summary characterization of a witness's prior statement, then the notes are irrelevant as an impeaching prior inconsistent statement, and thus inadmissible. *See United States v. Almonte*, 956 F.2d 27, 29-30 (2d Cir. 1992). The burden of proving that notes reflect a witness' own words rather than the note-taker's characterization falls on the party seeking to introduce the notes. *Id.* at 30.

Application of these rules of evidence will not prevent the defense from, otherwise, attempting to impeach the witness. Instead, they assure fair and fundamental process to both sides. Restrictions on a defendant's presentation of evidence are constitutional if they serve legitimate interests in the criminal trial process and are not arbitrary or disproportionate to the purposes they are designed to serve. *See Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *see also Taylor v. Illinois*, 484 U.S. 400, 414-16 (1988).

**F. Motion to Preclude the Defendant from Eliciting Evidence/Arguing About ▮▮▮▮▮▮ or Any Other Evidence He Plans to Present as Mitigation in the Penalty Phase**

Pursuant to 18 U.S.C. §§ 3592(a) and 3593(c), the defense may present evidence on "any mitigating factor" to the jury during the penalty phase, so long as the probative value of the evidence is not "outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." Here, there are preliminary indications that the defendant may raise ▮▮▮▮▮▮ as a mitigating factor at the penalty phase of this trial and may argue that other factors are mitigating against a sentence of death. The distinction between guilt and penalty phase is well-worn, and any such penalty-phase mitigation evidence is inadmissible during the guilt phase of the trial. *See Williams v. Taylor,* 529 U.S. 362, 398 (2000) ("[m]itigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case."); *Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir. 1995) (observing that "[e]vidence of mental problems may be offered to show mitigating factors in the penalty phase, even though it is insufficient to establish a legal defense to conviction in the guilt phase."); *United States v. Smith*, Cr. No. 3:16-00086-SLG-1, 2019 WL 11863698, at *1 (D. Alaska Sept. 13, 2019) ("the defense shall not introduce a mental health defense or mental health evidence during the guilt phase of trial"); *United States v. Tsarnaev*, No. 13-10200 (D. Mass. March 4, 2015), Doc. No. 1528, at 11 (holding as a "general matter" that the government's motion to exclude mitigation evidence in guilt phase was granted but reserving on precise ruling regarding specific evidence).

Here, the defendant has not raised ▮▮▮▮▮▮ defense to guilt. As such, he should not be permitted to ask ▮▮▮▮▮▮-related questions on cross-examination, make

76

arguments regarding ▮▮▮▮▮▮▮▮, or in any way forecast his penalty-phase ▮▮▮▮▮▮▮

mitigation evidence during the guilt phase of this trial. Nor should he be able to ask questions

or raise arguments regarding ▮▮▮▮▮▮▮▮ of others. Accordingly, the defense should be

precluded during the guilt phase from mentioning mitigating factors during its addresses to

the jury, and from asking questions eliciting evidence about any mitigating factors through

cross-examination or otherwise.

### G. Motion for Judicial Notice of UTC Time Conversion to Eastern Time

In the event that some of the service provider records were provided in Coordinated

Universal Time ("UTC") time and were converted to Eastern Standard Time for use in any

exhibits, the Court should take judicial notice of any such conversions since all of the conduct

relevant to this indictment occurred in the Eastern Time zone. The government requests that

the Court take judicial notice of UTC as a recognized fact and instruct the jury as follows:

> That coordinated universal time, abbreviated as UTC, is the primary time
> standard by which the world regulates clocks and time. Local time on the East
> Coast of the United States or the Eastern Time Zone is five hours behind UTC
> in the winter, but four hours while daylight savings is observed. Daylight
> savings begins on the second Sunday of March every year and ends on the first
> Sunday of November.

In *United States v. Michael*, 664 Fed. Appx. 32, 35-36 (2d Cir. 2016) (Summary Order),

the district court, in response to a juror note inquiring "what UTC time is and if there is a

difference between Eastern Daylight Savings Time and UTC time," provided a supplemental

jury instruction and told the jury the following: "Coordinated Universal Time, abbreviated as

UTC, is the primary time standard by which the world regulates clocks and time. Local time

on the east coast of the United States is five hours behind UTC during winter but four hours

behind while daylight savings is observed." On appeal, the Second Circuit ruled that:

> [T]he district judge's decision to take judicial notice of the relationship between UTC and Eastern Time, and to so instruct the jury, was not an abuse of discretion. Federal Rule of Evidence 201 permits a court to take judicial notice of a fact that is not subject to reasonable dispute at any point in the proceedings. Fed. R. Evid. 201(b), (d). The relationship between UTC and Eastern Time is not subject to reasonable dispute.

*Id.* at 36.

Any number of online websites provide accurate conversions from UTC time to Eastern Daylight or Standard Time. *See e.g.,* www.worldtimebuddy.com; www.timebie.com; www.timeanddate.com. Accordingly, the government moves this Court to take judicial notice that local time on the east coast of the United States is five hours behind UTC during winter, but four hours behind while daylight savings is observed, and permit government exhibits prepared (and/or for witnesses to testify accordingly) with reference the time in Eastern Time.

## H.  <u>Witness Sequestration and Case Agent Exemption</u>

The government requests pursuant to Federal Rule of Evidence 615 that the Court order that witnesses be excluded from the courtroom so that they will not hear the testimony of other witnesses. Pursuant to Rule 615(b), the government also requests that FBI Special Agents ▮▮▮▮▮ and ▮▮▮▮▮▮▮▮ and FBI Tactical Specialist ▮▮▮▮▮ be exempted from the sequestration order even though they will testify. *See also United States v. Perry*, 643 F.2d 38, 53 (2d Cir. 1981).

Federal Rule of Evidence 615(a) provides that, "[a]t a party's request, the court must order witnesses excluded from the courtroom so that they cannot hear other witnesses' testimony. Or the court may do so on its own." Under Rule 615(a)(2), however, a court is not permitted to sequester a witness who is "an officer or employee of a party that is not a natural person, after being designated as the party's representative by its attorney." In addition, Rule

615(a)(3) prohibits the sequestration of "any person whose presence a party shows to be essential to presenting the party's claim or defense." Sequestration of witnesses is to be virtually automatic unless they fit within one of the exemptions in Rule 615. *United States v. Jackson*, 60 F.3d 128, 135 (2d Cir. 1995). If there is opposition to the order to exclude a witness from the courtroom, the party opposing it bears the burden to demonstrate why an exemption to the exclusion applies, and the party seeking exclusion is to be given an opportunity to demonstrate that it is appropriate. *Id.* at 135-37; *see also, generally, United States v. Rivera*, 971 F.2d 876, 889-90 (2d Cir. 1992).

The government anticipates that FBI Special Agents ██████████ and ██████████ ██████████ and Tactical Specialist ██████████ will be present in the courtroom for the trial. They are also listed as trial witnesses for the government. Both Special Agents as well as Tactical Specialist ██████ are essential to the government's case given the duration of the investigation, number and breadth of exhibits, and number of trial witnesses. In conjunction with trial, Special Agents ██████ and ██████████ and Tactical Specialist ██████ will likely have distinct responsibilities in the courtroom at different times, such as assisting attorneys and paralegals, or helping to coordinate and usher witnesses in and out of the courtroom. In addition, Special Agents ██████ and ██████████ and Tactical Specialist ██████ have focused upon different aspects of the investigation and case management, whether it be assisting with digital and electronic evidence, discovery, or victim contacts, and their assistance to the prosecutors, and potential need to take the witness stand, will be varied, complementary, and essential throughout the trial. *See, e.g., United States v. Pellegrino*, 470 F.2d 1205, 1208 (2d Cir. 1972). Likewise, their presence in the courtroom at different times will facilitate the efficient presentation of the government's case. For the reasons stated above, and given the extent and

duration of the investigation in this case, Special Agents ████████ and ████ and Tactical Specialist ██████ should both be exempted from sequestration under Rule 615.

### I.  **Motion To Recall Case Agents**

Federal Rule of Evidence 611(a) provides that the court "should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment." Fed. R. Evid. 611(a).

District courts "have wide latitude over the order of testimony at trial," *United States v. Bailey*, 973 F.3d 548, 564 (6th Cir. 2020), and have routinely allowed the government to recall its case agents to present the evidence to the jury in an efficient manner. *See United States v. Bacon*, Cr. No. 11-0042, 2012 WL 5381415, at *1 (W.D. Pa. Oct. 31, 2012) (granting government's motion to recall witness because "the Court finds that it is preferable to present evidence to the jury in the most organized way possible"); *see also United States v. Butera*, 677 F.2d 1376, 1381 (11th Cir. 1982) (noting that the government's case agent "took the stand on four separate occasions to describe the underlying events in the case in chronological order" and holding that the district court did not abuse its discretion under Rule 611(a) in permitting the "sequential presentation" of the case agent's testimony); *United States v. Tawfik*, Cr. No. 17-20183, 2022 WL 866395, at *8 (E.D. Mich. Mar. 23, 2022) ("In light of this case law and because Rule 611(a) authorizes the Court to control the order of interrogation and the presentation of evidence, the Court finds that in order to facilitate an orderly and comprehensible presentation of this complex case, avoid inefficient use of court time, and avoid jury confusion (and thereby prevent prejudice to the defendants), the Government will

be permitted to allow its case agent and other witnesses to testify in segments related to specific schemes during its case-in-chief.") (internal quotation marks omitted).

Here, allowing the case agents to be recalled as necessary will promote efficiency, as they can authenticate and explain evidence as it arises in the case and assist with an orderly and comprehensible presentation of voluminous evidence. If a witness testifies more than once, cross-examination should be limited only to the subject matter of each successive appearance (as well as credibility), until the witness's final appearance, when a full cross-examination would be appropriate. This manner of presentation "provide[s] each defendant with numerous opportunities for cross-examination as to both credibility and the subject matter of his testimony." *Id.* at 528; *see also Butera*, 677 F.2d at 1381.

## VI.  DISCOVERY DEMAND

To date, the defendant has not responded to the government's ongoing demand for reciprocal Rule 16 discovery. To the extent that there exists reciprocal discovery to which the government is entitled under Federal Rules of Criminal Procedure 12.1, 16(b), 26.2, or other applicable rule that the defense has not produced, the government reserves the right to seek to have such materials excluded at trial. *See United States v. Young*, 248 F.3d 260, 269-70 (4th Cir. 2001) (upholding exclusion under Rule 16 of audiotape evidence defendant did not produce in pretrial discovery where defendant sought to introduce audiotape on cross-examination of government witness not for impeachment purposes, but as substantive "evidence in chief" that someone else committed the crime).

The defendant has not given notice of intent to rely on any defense of entrapment, mental incapacity, duress, or alibi. Therefore, to the extent the defendant may attempt to rely

on any such defense, the government reserves the right to object and to seek to have the defendant precluded from asserting such defenses.

## VII. **OTHER ISSUES**

The government hereby requests to reserve its right to submit supplemental memorandum to the Court on evidentiary issues should the need arise after the filing of this memorandum. This request is based on the fact that prior to trial there may be additional evidentiary issues of which the Court should be made aware.

DATED:  Buffalo, New York, June 17, 2026.

MICHAEL DIGIACOMO
United States Attorney
Western District of New York

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

BY:    *s/JOSEPH M. TRIPI*
    *s/BRETT A. HARVEY*
    *s/CHARLES M. KRULY*
    *s/MAEVE E. HUGGINS*
    *s/PIERRE RICHARD ANTOINE*
    Assistant United States Attorneys
    United States Attorney's Office
    Western District of New York
    138 Delaware Avenue
    Buffalo, New York 14202

BY:    *s/NEVILLE S. HEDLEY*
    Trial Attorney
    Civil Rights Division
    U.S. Department of Justice
    150 M Street NE, Suite 700
    Washington, DC 20002
    (202) 297-3424
    Neville.Hedley@usdoj.gov

BY:    *s/MICHAEL S. WARBEL*
    Trial Attorney
    Criminal Division
    U.S. Department of Justice
    1301 New York Avenue NW,
    Ste. 505
    Washington, DC 20530
    (202) 514-5605
    Michael.Warbel@usdoj.gov

# EXHIBIT A
## (ELECTRONIC EXHIBIT)

# EXHIBIT B
## (ELECTRONIC EXHIBIT)