UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

PAYTON GENDRON,

Defendant.

22-CR-109 (LJV)
Redacted Version of ECF No. 601

---

### OMNIBUS MOTION IN LIMINE TO PRECLUDE INADMISSIBLE EVIDENCE

Dated: June 17, 2026
Buffalo, New York

*s/Sonya A. Zoghlin*
Sonya A. Zoghlin
Assistant Federal Public Defender

*s/MaryBeth Covert*
MaryBeth Covert
Senior Litigator

*s/Julie Brain*
Julie Brain
Attorney at Law

*s/Theresa M. Duncan*
Theresa M. Duncan
Law Office of Theresa M. Duncan LLC

**TABLE OF CONTENTS**

I.  INTRODUCTION ...............................................................................5

II.  LEGAL PRINCIPLES ......................................................................6

III.  MOTIONS IN LIMINE RELATED TO AUDIO and VISUAL EVIDENCE.....11

    A.  **Motion in Limine to Limit Video Evidence from the GoPro Camera
       and Tops Surveillance Cameras**...............................................11

        1.  The Court should limit the presentation of the GoPro video and Tops
            store surveillance camera videos of the shooting ...............................20

        2.  The Court Should Exclude Cumulative Exhibits ...............................21

        3.  Compilation Exhibits Contained in 2000A, 2000B and 2000C are
            Inadmissible ...............................................28

        4.  Pre-shooting Video Footage contained in Gov. Exhibits 2000C and
            2000E are Inadmissible...............................................28

        5.  Post-shooting Video Footage Should be Excluded ...............................30

        6.  Video Evidence Should be Played at Normal Speed ...........................30

    B.  **Motion in Limine to Preclude Body Worn Camera Video Evidence**.........32

    C.  **Motion in Limine to Preclude 911 Audio Calls**...........................................40

IV.  MOTIONS IN LIMINE RELATED TO THE DISCORD /G SERVER AND
    MANIFESTO ...............................................45

    A.  **Manifesto Evidence: Ex. 4B-1B, 4B-1H, 4B-1I, 4B-1N, 4B-1P, 4B-1Q,
       4B-2B, 4B-2P,  4B2-Q, 4B2-S, 77-C1, 77-C7, 77-C9, 77-C10,
       1700-G4, 1700-G5, 1700-G6, 1700-G7, 1700-G10, 1700-G11,
       1700-G12, 1700-G13, 1700-G14, and 1700-G15** ...................................45

    B.  **Discord "G" Server Transcript: Gov. Exhibits 4B-1A, 4B-1C to
       4B-1G, 4B-1J to 4B-1M, 4B-1O, 1000A-1 to 1000A-15** .......................63

        1. Multiple Versions...............................................63

2. ██████████████ ████████████████████████ ..................................66

3. ███████████████████████ .................................................71

4. Consideration of Targets Other Than the Tops Market on Jefferson Avenue ...................................................................72

5. ███████████████████████████████ ............................................................................74

6. Unnecessarily Cumulative and Inflammatory Racist Posts ..................78

7. Discussions of Weapons or Armor Other Than What Payton Gendron Brought to Tops ..............................................................89

8. Musings About Post-Attack Events .......................................................90

9. Miscellaneous Categories ....................................................92

**V.  MOTIONS IN LIMINE RELATED TO ELECTRONIC DEVICES** ....................94

**A. Motion In Limine to Preclude Inadmissible Evidence Seized from iPhone 11** ...................................................................................94

**B. Motion In Limine to Preclude Inadmissible Evidence Seized from the Verbatim Thumb Drive** ..........................................................120

**C. Motion In Limine to Preclude Inadmissible Evidence Seized from the Black Computer Tower** .................................................................126

**D. Motion In Limine to Preclude Inadmissible Evidence Seized from the HP Laptop** .......................................................................135

**VI.  MOTIONS IN LIMINE RELATED TO ONLINE SITES AND SERVICES** ..137

**A. Motion in Limine to Preclude Evidence Seized from Discord** ................137

**B. Motion in Limine to Preclude Evidence Seized from Apple iCloud** ......145

**C. Motion in Limine to Preclude Evidence Seized from Amazon Twitch** ..162

**D. Motion in Limine to Preclude Evidence Seized from Google Account** ..166

**VII.  MOTIONS IN LIMINE RELATED TO PHYSICAL EXHIBITS SEIZED FROM ██████████, VEHICLE, AND ████████████** ...............188

**A. Motion In Limine to Preclude Inadmissible Evidence Seized from**
**███████** ...................................................................................188

**B. Motion In Limine to Preclude Inadmissible Evidence**
**Seized from Ford Taurus** ....................................................................193

**C. Motion In Limine to Preclude Inadmissible Evidence Seized from**
**███████** ...................................................................................195

**VIII.  MOTION IN LIMINE TO PRECLUDE INADMISSIBLE EVIDENCE**
**██████████** ........................................................................197

**IX.  MOTION IN LIMINE TO EXCLUDE EVIDENCE OF ████**
**███** ...................................................................................203

**X.  MOTION IN LIMINE TO PRECLUDE COMPILATION SUMMARY**
**VIDEO AND RELATED TESTIMONY** ...........................................206

## I.    INTRODUCTION

Payton Gendron, by and through his attorneys, pursuant to the First, Second, Fifth, Sixth, and Eighth Amendments to the United States Constitution and Fed. R. Evid. 107, 401, 402, 403, 801, 802, and 1006, respectfully submits these Motions in Limine to Preclude Inadmissible Evidence. The Court has ordered that motions in limine, whether directed to guilt- or penalty-phase evidence, be filed on today's date. The government has noticed over 690 exhibits for trial. Defense counsel have endeavored, to the best of their ability, to identify issues and evidence that lend themselves to in limine resolution. It is impossible, however, to anticipate all the evidentiary and other issues that will inevitably arise as this complex case moves toward trial. Accordingly, the defense reserves the right to raise additional issues not here presented. [1]

In terms of penalty-phase evidence and issues, these motions are directed solely to the aggravating factors and supporting evidence set forth in the government's Notice of Intent to Seek the Death Penalty, ECF No. 125, that remain following the Decision and Order Granting in Part Motions to Strike Aggravating Factors, ECF No. 464. Those aggravating factors are grave

---

[1] The government's interlocutory appeal of the Court's Order striking four of its five proposed non-statutory aggravating factors, ECF No. 464, remains pending before the Second Circuit Court of Appeals. "As a general matter, '[t]he filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal.'" *United States v. Rodgers*, 101 F.3d 247, 251 (2d Cir. 1996) (quoting *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982)). This rule is "designed 'to avoid confusion or waste of time resulting from having the same issues before two courts at the same time.'" *Id.* (quoting *United States v. Salerno,* 868 F.2d 524, 540 (2d Cir. 1989)). Because any questions regarding the admissibility of many exhibits at the penalty phase are inextricably intertwined with matters on appeal, the Court should decline to consider those matters until its jurisdiction is restored. *See, e.g., United States v. Brennan*, 385 F. Supp. 3d 205, 207-09 (W.D.N.Y. 2019) (noting agreement of both parties that interlocutory appeal of commitment for competency evaluation under 18 U.S.C. § 4241(d) divested court of jurisdiction with respect to hospitalization and declining to consider challenge to length of commitment until appeal resolved). Payton Gendron accordingly does not raise them herein.

risk of death to additional persons; substantial planning and premeditation; vulnerable victim; multiple killings and attempted killings; and victim impact. ECF No. 125. It is undisputed that Payton Gendron killed 10 people and injured three more in a racially motivated shooting at the Tops Market on May 14, 2022. In New York State proceedings, he pled guilty to one count of committing a domestic act of terrorism motivated by hate, ten counts of murder in the first degree, three counts of attempted murder, and one count of criminal possession of a weapon. The shootings were recorded on a GoPro video camera attached to Payton Gendron's helmet and multiple surveillance cameras placed around the Tops store. Posts to his Discord account and portions of his so-called manifesto make clear his intention to target Black people because of their race and how and why he chose the Tops Market for his attack.

Despite a wealth of relevant, admissible evidence, the government is seeking to introduce an avalanche of gratuitous, irrelevant, and inflammatory evidence. The cumulative effect of this evidence is likely to overwhelm even the most stoic of jurors and "risk a verdict impermissibly based on passion, not deliberation." *Payne v. Tennessee*, 501 U.S. 808, 836 (1991) (Souter and Kennedy, JJ., concurring). Thus, the Court should limit some evidence and exclude other evidence to ensure a fundamentally fair trial.

## II.    LEGAL PRINCIPLES

Many exhibits identified by the government are irrelevant, either in whole or in part, to the issues to be tried; unfairly prejudicial to the defense; and involve activity protected by the First Amendment Free Speech and Free Association Clauses.

"Evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. "[A]s a general rule, '[a]ll relevant evidence is admissible.'" *United States v.*

6

*Stewart*, 590 F.3d 93, 133 (2d Cir. 2009) (quoting Fed. R. Evid. 402); *see also United States v. Moses*, 565 F. Supp. 3d 394, 397 (W.D.N.Y. 2021) (same).  "The Supreme Court has stated . . . . . . that 'what counts as the Rule 403 'probative value' of an item of evidence . . .  may be calculated by comparing evidentiary alternatives.'" *United States v. Al-Moayad*, 545 F.3d 139, 160 (2d Cir. 2008) (quoting *Old Chief v. United States*, 519 U.S. 172, 185 (1997)); *see also United States v. Awadallah*, 436 F.3d 125, 132 (2d Cir. 2006) ("Probative value is also informed by the availability of alternative means to present similar evidence.").

Even relevant, otherwise admissible evidence may be excluded by the court "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "'In this context unfair prejudice means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Moses*, 565 F. Supp. 3d at 397 (quoting *United States v. Birney*, 686 F.2d 102, 106 (2d Cir. 1986)). *See also United States v. Miller,* 641 F. Supp. 2d 161, 166 (E.D.N.Y. 2009) ("The term 'unfair prejudice,' as to a criminal defendant, 'speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged.'") (quoting *Old Chief* , 519 U.S. at 180).

A trial court is required to conduct a "conscientious assessment of whether unfair prejudice substantially outweighs probative value." *United States v. Salameh*, 152 F.3d 88, 110-111 (2d Cir. 1998) (affirming district court's evidentiary rulings under Rule 403 where it "scrupulously reviewed each item[,] heard extensive argument from counsel . . . [and] excluded a number of the materials . . . as unduly prejudicial) (internal quotations omitted); *see also United States v. Abu-Jihaad*, 630 F.3d 102, 133-34 (2nd Cir. 2010) (affirming admission of violent video

content advocating jihad under Rule 403 where district court "reviewed the films in their entirety before approving only selected excerpts for display to the jury").

The danger of undue prejudice and inflammation of the jury is particularly keen in a capital case. As the Supreme Court recognized:

> From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action. It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion.

*Gardner v. Florida*, 430 U.S. 349, 357-58 (1977).

The Due Process Clause guards against situations where "evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991) (citing *Darden v. Wainwright*, 477 U.S. 168, 179–83 (1986)). Thus, federal courts must ensure that the admission of evidence does not "so infect[] the sentencing proceeding with unfairness as to render the jury's imposition of the death penalty a denial of due process." *Romano v. Oklahoma*, 512 U.S. 1, 12 (1994). "[B]ecause a fundamental-fairness analysis is not subject to clearly definable legal elements, when engaged in such an endeavor a federal court must tread gingerly and exercise considerable self-restraint." *Duckett v. Mullin*, 306 F.3d 982, 999 (10th Cir. 2002) (quotations omitted). Due process requires this careful balancing, since a violation of those rights "could arise out of a single action or piece of evidence. It could also arise from the cumulative effect of a number of pieces of evidence in combination." *United States v. Sampson*, 335 F. Supp. 2d 166, 183 (D. Mass. 2004).

Moreover, to the extent the government seeks to introduce any of the evidence challenged in this motion at the penalty phase of the trial, the Court must apply the standard set forth in 18 U.S.C. 3593(c):

> Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.

Much of the evidence the government seeks to introduce is also cumulative. Evidence is "cumulative 'when it adds very little to the probative force of the other evidence in the case so that if it were admitted its contribution to the determination of truth would be outweighed by its contribution to the length of trial.'" *United States v. Fulcher*, 250 F.3d 244, 250 (4th Cir. 2001) (quoting *United States v. Kizeart*, 102 F.3d 320, 325 (7th Cir.1996)); *Elwood v. Pina*, 815 F.2d 173, 178 (1st Cir. 1987) ("Evidence is cumulative if repetitive, and if 'the small increment of probability it adds may not warrant the time spent in introducing it.'") (quoting 1 Weinstein's Evidence ¶ 401[07] at 401–47–48 (1985)). The "exclusion of relevant, but cumulative, evidence is within the discretion of the trial court." *United States v. Jamil*, 707 F.2d 638, 643 (2d Cir. 1983).

Additionally, absent a legitimate connection to the issues being tried, the evidentiary use of a person's online activity violates the First Amendment Free Speech and Free Association Clauses. "A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen . . . to celebrate some views, to protest others, or simply to learn and inquire." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017). While once it might have been difficult to say which were the most important places for the exchange of views, "today the answer is clear. It is cyberspace—the 'vast democratic forums of the Internet' in general and social media in particular." *Id.* (quoting *Reno v. American Civil Liberties Union*, 521

9

U.S. 844, 868 (1997)). Accessing the internet is thus undoubtedly "the legitimate exercise of First Amendment rights." *Id.* at 108. *See also United States v. Eaglin*, 913 F.3d 88, 96 (2d Cir. 2019) (holding that "in modern society, citizens have a First Amendment right to access the Internet").

The First Amendment does not impose an absolute bar to the admission of evidence of a person's protected expressive activity in a criminal case. *See Dawson v. Delaware*, 503 U.S. 159, 165 (1992). Evidence of speech may, under some circumstances, be used when relevant "to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993); *see also United States v. Rahman*, 189 F.3d 88, 118 (2d Cir. 1999) (holding protected speech admissible against criminal defendant in conspiracy prosecution to prove motive). But the admission of evidence that proves nothing more than a defendant's "abstract beliefs" violates the First Amendment. *Dawson*, 503 U.S. at 167 (citing *Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("[T]he government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.")). "Although a given piece of evidence may be relevant in many ways, the government may not offer proof of a defendant's 'abstract beliefs' merely for the purpose of demonstrating that those beliefs, and by extension the defendant, are 'morally reprehensible.'" *United States v. Kane*, 452 F.3d 1040, 1043 (2d Cir. 2006).

### III.   MOTIONS IN LIMINE RELATED TO AUDIO AND VISUAL EVIDENCE

#### A.   Motion in Limine to Limit Video Evidence from the GoPro Camera and Tops Surveillance Cameras

The government's Exhibit List reveals its intent to introduce a large amount of video evidence at trial that is horrific, disturbing and extremely difficult to watch. Not only does exposure to this material have the potential to cause significant psychological damage and distress to the jurors who will decide the case, the proposed evidence will be so overwhelming that it will deprive the jurors of the ability to consider the evidence as a whole, including evidence in mitigation, and to decide the issues based on reason rather than based on emotions such as anger or sympathy. In order to guard against that eventuality as effectively as possible, and to protect Payton Gendron's constitutional rights to a fair trial and to a reliable determination of sentence, the Court should limit the presentation of this evidence as follows:

1.   The Court should permit the government to play the video of the murders recorded on Payton Gendron's Go Pro camera once, during its case in chief at the guilt phase;

2.   The Court should preclude for all purposes all video surveillance footage from the Tops grocery store that depicts the murders of the deceased victims and therefore is duplicative of the Go Pro footage;

3.   For all other video surveillance footage from the Tops grocery store recorded during and in the immediate aftermath of the shooting, the Court should limit the government to the presentation of a single view of each part of the store for each period of time. No duplication of time periods or events should be permitted, regardless of camera angles available – only one angle should be permitted in each instance.

4.   The Court should exclude all irrelevant and prejudicial surveillance footage of events both before and after the shooting.

The Due Process Clause forbids the introduction of "evidence . . . that is so unduly prejudicial that it renders the trial fundamentally unfair." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991) (citing *Darden v. Wainwright*, 477 U.S. 168, 179–83 (1986)). "[B]ecause a fundamental-

fairness analysis is not subject to clearly definable legal elements, when engaged in such an endeavor a federal court must tread gingerly and exercise considerable self-restraint." *Duckett v. Mullin*, 306 F.3d 982, 999 (10th Cir. 2002) (internal quotations omitted).  Due process concerns require careful balancing, because a violation of these rights "could arise out of a single action or piece of evidence. It could also arise from the cumulative effect of a number of pieces of evidence in combination." *United States v. Sampson*, 335 F. Supp. 2d 166, 183 (D. Mass. 2004).

In a capital case such as this, the Eighth Amendment requirement of heightened reliability in the determination of sentence means that the Court must be extraordinarily diligent in its efforts to guard against the admission of evidence that creates unfair prejudice and risks inflaming the passions of the jury. As the Supreme Court has stated:

> From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action. It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion.

*Gardner v. Florida*, 430 U.S. 349, 357-58 (1977). *See also Le v. Mullin*, 311 F.3d 1002, 1015 (10th Cir. 2002). "It is a hallmark of a fair and civilized justice system that verdicts be based on reason, not emotion, revenge, or even sympathy." Thus, federal courts must ensure that the admission of evidence does not "so infect[] the sentencing proceeding with unfairness as to render the jury's imposition of the death penalty a denial of due process." *Romano v. Oklahoma*, 512 U.S. 1, 12 (1994).

It would be impossible for Payton Gendron to receive a fair trial, or for the jurors' determination of the appropriate sentence to be based on anything other than raw emotion, if the Court were to permit the presentation of the volume of graphic and disturbing evidence that the government proposes to introduce. Counsel recognize, of course, that video evidence is highly, even uniquely, probative of the circumstances of the murders. But the inquiry does not end there.

If the emotional impact of the evidence is such that it will inevitably prevent or substantially impair the ability of jurors to consider and weigh evidence in mitigation, it is unfairly prejudicial. Evidence that compromises a jury's ability to perform its constitutional duty to consider a life sentence must be stricken, no matter how great its probative value.

Video as horrific and upsetting as the video in this case will inevitably affect jurors in a similar, or even more profound, way than even victim impact evidence. Social science research tells us that victim impact testimony can block jurors' ability to hear and process a defendant's mitigation story and feel empathy for him.

> [Victim impact statements] evoke unreasoned, unreflective emotion that cannot be placed in any usable perspective. In evidentiary terms, victim impact statements are prejudicial and inflammatory. They overwhelm the jury with feelings of outrage toward the defendant and identification with the victim. Finally, victim impact statements diminish the jury's ability to process other relevant evidence, such as evidence in mitigation.

Susan Bandes, *Empathy, Narrative, and Victim Impact Statements*, 63 Univ. of Chi. L. Rev. 361, 401 (1996) (internal citations omitted). *See also* Bryan Myers & Edith Greene, *The Prejudicial Nature of Victim Impact Statements: Implications for Capital Sentencing Policy*, 10 Psych., Pub. Pol'y and Law 492, 493-94 (2004) (victim impact evidence "may be so emotion-laden in its content that jurors may be persuaded more by how they feel about the testimony than by the facts of the case").

Psychological research in the victim impact context has identified several ways in which emotions affect decision making. *See* Janice Nadler & Mary R. Rose, *Victim Impact Testimony and the Psychology of Punishment,* 88 Cornell L. Rev. 419, 443-48 (2003*)* (collecting studies). "Anger is a punitive emotion; people who are angry in reaction to hearing about a crime are motivated to call for greater punishment for that crime." *Id.* at 443. Anger also alters people's perceptions of why an event happened. *Id.* at 444. People induced to feel anger in one study were

13

more likely to blame individuals for negative outcomes than they were to blame impersonal forces. *Id.* Anger also activates a form of confirmation bias. "Exposure to intense emotional suffering heightens decision makers' negative affect and consequently activates 'blame-validation processing.' In this state, jurors or other decision makers look for ways to hold an offender responsible, even for unforeseeable outcomes . . . In short, the anger aroused by hearing victim impact statements often induces decision makers to engage in a search for evidence to support more blame and punishment." *Id*. at 444-45. The same result will inevitably obtain if the government is permitted to present its proffered video evidence.

The Court should also consider the adverse effect that being subjected to an onslaught of shocking and upsetting video evidence will have on those citizens who are called for service on the jury. Academic researchers and popular media have long recognized that being required to view gruesome or shocking evidence can cause enduring harm to jurors; varying degrees of psychological distress have been documented, including clinically diagnosable Post Traumatic Stress Disorder, as a result of vicarious trauma. *See* Haley Bedard, *Juror Trauma: The Added Cost of Capital Cases*, Death Penalty Information Center (September 4, 2025) (noting that "up to 50% of jurors in violent criminal cases may experience symptoms of trauma) (available at https://deathpenaltyinfo.org/juror-trauma-the-added-cost-of-capital-cases); Liz Krieger, *After a Grisly Trial, Jurors Are Left With Mental Scars and Few Resources*, The New York Times (August 11, 2025) (available at https://www.nytimes.com/2025/08/10/well/the-hidden-trauma-of-jury-duty.html); Death Penalty Information Center, *Jurors Report Experiencing Continuing Trauma After Serving in South Carolina Death-Penalty Trial* (March 14, 2025) (available at https://deathpenaltyinfo.org/jurors-report-experiencing-continuing-trauma-after-serving-in-south-carolina-death-penalty-trial); Andrew Guthrie Ferguson, *The Trauma of Jury Duty*, The Atlantic

(May 17, 2015) ("[T]he greatest difficulty often lies in homicide and death penalty trials, in which jurors not only share the burden of imposing guilt (or even death), but are necessarily confronted with the loss of life that led to the case[,]" with some jurors reporting "physical ailments, including headaches, nightmares, and symptoms consistent with post-traumatic stress disorder.") (available at https://www.theatlantic.com/politics/archive/2015/05/the-trauma-of-jury-duty/393479/); Ruth S. Johnson, *The Hidden Horrors of Jury Duty: Jurors Suffer Long After the Trial Has Ended*, Psychology Today (March 16, 2015) (recognizing danger of PTSD arising out of repeated images of death and corpses at trial) (available at https://www.psychologytoday.com /us/blog/so-sue-me/201503/the-hidden-horrors-of-jury-duty); University of Leicester, Report Warns of Jury Service 'Trauma', ScienceDaily (March 20, 2009) (available at https://www.sciencedaily.com/releases/2009/03/090319102313.htm); Noelle Robertson, Graham Davies and Allice Nettleingham, *Vicarious Traumatization as a Consequence of Jury Service*, 48 The Howard J. of Crime & Just. 1 (2008) (available at https://onlinelibrary.wiley.com/doi/ 10.1111/j.1468-2311.2008.00539.x); Leigh B. Bienen, *Helping Jurors Out: Post Verdict Debriefing for Jurors in Emotionally Disturbing Trials*, 68 Indiana L. J. 1333, 1338 (1993) ("Behavioral evidence and the statements of jurors themselves suggest that many jurors are disturbed by the experience of serving on a jury, especially in capital cases."); Stanley M. Kaplan & Carolyn Winget, *The Occupational Hazards of Jury Duty*, 20 Bull. of Am. Acad. of Psychiatry and L. 325 (1992); Saul M. Kassen & David A. Garfield, *Blood and Guts: General and Trial-Specific Effects of Videotaped Crime Scenes on Mock Jurors*, 21 J. of Appl. Soc. Psych. 1459 (1991).

An increasing body of academic research has not only recognized the importance of courts being mindful of the impact of graphic and emotional evidence, but also identified tools

that are available to limit the dilatory effects of jury service in violent cases, including reducing duplicative evidence. See e.g. Alyssa Linares & Stacy Miles-Thorpe, *Vicarious Trauma in Jurors of Criminal Trials*, Crime Victims' Institute (January 2025) (recognizing that trials "involving violent crimes were significantly more often linked with trauma symptoms among jurors" and noting the importance of being mindful of the impact of graphic evidence and emotional testimony, highlighting judges "can encourage attorneys to limit the number of gruesome images, reduce duplicative testimony and photos that may traumatize jurors, and remove images from the screen once they have been displayed, instead of letting images linger") (available at

https://www.crimevictimsinstitute.org/pubs/?mode=view&input=249); Matthew Brooks, et al., *Trauma in the Courtroom: The Role of Prior Trauma Exposure and Mental Health on Stress and Emotional Responses in Jurors*, Br. J. Clin. Psych. (2024); Mark Rabil, Dawn McQuiston & Kimberly Wiseman, *Secondary Trauma in Lawyering: Stories, Studies, and Strategies*, 56 Wake Forest L. Rev. 825 (2021) (noting judicial attempts to reduce traumatic stress in jurors include "limiting the volume of gruesome evidence"); Samuel D. Hodge, Jr. & Lauren Williams, *Vicarious Trauma: A Growing Problem Among Legal Professionals That May Become A More Prevalent Cause Of Action*, 53 Tex. Tech L. Rev. 825 (2021) (noting judicial attempts to reduce traumatic stress in jurors include "limiting the volume of gruesome evidence"); Dawn McQuiston, *Vicarious Trauma in the Courtroom: Judicial Perceptions of Juror Distress*, American Bar Association (May 1, 2019) (noting the "solid body of research [which] shows that traumatic stress resulting from exposure to disturbing, gruesome, and/or emotional courtroom testimony and other circumstances related to jury duty can lead to jurors experiencing symptoms associated with psychological trauma and stress-related disorders" and judicial attempts to reduce stress by "limiting the volume of gruesome evidence") (available at

16

https://www.americanbar.org/groups/judicial/resources/judges-journal/archive/vicarious-trauma-courtroom-judicial-perceptions-juror-distress/).

In determining the appropriate limits on the government's presentation of the exceptionally disturbing evidence in this case, the Court should follow the approach taken by District Judge A. Richard Caputo of the Middle District of Pennsylvania in *United States v. Con-ui*, 13-cr-00123-ARC, 2017 WL 783437, at *5-6 (M.D. Pa., Mar. 3, 2017). In that case, also a federal death penalty prosecution, the court was asked to exclude altogether several videos that captured, from different angles, the gruesome beating and stabbing murder of a correctional officer by a prison inmate. *Id.* at *2. The court declined the defense request to exclude the evidence entirely, noting that "the video captures the very crime with which Mr. Con-ui is charged," and that "the jury ought to have the most dependable evidence from which to decide this case." *Id.*

However, the Court was mindful of the due process concerns raised by the overwhelming potential for prejudice that the video evidence presented. *Id.* at *6. It also noted that "a second showing of the video would constitute merely 'a graphic depiction of an event that had already been thoroughly proven.'" *Id.* at *5 (quoting *United States v. Bailey*, 840 F.3d 99, 122 (3d Cir. 2016)). It elaborated:

> A second showing of the video would greatly diminish its probative value. 'Even though the two sets of videos were probative, . . . the law of diminishing marginal returns still operates. The probative value of each clip was reduced by the existence of the clips before it. . . . As a result, after one excerpt from each video was displayed, the probative value of the remaining excerpts became diminished because knowledge . . . had already been established . . . by the prior video excerpts.' *United States v. Cunningham*, 694 F.3d 372, 389–90 (3d Cir. 2012). Thus, I find that the 'aggregate risk of unfair prejudice' is high, while the probative value of a second showing of the video low. *Id*. at 390.

*Id.*

17

The court therefore ruled that "the best course of action is to allow only one viewing of the video. The government will be permitted to show the video in its case-in-chief during the guilt phase, but no other presentations of the video will be permitted, either at the guilt or penalty stage." *Id.* It further directed that jurors would not be allowed to view the video again during deliberations at either phase of the case. *Id.* Additionally, the Court precluded the government from presenting multiple videos of the same events from different angles. *Id.* Instead, it directed the government "to edit the existing videos, which represent different angles of the incident, into one continuous single-screen, video." *Id.* "To be even more precise: only one angle may be shown at a time, and the edited video may not show the same conduct from different angles – only one angle may be chosen for each passing second." *Id.* at * 5 n.7.

The court concluded that these measures, as well as the passage of time between the presentation of the video at the guilt phase and jury deliberations at the end of the penalty phase following a break between the two phases, *id.* at *5, would best protect the defendant's right to a fair determination of sentence while still affording the government the benefit of "the full evidentiary force" of its case, *id.* at *4. It did so even though the videos proffered by the government were "of poor enough quality to guard against exposing the jury to gruesome depictions of the body, wounds, blood, and gore." *Id.* Indeed, it found:

> The actions depicted in the video occur at some distance from the camera, which further alleviates concerns of the video's prejudicial impact. In fact, compared to what modern audiences are exposed to in the media, the video is somewhat muted for a crime of this magnitude and presents a soundless and largely bloodless version of the events [which does not] show in any detail the injuries Officer Williams suffered as a result of the attack.

*Id. See also United States v. Escalante-Melgar,* 567 F. Supp. 3d 485, 491-494 (D.N.J. 2021) (admitting videos of murder with redactions to remove footage of victim being shot, where videos had no sound, were in black and white and no blood was visible). The same most

emphatically *cannot* be said about the video evidence in this case. ██████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████ The need for the Court to

take an approach at least as measured as that of the court in *Con-ui* is thus even more critical

than it was in that case.

In its Trial Exhibit List the government provided notice of its intention to use the

GoPro Video (Gov. Exhibit 1B (Electronic Exhibit: GoPro Video 1 – GH010011.MP4

and GoPro Video 2 – GH020011.MP4) as well as a multitude of video footage from the

Tops DVR footage for 3/8/22, 5/13/2022 and 5/14/2022:

- 2000A - Electronic Exhibit: Video Surveillance from Tops 3.8.2022, which is a compilation summary that is 15 minutes and 5 seconds in length. It contains spliced together footage of Payton Gendron's visits to the store on that date.

- 2000B - Electronic Exhibit: Video Surveillance from Tops 5.13.2022, which is a compilation video 40 minutes and 24 seconds in length. It contains spliced together footage of Payton Gendron's visits to the store on that date.

- 2000C (Electronic Exhibit: Video Surveillance from Tops 5.14.2022), which is a compilation video 11 minutes and 08 seconds in length. It contains spliced together footage of Payton Gendron's visits to the store in the morning before the shooting.

- 2000D1-2000D42 (Electronic Exhibit: Video Surveillance from Tops 5.14.2022), which include 42 individually marked videos the government has represented are clips of individual witnesses that were in and around Tops during the shooting. The footage contained in these 42 videos is 15 minutes and 46 seconds long.

19

- 2000E1-2000E32 (Electronic Exhibit: Excerpts of Tops Surveillance Video from 5.14.2022 used in Compilation Summary Video) (Government Exhibit 4000), which include 32 separately marked videos of Tops surveillance footage from May 14, 2022. The footage contained in these 22 videos totals 2 hours, 49 minutes and 17 seconds.

1. <u>The Court should limit the presentation of the GoPro video and Tops store surveillance camera videos of the shooting.</u>

Several of these exhibits contain videos which have graphic and/or disturbing images of the shooting at Tops Market on May 14, 2022: the GoPro Video, the 2000D series of exhibits, and the 2000E series. ████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████ █ ██

██████████████████████████

███████████████████████████████

██████████████████████████████████

███████████████████████████ Combined, the government

_____

█ ████████████████████████████████████
████████████████████████████████

█ ████████████████████████████████████
████████████████████

has identified 3 hours, 5 minutes and 3 seconds of Tops surveillance camera footage to capture a shooting that lasted approximately 2 minutes and 12 seconds.[4] We thus ask the Court to exclude all aspects of the Tops surveillance footage that show the same events and time frame as the GoPro video.

2.    The Court Should Exclude Cumulative Exhibits contained in the 2000D and 2000E series.

With respect to the 2000D and 2000E series, the Court should limit the government to the presentation of a single view of each part of the store for each period of time. No duplication of time periods or events should be permitted, regardless of camera angles available – only one angle should be permitted in each instance.  In the exhibits as proffered by the government, there are many instances of duplication of the exact same camera angle and footage (including subset duplication in which snippets of larger marked exhibits are separately marked), as well as similar footage by virtue of marking multiple camera angles covering the substantially the same events. This amount of duplication is exceeding prejudicial.  The following illustrates the extent of the duplication:

Vestibule (Start of Shooting)

Both 2000D-8 and 2000D-34 depict the same events and time periods. Both are camera angles facing into the vestibule. ██████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[4] This total *excludes* the extensive surveillance video clips included in Gov. Ex. 4000 (*Compilation Summary Video*).

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████

2000D-42 depicts yet another angle, in the vestibule facing facing north. ███████████

████████████████████████████████████████████

██████████████████████████████████████████ 2000D-8 is a

subset duplication of 2000E-7.

Front of Store

Ex. 2000D-3, is a camera angle facing from the produce section toward the security office

and vestibule. ███████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

2000D-3 is also a subset duplication of 2000E-3.

2000D5 is a closer angle of the customer service section and front aisle facing the pharmacy.

████████████████████████████████████████████████

████████████████████████████

2000D-6 is an exact duplication of  2000D-5. ███████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

2000D-5 and 2000D-6 are likewise subset duplications of 2000E-5.

Customer Service

2000D-37, is an aerial camera looking into the customer service counter. █████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████

████████████████████ 2000D-36 is a 30 second shorter subset of the exact same

footage contained in 2000D-37, ████████████████████████████████████

██████████ 2000D36 and 2000D37 are subset duplications of 2000E-23.

2000D-38 captures a different camera angle of the same content in 2000D-36 and 2000D-37.

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████ 2000D-38 is a subset duplication of

2000E-25.

Front Aisle

2000D-12, a camera angle from the front registers facing the produce section, ██████

██████████████████████████████████████████████ with substantial

overlap of those already depicted in 2000D-3, 2000D-5, 2000D-6, 2000D-8, 2000D-9, 2000D-

10, ███████████████████████████████████████████████████

████████████████████████ just from a different angle as depicted in 2000D-9.

2000D-13 is the same camera angle as 2000D-12, ████████████████████

████████████████████████████████ with substantial overlap of those already

depicted in 2000D-3, 2000D-5, 2000D-6, 2000D-8, 2000D-9, 2000D-10, and D12, ████

██████████████████████████████████████████████████ as in

2000D-12. ██████████████████████████████████

2000D-12 and 2000D-13 are subset duplications of 2000E-9.

<u>Aisles 7, 8, 9, 10</u>

2000D-9, is a camera angle from Aisles 7 and 8 looking at the registers, ████████



2000D-10 appears to be an exact duplicate of 2000-D9, with 2000D-9 being just one second

shorter. 2000E-8 is a subset duplication of 2000D-9 and 2000D-10.

2000D-18, is an aerial view of aisles 9/10, one aisle over from the angles of 2000D-9 and

2000D-10. ████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

<u>Aisle 13</u>

2000D-26 is an aerial angle of aisle 13. ███████████████████████████

████████████████████████████████████████████████████

████ 2000E-19 is a subset duplication of 2000D-26.

2000D-27 is also an aerial angle of aisle 13. █████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████ 2000D-27 is a

subset duplication of 2000E-20.

2000D-28 is a duplicate of 2000D-27, ███████████████████████████████

████████████████████████████████████████████ 2000D-

28 is an exact duplication of 2000E-20.

Dairy/Aisle 13

2000D-30, is a video of the dairy aisle. ██████████████████████████

████████████████████████████████████████████████████

████████████████████████████

2000D-31, is a subset duplication of 2000D-30, ██████████████████████

████████████████████████████████████████████████████

2000D-30 and 2000D-31 are subset duplications of 2000E-32.

2000D-32, a camera angle of aisle 13, hygiene, facing toward the front of the store. ████

████████████████████████████████████████████████████

██████████████████████████

2000D-33, is a duplication of the video in 2000D-32 facing toward the front of the store. ▮

▮▮▮▮▮

Aisle 3, 4, Meat Dept., Deli

2000D-15, a camera angle of aisles 3/4 facing the meat department, ▮▮▮▮▮

▮▮▮▮▮

2000D-23, is a camera angle from the meat department aisle facing toward the deli/prepared foods. ▮▮▮▮▮

▮▮▮▮▮ It is also a duplicate of 2000E-15.

2000D-21, shows a camera angle from the deli facing toward the meat department. ▮▮▮

▮▮▮▮▮

▮▮ It is also a subset duplication of 2000E-14.

Exterior Rear Exit

2000D-7 is a camera angle showing the rear exit of the store facing south. ▮▮▮

▮▮▮▮▮

▮▮▮▮▮ 2000D-35, one minute and 12 seconds long, is a slightly different camera angle, but shows the same events and time period as 2000D-7. ▮▮▮

▮▮▮▮▮

▮▮▮▮▮

Registers

2000D-16 is an overhead camera above a register. ████████████████████

████████████████████████████████ This footage is duplicated in the longer clip

at 2000E-12.

2000D-17 is an overhead camera above another register. ████████████████

████████████████████████████████████

2000D-16 and 2000D-17 are also subset duplications of 2000E-12.

2000D-24 is an overhead camera above a register. ██████████████████████

██████████████████████████████████

2000D-25 duplicates 2000D-24, ████████████████████████████

████████████████████████████████████████

2000D-24 and 2000D-25 are subset duplications of 2000E-18.

2000D-29 is an aerial view of one of the registers ███████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

Pharmacy

2000D-39 is an aerial camera looking into the pharmacy. ████████████████

████████████████████████████████ It is a subset duplication of 2000E-

26.

Vestibule (Near the End of the Shooting)

2000D-14, is a camera angle in the vestibule facing north.

2000D-41 is a subset duplication of 2000E-29.[5]

3. Compilation Exhibits Contained in 2000A, 2000B and 2000C Are Inadmissible.

Government Exhibits 2000A, 2000B and 2000C are compilation videos of Tops surveillance footage on March 8, 2022, May 13, 2022 and the morning of May 14, 2022, respectively. The videos have been manipulated to not simply play individual surveillance clips seriatim, but instead to include hearsay statements, including dates, approximate times, span of times, etc., interspersed to introduce the video clips immediately following. These curated mini-movies thus misrepresent what actually occurred on the dates in question. While the government could put the individual video clips into evidence, they should not be allowed to play the mini-movies since the title pages introducing the clips are hearsay and not admissible evidence.

4. Pre-shooting Video Footage contained in Gov. Exhibits 2000C and 2000E are Inadmissible.

As a general matter, many of the marked video clips of store footage prior to the attack are wholly irrelevant to the issues in this case and are therefore inadmissible under Fed. R. Evid. 401. The pre-shooting clips contain lengthy footage of shoppers in and around Tops Market, many of whom were not present during the shooting. *See e.g.*, Gov. Ex. 2000E-1 (approximately 6 minutes and 36 seconds); Gov. Ex. 2000E-5 (59 minutes and 57 seconds in length with

---

[5] Because so many of the 2000D series exhibits are duplicative or similar to each other, as well as also being duplicates of the 2000E series, although the 2000E series videos are also duplicative or similar to each other, to avoid repetition we omit a comparison of the 2000E series to each other.

approximately 32 minutes of pre-shooting footage), Gov. Ex. 2000E-25 (approximately 3

minutes of footage prior to the shooting). To the extent the videos are relevant because they also

include shoppers who were present during the shooting (an uncontested issue), they are

cumulative since there is an abundance of footage showing those same individuals during

portions of the footage of the shooting.  These pre-shooting videos are also unfairly prejudicial

since they engender a feeling of foreboding in the jurors regarding what is to come.  Therefore,

they should be excluded pursuant to Fed. R. Evid. 403.

Additionally, Gov. Exhibit 2000C, the compilation video, which includes a snipped video

separately marked as Gov. Exhibit 2000E-17, dramatizes Payton Gendron's brief visit to the Tops

Market around noon on May 14th, more than two hours before the crime. The government has

chosen which angles to display and what frames to include as he walks through the store. ████

█████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████  Even if it were admissible in this context, the government could

easily have chosen a video clip within seconds of that moment that clearly features Payton

Gendron and not ██████████████ :

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████

5.   Post-shooting Video Footage Should be Excluded.

Likewise, many of the video exhibits that contain footage of the scene following the shooting, including those that show law enforcement arriving in the store, also contain ████████

████████████████████████████████████████████████████████████████

███████████. *See, e.g.,* Gov. Ex. 2000E5 (59 minutes and 57 seconds in length with approximately 25 minutes of post-shooting footage); Gov. Ex. 2000E-7 (12 minutes and 31 seconds in length, approximately half of which captures a view of the entrance and vestibule featuring first responders entering and exiting the store); Gov. Ex. 2000E-12 (7 minutes and 12 seconds in length, █████████████████████████████████████████████████ Gov. Ex.2000E-18 (22 minutes and 31 seconds in duration, with approximately 7 minutes of post-shooting footage), and Gov. Ex. 2000E-25 (10 minutes in length with more than half related to post-shooting footage). These portions of the post-shooting videos are not relevant to any issues in the case and should therefore be excluded under Fed. R. Evid. 402. Even if these post-shooting video clips were relevant, any probative value they have is substantially outweighed by the dangers of unfair prejudice, including the effect on the jury of such emotional and inflammatory evidence, as well as unnecessarily presenting cumulative evidence, amongst this series of exhibits and the other Body Worn Camera footage of officers in and around the scene. *See* Gov. Ex. _____.

6.   Video Evidence Should be Played at Accurate Speed.

Several of the videos appear to play at other than accurate speeds and thus are misleading and should therefore be excluded under Fed. R. Evid. 403 and Fed. R. Evid. 901(a). *See, e.g.,* Gov.

Ex. 2000D-5 (fast); Gov. Ex. 2000D-6 (fast); Gov. Ex. 2000D-8 (fast); Gov. Ex. 2000D-12 (slow); Gov. Ex. 2000D-13 (slow); Gov. Ex. 2000D-29 (fast); Gov. Ex. 2000D-36 (slow); Gov. Ex. 2000D-37 (slow); Gov. Ex. 2000E-24 (fast); and Gov. Ex. 2000E-25(slow).

### B.  Motion in Limine to Preclude Video Evidence and Related Testimony from Body Worn Cameras

The government has included the "AXON Body Worn Camera Footage" of Buffalo

Police Department officers ▇▇▇▇▇▇▇▇ (Ex. #3001); ▇▇▇▇▇▇▇▇ (Ex. #3002);

▇▇▇▇▇▇ (Ex. #3003); and ▇▇▇▇▇ (Ex. #3004) on its Trial Exhibit List.[7] *See* Sealed

ECF No. 483 at 38. Each of these police officers is also on the government's List of Potential

Witnesses. *See* Sealed ECF No. 484 at 2-3.

▇▇▇▇▇▇▇▇▇▇▇▇▇▇ were all present at the Tops Market

when Payton Gendron was taken into custody or shortly thereafter. All told, the body worn

camera (BWC) footage for these four officers runs for over two hours (16 minutes for the

shortest to over an hour for the longest). Most of the content is not admissible under any theory;

presumably the government will seek to introduce only a small fraction of it.[8] The government

has not specified, however, which portions of these videos it seeks to introduce into evidence.

This Court should direct the government to do so, with precise time frames and a transcript of the

purported statements, to enable the defense to make more targeted objections and this Court to

address them. Payton Gendron also reserves the right to supplement these arguments based on

that response.

---

[6]This name is spelled ▇▇▇▇▇ on the government's Exhibit List and ▇▇▇▇▇ on its Witness List. The correct spelling appears to be ▇▇▇▇▇

[7] Two of these exhibits are mislabeled. Based on a comparison with police reports included in discovery, it's apparent that Officer ▇▇▇▇▇ body worn camera is #3003 (not #3002) and Officer ▇▇▇ body worn camera is #3002 (not #3003).

[8]Officer ▇▇▇ for example, was posted in the same position at the entrance to the store for approximately 43 minutes. During this time, he observed emergency personnel as they entered and exited the store, occasionally engaging in conversation. Presumably the government does not intend to offer this portion of the video as evidence.

In broad terms, however, the defense objections are based on hearsay that does not fall within any recognized exception (*see* Fed. R. Evid. 802, 803); relevance (*see* Fed. R. Evid. 401, 402); and Rule 403's prohibition against evidence the probative value of which is substantially outweighed by the risk of unfair prejudice, undue delay, and/or "needlessly presenting cumulative evidence." *See* Fed. R. Evid. 403 .

The government's description of the anticipated testimony from these officers suggests that it will seek to introduce statements by Payton Gendron, some of which are recorded on their BWCs. The government previously described the exchange between Payton Gendron and police officers at the scene after he was taken into custody as follows:



*See* Sealed ECF No. 420 at 58, 59.

Following this exchange, the government described a conversation withPayton Gendron ████ ████████████████████████████████████████████████ This Court has previously found that the statements Payton Gendron made at the scene of his arrest fall within the "public safety" exception to the *Miranda* requirement. *See* ECF 582 at 46-47. That these statements are not subject to suppression, however, does not make them admissible if they are otherwise prohibited by the Rules of Evidence.

   *Officer* ████████████ *body worn camera (Exhibit 3002)*

The government's "brief summary" of ████████ anticipated testimony is that he "assisted in bringing the defendant into custody as well as searching and collecting various items from the defendant's person, including the defendant's iPhone. Officer ████ will testify

33

regarding his actions and observations at Tops on May 14, 2022, and his interactions with the defendant." Sealed ECF No. 484 at 3. Officer ▉▉▉▉ BWC footage is over an hour long. All of it could fall within this general description, though most of it is clearly not admissible.

The only portion that is potentially relevant and admissible ends after approximately one minute and 32 seconds when he asks, "you alone" and Payton Gendron responds. Even during this portion, however, some of Officer ▉▉▉▉ comments should be precluded, e.g., ▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉ The remainder of the footage includes hearsay conversations with civilians and other law enforcement personnel, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉, radio transmissions, and ▉▉▉▉▉▉▉▉▉▉▉▉▉. None of this footage is admissible and all of it is emotional and inflammatory. The government should be required to specify which portions of this footage they propose to introduce, along with the government's interpretation of the words that are spoken; both are needed for the defense to make an informed challenge to Officer ▉▉▉▉ body camera footage.

*Officer* ▉▉▉▉▉▉▉▉▉ *body worn camera*

Officer ▉▉▉▉▉ BWC footage is 16 minutes and 14 seconds long. The government describes his anticipated testimony "regarding his actions and observations on May 14, 2022, and his interactions with the defendant, which includes a brief discussion wherein the defendant advised Office ▉▉▉▉ that he acted alone during the mass shooting." *See* Sealed ECF No. 484 at 2. The only additional information provided is that Officer ▉▉▉▉ "assisted in bringing the defendant into custody as well as searching the defendant and collecting various items from the defendant's person, including the Go Pro camera." *Id*.

Officer ▉▉▉▉ arrived at the scene as Payton Gendron was being taken into custody. Within seconds, Payton is brought to a marked police car where he is searched by multiple

officers. This interaction is duplicative of the BWC footage of Officer ▮▮▮▮. To the extent

Officer ▮▮▮▮▮▮ BWC footage is intended to reflect Payton Gendron advising him that ▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ this statement is not audible on Officer ▮▮▮▮▮ body

camera footage; only Officer ▮▮▮▮▮ response, ▮▮▮▮▮▮▮▮▮ is heard on his

BWC. In contrast, Payton Gendron's statement is audible on Officer ▮▮▮ BWC. There is no

reason to include both and one should be precluded as cumulative.

Officer ▮▮▮▮▮ BWC footage also contains multiple graphic images, from his arrival

on the scene (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮),[9]

and then intermittently throughout the video, at times at close range and in detail. ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮, and the general chaos of the scene is apparent throughout. These

sights and sounds will elicit strong emotional responses without offering probative value. Officer

▮▮▮▮▮ BWC also includes police radio transmissions, along with comments from other

officers, including Officer ▮▮▮ remark, ▮▮▮▮▮▮▮▮▮ These statements

are inadmissible hearsay and should be precluded for that reason alone.

In addition to being cumulative of other BWC footage, none of Officer ▮▮▮▮

interactions with Payton Gendron other than the recovery of property and the statement that he

was alone (which is not audible) is probative of this crime. ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮ These statements do not shed any light on the crime; to the extent

they suggest that he was involved in a shooting, there is overwhelming evidence of that

uncontested fact. On the other hand, these interactions invite a prejudicial comparison ▮▮▮▮

---

[9] If the Court is inclined to allow BWC footage that incidentally portrays graphic images of the deceased victims, the defense requests that the footage be edited to remove or obscure those images.

████████████████████████████████████████████████████████████████████

████████████████████ They shed no light on the crime or his motivations and should be precluded.

To be sure, Officer ████████ will be permitted to testify about the property he recovered. Taken as a whole, however, Officer ████████ BWC footage is cumulative, inflammatory, and adds no probative evidence to other BWC recordings and his own testimony. Again, the government should be required to specify what footage it intends to offer from Officer ████████ BWC, as well as a proposed transcription of the content of any conversations. If the Court declines to preclude all of this footage as cumulative and unnecessarily prejudicial, this specificity will permit the defense to make more targeted objections to the specific video footage the government proposes to offer into evidence.

*Officer* ████████ *body worn camera (Exhibit 3003)*

Officer ████████ BWC footage is 27 minutes and 26 seconds long. As with the three other officers whose BWC footage is identified as a potential exhibit, the government asserts he will testify "regarding his actions and observations at Tops on May 14, 2022, and his interactions with the defendant." *See* Sealed ECF No. 484 at 3. The government also notes that he "assisted in bringing the defendant into custody as well as searching and collecting various items from the defendant's person, including the defendant's iPhone." *Id*.

As with the others, Officer ████████ BWC is replete with hearsay statements from civilians, radio transmissions, witnesses, and other law enforcement, as well as his own commentary about the scene. ████████████████, as is a woman yelling, ████████████████ After assisting other officers to take Payton Gendron into custody, Office ████████ has only a brief interaction with Payton during which he assists Officers ████████████████ search him -

36

no statements are audible during this time. Thereafter, Officer ███████ moves through the store. ████████████████████████████████████████████████
████████████████████████████████████████ He has a brief conversation with both. As Officer ████████ walks through the store, graphic images of deceased victims are also visible, as are victims in the parking lot. After surveying the scene and talking to other law enforcement personnel, Officer ████████ transports Payton Gendron to the police station; Payton makes no statements during this time.[10]

To the extent Officer ████████ BWC footage is relevant and probative, because it portrays either the seizure or the initial search of Payton Gendron's person, it is entirely duplicative of the BWC of the other three officers and includes the same background noises of chaos and screaming. None of the remainder of this footage is admissible – it is primarily hearsay and is extremely inflammatory. For all of these reasons, it should be precluded.

*Officer ████████ body worn camera*

Officer ███ BWC is 27 minutes and 51 seconds long. The government has not provided any additional information about what portion they intend to introduce, although Officer ███ initial interaction with Payton Gendron is included in the "summary compilation video." *See* Sealed ECF No.483 (Ex. 4000).  The only description of her proposed testimony from the government is the same as the others, namely that "[s]he will testify regarding her actions and observations at Tops on May 14, 2022, and her interactions with the defendant." *See* Sealed ECF No. 484 at 3.

---

████████████████████████████████████████████████████████████████████
████████████

Of the nearly 28 minutes, Officer ▮▮▮ potentially relevant interactions with Payton Gendron are reflected in less than two minutes of her BWC. In that time, she and several other officers take him into custody and escort him to a patrol car. This scene is also captured on at least two, if not all three of the other officers' BWCs. Thereafter, Officer ▮▮▮ BWC includes footage of her securing the scene with crime scene tape and interacting with civilians, including witnesses, and other law enforcement personnel. She also accompanies Officer ▮▮▮ to transport Payton Gendron to the police station.

As with the other officers' videos, Officer ▮▮▮ BWC is replete with hearsay (from radio transmissions, background conversations, and her own interactions with others), graphic images, and the ▮▮▮. Her testimony should be limited to her brief interactions with Payton Gendron as she confronts him and takes him into custody; any radio transmission or conversations that occur before (including on her way to the scene) or after, are hearsay and should be precluded. Moreover, to the extent any portion of the relevant footage includes graphic images, those sections should be edited to remove or obscure those images.

As noted above, most of the BWC footage is not relevant nor admissible evidence and it is likely the government would concede as much. That's why the government should be required to specify which portions of each officer's BWC footage it submits is relevant and admissible. Moreover, some of the audio, including portions of officers' interactions with Payton Gendron, is inaudible. Because it's also not clear which communications the government proposes to introduce, the government should provide a transcript of these communications to provide the defense with an opportunity to review them and resolve any disagreements. Finally, the Court should direct the government to choose among the video footage that portrays the same event, e.g., Payton Gendron being taken into custody and searched, and preclude the other, duplicative

footage because is it cumulative and only serves to enhance the prejudice to Payton Gendron without adding any probative value.

### C. Motion in Limine to Preclude 911 Audio Calls

The government has announced its intention to introduce testimony, documentary evidence, and audio recordings regarding phone calls to 911 on May 14, 2022. *See* Sealed ECF No. 483 at 36-37 (Exhibits 2500-2506A); and Witness List, Sealed ECF No. 484 at #164



In addition to the calls from known callers, the government also proposes to introduce evidence of three additional calls to 911 from anonymous people, *see* Sealed ECF No. 483 at 37 (Exhibits 2501/2501A; 2503/2503A; and 2505/2505A), and testimony ███████████████████████████████████████ ████████████████████████████ *See* Sealed ECF No. 484 at 25 ███████████████ ████████████████████████████████████████████████████ ████████████████████████

Payton Gendron objects to the introduction of these 911 recordings because they are fraught with emotion, and probative only of the uncontested facts the government will introduce overwhelming evidence to prove, namely that Payton Gendron was shooting inside the Tops market, forcing terrified and confused shoppers (most of whom never saw him) to flee and hide, and leaving two employees traumatized and wounded. ███████████████████████ ████████████████████ Weighing the probative value against the dangers of

---

[11] ████████████████████████████████████████████████████████ ████████████████████████████████████████████████ *See* Sealed ECF No. 484 at 59-60. Based on this representation, the defense assumes that the government will *not* seek to introduce the 911 audiotape at the first phase of the trial. The defense reserves the right to object to the introduction of the 911 audiotape, which does not qualify for any exception to the rule against hearsay, if the government offers it as evidence during the first phase of the trial. *See* Motion to Exclude Inadmissible Victim Impact Evidence filed simultaneously herewith, objecting to the introduction of this evidence at the penalty phase.

unfair prejudice, the minimal probative value these recordings add to the mountain of evidence the government already has is substantially outweighed by the dangers of unfair prejudice and needlessly presenting cumulative evidence.

The government has provided notice that it intends to offer six 911 recordings during the first phase of trial. Three are from known callers: ███████████████████████████ ████████████ The remaining three calls are anonymous.

*911 call from* ███████████ *(Ex. 2500)*

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

█████████████████████████████████

█████████████████████████████████

███████████████████ Her 911 call is likely to be needlessly cumulative of her trial testimony and whatever probative value it has is substantially outweighed by the danger of unfair prejudice.

*911 call from* ████████ *(Ex. 2502)*

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

█████████████████████████████████

41

42

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████ ■ This

emotional response is unrelated to the probative value of the brief content, which is entirely

cumulative of his expected testimony.[13]

*911 call from* ████████████ *(Ex. 2504)*

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████

---

[12] The listener might also fairly assume that the wait was caused by the flood of calls to report this same incident.

■ ████████████████████████████████████████████████████
████████████████████████████████████████████████████

The image this audiotape provokes is emotionally compelling. It does not, however, add any

additional, probative evidence to ████████ anticipated, compelling testimony at trial. *See*

Sealed ECF No. 484 at 24 ████████████████████████████████████████

████████████████████████████████████████████████

████████████ *(Ex. 2501)*

    ████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██ *Anonymous caller (Ex. 2503) and Anonymous caller (Ex. 2505)*

    ████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

    ████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████

These emotionally powerful audio recordings will inevitably encourage jurors to put themselves in the position of the callers, eliciting a visceral response well beyond their probative value. This scenario is precisely what Rule 403 is designed to protect against: potentially relevant evidence that is both unfairly prejudicial and cumulative of other evidence that jurors will hear. *See, e.g., Hill v. Quigley*, 784 Fed. Appx. 16, 20-21 (2d Cir. 2019) (summary order) (emotional 911 call properly excluded where the emotional content conveyed the same facts that were covered in the witness' in-court testimony). They should be excluded.

IV.    **MOTIONS IN LIMINE RELATED TO THE "MANIFESTO" AND DISCORD /G SERVER POSTS**

A.    **Manifesto Evidence: Ex. 4B-1B, 4B-1H, 4B-1I, 4B-1N, 4B-1P, 4B-1Q, 4B-2B, 4B-2K, 4B-2P, 4B-2Q, 4B-2S, 77-C1, 77-C7, 77-C9, 77-C10, 1700-G4, 1700-G5, 1700-G6, 1700-G7, 1700-G10, 1700-G11, 1700-G12, 1700-G13, 1700-G14, and 1700-G15**

1.    <u>Multiple Versions</u>

The government has noticed its intent to introduce 25 copies or versions of Payton Gendron's so-called "manifesto."[14]  Although it is difficult to track differences between Word and Adobe files, based on page numbers the following documents are the same or virtually the same:

- Ex. 4B-1H, 4B-1P, 4B-1Q, 4B-2K, 4B-2S, 77-C1, 77-C7, 77-C10, 1700-G4, 1700-G13, 1700-G14 (166 pages)

- 4B-1B, 4B-1I, 4B-1N, 4B-2B, 4B-2P, 1700-G5, 1700-G6, 1700-G7, 1700-G10, 1700G-11, 1700G-12, 1700G-15 (180 pages)

The other exhibits include portions of the manifesto.

Exhibit 4B-2K is the version of the manifesto linked in the message Payton Gendron sent with links to the livestream, manifesto, and two files containing posts from his Discord G server to approximately 66 individuals immediately before the shooting. There is no evidence that anyone other than Payton saw the other versions of the manifesto. Thus, Ex. 4B-2K is the relevant version of the document and the one we discuss herein.

---

[14] The 25 copies of the manifesto were extracted from the following evidence: Ex. 4: Black Computer Tower (1B70) (Exs. 4B-1B, 4B-1H, 4B-1I, 4B-1N, 4B-1P, 4B-1Q, 4B-2B, 4B-2K, 4B-2P, 4B2-Q, and 4B2-S); Ex. 77A: HP Laptop (Exs.77-C1, 77-C7, 77-C9, and 77-C10); Ex. Google Account ███████████████ (Exs. 1700-G4, 1700-G5, 1700-G6, 1700-G7, 1700-G10, 1700-G11, 1700-G12, 1700-G13, 1700-G14, and 1700-G15).

The manifesto will be a key piece of evidence for both sides and will be the subject of much testimony and argument.  Admitting multiple versions of the manifesto risks confusing the jury as to which document they should refer when considering the content and the parties' arguments with respect to it.  Additionally, the introduction of only one version of the manifesto will ensure that any posts this Court excludes will not be shown to the jury.  For these reasons, the government should only be allowed to introduce Exhibit 4B-2K with the redactions discussed below and the others should be excluded.

2.    Only Relevant Content is Admissible; All Else Should Be Redacted.

The manifesto posted on May 14, 2022, is 166 pages long. *See* Ex. 4B-2K. While much of its content is arguably relevant, other portions are not or their probative value is substantially outweighed by one or more of the dangers enumerated in Fed. R. Evid. 403.  Under the Federal Rules of Evidence, only relevant evidence is admissible, and courts retain discretion to exclude material that is unfairly prejudicial, confusing, or immaterial.  Fed. R. Evid. 401, 402, and 403.  Moreover, the entire manifesto is protected by the First Amendment Free Speech Clause. While evidence of speech may, under some circumstances, be used when relevant "to establish the elements of a crime or to prove motive or intent," *Mitchell*, 508 U.S. at 489, the admission of evidence that proves nothing more than a defendant's "abstract beliefs" violates the First Amendment. *Dawson*, 503 U.S. at 167.

The manifesto includes discussion of a wide range of topics unrelated to the crimes charged, including, among other things, thoughts about:

- ███████████████████████████████████████████

---

15 ████████████████████████████████████████████████
████████████████████████████████████████ *See Zant v.*

(redacted)

- (redacted)

- (redacted)

- (redacted)

- (redacted)

None of these topics are probative of the planning, preparation, or execution of the Tops shooting and thus posts addressing them are not admissible. Fed. R. Evid. 402. They should be redacted before the manifesto is admitted into evidence. Redaction is necessary to ensure the jury is allowed to consider only probative content while also safeguarding against unfair prejudice or violations of the First Amendment. Redaction has been recognized as a proper method to protect sensitive information without sacrificing the evidentiary value of a document. *See, e.g., Zimmerman v. Randall,* No. 23-7683-PR, 2025 WL 2910651, at *3 (2d Cir. Oct. 14, 2025) (unpublished) (affirming decision to redact inadmissible portions of party's exhibits).

---

*Stephens*, 462 U.S. 862, 885 (1983) (a sentence cannot be based upon "factors that are constitutionally impermissible or totally irrelevant to the sentencing process, such as for example the race, religion, or political affiliation of the defendant").

[16] The latter of these two quotes was copied from the Tarrant manifesto.

In addition to this general objection to the admission of irrelevant, First Amendment protected posts, Payton Gendron asks the Court to order the government to redact from the manifesto text falling within the following categories:

3.

See, e.g., Ex. 4B-2K at 7



*Id.* at 33.[17]

---

[17] Payton Gendron did not create this meme or any of the other images and memes reproduced in this motion. The majority were readily available on the internet at the time, particularly on social media platforms like 4Chan.



*Id*. at 44.



*Id*. at 46.

The Indictment charges Payton Gendron with offenses committed because of the victims'

actual or perceived race or color, to wit: "Black people."  ECF No. 6.  Similarly, the Notice of

Intent to Seek the Death Penalty refers only to bias against Black people.  ECF No. 125.  His beliefs or feelings about any other group of people have no probative value with respect to any aspect of the planning or execution of the shooting or his intent in committing the crimes charged.  *See* Fed. R. Evid. 401 (evidence is relevant only if has a tendency "to make a fact more or less probable than it would be without the evidence; and … the fact is of consequence in determining the action.").  If anything, this evidence is proof of "nothing more than … abstract beliefs" and should be excluded on that ground.  *See Dawson*, 503 U.S. at 167. Evidence of these abstract beliefs would serve no other purpose than impermissibly "demonstrating that those beliefs, and by extension the defendant, are 'morally reprehensible.'"  *Kane*, 452 F.3d at 1043.

Even if the evidence had probative value (which it doesn't), it would be substantially outweighed by the danger of unfair prejudice.  Admission of this evidence impermissibly invites jurors to convict and sentence Payton not because of what he did, but because of the offensiveness of his beliefs.  The evidence falling into this category is likely to have a "'strong emotional or inflammatory impact' that would "pose a risk of unfair prejudice because [it] 'tends to distract' the jury from the issues in the case and ... [might] arouse the jury's passions to a point where they would act irrationally in reaching a verdict."  *United States v. Monsalvatge*, 850 F.3d 483, 495 (2d Cir. 2017) (cleaned up) (quoting *United States v. Robinson*, 560 F.2d 507, 514 (2d Cir. 1977)).  The evidence invites the jury to condemn Payton for ███████████████ rather than his specific intent towards Black people and creates ███████████████ ████████████████████████████████████ ███████████████████████████████.

In addition to substantive discussion of these groups of people, ███████████ ███████████████████████████.  *See, e.g.*, Ex. 4B-2K at 80

51



Whatever portions of the manifesto the Court finds are relevant and admissible should be scrubbed of this irrelevant and unfairly prejudicial language.

.[18]

These statements have no probative value with respect to any aspect of the planning or execution of the shooting or Payton Gendron's intent in committing the crimes charged, and, as offensive as they are, they are protected by the First Amendment Free Speech Clause. *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969), makes it clear that the First Amendment

---

[18] These portions of Payton Gendron's manifesto are taken almost verbatim from the Tarrant manifesto.

protects speech that advocates violence, so long as the speech is not directed to inciting or

producing imminent lawless action and is not likely to incite or produce such action.  These posts

fall squarely within that protection.



. There is no need for

this evidence, much less a clear one, and it should be excluded.[19]

[20]

---

[19] Given the pendency of the government's appeal, Payton Gendron does not address here the impact of this evidence on the stricken aggravating factors. *See* note 1, *supra*.

[20] Both of these passages are found amid large amounts of text copied from Brenton Tarrant's manifesto almost verbatim.

██████████████████████████████, therefore these discussions are irrelevant.  At the same time, they are highly prejudicial given their subject.  The danger of unfair prejudice ████████████████████ is particularly acute because such allegations are uniquely likely to arouse hostility, sympathy, and moral outrage unrelated to the issues before the court. This danger is especially high when passages such as this are combined with references ████████████ ████████.  "Unfair prejudice" within the meaning of Rule 403 "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Advisory Committee's Notes on Fed. Rule Evid. 403, 28 U.S.C. App., p. 860; *see also Old Chief*, 519 U.S.  at 180. ██████████████████████████████████████████

These paragraphs should be redacted.

███████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

The only one of these men arguably relevant to this case is Brenton Tarrant.[21]  There are many references to Tarrant in the manifesto and Discord G Server posts, and Payton Gendron copied much of his manifesto from one written by Tarrant.  Tarrant's name is also written on the gun Payton Gendron used during the Tops shooting.

The others are not relevant and their crimes make references to them unfairly prejudicial.

Other than arguably Brenton Tarrant, the references to these killers are not probative of any "fact of consequence" in determining whether Payton Gendron is guilty of the crimes charged.  *See* Fed. R. Evid. 401. While this evidence shows they may have served as an

---

[21] Tarrant killed 51 people and injured 89 others during shootings at two mosques in New Zealand in 2019.
[22] While the gun is obviously relevant and admissible, the identification of the names on the gun are not.  For the reasons discussed below, the government should not be allowed introduce testimony identifying any of these killers other than arguably Brenton Tarrant.

55

inspiration for Payton's actions, inspiration is different from legally relevant concepts such as motive or intent.  Inspiration is a source that influences or stimulates one to act;[23] for example, a person might be inspired to do good after reading about historic or religious figures who committed acts of altruism based on shared values or, as in this case, be inspired to do wrong after reading about others who committed bad acts based on similar beliefs. It is an abstract concept, and one that falls squarely within the protections of the First Amendment.  "It is now well established that the Constitution protects the right to receive information and ideas . . . This right to receive information and ideas, regardless of their social worth, is fundamental to our free society." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (internal citations omitted).  While evidence of speech may, under some circumstances, be used when relevant "to establish the elements of a crime or to prove motive or intent," *Mitchell*, 508 U.S. at 489, the admission of evidence that proves nothing more than a defendant's "abstract beliefs" violates the First Amendment. *Dawson*, 503 U.S. at 167.

Inspiration differs from motive.  While inspiration is a source of influence or something that sparks action, motive is the purpose or reason *why* someone acts. In other words, inspiration is a catalyst, while motive is the purpose or reason driving an action.[24] Evidence of motive, the purpose or reason for doing something, is frequently admitted at trials, but not for its own sake.

---

[23] The Merriam Webster Dictionary defines "inspiration" as "something that makes someone want to do something or that gives someone an idea about what to do or create: a force or influence that inspires someone."  https://www.merriam-webster.com/simple/inspiration.

[24] To use an innocuous example, imagine a person who builds a bench. That person was moved to build it after watching a talented carpenter construct one (inspiration). They built the bench as a gift for a loved one to make that person happy (motive). They deliberately cut wood and pieced it together to make the bench (intent).

Motive is legally relevant only to the extent it bears on criminal intent, the culpable state of mind with which a criminal act is done.

> Intent and motive should never be confused. Motive is what prompts a person to act or fail to act. Intent refers only to the state of mind with which the act is done or omitted. Personal advancement [and] financial gain are two well recognized motives for much of human conduct. These motives may prompt one person to voluntary acts of good and others voluntary acts that are criminal. Good motive alone is never a defense where the act done or omitted constitutes a crime. So the motive of the accused is immaterial, except insofar as evidence of motive may aid in determining the state of mind or intent.

*United States v. Simpson*, 950 F.2d 1519, 1525 (10th Cir. 1991), *abrogated on other grounds by United States v. McBride*, 94 F.4th 1036, 1043 (10th Cir. 2024). Whether Payton Gendron was inspired by the actions of others to commit the Tops shooting is simply not relevant; what is arguably relevant is his motive, which he describes in detail throughout his manifesto and in his Discord G server posts.  Thus, whatever probative value this evidence might have is minimal and is substantially outweighed by the danger of unfair prejudice.

Admitting evidence of the other killers would invite jurors to view Payton Gendron not as an individual, but one among a group of mass killers.  In other words, it would improperly invite the jury to find Payton Gendron guilty by association. *See United States v. Zhong*, 26 F. 4th 536, 557-58 (2d Cir. 2022) ("The government . . . may not invite the jury to find guilt based on a defendant's associations") (citing *United States v. Cruz*, 981 F.2d 659, 663 (2d Cir. 1992) ("[G]uilt may not be inferred from the conduct of unrelated persons")).  It would require minitrials on their irrelevant crimes, causing an unnecessary distraction from the issues relevant to this case and a waste of time.  More importantly, it would be unfairly prejudicial because it would invite comparisons between the offenses those men committed, speculation about their mental health at the time of those crimes, and speculation about what happened to them, including sentences they might have received.

57

It also creates an unacceptable risk of jurors reaching their sentencing decisions based not just on the facts and circumstances of this case, but also the facts and circumstances of those other cases, or jurors using their sentencing decision in this case to send a message to others about the broader problems of racism and xenophobia.[25] This is patently improper. *See Sinisterra v. United States*, 600 F.3d 900, 910 (8th Cir. 2010) ("The prosecutor's arguments linking Sinisterra to the broader drug problems of the United States, telling the jury to act as the conscience of the community, and asking the jury to send a message with its verdict were improper. Such arguments impinge upon the jury's duty to make an individualized determination that death is the appropriate punishment for the defendant. … Similarly, the prosecution puts too significant a burden on a single defendant when it instructs the jury to act as the conscience of the community and send a message from one case to another.") (citations omitted); *Weaver v. Bowersox*, 438 F.3d 832, 841 (8th Cir. 2006) ("The argument that a signal must be sent from one case to affect other cases puts an improper burden on the defendant because it prevents an individual determination of the appropriateness of capital punishment. Further, invoking a jury's general fear of crime to encourage the application of the death penalty in a particular case is unfairly inflammatory.  Using the conscience of the community as a guiding principle for punishment puts too significant of a burden on a single defendant.") (citations omitted); *United States v. Runyon*, 707 F.3d 475, 514-15 (4th Cir. 2013) ("send a message" arguments improperly "invite[] [the jury] to play to an audience beyond the defendant [and] serve some larger social objective or to seek some broader social approval as well").

---

[25] As discussed in note 1, *supra*, Payton Gendron is not raising arguments related to the stricken aggravating factors given the pendency of the government's appeal.

Due process and the Eighth Amendment require that the government's evidence focus not on generalized wrongs but on Payton Gendron and his offense, in accordance with the requirement that capital juries make "a reasoned, individualized sentencing determination based on [the defendant's] record, personal characteristics, and the circumstances of his crime." *Kansas v. Marsh*, 548 U.S. 163, 173-74 (2006). A jury "may not hold the defendant responsible for the crimes of others." *United States v. Reliford*, 58 F.3d 247, 251 (6th Cir. 1995). This evidence is irrelevant and unfairly prejudicial and it must be excluded.

<u>Unnecessarily Cumulative and Inflammatory Racist Posts</u>

████████████████████████████████████████████. While evidence that Payton Gendron targeted Black people is clearly relevant, evidence of his ideological reasons for targeting them is far less so. The government has a mountain of evidence to prove that this was a racially motivated crime, a fact that is not disputed. ████████ ████████████████████████████████████████ ████████████



Ex. 4B-2K at 4.



*Id.* at 5.  Statements and memes reflecting the belief that Black people are replacing White people and that violence is necessary to protect White people from extinction are relevant as evidence of Payton Gendron's motive and intent.  However, other statements and memes denigrating Black people are simply evidence of abstract, racist beliefs that are not relevant and are protected by the First Amendment Free Speech Clause.  *See Dawson*, 503 U.S. at 167.  Evidence of these abstract beliefs serves no other purpose than "demonstrating that those beliefs, and by extension the defendant, are 'morally reprehensible.'" *Kane*, 452 F.3d at 1043. Because of how inflammatory many of the posts are, their admission also seriously threatens Payton Gendron's right to a fair trial and sentencing. *See Payne*, 501 U.S. at 825 (The Due Process Clause guards against situations when "evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair.").  They are very likely to have a "'strong emotional or inflammatory impact' that would "pose a risk of unfair prejudice because [it] 'tends to distract' the jury from the issues in the case and ... [might] arouse the jury's passions to a point where they would act irrationally in reaching a verdict." *Monsalvatge*, 850 F.3d at 495 (quoting *Robinson*, 560 F.2d at 514).

60



Ex. 4B-2K at 21-22.

███████ This entire section should be excluded.

<u>Discussions of Weapons or Armor Other Than What Payton Gendron Brought to Tops</u>

A large portion of the manifesto is devoted to discussions of weapons and gear Payton

Gendron researched in the months before the Tops shooting.  Ex. 4B-2K at 63-157.  It is virtually

the only original writing in the manifesto. While discussion of the weapons and gear he used in

the attack may be relevant to show planning and premeditation, this discussion is interspersed

with discussions of other weapons and gear that Payton Gendron did not use, buy, or even try out.  Discussions of these weapons and gear should be excluded as irrelevant. ███████████

████████████████████████████████████████████████████████████████████████

███████████ ████████████████████████████████████████████████████████

██████████████████████████████ [26]  Thus, they should also be excluded.

Musings About Post-Attack Events

Musings about what might transpire after Payton Gendron committed an attack are not relevant to the planning or execution of the shootings or his intent in committing the crimes charged. They are unfairly prejudicial because they wrongly suggest that Payton Gendron is ██████████████████████, which is likely to inflame jurors and encourage a death verdict based on emotion and disgust rather than reason.  *See, e.g.*, Ex. 4B-2K at 6 ████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████ █████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████  In addition to the reasons given

---

[26] As noted above, because of the pending appeal this Court lacks jurisdiction to consider arguments related to the stricken aggravators and thus Payton Gendron does not address them here. *See* footnote 1, *supra*.

[27] This was copied verbatim from the manifesto written by Brenton Tarrant. Ex. 4B-2R at 13.

above, this passage should be redacted because it invites speculation as to Payton Gendron's mindset when he pled guilty in state court.

**B. Discord "G" Server Transcript: Gov. Exhibits 4B-1A, 4B-1C to 4B-1G, 4B-1J to 4B-1M, 4B-1O, 1000A-1 to 1000A-15, 1700G-1 to G-3 and 1700G-16 to G18**

    1.  <u>Multiple Versions</u>

The government has also noticed its intent to introduce multiple versions and copies of "transcripts" of posts Payton Gendron made to his Discord G Server from November 18, 2021, through May 14, 2022.  Discord is a free, cloud-based platform that allows its users to communicate with each other via text, voice, and video. It started as a way for video gamers to share information but eventually grew to be popular with a variety of interest groups.  Users can create "servers," or communication hubs, that can either be public or private. A server is typically established to facilitate conversation about a particular topic of interest to its owner. Within a server, users can create multiple "channels" that members of the server can use to communicate about subtopics.

Discord users can make online posts to servers they control or have access to.  Those posts appear in date order as they are added to the server or responded to by other users.  The owner of a server can then download its contents to a word document, which will show the dates and times of individual posts in chronological order.  *See, e.g.*, Ex. 1000A-1.

In this case, Payton Gendron created a server (referred to herein as the "Discord G Server"), with multiple channels.  That server remained completely private until May 14, 2022, when he sent a post with links to the livestream, manifesto, and two files containing posts from the Discord server to approximately 66 individuals immediately before the shooting.  These documents were made available with links to document sharing platforms.

The government seeks to admit 11 copiesof the Discord G Server transcripts that were saved to the desktop computer seized from Payton Gendron's home[28] and 6 more seized from a Google Drive (Exhibits 1700G-1 to G-3 and 1700G-16 to G18), for a total of 17 copies.[29]  The version Payton Gendron posted on May 14, 2022, is found in two documents: Ex. 4B-1A (Post April 29th Discord Transcript.docx) and Ex. 4B1-C (April 29 and before.docx). *See* Ex. 1009C (May 14 post). These are the versions most relevant to this case. The fact that copies[30] were found on devices accessible to Payton Gendron might be relevant to confirm the ownership of the G server or the authorship of the posts, but neither of these issues is in dispute.    This minimal probative value is substantially outweighed by the dangers of needlessly presenting cumulative evidence and confusing the jury.  *See* Fed. R. Evid. 403.

Posts contained within the Discord G Server transcript will be key pieces of evidence for both sides and will be the subject of much testimony and argument.  The two files Payton linked in his May 14, 2022, post, are nearly 700-pages long combined.  Admitting multiple versions of the transcript risks confusing the jury as to which document they should refer when considering the content and the parties' arguments with respect to it.  Additionally, the introduction of only one version from the devices will ensure that any posts this Court excludes will not be shown to

---

[28] Exhibit 4B-1A is entitled "Post April 29th Discord Transcript.docx", Exhibit 4B-1C is entitled, "April 29 and before.docx", and Exhibits 4B-1D to 4B-1G, 4B-1J to 4B-1M, 4B-1O are entitled "Discord Transcript real.docx" with some file names including a number (1-7) in parenthesis before the period.

[29] It also seeks to introduce version obtained from the internet platform Discord (Exhibits 1000A-1 to -15). Although it is incomplete, that exhibit contains posts from May 13-14, 2022, that are not found in the other versions.

[30] Exhibit 1700-G2 and 1700-G16 are duplicative of Exhibit 4B-1A. Exhibits 4B-1D through -1K, 4B-1M, 4B-1O, 1700-G1, 1700-G3, 1700-G17, and 1700-G18 are duplicative of Exhibit 4B-1C.

the jury.  For these reasons, the government should only be allowed to introduce one version and the others found on the devices should be excluded.

The Discord G Server includes over 5,000 individual posts from November 2021 to mid-May 2022, which combined total 672- to 780-pages of transcript, depending on the formatting. While many posts are arguably relevant, many others are not or their probative value is substantially outweighed by one or more of the dangers enumerated in Fed. R. Evid. 403.  All the posts are protected by the First Amendment Free Speech Clause, and in ruling on the challenges raised herein, this Court must guard against violation of Payton Gendron's First Amendment rights by admission of evidence proving "nothing more than … abstract beliefs."  *Dawson*, 503 U.S. at 167.

The posts cover a wide range of topics unrelated to the crimes charged, including, among many other things, thoughts about:



None of these topics are probative of the planning, preparation, or execution of the Tops shooting and thus posts addressing them are inadmissible.  Fed. R. Evid. 402. Discussions of these topics are evidence of "nothing more than … abstract beliefs" protected by the First Amendment Free Speech Clause. *Dawson*, 503 U.S. at 167.

Redaction is necessary to ensure the jury is allowed to consider only probative content while also safeguarding against unfair prejudice or violations of the First Amendment. The government should only be allowed to present relevant posts, and, if it seeks to use the transcripts identified on its exhibit list, all irrelevant posts should be redacted.

In addition to this general objection to the admission of irrelevant, First Amendment protected posts, Payton Gendron asks the Court to exclude all posts falling within the following categories:

2. █████████████████████████████████
████████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
██████████████████████████████████
█████████████████████████████
████████████████████████████
█████████████████████████████████
█████████████████████████████████
████████████████████████████
██████████████████████████████████



4B-1C at 520 (04/25/2022).[31]  These posts are not relevant to the charges in this case, and, as repugnant as they are, protected by the First Amendment Free Speech Clause.

The Indictment charges Payton Gendron with offenses committed because of the victims' actual or perceived race or color, to wit: "Black people."  ECF No. 6.  His beliefs or feelings about any other group of people have no probative value with respect to any aspect of the planning or execution of the shooting or his intent in committing the crimes charged.  Fed. R. Evid. 401 (evidence is relevant only if has a tendency "to make a fact more or less probable than it would be without the evidence; and … the fact is of consequence in determining the action.").  If anything, this evidence is proof of "nothing more than … abstract beliefs" and should be excluded on that ground.  *See Dawson*, 503 U.S. at 167.

---

[31] As noted above, Payton Gendron did not create any of the images or memes included in this motion although he did repost them to his Discord channel.

Even if the evidence had probative value (which it doesn't), it would be substantially outweighed by the danger of unfair prejudice. Admission of this evidence impermissibly invites jurors to convict and sentence Payton not because of what he did, but because of the offensiveness of his beliefs. The evidence falling into this category is likely to have a "'strong emotional or inflammatory impact' that would "pose a risk of unfair prejudice because [it] 'tends to distract' the jury from the issues in the case and ... [might] arouse the jury's passions to a point where they would act irrationally in reaching a verdict." *Monsalvatge*, 850 F.3d at 495 (quoting *Robinson*, 560 F.2d at 514). The evidence invites the jury to condemn Payton ████████████ ████████ rather than his specific intent towards Black people ████████████████ ████████████████████████████████████████ ████████████████████████████████████████ .

These posts are extremely inflammatory. ████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████

68



Ex. 4B-1C at 329 (03/13/2022).



"Although a given piece of evidence may be relevant in many ways, the government may

not offer proof of a defendant's 'abstract beliefs' merely for the purpose of demonstrating that

those beliefs, and by extension the defendant, are 'morally reprehensible.'" *Kane*, 452 F.3d at 1043. Payton Gendron's thoughts and opinions about groups of people other than Black people are quintessential abstract beliefs protected by the First Amendment Free Speech Clause and their introduction in this case would do nothing more than impermissibly inflame the passions of the jury. *See Payne*, 501 U.S. at 825 (Due Process Clause prohibits admission of evidence that "is so unduly prejudicial that it renders the trial fundamentally unfair."). They should be excluded.

3.

These statements have no probative value with respect to any aspect of the planning or execution of the shooting or Payton Gendron's intent in committing the crimes charged, and, as offensive as they are, they are protected by the First Amendment Free Speech Clause. *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969), makes it clear that the First Amendment

protects speech that advocates violence, so long as the speech is not directed to inciting or producing imminent lawless action and is not likely to incite or produce such action. These posts fall squarely within that protection.



. There is no need for this evidence, much less a clear one, and it should be excluded.[32]

    4.   Consideration of Targets Other Than the Tops Market on Jefferson Street



While this Court has indicated its inclination to admit general evidence that Payton considered other locations while planning the Tops shooting, it has also indicated its intent to exclude the names of the places he considered. *See* Trans. of June 17, 2025, Hearing at 26 ("I really do think that there's no reason that you need to get into the names of the other places. And -- and my -- I'm not casting -- any -- I'm -- as I've said many times, I'm good at second guessing myself. But my -- so I will not make that ruling today as a definitive ruling. But I can tell you I'm strongly inclined to allow you to get into the details of the planning but not to name the places."); *see also* ECF No. 464 at 7. That inclination is correct. Even

---

[32] Given the pendency of the government's appeal, Payton Gendron does not address here the impact of this evidence on the stricken aggravating factors. *See* note 1, *supra*.

assuming evidence that he considered alternative locations is probative of his planning and

premeditation for the crimes he ultimately committed at the Tops Supermarket, that probative

value is very low. The government has a wealth of evidence to show that Payton Gendron

planned and premeditated the Tops shooting independent of the evidence related to other places

he considered but rejected.  Given that, the identity of the other locations he considered has no

probative value.  Fed. R. Evid. 401. Worse, evidence of the names of those locations is unfairly

prejudicial because, as the Court noted, it could "resonate" with jurors who have a connection to

those locations and invite speculation about what might have happened had Payton Gendron

selected a different location in Buffalo or a different city altogether, and ██████████

████████████████████████████    *See* Fed. R. Evid. 403; *see also* Trans. of

June 17, 2025, Hearing at 23 ("[L]et's say he considered a -- a city in which one of these folks

had relatives living. What -- and, obviously, that's gonna be something that resonates with that --

with that person. Why does the fact that it is Milwaukee or Detroit or Cle -- why does that matter

whether it's Milwaukee or Detroit or Cleveland? He considered other places.").

██████████████████████████████████

████████████████████████████████████

███████████████████████████████████

██████████████████████████████

████████████████████████████████████

███████████████████████████████████

██████████████████████████████

████████████████████████████████████

████████████████████████████

███████████████████  That Payton Gendron considered but rejected these emotionally evocative locations has no probative value with respect to the planning or execution of the Tops shooting or his intent in committing the crimes charged.  But the unfair prejudice of this evidence is overwhelming and clear.

5.  References to Others Who Committed Ideologically Motivated or Racist Crimes

The G Server posts also include statements expressing admiration or sympathy for the following people who committed ideologically motivated or racist murders:





Other than arguably Brenton Tarrant, the references to these killers are not probative of

any "fact of consequence" in determining whether Payton Gendron is guilty of the crimes

---

[33] Much of Payton Gendron's manifesto was copied from Brenton Tarrant's.

[34] In addition to appearing in the Discord G Server posts, ███████████████████ ███████████████████████████████ were written on the gun Payton Gendron used during the shooting at the Tops store. As discussed infra, while the gun is clearly relevant evidence, any explanations of the names written on that gun should be prohibited under Fed. R. Evid. 403.

charged. *See* Fed. R. Evid. 401. While this evidence shows they may have served as an inspiration for Payton's actions, as discussed above, inspiration is different from legally relevant concepts such as motive or intent. It is an abstract concept, and one that falls squarely within the protections of the First Amendment. "It is now well established that the Constitution protects the right to receive information and ideas . . . This right to receive information and ideas, regardless of their social worth, is fundamental to our free society." *Stanley*, 394 U.S. at 564 (internal citations omitted). While evidence of speech may, under some circumstances, be used when relevant "to establish the elements of a crime or to prove motive or intent," *Mitchell*, 508 U.S. at 489, the admission of evidence that proves nothing more than a defendant's "abstract beliefs" violates the First Amendment. *Dawson*, 503 U.S. at 167.

Whether Payton Gendron was inspired by the actions of others to commit the Tops shooting is simply not relevant; what is arguably relevant is his motive, which he describes in detail throughout his manifesto and the Discord G server posts. Moreover, even if this evidence was probative of a fact in issue, that value is minimal and is substantially outweighed by the danger of unfair prejudice.

Admitting this evidence would invite jurors to view Payton Gendron not as an individual, but one among a group of mass killers. In other words, it would improperly invite the jury to find Payton Gendron guilty by association. *See Zhong*, 26 F. 4th at 557-58 ("The government . . . may not invite the jury to find guilt based on a defendant's associations").

It also creates an unacceptable risk of jurors reaching their sentencing decisions based not just on the facts and circumstances of this case, but also the facts and circumstances of those other cases, or jurors using their sentencing decision in this case to send a message to others

about the broader problems of racism and xenophobia.[35] This is patently improper. *See*

*Sinisterra*, 600 F.3d at 910 ("The prosecutor's arguments linking Sinisterra to the broader drug

problems of the United States, telling the jury to act as the conscience of the community, and

asking the jury to send a message with its verdict were improper. Such arguments impinge upon

the jury's duty to make an individualized determination that death is the appropriate punishment

for the defendant. … Similarly, the prosecution puts too significant a burden on a single

defendant when it instructs the jury to act as the conscience of the community and send a

message from one case to another.") (citations omitted); *Weaver*, 438 F.3d at 841 ("The argument

that a signal must be sent from one case to affect other cases puts an improper burden on the

defendant because it prevents an individual determination of the appropriateness of capital

punishment. Further, invoking a jury's general fear of crime to encourage the application of the

death penalty in a particular case is unfairly inflammatory.  Using the conscience of the

community as a guiding principle for punishment puts too significant of a burden on a single

defendant.") (citations omitted).

Due process and the Eighth Amendment require that the government's evidence focus not

on generalized wrongs but on Payton Gendron and his offense, in accordance with the

requirement that capital juries make "a reasoned, individualized sentencing determination based

on [the defendant's] record, personal characteristics, and the circumstances of his crime." *Marsh*,

548 U.S. at 173-74. A jury "may not hold the defendant responsible for the crimes of others."

*Reliford*, 58 F.3d at 251.  This evidence is irrelevant and unfairly prejudicial and it must be

excluded.

---

[35] As discussed in note 1, *supra*, Payton Gendron is not raising penalty phase arguments
impacted by the  pending appeal.

6.    Unnecessarily Cumulative and Inflammatory Racist Posts

████████████████████████████████████████████████████████████ .

While evidence that Payton Gendron targeted Black people is clearly relevant, evidence of his

ideological reasons for targeting them is far less so.  The government has a mountain of evidence

to prove that this was a racially motivated crime, a fact that is not disputed.  ███████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████ "The Supreme

Court has stated… that 'what counts as the Rule 403 'probative value' of an item of evidence ...

may be calculated by comparing evidentiary alternatives.'" *Al-Moayad*, 545 F.3d at 160 (quoting

*Old Chief* , 519 U.S. at 185); *see also Awadallah*, 436 F.3d at 132 ("Probative value is also

informed by the availability of alternative means to present similar evidence.").  With so much

direct evidence at its disposal, the government should not be allowed to admit unfairly

prejudicial and tangential evidence to prove what is ultimately an undisputed point.

Given that, the government should not be permitted to admit every racist or bigoted post

about Black people that Payton made or reposted to his G Server. The Court should order the

78

government to identify which posts it believes are most relevant, allow Payton Gendron to lodge specific objections, if any, to those posts,[36] and exclude the rest.

Additionally, as discussed above, there is a wealth of evidence of Payton's racist motive in committing the crimes charged: he believed Black people were replacing White people, threatening the extinction of the White race.  Many of the Discord G Server posts speak to this belief.  ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████

Other posts make clear Payton Gendron committed his crimes against Black people because he believed it was necessary to protect White people from extinction.  ████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

---

[36] So many of the posts made to the Discord G Server fall within this category that is not feasible to address them all here.





Posts like these are arguably relevant to prove Payton Gendron's motive and intent, although there is a point at which these posts become cumulative, lose probative value, and become substantially outweighed by the dangers of undue prejudice and needlessly

81

presenting cumulative evidence. *See United States v. Cunningham*, 694 F.3d 372, 389–90 (3d

Cir. 2012) ("Even though the two sets of videos were probative, however, the law of diminishing

marginal returns still operates. The probative value of each clip was reduced by the existence of

the clips before it. Once one video excerpt from each of the two videos was shown, the fact being

proven—i.e., that the person distributing, receiving, and possessing that pornography would

know that it contained images of real minors engaging in sexually explicit activity—may well

have been established. As a result, after one excerpt from each video was displayed, the

probative value of the remaining excerpts became diminished...").

However, the Discord G Server also contains a multitude of posts that are not probative

of Payton's motive, but are simply evidence of abstract, racist beliefs protected by the First

Amendment Free Speech Clause.  At the hearing on Payton Gendron's Motion to Strike

Aggravating Factors, this Court recognized that while some of Payton Gendron's racist writings

would be admissible, the government shouldn't be permitted to put "in every single racist

comment he ever made. We're gonna start getting duplicative and unnecessarily so."  Trans. of

June 17, 2025, Hearing, at 32.  The Court noted that in determining which writings were

admissible or inadmissibl*e* "the question is ... where is the line drawn."  *Id*.  The line should be

drawn between the kind of posts described above—bearing on the fear of white replacement and

genocide—and other racist posts that serve no purpose other than "demonstrating that those

beliefs, and by extension the defendant, are 'morally reprehensible.'" *Kane*, 452 F.3d at 1043.

Because of how inflammatory many of the posts are, their admission seriously threatens

Payton Gendron's right to a fair trial and sentencing. *See Payne*, 501 U.S. at 825 (The Due

Process Clause guards against situations when "evidence is introduced that is so unduly

prejudicial that it renders the trial fundamentally unfair.").  Whatever probative value these posts

may have, if any, is substantially outweighed by the danger of unfair prejudice.  They are very

likely to have a "'strong emotional or inflammatory impact' that would "pose a risk of unfair

prejudice because [it] 'tends to distract' the jury from the issues in the case and ... [might] arouse

the jury's passions to a point where they would act irrationally in reaching a verdict."

*Monsalvatge*, 850 F.3d at 495 (citation omitted).

These inadmissible posts fall into two general categories. ████████████████

████████████████████████████████████████████████████████

██████ ███████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

84









---

[37] Payton Gendron did not author this post or the next one but copied them from the internet.

[38] This post was also copied from 4Chan.





These are only a few of the racist posts found on the Discord G Server.  As with the video evidence discussed above, the avalanche of racist posts the government seeks to admit are likely to overwhelm and even traumatize jurors.  Because they are not relevant, protected by the First Amendment, and/or unfairly prejudicial, all posts falling into these two categories should be excluded.

7.   Discussions of Weapons or Armor Other Than What Payton Gendron Brought to Tops

Like the manifesto discussed above, the Discord G Server includes posts about weapons Payton Gendron did not own and, more importantly, did not use or carry on May 14, 2022. Payton had an interest in guns long before he began planning the Tops shooting.  It began when he went hunting with his uncle, and his parents eventually bought him a rifle for that purpose. He also collected WWII and other military gear as a hobby. Payton's interests in, desires for, or recommendations of different weapons or gear than he used to commit his offense are not relevant to the planning or execution of the Tops shooting. At the same time, they are unfairly prejudicial and create serious risks of confusing the issues, misleading the jury, and needlessly presenting cumulative evidence.  Moreover, they are protected by the First Amendment.



████████████████████████████████████████

████████████████████ Posts like these should be excluded.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

Payton's possession of the hunting rifle was perfectly legal and unconnected to the planning or execution of the crimes with which he is charged. His legal possession and use of that weapon is protected by the Second Amendment and possession of the video is protected by the First Amendment Free Speech Clause.

        8.   Musings About Post-Attack Events

The transcript includes musings about what might transpire after Payton Gendron committed an attack. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████ The Court has said it is inclined to exclude this evidence. *See* Trans. of June 17, 2025, Hearing at 35 (expressing skepticism at government's argument that musings about post-attack events were relevant to the substantial planning aggravator: "Yeah. I'm not so sure it is. And I think that that likely is prejudicial. But, again, we'll cross that bridge when we come to it."); ECF No. 464 at 7. Again, the Court's inclination is correct. Such musings are not relevant to the planning or execution of the shootings or Payton's intent in committing the crimes charged. They are also unfairly prejudicial and likely to inflame jurors and encourage a death verdict based on emotion and disgust rather than reason—the exact kind of capricious and

arbitrary action the Constitution forbids. *See generally Lewis v. Jeffers*, 497 U.S. 764, 774 (1990) (The Fifth, Sixth, and Eighth Amendments of the Constitution require that a capital sentencing scheme suitably direct and limit a sentencing jury's discretion "so as to minimize the risk of wholly arbitrary and capricious action.").

Statements like this one incorrectly suggest that Payton Gendron is indifferent to the severity of a life sentence and may encourage the jurors to vote for death on that basis, which would be improper and in violation of the Eighth Amendment. *See, e.g., Bland v. Sirmons*, 459 F.3d 999, 1027 (10th Cir. 2006) (condemning prosecutor's statement "[m]aybe the Defendant will be in prison, maybe he will be behind that concrete and those jail bars with his T.V. and his cable and good food" as "making light of the penalty of life in prison to demonstrate that the only proper punishment for a defendant's crime was death"); *United States v. Johnson*, 713 F. Supp. 2d 595, 631 (E.D. La. 2010) (granting motion for new sentencing hearing in federal capital prosecution in part based on government's argument that "[defense counsel] essentially asks you to send [the defendant] to his room where he gets privileges, three squares, and the ability to have visitors. The only visitors that [the victim] will have come to his grave site"). Thus, any probative value this category of posts have is substantially outweighed by the danger of unfair prejudice.

███████████

█████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████ It has no probative value with respect to any aspect of the planning or execution of the shooting and is,

therefore, inadmissible under Fed. R. Evid. 402.  It is also incredibly prejudicial. ███████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████████ It should be excluded.

### 9.   Miscellaneous Categories

In addition to the categories discussed above, there are many other posts that should be excluded because they are irrelevant, unfairly prejudicial, and protected by the First Amendment. They include:

- [39]

- ███████████████████████████████████████

- ██████████[40]██████████████████████████

---

[39] This post should also be excluded on the ground it contains abstract, racist beliefs that are irrelevant and protected by the First Amendment Free Speech Clause.

[40] The admission of these ██████████ would confuse the issues and potentially mislead the jury. Fed R. Evid. 402, 403. Jurors would be invited to speculate about the meaning ██████████ ██████████ particularly in evaluating Payton Gendron's mens rea at the time of the offense.

███████ None of ████████████████ are relevant, and they are protected by the First Amendment Free Speech Clause.

- ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

## V.    MOTIONS IN LIMINE RELATED TO ELECTRONIC DEVICES

### A.  Motion In Limine To Preclude Inadmissible Evidence Seized from iPhone 11

Following his arrest in this case, law enforcement seized an iPhone 11 from Payton

Gendron's person and subsequently seized vast amounts of data from that iPhone 11 pursuant to

a search and seizure warrant. [41] In its Exhibit List, Sealed ECF No. 483 at 3-13, and subsequent

amendments, the government has announced its intention to use certain portions of this

information at trial, including items that are inadmissible and should be excluded.

### 2C – FBI FD-302 Summarizing Findings from Black Apple iPhone 11 [42]

The government seeks to introduce an FBI FD-302 report, authored on August 18, 2022,

by SA Christopher Dlugokinski. This report is inadmissible hearsay as it consists entirely of out-

of-court statements by SA Dlugokinski that have no relevance to the proceedings other than for

the truth of the matters asserted. The document is a summary of the FBI's searches of the data

extracted from the iPhone and of data that was seized. To the extent that it contains information

---

[41] The government has marked a copy of the search warrant that was issued for Payton
Gendron's google account as an exhibit at trial. *See* Gov. Ex. 2A. The government has separately
confirmed that this and all the warrants listed (see Gov. Exs. 4-1, 77B, 1000, 1100, 1400, 1600,
1700, as well as the EDRs (*see* Gov Ex. 1300), and the grand jury subpoenas (*see* _Gov. Exs.
1500 and 1800), have been marked for purposes of identification only. The government advises
they do not intend to introduce these exhibits and that they do not intend to place them into
evidence unless they are put at issue . Accordingly, we have not addressed the issues regarding
admissibility of these exhibits herein.

Payton Gendron continues to assert that the search and seizure of data from his iPhone 11 was
unlawful for all of the reasons set forth in his Motion to Suppress Evidence Seized from iPhone,
*see* ECF No. 380, and Reply to the government's Response thereto, *see* ECF No. 436.

[42] No. 2B on the government's Exhibit List is entitled "Derivative Evidence from Black Apple
iPhone 11." Following conversations with the government, we understand that this "umbrella"
exhibit will be used for identification purposes only and that the government will not seek to
introduce its contents as evidence.

outside of the personal knowledge of SA Dlugokinski himself, e.g., "[i]n July, 2022, FBI accessed and imaged the contents of Payton Gendron's iPhone 11and uploaded to FBI systems for access and review," "Gendron obtained a new iPhone in mid-March," the report is double hearsay.

Additionally, the report references the existence of a great deal of data recovered from the iPhone that the government is not seeking to introduce at trial. ██████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████ This information is not only irrelevant, it is also potentially prejudicial because it unnecessarily invites speculation by jurors as to the contents of those items that are not placed into evidence.

The report also states that law enforcement extracted ███████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

████████ The government apparently - and quite correctly - does not seek to present any of this irrelevant and highly prejudicial material at trial. The injection of the issues into evidence by way of Ex. 2C is thus obviously improper.

The report goes on to summarize the content of notes that were extracted from the iPhone. This summary is entirely cumulative of Ex. 2AA, which itself purports to be a summary of data found in the Notes application on the iPhone. Additional objections to the contents of

portions of the notes themselves that is included in the summary in the report are addressed in connection with Ex. 2AA, *infra*, and incorporated by reference. The report also includes a brief summary of the Web History recovered; again, the summary is cumulative of a separate exhibit, Ex. 2X, and objections to specific portions are addressed in connection with the exhibit itself, *infra*.

Finally, the report states that 134 documents were extracted from the iPhone, none of which the government seeks to introduce at trial. The titles of two of those documents are included in the report in full. ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████ These documents are wholly irrelevant to the charges against Payton Gendron, potentially unfairly prejudicial and their possession is protected by the First Amendment Free Speech Clause.

### 2D – Report of Examination Summarizing Extraction of Black Apple iPhone 11

The government seeks to introduce a Report of Examination authored on October 16, 2022, by FBI Digital Forensic Examiner Bryan Jordan, regarding his extraction of data from the Black iPhone 11. This report is inadmissible hearsay. It also contains irrelevant and potentially prejudicial information, including a description of unsuccessful efforts to use brute force methods to obtain the passcode for the device. This information lacks any probative value and risks inviting the jury to engage in speculate regarding additional data that may have been stored on the iPhone.

### 2G – Discord Chat 5 from Black iPhone 11

96

The government seeks to introduce a Discord group chat seized from the iPhone involving a group of 12 people, including Payton Gendron's username, ███████████. The final post is the post with links to the livestream, manifesto and Discord G server and transcript that Payton Gendron sent to approximately 66 individuals immediately before the attack. However, it also includes messages posted by different members of the group over the preceding days, beginning on April 25, 2022. Payton was not a part of any of those discussions, and they plainly have nothing to do with the motive, planning or execution of the crimes with which he is charged. None of the individuals in the chat group will testify at trial according to the government's witness list. All content except for the ███████████ post on May 14, 2022, should therefore be excluded as irrelevant and protected by the First Amendment Free Association and Free Speech Clauses.

### 2I – Discord Chat 8 from Black iPhone 11

The government seeks to introduce a Discord group chat seized from the iPhone involving a group of eight people, including Payton Gendron's username, ███████████. The final post is the post with links to the livestream, manifesto and Discord G server and transcript that Payton Gendron sent to approximately 66 individuals immediately before the attack. However, it also includes messages posted by different members of the group earlier in the day, all of which appear to pertain to online personality and IQ tests that certain members of the group had taken. Payton was not a part of any of those discussions, and they plainly have nothing to do with the motive, planning or execution of the crimes with which he is charged.

Additionally, some of the messages are unfairly prejudicial in that they might be construed by the jury – incorrectly – to be comments about race, ████████████████████ ████████████████████████████████████████████████████████, *id.*

███████████████████████████████████████████████████

████████████████████████████████████ None of the

individuals in the chat group will testify at trial according to the government's witness list. All

content except for the ██████████ post on May 14, 2022, should therefore be excluded as

irrelevant and protected by the First Amendment Free Association and Free Speech Clauses.

### 2J – Discord Chat 9 from Black iPhone 11

The government seeks to introduce a Discord group chat seized from the iPhone

involving a group of 12 people, including Payton Gendron's username, ██████████. The

final post is the post with links to the livestream, manifesto and Discord G server and transcript

that Payton Gendron sent to approximately 66 individuals immediately before the attack.

However, it also includes messages posted by different members of the group earlier in the day

and the day before. Payton was not a part of any of those discussions, and they plainly have

nothing to do with the motive, planning or execution of the crimes with which he is charged.

Additionally, many of the messages are unfairly prejudicial in that they contain links to

additional content that is not included in the Exhibit and may invite the jury to engage in

improper speculation regarding the subject matter of that content. None of the individuals in the

chat group will testify at trial according to the government's witness list. All content except for

the ██████████ post on May 14, 2022, should therefore be excluded as irrelevant and

protected by the First Amendment Free Association and Free Speech Clauses.

### 2K – Discord Chat 10 from Black iPhone 11

The government seeks to introduce a Discord group chat seized from the iPhone

involving a group of 10 people, including Payton Gendron's username, ██████████. The

final post is the post with links to the livestream, manifesto and Discord G server and transcript

that Payton Gendron sent to approximately 66 individuals immediately before the attack. However, it also includes messages posted by different members of the group earlier in the day and the day before. Payton was not a part of any of those discussions, and they plainly have nothing to do with the motive, planning or execution of the crimes with which he is charged.

Additionally, some of the messages are unfairly prejudicial in that they might be construed by the jury to be misogynistic, ███████████████████████████████ ███████████████████████████████████████████ racist, *id.* ██████████████ and sexually explicit, *id.* ██████████████████████████ ████████████████████████████████████████ None of the individuals in the chat group will testify at trial according to the government's witness list. All content except for the ███████████ post on May 14, 2022, should therefore be excluded as irrelevant and protected by the First Amendment Free Association and Free Speech Clauses.

### 2L – Discord Chat 11 from Black iPhone 11

The government seeks to introduce a Discord group chat seized from the iPhone involving a group of 11 people, including Payton Gendron's username, ███████████. The final post is the post with links to the livestream, manifesto and Discord G server and transcript that Payton Gendron sent to approximately 66 individuals immediately before the attack. However, it also includes messages posted by different members of the group earlier in the day. Payton was not a part of any of those discussions, and they plainly have nothing to do with the motive, planning or execution of the crimes with which he is charged.

Additionally, some of the messages are unfairly prejudicial in that they might be construed by the jury to be comments about religion, *see* Ex. 2I ████████████████████ ███████████████████████████████████████████████



and race, *id.*

None of the individuals in

the chat group will testify at trial according to the government's witness list. All content except

for the ▮▮▮▮▮▮▮▮ post on May 14, 2022, should therefore be excluded as irrelevant and

protected by the First Amendment Free Association and Free Speech Clauses.

### 2M – Discord Chat 13 from Black iPhone 11

The government seeks to introduce a Discord group chat seized from the iPhone

involving a group of six people, including Payton Gendron's username, ▮▮▮▮▮▮▮▮. The

final post is the post with links to the livestream, manifesto and Discord G server and transcript

that Payton Gendron sent to approximately 66 individuals immediately before the attack.

However, it also includes messages posted by different members of the group starting on May

12, 2022. Payton was not a part of any of those discussions, and they plainly have nothing to do

with the motive, planning or execution of the crimes with which he is charged.

Additionally, many of the messages are unfairly prejudicial in that they contain links to

additional content that is not included in the Exhibit and may invite the jury to engage in

improper speculation regarding the subject matter of that content. None of the individuals in the

chat group will testify at trial according to the government's witness list. All content except for

the ▮▮▮▮▮▮▮▮ post on May 14, 2022, should therefore be excluded as irrelevant and

protected by the First Amendment Free Association and Free Speech Clauses.

### 2N – Discord Chat 14 from Black iPhone 11

The government seeks to introduce a Discord group chat seized from the iPhone involving a group of five people, including Payton Gendron's username, ███████████. The final post is the post with links to the livestream, manifesto and Discord G server and transcript that Payton Gendron sent to approximately 66 individuals immediately before the attack. However, it also includes messages posted by different members of the group earlier in the day that appear to be about firearms accessories. Payton was not a part of any of those discussions, and they plainly have nothing to do with the motive, planning or execution of the crimes with which he is charged. None of the individuals in the chat group will testify at trial according to the government's witness list. All content except for the ███████████ post on May 14, 2022, should therefore be excluded as irrelevant and protected by the First Amendment Free Association and Free Speech Clauses.

**2O – Discord Chat 15 from Black iPhone 11**

The government seeks to introduce a Discord group chat seized from the iPhone involving a group of eight people, including Payton Gendron's username, ███████████. The final post is the post with links to the livestream, manifesto and Discord G server and transcript that Payton Gendron sent to approximately 66 individuals immediately before the attack. However, it also includes messages posted by different members of the group earlier in the day. Payton was not a part of any of those discussions, and they plainly have nothing to do with the motive, planning or execution of the crimes with which he is charged.

Additionally, many of the messages are unfairly prejudicial. In numerous instances they contain links to additional content that is not included in the Exhibit and may invite the jury to engage in improper speculation regarding the subject matter of that content. One such link contains the phrase ███████████ *See* Ex. 20. ███████████████████



; jurors who are familiar with the site will recognize the url. Additionally, one post, ███████████████████████████████████████████ ████████████████████████████████████████ ███████████████ ██████████ and ████████████████ and calls the White House press secretary ████ ██████████ *Id.* It also contains a link to ████████████████████████████████████ journalism website.

None of the individuals in the chat group will testify at trial according to the government's witness list. All content except for the ████████████ post on May 14, 2022, should therefore be excluded as irrelevant and protected by the First Amendment Free Association and Free Speech Clauses.

### 2P – Discord Chat 16 from Black iPhone 11

The government seeks to introduce a Discord message exchange between Payton Gendron's username, ████████████, and an individual whose username is ████████████ ██████ The exchange takes place on March 7, 2022, and appears to be about New York state gun laws. The exchange has nothing to do with the motive, planning or execution of the crimes with which Payton Gendron is charged. The Exhibit should therefore be excluded as irrelevant and protected by the First Amendment Free Association and Free Speech Clauses.

### 2Q – Discord Chat 17 from Black iPhone 11

The government seeks to introduce a Discord message exchange between Payton Gendron's username, ████████████, and an individual whose username is ████████████ ██████. The final post is the post with links to the livestream, manifesto and Discord G server and transcript that Payton Gendron sent to approximately 66 individuals immediately before the attack. However, it also includes an exchange of messages between the two dated March 20,

2022, that appears to be about vintage World War II rifle ammunition. The exchange has nothing to do with the motive, planning or execution of the crimes with which Payton Gendron is charged. Additionally, the Exhibit includes unfairly prejudicial material. ██████████



*See* Ex. 2Q. All content except for the ██████ post on May 14, 2022, should therefore be excluded as irrelevant, prejudicial and protected by the First Amendment Free Association and Free Speech Clauses.

### 2R – Discord Chat 18 from Black iPhone 11

The government seeks to introduce a Discord message exchange between Payton Gendron's username, ██████████, and an individual whose username is ██████████. The final post is the post with links to the livestream, manifesto and Discord G server and transcript that Payton Gendron sent to approximately 66 individuals immediately before the attack. However, it also includes an exchange of messages between the two dated June 1, 2021, years before there is any evidence that Payton Gendon began conceiving of or planning the attack. The exchange appears to concern ██████. The exchange has nothing to do with the motive, planning or execution of the crimes with which Payton Gendron is charged. Additionally, the Exhibit includes unfairly prejudicial material, including the discussion of ██████ unrelated to the Tops shooting. *See* Ex. 2R. All content except for the ██████ post on May 14, 2022, should therefore be excluded as irrelevant, prejudicial and protected by the First Amendment Free Association and Free Speech Clauses.

### 2T – Discord Chat 21 from Black iPhone 11

The government seeks to introduce a Discord message exchange between Payton Gendron's username, ▮▮▮▮▮▮▮▮, and an individual whose username is ▮▮▮▮▮▮▮. The final post is the post with links to the livestream, manifesto and Discord G server and transcript that Payton Gendron sent to approximately 66 individuals immediately before the attack. However, it also includes an exchange of messages between the two dated April 27, 2022, which appears to be about ▮▮▮▮▮▮▮ The exchange has nothing to do with the motive, planning or execution of the crimes with which Payton Gendron is charged. All content except for the ▮▮▮▮▮▮▮ post on May 14, 2022, should therefore be excluded as irrelevant and protected by the First Amendment Free Association and Free Speech Clauses.

### 2U – Discord Chat 22 from Black iPhone 11

The government seeks to introduce a Discord message exchange between Payton Gendron's username, ▮▮▮▮▮▮▮▮, and an individual whose username is ▮▮▮▮▮▮▮ The final post is the post with links to the livestream, manifesto and Discord G server and transcript that Payton Gendron sent to approximately 66 individuals immediately before the attack. However, it also includes an unrelated exchange of messages between the two dated April 29, 2022. The exchange has nothing to do with the motive, planning or execution of the crimes with which Payton Gendron is charged. All content except for the ▮▮▮▮▮▮▮ post on May 14, 2022, should therefore be excluded as irrelevant and protected by the First Amendment Free Association and Free Speech Clauses.

### 2V – Discord Chat 24 from Black iPhone 11

The government seeks to introduce a Discord message exchange between Payton Gendron's username, ▮▮▮▮▮▮▮▮, and an individual whose username is ▮▮▮▮▮▮▮ ▮▮▮▮ The final post is the post with links to the livestream, manifesto and Discord G server and

transcript that Payton Gendron sent to approximately 66 individuals immediately before the attack. However, the Exhibit also includes an unrelated exchange of messages between the two dated May 6, 2022. The exchange has nothing to do with the motive, planning or execution of the crimes with which Payton Gendron is charged. All content except for the ████████ post on May 14, 2022, should therefore be excluded as irrelevant and protected by the First Amendment Free Association and Free Speech Clauses.

**2W-1 – 2W-124 – Photos From Black iPhone 11**

Exhibits 2W-1 through 2W-124 are a collection of 124 image files extracted and selected by law enforcement that purport to be images that were stored in Payton Gendron's iPhone.[43] Of these 124 images, Payton Gendron moves to exclude the following:

2W-12 – this image is a duplicate of the image marked 2W-5; it is therefore cumulative under Fed. R. Evid. 403.

2W-15 – this image, of boxes of ammunition and what appears to be an online order slip, likely originated somewhere on the internet. The order number and shipping address on the order slip are pixelated out. The image's creator is unknown. The image is therefore irrelevant to the issues in the case.

2W-16 – this image is a duplicate of the image marked 2W-13; it is therefore cumulative under Fed. R. Evid. 403.

2W-21 – this image is a duplicate of the image marked 2W-3; it is therefore cumulative under Fed. R. Evid. 403.

---

[43] No. 2W on the government's Exhibit List is entitled "Photos from Black iPhone 11." Following conversations with the government, we understand that this "umbrella" exhibit will be used for identification purposes only and that the government will not seek to introduce its contents as evidence.

2W-22 – this image is a photograph of Payton Gendron's legal Savage Axis hunting rifle that he received as a Christmas gift from his parents in 2019. The date of the photograph is unknown but the gun is still in its box suggesting that the photograph was taken shortly after the gun was given to Payton. The photograph therefore lacks probative value as to any aspect of the planning or execution of the attack.

2W-23 – this image is a duplicate of the image marked 2W-22; it is therefore cumulative under Fed. R. Evid. 403.

2W-24 – this image is a duplicate of the image marked 2W-22; it is therefore cumulative under Fed. R. Evid. 403.

2W-25 – this image is a self-portrait photograph of Payton Gendron of unknown date displaying no weapons or other items of gear associated with the attack. It is therefore irrelevant to the issues in the case.

2W-28 – this image is an internet meme consisting of a collection of photographs of groups of White people together with the caption: ███████████████████████ ███████████████████ It was not created by Payton Gendron and has no probative value with respect to any aspect of the planning or execution of the attack. It is therefore evidence of, if anything, abstract beliefs that are irrelevant to the issues in the case, unfairly prejudicial and protected by the First Amendment Free Speech Clause.

2W-31 – this image is a photograph of Payton Gendron in a Boy Scouts uniform at a Boy Scouts event on unknown date. The image is irrelevant to the issues in the case.

2W-35 – this image is a duplicate of the image marked 2W-20; it is therefore cumulative under Fed. R. Evid. 403.

2W-37 – this image is an internet meme consisting of a photograph of a White woman together with the caption: ████████████████████████████████████

Also part of the image is the text: █████████████████████████████



████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████ The meme was not created by Payton Gendron and has no probative value with respect to any aspect of the planning or execution of the attack. It is therefore evidence of, if anything, abstract beliefs that are irrelevant to the issues in the case, unfairly prejudicial and protected by the First Amendment Free Speech Clause.

2W-37 – this image is a photograph of Payton Gendron's legal Savage Axis hunting rifle that he received as a Christmas gift from his parents in 2019. The date of the photograph is unknown but there is no writing on the gun as there was when he put it in his car and drove to Buffalo to commit the attack. The photograph therefore lacks probative value as to any aspect of the planning or execution of the attack.

2W-39 – this image is a photograph of Payton Gendron ███████████████████ ████████████████████████████████████████ It is irrelevant and inadmissible. *See*, Section IV, *supra*.

2W-40 – this image is an internet meme consisting of a photograph of a White woman together with the caption: ████████████████████████████████

████████████████████████████████████████████████

███████████████████ The meme was not created by Payton Gendron and has no probative

value with respect to any aspect of the planning or execution of the attack. It is therefore evidence of, if anything, abstract beliefs that are irrelevant to the issues in the case, unfairly prejudicial and protected by the First Amendment Free Speech Clause.

2W-41 – this image is a self-portrait photograph of Payton Gendron of unknown date displaying no weapons or other items of gear associated with the attack. It is therefore irrelevant to the issues in the case.

2W-44 – this image is a self-portrait photograph of Payton Gendron of unknown date displaying no weapons or other items of gear associated with the attack. It was taken outdoors on a hiking trail. It is therefore irrelevant to the issues in the case.

2W-47 – this image is an internet meme entitled  The meme was not created by Payton Gendron and has no probative value with respect to any aspect of the planning or execution of the attack. It is therefore evidence of, if anything, abstract beliefs that are irrelevant to the issues in the case, unfairly prejudicial and protected by the First Amendment Free Speech Clause.

2W-48 – this image is an internet meme ▮▮▮▮▮▮▮▮▮▮ The meme was not created by Payton Gendron and has no probative value with respect to any aspect of the planning or execution of the attack. It is therefore evidence of, if anything, abstract beliefs that are irrelevant to the issues in the case, unfairly prejudicial and protected by the First Amendment Free Speech Clause.

2W-49 – this image is an internet meme ██████████████████████████

████████████████████████████████████████████████

████ The meme was not created by Payton Gendron and has no probative value with respect to any aspect of the planning or execution of the attack. It is therefore evidence of, if anything, abstract beliefs that are irrelevant to the issues in the case, unfairly prejudicial and protected by the First Amendment Free Speech Clause.

2W-53– this image is an internet meme ████████████████████████

████████████████████████████████████████████████

██████. The meme was not created by Payton Gendron and has no probative value with respect to any aspect of the planning or execution of the attack. It is therefore evidence of, if anything, abstract beliefs that are irrelevant to the issues in the case, unfairly prejudicial and protected by the First Amendment Free Speech Clause.

2W-54 – this image is an internet meme ██████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████. The meme was not created by Payton Gendron and has no probative value with respect to any aspect of the planning or execution of the attack. It is therefore evidence of, if anything, abstract beliefs that are irrelevant to the issues in the case, unfairly prejudicial and protected by the First Amendment Free Speech Clause.

2W-58 – this image is a self-portrait photograph of Payton Gendron in his home of unknown date, displaying no weapons or other items of gear associated with the attack. It is therefore irrelevant to the issues in the case.

2W-60 – this image is a self-portrait photograph of Payton Gendron in his home of unknown date wearing items of tactical gear. It is not identical to Ex. 2W-50 but contains no information that is not also contained in that exhibit. It is therefore cumulative of Ex. 2W-50 and the government should be required to select only one of the two images to present at trial.

2W-62 – this image is a self-portrait photograph of Payton Gendron in a public bathroom of unknown date, displaying no weapons or other items of gear associated with the attack. It is therefore irrelevant to the issues in the case.

2W-64 – this image is a self-portrait photograph of Payton Gendron of unknown date displaying no weapons or other items of gear associated with the attack. It was taken outdoors on a hiking trail. It is therefore irrelevant to the issues in the case.

2W-65 – this image is a duplicate of the image marked 2W-5; it is therefore cumulative under Fed. R. Evid. 403.

2W-66 – this image depicts a post on Twitter ███████████████████ ████████████████████████████████████████████ █████████████████████████████████████████████ ██████████████████ The post was not created by Payton Gendron and has no probative value with respect to any aspect of the planning or execution of the attack. It is therefore evidence of, if anything, abstract beliefs that are irrelevant to the issues in the case, unfairly prejudicial and protected by the First Amendment Free Speech Clause.

2W-67 – this image is a self-portrait photograph of Payton Gendron in a public bathroom of unknown date, displaying no weapons or other items of gear associated with the attack. It is therefore irrelevant to the issues in the case.

2W-68 – this image is an internet meme ██████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████ The meme was not created by Payton Gendron and has no probative value with respect to any aspect of the planning or execution of the attack. It is therefore evidence of, if anything, abstract beliefs that are irrelevant to the issues in the case, unfairly prejudicial and protected by the First Amendment Free Speech Clause.

2W-69 – this image is a self-portrait photograph of Payton Gendron in a car at an unknown location on an unknown date, displaying no weapons or other items of gear associated with the attack. It is therefore irrelevant to the issues in the case.

2W-39 – this image is a photograph ███████████ It is irrelevant and inadmissible. *See*, Section IV, *supra*.

2W-71 – this image is a photograph of assault weapons that appears to have been taken in a gun store on an unknown date. The guns depicted are not guns that Payton Gendron owned, used in the attack or ever even considered using in the attack. The image is therefore irrelevant to the issues in the case.

2W-76 – this image is a self-portrait photograph of Payton Gendron outdoors wearing goggles and hearing protection. It is not identical to Ex. 2W-72 but contains no information that is not also contained in that exhibit. It is therefore cumulative of Ex. 2W-72 and the government should be required to select only one of the two images to present at trial.

2W-78 – this image is a photograph ███████████ It is irrelevant and inadmissible. *See*, Section IV, *supra*.  It is also a duplicate of Ex. 2W-39 and thus inadmissible as cumulative.

111

2W-79 – this image is a duplicate of the image marked 2W-30; it is therefore cumulative under Fed. R. Evid. 403.

2W-88 – this image is a photograph of an assault weapon and magazines of unknown provenance. The gun depicted is not a gun that Payton Gendron owned, used in the attack or ever even considered using in the attack. The image is therefore irrelevant to the issues in the case.

2W-89 – this image is an internet meme ███████████████████████████ ████████████████████████████████████████. The meme was not created by Payton Gendron and has no probative value with respect to any aspect of the planning or execution of the attack. It is therefore evidence of, if anything, abstract beliefs that are irrelevant to the issues in the case, unfairly prejudicial and protected by the First Amendment Free Speech Clause.

2W-95 – this image is a self-portrait photograph of Payton Gendron outdoors at an unknown location on an unknown date, displaying no weapons or other items of gear associated with the attack. It is therefore irrelevant to the issues in the case.

2W-97 – this image is an internet meme ████████████████████████ ███████████████████████████. The meme was not created by Payton Gendron and has no probative value with respect to any aspect of the planning or execution of the attack. It is therefore evidence of, if anything, abstract beliefs that are irrelevant to the issues in the case, unfairly prejudicial and protected by the First Amendment Free Speech Clause.

2W-109 – this image is a photograph taken from inside Payton Gendron's car ████████ ████████████████████████ This Exhibit should be excluded for the same reasons that all references to alleged alternate potential locations to commit an attack by name should be excluded as irrelevant and highly prejudicial. The Court has previously indicated that it intends

to exclude evidence of specific locations that Payton Gendron allegedly considered as other potential targets. *See* ECF No. 464 at 7.

2W-121 – this image is a photograph of wire coat hanger. The image is irrelevant to the issues in the case.

2W-123 – this image is an internet meme  The meme was not created by Payton Gendron and has no probative value with respect to any aspect of the planning or execution of the attack. It is therefore evidence of, if anything, abstract beliefs that are irrelevant to the issues in the case, unfairly prejudicial and protected by the First Amendment Free Speech Clause.

2W-124 – this image is an internet meme  The meme was not created by Payton Gendron and has no probative value with respect to any aspect of the planning or execution of the attack. It is therefore evidence of, if anything, abstract beliefs that are irrelevant to the issues in the case, unfairly prejudicial and protected by the First Amendment Free Speech Clause.

**2X – Web History From Black iPhone 11**

Exhibit 2X is an Excel spreadsheet with 333 line items, purporting to represent locations on the web that were visited using Payton Gendron's iPhone. 321 of those items are dated between January 20, 2022, and May 14, 2022. The remaining 12 items have no date associated with them. In light of the absence of evidence of when those websites may have been visited, those items lack probative value and should be excluded on this ground alone.

A handful of the 321 dated items are arguably relevant based on an inferable connection to the crimes with which Payton Gendron is charged. Items 6, 7 and 179-181 appear to involve the file-sharing site MEGA, on which copies of the manifesto and Discord transcript were stored and links included in the post that Payton Gendron sent to 65 users immediately before the attack. Items 182-187 and 286-291 appear to involve accessing the GoPro website, including instructions on how to livestream from a GoPro camera as Payton Gendron did on May 14, 2022. The remainder of the dated items in the Exhibit lack probative value, are in many instances unfairly prejudicial, and are protected by the First Amendment Free Speech Clause.

Many of the items have "titles" in addition to urls, or web addresses. However, those titles provide insufficient information about the contents of the webpage that was allegedly visited to support any inference that the online activity was connected to the motive, planning or execution of the crimes with which Payton Gendron is charged. Many "titles" simply name the website that appears to host the visited webpage. *See, e.g.,* ███████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████

The titles of others make clear that, whatever webpage was viewed, it had no conceivable relevance to the crimes. *See, e.g.,* ████████████████████████████
████████████████████████████████████████ █ ████████████████████

---

[44] The fact that this item is dated after Payton Gendron's arrest in this case further underscores its irrelevance and suggests that the data in the Exhibit as a whole is not what it purports to be. The Exhibit should therefore be excluded in its entirety due to the government's failure to establish its authenticity as required by Fed. R. Evid. 901(a).



The titles of still more items are simply meaningless strings of letters and numbers, *see* Items 8, 141, 153, 155-56, 169-170, 172-75, 209-10, 224-25, 230-31, 244-47, 253, 256, 266, and a large number do not have titles at all, *see* Items 1, 35, 138, 140, 142, 144, 145, 147, 149-152, 157, 161, 164, 167, 171, 191, 195, 200-01, 203, 206, 213, 215, 218, 222, 226, 229, 233, 236, 242, 249-50, 255, 259, 265, 269, 274, 292, 294, 299, 300, 310-11, 313-16, and 318-21.

### 2Y-2 – 2Y-20 – Videos From Black iPhone 11

Exhibits 2Y-2 through 2Y-20 are a collection of 18 video files extracted and selected by law enforcement that purport to be videos that were stored on Payton Gendron's iPhone.[45] Of these 18 videos, Payton Gendron moves to exclude the following:

2Y-2 is a video of an unknown male

The video neither depicts, nor was created by, Payton Gendron. It has no probative

---

[45] No. 2Y on the government's Exhibit List is entitled "Videos from Black iPhone 11." Following conversations with the government, we understand that this "umbrella" exhibit will be used for identification purposes only and that the government will not seek to introduce its contents as evidence. Exhibit number 2Y-1 has been withdrawn by the government.

value with respect to any aspect of the planning or execution of the attack. It is therefore

irrelevant to the issues in the case and its possession is protected by the First Amendment Free

Speech Clause.

2Y-4 is a video of less than 10 seconds in length that is ███████████████



███ The video was not created by Payton Gendron; nor was ███████████ used in

connection with the attack. The video therefore has no probative value with respect to any aspect

of the planning or execution of the crimes. It is irrelevant to the issues in the case, unfairly

prejudicial due to its disturbing nature and its possession is protected by the First Amendment

Free Speech Clause.

2Y-5 is a video of an unknown male ████████████████. The video was

neither created by nor depicts Payton Gendron. No ██████████ were used in connection with

the attack. The video therefore has no probative value with respect to any aspect of the planning

or execution of the crimes. It is irrelevant to the issues in the case, unfairly prejudicial due to its

disturbing nature and its possession is protected by the First Amendment Free Speech Clause.

2Y-6, 2Y-11 and 2Y-12 are videos of Payton Gendron firing his Savage Axis hunting rifle

at an outdoor shooting range with a companion who recorded the footage. Payton's possession of

the hunting rifle, which he received as a Christmas gift from his parents years prior to the attack,

was perfectly legal and unconnected to the planning or execution of the crimes with which he is

charged.  His legal possession and use of that weapon is protected by the Second Amendment

and possession of the videos is protected by the First Amendment Free Speech Clause.

2Y-20 is a video of Payton Gendron loading and trying but failing to shoot a shotgun at an outdoor shooting range with a companion who recorded the footage. Payton's handling of the shotgun, which did not belong to him, was legal and unconnected to the planning or execution of the crimes with which he is charged. His possession and use of that weapon is therefore protected by the Second Amendment and possession of the video is protected by the First Amendment Free Speech Clause.

2Y-19 is a video of an unknown male ███████████████████████████ The video was neither created by nor depicts Payton Gendron. No ████████████████ were used in connection with the attack. The video therefore has no probative value with respect to any aspect of the planning or execution of the crimes. It is irrelevant to the issues in the case, unfairly prejudicial due to its disturbing nature and its possession is protected by the First Amendment Free Speech Clause.

### 2Z – Search History from Black iPhone 11

Exhibit 2Z is an Excel spreadsheet with eight line items, seven of which purport to represent locations on the web that were visited using the Apple Maps application on Payton Gendron's iPhone, and one is a search using the Safari application. Three of the searches, all of which are dated April 20, 2022, have no connection to the motive, planning or execution of the charged crimes and should be ordered excised from the Exhibit as irrelevant.

### 2AA – Notes Summary from Black iPhone 11

Instead of the actual data extracted from the Notes application on the iPhone, the government seeks to introduce an undated, unsigned Word document that purports to be a summary of selected portions of that data along with editorial comments. This summary is the hearsay statement of its author. It is also inadmissible under Fed. R. Evid. 1002, which states:

117

"An original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise." No other rule or statute excuses the requirement of an original document under these circumstances. Certainly, the actual data is not so voluminous as to permit invocation of Fed. R. Evid. 1006(a) ("The court may admit as evidence a summary . . . offered to prove the content of voluminous admissible writings . . . that cannot be conveniently examined in court"). Ex. 2AA should therefore be excluded in its entirety.

Particular aspects of the document are inadmissible for additional reasons. The first four items listed, marked #2, #5, #6 and #11, are irrelevant to the charges that the government must prove at trial. #2 is a list of items owned by Payton Gendron's friend, ███████, as part of his ammunition collection. This collection was for hobbyist purposes only; none of the items was intended for use in a firearm and many were incompatible with any firearm owned by Payton Gendron and/or unusable altogether. The collection, the iPhone note and the summary thereof contained in Ex. 2AA lack any probative value whatsoever with respect to the charged offenses.

#5 purports to summarize a note documenting activity at a flea market stand over an unspecified six-day period. Again, the iPhone note and the summary thereof contained in Ex. 2AA lack any probative value whatsoever with respect to the charged offenses. Additionally, as to #5 the author adds: ████████████████████████████ This editorial comment is both irrelevant and inadmissible lay opinion pursuant to Fed. R. Evid. 701.

#6 purports to summarize school homework assignments. As such, it is clearly irrelevant and also consists almost entirely of inadmissible lay opinion pursuant to Fed. R. Evid. 701. The body of the summary states in full: ██████████████████████

118

████████████████████████████████████████████████████████████

████████

#11 states that the note contains ████████████████████████████████ Only

the ██████ quote is included in the summary, which states: ████████████████████████

████████████████████████████████████████ The fact

that this quote was allegedly stored on Payton Gendron's iPhone is wholly irrelevant to the

charges at issue and protected by the First Amendment Free Speech Clause.

#15 of the summary quotes and characterizes data from the iPhone that the author

believes documents ██████████████████████████ In addition to is overall

inadmissibility noted above, this section of the summary is utterly misleading in that it states that

the note was created on ██████████ There is absolutely no evidence to suggest that Payton

Gendron began conceiving of or planning for the attack in 2020. It is affirmatively untrue and

highly prejudicial for the government to suggest that the content of the note was created on that

date. Additionally, "screenshots" of unexplained provenance are attached to the summary and

described as reflecting the contents of note #15. Those screenshots include demonstrably

irrelevant material, including the unexplained statement ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████

### B. Motion In Limine to Preclude Inadmissible Evidence Seized from the Verbatim and Sandisk Thumb Drives

Following his arrest in this case, law enforcement obtained a search warrant for Payton Gendron's home and seized 45 electronic devices during the subsequent search.[46] In its Exhibit List, Sealed ECF No. 483 at 13-14, and subsequent amendments, the government has announced its intention to introduce two thumb drives (1B61) found in Payton Gendron's home, as well as images and a video found on those drives. These exhibits are numbered 3A, 3A1-13, 3B, and 3B-1. Exhibits 3A and 3B are the physical thumb drives and 3A-1 and 3B-1 are denominated as "seized evidence" from those thumb drives. The remainder are individual files. Payton Gendron objects to the admission of the following exhibits from this series pursuant to Fed. R. Evid. 402 and 403 as well as the First and Second Amendments to the United States Constitution.

**3A-2:** ███████████████████████

The government seeks to introduce a chart ███████████████████████

███████████  Payton Gendron did not create this chart, which is publicly available on the internet. Nor did he use any of the ammunition depicted in the chart during the shooting. The chart has no probative value with respect to any aspect of the planning or execution of the shooting and is therefore inadmissible under Rule 402. It is also extremely prejudicial ███████

███████████████████████████████████████████

███████████████████████████████████████ . ███████████

---

[46] Payton Gendron continues to assert that the search and seizure of data from his Desktop Computer and Thumb Drives was unlawful for all of the reasons set forth in his Motion to Suppress Evidence Seized from Desktop Computer and Thumb Drives, *see* ECF No. 400, and Reply to the government's Response thereto, *see* ECF No. 451.

[47] No. 3A-1 on the government's Exhibit List is entitled "Seized Evidence from Verbatim Thumb Drive." Following conversations with the government, we understand that this "umbrella" exhibit will be used for identification purposes only and that the government will not seek to introduce its contents as evidence

███████████████████████████████████████████████████████

██████████████████████████████. Admission of this exhibit would invite jurors

to speculate as to whether Payton Gendron possessed ████████████ and what significance,

if any, the chart has to the charges against him. It would also confuse the issues and waste time

given the complexity of the chart, which is not self-explanatory.

### 3A-3: Screenshot ██████████████████████████

The government seeks to introduce a screenshot of a meme based on a purported version

of Wikipedia page ████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████. Payton

Gendron did not create the meme, and it has no probative value with respect to any aspect of the

planning or execution of the shooting.  Thus, it is inadmissible under Fed. R. Evid. 402.

Moreover, the exhibit is unfairly prejudicial as it invites the jury to speculate ████████████

██████████████████████████████████████████████, among

other dangers. ███████████████████████████████████

████████ Thus, the evidence should be excluded under Rule 403. To the extent it is offered

as evidence of Payton Gendon's abstract beliefs, those beliefs are irrelevant to the issues in the

case and protected by the First Amendment Free Speech Clause.

### 3A-4: Electronic Exhibit: GIF Reading ██████████████████

The government intends to introduce a GIF (an image that can include animations) that

reads ███████████████████████████████████████████████

███████████████████████ Payton Gendron's possession of this GIF, which

he did not create, has no probative value with respect to any aspect of the planning or execution

of the shooting. To the extent the exchange is offered as evidence of Payton Gendon's abstract beliefs, those beliefs are irrelevant to the issues in the case and protected by the First Amendment Free Speech Clause.

### 3A-5: Photo Containing Username and Password

The government intends to introduce a photograph of a notepad on which are written ███████████████████████████████████████ There is no indication of when this photograph was taken or by whom, and the entries on the notepad have no probative value with respect to any aspect of the planning or execution of the shooting. Thus, the exhibit is inadmissible under Rule 402.

### 3A-6:  Message Concerning Brenton Tarrant[48]

This exhibit is an exchange between two anonymous users dated November 9, 2021, in which one writes ████████████████████████████████████████ and the other responds, in part, ████████████ The same exchange is found in a post on page of 7 of the Discord G Server transcript.  That Payton Gendron also possessed the image on a thumb drive is not relevant and this evidence is cumulative under Rule 403.  To the extent the exchange is offered as evidence of Payton Gendon's abstract beliefs, those beliefs are irrelevant to the issues in the case and protected by the First Amendment Free Speech Clause.

### 3A-7: Screenshot Concerning ████████████████████

This exhibit is a duplicate of government exhibit 3A-3. In addition to being inadmissible for the reasons give above, this is exhibit is cumulative and should be excluded on that ground as well.

### 3A-9: Message Concerning Brenton Tarrant

---

[48] Brenton Tarrant murdered 51 people as they prayed at two Mosques in New Zealand in 2019.  He is mentioned in Payton Gendron's "manifesto" and his online journal.

122

This exhibit is a duplicate of government exhibit 3A-6. In addition to being inadmissible for the reasons give above, this is exhibit is further cumulative and should be excluded on that ground as well.

**3A-10: Video of** ███████████████████

This exhibit is a video that starts with an image of ████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████████ Payton Gendron did not create this video, and it has no probative value with respect to any aspect of the planning or execution of the shooting. To the extent it is offered as evidence of Payton Gendon's abstract beliefs, those beliefs are irrelevant to the issues in the case and protected by the First Amendment Free Speech Clause. Additionally, the video is unfairly prejudicial ███████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████ *See* Fed. R. Evid. 403.

**3A-11: Screenshot of** ███████████████████

This exhibit is a screenshot of a ████████████████████████████████. The post was not created by Payton Gendron, and it has no probative value with respect to any aspect of the planning or execution of the attack. To the extent the exchange is offered as evidence of Payton Gendon's abstract beliefs, those beliefs are irrelevant to the issues in this case and protected by the First Amendment Free Speech Clause.

**3A-12: Painting of Brenton Tarrant on Wall**

---

[49] Although the government's exhibit list identifies this exhibit as a photograph, it is a 1:33 minute video.

This exhibit is a photograph of a painting of Brenton Tarrant on a wall. The photograph was not created by Payton Gendron, and it has no probative value with respect to any aspect of the planning or execution of the attack. To the extent the exchange is offered as evidence of Payton Gendon's abstract beliefs, those beliefs are irrelevant to the issues in this case and protected by the First Amendment Free Speech Clause.

**3A-13: Meme,** ████████████████████████████

This exhibit is a photograph of a man sitting at a table with a sign that reads, ██████████ ████████████████████████████ The man in the photograph has no role in this case and the image was not created by Payton Gendron. It has no probative value with respect to any aspect of the planning or execution of the attack. To the extent the exchange is offered as evidence of Payton Gendon's abstract beliefs, those beliefs are irrelevant to the issues in this case and protected by the First Amendment Free Speech Clause.

**3B and 3B-1: Thumb Drive and Seized Evidence**

This exhibit is a 414-page pdf consisting of 184 photographs found on a SanDisk Thumb Drive along with data related to the extraction of those photographs. Most of the photographs were found in a folder named, █████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████     █████ ████████████████████████████. Most of the photographs are duplicated, and some are followed by "Annotations" that appear to be attempts at extracting written text in the images, such as descriptions on boxes of ammunition. These annotations include text describing what is depicted in the photograph, such as what an item is

best used for ███████████████████████████████ [50] But some of the text is garbled or unintelligible such as ███████████████████████████ None of the text was written by Payton Gendron nor did he create the images.

The photographs and their metadata have no probative value with respect to any aspect of the planning or execution of the attack. The ammunition and gear pictured were not used in the Tops shooting. At most, they show a general interest in ammunition, military surplus, and related gear. Such an interest is irrelevant to the charges in this case and protected by the First Amendment Free Speech Clause and the Second Amendment. Many of the photographs are also prejudicial because they are firearm related and thus invite the jury to speculate as to their significance. Additionally, the extraction reports—particularly the Annotations—are confusing and add nothing of value. As noted above, the Annotations are frequently gibberish. But some of that gibberish—███████████████████—is potentially prejudicial. Finally, many (if not most) are cumulative of each other. For these reasons, Exhibits 3B and 3B-1 are inadmissible.

---

[50] ██████████████████████████████████████████████████████████

### C.  Motion In Limine to Preclude Inadmissible Evidence Seized from the Black Computer Tower

During the search of Payton Gendron's home, law enforcement seized a desktop computer tower (1B70). In its Exhibit List, Sealed ECF No. 483 at 14-16, and subsequent amendments, the government has announced its intention to introduce the computer and various materials extracted from it.  These exhibits are numbered 4, 4-1, 4A, [51] 4B, 4B-1 to 4B-1Q, 4B-2 to 4B-2W, and 4B3. Payton Gendron objects to the admission of the following exhibits (or portions of them) from this series (as well duplicates of them extracted from other devices) pursuant to Fed. R. Evid. 107, 401, 402, 403, and 1006, as well as the First, Fifth, Sixth and Eighth Amendments to the United States Constitution.

### Ex. 4B-1: File Listing of Microsoft Word Documents and 4B-2: File Listing of Adobe PDF Files

The government has given notice that it intends to introduce two exhibits it describes as "file listing(s)" of documents recovered from a computer used by Payton Gendron.  The lists appear to be manually created and do not include all the files recovered from the computer, just the ones the government seeks to admit.  Both lists include file names, file type, date created, date modified, and date accessed. The Exhibits are therefore inadmissible hearsay. The Federal Rules of Evidence include two rules addressing the admissibility of summary evidence like Government Exhibits 4B-1 and 4B-2.  Rule 1006 governs the admission "as evidence [of] a summary, chart, or calculation offered to prove the content of voluminous admissible writings, recordings, or photographs that cannot be conveniently examined in court, whether or not they

---

[51] Ex. 4A and Ex. 4B are "derivative evidence" and "scoped data" from the Black Computer Tower Following conversations with the government, we understand that these "umbrella" exhibits will be used for identification purposes only and that the government will not seek to introduce their contents as evidence.

126

have been introduced into evidence." A summary admitted under Rule 1006 is evidence and is provided to the jury during deliberations. Rule 107 allows a "party to present an illustrative aid to help the trier of fact understand the evidence or argument if the aid's utility in assisting comprehension is not substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, or wasting time." However, "[a]n illustrative aid is not evidence and must not be provided to the jury during deliberations unless" the parties consent or the court finds good cause to order otherwise. *Id.*

Government Exhibits 4B-1 and 4B-2 do not satisfy the criteria set forth in Rule 1006. There are only 17 Word files listed in Exhibit 4B-1 and 23 Adobe files in Exhibit 4B-2, and most of those files are duplicates of each other. This is far from voluminous. *See, e.g., Daniel v. Ben E. Keith Co.*, 97 F.3d 1329, 1335 (10th Cir. 1996) (holding that eighteen-page medical report was not voluminous within the meaning of Rule 1006); *Sec. & Exch. Comm'n v. Davenport*, No. 8:21-CV-01427-PD, 2024 WL 5317310, at *2 (C.D. Cal. Sept. 19, 2024) (unpublished) (holding that Rule 1006 did not apply to summary video created from 16 videos because, among other things, the 16 videos were not voluminous; "The Proposed Exhibit is an approximately nine-minute video made of clips from 16 videos that total approximately an hour of mostly repetitive footage.").

Nor is the data included in the lists voluminous. The "File Listing of Microsoft Word Documents" (Govt. Ex. 4B-1) shows that the 17 Word files were created, modified or accessed from April 16, 2022, through May 13, 2022, a period of 28 days. The "File Listing of Adobe PDF Files" (Govt. Ex. 4B-2) shows that 23 Adobe files were created, modified or accessed from November 14, 2021, through May 13, 2022, a period of about six months. While these dates may be relevant to show planning, they fall within a relatively short period of time and the files

127

were frequently created, modified or accessed the same day.  Thus, the date information is not sufficiently voluminous to allow the admission of these lists under Rule 1006.

Moreover, given how repetitive the lists are (*see* discussion, *infra*), they are of no value to the jury in understanding the evidence in this case as required under Rule 107.  That Payton Gendron revised the so-called manifesto and added to his online journal over time or that he saved multiple copies of both on his computer has zero tendency to make a "fact of consequence" any more or less probable than it would be without the evidence. Fed. R. Evid. 401. While portions of the contents of the manifesto and online journal—particularly the final versions sent to other people—may be relevant, the fact multiple copies of those documents were saved on different devices is not.  The same is true of the fact duplicative copies of other documents (such as Brenton Tarrant's "The Great Replacement") were saved to the computer.

Even if the lists of documents did have some utility in helping jurors "understand the evidence or argument," that utility is substantially outweighed by the danger of confusing the issues and wasting time.  The government's document lists do not include all files located on the computer, just the ones the government deems relevant. To lay the proper foundation for the exhibit, the government will be required to call a witness to explain how the lists were created, including how the witness decided which files to include and exclude, the extent to which the witness reviewed the underlying documents in making those decision, how the dates in the table were determined and whether they are accurate. Depending on the testimony, the defense may need to cross-examine the sponsoring witness.  This creates a substantial risk of confusing the issues, as the dates each file was created, modified or accessed is not relevant. It also will waste the jury's time during what will otherwise be a long trial.  Finally, this testimony is unfairly

prejudicial as it invites the jury to speculate as to what other files were on the computer.  Thus, Government Exhibits 4B-1 and 4B-2 should be excluded.

**Ex. 4B-2A (** ██████████████████████████ **),[52] 4B-2D**
██████████████████████████ **), and 4B-2E (** ██████████████████ **)**

The government seeks to introduce two documents ████████████████████

████████████████████████████████████████████████████

████████████████████  None of these documents was authored by Payton Gendron.

████████████████████████████████████████████████████

████████████████████████████. These exhibits have no probative value with respect to any aspect of the planning or execution of the shooting.  They are thus irrelevant, potentially prejudicial in as much as they are firearms-related and invite jurors to speculate as to their significance, and Payton Gendron's possession of them is protected by the First Amendment Free Speech Clause.

### Ex. 4B-2C, 4B-2H, 4B-2I, 4B-2L, 4B-2N, 4B-2R, 4B-2S, 4B-2T, 4B-2U, and 4B-2W: "Manifestos" Written by Others

In its Exhibit List, Sealed ECF No. 483 at 33-35, and subsequent amendments, the government has announced its intention to introduce copies—sometimes multiple copies—of documents written by people who committed ideology-based mass shootings.  Those exhibits include:

- **Ex. 4B-2C:** ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

52 ████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████

- **Ex. 4B-2H:** ██████████████████████████████████████████
  ████████████████████████████
  ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████ .

- **Ex. 4B-2I, 4B-2L, 4B-2N, 4B-2R, 4B-2U, 4B-2W, and 77C-4:** ███████
  ████████████████████████████████████████████████████
  ████████████████████████

  ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████



- **Ex. 4B-2T:** ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

*******

The fact Payton Gendron ████████████████████████████████

████████████████████████ is not probative of any "fact of consequence" in

determining whether he is guilty of the crimes charged.  *See* Fed. R. Evid. 401. At most these

████████████████████████████████████████, but, as discussed in greater

detail above, inspiration is different from legally relevant concepts such as motive or intent.  It is

an abstract concept, and one that falls squarely within the protections of the First Amendment.

See *Stanley*, 394 U.S. at 564 ("It is now well established that the Constitution protects the right

to receive information and ideas . . . This right to receive information and ideas, regardless of

their social worth, is fundamental to our free society.") (citations omitted).  While evidence of

speech may, under some circumstances, be used when relevant "to establish the elements of a

crime or to prove motive or intent," *Mitchell*, 508 U.S. at 489, the admission of evidence that

proves nothing more than a defendant's "abstract beliefs" violates the First Amendment.

*Dawson*, 503 U.S. at 167.

Whether Payton Gendron was inspired by the actions of others to commit the Tops

shooting is simply not relevant; what is arguably relevant is his motive (which he described in

131

detail in his manifesto and online journal), but only as it relates to his intent to commit the crimes with which he is charged.  And even if evidence of inspiration was probative of motive which was then probative of intent, the value of the inspiration evidence is attenuated at best and the contents of the writings more attenuated still.  In that scenario, what might matter is that Payton Gendron was inspired by the authors of the manifestos to commit his crime and that he adopted as his own a portion of one manifesto—the shorter one written Brenton Tarrant—by copying verbatim some of Tarrant's writings into his own "manifesto."  Still, the details of the content of the writings—particularly of people other than Tarrant—is not what matters—it is the fact that

███████████████████████████████████████████████████████████

██████ .

Possession of these writings adds little of value to show Payton Gendron' killed 10 people and injured 3 others because of the actual or perceived race and color of the people he targeted given the substantial and far more probative evidence available to prove this, including, but certainly not limited to, video showing the shootings and Payton Gendron's own writings explaining his motive and intent.  "The Supreme Court has stated… that 'what counts as the Rule 403 'probative value' of an item of evidence ... may be calculated by comparing evidentiary alternatives.'" *Al-Moayad*, 545 F.3d at 160  (quoting *Old Chief*, 519 U.S. at 185).  Should the Court determine these writings have probative value, it should consider the availability of Payton Gendron's own writings in determining whether the probative value of his possession of other people's writings is substantially outweighed by the dangers of unfair prejudice, confusing the issues, misleading the jury, wasting time, and needlessly presenting cumulative evidence.

These exhibits are extremely and unfairly prejudicial.  Admitting them would invite jurors to view Payton Gendron not as an individual, but as one among a group of mass killers.  In

132

other words, it would improperly invite the jury to find Payton Gendron guilty by association. *See Zhong*, 26 F. 4th at 557-58. It also creates an unacceptable risk of jurors reaching their sentencing decisions based not just on the facts and circumstances of this case, but also the facts and circumstances of those other cases. [53]

The exhibits also include a multitude of inflammatory statements and raise issues that have no relevance to this case. ███████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████ They are irrelevant.

Admitting these documents would require minitrials as to each of these men, their crimes, and their mental health. It likely would require long cross-examinations as the defense would need to distinguish these crimes and writings from the instant case. Given the minimal probative

---

[53] As discussed in note 1, *supra*, Payton Gendron is not raising penalty phase arguments now given the pendency of the government's appeal. The evidence of the other manifestos particularly implicates two of the non-statutory aggravators at issue on appeal: racially motivated violence and attempt to incite violence.

value of the evidence, if any, this would result in a colossal waste of time in an already long trial. *See* Fed. R. Evid. 403.

Finally, admitting the documents is likely to create a great deal of confusion as jurors try to keep straight who said what (was it Payton Gendron or someone else?) and for what purpose they can use information introduced at trial.  Given how racist and vile the documents are, limiting instructions would do little to obviate these concerns.  And any confusion in this area would create a significant risk of violating Payton Gendron's due process right to a fair trial.



**4B-2F:** ██████████████        **4B-2G: TM-32-201-1-**██████

Our challenges to these exhibits are included *infra*, Section IX (Motion In Limine to Preclude Inadmissible Evidence ██████████████).

**4B-2J, 4B-2M, 4B-2O, and 4B-2V: Miscellaneous Writings**

These exhibits are miscellaneous writings that contain topics and/or information found in Payton Gendron's manifesto or the Discord G-server transcript. Exhibits 4B-2J and 4B-2M are duplicates of the same document entitled, ████████████████ Exhibits 4B-2O and 2B-2V ████████████. All four are cumulative of the Discord G Server transcript and "manifesto" and should be excluded.

### D.  Motion In Limine to Preclude Inadmissible Evidence Seized from the HP Laptop

During the search of Payton Gendron's car, law enforcement seized a laptop computer (1B40).[54] In its Exhibit List, Sealed ECF No. 483 at 20-21, and subsequent amendments, the government has announced its intention to introduce the computer and various materials extracted from it.  These exhibits are numbered 77A-77C-17, 4, 4-1, 4A, 4B, 4B-1 to 4B-1Q, 4B-2 to 4B-2W, and 4B3. Payton Gendron objects to the admission of the following exhibits (or portions of them) from this series (as well duplicates of them extracted from other devices) pursuant to Fed. R. Evid. 107, 401, 402, 403, and 1006, as well as the First, Fifth, Sixth and Eighth Amendments to the United States Constitution.

**Ex. 77C-2 and 77C-3:** ████████████████████████████

These exhibits each contain ███████████████████████████████ ████████████.  The photographs are of random people and were not taken by Payton Gendron.  They have no probative value with respect to any aspect of the planning or execution of the attack. It is therefore evidence of, if anything, abstract beliefs that are irrelevant to the issues in the case, unfairly prejudicial and protected by the First Amendment Free Speech Clause.

<u>Ex. 77C-11:</u> ████████████████

This exhibit is a meme ██████████████████████████.  It was not created by Payton Gendron and it has no probative value with respect to any aspect of the planning or

---

[54] Payton Gendron continues to assert that the search and seizure of data from his laptop was unlawful for all of the reasons set forth in his Motion to Suppress Evidence Seized from iPhone 11 and HP Laptop, *see* ECF No. 380*,* and Reply to the government's Response thereto, *see* ECF No. 436.

execution of the attack.  It is therefore evidence of, if anything, abstract beliefs that are irrelevant to the issues in the case, unfairly prejudicial and protected by the First Amendment Free Speech Clause.

Ex. 77C-12: ███████████████ and 77C-13: ███████████

These exhibits ████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████. They are very similar although not identical.  This same drawing with the same highlighting can also be found at Ex. 4B-2K.  There is no need to introduce multiple versions of the same drawing and thus these exhibits should be excluded as unnecessarily cumulative of each other and those other exhibits.

Ex. 77C-16

## VI.    MOTIONS IN LIMINE RELATED TO ONLINE SITES AND SERVICES

### A. Motion in Limine to Preclude Evidence Seized from Discord

During their investigation, law enforcement seized data from Payton Gendron's Discord account.[55]  In its Exhibit List, Sealed ECF No. 483 at 29-32, and subsequent amendments, the government has announced its intention to introduce information obtained from servers linked to Payton Gendron's username, ███████████ including his Discord G Server.  These exhibits are numbered 1000-1012A. Payton Gendron objects to the admission of the following exhibits from this series (and duplicates of them extracted from other devices) pursuant to Fed. R. Evid. 107, 401, 402, 403, and 1006, as well as the First, Fifth, Sixth and Eighth Amendments to the United States Constitution.

### Ex. 1000A-1 to 1000A-15: Electronic Exhibit: Discord G Server from ███████████ November 2021 – May 2022 with photo appendices

Payton Gendron's objections to the contents of the Discord G Server transcript are found *infra*, Section IV (A).  Here we address unique objections to the version of the transcript the government has labeled 1000A-1 through 1000A-15. These exhibits include a purported transcript of the posts made to the Server from November 2021 through May 2022 (1000A-1) and 14 "photo appendices" that include images of memes, gifs, and videos from that transcript (1000A-2 to -15).

As a preliminary matter, the exhibits are inadmissible under Fed. R. Evid. 901 as they are not accurate depictions of the ███████████ channel of the Discord G Server. The exhibits do not include all posts or media posted to that channel, including photographs, memes, and videos.

---

[55] Payton Gendron continues to assert that the search and seizure of data from his Discord account was unlawful for all of the reasons set forth in his Motion to Suppress Evidence Seized from Discord Account, *see ECF No. 403,* and Reply to the government's Response thereto, *see* ECF No. 454.

For example, page 1 of Exhibit 1000A-1 includes posts introducing four photographs  The exhibit

and the accompanying appendix (Ex. 1000A-2) contain only one of the four photographs. On

page 258 of Exhibit 1000A-1, the following two posts from February 28, 2022, are adjacent to

one other.

Ex. 1000A at 258. However, there are four posts between these two messages:



Ex. 4B-1C at 207.

Fed. R. Evid. 901 requires the proponent of evidence to "produce evidence sufficient to

support a finding that the item is what the proponent claims it is." The government's exhibit list

describes Ex. 1000A-1 as "Electronic Exhibit: Discord G Server from [redacted] November

2021 - May 2022," and the subsequent exhibits as "Electronic Exhibit: Photo Appendix from

[redacted] [date range]." But that is not what is contained in the exhibit.

If the omissions are intentional, the government should identify what portions of the

transcript have been omitted so that defense counsel may object to particular omissions where

appropriate. *See* Fed. R. Evid. 1006 ("If a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part — or any other statement — that in fairness ought to be considered at the same time. The adverse party may do so over a hearsay objection.").

### Ex. 1001: Electronic Exhibit: Discord G Server from 'copypasta'

The government seeks to introduce posts Payton Gendron made to a channel on his Discord G Server called "copypasta".  Pages 21 and 24 of this Exhibit include ▮▮▮▮▮▮ memes that Payton Gendron did not create.  The Indictment charges Payton Gendron with offenses committed because of the victims' actual or perceived race or color, to wit: "Black people."  ECF No. 6.  His beliefs or feelings about any other group of people have no probative value with respect to any aspect of the planning or execution of the shooting or his intent in committing the crimes charged.  These memes are thus irrelevant and, if anything, proof of abstract beliefs protected by the First Amendment Free Speech Clause.  *See Dawson*, 503 U.S. at 167. Moreover, these ▮▮▮▮▮▮ memes are inflammatory and any probative value they might have is substantially outweighed by the danger of unfair prejudice.  The memes should be excluded from the exhibit.

### Ex. 1002: Electronic Exhibit: Discord G Server from 'general'

The government seeks to introduce a transcript from the channel "general" on Payton Gendron's Discord G server.  The posts include messages Payton sent as he prepared to enter the Tops store on May 14, 2022, followed by other users' reactions to his actions.  The reactions of other people have no probative value with respect to any aspect of the planning or execution of the shooting and should be excluded.

Additionally, one of the reaction messages is unfairly prejudicial because it includes a racial slur.  Ex. 1002 at 3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

██████████████████████████). Thus, it should also be excluded on Fed. R. Evid. 403 grounds also.

### Ex. 1008: Electronic Exhibit: Discord G Server from 'what-i-would-have-done-differently'

The government seeks to introduce a series of posts on the channel "what-i-would-have-done-differently" on Payton Gendron's Discord G server.  The transcript includes posts describing weapons and armor that Payton Gendron did not buy or use in the May 14 shooting. *See, e.g.*, Ex. 1008 at 1 ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████). Payton Gendron's reflections on what he would have done differently are not relevant to the planning or execution of the shooting or to his intent in committing the crime.  Additionally, the post quoted above is unfairly prejudicial to the extent it discusses ████████████████████████████ All posts on page 2 until the last post on page 3 and the second post on page 4 should be redacted.

### Ex. 1009A: Electronic Exhibit: Direct Messages ████████████████

The government seeks to introduce direct messages between Payton Gendron's username, ██████████ and another user,████████████.  The exhibit includes ██████████████ forwarding to ██████████ the post with links to the livestream, manifesto, and Discord G server transcript that Payton Gendron sent to approximately 66 individuals immediately before the attack, along with the message ██████████████ ██████████  It also includes ████████████ reactions to the shooting, including:

█ ████████



██████████████ reactions to Payton Gendron's actions after the fact have no probative value with respect to any aspect of the planning or execution of the shooting. Additionally, the comment ████████████ is unfairly prejudicial and would violate the prohibition on name-calling or demonizing a capital defendant. *See, e.g., Darden v. Wainwright*, 477 U.S. 168, 180-81 (1986) (prosecutor referring to defendant as an animal was "undoubtedly . . . improper"); *Wilson v. Sirmons*, 536 F.3d 1064, 1118 (10th Cir. 2008) ("As to the prosecutor's use of the terms 'animal' and 'unadulterated evil' to describe Mr. Wilson, we find the pejoratives unprofessional, inappropriate, and unworthy of an officer of the court.").

### Ex. 1009B: Electronic Exhibit: Direct Messages ████████████

The government seeks to introduce direct messages between Payton Gendron's username, ████████████ and another user, ████████. These messages end with the post with links to the livestream, manifesto, and Discord G server transcript that Payton Gendron sent to approximately 66 individuals immediately before the attack, followed by ████████████, ████ ████████████████████████████████████ ████████████████████████████.

The exchange between ████████ and Payton Gendron prior to May 14, 2022, has no probative value with respect to any aspect of the planning or execution of the shooting and is unfairly prejudicial ████████████████████. It should be excluded.

### Ex. 1009C: Electronic Exhibit: Direct Messages ████████████

The government seeks to introduce direct messages between Payton Gendron's username, ████████████ and another user, ████████. The messages end with the post with links to the livestream, manifesto, and Discord G server transcript that Payton Gendron sent to

approximately 66 individuals immediately before the attack. Prior to that is the following exchange from April 30, 2022:

████████████████████████

██████████████████████████████████

████████████████

█████████████████████████████████

██████████████████████████████████

This exchange has no probative value with respect to any aspect of the planning or execution of the shooting and is unfairly prejudicial. Admitting this exchange could invite the jury to speculate as to the significance of ████████████ to the May 14 attack and the relationship between ███████████ and Payton Gendron.

**Ex. 1009D: Electronic Exhibit: Direct Messages** ████████████████

The government seeks to introduce a Discord message exchange between Payton Gendron's username, ███████████, and another user, █████████████. It includes the post with links to the livestream, manifesto and Discord G server and transcript that Payton Gendron sent to approximately 66 individuals immediately before the attack. However, it also includes an exchange of messages between the two dated March 21, 2022, that appears to be about ████████████████████████████████ posts after the shooting.[56] These exchanges have nothing to do with the motive, planning or execution of the crimes with which Payton Gendron is charged. Additionally, the exhibit includes unfairly prejudicial material. For example, ████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

---

[56] This exchange is also found in government exhibit 2Q, which was recovered from an Apple iPhone.

*See* Ex. 1009D. Following the shooting ███████████████████████████

███████████████ All content except for the ███████████ post on May 14, 2022,

should therefore be excluded as irrelevant, prejudicial and protected by the First Amendment

Free Association and Free Speech Clauses.

### Ex. 1011A: Electronic Exhibit: Excerpt of Discord Channel 'SETF' 'general' tab, Messages from 5.14.2022

The government seeks to introduce messages from a Discord server, SETF.  The first

message in the exhibit is the post with links to the livestream, manifesto and Discord G server

and transcript that Payton Gendron sent to approximately 66 individuals immediately before the

attack. The remainder are posts by other people commenting on that post and the shooting.

These exchanges have nothing to do with the motive, planning or execution of the crimes with

which Payton Gendron is charged. Additionally, the exhibit includes unfairly prejudicial

material, including speculations such as, ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████

### Ex. 1012A: Electronic Exhibit: Excerpt of Discord Channel Lockdown 'bag-general tab'

The government seeks to introduce the following messages posted on a Discord server,

"Lockdown" on March 3, 2022:



144



The phrase ▓▓▓▓▓▓▓▓▓ should be redacted as it has no probative value with respect to any aspect of the planning or execution of the shooting or Payton Gendron's intent in committing the crimes charged and is an abstract belief protected by the First Amendment Free Speech Clause.

**B.    Motion in Limine to Preclude Evidence Seized from Apple iCloud**

Following his arrest in this case, law enforcement obtained a search warrant for Payton

Gendron's iCloud account, ███████████████ , and received a large amount of data from

Apple, Inc., pursuant thereto.[57]  In its Exhibit List, Sealed ECF No. 483 at 32-33, and subsequent

amendments, the government has announced its intention to use certain portions of this

information at trial, including items that are inadmissible and should be excluded.

**1402 – iCloud iPhone 11 Notes**[58]

The government seeks to introduce an undated .txt file of data that purports to have been

extracted from the iCloud search warrant return and was created using the Notes application on

an iPhone. Numerous aspects of this document are inadmissible and should be ordered excised

from the Exhibit.

███████████████████████    The first note in the document appears to refer to

███████████████ . Such ammunition played no role in the crimes with which Payton

Gendron is charged and both the purpose of the note and the date of its creation are lacking. This

portion of the Exhibit is thus irrelevant, potentially prejudicial in as much as it is firearms-related

and invites jurors to speculate as to its significance, and protected by the First Amendment Free

Speech Clause. It should therefore be excluded.



███████    This note may be interpreted as ████████████████████

███████████████████████████ . The purpose of the note and

---

[58] No. 1401 on the government's Exhibit List is entitled "Device 4 iCloud_Log, Search Warrant
Return/Seized Evidence for iCloud Account ███████████████ , 22-mj-118." Following
communications with the government, we understand that this "umbrella" exhibit will be used
for identification purposes only and that the government will not seek to introduce its contents as
evidence.

the date of its creation are lacking; it has no connection to the motive, planning or execution of the attack on May 14, 2022. This portion of the Exhibit is thus irrelevant, potentially prejudicial in as much as it is ████████ and invites jurors to speculate as to its significance, and protected by the First Amendment Free Speech Clause.

████████████████ The purpose of this note and the date of its creation are lacking; it has no connection to the motive, planning or execution of the attack. This portion of the Exhibit is thus irrelevant and potentially prejudicial in that it invites jurors to speculate as to its significance.

████████ This note may be interpreted as referring to ████████████ ███████████████████████. The purpose of the note and the date of its creation are lacking; it has no connection to the motive, planning or execution of the attack on May 14, 2022. This portion of the Exhibit is thus irrelevant, potentially prejudicial in as much as it is ████████ and invites jurors to speculate as to its significance, and protected by the First Amendment Free Speech Clause.

████████ The purpose of this note and the date of its creation are lacking; it has no connection to the motive, planning or execution of the attack. This portion of the Exhibit is thus irrelevant.

████████ ██████████████████████████████

████████ The purpose of the note and the date of its creation are lacking; it has no connection to the motive, planning or execution of the attack on May 14, 2022. This portion of the Exhibit is thus irrelevant, potentially prejudicial in as much as it is ████████ and protected by the First Amendment Free Speech Clause.

███████████    The purpose of this note and the date of its creation are lacking; it has no connection to the motive, planning or execution of the attack. This portion of the Exhibit is thus irrelevant.

████████████████████    The purpose of this note and the date of its creation are lacking; it has no connection to the motive, planning or execution of the attack. This portion of the Exhibit is thus irrelevant and potentially prejudicial in that it invites jurors to speculate as to its significance.

█████████████████    The purpose of this note and the date of its creation are lacking; it has no connection to the motive, planning or execution of the attack. This portion of the Exhibit is thus irrelevant and potentially prejudicial in that it invites jurors to speculate as to its significance.

████████████████████████████████████████

████████████    The purpose of this note and the date of its creation are lacking; it has no connection to the motive, planning or execution of the attack. This portion of the Exhibit is thus irrelevant and potentially prejudicial in that it invites jurors to speculate as to its significance.

█████████████████    The purpose of this note and the date of its creation are lacking; it has no connection to the motive, planning or execution of the attack. This portion of the Exhibit is thus irrelevant and potentially prejudicial in that it invites jurors to speculate as to its significance.

████████████    The purpose of this note, the date of its creation and the owner of the telephone number are lacking; it has no connection to the motive, planning or execution of the attack. This portion of the Exhibit is thus irrelevant

147

"**4.71**." The purpose of this note and the date of its creation are lacking; it has no connection to the motive, planning or execution of the attack. This portion of the Exhibit is thus irrelevant.

"**2.55**." The purpose of this note and the date of its creation are lacking; it has no connection to the motive, planning or execution of the attack. This portion of the Exhibit is thus irrelevant.

███████  ████████████████████████████████████████

███████████████████████████ No such weapon played a role in the crimes with which Payton Gendron is charged and both the purpose of the note and the date of its creation are lacking. This portion of the Exhibit is thus irrelevant, potentially prejudicial in as much as it is firearms-related and invites jurors to speculate as to its significance, and protected by the First Amendment Free Speech Clause.

████████████████████████████ This note may be interpreted as ██████████

██████████████████████████████████. The purpose of this note and the date of its creation are lacking; it has no connection to the motive, planning or execution of the attack. This portion of the Exhibit is thus irrelevant and potentially prejudicial in that it invites jurors to speculate as to its significance.

███████████  The purpose of this note and the date of its creation are lacking. The inclusion of ██████ suggests it might date back to October, 2021, or even earlier, and therefore was created before there is any evidence to suggest that Payton Gendron had begun conceiving of or planning the attack. This portion of the Exhibit is thus irrelevant, potentially prejudicial in as

148

much as it is firearms-related and invites jurors to speculate as to its significance, and protected by the First Amendment Free Speech and Free Association Clauses.



The purpose of this note and the date of its creation are lacking. The inclusion of ███████ suggests that it dates back to October, 2021, or even earlier, and therefore was created before there is any evidence to suggest that Payton Gendron had begun conceiving of or planning the attack. This portion of the Exhibit is thus irrelevant, potentially prejudicial in as much as it invites jurors to speculate as to its significance and protected by the First Amendment Free Speech and Free Association Clauses.

███████████ The purpose of this note and the date of its creation are lacking; it has no connection to the motive, planning or execution of the attack. This portion of the Exhibit is thus irrelevant and potentially prejudicial in that it invites jurors to speculate as to its significance.

███████████ The purpose of this note and the date of its creation are lacking; it has no connection to the motive, planning or execution of the attack. This portion of the Exhibit is thus irrelevant and potentially prejudicial in that it invites jurors to speculate as to its significance.

██████████████████ No such accessories played a role in the crimes with which Payton Gendron is charged and both the purpose of the note and the date of its creation are lacking. This portion of the Exhibit is thus irrelevant, potentially prejudicial in as

149

much as it is firearms-related and invites jurors to speculate as to its significance and protected by the First Amendment Free Speech Clause.

The purpose of this note and the date of its creation are lacking; it has no connection to the motive, planning or execution of the attack. This portion of the Exhibit is thus irrelevant.

The purpose of this note and the date of its creation are lacking; it has no connection to the motive, planning or execution of the attack. This portion of the Exhibit is thus irrelevant, potentially prejudicial , and protected by the First Amendment Free Speech Clause.

The purpose of this note and the date of its creation are lacking; it has no connection to the motive, planning or execution of the attack. This portion of the Exhibit is thus irrelevant.

The purpose of this note and the date of its creation are lacking; it has no connection to the motive, planning or execution of the attack. This portion of the Exhibit is thus irrelevant and potentially prejudicial in that it invites jurors to speculate as to its significance.

The purpose of this note and the date of its creation are lacking; it has no connection to the motive, planning or execution of the attack. This portion

of the Exhibit is thus irrelevant and potentially prejudicial in that it invites jurors to speculate as to its significance.

███████████████████████████████ The purpose of this note and the date of its creation are lacking; it has no connection to the motive, planning or execution of the attack. This portion of the Exhibit is thus irrelevant and potentially prejudicial in that it invites jurors to speculate as to its significance.

█████████████ The purpose of this note and the date of its creation are lacking; it has no connection to the motive, planning or execution of the attack. This portion of the Exhibit is thus irrelevant and potentially prejudicial in as much as it is firearms-related and invites jurors to speculate as to its significance.

████████████████████████████ The purpose of this note and the date of its creation are lacking; it has no connection to the motive, planning or execution of the attack. This portion of the Exhibit is thus irrelevant and potentially prejudicial in that it invites jurors to speculate as to its significance.

███████████████ The purpose of this note and the date of its creation are lacking; it has no connection to the motive, planning or execution of the attack. This portion of the Exhibit is thus irrelevant and potentially prejudicial in as much as it is firearms-related and invites jurors to speculate as to its significance.

██████████████ The purpose of this note and the date of its creation are lacking; it has no connection to the motive, planning or execution of the attack. This portion of the Exhibit is thus irrelevant and potentially prejudicial in as much as it is firearms-related and invites jurors to speculate as to its significance.

███████████ The purpose of this note and the date of its creation are lacking; it has no connection to the motive, planning or execution of the attack. This portion of the Exhibit is thus irrelevant and potentially prejudicial in as much as it is firearms-related and invites jurors to speculate as to its significance.

██████████████████████████████████████████████

█████████████ The purpose of this note and the date of its creation are lacking; it appears to refer to a school assignment and has no connection to the motive, planning or execution of the attack. This portion of the Exhibit is thus irrelevant and potentially prejudicial in as much as it invites jurors to speculate as to its significance.

██████████████████████████ The purpose of this note and the date of its creation are lacking; it has no connection to the motive, planning or execution of the attack. This portion of the Exhibit is thus irrelevant and potentially prejudicial in as much as it invites jurors to speculate as to its significance.

█████████████████████████ The purpose of this note and the date of its creation are lacking; it has no connection to the motive, planning or execution of the attack. This portion of the Exhibit is thus irrelevant and potentially prejudicial in as much as it invites jurors to speculate as to its significance.

████████████████████████████████████ ███████████

██████████████████████████ The purpose of this note and the date of its creation are lacking; it has no connection to the motive, planning or execution of the attack. This portion of the Exhibit is thus irrelevant, potentially prejudicial in as much as ████ █████████████████████████, and protected by the First Amendment Free Speech Clause.

**1403 – Excerpt of File chat-5_Pam Gendron ████████ 1.19.2022 and 1404 – Excerpt of File chat-5_Pam Gendron_████████ 3.8.2022**

The Court should exclude Exhibits 1403 and 1404 in their entirety. On its Exhibit List, *see* Sealed ECF No. 483 at 32-33, the government lists two items that are both entitled Excerpt of File chat-5_Pam Gendron, one that also includes a date of "1.19.2022" in its file name, *see id.* at 32, Ex. No. 1403, and one that also includes a date of "3.8.2022" in its file name, *see id.* at 32, Ex. No. 1404. In accordance with the Court's Orders, *see* ECF Nos. 433, 481, the government's Exhibit List was filed on November 10, 2025. The government thereafter provided the defense with the first production of what it described as copies of the proposed exhibits themselves on January 21, 2026; that production included Exhibits 1403 and 1404.

When defense counsel reviewed Exhibits 1403 and 1404 in preparation for filing motions in limine, it was discovered that both Exhibits are identical. Moreover, despite their file names indicating that they are excerpts, both Exhibits represent the entire history of text messages between Payton Gendron and his mother, Pamela Gendron, that was extracted from the Apple iCloud search warrant return. This history dates back to December 29, 2015, when Payton was 12 years old. It includes approximately 3,002 separate messages.

Accordingly, on May 30, 2026, defense counsel contacted the government and requested copies of the excerpts of the data it actually intended to introduce. Via email on June 4, 2026, the government declined the request, stating that, beyond agreeing that it will not seek to introduce duplicate copies of the same data set, it would not "sub-mark or limit use of the .txt files that span from 12/29/2015-3/22/2022." It elaborated that it views the entire data set as available to it to introduce to "show user attribution and link[] the cell phone and email address to Payton" and to "demonstrate that Payton had an ability to conceal anything that would make his mother suspicious of his plans." It further stated that "without knowing mitigators yet, the messages may

be relevant about his childhood or parental relationships," and "the government may want to make use of the messages depending on your defense."

The government also referenced text exchanges that occurred on particular dates, as follows:



As noted, however, the government nevertheless declined to limit the scope of its proposed Exhibits. The government's unreasonable refusal to identify the portions of Exhibits 1403 and 1404 that it believes are relevant to its case and admissible under the Federal Rules of Evidence violates at least the spirit of the Court's Order of July 30, 2025, directing the government to file a list of its proposed exhibits. *See* ECF No. 433. In order to prepare a motion in limine with respect to these Exhibits, defense counsel would be obliged to review and assess, at a minimum, the possible relevancy and potential for prejudice, confusion, cumulativeness,

delay and waste of time of over 3,000 messages recorded over a seven-year period which began many years before there is any evidence to suggest that Payton Gendron conceived of or began planning the May 14, 2022, attack. This is backwards; it is the government's responsibility to identify and only seek to admit those items of evidence that it has a good faith basis to believe are relevant to the issues to be tried and otherwise admissible.

The Court should therefore exclude Exhibits 1403 and 1404 in their entirety. Subject to the Fourth Amendment violations identified below, if the government can establish good cause for its failure to properly identify these exhibits by the Court-ordered deadline of November 11, 2025, it remains free to move the Court for leave to amend its Exhibit List to include alternate versions of Ex. 1403 and 1404 that it believes comport with the Rules of Evidence.[59]

Additionally, the government's attempt to avail itself of every single text message ever exchanged between Payton and his mother, and particularly its attempt to do so for the avowed purpose of rebutting an as yet unknown defense or mitigating circumstance presented at the penalty phase, underscores the unreasonableness under the Fourth Amendment of the

---

[59] Even with the requisite showing of good cause, any attempt by the government to seek admission of text messages between Payton and his mother that relies upon the bases for admissibility identified in its communication with defense counsel quoted above should be rejected. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ In any event, the government has a mountain of other evidence establishing that Payton drove to Buffalo and back that day, including video footage of him at the Tops store, eyewitness accounts of his presence there, and his admissions in posts on his Discord G server.

government's wholesale seizure of this data from the Apple iCloud search warrant return. *See* ECF No. 399 at 27-32.[60]

As set forth in Payton Gendron's Motion to Suppress Evidence Seized from Apple iCloud Account, the government's execution of the search warrant was unreasonable and violated the Fourth Amendment because, *inter alia*, it seized large quantities of data that were outside the scope of the warrant. *See id.* Specifically with respect to text messages, instead of limiting itself to items that constituted "contraband, fruits, evidence and/or instrumentalities of" the charged offenses, *see id.,* Ex. C, Search and Seizure Warrant, Attachment B.II., the government illegally seized the entire category of data without regard to its relevance, if any, to the crimes being investigated. In so doing, the Motion alleged, the government acted "'in flagrant disregard of the warrant's terms,'" requiring "'suppression of *all* evidence seized.'" *Id.* at 27 (quoting *United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988)).

In its Response to the Motion, the government stated only that (1), "much" of the evidence alleged to be outside the scope of the warrant, including the text messages, helped to confirm the identity of the account's owner as authorized by the warrant, and (2) that, instead of invalidating the entire search, the Court should just suppress the data that should not have been seized. *See* ECF No. 435 at 81. The Court did not address Payton Gendron's arguments regarding the execution of the Apple iCloud warrant in its Order denying that and other motions to suppress. *See* ECF No. 582 at 31-33. It did address similar arguments regarding the unreasonable execution of the search warrant for Payton Gendron's Google account, however. *Id.* at 20-21.

---

[60] Payton Gendron continues to assert that the search and seizure of data from his Apple iCloud account was unlawful for all of the reasons set forth in his Motion to Suppress Evidence Seized from Apple iCloud Account, *see id.,* and Reply to the government's Response thereto, *see* ECF No. 450.

There, it relied upon the government's representation that "it will not use any irrelevant material in its case" to find that the defense had failed to establish "flagrant disregard of the warrant's parameters that would justify suppressing everything obtained under the warrant." *Id.* at 20. [61] The Court still found that any data seized that was in fact irrelevant "should be suppressed," and invited the defense to renew its challenge in the event that the government attempted to introduce such evidence. *Id.*

The Court should reconsider its denial of the Motion to Suppress Evidence Seized from Apple iCloud Account and find, based on the government's subsequent conduct, that it flagrantly disregarded the terms of the warrant when it seized large amounts of irrelevant data from the return. The government is clearly laboring under— and deliberately exploiting—the misapprehension that the Constitution permits it to seize whatever data it wishes from a digital search warrant return if it believes that the information might come in handy down the road to convince a jury to disregard mitigating evidence and sentence the defendant to death. Its representation to defense counsel that it has retained the entire seven-year history of text messages between Payton and his mother because, "without knowing mitigators yet, the messages may be relevant about his childhood or parental relationships," i.e., to rebut the

---

[61] The Court also cited the government's representation that, "in some instances . . . there was no way to segregate non-responsive information" from information that was legitimately within the scope of the warrant. *Id.* As a factual matter, the claim with respect to the Google data is untrue. As Payton Gendron clearly alleged in his Motion to Suppress Evidence Seized From Google Account, *see* ECF No. 378 at 22-26, and Reply, ECF No. 437 at 19-24, the government was fully able to separate responsive from non-responsive data during its review of the Google search warrant return; it simply chose not to do so in numerous instances. At a minimum, this fact is established by the government's demonstrated ability to narrow its seizure, albeit inadequately as a constitutional matter, of some categories of data, *see id.* at 26-27, and its failure to offer any explanation for why it was unable to do the same for the others. An evidentiary hearing should therefore have been granted to find the necessary facts to adjudicate that Motion. The government made no such claim with respect to the Apple iCloud data.

defense's mitigation presentation, and "the government may want to make use of the messages depending on your defense," could not demonstrate this point more forcefully.

The government's position is, of course, entirely wrong and contrary to law. The seizure of information from the search warrant return that might be relevant to rebut a defense or mitigating circumstance that the defense might present is unquestionably outside the scope of the search warrant that was issued. *see* ECF No. 399, Ex. C, Search and Seizure Warrant, Attachment B.II. And no exception to the warrant requirement permits the seizure of such information. The Fourth Amendment only ever permits the seizure of evidence, instrumentalities or fruits of a crime, or contraband, *see Warden v. Hayden*, 387 U.S. 294, 300-01 (1967); not information that might assist the government at a potential sentencing. Accordingly, the plain view doctrine applies only "where it is immediately apparent to the police that they have evidence before them." *Horton v. California*, 496 U.S. 128, 136 (1990); *see also id.* at 136-37 ("not only must the item be in plain view; its incriminating character must also be 'immediately apparent'") (quoting *Arizona v. Hicks*, 480 U.S. 321, 326-27 (1987)).

The government's actions in regard to the iCloud search warrant return are the same as those condemned by the district court in *United States v. Wey*, 256 F. Supp. 3d 355, 403-405 (S.D.N.Y. 2017). In that case, the government seized from the defendant's apartment documents that were "purely personal in nature, or otherwise plainly outside the scope of the [crimes] described in the [search warrant] Affidavits," including medical records, family photographs, school mementoes and recreational schedules. *Id.* at 403-04. In short, it unconstitutionally wielded the warrants "to appropriate documents that were perhaps of interest to some broader investigation of the Weys' lives and finances but that bore little or no discernable connection to the . . . probable cause showing actually submitted to the Magistrate Judge." *Id.* at 404.

Subsequently, the government sought to defend its seizure of these items on the ground that they "purportedly bore vague connections to the Weys' personal histories and finances." *Id.* at 404. An FBI agent testified that "it was 'very important' that the FBI gain a better understanding through the Searches of the Wey family's 'very complex' 'financial arrangements.'" *Id.* at 405. The court found that the government's "strained explanations of why the[] materials were in fact *properly* seized" were "[p]erhaps more troubling than either the initial seizure or the continuing retention" of the material. *Id.* at 404. Those explanations, "leave the Court to find that much—perhaps even most—of the overseizure was not the result of expediency, mistake or even simple negligence. To the contrary, it seems, this material was reviewed, and a conscious effort was made to deem patently unresponsive materials responsive to the Warrants." *Id.*

Here, too, the inference is inescapable that, whether in ignorance of the law or in blithe indifference to it, the government has deliberately and flagrantly disregarded the terms of the warrant to gain an unconstitutional advantage and further its campaign to end Payton Gendron's life. Indeed, the government's asserted justification for retaining and using the 7-year history of text messages between Payton and his mother—to rebut potential mitigation evidence at sentencing— is even more tenuous than the excuse offered in *Wey*. There, at least, there was an asserted connection to the crimes that were the subject of the warrant, albeit attenuated and inadequate.

Recourse to the claim that the seizure of this tranche of data was legitimate because it "show[s] user attribution and link[s] the cell phone and email address to Payton" cannot save the government's position. If law enforcement were permitted to seize anything on a digital device or online account that could connect the device or account to its owner, the Fourth Amendment

159

warrant requirement would be eviscerated in this context.[62] *See* ECF No. 450 at 14 (citing *United States v. Holcomb,* 132 F.4th 1118, 1128 (9th Cir. 2025) (finding a warrant overbroad because it purported to authorize the unlimited seizure of evidence that the defendant had "dominion or control" over a computer)).[63] *See also United States v. Johnson*, 93 F.4th 605, 612-14 (2nd Cir. 2024) (approving search of GPS metadata pursuant to warrant authorizing search and seizure of information regarding who used computer limited to time periods when items of evidence specified in warrant were created, noting that warrant provisions "can only be read to authorize a

---

[62] This "context" is now basically our entire lives as citizens of the United States in the 21st Century. Both the Supreme Court and the Second Circuit have repeatedly recognized the heightened privacy concerns that are implicated in the context of searches and seizures of digital evidence given the significant risk of unlawful intrusion into the most sensitive aspects of a person's life.

> Many of the more than 90% of American adults who own a cell phone keep on their person a digital record of nearly every aspect of their lives—from the mundane to the intimate  . . . [A] cell phone search would typically expose to the government far *more* than the most exhaustive search of a house: A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form—unless the phone is.

*Riley v. California*, 573 U.S. 373, 395-97 (2014); *see also United States v. Ulbricht*, 858 F.3d 71, 99 (2d Cir. 2017) ("A general search of electronic data is an especially potent threat to privacy because hard drives and e-mail accounts may be akin to a residence in terms of the scope and quantity of private information [they] contain") (internal quotations omitted).

[63]  After the filing of the defense Reply to the government's Response to the Motion to Suppress Evidence Seized from Apple iCloud Account, on September 11, 2025, the 9th Circuit panel withdrew its opinion in *Holcomb* following the filing of a petition for rehearing by the government, noting that it would issue a new opinion in due course. *See United States v. Holcomb*, 153 F.4th 965 (9th Cir. 2025). However, the government sought rehearing based only on the divided panel's rejection of the applicability of the severability doctrine and the good faith exception to the facts of the case. *See United States v. Holcomb*, No. 23-469, ECF No. 59 (2d Cir. Mar. 28, 2025). The central holding of the decision, that a warrant provision purporting to authorize the seizure of unlimited information linking the device to its owner is unconstitutionally overbroad, which was joined by all three judges, will therefore likely remain undisturbed.

search for the metadata embedded in files containing CSAM" and that provisions thus "defined more carefully [the information subject to seizure] than a simple reference to metadata would have achieved").

The Court should therefore find that the government flagrantly disregarded the terms of the warrant and that all evidence seized during its execution must be suppressed. If the Court finds that further factual development is necessary to adjudicate this issue, it should conduct an evidentiary hearing.

**C.     Motion in Limine to Preclude Evidence Seized from Amazon Twitch**

Following his arrest in this case, law enforcement seized evidence from Payton Gendron's

Twitch account associated with the identifier ████████████████ pursuant to a search

and seizure warrant, 22-mj-117.  In its Exhibit List, Sealed ECF No. 483 at 33-35, and

subsequent amendments, the government has announced its intention to use certain portions of

this evidence at trial, see Gov. Exhibits 1600 and 1601, including items that are inadmissible and

should be excluded.  Application of the legal principles discussed in the introduction to this

Omnibus Motion to the Twitch Exhibits contained in Exhibits 1600 and 1601 demonstrates that a

large amount of data is not relevant to the issues in this case, and is therefore inadmissible.

### A.  Exhibit 1601 – Search Warrant Seized Evidence Response for Amazon Twitch Account, 22-mj-117

Amazon responded to the search warrant by providing sixteen categories of account

data. Across all sixteen categories in the response, the data includes activity from October 20,

2017 through May 14, 2022. In most categories, as reflected more specifically below, the only

relevant data is that from May 14, 2022. The remainder of the data, in particular that which

predates May 14,  2022, is irrelevant, and should be inadmissible. As it relates to data from May

14, 2022, in some categories, the data includes activity from other users which occurs after the

shooting, and is in no way relevant to activity that Payton Gendron engaged in. That data is

therefore also inadmissible.

### 1.  Alternate Accounts

This data reflects that there were two alternate  accounts.  The accounts appear to be

associated simply because on an unspecified date they shared an IP address. There is no evidence

that these alternate accounts are related to Payton Gendron or the crime. This data should be

excluded as irrelevant and prejudicial because it invites speculation that his early account activity was related to the shooting on May 14, 2022.

### 3. Account Activity – Videoplay Activity

All of the data in the Account Activity – Videoplay Activity should be excluded since there is no evidence that this data relates to the crime or to planning or preparation. It should be excluded as not relevant and unfairly prejudicial because it invites the jury to speculate that this video play activity was all related to the shooting.

### 4. Account Activity – Minutes Watched

All of the data in  in Account Activity – Minutes Watched should be excluded since there is no evidence that this data relates to the crime or to planning or preparation. It should be excluded as not relevant and unfairly prejudicial because it invites the jury to speculate that all of this activity relates to the shooting.

### 5. Account Activity – PageView

All of the data in Account Activity – PageView should be excluded since there is no evidence that the data relates to the crime or to planning and preparation. It should be excluded as  not relevant and unfairly prejudicial because it invites the jury to speculate that this activity all relates to the shooting.

### 6. Chat History

All of the chats included in the Chat History appear to be gaming related. None of the data appears relevant to any issues in this case, and thus should be excluded in its entirety.

### 7. Stream Chat Log

The Stream Chat Log data contains a single entry on 05-14-2022 by a user other than Payton Gendron. The user, ████████████ posts on the ████████ channel after the shooting incident. Since the chat was made by someone other than Payton Gendron after the shooting took place it is irrelevant and inadmissible.

### 8. Browser Info

All of the data in Browser Info should be excluded because there is no evidence that it relates to the crime or to planning or preparation. It should be excluded as irrelevant and unfairly prejudicial because it invites the jury to speculate that all of the data relates to the shooting.

### 9. Detail Log in History

The only relevant data from the Detail Log in History relates to 2022 activity. Data related to actions taken by users other than ████████ (i.e. entries with user prefixes ████████ ) should be redacted since that data appears to relate to actions taken by Twitchand not Payton Gendron. For this reason, those data entries are not relevant and are unfairly prejudicial.

### 10. IP History

All of the data in IP History should be excluded because there is no evidence that it relates to the crime or to planning or preparation. It should be excluded as irrelevant and unfairly prejudicial because it invites the jury to speculate that all of the data relates to the shooting.

### 11. Session Meta Data

All of the data in Session Meta Data should be excluded because there is no evidence that it relates to the crime or to planning or preparation. It should be excluded as irrelevant and unfairly prejudicial because it invites the jury to speculate that all of the data relates to the shooting.

### 12. Follow-Unfollow

164

The Follow-Unfollow spreadsheet contains 11 entries all of which predate 2022. As such, the entire spreadsheet is irrelevant and should not be admitted.

### 13. Followed By

The Followed By data contains one single entry login on 05-14-2022  12:19 PM (PT), login, ███████, channel ███████. Since this activity was not done by Payton Gendron and occurs after the shooting took place it is irrelevant. It is also unfairly prejudicial and should therefore be excluded pursuant to Fed. R. Evid. 403.

### 14. Account Search History

All of the Account Search History data relates to activity between 07-03-2019 and 06-09-2020. Since all this activity predates 2022, it has no relevance to the issues in this case and should be precluded under Fed. R. Evid. 401.

### 15. Stream Interactions

The Stream Interactions, 7 views and 1 chat, are all related to activity that occurs after the shooting on May 14, 2022, by user ids and logins that are not associated with Payton Gendron. Therefore, this data is not relevant to the issues in the case under Rule 401, and if relevant, is unfairly prejudicial and should be excluded under Rule 403.

165

### D.    Motion in Limine to Preclude Evidence Seized from Google Account

Payton Gendron, by and through his attorneys, pursuant to the First, Second, Fifth, Sixth, and Eighth Amendments to the United States Constitution and Fed. R. Evid. 401, 402 and 403, respectfully submits this Motion in Limine to Preclude Inadmissible Evidence Seized from Google Account.

Following his arrest in this case, law enforcement seized vast amounts of evidence from Payton Gendron's Google account associated with the identifier ▮▮▮▮▮▮▮▮▮▮ pursuant to a search and seizure warrant, 22-mj-123.  In its Exhibit List, Sealed ECF No. 483 at 33-35, and subsequent amendments, the government has announced its intention to use certain portions of this information at trial, including items that are inadmissible and should be excluded.

Application of the legal principles set forth herein to proposed Exhibit 1700-A-G dictates that the bulk of the evidence that the government seeks to introduce be excluded.

### 1700-A1 – Subscriber Information Record for ▮▮▮▮▮▮▮▮▮▮ [64]

To the extent that the government seeks to present subscriber information to establish ownership of the Google account at issue and the date on which it was created, Payton Gendron does not object. However, the list of services associated with the account should be redacted. The information is irrelevant. It is also potentially prejudicial because it unnecessarily invites speculation by jurors as to Payton Gendron's use of those services. The document also contains login dates and times and IP addresses dating all the way back to August 17, 2021. With the exception of entries for May 13 and 14, 2022, this information should be redacted because it is

---

[64] No. 1700-A on the government's Exhibit List is entitled "Identified Data from Google Search Warrant for ▮▮▮▮▮▮▮▮▮▮ " Following conversations with the government, we understand that this "umbrella" exhibit will be used for identification purposes only and that the government will not seek to introduce its contents as evidence.

irrelevant. References to ███████████████ and "███████████████ should also be redacted for the same reason.

### 1700-A2 – Google Account Change History

Ex. 1700-A2, containing the dates on which various Google services were added and/or removed from the account, should be excluded in its entirety. The names and dates of the various services are irrelevant and unnecessarily invite juror speculation, as noted above. The entries date back to August 23, 2017, years before the crimes at issue were planned or committed. Additionally, the reference to the suspension of the YouTube account following Payton Gendron's arrest is irrelevant and further suggests a level of monitoring and supervision of content on that platform that is misleading to the jury. *See* 1700-F– Emails Related to Account Suspensions, *infra*.

### 1700-A3 – Google Image Search for ███████████████

Ex. 1700-A3, a record of a Google Images search of the terms ███████████████ ███████ on April 12, 2020, should be excluded as irrelevant and therefore protected by the First Amendment. This search occurred over two years before the crimes occurred and at least a year and a half before there is any evidence to suggest that Payton Gendron began planning the attack. ████████████████████████████████████████████████ ████████████████████████████████ It therefore contains no suggestion of racial bias or animus, much less any that is connected to the crimes or probative of the motive or intent for those crimes. The record almost certainly reflects a search for information related to a school assignment or other innocuous purpose, and therefore constitutes expressive activity protected by the First Amendment.

**1700-B1 – Searches Related to Tops and 14208 Zip Code**[65]

[Don't think there's anything to object to here.]

**1700-B2 – Searches Related to Buffalo**

Ex. 1700-B2 is a record of 197 pages of selected activity on the Google Maps application spanning a time period from February 12 to May 12, 2022, and involving the Buffalo, NY area. Of the 856 separate items included in the exhibit, only 14 reflect actual searches. The remainder are indications of viewing the map screen of a certain area, and apparent clicks on locations that appeared while browsing. None of the items reflects a search for, or is connected to, the Tops grocery store at 1275 Jefferson Avenue.

Items naming specific locations outside of Buffalo should be excluded as irrelevant to the issues to be tried, as none has any connection to the charges that the government must prove. To the extent that the jury may speculate that this activity was conducted for the purpose of exploring alternate targets for the attack, mention of the locations by name would also cause unfair prejudice to Payton Gendron. The Court has indicated that it intends to exclude evidence of specific locations that Payton Gendron allegedly considered as other potential targets for that

---

[65] No. 1700-B on the government's Exhibit List is entitled "Google Map Searches." Following conversations with the government, we understand that this "umbrella" exhibit will be used for identification purposes only and that the government will not seek to introduce its contents as evidence.

Additionally, the folder in which this Exhibit was supplied to the defense on January 21, 2026, contains a .html file of all 1,922 map searches that were included in the search warrant return from Google and that were seized, indiscriminately, as "relevant" evidence within the scope of the search warrant by the government. *See* ECF No. 378 at 25-26. Also in the folder is a .docx file containing three pages of selected searches excerpted from the .html file. Defense counsel understand that it is the latter digital file that the government intends to introduce as Ex. 1700-B1 and accordingly address the contents of that file only.

reason. *See* ECF No. 464 at 7. Accordingly, the following items should be redacted from Ex.

1700-B2:





Items naming specific districts of Buffalo other than that in which the Tops grocery store

is located should also be excluded as irrelevant and unfairly prejudicial. Accordingly, the

following items should be redacted from Ex. 1700-B2:

████████████████████████████████████████████████████

███████████████████

Items naming specific locations within Buffalo but unrelated to the Tops grocery store where the attack took place, where the account activity frequently lasted a second or less, should also be excluded as irrelevant and unfairly prejudicial. Accordingly, the following items should be redacted from Ex. 1700-B2:



_____

█ ████████████████████████████████████████████████







**1700-B3 – Searches Related to Other Locations**

Ex. 1700-B3 is a record of 114 pages of selected activity on the Google Maps application spanning a time period from January 31, 2021, to May 12, 2022, that is unrelated to the Tops grocery store or even to Buffalo more generally. The Exhibit should therefore be excluded in its entirety as it irrelevant. Again, to the extent that the jury may speculate that this activity was conducted for the purpose of exploring alternate targets for the attack, mention of the locations by name would also cause unfair prejudice to Payton Gendron. *See* ECF No. 464 at 7.

Of the 679 separate items included in the exhibit, only 9 reflect actual searches. The remainder are indications of viewing the map screen of a certain area, and apparent clicks on locations that appeared while browsing. A large percentage of the areas and locations that appear in the Exhibit are, unsurprisingly, close to Conklin, NY, the town in Broome County in which Payton Gendron lived; ███████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████

Areas and locations mentioned include a number that appear to be in the Buffalo area but are unrelated to the crime, and are thus irrelevant and inadmissible for the reasons stated in connection with Exhibit 1700-B2, above. Those items include: area around ████████████ ██████████████████████████████████████████ ████████████████████████████ There is one view of Canterbury, NZ, which is irrelevant and inadmissible for the reasons stated in connection with Exhibit 1700-B4, below.

---

[67] The views of ████████████████████████████████ additionally are dated January 31, 2021, long before there is any evidence to suggest that Payton Gendron began planning the attack.

There are a number of items relating to locations outside of the State of New York altogether, including ███████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████. None is connected to the crimes that the government must prove, and thus they are irrelevant, prejudicial and protected expressive activity under the First Amendment.

There are multiple views of locations in and adjacent to the city of Binghamton, including ██████████████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████. Again, none is connected to the crimes that the government must prove, and thus they are all irrelevant, unfairly prejudicial and protected expressive activity under the First Amendment.

███████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

---

[68] There is strong evidence that Payton Gendron bought the Bushmaster XM-15 rifle that he used during the attack at Vintage Firearms. *See e.g.* Gov. Ex. 217A; 217B. However, the store has no other connection to the crimes and, in light of the abundant alternative evidence of the purchase, it is wholly unnecessary for the government to resort to constitutionally protected activity to prove this incidental fact.

███████████████████████████████████████ Again, none is connected

to the crimes that the government must prove, and thus they are irrelevant, unfairly prejudicial

and protected expressive activity under the First Amendment.

**1700-B4 – Google Maps** ████████████████████████

Exhibit 1700-B4 indicates that, on January 17, 2022, Payton Gendron conducted a search

on Google Maps for ██████████████████████████████████████.[69] ████████████

█████████████████████████████████████████████████████████████████████

████████████. There is no evidence to suggest that this activity constituted planning or

preparation for his attack four months later; this Exhibit should therefore be excluded in its

entirety as irrelevant. Additionally, because it is irrelevant to prove any element of the crimes

with which he is charged, this online activity constituted expressive conduct that is protected by

the First Amendment.

**1700-C1– Google Searches** ████████████████████████

Exhibit 1700-C1 indicates that, also on January 17, 2022, ████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

████████ There is no evidence to link this search to planning or preparation for the attack at the

Tops Grocery Store four months later; this portion of the Exhibit should therefore be excluded as

irrelevant. The same is true of the remainder of the Exhibit, which consists of ████████████

█████████████████████████████████████████████████████████████████████

---

[■] ██████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████

177

███████████████████, over a year before the attack at Tops. Because it is thus irrelevant to prove the crimes with which Payton Gendron is charged, this Exhibit reflects online activity constituting expressive conduct that is protected by the First Amendment, and it must be excluded on that ground, also.

**1700-C2– Google Searches** ████████████████████████████████████

Exhibit 1700-C2 indicates that, on February 21, 2021, well over a year before the crimes were committed, Payton Gendron conducted Google searches ███████████████████ ████████████████████████████████████████████ ███████████████████████████████████████ Even earlier, on January 31, 2021, he conducted a Google search for the phrase ██████████████████ ██████ The reasons for this activity are wholly unknown, and there is no basis on which to link any of it to the events of May 14, 2022. The Exhibit should therefore be excluded as irrelevant. Additionally, because it is irrelevant to prove the crimes with which Payton Gendron is charged, this Exhibit reflects online activity constituting expressive conduct that is protected by the First Amendment, and it must be excluded on that ground, also.

**1700-C3– Google Searches Related to Firearms and Armor**

Exhibit 1700-C3 is a list of 511 Google searches and websites visited that the government alleges are related to firearms and armor. All but two of them occurred between January 9, 2021, and February 26, 2021, over a year before the crimes were committed and long before there is any evidence to suggest that Payton Gendron began planning the attack. Unsurprisingly, therefore, none has any relevance to the charged offenses. Some of the activity captured in Exhibit 1700-C3 was for gathering information about Payton Gendron's perfectly legal hunting

rifle, a Savage Axis 30-06, that he received as a gift at Christmas in 2019, and for sourcing and pricing ammunition for hunting and target shooting with that gun. For example:



The vast majority of the searches and web page views were for the purpose of gathering information about firearms, body armor and other items that are featured in video games, including Escape from Tarkov, Roblox - State of Anarchy and Rust. A number of the searches and views include the name of the game in the search terms or results themselves. For example:





Although the search terms or web page names themselves do not explicitly reference the name of a video game, a number of the other searches and views are for types of weapons and ammunition or versions thereof that only exist in games, and not in real life. For example:



An additional large subset of the searches and views relate to firearms, ammunition or body armor that exist in the real world but are also available as player options within those videogames and were searched or viewed for that reason.[70] For example:



Many of the types of firearms and ammunition included in the Exhibit that do exist in the real world as well as in videogames are nevertheless demonstrably unconnected to events of May 14, 2022, including:



And some of the items included in the Exhibit are not even firearms or armor at all:

---

[70] Many video game developers and publishers use real weapons, ammunition, body and other accessories within their games to increase verisimilitude and thereby enhance the player experience and increase the marketability and profitability of their products.

Neither of the only two entries from 2022 relates to firearms or armor connected to the events of May 14, 2022, either. Those entries are:



The Plate Land Wiki page on the platform Fandom.com is a digital chat and discussion space associated with the Discord server, Plate Land. The Plate Land Wiki and Discord server were initially created as a digital forum for enthusiasts to discuss and exchange information about a videogame, Arma 3, and specifically about a modification developed for that game called the Advanced Armor Plate Mod and Universal Ammo System. *See* https://plateland.fandom.com/wiki/Plate_Land_Wiki ("The new home for documenting the comprehensive and highly realistic Advanced Armor Plate Mod and Universal Ammo System Over time, the Discord server morphed into a hobbyist site for gun and body armor enthusiasts to chat about items of interest to them more generally."). Payton Gendron joined the Plate Land server at the end of July, 2020, long before the attack and long before there is any evidence that he began planning it.

Because it is irrelevant to the crimes with which Payton Gendron is charged and reflects online activity constituting expressive conduct that is protected by the First Amendment, this Exhibit must be excluded in its entirety.

### 1700-D– Google Activities Log

Exhibit 1700-D is a spreadsheet of 123,714 rows reflecting limited information regarding the use of Google services between April 29, 2022, and May 14, 2022. Absent any link to the crimes committed on May 14, 2022, this Exhibit is irrelevant and should be excluded in its entirety. It also reflects online activity constituting expressive conduct that is protected by the First Amendment Free Speech and Free Association Clauses, and it must be excluded on that ground, also.

### 1700-E– Google Aggregated Activities Log

Exhibit 1700-E is a spreadsheet of 1,213 rows reflecting limited information regarding the use of Google services dating back to August 24, 2017, when Payton Gendron was 14 years

old and many years before there is any evidence that he began planning the crimes that he committed on May 14, 2022. Absent any link to those crimes, this Exhibit is irrelevant and should be excluded in its entirety. It also reflects online activity constituting expressive conduct that is protected by the First Amendment Free Speech and Free Association Clauses, and it must be excluded on that ground, also.

**1700-F– Emails Related to Account Suspensions**

Exhibit 1700-F is a collection of eight emails sent to Payton Gendron's gmail account after his arrest. One was sent by YouTube.com at 7:42pm on May 14, 2022, stating that the ███████ channel had been permanently removed from the YouTube website to protect other users because of content deemed to constitute "severe or repeated violations" of the Community Guidelines. The email states: █████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████

This document constitutes inadmissible hearsay under Fed. R. Evid. 801 and 802. It is also irrelevant, as it consists solely of the lay opinions of an unidentified YouTube employee or employees that material on Payton Gendron's channel █████████████████████

███████████████████████████████████████████

███████████████████████████ The offending material is neither specified nor described, and so the basis for that opinion is unknown. Additionally, the email could mislead jurors by suggesting to them that YouTube is a responsible online platform that effectively and conscientiously identifies and removes harmful content from its site – a

184

conclusion that is incorrect.  *See, e.g.,* Paul M. Barrett and Justin Hendrix, *A Platform 'Weaponized:' How YouTube Spreads Harmful Content and What Can Be Done About It*, (NYU Stern Ctr. for Bus. & Human Rights 2022).



eddit, also, has faced criticism regarding the efficacy of its content moderation practices. *See, e.g.,* Tanvi Bajpai and Eshwar Chandrasekharan, "*Think About it Like You're a Firefighter:" Understanding How Reddit Moderators Use the Modqueue*, Proceedings of the 2026 CHI Conference on Human Factors in Computer Systems, (2026).

The remaining six emails that comprise Exhibit 1700-F were all sent by Google Drive Trust & Safety Team informing Payton Gendron that

policy."

These emails, too, are inadmissible hearsay under Fed. R. Evid. 801 and 802, and they are also irrelevant, as they consist of the lay opinions of unidentified Google Drive employees. Exhibit 1700-F should therefore be excluded in its entirety.

185

**1700-G-1-20 – Documents Contained in Google Drive**

Exhibit 1700-G-1-20 is a collection of 20 files produced by Google in response to the search warrant that purport to be files that were stored in Payton Gendron's Google Drive account.[71] Of these 20 files, Payton Gendron moves to exclude the following:[72]

Ex. 1700-G-8 – ███████████████████████████████████████

████████████████████████████████████████████████████

The type of body armor to which the report relates is unrelated to the crimes and has never been owned or used by Payton Gendron; the document is thus irrelevant. The viewing and possession of this document therefore constitutes expressive activity protected by the First Amendment.

Ex. 1700-G-9 – ████████████████████████████████████

███████████████████    This document, which was over 50 years old at the time of the crimes in this case, has nothing to do with the crimes or with the planning thereof and is of purely historical, hobbyist interest. The document is thus irrelevant to the government's case and the viewing and possession of it constitutes expressive activity protected by the First Amendment.

**1700-H-1-39 – Photos From Google Drive**

Exhibit 1700-H-1-39 is a collection of 39 files produced by Google in response to the search warrant that purport to be images that were stored in Payton Gendron's Google Drive account.[73] Of these 39 images, Payton Gendron moves to exclude the following:

---

[71] No. 1700G on the government's Exhibit List is entitled "Documents Contained in Google Drive." Following conversations with the government, we understand that this "umbrella" exhibit will be used for identification purposes only and that the government will not seek to introduce its contents as evidence.

[72] There are additional documents on the Google Drive that are challenged elsewhere herein. *See* Sections IV.A and B, *supra*.

[73] The images as provided to the defense are not numbered 1-39; rather, they were provided as individual files in a folder. They will accordingly be referred to herein by filename.



VII.   **MOTIONS IN LIMINE RELATED TO PHYSICAL EXHIBITS SEIZED FROM** ▮▮▮▮▮▮▮▮ **VEHICLE AND** ▮▮▮▮▮▮▮▮

A.  **Motion In Limine to Preclude Inadmissible Evidence Seized from** ▮▮▮▮▮▮

Payton Gendron, by and through his attorneys, pursuant to the First, Second, Fifth, Sixth, and Eighth Amendments to the United States Constitution and Fed. R. Evid. 401, 402, 403, 801, and 802, respectfully submits this Motion in Limine to Preclude Inadmissible Evidence Seized from a search of his family home at ▮▮▮▮▮▮▮▮, and images taken during the course of the search.[74] In its Exhibit List, Sealed ECF No. 483 at 7-8, and subsequent amendments, the government has announced its intention to use certain portions of this information at trial, including items that are inadmissible and should be excluded.

Application of the legal principles set forth herein to proposed Exhibits 7 thru 21, and 22_001 thru 22_506, dictates that the bulk of the evidence that the government seeks to introduce be excluded.

**Exhibit 7- Physical Exhibit:** ▮▮▮▮▮▮▮▮▮▮▮ **(1B77);**

**Exhibit 8 - Physical Exhibit:** ▮▮▮▮▮▮▮ **(1B78)**

The government seeks to introduce a ▮▮▮▮▮▮▮▮ found on the floor of the garage (Exhibit 7), and similarly, ▮▮▮▮▮▮ found on a shelf in the garage (Exhibit 8). Neither of these exhibits are relevant to the offense conduct. Introduction of every ▮▮▮▮▮▮▮▮ found in the home is unfairly prejudicial, since there is no indication that the ▮▮▮▮▮ are indicative of planning and preparation for the shooting.

**Exhibit 9 - Physical Exhibit:** ▮▮▮ **(1B85)**

---

[74] Payton Gendron continues to assert that the search and seizure of evidence from ▮▮▮▮▮ was unlawful for all of the reasons set forth in his Motion to Suppress Evidence Seized from ▮▮▮▮▮, *see* ECF No. 405.

**Exhibit 11 - Physical Exhibit:** ███████████████ **(1B90)**

**Exhibit 12 - Physical Exhibit:** ████ **(1B91)**

**Exhibit 13 - Physical Exhibit:** █████████████████ **(1B95)**

**Exhibit 15A – Physical Exhibit –** ██████████ **(1B100)**

**Exhibit 15B – Physical Exhibit:** ██████████ **(1B100)**

**Exhibit 16 – Physical Exhibit** ████████ **(1B101)**

**Exhibit 19 – Physical Exhibit:** ███████████ **(1B119)**

These exhibits are various ██████████████ that were found in Payton

Gendron's bedroom, his closet or in the nightstand located next to the bed. Absent evidence that

these materials were used in preparation or planning for the offense, they are irrelevant.

**Exhibit 17 – Physical Exhibit** ███████████ **(1B102)**

This is a ███████████████████ found in the bedside table of his parents

bedroom. ███████████████████████████████████████████

████████████ . It has no probative value to the planning and preparation for the offense and

should be excluded.

**Exhibit 18 – Physical Exhibit –** █████████████████████████
**(1B110)**

The government seeks to enter ██████████████████ found in the

garage on the floor. Absent evidence that these materials were used in preparation or planning

for the offense, they are irrelevant.

**Exhibit 20 – Physical Exhibit – Black Notebook (1B120)**

The government seeks to introduce three pages from a black notebook found in Payton

Gendron's bedroom, which █████████████████████████████████

███████████████████████████████████████ *Compare* Ex. 20

*with* Tarkov Advisor Item Search, https://www.tarkovadvisor.com/en/item.  For example, three of the first five entries on page 1 can be found searching ███████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████ Thus, this exhibit is irrelevant. It is also unfairly prejudicial and would confuse the issues.  It should be excluded.

**Exhibits 22_0001 – 22_506 – (506) Photos from Search of 12 (sic) ████████**

The government has marked 506 photos from the search of the family residence at █ ████████ ██████████████. Most of the 506 photos are irrelevant to the issues presented in this case, and thus are inadmissible. Others are duplicative and therefore cumulative and should be precluded under Fed. R. Evid. 403.

1. <u>Ex. 22_001 through 22_006</u>

Exhibits 22_0001 through 22_006 are duplicative images of the corresponding physical exhibits identified as Exhibits 5A, 5B-1, 5B-2, 5B-3, 5B-4, 6A and 6B, and are therefore cumulative under Fed. R. Evid. 403.

2. <u>Eh. 22_009 through 22_475</u>

Exhibit 22_009 is an image of the front of the house, but is duplicative of 22_008, another image of the front of the house. The remainder in this series include pictures of the exterior and interior of the home that have no probative value and are thus irrelevant, more specifically pictures of the following:

- exterior of the home (22_010 through 22_019);

- interior of the garage (22_020 through 22_041);

- vin number of the car parked in the garage (22_042 through 22_046, 22_070);

- laundry room (22_047) through 22_050)

- kitchen (22_051 through 22_058)

- dining table (22_060 through 22_069)

- living room (22_071 through 22_086)

- whiteboard calendar (22_087)

- den (22_088 through 22_111)

- foyer (22_112 through 22_123)

- office (22_124 through 22_146)

- foyer closet (22_147 and 22_148)

- storage room (22_149 through 22_170)

- pantry (22_171 through 22_173)

- half bathroom (22_174 through 22_177)

- answering machine (22_178 and 22_179)

- closet (22_180)

- staircase (22_181 through 22_184)

- upstairs hallway (22_185 and 22_186)

- linen closet (22_187 and 22_188)

- ██████████ bedroom and closet (22_220 through 22_245)

- Bathroom (22_247 through 22_252)

- Pam's closet (22_253 through 22_273)

- ██████████ bedroom and closet (22_274 through 22_291)

- Parents' bedroom, bathroom and closet (22_292 through 22_339)

- Attic (22_353 through 22_357)

- Basement stairs, den, bathroom, hot tub and storage (22_358 through 22_443)

- Shed (interior and exterior) (22_444 through 22_472)

- Crawl space (22_473 through 22_475)

3.  <u>Ex. 22_476 through 22_481</u>

These six exhibits are pictures of ███████████████ found on a shelf in the garage. The ██████████ is dated labeled ████████ Absent evidence that these materials were used in preparation or planning for the offense, they are irrelevant.

3.  <u>Ex. 22_482 through 22_483</u>

These two photos are of the physical Exhibit 58, which was recovered from the Ford Taurus, and are therefore cumulative under Fed. R. Evid. 403.

4.  <u>Ex. 22_484 through 22_488</u>

This series of five photo exhibits are duplicative of physical Exhibits 5A, 5B-1, 5B-2, 5B-3, 5B-4, and are therefore cumulative under Fed. R. Evid. 403.

5.  <u>Ex. 22_500 through 22_506</u>

These photographs depict Gov. Exhibit 7 – Physical Exhibit – ███████████████ ██████████ and Exhibit 18 - ███████████████████████████ (1B110) which were both found in the garage.  The physical exhibits are challenged, *supra* at subsection A, for having no relevance to the offense conduct. The photographs suffer from the same lack of relevance and additionally are duplicative and thus cumulative under Fed. R. Evid. 403.

**B. Motion In Limine to Preclude Inadmissible Evidence Seized from Ford Taurus**

Application of the legal principles to proposed Exhibits 61 and 70, both of which were seized during a search of the Ford Taurus in the aftermath of the shooting, demonstrates that these items have no probative value and should be excluded.

Exhibit 61 is described as Physical Exhibit: School Paperwork and Spiral Notebook (1B19). The government seeks to introduce an excerpt from the notebook which appears to be an English class assignment. The assignment has nothing to do with the motive, planning or execution of the crimes with which Payton Gendron is charged. This excerpt, as well as all content from the notebook, should therefore be excluded as irrelevant and protected by the First Amendment Free Association and Free Speech Clauses.

Additionally, although the weapons recovered from the vehicle (Ex. 83 (Savage Arms rifle) and Ex. 84 (Mossberg shotgun)) and the gun used in the shooting (Ex. 217 (Bushmaster XM-15) are relevant and admissible at trial, the government should be precluded from introducing evidence identifying and explaining the significance of names appearing on those weapons under Rule 403.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████ There are a total of approximately 33 names written on the two weapons. Assuming that the fact Payton Gendron wrote the names of these victims and perpetrators on his weapons is probative of something of consequence in this case, the identity of these people and the specific circumstances of their deaths or crimes are not.

193

Moreover, any probative value would be substantially outweighed by every one of the dangers enumerated in Fed. R. Evid. 403.  The evidence would be unfairly prejudicial for the reasons given in our discussion of the manifesto and Discord G server posts, by creating the risk that the jurors would use information regarding the other ideologically motivated killers to find Payton Gendron guilty by association or deny him the individualized sentencing the Constitution requires.  The admission of details of unrelated crimes would confuse the issues and potentially mislead the jurors as they struggle to differentiate between the crimes and the ones for which Payton Gendron is on trial and understand the purposes for which this evidence might be used. It would also cause undue delay and waste time as the parties engage in minitrials for each of the people whose names are written on the guns, and it would needlessly present cumulative evidence of Payton Gendron's intent in committing the Tops shooting.  Thus, while the government should be allowed to admit the guns in the condition in which they were found, it should be precluded from introducing testimony about the names written on them.

194

### C. Motion In Limine to Preclude Inadmissible Evidence Seized from ██████████ ██



Neither of these exhibits are relevant to the offense conduct. These ████████████ were not used in connection with the offense, nor is there any evidence that they were used in connection with the planning or preparation for the offense. Therefore, they are entirely irrelevant and have no basis for admissibility.  In addition, even if relevant, the introduction of ████████████████ that Payton Gendron ever possessed is unfairly prejudicial, since it

invites the jury to infer that he was planning for this offense as far back as when he acquired his first weapon in 2019. The probative value of this evidence is substantially outweighed by the unfairly prejudicial effect.

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████ There are a total of approximately 33 names written on the two weapons.

Assuming the fact Payton Gendron wrote the names of these victims and perpetrators on his weapons is probative of something of consequence, the identity of these 33 people and the specific circumstances of their deaths or crimes are not. Moreover, any probative value such evidence would have is substantially outweighed by most of the dangers enumerated in Fed. R. Evid. 403. The evidence would be unfairly prejudicial for the reasons given above for excluding references to other mass killers from the manifesto and Discord server posts, namely by creating an unacceptable risk that jurors would use information regarding those other ideologically motivated killers to find Payton Gendron guilty by association or to deny him the individualized sentencing the Constitution requires. The admission of details of unrelated crimes would confuse the issues and potentially mislead the jurors. It would also waste time as the parties engage in minitrials for each of the people whose names are written on the gun, and it would needlessly present cumulative evidence. Thus, while the government should be allowed to introduce the guns in the condition in which they were found, it should be precluded from introducing testimony about the names written on them.

196

## IX.    MOTION IN LIMINE TO PRECLUDE INADMISSIBLE EVIDENCE

███████████████████

Payton Gendron, by and through his attorneys, pursuant to the First, Second, Fifth, Sixth, and Eighth Amendments to the United States Constitution and Fed. R. Evid. 401, 402 and 403, respectfully submits this Motion in Limine to Preclude Inadmissible Evidence ██████ ██████.[75] In its Exhibit List, Sealed ECF No. 483 at 33-35, and subsequent amendments, and Witness List, Sealed ECF No. 484 at 13, the government has announced its intention to introduce testimony and documentary evidence regarding a law enforcement search of Payton Gendron's car ██████ following his arrest, as well as certain ████████████ ████████████. ████████████ ████████████. This evidence is thus irrelevant, unfairly prejudicial and, in several instances, constitutes expressive activity that is protected by the First Amendment. The government should therefore be precluded from introducing it.

### INADMISSIBLE EVIDENCE

The government intends to introduce the following evidence:

████████████████████████

████████████████████████

████████████████████████

██████████████████ █████████

---

[75] Payton Gendron continues to assert that the search and seizure of data from his Google Account was unlawful for all of the reasons set forth in his Motion to Suppress Evidence Seized from Google Account, *see* ECF No. 378, and Reply to the government's Response thereto, *see* ECF No. 437.

[76] ████████████████████████ ████████████





\* \* \*

.Such an inflammatory, and baseless, belief would surely tend to "lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Miller,* 641 F. Supp. 2d at 166.

This unfair prejudice would be compounded by the introduction of constitutionally protected reading materials in Payton Gendron's possession following his arrest.

199



Even where some narrow portions of the text are relevant to the charges at issue, courts have found that it is error to admit the entire document.

Nevertheless, it found that the admission of the remainder of the text

200

was an abuse of discretion, as it was irrelevant and "could only risk inflaming the jury." *Id.* at

502. ████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

    ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████    Accordingly, the publication is wholly unnecessary to the prosecution and highly

prejudicial to the defense. ██████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████

    ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████    And this evidence carries an additional risk of prejudice because it

improperly invites the jury to find Payton Gendron guilty by association. *See. Zhong*, 26 F. 4th at

557-58  ("The government . . . may not invite the jury to find guilt based on a defendant's

associations") (citing *Cruz*, 981 F.2d at 663 ("[G]uilt may not be inferred from the conduct of

unrelated persons") and *United States v. Lopez-Medina*, 461 F.3d 724, 741-42 (6th Cir. 2006)

("Evidence that demonstrates only 'guilt by association' . . . is irrelevant to the question of a

defendant's actual guilt")).

## X.     MOTION IN LIMINE TO EXCLUDE EVIDENCE OF ███████████

The government has provided notice that as part of its case-in-chief during the guilt phase of the upcoming capital trial, it intends to introduce evidence that Payton Gendron visited the Tops Market on two prior occasions in preparation for the shootings, first on March 8, 2022, and then again on May 13, 2022, as proof of premeditation.



██████████████████████████████████████████████████

██████

    █████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████ However, such an inference is not only grossly attenuated from the charged

offenses, it is also wholly unnecessary. ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████

    ████████████████████████████████ is thus the epitome of "needlessly presenting

cumulative evidence."  The "exclusion of relevant, but cumulative, evidence is within the

discretion of the trial court." *Jamil*, 707 F.2d at 643.

    Courts have been hesitant to exclude cumulative evidence prior to the presentation of

evidence in deference to each party's right to choose between the cumulative evidence in

deciding how to present their case.  *See id.*  However, the Court should have no hesitation doing

so here.  It is inconceivable that, in seeking to prove Payton Gendron visited the Tops Market on

March 8, 2022, the government would forgo presenting any of the following: ████████████

 This

would serve only to waste the jury's time. *See* Fed. R. Evid. 403 (court may exclude otherwise

relevant evidence if its probative value is substantially outweighed by the danger of wasting

time); *see also United States v. Ulbricht*, 79 F. Supp. 3d 466, 492–93 (S.D.N.Y. 2015) (in trial

arising from defendant's alleged operation of an online marketplace for illicit goods and services,

granting defense motion in limine to exclude evidence that marketplace sold goods and services

not mentioned in indictment because, among other things, "allowing such evidence may lead to a

mini-trial on collateral issues").

## XI.    MOTION IN LIMINE TO PRECLUDE COMPILATION SUMMARY VIDEO AND RELATED TESTIMONY

In its Trial Exhibit List, the government provided notice that it intends to offer a "Compilation Summary Video" as evidence at trial. *See* Sealed ECF No. 483 at 39 (Ex. No. 4000). The government may intend to offer this exhibit through ███████████████████████ ███████████; and/or ████████████████████████████████████ ████████ both of whom are described in the government's List of Potential Witnesses as helping █████████████████████████████████████████ *See* Sealed ECF No. 484 at 11. Mr. Coleman's potential testimony appears to relate solely to his review of evidence for the purpose of compiling the ████████████████ *Id.* This "compilation summary video" is essentially a 100-minute, made-for-trial movie created by the government by dramatically arranging and intersplicing segments of discovery that may or may not ultimately be deemed admissible at either phase of the trial, along with superimposed captions and graphics, often separated by a fade to black screen and title page. The movie zooms in on some objects and plays at varying speeds. It includes:

- video footage from Tops Market's surveillance cameras on multiple dates and times (including the attack on May 14th) and from multiple angles, at times freezing and zooming in on individual frames;

- approximately 25 minutes of the GoPro video leading up to and including the attack on May 14th;

- video of Cabela's parking lot;

- numerous posts (text, photographic, and video) from the Discord G server interspersed among other images; and,

- photographs of seized evidence, e.g., maps, notes, letters, and diagrams.

206

Many of these images depict inadmissible evidence addressed elsewhere by the defense, as they are irrelevant, cumulative, devoid of context, and ultimately more prejudicial than probative.

Moreover, setting aside the admissibility of each image included in this lengthy compilation, which would need to be analyzed individually, the movie as a whole creates a dramatic narrative that is designed to inflame the emotions of the jurors by re-exposing them to often emotionally wrenching, graphic evidence likely to have previously been admitted and displayed, potentially with appropriate limiting instructions. Or to expose them in the first instance to a curated movie created by the government rather than as individual items of evidence to be proffered as exhibits and available for the jurors to examine objectively as the rules of evidence require.

As discussed elsewhere, many of the posts from the Discord G server are irrelevant to the issues before this jury and extremely prejudicial.[78] Yet many of those messages are included in the government's compilation video. ██████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████

---

[78] See Section IV (A), *infra*.

Additional images are displayed out of context or spliced together in an order that risks misleading or confusing the jury. For example, messages and photographs from the Discord G server are displayed consecutively in the compilation video, conveying the impression that they were posted that way originally, when in fact they were frequently separated by time (sometimes days or weeks) and numerous intervening messages; messages and images are displayed out of chronological order (e.g., a Discord G server post written before an event is displayed after video of the same event); inconsistent and at times inaccurate captioning of audio; ███████████ ████████████████████████████████████████████ █████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████ and another message displayed without the quotation marks that appeared at the top and bottom of the original post, implying that the words are Payton Gendron's when they are not.

The summary compilation also includes cumulative, repetitive, and at times irrelevant surveillance footage of Payton Gendron in and around Tops Market on three occasions before the crime. On March 8 and May 13, 2022, the compilation summary shows Payton Gendron entering and exiting the grocery store multiple times and wandering or standing inside the store from multiple camera angles. These video clips span approximately seven and ten minutes, respectively, and are interspersed with messages from the Discord G server. Between segments of his March 8th visits, the screen fades to black and a photograph of a receipt from Payton Gendron's purchase that day appears. As the image of the receipt is slowly enlarged, a blue circle

208

is superimposed on the date and time.[79] Similarly, on May 13th, after he is seen walking toward the exit, the Tops video is stopped and an image of the receipt from that day and time is superimposed on the picture – this visual technique is used three times in footage for that day. These are government-created dramatizations of potential evidence that should be individually offered, authenticated, and a determination made about its admissibility. Under no evidentiary theory are they appropriately admitted as evidence in the context of an hour and 40-minute compilation movie.

The most dramatic, graphic, and inflammatory content in the "summary compilation video" is the footage of the crime and crime scene, which includes both the GoPro video (beginning 20 minutes before the crime is committed), and multiple, repetitive angles of the shooting compiled from the Tops surveillance videos. Though it undoubtedly felt endless to the people who experienced it, the video evidence shows that the shooting lasted approximately 2 minutes and 12 seconds. In contrast, the government's presentation of this horrendous, graphic scene, including the GoPro video and Tops Surveillance video clips spliced together from multiple cameras and portraying overlapping time periods, lasts approximately seven minutes and 46 seconds and includes 38 separate video clips, as well as ███████████████ ██████  Because the clips are stitched together without obvious interruption, the movie appears as one continuous event, making it impossible for the unfamiliar viewer to ascertain when they are seeing the same action from a different angle or a different event.

After showing the Buffalo Police body worn camera of Payton Gendron's arrest and the immediate aftermath, ████████████████████████████████████████████

---

[79] The zoom feature of the video production is also used on several other occasions to dramatize the presentation of other images, including hand drawn maps and Payton Gendron's letter to his family, as is the superimposed circle.

██ █ ███████████████████████████████████████████████

██████ before the screen slowly fades to black. In addition to its obvious emotional,

inflammatory, and prejudicial effect on the jury, the movie is also misleading, and cumulative. It

is simply unnecessary for the government to expose the jurors to this dramatic video to prove

what Payton Gendron did and what the victims experienced.

Astoundingly, the government has indicated it intends to introduce its movie as

substantive, summary evidence under Fed. R. Evid. 1006. That Rule provides, in relevant part:

> **(a) Summaries of Voluminous Materials Admissible as Evidence.** The court may
> admit as evidence a summary, chart, or calculation offered to prove the content of
> voluminous admissible writings, recordings, or photographs that cannot be conveniently
> examined in court, whether or not they have been introduced into evidence.
> ...
> **(c) Illustrative Aids Not Covered.** A summary, chart, or calculation that functions only
> as an illustrative aid is governed by Rule 107.
> As the text of the Rule makes clear, a summary is admissible only if offered to prove the

content of voluminous evidence "that cannot be conveniently examined in court." Every

admissible piece of the compilation video can and likely will be conveniently examined in court,

and for the government to suggest otherwise is preposterous.

Moreover, Rule 1006 allows the admission of a summary of "voluminous admissible

writings, records, or photographs" regardless of whether they have been introduced into

evidence. "Because the underlying documents need not be introduced into evidence, the chart

itself is admitted as evidence in order to give the jury evidence of the underlying documents."

*United States v. Janati*, 374 F.3d 263, 273 (4th Cir. 2004); *see also* Fed. R. Evid. 2006, Advisory

Committee Notes ("[T]he purpose of Rule 1006 is to permit alternative proof of the content of

writings, recordings, or photographs too voluminous to be conveniently examined in court. ... [It

---

[80] The content of the body worn camera footage and objections thereto is discussed elsewhere. *See* Section III.B, *supra*.

has been] amended to clarify that a properly supported summary may be admitted into evidence whether or not the underlying voluminous materials reflected in the summary have been admitted. ... Because Rule 1006 allows alternate proof of materials too voluminous to be conveniently examined during trial proceedings, admission of the underlying voluminous materials is not required and the amendment so states."). In suggesting that its movie is admissible as substantive evidence under Rule 1006, the government is suggesting that it is unnecessary for it to introduce the individual pieces of evidence contained within that compilation. If the government's theory were correct, there would be no more need for evidentiary presentations; each party could simply compile the evidence it sought to admit into a PowerPoint, present that to the jury through the witness who compiled it, and then rest. Rule 1006 was created as an exception to Rule 1002, the "best evidence rule." *See* Wright & Miller, § 8041 Statutory History, 31 Fed. Prac. & Proc. Evid. § 8041 (2d ed.) ("This exception to Federal Rule of Evidence 1002 is based on the practical need to streamline the process of proof where evidence consists of a large number of originals that cannot conveniently be examined in court."). It is not intended to be an independent basis for the admission of evidence or invitation for a party to preview its closing argument or send its closing argument into the jury deliberation room.

Even if the government were being more reasonable and seeking to admit the movie as an illustrative aid for closing it should still be excluded for the reasons given above. Illustrative aids are governed by Fed. R. Evidence. 107, which provides, in relevant part:

> **(a) Permitted Uses.** The court may allow a party to present an illustrative aid to help the trier of fact understand the evidence or argument if the aid's utility in assisting comprehension is not substantially outweigh by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, or wasting time.

211

212

For all the reasons given above, whatever utility the compilation video may have in neatly packaging the government's case it is inadmissible and grossly prejudicial should be excluded.