UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v. 22-CR-109 (LJV)

PAYTON GENDRON,

Defendant.

---

**REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTIONS IN LIMINE AND SUPPLEMENTAL RESPONSE TO DEFENDANT'S MOTIONS IN LIMINE**

## I. INTRODUCTION

In his Motion, Payton Gendron asked the Court to put reasonable limits on the government's avalanche of gratuitous, irrelevant, and inflammatory evidence. He noted that the cumulative effect of the evidence is likely to overwhelm even the most stoic of jurors and "risk a verdict impermissibly based on passion, not deliberation." *Payne v. Tennessee*, 501 U.S. 808, 836 (1991) (Souter and Kennedy, JJ., concurring). In its Response, the government almost exclusively argues that its proposed evidence is relevant to motive, intent, substantial planning, and the reinstated attempt to incite violence aggravating factor. But it largely fails to address the many points the defense raised about the unfair prejudice of much of this evidence and the fact that most of the challenged evidence is overwhelming cumulative of other evidence offered to prove those same points.

Federal Rule of Evidence 403 recognizes that otherwise relevant evidence may be excluded when its probative value is substantially outweighed by, among other things, the danger of unfair prejudice, confusion of the issues, misleading the jury, or needless presentation of cumulative evidence.

In evaluating admissibility under Rule 403, a court should not measure the probative value of evidence in isolation. It must be assessed in light of evidentiary alternatives and evidence already before the jury. The cumulative nature of the evidence bears on the probative-value side of the Rule 403 balancing test: evidence that merely repeats what the jury has already heard contributes less to the determination of a fact than evidence that supplies genuinely new information.

Once the government has established a particular proposition through substantial independent evidence, additional evidence that merely repeats or substantially duplicates that proof has little incremental probative value. In other words, although each piece of evidence may be relevant in the abstract, its marginal value diminishes as cumulative evidence accumulates. *See, e.g.*, *United States v Perrault*, 995 F.3d 748, 769 (10th Cir. 2021) (directing district courts confronting cumulative evidence under Fed. R. Evid. 413 or 414 to consider the "diminishing marginal return on each additional witness's testimony" and recognizing that the probative value of later witnesses may be less than that of earlier witnesses); *United States v. Cunningham*, 694 F.3d 372, 389–90 (3d Cir. 2012) (recognizing that "the law of diminishing marginal returns" applies even to probative evidence); *United States v. Never Misses a Shot*, 781 F.3d 1017, 1028 (8th Cir. 2015) (describing multiple similar witnesses as "cumulative evidence with little additional probative value").

The government attempts to undermine this well-established principle by repeating a single line from the *Fell* decision like it is a mantra: "*more* evidence, not less, should be admitted on the presence or absence of aggravating and mitigating factors." *United States v. Fell*, 360 F.3d 135, 143 (2d Cir. 2004) (emphasis in original). *See* ECF No. 639 at 13, 20, 43; ECF No. 676 at 3, 4 (x2), and 7. But this line does not mean what the government wishes it did: that the government is free to pile on as much redundant, repetitive, and extremely prejudicial evidence as it would like to prove an undisputed fact. Indeed, *Fell* makes this very point:

> [T]he balancing test set forth in the FDPA is, in fact, more stringent than its counterpart in the FRE, which allows the exclusion of relevant evidence "if its probative value is *substantially* outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403 (emphasis added). Thus, *the presumption of admissibility of relevant evidence is actually narrower under the FDPA than under the FRE*. … [U]nder the FDPA Standard, "judges continue their role as evidentiary gatekeeper and, pursuant to the balancing test set forth in § 3593(c), retain the discretion to exclude any type of unreliable or prejudicial evidence that might render a trial fundamentally unfair."

*Id*. at 145 (emphasis added; quoting *United States v. Battle*, 264 F. Supp. 2d 1088, 1106 (N.D. Ga. 2003)); *see also United States v. Johnson*, 239 F. Supp. 2d 924, 946 (N.D. Iowa 2003) (holding that the FDPA "expressly supplants only the rules of evidence, not constitutional standards .... [The trial court] retains the authority under the statute to impose upon the parties any standards of admissibility *or fairness* dictated by the Fifth and Sixth Amendments") (emphasis in original).

The issue in *Fell* was whether the FDPA was unconstitutional because it makes the Federal Rules of Evidence inapplicable to capital proceedings. *Fell*, 360 F.3d at 137-138. The Second Circuit reversed the district court's holding that it was. In doing so, the Second Circuit agreed with the district court that heightened reliability is "essential to the process of imposing a death sentence." *Id*. at 143. It noted that the Supreme Court has repeatedly emphasized that the Constitution "places special constraints on the procedures used to convict an accused of a capital offense and sentence him to death. The finality of the death penalty requires a 'greater deal of reliability' when it is imposed.'" *Id.* (quoting *Murray v. Giarratano*, 492 U.S. 1, 8-9 (1989)). However, the appellate court disagreed with the district court's assumption that the Federal Rules of Evidence are the only means of safeguarding a defendant's constitutional rights and providing the "'heightened reliability' necessary in imposing a sentence of death." *Id*. at 144. The Second Circuit held that the FDPA standard—which requires exclusion of information "if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury"—narrows the "presumption of admissibility" and therefore satisfies

constitutional requirements. *Id*. at 145.

In a later decision, the Second Circuit made clear its decision in *Fell* does not stand for the proposition that the government can pile on evidence without limits:

> It is true, as the government points out, Gov't Br. at 31, that in *United States v. Fell*, we noted, "the Supreme Court has ... made [it] clear that in order to achieve [the required] 'heightened reliability[ ]' [in the penalty phase of a capital case], more evidence, not less, should be admitted on the presence or absence of aggravating and mitigating factors." *Fell*, 360 F.3d at 143 (*citing Gregg v. Georgia*, 428 U.S. 153, 203–04, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). But it hardly follows from that general observation that relevant evidence is always permitted. Acceptance of that reasoning would eviscerate the trial court's ability to exclude unduly prejudicial material from the penalty hearing inasmuch as any decision to exclude necessarily means less evidence, not more.
>
> In upholding the constitutionality of section 3593(c) in *Fell*, we noted that the requirement of a fundamentally fair trial is certainly met [by section 3593(c) ], given that the balancing test set forth in the FDPA *is, in fact, more stringent than* its counterpart in the [Federal Rules of Evidence], which allows the exclusion of relevant evidence "if its probative value is *substantially* outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403.... Thus, the presumption of admissibility of relevant evidence is actually narrower under the FDPA than under the FRE. *Fell*, 360 F.3d at 145 (first emphasis added).

*United States v. Pepin*, 514 F.3d 193, 204 (2d Cir. 2008); *see also id.* (noting that Supreme Court precedent does not "hold that the government is entitled to present to the jury 'the fullest possible information about the defendant' regardless of what that information might be").

Citing to *Pepin*, the government also argues that the "fact that this is a capital case does not change how the Court must apply the Federal Rules of Evidence in the guilt phase." ECF 676 at 6. This is wrong. While it is true that Rule 403, not § 3593, governs the admission of evidence at the guilt phase of the trial, the Second Circuit made clear in *Pepin* that a district court is not required to "to ignore its subsequent obligation to apply the section 3593(c) standard at the penalty phase" when making Rule 403 determinations at the guilt phase. *Pepin*, 514 F.3d at 208. The only thing *Pepin* precludes is excluding

evidence from the guilt phase solely because it would be inadmissible at the penalty phase. But whether evidence is introduced at the guilt phase or the penalty phase, a court is required to "make a conscientious assessment of whether the probative value of the evidence on a disputed issue in the case" is substantially outweighed at the guilt phase or simply outweighed at the penalty phase "by the prejudicial tendency of the evidence to have some other adverse effect upon the defendant." *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980). And in making that assessment, a court must consider the cumulative nature of the evidence as it bears on the probative value of the evidence and ask whether the proffered evidence merely repeats what the jury has already heard contributes or supplies genuinely new information.

## II. MOTIONS IN LIMINE RELATED TO AUDIO AND VISUAL EVIDENCE

### A. Motion In Limine to Limit Video Evidence from the GoPro Camera and Tops Surveillance Cameras

Preliminarily, the government suggests that it has "endeavored to minimize the jury's exposure to unnecessarily graphic evidence in this case." ECF No. 639 at 9. That position is belied by the fact that it has listed as exhibits no less than 82 video clips, totaling 4 hours and 35 minutes of footage, not including a compilation video that is an additional one hour and 40 minutes in length. This hardly represents minimization of graphic video evidence in a case where the shooting itself lasted less than less than two minutes and 30 seconds. The Court, in exercising its duty to weigh the probative value of evidence against its prejudicial effect, should exclude the duplicative evidence that the government intends to introduce, as well as limit the compounding prejudice that will result from the repeated publication to the jury of some of the most graphic evidence available.

The government spends much of its Response on this issue arguing the admissibility *vel non* of the GoPro video and the Tops surveillance footage, citing repeatedly to *United States v. Con-ui*, 13-cr-00123-ARC, 2017 WL 783437, at *5-6 (M.D. Pa. Mar. 3, 2017). *See* ECF No. 639 at 5, 12, 13-15, 18,

19, 28. Yet, the defense did not move to exclude the graphic evidence in this case in its entirety. Instead, the defense asked the Court to follow the approach of Judge Caputo in the case the government relies so heavily on, and to limit the repeated showing of this evidence because the emotional impact of the repetition of this evidence will inevitably prevent or substantially impair the ability of jurors to consider and weigh evidence in mitigation. *Id*. at *6.

**GoPro Video**

In its Response, the government addresses Payton Gendron's motion to limit the display of the GoPro video that records the attack. *See* ECF No. 639 at 16-20. Aside from its repeated statements of the uncontested relevance of the GoPro video, *see, e.g., id*. at 11 ("[t]he GoPro video is uniquely probative and relevant…"); *id.* at 12 (there can be no more probative and relevant evidence than the GoPro video. Indeed, the video "captures the very crime[s] with which [the defendant] is charged," and "the jury ought to have the most dependable evidence from which to decide this case"), the government fails to seriously address the defense request to limit the overwhelming prejudice that will flow from the repeated showing of this disturbing video.[1]

The only dispute regarding the GoPro video capturing the attack is the number of times that the government should be permitted to display it to the jury during the course of this trial. The government's Response states its intention to play this video *four* times during the course of the trial. *See id.* at 10 ("The government currently intends to play the pre-attack video once and the attack video up to four times in both the guilt and penalty phases, including jury addresses.").[2] If permitted, this unnecessary

[1] In suggesting that the GoPro video has independent relevance in the penalty phase, the government suggests that it is necessary to "prove different things." But those things are not entirely independent from guilt, where the government must also prove that Payton Gendron intended to commit the killings, that he intentionally participated in an act resulting in death; that he committed multiple killings and attempted killings.

[2] The government's language in this regard is somewhat ambiguous and could be read to suggest that ion that it currently intends to play the attack video "up to four times in both the guilt and penalty phases"

exposure and resultant trauma to the jurors will overwhelm even the significant probative value of the evidence. The government's request proves fatal to their proclamation that they have taken a very "measured" approach to the graphic evidence in this case. *Id*. at 13. The government is not entitled to enhance the already devastating impact of its evidence by repeatedly showing it to the jury, especially where unfair prejudice to the defense is the inevitable result. This is not a case where the defendant's guilt is a serious issue. It is, however, a case where the defendant's life is at jeopardy. The government is reminded that the Supreme Court has cautioned that, in a capital case, emotion fosters caprice, and that when emotion and caprice overtake reason, a sentence of death cannot stand:

> From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action. It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion.

*Gardner v. Florida*, 430 U.S. 349, 357-58 (1977). Payton Gendron makes no claim that the video should be excluded in its entirety. Instead, the inquiry needs to be re-focused to a determination of whether the graphic details of the attack, as depicted on the GoPro video, will have a blinding impact on the jury's ability to consider evidence in mitigation if it is exposed to it repeatedly. If, faced with such evidence, a jury is overwhelmed by the evidence to a point it cannot consider anything but a sentence of death, the trial loses any claim to legitimacy.

The government does not challenge the validity of the extensive social science cited by the defense that demonstrates that emotions affect decision making. *See* ECF No. 639 at 15. Rather, the

---

*and* leaves open the possibility that it intends to play the video up to four times at the guilt phase <u>and</u> up to four times at the penalty phase, for a total of eight times. Defense counsel assume that the government does not intend to subject the jury to this disturbing evidence in such a clearly excessive and gratuitous manner. The absurdity of that led defense counsel to interpret their assertion as an intention to play the video four times total. Four total times, any probative value is substantially outweighed by its highly prejudicial effect; eight times is doubly so.

government suggests this Court should ignore the import of that science in deciding the appropriate limitations that should be placed on the presentation of this evidence. The government ignores that science-based recommendation that courts avoid duplicative testimony and graphic evidence, not only to spare jurors the trauma associated with unnecessary repeated exposure, but also, critically, to ensure that jurors remain capable, especially in a capital case, of carrying out their duty to process all relevant evidence, including evidence in mitigation.

The only case the government cites which addresses the repeated display of graphic video evidence is *Con-ui*, 2017 WL 783437, and there, the court wisely limited the display of graphic evidence to ensure a fair trial, limiting the display to, inter alia: (1) only one viewing of the video during the guilt phase, with no other presentation at either the guilt or penalty stage; (2) not allowing the display during jury deliberations at either phase; and (3) precluding presentation of multiple videos of the same events from different angles. *Id*. at *5. The court concluded that these measures, as well as the passage of time between the presentation of the video at the guilt phase and jury deliberations at the end of the penalty phase following a break between the two phases, *id.* at *5, would best protect the defendant's right to a fair determination of sentence while still affording the government the benefit of "the full evidentiary force" of its case, *id.* at *4.

The government asserts that it is "necessary" to expose the jury to the GoPro video multiple times "for several reasons," ECF No. 639 at 10-12; none is persuasive. The government first expresses concern that the jury may fail to notice each of the individual actions of Payton Gendron that are captured on the video. *Id.* at 10-11. It fails to articulate, however, what material facts about the crimes the jury could possibly fail to appreciate after viewing this video, even just once. The events are displayed, as they occurred, all too graphically and indelibly. Especially combined with the evidence from the medical examiners who conducted the autopsies of the victims' bodies, the crime scene

photographs and artifacts, and the multiple eyewitness accounts that the government also plans to present, it simply defies credulity to assert that the jurors will be left with any questions about what happened in the Tops store on May 14, 2022.

The government also worries that jurors will fail to attend to the moment [redacted] at that time. *Id.* at 11. However, [redacted]; the government fails to specify what additional information the jurors would glean from being forced to view the entire series of events over and over again. The full extent of [redacted] experience will undoubtedly be vividly conveyed by the Tops surveillance footage, the body worn camera of the first responders who attended to his injuries and the testimony of [redacted].

And the GoPro video does not show [redacted] at all; the government appears to be arguing that multiple viewings of the eight murders shown on the recording is necessary so that the jurors can "notice the pharmacy in the distance." *Id.* Diagrams and photographs of the crime scene, artifacts recovered from the pharmacy, Tops surveillance footage and the testimony of eyewitnesses, [redacted], will more than suffice for that purpose. It bears emphasis that the defense has not objected to any portion of the Tops surveillance footage that captures relevant aspects of the shooting that are not otherwise shown on the GoPro video. *See* ECF No. 601 at 21-27.

The government also suggests that a juror may not appreciate the "sheer number of shots fired" during the attack. ECF No. 639 at 11. Here, however, the government omits the fact that the GoPro recording captures the audio of the attack in addition to the video. Appreciation of the number of rounds fired during the attack is unavoidable when watching the video with the embedded audio. Finally, the government asserts that the GoPro video has "independent relevance in the penalty phase, where the government must prove different things." *Id.* at 12. Specifically, it notes that it must prove that Payton

Gendron intended to commit the killings and that he committed multiple killings and attempted killings. *Id.*

However, both of these circumstances will necessarily be proven by virtue of the evidence that will be presented at the guilt phase. Although the jury must make separate findings at the penalty phase, the evidence is the same. And it again strains credulity to assert that the jurors *will* struggle to rely on "their collective memory" of the GoPro video, having been exposed to it at the guilt phase. *Id.* While proof of the grave risk of death to individuals other than those that the government alleges that Payton Gendron attempted to kill might implicate slightly different proof, as the government admits, it is the Tops surveillance footage, and not the GoPro video, that [redacted] *Id.*

The government's reliance on *United States v. Council*, No. 4:17-CR-00866-RBH, 2019 WL 3940759, at *1 (D.S.C. Aug. 21, 2019), is misplaced. There, in denying a motion to limit video evidence, the district court specifically noted the differences between the evidence before it and even the video in *Con-ui*. *Id.* ("The clips at issue are markedly different from the video described in *United States v. Con-ui*, 2017 WL 783437, at *2–6 (M.D. Pa. Mar. 1, 2017) (limiting admission of a video depicting 'the infliction of over 200 stab wounds, kicks to the head, and other acts of violence')"). Unlike the GoPro video, in *Council*, no one video captured the robbery and murders. *See Id.* , ECF No. 630 at 4.

The number of times the jury should be shown the GoPro video strikes precisely at the heart of Rule 403's requirement that relevant evidence be admitted only insofar as its probative value is not outweighed by substantial prejudice. Evidence that compromises a jury's ability to perform its constitutional duty to consider a life sentence violates that Rule and must be stricken, no matter how great its probative value.

**Tops surveillance footage recording the attack**

In its Response, the government suggests that the Tops surveillance footage is "inherently less graphic" that the GoPro video, and therefore should be admitted without limitation. ECF No. 639 at 16-20. Here, the government ignores the very telling similarities between the Tops surveillance footage and that of the video evidence in *Con-Ui* on which it cites to repeatedly in its Response. *See* ECF No. 639 at 5, 12, 13-15, 18-19, 28. The *Con-ui* video was "of poor enough quality to guard against exposing the jury to gruesome depictions of the body, wounds, blood and gore." *Id*. at *4. Indeed, the court found:

> The actions depicted in the video occur at some distance from the camera, which further alleviates concerns of the video's prejudicial impact. In fact, compared to what modern audiences are exposed to in the media, the video is somewhat muted for a crime of this magnitude and presents a soundless and largely bloodless version of the events [which does not] show in any detail the injuries Officer Williams suffered as a result of the attack.

*Id.*

The Tops surveillance footage, taken by multiple stationary surveillance cameras from varying distances, is more disturbing than the video in *Con-ui* – the Tops surveillance cameras captured color video, not black and white as in *Con-ui.* Nonetheless, in the face of that video evidence, the Court in *Con-ui* recognized the need to place limitations on the duplicative showing of the video. When left to its own devices, we see what the government does – it duplicates clips; shows every single camera angle available for a particular victim or witness. The surveillance footage visually depicts the same murders, also in high quality and in color, as well as clearly conveying the widespread terror and panic of all of the other individuals who were in the store when the shooting happened. The need for the Court to take an approach at least as measured as that of the court in *Con-ui* is thus even more critical than it was in that case.

Minimally, this Court should require the government to more specifically identify the particular

videos it intends to play and how many times it intends to play each. At one point, the government claims "[t]o the extent any of the surveillance footage is truly duplicative – that is, to the extent it shows the exact same events from the exact same angle – the government does not intend to play the same video multiple times." ECF No. 639 at 17, n. 6. But immediately thereafter, the government notes that "[e]xtensive Tops surveillance footage – which depicts the exterior and interior of the store from an elevated vantage point – [redacted]. *Id.* at 18 (citing Gov. Exs. 2000D-1 – 2000D42). The government makes no attempt to address the duplication issue raised by defense counsel in the Motion. *See* ECF No. 601 at 21-28 (outlining the duplication in the 2000D series and 2000E series of exhibits).

**Pre-shooting Tops surveillance footage**

In its Response, the government addresses Payton Gendron's motion to limit the Tops surveillance footage from when he visited the store on March 8, 2022, May 13, 2022, and the morning of May 14, 2022. *See* ECF No. 639 at 20-23. However, yet again, the government focuses only on the admissibility of these videos to show Payton Gendron planning his attack over multiple days. The defense did not challenge the admissibility of the video clips themselves but objected only to the manipulation of the clips to include hearsay statements, including dates, approximate times, span of times, etc., interspersed between them. The defense does not object to the display of the videos themselves seriatim. The government fails to address this argument in its Response.

**B. Motion In Limine to Preclude Body Worn Camera Video Evidence**

The defense has previously set forth its objections to the introduction of significant portions of the Buffalo Police body worn camera (BWC) footage noted on the government's trial list as Exhibits 3001-3004. *See* ECF No. 483 (sealed) at 38. Those objections are set forth in ECF No. 601 at 32-39 and

ECF No. 635 at 7-9 and are incorporated herein. In its most recent, supplemental filing (ECF No. 676 at 17), the government notes it will offer seven, excerpted versions of this body worn camera footage (identified as 3001A-3001D; 3002A; and 3004) and corresponding transcripts. *See* ECF 676 at 17.[3] These excerpts, however, suffer from the same admissibility issues as the originals: it is replete with hearsay that does not fall within any recognized exception (*see* Fed. R. Evid. 802, 803); relevance (*see* Fed. R. Evid. 401, 402), and Rule 403's prohibition against evidence the probative value of which is substantially outweighed by the risk of unfair prejudice, undue delay, and/or "needlessly presenting cumulative evidence." *See* Fed. R. Evid. 403; *see also* U.S. Const. amend. V, VI, VIII.

Each of the BWC footage from the four officers is summarized in Payton Gendron's initial Omnibus Motion in Limine (ECF No. 601 at 32-39) and will not be repeated here. Rather, the defense will identify the objectionable content that remains in the excerpted versions the government has provided.

**Exhibits 3001A - 3001D**

These exhibits are 4 excerpts from [redacted] BWC, all of which contain content that should be excluded. *See* ECF No. 601 at 34-36. This content includes the following:

- [redacted]
- [redacted]
- [redacted]

[3] The government notes that it will not seek to introduce the transcripts into evidence but will offer them as an "aid to the jury." *Id*. These transcripts have not yet been provided to the defense, which reserves the right to challenge the contents if appropriate.

- [redacted]
- [redacted]
- [redacted]
- [redacted]

There is no probative value in [redacted] BWC footage that is not cumulative of the BWC footage of other officers that the government intends to present. Rather, these excerpts are designed to highlight [redacted] inviting the purely prejudicial contrast with the devastating attack he had just committed. Payton Gendron has made no claim, nor will he, that he was mistreated by police officers at the scene of this crime. These interactions, therefore, are irrelevant and significantly more prejudicial than probative.

**Exhibit 3002A**

This exhibit is a 2 minute, 40 second excerpt of [redacted] BWC. *See* ECF 601 at 33-34. As previously noted by the defense, the only portion of this footage that is potentially relevant ends after approximately one minute, 32 seconds. During this segment, [redacted] These inflammatory images, and extraneous comments, should be excluded.

**Exhibit 3003A**

The government proposes to introduce seven minutes of [redacted] BWC. As previously described, ECF No. 601 at 36-37, [redacted] all of which is included in this excerpt. As the excerpted footage continues, [redacted] The defense has previously objected to these hearsay conversations and graphic, inflammatory images, all of which the government proposes be included in the excerpts presented at trial.

**Exhibit 3004A**

This excerpt includes the first six and a half minutes of [redacted] BWC. *See* ECF No. 601 at 37-38. This footage includes [redacted] (All of these interactions are captured on at least two of the other officers' BWC.) These scenes are captured within the first three minutes of [redacted] BWC. The remainder of the footage the government seeks to present includes the same conversations during the search that are recorded on the other officers' cameras, including the comment, [redacted]. Again, these conversations are not probative, are cumulative, include hearsay, often from unknown speakers, and are obviously fraught with panic and

fear. They should be excluded from evidence.

The government's response (ECF No. 635 at 23-27) to the defense objection to the BWC footage includes these arguments: 1) if the videos do contain hearsay, the statements only describe facts that the defendant has conceded, *id*. at 25, (which is not a recognized exception to the rule against hearsay); 2) "nothing about incidental screaming is prejudicial," *id*., (not so); and 3) the defendant "seeks to use Rule 403 as a shield to protect himself from his own conduct" and would like the government to "sanitize it's case," *id* at 26-27.[4] These arguments fail. There will inevitably be overwhelming evidence, most of which will be intensely emotional and disturbing. The defense has not asked that the trial be conducted by stipulation. Rather, the defense asks the Court to take precautions, as required by Rule 403, to exclude content that merely adds substantial prejudice without probative, non-cumulative evidence.

**C. Reply to Government Response to Admit 911 Recordings**

The defense has previously addressed, and objected to, the 911 recordings (and related CAD reports) the government seeks to introduce at trial and incorporates those arguments herein. *See* ECF No. 601 at 40-44; ECF No. 635 at 5-7. The defense continues to maintain that these recordings should be excluded because their probative value is substantially outweighed by the danger of unfair prejudice and needlessly presenting cumulative evidence in violation of Rule 403. This is particularly true of the [redacted] because the imbalance between any probative value they may provide and the inflammatory and cumulative nature of the calls is even greater. *See* ECF No. 635 at 5-7.[5]

[4] Notably, the government does not even attempt to argue why [redacted] is relevant and admissible.
[5] The government has recently provided a redacted version of Exhibit 2501, which it has identified as Exhibit 2501B. See ECF No. 676 at 15, n. 9. [redacted].

The government argues that these emotional calls provide evidence that is not available from other sources and is, therefore, not cumulative. *See* ECF No. 676 at 16. As its witness and exhibit lists make clear, however, this is simply not so; the jurors will know all this information and much more from other evidence, including extensive eye-witness testimony and audio-visual recordings that will be, no doubt, similarly compelling and extremely emotional. For example, [redacted]. *See* ECF No. 635 at 6. The same information is provided in a 911 call the government also seeks to introduce (Exhibit 2502) from a known caller and government witness, as well as multiple other eyewitnesses who appear on the government's witness list.

Moreover, the government notes that [redacted]. ECF No. 676 at 16. This argument overlooks approximately 50 civilian witnesses the government expects to testify, among other things, that they [redacted] *See* ECF No. 485 (sealed) at 24-40.[6]

The government also asserts that the 911 calls, both identified and anonymous, are necessary to prove the allegation in Count 27 of the indictment, i.e., that Payton Gendron attempted "to kill Black people in and around Tops" other than the deceased victims (*see* ECF No. 6 at 7), adding, "[t]o prove that the defendant attempted to kill those victims, the government must, of course, prove that the victims

---

*See* ECF No. 635 at 6-7; ECF No. 601 at 43-44.

[6] The government has provided notice that it intends to call [redacted] *See Id.*

were 'in and around' Tops when the shooting took place." ECF No. 676 at 16. This argument, however, flies in the face of the government's consistent assertion, in response to defense challenges, that it need not identify the individual victims, but only a defined "set" or "class" of victims to satisfy Count 27. *See, e.g.*, ECF No. 239 at 7-8.[7]

For these reasons, in addition to those previously set forth by the defense (*see* ECF No. 601 at 40-44; ECF No. 635 at 5-7), Payton Gendron respectfully requests that the government be precluded from introducing the 911 audio recordings (*see* ECF No. 483 at 36-37) at trial.

## III. MOTIONS IN LIMINE RELATED TO THE DISCORD G\ SERVER AND MANIFESTO

### A. Multiple Versions

The government represents it will limit to two the number of copies of the manifesto and the Discord G\ server. *See* ECF No. 676 at 11-13; *see also* ECF No. 639 at 29.

### B. Offensive and Inflammatory Statements About Groups of People Other than Black People.

Payton Gendron has moved the Court to exclude evidence reflecting bias or animus towards, or offensive statements about, groups of people other than Black people. *See* ECF No. 601 at 48-54, 66-72. Except for [redacted] the government agrees this evidence should be redacted. *See* ECF No. 639 at 36-37. [redacted] *Id.* at 36. The government therefore asks the Court to defer ruling on this category of evidence until after it

[7] Nor can the anonymous calls satisfy the allegation that those callers fall within that specific set of victims, i.e., "Black people in and around Tops."

rules the admissibility of SSA Yeager's testimony. *Id*.

The Court should reject the government's request to delay ruling on this evidence. [redacted]. So-called "expert" testimony about the origins of that belief amongst certain other individuals, and additional layers of a conspiracy to bring about this eventuality that some adherents subscribe to, will add no legitimate value to the jury's understanding of the motive for the crime, which is the only permissible use for expressive activity otherwise protected by the First Amendment.

The admission of such evidence would, however, unnecessarily interject extremely inflammatory and prejudicial evidence into the case. This is a classic example of a "matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect" that must be excluded under Rule 403. *United States v. McRae*, 593 F.2d 700, 707 (5th Cir. 1979). It impermissibly invites jurors to convict and sentence Payton not because of what he did, but because he is a reprehensible person as evidenced by his abstract, offensiveness beliefs. Such evidence would inevitably have a "'strong emotional or inflammatory impact' that would "pose a risk of unfair prejudice because [it] 'tends to distract' the jury from the issues in the case and . . . [might] arouse the jury's passions to a point where they would act irrationally in reaching a verdict." *United States v. Monsalvatge*, 850 F.3d 483, 495 (2d Cir. 2017) (quoting *United States v. Robinson*, 560 F.2d 507, 514 (2d Cir. 1977)). Put bluntly, Payton Gendron is not charged with killing, or attempting to kill, [redacted] does not make it any more likely that Payton Gendron believed Black people are replacing White people, or that he committed the

crimes with which he was charged because the victims and intended victims were Black.

Pursuant to the Court's Order, ECF No. 197, the government filed an Informational Outline detailing the evidence it intends to present at the penalty phase in support of its alleged statutory and non-statutory aggravating factors, ECF No. 210. Those aggravating factors include that the murders were committed after substantial planning and premeditation, and that "Payton Gendron expressed bias, hatred and contempt toward Black persons, and his animus toward Black persons played a role in the killings." *Id.* at 6, 21. The government outlined the evidence for each with no significant reference to [redacted]. *Id.* at 6-13, 21-27.

Nor has the government felt the need to refer to [redacted] in any of the descriptions of the crime that it has put forth for inclusion in multiple sets of proposed jury instructions, or in the jury questionnaire that over 1,100 prospective jurors have now completed. To now permit the government to introduce this wholly irrelevant and unnecessary yet potentially incendiary evidence, without even the opportunity to inquire into potential jurors' reactions to such information in the questionnaire, would be grossly unfair.

### C. [redacted].

The government agrees this evidence should be redacted. *See* ECF No. 639 at 36-37.

### D. Consideration of Targets Other than the Tops Market on Jefferson Street

The government argues that the Court should reconsider its inclination to exclude the specifics of alternative locations that Payton Gendron allegedly considered as he was planning his crime or, alternatively, to allow it to introduce evidence of the types of locations Payton Gendron considered. *See* ECF No. 697 at 43. It argues that Payton Gendron's "thought process regarding his site selection is

evidence of his motive and intent," namely the selection of a site that would allow him to kill as many Black people as possible. *Id.* But the specifics of the locations he considered—including the location types—adds nothing of significance to that point while introducing a substantial risk of unfair prejudice. ECF No. 601 at 73. This is particularly true of evidence related to [redacted]. [redacted] does not, as the government suggests, lessen the danger of unfair prejudice, ECF No. 697 at 44. Instead, it interjects the additional danger of unnecessarily confusing the issues.

The government suggests that this Court previously indicated it was inclined to introduce evidence about the types of locations Payton Gendron considered, [redacted] ECF No. 676 at 19. This is simply not true. While the Court indicated it might allow the government to elicit evidence that Payton Gendron "looked at other places, that he actually visited other places, that he visited supermarkets or malls or whatever in the other places," ECF No. 387 at 30, it never indicated an inclination to allow the government to discuss the specifics of places he merely considered, including emotionally charged places [redacted] Such evidence should be excluded.

[redacted]

Payton Gendron has moved to exclude references to other individuals who have been accused, charged and/or convicted of committing ideologically motivated or racist crimes on the ground that, with the arguable exception of Brenton Tarrant, evidence related to such individuals and their crimes is irrelevant and overwhelmingly likely to result in unfair prejudice to the defense. ECF No. 601 at 54-59, 74-77. In its initial Response, the government rather cursorily argues that such evidence is relevant to show Payton Gendron's motive and intent, and it does not address at all the argument that it is unfairly prejudicial. *See* ECF No. 639 at 38-40. In its Supplemental Response, the government argues that the

evidence is relevant at the penalty phase to prove the attempt to incite violence aggravator. ECF No. 676 at 5-8. The government argues that evidence [redacted] tends to prove that Payton Gendron himself attempted to inspire others to commit such acts. This is far too tenuous a basis upon which to admit such unfairly prejudicial evidence, particularly when that evidence is comprised of expressive activity that is protected by the First Amendment.

Some evidence referencing Brenton Tarrant is arguably relevant because so much of Payton Gendron's so-called manifesto is copied verbatim from Tarrant's manifesto. However, the defense does not "largely concede[] that evidence of his devotion to Brenton Tarrant is admissible." ECF No. 676 at 6. The government is required to prove that Payton Gendron committed his crimes because of the actual or perceived race or color of Black people. Evidence that [redacted] has little, if any, probative value on that point.

What the evidence does do—as the government's Supplemental Response makes clear—is encourage jurors to view Payton Gendron not as an individual, but as one among a homogenous group of mass shooters. See ECF No. 676 at 6 ("The defendant's manifesto and other writings showed his belief that he was next in a long line of hate-based mass killers."). This is improper and, given that Payton Gendron faces the death penalty, violates the Eighth Amendment requirement of a reliable, individualized capital sentencing determination. As discussed in the Motion, it creates an unacceptable danger that jurors will reach their sentencing decisions based not just on the facts and circumstances of this case, but also on the facts and circumstances of those other cases. *See* ECF No. 601 at 58. As the government argued in its Omnibus Penalty Phase Motion in Limine, ECF No. 597 at 14-15, evidence of comparator cases has "nothing to do with the defendant in this case or the circumstances of his offense

or any of the mitigating factors in§ 3592(a)." *United States v. Taylor*, 583 F. Supp. 2d 923, 935-36 (E.D. Tenn. 2008). A jury's "decision on life or death must turn on its understanding of this case, the offense involved, and this defendant, not on the specifics of other cases and other defendants." *Id.* at 936.

The admission of such evidence will also inevitably result in minitrials on the irrelevant crimes and the individuals who committed them. The government disputes this, asserting it will seek only to introduce the fact that [redacted] ECF No. 676 at 7. However, if the government is allowed to introduce that evidence, the defense must be allowed to explain it, contextualize it and rebut any adverse inferences that the jury may draw from it. "Rebuttal is 'necessarily a flexible concept,' and not 'limited to evidence that directly contradicts what it opposes; rather, rebuttal encompasses any evidence that the trial judge concludes fairly counters and casts doubt on the truthfulness of factual assertions advanced, whether directly or implicitly, by an adversary.'" *United States v. Rosemond*, 841 F.3d 95, 108 (2d Cir. 2016) (quoting *United States v. Barrow*, 400 F.3d 109, 120-21 (2d Cir. 2005)).

If the government presents evidence that encourages the jury to draw negative parallels between Payton Gendron and other mass shooters, the defense will be obligated to respond and meet that evidence. If the evidence invites the jury to reject Payton Gendron's mitigating evidence based on assumptions and speculation regarding, for example, the background and mental health of another individual accused of a similar crime, the defense will be forced to put on evidence to refute those assumptions and to show the differences between that individual and Payton. And if a jury is likely to consider the sentence received by another high-profile defendant when deciding the appropriate sentence for Payton Gendron, the defense will be obligated to explain why the cases are not comparable. To avoid this untenable and fundamentally unfair result, unnecessary references to other [redacted] should be excluded from the manifesto, the G\ server and any other exhibits in which they appear.

### F. Unnecessarily Cumulative and Inflammatory Racist Posts

In the Motion, Payton Gendron moved to exclude irrelevant, cumulative and extremely inflammatory material about Black people from the manifesto and G\ server on the ground that their probative value is minimal and the danger of unfair prejudice extreme, and that the material represents abstract beliefs that are constitutionally protected under the First Amendment. ECF 601 at 59-61, 78-89. The government responds that this evidence is relevant to show Payton Gendron's motive for the charged crimes. *See* ECF No. 639 at 30, 37. Under the HCPA, motive is an element of the offenses charged. Thus, as the government correctly notes, to prove motive it must prove that Payton Gendron committed the crimes because of the victims' "actual and perceived race and color." *Id.*

To meet this burden, the government is clearly permitted to present evidence that directly tends to establish that the attack was committed because the victims and intended victims were Black and that Payton Gendron believed that White people were being replaced by Black People. And it has an abundance of evidence in that regard, in the form of statements in the manifesto and G\ server that make the point expressly. It may also introduce evidence of racial bias that is directly tied to, and therefore probative of the motive for, the crime. Statements indicative of racial bias that were added to the actual murder weapon or to clothing worn during the attack, for example, have a similarly direct connection to the actual motive for the crime. But what the government may not do, and the First Amendment does not permit, is the evidentiary use of abstract political, ideological or other protected speech that goes beyond proof of motive and serves instead to invite the jury to convict and punish based upon thought rather than actions, and character rather than culpability.

The government therefore may not introduce every racist writing, post, meme, and symbol found in the manifesto and G\ server transcript, retrieved from the various electronic devices seized from his home and car, or extracted from his online and digital accounts.

In addition to violating the First Amendment, the use of hateful and offensive speech that goes beyond direct evidence of the motive element of the HCPA contravenes Fed. R. Evid. 404(b). Rule 404(b) restricts the admission of evidence not just of criminal activity, but any evidence "of extrinsic acts that might adversely reflect on the actor's character." *United States v. Scott*, 677 F.3d 72, 78 (2d Cir. 2012) (citing *Huddleston v. United States*, 485 U.S. 681, 685 (1988)). "[D]irect evidence of . . . the charged act," or evidence that is "inextricably intertwined with" it, such as the type of evidence described above, is not subject to the Rule. Id. at 77. But all other bad character evidence may be admitted only if "'(1) it [i]t is offered for a proper purpose; (2) it [i]s relevant to a material issue in dispute; (3) its probative value is [not] substantially outweighed by its prejudicial effect; and (4) the trial court g[ives] an appropriate limiting instruction.'" *Id.* at 79 (quoting *United States v. LaFlam*, 369 F.3d 153, 156 (2d Cir. 2004) (per curiam)).

Here, evidence of hateful, racist speech that goes beyond that which is probative of the motive element of the HCPA is not offered for any proper purpose. And as argued in the Motion, the cumulative effect of this mass of inflammatory evidence is to unfairly and impermissibly rouse the jury's passions to a point where "they would act irrationally in reaching a verdict." *Monsalvatge*, 850 F.3d at 495.

### G. Discussion of Weapons or Armor Other than What Payton Brought to Tops

The government argues that discussions of weapons or armor that were not used in the shooting are relevant to show premeditation, substantial planning, and the attempt to incite violence aggravating factor. ECF No. 639 at 40-41; ECF No. 676 at 8-9. For this evidence to be probative of premeditation or substantial planning, the government would have to show that Payton Gendron conducted this research prior to purchasing or acquiring the equipment he used during the crime, which it cannot do.

The evidence is also not particularly probative of the attempt to incite violence aggravators. If

anything, the discussions of weapons, armor and other equipment are simple lists. They provide little useful information for someone contemplating a mass shooting. For example, an aspiring copycat is not likely to be spurred into action by [redacted] when, in actual fact, none of the differences actually make a significant impact on whether an attack can be carried out or not.

### H. Musings About Post-Attack Events

The government argues that musings about what might happen after Payton Gendron committed the attack are relevant to prove its attempt to incite violence aggravator. *See* ECF No. 676 at 10-11. They are not. The first example the government gives is not an original statement but rather is copied verbatim from Brenton Tarrant's manifesto. *See* ECF No. 676 at 10-11 [redacted] *see also* Gov. Ex. 4B-2L at 13 (Tarrant manifesto); GOV-17651 (comparison of the two documents). The second example is a statement of a [redacted] and the delusional belief that [redacted] ECF No. 676 at 11. Moreover, neither statement remotely establishes that Payton Gendron, "*in preparation for and in committing the acts of violence charged in this case*, attempted to incite violent action by others." ECF. No. 125 at 4 (emphasis added). In other words, Payton Gendron's musings on what he might do in the future or what might happen to him are outside the scope of that aggravator.

Finally, as argued in the Motion, these musings are unfairly prejudicial and likely to inflame jurors by incorrectly suggesting that Payton Gendron is indifferent to the severity of a life sentence and may encourage jurors to vote for death on that basis, which would be improper and in violation of the Eighth Amendment. ECF 601 at 91.

### I. [redacted]

The government represents that it will not introduce evidence of this incident in its case in chief at trial. *See* ECF No. 639 at 61.

### J. Only Relevant Content is Admissible; All Else Should Be Redacted

The government does not respond to Payton Gendron's request to exclude statements on topics unrelated to the crimes charged, such as evidence [redacted]. *See* ECF No. 601 at 46-47, 65-66, 92-93. The Court should thus order that information falling within these categories be redacted from each version of the manifesto and the G\ server.

## IV. MOTIONS IN LIMINE RELATED TO ELECTRONIC DEVICES

### A. Motion In Limine to Preclude Inadmissible Evidence Seized from iPhone 11

#### 2C – FBI FD-302 Summarizing Findings from Black Apple iPhone 11

The government represents that it will not use this Exhibit in its case in chief at trial. *See* ECF No. 639 at 47.

#### 2D – Report of Examination Summarizing Extraction of Black Apple iPhone 11

The government represents that it will not use this Exhibit in its case in chief at trial. *See id.* at 47.

#### 2G – 2V - Discord Chats from Black iPhone 11

The government represents that it will redact all objected-to material in Exhibits 2G-2O and 2Q-

2V. *See id.* It further represents that it will not use Exhibit 2P in its case in chief at trial. *See id.*

**2W-1 – 2W-124 – Photos From Black iPhone 11**

The government represents that it will not use Exhibits 2W-12, 15, 16, 21, 23, 24, 31, 35, 41, 65, 71, and 79 in its case in chief at trial. *See id.* at 47-48.

Exhibits 2W-22 and 38 are images of a firearm that Payton Gendron received as a Christmas gift from his parents in 2019. It was recovered from his car after his arrest but was not used to commit the charged crimes. The images are thus relevant to neither "substantial planning" nor "execution of the attack." *Id.* at 48, 49. It also does not accurately represent the appearance of the firearm when it was recovered, as it lacks handwriting that was added to it later. The government asserts that the Exhibits are therefore relevant to prove that Payton Gendron was the person who added the writing to the rifle. *See id.* However, the contents of those writings should be excluded for the reasons set forth in the Motion, ECF No. 601 at 54-59, and herein, *see* Sections III.F., III.G., *supra.* The government also points to the fact that the images appear in Payton Gendron's Discord G\ server. *See* ECF No. 639 at 48-49. However, the fact that the images were also recovered from his iPhone has no independent relevance to the issues being tried and merely demonstrates their duplicativeness. The Exhibits should therefore be excluded as cumulative, also.

Exhibits 2W-25, 44, 58, 62, 64, 67, 69, and 95 are [redacted] that depict no weapons or gear that were used to commit the crimes and are thus irrelevant. As to Exhibit 2W-95, the government states only that the photograph also appears in the G\ server, *id.* at 54, a fact that, as noted, merely demonstrates its cumulativeness. As to 2W-58, 62, and 69, the government's theory of relevance is that they show him wearing clothes that are "similar" to the clothes that he was wearing when he committed the crimes, three, one and two months prior, respectively. *Id.* at 51-52. It

fails to explain, however, why this circumstance makes any material fact in this case more or less probable than it would be without these Exhibits. *See* Fed. R. Evid. 401. Obviously, other proof demonstrates conclusively what clothes Payton Gendron was wearing during the attack. These photographs show only that Payton Gendron owned clothes; the alleged 'similarity' between the garments depicted and those that he wore on May 14, 2022, at the very most suggests that he had worn the latter on prior occasions, a circumstance that, even if true, lacks any probative value whatsoever.

Exhibit 2W-25 depicts him wearing clothes that lack even that tenuous connection to the crime; the government's theory of relevance is merely that it was taken the same day that the crimes occurred. *See id.* at 48. The significance of this fact is not explained, and in fact there is none. As to Exhibit 2W-58, the government also notes that the image appears in Payton Gendron's Discord G\ server. *See* ECF No. 639 at 51. As stated above, this fact merely demonstrates its cumulativeness. As to Exhibit 2W-67, the government's theory of relevance is that it shows Payton Gendron the day before the attack wearing a shirt that surveillance video that it also seeks to introduce also shows that he was wearing the day before the attack. *See id.* at 52. The Exhibit is irrelevant and cumulative.

Exhibit 2W-44 shows Payton Gendron on a hiking trail, again with no weapons or gear—or even allegedly similar clothing—used to commit the charged crimes. The government's cryptic theory of relevance is that the photograph was taken [redacted], as described in his G\ server." *Id.* at 50. Its citation to Exhibit 4B-1C at 527 indicates that the government is referring to posts made on April 27, 2022, [redacted], there is no allegation or evidence to suggest that Payton conducted any activities related to planning the attack at that park. His presence there, and a photograph thereof, is

thus irrelevant to any material issue in the case.

As to Exhibit 2W-64, the government's theory of relevance is that it shows Payton Gendron "at [redacted] are evidence of substantial planning, plainly it would be the videos of him engaged in those activities at that location that are relevant; a photograph showing that he may have been there on a different date proves nothing with respect to the crime.[8]

Exhibits 2W-28, 37, 40, 47-49, 53, 54, 66, 68, 89, 97, 123, and 124 are all memes that Payton Gendron copied from the internet that relate to abstract beliefs about race that are protected expression under the First Amendment. The government asserts that Payton Gendron's possession of them is relevant to prove his racist motive and intent. *See* ECF No. 639 at 49-55. For the reasons stated in the Motion, ECF 601 at 59-60, in briefing regarding the racially motivated aggravating factor, ECF No. 268 at 22-27, ECF No. 660 at 2-4, and herein, *see* Section III.G., *supra,* all evidence of abstract beliefs that are not directly probative of the motive for committing the crimes, i.e., because of the race of the deceased and intended victims, must be excluded on First Amendment grounds. The sheer volume of evidence that the government seeks to introduce on this issue is also cumulative and will result in overwhelming and unfair prejudice to the defense. Contrary to the government's claim, ECF No. 676 at 2-4, nothing in the recent opinion of the Second Circuit affirming the use of racial motivation as an aggravating factor requires or permits the admission of this evidence.

In addition, the government incorrectly states that Exhibit 2W-89 includes [redacted]

[8] The government made the same argument regarding Exhibit 2W-76. See ECF No. 639 at 52-53. Defense counsel inadvertently neglected to move to exclude Exhibit 2W-76 and its substantial duplicate, 2W-72, on this basis in the Motion, and respectfully request that their admissibility be adjudicated by the Court along with Exhibit 2W-64.

[redacted] *Id.* at 53-54. [redacted] as more unfairly prejudicial than probative, hence it offers no basis on which to admit the meme that is Exhibit 2W-89.

As to Exhibits 2W-37, 40, 47-49, 53, and 54, the government also notes that the images appear in Payton Gendron's Discord G\ server. *See* ECF No. 639 at 50-51. As stated above, this fact merely demonstrates the cumulativeness of these Exhibits, as the fact that they also appear on the iPhone makes no fact of consequence to this case more probable. For the same reason, the government's argument with respect to Exhibit 2W-123, that it also appears in Payton Gendron's manifesto, *see id.* at 55, underscores the irrelevance and cumulativeness of that Exhibit. Finally, the government asks the Court to defer ruling on the admissibility of [redacted] until it determines whether the purported expert testimony of SSA Yeager will be permitted. *Id.* at 49, n.15. It does so on the basis that SSA Yeager's testimony will address [redacted] and thus render relevant to Payton Gendron's "motive and intent" [redacted]. *Id.* In fact, of the Exhibits discussed in this Section, only one – Exhibit 2W-37 – [redacted]. For the reasons stated above, that Exhibit should be excluded on the additional grounds that evidence of [redacted] is expression that is protected by the First Amendment, irrelevant to the issues in this case and highly prejudicial. *See* Section III.C., *supra*.

Exhibits 2W-39, 70[9], and 78 are photographs that relate to an incident that occurred in March

[9] In the Omnibus Motion, see ECF No. 601 at 111, defense counsel mistakenly referred to Exhibit 2W-70 as 2W-39. The government has responded to the argument as to 2W-39 and 78 but not, understandably, 2W-70. The grounds for excluding both Exhibits are the same, however, as 2W-70 is a duplicate of 2W-78.

2022, [redacted]. In the Motion, Payton Gendron moved to exclude all evidence of this incident as irrelevant and unfairly prejudicial. *See* ECF No. 601 at 91-92, 111. In its Response, the government represents that it will not use such evidence in its case in chief, ECF No. 639 at 46, including Exhibit 2W-78, *see id.* at 53. However, it does intend to use Exhibit 2W-39, [redacted] after the incident occurred. *See id.* at 49-50. The government's theory of relevance appears to be three-fold: first, in the photograph [redacted] second, that the photograph also appears in his Discord G\ server, along with a discussion of the incident; and third, it supports the inference that the G\ server belonged to Payton Gendron. *Id.*

As noted above, the alleged similarity between glasses depicted and those that he wore on May 14, 2022, at the very most suggests that he had worn the latter on prior occasions, a circumstance that, even if true, lacks any probative value whatsoever. The second point merely demonstrates the cumulativeness of the Exhibit, as the fact that it also appears on the iPhone makes no fact of consequence to this case more probable. Finally, Payton Gendron's ownership of the G\ server will be uncontested and, even if it weren't, the government has available to it an abundance of evidence to demonstrate ownership that lacks the unfairly prejudicial effect of irrelevant evidence [redacted]

Exhibit 2W-121 [redacted]. The government's theory of relevance for this Exhibit is that it is "relevant and admissible evidence of substantial planning because [Payton Gendron] [redacted] in his G\ server." *Id.* at 54-55. What Payton actually posts in the G\ server is: "[redacted] The evidence thus affirmatively shows that, if Payton

Gendron in fact [redacted] depicted in Exhibit 2W-121, these actions had nothing to do with the crimes at issue in this case.

There are two images that the defense has challenged, not on relevance grounds but because they are substantially similar to, and therefore cumulative of, other exhibits that the government seeks to introduce. *See* ECF No. 601 at 110 (Exhibit 2W-60 duplicative of 2W-50); *id.* at 111 (Exhibit 2W-76 duplicative of 2W-72). The defense moved the Court to require the government to elect which of the two exhibits it wishes to introduce in each instance. The government has not addressed this aspect of the Motion.

As to the remaining Exhibits that the defense has moved to exclude, Exhibits 2W-88 and 109, the government states only that their contents are "relevant and admissible evidence of substantial planning" because they also appear in the G\ server. *See id.* at 53, 54. The government makes no effort to explain why the fact that these images are in the G\ server is probative of substantial planning, much less why their duplication on the iPhone is also relevant thereto.

**2X – Web History from Black iPhone 11**

As set forth in some detail in the Motion, ECF No. 601 at 113-15, Exhibit 2X is [redacted] and which are, with few exceptions, irrelevant to the crimes charged. The government's Response as to this Exhibit is comprised of two sentences, one of which is merely a conclusory statement that the contents of the Exhibit are "relevant and admissible evidence of motive and intent as well as substantial planning." ECF No. 639 at 55. The Response also alludes to [redacted]. *Id.* To the extent that the government is referring to items 6, 7, 179-181, and 182-187, the defense concurs that those items may be relevant. The

remainder of the document should be excluded for the reasons stated in the Motion.

**2Y-2 – 2Y-20 – Videos From Black iPhone 11**

In its Response, the government represents that it will not introduce in its case in chief three of the eight video files extracted by law enforcement from Payton Gendron's iPhone, namely Exhibits 2Y-2, 5, and 19. *See id.* at 55-56. It argues that Exhibit 2Y-4, [redacted], should be admitted because it "bears on" research that Payton Gendron conducted about which body armor to use. *Id.* at 56. This video does not constitute research or convey usable information. [redacted]. There is actual information regarding AR500 body armor included in Payton Gendron's manifesto. If such content has any legitimate relevance to the crimes at issue, it is the relevant portions of the manifesto that should be introduced. The amateurish attempt at humor that is Exhibit 2Y-4 will be disturbing to many and thus unfairly prejudicial, as well as protected by the First Amendment.

Exhibits 2Y-6, 11, and 12 are [redacted]. Payton's possession of the hunting rifle, which he received as a Christmas gift from his parents years prior to the attack, was unconnected to the planning or execution of the crimes with which he is charged. In support of the admission of these Exhibits, the government notes only that the rifle was found in Payton's car following his arrest. *Id.* at 56. It makes no attempt to explain how this fact imbues [redacted] with any legitimate probative value. Payton Gendron's legal possession and use of that weapon is protected by the Second Amendment and possession of the videos is protected by the First Amendment Free Speech

Clause.

The government also seeks to present Exhibit 2Y-20, [redacted], belonging to someone else, was unconnected to the crimes with which he is charged and in no way constitutes "evidence of substantial planning" thereof. *Id.* It is therefore protected by the Second Amendment and possession of the video is protected by the First Amendment Free Speech Clause.

**2Z – Search History from Black iPhone 11**

In the Motion, the defense moved to exclude on relevance grounds three of the eight searches purportedly reflected in Exhibit 2Z and dated April 20, 2022. *See* ECF No. 601 at 117. The government responds that these searches are evidence of planning because Payton Gendron [redacted] on that date. ECF No. 639 at 56. However, there is no evidence to suggest [redacted]. The searches are irrelevant to the charged crimes.

**B. Motion In Limine to Preclude Inadmissible Evidence Seized from the Verbatim Thumb Drive**

**Exhibit 3A-2 –** [redacted]

The government does not dispute the fact Payton Gendron [redacted]. See ECF No. 639 at 57. It nonetheless argues that [redacted], a topic Payton researched and wrote about in his manifesto. But the government does not identify any discussion of [redacted], instead relying exclusively on a generic assertion of relevance. Because this Exhibit is not relevant and is unfairly prejudicial, it should be excluded.

**Exhibits 3A-3 and 3A-7** [redacted]

The government argues that this evidence is admissible because [redacted] and therefore is relevant to Payton Gendron's alleged belief in the Great Replacement Theory. See ECF No. 639 at 57-58. As discussed elsewhere, [redacted] is irrelevant and extremely prejudicial. *See* Section III.C., *supra*. This is especially true of this Exhibit, which [redacted]g. This is another example of the government seeking to introduce a "matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect" and must be excluded under Rule 403. *McRae*, 593 F.2d at 707.

**Exhibit 3A-4 –** [redacted]

As with so many of its Exhibits, the government responds to the Motion to exclude this meme with mere assertions of its relevance. *See* ECF No. 639 at 58. The government argues that the possession of this meme is evidence of motive and intent but does not explain how or why it tends to prove either. Additionally, this argument flies in the face of First Amendment protections. "It is now well established that the Constitution protects the right to receive information and ideas . . . This right to receive information and ideas, regardless of their social worth, is fundamental to our free society." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (internal citations omitted).

**Exhibit 3A-5 –** [redacted]

The government indicates it seeks to admit this evidence to show Payton Gendron used the thumb drive on which it was found and to establish ownership of his iCloud account. *See* ECF No. 639 at 58. Given that neither of these are disputed facts, this evidence has little to no probative value.

**Exhibits 3A-6 and 3A-9 – [redacted]**

The government asserts that the fact this message was found on this thumb drive in addition to on the Discord G\ server is evidence that it was important to Payton and thus is relevant to show motive, intent and substantial planning. ECF No. 639 at 58-59. Its alleged importance is of no evidentiary value, and these Exhibits are cumulative of the G\ server entry.

**Exhibit 3A-10 – [redacted]**

The government blandly asserts that this video is relevant to motive, intent, and substantial planning without explaining how that is so. *See* ECF No. 639 at 59. The fact it is racist does not make it relevant. Additionally, the fact Payton Gendron saved the video to a thumb drive does not prove its "importance to him" even assuming importance was relevant, which it is not. The government does not dispute that the evidence is extremely prejudicial, indeed it could not credibly do so. This evidence has no probative value, is extremely prejudicial, and should be excluded.

**Exhibit 3A-11 – [redacted]**

As with the previous Exhibits, the government asserts that this screenshot is probative of motive, intent, and substantial planning without explaining why this is so. *See* ECF No. 639 at 59. It also repeats its speculative argument that the mere act of saving a document means it is important. Additionally, the government's arguments regarding its [redacted]—highlights how cumulative this evidence is of far more probative evidence of the issues in the case.

**Exhibit 3A-12 – [redacted]**

The government asserts that this evidence proves Payton Gendron's [redacted] of

[redacted] but does not explain how evidence of [redacted] is probative of any fact of consequence in this case. Indeed, it is not. Evidence related to [redacted] is not relevant for its own sake, but rather only if it bears on Payton's motive or intent. [redacted] does neither and should be excluded.

**Exhibit 3A-13 –** [redacted]

As with the previous Exhibits, the government asserts that this screenshot is probative of motive and intent without explaining why this is so. See ECF No. 639 at 60. It also repeats its speculative argument that the mere act of saving a document means it is important. It should be excluded.

**Exhibit 3B and 3B-1 -- Thumb Drive and Seized Evidence**

The government represents that it will not use these Exhibits in its case in chief at trial. See ECF No. 639 at 61.

**C. Motion In Limine to Preclude Inadmissible Evidence Seized from the Black Computer Tower**

**Exhibits 4B-1 and 4B-2 – File Listings**

The government represents that it will not use these Exhibits unless Payton Gendron contends that he did not write his manifesto or the posts found on his Discord G\ server. *See* ECF No. 639 at 61. As Payton Gendron does not contest his authorship of either, this evidence is irrelevant and should be excluded.

**Exhibits 4B-2A, 4B-2D, and 4B-2E –** [redacted]

The government represents that it will not use these Exhibits in its case in chief at trial. *See* ECF No. 639 at 61.

**Exhibits 4B-2C, 4B-2H, 4B-2I, 4B-2L, 4B-2N, 4B-2R, 4B-2S, 4B-2T, 4B-2U, 4B-2W, 77C-4, 77C-6, 77C-8 –** [redacted]

The government argues that evidence that Payton Gendron [redacted] is probative of motive, intent and substantial planning. *See* ECF No. 639 at 62. That he saved them does not make them relevant. In likely recognition of how prejudicial these documents are, the government assures the Court it "does not intend to publish" all the Exhibits or "spend significant time, if any at all, highlighting the contents of them." Id. at 64. The Court should find no comfort in the government's assurances as the jury will have these documents if they are admitted into evidence and thus can review their contents, which are irrelevant and extremely inflammatory. *See* ECF No. 601 at 133 (discussing contents of writings). Moreover, it would be ineffective of defense counsel to allow these documents to go back to the jury without spending a significant amount of time cross-examining the sponsoring witnesses on important distinctions between [redacted]. Whatever minimal probative value these documents may have is substantially outweighed by many of the dangers listed in Rule 403 and they must be excluded.

**Exhibit 4B-2F –** [redacted]

The government represents that it will not use these Exhibits in its case in chief at trial. *See* ECF No. 639 at 64.

**Exhibits 4B-2J, 4B-2M, 4B-2O, and 4B-2V: Miscellaneous Writings**

The government acknowledges that these Exhibits are largely duplicative of Payton Gendron's other writings and represents that it may not choose to admit them for this reason. *See* ECF No. 639 at 65. It then asks the Court to defer ruling on the defense motion to exclude them. *Id*. The Court should deny this request and exclude this evidence from the government's case-in-chief under Rule 403.

### D. Motion In Limine to Preclude Inadmissible Evidence Seized from the HP Laptop

**Exhibits 77C-2 and 77C-3 – [redacted]**

The government argues that these images are relevant because [redacted] and mere possession of material its proposed expert can tie to [redacted] is somehow relevant to show that Payton Gendron committed his crimes because of the actual or perceived race or color of Black people. *See* ECF No. 639 at 65. Even assuming [redacted] the possession of these materials has minimal probative value and is cumulative of other, more direct evidence proving Payton's intent to target Black people.

**Exhibit 77C-11 – [redacted]**

As with the previous Exhibits, the government asserts that this meme is probative of motive and intent without explaining why this is so. *See* ECF No. 639 at 60. It also acknowledges this meme appears in the manifesto and G\ server, meaning it is cumulative. It should be excluded.

**Exhibits 77C-12 and 77C-13 – [redacted]**

The government argues that [redacted] are relevant. *See* ECF No. 639 at 66. But Payton Gendron did not argue they weren't relevant; he argued that they were cumulative because these same images were included in the G\ server. The government does not address this issue, and the fact the [redacted] were found on Payton's laptop in addition to the G\ server is not probative of any fact of consequence. These duplicate images should be excluded.

## V. MOTIONS IN LIMINE RELATED TO ONLINE SITES AND SERVICES

### A. Motion In Limine to Preclude Evidence Seized from Discord

**Exhibits 1000A-1 – 1000A-15 G\ Server from [redacted] November 2021 – May 2022 with photo appendices**

Although the government argues this Exhibit is admissible, it has since replaced it with another

version of the G\ server. The defense is currently processing that version and reserves the right to file a supplemental reply if necessary to address similar issues with the new version.

**Exhibit 1001 G\ Server from 'copypasta'**

Payton Gendron moved to exclude [redacted] from this Exhibit. *See* ECF No. 601 at 139. For the reasons given above, they should be excluded.

**Exhibit 1002 G\ Server from 'general'**

The government represents that it does not intend to introduce [redacted]. *See* ECF No. 639 at 67. Thus, the Court should exclude them from the government's case-in-chief.

**Exhibit 1008 G\ Server from [redacted]**

The government asserts that Payton Gendron's [redacted] is relevant to malice aforethought, premeditation, and substantial planning, but it does not explain why it believes it is relevant. *See* ECF 639 at 67-68. This is because it is not. Moreover, other than [redacted], the government does not respond to the argument that whatever probative value the posts on this channel may have is substantially outweighed by the danger of unfair prejudice. *Id*. For the reasons stated in the Motion, ECF No. 601 at 140, this Exhibit should be excluded.

**Exhibit 1009A Direct Messages [redacted]**

The government represents that it will not use this Exhibit in its case in chief at trial. *See* ECF No. 639 at 68.[10]

---

[10] Although the government reserved its right to supplement its response should the Second Circuit reinstate the attempt to incite violence aggravator and it has not done so. The same is true of the other

**Exhibit 1009B Direct Messages [redacted]**

The government represents that it will not use this Exhibit in its case in chief at trial. *See* ECF No. 639 at 68.

**Exhibit 1009C Direct Messages [redacted]**

The government represents that it will not use this Exhibit in its case in chief at trial. *See* ECF No. 639 at 68.

**Exhibit 1009D Direct Messages [redacted]**

The government represents that it will not use this Exhibit in its case in chief at trial. *See* ECF No. 639 at 69.

**Exhibit 1011A: Excerpt of Discord Channel [redacted] 'general' tab messages from 5.14.2022**

The government represents that it will not use this Exhibit in its case in chief at trial. *See* ECF No. 639 at 69.

**Exhibit 1012A: Excerpt of Discord Channel [redacted] tab**

As requested, the government agrees to redact the phrase [redacted] from this Exhibit. *See* ECF No. 639 at 69.

**B. Motion In Limine to Preclude Evidence Seized from Apple iCloud**

**1402 – iCloud iPhone 11 Notes**

In response to Payton Gendron's detailed recitation of the inadmissible content contained within Exhibit 1402, ECF 600 at 145-152, the government first invites the Court to defer ruling on this aspect

---

direct message exhibits.

of the Motion and to wait and see whether it ultimately decides to introduce the Exhibit, ECF No. 639 at 70. The Court should decline this invitation. Payton Gendron moved in Limine to exclude this evidence because the grounds for doing so are readily apparent and ripe for adjudication. The government makes no claim that its determination whether to use the evidence is contingent upon any unforeseeable circumstances, such as evidence presented by the defense; rather, its request appears to be based upon simple indecision—despite its insistence that it is ready for trial on numerous occasions over the course of the last four years. *See, e.g.,* ECF No. 74 at 38 (Tr., 3/10/2023) (MR. TRIPI: . . . We have a single defendant indictment. That's our case. We're ready for trial on the guilt phase"). Absent a showing of good cause, the defense is entitled to a ruling on its Motion.

The government's response on the merits of the objections to Exhibit 1402 is limited to conclusory statements that the Exhibit generally includes "notations regarding his motive and intent as well as his preparation and other items of interest." *Id.* Needless to say, whether the notes are "of interest" to the government is not the legal standard for their admissibility. The government alludes to general categories of information that it asserts are contained in the Exhibit but makes no effort to explain how those categories relate to the charged crimes, much less to link them to the specific content objected to by the defense. The Motion should be granted for the reasons stated therein.

**1403 – Excerpt of File [redacted]**

In the Motion, Payton Gendron moved to exclude Exhibits 1403 and 1404 because the government failed to comply with its discovery obligations as ordered by the Court, ECF No. 601 at 153-55, and because of new evidence that the data was obtained in flagrant disregard of the terms of the search warrant pursuant to which it was purportedly seized, in violation of the Fourth Amendment, *id.* at

155-161.[11] In its Response, the government represents that it will not use Exhibits 1403 or 1404 in its case in chief. *See* ECF No. 639 at 70. However, it also asserts that it may try to use them in rebuttal to evidence presented by the defense. *Id.* The government is prohibited from using evidence obtained in violation of the Constitution to rebut defense witnesses other than the defendant himself. *See* ECF No. 677 at 7-9, incorporated by reference as if fully set forth herein; *James v. Illinois*, 493 U.S. 307 (1990) (holding that Constitution forbids use of evidence obtained in violation of Fourth Amendment to impeach defense witnesses other than defendant).

Unless the Court were to adjudicate, and deny, the defense motion for reconsideration of its Motion to Suppress Evidence Seized from Apple iCloud Account, ECF No. 399 at 27-32, the government is precluded from using any part of these Exhibits to rebut the defense case. Accordingly, the government's request that the Court decline to adjudicate the reconsideration motion, ECF No. 639 at 70, n.25, forecloses the government's ability to use the Exhibits for that purpose. Even if the government later "promptly notif[ies] the Court" of its desire to use the Exhibits in rebuttal "so that it can consider" the defense Motion in Limine, *id.* at 70, it will remain foreclosed unless the Court also adjudicates the renewed motion to suppress. To the extent that the government is suggesting that the Court and the defense stand ready to conduct an evidentiary hearing on the Fourth Amendment issue in the middle of trial, that suggestion should be rejected.[12]

---

[11] In the Motion, defense counsel cited the opinion of the Ninth Circuit Court of Appeals in United States v. Holcomb, 132 F. 4th 1118, 1128 (9th Cir. 2025), for the proposition that a search warrant purporting to authorize the seizure of unlimited information that might link the device to its owner is unconstitutionally overbroad. See ECF No. 601 at 160. In so doing, counsel noted that the opinion had been withdrawn pending reissuance following a petition for rehearing but predicted that the relevant holding would remain undisturbed. Id. at 160, n.63. On July 17, 2026, the opinion was reissued, once again holding that the 'dominion and control' provision of the warrant at issue therein was both overbroad and insufficiently particular in violation of the Fourth Amendment. See United States v. Holcomb, 183 F. 4th 704, 713-15 (9th Cir. 2026).

[12] The government also asserts that its rebuttal mental condition experts should be permitted to review this illegally obtained evidence as part of formulating their opinions. See id. at 70, n.24 ("The

### C. Motion In Limine to Preclude Evidence Seized from Amazon Twitch

The government represents that will introduce in its case in chief only limited evidence from Exhibit 1601, including that [redacted]. *See* ECF No. 639 at 71.

### D. Motion In Limine to Preclude Evidence Seized from Google Account

As to all Exhibits containing information extracted from Payton Gendron's Google.com account, the government suggests that the Court defer ruling until trial is underway. *See* ECF No. 639 at 71. The Court should decline this invitation. Payton Gendron moved in Limine to exclude this evidence because the grounds for doing so are readily apparent and ripe for adjudication. The government makes no claim that its determination whether to use the evidence is contingent upon any unforeseeable circumstances, such as evidence presented by the defense; rather, its request appears to be based upon simple indecision. Absent a showing of good cause, the defense is entitled to the benefit of a ruling on its Motion as it prepares for trial.

In addition, the Google evidence includes yet more [redacted]. For this

government's expert witnesses may properly consider this evidence when rendering expert opinions."). If they do so, their testimony will be subject to preclusion for the same reasons that it must be precluded due to their review of video recorded statements extracted from Payton Gendron in violation of his Fifth and Sixth Amendment rights. See ECF No. 677 at 9-14, incorporated by reference as if fully set forth herein; cf. ECF No. 658 at 30 ("THE COURT: But what concerns me is if the tests are done and the expert now formulates an opinion, how does the expert excise the bad test from the expert's opinion? In other words, the expert's opinion is made on the universe of knowledge that the expert has. And it's going to be difficult, if I say, Geez, I made a mistake and this test shouldn't have been done, for the expert to say, Okay, well, I'll take that little chunk of my knowledge out and give an opinion based on everything except that. So there's a risk there for the government as well.").

category of evidence, among others, it is necessary for the Court to have a complete understanding of the scope and volume of material that the government seeks to introduce, from all sources, in order to make the "conscientious assessment of whether unfair prejudice substantially outweighs probative value" required by Fed. R. Evid. 403. *United States v. Salameh*, 152 F.3d 88, 110-11 (2d Cir. 1998).

**1700-A1 – Subscriber Information Record for [redacted]**

In its Response, ECF No. 639 at 72, the government indicates that it has no objection to the redactions proposed by the defense in the Motion, ECF No. 601 at 166-67.

**1700-A2 – Google Account Change History**

Although it refers to Exhibit 1700-A2 in a heading, ECF No. 639 at 72, the government does not actually respond to the defense arguments with respect to this Exhibit. It should be excluded in its entirety for the reasons set forth in the Motion. *See* ECF No. 601 at 167.

**1700-A3 – Google [redacted]**

The government responds to the Motion with respect to Exhibit 1700-A3, [redacted] dated April 12, 2020, with mere conclusory assertions of its relevance. *See* ECF No. 639 at 72. It completely ignores the fact that the search was allegedly made *over two years* before the crimes occurred and at least a year and a half before there is any evidence to suggest that Payton Gendron conceived of or began planning the attack; contains no hint of racial bias or animus; and is expression on a matter of public concern that sits at the very apex of First Amendment protections. *See* ECF No. 601 at 167; *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (noting that "'speech in public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection'") (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)).

The government is permitted to use constitutionally protected expression as evidence against a criminal defendant only when it is directly relevant to prove motive or an element of the underlying offense. *See* Section III.G., *supra.* Exhibit 1700-A3 falls far outside this narrow exception to the requirements of First Amendment jurisprudence and it must therefore be excluded. Permitting the government to use expressive activity with such a tenuous logical and temporal connection to criminal activity and such a profound tendency to portray the defendant as morally reprehensible fails to pass constitutional muster.

**1700-B2 –** [redacted]

In the Motion, ECF No. 601 at 168-174, Payton Gendron moved for extensive redactions of Exhibit 1700-B2, [redacted]. The unfair prejudice that will result if the [redacted], requires the exclusion of such evidence. *See* Section III.E., *supra.* Additionally, because of how the application works, only a small fraction of the activity potentially represents conscious action by the user, beyond navigating to or viewing a general area. The evidence is therefore both irrelevant and misleading.

The government again responds with mere conclusory assertions of relevance, failing to even attempt to identify any logical chain of inference that might support admissibility of the items objected to. *See* ECF 639 at 72-73. While claiming that [redacted] *id.* at 72, the government fails to identify which of the items it believes fall into that category, much less which of those may reflect conscious action on the part of Payton Gendron.

**1700-B3 –** [redacted]

The defense has moved to exclude Exhibit 1700-B3, [redacted] unrelated to the Tops grocery store or even to Buffalo more generally, in its entirety. *See* ECF 601 at 174-77. The government agrees that the portions of the Exhibit that relate to the Conklin, NY area, where Payton Gendron's family lives, ECF No. 601 at 175-76, and to areas outside of New York State, *id.* at 176, should be excluded. *See* ECF No. 639 at 72 n.28. The remainder of the Exhibit should also be excluded, for the reasons stated in the Motion and Section III.E., *supra.*

**1700-B4 –** [redacted]

In its Response, ECF No. 639 at 73, the government fails to supply any logical reasoning under which Payton Gendron's [redacted] as reflected in Exhibit 1700-B4 is probative of his motive, intent or planning of the May 14, 2022, attack. The government correctly notes that the defense agrees that *some* information regarding Brenton Tarrant and his crimes is admissible, principally because Payton Gendron copied over 70% of his so-called manifesto verbatim from a similar document prepared by Tarrant. However, we do not concede that a [redacted] constitutes evidence of planning or motive.

Nor do we concede that [redacted] reflected in Exhibit 1700-C1, constitute such evidence, [redacted]. The government fails to acknowledge that these [redacted] over a year before the charged crimes and long before there is any evidence whatsoever to suggest that Payton Gendron had conceived of, or was planning, an attack himself. As for the [redacted], such naivete shows on its face that the activity had nothing to do with the motive or planning for the attack at the Tops grocery store. None of the government's conclusory statements in its Response supports a different conclusion.

**1700-C2– Google Searches** [redacted]

Exhibit 1700-C2 should be excluded for the same reasons as Exhibit 1700-A3, *supra.*

**1700-C3– Google Searches** [redacted]

In its Response, the government ignores the fact that, with the exception of two items related solely to videogaming, the Google web browser searches reflected in Exhibit 1700-C3 all occurred prior to February 26, 2021, i.e., over a year before the crimes were committed and long before there is any evidence to suggest that Payton Gendron conceived of or began planning the attack. On this ground alone, this Exhibit should be excluded in its entirety as requested in the Motion. *See* ECF No. 601 at 178-183. The government's assertion that the fact that Payton Gendron's hunting rifle was in his car at the time of his arrest renders it probative of planning for the attack, ECF No. 639 at 74, should be rejected, as the rifle played no part whatsoever in the commission of the crimes. In any event, [redacted], are irrelevant regardless of the presence of the rifle in the car well over a year later.

The government does concede that all searches related to videogaming should be excluded, as well as irrelevant searches for information about [redacted]. *Id.* at 73-74, n.29. However, it fails to identify any items in Exhibit 1700-C3 that it believes are *not* videogame-related. The Exhibit should therefore be excluded in its entirety as requested.

**1700-D– Google Activities Log, 1700-E– Google Aggregated Activities Log, and 1700-F–** [redacted]

The government represents that it will not use these Exhibits in its case in chief at trial. *See* ECF No. 639 at 74.

**1700-G-1-20 – Documents Contained in Google Drive**

In the Motion, ECF No. 601 at 186, the defense moved to exclude two documents extracted from the Google search warrant return that were allegedly stored in Payton Gendron's Google Drive account, namely Exhibits 1700-G-8 and G-9. In response, the government merely states that the Exhibits are relevant to show motive, intent and planning, with no explanation whatsoever as to how that can be true of [redacted] *See* ECF No. 639 at 74. These Exhibits should be excluded.

**1700-H-1-39 – Photos from Google Drive**

In the Motion, the defense moved to exclude three of the 39 images extracted from the Google search warrant return that were allegedly stored in Payton Gendron's Google Drive account and labeled by the government as Exhibits 1700-H-1-39. *See* ECF No. 601 at 186-87. In response, the government merely repeats the conclusory mantra that the Exhibits are relevant to show motive, intent and planning. *See* ECF No. 639 at 74-75. Image436, [redacted] should be excluded for the reasons stated in the Motion and herein with respect to Exhibit 1700-B-4, *supra*. Image395 and Image303, both internet memes, should be excluded for the reasons stated in the Motion and herein with respect to [redacted] and included in Exhibit 2-W-1-124, *supra*. Image224 is a duplicate of Exhibit 2W-88, [redacted] that has no connection to the crimes or to any material issue in the case, should also be excluded.

## VI. MOTIONS IN LIMINE RELATED TO PHYSICAL EXHIBITS SEIZED FROM [redacted], VEHICLE, AND [redacted]

### A. Motion In Limine to Preclude Inadmissible Evidence Seized from [redacted]

The government represents that it will not introduce Exhibits 7, 8, 17, and 18, in its case and chief at trial, ECF No. 639 at 76, but reserves its right to introduce [redacted] recovered from the defendant's bedroom and that he discusses in his G\ server. The government offers no evidence that these materials were used in preparation or planning for the offense other than a vague reference to the research that Payton Gendron engaged in prior to committing the attack. Absent any connection to the crimes with which Payton Gendron is charged, these items are irrelevant.

The government represents that it reserves its right to introduce a limited number of photographs taken during the search of [redacted] to explain the location of physical items seized, including Exhibits 22_001-22_008, 22_189-22_198, 22_200-22_219, 22_340-22_351 and 22_481-22_499. To the extent the government fails to prove that any of the items depicted were used in preparation or planning for the offense, or if the photographs are duplicative of the physical evidence they depict, we reserve our right to object to the admissibility of these pictures. We understand that the government will not use any of the remaining Exhibits in the photograph series, from Exhibits 22_001 through 22_506, in its case in chief.

### B. Motion In Limine to Preclude Inadmissible Evidence Seized from Ford Taurus

The government represents that it will not introduce Gov. Exhibits 61 and 70 in its case and chief at trial, ECF No. 639 at 77. Additionally, although the weapons recovered from the vehicle (Ex. 83 (Savage Arms rifle) and Ex. 84 (Mossberg shotgun)) are relevant and admissible at trial, for the reasons states in the Motion, ECF No. 601 at 193-93, and herein, *see* Sections III.F. and III.G., *supra*, the government should be precluded from introducing [redacted]

[redacted].

### C. Motion In Limine to Preclude Inadmissible Evidence Seized from [redacted]

The government represents that it will not introduce Gov. Exhibits 901 and 902 in its case and chief at trial, ECF No. 639 at 78.

## VII. MOTION IN LIMINE TO PRECLUDE INADMISSIBLE EVIDENCE REGARDING [redacted]

**Retired FBI [redacted].**

The defense has moved to exclude the testimony of [redacted] *See* ECF No. 601 at 197, 199. For the reasons stated in the Motion, this evidence is irrelevant, highly prejudicial and should be excluded. *Id.* at 199. The government's theory of relevance is that the search "is simply a matter of what happened" at the scene of the crime after the crimes were committed. ECF No. 639 at 79. Of course, not everything that "simply . . . happened" during post-crime scene processing is relevant at trial; evidence must have "a tendency to make a fact [of consequence in determining the action] more or less probable than it would be without the evidence." Fed. R. Evid. 401. No such tendency is present here and the government does not even attempt to identify one. The evidence would therefore be inadmissible even without its tendency to cause significant unfair prejudice.

**Ex. 4B-2F – [redacted].**

The government represents that it will not use these Exhibits in its case in chief at trial. *See* ECF No. 639 at 79. It does note in its Response that it intends to introduce a [redacted] that was extracted from the G\ server. *Id.* at 79, n.36. This photograph should be excluded for the reasons stated in the Motion, ECF No. 601 at 74-78, 54-59, 201-202, and herein, *see* Section III.F.,

*supra*.

**Ex. 4B-2C:** [redacted]

[redacted] should be excluded in its entirety for the reasons stated in the Motion, ECF No. 601 at 74-78, 54-59, 199, and herein, *see* Section III.F, *supra*.

## VIII. MOTION IN LIMINE TO EXCLUDE [redacted]

The government represents that it will not introduce evidence [redacted], in its case in chief at trial, except for mention of the incident in a G/ server. *See* ECF No. 639 at 80.

## IX. MOTION IN LIMINE TO PRECLUDE COMPILATION SUMMARY VIDEO AND RELATED TESTIMONY

The government has changed its theory of admissibility for its "compilation video" from Fed. R. Evid. 1006 (summary exhibit) to Fed. R. Evid. 107 (illustrative aid). ECF No. 676 at 17-19. While this resolves the question of admissibility (illustrative aids under Rule 107 are not evidence and are not given to the jury during deliberations), it leaves unresolved several of Payton Gendron's objections to the content and length of the video. *See* ECF No. 601 at 206-210; ECF No. 662 at 14. The government has agreed to remove [redacted] an entry from the G\ server referring to Payton Gendron filling up his gas tank, and a significant portion of the pre-attack GoPro video. ECF 639 at 84-85. However, issues regarding other portions of the video, [redacted] and the manner in which these pieces are stitched together by the government, remain unresolved. Ultimately, the Court will not be able to rule on whether the video may be used as an illustrative aid until after it has resolved these issues.

Additionally, the government has not made clear when it intends to present its compilation video to the jury. Payton Gendron objects to presentation of the video during the evidentiary portion of the trial as it is wholly unnecessary for the jury to understand the evidence and thus has little utility in assisting comprehension of that evidence. If anything, the video might help the jury understand the government's prosecution theory, but that must wait for closing arguments. Allowing the government to play the video at the close of its evidence and before the defense has presented its case would also create a substantial and unacceptable danger of unfair prejudice insofar as it would bolster the government's case and essentially give it two closing arguments. It would also confuse the issues, mislead the jury and waste time.

## X. REPLY TO NEW ISSUES RAISED IN THE GOVERNMENT'S COMBINED SUPPLEMENTARY RESPONSE TO DEFENSE MOTIONS IN LIMINE

### A. Reply Regarding the Transcript of Payton Gendron's Guilty Plea in County Court (ECF No. 676 at 13-15)

With its Combined Supplemental Response to Defendant's Motions in Limine and Reply in Support of the Government's Guilt Phase Motions in Limine, the government has now provided a full transcript of Payton Gendron's guilty plea in Erie County Court outlining its proposed redactions. *See* ECF No. 676 at 14; *see also* Exhibit 5000A.[13] The instant Reply from the defense is limited to the relatively narrow areas of disagreement between the parties that remain. Those areas of disagreement are delineated in Exhibit A, attached hereto – the government's proposed redactions are outlined in red, and the areas of disagreement between the parties have been highlighted in yellow.[14]

---

[13] The government appears to concede that, absent an assertion of a constitutional defect in the state court plea (not applicable here), Judge Eagan's finding that Payton Gendron was making "a knowing, informed and voluntary decision," is not admissible at this trial. *See* ECF No. 676 at 15; Gov. Ex. 5000A at 22.

[14] Where the government's proposed redactions are highlighted in yellow, the defense requests that

These areas of disagreement fall into the following categories: 1) passages in which the Court, after eliciting Payton Gendron's factual admissions to the elements of the crimes charged, cites the title and New York State Penal Law section of those crimes (*see* Exhibit 5000A at 23-33); and 2) some, but not all of the colloquy related to Payton Gendron's state of mind, knowledge, mental and physical condition, and understanding of the consequences of his plea (*see id*. at 16, 20-21, 22).

First, as explained in the Defense Response to the Government's Combined Guilt Phase Pretrial Memorandum and Motions in Limine (ECF No. 635 at 3-4), the title and section number assigned to a particular offense in the New York State Penal Law are simply not relevant to prove Payton Gendron's conduct underlying the federal charges. These passages are, therefore, inadmissible under the Federal Rules of Evidence. *See* Fed. R. Evid. 401. Moreover, even if these titles and section numbers, combined with Payton Gendron's utterance of the word "guilty" were admissible as the statement of a party opponent under Rule 801 *and* relevant under Rule 401, the probative value of these titles is substantially outweighed by the danger of unfair prejudice, confusing the issues, or misleading the jury under Rule 403.

This is particularly true of that portion of the plea colloquy that refers to New York Penal Law §490.28, titled "Domestic Act of Terrorism Motivated by Hate in the First Degree." As elicited by Judge Eagan during the plea colloquy and relevant here, this crime requires that a defendant intend to cause death or serious physical injury to five or more persons; causes the death of at least one person; and causes or attempts to cause the death of four or more additional persons; in whole or substantial part because of the perceived race and/or color of such person or persons. *See* Exhibit 5000A at 22-23; NYS P.L. §490.28.

those passages *not* be redacted; where unredacted passages are highlighted in yellow, the defense requests that they be redacted.

Payton Gendron admitted that he engaged in the conduct that satisfied these elements. *See* Exhibit 5000A at 22-23. The fact that the New York State Legislature named this crime "domestic act of terrorism" does not establish that he committed any additional, relevant conduct. Moreover, the phrase "domestic terrorism" does not share a universal definition in either common usage or law, *see, e.g.*, 18 U.S.C. §2331(5) (defining "domestic terrorism" under federal law). It is also, unmistakably, a frightening and inflammatory label that adds nothing relevant to Payton Gendron's factual admissions.

The government's response to these objections misses the mark. Rather than address the arguments that the titles and section numbers of the New York Statute are irrelevant and unfairly prejudicial, the government asserts only that, combined with Payton Gendron's response, the Court's inquiry is not hearsay. *See* ECF No. 676 at 14. Even assuming that assertion to be true, it fails to address the fundamental defense objections. These portions of the colloquy should be excluded under Rules 402 and 403.

Next, the government inconsistently proposes that some portions of the colloquy that are designed to establish Payton Gendron's ability to understand the proceedings and appreciate the consequences of his decision to plead guilty be redacted. Though the government does not explain its logic, presumably it seeks to admit certain passages to establish that Payton Gendron's admissions are credible. If that is true, however, the same logic applies across the board; there is no apparent basis to pick and choose among these exchanges as the government has proposed.

For example, the government includes the Court's statement that the law requires it "to conduct an inquiry of the parties to ensure the Defendant's guilt and that his plea is entered knowingly, intelligently, voluntarily and of his own volition." *See* Exhibit 5000A at 4. As the colloquy continues, the government includes questions about his age, physical and mental health, intoxication, education, and whether he's discussed the change of plea with his defense team. *Id*. at 15. Immediately thereafter,

however, the government proposes to redact the following exchange, which is clearly designed to explore the same concerns:

> The Court: Have you had enough time to discuss this change of plea with them?
>
> The Defendant: Yes.
>
> The Court: Have they answered any questions or concerns you may have about changing your plea in this matter?
>
> The Defendant: Yes.
>
> The Court: Are you satisfied with their services?
>
> The Defendant: Yes.
>
> The Court: Do you have confidence in their advice?
>
> The Defendant: Yes.
>
> The Court: While you are an adult in the eyes of the law, you are still a young man. Have you had an opportunity to discuss the change of plea with your parents?
>
> The Defendant: Yes.
>
> The Court: Have you had enough time to discuss it with them?
>
> The Defendant: Yes.
>
> The Court: Is there anyone else that you wish to speak to regarding your plea before we go forward today?
>
> The Defendant: No.
>
> *Id*. at 16.

Following this passage, the Court moves on to questions about the voluntariness of the plea, e.g., whether Payton Gendron has been threatened or coerced to change his plea, and whether he has made an independent decision to change his plea. *Id*. at 16-17. The government would like to include these questions and answers, as well as the exchanges that follow in which the Court explains the rights he is waiving by entering a guilty plea. *Id*. at 17-18. The government would like to redact, however, the

Court's explanation that "the only available sentence for the first count…is life imprisonment without parole" and Payton's acknowledgment of that inevitable result. *Id*. at 20-21. This exchange, too, establishes his understanding of the consequences of his decision to make these admissions and the voluntariness of his plea.

Thereafter, the government proposes to include the Court's question, "Are you prepared to go forward with your plea at this time" (*id*. at 21), but would like to redact the related exchange that immediately follows:

> The Court: Do you need any more time to think about this change of your plea?
>
> The Defendant: No.
>
> The Court: Would you like another opportunity to speak with your lawyers before we proceed?
>
> The Defendant: No.
>
> The Court: Is there anyone else that you would like to speak with before we proceed?
>
> The Defendant: No.
>
> *Id*. at 22.

The defense has not sought to exclude the questions posed by the Court to ascertain that Payton's "plea [was] entered knowingly, intelligently, voluntarily and of his own volition" (*see* Exhibit 5000A at 4) and his responses. If these exchanges are included, however, fundamental fairness requires that the same standard be applied consistently through the entire transcript.

Based on the foregoing Payton Gendron's motions in limine to preclude or limit inadmissible evidence should be granted.

Dated: September 16, 2026
Buffalo, New York

*s/Sonya A. Zoghlin*
Sonya A. Zoghlin
Assistant Federal Public Defender

*s/MaryBeth Covert*
MaryBeth Covert
Senior Litigator

*s/Julie Brain*
Julie Brain
Attorney at Law

*s/Theresa M. Duncan*
Theresa M. Duncan
Law Office of Theresa M. Duncan LLC