UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

PAYTON GENDRON,

Defendant.

22-CR-109 (LJV)

**MOTION TO DISMISS THE INDICTMENT FOR VIOLATIONS OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND THE JURY SELECTION AND SERVICE ACT IN THE TRIAL JURY SELECTION**

## I. INTRODUCTION

The integrity of the jury selection process relies on transparent and fair procedures, consistent with the Sixth Amendment's guarantee of a jury selected from a fair cross-section of the community, *Taylor v. Louisiana*, 419 U.S. 522, 528 (1975), and the Jury Selection and Service Act (JSSA). The Sixth Amendment and JSSA provide that all litigants in federal courts are entitled to have grand and petit juries selected at random from a fair cross-section of the community. *See* 28 U.S.C. § 1861. And "[n]o citizen shall be excluded from service as a grand or petit juror…on account of race, color, religion, sex, national origin, or economic status." 28 U.S.C. § 1862.

Payton Gendron hereby moves to dismiss the Indictment on the grounds that the petit jury pool fails to reflect a fair and reasonable cross section of the community resulting in continued systemic under-representation of African Americans in the Western District of New York's jury lists.

## II. PROCEDURAL HISTORY

On July 14, 2022, Payton Gendron was indicted by the March 2022 grand jury that was impaneled on March 25, 2022. (ECF No. 6). Following indictment, the defense sought and obtained discovery about grand jury selection practices and procedures in the Western District of New York, and thereafter filed a *Motion to Dismiss the Indictment as it was Obtained in Violation of the Fifth and Sixth Amendments to the United States Constitution and in Violation of the Jury Selection and Service Act*, ECF No. 409. After completion of briefing and oral argument on the Motion, the Court issued a Decision and Order denying it, ECF No. 504, finding that Payton Gendron had not proven a fair-cross-section violation, and further finding that the disparities in representation were neither unfair nor systemic. *Id*. at 1.

Nonetheless, the current data shows a continued under-representation of Black persons in the 2025 Qualified Jury Wheel. Payton Gendron therefore asks the Court to dismiss the indictment because he is being deprived of his right to a trial jury drawn from a fair cross section of the community.

## III. LEGAL STANDARD

Under a fair cross-section challenge, the court applies the three-pronged test set forth in *Duren v. Missouri*, 439 U.S. 357, 364 (1979), requiring a defendant to show:

> (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Id.* "The *Duren* test 'governs fair[-]cross[-]section challenges under both the JSSA and the [S]ixth [A]mendment.'" *United States v. Rioux*, 97 F.3d 648, 660 (2d Cir. 1996) (quoting *United States v. LaChance*, 788 F.2d 856, 864 (2d Cir. 1986)).

In support of the present Motion, we rely on the Declaration of Jeffrey Martin, annexed hereto as Exhibit A, which demonstrates that in the Western District of New York, Black people continue to be systemically and significantly underrepresented in the District's jury lists, including in the 2025 Qualified Jury Wheel from which the trial jury is to be selected in this case.

## IV. ARGUMENT

### A. Black People are a "Distinctive Group."

The government has previously conceded, and there could be no serious dispute, that Black people are a "distinctive group." *See* ECF No. 413 at 4 (government conceding the first prong of the *Duren* test in the first motion to dismiss the indictment based on the selection of the grand jury); *United States v. Jackman*, 46 F.3d 1240, 1246 (2d Cir. 1995) (explaining that Black people and Hispanic people are distinctive groups). A claim of under-representation of Black people satisfies the first prong of the *Duren* test.

### B. The Representation of Black People in the 2025 Master Jury Wheel Is Not Fair and Reasonable in Relation to the Number of Such Persons in the Community.

In support of the second prong of *Duren*, Jeffrey Martin, an expert in statistical analysis and jury composition, has reviewed and analyzed the data disclosed by the Court. *See* Ex. A. In opining that the under-representation of Black people in the venire from which the trial jury is to be selected is not fair and reasonable in relation to the number of such persons in the community, Mr. Martin has utilized three statistical methods to demonstrate the significant under-representation: the absolute disparity method, the comparative disparity method, and the statistical decision theory. "[T]he absolute disparity method 'measures the diminished likelihood

that members of an underrepresented group, when compared to the population as a whole, will be called for jury service.'" *United States v. Slaughter*, 110 F.4th 569, 580-81 (2d Cir. 2024), quoting *Rioux*, 97 F.3d at 655. The "[c]omparative disparity is calculated by dividing the absolute disparity by the group's percentage in the population, then multiplying by 100 (to turn the figure into a percentage)." *Slaughter*, 110 F.4th at 581. Lastly, "[s]tatistical decision theory [or standard deviation analysis] measures the likelihood that underrepresentation could have occurred by sheer chance"; in other words, "the more improbable it is that a particular jury pool resulted from random selection, the more likely there is a defect in the jury selection process." *Id*. at 580 (cleaned up), citing *Rioux*, 97 F.3d at 655.

The data establishes a statistically significant underrepresentation of Black persons using any of the approved methods of analysis. Specifically, the defense expert finds:

- The absolute disparity for Black or African-American persons on the 2025 Qualified Jury Wheel is 2.57% under-representation. Ex. A at ¶ 24.

- The comparative disparity for Black or African-American persons on the 2025 Qualified Wheel is 29.78% under-representation. That means more than a quarter of the Black or African-American persons expected to be in the Qualified Wheel are missing. Ex. A at ¶ 29.

- The percentage of Black or African-American persons in the 2025 Qualified Jury Wheel differs from the percentage of Black or African-American persons in the jury eligible population by more than 6 standard deviations. The under-representation of Black or African-American persons is statistically significant. That is, the under-representation is a product of a systematic non-random factor. Ex. A at ¶ 33.

We urge the Court to not look solely at the absolute disparity method in assessing the underrepresentation of Black persons in the jury wheel.[1] As the Second Circuit in *United States v.*

---

[1] In denying the defense motion to dismiss the Indictment on the basis that the grand jury selection was in violation of the Fifth and Sixth Amendments, and the JSSA, this Court limited its analysis to the absolute disparity method. ECF No. 504 at 7-10 (noting the Second Circuit's acknowledgment of the limitations of the absolute disparity method, but citing the Court's continued application of the method since then).

*Biaggi*, recognized, "[t]he risk of using [the "absolute numbers"] approach is that it may too readily tolerate a selection system in which the seemingly innocuous absence of small numbers of a minority from an average array creates an unacceptable probability that the minority members of the jury ultimately selected will be markedly deficient in number and sometimes totally missing." *Id*. at 678. The Court in *Biaggi* also noted that the facts of that case pressed the "absolute numbers" approach "to its limit." *Id*.

Similarly, in *United States v. Slaughter*, the Court again "recognized the limits of [the absolute disparity/absolute numbers] method 'when applied to an underrepresented group that is a small percentage of the total population,' because an underrepresentation that can be fixed by adding 'only' one or two members to an average venire might 'lead to the selection of a large number of venires in which members of the group are substantially underrepresented or even totally absent.'" 110 F.4th at 581 (quoting *Jackman*, 46 F.3d at 1247). Considering these concerns, the Court was "mindful that the circumstances of any given case may warrant the use of different or even multiple modes of statistical analysis…." *Id*. This is such a case.

The risks and limitations of relying exclusively on the absolute disparity method of analysis are readily apparent under the circumstances of this case. Because absolute disparity does not adjust for the size of the group, it disproportionally affects minority groups in less-populated districts. *See Jackman*, 46 F.3d at 1247 (the problem with absolute numbers/disparity approach is "particularly acute here because of the small percentage of voting-age Blacks and Hispanics residing within the Hartford Division (6.34% and 5.07% respectively, as compared

with 19.9% and 15.7% within the Manhattan Master Wheel of the Southern District of New York in *Biaggi*").[2]

The comparative disparity approach resolves the defect of misleading comparisons from different jurisdictions. In this case, the comparative disparity approach reveals that the 2025 Qualified Jury Wheel is missing more than a quarter of the Black or African American persons expected to be in the wheel. *See* Ex A at ¶27. This figure establishes the significant underrepresentation of Black persons in the pool from which trial jurors are to be selected in this case.

### C. The Under-representation of Black Persons is Due to Systematic Exclusion of the Group in the Jury-Selection Process.

As to the final prong in the *Duren* test, the data analysis proffered by the defense also establishes that the underrepresentation of Black persons in the 2025 Qualified Jury Wheel is systemic. Mr. Martin explains:

> Standard deviations allow statisticians to scientifically determine whether the demographics of the jury list diverge substantially enough from the population demographics that the difference is not the product of chance but is systematic. Statisticians use a standard of 2 or 3 standard deviations to determine statistical significance. If there is no systematic under or over-representation of a distinctive group, the divergence of demographics should exceed 2 standard deviations only approximately 5% of the time while the divergence of demographics should exceed 3 standard deviations only approximately 0.5% of the time. In the same way that the decrease in probability from 2 standard deviations to 3 standard deviations from expected is much greater than 1.5 times (or 3/2 times), higher standard deviations from expected exponentially reduce the probability. The probability of more than 5 standard deviations from expected is practically 0.00%. The smaller the sample size, the larger the range of possible outcomes and so the less a non-random factor can be determined.

---

[2] The problem is "particularly acute" here as well: in the Buffalo Division of the Western District of New York, the small percentage of Blacks residing within the division, coupled with the disproportionate of those living on the East Side of Buffalo, see ECF No. 489 at 70-98, risks having a jury that wholly underrepresents this population.

Ex. A, ¶ 44. The data demonstrates that "[t]he percentage of Black or African-American persons in the 2025 Qualified Jury Wheel differs from the percentage of Black or African-American persons in the jury eligible population by more than 6 standard deviations. The under-representation of Black or African-American persons is statistically significant. That is, the under-representation is a product of a systemic non-random factor." *Id.* at ¶ 45.

Data analyzed from the Form AO-12s supplied for other Master Jury Wheels for the Buffalo Division provide a historical view of representativeness. *Id.* at ¶ 36-41. That data demonstrates a historical disparity in the Buffalo Division, namely an under-representation of Black or African-American persons compared to the jury eligible population shows a consistent statistically significant under-representation. *Id.* at ¶ 42.

Systematic exclusion may be proven where, as here, data demonstrates that underrepresentation of a distinctive group occurred over an extended time. As observed in *Biaggi*, 909 F.2d at 678, the "opportunity [for a representative jury] can be imperiled if venires regularly lack even the small numbers of minorities necessary to reflect their proportion of the population." Underrepresentation of Black persons in the Buffalo Division 2025 Qualified Jury Wheel is significant and continuous.

## V. CONCLUSION

For the reasons stated above, Payton Gendron respectfully requests that the Court, upon a showing of substantial noncompliance with the JSSA in selection of the trial jury, and violations of the Sixth Amendment, dismiss the indictment.

DATED: October 11, 2026
Buffalo, New York

*s/Sonya A. Zoghlin*
Sonya A. Zoghlin
Assistant Federal Public Defender

*s/MaryBeth Covert*
MaryBeth Covert
Senior Litigator

*s/Julie Brain*
Julie Brain
Attorney at Law

*s/Theresa M. Duncan*
Theresa M. Duncan
Law Office of Theresa M. Duncan LLC